**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MARCEL BROWN,** | |
| Plaintiff, | |
| v. | **No. 19-cv-4082** |
| **CITY OF CHICAGO;** Chicago Police Detectives **MICHAEL MANCUSO, KEVIN McDONALD, GARRICK TURNER, RUBIN WEBER, STEVE CZABLEWSKI** and **WILLIAM BURKE; COUNTY OF COOK, ILLINOIS;** Assistant State's Attorney **MICHELLE SPIZZIRRI,** | **The Honorable Sara L. Ellis Magistrate Judge Sunil R. Harjani** |
| Defendants. | |

**DEFENDANT OFFICERS' ANSWER AND
<u>AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT</u>**

Defendants Michael Mancuso, Garrick Turner, Rubin Weber, Steve Czablewski and William Burke ("Defendant Officers"), by and through their undersigned counsel, hereby submit their Answer and Affirmative Defenses to Plaintiff Marcel Brown's ("Plaintiff") Complaint.

## <u>INTRODUCTION</u>

1.     In 2011, Marcel Brown was convicted on an accountability theory of the murder of Paris Jackson in Amundsen Park in the City of Chicago on the night of August 30, 2008, a crime he did not commit. Arrested at the age of 18, he spent nearly a decade in prison before ultimately being exonerated and certified innocent.

**<u>ANSWER:</u>** Defendant Officers admit that in 2011, Plaintiff was convicted for the murder of Paris Jackson in Amundsen Park in the City of Chicago, which occurred on August 30, 2008. Defendant Officers further admit that Plaintiff was 18 years old when he was arrested for the murder of Paris Jackson. Defendant Officers deny the remaining allegations set forth in Paragraph 1.

2.     Marcel Brown's wrongful conviction was no accident. Determined to close a

murder case, the Defendants—the Defendant Officers and Defendant Assistant State's Attorney Michelle Spizzirri—coerced false and inculpatory statements from Plaintiff. The Defendant Officers also fabricated evidence and withheld exculpatory evidence from the trial prosecutor and from the defense that would have prevented Plaintiff's conviction.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 2.

3.     As a result of the Defendants' misconduct, Marcel Brown was charged and wrongfully convicted, and sentenced to 35 years in prison.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 3.

4.     Seven years after he was convicted, and nearly 10 years after being arrested and taken into custody by the Defendant Officers, the charges against Marcel Brown were dropped following a hearing in which it was determined that certain inculpatory statements used to convict him had been obtained in clear violation of law.

**ANSWER:** Defendant Officers admit that approximately seven years after Plaintiff was convicted and approximately ten years after he was arrested and taken into custody for the murder of Paris Jackson, Cook County State's Attorney's Office dismissed the charge of murder against Plaintiff. Defendant Officers lack knowledge or information sufficient to form a belief as to the remaining allegations set forth in Paragraph 4.

5.     The misconduct that gave rise to Marcel Brown's wrongful prosecution and conviction was not an aberration. The Chicago Police Department ("CPD") has for many years tolerated and even rewarded Police detectives who "solve" serious crimes, including homicides, via coercive interrogations, frequently targeting young, African-American men and boys, and thereby closing and clearing unresolved cases while avoiding the effort and engagement that would be necessary to develop evidence and identify the true perpetrators.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 5.

6.     Plaintiff Marcel Brown now files this civil rights action to bring the Defendants' misconduct to light, and to ensure that they are held accountable for their misconduct. Although Plaintiff has won back his freedom, he will never regain the lost years in which he was incarcerated for a crime he did not commit. This lawsuit seeks redress for these grievous injuries.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 6.

## JURISDICTION AND VENUE

7.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

**ANSWER:**  Defendant Officers admit that this action is purportedly brought under 42 U.S.C. § 1983. Defendant Officers deny that Plaintiff has had any deprivation of rights and deny the remaining allegations set forth in Paragraph 7.

8.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein occurred in this judicial district, the parties reside in this district, and Defendant City of Chicago is a municipal corporation located here.

**ANSWER:**  Defendant Officers admit that the Court has jurisdiction over this Complaint and that venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

9.     Plaintiff Marcel Brown is a 29 year old African-American man who now resides in Cook County, Illinois. In August 2008, when he was arrested and falsely charged with the murder of Paris Jackson, Marcel was a recent high school graduate.

**ANSWER:**  Defendant Officers admit that Plaintiff is a 29-year-old African-American man. Defendant Officers deny that Plaintiff was falsely charged with the murder of Paris Jackson in August 2008. Defendant Officers lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 9.

10.     At all relevant times, Defendants Michael Mancuso, Kevin McDonald, Garrick Turner, Rubin Weber, Steve Czablewski and William Burke were officers with the CPD, employed by Defendant City of Chicago, and acting within the scope of their employment. They are sued in their individual capacities. These individuals are referred to collectively as "Defendant Officers."

**ANSWER:**  Defendant Officers admit that, at relevant times, Defendants Michael Mancuso, Kevin McDonald, Garrick Turner, Rubin Weber, Steve Czablewski and William Burke were Police Officers or otherwise employed by the Chicago Police Department ("CPD"). The allegations in Paragraph 10 regarding Defendant Officers acting within the scope of their

employment state legal conclusions to which no response is required. To the extent a response is deemed to be required, Defendant Officers admit that they were employees of the CPD, and they would have been acting within the scope of their employment as employees of the CPD in the performance of the lawful duties of their offices. Defendant Officers admit that Plaintiff purports to sue the Defendant Officers in their individual capacities and refer to the individual officers as "Defendant Officers."

11.     At all relevant times, Defendant Michelle Spizzirri was an Assistant State's Attorney in the Cook County State's Attorney's Office. She is sued in her individual capacity.

**ANSWER:**  Defendant Officers admit on information and belief Defendant Michelle Spizzirri was an Assistant State's Attorney ("ASA") with the Cook County State's Attorney's Office and that she is being sued in this lawsuit in her individual capacity.

12.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

**ANSWER:**  Defendant Officers admit the allegations set forth in Paragraph 12.

13.     Defendant Cook County is a governmental entity within the State of Illinois, and it is obligated to indemnify employees of the Cook County State's Attorney's Office.

**ANSWER:**  Defendant Officers lack knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 13.

## FACTS

14.     At about 9 a.m. on the morning of August 31, 2008, a Chicago Park District worker discovered the body of Paris Jackson lying on a grate immediately behind the fieldhouse at Amundsen Park on the west side of Chicago. Jackson had obviously been the victim of a shooting; there were bullet wounds on the front and rear sides of his upper torso.

