**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARCEL BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19-cv-4082 |
| v. | ) | |
| | ) | The Hon. Lindsay C. Jenkins |
| CITY OF CHICAGO, *et al.* | ) | Magistrate Judge Sunil R. Harjani |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
<u>DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

Table of Contents ……………………………………………………………………………… i

Table of Authorities ............................................................................................. iii

Introduction and Relevant Facts…………………………………………………...1

Paris Jackson's Murder and the False Police Case Against RJ Branch……………...…2

No Probable Cause to Charge and Prosecute Plaintiff………………………………….7

Defendant Burke's Involvement in the Investigation……………………………………10

Argument ………………………………………………………………………………11

I.   There is a material dispute of fact as to whether, setting plaintiff's statements aside, there was probable cause to charge him as an accessory to RJ Branch's supposed murder of Paris Jackson. ........................................................................... 11

II.   Because plaintiff has tort claims which survive summary judgment, plaintiff's state law conspiracy claim also survives .............................................................. 15

III.   Defendants can be found liable for failure to intervene in accordance with appellate precedent. ............................................................................ 16

IV.   There is sufficient evidence for plaintiff to proceed to trial against Defendant binding Burke  ............................................................................ 17

**A.**  There is a material dispute as to whether Detective Burke directly participated, conspired, and/or failed to intervene in the fabrication of Eugene Stanciel's inculpatory statements…………………………………………………………18

B. There is a material dispute of fact as to whether Defendant Burke directly participated, conspired, and/or failed to intervene in the attempted witness manipulation and concealment and falsification of Rufus McGee's exculpatory eyewitness account of the shooting………………………………………………..22

C. There is a material factual dispute as to whether Defendant Burke engaged in a conspiracy to bring a malicious prosecution against Plaintiff………………………24

V.   The City's Motion For Summary Judgment must be denied. ............................... 25

Conclusion…………………………………………………………………………………25

Certificate of Service .................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdullahi v. City of Madison*,
    423 F.3d 763 (7th Cir. 2005) .................................................17

*Adcock v. Brakegate, Ltd.*,
    164 Ill. 2d 54 (1994) .................................................16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................11

*Beaman v. Freesmeyer*,
    2021 IL 125617.................................................11, 24

*Beaman v. Freesmeyer*,
    776 F.3d 500 (7th Cir. 2015) .................................................18

*Beaman v. Freesmeyer*,
    2019 IL 122654, 131 N.E.3d 488 (Ill. 2019) .................................................24

*Beaman v. Freesmeyer*,
    2021 IL 125617, 183 N.E.3d 767 (Ill. 2021) .................................................24

*Bell v. City of Milwaukee*,
    746 F.2d 1205 (7th Cir. 1984) .................................................16

*Carvajal v. Dominguez*,
    542 F.3d 561, (7th Cir. 2008) .................................................18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................11, 16

*Evans v. City of Chicago*,
    522 F. Supp. 789 (N.D. Ill. 1980) .................................................16

*Franklin v. Harvey Det. Rasheed Askew*,
    No. 19-CV-04375, 2022 WL 17093358 (N.D. Ill. Nov. 21, 2022) .................................................14

*Freides v. Sani-Made Manufacturing Co.*,
    33 Ill. 2d 291 (1965) .................................................11

*Fritz v. Johnson*,
    209 Ill.2d 302, TK, 807 N.E.2d 461 (Ill. 2004) .................................................24, 25

*Gill v. City of Milwaukee*,
    850 F.3d 335 (7th Cir. 2017) .............................................17

*Imbler v. Pachtman*,
    424 U.S. 409 (1976)...........................................................16

*Jones v. City of Chicago*,
    856 F.2d 985 (7th Cir. 1988*)* .........................................18

*Kuri v. City of Chicago*,
    2017 WL 4882338 (N.D. Ill. Oct. 30, 2017)....................12

*Maryland v. Wilson*,
    519 U.S. 408 (1997)...........................................................17

*Moore v. City of Chicago*,
    No. 02-cv-5130, 2007 WL 3037121 (N.D. Ill. 2007) ..........20

*Mwangangi v. Nielsen*,
    48 F.4th 816 (7th Cir. 2022) .....................................2, 16, 17

*NLFC, Inc. v. Devcom Mid-Am., Inc.*,
    45 F.3d 231 (7th Cir. 1995) ..............................................11

*People v. Dennis*,
    181 Ill. 2d 87 (1998) ....................................................13, 15

*People v. Fernandez*,
    2014 IL 115527 .................................................................13

*People v. McCauley*,
    163 Ill. 2d 414 (1994) .........................................................9

*People v. Perez*,
    189 Ill. 2d 254 (2000) ...........................................12, 13, 15

*People v. Richardson*,
    270 N.E.2d 568 (Ill Ct. App. 1971) .............................14, 15

*People v. Taylor*,
    186 Ill. 2d 439 (1999) ..................................................13, 15

*Phillips v. City of Chicago*,
    No. 14-cv-9372, 2018 WL 1309881 (N.D. Ill. Mar. 13, 2018) ...........18

*Rivera v. Guevara*,
    319 F. Supp. 3d 1004 (N.D. Ill. 2018), No. 12-CV-04428, 2018 WL 11469072
    (N.D. Ill. May 17, 2018) ...................................................18

iii

*Sanchez v. City of Chicago*
    700 F.3d 919 (7th Cir. 2012) ................................................................18

*Stewardson v. Biggs*,
    43 F.4th 732 (7th Cir. 2022) ................................................................17

*United States v. Giovannetti*,
    919 F.2d 1223 (7th Cir. 1990) ..............................................................16

*Whitlock v. Brueggemann*,
    682 F.3d 567 (7th Cir. 2012) ................................................................18

*Wilson v. Est. of Burge*,
    No. 21-cv-03487, 2023 WL 2750946 (N.D. Ill. Mar. 31, 2023) ..........................12

*Yang v. Hardin*,
    37 F.3d 282 (7th Cir. 1994) ................................................................17

**Statutes**

42 U.S.C. § 1983 ................................................................15, 16, 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARCEL BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19-cv-4082 |
| v. | ) | |
| | ) | The Hon. Lindsay C. Jenkins |
| CITY OF CHICAGO, *et al.* | ) | Magistrate Judge Sunil R. Harjani |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Marcel Brown submits this memorandum in opposition to the pending motions for partial summary judgment. The individual police officer defendants (hereinafter, "Defendants") have filed a motion (ECF No. 243) that targets only a subset of Plaintiff's claims; it seeks dismissal as to all Defendants of Plaintiff's malicious prosecution claim (Count VI), Plaintiff's state law conspiracy claim (Count VIII), and Plaintiff's federal failure to intervene claim (Count III). Separately, Defendants Steve Czablewski and William Burke move for summary judgment as to all claims against them. The City of Chicago (the "City") has filed a motion (ECF No. 242) seeking summary judgment on the claims for *respondeat superior* and for indemnification that Plaintiff alleges in Counts IX and X. These motions must be denied.

