UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Marcel Brown,

    *Plaintiff,*

v.

City of Chicago, *et al.*,

    *Defendants.*

No. 19 CV 4082

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Plaintiff Marcel Brown was convicted of first-degree murder on a theory of accomplice liability for the 2008 killing of Paris Jackson. [Dkt. 275 ¶ 2.] A state court vacated Brown's conviction in 2018 because he had been denied access to counsel during a police interrogation, and the state declined to retry him. [*Id.* ¶ 57.] Brown filed this lawsuit against the City of Chicago and Chicago police officers alleging violations of his constitutional rights and state law. The City and the officers move for partial summary judgment [Dkt. 242, 243], but the only claims currently pending against the City are derivative claims, so the City's motion rises or falls with the officers' [*see* Dkt. 242; Dkt. 276 at 25].[1] Further, Brown does not contest the entry of summary judgment as to Steve Czablewski. [Dkt. 276 at 2.] Therefore, the Court refers to the remaining Defendant officers—William Burke, Michael Mancuso, Kevin McDonald,[2] Garrick Turner, and Rubin Weber—simply as "Defendants." For the

---

[1]    Brown also brings a *Monell* claim seeking to hold the City directly liable, but that claim has been bifurcated and is not at issue here. [*See* Dkt. 88.]

[2]    To be precise, Geri Lynn Yanow is acting as Special Representative of the Estate of McDonald. [Dkt. 246 at 1.] For simplicity, the Court refers to the Estate as "McDonald."

reasons explained below, the Defendants' motion for summary judgment is granted in part and denied in part; because the City's motion meets the same fate as the individual Defendants', it too is granted in part and denied in part.

## I. Background

The Court draws on the parties' Local Rule 56.1 filings to recount the facts, which are undisputed unless otherwise noted. The evidence in the underlying criminal case largely took the form of witness statements and testimony, and many individuals share identical or similar names with others. For clarity, the Court begins by explaining how it refers to the relevant individuals in this case. It first introduces everyone by full name. It then refers to individuals with nicknames as follows:

| Individual | Nickname(s) | Name the Court Uses |
| --- | --- | --- |
| Marcel Brown | Main Main and (disputed) May May [Dkt. 275 ¶ 1] | Brown or Plaintiff |
| Renard Branch Jr. | R.J. | R.J. |
| Terry Scott | T.J. | T.J. |
| Eugene Stanciel | Eddie Cane | Stanciel |
| Marisol Ocampo | Mari | Ocampo |
| David Portis | Day Day | Portis |

The Court refers to the following individuals by first name because they share last names with others: Taneshia Branch (now Bell); Kema and Isaiah Davis; Cierra and Paris Jackson; Ebony, Krystal, Krystine, and Jasmine Jenkins; and Almanique Scott. The Court refers to all others by last name.

### A. Amundsen Park, August 30–31, 2008

This case concerns events that occurred in Amundsen Park on the West Side of Chicago on the evening of August 30 and the morning of August 31, 2008 and the ensuing police investigation and prosecutions of Brown and his cousin R.J. Branch.

In the evening of August 30, two groups of teenagers were gathered at the park. [Dkt. 275 ¶¶ 5–6.] One group, "Taneshia's group," included Taneshia Branch; the other, "Ocampo's group," included Mari Ocampo. [*Id.* ¶ 6.] Also present were Paris Jackson, Rufus McGee, Day Day Portis, Brandon Powell, Eugene Stanciel, and a 13-year-old boy named Deshawn. [*See, e.g.*, Dkt. 282 ¶ 6.] An argument broke out between Taneshia's and Ocampo's groups, and someone—it is disputed who—called R.J. [Dkt. 275 ¶¶ 7–9.] Defendants contend that Taneshia made the call, while Brown asserts that Cierra Jackson or Almanique Scott did. [*Id.* ¶ 8.] This dispute is immaterial for summary judgment purposes, as it is undisputed that several witnesses stated that Taneshia was on the phone. [*E.g.*, *id.* ¶¶ 22, 24, 35.] Brown and T.J. Scott also received calls from Cierra and Almanique. [*Id.* ¶ 9.]

Brown, R.J., and T.J. were at a nearby White Castle when they received these calls, and R.J. had loaded a gun with him. [*Id.* ¶¶ 9, 12.] Brown drove R.J. and T.J. to the park in his mother's gold Malibu, of which he was the primary driver. [*Id.* ¶¶ 10–11, 13.] The parties dispute certain details about the drive to the park and the ensuing events, but some of these disputes are immaterial.[3] It is undisputed that R.J. entered the park, spoke with Stanciel, and fired his gun several times. [*Id.* ¶¶ 14–15.] R.J. then ran back to the Malibu—it is disputed whether anyone was shooting at this point—and Brown drove R.J. and T.J. away. [*Id.* ¶ 16; Dkt. 282 ¶ 12; *see* Dkt. 276 at

---

[3] For example, Brown asserts that T.J. was in the front passenger seat and R.J. sat in the back seat, but several witnesses stated that R.J. got out of the front passenger seat. [Dkt. 275 ¶¶ 13, 22, 24.] Brown also disputes that he exited the Malibu immediately after arriving in the park, but witnesses say they saw Brown exit the car at once. [*Id.* ¶¶ 14–15, 22, 24, 41.]

13.] Brown asserts that someone else fired a shot while R.J. was running back to the Malibu. [Dkt. 275 ¶ 16; Dkt. 282 ¶ 12.]

There were several 911 calls between 10:59 and 11:07 p.m. reporting that shots were fired in the park. [Dkt. 275 ¶ 17; Dkt. 282 ¶ 20.] Brown contends that the last 911 call occurred at around 11:41 p.m., well after Brown, R.J., and T.J., drove away. [Dkt. 282 ¶ 20.] He relies on a police report stating, "[Responding detectives] learned from interviews with officers on the scene that there were several broadcasts of shots fired in the park from approx. [10:59 to 11:41 p.m.] on the 30th of August." [Dkt. 271-81 at 12.] Defendants dispute that 911 calls came as late as 11:41 p.m., pointing to call logs reflecting calls between 10:59 and 11:07 p.m. [Dkt. 282 ¶ 20; *see* Dkt. 271-6.] This dispute is genuine but not material.[4] Police cars responding to the 911 calls drove through the park, including on pathways behind the fieldhouse in the park; they did not find a body. [Dkt. 275 ¶ 17; Dkt. 282 ¶ 14.]

Shortly after the shooting, girls in Taneshia's and Ocampo's groups began fighting outside the park. [Dkt. 282 ¶ 15.] Alicia Hardiman was stabbed during the fight; it is disputed whether Ocampo had a knife. [*Id.* ¶¶ 15–16.] Police responded to 911 calls about the stabbing, and some of the officers responding to the shooting and stabbing were told that Stanciel had a gun. [*Id.* ¶¶ 15, 17.] Stanciel attempted to flee, but police arrested him; he was released at 7:40 a.m. on August 31. [*Id.* ¶ 17.]

---

[4] The dispute is genuine because the Court must construe the facts in the light most favorable to Brown, *see Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013), and the 911 call logs are not so conclusive that a jury could not credit the police report's mention of an 11:41 p.m. call, *cf. Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997). But the dispute is immaterial because, as explained below, it is not dispositive to any claim at issue here.

On August 31 at approximately 9:00 a.m., a Chicago Park District employee found a body behind the fieldhouse in the park and called 911. [Dkt. 275 ¶ 18.] The body was found lying across a metal grate; the cause of death was a single gunshot wound in the back. [*Id.* ¶ 19; Dkt. 282 ¶ 19.]

## B. The Investigation

Defendants Mancuso and McDonald led the investigation into Paris's killing, and the other Defendants—including former Defendant Czablewski—assisted. [Dkt. 282 ¶ 18.] Brown believes that some aspects of the investigation were tainted by misconduct, but he does not challenge other parts of the investigation.

