IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARCEL BROWN,<br><br>        Plaintiff,<br><br>  v.<br><br>CITY OF CHICAGO, et al.,<br><br>        Defendants. | No. 19-cv-4082<br><br>The Honorable Lindsay C. Jenkins<br>Magistrate Judge Heather K. McShain |

**PLAINTIFF'S MOTION TO BAR OPINION TESTIMONY OF WILLIAM MARSH**

Plaintiff Marcel Brown ("Plaintiff") moves pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) to bar the proposed expert testimony of William Marsh, a retired sergeant of the Los Angeles Sheriff's Department ("LASD"), whom Defendants have retained to offer expert opinions on police practices with respect to the conduct of interrogations. Mr. Marsh's proposed testimony ranges far beyond his experience, training, and education. He does not rely on any national or generally-accepted standards regarding police interrogation. Mr. Marsh's opinions are nothing more than his personal endorsement of Defendants' conduct based on his own practice working at one particular law enforcement agency. His views about Defendants' interrogation would add nothing to the jury's understanding of the propriety of that interrogation. Mr. Marsh should be barred from testifying.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence ("Rule") 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product

of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires the Court to ensure that expert evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The reliability requirement serves to distinguish a well-grounded expert opinion, which is admissible, from "subjective belief," which is not. *Id.* at 590. The purpose of this gatekeeping is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). "'[N]othing . . . requires a district court to admit opinion evidence'" that rests solely on "'the *ipse dixit* of the expert.'" *Id.* at 157 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

The Court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. Courts consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Rule 702 permits expert opinion only if the testimony is "based on sufficient facts or data" *and* "the product of reliable principles and methods," which the expert has "reliably applied." *Higgins v. Koh Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) (quoting Fed. R. Evid. 702). "Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014). In addition to being reliable, expert testimony must "assist the trier of fact to understand the evidence or determine a fact at issue." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Court often "utilize[] a three-part analysis when applying the *Daubert* framework. The Court determines (1) 'whether the witness is qualified'; (2) 'whether the expert's methodology is scientifically reliable'; and (3) 'whether the testimony will assist the trier of fact to understand the

evidence or to determine a fact in issue.'" *Andersen v. City of Chicago*, 454 F. Supp. 3d 808, 812 (N.D. Ill. 2020) (quoting *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). "The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence." *Id.*

## BACKGROUND AND CONTEXT

Plaintiff claims that Defendants violated his Fifth Amendment rights by coercing him over 34.5 hours of incommunicado interrogation to falsely implicate himself as an accessory to the August 2008 murder of Paris Jackson in Amundsen Park. Plaintiff designated Matthew Jones, a retired detective who specializes in studying, analyzing, and teaching interview and interrogation techniques, as an expert witness. Mr. Jones examined (1) whether the interrogation went beyond generally-accepted police practices with respect to its length, (2) whether other features of the interrogation went well beyond generally accepted police practices, and (3) whether the interrogation methods used by the Defendant detectives cast doubt on the reliability of the statements that Plaintiff made toward the end of the interrogation and which were used to procure his conviction at trial. Jones Report, at 1–2, 35–39 (**Exhibit A**).

Mr. Jones's opinions were based on a detailed review of the video and transcript of the interrogation, assessed against generally accepted police practices. This analysis was based not only on Mr. Jones's lengthy experience as a police investigator, but also his systematic study of police interview and interrogation techniques, his collaborations with social science researchers who study false confessions, his own work developing science-based training curriculums for investigators, and his extensive experience training investigators on sound, generally-accepted interview techniques, which is now his principal occupation. Jones Rep. at 1–2, 35–39.

In his report, Mr. Jones analyzed situational factors (such as the length and location of the interrogation, and Plaintiff's complete isolation from family or an attorney) and dispositional

3

factors (including Plaintiff's age, inexperience with the criminal justice system, belief in his own innocence, and suggestibility) that characterized the interrogation. Mr. Jones also examined the specific questioning tactics used by the Defendant detectives, including the use of a tremendous number of leading questions, theming tactics, and various social influence tactics. *Id.* at 4–34. Mr. Jones concluded that the Defendants "conducted an interrogation that was well outside acceptable police practices at the time the incident occurred in order to elicit an unreliable confession that was used to obtain [Plaintiff's] conviction." *Id.* at 34. ). In a supplemental report, he provided additional analysis showing how the changes in Plaintiff's statements during the interrogation correspond to "contamination" introduced by Defendants' questioning and pressure to align his statements with what Defendants were suggesting. Supp. Jones Report (**Exhibit B**).

