**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARCEL BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19-cv-4082 |
| v. | ) | |
| | ) | The Hon. Lindsay C. Jenkins |
| CITY OF CHICAGO, *et al.* | ) | |
| | ) | Magistrate Judge Heather K. McShain |
| Defendants. | ) | |


**PLAINTIFF MARCEL BROWN'S RESPONSES TO
DEFENDANTS' MOTIONS *IN LIMINE***

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO BAR TESTIMONY OR EVIDENCE RELATING TO STEPHEN "WHAM" CARY**

In furtherance of their plan to coerce Plaintiff to implicate himself as an accessory to RJ Branch's supposed murder of Paris Jackson, Defendants refused to allow attorney Wham Cary into the interrogation room where Plaintiff was being questioned. Mr. Cary had been retained by Debra Scott, Plaintiff's mother, for the express purpose of counseling Plaintiff regarding his constitutional rights in connection with Defendants' interrogation. Mr. Cary appeared at the detective headquarters where Plaintiff was confined at around 6:30 p.m. on September 3, 2008, some three hours into Defendants' 34-hour marathon interrogation. He asked the detective seated at a desk at the second-floor entrance to the headquarters to allow him to speak with Plaintiff. That person left his station, returned several minutes later, and told Mr. Cary that Plaintiff did not wish to speak with an attorney. ECF No. 271-39, Tr. of Sept. 30, 2021 Cary Dep. at 71:12–72:04. To the contrary, Plaintiff had not been informed of Mr. Cary's presence on his behalf. *See, e.g.*, ECF No. 332-8, Tr. of Sept. 8, 2021 Brown Dep. at 567:2-568-22. Plaintiff will testify at trial that he would have welcomed the opportunity to speak with counsel if he had only known Mr. Cary was present.

These facts were enough to persuade the presiding judge in Plaintiff's underlying criminal proceedings to vacate Plaintiff's conviction because the police had violated Plaintiff's rights under the Illinois Constitution as interpreted by the Illinois Supreme Court in *People v. McCauley,* 163 Ill. 2d 414 (1994). Nonetheless, Defendants ask the Court to exclude any mention of Mr. Cary or his attempts to speak with Plaintiff. They rely on the fact that, in contrast to Illinois law, the federal constitution does not require police officers to allow access to an attorney seeking to speak with a person the police are interrogating. *See Moran v. Burbine*, 475 U.S. 412 (1986).

1

Defendants' argument that the evidence of Mr. Cary's exclusion is legally irrelevant fails for two reasons. *First,* Defendants overlook that Fifth Amendment violations are assessed with reference to the totality of the circumstances; *all* the factors leading to a confession are relevant and part of the analysis, even though each one of Defendant's individual actions might not violate the constitution, standing alone. *Second,* the Constitution, as one court put it, does not prohibit mistakes. *Costa v. Ramaiah*, 689 F. Supp. 3d 553, 591 (N.D. Ill. 2023). Defendants may be found liable if their actions during the interrogation were intentional and for the purposes of isolating Plaintiff and overcoming his will. The exclusion of Mr. Cary is evidence of Defendants' intent and knowledge and admissible for that separate reason.

Defendants are also wrong about the state of the record with respect to their personal involvement in the exclusion of Mr. Cary. There is a triable question, notwithstanding their self-serving denials, whether one or more of the Defendants was directly responsible for keeping Mr. Cary away from Plaintiff.

And, finally, Defendants will not be unduly prejudiced by the admission of this evidence. The events involving Mr. Cary will not unduly lengthen or complicate the trial and the jury will not be confused by Mr. Cary's testimony.

### The Denial of Access to Mr. Cary Is Relevant to Whether, Considering the Totality of the Circumstances, Defendants Violated Plaintiff's Fifth Amendment Rights by Coercing his Confession

It is axiomatic that assessing whether a person was coerced into a confession in violation of the Fifth Amendment requires consideration of the totality of the circumstances that led to the confession. The totality-of-the-circumstances inquiry does not "turn[] on the presence or absence of a single controlling criterion," it requires a "careful scrutiny of all surrounding circumstances." *Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973); *see also Kerr v. City of*

*Chicago*, 424 F.2d 1134, 1138 (7th Cir. 1970) ("All of the acts of commission and omission—the totality of the circumstances—are of great importance in determining whether plaintiff's confession was coerced ... ."). Defendants assume that, because denying Mr. Cary access to Plaintiff did not *by itself* violate the Fifth Amendment of the United States Constitution, the denial of access is therefore irrelevant. They are mistaken.

For example, it is established that the Fifth Amendment does not forbid police from lying to a suspect about the strength of the evidence against him. *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992). But it does not follow that police lies are therefore wholly irrelevant to the assessment of whether the suspect's confession was involuntary, and the Fifth Amendment was violated. *E.g.*, *United States v. Stewart*, 2006 WL 83128, at *7 (E.D. Wis. Jan. 11, 2006) ("Deceit or misrepresentation by the police is relevant in assessing the voluntariness of a confession, it does not, however, render a confession involuntary in and of itself."); *Johnson v. Pollard*, 559 F.3d 746, 754 (7th Cir. 2009) ("An interrogating officer's misrepresentations are neither dispositive of nor irrelevant to the question of whether a defendant's statement was voluntary."); *United States v. Rodgers*, 186 F. Supp. 2d 971, 977 (E.D. Wis. 2002) ("[A]ny form of police trickery in the interrogation room merits close judicial scrutiny [and] lies about evidence can sometimes lead to unreliable confessions."). It is equally clear that violations of state law in the interrogation room may, in combination with other factors, produce an involuntary confession. *See United States v. Guzman*, 879 F. Supp. 2d 312, 323 (E.D.N.Y. 2012) (concluding that the violation of state juvenile delinquency statute counts as a "factor[] that the Court is to consider when evaluating the totality of the circumstances surrounding a juvenile's statements to law enforcement"); *see also United States v. Doe*, 226 F.3d 672, 679 (6th Cir. 2000) (determining that the violation of a state juvenile

delinquency statute "is properly considered to be a material circumstance" in determining the voluntariness of the inculpatory statements).

By the same token, even though the exclusion of Mr. Cary from Plaintiff's interrogation room does not by itself violate the Fifth Amendment, that exclusion remains relevant because it is part of the totality of the circumstances that led to Plaintiff's confession. The jury must be permitted to weigh the evidence of Mr. Cary's exclusion when it makes its assessment of that totality. Indeed, the above cases holding that evidence of police deceit is relevant in assessing the totality of the circumstances of an interrogation furnish direct support for the admissibility of Mr. Cary's exclusion. The failure to tell Plaintiff that he had counsel available to him was unquestionably a form of deceit. Like other forms of deceit, Defendants' concealment of Mr. Cary's presence may not be actionable standing alone, but it is still undeniably relevant and admissible in the assessment of the conditions that led Plaintiff to confess. *Cf., e.g.*, *Holland*, 963 F.3d at 1050 (access to counsel is a factor considered in the totality of the circumstances).

### The Denial of Access to Mr. Cary Is Relevant To Show Defendants' Knowledge and Intent To Isolate Plaintiff and Overbear His Will

Separately, the evidence of Mr. Cary's exclusion is relevant and admissible because it bears on Defendants' state of mind and will serve to refute their anticipated testimony that their lengthy interrogation of Plaintiff was just designed to learn the "truth."

Defendants knew that Illinois law required them to admit Mr. Cary when he arrived at the police station. *E.g.*, ECF No. 271-29, Tr. of 7/21/21 Mancuso Dep. at 419:15-420:9. Thus, the fact that they concealed Mr. Cary's presence from Plaintiff and lied to Mr. Cary is relevant to show that Defendants were actively seeking to isolate Plaintiff without regard to the protections that Illinois law afforded him. The jury should be permitted to weigh this evidence as it considers

whether the other actions Defendants took in the course of the interrogation—threatening Plaintiff with years of confinement if he did not admit knowledge of RJ Branch's supposed plan to use a gun in Amundsen Park; refusing to accept Plaintiff's denials of such knowledge; feeding Plaintiff information to parrot back in his confession; and so forth—were undertaken, not in a good faith effort to get at "the truth" (as Defendants will contend at trial), but were part of a plan to coerce Plaintiff's confession by whatever means were necessary.

Unquestionably, Defendants' intent and purpose to isolate Plaintiff is a relevant factor in the assessment the jury must make as to whether to accept their insistence that Defendants were engaged in a good faith investigation. It has long been recognized in the Seventh Circuit that "to establish a Fifth Amendment violation," a plaintiff must show that the defendant "acted with the knowledge that harm might ensue to the plaintiff," and "that such conduct was unreasonable or culpable." *Beard v. Mitchell*, 604 F.2d 485, 495 (7th Cir. 1979); *see also United States v. Harty*, 476 F. Supp. 2d 17, 27 (D. Mass. 2007) (noting that "an officer's subjective intent is relevant to the issue of whether she knew that her conduct was reasonably likely to provoke an incriminating response"); *Dearstyne v. Mazzuca*, 48 F. Supp. 3d 222, 245 (N.D.N.Y. 2011).

To rebut Defendants' claims that they were acting in good faith, Plaintiff must be permitted to show the jury that they deliberately violated the requirements of Illinois law and lied to Mr. Cary as part of a plan to hold Plaintiff in isolation for as long as necessary to secure his confession.

### Contrary to their Protestations, There Is Evidence That Defendants Knew of Mr. Cary's Presence at Area Five

Defendants will insist at trial that they never spoke with Mr. Cary regarding his representation of Plaintiff and were never informed that Mr. Cary was present seeking to speak with Plaintiff. Defendants point to their self-serving testimony to this effect. But that is an

incomplete account of the record and the jury must have the opportunity to assess whether Defendants' denials are worthy of belief.

*McCauley,* which imposed an unequivocal requirement to allow Mr. Cary access to Plaintiff, had been the law of Illinois for 14 years at the time of Plaintiff's interrogation. The Chicago Police had established procedures for ensuring compliance with *McCauley.* The front desk officer on duty at the time Mr. Cary arrived testified unequivocally that (though he does not recall anything about the events of September 3, 2008) he would have photocopied the credentials of an attorney seeking to speak with a person in custody and would have permitted the attorney to walk upstairs to the second floor. Ex. 1, Tr. of 10/25/22 Halpern Dep. at 74:13-75:13. Likewise, the detective stationed at the second-floor desk at the time of Mr. Cary's arrival, would have been informed by the front desk officer of the attorney's purpose, and was in turn required to inform the detective responsible for questioning the suspect that the suspect had an attorney seeking to meet with them—a point that will be established by the testimony of the desk detective on duty when Mr. Cary arrived. *See* Ex. 2, Tr. of 9/16/22 McHugh Dep. at 156:24-157:6; 169:14-170:13.

Michael Mancuso, Plaintiff's lead interrogator and the principal living Defendant, does not dispute these procedures. In his deposition, Mancuso admitted that if he had been in the station when Mr. Cary arrived seeking to speak with Plaintiff, he would have been advised. If he had not been in the station at that moment, another detective involved in the investigation "needed to know" that a lawyer was there seeking to speak with his suspect. ECF No. 271-29, Tr. of 7/21/21 Mancuso Dep. at 417:2-21. Mancuso understood that not giving Mr. Cary access to Plaintiff would constitute a violation of Plaintiff's rights and he would therefore expect to be notified. Mancuso acknowledged that he could and would be notified by page or by cell phone

even if he were not in the station at the time Mr. Cary arrived and requested to speak with Plaintiff. 421:6-422:2.

Mancuso claims that Mr. Cary is lying when Cary says that he requested to speak with Plaintiff at Area Five. He can testify to that effect at trial, and the jury will decide whom to believe. But Mr. Cary should not be barred from the witness stand on the false premise that there is "no evidence" Defendants were informed of his request to speak with Plaintiff.

### Mr. Cary's Testimony Will Not Cause Undue Prejudice

Finally, Defendants' theory that Mr. Cary should be barred because his testimony would unduly prejudice them should be swiftly rejected. There is no doubt that Mr. Cary's appearance at the trial will prejudice Defendants. Mr. Cary exposes them as engaged in a focused effort to keep Plaintiff isolated from all outside influence during an unconscionable, 34-hour interrogation—and willing to break the rules to gain a confession. That is no basis to exclude the evidence. The prejudice Defendants will suffer from this evidence is not "undue."

Defendants claim that the trial will be delayed and complicated if this evidence is presented, but they greatly overstate the time that will be involved to present the scenario involving Mr. Cary. The desk personnel can likely be presented by stipulation. Most of the witnesses who will testify about Mr. Cary's actions (some Defendants and Plaintiff's family) will already be testifying for other purposes. Mr. Cary himself will hardly be a lengthy witness. This will not become a mini-trial as Defendants incorrectly predict.

Nor will the account of Mr. Cary's exclusion confuse the jury. They can be instructed that the violation of *McCauley* is not a federal constitutional violation but is one factor to consider in weighing the circumstances leading to Plaintiff's confession, as the Fifth Amendment jury instruction will ask them to do. Jurors are presumed to be fully capable of following their

instructions. *See, e.g.*, *United States v. Olano*, 507 U.S. 725, 740 (1993); *United States v. Clarke*, 227 F.3d 874, 883 (7th Cir. 2000).

For all these reasons, the Court should deny Defendants' Motion *in Limine* No. 1 and should permit Mr. Cary to testify.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 2 TO BAR REFERENCE TO OTHER LAWSUITS, COMPLAINT REGISTER ("CR") FILES, OR OTHER DISCIPLINARY HISTORY EVENTS**

Plaintiff concedes that this case should be tried based on the events at issue, and not based on allegations of misconduct on other occasions. That principle would effectively bar other misconduct accusations against the Defendant officers, unless and until they open the door, in which case Plaintiff would raise the issue with the Court outside the jury's presence.

However, this principle should apply both ways. Just as the police officers should not have to face prior complaints of wrongdoing on other dates, Plaintiff and non-party witnesses should likewise not be confronted with allegations that they were arrested or accused of unrelated misconduct either. In particular, Plaintiff's arrests as a teenager for minor infractions (shooting at birds with a BB gun, for example) should be barred as should Plaintiff's vague and ambiguous references to "ain't committing no more crime" and the like in recorded prison phone calls. *See* Plaintiff's Motion *in Limine* No. 3, ECF No. 335, at 15-18.

Mutual exclusion of irrelevant negative information will keep the trial focused on the issues at hand, will save time, and will promote fairness to both sides.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 3 TO BAR TESTIMONY OR EVIDENCE RELATING TO VIOLATIONS OF THE CHICAGO POLICE DEPARTMENT'S INTERNAL RULES, REGULATIONS, ORDERS, POLICIES, AND PROCEDURES**

Defendants' motion to bar any evidence or testimony regarding deviations from the Chicago Police Department's internal rules, regulations, orders, policies, and procedures should be denied, for it runs headlong into ample contrary authority.

There is evidence and testimony in this case regarding a number of CPD policies and procedures concerning key factual issues—as well as Defendants' violations of those policies and procedures—including, *inter alia*, CPD policies and procedures governing: responding to 911 calls of shots fired; handling of OEMC records; canvassing crime scenes; maintaining records in investigative files; front desk officer responsibilities; dealing with attorneys who arrive at the Area to represent someone in custody; communicating information with lead detectives; documenting witness statements; allowing suspects a phone call; and allowing suspects access to attorneys.

Contrary to Defendants' contention, evidence of policy violations is not *per se* barred; in fact, it is relevant and admissible for several purposes. To be sure, a violation of policy or procedure may not by itself make out a constitutional violation, *see Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006), but such evidence is relevant to the reasonableness of Defendants' actions and state of mind. *See United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) (explaining that "[s]ince *Thompson*, however, we have clarified that there is no per se rule against the admission of police policies or training," and noting that it is admissible "where an officer's intent is at issue"); *United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017) ("Despite its strong language, *Thompson* should not be understood as establishing a rule that evidence of police policy or procedure will *never* be relevant to the objective-reasonableness

10

inquiry."); *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009) ("[A]lthough violation of the prison's rule against public searches was not, by itself, a violation of the constitution, it was relevant evidence on which the jury could have relied to conclude that the searches were done with an intent to harass." (citation omitted)); *Martinez v. City of Chicago*, No. 14-CV-369, 2016 WL 3538823, at *6 (N.D. Ill. June 29, 2016) ("there is no categorical bar preventing parties from introducing such evidence" of violations of departmental regulations and police practices"); *see also Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) ("Expert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights").