**ANSWER:**  Upon information and belief, Defendant Officers admit the allegations set forth in Paragraph 14.

15.     There was no evidence at the location of Jackson's body to suggest who was responsible for the gunshot wounds. There was no murder weapon. There was no sign of bullet strikes against the fieldhouse building behind Jackson's body. No shell casings or ballistic

4

evidence of any kind was found near the body. Investigators identified what they believed might be a few droplets of blood in the vicinity of the body, but they did not confirm by testing that the droplets were blood or, if they were, whose blood it was.

**ANSWER:** Defendant Officers lack knowledge or information sufficient to form a belief

as to the allegations set forth in Paragraph 15.

16. Later on August 31, one Marisol Ocampo, a young woman who had been at the Park the night before, was taken to the CPD detective headquarters at Grand and Central and subjected to questioning. She told the Defendant Officers that a boy she knew as RJ had arrived at the Park in a gold-colored Chevrolet Malibu with two other boys and that RJ and one other person had gotten out of the car. According to the Defendant Officers' reports, Ms. Ocampo related that RJ was involved in a confrontation regarding whether others in the Park had been bothering RJ's sister, Taneshia Branch. According to the Defendant Officers' reports, Ms. Ocampo stated that RJ asked his sister Taneshia who was bothering her. Ms. Ocampo, according to the reports, went on to falsely state that, without provocation, RJ then began shooting in the direction of a group of young men who were running away. According to Ms. Ocampo, one of these young men was Eugene Stanciel, the father of Ms. Ocampo's children.

**ANSWER:** Defendant Officers admit that on August 31, 2008, Marisol Ocampo

("Ocampo"), a young woman who had been at the Park the night before, was driven to the CPD

detective headquarters at Grand and Central. Defendant Officers further admit that Ocampo told

CPD Officers that Renard Branch ("Branch") had arrived at the Park the night before in a gold-

colored Chevrolet Malibu with two other boys and that Branch and one other person had gotten

out of the car, and that Branch was involved in a confrontation regarding other individuals in the

Park. Answering further, Defendant Officers admit that Ocampo told CPD Officers that Branch

shot a gun into the direction of a group of young men, including Eugene Stanciel, who were

running away. Defendant Officers deny the remaining allegations set forth in Paragraph 16.

17. During questioning at the detective headquarters, Ms. Ocampo produced photographs of RJ and Plaintiff taken from MySpace. Ms. Ocampo said that Plaintiff was the driver of the Chevrolet Malibu.

**ANSWER:** Defendant Officers admit the allegations set forth in Paragraph 17.

18. Ms. Ocampo was vulnerable to pressure and manipulation from the Defendant Officers. Evidence suggested that she had participated in a stabbing that occurred on Meade Street just outside of Amundsen Park that same night. For reasons that have never been disclosed,

Ms. Ocampo was not charged with that crime.

**ANSWER:** Defendant Officers deny the allegations set forth in the first sentence of Paragraph 18. Defendant Officers lack knowledge or information sufficient to form a belief as to the remaining allegations set forth in Paragraph 18.

19. In addition, Ms. Ocampo was not a disinterested witness. As the Defendant Officers knew, there were two groups of young women in the Park that night who had a history of conflict, one group led by Ms. Ocampo, the other led by Taneshia Branch (RJ's sister). Accounts regarding RJ's actions—specifically whether he had fired a weapon and, if he had, whether he had done so in response to shots that were first fired at him—mostly differed based on the affiliations of the witnesses.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 19.

20. In fact, RJ (whose real name was Renard Branch and who is Plaintiff's cousin) was not responsible for Paris Jackson's death.

**ANSWER:** Defendant Officers admit that Renard Branch was called RJ at times. Defendant Officers lack information as to whether Branch was Plaintiff's cousin. Defendant Officers deny the remaining allegations set forth in Paragraph 20.

21. At the time RJ arrived at Amundsen Park, Paris Jackson was with a group of young men playing dice near a baseball diamond some distance behind the Park fieldhouse. As soon as he spotted RJ, Rufus McGee, one of the young men in Paris Jackson's group, ordered his group to begin firing at RJ.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 21.

22. When one or two members of that group opened fire, RJ took cover behind a tree and fired back in the direction of the bullets coming toward him.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 22.

23. But RJ's fire did not strike Paris Jackson. Paris was standing near the corner of the Amundsen Park gym, at a location where it was impossible for RJ's bullets to hit him. When, moments later, RJ fled from the Park, Paris was still alive and well.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 23.

24. Consistent with Rufus McGee's account, and despite the coercive tactics that the Defendant Officers employed against a number of witnesses, not a single witness has ever come forward to claim that they saw Paris Jackson struck by a bullet that RJ fired.

**ANSWER:** Defendant Officers admit that no witness told Defendant Officers that they saw Paris Jackson get struck by a bullet fired by Branch. Defendant Officers deny the remaining allegations set forth in Paragraph 24.

25. As a result of the exchange of gunfire, a number of citizens made calls to the Chicago Police emergency number. Officers were dispatched to the Park and searched the area, including behind the fieldhouse. No officer observed a body. Where and when Paris Jackson was shot on the night of August 30 remains an unsolved mystery.

**ANSWER:** Defendant Officers admit that a number of citizens called the Chicago Police emergency number repeating gunshots on August 30, 2008 near the Park and that Officers were dispatched to the Park. Defendant Officers further admit that the dispatched Officers did not observe a dead body at the Park on August 30. Defendant Officers deny the remaining allegations set forth in Paragraph 25.

26. Plaintiff was the driver of the Chevrolet Malibu that carried RJ and one other boy, Terry ("TJ") Scott (also a cousin of Plaintiff and RJ), to Amundsen Park; the car belonged to Plaintiff's mother. Plaintiff had no knowledge that RJ was armed when Plaintiff drove RJ to the Park.

**ANSWER:** Defendant Officers admit that Plaintiff was the driver of the Chevrolet Malibu that drove Branch and one other boy, Terry ("TJ") Scott (also a cousin of Plaintiff and Branch), to Amundsen Park, and further admit that the car belonged to Plaintiff's mother. Defendant Officers deny the remaining allegations set forth in Paragraph 26.