**INTRODUCTION AND RELEVANT FACTS**

There are three main arguments in Defendants' motion. *First*, Defendants contend that the undisputed facts show there was probable cause to charge Plaintiff with the murder of Paris Jackson on the theory that Plaintiff aided and abetted the murder by driving RJ Branch to and from Amundson Park. The existence of probable cause for charging would defeat Plaintiff's state law malicious prosecution claim. Relatedly, because malicious prosecution is the only remaining

1

substantive state law claim in this case, Defendants also seek dismissal of Plaintiff's state law conspiracy claim. *Second*, Defendants challenge Plaintiff's federal claim for failure to intervene , relying on Judge Easterbrook's concurrence in *Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022), which questioned the legal viability of such a claim under Section 1983. *Finally*, Defendants seek summary judgment in favor of Defendants Burke and Czablewski, contending that neither had sufficient personal involvement in the misconduct that led to Plaintiff's wrongful conviction.

In the interests of narrowing the issues for trial, Plaintiff does not contest dismissal of Defendant Czablewski. All other aspects of Defendants' motion lack merit and should be denied. Outside of Plaintiff's coerced confession, Defendants had no evidence whatsoever of Plaintiff's culpable mental state, so they lacked probable cause to pursue murder charges against him on an accountability theory and are not entitled to judgment on Plaintiff's malicious prosecution claim. Defendants' challenge to the failure to intervene claim relies on a concurring opinion which runs counter to decades of binding Seventh Circuit precedent. And ample record evidence, properly construed in Plaintiff's favor, supports the inference that Defendant Burke personally participated in the constitutional violations alleged by Plaintiff.

A brief review of the pertinent facts is necessary to contextualize the problems with Defendants' motion.[1]

### Paris Jackson's Murder and the False Police Case Against RJ Branch

Partis Jackson's body was discovered on the morning of August 31, 2008, sprawled across a grate at the rear of the Amundson Park fieldhouse. Plaintiff's Statement of Additional Material Facts ("PSOF") ¶ 19; Plaintiff's Response to Defendant Officers' Statement of Material

---

[1] The City's motion is entirely derivative of the Defendants' motion. As Plaintiff explains in the final section of this memorandum, the City's motion must be denied in its entirety.

Facts ("RDSOF") ¶ 18. Defendants Mancuso and McDonald were assigned to lead the investigation. PSOF ¶ 18. The other Defendants assisted those two in various ways. *Id.*

The grate with the body resting on it was adjacent to a parking lot. *Id.* ¶ 19. Mr. Jackson had been shot once in the back. RDSOF ¶ 19. An autopsy conducted the following morning would reveal that the bullet passed through his rear chest wall, perforated his left lung and the left atrium of his heart, and then injured the root of the pulmonary artery and one of the larger coronary arteries before it exited the front chest wall. *Id.* A forensic investigator thoroughly examined the area around the body, including under the grate, and found no signs of accumulated blood. PSOF ¶ 22. There was a small smudge of apparent blood six feet from the body. *Id.* Investigators located a small quantity of red substance that was possibly blood 46 feet from Mr. Jackson's body adjacent to a sidewalk leading to the grate where Mr. Jackson's body lay. *Id.*[2] Mr. Jackson's body showed signs of postmortem abrasions and a postmortem patterned impression on his face corresponding to the grate on which he lay. *Id.* ¶ 23. These facts suggest that Mr. Jackson did not initially collapse on the grate but that his body was moved there after his death. *Id.*

Defendants Mancuso, McDonald, Burke, and Turner learned that the Chicago Police Department's 911 call center had received multiple phone calls reporting that gunshots were fired in and around Amundson Park the night before. *Id.* ¶ 20. Between 10:59 pm and 11:07 pm, multiple 911 callers reported that there were people in the Park shooting, that there were 10 to 20 shots fired, and that a group of black males had guns. *Id.* ¶ 13. The records showing these call details were among the materials in the Defendants' investigative file. *Id.* ¶ 20.

---

[2] Recent testing has established that that substance was not in fact human blood. PSOF ¶ 22.

Defendant Burke spoke at the scene of the recovery of Mr. Jackson's body with a 16-year-old boy named Brandon Powell, who assisted the Defendants in identifying Mr. Jackson as the victim. *Id.* ¶ 21. Burke recorded that Powell "stated that a gold Malibu had been driving around the park recently starting trouble." *Id.* Curiously, Powell did not report to Burke that he had been in the Park with Mr. Jackson, his best friend, that night and told Burke instead that he had last tried to contact Mr. Jackson by phone around 8:00 or 9:00 pm that evening but that Mr. Jackson did not answer. *Id.* Multiple witnesses subsequently placed Powell together with Mr. Jackson in the Park later that evening around the time when shots were heard. *Id.* Neither Burke nor any other detective followed up on this discrepancy. *Id.*

Defendants learned from 19-year-old Marisol Ocampo that she was at the Park the evening of August 30, 2008, with a group of girls. Marisol's group argued with a second group of girls (who arrived later) and, like Marisol's group, gathered in the illuminated playground area to the east of the Amundson Park fieldhouse. RDSOF ¶ 39; Pl.'s Ex. 18, Case Supp Report – Scene at MB 10056. According to multiple witnesses, the opposing group included Taneshia Branch, RJ Branch's sister, and Cierra Jackson, Plaintiff's sister. RDSOF ¶¶ 24, 25, 28, 30; Pl.'s Ex. 17, Case Supp Report – Interviews at MB 10112, 10114-17, 10119-20.