### 1. Initial Steps

Officers including Mancuso and McDonald arrived shortly after 9:00 a.m. [*Id.* ¶ 19.] They learned that multiple 911 calls had been made the previous night, and the notes from two calls included "people in the park shooting" and "group of m/b [male Black] white t shirt with guns." [*Id.* ¶ 20.] Powell, who was at the park that morning, identified the body as his friend Paris. [Dkt. 275 ¶ 19; Dkt. 282 ¶ 21.] Burke interviewed Powell, who stated that "a gold Malibu had been driving around the park recently starting trouble," but Powell did not say that he had been with Paris in the park the previous evening. [Dkt. 282 ¶ 21.] Although police later learned that Powell had been with Paris, they did not interview Powell again. [*Id.*] With two other officers, Burke canvassed the neighborhood, and he interviewed Paris's girlfriend, Marita Myles, who told Burke that Paris regularly hung out with McGee and provided the street McGee lived on. [Dkt. 275 ¶ 51; Dkt. 282 ¶ 25.] Police brought McGee to the station for questioning—it is disputed whether they forced McGee to come—and they

also picked up Stanciel at his home, handcuffed him, and brought him to the station. [Dkt. 282 ¶¶ 26, 28.][5]

### 2. Unchallenged Interviews

Detectives interviewed 22 witnesses (Brown points out that Taneshia, Cierra, and Almanique were not among them). [Dkt. 275 ¶ 20.] Assistant State's Attorneys ("ASAs") interviewed 14 of those witnesses, usually with an officer present. [*Id.* ¶ 21.] The ASAs handwrote statements, which the witnesses adopted and signed. For 12 witnesses interviewed by ASAs, Brown does not argue that the statements were fabricated, coerced, or otherwise improper.[6]

Krystine Jenkins (interviewed on September 4 by ASA John McNulty and Turner) stated that she saw Taneshia arguing with Krystine's cousin Deshawn, then she saw Taneshia on the phone. About 15 minutes later, she saw R.J. arrive in a gold Malibu, and R.J. and Brown got out of the car. R.J. hopped a fence to enter the park, approached the benches where Krystine and her friends, and Taneshia's group, were. R.J. asked Taneshia "which one of them," pulled a black handgun out of his pocket,

---

[5]     There was no ballistic evidence recovered at the scene. [Dkt. 282 ¶ 24.] Investigators conducted forensic analysis, and the parties dispute the implications of the findings [*id.* ¶¶ 22–23], but those disputes are not relevant to the issues at summary judgment.

[6]     Brown's Local Rule 56.1 response notes that there are discrepancies between some witnesses' statements to prosecutors and police and their later grand jury or trial testimony and that some witnesses were minors and interviewed without a parent, guardian, or lawyer present. [*See, e.g.*, Dkt. 275 ¶¶ 22–24.] On the former point, as the discussion below will explain, Brown's only claims at issue here concern probable cause—which is determined by considering the facts at the time a criminal complaint is filed—or allegedly fabricated or suppressed evidence, so any inconsistencies between the statements given to ASAs and later testimony are immaterial. On the latter point, Brown does not argue that any statement was coerced because an adult was not present, and since *confessions* by minors obtained without a friendly adult present can, under some circumstances, be admissible, *Haraway v. Young*, 302 F.3d 757, 762–63 (7th Cir. 2002); *Carter v. Thompson*, 690 F.3d 837, 843 (7th Cir. 2012), there cannot be a categorical bar on police relying on witness statements by minors.

and pointed it at Stanciel. Krystine ran and heard five or six gunshots. When she turned around, she saw the Malibu driving away. R.J. was the only person Krystine saw in with a gun in the park. She had seen Paris earlier in the evening. [*Id.* ¶ 22.]

Shaniqua Grayer (ASA Longo and Czablewski, September 2) saw Taneshia make a call, saying Stanciel was "acting tough"; Almanique also made a call. Minutes after the call, R.J. appeared. He walked up to Taneshia; said, "I'll be back"; and walked toward the gold Malibu. Ten minutes later, the Malibu returned and parked. Brown, R.J., and T.J. got out of the car, and R.J. jumped the fence into the park and pointed a black gun that looked like a revolver at Stanciel. Someone yelled, "clear the park"; boys started running; and R.J. shot in the boys' direction. Grayer heard six or seven shots. She saw R.J. get back in the Malibu and fire one more shot from inside the car. R.J. was the only one she saw with a gun, but she did not see Paris. [*Id.* ¶ 24.]

Tyrone Bailey (ASA Longo and Mancuso, September 2) stated that he saw Taneshia and Deshawn "having words," and about 15 minutes later he saw R.J. hop the gate and approach Bailey, Stanciel, and possibly Deshawn. R.J. said, "which one of you n****** said something to my sister"; Bailey gave him a little shove and replied, "nobody said nothing"; and Stanciel asked R.J., "what the f*** are you doing?" Bailey then saw R.J.'s gun—apparently a revolver—which R.J. pointed at Stanciel. Stanciel ran, Bailey yelled to get the kids out of the park, and R.J. began shooting. Bailey did not see Paris or Brown that night. [*Id.* ¶ 25.]

Krystal Jenkins (ASA Longo and Mancuso, September 1) stated that Taneshia and Deshawn were talking. Stanciel was trying to get Deshawn to go home. Krystal

7

left the park on her bike; when she got back, she saw people running and saying R.J. had a gun. Krystal heard gunshots, but she did not see Paris that night. [*Id.* ¶ 26.]

Jasmine Jenkins (ASA Longo and Mancuso, September 1) heard Taneshia say on the phone, "they are all up here and some little boy is in my face." She saw R.J. arrive in a gold Malibu that she had seen him in earlier that day; she saw Brown driving. R.J. got out of the car and hopped the park gate. He had a black gun in his hand and was pointing it toward everyone Jasmine was with. Jasmine ran when she saw the gun and heard a lot of gunshots. She did not see anyone besides R.J. with a gun that night. She also did not see Paris, but about 15 minutes before R.J. arrived, she heard someone say, "Hey Paris." [*Id.* ¶ 28.]

Brittany Williamson (ASA Michael Hogan, September 1) stated that as she was preparing to leave, Brown was with R.J., and R.J. walked into the park. Williamson started to leave and saw Taneshia arguing with Stanciel. R.J. walked toward the back of the fieldhouse as she walked the opposite way, and she heard about three shots from the direction toward which R.J. was walking. [*Id.* ¶ 30.]

Kayla Kuykendoll (ASA Longo and Czablewski, September 2) stated that shortly after 10 p.m. she heard loud voices that sounded like an argument. About 20 minutes later, she heard people yelling to run and began running. Kuykendoll heard at least three gunshots and hid. She saw a gold Malibu speeding away and stated that Brown usually drives that Malibu. [*Id.* ¶ 32.]

Kema Davis (ASA Longo and Mancuso, September 2) saw Taneshia on the phone; about 10 minutes later, she saw a gold Malibu pull up. When she looked back

toward the car, she saw a man hopping the fence, but did not see his face. Kema saw that person reach for his waist and, thinking he was reaching for a gun, began running. She heard at least two gunshots. [*Id.* ¶ 34.]

Ebony Jenkins (ASA Longo and Burke) stated that Taneshia argued with Deshawn and then called someone saying, "I got into it with someone." About 15 minutes later, Ebony saw a gold Malibu arrive with Brown driving. R.J. got out of the car and headed directly to where Stanciel and Deshawn were. R.J. asked Taneshia, "who you talkin about," and Taneshia responded, "him right there," pointing to Deshawn. R.J. then drew a black gun, pointed it toward Stanciel and Deshawn, and opened fire. Ebony heard seven or eight gunshots as she ran away. She did not see Paris in the park. [*Id.* ¶ 35.]