Defendants retained Mr. Marsh as a rebuttal witness. The opinions he proffers in his report consist entirely of responses to the opinions provided by Plaintiff's expert Mr. Jones. *See* Marsh Report (**Exhibit C**).[1] Specifically, Mr. Marsh opines that the 34.5 hours that Plaintiff was continuously locked in the interrogation room—including more than 5 hours of active interrogation—were consistent with generally accepted police practices. *Id.* at 3-7. He opines that every other aspect of Plaintiff's interrogation—including the denial of access to a lawyer, denial of a phone call to his mother, and the prolonged use of numerous high-pressure, confrontational, and suggestive questioning tactics—were likewise acceptable. *Id.* at 7-9. These opinions, however, do not reflect an assessment of the interrogation against any generally-accepted police practices or national standard governing interrogations. They are pure *ipse dixit*. Indeed, Mr. Marsh is unqualified to render opinions on generally accepted interrogation practices, and his opinions are not the product

---

[1] In the penultimate paragraph of his report, Mr. Marsh purports to provide an opinion endorsing the conduct of the the *entire* investigation, not just the interrogation. Marsh Rep. 14. That conclusion is plainly improper and inadmissible; nothing else in the report even purports to examine the overall investigation.

4

of any reliable methodology. They are merely one retired detective vouching for the propriety of the what the Defendant detectives did here. Mr. Marsh should not be permitted to testify.

## ARGUMENT

**I.    MR. MARSH IS NOT QUALIFIED TO PROVIDE EXPERT OPINIONS ABOUT GENERALLY ACCEPTED PRACTICES WITH RESPECT TO THE CONDUCT OF POLICE INTERROGATIONS.**

Mr. Marsh is not qualified by education, training, or experience to opine about generally or nationally accepted practices with respect to the conduct of interrogations. With respect to his education and training, Mr. Marsh has testified that the only formal training or education he received on police interrogation was (1) as part of "homicide school" when training to become a detective at the LASD in 1997, and (2) during a weeklong course in "behavioral analysis"—*i.e.* the idea that deception can be reliably discerned in an interview subject's body language—in 1999. Marsh Tr. at 61:23-62:06 (**Exhibit D**). However, Mr. Marsh testified that his LASD homicide school training does *not* inform his opinions in this case, *id.* at 59:25-60:8, and he concedes that he does not rely on behavioral analysis "at all," *id.* at 63:13-64:11. Mr. Marsh thus cannot be qualified based on his training or education because he concedes that none of it is relevant to his opinions here.

Mr. Marsh's experience likewise does not qualify him to opine about generally or nationally accepted police practices. Mr. Marsh spent his entire career as a law enforcement investigator working at one department, LASD. While Mr. Marsh states that he has conducted interviews of thousands of individuals in his career, Marsh Rep. at 1, there is no indication that his experience educated him on national standards or generally-accepted interrogation methods, beyond the vague claim that he had sometimes collaborated with out-of-state agencies. Marsh Tr. at 96:5-97:20. This is crucially important because, when it comes to police practice experts, "[e]vidence of purely localized police procedure," such as the practices of the LASD, "is less

5

likely to be helpful than nationally or widely used policy." *United States v. Brown*, 871 F.3d 532, 538 (7th Cir. 2017). This is because "[t]he jury's task is to determine how a reasonable officer would act in the circumstances, not how an officer in a particular local police department would act." *Id.*

Mr. Marsh also cannot be qualified as an expert by virtue of having trained others on police interrogation. In his report, Mr. Marsh claims to have trained and consulted with "scores of homicide investigators, instructors, and lecturers who have expertise in this subject matter." Marsh Rep. at 1. But at his deposition he testified that in the course of his decades-long career he has in fact conducted only three trainings concerned with how to conduct an interview/interrogation; that these were all internal presentations to LASD's Homicide Bureau; that each one lasted only 1-2 hours; and that he did not develop (or even necessarily agree with) the LASD handouts about interrogation methods that accompanied those trainings. Marsh Tr. at 90:16-93:20. While Mr. Marsh has engaged in other forms of consulting—for instance, providing tactical and firearms training to security services in the United Arab Emirates, and assisting another former-LASD official named Michael Bumcrot in his consulting practice—none of those involved any work focused on interrogation methods. *Id.* at 69:21-74:19.