Several of Plaintiff's claims turn on whether Defendants acted intentionally, and Defendants' departures from CPD policies and procedures are relevant and probative of that. *See Ezell v. City of Chicago*, 2023 WL 5287919, at *20 (N.D. Ill. Aug. 16, 2023) (finding evidence of CPD policy violations relevant because "[t]o establish their due process claims, Plaintiffs must show that Defendants acted knowingly," and "[e]stablishing this policy baseline will help Plaintiffs show . . . that Defendants' conduct was intentional").

Departures from CPD policies are also relevant to punitive damages. *See England v. Allen*, No. 17-cv-8911, 2019 WL 2743481, at *5 (N.D. Ill. July 1, 2019) (violation of agency rules and procedures may be relevant to claim for punitive damages or other circumstances not foreclosed by *Thompson*); *Jones v. Walters*, No. 12-cv-5283, 2016 WL 1756908, at *8 (N.D. Ill. Apr. 29, 2016); *Delgado v. Mak*, No. 06 C 3757, 2008 WL 4367458, at *8 (N.D. Ill. March 31, 2008); *Via v. Lagrand*, 2007 WL 495287, at *6 (N.D. 2007).

11

Defendants fail to point to any prejudice substantial enough to outweigh the probative value of this evidence. They argue that the jury would confuse violations of policy with violations of constitutional law, but jury instructions can address that. Indeed, Seventh Circuit pattern jury instruction 7.04 recognizes that rules and regulations evidence is admissible in a Section 1983 case, and explains that juries may "consider this evidence in [their] deliberations," but that the issue is whether the defendant violated the constitution, not whether he violated rules and regulations. Plaintiff will offer this instruction; no prejudice will ensue. *See* Ex. 3, *Taylor v. City of Chicago*, No. 14 C 737, ECF No. 867, at 3 (N.D. Ill Dec. 10, 2021) (denying defendants' motion to bar reference to any alleged deviation from CPD internal policies in wrongful conviction case and explaining that the Court "will consider a limiting instruction to be offered at the time of any testimony on this issues"); *Lopez v. City of Chicago*, No. 01 C 1823, 2005 WL 563212, at *10 (N.D. Ill. Mar. 5, 2005) (denying defendants' request to bar evidence of non-compliance with department rules and regulations because "such evidence may be relevant and that confusion in this regard may be avoided with a proper jury instruction"); *Townsend v. Benya*, 287 F. Supp. 2d 868, 876 (N.D. Ill. 2003) ("any possible prejudice to Defendants in the form of jury confusion between rules violations and constitutional violations may be avoided through explanatory jury instructions"). Accordingly, Defendants' motion *in limine* number 3 should be denied.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 4 TO BAR EVIDENCE OR ARGUMENT RELATING TO THE THOROUGHNESS OF DEFENDANT OFFICERS' INVESTIGATION OF THE HOMICIDE OF PARIS JACKSON**

Defendant Officers, motivated by an inappropriate priority to close the Paris Jackson case as quickly as possible, acted in concert to incriminate their first viable suspects. To that end, they coerced false statements, they suppressed witnesses who told them that multiple people were shooting in the park, and they failed to investigate numerous, obvious lines of evidence that threatened to undermine their theory that RJ and Plaintiff were responsible for Jackson's death. Yet Defendants' motion seeks to bar "any. . . evidence that Plaintiff may attempt to rely on to argue Defendant Officers did not conduct a thorough investigation." Def. MIL at 23. The motion appears to be extraordinarily broad, seeking to bar as irrelevant every unflattering part of Defendants' investigation, and every piece of evidence they failed to investigate and which should have pointed them away from Plaintiff and RJ. Defendants' argument would lead to the absurd result of excluding all exculpatory evidence that a Defendant Officer decided to ignore. Such evidence will be relevant to several issues at trial. The Court should reject this hail-mary motion.

## ARGUMENT

Evidence regarding Defendants' failures to investigate exculpatory lines of evidence are centrally relevant to at least three questions the jury will need to decide at trial, including Plaintiff's innocence with respect to the murder of Paris Jackson; Defendants' intent and state of mind; and whether Defendants warrant punitive damages.

*First*, Plaintiff must be permitted to introduce evidence concerning the lines of inquiry that Defendants failed to pursue because that very same evidence is important evidence showing Plaintiff's innocence, which is relevant to the question of damages. *Parish v. City of Elkhart*, 702

13

F.3d 997, 1003 (7th Cir. 2012). Defendants will contend at trial that RJ shot Paris Jackson and that Plaintiff was responsible for the murder. Plaintiff must be able to offer evidence about all of the information and leads developed during the investigation that show the opposite.

Defendant Officers made numerous decisions during the investigation to ignore evidence and lines of inquiry pointing them away from Plaintiff and RJ. To take a few specific examples, Defendants failed to obtain and preserve the audio of 9-1-1 phone calls in which nearby residents reported multiple people shooting in the park, which contradicted Defendants' central thesis that RJ was the only one with a gun. Defendants failed to interview those 9-1-1 callers, just as they failed to interview numerous witnesses who were inside the park and who would have told them about the crossfire. (Notably, when Defendants did interview an eyewitness, Rufus McGee, who contradicted their theory, they unconstitutionally suppressed his statement.) Defendants also failed to consider the blood and autopsy evidence, which were inconsistent with Jackson having been shot by RJ that night and instead show that his body was placed on the grate behind the fieldhouse post-mortem, sometime before it was discovered at 9 o'clock the next morning. In addition, Defendants failed to follow up on potential suspects identified in a letter written by Jackson himself shortly before his death, and which pointed to ongoing disputes with specific other boys in the neighborhood. Plaintiff must be permitted to introduce all of this evidence as it tends to show that Plaintiff was in fact innocent of the crime.

More broadly, it would be impossible for Plaintiff to tell the jury the story of what we know (and don't know) about what happened that evening if he were prevented from telling the jury about any of the evidence that Defendants failed to properly investigate. Defendants cannot hamstring Plaintiff's case and prevent him from putting that evidence before the jury simply because it would draw the jury's attention to the ways in which their investigation was shoddy.

To the contrary, Plaintiff is entitled to present this evidence to show the jury that Plaintiff is innocent—and that Defendants should have known as much too.

*Second*, evidence showing that Defendants' investigation failed to pursue evidence that would have undermined their case against Plaintiff is directly relevant to Defendants' state of mind. Plaintiff's due process claim for the fabrication of evidence requires Plaintiff to show that Defendants *knowingly* fabricated evidence against Plaintiff. *Brown v. City of Chicago*, 633 F.Supp.3d 1122, 1156-57 (N.D. Ill. 2022). "'Knowledge and intent must often be proven by circumstantial evidence.'" *Brown*, 633 F. Supp. 3d at 1157 (citing *Stinson v. Gaugar*, 868 F.3d 516, 527 (7th Cir. 2017)). Here, as in other fabrication cases, evidence that "Defendant Officers did not investigate [alternative suspects]" can "lead to a reasonable inference that Defendant Officers ignored other perpetrators in order to pin the murder on [the plaintiff]." *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *7 (N.D. Ill. May 17, 2016) (denying summary judgment on due process fabrication claim). In other words, their failure to investigate helps to show that they acted knowingly in fabricating evidence.

Likewise, Plaintiff's conspiracy claim, which alleges that Defendants conspired to coerce a false confession and to fabricate and suppress evidence, requires Plaintiff to show Defendants entered into an agreement to participate in those unlawful acts. *Brown v. City of Chicago*, No. 19-cv-4082, 2023 WL 1070220, at *11 (N.D. Ill. Dec. 29, 2023) (citing *Vance v. Chandler*, 597 N.E.2d 233, 236 (Ill. 1992)). A conspiratorial agreement is often proven by circumstantial evidence. *See Lenard v. Argento*, 699 F.2d 874, 883 (7th Cir. 1983). A pattern of investigative conduct all aimed at inculpating Plaintiff and avoiding contrary lines of inquiry is evidence of such an agreement. *Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1191 (N.D. Ill. 2013) (noting

15

that a "pattern of misconduct . . . can give rise to an inference . . . of a conspiratorial agreement" (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012))).

As discussed above, Defendants ignored numerous pieces of evidence undermining their theory of the case against Plaintiff and RJ. This pattern of decisions will help show the jury that Defendants' unconstitutional conduct aimed at incriminating Plaintiff was intentional. Indeed, the fact that Defendants chose not to pursue those (and other) obvious lines of inquiry—all of which pointed away from Plaintiff and RJ—powerfully shows that Defendants were acting intentionally and in concert when they fabricated, suppressed, and coerced evidence in order to pin the murder on Plaintiff. Evidence of Defendants' investigative failures is thus plainly relevant to the issues the jury will have to decide.[1]

*Third*, this same evidence will help the jury to decide whether to impose punitive damages on the Defendants. "[P]unitive damages may be awarded against a defendant if her actions were 'malicious or in reckless disregard of [p]laintiff's rights. '" *Via v. Lagrand*, No. 03 C 3278, 2007 WL 495287, at *6 (N.D. Ill. Feb. 12, 2007) (quoting Seventh Cir. Pattern Civil Jury Instr. 7.24). Defendants' pattern of decisions not to gather evidence or pursue lines of inquiry that would have upended their theory of the case against Plaintiff and RJ are properly considered by the jury when deciding whether their unconstitutional tactics were malicious or reckless.

---

[1] In addition, to the extent that Defendants' investigative failures violated CPD policy and procedure, such violations are also admissible in that way to show knowledge, intent, motive, bias, malice, and entitlement to punitive damages. *See generally,* Pl. Response to Def. MIL No. 3; *United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) (noting evidence of policy violation is admissible "where an officer's intent is at issue"); *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009) ("[A]lthough violation of the prison's rule against public searches was not, by itself, a violation of the constitution, it was relevant evidence on which the jury could have relied to conclude that the searches were done with an intent to harass." (citation omitted)); *England v. Allen*, 2019 WL 2743481, at *5 (N.D. Ill. July 1, 2019) (violation of agency rules and procedures may be relevant to claim for punitive damages).

16

Defendants' arguments to exclude all of this crucial evidence have no merit. Defendants contend that because there was probable cause to believe Plaintiff participated in the murder of Jackson, the failure to investigate other leads is irrelevant. Def. MIL at 22. But the existence of probable cause will not be an issue at trial. The notion that failures to investigate are irrelevant to probable cause—whatever its merit—has no bearing on whether failures to investigate are relevant to the claims that actually exist here. Notably, all of the cases that Defendants cite in support are cases about whether the police had probable cause for an arrest. Def. MIL at 22-23 (citing *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 442 (7th Cir. 1986); *Schertz v. Waupaca Cnty.*, 875 F.2d 578, 583 (7th Cir. 1989); *Nugent v. Hayes*, 88 F. Supp. 2d 862, 868 (N.D. Ill. 2000); *Davis v. Owens*, 973 F.2d 574, 577 (7th Cir. 1992)). Those cases are irrelevant to this trial, where probable cause will not be an issue.

Defendants also miss the mark when they argue that there is no constitutional right to a thorough investigation. *See* Def MIL at 23. Plaintiff is not asserting any such right and will not do so at trial. Instead, the reasons why Defendants' faulty investigation will matter at trial is because the story of their investigation—and their serial refusal to pursue contrary evidence— will show the jury their state of mind when they coerced, fabricated, and suppressed evidence in order to pin the crime on Plaintiff, and because the very leads that Defendants did not follow will help Plaintiff prove his innocence. Defendants offer no reasons whatsoever why evidence or argument about Defendants' shoddy investigation should not come in for these purposes. Defendants' motion should be denied in full.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 5 TO BAR
HANDWRITTEN LETTER PURPORTEDLY WRITTEN BY PARIS JACKSON**

Within days after Paris Jackson was killed, his mother provided detectives with a
handwritten letter that she had found in his room after he died. ECF No. 332-13, at 7 (Case Supp.
Report). The letter, which is addressed to a person named "Louis" who Paris describes as his
"cousin," describes tensions among boys in the neighborhood and names specific people who
Paris was in active conflict with. ECF No. 332-12. For example, Paris writes that "Redman tried
2 jump hard when I fought Kool." *Id.* Later, he writes that "Flyboyz jump on D.U. but we got
them back the next day." *Id.* Defendants seek to exclude the letter as irrelevant, hearsay, and
prejudicial. They are incorrect.

### ARGUMENT

### The letter is relevant to the circumstances of Paris's death
### and to Defendants' state of mind

The letter will be relevant to at least two issues at trial. *First*, the letter is relevant to the
question of who actually killed Paris. That question, which remains an unsolved mystery, is
relevant to the issue of damages because Defendants will still contend that RJ shot Paris and that
Plaintiff is responsible for RJ's actions. *See Parish v. City of Elkhart*, 702 F.3d 997, 1003 (7th
Cir. 2012). The letter shows that there were several people with whom Paris had ongoing
disputes and physical altercations soon before he was shot dead. This is plainly relevant to the
jury's assessment of whether Paris may have been shot by someone else later that night. At trial,
there will be witness testimony showing that Paris was seen alive and running *after* RJ had
stopped shooting. The letter will help the jury to understand the swarm of conflicts that could
have led him to be shot dead later that evening, before he was discovered in the morning having
been placed face-down on the grate behind the fieldhouse after he died.

*Second*, the letter will be relevant to establish Defendants' state of mind, which is an element of Plaintiff's fabrication and conspiracy claims, as well as the question whether to impose punitive damages. *See* Pl. Resp. to Def. MIL No. 4. Plaintiff will show that Defendants did nothing to investigate the people and conflicts that Paris identifies in the letter—and Defendants do not dispute that contention in their motion. Def. MIL at 25. This failure to investigate alternative suspects is one piece of evidence showing that Defendants' actions were motivated by the goal of closing the case against Plaintiff rather than uncovering the truth. It will thus help to prove Defendants' culpable state of mind when they knowingly fabricated evidence and conspired to suppress exculpatory statements.

Defendants contend the letter is irrelevant because they do not have a constitutional obligation to investigate every lead. Def. MIL at 25. But Plaintiff does not assert any such constitutional theory. Nor does Plaintiff seek to use the letter to assert any new theory of liability. *Id*. Instead, as discussed already, Plaintiff seeks to use the evidence to prove the scienter elements of the claims he has actually brought, and to rebut Defendants' claim that he is responsible for the murder. It is also irrelevant that Defendants received the letter after the State's Attorney's Office had approved charges against Plaintiff, *see* Def MIL at 24-26, because the due process and conspiracy claims in this case do not concern the decision to institute charges, but rather the use of fabricated and coerced statements and the suppression of exculpatory evidence at trial. *See Brown v. City of Chicago*, No. 19 C 4082, 2023 WL 10702220, at *13-14 (N.D. Ill. Dec. 29, 2023). Defendants' failure to investigate exculpatory leads that came in after false charges were approved against Plaintiff only underscores that they were acting culpably and furthering a conspiratorial agreement to pin the murder on Plaintiff despite contrary evidence.

**The letter is not inadmissible hearsay**

Defendants seek to exclude the letter as hearsay. They are incorrect. First, the letter is not offered for its truth and is therefore not hearsay. *See* Fed. R. Evid. 801; *United States v. Gajo*, 290 F.3d 922, 930 (7th Cir.2002). Plaintiff wishes to use the letter to show that Defendants failed to take action to investigate any of the leads it contained. That does not ask the jury to accept any of the statements in the letter as true, but only to consider the letter's existence, the fact that Defendants had it, and the effect that it had—or, more accurately, failed to have—on the Defendants. These are permissible, non-hearsay uses of out-of-court statements. *See, e.g.*, *Cairel v. Alderden*, 821 F.3d 823, 830–31 (7th Cir. 2016) (statements were not hearsay when used to explain steps officers took in an investigation); *accord Jones v. City of Chicago,* No. 14-CV-4023, 2017 WL 413613, at *16 (N.D. Ill. Jan. 31, 2017) (admitting statements in officers' possession to show effect on the listener); *Brown v. Mazurski*, No. 99 C 2194, 2000 WL 1745242, at *3 (N.D. Ill. Nov. 28, 2000) (statement was not hearsay when offered to prove officer's state of mind).

However, even if Plaintiff were to offer the letter for its truth—for example, to suggest to the jury that Paris had conflicts with certain people in the neighborhood—its contents are still admissible under several exceptions to the hearsay rule. The letter's contents are statements against interest made by an unavailable witnesses. *See* Fed. R. Evid. 804(b)(3). In the letter, Paris discusses committing crimes, including physical altercations with others. These are statements against Paris's penal interest and he is, of course, unavailable. The statements are also admissible as a statement of Paris's "then-existing state of mind (such as motive, intent, or plan)." Fed. R. Evid. 803(3). For example, in describing the escalating conflicts and threats, Paris relates that "a lot of shit happen right about now" and "shit crazy." ECF No. 332-12. These are expressions of

20

Paris's state of mind in the days before he was shot and are admissible to show the jury as much. The letter is also admissible under the residual exemption because the circumstances of its creation—a private letter to a cousin that he apparently had not yet sent—indicate its trustworthiness and because it "is more probative" with respect to Paris's then-existing conflicts "than any other evidence that [Plaintiff] can obtain." Fed. R. Evid. 807.