27. No witness claimed that Plaintiff possessed a gun on the night of August 30. No witness claimed that Plaintiff was with RJ at the time RJ reportedly fired shots.

**ANSWER:** Defendant Officers admit that no witness told Defendant Officers that Plaintiff possessed a gun on the night of August 30, 2008. Defendant Officers deny the remaining allegations set forth in Paragraph 27.

28. Most of those questioned by the Defendant Officers had no recollection of seeing Plaintiff in the Park on the night in question.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 28.

29.    Plaintiff did not enter the Park with RJ and Plaintiff had no involvement whatsoever in the exchange of gunfire between RJ and the young men in Rufus McGee's group.

**ANSWER:**  Defendant Officers deny the allegations set forth in Paragraph 29.

30.    The Defendant Officers were determined to solve the Paris Jackson homicide without delay and with minimal effort. They set about to use the story they had developed from Marisol Ocampo to create a case against RJ. The Defendant Officers encouraged and coerced witnesses who had been at the Park to adopt their theory that RJ was the only person in Amundsen Park who had a gun on the night of August 30; that RJ fired a handgun repeatedly without provocation; that RJ therefore was the only person who could have shot and killed Paris Jackson; and that RJ did so without justification. In order to support and sustain this theory, the Defendant Officers pressured and coerced witnesses and suppressed and concealed any information that countered their chosen theory.

**ANSWER:**  Defendant Officers deny the allegations set forth in Paragraph 30.

31.    Rufus McGee told the Defendant Officers in an interview on or about August 31, 2008 that RJ and Plaintiff were *not* responsible for Paris's death. The Defendant Officers refused to accept this information and pressured Mr. McGee to name RJ as the person who had killed Paris. When Mr. McGee would not adopt this account, the Defendant Officers prepared a report falsely stating, in essence, that Mr. McGee had no pertinent information and thereby concealed and suppressed critically important evidence that was exculpatory of both RJ and Plaintiff.

**ANSWER:**  Defendant Officers deny the allegations set forth in Paragraph 31.

32.    On or about August 31, the Defendant Officers questioned Eugene Stanciel, a young man with whom RJ had supposedly argued prior to brandishing a handgun and opening fire, about what had happened in the Park the night of August 30. Stanciel informed the Defendant Officers that he had not seen anyone possess or shoot a weapon in the Park the night of August 30, although he had heard shots emanating from behind the fieldhouse. The Defendant Officers responded with threats, telling Stanciel that Marisol Ocampo, the mother of his children, would be charged with a crime if he did not cooperate and that his children would be taken away.

**ANSWER:**  Defendant Officers deny the allegations set forth in Paragraph 32.

33.    In response to these coercive tactics, Stanciel adopted the story that RJ had pointed a gun at him and had fired without provocation at the group of young men behind the fieldhouse. The Defendant Officers fabricated this evidence. The Defendant Officers also concealed and suppressed the critical exculpatory evidence that Stanciel had stated to them, prior to being subjected to the Defendant Officers' coercion, that Stanciel did not see anyone in the Park with a gun on the night in question.

**ANSWER:**  Defendant Officers deny the allegations set forth in Paragraph 33.

34.    TJ Scott, the third boy who arrived in the Chevrolet Malibu, entered the Park at RJ's side. The Defendant Officers coerced and threatened TJ until he agreed to make a statement

that RJ had shot in the direction of the young men behind the fieldhouse without provocation and their report included this fabricated statement. Although the Defendant Officers' report acknowledged that TJ's account had changed in the course of their questioning, the report omitted any reference to the coercion that the Defendant Officers had employed, thereby suppressing and concealing that exculpatory information.

**ANSWER:** Defendant Officers admit that TJ Scott, the third boy who arrived in the

Chevrolet Malibu, entered the Park. Defendant Officers deny the remaining allegations set forth

in Paragraph 34.

35.     Throughout the investigation, the Defendant Officers studiously avoided hearing from witnesses who had seen and heard gunfire from behind the fieldhouse before RJ ever shot his gun. The Defendant Officers interviewed nearly all of the young women in Marisol Ocampo's group, who told the same story as Ocampo that RJ was the one who started the shooting.

**ANSWER:** Defendant Officers admit that Officers interviewed nearly all the young

women in Ocampo's group at the Park on August 30, 2008 and they made similar statements as

Ocampo: that Branch was the one who started the shooting. Defendant Officers deny the remaining

allegations set forth in Paragraph 35.

36.     But the Defendant Officers failed to interview and document information from many of the young women in Taneshia Branch's group. The Defendant Officers' reports stated or implied that these witnesses were refusing to cooperate when, in fact, they were able and willing to confirm that RJ shot a handgun but did so only after shots had been fired in his direction from behind the fieldhouse.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 36.

37.     Using the information from Ocampo-affiliated witnesses and the false statement they had coerced from Stanciel, the Defendant Officers were able to fabricate a murder case against RJ. But to charge Plaintiff, they needed evidence that he had foreknowledge that RJ possessed a weapon and planned to use it in Amundsen Park on the night in question. To that end, the Defendant Officers set about to coerce false, inculpatory statements from Plaintiff.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 37.

38.     At around 3:00 p.m. on September 3, 2008, the Defendant Officers arrested Plaintiff, then 18 years old, at his home and transported him to the detective headquarters at Grand and Central, where they confined him in an interrogation room for a period of more than 34 hours. During that time they, in conspiracy with Defendant Spizzirri, relentlessly employed coercive interrogation practices and techniques to overbear Plaintiff's will and coerce him into making false statements inculpating himself in a supposed plan by RJ to shoot young men in Amundsen Park

who were bothering RJ's sister Taneshia. The interrogation was recorded on video.

**ANSWER:** Defendant Officers admit that around 3:00 p.m. on September 3, 2008, Defendant Officers arrested Plaintiff, then 18 years old, at his home and transported him to the detective headquarters at Grand and Central. Defendant Officers further admit that Officers interviewed Plaintiff in an interrogation room and the interview was recorded on video. Defendant Officers deny the remaining allegations set forth in Paragraph 38.

39.    The Defendant Officers' coercive interrogation techniques included isolating Plaintiff from all contact with the outside world. For a day and a half, Plaintiff lived in a windowless, barren room behind a locked door while he was subjected to tag-team questioning by the Defendant Officers and Defendant Spizzirri. Plaintiff repeatedly asked to make a phone call to his mother over the course of these many hours. The Defendant Officers refused or ignored these requests. In doing so, the Defendant Officers knowingly and deliberately violated Plaintiff's right pursuant to Illinois statute to make a reasonable number of telephone calls. See 725 ILCS 5/103-3.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 39.