Witnesses informed the Defendants that, during the argument, Taneshia made a phone call, presumably to RJ. RDSOF ¶¶ 22, 24, 28, 34, 35, 37, 41. During their interrogation of Plaintiff, Defendants learned that Plaintiff also received a phone call from *his* sister, Cierra Jackson, asking for a ride away from the Park. PSOF ¶ 36.

Shortly after the phone calls, RJ arrived at the playground area. RDSOF ¶¶ 10, 13-14. Some witnesses noticed that RJ arrived at the Park in a gold Malibu driven by Plaintiff. *Id.* ¶¶ 22, 24, 28, 35, 37, 39, 41. Witnesses described that RJ pulled a gun from his pocket. *Id.* ¶¶ 22, 35,

37, 39, 41. Accounts varied: some witnesses said that RJ threatened a young man named Eugene Stanciel with the gun (and/or shot in Mr. Stanciel's direction), *id.* ¶¶ 22, 24, 25, 35, 39, 41; others said that RJ shot in the direction of persons fleeing from the playground, *id.* ¶¶ 24, 39; and others said that RJ shot in the direction of a group of boys seated on a bench at some distance from the playground, *id.* ¶ 37; Pl.'s Ex. 18, Case Supp Report – Scene at MB 10056.

      None of the witnesses stated that RJ's gunshots struck any person, let alone Paris Jackson. PSOF ¶ 31. Indeed, several witnesses told Defendants they did not even see Mr. Jackson in the Park that night. RDSOF ¶¶ 24-26, 28, 32, 34-35, 41. At least one witness told the Defendants that gunfire from behind the fieldhouse was directed in RJ's direction at the playground area. PSOF ¶ 29. Vanessa Bell, who was part of Taneisha's group in the playground area, told police that "shots were coming toward her from the area of the field house." *Id.*

      The Defendants' theory was that RJ's bullet struck Mr. Jackson in the back, after which Mr. Jackson, mortally wounded, staggered or ran from an area in the rear of the fieldhouse along the side of the building to the grate where he collapsed and was discovered the next morning. *Id.* ¶ 33. Evidence in Defendants' possession undercut this theory. *First*, Defendants interviewed Rufus McGee, who was part of a group of young men behind the fieldhouse. *Id.* ¶¶ 6, 26. McGee told Defendants that Paris Jackson was alive after RJ stopped shooting. *Id.* ¶ 26. According to McGee, Defendants pressured him to implicate RJ as Paris's assailant, but McGee resisted; Defendants held McGee at the police station for several hours before finally releasing him. *Id.* The evidence construed in Plaintiff's favor establishes that Defendant Burke and another officer conducted this abusive interview of McGee. *Id.* ¶¶ 26-27. Neither Defendant Burke nor any other detective took contemporaneous notes of McGee's interview, as is required for all witness interviews. *Id.* ¶ 27. The subsequent summary report prepared by Defendants Mancuso,

McDonald, Burke, and others omitted their attempted witness manipulation, and falsified McGee's statements to conceal his exculpatory account that Paris was alive after RJ stopped shooting: the report indicated, falsely, that McGee "gave the same basic account" as another witness, Isaiah Davis, who had no pertinent information and reported that he did not even know who was shooting and had not seen Paris in the Park. *Id.* Defendant Burke also conducted the interview of Isaiah Davis. *Id.*

*Second,* according to witnesses, Chicago Police patrol vehicles drove into and through the Park in response to the 911 calls of shots fired. *Id.* ¶ 14. Witnesses saw one or more police vehicles behind the fieldhouse, but the police did not find a body at that time. *Id.* Defendants' investigative file made no mention of this information.

Thus, although there was ample evidence that RJ Branch displayed and shot a firearm in Amundson Park the night before Paris Jackson's body was discovered behind the Park's fieldhouse, there was no witness and no other evidence suggesting, much less establishing, that RJ fired a bullet that struck Mr. Jackson. *See id.* ¶¶ 22-24, 31.

To attempt to fill that gap, Defendants obtained statements from witnesses in the playground to the effect that RJ was the only person the witnesses saw with a gun that night. *See* RDSOF ¶¶ 22, 28, 41 (Krystine Jenkins stated that RJ was "the only person that she saw in the park with a gun;" Jasmine Jenkins knew RJ was shooting because "he was the only guy she saw with a gun that night;" Shaquincia Williams stated that RJ was "the only one that she saw with a gun that night."). Defendant Officers, including Burke, threatened Eugene Stanciel to obtain testimony to support this theory of the crime. PSOF ¶ 28. Defendant Burke and other officers told Mr. Stanciel that he would be charged with the murder, that his children's mother would be

charged in connection with a stabbing that happened later the same evening, and that his children would be taken away—unless he provided a statement incriminating RJ. *Id.*

RJ was convicted. *Id.* ¶ 40. The murder case fell apart at the post-conviction stage when Rufus McGee testified to the specifics of his observations from his vantage point behind the fieldhouse. *Id.* Mr. McGee's testimony included statements against his own penal interests: he said that there was an *exchange* of gunfire between a person McGee had ordered to shoot at RJ and RJ, who fired in response. *Id.* Based on the *Brady* violation (the police report falsely implied that McGee had no relevant information), the Circuit Court vacated RJ's conviction and ordered a new trial. *Id.* RJ eventually pled guilty to aggravated discharge of a firearm and was sentenced to time served. *Id.*

### No Probable Cause to Charge and Prosecute Plaintiff

Plaintiff was convicted and sentenced to 35 years in prison on the theory that he was an accomplice to RJ's murder of Mr. Jackson. *Id.* ¶ 38. Several witnesses provided statements that Plaintiff was the driver of a gold Malibu that brought RJ to Amundson Park. RDSOF ¶¶ 22, 24, 28, 35, 37, 39, 41. Police also knew that RJ left the park in the gold Malibu that Plaintiff was driving. *Id.* ¶¶ 22, 24, 41.