Ashtin Warner (ASA Longo and Burke, September 1) stated that she and Taneshia were on benches when Taneshia began arguing with Deshawn. Taneshia made a phone call. Warner does not know whom Taneshia called, but 15 minutes later, R.J. arrived in a gold Malibu that Brown was driving. She saw R.J. get out of the passenger side, enter the park through an opening in the fence, and approach a group of mostly boys that included Stanciel and Deshawn. R.J. yelled, "who said something to my sister?" and pulled out a gun. Warner began walking away, but she looked back and saw R.J. "point the gun in the direction of [Stanciel], Deshawn, Paris, and everyone else standing near them." R.J. began firing, and Warner ran. She did not know Paris had been shot until the next day, and she did not see Brown get out of the Malibu. [*Id.* ¶ 37.]

9

Ocampo (ASA Hogan and Mancuso) stated that R.J. arrived in "the Malibu that they are always in," which was driven by Brown. R.J. came into the park with T.J., and people began to run. Ocampo turned and saw a gun in R.J.'s pocket, which he pulled out and asked Taneshia, "which one, Sis," while pointing the gun at "them." Taneshia pointed to Stanciel and "Kool." Ocampo saw Paris, who was with Ocampo, start to run, and R.J. said, "Which one is f***ing with my sister? I'll kill all of you n******." R.J. began shooting at the boys, including Paris, who were running away. R.J. fired about five shots, then ran back to the Malibu. Ocampo did not know Paris had been killed until the next day. [*Id.* ¶ 39.]

Shaquincia Williams (ASA Longo and Burke, September 2) stated that Taneshia and Deshawn argued, after which Taneshia spoke on the phone. About 15 to 20 minutes later, R.J. arrived in a gold Malibu. Brown (driver's seat), R.J. (front passenger seat), and T.J. (back seat) got out, and R.J. went straight toward Stanciel. R.J. asked Taneshia, "which one?" and waved a black-looking gun toward Stanciel and the people standing around him. R.J. then began shooting, and Shaquincia ran; when she turned around, she saw R.J. get back into the car and saw Brown "running toward the car too saying 'hey hey' like he wanted the car to wait for him." Brown had run in a different direction than R.J. The only person Shaquincia saw with a gun was R.J., and she heard at least five shots when he was shooting, plus one more from the direction of the Malibu as the car was pulling away. She did not see Paris. [*Id.* ¶ 41.]

Separately, McDonald interviewed Vanessa Bell on September 1, 2008, with no ASA present. [Dkt. 282 ¶ 29.] She told McDonald that "shots were coming toward

10

her from the area of the field house," but she "did not see who was shooting just flashes of light and a white tee shirt." [*Id.*]

### 3. Stanciel's Statement

The first part of the investigation Brown contends was improper was the police's interview of Stanciel. Police picked Stanciel up on August 31 (separate from his arrest and release in connection with the stabbing), handcuffed him, and brought him to the police station, where he was interviewed by Burke and other officers. [Dkt. 282 ¶ 28.] According to later testimony by Stanciel, he told the officers that R.J. and Brown were at the park, but he did not think R.J. killed Paris or Paris was shot at that time. [*Id.*] Stanciel asserts that police coerced him into implicating R.J. and Brown and signing a false statement. [*Id.*] According to Stanciel, police threatened to charge him with Paris's murder, to charge Ocampo—with whom he had one child and was expecting a second—with the stabbing, and to take his children away. [*Id.*]

### 4. McGee's Statement

Brown also argues that Defendants suppressed a statement by McGee that was exculpatory to him and R.J. It is undisputed that McGee was interviewed on August 31; according to later testimony by McGee, he told the officers who interviewed him that R.J. did not shoot Paris. [*Id.* ¶ 26.] The officers allegedly pressured him to say that R.J. shot Paris, but McGee refused. [*Id.*] Normal procedure would have been to prepare a general progress report ("GPR"), but no GPR appears in the record. [*Id.* ¶ 27.] Instead, a case supplemental report submitted in October 2008 states that McGee was interviewed and gave a similar account as Isaiah Davis, whom Burke interviewed. [*Id.*] But Isaiah had told Burke that he did not see Paris in the park that

night, whereas McGee testified that he told officers that R.J. did not shoot Paris and that Paris was alive after R.J. stopped shooting. [*Id.*; *see* Dkt. 271-17 at 16.]

### 5. Brown's Confession

Finally, Brown challenges the manner in which Defendants obtained his confession. He was arrested on September 3, 2008, and questioned intermittently for about 33 hours until just after midnight on September 5, 2008. [Dkt. 275 ¶ 43; Dkt. 282 ¶ 34.] Mancuso, McDonald, Turner, and Weber conducted the interrogation. [Dkt. 282 ¶ 34.] Brown's family retained a lawyer to represent him, but Brown contends that when the lawyer arrived at the police station at 6:00 p.m. on September 3, Defendants falsely told him that Brown did not want to see him, but they never told Brown his lawyer was present. [*Id.*] Brown says he repeatedly denied knowing that R.J. had a gun before arriving at the park or that R.J. planned to use violence. [*Id.* ¶ 37.] Eventually, Brown stated that he might have known about the gun and that R.J. made threatening statements during the drive. [Dkt. 275 ¶ 43; Dkt. 282 ¶ 37.][7]

### C. Criminal and Postconviction Proceedings

Brown was charged with first-degree murder on an accountability theory. [Dkt. 275 ¶ 44.] The grand jury returned an indictment on September 28, 2008, and after a bench trial, in 2011 Brown was convicted and sentenced to 35 years in prison, in large part based on his confession. [*Id.* ¶¶ 2, 44; Dkt. 282 ¶ 38.][8] R.J. was also tried and convicted of first-degree murder. [Dkt. 282 ¶ 40.]

---

[7]     Defendants dispute Brown's account, but they have not sought summary judgment on the merits of the coerced confession claim, so the Court does not delve into the disputes.

[8]     The grand jury and trial testimony is not material to the summary judgment motions.

In 2015, Brown filed a state postconviction petition challenging his conviction on several grounds. [Dkt. 275 ¶ 57; Dkt. 282 ¶ 39.] In support of his petition, Brown submitted an affidavit from Stanciel stating that the statement he gave "was false and coerced by officers Michael Mancuso, William Whalen, and Reno Baiocchi." [Dkt. 275 ¶ 59.] In a subsequent deposition, however, Stanciel testified that he did not know who interviewed him; he had copied those names from a police report, assuming that the authors of the report were the same detectives who interviewed him. [*Id.*] In 2018, Brown's conviction was vacated because he had been denied counsel during his interrogation, and the state declined to retry him. [*Id.* ¶ 2; Dkt. 282 ¶ 39.]

R.J. also sought state postconviction relief. [Dkt. 282 ¶ 40.] In support of his petition, he submitted an affidavit from McGee stating that he told the police that R.J. and Brown did not shoot Paris. [Dkt. 275 ¶ 63.] McGee later testified that he was interviewed by two detectives, one white and one Black, but he did not name either detective. [*Id.* ¶ 64.] R.J.'s murder conviction was vacated; he pleaded guilty to aggravated discharge of a firearm and was sentenced to time served. [Dkt. 282 ¶ 40.]