In light of this lack of education, training, or experience, it is perhaps unsurprising that Mr. Marsh has never before been qualified as an expert regarding the conduct of police interrogations. *Id.* at 76:06-78:21. In his disclosures, Mr. Marsh did identify one prior case in which he served as an expert, *People v. Salas*, No. KA 063662 (L.A. Cty. Sup. Ct. 2021). Marsh Rep. at 29; Marsh Tr. at 78:09-11. Under questioning, however, Mr. Marsh explained that *Salas* was a criminal prosecution in which he was the primary investigator and was testifying as a witness for the State as to the results of the entire investigation. Marsh Tr. at 77:8-16, 78:24-79:03. He was not retained as an independent expert, but instead was qualified as an "expert" to be able to offer opinions about why certain witnesses/victims were reluctant to speak truthfully

6

to police about the underlying crime despite multiple interviews over a course of years.² *Id.* at 79:6-82:9. That expert testimony has nothing to do with what Mr. Marsh is opining about in this case—*i.e.* identifying generally accepted police methods when interrogating a suspect in custody and assessing a particular interrogation against such standards. Mr. Marsh is not qualified to provide such opinions and thus his testimony should be excluded.

II. **MR. MARSH'S OPINIONS ARE NOT BASED ON ANY SOUND METHODOLOGY BECAUSE THEY DO NOT RELY ON GENERALLY-ACCEPTED POLICE INERROGATION STANDARDS AND THEY DO NOT PROPERLY COMPARE DEFENDANTS' INTERROGATION AGAINST ANY SUCH STANDARDS.**

To be admissible, an expert's opinions must be based on a sound methodology that is reliably applied to the facts of the case, rather than reflecting the expert's mere say-so. *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). Mr. Marsh has no sound methodology and his opinions are connected to the facts only by his own *ipse dixit*. He has generated his opinions favoring the Defendants by ignoring even the most basic guidance and legal rules regarding proper police interrogation methods, by disregarding inconvenient facts, and by speculating baselessly about the Defendant detectives' motives. While the testimony of a police practices expert may be admissible where the expert "analyzes the actions of the involved officers and compares those actions with various standards of training and practice," *Andersen*, 454 F. Supp. 3d at 814, Mr. Marsh does not do that here; rather, he simply compares the actions of the Defendants with his own personal opinions about proper police interrogations. Nor does Mr. Marsh "explain how he reaches his conclusions—either by linking them to generally accepted standards in the field or by citing information within his own practical experience." *Id.*

As a threshold matter, Mr. Marsh fails to identify any sources for his assertions about generally accepted police interrogation practices. Mr. Marsh's report does not cite a single manual,

---

² A transcript of that decision or testimony was never provided in response to Plaintiff's subpoena.

7

guideline, training program, or other set of standards governing police interrogation, except for five handouts from LASD's homicide school and a single PowerPoint presentation that accompanied a 2012 in-service training by an LASD lieutenant. Marsh Rep. at 19. These documents do not reflect nationally accepted standards; they reflect LASD's idiosyncratic practices. Moreover, Mr. Marsh, on examination, conceded that he does not even endorse the contents of LASD's handouts and relied on them merely as documents to "comment on" when conducting the three short internal training sessions that he ran on the topic. Marsh Tr. at 91:10-93:20.