### Admission of the letter would not unfairly prejudice Defendants

Defendants claim the letter is unfairly prejudicial because "there is no way to question Jackson about what the contents of the letter actually mean" and it would be unfair to "[a]llow[] Plaintiff to suggest to the jury that Defendant Officers should have done more work based on the letter." Def. MIL at 27. What Defendants describe, however, is not unfair prejudice, but simply the possibility of conflicting views of the letter's meaning. Defendants are of course free to offer their own interpretation of the letter to the jury—and to offer their own explanations for why they failed to investigate it. That is a matter for the jury to weigh.

Moreover, the fact that Paris is not alive to explain the letter's meaning is beside the point: that unfortunate fact was equally true when Defendants received the letter after his death—and when Defendants declined to investigate the potential leads it contained. The jury will see precisely the same evidence that Defendants had during the critical period when Plaintiff was facing charges for murder. While Defendants may not like the contents of the letter, they have failed to identify any reason why its use would create a risk of prejudice, properly understood as a "genuine risk that the emotions of the jury will be excited to irrational behavior." *Morgan v. City of Chicago*, 822 F.3d 317, 339 (7th Cir. 2016) (citation omitted). The letter should be admitted.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 6 TO BAR OEMC CALL AND DOCUMENT REGARDING PURPORTED CALLS MADE TO OEMC ON AUGUST 30, 2008**

Defendants seek to bar certain evidence related to the 911 calls received by the City's Office of Emergency Management and Communications ("OEMC") on the night of August 30, 2008, concerning the shooting in Amundsen Park. Specifically, they seek to bar: (1) a phone call from Officer Eddie Reed to OEMC dispatch on August 31, 2008, requesting 911 calls received on August 30, 2008 (the "Officer Reed OEMC Call")[2]; and (2) the event history table of 911 calls received by OEMC on August 30, 2008 (the "Event History Table"). These pieces of evidence are highly relevant to the case and should not be excluded.

*Background*

On the night of August 30, 2008, Renard Branch, Jr. ("RJ") entered Amundsen Park to get his sister and cousins. When a group of boys spotted RJ in the Park, one of the boys, David Portis ("Day Day"), started shooting at RJ. In fear of his life, RJ returned fire and then ran out of the Park.

Between 10:59 p.m. and 11:07 p.m. that night, OEMC received at least six 911 calls reporting that shots were fired in or around the Park. ECF No. 271-6, Event History Table; ECF No. 271-5, Olsen Dep. at 82:11-83:15, 130:01-18, 135:21-136:01. The 911 callers provided details clearly indicating that multiple people in the Park were shooting, multiple gun shots were heard, and multiple people were observed carrying guns. ECF No. 271-6, Event History Table. The last 911 call of shots fired near the Park came in at 11:41 p.m. ECF No. 332-15, Ex. 15, 8/31/08 Dispatch Audio Tr. at 36:08-15.

---

[2] Defendants attached a transcript of the Officer Reed OEMC Call to their motion. ECF No. 332-15, Def. Ex. 15, Tr. 8/31/08 Dispatch Audio Tr. Defendants do not dispute that the transcript is accurate.

At least 5 police cars were dispatched to the Park in response to these multiple 911 calls. ECF No. 271-8, Dorsch Dep. at 72:08-22, 73:19-75:14; ECF No. 271-6, Event History Table. Police drove through the Park, including on the pathways behind the fieldhouse, to investigate the 911 calls of shots fired and did not find a body.  ECF No. 271-5, Olsen Dep. at 140:17-142:15, 145:02-21; ECF No. 271-9, Taneshia Dep. at 227:07-229:10; ECF No. 271-10, Cierra Dep. at 161:01-05, 163:05-10, 215:02-08; ECF No. 271-11, Jasmine Jenkins Trial Tr. at 135:15-21.  Police cleared the 911 calls at 1:11 a.m. with a code indicating that they found no evidence that any person had been shot after investigating the scene.  ECF No. 271-5, Olsen Dep. at 101:18-106:13, 108:11-16; ECF No. 271-6, Event History Table at MB 9718.

Paris Jackson's body was found the next morning behind the fieldhouse in Amundsen Park.  After responding to the scene, Officer Eddie Reed called OEMC to ask about the 911 calls received the night before regarding shots fired in the area.  OEMC Dispatch informed Officer Reed that several 911 calls came in between 2259 and 2341 (10:59 p.m. and 11:41 p.m.).  ECF No. 332-15, Ex. 15, 8/31/08 Dispatch Audio Tr. at 36:02-15.  Officer Reed then relayed this information about the 911 calls to Defendants when they arrived on scene.  Ex. 4, Reed Dep. at 83:19-85:03; ECF No. 271-18, Case Supp Report – Scene at MB 10055.

At some point during their investigation, Defendants also became aware of the details shared by the 911 callers—including that multiple people in the park were shooting and had guns.  As a matter of procedure, the detective working the special desk at Area 5 would likely have printed out the OEMC Event History Table noting those details on August 31, 2008, at 10:07 a.m. and given it to the Defendants when they came back to the Area.  Ex. 2, McHugh Dep. at 179:02-183:24, 186:13-17.  The Event History Table was then placed in Defendants' Paris Jackson investigative file.  ECF No. 271-20, City's Resp. to Pl.'s 2nd Set of RTAs at 1-2.

Defendants suppressed this exculpatory 911 calls evidence and withheld this evidence from

Plaintiff's criminal defense attorney, David Wiener.

Defendants also failed to follow up on the information they learned from the 911 calls.

Defendant Burke and two other officers canvassed the scene on August 31, 2008, but they did

not try to talk to any of the people that called 911 to report the shooting. ECF No. 271-27,

Canvas Supp Report; ECF No. 271-22, Burke Dep. at 85:10-18, 87:12-89:17. Defendants also

failed to obtain the audio recordings of the calls from OEMC and save them in the investigative

file. ECF No. 271-16, 7/20/21 Mancuso Dep. at 143:16-23.

### Both Pieces of Evidence Are Relevant in Multiple Ways and Would Not Cause Any Unfair Prejudice

Defendants contend that the Officer Reed OEMC Call and the Event History Table are

irrelevant to Plaintiff's case and would only serve to mislead and confuse the jury. Contrary to

Defendants' contention, both pieces of evidence are relevant to several issues in the case.

*First*, the Officer Reed OEMC Call and the Event History Table are relevant to Plaintiff's

due process suppression claim. Both pieces of evidence support Plaintiff's argument that

Defendants concealed exculpatory evidence of the 911 calls during the criminal proceedings

against Plaintiff. Even though Defendants were aware that there were several 911 calls reporting

that multiple people in the Park were shooting over a 42-minute period, and had the Event

History Table—which included notes on those 911 calls—in their investigative file, that detailed

information and the Event History Table were never turned over to Plaintiff's defense counsel,

Mr. Wiener.[3] Because Mr. Wiener never received this exculpatory evidence, he was unable to

properly prepare Plaintiff's defense and argue that there were other potential suspects who

committed the murder of Paris Jackson. This evidence, therefore, is directly relevant to

---

[3] Plaintiff expects to prove this point through Mr. Wiener's testimony at trial.

Plaintiff's due process suppression claim. *See Parish v. City of Chicago*, 594 F.3d 551, 554 (7th Cir. 2009) (identifying the elements of a due process suppression claim).

Defendants argue that because this exact theory of liability was not included in Plaintiff's operative complaint or Plaintiff's response to the City's contention interrogatory, Plaintiff cannot now assert it. Defs. Mot. at 32 n.8. However, Plaintiff plead a violation of his due process rights through the suppression of evidence. *See* Dkt. 136 ¶ 74. Because Plaintiff only found out about these exculpatory 911 calls through discovery, Plaintiff could not have possibly known about their suppression when he filed his complaint. *See Casciaro v. Von Allmen*, No. 17 CV 50094, 2018 WL 4030583, at *6 (N.D. Ill. Aug. 23, 2018) (denying a motion to dismiss a *Brady* claim because "without the benefit of full discovery, the court cannot say that there was a *Brady* violation"); *Sellers v. Bragg*, No. 04 CV 3663, 2005 WL 1667406, at *5 (N.D. Ill. July 13, 2005) (denying a motion to dismiss a due process suppression claim because "[d]iscovery will enable the parties to explore these issues"). Further, Plaintiff is not required to assert every claim in response to a contention interrogatory. Multiple courts have held that because interrogatories are answered before either party has a full understanding of the case, the party answering the interrogatory is not bound by the answer it gives. *See Marcoin, Inc. v. Edwin K. Williams & Co., Inc.*, 605 F.2d 1325, 1328 (4th Cir. 1979) ("As a general rule, an answer to an interrogatory does not conclusively bind the answering party in all instances."); *Tyson v. Amerigroup Ill., Inc.*, 230 F.R.D. 538, 541 (N.D. Ill. 2005) ("The general rule governing the use of answers to interrogatories is that under ordinary circumstances they do not limit proof." (citation omitted)); *R2 Med. Sys., Inc. v. Katecho, Inc.*, 931 F.Supp. 1397, 1414 (N.D. Ill. 1996) ("Answers to interrogatories, however, do not bind parties as do allegations or admissions in a pleading."); *Aktiebolaget Vargos v. Clark*, 8 F.R.D. 635, 636 (D.D.C 1949) ("interrogatories are not to be

used as a device or a stratagem to maneuver the adverse party into an unfavorable tactical position"); *R.C.A. Manufacturing Co. v. Decca Records, Inc*., D.C., 1 F.R.D. 433, 435 (S.D.N.Y. 1940) ("If in the interim, between the time of the answers to these interrogatories and the trial, defendants obtain further information, they will not be prevented from offering such further information on the trial and should under this interrogatory furnish it to plaintiff when it is obtained."); *see also* Wright & Miller § 2181 Effect of Answers, 8B Fed. Prac. & Proc. Civ. § 2181 (3d ed.).  Therefore, there is no basis to bind Plaintiff to his contention interrogatory answer, particularly not when, as Defendants concede, Defendants have been on notice of this theory of liability for years.  *See* Ex. 5, *Hudson v. City of Chicago*, No. 16-cv-4452, ECF. No. 252, at 3-4 (N.D. Ill. Jan. 25, 2021) (denying defendants motion *in limine* to bar evidence not disclosed in plaintiff's answer to contention interrogatories because "the City can hardly be surprised, let alone prejudiced, that Hudson seeks to present this theory of liability at trial").

Defendants further argue that Plaintiff cannot show that any Defendant Officer is responsible for the suppression of the 911 calls.  Defs. Mot. at 32-33.  Plaintiff disagrees. Regardless, this is an argument for trial and not a basis to exclude the evidence.  *See Shefcik v. Village of Calumet Park*, No. 06 CV 5142, 2008 WL 11516555, at *2-3 (N.D. Ill. Aug. 7, 2008) (denying defendant's motion *in limine* to bar certain evidence because it presented a question of fact for the jury).

*Second*, the Officer Reed OEMC Call and the Event History Table support Plaintiff's innocence, which is relevant to the damages he sustained as a result of Defendants' actions. Plaintiff was convicted on the theory that he was an accomplice to RJ's murder of Paris Jackson. Both pieces of evidence powerfully disprove this theory.  RJ, contrary to Defendants' false theory, was not the only person shooting in and around Amundsen Park the night before Paris

26

Jacksons' body was found. Moreover, and even more exculpatory, the police response that the Event History Table documents did not result in the discovery of Paris Jackson's body following RJ's departure from the Park—even though police examined the area where the body would be found the next morning. If RJ did not shoot Paris, as this evidence tends to show, then, obviously, Plaintiff is innocent of being RJ's accomplice in murder. Evidence of innocence is "critical to the damages issues." *Parish v. City of Elkhart*, 702 F.3d 997, 1003 (7th Cir. 2012); *see also Ezell v. City of Chicago*, No. 18 CV 1049, 2023 WL 5287919, at *15 (N.D. Ill. Aug. 16, 2023) (allowing expert testimony because it spoke to plaintiffs' claims of actual innocence).

*Third*, both the Officer Reed OEMC Call and the Event History Table speak to Defendants' intent. This evidence proves that there were other shooters in the Park that night and that the shooting continued after RJ and Plaintiff left the Park. Despite being aware of this evidence, Defendants failed to follow up on *any* of the 911 calls from the previous evening to see if the callers had any additional information related to the murder of Paris Jackson. Instead, Defendants homed in on Plaintiff and RJ and refused to investigate any other potential leads. This tunnel vision approach goes directly to Defendants' intent to disregard other evidence and aggressively pursue a case against Plaintiff and violate his constitutional rights. *See Gaines v. Chicago Bd. of Ed.*, No. 19 C 775, 2024 WL 640802, at *19 (N.D. Ill. 2024) (noting that evidence is admissible if it is relevant to a party's intent); *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *7 (N.D. Ill. May 17, 2016) (finding that evidence that "Defendant Officers did not investigate [alternative suspects]" can "lead to a reasonable inference that Defendant Officers ignored other perpetrators in order to pin the murder on [the plaintiff]").

27

*Fourth*, this evidence is relevant to Plaintiff's request for punitive damages because Defendants' misconduct in the face of Plaintiff's innocence heightens their culpable intent. *See Via v. Lagrand*, No. 03 C 3278, 2007 WL 495287, at *6 (N.D. Ill. Feb. 12, 2007) ("[P]unitive damages may be awarded against a defendant if her actions were 'malicious or in reckless disregard of [p]laintiff's rights.'" (quoting Seventh Cir. Pattern Civil Jury Instr. 7.24)).

Because of the high relevance of both pieces of evidence, the probative value far outweighs any purported prejudicial effect. *See* Fed. R. Evid. 403. As discussed above, both pieces of evidence either support, or go directly to the heart of Plaintiff's case. Merely because Defendants do not like what the evidence shows—that Defendants did not fully investigate all available leads before zeroing in on Plaintiff and suppressed evidence of his innocence—does not make it unfairly prejudicial.[4]

### The Officer Reed OEMC Call Falls Within a Hearsay Exception

Defendants seek to exclude the Officer Reed OEMC Call as hearsay. However, this evidence falls within the business records hearsay exception.

Records are admissible under the business records exception if "(1) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (2) the record was kept in the ordinary course of a regularly conducted activity of a business, organization, occupation, or calling; (3) making the record was a regular practice of that activity; (4) all these conditions are shown by the testimony of a custodian or another qualified witness;

---

[4] Defendants argue that they would be unfairly prejudiced because they would be unable to question the unidentified OEMC dispatcher who spoke to Officer Reed or the 911 callers. Defs. Mot. at 33. However, this argument is of no moment. Being unable to question the dispatcher or the 911 callers would not actually rebut Plaintiff's argument that Defendants failed to fully investigate Mr. Jackson's murder or that Defendants suppressed exculpatory evidence. If anything, Defendants' own testimony about the purported thoroughness of their investigation should rebut Plaintiff's argument. Therefore, there is no resulting prejudice to Defendants.

and (5) the opponent does not show that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness." *Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019) (internal quotation marks omitted); *see also* Fed. R. Evid. 803(6).

Here, the Officer Reed OEMC Call falls within the exception because: (1) it is an audio recording that was made when Officer Reed and the OEMC dispatcher had their conversation; (2) the audio recording was kept in the ordinary course of OEMC and police business; (3) calling into dispatch is a regular practice of police business; (4) witness testimony will show that all these conditions are met; and (4) Defendants have not shown that the audio recording (or transcript) indicates a lack of trustworthiness. *See* Ex. 4, Reed Dep. at 27:04-24, 30:1-31:24. Defendants argue that this exception does not apply because Officer Reed's request for "shots fired" calls was a "one-time, non-routine request." Defs. Mot. at 30. Defendants' argument misses the mark and is directly contradicted by Officer Reed's testimony. Officer Reed testified that he communicated with dispatch routinely in the normal course of police business to request information from Dispatch, including information related to 911 calls. Ex. 4, Reed Dep. at 27:12-20, 28:10-12, 30:01-31:07. The Officer Reed OEMC Call therefore squarely falls within the business records exception.[5]

---

[5] To the extent that Defendants argue that the statements by the dispatcher describing the statements from the 911 callers represent an instance of double hearsay, such argument is without merit. Upon Officer Reed's request, the dispatcher provides a high-level summary of the calls. The statements made by the 911 callers do not fall within the definitions of hearsay because they would be used to demonstrate that Officer Reed knew about the calls that came in the previous night for instances of gun-related activity. *See Palmer v. City of Decatur*, No. 17-CV-3268, 2021 WL 7707939, at *7 n.1 (C.D. Ill. Sept. 20, 2021) (noting that third-party statements in police reports are admissible to show what information was provided to the officer). Even if the statements by the 911 callers were considered hearsay, such statements would fall into the present sense impression exception or the excited utterance exception. *See* Fed. R. Evid. 803(1) & (2); *United States v. Boyce*, 742 F.3d 792, 798 (7th Cir. 2014).