40.    Members of Plaintiff's family came to the police station where Plaintiff was being held along with a lawyer, Stephen Wham Cary, whom they had hired to meet with and advise Plaintiff. The Defendant Officers refused to inform Plaintiff that a lawyer was present seeking to meet with him and falsely told Mr. Cary and Plaintiff's family that Plaintiff did not want to meet with Mr. Cary. As the Defendant Officers well knew, this course of action was in plain violation of the Illinois constitution as explained in the 1994 decision of *People v. McCauley*, 645 N.E.2d 923 (Ill. 1994).

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 40.

41.    The Defendant Officers and Defendant Spizzirri took advantage of Plaintiff's vulnerabilities. Plaintiff was a very recent high school graduate who lived at home with his mother. Although Plaintiff had completed high school, his intellectual abilities were limited. His grades were poor and his performance on standardized testing placed him at low levels in mathematics, science and reading.

**ANSWER:** Defendant Officers deny the allegations set forth in the first sentence of Paragraph 41. Defendant Officers lack knowledge or information sufficient to form a belief as to the remaining allegations set forth in Paragraph 41.

42.    In addition to his youth and limited intellectual abilities, Plaintiff was inexperienced with the criminal justice system. His only prior arrest was for disorderly conduct, a minor charge that was dismissed in short order. Plaintiff had never before been the subject of an interrogation

conducted by highly sophisticated police officers. As the Defendant Officers and Defendant Spizzirri well knew and intended, Plaintiff became increasingly terrified and desperate as the interrogation wore on.

**ANSWER:** Defendant Officers deny the allegations set forth in the last sentence of Paragraph 42. Defendant Officers lack knowledge or information sufficient to form a belief as to the remaining allegations set forth in Paragraph 42.

43. The Defendant Officers and Defendant Spizzirri knowingly exacerbated Plaintiff's vulnerabilities by depriving him of sleep and adequate nourishment during their excessively long interrogation. The interrogation room had no accommodation for sleeping; it was furnished only with a chair and a small wooden bench. The Defendant Officers and Defendant Spizzirri entered and exited the room repeatedly throughout the night and the day and the second night of Plaintiff's confinement, giving Plaintiff no opportunity for extended sleep—even assuming that sleep would have been possible in that environment.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 43.

44. During his 34 hours under interrogation, the only food that the Defendant Officers provided to Plaintiff was two bags of chips, three sandwiches (only one of which Plaintiff was able to consume because he was too terrified to eat) and some mints. The Defendant Officers and Defendant Spizzirri knew that this amount of food was inadequate to nourish Plaintiff over the course of the extended interrogation.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 44.

45. As the Defendant Officers and Defendant Spizzirri knew and intended, the sleep deprivation and inadequate nourishment had the effect of further limiting Plaintiff's cognitive functioning, judgment, memory and ability to resist their pressure and coercion.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 45.

46. Under the foregoing conditions, and knowing Plaintiff's vulnerabilities, the Defendant Officers and Defendant Spizzirri knowingly and intentionally employed illegal and coercive questioning to overcome Plaintiff's will and force him to make inculpatory statements. The coercive questioning included but was not limited to:

    a. Providing Plaintiff with false information concerning the status of the investigation, for example, by telling Plaintiff that "all" the witnesses in the Park agreed that RJ was the only person with a gun on the night of August 30.

    b. Questioning Plaintiff with raised and angry voices, causing him on multiple occasions to request that the Defendant Officers keep their voices down.

    c. Belittling and mocking Plaintiff for wanting to call his mother.

d.      Feeding Plaintiff the information that the Defendant Officers and Defendant Spizzirri wanted Plaintiff to state—including the wording of the threats RJ had supposedly made in the car on the way to the Park.

e.      Refusing to accept Plaintiff's repeated and emphatic denials that he knew RJ had a gun while the boys were en route to the Park and Plaintiff's denials that RJ had made threatening statements—even when Plaintiff denied knowledge about the gun more than 40 times in response to the Defendant Officers' and Defendant Spizzirri's insistent and repetitive questioning. For example, more than 30 hours into the interrogation, when Plaintiff had still not sufficiently inculpated himself, Defendant Spizzirri insisted that there was in Plaintiff's mind a "little … voice that talks to you" that, if Plaintiff listened, would encourage him to provide "just a little more truth."

f.      Threatening Plaintiff that, if Plaintiff did not tell them what they wanted to hear (*i.e.*, provide an account that was "the truth"—and in which Plaintiff implicated himself as an accessory to murder), Plaintiff would go to prison for many years (*e.g.*, "We're going to stretch it. 24 hours could lead to 24 years, depending on what you say." ". . . . you'll be taking that bus ride to Joliet . . . ." Prisons are "ugly" and "not nice places.")

g.      Repeatedly implying and suggesting to Plaintiff that, by "telling the truth" he could avoid these consequences and go home. For example, Defendant Spizzirri, in violation of her ethical responsibilities, went so far as to provide Plaintiff with the false and erroneous legal advice that it was in Plaintiff's best interests to "tell the truth"—*i.e.*, implicate himself in the murder.

h.      Causing Plaintiff to internalize the Defendants' false paradigm that by insisting on his innocence he would cause himself to go to prison, but by confessing to involvement would be allowed to go home. As Plaintiff put it during the interrogation: "I'm scared that, like, if I don't—if I tell you I didn't see [RJ] with the gun, I didn't know he had a gun, I'm going to jail. But if I tell you he have the gun, I'll go home … That's what I'm scared about." After bending to Defendants' will and making inculpatory statements near the end of the interrogation, Plaintiff asked if he could go home.

**ANSWER:**  Defendant Officers deny the allegations set forth in Paragraph 46.

47.     After more than 30 hours, exhausted, terrified, confused and utterly worn down by the grueling interrogation, Plaintiff made a series of statements indicating that, during the ride to the Park, RJ had threatened that he would "fuck up" the young men at the Park and that Plaintiff understood that to mean that RJ intended to shoot at the young men. Plaintiff also asserted that RJ said the young men in the Park were "gonna die." Despite the extended, coercive questioning, Plaintiff never unequivocally said that he knew RJ was armed before they arrived at the Park. The most Plaintiff would say was "I knew he had a gun but I wasn't certain." And, very shortly, Plaintiff retracted even that statement, insisting again that he did not know RJ to be armed.