Defendants had no witness statement indicating that Plaintiff was a participant in any of RJ's actions in relation to the firearm. *See id.* ¶¶ 22, 24-26, 28, 30, 32, 34-35, 37, 38, 41; PSOF ¶ 32. The witness accounts of RJ's shooting uniformly did not include any suggestion that Plaintiff was next to RJ for the shooting or that Plaintiff did or said anything to further or encourage the shooting. *See* RDSOF ¶¶ 22, 24-26, 28, 30, 32, 34-35, 37, 38, 41. Almost all the witnesses described RJ as coming into the playground area of the Park without Plaintiff. PSOF ¶ 32. Some

7

witnesses claimed to have seen Plaintiff remain near the car. *Id.*; RDSOF ¶¶ 24, 28, 35, 37. Other witnesses saw Plaintiff at other locations in the Park. PSOF ¶ 32; RDSOF ¶ 41.

Some witnesses said that they saw Plaintiff and RJ running back to the gold Malibu after RJ fired his gun. RDSOF ¶ 41; Pl.'s Ex. 17, Case Supp Report – Interviews at MB 10115. Fleeing from the Park would have been consistent with the evidence in Defendants' possession that shots were being fired from behind the fieldhouse in the direction of the playground. *See* PSOF ¶ 29.

Defendants arrested Plaintiff on September 3, 2008, on suspicion that he was an accomplice to murder. RDSOF ¶ 43. They confined Plaintiff in an interrogation room at the Area Five police headquarters for approximately 33 hours, questioning him intermittently and leaving him isolated for extended periods. PSOF ¶ 34. Plaintiff's family retained a lawyer to represent Plaintiff at the police station, but, when that lawyer arrived at the police headquarters and asked to speak with Plaintiff, Defendants falsely told him that Plaintiff did not want to speak with him. *Id.* ¶ 35. In fact, they never even informed Plaintiff that a lawyer was there for him. *Id.*

For many hours, Plaintiff insisted that he had no knowledge that RJ was armed or that RJ planned violence at the Park. *Id.* ¶ 37. Defendant Mancuso and others rejected Plaintiff's repeated denials. *Id.* They threatened Plaintiff with lengthy imprisonment if he would not acknowledge that he was aware during the drive with RJ to the Park that RJ had a gun (and planned to use it) and they led Plaintiff to believe that he would be permitted to go home if he admitted this knowledge. *Id.* At the end of Plaintiff's second night in the interrogation room, following a relentless session of leading and suggestive questioning, Plaintiff finally made an equivocal statement suggesting that he knew RJ had the gun and that RJ had made threatening

statements during the drive. *Id.* Within a few minutes, Plaintiff recanted. *Id.* But based on the

"admission," Defendants secured murder charges against Plaintiff. *Id.*

Plaintiff opted for a bench trial in the Circuit Court of Cook County and was convicted.

*Id.* ¶ 38. At the hearing on Plaintiff's post-trial motion, the trial judge commented that Plaintiff's

conviction hinged entirely on Plaintiff's inculpatory statements:

> I sat for months listening to the evidence and I'm thinking the whole time I'm
> there, I'm saying wow. This is a very, very, very [sic] weak case on Brown until I
> heard the statements and the statements put everything in a whole new light.
> Everything that Brown did that night when illuminated by the light of those
> statements changes.

*Id.*

The Circuit Court judge did not learn during the trial about the coercive interrogation

process that led to Plaintiff's inculpatory statements, including that Plaintiff's lawyer was turned

away when he requested to speak with Plaintiff. *Id.* Years later, Plaintiff filed a post-conviction

petition alleging, among other things, that it was a violation of the Illinois constitution to deny

Plaintiff the opportunity to meet with counsel who appeared at police headquarters seeking to

speak with Plaintiff. *Id.* ¶ 39; *see People v. McCauley,* 163 Ill. 2d 414 (1994). Following an

evidentiary hearing, the judge granted Plaintiff's post-conviction petition and suppressed

Plaintiff's statements, eventually leading to Plaintiff's exoneration. PSOF ¶ 39.

In this litigation, Plaintiff alleges (in Count I of his complaint) that the interrogation

process as a whole violated his Fifth Amendment rights. Defendants do not seek summary

judgment as to that claim. Tacitly acknowledging that information gleaned through coercive

interrogation cannot contribute to probable cause, Defendants base their summary judgment

argument on the theory that, *independent of the admissions Plaintiff made at the end of the*

*marathon interrogation*, the investigation developed probable cause to charge Plaintiff as RJ

Branch's accomplice in the murder of Paris Jackson.

**Defendant Burke's Involvement in the Investigation**

Defendant Burke was intimately involved in the investigation and participated in at least two of the central instances of misconduct. *First*, Defendant Burke interviewed Rufus McGee, who was with Mr. Jackson and saw RJ shooting at the Park, but whose account exonerated RJ, and pressured McGee to change his story and implicate RJ. PSOF ¶¶ 6-10, 26-27. Defendant Burke failed to record or preserve notes of that interview and was involved in falsifying the contents of RJ's statements in a subsequent typed summary, thereby concealing powerfully exculpatory information (along with evidence of his own attempts at witness manipulation). *Id.* ¶ 27.

*Second,* Defendant Burke participated in interviews of Eugene Stanciel during which Mr. Stanciel was threatened with prosecution, with his girlfriend's prosecution, and with the loss of his parental rights, unless he provided an account that incriminated Plaintiff and RJ. *Id.* ¶ 28.

Defendant Burke was also involved in numerous other parts of the investigation, including interviews of at least nine additional witnesses, canvassing the crime scene, going door-to-door to speak with people in homes near the Park, requesting phone records, and submitting evidence for forensic analysis. *Id.* ¶¶ 21, 25; RDSOF ¶¶ 51-52. He briefed the lead detectives about the investigation and was briefed by them in turn, participating in crucial decisions that led the police to procure charges and, ultimately, a conviction based on fabricated, coerced, and concealed evidence.[3] *See* RDSOF ¶¶ 51-54, 56.

---

[3] As argued below, Plaintiff presses claims against Defendant Burke for violation of his Due Process rights (Count I) as a result of fabrication and concealment of evidence, along with associated federal claims of conspiracy and failure to intervene. Plaintiff also presses state-law conspiracy and malicious prosecution claims against Defendant Burke. Plaintiff, however, withdraws his claim against Defendant Burke under the Fifth Amendment (Count II), which relates to the coercive interrogation and false supposed "confession" obtained from Plaintiff.