### D. Brown's Civil Case

On June 18, 2019, Brown filed this lawsuit against the City of Chicago, Cook County, and individual police officers and prosecutors under federal and state law. The scope of the lawsuit has narrowed over four and a half years of litigation. Brown's *Monell* claim against the City of Chicago has been bifurcated and is not at issue here. [Dkt. 88.] The other claims pending in the operative Second Amended Complaint [Dkt. 136] include federal claims under 42 U.S.C. § 1983 and state law claims against the individual Defendants and derivative state law claims against the City. Brown's

§ 1983 claims against the individual Defendants are for due process violations (Count I), coerced confession (Count II), failure to intervene (Count III), and conspiracy to violate constitutional rights (Count IV). Brown also brings Illinois law claims for malicious prosecution (Count VI) and civil conspiracy (Count VIII).[9] Against the City, Brown brings indemnification (Count IX) and *respondeat superior* (Count X) claims under Illinois law.

Before the Court are the City's and the individual Defendants' motions for partial summary judgment. [Dkt. 242, 243.] All individual Defendants move for summary judgment on Counts III, VI, and VIII, and Burke and Czablewski also move for summary judgment on the remaining counts. Brown does not contest the motion with respect to Czablewski. [Dkt. 276 at 2.] The City's motion asks the Court to grant summary judgment on the derivative claims to the same extent it does on the direct claims against the individual Defendants [Dkt. 242]; the Court will do so. As the Court explains below, both motions are granted in part and denied in part.

## II.   **Legal Standard**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245,

---

[9]     Brown voluntarily dismissed Count VII, his Illinois law claim for intentional infliction of emotional distress. [Dkt. 235.]

1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors*, 714 F.3d at 532 (citation omitted).

## III. Arguments by All Defendants

The Court begins with the arguments made by all Defendants, which target Brown's malicious prosecution and civil conspiracy claims under Illinois law and his § 1983 failure to intervene claim.[10] The Court holds that the malicious prosecution claim fails but that a jury must decide Brown's other claims.

### A. Malicious Prosecution

The Court begins with Count VI, Brown's claim for malicious prosecution under Illinois law. The elements of malicious prosecution are: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Moran v. Calumet City*, 54 F.4th 483, 499 (7th Cir. 2022) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (1996)). Defendants argue that they are entitled to summary judgment because there was probable cause for the first-degree murder charge brought against him. [Dkt. 246 at 5.] The Court agrees.

Probable cause at the time a criminal complaint is filed is an absolute defense to a malicious prosecution claim. *See Moran*, 54 F.4th at 499; *Gauger v. Hendle*, 954 N.E.2d 307, 329 (Ill. App. Ct. 2011). "Probable cause is defined as a state of facts that

---

[10] Burke makes additional arguments about these claims, which Court addresses below.

would lead a reasonably cautious person to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged." *Beaman v. Freesmeyer*, 183 N.E.3d 767, 789 (Ill. 2021) (citations omitted). Under Illinois law, like federal law, "[p]robable cause is an objective rule; an officer's subjective belief as to the existence of probable cause is not determinative." *People v. Lee*, 828 N.E.2d 237, 244 (Ill. 2005) (citation omitted); *accord Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023) ("The probable cause inquiry is purely objective, and the officer's subjective state of mind and beliefs are irrelevant." (cleaned up)).[11] Police cannot rely on fabricated evidence or evidence knowingly tricked out of a witness to support probable cause, *see Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011); *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012), but when some evidence is fabricated, there still may be probable cause if the untainted evidence is sufficient to support probable

---

[11] Illinois courts sometimes state that probable cause has both objective and subjective components. *See, e.g.*, *People v. Garcia*, 978 N.E.2d 366, 369 (Ill App. Ct. 2012) ("Probable cause is a flexible, commonsense standard, which has both a subjective and an objective component." (citations omitted)). In substance, however, this standard seems to track the purely objective federal standard. *Compare id.* ("Probable cause exists where the police have knowledge of facts that would lead a reasonable person to believe that a crime has occurred and that it has been committed by the defendant, and this belief must be objectively reasonable under the totality of the circumstances." (citations omitted)), *with Pierner-Lytge*, 60 F.4th at 1043 ("Probable cause exists when a reasonable officer with all the knowledge of the on-scene officers would have believed that the suspect committed an offense defined by state law." (cleaned up)). While some language in older cases suggests that an officer must subjectively believe the basis for probable cause, more recent Illinois caselaw appears to align with the federal standard. *Compare People v. Velleff*, 419 N.E.2d 89, 91 (Ill. App. Ct. 1981) ("[W]e have found no case in which probable cause has been found for a search on objective facts where the officer testifies that he, in fact, did not believe that at the time of the search that a crime had been committed."), *with People v. Long*, 861 N.E.2d 335, 340 (Ill. App. Ct. 2007) (citing Supreme Court cases in support of the objective standard). And even if there is daylight between the two standards, Brown has not made this argument, so he has waived it. *Cf. Webb v. Frawley*, 906 F.3d 569, 580–81 (7th Cir. 2018). The Court will therefore treat probable cause under Illinois law as identical to probable cause under federal law.

cause, *cf. United States v. Taylor*, 63 F.4th 637, 649–50 (7th Cir. 2023) (evidence obtained pursuant to search warrant is suppressed only if probable cause would have been absent but for intentional or reckless misrepresentation or omission of facts); *Bianchi v. McQueen*, 58 N.E.3d 680, 698–99 (Ill. App. Ct. 2016) (plaintiffs stated malicious prosecution claim where they alleged that an indictment "was based solely upon that fabricated evidence and false testimony" (citation omitted)).

A single eyewitness identification of a suspect is sufficient to create probable cause, even if the identification is questionable or police doubt its accuracy. *Moran*, 54 F.4th at 499–500; *Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019). [*See* Dkt. 246 at 6.] There is a genuine dispute as to whether Brown's confession and Stanciel's statement were coerced, so that evidence cannot contribute to probable cause at summary judgment. [*See* Dkt. 276 at 12.] However, other witnesses provided statements that Brown does not argue were tainted. [*Cf. id.* at 13–14; Dkt. 281 at 2–4.] The question, therefore, is whether those statements support probable cause. *See Blackmon v. City of Chicago*, 2023 WL 7160639, at *7–9 (N.D. Ill. Oct. 31, 2023) (analyzing whether probable cause existed independent from disputedly fabricated testimony), *appeal docketed*, No. 23-3288 (7th Cir. Nov. 30, 2023).

The Court agrees with Defendants that the statements written by ASAs and adopted by witnesses establish probable cause. [Dkt. 246 at 6.] It is undisputed that the statements contained the following account of the events of August 30, 2008:

- Taneshia argued with Deshawn. (Ebony, Krystal, Krystine, Tyrone, Shaquincia, Warner.)
- Taneshia spoke on the phone. (Ebony, Jasmine, Kema, Krystine, Shaniqua, Shaquincia, Warner.)

- Minutes later, a gold Malibu arrived. (Ebony, Kema, Jasmine, Krystine, Ocampo, Shaquincia, Warner.)
- Brown was driving the Malibu. (Ebony, Jasmine, Krystine, Shaniqua, Ocampo, Shaquincia, Warner.)
- Brown and R.J. got out of the car. (Krystine, Shaniqua, Shaquincia.)
- R.J. approached the group Taneshia was with. (Ebony, Jasmine, Krystine, Shaniqua, Shaquincia, Tyrone, Warner, Williamson.)
- R.J. pulled out a gun and fired several shots. (Ebony, Jasmine, Krystine, Ocampo, Shaniqua, Shaquincia, Tyrone, Warner.)
- R.J. ran back to the Malibu (Shaniqua, Shaquincia.)
- The Malibu drove away. (Krystine, Kuykendoll, Shaquincia.)
- Paris was in the park that evening. (Krystine, Ocampo, Warner.)
- Paris was in the group that was shot at. (Ocampo, Warner.)
- R.J. was the only person seen with a gun that night. (Jasmine, Krystine, Shaniqua, Shaquincia.)