Mr. Marsh's report does make passing reference to the "Reid Technique" for police interrogation, *see* Marsh Rep. at 7–8, which, according to Plaintiff's expert "was one of the more widely taught interrogation curriculums in the U.S." Jones Rep. at 5. But Mr. Marsh fails to cite the actual methods and standards embodied in this technique and does not even refer to Reid's widely-available manuals. At his deposition, he conceded that he is "no expert" on Reid and was unable even to articulate the core steps of police interrogations that Reid sets forth. Marsh Tr. at 160:12-13, 161:10-20. He is also unfamiliar with any studies investigating whether the Reid technique (or other confrontational approaches) have been associated with false confessions. *Id.* at 162:10-18 In short, Mr. Marsh's opinions do not actually rely on the Reid technique or any other national standards or guidelines. Instead, Mr. Marsh repeatedly testified to the effect that he had developed his own personal interview style and techniques. *Id.* at 93:7-20, 160:6-161:9. Yet he fails to offer any basis to conclude that his own personal opinions regarding proper interrogation methods conform with generally accepted practices. Mr. Marsh's opinions simply do not rest upon any nationally- or generally-accepted guidelines for police interrogation and so must be excluded.

### A. Mr. Marsh should not be permitted to testify about whether the length of Defendants' interrogation was contrary to accepted police practices.

Mr. Marsh's specific opinions purporting to rebut Plaintiff's expert Mr. Jones are likewise unsupported and inadmissible. Mr. Jones's first opinion is that the 34.5 hours that Plaintiff was held

8

within the interrogation room—and more than five hours of active interrogation during that time—were far outside the range of any generally accepted police practices. Jones Rep. at 11. In support of that conclusion, Mr. Jones analyzed not just the extraordinary length of Plaintiff's confinement and interrogation, but also Plaintiff's isolation (he was not allowed to speak to his mother, his lawyer, or anyone other than his interrogators), the stark environment of the interrogation room (a cold, small room with only a 4' x 10" bench and no toilet, sink, or mattress), his inability to get proper sleep, and lack of proper food.

Mr. Marsh opines that the length of the interrogation and all of these attendant features fell within generally accepted police practices, but his opinion lacks any foundation. At the outset, Mr. Marsh's endorsement of Defendants' extraordinarily long interrogation is based on the patently untenable view that it is generally acceptable practice for a police interrogation to last anywhere up to 48 hours. Marsh Tr. at 105:8-24 ("Question: [S]o to be clear, your opinion is that, so long as interrogators complete their interrogation within a 48-hour period, you would not criticize the interrogation as being too long? Marsh: That's correct."). This view appears to be premised on a fundamental confusion between the permissible length of time a person can be detained without charges (48 hours, in both Illinois and Mr. Marsh's home state of California), and the generally acceptable duration of an incommunicado *interrogation*. Mr. Marsh offered absolutely no support for conflating these ideas and there is none. In fact, his blanket endorsement of 48-hour long custodial interrogations contravenes decades of case law finding that such lengthy interrogations violate baseline protections against involuntary confessions. *See, e.g.*, *Darwin v. Connecticut*, 391 U.S. 346 (1968) (per curiam) (finding confession involuntary when procured through incommunicado interrogation lasting 30 to 48 hours); *Clewis v. Texas*, 386 U.S. 707 (1967) (holding unconstitutional an interrogation that took place intermittently over 38 hours of custody). An interrogation practice cannot be generally accepted when it is unconstitutional. Mr. Marsh's opinion to the contrary

9

demonstrates as clearly as anything that his opinions are utterly baseless and unreliable.

Mr. Marsh's opinion regarding the appropriate length of interrogations is also contradicted by his own experience conducting "thousands" of interrogations. Mr. Marsh testified that in all his decades with LASD, the longest he had ever kept a person continuously locked incommunicado in an interrogation room was 25 hours. Marsh Tr. at 175:7-20. He offers no explanation for how, then, it is generally acceptable to interrogate people for 48 hours—nearly twice as long—nor does he attempt to explain how the circumstances of Plaintiff's interrogation were so extraordinary as to justify holding Plaintiff in isolation for nearly 10 hours longer than the very lengthiest interrogation of his career. Indeed, Mr. Marsh's actual experience only underscores how radically Plaintiff's interrogation exceeded the boundaries of acceptable police conduct.