Even if the Officer Reed OEMC Call were not admissible for its truth, this evidence would still be allowable for a non-hearsay purpose: to show that Officer Reed requested from Dispatch the 911 calls related to shots fired in the area upon discovering the body of Paris Jackson to assist the detectives with their investigation. Officer Reed then conveyed the information he received from Dispatch to Defendants. As explained above, the mere fact that Defendants knew about the 911 calls—regardless of whether the calls are true or not—is relevant to Plaintiff's suppression claim and Defendants' state of mind.

Therefore, Plaintiff should be permitted to use the Officer Reed OEMC Call at trial. [6]

### *The Event History Table Can Be Authenticated Through Testimony and Falls Within Hearsay Exceptions*

Defendants move to exclude the Event History Table by arguing that the evidence cannot be authenticated, and no foundation can be provided for it. [7] Despite Defendants' arguments, the Event History Table can indeed be authenticated through the testimony of witnesses.

To authenticate a piece of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The bar

---

[6] In a footnote, Defendants also seek to bar the portion of the case supplementary report where Defendants indicate that they learned from officers on scene (i.e. Officer Reed) that there were several 911 calls of shots fired in the Park from approximately 2259 to 2341 hours on August 30, 2008. Defs. Mot. at 29 n.7. Similar to the reasons discussed herein, this report is not hearsay, but rather reflective that Officer Reed made the statement to Defendants and therefore Defendants knew that there were 911 calls. Even if the report were considered hearsay, it falls within the then-existing state of mind exception and the business records exception. *See Holt v. Lewsader*, No. 18-CV-2169, 2021 WL 4094996, at *12 (C.D. Ill. Apr. 19, 2021) (allowing the admission of statements that would show the effect on declarant's state of mind, and/or emotion or mental feelings); *Palmer*, 2021 WL 7707939, at *7 n.1 (noting that police reports are admissible under the business records exception). Further, this evidence is highly relevant to Plaintiff's claims and damages because it shows that Defendants knew about these calls and yet nonetheless relentlessly pursued Plaintiff in their investigation.

[7] Plaintiff is admittedly perplexed by Defendants' position that the document that they produced cannot be authenticated. *See Scott v. City of Chicago*, 724 F. Supp. 2d 917, 925 (N.D. Ill. 2010) ("[I]t is frankly offensive for defense counsel to object to official police documents *that defense counsel themselves provided to [plaintiff's] counsel*." (emphasis in original)).

for authentication under Rule 901 "is not high." *Pearson v. United Debt Holdings, L.L.C.*, 123

F. Supp. 3d 1070, 1073 (N.D. Ill. 2015). "Rule 901 requires only a prima facie showing of

genuineness and leaves it to the jury to decide the true authenticity and probative value of the

evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997). One method to

authenticate a document is through the testimony of a witness with knowledge. Fed. R. Evid.

901(b). Here, multiple witnesses have offered testimony as to what an OEMC event history

table is and how one would have been generated in 2008. *See* ECF No. 332-17, Martin Dep. at

149:7-17, 150:1-4, 150:15-21, 163:14-164:21; ECF No. 271-5, Olson Dep. at 79:10-24, 92:4-12;

Ex. 2, McHugh Dep. at 177:8-178:1, 178:11-14, 179:2-17,181:12-182:17, 183:19-24.[8]

Defendants do not argue that the document is fake or that there is a reason to doubt its

trustworthiness. *See Scott*, 724 F. Supp. 2d at 925 (denying defendant officers' motion *in limine*

to bar police evidence on grounds that there was no foundation where there was no suspicion that

a document was "bogus" or that there was an issue with the chain of custody). Instead, they

argue that because Plaintiff could not identify who created the document or when it was created,

Plaintiff cannot authenticate it or lay a proper foundation for it. Defs' Mot. at 31. But such an

argument does not carry any water because it does not attack the document's trustworthiness.

*See Scott*, 724 F. Supp. 2d at 925 (outlining examples of when a document would be barred for

authenticity purposes).

      Defendants also argue that the Event History Table presents two layers of hearsay,

however, both levels of hearsay fall within a hearsay exception. The first layer, the actual Event

---

[8] For instance, Daniel McHugh, a former Chicago Police Department detective with over a decade of experience, testified at his deposition that it was typical for the special desk officer at Area 5 to print the results of an event history for a homicide, Ex. 2, McHugh Dep. at 179:2-17, that the Event History Table looked like an event history from 2008, *id.* at 181:12-182:05, and that it was likely printed on August 31, 2008, at 10:07 in the morning, *id.* at 182:06-17.

History Table document, falls within the public-records exception. Under Rule 803(8), a record or statement of a public office is admissible "if it sets out . . . a matter observed while under a legal duty to report." Fed. R. Evid. 803(8)(A)(ii). Here, the Event Table History is admissible under such an exception. *See Scott v. Wendy's Props., L.L.C.*, No. 20 CV 6829, 2024 WL 1768630, at *2 n.4 (N.D. Ill. Apr. 24, 2024) (holding that an OEMC call log was admissible under the public-records exception); *see also Jordan v. Binns*, 712 F.3d 1123, 1132-34 (7th Cir. 2013) (admitting a police report under the public-records exception). In addition to being admissible under the public-records exception, the Event Table History is admissible under the business records exception. *See* Fed. R. Evid. 803(6); *see also Wilson v. City of Chicago*, No. 07 CV 1682, 2013 WL 268468, at *5 (N.D. Ill. Jan. 24, 2013) (noting that police reports are admissible in civil cases under the business record exception and collecting cases); *Palmer v. City of Decatur*, No. 17-CV-3268, 2021 WL 7707939, at *7 n.1 (C.D. Ill. Sept. 20, 2021). The Event Table History was: (1) made at or near the time the 911 calls were received by OEMC; (2) kept in the course of OEMC's ordinary business; (3) made as part of a regular practice of OEMC; (4) witness testimony will show that all these conditions are met; and (5) Defendants have not shown that the document indicates a lack of trustworthiness.[9] *See* ECF No. 332-17, Martin Dep. at 149:07-150:21; ECF No. 271-5, Olson Dep. at 79:10-24; Ex. 2, McHugh Dep. at 177:08-180:02, 181:12-182:17, 183:19-24.

---

[9] Defendants do not substantively argue against the document's trustworthiness but instead simply assert that Plaintiff will be unable to establish its trustworthiness. Defs. Mot. at 30. Plaintiff is again perplexed that Defendants are forcing Plaintiff to establish the trustworthiness of the document that Defendants produced. *See Scott*, 724 F. Supp. 2d at 925. Defendants' failure to make a substantive argument as to why their own document is untrustworthy is insufficient to actually defeat the public-records exception. *See Jordan*, 712 F.3d at 1134 (discussing substantive arguments to challenge the trustworthiness of a document and denying them).

The second layer is the summaries of statements made by 911 callers.  As Defendants acknowledge, these summaries include that callers heard shots fired, perpetrators were still shooting, and that there were people in the park shooting.  *See* Defs. Mot. at 30.  Such statements easily fall within the present sense exception.  Evidence is admissible under the present sense exception if the following requirements are met: "(1) the statement must describe an event or condition without calculated narration; (2) the speaker must have personally perceived the event or condition described; and (3) the statement must have been made while the speaker was perceiving the event or condition, or immediately thereafter."  *United States v. Boyce*, 742 F.3d 792, 797 (citation omitted).  Here, the statements provided by the 911 callers: (1) were describing that shots were being fired in and around the Park; (2) while the callers were personally perceiving the shooting; and (3) were being made at the time of the shooting, or immediately thereafter.  ECF No. 271-6, Event History Table; *see United States v. Thomas*, 453 F.3d 838, 844 (7th Cir. 2006) (holding that the district court did not err in admitting a 911 call under the present sense impression exception); *United States v. Campbell*, 782 F. Supp. 1258, 1260-61 (N.D. Ill. 1991) (finding that a 911 call satisfied the present sense impression exception).

Even if the statements made by the 911 callers do not fall within the present sense exception, they are still admissible under the broader excited utterance exception.  "For the excited utterance exception to apply . . . the proponent must demonstrate that: '(1) a startling event occurred; (2) the declarant makes the statement under the stress of the excitement caused by the startling event; and (3) the declarant's statement relates to the startling event.'"  *Boyce*, 742 F.3d at 798 (citation omitted).  Here, the excited utterance exception applies because (1) the startling event was that there was an active shooting occurring in and around the Park; (2) the

911 callers were under the stress and excitement of witnessing a shooting; and (3) the statements that the 911 callers made all relate to the shooting. *See Boyce*, 742 F.3d at 797-99 (7th Cir. 2014) (holding that the 911 call was properly admitted under the broader excited utterance exception). [10]

Finally, even if the Event History Table were not admissible for its truth, similar to the Officer Reed OEMC Call, this evidence would still be allowable to show that Defendants were aware of the 911 calls and the police response, kept the Event History Table in their investigative file, and ignored this evidence.

Therefore, Plaintiff should be permitted to introduce the Event History Table at trial.

Accordingly, Defendants' motion *in limine* number 6 should be denied.

---

[10] Defendants' reliance on *Scott v. Wendy's Properties, L.L.C.* is misplaced. In *Scott*, the court excluded an OEMC call log that included "criminal activity [such] as batteries, persons with guns, and other disturbances, as well as EMS calls" because there was not additional information to determine whether each call fell within a hearsay exception. 2024 WL 1768630, at *2 n.4. In contrast, all the calls here relate only to shots being fired. These are the exact type of 911 calls that fall within the present sense exception, if not the broader exception of excited utterance. *See Boyce*, 742 F.3d at 797-98.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 7 TO BAR TESTIMONY OR EVIDENCE RELATING TO A GENERAL "CODE OF SILENCE" OR "BLUE WALL"**

The entirety of Defendants' Motion *in Limine* No. 7 focuses on the impropriety of evidence that tends to show "guilt by association" through *generalized* allegations of police misconduct and *generalized* references to a police officer "code of silence." Plaintiff agrees—and has already stipulated—that he will not introduce evidence regarding highly publicized incidents of police misconduct or other incidents of wrongful convictions. Plaintiff does not need to try to win this case by inflaming unfair prejudice. Where Defendants' motion goes too far, however, is by suggesting that it would be improper to reference *any* abnormalities, rules violations, deception, dishonesty, or anything else that arguably qualifies as "misconduct" by officers who worked on Plaintiff's investigation. Nor have Defendants justified an order barring *any* evidence or argument that the officers involved were reluctant to implicate each other and covered up for one another in accordance with the code of silence. Defendants' motion should be denied.

On its face, Defendants' motion is far too broad as to both allegations of police misconduct and to evidence of a code of silence among officers. The Court "exercise[s] broad discretion in controlling counsels' arguments and in ensuring that argument does not stray unduly from the mark." *Charles v. Cotter*, 867 F. Supp. 648, 664 (N.D. Ill. 1994). As to allegations of police misconduct, it is impossible to say definitively at this stage that any and all references to reports of police misconduct have no place whatsoever at trial. Courts routinely deny motions on this basis, showing "unwilling[ness] to muzzle [plaintiff's] counsel at this early phase" on a "subject that far better lends itself to consideration in the trial environment." *Regalado v. City of Chicago*, No. 96 C 3634, 1998 WL 919712, at *2 (N.D. Ill. 1998) (Shadur, J.) (noting the Court

denied an "identical motion" seeking to bar then-current news reports about police misconduct in *Cotter* – it "looks very much as though the motion is one lodged in the Corporation Counsel's Office computer" – and denying the same motion "just as Judge Castillo did [in *Cotter*]"). Defendants' blanket motion should therefore be denied, with Defendants remaining free to object as the issues develop at trial. *See Volland-Golden v. City of Chicago*, No. 13 C 1477, 2016 WL 4678299, at *5 (N.D. Ill. Sept. 7, 2016) (Shadur, J.) (holding same).

As to evidence of a code of silence, granting Defendants' motion would bar any inferences, even those supported by evidence, that witnesses who know and work with each other, and who may even be friends, can be biased in one another's favor and may even lie to help their compatriots. This is a perfectly legitimate inference when advanced regarding any definable group of people—co-workers in a company or hospital, people sharing the same profession, or members of a club or organization—and it does not become illegitimate when applied to police. It is common trial practice to impeach on the basis of bias—to suggest that the testimony of a witness is suspect because of that witness's relationship to a party. Jurors are explicitly told that they can rely on common sense, and bias is always relevant. *See Townsend v. Benya*, 287 F. Supp. 2d 868, 876 (N.D. Ill. 2003) ("A party's and a witness's common group membership is probative of bias, even without proof that the party or the witness embrace the organization's tenets." (citing *United States v. Abel*, 469 U.S. 45, 52 (1984))). Defendants are entitled to take a contrary position, but there is no legal basis to limit Plaintiff's right to argue bias as Defendants seek here.

There is ample evidence that Defendants subscribed to the code of silence in this case. The record shows that throughout their investigation, Defendants fabricated inculpatory witness statements, concealed a directly exculpatory statement, concealed exculpatory records, and

coerced Plaintiff's confession. To the extent that Defendants attempted to collude with one another and cover up their actions surrounding their investigation and Plaintiff's confession, Plaintiff should be allowed to present that evidence. Evidence of a code of silence between and involving the specific Defendants in this case is relevant at least to bias, and courts have consistently denied the motion Defendants have filed here for this same reason. *See Wilbon v. Plovanich*, No. 12 C 1132, 2016 WL 890671, at *7 (N.D. Ill. Mar. 9, 2016) (allowing evidence of code of silence "to test the bias or motivation of any witness"); *Cooper v. Dailey*, No. 07 C 2144, 2012 WL 1748150, at *4 (N.D. Ill. May 16, 2012) ("Plaintiff may explore the possibility that the defense witnesses in this case are biased because of loyalty to one another."); *Christmas v. City of Chicago,* 691 F. Supp. 2d 811, 819 (N.D. Ill. 2010) (finding that plaintiffs may introduce evidence that the officers involved adhered to a code of silence because such evidence "would be probative of officers' bias, and that bias is always relevant"); *Galvan v. Norberg*, No. 04 C 4003, 2006 WL 1343680, at *2-3 (N.D. Ill. May 10, 2006) (denying blanket motion *in limine* to bar evidence of "code of silence" because "evidence or argument of this type can go to the issue of the bias or motivation of witnesses"); *Saunders v. City of Chicago*, 320 F. Supp. 2d 735, 740 (N.D. Ill. 2003) ("Defendants' motion to bar testimony that police officers in general or these officers in particular conspire to cover up one another's bad acts through a 'code of silence' is denied as overly broad. The plaintiff may explore the possibility that the defense witnesses in this case are biased because of loyalty to one another.").

Moreover, evidence of a code of silence is relevant to Plaintiff's conspiracy and failure to intervene claims. *See, e.g., Cooper v. Dailey*, No. 07 C 2144, 2012 WL 1748150, at *4 (N.D. Ill. May 16, 2012) (allowing plaintiff to use specific evidence of a code of silence to show bias and bolster the conspiracy claim); *Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 3205304, at *5

(N.D. Ill. July 28, 2011) (finding that specific evidence of a code of silence, in addition to being relevant to showing the witness's bias toward other officers, "may also be relevant to Plaintiff's conspiracy claim"); *Norton v. Schmitz*, No. 08 C 4365, 2011 WL 4984488, at *2 (N.D. Ill. May 27, 2011) (excluding general evidence of a code of silence but allowing the plaintiff to "present evidence that the defendants conspired to cover up the incident that gave rise to this lawsuit").

Finally, Defendants claim that this evidence should be excluded because of its prejudicial effect. Given the widespread public acknowledgement of the code of silence—indeed the code of silence has repeatedly been recognized by the Department of Justice, the City's mayors, current and former CPD officials, and the City's own panel of experts from the Police Accountability Task Force—there is no unfair prejudice from this evidence. And the probative value of this evidence far outweighs any prejudicial effect.