**ANSWER:** Defendant Officers admit that Plaintiff made statements indicating that, during the ride to the Park on August 30, 2008, Branch had threatened that, in regard to the young men, Branch was "gonna go fuck them up" at the Park and that Plaintiff understood that to mean that Branch intended to shoot the young men. Defendant Officers further admit that Plaintiff told Officers that Branch also told Plaintiff: "I'm tired of these niggers messing with my sister, they gonna die." Defendant Officers deny the remaining allegations set forth in Paragraph 47.

48.     The Officer Defendants prepared a police report that omitted any mention of any of the coercion that they and Defendant Spizzirri had used to gain Plaintiff's inculpatory admissions. In particular, the police report failed to disclose the exculpatory information that the Defendant Officers had turned away Mr. Cary, Plaintiff's lawyer, at the police station without informing Plaintiff of Mr. Cary's presence there. The Defendant Officers' report also falsely stated that Plaintiff had unequivocally confessed to knowing RJ to be armed during the ride to the Park.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 48.

49.     Plaintiff's admissions near the end of the interrogation were false and coerced and the result of the coercive and illegal interrogation practices of the Defendant Officers and Defendant Spizzirri. Plaintiff's sole purpose in going to the Park was to find Eugene Stanciel, with whom he was on good terms, to encourage Stanciel to help make peace between the young women who were arguing. Plaintiff did not know that RJ was armed that night. Plaintiff did not enter the Park in the company of RJ. Plaintiff had no involvement in RJ's decision to shoot a gun on the night of August 30.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 49.

### PLAINTIFF'S CONVICTION

50.     Plaintiff and RJ were tried in a joint bench trial before Cook County Judge Thomas Gainer on periodic dates between November 2009 and September 2011 for the murder of Paris Jackson.

**ANSWER:** Defendant Officers admit the allegations set forth in Paragraph 50.

51.     During the trial, Defendant Mancuso was permitted to read the police report that inaccurately and incompletely described Plaintiff's statements during the course of the interrogation. This evidence was the only evidence of Plaintiff's guilt. No other evidence linked Plaintiff to any shooting on the night of August 30, 2008.

**ANSWER:** Defendant Officers admit that there was an order issued that permitted Defendant Mancuso to read the police report at Plaintiff's trial. Defendant Officers deny the remaining allegation set forth in Paragraph 51.

52. During his testimony, Defendant Mancuso did not disclose the coercive measures that he, the other Officer Defendants and Defendant Spizzirri had employed in order to obtain Plaintiff's admissions. Nor did Defendant Mancuso disclose that he and the other Officer Defendants had violated the rule of *People v. McCauley* by falsely telling Mr. Cary, the lawyer who appeared at the police station to represent Plaintiff, that Plaintiff did not wish to speak with Mr. Cary.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 52.

53. As a result of the above-described misconduct on the part of the Defendants, Plaintiff was wrongfully convicted of first-degree murder and sentenced to serve 35 years in prison.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 53.

54. Throughout his prosecution and incarceration, Plaintiff continued to maintain his innocence and pursued all possible legal avenues to prove it.

**ANSWER:** Defendant Officers lacks sufficient information as to the allegations set forth in Paragraph 54.

55. On June 19, 2018, following an evidentiary hearing, the Circuit Court of Cook County entered an order vacating Plaintiff's conviction and ordering a new trial. The decision was based on testimony from Stephen Wham Cary, the lawyer whom the Defendant Officers turned away from the police station in September 2008; from Plaintiff's mother, who produced a bank record corroborating that she had used an ATM machine at the police station to pay Mr. Cary for representing Plaintiff; and from Plaintiff, who denied ever knowing that a lawyer had asked to meet with him when he was under interrogation. The court concluded that Plaintiff's continued interrogation was manifestly illegal under *McCauley* and that Plaintiff's conviction could not be sustained without the confession.

**ANSWER:** The City admits Plaintiff's conviction was vacated on June 19, 2018 by the Circuit Court of Cook County. The remaining allegations make characterizations about the order vacating his conviction. The City refers to the order vacating the conviction and denies any allegations inconsistent therewith.

56. Four weeks later, on July 18, 2018, the Cook County State's Attorney dismissed all

14

charges against Plaintiff, ending the criminal case against him.

**ANSWER:** Defendant Officers admit the allegations set forth in Paragraph 56.

57.    On March 7, 2019, Plaintiff filed a Petition in the Circuit Court of Cook County for a Certificate of Innocence. The Circuit Court granted the Petition on June 7, 2019.

**ANSWER:** Defendant Officers admit the allegations set forth in Paragraph 57.

58.    The Defendant Officers' egregious misconduct in this case was not an isolated occurrence. It was undertaken pursuant to, and proximately caused by, the *de facto* policies and practices of the City of Chicago, acting through the CPD and its officers, which were in place at all relevant times.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 58.

59.    Plaintiff was coerced into giving false and inculpatory statements pursuant to these municipal policies and practices. The CPD and its detectives and police officers have a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects and witnesses in criminal cases, causing scores of false confessions and wrongful convictions in the City of Chicago.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 59.

60.    At all relevant times, the City of Chicago had a policy and practice of coercing false confessions from those in police custody and using these statements to obtain wrongful convictions. Pursuant to this municipal policy and practice, CPD officers used interrogation tactics identical or similar to those employed by the Defendants in this case to extract confessions. These tactics included: (a) psychological intimidation and manipulation; (b) the use of clearly unreliable or coerced informants and/or witnesses; (c) the fabrication of confessions; (d) the misleading of parents/guardians and denial of access to their children during interrogations; (e) the denial of access to counsel; (f) the concealment of exculpatory information; (g) false promises of leniency in exchange for "cooperation" in the form of a confession; (h) sleep and food deprivation; and (i) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt or innocence of the offense.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 60.

61.    In particular, at the time of the events alleged herein, the CPD had a practice of conducting lengthy, coercive interrogations of persons whom they had secreted at police facilities, among them the Homan Square facility, so that they could not be located or contacted by family members or by lawyers seeking to represent them. This practice included lying to family members and attorneys about the location and status of persons in CPD custody as police investigators worked to obtain confessions from those individuals.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 61.