**ARGUMENT**

The standard that governs Defendants' pending motion is well-settled; the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact by identifying those portions of the record that it believes demonstrate the absence of such an issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citation omitted); *see also NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

**I.      THERE IS A MATERIAL DISPUTE OF FACT AS TO WHETHER, SETTING PLAINTIFF'S STATEMENTS ASIDE, THERE WAS PROBABLE CAUSE TO CHARGE HIM AS AN ACCESSORY TO RJ BRANCH'S SUPPOSED MURDER OF PARIS JACKSON.**

There is no disagreement that a plaintiff asserting a malicious prosecution claim must establish the absence of probable cause to institute the criminal proceedings against him. *See generally Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 74. "Lack of probable cause for instituting the original [criminal] proceedings is an indispensable element of an action for malicious prosecution." *Id.* at ¶ 115 (citing *Freides v. Sani-Made Manufacturing Co.,* 33 Ill. 2d 291, 295 (1965)).

Defendants contend that undisputed facts establish probable cause to charge Plaintiff as an accessory to RJ Branch's supposed "murder" of Paris Jackson. Defs. Mem. at 6-10.[4] Their argument is defeated by controlling Illinois law, which Defendants' brief fails to cite. As the

---

[4] Defendants do not dispute that the summary judgment record supports the other elements of malicious prosecution and rely entirely on their arguments regarding probable cause.

11

Illinois Supreme Court has made clear, to convict a person as an aider or abettor of another's crime, the prosecution must establish "either: (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *People v. Perez*, 189 Ill. 2d 254, 266 (2000). Put simply, the evidence must establish that the alleged aider and abettor has the requisite *mens rea.* The record of undisputed summary judgment facts shows that police developed no evidence whatsoever showing Plaintiff had the necessary culpable state of mind required to charge him with murder on an accountability theory.

As Defendants recognize, any statements Plaintiff made during the marathon interrogation cannot be part of the undisputed record as to their summary judgment motion. If those statements were the product of coercion, they could not contribute to probable cause. *Cf., e.g.*, *Wilson v. Est. of Burge*, No. 21-cv-03487, 2023 WL 2750946, at *53 (N.D. Ill. Mar. 31, 2023) ("'Defendants cannot manufacture their own probable cause by fabricating evidence and manipulating eyewitnesses,' to avoid a state law malicious prosecution claim." (quoting *Kuri v. City of Chicago,* 2017 WL 4882338, at *7 (N.D. Ill. Oct. 30, 2017))). Defendants do not seek summary judgment with respect to Plaintiff's separate claim that they violated Plaintiff's Fifth Amendment rights during the lengthy interrogation by coercing his inculpatory statements. That violation—and the voluntariness of Plaintiff's inculpatory remarks—will have to be resolved at trial. The interrogation statements therefore have no place in the summary judgment record; there is a disputed question of fact whether those statements were coerced.

Without a statement from the defendant, it is possible to infer intent "from the character of [the] defendant's acts as well as the circumstances surrounding the commission of the offense." *Perez,* 189 Ill. 2d at 266. But, as Illinois courts have repeatedly cautioned, "mere presence of a defendant at the scene of a crime does not render him accountable for the offense."

*Id.* at 268. In the words of the Illinois Supreme Court, "[g]uilt by association is a thoroughly discredited doctrine." *Id.* at 266.

In the *Perez* case, the Illinois Supreme Court amplified this point, specifically holding that evidence that the defendant was present at the scene of the crime, knew of its commission and fled the scene, was *not* sufficient to prove that he intentionally aided in or encouraged the crime's commission. *Id.* at 268. Similarly, in *People v. Taylor*, 186 Ill. 2d 439, 447 (1999), the Supreme Court held that a defendant driver who was aware that his passenger had a gun but did not know that the passenger intended to shoot the gun was not liable as an accomplice to the shooting even though the driver stopped the car at the shooter's request and drove away from the scene with the shooter after the shooting incident. And in *People v. Dennis,* 181 Ill. 2d 87, 103-104 (1998), the Supreme Court held that the person who drove a bank robber from the crime scene could not be found guilty as an accomplice if he did not intend that the robbery would be committed and was unaware of the robbery as he drove the offender from the scene. *See also*, *People v. Fernandez,* 2014 IL 115527 (criminal accomplice liability cannot be established based on shared intent when the alleged accomplice does not know that a crime will be committed; liability cannot be based on "common criminal design" where the alleged accomplice does not "aid[] another in the planning or commission of an offense").

Defendants neatly summarize the evidence they had to support the accountability theory against Plaintiff: "eyewitnesses stated that Plaintiff was seen driving the shooter to the Park moments before the shooting and driving the shooter away from the Park immediately after the shooting." Defs. Memo at 8. That simply is not enough. Like *Perez,* the undisputed evidence against Plaintiff establishes merely that he was present at the scene and that he fled. PSOF ¶ 32; RDSOF ¶¶ 22, 24, 41. The Defendants had zero evidence from eyewitnesses or any other

13

source—and they point to nothing in the summary judgment record—that Plaintiff did anything to support, facilitate, or assist RJ in the shooting.

Under controlling Illinois law, Defendants needed evidence that Plaintiff shared RJ Branch's presumed intent to kill Paris Jackson or that Plaintiff participated with RJ in a "common criminal design." They did not have this evidence. It would be a fair inference that Defendants confined Plaintiff and interrogated him over the course of 33 hours because they knew full well that the eyewitness evidence in their possession was not enough to justify charging Plaintiff as an accomplice.

Ignoring the controlling cases, Defendants rely on the federal district court's decision in *Franklin v. Harvey Det. Rasheed Askew*, No. 19-CV-04375, 2022 WL 17093358, at *1 (N.D. Ill. Nov. 21, 2022), which found that there was probable cause to charge the driver in a drive by shooting case as an accessory to attempted murder. *Franklin* is no help to Defendants. In that case, driving the vehicle amounted to direct participation in the attempted murder—after all, this was a *drive by* shooting in which driving the vehicle facilitated the crime. *Id.* at *5. Moreover, the police had evidence that the driver and the shooter had provided a false story suggesting they were victims not perpetrators. *Id. Franklin* is simply not on point.