[Dkt. 275 ¶¶ 22, 24, 26, 28, 30, 32, 34–35, 37, 39, 41.] To be sure, the witnesses' stories differ in some respects, but such inconsistencies do not defeat probable cause. *See Coleman*, 925 F.3d at 351; *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016). Although not everyone testified to every step in this sequence of events, no one denied that Taneshia was on the phone, Brown drove R.J. to the park in the gold Malibu, R.J. fired a gun several times, and R.J. left in the Malibu. And with one possible exception, no witness denied that Brown drove the Malibu away.[12] Further, three witnesses stated that Paris was in the park and two of them stated that he was in the group R.J. shot toward. These facts, especially given several witness accounts and

---

[12]      Shaquincia testified before the grand jury that the gold Malibu drove away without Brown then returned to pick him up, meaning that Brown was not the driver. [Dkt. 275 ¶ 42.] But Shaquincia's written statement, the relevant account for purposes of assessing probable cause, is not as definite, stating that R.J. got into the car and "she saw [Brown] running toward the car too saying 'hey hey' like he wanted the car to wait for him." [*Id.* ¶ 41.] It would be odd for Brown to flag down a car that he would be driving, and construed in favor of Brown at summary judgment, the Court finds that Shaquincia's statement indicates that he did not drive away from the park. But because probable cause can exist despite conflicting witness statements, *Coleman*, 925 F.3d at 351; *Cairel*, 821 F.3d at 835, this statement is insufficient to create a genuine dispute as to whether probable cause existed.

the tight timeline, "would lead a reasonably cautious person to believe, or to entertain an honest and strong suspicion," that R.J. came to the park and began shooting in response to Taneshia's phone call; that he shot and killed Paris; and that Brown, the driver, was involved in that plan. *See Beaman*, 183 N.E.3d at 789 (citations omitted).

The evidence that Paris was still alive when Brown, R.J., and T.J. left the park does not defeat probable cause. That evidence consists of McGee's statement that Paris was still alive when R.J. stopped shooting and fled, which the Court assumes for present purposes was suppressed by the police; the 911 call that Brown argues came in at 11:41 p.m.; the notes indicating one 911 call stated that "people" were shooting and a "group" had guns; and the fact that police did not find a body when they reported to the park on the night of August 30. Plus, Vanessa Bell's statement that shots were coming from the area of the fieldhouse could indicate someone returning fire toward R.J. But even taking these facts into account, probable cause would exist. *Cf. Taylor*, 63 F.4th at 649–50 (similar analysis when assessing the validity of a search warrant).

Witnesses saw R.J. shoot toward a group of individuals that included Paris, and Paris turned up dead in the same area. True, other evidence points to Paris being alive and shots being fired after R.J. fled, but no evidence conclusively inculpated or exculpated R.J. McGee could have been mistaken or lying about seeing Paris alive after the shooting, and the other evidence is inconclusive. The possibility that R.J. did not kill Paris might constitute reasonable doubt, but it does not thwart probable cause. *See Coleman*, 925 F.3d at 351 ("Where a reasonable person would have a sound

reason to believe the suspect committed a crime, the police may arrest and allow the criminal justice system to determine guilt or innocence." (citation omitted)); *Bridewell v. Eberle*, 730 F.3d 672, 676 (7th Cir. 2013) (in establishing probable cause, police need not "draw inferences in favor of the suspects"). Nor were Defendants obligated to continue to probe further into the evidence suggesting R.J. did not kill Paris. *See Beauchamp v. City of Noblesville*, 320 F.3d 733, 745–46 (7th Cir. 2003) ("Once an officer has established probable cause on every element of a crime, he need not continue investigating to test the suspect's claim of innocence." (citations omitted)); *Greenpoint Tactical Income Fund LLC v. Pettigrew*, 38 F.4th 555, 569 (7th Cir. 2022).

Brown argues that Defendants needed more evidence to have probable cause to believe he was culpable for Paris's murder on an accountability theory. [Dkt. 276 at 11–12.] He explains that "to convict a person as an aider or abettor of another's crime, the prosecution must establish 'either: (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design.'" [*Id.* at 12 (quoting *People v. Perez*, 725 N.E.2d 1258, 1264–65 (Ill. 2000)).] But mere presence at the scene of a crime does not render a defendant accountable. [*Id.* at 12–13 (citing *Perez*, 725 N.E.2d at 1265); *see also id.* at 13 (citing *People v. Taylor*, 712 N.E.2d 326, 329 (Ill. 1999); *People v. Dennis*, 692 N.E.2d 325, 334 (Ill. 1998); *People v. Fernandez*, 6 N.E.3d 145 (Ill. 2014)).] As Brown sees it, to have probable cause, "Defendants needed evidence that Plaintiff shared RJ Branch's presumed intent to kill Paris Jackson or that Plaintiff participated with RJ in a 'common criminal design.'" [Dkt. 276 at 14.] He argues that because the undisputed evidence "establishes merely that he was

20

present at the scene and that he fled" and "Defendants had zero evidence from eyewitnesses or any other source—and they point to nothing in the summary judgment record—that Plaintiff did anything to support, facilitate, or assist RJ in the shooting," Defendants lacked probable cause. [*Id.* at 13–14.]

Defendants respond that the cases Brown relies on addressed the government's burden of proof to sustain a conviction on an accomplice theory, but to be entitled to summary judgment Defendants need only show that they had probable cause, which does not require an evidentiary showing as to Brown's state of mind. [Dkt. 281 at 5.] Defendants are correct. Probable cause "is not a high bar and requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," *Doe v. Gray*, 75 F.4th 710, 718–19 (7th Cir. 2023) (cleaned up), and the required probability to support probable cause is "something more than a hunch" but less than the more-likely-than-not level, *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013) (citations omitted). As explained above, the facts known to Defendants at the time the criminal complaint was filed made it reasonable to believe that R.J. killed Paris and that Brown was involved, which establishes probable cause.

Brown's arguments to the contrary fail. He suggests that there was no evidence he "support[ed], facilitate[d], or assist[ed] RJ in the shooting" [Dkt. 276 at 13–14], but the timing of the events, combined with Brown's driving R.J. to and from the park, would give a reasonable officer reason to believe that Brown was complicit, even if there was insufficient evidence to prove that beyond a reasonable doubt or even by a preponderance of the evidence. *See Doe*, 75 F.4th at 718–19; *Abbott*, 705 F.3d at 714.

Next, Brown argues that because he was interrogated for over 30 hours, "[i]t would be a fair inference" that Defendants "knew full well that the eyewitness evidence in their possession was not enough to justify charging Plaintiff as an accomplice." [Dkt. 276 at 14.] That may be, but whether there is probable cause is an objective inquiry; an officer's subjective beliefs are irrelevant. *Pierner-Lytge*, 60 F.4th at 1043.[13]

Finally, Brown argues that cases Defendants cite—*Franklin v. Askew*, 2022 WL 17093358 (N.D. Ill. Nov. 21, 2022), and *People v. Richardson*, 270 N.E.2d 568 (Ill. App. Ct. 1971)—are distinguishable because the flight in those cases was more indicative of criminal culpability than Brown driving R.J. away from the park here. [Dkt. 276 at 14–15.] That is a fair point, but the conclusion that "the supposed evidence of 'flight' [in this case] is equally consistent with Plaintiff leaving a dangerous situation for his own safety (running away from a park where gunshots are flying is the reaction that an entirely innocent person would have) as with purposefully aiding RJ's departure from a crime scene" [*id.* at 15] does not help him. Probable cause does not require the guilty explanation to be more likely than the innocent explanation, *Abbott*, 705 F.3d at 714, so if the two explanations are equally likely, probable cause existed.

The undisputed evidence establishes that when the criminal complaint was filed, Defendants had probable cause to believe that Brown assisted in R.J.'s murder of Paris. Probable cause is an absolute defense to malicious prosecution. *Moran*, 54 F.4th at 499–500. Thus, Defendants are entitled to summary judgment on Count VI.