Mr. Marsh's opinion also fails to engage with the actual evidence of generally-accepted standards that Mr. Jones offered. In his report, Mr. Jones explained that police interrogation manuals and expert opinion indicate that an interrogation should not generally last more than four hours Jones Rep. at 5 (citing authorities). Mr. Marsh's opinion fails to even mention this guideline.

In addition, Mr. Marsh's opinion endorsing Plaintiff's prolonged interrogation is based on a false and manipulated version of the circumstances of that interrogation. For example, Mr. Marsh dismisses the fact that Plaintiff was held for 34.5 hours in incommunicado detention in a small interrogation room with access to nobody but his interrogators, instead seeking to focus solely on the amount of time he was actively interrogated over those 34.5 hours. Marsh Rep. at 5. He also claims that the length of interrogation is justified, in part, because Plaintiff "freely cooperated with CPD detectives," when in fact Plaintiff was locked in a room by the very detectives who held the keys to his freedom and repeatedly demanded that he answer questions while refusing to allow him to talk with anyone else. *Id.* at 4. He seeks to rebut the notion that Plaintiff was improperly isolated by remarking that Plaintiff had regular contact with the various interrogators during the 34.5 hour

10

period. *Id.* at 5. But, of course, it is precisely the fact that Plaintiff was *only* permitted to speak with his interrogators—and prevented from speaking with anyone else—that constituted his isolation.

Mr. Marsh likewise improperly dismisses the effects of sleep deprivation by claiming that Plaintiff appeared to spend a total of 9 hours sleeping, but he fails to contend with the fact that this sleep was frequently interrupted by Defendants and took place almost entirely in a brightly lit interrogation room with nothing but a hard, small bench. Marsh Rep. at 6. Mr. Marsh's opinion that Plaintiff did not display outward signs of sleep deprivation likewise cannot be admitted. There is no basis to credit Mr. Marsh's pronouncements about the absence of sleep deprivation nor to credit his opinion that the degree of sleep deprivation Plaintiff felt would not "impact his ability to participate in questioning." *Id.* Mr. Marsh simply has no expertise, training, or other basis to make such opinions. The same is true of Mr. Marsh's opinion that Plaintiff was provided enough to eat: Mr. Marsh emphasizes that Plaintiff was given water, a sandwich, and breakfast meal from McDonalds, but fails to measure this against the extraordinary length of the interrogation or any other observations—including how little Plaintiff actually ate. In any case, there is no basis to credit Mr. Marsh's opinion that Plaintiff "ability to participate in questioning" was not "impacted" by hunger. *Id.*

Finally, Mr. Marsh engages in pure speculation to attempt to justify Defendants' refusal to permit Plaintiff to call his mother at any time during the 34.5 hour interrogation, despite Plaintiff making nine separate requests to do so. Mr. Marsh invents from whole cloth the notion that the Detectives were somehow seeking to "protect the integrity of the investigation" by preventing him from using a phone call with his mother to somehow alert confederates. At his deposition, Marsh admitted he had no idea who those confederates might be or how Plaintiff's phone call could otherwise have actually hindered the investigation. Marsh Tr. at 143:2-148:17. Yet Mr. Marsh persisted in vouching for the "reasonableness" of Defendants' actions—even though he could not

11

recall a single instance in his own career where he had denied a person a phone call for nearly so long. *Id.* at 153:24-154:15. The Court cannot permit Mr. Marsh to engage in speculation about Defendants' motives in order to supply an innocent justification for their decision to hold Plaintiff incommunicado until the interrogation was over. *See Davis v. Duran*, 277 F.R.D. 362 (N.D. Ill. 2011) (the proposed police practices expert "could not, in any circumstances, testify to the motivation of the investigators"); *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ("[T]he whole point of *Daubert* is that experts can't "speculate." They need analytically sound bases for their opinions. . . . .[The proposed expert] could not testify as an expert that [a party] had a particular motive."). In addition, Mr. Marsh opines that the Defendants acted "appropriately" and within Illinois law by allowing a phone call within a "reasonable time"—*i.e.* not until *after* they completed the interrogation, extracted the key incriminating statement they sought, and obtained approval for charges. This opinion is improper because Mr. Marsh is not permitted to testify as to the legality of Defendants' conduct—*i.e.* its "reasonableness" under Illinois law—because that is a matter for the court and jury to determine, not him. *See Anderson*, 454 F. Supp. 3d at 819-20; *Brown v. City of Chicago*, No. 18-cv-7064, 2023 WL 2561728, at *5 (N.D. Ill. Mar. 17, 2023); *see also infra* 14 (discussing Mr. Marsh's opinion about Plaintiff being deprived the ability to speak with an attorney)