In short, Plaintiffs should not be barred from suggesting or arguing that the police officer witnesses are lying and covering up for each other in accordance with the code of silence, or that certain police misconduct is relevant and probative to Plaintiffs' claims. If Defendants have a specific objection to how any evidence or argument plays out in a particular instance, they should raise that objection in context at trial. "Evidence may be excluded *in limine* only where it is clearly inadmissible for any purpose," and Defendants cannot show that either form of evidence they seek to bar in this motion is wholly inadmissible here. *Petrovic v. City of Chicago*, No. 06 C 6111, 2008 WL 818309, at *1 (N.D. Ill. March 21, 2008). Defendants' motion *in limine* number 7 therefore should be denied.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 8 TO BAR EVIDENCE OR ARGUMENT RELATING TO "STREET FILES"**

This motion badly overreaches.

As Defendants are fully aware, it was the practice of the Chicago Police Department (CPD) during the relevant time period to maintain a parallel set of files outside the "official file" kept in the City's Records Division. Detectives maintained separate files that contained information that did not make it into the official reports.

Plaintiff seeks to cross-examine the police officers in this case about the fact that certain interviews did not get documented in official reports that were turned over in discovery—the interview of Rufus McGee, which is referred to in Defendant Mancuso's official report in the most cryptic way, is one instance where it is reasonable to suspect that there are notes or other documentation that has never seen the light of day. Defendants should not be able to deny that this occurred, or that the suppression was intentional. It was the routine practice that existed at that time. Namely, detectives maintained parallel files in which there were "official reports" and "unofficial reports" and only "official reports" were transmitted to the City's Records Division whereas the "unofficial reports" were considered property of the detectives, and often withheld and not turned over to prosecutors or criminal defendants. Sometimes called running files or Area files, they consisted of copies of supplementary reports, case reports, evidentiary reports, photographs, and handwritten notes.

Importantly, Defendants do not, and cannot, dispute that the CPD maintained this "street file" practice. Beginning with *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), and continuing with jury verdicts in *Fields v. City of Chicago*, et al., No. 10 C 1168, and *Rivera v. City of Chicago*, No. 12 C 4428 (both litigated by undersigned counsel's law firm), juries have found against the City on claims that the CPD's street file policy and practice existed and caused

suppression of relevant evidence. Indeed, given this series of adverse jury verdicts, Judge Lefkow has barred the City on collateral estoppel grounds from denying that the street file practice existed. *Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 779 (N.D. Ill. 2017) (the City is barred from arguing that it does not have a policy or practice of withholding material exculpatory and/or impeachment evidence in street files).

The City's motion *in limine* does not even attempt to suggest that the street file practice at issue is not probative. It most certainly is. Plaintiff alleges that these detectives developed exonerating evidence in their interviews of McGee and other witnesses. They must have documented what they learned. Given CPD practice for many years, it is only logical to assume that they filed that information in a separate "street file." Unless the Defendants are conceding this point, it is fair game for Plaintiff to cross-examine them on the fact that such suppression was the routine expectation. Indeed, anything else would have been contrary to the baseline behavior. Such a line of inquiry is undoubtedly relevant.

Defendants suggest weakly that it would be unduly prejudicial to open this line of inquiry. But they never really explain why. Their argument seems to be that the street file practice was so insidious that merely invoking it is too prejudicial. That reasoning only reinforces its relevance. If the mere concept of street files so starkly invokes an attempt to cheat, then it is not clear why these Defendants should be spared the consequences of participating in that behavior.

Nor is any prejudice unfair. If, as Defendants' motion suggests, the name "street files" is the problem, then Plaintiff is happy to refer to the separate files as "running files" or "Area files." It is the fact of these parallel files that is important to this trial, not the name.

In sum, Defendants have not justified an order barring anything. When cross-examined about why the Rufus McGee evidence never made it into the official file, Plaintiff should be entitled

40

to point out that this was not an accident, particularly if the Defendants try to deny it. It is premature to know which way the testimony will go, and there is no cause at this stage to bar anything.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 9 TO BAR ARGUMENT THAT PLAINTIFF IS ENTITLED TO RECOVER FOR TIME SPENT IN PRETRIAL DETAINMENT AND TO BAR ARGUMENT THAT PLAINTIFF WAS WRONGFULLY INCARCERATED FOR MORE THAN 7.5 YEARS**

Defendants have moved to limit Plaintiff's claims for damages to the time between his conviction and the present day, arguing that he may not seek redress in this case for the harm he suffered between the time that charges against him were filed and his criminal conviction. There are two independent reasons to deny Defendants' motion.

*First*, to the extent Defendants wish to limit Plaintiff's substantive claims or his claims for damages in some substantive respect, a motion *in limine* is an improper vehicle to obtain that relief. Such a limitation must be sought before trial via Rule 56 or by some proposed instruction to the jury. *See Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 3205304, at *4 (N.D. Ill. July 28, 2011) (denying motion *in limine* to exclude evidence of a wrongfully convicted plaintiff's innocence "because motions *in limine* are designed to narrow evidentiary issues for trial, not resolve factual disputes or weigh evidence"); *see also United States ex rel. Streck v. Takeda Pharms. Am., Inc.*, No. 14 C 9412, 2023 WL 3093476, at *2 (N.D. Ill. Apr. 26, 2023) ("[M]otions *in limine* are intended to alert the court and the parties of evidentiary issues that may arise during the trial and to exclude anticipated prejudicial evidence before it is offered. . . . Motions for summary judgment are supposed to be presented early enough in the proceedings to allow the opposing party ample time to defend its position and the Court to consider the motion in an orderly manner. . . . Motions *in limine* are not intended to be used as a substitute for an untimely summary judgment motion. To do otherwise encourages trial by ambush."); *Overwell Harvest Ltd. v. Widerhorn*, No. 17 C 6086, 2022 WL 21306914, at *3 (N.D. Ill. Dec. 2, 2022) (motion *in limine* inappropriate if it "essentially seeks a summary judgment ruling"); *Dowe v. Nat'l R.R. Passenger Corp.*, No. 01 C 5808, 2004 WL 887410, at *11 (N.D. Ill. Apr. 26, 2004)

(denying defendant's motion *in limine* where the defendant sought to eliminate claims "[u]nder the guise of a motion *in limine*" rather than through a timely motion for summary judgment).

*Second*, Defendants' contention that Plaintiff may not seek damages for the period prior to his conviction is at odds with the constitutional claims on which the jury will be instructed and the compensatory damages available if Plaintiff proves those claims. Compensatory damages are available under § 1983 for any actual injury suffered as the result of a violation of constitutional rights. C*arey v. Piphus*, 435 U.S. 247, 264 (1978) ("[T]he basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights."); *see Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002) ("[W]hen an illegal arrest sets off a chain of indignities ... [the victim] is entitled to obtain damages for these indignities ... [f]or they are foreseeable consequences of the illegal arrest, and the ordinary rules of tort causation apply to constitutional tort suits."). The same is true of state-law torts. *Id.* Whether a particular constitutional violation or state-tort caused an injury is a quintessential jury question. *Taylor v. City of Milford*, 10 F.4th 800, 812 (7th Cir. 2021). As a general matter, therefore, and contrary to Defendants' arguments, Plaintiff is entitled to seek compensation for the natural consequences that flow from Defendants' violations of law—including the confinement that resulted immediately from those violations.

Defendants cite several due process cases from which they seek to extract the proposition that only Fourth Amendment violations can yield compensation for pre-conviction time in custody. Defendants ignore that one of Plaintiff's central remaining claims is that Defendants' lengthy interrogation coerced Plaintiff to make a false confession that was used against him in criminal proceedings before his conviction—to secure charges against him, to prosecute him, to justify his detention before trial—in violation of the Fifth and Fourteenth Amendments. This

constitutional violation caused injuries *prior* to Plaintiff's conviction, a claim squarely recognized by the Seventh Circuit in *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1026 (7th Cir. 2006). *Sornberger* holds that the use of a coerced confession used to *institute* criminal proceedings violates the Fifth and Fourteenth Amendments and causes damages recoverable under § 1983 even in the absence of a conviction. There will be ample evidence, starting with Defendants' own "cleared/closed report" establishing that Plaintiff's coerced, false confession was "used" to institute the criminal case against him.

Defendants are also wrong about what injuries caused by Defendants' violation of Plaintiff's right to due process are compensable under § 1983. A fabrication of evidence may violate due process and cause injury in the pretrial period. *McDonough v. Smith*, 588 U.S. 109, 115-16 & n.2 (2019); *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (holding that the fabrication of evidence violates due process "if that evidence is later used to deprive the defendant of [his] liberty *in some way*.") (emphasis added). Defendants' contrary contention that a Fourth Amendment claim, and not a due process claim, is the constitutional claim that a Plaintiff can bring that allows recovery for actual injuries suffered prior to a conviction contradicts several recent Supreme Court decisions. Following the reaffirmation in *Manuel v. Joliet*, 580 U.S. 357, 369-70 (2017), that there is a Fourth Amendment claim available to those seized without probable cause between the issuance of legal process and the favorable termination of a criminal case, the Court in *McDonough*, 588 U.S. at 115-16 & n.2, entertained a due process theory related to fabrication of evidence in the same period of time, recognizing that the actions of a police officer who fabricates evidence may violate *multiple* constitutional

provisions at once, *id.*; *see also Thompson v. Clark*, 596 U.S. 36, 43 n.2 (2022).[11] There is in short no basis to hold that the dismissal of Plaintiff's malicious prosecution claim bars Plaintiff from recovering damages for the pretrial detention that Defendants' other violations of law caused him to experience.

This Court should deny Defendants' motion *in limine* to limit the damages that Plaintiff may seek.

---

[11]  To the extent that *Lewis v. Chicago*, 914 F.3d 472, 475 (7th Cir. 2019), stated that "the Fourth Amendment, not the Due Process Clause, governs a [§ 1983] claim for wrongful pretrial detention," that statement was overruled by the statements just cited in *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019). *See Winn v. City of Chicago*, No. 20 C 5246, 2022 WL 80272, at *3 (N.D. Ill. Jan. 6, 2022). Regardless, even if *Lewis* still had force when it came to due process claims, nothing in *Lewis* purported to overrule any of the other case law governing Plaintiff's self-incrimination claim discussed above.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 10 TO BAR ARGUMENT OR EVIDENCE SUGGESTING THAT DEFENDANT OFFICERS LACKED PROBABLE CAUSE**

After being exonerated of a false murder conviction, Plaintiff Marcel Brown sued the City of Chicago and several of its police officers. ECF No. 1. Plaintiff sued under 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights by fabricating false evidence against him, suppressing exculpatory evidence, coercing him into a false confession, and failing to intervene to stop these violations. ECF No. 136, Am. Compl. ¶¶ 72-93. Brown also brought a state-law claim for malicious prosecution. *Id*. ¶¶ 101-105. The Court granted summary judgment against Brown on that malicious prosecution claim but the bulk of his constitutional claims are now going to trial. ECF No. 294 at 36.

Defendants ask the Court to exclude "any argument or evidence suggesting that [they] lacked probable cause" to arrest Plaintiff. Defs. Mot. at 41. With the malicious prosecution claim out of the trial, the concept of probable cause will not go to this jury.[12] So Plaintiff agrees that the parties should be barred from referring to and arguing about the probable cause standard. Plaintiff has no intention of saying the words probable cause much less arguing that Defendants lacked it. Plaintiff will not be re-litigating his malicious prosecution claim at trial. Plaintiff even filed his own motion *in limine* seeking that relief. ECF No. 335 at 40 (Pl's MIL No. 10). His motion was necessary because Defendants refused to make the bar to references to probable cause bilateral. If Plaintiff cannot suggest that Defendants lacked probable cause to arrest him, then Defendants should similarly be prevented from suggesting that had it. It is simply irrelevant to this trial.

---

[12] Plaintiff respects but disagrees with the Court's summary judgment decision and plans to appeal at the appropriate time. Nothing in this response should be construed as a waiver of those appeal rights.

But that is where any agreement ends. Defendants do not just want to prevent Plaintiff from talking about probable cause as a concept, they want to bar "any … evidence suggesting that [they] lacked" it. Defs. Mot. at 41. They claim that the law-of-case doctrine applies to the Court's summary judgment ruling and requires this exclusion. *Id*. Not so. The rule allowing Courts to bar evidence bearing on claims lost to summary judgment is limited to evidence "solely relevant" to those lost claims. *E.g.*, *Gen. Citrus Int'l Inc. v. Remien*, No. 04-cv-6402, 2009 WL 2486164, at *2 (N.D. Ill. Aug. 10, 2009). Limiting exclusion to evidence that is only relevant to the lost claim makes sense. Many cases lose a claim or two to summary judgment before proceeding to trial. But no rule of law or logic supports excluding evidence relevant to a trial claim just because it was also relevant to a claim defeated by summary judgment.

But that is exactly what Defendants are asking for. By asking to exclude any evidence suggesting a lack of probable cause, Defendants seek to exclude most, perhaps all, of the evidence supporting Plaintiff's constitutional claims. Take Plaintiff's testimony about his innocence for example. That supports his constitutional claims because, among other reasons, it supports his damages claim. *Parish v. City of Elkhart, Ind.*, 702 F.3d 997, 1003 (7th Cir. 2012). But, because it also suggests Defendants lacked probable cause, Defendants seek to exclude it. That would be nonsensical.

And so it is understandable that none of Defendants' cases support their position. Not one excludes a piece or category of evidence relevant to a claim that is going to trial just because it was also relevant to a claim lost to summary judgment. They all hew to the "solely relevant" guideline. *Life Spine, Inc. v. Aegis Spine, Inc.*, 2023 WL 7919579, at *4 (N.D. Ill. 2023) (excluding specific list of evidence related solely to dispatched claims); *Dunkley v. Illinois Dep't of Human Servs.*, 2022 WL 4132462, at *2 (N.D. Ill. Sept. 12, 2022) (same); *see also Kalra v.*

*Adler Pollock & Sheehan, P.C.*, 2023 WL 363043, at *3 (D. Conn. Jan. 23, 2023) (excluding, not evidence, but affirmative defenses that mirrored dismissed claims).

Beyond logic and lack of caselaw, there is another reason to deny Defendants' motion. They failed to meet their burden. Here, because they invoked their law-of-the-case argument, Defendants bore the burden of identifying for the Court the specific evidence they believed to be inadmissible under that argument. *See*, *e.g.*, *Gaines v. Chicago Bd. of Educ.*, No. 19-cv-775, 2024 WL 640802, at *19 (N.D. Ill. Feb. 15, 2024) (denying motion *in limine* "because [the moving party did] not sufficiently identif[y] the specific evidence for which" its argument applied). But they did not identify a single, specific piece of evidence in their motion. They instead adopted the disfavored strategy of seeking *in limine* to "exclude [a] broad category of evidence"; a strategy which "should rarely be employed." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975); *see also United States v. Phillips*, No. 12-cr-872, 2014 WL 2801604, at *2 (N.D. Ill. June 12, 2014) (citing *Sperberg* with approval). The motion therefore fails on burden, as well as on law and commonsense.

Because it fails, the motion should be denied. The Court should instead grant Plaintiff's motion and bar the parties from discussing probable cause as a concept or issue, but not exclude any evidence. At most, the Court should allow the parties to, at trial, object to any specific piece of evidence they believe is irrelevant to any surviving claim and therefore "solely related" to probable cause.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 11 TO BAR TESTIMONY OR EVIDENCE RELATING TO MARISOL O'CAMPO'S PRIOR DRUG USE OR EMPLOYMENT HISTORY**

Marisol Ocampo claims that she was at Amundsen Park when Plaintiff Marcel Brown's cousin, RJ, fired a gun there. Defendants like some of the things she has said about what happened and wish to elicit that testimony at the upcoming trial. They do not like that Ocampo has admitted to recent drug use and that her drug use has hurt her memory. To try to have their cake and eat it too, Defendants have moved *in limine* to prevent Plaintiff from impeaching her memory with evidence of drug use. Defs. Mot. at 42-44. They also seek to prevent Plaintiff from raising Ocampo's work at a strip club. *Id.* Plaintiff agrees that Ocampo's work is irrelevant, but her drug use is admissible.

"Evidence of a witness' prior drug use may be admitted insofar as it relates to [the witness's] *possible* inability to recollect and relate" the facts. *United States v. Mojica*, 185 F.3d 780, 789 (7th Cir. 1999) (citing *United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir.1992) (emphasis added)). The Court may only refuse examination on the issue when "memory or mental capacity is not legitimately at issue and the evidence is offered solely as a general character attack." *Id*. The effect of Ocampo's drug use on her ability to remember what happened almost 16 years ago is legitimately at issue for at least three reasons.