62.     Juveniles and young adults like Plaintiff were the most vulnerable targets of these municipal policies. Law enforcement officers are trained to know that youth are inherently more suggestible, susceptible to manipulation, and frequently lack the ability to fully understand their rights—let alone assert them—during an interrogation. As a matter of widespread custom and practice, CPD officers exploited the vulnerability and suggestibility of the youth in their custody in order to obtain false confessions and close cases. CPD detectives systematically denied juvenile and teenage suspects access to their guardians and to counsel, fed them details of the crime, made false promises of leniency, and generally subjected these youth to immense physical and psychological pressure until they "confessed."

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 62.

63.     Also pursuant to municipal policy and practice, members of the CPD systematically suppressed evidence pertaining to the fabricated and coerced confessions obtained in interrogations. This exculpatory information was concealed both from trial attorneys within the Cook County State's Attorney's Office and from criminal defendants and their counsel. In furtherance of this municipal policy and practice, CPD officers repeatedly committed perjury while testifying in criminal proceedings in order to conceal their use of coercive interrogation techniques.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 63.

64.     At all relevant times, the City of Chicago also had in place *de facto* policies and practices by which CPD officers were led to believe they could act with impunity, which served to facilitate and further their misconduct. These policies and practices included: failing to identify and track officers who commit serious misconduct; failing to investigate cases in which CPD officers are implicated in obtaining coerced and false confessions, as well as unfounded charges and wrongful convictions; failing to meaningfully discipline officers accused of such unlawful conduct; and facilitating a code of silence within the CPD. Pursuant to the City's code of silence, CPD officers were trained and required to lie or remain silent about misconduct committed on the job by their fellow officers.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 64.

65.     The City of Chicago's failure to train, supervise, and discipline its officers effectively condoned, ratified, and sanctioned the kind of misconduct that the Defendant Officers committed against Plaintiff.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 65.

66.     The City of Chicago and officials within the CPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the patterns of misconduct. They thereby perpetuated these unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing wrongful incarceration.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 66.

67.     All of the policies and practices described in the foregoing paragraphs were

knowingly approved by City of Chicago policymakers, who were deliberately indifferent to the fact that CPD officers systematically violated the rights of the people they were sworn to protect.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 67.

68. Plaintiff was incarcerated for almost a decade for a crime he did not commit. He must now attempt to make a life for himself outside of prison without the benefit of that decade of life experiences in young adulthood that normally equip adults for the task.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 68.

69. Plaintiff's emotional pain and suffering stemming from the loss of these formative years has been substantial. During his incarceration, Plaintiff was stripped of the basic pleasures of human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed the opportunity to begin living independently, to share holidays, births, funerals, and other life events with loved ones, to have girlfriends, to fall in love, to marry, and to pursue an occupation, and the fundamental freedom to live his life as an autonomous human being.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 69.

70. As a result, Plaintiff has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 70.

### Count I – 42 U.S.C. § 1983
### Violation of Due Process (Fourteenth Amendment)

71. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** Defendant Officers adopt and restate their answers and responses to each

paragraph of Plaintiff's Complaint and for their answer and response to Paragraph 71 as though

fully set forth herein.

72. As described more fully above, all of the Defendant Officers, acting individually, jointly, and/or in conspiracy, deprived Plaintiff of his constitutional right to due process and to a fair trial.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 72.

73. In the manner described more fully above, the Defendant Officers fabricated false inculpatory statements from Plaintiff and from others, deliberately withheld and suppressed exculpatory evidence from the prosecutors and defense counsel, and fabricated false reports and other evidence, thereby causing the wrongful prosecution of Plaintiff. Absent this misconduct, the

criminal prosecution of Plaintiff could not and would not have been pursued.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 73.

74. The Defendant Officers' misconduct directly resulted in the unjust criminal conviction and continuing wrongful incarceration of Plaintiff, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 74.

75. As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 75.

76. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 76.

**Count II – 42 U.S.C. § 1983**
**Coerced and Inculpatory Statements**
**(Fifth Amendment and Fourteenth Amendment)**

77. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** Defendant Officers adopt and restate their answers and responses to each paragraph of Plaintiff's Complaint and for their answer and response to Paragraph 77 as though fully set forth herein.

78. In the manner described more fully above, the Defendants, including the Defendant Officers and Defendant Spizzirri, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, conducted an unconstitutional interrogation of Plaintiff, and coerced him into making involuntary statements implicating himself as an accessory to RJ's supposed murder of Paris Jackson, in violation of Plaintiff's rights secured by the Fifth and Fourteenth Amendments.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 78.

79. The false and involuntary inculpatory statement Defendants obtained from Plaintiff was used against Plaintiff to his detriment in his criminal case. This statement was the only reason that Plaintiff was prosecuted for and convicted as RJ's accomplice in the murder of Paris Jackson.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 79.

80.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 80.

81.     As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 81.

## Count III – 42 U.S.C. § 1983
## Failure to Intervene

82.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**  Defendant Officers adopt and restate their answers and responses to each

paragraph of Plaintiff's Complaint and for their answer and response to Paragraph 82 as though

fully set forth herein.

83.     In the manner described above, during the constitutional violations described herein, one or more of the Defendants, including the Defendant Officers and Defendant Spizzirri, stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had a reasonable opportunity to do so.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 83.

84.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 84.

85.     As a result of the misconduct described in this count, Plaintiff suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 85.

## Count IV – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

86.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** Defendant Officers adopt and restate their answers and responses to each paragraph of Plaintiff's Complaint and for their answer and response to Paragraph 86 as though fully set forth herein.

87.     After the death of Paris Jackson, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 87.

88.     Before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive him of exculpatory information to which he was lawfully entitled and which would have led to his not being charged, his acquittal, or his more timely exoneration.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 88.

89.     In furtherance of this conspiracy, each of the Defendant Officers engaged in and facilitated overt acts, including but not limited to those set forth above—fabricating evidence, withholding exculpatory evidence, and obtaining involuntary statements—and was an otherwise willful participant in joint activity.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 89.

90.     After the death of Paris Jackson, Defendant Spizzirri, acting within the scope of her employment and under color of law, agreed with the Defendant Officers and other individuals to deprive Plaintiff of his constitutional right against compelled self-incrimination, as provided for by the Fifth Amendment, and described in the various paragraphs of this Complaint.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 90.