Defendants also cite *People v. Richardson*, 270 N.E.2d 568, 570 (Ill Ct. App. 1971), arguing that "Plaintiff could have been convicted of first-degree murder if 'proof of acts in furtherance of a common design or purpose to commit a crime… [could] be drawn from the circumstances surrounding the commission of the act by the group.'" Defs. Mem. at 10 (quoting *Richardson*). But as with *Franklin*, *Richardson* is inapposite. In *Richardson*, the Illinois appellate court upheld an armed robbery conviction under an accountability theory for the alleged getaway driver, who saw his two alleged accomplices running from the office they had just robbed, and

who sped away from the scene with them, running a red light and failing to stop when pursued by police with sirens blaring. *Richardson*, 270 N.E.2d at 570. Here, however, unlike in *Richardson,* the supposed evidence of "flight" is equally consistent with Plaintiff leaving a dangerous situation for his own safety (running away from a park where gunshots are flying is the reaction that an entirely innocent person would have) as with purposefully aiding RJ's departure from a crime scene. And unlike in *Richardson,* here there is no evidence of an attempt to evade police. *Richardson* offers no aid to Defendants in their efforts to bootstrap their non-existent *mens rea* evidence into probable cause for the false murder charges they pursued against Plaintiff.

Defendants other cited cases are from jurisdictions outside of Illinois and cannot be used to undermine the controlling decisions in *Perez*, *Taylor*, and *Dennis.* Defendants' proffered summary judgment evidence does not establish probable cause to prosecute Plaintiff as an accomplice to RJ Branch's supposed murder of Paris Jackson.

## II. BECAUSE PLAINTIFF HAS TORT CLAIMS WHICH SURVIVE SUMMARY JUDGMENT, PLAINTIFF'S STATE LAW CONSPIRACY CLAIM ALSO SURVIVES.

Defendants argue they are entitled to summary judgment on Plaintiff's state law conspiracy claim because if, as they assert, they are entitled to judgment on the malicious prosecution claim, the conspiracy claim necessarily falls with it. Defs. Mem. at 10-11. The argument fails for two reasons. First, as demonstrated above, Defendants are not entitled to summary judgment on malicious prosecution, so there is a triable substantive state law claim from which conspiracy liability may flow. Second, even if Plaintiff's malicious prosecution claim were dismissed, Plaintiff could pursue a state law civil conspiracy claim arising from Defendants' tortious misconduct under Section 1983. As reflected in the Illinois case law cited

15

by Defendants, "[a] cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62-63 (1994). Even absent a malicious prosecution claim, Plaintiff has triable *constitutional* torts, brought pursuant to 42 U.S.C. § 1983, which Defendants do not challenge at this stage of proceedings. Dkt. No. 136 ¶¶72-82 (Counts I and II of operative complaint, alleging §1983 claims for violations of Plaintiff's Fifth and Fourteenth Amendment rights); *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976) (section 1983 "creates a species of tort liability"); *Evans v. City of Chicago*, 522 F. Supp. 789, 792 (N.D. Ill. 1980) (holding that a section 1983 claim constituted a "tort" for purposes of interpreting Illinois state statute).

Defendants also assert that "Plaintiff has failed to provide any evidence demonstrating an agreement among the officers to participate in an unlawful act." Defs. Mem. at 11. They provide no factual citation or any further discussion of the point, so it is forfeited. *See United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with *pertinent* authority . . . forfeits the point."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (summary judgment movant bears initial burden of articulating "the basis for its motion, and identifying those portions of" the record upon which it relies). Even if it were not forfeited, Defendants argument would lack merit, because there is ample evidence in the record supporting an agreement among the officers to violate Plaintiff's rights. *See, e.g.*, PSOF ¶¶ 18-37; *see also Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984) ("[C]ircumstantial evidence may provide adequate proof of conspiracy.").

### III. DEFENDANTS CAN BE FOUND LIABLE FOR FAILURE TO INTERVENE IN ACCORDANCE WITH BINDING APPELLATE PRECEDENT.

Defendants seek summary judgment on Plaintiff's failure to intervene claim, relying entirely on Judge Easterbrook's concurring opinion in *Mwangangi v. Nielsen*, 48 F.4th 816, 834-

835 (7th Cir. 2022), which questioned the underlying validity of such a claim. Defs. Mem. at 11-12. But the views of a single member of the court of appeals expressed in a concurrence are not binding precedent. *Maryland v. Wilson*, 519 U.S. 408, 408 (1997) (concurrence is not binding precedent).

The proceedings in this court are governed by the longstanding, binding Seventh Circuit precedent, stretching back decades and continuing to the present day, which holds unambiguously that failure to intervene is a cognizable claim under 42 U.S.C. § 1983. *See, e.g., Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022) (officer who is present and fails to intervene to prevent other officers from infringing a person's constitutional rights is liable under §1983); *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (same); *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (same); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (same). Defendants' argument fails.

## IV.  THERE IS SUFFICIENT EVIDENCE FOR PLAINTIFF TO PROCEED TO TRIAL AGAINST DEFENDANT BURKE.

Defendant Burke was a direct participant in fabricating inculpatory evidence from Eugene Stanciel, who testified against Plaintiff at trial, as well as in attempting to secure false inculpatory evidence from and concealing exculpatory statements given by Rufus McGee. Reasonable inferences from the record place Burke at the heart of conspiracy to frame Plaintiff for a murder he did not commit. Burke's actions not only make him liable on Plaintiff's due process claim and the related failure to intervene and federal conspiracy claims, but also for malicious prosecution and state law conspiracy. Summary judgment is not proper as to Defendant Burke.

**A. There is a material dispute as to whether Detective Burke directly participated, conspired, and/or failed to intervene in the fabrication of Eugene Stanciel's inculpatory statements.**

An officer violates the Due Process Clause if he "manufactures false evidence against a criminal defendant [and] that evidence is later used to deprive the defendant of her liberty in some way," *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012), or "if [he] fail[s] to disclose [exculpatory] evidence to prosecutors," *Phillips v. City of Chicago*, No. 14-cv-9372, 2018 WL 1309881, at *19 (N.D. Ill. Mar. 13, 2018) (citing *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015); *Carvajal v. Dominguez*, 542 F.3d 561, 566-567 (7th Cir. 2008)).