---

[13]    Without endorsing any tactics Defendants may have employed, the Court notes that police might continue an interrogation hoping to secure a confession even if there is probable cause, because the prosecution must eventually prove guilt beyond a reasonable doubt.

## B.     Civil Conspiracy

Defendants argue that they are entitled to summary judgment on Count VIII, Illinois law civil conspiracy, because a civil conspiracy claim must be predicated on tortious conduct under state law and because Brown has not produced evidence of an agreement by Defendants. [Dkt. 246 at 10–11.] Brown argues that a violation of federal law can constitute unlawful conduct underlying a civil conspiracy claim and that he has produced enough evidence to raise a genuine dispute about whether there was an agreement. [Dkt. 276 at 15–16.] The Court agrees with Brown.

### 1.     Scope of Civil Conspiracy

The Supreme Court of Illinois has defined civil conspiracy claims more broadly than Defendants suggest. As articulated by that court,

> [t]he necessary elements of civil conspiracy include: (1) an agreement between two or more persons; (2) to participate in an *unlawful act*, or a lawful act in an *unlawful manner*; (3) an injury caused by an unlawful overt act performed by one of the parties; and (4) the overt act was done pursuant to and in furtherance of the common scheme.

*Vance v. Chandler*, 597 N.E.2d 233, 236 (Ill. 1992) (emphases added and citation omitted). Linguistically, "unlawful" is broader than "tortious," encompassing criminal as well as civil liability. *See Unlawful*, Black's Law Dictionary (11th ed. 2019) ("1. Not authorized by law; illegal. 2. Criminally punishable. 3. Involving moral turpitude." (examples omitted)). *Vance* confirms that Illinois employs a capacious definition of "unlawful." 597 N.E.2d at 236 ("[W]e find the plaintiff's allegations which describe the conspirators' actions in soliciting, hiring and paying an individual to murder the plaintiff are acts which clearly qualify as *unlawful* acts."); *see also Davis v. Times Mirror Mags., Inc.*, 697 N.E.2d 380, 388 (Ill. 1998) (suggesting breach of contract can

form the basis for a civil conspiracy claim); *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994) ("To state a cause of action for conspiracy, a plaintiff must allege not only that one of the conspirators committed an overt act in furtherance of the conspiracy, but also that such act was tortious *or unlawful* in character." (emphasis added and citations omitted)). The Court interprets this caselaw to indicate that the cause of action underlying a civil conspiracy claim need not derive from state law.

Defendants' counterarguments are unpersuasive. They cite one intermediate Illinois appellate court case, but that opinion states only that "[c]onspiracy is not an independent tort. Where, as here, plaintiff fails to state an independent cause of action underlying his conspiracy allegations, the claim for conspiracy also fails." *Thomas v. Fuerst*, 803 N.E.2d 619, 625–26 (Ill. App. Ct. 2004) (citing *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662 (Ill. App. Ct. 2000), for the same proposition). Even there, the court distinguishes between a "tort" and a "cause of action," suggesting that the latter is a broader category than the former.

The nonbinding federal cases Defendants cite are no more helpful. [Dkt. 246 at 10–11; Dkt 281 at 6–7.] *McGreevy v. Stroup*, 413 F.3d 359, 370–71 (3d Cir. 2005), applied Pennsylvania law, which might be helpful if the Court needed to look outside of Illinois caselaw to determine the scope of civil conspiracy, but here the Court looks to authoritative in-state precedent. And the other cases do not cite Illinois authority that could call the Court's above analysis into question, and the opinions' discussion of Illinois law appears to have been limited to the facts at issue in those cases. *See Bisharat v. Village of Niles*, 2014 WL 2514510, at *10 (N.D. Ill. June 4, 2014) (while

discussing state law claims, observing that because "there are no remaining viable state tort claims against the Village of Niles defendants," they are "entitled to summary judgment on" the civil conspiracy claim); *Jones v. City of Chicago*, 2011 WL 1898243, at *6 (N.D. Ill. May 18, 2011) (plaintiff's civil conspiracy claim was predicated on her malicious prosecution claim); *Sassak v. City of Park Ridge*, 431 F. Supp. 2d 810, 821–22 (N.D. Ill. 2006) (parties agreed that a civil conspiracy claim could only be founded on a state law claim). Here, there is no such agreement between the parties, and while the Complaint mentions the state law claims in connection with civil conspiracy [Dkt. 281], it does not limit the scope to those state law claims [Dkt. 136 ¶ 111 (alleging acts "including but not limited to" the state law claims)].

Federal courts must be cautious when a decision might expand the scope of state law, *see Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635–36 (7th Cir. 2007), but given how the Supreme Court of Illinois has described civil conspiracy, the Court concludes that the unlawful conduct underlying a civil conspiracy can arise under federal law, including a § 1983 violation.

### 2. Proof of Agreement

Defendants also argue that they are entitled to summary judgment because Brown lacks sufficient evidence that there was an agreement to participate in an unlawful act. [Dkt. 246 at 11; Dkt. 281 at 7–8.][14] They point out that Brown attempts to prove his conspiracy claim by circumstantial evidence, so the evidence must be

---

[14] Brown argues that Defendants forfeited this argument by failing to develop it in their opening brief [Dkt. 276 at 16], but the Court agrees with Defendants that because they were pointing to an absence of evidence, they did not need to preemptively rebut arguments Brown could make about the record evidence [*see* Dkt. 281 at 7].

clear and convincing, but Brown's evidence merely amounts to "highlighting alleged mistakes or oversights during a police investigation." [Dkt. 281 at 8.] *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999).

Perhaps a jury will agree with that characterization, but at summary judgment the Court must view the record in Brown's favor, and the cases Defendants rely on are inapposite. [Dkt. 281 at 8.] In those cases, the record did not permit an inference that the defendants did more than work together on an investigation, which is not enough to prove civil conspiracy. In both *Bisharat*, 2014 WL 2514510, and *Beaman v. Souk*, 7 F. Supp. 805 (C.D. Ill. 2014), motions for summary judgment were granted in their entirety, and *Coghlan v. Beck*, 984 N.E.2d 132 (Ill. App. Ct. 2013), affirmed the grant of a motion to dismiss. Here, however, Defendants (other than Burke) have not moved for summary judgment as to the coerced confession or due process claims, so they have implicitly conceded that a jury could find that each Defendant besides Burke violated Brown's constitutional rights. At this stage, the Court cannot say as a matter of law that a jury could not find by clear and convincing evidence that there was also an agreement to pursue that course of conduct. *See Adcock*, 645 N.E.2d at 894 ("[T]he gist of a conspiracy claim is not the agreement itself, but the tortious acts performed in furtherance of the agreement." (citations omitted)); *cf. McClure*, 720 N.E.2d at 258 (erecting guardrails to prevent defendants who "[a]ccidental[ly], inadvertent[ly], or negligent[ly] participat[ed] in a common scheme" from being liable for civil conspiracy, as opposed to direct tortfeasors (citation omitted)).

### C.     Failure to Intervene

In Count III, Brown alleges that Defendants violated § 1983 by failing to intervene to prevent constitutional violations by other officers. Defendants argue that they are entitled to summary judgment on this count because failure to intervene claims are not actionable under § 1983. [Dkt. 246 at 11–12.] Defendants rely on Judge Easterbrook's concurrence in *Mwangangi v. Nielsen*, which argues that the Seventh Circuit's recognition of failure to intervene claims is inconsistent with Supreme Court caselaw. 48 F.4th 816, 834–35 (7th Cir. 2022) (Easterbrook, J., concurring). Defendants note that "it is well-established that § 1983 only supports individual liability claims arising from direct personal involvement and cannot be vicarious or based on a theory of respondeat superior" [Dkt. 246 at 11 (citing *Ashcroft v. Iqbal*, 566 U.S. 676–77 (2009))], and like Judge Easterbrook, they argue that failure to intervene is a form of vicarious liability [*id.* at 11–12]. Brown responds that binding Seventh Circuit precedent holds that failure to intervene claims are cognizable and that the concurrence does not change matters. [Dkt. 276 at 16–17.]