Ultimately, Mr. Marsh's opinion on the length of the interrogation is nothing more than his personal endorsement of the Detectives' conduct, based on a patently confused understanding of proper standards and a concerted effort to elide, sanitize, or invent facts to justify Plaintiff's 34.5-hour ordeal. The opinion is inadmissible.

> **B.    Mr. Marsh should not be permitted to testify about whether other aspects of Defendants' interrogation of Plaintiff were contrary to accepted police practices or affected the reliability of his statements under interrogation.**

Mr. Marsh purports to rebut Plaintiff's expert Mr. Jones's second and third opinions: *i.e.* that other factors of Marcel's interrogation put it outside generally accepted police practices and that the

12

circumstances of the interrogation call into doubt the reliability of Marcel's statements. But these opinions also lack any sound methodology or reliable basis.

First, Mr. Marsh opines that the use of a "direct confrontation" style of interrogation was a generally accepted police practice in 2008, but he fails to engage with Mr. Jones's actual opinion, which is that the particular situational and dispositional risk factors present in this case—in combination with the repeated, prolonged use of various coercive interrogation techniques— exceeded accepted standards and were known by 2008 to create a risk of false confession. Jones Rep. at 11-31. Mr. Marsh's report claims that "Mr. Jones puts undue weight" on these factors and "does not provide adequate explanation or any real support for [the] position" that they cast doubt on the reliability of Plaintiff's statements. But under questioning, Mr. Marsh actually agreed that each of the situational and dispositional risk factors identified by Mr. Jones would increase the likelihood of a coerced confession. Marsh Tr. at 86:18-88:22.[3]

Second, Mr. Marsh asserts that none of the situational and dispositional factors described by Mr. Jones were in fact present. But these opinions too are without basis. For instance, Mr. Marsh's report claims that Plaintiff's age at the time of the interrogation is irrelevant because Plaintiff was, legally, an adult, having recently turned 18. Marsh Rep. at 10. But at his deposition, Mr. Marsh conceded that merely becoming a legal adult does not eliminate youth as a risk factor. Marsh Tr. at 165:20-166:4. He also conceded that he lacked expertise to opine about the relationship between age and susceptibility to coercion. *Id.* at 166:5-167:21.

To take another example, Marsh dismisses the notion that Plaintiff's inexperience with the criminal justice system was a risk factor, citing only the fact that Plaintiff had previously interacted with Detective Weber and ASA Spizzirri. Marsh Rep. at 11. At his deposition, however, Mr. Marsh

---

[3] Mr. Marsh's report contends that the non-coercive "cognitive interview" method described by Mr. Jones "was largely developed after 2008." Marsh Rep. at 8. But at his deposition, he conceded that he had no basis to dispute that such techniques were in fact put into use beginning in 1984. Marsh Tr. at 163:1-8, 178:12-24.

13

was confronted with the fact that in these prior interactions with police, Plaintiff had been the *victim* of a crime (shots fired into his home) that he was voluntarily reporting—not a *suspect* in a crime targeted for interrogation by law enforcement. Under questioning, Mr. Marsh reluctantly conceded that these "can be" different experiences and that it would not surprise him if Plaintiff experienced those two circumstances in different ways. Marsh Tr. at 167:25-169:18.