First, Ocampo admits that her drug use, specifically ecstasy, and her alcohol use have made her memory worse over time. ECF No. 247-2, Ocampo Dep. at 13:17-14:02. The Seventh Circuit has allowed cross-examination on drug use as it relates to memory when the witness admits that drug use has caused memory problems. In *Robinson*, 956 F.2d at 1397, the Seventh Circuit affirmed the district court's decision to allow cross-examination of a witness named Yackey who admitted suffering blackouts and memory loss from drinking. *See also United States*

*v. Galati*, 230 F.3d 254, 262 (7th Cir. 2000) (allowing cross-examination to reveal that witness was using methadone). Defendants cite *Robinson* but ignore the fact that it allowed the very thing they seek to exclude under circumstances like those here.

Second, Ocampo's memory is genuinely at issue within the meaning of *Mojica* and *Robinson* because Ocampo admitted that she was under the influence at her deposition. ECF No. 247-2, Ocampo Dep. at 12:01-15. The night before the deposition Ocampo did not sleep, drank a lot, and used ecstasy. *Id*. She believed she still had "liquor in her system" during the deposition. *Id*. To the extent her deposition testimony is used at trial to impeach her, to refresh her recollection, or for any other purpose, her drug use beforehand is relevant to impeach her deposition testimony. Defendants do not address this point in their motion.

Third, Ocampo's memory is genuinely at issue in the sense that there appears to be a great deal she cannot remember about what happened sixteen years ago. She cannot remember what she told police the night of the incident. *Id*. at 18:03-05. She cannot remember how it was she came to talk to the police that night. *Id*. at 18:19-22. She cannot remember how she learned that Paris Jackson had been killed. *Id*. at 21:17-22:3. And she cannot remember whether she saw Paris Jackson in the park that day. *Id*. at 34:03-08, 35:12-17. These are just a few of dozens of examples from her deposition where Ocampo's memory now fails.

For all these reasons, the Court should find that Ocampo's memory is genuinely at issue and allow Plaintiff to cross-examine her about her drug use. This includes her drug use since the incident and continuing to the present, including before her deposition. It also includes her drug use on the day of and around the time of the incident itself. Ocampo claims she was pregnant and not drinking on the day of the incident, *id*. at 151:0-14, but she admitted smoking marijuana before walking that admission back, *id*. at 151:15-18. Given Ocampo's admission that she

believes her drug use is making her memory worse, this cross-examination is a legitimate attempt to impeach her recollection; not "solely a general character attack." *Mojica*, 185 F.3d at 789.

Defendants' arguments ignore key facts and key aspects of the decisions they rely on. In both *Robinson* and *Galati*, for example, the Seventh Circuit affirmed the district court's decision to allow some drug-use cross examination. *Robinson*, 956 F.2d at 1397; *Galati*, 230 F.3d at 262. Defendants cite both cases, ignore the parts that are bad for them, and do nothing to try to distinguish the cross allowed in the cases from what Plaintiff intends.

Next, Defendants argue that because some aspects of some of Ocampo's statements are consistent over time, there can be no issue with her memory. But no case law supports Defendants' contention that such consistency means memory cannot legitimately be at issue. Defendants are going on their own say so. And the consistency is less than Defendants' claim. For example, Defendants say Ocampo consistently testified that "she saw RJ point a gun and fire a gun in the direction of others, including Paris … ." Defs. Mot at 45. But to make that claim, Defendants must ignore parts of Ocampo's deposition, where she cannot remember whether Paris was at the park. ECF No. 247-2, Ocampo Dep. at 34:03-08, 35:12-17. So even if Defendants' consistency standard mattered, they do not have the goods to back it up.

Plaintiff submits that, given Ocampo's admissions about her memory and drug use at her deposition, Defendants' motion (except as to the employment evidence) should be denied outright and Plaintiff's anticipated cross-examination allowed.

51

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 12 TO BAR REFERENCE TO WILLIAM MARSH'S BACKGROUND**

Defendants seek to bar Plaintiff from mentioning or asking their police interrogation expert William Marsh about several parts of his professional career that would call into question his expertise, judgment, and potential bias. The motion should be denied because, even if the Court denies Plaintiff's pending *Daubert* motion to bar Mr. Marsh's testimony, Plaintiff is permitted to test the opinions of Marsh "before the jury with the familiar tools of 'vigorous cross-examination'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)). Defendants' effort to shield their expert from hard questions that could call into question his credibility and judgment should be rejected.

## ARGUMENT

If the Court denies Plaintiff's *Daubert* motion and permits Mr. Marsh to testify as to some or all of his opinions, Plaintiff will be entitled to vigorously cross-examine him at trial. "The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). Among the core lines of cross examination that Plaintiff should be permitted to pursue are (1) questions that probe Mr. Marsh's candor and credibility, *see id.*; (2) questions regarding his "personal knowledge or experience" in law enforcement, which forms the basis for his purported expert opinions, *see Ezell v. City of Chicago*, No. 18 C 1049, 2023 WL 5287919, at *2 (N.D. Ill. Aug. 16, 2023) (quoting *Kumho Tire Co., Ltd. V. Carmichael,* 526 U.S. 137, 150 (1999)); and (3) questions that probe Mr. Marsh's biases and motives, including pecuniary motivations that may bias his testimony, *see Abernathy v. Eastern Illinois Railroad Company*, 940 F.3d 982, 992 (7th Cir. 2019) (holding that the district court did not abuse its discretion in permitting the cross-

examination of defendants' expert witness about financial ties to the defendants' parent company to show bias); *United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) ("Questioning a witness' motives for testifying is precisely the type of inquiry permissible on cross-examination."); *U.S. v. Manske*, 186 F.3d 770, 777 (7th Cir. 1999) (noting that cross-examining a witness to establish bias is the 'quintessentially appropriate topic for cross-examination'" (quoting *Bachenski v. Malnati*, 11 F.3d 1371, 1375 (7th Cir.1993)).

The topics that Defendants seek to exclude are all relevant to these permissible lines of cross examination. The Court should not permit Defendants to insulate their expert from uncomfortable questions that will shed light on his experience, candor, and biases.

### Questions regarding complaints of alleged misconduct

Plaintiff should be permitted to cross-examine Marsh regarding the record of complaints in his Los Angeles Sheriff's Department ("LASD") personnel file and a prior lawsuit in which he was named as a Defendant. Questions regarding these matters will be relevant because Mr. Marsh explicitly relies upon the whole of his professional experience in law enforcement to form his opinions in this matter. *See* ECF No. 310-3 (Marsh Expert Report) at 3. Mr. Marsh spent his entire pre-retirement career within LASD, and testified that his opinions in this case emerged from his experience, on-the-job training, and interactions with colleagues in that role. ECF No. 310-14, Marsh Dep. October 3, 2023 at 97:12-98:1. Any complaints lodged against Marsh for misconduct in the course of those duties are germane to understanding how he conducted himself there. His responses to questions regarding those complaints will also allow the jury to assess his credibility and candor, giving him an opportunity to explain the actions he took in those circumstances. (Indeed, depending on how he answers, such questioning could allow Marsh to explain himself in ways that *bolster* his credibility and expertise in the eyes of the jury.)

While Defendants seek to cast all of the complaints against him—and the lawsuit in which he was named—as irrelevant to his expert testimony regarding police interview methods, that argument misses the mark for two reasons. First, some of the incidents relate to Marsh's conduct during the period when he was a supervisor with responsibility to oversee officers who conducted interviews as part of their duties. In addition, complaints and a lawsuit against him while he was leading a team of SWAT officers are relevant insofar as they illuminate his experience, supervisory responsibilities, and professional standards. For instance, the events underlying the 1992 lawsuit that Plaintiff's questioned Mr. Marsh about at his deposition took place while Marsh was serving as a Team Leader on the Special Enforcement Bureau's Special Enforcement Detail (SWAT).[13] The same is true with respect to various complaints regarding unreasonable force and civil rights violations.

Second, Defendants have refused to agree to limit Mr. Marsh's testimony to matters regarding police interrogation and appear to reserve the right to have him comment on other aspects of the investigation, even though no such opinions were disclosed in his report (or deposition). While Plaintiff urges the Court to impose a mutual bar on each of the parties' police practices experts testifying to matters beyond the interrogation, *see* Pl. Resp. to MIL No. 16, if Defendants are allowed to elicit testimony from Marsh on other topics, they cannot limit his cross-examination only to interrogation-related complaints filed against him.

**Questions regarding the misconduct and culture at the Firestone Station**

---

[13]  The fact that the lawsuit was settled without an admission of wrongdoing is irrelevant. Plaintiff is not trying to use the lawsuit to prove wrongdoing, *see* Def. MIL at 47 (citing *Slaven v. City of Chicago*, No. 95 C 7310, 1999 WL 1024563, at *1 (N.D. Ill. Nov. 1, 1999)), but instead would be cross-examining Marsh regarding the allegations in the lawsuit in order to elicit testimony that will allow the jury to better understand his experience, conduct, candor, and credibility.

LASD has a well-documented history of "deputy gang" groups that "have been and still are, engaged in harmful, dangerous, and often illegal, behavior." *See* Report and Recommendations of the Special Counsel to Sheriff Civilian Oversight Commission Regarding Deputy Gangs and Deputy Cliques in the Los Angeles Sheriff's Department, Sheriff Civilian Oversight Commission, February 2023 ("2023 Report").[14] The LASD Firestone Station was associated with one of these deputy gangs called the "Pirates."[15] A 2023 report by special counsel engaged by the Sheriff Civilian Oversight Commission ("COC") found that deputy gangs and cliques have existed in LASD since at least 1973. 2023 Report, at 7. The report explains that "deputy cliques run the stations or units where they exist, as opposed to the sergeants, lieutenants and the captain." *Id. a*t 10. These "cliques" or gangs "lie in reports protect each other," "threaten the public with use of excessive force without justification," and "create rituals that valorize violence." *Id.* at 10-11. To be invited to join, a deputy "must demonstrate 'toughness' that is frequently associated with the use of excessive force or other forms of unconstitutional policing." *Id.* at 10-11.

Plaintiff should be permitted to ask questions about this sordid history because it is directly relevant to Mr. Marsh's experience as an interrogator and supervisor—and also to his candor and credibility. Mr. Marsh's first experience as an investigator regularly conducting interviews took place when he worked at the Firestone Station. ECF 310-3 Marsh Expert Report at 22-23. While still at Firestone, Marsh was promoted to be a Field Training Officer tasked with

---

[14]https://file.lacounty.gov/SDSInter/bos/commissionpublications/report/1138014_DeputyGangsSpecialCounselReporttoCOC3.2.2023.PDF.PDF

[15] 50 Years of Deputy Gangs in the Los Angeles County Sheriff's Department, Center for Juvenile Law and Policy, LMU Loyola Law School, January 2021, https://assets-us-01.kc-usercontent.com/0234f496-d2b7-00b6-17a4-b43e949b70a2/619cd770-995c-4dd1-a9a4-b2cde1df8f17/CJLP_Report_LASD_Deputy_Gangs_012021.pdf

training and overseeing new patrol deputies. ECF 310-3 Marsh Expert Report at 22-27; Marsh

Dep. October 3, 2023 at 35:5-20. Plaintiff seeks to question Mr. Marsh about the activities of

deputy gangs at Firestone because they bear directly on his experience and the practices that he

would have observed during this seminal period in his career. Such questions also go to his

candor and credibility. Despite Mr. Marsh's supervisory role at Firestone—which included a

duty to report any misconduct of which he became aware, *see* Marsh Dep. at 37:2-15—Mr.

Marsh testified at his deposition that he never *once* reported misconduct by any sheriff's deputy

at Firestone or at any other time during his entire career. *Id.* at 37:17-38:14.[16] The jury is entitled

to judge the credibility of Mr. Marsh's denial that he never observed any misconduct at all, even

though he worked for many years as a supervisor in a Department (and stationhouse) notorious

for deputy gangs.

While Defendants contend that any questions regarding these deputy gangs would be

unfairly prejudicial, *see* Def. MIL at 48, that is not the case where—as here—the point of such

questions is not to suggest that Mr. Marsh participated in any such behavior himself, but rather to

understand his experience as an investigator and supervisor, and his candor and attitude toward

well-documented instances of misconduct in his Department. Mr. Marsh's answers to such

questions will help the jury assess whether his opinions of Defendants' conduct here are likewise

credible, candid, and based on sound professional experience.

### Questions regarding Mr. Marsh's nine-year working relationship with expert/consultant Michael Bumcrot

Mr. Marsh worked for nearly a decade as an associate of Michael Bumcrot, a busy police

practices consultant who focused largely on police shooting cases. ECF No. 310-14, Marsh Dep.,

---

[16] Mr. Marsh testified that in one instance he participated in an internal investigation of a deputy he was supervising, but he did not report the misconduct himself. ECF No. 310-4, Marsh Dep., at 37:2-38:14.

at 72:4-6. Mr. Marsh's time working with Mr. Bumcrot was a primary driver of his decision to enter expert consulting himself. *Id*. at 74:20-75:3. Mr. Marsh's proposed testimony in this case would in fact be his very first expert engagement on his own. Mr. Marsh's experience working with Mr. Bumcrot is thus an important part of the experience and expertise that he purports to draw upon here. Plaintiff should be permitted to question him about that work.

Among other topics related to his work with Mr. Bumcrot, Plaintiff should be permitted to ask about what must have been one of the most salient episodes in Mr. Bumcrot's entire consulting practice: that is, when he was confronted with racist posts he had published on Facebook and was subsequently dropped as an expert witness in another Chicago police misconduct case. *See* Def MIL at 49 (acknowledging Mr. Bumcrot's testimony in the "Marquette Park Four" case in which Plaintiff's counsel participated). Among other things, the jury should be permitted to assess Mr. Marsh's credibility if he persists in denying any knowledge of this episode or—if Mr. Marsh admits knowledge—to hear testimony that would allow the jury to assess whether Mr. Marsh harbors similar bias. While Defendants contend that this topic would be unfairly prejudicial, such questions concerning an important mentor in Marsh's fledgling career as an expert witness are entirely fair and probative of Marsh's experience, potential biases, candor, and credibility.

**Questions regarding Mr. Marsh's work training security forces in the UAE**

Plaintiffs seek to question Mr. Marsh about work he did with the Lexington Security Group to "provide[] specialized training for law enforcement and military in the United Arab Emirates." ECF No. 310-3, Marsh Rep. at 27. According to his CV, Mr. Marsh was on staff with Lexington Security Group for around two years and seven months. *Id*. At his deposition, Mr. Marsh testified that his work involved training UAE security personnel in tactical, SWAT-like

57

enforcement operations. ECF No. 310-4, Marsh Dep. at 70:16-25. Mr. Marsh testified that he

applied, was interviewed, selected for the position, and ultimately agreed to undertake it. ECF

No. 310-4, Marsh Dep. at 68:22-70:11. He claimed that he did so without regard to—indeed,

purportedly without any knowledge of—UAE's well-documented record of "[s]ignificant,

human rights issues" including instances of "arbitrary arrest and detention" and "incommunicado

detention." *See* U.S. Dep't of State, 2022 Country Reports on Human Rights Practices: United

Arab Emirates[17]; ECF No. 310-4, Marsh Dep. at 69:15-20, 71:8-25.

Plaintiff should be allowed to examine Mr. Marsh about these matters for two reasons.

First, it will illuminate for the jury Mr. Marsh's potential pecuniary motives. The jury is entitled

to hear how Mr. Marsh has chosen to spend his time and earn a living since retiring from the

LASD. Mr. Marsh's answers regarding questions about his willingness to train security forces in

an autocratic regime may lead the jury to a reasonable inference that pecuniary interests drive

Mr. Marsh's decisions—and may likewise bias the opinions he has provided for Defendants in

this case.

Second, the fact that Mr. Marsh has spent a substantial portion of his time post-retirement

focused on teaching SWAT tactics will help Plaintiff show the jury that Mr. Marsh's expertise on

police interrogations is, at best, a sideline rather than his main expertise. Even if the Court finds

that Mr. Marsh is sufficiently qualified under the *Daubert* standard to opine on police

interrogations, questions regarding his UAE work—alongside his other post-retirement work

with consultant Michael Bumcrot on police shooting cases—will show the jury that Mr. Marsh's

principal interests and expertise are decidedly not in interrogation methods, but other aspects of

---

[17] https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/united-arab-emirates/#:~:text=Significant%20human%20rights%20issues%20included,in%20another%20country%3B%20unlawful%20government

law enforcement. In addition, it would be unfair to allow Defendants to shield Mr. Marsh from answering questions about his recent work, and thereby deprive Plaintiff the ability to draw a contrast between his expertise regarding interrogations and that of Plaintiff's expert Matthew Jones, who has made it his life's work post-retirement to do research, training, and consulting specifically focused on police interview techniques.