91.     In furtherance of this conspiracy, Defendant Spizzirri engaged in and facilitated overt acts, including but not limited to obtaining involuntary statements from Plaintiff and concealing evidence of the coercive tactics, and was an otherwise willful participant in joint activity.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 91.

92.     As a direct and proximate result of the illicit prior agreements and actions in furtherance of the conspiracies referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 92.

## Count V – 42 U.S.C. §1983
### Municipal Liability

93. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** Defendant Officers adopt and restate their answers and responses to each paragraph of Plaintiff's Complaint and for their answer and response to Paragraph 93 as though fully set forth herein.

94. The actions of the individual Defendant Officers were undertaken pursuant to the policies and practices of the CPD, described above and below, which included (1) failing to supervise, discipline and control Chicago Police officers and (2) maintaining a code of silence within the CPD, all of which facilitated the Defendant Officers' misconduct here.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 94.

95. These policies and practices were ratified by policymakers for the City of Chicago with final policymaking authority.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 95.

96. At all times material to this Complaint, Defendant City of Chicago, through its Police Department, the Independent Police Review Authority (IPRA), Police Superintendents, Police Board, Mayor, City Council and/or Corporation Counsel's Office, had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

      a.    conducting physically, psychologically, or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees, in order to obtain confessions, including from juveniles and teenagers;

      b.    manufacturing, fabricating, and/or using improper suggestive tactics to obtain statements from suspects and witnesses, particularly juveniles and teenagers;

      c.    secreting suspects in police facilities and preventing family members and attorneys seeking to represent the suspects from contacting those suspects while police worked to obtain confessions from those suspects;

      d.    filing false police reports, and giving false statements and testimony about these interrogations, confessions, and witness statements;

      e.    suppressing evidence concerning the circumstances of these interrogations and confessions;

      f.    pursuing and obtaining prosecutions and incarceration on the basis of confessions obtained during these interrogations, and otherwise covering up the true nature of the interrogations, confessions, and witness statements;

g.      failing to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control police officers, particularly those who were repeatedly accused of physically, psychologically, or otherwise illegally or improperly engaging in coercive questioning or interrogation of witnesses, suspects and arrestees; of torture and related physical abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions; and/or of making false reports and statements;

h.      the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a through e, above, whereby police officers refused to report or otherwise covered up instances of police misconduct, and/or fabricated, suppressed, and/or destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. This code of silence also has resulted in police officers either remaining silent or giving false and misleading information, and/or testimony during official investigations and grand jury proceedings, in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have been accused of misconduct.

**ANSWER:**  Defendant Officers deny the allegations set forth in Paragraph 96.

97.      The interrelated pattern and practices alleged above were or should have been well known within the CPD, both before and after Plaintiff was interrogated and wrongfully convicted, as well as by successive mayors, police superintendents and OPS and IPRA directors, and by the Chicago City Council and the Chicago Police Board, and other policy-making, command, and supervisory City and police personnel, who participated in the cover-up and/or continuation of the policies and practices for years.

**ANSWER:**  Defendant Officers deny the allegations set forth in Paragraph 97.

98.      The interrelated policies, practices, and customs set forth above, both individually and together, were maintained and implemented with deliberate indifference. They encouraged, *inter alia*, the coercing of statements from suspects, witnesses, and arrestees, particularly from juveniles and other teenagers; the construction and fabrication of confessions, admissions, statements, and other false witness evidence; the suppression and destruction of exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, and the obstruction of justice; and the pursuit and continuation of wrongful convictions and false arrests and imprisonments. The interrelated policies, practices and customs set forth above were, separately and together, a direct and proximate cause (*i.e.* a moving force) of the unconstitutional acts committed by the Defendant Officers and their co-conspirators, and the injuries suffered by Plaintiff, including his wrongful conviction and imprisonment.

**ANSWER:**  Defendant Officers deny the allegations set forth in Paragraph 98.

99.      The City of Chicago's failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the Defendant Officers was also done with deliberate indifference and likewise acted as a direct and proximate cause (*i.e.* a moving force) of the injuries to Plaintiff.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 99.

### Count VI – State Law Claim
### Malicious Prosecution

100. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** Defendant Officers adopt and restate their answers and responses to each paragraph of Plaintiff's Complaint and for their answer and response to Paragraph 100 as though fully set forth herein.

101. The Defendant Officers, despite knowing that probable cause did not exist to charge Plaintiff for the murder of Paris Jackson, acted individually, jointly, and/or in concert and in conspiracy, to cause Plaintiff to be arrested and prosecuted for that crime. The Defendant Officers made statements to trial prosecutors with the intent of exerting influence and to institute and continue the unjust judicial proceedings. The Defendant Officers played a substantial role in the commencement and continuation of the prosecution of Plaintiff.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 101.

102. Specifically, the Defendant Officers were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the death of Paris Jackson. There was no proof that RJ had fired the shot that struck and killed Paris Jackson. There was no evidence that Plaintiff possessed a gun at any time on the night of August 30. There was no proof that Plaintiff was present with RJ when RJ allegedly fired shots in the direction of young men in Amundsen Park who had first fired at RJ. There was no evidence, in sum, that connected Plaintiff in any way to the death of Paris Jackson. In the absence of any such evidence, the Defendant Officers coerced false, inculpatory statements from Plaintiff in the course of an excessively long interrogation during which Plaintiff was cut-off and isolated from all contact with the outside world—including from a lawyer who had been hired to represent Plaintiff and was attempting to speak with him, in plain violation of the law. Furthermore, the Defendant Officers intentionally withheld from and misrepresented to trial prosecutors and the grand jury facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence that could have led to the actual assailant(s). The Defendant Officers performed the above-described acts deliberately, with malice, and with reckless disregard for Plaintiff's rights.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 102.

103. On July 18, 2018, the Cook County State's Attorney's Office nolle prossed [sic] Plaintiff's case, and on June 7, 2019, the Circuit Court of Cook County awarded Plaintiff a Certificate of Innocence, which constitutes a termination of the criminal proceedings in his favor.

**ANSWER:** Defendant Officers admit that on July 18, 2018, the Cook County State's Attorney's Office dismissed all charges against Plaintiff and on June 7, 2019, the Circuit Court of

Cook County granted the Plaintiff's Petition for a Certificate of Innocence. Defendant Officers deny the remaining allegations set forth in Paragraph 103.

104.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 104.