Defendant Burke can be held liable for these Due Process violations in three distinct ways. *First*, he is liable as a principal because "he caused or participated in [the] alleged constitutional deprivation[s]" himself. *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1050 (N.D. Ill. 2018) (internal quotation and citation omitted), *opinion clarified*, No. 12-CV-04428, 2018 WL 11469072 (N.D. Ill. May 17, 2018). *Second*, he is "liable as a conspirator," because he was "a voluntary participant in a common venture" to fabricate and conceal evidence. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988*). Third*, he can be held liable "for failing to intervene in a constitutional violation perpetrated by another person" because he "'had notice, opportunity, and the ability to prevent the other person from inflicting harm.'" *Rivera*, 319 F. Supp. 3d at 1050 (quoting *Sanchez v. City of Chicago*, 700 F.3d 919, 928 (7th Cir. 2012)).

Defendants do not dispute that Plaintiff's allegations regarding the fabrication of Eugene Stanciel's statements and the concealment of Rufus McGee's statements give rise to Due Process claims. *See* Defs. Mem. at 13-15. Nor do Defendants seek summary judgment on the theory that no such violations occurred. Instead, the only argument that Defendants advance is that Plaintiff

cannot tie Defendant Burke to these violations. The evidence shows otherwise and precludes summary judgment on this basis.

There is evidence that Defendant Burke participated in coercing Eugene Stanciel to fabricate false and incriminating statements. PSOF ¶ 28. Mr. Stanciel has sworn under oath several times that he was threatened with losing his children, with criminal charges, and with his girlfriend's prosecution unless he provided a statement (and subsequent testimony) that falsely incriminated Plaintiff by conforming with the officers' theory of the case. *Id.*; RDSOF ¶¶ 59-60. Mr. Stanciel has stated that this coercion happened when he was brought into the police station and interviewed by police and then an Assistant State's Attorney on August 31, 2008, into the early morning hours of September 1. PSOF ¶ 28; RDSOF ¶¶ 21, 59-62. Defendant Burke admits in his deposition that he participated in the police interrogation of Mr. Stanciel on August 31, 2008. PSOF ¶ 28; RDSOF ¶ 61. Defendant Burke wrote the handwritten General Progress Report (GPR) notes purporting to summarize the contents of those police interviews. RDSOF ¶ 61. Indeed, Defendant Burke testified that he would only write GPRs for interviews that he conducted. *Id.*; Pl.'s Ex. 22, Burke Dep. at 100: 17-19; *see also id.* at 70:15-71:06. The evidence thus shows that Defendant Burke had personal responsibility for conducting and documenting the police interviews during which Mr. Stanciel was coerced into providing a false account.

Defendant Burke also participated in ASA Lisa Longo's creation of a handwritten statement purporting to document Mr. Stanciel's (fabricated) account of events. RDSOF ¶ 21. Defendant Burke was the only police officer present during ASA Longo's interview. *Id.* Mr. Stanciel has testified that he was coerced into signing the handwritten statement in order to protect his children and his children's mother, who faced potential criminal liability for a stabbing that happened outside the Park soon after shots were fired. *Id.*; PSOF ¶ 28. Defendant

Burke was present in the room throughout that process, personally shepherding along—and, certainly, failing to stop—the creation of the false signed statement.

Defendant Burke claims he is entitled to summary judgment based on his denial during his deposition that he threatened Mr. Stanciel or was aware of any improper conduct. Defs. Mem. at 17. But this self-serving denial was not based on any actual recollection of the interview: Defendant Burke testified repeatedly that he did not independently recall interviewing Mr. Stanciel, and, specifically, that he did not recall the things he said to Mr. Stanciel to persuade Mr. Stanciel to speak with him. RDSOF ¶ 54. Even when asked directly, he said that he did not recall whether he suggested to Mr. Stanciel that he could be charged with the Paris Jackson homicide. *Id*. When asked about other threats that were levelled at Mr. Stanciel, he responded by testifying he "would never do that." *Id*.

Defendant Burke leans heavily on the idea that Mr. Stanciel did not identify Defendant Burke by name as one of the officers who threatened him, citing *Moore v. City of Chicago*, No. 02-cv-5130, 2007 WL 3037121, at *9 (N.D. Ill. 2007). Defs. Mem. at 14. But in *Moore* there was no other evidence tying the defendant officer to the alleged misconduct. There is ample such evidence here. Defendant Burke also points to one affidavit that Mr. Stanciel wrote in which he named three other detectives in connection with the coercion but does not mention Burke. Defs. Mem. at 14. But Mr. Stanciel subsequently testified that he did not actually know the names of the detectives who had interviewed him and that he had simply copied those three detectives' names into his affidavit from a police report, on the assumption that the detectives named in the police report must have been the ones who interviewed him. RDSOF ¶ 59. Mr. Stanciel's physical description of the detectives who coerced him further confirms that Defendant Burke participated in his coercion: Mr. Stanciel described two detectives as white and one as Black.

RDSOF ¶ 61. Police records show that the Defendants who documented witness interviews at the police station that day were Detective Burke (a white man), Detective Mancuso (a white man), Detective McDonald (a white man), and Detective Turner (a Black man). *See* Pl.'s Ex. 17, Case Supp Report – Interviews at MB 10111-17.

Finally, Defendants make much out of a snippet of Mr. Stanciel's deposition testimony in which he states that multiple officers were "in and out" of the interview room in order to suggest that perhaps some *other* detectives coerced Mr. Stanciel while Defendant Burke was not present. Defs. Mem. at 17. This argument fails. Mr. Stanciel's description of detectives coming "in and out" simply echoes his testimony in which he explained that detectives interviewed him intermittently, coming into the room for a time then leaving him alone before returning. RDSOF ¶ 62. Defendants' speculative argument cannot overcome the documentary evidence, construed in Plaintiff's favor, that Defendant Burke was the principal detective responsible for Mr. Stanciel's interviews on August 31 and the early morning hours of September 1, 2008. *Id.* ¶¶ 21, 61; PSOF ¶ 28.

There is thus a material factual dispute about whether Defendant Burke is personally liable for Mr. Stanciel's coerced, fabricated statements. There is evidence that he personally participated or, at least, acted in concert with others as a conspirator and failed to intervene to prevent the fabrication of a coerced statement. It is for the jury to decide whether to credit Mr. Stanciel's testimony and the documentary evidence or to accept Defendant Burke's self-serving denials.