Brown is correct. The Seventh Circuit has permitted § 1983 failure to intervene claims for decades. [*Id.* at 17 (citing cases dating back to 1994).] Defendants argue that "none of these cases have actually addressed the legal validity of a failure-to-intervene theory," whereas "Judge Easterbrook's concurring opinion … substantively analyzes why a failure-to-intervene claim fails as a matter of law." [Dkt. 281 at 8–9.] But even if the Seventh Circuit failed to sufficiently analyze or wrongly decided this issue, this Court must follow its precedent unless and until the Supreme Court or the Seventh Circuit holds otherwise. *See Haynes v. United States*, 873 F.3d 954, 955 (7th

27

Cir. 2017) ("The Supreme Court has under advisement a case … that may reveal whether [Seventh Circuit cases] correctly applied [a Supreme Court case], but the district judge properly treated [our] decisions as controlling unless the Justices say otherwise."). The Seventh Circuit has not revisited this issue even after *Mwangangi*, *see Patrick v. City of Chicago*, 81 F.4th 730, 737–38 (7th Cir. 2023), and Judge Easterbrook joined the *Mwangangi* majority applying that precedent. Defendants are free to ask the Seventh Circuit to overrule its failure to intervene caselaw on appeal, but they are not entitled to summary judgment on these claims.

*      *      *

In sum, all Defendants are entitled to summary judgment on the malicious prosecution claim, but not on the civil conspiracy and failure to intervene claims.

## IV. Burke's Arguments

The Court now considers the additional arguments Burke makes in support of summary judgment as to himself alone. Burke argues that he is entitled to summary judgment on all of Brown's claims. [Dkt. 246 at 12.][15] In response, Brown withdraws his coerced confession claim (Count II) against Burke [Dkt. 276 at 10 n.3][16] but argues that summary judgment is improper his § 1983 claims based on due process violations (Count I), failure to intervene (Count III), and conspiracy to deprive constitutional

---

[15] The Court has already held that Burke is entitled to summary judgment on Brown's malicious prosecution claim, and his arguments about regarding Illinois civil conspiracy rest on the assumption that only a state law claim can underly a civil conspiracy claim, which the Court rejected. [Dkt. 246 at 18–19.] The Court does not address these claims here.

[16] Brown does not argue that Burke could be liable under Counts III, IV, or VIII using the coerced confession as the underlying violation [*see* Dkt. 276 at 17–25], so the Court will enter summary judgment on those Counts to the extent they rely on the coerced confession.

rights (Count IV). Whether Brown's derivative § 1983 claims survive depends in part on whether there is a genuine dispute as to the underlying due process claim, which has two components: fabrication of evidence and suppression of evidence. The Court holds that Brown's fabrication claim can go to a jury, but Burke is entitled to summary judgment on the suppression claim. Likewise, Counts III and IV survive to the extent that they are based on Brown's underlying fabrication, but not suppression, claim.

### A. Due Process Fabrication

Brown's first due process theory is that Defendants coerced Stanciel into fabricating statements inculpating Brown in Paris's murder. [*See* Dkt. 276 at 18.] To succeed on this claim, Brown must prove that Burke "manufactured false evidence against him, which was later used to deprive him of his liberty in some way. The fabricated evidence must be material, which means there is a reasonable likelihood the evidence affected the judgment of the jury." *Moran*, 54 F.4th at 498 (cleaned up). No Defendant argues that there is a dispute as to whether Stanciel's statement was fabricated; instead, Burke contends that a jury could not find that he was involved in coercing the fabricated statement. [Dkt. 246 at 14.] The Court disagrees.

Burke admits that he participated in Stanciel's interrogation, completed a GPR after the interrogation, and was present for Stanciel's discussion with ASA Longo. [Dkt. 275 ¶ 21.] There is evidence that Stanciel was coerced into giving a false statement. [Dkt. 282 ¶ 28.] While Stanciel submitted an affidavit identifying "Officers Michael Mancuso, William Whalen, and Reno Baiocchi," but not Burke, as the officers who coerced him [Dkt. 246 at 14], Stanciel explained that he copied the names from

a police report and did not actually know the officers' identities [Dkt. 275 ¶ 59]; *cf. Seshadri*, 130 F.3d at 804 ("[A] party might be able to explain away his prior inconsistent statements."). Viewing this evidence in the light most favorable to Brown, a jury could infer that Burke was one of the detectives who coerced Stanciel.

Burke argues that despite this evidence, "Stanciel's inability to identify Burke dooms Plaintiff's claim." [Dkt. 246 at 14.] Burke relies on *Moore v. City of Chicago*, which granted summary judgment on a pretrial detainee's denial of medical care claim. 2007 WL 3037121, at *8–9 (N.D. Ill. Oct. 15, 2007). Based on the evidence, "an inference could be made that [the defendant] was present and on-duty when [the] plaintiff was requesting medical care," but the plaintiff did not testify that the defendant was present when she requested care, and there was no evidence that another officer told the defendant. *Id.* Applying a deliberate indifference standard,[17] the court reasoned that there was no genuine dispute as to whether the defendant was responsible for the plaintiff's medical care. *Id.* at *9.

*Moore* is distinguishable. There, the factual issue was narrow: to be liable, the defendant either needed to be present when the plaintiff experienced the medical event or to have been told about the plaintiff's medical needs. Here, though, the question is whether Burke participated in coercing Stanciel's false statement. At summary judgment, the Court must assume that Stanciel's statement was coerced,

---

[17]     When *Moore* was decided, the Seventh Circuit analyzed claims by pretrial detainees under the deliberate indifference standard that applies to claims by convicted prisoners, but subsequent cases clarified that objective reasonableness under the Fourth or Fourteenth Amendment is the proper test. *See Miranda v. County of Lake*, 900 F.3d 335, 350–54 (7th Cir. 2018); *Jump v. Village of Shorewood*, 42 F.4th 782, 792–93 (7th Cir. 2022).

and the record establishes that Burke interrogated Stanciel, wrote a GPR, and was present when ASA Longo took his statement. Given these facts, for Burke *not* to know about the coercion, Stanciel would have had to speak consistently with his ultimate fabricated statement when Burke was in the room and the coercion would have had to take place while Burke was not in the room. Construing the record in Brown's favor, a jury could reach the opposite conclusion and infer that Burke participated in or knew about the coercion.

Burke makes another argument in his reply brief, that Brown's claim based on Stanciel's statement fails because it was not introduced during or mentioned at Brown's trial. [Dkt. 246 at 12–13.] *See Moran*, 54 F.4th at 498. Burke is correct that Brown did not develop this argument. [*See* Dkt. 276 at 24 (asserting without citation or argument that "Stanciel's incriminating statement … was relied on by prosecutors at the grand jury and at trial").] But there is good reason Brown gave this issue such short shrift: Burke did not raise it in his opening brief, and "arguments raised for the first time in a reply brief are waived." *Wonsey v. City of Chicago*, 940 F.3d 394, 398–99 (7th Cir. 2019) (citations omitted); *see Days Corp. v. Lippert Components, Inc.*, 558 F. Supp. 3d 682, 685 (N.D. Ind. 2021).[18] The Court will not consider this argument at summary judgment, but if Brown fails to carry his burden of production on this claim at trial, judgment as a matter of law may be appropriate.