Mr. Marsh goes so far as to opine that the Defendants acted reasonably in denying Plaintiff the ability to speak with an attorney during the interrogation—"even if the investigator had some knowledge that an attorney may be present" at the detective area. Marsh Rep. at 9. This opinion is inconsistent with Illinois law, which forbids police from interfering with a suspect's ability to receive the assistance of an immediately-available attorney. *People v. McCauley*, 163 Ill.2d 414 (1994). By the time of his deposition, Mr. Marsh had familiarized himself with Illinois law and acknowledged that Plaintiff possessed this right, but, remarkably, he still refused to admit that Defendants had any responsibility to honor that right. Marsh Tr. at 157:22-158:13 ("Q. Do you think that the detectives had the responsibility to honor that right that he possessed? A. I believe in this case they acted properly. Q. I didn't ask you whether they acted properly or not. I asked you a simple question. Did the detectives have the responsibility in this case to honor that right of Mr. Brown's? A. I can't say."). Mr. Marsh cannot be permitted to testify that practices made illegal in Illinois are "reasonable." Mr. Marsh also attempts to justify the Defendants' conduct by claiming the Defendants did not necessarily know that an attorney had been turned away, but he does so by engaging in pure speculation about how it could have happened that none of the investigators interrogating Plaintiff were ever informed that an attorney was physically present at the station and asking to see him. *See* Marsh Tr. at 135:20-140:17. This opinion is nothing more than unsupported conjecture on a hotly contested factual dispute, and it therefore must not be admitted. *See Cooper v. City of Chicago Heights*, No. 09-cv-3452, 2011 WL 2116394, at *7 (N.D. Ill. May 27, 2011) ("An expert

14

witness cannot simply speculate because speculation is not based on a reliable methodology.").

Finally, Mr. Marsh takes issue with Mr. Jones's extensively-documented opinion that Defendants used a tremendous volume of leading questions to both contaminate the interview (by suggesting to Plaintiff specific admissions they sought) and to pressure him into providing those admissions. Mr. Marsh opines that Defendants acted within accepted practices, but he again fails to support his *ipse dixit* opinion. Thus, while Mr. Marsh contends that the use of leading questions is commonplace, he fails to engage with the *volume* of such questions and the *manner* in which they were used here. Marsh Rep. at 11-12. He also fails to contend with the fact that the Defendants' leading questions improperly suggested admissions they were seeking to obtain. Elsewhere in his report, Mr. Marsh acknowledges that "[i]n employing [the confrontational interview] method, an investigator must have evidence to support an assertion that a subject was involved in a crime," *id.* at 8, but yet he fails to apply that principle to Defendants' leading and suggestive questioning.

Mr. Marsh also attempts to justify the use of leading questions by reference to his own use of the tactic, but the sole example he provides is completely irrelevant. He describes using a leading question to deliberately tip off a suspect that police had discovered certain information, in hopes that the suspect would communicate that fact to still-unknown confederates on a wiretapped line. Marsh Rep. at 6-7. But this kind of strategic ploy has nothing to do with what Mr. Jones observed in Defendants' interrogation—*i.e.* a concerted effort to suggest "acceptable" admissions and obtain them from Plaintiff. Similarly, Mr. Marsh contends that the Defendants' occasional statements to Plaintiff that they wanted "the truth" served to inoculate all of the coercive tactics they used. He provides no support for this opinion. He also fails to contend with the fact that Defendants' persistent demands for "the truth" could itself serve as a pressure tactic, communicating to Plaintiff that he needed to say something different to satisfy his interrogators. *See Hurt v. Wise*, 880 F.3d 831, 847-48 (7th Cir. 2018). As with all of his opinions, these are unfounded and will not assist the jury.

15

## CONCLUSION

Defendants' purported expert in police interrogation methods lacks the qualifications to be an expert in police interrogation practices, and his opinions are not based on any reliable methodology, standards, or assessment of the facts. His testimony should be excluded.

Respectfully submitted,

**MARCEL BROWN**

By: /s/ Jonathan Manes
One of his attorneys

Vanessa del Valle
Jonathan Manes
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Ave.
Chicago, IL 60611
312 503 1336

Locke E. Bowman
LOEVY + LOEVY
311 N. Aberdeen St.
Third Floor
Chicago, IL 60607
773 710 0158

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on May 7, 2024, he served the foregoing motion upon all counsel who have filed appearances in these actions via the Court's CM/ECF which automatically sent copies to all such counsel.

/s/ Jonathan Manes

Case: 1:19-cv-04082 Document #: 310 Filed: 05/07/24 Page 17 of 17 PageID #:13504