Such lines of questioning are not unfairly prejudicial. Defendant suggest that confronting Mr. Marsh about his work in the UAE will somehow lead the jury to believe that "Mr. Marsh is somehow responsible for the UAE's alleged bad acts." Def. MIL at 50. But this is simply fanciful. Mr. Marsh can testify as to what he did or did not do and see. And while questions about Mr. Marsh's time training UAE security forces may well be unflattering or uncomfortable, the fact is that Mr. Marsh chose to engage in that work over a period of years. Defendants cannot shield their expert from questions that will illuminate his post-retirement engagements, and the ways that he has chosen to market and monetize his law enforcement experience.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 13 TO BAR STATEMENTS MADE BY JUDGE GAINER AND TO BAR EVIDENCE RELATING TO THE DETAILS OF PLAINTIFF'S POSTCONVICTION PROCEEDINGS, INCLUDING HOW OR WHY PLAINTIFF'S POSTCONVICTION RELIEF WAS GRANTED**

To the extent Defendants have any point at all, Plaintiff is not suggesting that the jury needs to be informed of all of the details of the post-conviction proceedings, or the terms of the rulings. Plaintiff acknowledges that Judge Gainer's words are not admissible evidence at this trial and has never suggested otherwise.

But Defendants' motion does not stop there. It goes way beyond relief any other court has ever granted in a civil wrongful conviction case and asks this Court to be the first to bar all references to the post-conviction proceedings at all—even the fact that Plaintiff's conviction was overturned.

That relief is completely unjustified. Just as has been the case at every one of the dozens of other wrongful conviction cases to go to trial, Plaintiff in this case too is entitled to present his damages by telling the jury the story of what happened to him. Much as Defendants wish it were otherwise, that story does not end with Plaintiff's conviction. His conviction was overturned, culminating in his Certificate of Innocence. *See* Pl. Resp. to Def. MIL No. 15.

In constructing their argument to bar this fact, Defendants scrupulously avoid the most obvious basis for admitting this evidence: damages. Plaintiff will explain how he spent years fighting for his freedom through the courts, describing the toll on him that these courtroom struggles took, including various set-backs before his eventual victory, and what it meant to him to walk out of prison. This testimony, far from irrelevant, unduly prejudicial, or hearsay, is simply routine damages testimony associated with a wrongful conviction. To restrict it would distort the story unfairly, and completely without justification.

Importantly, when Plaintiff was sentenced to 35 years in prison, he could not have known he

60

would be released early. Plaintiff will tell the jury he had to live with the stress and anxiety caused by thinking he would spend most of the rest of his adult life incarcerated for something he did not do. He will testify about how this stress and anxiety built and changed as he navigated the post-conviction process. When Plaintiff was released early, and abruptly, this caused him to experience all sorts of other emotions, also relevant to his damages narrative. The jury needs to hear that evidence too.

In suggesting otherwise, what is most notable about this motion is the lack of any authority for the relief Defendants seek. Plaintiff is unaware of any court, ever, that has barred Plaintiff in a wrongful conviction case from eliciting that his conviction was overturned. Defendants certainly cite none. Indeed, the issue is so one-sided that there are not even any cases going the other way. Defendants' argument—that a wrongful conviction plaintiff does not get to introduce the fact that he does not come to court as someone still convicted of the crime—is so bizarre and unprecedented that apparently no other litigant has ever even attempted it. That is because the argument has no merit and should be rejected.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 14
TO BAR UNDISCLOSED THEORIES OF LIABILITY**

Defendants move to bar Plaintiff from introducing "all arguments or evidence concerning undisclosed theories of liability." Def. MIL at 64. The Court should deny the motion because it is entirely abstract, would fail to resolve any potential disputes that may arise as to any particular theory of liability, and because it states an incorrect standard for when theories of liability may be barred at trial. Defendants' motion, if granted, would sow confusion by making an abstract, general pronouncement without clarifying what, specifically, may or may not be presented to the jury at trial. The motion should be denied.

Defendants' motion asks the Court, in general terms, to bar "undisclosed theories of liability" but it fails to specify any actual theories it seeks to exclude. Simply declaring a bar on "undisclosed theories of liability," as Defendants ask, would leave all of the meaningful questions unresolved, sowing confusion and opportunities for mischief at trial. For example, a blanket order granting this motion would invite Defendants to make unilateral judgments about what they regard as an "undisclosed" theory and what "arguments or evidence" they believe concern such a theory. Armed with a generalized ruling barring "undisclosed" theories, Defendants could seek to intercede at any time during the trial to stop such "argument or evidence." That would not just be extremely disruptive. It would inevitably force the Court to undertake the concrete, fact-bound inquiries that Defendants' motion utterly lacks: Is Plaintiff in fact pursuing a distinct "theory of liability" by adducing particular evidence or argument? How did that theory arise and when were Defendants put on notice of it? Would its introduction actually work unfair prejudice or improper disruption of the trial? In other words, a blanket order would answer no practical questions while creating significant uncertainty and opportunities for Defendants to disrupt the trial.

Perhaps unsurprisingly, Defendants cite no precedent whatsoever in which a Court has issued a blanket, generalized order of the type Defendants seek. Indeed, every one of the cases Defendants rely on actually involves a decision to exclude a specific, narrowly-defined theory of liability (or defense theory). *See* Def. Mil, at 64-66 (citing *Aldridge v. Forest River, Inc.*, 635 F.3d 870 (7th Cir. 2011) (in products liability case, affirming trial court's refusal to permit Plaintiff to amend complaint during trial to assert different product was defective); *Next Payment Sols., Inc. v. Clearesult Consulting, Inc.*, No. 17 C 8829, 2023 WL 7196125 (N.D. Ill. Apr. 17, 2023) (rejecting Plaintiff's late effort to add a novel "proprietary information" theory of liability in place of a failed trade secret theory); *Crest Hill Land Dev., LLC v. City of Joliet*, 396 F.3d 801, 804 (7th Cir. 2005) (rejecting Defendant's effort to amend its Answer after the close of discovery to withdraw a key admission); *Bethany Pharm. Co. v. QVC, Inc.*, 241 F.3d 854, 862 (7th Cir. 2001) (rejecting amendment to complaint to add promissory estoppel claim); *United States ex rel. Patzer v. Sikorsky Aircraft Corp.*, No. 11 C 0560, 2024 WL 1671447, at *17 (E.D. Wis. Apr. 18, 2024) (prohibiting plaintiff from pursuing fraudulent inducement claim at trial); *Client Funding Sols. Corp. v. Crim*, 943 F. Supp. 2d 849, 853 (N.D. Ill. 2013) (denying leave to amend complaint near trial to change the substance of Plaintiff's conspiracy claim); *In re C2R Global Mfg., Inc.*, No. 18-30182-beh, 2021 WL 1346047, at *6 (Bankr. D. Wis. Mar. 30, 2021) (in false advertising trial, barring party from relying on newly-identified statements as a basis for liability)). There is simply no basis in precedent for the kind of generalized, unspecified bar on undisclosed theories of liability.

In addition, Defendants' motion asks the Court to impose an incorrect and improperly rigid test for excluding theories of liability. Defendants appear to be arguing that all theories of liability must be excluded unless "allege[d] in [Plaintiff's] Complaint, disclose[d] in response to

interrogatories, or argue[d] in response to summary judgment." Def. MIL at 64. But this is not the law. As the cases Defendants cite show, what matters is whether trial on the disputed theory would unfairly prejudice Defendants or unduly delay the trial. *See generally Crest Hill Land Dev., LLC v. City of Joliet*, 396 F.3d 801, 804 (7th Cir. 2005); *Bethany Pharm. Co. v. QVC*, *Inc.*, 241 F.3d 854, 862 (7th Cir. 2001). That decision is one within the discretion and judgment of the trial court, *id.*, and is necessarily a fact-bound question that depends on the specific theory of liability at issue, an assessment of where and how it arose in the course of the litigation, and whether any actual prejudice would result. All of the cases Defendants rely on engage in this kind of granular, practical analysis. None imposes the rote rule Defendants advocate.

Thus, for instance, the fact that a theory may not have been explicitly listed in interrogatory responses does not mean that it must be excluded. Multiple courts have held that because interrogatories are answered before either party has a full understanding of the case, the party answering the interrogatory is not bound by the answer it gives. *See Marcoin, Inc. v. Edwin K. Williams & Co., Inc*., 605 F.2d 1325, 1328 (4th Cir. 1979) ("As a general rule, an answer to an interrogatory does not conclusively bind the answering party in all instances."); *Tyson v. Amerigroup Ill., Inc.*, 230 F.R.D. 538, 541 (N.D. Ill. 2005) ("The general rule governing the use of answers to interrogatories is that under ordinary circumstances they do not limit proof." (citation omitted)); *see also* Pl. Resp. to Def. MIL No. 6. What matters is not the particular form of disclosure, but whether the opposing party was, in practice, on notice of the theory of liability. *See* Ex. 5, *Hudson v. City of Chicago*, No. 16-cv-4452, ECF No. 252, at 3-4 (N.D. Ill. Jan. 25, 2021) (denying defendants motion *in limine* to bar evidence not disclosed in plaintiff's answer to contention interrogatories because "the City can hardly be surprised, let alone prejudiced, that Hudson seeks to present this theory of liability at trial").

Likewise, Defendants are incorrect that Plaintiff should be barred from adducing theories not offered in response to summary judgment, particularly because Defendants here did not actually move for summary judgment with respect to many of the claims that will be tried. For example, Defendants did not move for summary judgment against Defendants Mancuso, Turner, Weber, or MacDonald on Plaintiff's due process suppression and fabrication claim. *See* ECF No. 294, at 14, 36 (Memorandum Opinion and Order on Motion for Summary Judgment). Instead, at summary judgment, Plaintiff was only called upon to explain the *Brady* violations committed by Defendant Burke (and former Defendant Czablewski). *Id.* Accordingly, Plaintiff had no need or opportunity at summary judgment to detail his theories of liability on his *Brady* and fabrication claims against those Defendants, including both lead detectives handling the investigation. Defendants are thus incorrect (and misleading) when they argue that Plaintiff cannot introduce a theory for his *Brady* claim that he did not argue in response to summary judgment. *See* Def. MIL, at 64. Defendants made a strategic decision at summary judgment and have only themselves to blame if they missed an opportunity to further flush out Plaintiff's theories of liability on those claims. Certainly, Defendants cannot now fault Plaintiff for not laying out theories of liability in response to a non-existent motion.[18]

To be clear, Plaintiff agrees that, as a general matter, no party should be sandbagged at trial with a theory that they did not have an opportunity to adequately explore pre-trial. *See*

---

[18]  In Defendants' motion *in limine* No. 6, they seek to exclude Plantiff's *Brady* claim against the Defendant Officers based on Defendants' failure to disclosure records of exculpatory 9-1-1 calls received on the evening of the crossfire in Amundsen Park. *See* Def. MIL No. 6, at 32 & n.8. As Plaintiff explains in his response to that motion, Defendants have long been on notice of this theory of liability, and there would be no unfair prejudice or delay from pursuing it at trial. *See* Pl. Resp. to Def. MIL No. 6. Notably, Defendants did not move for summary judgment on the *Brady* claim against Defendants Mancuso, MacDonald, Turner, and Weber, so Defendants cannot complain about not having faced this theory then.

*generally Crest Hill Land Dev., LLC v. City of Joliet*, 396 F.3d 801, 804 (7th Cir. 2005). But

such decisions cannot and should not be decided in the abstract. The motion should be denied.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 15 TO BAR REFERENCE TO PLAINTIFF'S CERTIFICATE OF INNOCENCE**

There are no grounds to grant Defendants' motion to bar reference to Plaintiff's Certificate of Innocence ("COI"). The overwhelming weight of authority calls for its admission. *See Patrick v. City of Chicago*, 974 F.3d 824, 832-33 (7th Cir. 2020) (affirming the district court's decision to admit the plaintiff's COI); *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1170 (N.D. Ill. 2022) (noting that "several courts in this district have concluded that a COI is admissible evidence"). These cases rejected motions *in limine* just like Defendants', admitting COIs over the same objections of irrelevance, prejudice, and hearsay that Defendants make here. In short, the cases establish that a plaintiff's innocence is highly relevant in wrongful conviction actions and that a COI is competent evidence of innocence.

### *The COI Is Relevant In Multiple Ways*

Defendants argue that the COI is irrelevant to any issue in this case because Plaintiff's malicious prosecution claim was dismissed at summary judgement and none of Plaintiff's remaining claims require a showing of innocence. Defs. Mot. at 68-69. Contrary to Defendants' contention, Plaintiff's COI is relevant to several issues in the case.

*First*, the COI completes the story of Plaintiff's wrongful conviction. "As a practical matter, it seems difficult to tell the story of the case without it." ECF No. 333-36, Ex. 36, *Bolden v. City of Chicago*, No. 17-cv-417, ECF No. 467, at 26 (N.D. Ill. Sept. 22, 2021) (denying defense motion to exclude COI). And it would unduly prejudice Plaintiff to preclude it. There is no question that the jury will learn about Plaintiff's arrest, conviction, and post-conviction proceedings. It would be unfair and misleading to leave out the last chapter—Plaintiff's receipt of the COI. That is, if the jury will be told Plaintiff was found guilty, they should also be told they Plaintiff was later found innocent. *See Kluppelberg v. Burge*, 84 F. Supp. 3d 741, 746

67

(N.D. Ill. 2015) (the COI is "relevant to neutralizing the potential unfair prejudice to plaintiff" if defendants intend to argue that plaintiff committed the crime); *Newsome v. McCabe*, No. 96 C 7680, 2002 WL 548725, at *6 (N.D. Ill. Apr. 4, 2002) (holding that excluding evidence of a pardon would have been "highly prejudicial to [plaintiff]" and would have "invited jurors to draw the impermissible inference that he was actually guilty, and, thus, absolve defendants of any misconduct"); *Brown*, 633 F. Supp. 3d at 1170 ("Because here, like in in *Kluppelberg*, 'the application for the COI is part of the narrative of this case,' this court is inclined to follow suit" and allow its admission (quoting *Kluppelberg*, 84 F. Supp. 3d at 747)).

*Second*, the COI is relevant to—and even "may be necessary"—for the jury to decide whether Plaintiff was injured "and, if so, the extent of damages." *Kluppelberg*, 84 F. Supp. 3d at 747; *see also Rivera v. Guevara*, No. 12-CV-04428, 2018 WL 11468911, at *1 (N.D. Ill. May 30, 2018) (denying motion *in limine* to bar COI because "[plaintiff's] long incarceration as an innocent person undoubtedly increased his suffering and is therefore probative on the issue of damages"); *Chatman v. City of Chicago*, No. 14 C 2945, 2018 WL 11426432, at *3 (N.D. Ill. Oct. 11, 2018) (COI admissible because "[t]he COI is evidence supporting [plaintiff's] position that he did not commit the crime"); *Harris v. City of Chicago*, No. 14 C 4391, 2018 WL 2183992, at *3 (explaining that plaintiff's COI "is relevant and admissible . . . to her damages if Defendants argue that Plaintiff committed the crime"). Defendants' contention that Plaintiff "cannot infer he suffered harm and losses by pointing to a COI as proof," Defs. Mot. at 76, runs headlong into the Seventh Circuit's clear contrary holding in *Parish v. City of Elkhart*, 702 F.3d 997, 1003 (7th Cir. 2012), that a Section 1983 plaintiff's guilt or innocence is relevant to damages. *Id.* (reversing district court and remanding for new trial where "the district court's rulings improperly limited the introduction of evidence relating to [plaintiff's] innocence, and

that evidence was critical to the damages issue"). Furthermore, the COI is relevant to Plaintiff's request for punitive damages because Defendants' misconduct in the face of Plaintiff's innocence heightens their culpable intent. *See Henry v. Ramos*, 1997 WL 610781, at *2 (N.D. Ill. Sep. 28, 1997) ("An average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen.").

*Third*, the COI is relevant to Plaintiff's substantive claims of due process and coerced confession "insofar as it is needed to keep the jury's focus on the materiality issue as opposed to [Plaintiff's] actual guilt or innocence." *Kluppelberg*, 84 F. Supp. 3d at 747; *see also Harris*, 2018 WL 2183992, at *3 (same).

### The Probative Value of the COI Is Not Substantially Outweighed By Unfair Prejudice

The COI should not be barred under Rule 403. That rule does not prevent Plaintiff from using evidence "as a sword against Defendant Officers." Defs. Mot. at 73. That, after all, is the point of a plaintiff's evidence and "[t]he Federal Rules of Evidence are rules of inclusion, not exclusion." *Kluppelberg*, 84 F. Supp. 3d at 747. Rule 403 bars evidence only when its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. Fed. R. Evid. 403.