### Count VII – State Law Claim
### Intentional Infliction of Emotional Distress

105.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**  Defendant Officers adopt and restate their answers and responses to each paragraph of Plaintiff's Complaint and for their answer and response to Paragraph 105 as though fully set forth herein.

106.    The acts and conduct of the Defendants, including the Defendant Officers and Defendant Spizzirri, as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 106.

107.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 107.

### Count VIII – State Law Claim
### Civil Conspiracy

108.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**  Defendant Officers adopt and restate their answers and responses to each paragraph of Plaintiff's Complaint and for their answer and response to Paragraph 108 as though fully set forth herein.

109.    As described more fully in the preceding paragraphs, the Defendants, including the Defendant Officers and Defendant Spizzirri, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 109.

110. In furtherance of the conspiracy, the Defendant Officers committed unlawful overt acts and was an otherwise willful participant in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 110.

111. In furtherance of the conspiracy, Defendant Spizzirri committed unlawful overt acts and was otherwise willful participants in joint activity including but not limited to the intentional infliction of emotional distress upon Plaintiff.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 111.

112. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 112.

113. As a direct and proximate result of the Defendants' conspiracies, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 113.

## Count IX – State Law Claim
### Respondeat Superior

114. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** Defendant Officers adopt and restate their answers and responses to each paragraph of Plaintiff's Complaint and for their answer and response to Paragraph 114 as though fully set forth herein.

115. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment and under color of law.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 115.

116. Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

**ANSWER:** Defendant Officers deny the allegations set forth in Paragraph 116.

## Count X – State Law Claim
### Indemnification

117.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**  Defendant Officers adopt and restate their answers and responses to each paragraph of Plaintiff's Complaint and for their answer and response to Paragraph 117 as though fully set forth herein.

118.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which its employees are liable within the scope of their employment activities.

**ANSWER:**  Defendant Officers admit that 745 ILCS 10/9-102 sets forth that a local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages for which it or an employee while acting within the scope of his employment is liable in the manner provided in 745 ILCS 10. Defendant Officers deny the remaining allegations set forth in Paragraph 118.

119.    The Defendant Officers are or were employees of the CPD who acted within the scope of their employment in committing the misconduct described herein.

**ANSWER:**  Defendant Officers admit that they are or were employees of the CPD. Defendant Officers deny the remaining allegations set forth in Paragraph 119.

120.    Defendant Spizzirri was at all times material to this complaint the employee of the Cook County State's Attorney's Office, and Defendant Cook County is therefore responsible for any judgment entered against Defendant Spizzirri and for any judgment entered against her arising from said employment with the County, making the County a necessary party to this complaint.

**ANSWER:**  Defendant Officers admit that Defendant Spizzirri was an employee of the Cook County State's Attorney's Office. The remaining allegations in Paragraph 120 state legal conclusions to which no response is required.

26

## **AFFIRMATIVE DEFENSES**

Defendant Officers, without prejudice to their denials and all other statements in their Answer and elsewhere, for their affirmative defenses to Plaintiff's Complaint, state:

1.      Under the Illinois Tort Immunity Act, Defendant Officers are not liable under state law for any injury caused by the act or omission of another person. 745 ILCS 10/2-204.

2.      Under the Illinois Tort Immunity Act, Defendant Officers are not liable for their respective acts or omissions in the execution or enforcement of any law unless such acts or omissions constitute willful and wanton conduct. 745 ILCS 10/2-202.

3.      Under the Illinois Tort Immunity Act, Defendant Officers are not liable for injury caused by their instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless they act maliciously and without probable cause. 745 ILCS 10/2-208.

4.      Defendant Officers are absolutely immune for any testimony they may have given in Plaintiff's underlying criminal case. *See Briscoe v. LaHue*, 460 U.S. 325 (1983).

5.      Plaintiff's claims in the Complaint are barred by the applicable statutes of limitations.

6.      Plaintiff's claims in the Complaint are barred by the doctrines of *res judicata* and collateral estoppel.

7.      To the extent any injuries or damages claimed by Plaintiff were proximately caused, in whole or in part, by negligent, willful, wanton, and/or other wrongful conduct on the part of Plaintiff as reflected in the public record, including but not limited to police reports, any verdict or judgment obtained by Plaintiff must be reduced by an amount commensurate with the degree of fault attributed to Plaintiff by the jury in this case.

8. Plaintiff's causes of action are barred because the investigation, arrest, and incarceration of Plaintiff were justified.

9. Any damages obtained by Plaintiff for the injuries alleged in the Complaint are subject to a set-off and should be reduced by any amount previously received by Plaintiff for the same injuries.

10. To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that a plaintiff has a duty to mitigate his or her damages.

11. At all times material to the events alleged in Plaintiff's Complaint, reasonably competent police officers, objectively viewing the facts and circumstances then confronting Defendant Officers, would have believed that the actions taken were objectively reasonable and were within clearly established constitutional limits. Defendant Officers, therefore, are entitled to qualified immunity.

12. To the extent Plaintiff is asserting a federal malicious prosecution claim, such claim fails as a matter of law. *Manuel v. City of Joliet, Illinois*, 903 F.3d 667, 670 (7th Cir. 2018); *see also Manuel v. City of Joliet*, 137 S. Ct. 911, 918-19 (2017).

13. To the extent Plaintiff is asserting a due process fabrication of evidence claim based on allegedly fabricated evidence that was not admitted at trial, such claim fails as a matter of law. *See Avery v. City of Milwaukee*, 847 F.3d 433, 442 (7th Cir. 2017).

## JURY DEMAND

Defendants Michael Mancuso, Garrick Turner, Rubin Weber, Steve Czablewski and William Burke hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

**MICHAEL MANCUSO, GARRICK TURNER, RUBIN WEBER, STEVE CZABLEWSKI** and **WILLIAM BURKE**

Dated: October 8, 2019      By:   /s/ *Kyle L. Flynn*              
                          One of Their Attorneys

John F. Gibbons
Kyle L. Flynn
Aaron S. Klein
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
312.456.8400 (telephone)
312.456.8435 (facsimile)
gibbonsj@gtlaw.com
flynnk@gtlaw.com
kleina@gtlaw.com

29

## **CERTIFICATE OF SERVICE**

I, Kyle L. Flynn, an attorney, certify that I electronically filed Defendant Officers' Answer and Affirmative Defenses to Plaintiff's Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties of record on this 8th day of October, 2019.

*/s/ Kyle L. Flynn*
Attorney for Defendant Officers