**B. There is a material dispute of fact as to whether Defendant Burke directly participated, conspired, and/or failed to intervene in the attempted witness manipulation and concealment and falsification of Rufus McGee's exculpatory eyewitness account of the shooting.**

There is likewise ample evidence that Defendant Burke was the officer who interviewed Mr. McGee or, at least, that he knew about or agreed to participate in a scheme with other officers to falsify and conceal Mr. McGee's exculpatory account of events. Defendants do not contest that concealing Mr. McGee's exculpatory statement—that Paris was still alive at the time RJ stopped shooting—was a Due Process violation or that there is a material dispute as to whether such concealment occurred. *See* Defs. Mem. at 13-15. Additionally, McGee describes an attempt at witness manipulation by the officers who interviewed him, who pressured him to implicate RJ as Paris's shooter (and who held him confined at the police station for hours when he refused to do so). PSOF ¶ 26-27. As with the allegations related to Mr. Stanciel, Defendants' only argument is that "[t]here is no evidence connecting Burke to this alleged misconduct." Defs. Mem. at 15. That is incorrect.

Defendant Burke is the detective who first learned that Mr. McGee might be a witness and obtained his contact information on August 31. RDSOF ¶ 51. Later that day, Mr. McGee was located by police and brought to the Area 5 detective division to be interviewed. PSOF ¶ 26. Mr. McGee was confined at Area 5 for a number of hours. *Id.* He was interviewed by two detectives and, while he could not remember their names, he described them as one white detective and one Black detective. RDSOF ¶ 64. On August 31, 2008 (and into the wee hours of September 1), 12 other witnesses were interviewed at Area 5; all those interviews were conducted by either Defendant Burke (who is white), Mancuso (who is white), McDonald (who is white), or Turner (who is Black). *See* PSOF ¶ 26; Pl.'s Ex. 17, Case Supp Report – Interviews at MB 10111-17. This evidence establishes that the white detective who interviewed Mr. McGee

was either Defendant Burke, Mancuso, or McDonald, and that Defendant Burke was coordinating closely with Defendants Mancuso and McDonald that evening interviewing witnesses.

Unlike every other witness interviewed, there were no handwritten GPR notes for the interview of Rufus McGee. PSOF ¶ 27. The only place Mr. McGee's interview is documented in the police's investigatory file is a Case Supplementary Report prepared months later that summarized all the interviews conducted in the days following the shooting. *Id.* That Case Supplementary Report provided only the following description of the interview: "Rufus McGee was interviewed and he gave the same basic account of the incident as had Isaiah Davis." *Id.*

Importantly, Isaiah Davis was interviewed by Defendant Burke on August 31. *Id.* The fact that Mr. McGee's statement is lumped together with Mr. Davis's and described only by reference to that interview supports the inference that both interviews were conducted by Defendant Burke.

Taken together, the evidence creates a material factual dispute about whether Defendant Burke concealed exculpatory evidence and attempted to manipulate McGee into giving a false inculpatory statement, conspired to do so, and/or knowingly failed to intervene to stop that misconduct. Defendants argue that, as with the fabricated Stanciel statement, Defendant Burke is entitled to summary judgment because he has denied involvement (based on no actual memory of the events) and because Mr. McGee did not identify him by name. Defs. Mem. at 15-16. But these two facts do not entitle Defendant Burke to summary judgment against the weight of contrary evidence creating a material factual dispute as to his involvement as a principal, conspirator, or at least a culpable bystander.

23

### C. There is a material factual dispute as to whether Defendant Burke engaged in a conspiracy to bring a malicious prosecution against Plaintiff.

For the same reasons, there is a material factual dispute as to whether Defendant Burke is liable for committing the state-law torts of malicious prosecution and conspiracy to maliciously prosecute Plaintiff. Under Illinois law, "'liability for malicious prosecution extends to all persons who played a significant role in causing the prosecution of the Plaintiff.'" *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 79, 183 N.E.3d 767 (Ill. 2021) ("*Beaman III*") (quoting *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 43, 131 N.E.3d 488 (Ill. 2019) ("*Beaman II*")). An officer plays a "significant role" if he "'knowingly provided misinformation to [a prosecutor], concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct' that was instrumental in the commencement or continuation of the criminal prosecution." *Beaman III*, 2021 IL 125617 ¶ 79 (quoting *Beaman II*, 2019 IL 122654, ¶ 45).

Defendant Burke has participated in exactly these sorts of ways: concealing the exculpatory statement of Mr. McGee, attempting to obtain a false inculpatory statement from McGee, and participating in coercion to fabricate Mr. Stanciel's incriminating statement that was relied on by prosecutors at the grand jury and at trial. Just as there is a material dispute as to whether Defendant Burke is liable for this conduct under the Due Process Clause, there is a material dispute as to whether he played a significant role in causing Plaintiff's malicious prosecution.

Likewise, Defendant Burke is liable for engaging in a state-law civil conspiracy. To be held liable for a conspiracy in Illinois, there must be "(1) a combination of two or more individuals, (2) for the purpose of accomplishing by concerted action an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnson*, 209 Ill.2d 302, TK, 807 N.E.2d

24

461, 470 (Ill. 2004). Here, there is a triable issue as to whether Defendant Burke combined with Defendant Mancuso and others in order to pursue a malicious prosecution of Plaintiff based on the fabricated Stanciel statement and the concealed McGee statement. The evidence therefore creates a material dispute as to whether Defendant Burke is liable for conspiracy.

## V.     THE CITY'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED.

The City moves for summary judgment as to the indemnification and *respondeat superior* claims in Counts IX and X on the theory that those counts fall to the extent summary judgment is granted on the Defendants' motion. But Plaintiff has shown that the Defendants' motion is without merit (except as to Defendant Czablewski). The City's motion therefore fails.

## CONCLUSION

For the foregoing reasons, this Court should enter an order denying Defendants' motion for summary judgment (except as to Defendant Czablewski).

Respectfully submitted,

**MARCEL BROWN**

By:  /s/ Locke E. Bowman
    One of his attorneys

Locke E. Bowman
Sam Heppell
Loevy & Loevy
311 N. Aberdeen St., Ste. 3
Chicago, IL 60607
312 243 5900

Vanessa del Valle
Jonathan Manes
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-8576

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on August 8, 2023 he caused the foregoing

document to be served upon all counsel who have filed appearances in this action via CM/ECF.

<u>/s/ Locke E. Bowman</u>