Thus, there is a genuine dispute that precludes summary judgment on this part of Brown's due process claim. Because a jury could find that Burke was present

---

[18]     Defendants' opening brief did not point out a lack of evidence that Stanciel's statement impacted the trial, in contrast to their argument about civil conspiracy. *See supra* note 14.

while Stanciel's statement was coerced, it could also find that he failed to intervene to stop other officers from coercing the false statement or that Burke conspired with other officers to deprive Brown of his constitutional rights. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (failure to intervene); *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (conspiracy). The Court denies Burke's motion for summary judgment on Counts I, III, and IV to the extent these claims seek to hold Burke directly or derivatively liable for fabricating Stanciel's statement.

### B.    Due Process Suppression

Burke also argues that he is entitled to summary judgment on the suppression component of Brown's due process claim. [Dkt. 246 at 14–15.] To hold Burke liable for suppression of evidence, Brown must establish "that (1) the nondisclosed evidence is favorable to him; (2) the evidence was concealed by [Burke]; and (3) the concealed evidence resulted in prejudice." *Moran*, 54 F.4th at 492 (cleaned up). Defendants admit that no GPR was prepared after McGee was interviewed on August 31, 2008, and they do not dispute for purposes of summary judgment that McGee told police that Paris was alive when R.J. stopped shooting. [*See* Dkt. 246 14–15; Dkt. 282 ¶¶ 26–27.] Instead, Burke argues that no reasonable jury could find that he participated in concealing McGee's statement because there is no evidence that he interviewed McGee. [Dkt. 246 at 14–15; Dkt. 281 at 13–14.] The Court agrees.

The alleged concealment was failing to record in a GPR McGee's statement exonerating R.J. (and Brown) of Paris's murder and subsequently stating that McGee gave a similar account to Isaiah, who stated that he did not see Paris. [Dkt. 276 at 22; Dkt. 282 ¶¶ 26–27.] To have personally taken part in the concealment, Burke

would have had to be present either for the August 31 interview of McGee—during which he exculpated R.J. in statements that were not recorded—or have falsely stated that McGee gave a similar account as Isaiah had in the case supplementary report. The record supports neither inference.

Although there is evidence that Burke discovered that McGee was a potential witness, interviewed Isaiah, and interviewed several other witnesses on August 31, these facts do not support a reasonable inference that Burke interviewed McGee. McGee stated that he was interviewed by one white detective and one Black detective, but he did not identify the white detective, who could have been Burke, Mancuso, or McDonald. [Dkt. 276 at 22–23.] Without evidence to suggest that Burke, rather than one of the others, interviewed McGee,[19] a jury would have to speculate that Burke conducted the interview, and a plaintiff cannot rely on mere speculation to defeat summary judgment. *Moran*, 54 F.4th at 491; *see Balle v. Kennedy*, 73 F.4th 545, 556 (7th Cir. 2023) (evidence that a defendant might have been somewhere at the relevant time was insufficient to support an inference that he must have been there).

Nor does the possibility that Burke was told about the concealment by another officer create a factual dispute that precludes summary judgment. Brown argues that the evidence supports a finding "that Defendant Burke was coordinating closely with Defendants Mancuso and McDonald [on August 31] interviewing witnesses." [Dkt. 276 at 23.] The Court agrees, but it isn't enough that the detectives were coordinating

---

[19]     For example, if detectives customarily interviewed possible witnesses they identified, it might be reasonable to infer that Burke was the interviewer, but Brown has not pointed to evidence of this kind in the record.

interviews. To be liable for suppressing McGee's statement, Burke must have known that the detectives would conceal the statement or at least that McGee exculpated R.J. from the killing, and a jury could only speculate as to whether other police told Burke about this aspect of McGee's interview.

Next, Brown argues that because Burke interviewed Isaiah on August 31 and the only documentation about McGee's statement is the supplemental report stating that it was consistent with Isaiah's account, a jury could infer that Burke conducted both interviews. [*Id.*] The Court disagrees. The supplemental report was submitted in October [Dkt. 271-17], and because the detectives shared information, there was ample opportunity for others to learn about the content of Isaiah's interview [*see* Dkt. 282 ¶ 51 ("Defendant Burke spoke with the lead detectives, Michael Mancuso and Kevin McDonald, throughout the investigation, including by briefing them on his activities and being briefed on parts of the investigation in which he did not personally participate.")]. Burke contributed to the supplemental report, but nothing indicates he provided the description of McGee's interview. Mancuso is listed as the reporting officer, and although some portions of the report are attributed to other officers, McGee's statement is not. [Dkt. 271-17 at 2, 16; *compare, e.g.*, *id.* at 20 ("These handwritten statements were witnessed by Det.s Burke and Haniacek respectively.").] The only way a jury could find that Burke falsified the description of McGee's statement in the supplemental report would be to speculate, which is insufficient to defeat summary judgment. *See Moran*, 54 F.4th at 491.

The lack of evidence that Burke conducted McGee's interview or concealed his statement afterward is equally fatal to Burke's § 1983 failure to intervene and conspiracy claims based on suppression of evidence. Without evidence that Burke was present for the interview or learned about the concealment afterward, a jury could not find that he had an opportunity to intervene or that he agreed to violate Burke's constitutional rights in this way. *Gill*, 850 F.3d at 342; *Daugherty*, 906 F.3d at 612. Therefore, the Court will grant Burke's motion for summary judgment on Counts I, III, and IV to the extent that those claims turn on the suppression of evidence.

## V.     The City's Motion for Summary Judgment

Finally, the Court turns to the City's motion for summary judgment on Brown's indemnification and *respondeat superior* claims. These are derivative liability claims that rise or fall with Brown's claims against the individual Defendants. [Dkt. 242 at 2; Dkt. 276 at 25.] *Moran*, 54 F.4th at 500. Therefore, the City's motion for summary judgment will be granted and denied to the same extent that the Court has granted or denied the individual Defendants' motion for summary judgment.

## VI.     Conclusion

For the foregoing reasons, the motions for summary judgment [Dkt. 242, 243] are granted in part and denied in part. The individual Defendants' motion is granted as to all claims against Czablewski and Count VI against all individual Defendants. The Court grants summary judgment in Burke's favor on the suppression component of Count I, on Count II in its entirety, and on Counts III and IV to the extent they are predicated on violations of those portions of Count I or Count II. The City's motion is granted to the extent that Brown seeks to hold it derivatively liable on these claims.

35

The individual Defendants' motion is denied as to Count I against Burke insofar as it is based on the fabrication of Stanciel's inculpatory statement. The motion for summary judgment is denied on Counts III, IV, and VIII to the extent that those counts seek to hold Defendants liable based on underlying claims that survive summary judgment. The City's motion is denied to the extent that Brown seeks to hold it derivatively liable on these claims.

As indicated above, not all claims were at issue in the summary judgment motions. Setting aside the bifurcated *Monell* claim, these claims remain[20]:

| Count | Pending Against |
|---|---|
| I: § 1983 due process fabrication | Burke, Mancuso, McDonald, Turner, Weber |
| I: § 1983 due process suppression | Mancuso, McDonald, Turner, Weber |
| II: § 1983 coerced confession | Mancuso, Turner, Weber, McDonald |
| III: § 1983 failure to intervene | Burke, Mancuso, McDonald, Turner, Weber |
| IV: § 1983 conspiracy | Burke, Mancuso, McDonald, Turner, Weber |
| VIII: Illinois civil conspiracy | Burke, Mancuso, McDonald, Turner, Weber |
| IX: indemnification | City of Chicago |
| X: *respondeat superior* | City of Chicago |

At the February 6, 2024 hearing [*see* Dkt. 290], the Court will set a trial date on these claims.

Enter: 19-cv-4082
Date:  December 29, 2023

_____

Lindsay C. Jenkins
United States District Judge

---

[20]      The underlying violation for Counts III, IV, and VIII against Burke is limited to the fabrication component of Count I.

36