The many other cases that have admitted COIs belie Defendants' claim that a COI is a "nuclear bomb" that will "subsume the entirety of the case" and so must be excluded under Rule 403. Defs. Mot. at 75. That includes *Patrick*, on which Defendants rely to argue that the COI is unduly prejudicial. *Id.* at 73-74. *Patrick*, however, *upheld* the admission of the COI, concluding that the prejudice to Defendants did not overcome the probative value of the COI. 974 F.3d at 833-34. As *Patrick* made clear, "[w]ell-crafted jury instructions can guard against the risk of unfair prejudice or confusion of the issues." *Id.* at 833; *see also Brown v. City of Chicago*, No.

69

18 C 7064, 2023 WL 2640317, at *2 ("The court also recognizes the possibility that admission of the COI could generate confusion but believes that risk can be addressed by way of appropriate jury instructions, like those the Seventh Circuit cited favorably in *Patrick*." (citing *Patrick*, 974 F.3d at 833, in turn citing *Harris*, 2018 WL 2183992, at *5)); *Gray v. City of Chicago*, No. 1:18-CV-02624, 2023 WL 7092992, at *12 (N.D. Ill May 8, 2023) (finding that "the certificate is admissible against Rule 403 concerns" and that "a proper limiting instruction will safeguard against the jury reading too much into the certificate without independently considering all the evidence"); *Rivera*, 2018 WL 11468911, at *1 ("The sources of prejudice defendants cite appear fanciful, but if defendants believe they are not, they can propose an appropriate limiting instruction."); Ex. 6, *Taylor v. City of Chicago*, No. 14 C 737, ECF No. 851, at 10-11 (N.D. Ill Oct. 1, 2021) (finding that the plaintiff's COI was admissible and explaining that the court will give the *Harris* limiting jury instruction). It is no answer to insist, as Defendants do (at 75-76) that "the jury will ignore" the Court's instructions. *See United States v. Joshua*, 648 F.3d 547, 554 (7th Cir. 2011) ("We presume that the jury follows the district court's instructions.").[19]

Moreover, Defendants will be permitted to make their case at trial that the COI deserves little weight. Defendants are free to argue, for example, that the COI findings are not binding on the jury and that the state court did not make any determinations as to whether Defendants violated Plaintiff's rights in the manner Plaintiff here alleges. *See Chatman*, 2018 WL 11426432

---

[19] Defendants point (at 74) to Judge Seeger's thoughts on the potential prejudice of a COI. But Judge Seeger was not ruling on a motion *in limine*, he was hearing a motion to quash a subpoena to the CCSAO. And his thoughts—in portions of the transcript Defendants omit—were tentative. ECF No. 333-34, Ex. 34, 6/28/2023 *DeLeon-Reyes* Tr. at 29:10-14 ("Maybe it is the right thing to do. But I will tell you, nobody should take it as given that it's coming in. Okay? So people should be prepared to entertain discussion on that. Because I don't know."). With full briefing, especially about *Patrick*, Judge Seeger may well do just what he did in the *Bolden* case: admit the COIs, just as "most judges" have done in many other cases. *Id.* at 29:01-11; *see id.* at 29:06-8 ("I had a nice little string cite on this. I remember citing Judge St. Eve and company, so I thought I was in good company.").

at *5 ("The Court finds that the risk of prejudice to the Defendants from the COI's admission is minimal . . . the COI makes no findings of fact with regard to Riggio's behavior, or, for that matter, the conduct of the Officer Defendants at issue here."); *Harris*, 2018 WL 2183992, at *4 (citing the court's previous ruling rejecting the argument that "the risk of unfair prejudice would substantially outweigh the highly probative Certificate of Innocence, especially because the Certificate of Innocence does not make any findings regarding the CPD Officer Defendants"); *Kluppelberg*, 84 F.Supp.3d at 747 ("The COI makes no finding as to any act of any police officer involved in the case that would put them in the position of having to rebut a finding made in a proceeding to which they were not a party . . . [t]he COI, like the initial guilty verdict, is evidence in this case. Our system of justice trusts the jury in its sound judgment to weigh all of the evidence in determining which party is entitled to a favorable verdict."). These straightforward points can be made clearly and efficiently without devolving into a "mini-trial." *See Chatman*, 2018 WL 11426432, at *3 ("[I]f Defendants wish to dispute Plaintiff's innocence, they are free to try without leading the jury into a mini-trial on the adequacy of the COI proceedings." (internal quotation marks omitted)).

Finally, Defendants fail to recognize that admitting the COI rather than excluding it is what clears up jury confusion. As the *Rivera* court put it, "Jurors are almost certain to be distracted by questions about why plaintiff was released," and "[p]roof of the Certificate of Innocence . . . will eliminate this potential distraction and settle the issue of why he was released. Because it will quickly remove a source of distraction, for that reason alone its probative value vastly outweighs its prejudicial impact." 2018 WL 11468911, at *1; *see also Chatman*, 2018 WL 11426432, at *3 ("Without [the COI], the jury might be led to believe mistakenly that the charges against [plaintiff] were dropped due to a procedural defect or other technicality.").

### *The COI Is Admissible Under Hearsay Exceptions*

Numerous courts have rejected Defendants' next argument that admitting the COI would violate the rule against hearsay.[20] *See, e.g.*, *Chatman*, 2018 WL 11426432, at *4; ECF No. 333-36, Ex. 36, *Bolden*, No. 1:17-cv-00417, ECF No. 467, at 26; *Logan v. City of Chicago*, No. 09-cv-5471, ECF No. 423 (N.D. Ill. Oct. 19, 2012); *Brown*, 633 F. Supp. 3d at 1170 (rejecting hearsay objection and noting that "several courts in this district have concluded that a COI is admissible evidence"). Those courts have correctly held that a COI meets the elements of Rule 803(8)'s public records exception, because a COI (generally, and here specifically) "sets out the office's activities—namely, the activities of the Judge in the Circuit Court of Cook County—and there is no dispute about whether the State court's rulings were accurately recorded on the Certificate." *Brown*, 2023 WL 2640317, at *2.[21] And these courts have rejected the very arguments and authorities Defendants offer here. *E.g.*, *Kluppelberg*, 84 F. Supp. 3d at 746; *Logan*, No. 09-cv-5471, ECF No. 423, at 2-3; *Harris*, 2018 WL 2183992, at *3 ("Plaintiff's certificate is relevant and admissible."); Defendant Officers' Motion in Limine No. 1 at 6, *Harris*, 2017 WL 6624868 (N.D. Ill. Jan. 6, 2017) (relying on the same cases Defendants here cite in their motion at 69-70); *Chatman*, 2018 WL 11426432, at *5 ("The Court finds the reasoning in *Kluppelberg* persuasive."). This Court should do the same.

In the face of this overwhelming authority, Defendants offer only one case that is actually about a COI—*Walker v. White*. But the decision in *Walker* to bar the COI on hearsay and prejudice grounds was "based on the defense stipulation that the proceedings had been

---

[20] Separately, the Court may also take judicial notice of the fact that the COI was issued to Plaintiff—a fact that is not subject to reasonable dispute. *Chatman*, 2018 WL 11426432, at *4 (citing authority).

[21] Alternatively, the COIs are admissible as business records under Rule 803(6), or under the residual exception in Rule 807.

terminated in a manner of innocence." Ex. 7, *Walker* 3/2/2023 Hearing Tr. at 41:21-24. That reasoning is simply not applicable here. What is more, *Walker* overlooked that two of the reasons a COI is admissible—its relevance to damages and as rebuttal evidence should Defendants try "to negative the materiality of their alleged actions" by arguing that Plaintiff is actually guilty—"avoid the problems associated with admitting civil judgments for the truth of their facts." *Chatman*, 2018 WL 11426432, at *4-5 (N.D. Ill. Oct. 11, 2018) (describing *Kuppelberg*'s reasoning on this point and finding it "persuasive").

In the event the Court nonetheless concludes that the COI is not admissible under the public records exception to the hearsay rule, Plaintiff should at least be permitted to offer the COI, not for the truth of its findings of innocence, but merely to set forth an important part of the procedural history of the underlying criminal case.

Accordingly, Defendants' motion *in limine* number 15 should be denied.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 16 TO BAR PLAINTIFF'S EXPERT MATTHEW JONES FROM OFFERING UNDISCLOSED OPINIONS REGARDING THE PARIS JACKSON HOMICIDE INVESTIGATION**

Defendants move to bar Plaintiff's police practices expert Matthew Jones from testifying as to anything that happened in the investigation outside of Plaintiff's incommunicado interrogation between 1:30 a.m. on September 3, 2008, and 3pm on September 5, 2008. Def. MIL at 77-78. Plaintiff objects to this motion for two reasons: it seeks to impose a unilateral limit on Mr. Jones that should in fact apply symmetrically to both Mr. Jones and Defendants' expert, William Marsh, whose opinions cover the same ground, and because it seeks to improperly limit the testimony Mr. Jones will be able to offer at trial. The Court should deny the motion and impose a mutual bar on both parties' respective police practices experts offering opinions as to the conduct of parts of the investigation unrelated to the interrogation.

*First*, Plaintiff objects because, despite Plaintiff's explicit request during a meet-and-confer, Defendants have refused to enter into a mutual, reciprocal stipulation to bar their own police interrogation expert, William Marsh, from offering opinions related to the conduct of the interrogation. A mutual bar on such testimony is appropriate and necessary here because both experts' opinions covered precisely the same topics, focusing squarely on the interrogation. This is clear from Mr. Marsh's report, which explicitly states that each of his proffered opinions is offered in rebuttal to those of Mr. Jones. *See* ECF No. 313-1, Marsh Rep. at 1. Indeed, Mr. Marsh's entire report is structured around "Response[s] to Plaintiff's Opinion[s]." *See id.* at 3-7 ("Response to Plaintiff Opinion #1"); *id.* at 7-9 ("Response to Plaintiff's Expert's Opinion #2"); *id.* at 10-11 ("Response to Plaintiff's Expert's Opinion #3"); *id.* at 11-14 ("Analysis, Opinion, and Rebuttal of Opinions Offered in Supplemental Report of Matthew S. Jones"). Defendants have elsewhere acknowledged, in response to Plaintiff's *Daubert* motion, that "Defendants

74

disclosed William Marsh as an expert on police practices to rebut the testimony of Plaintiff's purported police practices expert, Matthew Jones." ECF No. 313, at 1 (Defs' Response to Pl's Mot. To Bar Opinion Testimony of William Marsh). Nothing in Defendants' opposition to Plaintiff's *Daubert* motion, which seeks to bar *all* of his opinions, even mentions an opinion Mr. Marsh purports to offer on a topic unrelated to the interrogation. Likewise, at his deposition, Mr. Marsh did not opine on aspects of the investigation unrelated to Defendants' actions relating to the custodial interrogation.[22]

In short, both sides' police practices experts only offer opinions regarding the conduct of the interrogation. Both only discuss the broader investigation incidentally, as it bears upon their opinions with respect to the conduct of the interrogation.

*Second*, Defendants' motion seeks to improperly narrow the scope of the opinions and testimony that Mr. Jones may offer. Defendants apparently wish to limit his testimony only to what transpired inside the interrogation room, to the exclusion of events in the broader interrogation that bear upon the Defendant interrogators' conduct. *See* Def. MIL at 77-78. But Mr. Jones's opinions and testimony regarding the interrogation were informed by his review and

---

[22] At one point, Mr. Marsh purports to offer an opinion that Defendants had probable cause to arrest Plaintiff and bring him in for a custodial interrogation. *See* ECF No. 313-3, Marsh Dep, at 107:03-109:15. But, of course, an expert may not testify as to the existence of probable cause, which is a legal determination, and probable cause will not even be an issue at this trial. In any case, this answer was provided in the context of questioning Mr. Marsh about the propriety of Defendants' lengthy interrogation and their apparent decision to begin a custodial interrogation well in advance of having enough evidence to present to the prosecutor to consider filing charges. *Id.* at 106:8-21. Accordingly, even this opinion relates to the conduct of the interrogation, not other aspects of the investigation.

    Likewise, Mr. Marsh made reference to supposed activities going on in the investigation when he provided deposition testimony attempting to justify Defendants' refusal to permit Plaintiff to call a family member for 34.5 hours. *Id.* at 143:02-148:17. As Plaintiff has argued in his *Daubert* reply, Mr. Marsh invents these supposed justifications from whole cloth, ECF No. 322, at 6-7. But, in any case, this portion of his testimony—like the portions of Jones's opinions that make reference to action outside the interrogation room—is purporting to illuminate the conduct of the interrogation, not to provide a separate opinion about the conduct of the overall investigation beyond the interrogation.

assessment of other relevant activity happening outside the interrogation room, before and during the interrogation.

Thus, for example, Mr. Marsh's report includes not just a brief factual narrative of the investigation, but a detailed discussion of Plaintiff's mother's effort to hire an attorney, Wham Cary, for Plaintiff while he was being interrogated; a description of Mr. Cary's effort to speak to his client (i.e. Plaintiff); and an account of how the CPD desk officer at the detective division falsely told Mr. Cary twice that Plaintiff did not want to speak with him, when in fact Plaintiff was never told of his presence. ECF No. 332-37, Marsh Rep. at 26-27. The report discusses Plaintiff's family members' presence at the police station and Defendants' refusal to permit Plaintiff to call his mother. *Id.* at 11, 27, 34. The report discusses aspects of the trial proceeding and post-conviction proceedings in Plaintiff's underlying criminal case. *Id.* at 32-33. The report also discusses "false evidence ploys" in the interrogation room where Defendants misstated evidence that they had supposedly gathered from witnesses in order to attempt to pressure a false confession. *Id.* at 15, 18. More broadly, Mr. Jones's report specifies that his opinions are based on his review not just of the interrogation video and transcript, but also "the police's investigative file, and transcripts of various depositions and court proceedings, among other documents." ECF No. 332-37, Jones Rep., at 3 & Appendix B (listing materials reviewed).

Mr. Jones's deposition testimony is consistent with these portions of his report. While he of course testified that the main focus of his work was reviewing the videotaped interrogation, he explained under questioning that he had also reviewed "documents . . . related to . . . testimony of Wham Cary," documents "related to post-conviction testimony, "some of the photos" and "other documents that [Plaintiff's counsel] gave me." ECF No. 332-38, Jones Dep. 3/3/2023 (Part I), at 11:14-12:15. With respect to false evidence ploys, in particular, he referred to

underlying witness statements gathered by Defendants as the basis to confirm that Defendant interrogators were in fact misstating the evidence they had gathered. *Id.* at 167:3-12.

Defendants are thus simply wrong when they assert that Mr. Jones's proffered opinions are limited to what happened inside the interrogation room. He should be permitted to discuss those portions of the underlying interrogation that inform his opinions regarding the conduct of interrogation.

Accordingly, the Court should (1) deny the motion to the extent it seeks to prevent Plaintiff's expert from discussing parts of the broader investigation that bear upon the conduct of the interrogation, and (2) issue an order imposing a mutual bar on both sides' experts from offering testimony regarding the conduct of the investigation that goes beyond their disclosed opinions regarding the conduct of the interrogation.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 17 TO BAR EVIDENCE OR ARGUMENT REGARDING THE PASSAGE OF TIME BETWEEN THE PARIS JACKSON MURDER AND CRIMINAL TRIAL AND CONVICTION**

Defendants ask for an order barring any reference to the lengthy passage of time between the commencement and the conclusion of the joint bench trial of Plaintiff and RJ Branch in the Cook County Circuit Court. This motion is an adjunct to Defendants' claim that Plaintiff may not recover damages for any time spent in custody before his conviction. *See* Def. MIL No. 9.

Defendants' argument that pre-conviction damages should be barred (and especially that they should be barred via a motion *in limine*) is a non-starter for the reasons set forth in Plaintiff's response to that motion. *See* Pl. Resp. to Def. MIL No. 9. But, in any event, Plaintiff's exposure to the unfolding of the criminal process, with its delays and attendant frustrations, is among the consequences that Defendants' misconduct produced. There is simply no reason to bar the evidence. Plaintiff will not argue or suggest that the delay in the trial was caused by Defendants. It is merely a feature of the system into which Plaintiff was unjustly thrown.

Defendants' motion *in limine* no. 17 should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully asks this Court to enter an order for the

relief requested herein.

Respectfully submitted,

**MARCEL BROWN**

By:  /s/ Vanessa del Valle
    One of his attorneys

Vanessa del Valle
Jonathan Manes
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-8576

Locke E. Bowman
Jon Loevy
Tom Kayes
Loevy & Loevy
311 N. Aberdeen St., Ste. 3
Chicago, IL 60607
312 243 5900

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on July 16, 2024, he served the foregoing

document upon all counsel who have filed appearances in this action via CM/ECF.

/s/ Vanessa del Valle