**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Marcel Brown, | |
| *Plaintiff,* | No. 19 CV 4082 |
| v. | Judge Lindsay C. Jenkins |
| City of Chicago, *et al.*, | |
| *Defendants.* | |

**ORDER**

Before the Court are Plaintiff's [Dkt. 335] and Defendants' [Dkt. 333] motions *in limine* (MILs).[1] As explained below, the Court rules on some of the motions in full, others in part, and defers ruling on others.

**PLAINTIFF'S MOTIONS**

## Plaintiff's MIL No. 1: IDOC Phone Calls

Plaintiff moves to bar admission of all jail calls that Defendants have identified pursuant to the procedure the Court established. [Dkt. 335 at 2–5; *see* Dkt. 297.] The Court largely defers ruling on this motion, which it will do by separate order after a complete review of Defendants' designations and the parties' arguments in the chart they provided to the Court. To the extent that Plaintiff moves to bar admission of all calls on the ground that Defendants did not specify the portions of calls they sought to introduce, the motion is denied. As the Court sees it, Defendants' failure to identify the specific portions of the calls flows largely from the Court's directive to "exchange a list of designated recorded calls for use at trial," which does not mention designating portions of calls. [Dkt. 297.] At the time the Court entered that order, it did not fully appreciate the length of many calls, and it regrets that the procedure created unnecessary work for Plaintiff's counsel and prevented them from focusing on objections to the specific portions of calls Defendants propose to introduce. Accordingly, the Court grants the motion for leave to object in writing to calls the Court rules are or may be admissible. [Dkt. 335 at 2.] Plaintiff's MIL No. 1 is otherwise entered and continued.

## Plaintiff's MIL No. 2: Gang Affiliations

Plaintiff moves "to bar Defendants from making references to gangs at trial, including by making argument or introducing evidence regarding Plaintiff or RJ

---

[1]     The earlier motions [Dkt. 331, 332], which have been superseded, are stricken.

Branch's supposed gang affiliations, or a gang-related motive for the crossfire in Amundsen Park the night before Paris Jackson was found dead there the next day." [*Id.* at 6.] This motion is granted in part and denied in part. There is enough evidence that some witnesses considered the groups of friends at issue here to be "gangs" such that it would be inappropriate to exclude all mention of gangs, and whether Plaintiff was part of—or knew that RJ was part of—a rivalry between groups of young people (whatever those groups were called). To avoid unfair prejudice to Plaintiff, however, evidence about gangs and gang-related activity must be limited as described below.

Plaintiff is correct that evidence of gang membership or gang activity is often excluded because of its potential to unfairly poison a jury against a party. [*Id.* at 10–13.] *See, e.g., United States v. Irvin*, 87 F.3d 860, 867 (7th Cir. 2000) ("Gangs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior. There is therefore always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict."); *United States v. Richmond*, 222 F.3d 414, 417 (7th Cir. 2000) ("Evidence of gang involvement must be considered carefully to avoid undue prejudice."). For similar reasons, evidence of gang membership or activity can constitute evidence of prior bad acts that is inadmissible under Federal Rule of Evidence 404(b). [Dkt. 335 at 13–14.] *See, e.g., Ramirez v. City of Chicago*, 2009 WL 3852378, *1 (N.D. Ill. Nov. 17, 2009) (noting the risk of gang membership being considered propensity evidence).

Defendants counter that there is evidence that the group that Plaintiff and RJ Branch were in, USDA, was a rival of another group, Young Money, whose members included Rufus McGee and Eugene Stanciel, who were in the group that RJ shot at in Amundsen Park. [Dkt. 337 at 8–11.] Further, RJ was a member of the Vice Lords, a more formal gang, and McGee (Four Corner Hustlers) and Stanciel (Insane Mafia) were members of rival gangs. [*Id.* at 9.] Defendants argue that these affiliations, combined with evidence that Amundsen Park was somewhere RJ would not go unless prepared for a conflict, support an inference that Plaintiff knew RJ was likely to have a gun when Plaintiff drove RJ to the park. [*Id.* at 10–11.] Thus, Defendants argue, this case presents the kind of "appropriate circumstances," where "gang evidence has probative value warranting its admission over claims of prejudice." *United States v. Montgomery*, 390 F.3d 1013, 1018 (7th Cir. 2004).

The Court agrees with Defendants in part. Plaintiff argues that USDA and Young Money were not "criminal gangs" but "were just monikers that kids in [the] neighborhood[s] used to describe themselves" [Dkt. 335 at 6–7], but there is enough evidence that these groups were at least sometimes called "gangs" to permit that word to be used to describe them. [Dkt. 337 at 8–9; *see, e.g.,* Dkt. 337-4 at 5 ("The Court: Were you [McGee] in one gang and he [RJ] was in another? The witness: Yeah.").] To be sure, there is ample room to argue that the use of the word "gang" in this context does not refer to organized street gangs such as the Vice Lords. [*See, e.g.,* Dkt. 337-1 at 77:22–78:1 (McGee's deposition testimony denying that he and RJ were in gangs

2

at the time of the shooting), 200:12–201:19 (McGee explaining his postconviction hearing testimony: "It's not a gang. We just had people that we f*** with and he had people he f*** with. … You is referred to as a gang member off the area that you stay in, regardless of how you put it. So if you get put up in the mafia area, and you come from that area, they're going to say you're mafia. That's just how it is.").] The nuances of references to "gangs" is a matter best suited for opening statements, examination, and closing arguments, not a MIL. [*See also* Dkt. 335 at 8 (emphasizing differences between USDA and organized gangs).] Similarly, Defendants may argue that RJ would not have gone to Amundsen Park unless he was prepared to fight because that was a hangout spot for his "enemies" including Stanciel and McGee. [*See* Dkt. 377 at 8–9; Dkt. 337-1 at 77:7–:10 (McGee's deposition: "Q. Why did you think that [RJ] was going to come and get you? A. Because he shouldn't be on this side of the line, and we can't be on their side."); Dkt. 337-2 at 343:4–:7 (Plaintiff's deposition: "Q. Back in 2008 did the members of Young money -- did you know them to hang out at Amundsen Park? A. Sometime.").] Permitting Defendants to introduce evidence and argument about these matters will enable them to argue their theory that Plaintiff knew that RJ had the gun, which is highly relevant to the issues at trial.

Defendants' use of gang-related evidence can only go so far, however. They may not equate USDA and Young Money to formal gangs that engage in organized criminal activity, hold territory, and have "clear membership, loyalties, and duties." [Dkt. 335 at 8 (noting these distinctions).] In light of Defendants' position that despite the differences between these groups and more organized gangs, USDA and Young Money may still be considered "gangs" [Dkt. 337 at 13–14], Defendants may not invoke the specter of greater criminal gang activity. Doing so would risk confusing the jury about Plaintiff's alleged "gang" affiliation and could cause unfair prejudice if the jury conflates Plaintiff's USDA-related activities with, for example, the criminal activity of the Vice Lords. *See* Fed. R. Evid. 403. Defendants also may not argue that RJ's, McGee's, and Stanciel's membership in the Vice Lords, the Four Corner Hustlers, and the Insane Mafia precipitated the shooting. [*See* Dkt. 337 at 9 ("These affiliations with more formal rival gangs further entrenched the divisions between Plaintiff and RJ, and the group that RJ shot at in Amundsen Park.").] Defendants' citations provide at best shaky support for the contention that RJ's, McGee's, and Stanciel's affiliation with formal gangs—rather than affiliation with USDA and Young Money, or a different reason—made them "enemies."[2] Given the weak evidentiary support for this proposition; the lessened probative value of this theory because Defendants' may present the same basic argument otherwise, as described above; and the likelihood that depicting the Amundsen Park shooting as a turf

---

[2]  Brittany Williamson testified at her deposition that McGee and RJ were "enemies" and that McGee was in the Four Corner Hustlers, but she did not state that gang membership drove their enmity, and there may hearsay and foundation concerns with her ability to testify about that enmity. [*See* Dkt. 337-6 at 111–12.] And McGee testified in his deposition that RJ and Stanciel "would try to hurt each other or whatever. Fight each other or whatever" if they saw one another, but he did not link that to rival gang membership. [Dkt. 337-1 at 210.]

dispute between organized gangs will unfairly prejudice Plaintiff, the Court will exclude this evidence under Rule 403. The Court defers ruling on whether mentions of gang activity or "gangbanging" on jail calls can be admitted until it has a chance to more fully review those calls. [*See* Dkt. 337 at 9–10.]

Thus, Plaintiff's MIL No. 2 is granted in part, denied in part, and entered and continued in part.

**Plaintiff's MIL No. 3: Prior Arrests and Bad Acts**

Plaintiff moves to exclude evidence of his arrest history prior to his 2008 arrest for the murder of Paris Jackson and to exclude evidence of the facts underlying those arrests. [Dkt. 335 at 15–18.] "The well-established, general rule is that a witness's credibility may not be impeached by evidence of his or her prior arrests, accusations, or charges." *Barber v. City of Chicago*, 725 F.3d 702, 709 (7th Cir. 2013) (citations omitted). Plaintiff argues that his prior arrests and other bad acts should be excluded on these grounds. Defendants argue that Plaintiff has opened the door and that this evidence is admissible to rebut Plaintiff's portrayal of himself as a law-abiding young man with little understanding of the criminal justice system. [Dkt. 337 at 14–16.] The Court agrees with Defendants in principle, so it will permit them to introduce some evidence about Plaintiff's prior history with the criminal justice system, but this evidence must be carefully tailored to avoid unfair prejudice.

It is Plaintiff's decision whether to argue to the jury that his inexperience with police or the criminal justice system made him more likely to be induced into giving a false confession. This may be a convincing line of argument, but it comes with downsides, including that it opens the door to more evidence about past encounters with the law than would otherwise be admissible. *See, e.g.*, *Geitz v. Lindsey*, 893 F.2d 148, 151 (7th Cir. 1990) (noting that while the Seventh Circuit "has held that essentially all the information that the cross-examiner is allowed to elicit is the crime charged, the date, and the disposition" when a conviction is offered for impeachment purposes, more details may properly be elicited when the conviction or underlying conduct is offered for another purpose); *Sanchez v. City of Chicago*, 700 F.3d 919, 931–32 (7th Cir. 2012) (affirming, albeit with some reservation, decision to permit cross-examination regarding prior arrests when the plaintiff claimed emotional distress damages due to his treatment at the hands of the police). If Plaintiff abandons this line of argument, then the Court is likely to exclude evidence about his past encounters with the police. But if he argues that he was particularly likely to falsely confess because he lacked experience interacting with police, Defendants may cross-examine him about those interactions. However, the Court sees no reason why the crimes for which Plaintiff was arrested, whether he was charged in connection with the arrests, or the alleged conduct underlying those arrests is relevant to the question of Plaintiff's interactions with police and the criminal justice system. If Plaintiff wishes to limit the scope of questioning on these topics to the fact that Plaintiff had previously been arrested and questioned, and the nature of those interactions, he may

renew this MIL. Of course, if Plaintiff prefers that a more complete picture of these past interactions with the law be admitted, he may choose to do so.

As for Plaintiff buying and selling a gun illegally in 2005, the Court intends to largely exclude this evidence unless Plaintiff opens the door to it. Defendants argue that they should be able to rebut Plaintiff's argument that his "lack of contact with crime and the criminal justice system helps to prove he did not know that RJ had a gun on August 30, 2008 or that he planned to open fire in Amundsen Park." [Dkt. 337 at 17.] This line of argument veers too far into propensity evidence. Why does buying and selling a gun illegally make it more likely that Plaintiff knew RJ had a gun or planned to shoot on August 30, 2008? The answer boils down to propensity—because someone committed one crime in the past, he is more likely to be aware of or participate in the commission of other crimes in the future. That is inadmissible propensity evidence. Fed. R. Evid. 404(b)(1). While prior bad acts can be admissible to prove knowledge under Rule 404(b)(2), the evidence about the gun is only loosely probative of Plaintiff's knowledge that RJ was carrying a gun three years later. The Court will, however, allow Defendants to ask Plaintiff if, prior to August 2008, he was aware how a person "physically handles themselves when carrying a gun" to set up their argument that this supports their position that Plaintiff must have known RJ had a gun on August 30, 2008. [Dkt. 337 at 17.] Unless Plaintiff prefers a fuller account to come in or if he denies having such knowledge (or otherwise testifies that he has never illegally possessed a gun), Defendants cannot probe the specifics about how Plaintiff came to possess this knowledge. The Court also rejects the argument that Plaintiff purchased the gun for protection, which "shows that Plaintiff felt that he needed protection from men in rival crews." [*Id.* at 17–18.] The evidence for the protection motive is far from ironclad, possession of a gun for several years before the events of 2008 is at best weakly probative of Plaintiff's mental state years later, and this comes too close to being inadmissible propensity evidence.

To the extent that the motion seeks to bar Plaintiff's statements on jail calls, the Court defers ruling for now.

Plaintiff's MIL No. 3 is therefore granted in part, denied in part, and entered and continued in part. The denial is without prejudice to the extent that Plaintiff may renew this motion to limit the scope of questioning regarding his prior arrests.

**Plaintiff's MIL No. 4: Witnesses' Criminal History**

Plaintiff moves to bar evidence of third-party witnesses' criminal history. [Dkt. 335 at 19–21.] Defendants respond that they seek to introduce only a limited subset of the witnesses' criminal histories. [Dkt. 337 at 18–19.] Insofar as Defendants do not oppose the motion, it is granted. With respect to the opposed portions, the motion is granted in part and denied in part.

*RJ Branch*. Defendants seek to admit RJ's entire criminal history, comprising a 2007 arrest for aggravated battery with a firearm, a 2006 arrest for possession of a firearm, a 2006 arrest and charge for aggravated assault with a dangerous weapon, and several other arrests. [Dkt. 337 at 19.] Some of these charges resulted in juvenile adjudications, but none besides the murder of Paris Jackson resulted in a conviction, so they are not admissible for impeachment purposes under Rule 609(d). [Dkt. 335 at 20 & n.6.] *See Jordan v. City of Chicago*, 2011 WL 6119147, at *1 (N.D. Ill. Dec. 8, 2011) (citing *Lenard v. Argento*, 699 F.2d 874, 895 (7th Cir. 1983)). Defendants do not argue that RJ's criminal history is admissible for impeachment purposes, but rather to help establish that Plaintiff knew RJ possessed a gun on August 30, 2008. [Dkt. 337 at 19–20.] The Court agrees with Defendants that this evidence can be admitted for purposes of establishing what Plaintiff knew about RJ's record, and because it will be undisputed that RJ entered Amundsen Park and began shooting, the risk of unfair prejudice against him or Plaintiff as a result is less than it would be if RJ's role as the shooter were in dispute. [*See id.* at 20.] With that said, RJ's criminal history itself is a collateral issue—what matters is Plaintiff's knowledge of that criminal history. Defendants can therefore probe Plaintiff's knowledge of RJ's arrests, charges, and juvenile adjudications as of August 2008; introduce evidence of RJ's criminal history; and argue that Plaintiff must have known RJ had a gun based on his knowledge of RJ's criminal history. However, the Court cautions Defendants that it will not allow copious evidence on this topic, which would waste time and could confuse the issues and, at the margins, unfairly prejudice the jury against Plaintiff. *Cf. United States v. Kohli*, 847 F.3d 483, 492–93 (7th Cir. 2017) (explaining that a district court may bar a party from impeaching a witness on collateral matters with extrinsic evidence). The focus should remain on Plaintiff's contemporaneous knowledge of RJ's conduct.

*Eugene Stanciel*. Defendants propose to introduce evidence that Stanciel was convicted of aggravated battery to a peace officer and evidence of Stanciel's numerous arrests. [Dkt. 337 at 20–23.] As to the conviction, for which Stanciel received a prison sentence that ended in July 2014, neither the fact that he was convicted of this crime nor the circumstances underlying its commission has a "probative value, supported by specific facts and circumstances, [that] substantially outweighs its prejudicial effect," because it will be more than 10 years old at the time of trial, it cannot be introduced for purposes of impeaching Stanciel's character for truthfulness. Fed. R. Evid. 609(b). Defendants suggest two other uses for this conviction. First, the timing belies his claim that the police were "always putting cases on [him] due to the fact of [the RJ] case," because prior to his arrest and conviction for the aggravated battery charge, Stanciel had provided only testimony that would be helpful to the police, so there would have been no motive to retaliate against Stanciel by bringing this charge. [Dkt. 337 at 21; *see* Dkt. 337-7 at 129–30.] The Court is not convinced that Stanciel's deposition testimony supports this line of argument. Stanciel did not elaborate on what about the RJ case he believed caused the police to retaliate against him; it is possible, for example, that Stanciel believed that police were retaliating against him because he had been involved in the conflict in Amundsen Park, not because of his testimony in RJ's criminal case. Defendants may ask Stanciel to elaborate about his

deposition testimony on this point, but they may not use the aggravated battery to impeach his credibility unless his account of police retaliation is inconsistent with the timing of that offense. The Court expects Defendants to raise this issue outside the hearing of the jury if based on Stanciel's testimony they believe this conviction is valid impeachment on timing grounds.

Defendants' second argument about the aggravated battery conviction is more persuasive. They intend to argue that Stanciel changed his testimony to avoid being labeled a "snitch," and one piece of evidence is a conversation between Stanciel and Marisol Ocampo on an IDOC call. [Dkt. 337 at 21–22.] Defendants argue that they must discuss Stanciel's conviction to lay a foundation and provide context for the call. The Court agrees to an extent, but the necessary context is the fact that Stanciel was in custody when this call was made, not that the custody was pursuant to a felony conviction for aggravated battery to a peace officer. Thus, if this call is admissible (which the Court does not decide at this time), Defendants will be permitted to lay a limited foundation to establish that Stanciel was in custody and his calls were being recorded, but they may not elicit more testimony about the nature of the custody.[3]

As for the arrests, Plaintiff argues that evidence about all of Stanciel's arrests, save for his August 30, 2008 arrest, should be excluded because arrest records are inadmissible character evidence under Rule 404(b) and are unduly prejudicial under Rule 403. [Dkt. 335 at 24–25.] The Court agrees that the arrests may not be used to impeach Stanciel's credibility. *See Barber*, 725 F.3d at 709. But Defendants propose another use for this evidence: to challenge Plaintiff's theory that the police induced Stanciel to give false testimony via threats, because "the number of times Stanciel was arrested … makes it less likely that Stanciel would provide false testimony to escape a situation he had been in many times before August 30, 2008." [Dkt. 337 at 22–23.] The Court agrees, so it will allow Defendants to probe Stanciel's arrest record, provided that Plaintiff first argues that Stanciel was induced to give false testimony by police threats. This evidence will be limited to the number of times Stanciel was arrested prior to August 30, 2008, however, because later arrests are irrelevant to the question of Stanciel's actions in connection with that arrest. [*Cf.* Dkt. 335 at 19 (noting that Stanciel was arrested 34 times between 2005 and 2018).]

*Rufus McGee*. Defendants seek to offer, for impeachment purposes, (1) a 2017 felony conviction for possessing a controlled substance; (2) misdemeanor convictions for obstructing identification in 2014 and 2016; (3) a 2013 misdemeanor conviction for forgery; and (4) two arrests and pending felony charges on which he is awaiting trial. [Dkt. 337.] The convictions—items (1), (2), and (3)—are admissible. The felony conviction is admissible under Rule 609(a)(1)(A) because it is less than 10 years old. The misdemeanors are admissible because "establishing the elements of the crime[s]

---

[3]     If necessary, and depending on whether the conviction is offered for any other purpose, the Court can instruct the jury that evidence about Stanciel's custody was offered only to lay the foundation for the call and may not be considered for any other purpose.

required proving — or the witness's admitting — a dishonest act or false statement." Fed. R. Evid. 609(a)(2). [*See* Dkt. 337 at 24–25. *Contra* Dkt. 335 at 23.][4] To limit the chance of unfair prejudice, the Court will limit the evidence to the title of the offense, the date, and the fact that McGee was convicted. *Geitz*, 893 F.2d at 151. Evidence of the arrests, however, will be excluded. "Unlike a criminal conviction, an *arrest* is not, in itself, probative of the arrested person's character for truthfulness." *Nelson v. City of Chicago*, 810 F.3d 1061, 1068 (7th Cir. 2016) (citations omitted). Defendants will already be able to make the point that McGee's criminal history lessens his credibility to the extent permitted by Rule 609. Piling arrests on top of convictions would add little probative value and would risk unfair prejudice.

*TJ Scott*. Defendants seek to introduce evidence of TJ Scott's felony convictions from August 2008, for battery stemming from a robbery charge, and November 2009, for possession of heroin with intent to deliver, not to impeach TJ but to contradict Plaintiff's account that USDA was merely a group of friends who hung out, danced, and rapped. [Dkt. 337 at 26.] The Court agrees that this evidence is relevant for that purpose, but for the reasons explained above with respect to RJ's criminal history, the key issue is Plaintiff's knowledge of TJ's criminal conduct or record. Defendants may ask Plaintiff about his knowledge of these incidents, but because TJ's criminal history is less probative than RJ's, the Court is unlikely to allow Defendants to ask TJ about these convictions or to use extrinsic evidence to impeach Plaintiff about his knowledge of TJ's convictions. *Cf. Kohli*, 847 F.3d at 492–93.

Plaintiff's MIL No. 4 is therefore granted in part and denied in part. The Court expects that some issues implicated in this motion will recur at trial; this ruling does not preclude either party from seeking to admit or exclude evidence of third-party witnesses' criminal histories to the extent that doing so is consistent with this ruling.

## Plaintiff's MIL Nos. 5 and 6: Witness Tampering

Plaintiff's MIL No. 5 asks the Court to bar evidence or argument about witness tampering generally, except as to Stanciel, and MIL No. 6 specifically seeks to bar testimony that Eric Blackmon, a paralegal and investigator working on the case, tried to improperly induce Ocampo to testify in Plaintiff's favor. [Dkt. 335 at 26–34.] Both motions are entered and continued. As to MIL No. 5, final resolution will require a ruling on the IDOC calls. As to both MILs, given the difficulty the parties had getting Ocampo to sit for her deposition and her mental condition at the time, the Court is not comfortable allowing the parties to argue about what testimony Ocampo will give or elicit testimony from her on these issues without first previewing her testimony outside the hearing of the jury. While the Court agrees with Defendants that the issue

---

[4]     The Seventh Circuit has stated that forgery convictions "are clearly admissible under Rule 609(a)(2)," *United States v. Byrd*, 771 F.2d 215, 219 (7th Cir. 1985), and obstructing identification requires proof of "intentionally or knowingly furnish[ing] a false or fictitious name, residence address, or date of birth to a peace officer." 720 ILCS 5/31–4.5.

of witness tampering is potentially quite probative [*see* Dkt. 337 at 27–36], even the mention of witness tampering runs a serious risk of unfairly prejudicing the jury. The Court intends to tread very carefully about this issue in the presence of the jury. It will not permit evidence or argument on the topics raised by MILs No. 5 and 6 unless it is satisfied in advance that there will likely be admissible evidence to close the loop. *See* Fed. R. Evid. 104(a), (c)(3). The Court expects the parties to approach these topics similarly cautiously. The Court will address this issue more fully at the final pretrial conference. It raises the issue here to allow the parties to consider how best to approach this issue to minimize disruption to the trial and possible prejudice.[5]

### Plaintiff's MIL No. 7: Gaga's Death

Lazerick Webster, nicknamed "Gaga," was a 13-year old cousin of RJ's and a close friend of Plaintiff's. He died in June 2007 when a van he was sleeping in caught fire. Plaintiff moves to bar evidence related to Gaga and his death because it is not relevant to the issues for trial. [Dkt. 335 at 35.] Defendants argue that this evidence is relevant to show that Plaintiff had experience with the criminal justice system, as he was interviewed in connection with Gaga's death, and that Gaga's death shows the tension that existed among rival groups around the time of Paris Jackson's death. [Dkt. 337 at 36–38.] The Court agrees with Defendants to an extent. As discussed above, what matters is Plaintiff's knowledge of tensions in the neighborhood and his experience with the police, so Defendants may question him to a limited extent about Gaga's death and, if the door is opened about his experience with the criminal justice system, about police questioning about the death. The Court will not permit further evidence about Gaga, however, given that the death occurred 14 months before the shooting at issue and is not necessarily connected to the Amundsen Park shooting. Therefore, MIL No. 7 is granted in part and denied in part.

### Plaintiff's MIL No. 8: References to "Convict" and "Murderer"

Plaintiff asks the Court to bar "any description of Plaintiff before the jury as a 'convict,' 'convicted person,' 'murderer,' 'convicted murderer,' or the like." [Dkt. 335 at 37.] Defendants assert that they "have no intention of calling Plaintiff a 'convict' or that he currently stands convicted of murder," but they argue that they must be able to argue "that the evidence reasonably demonstrated that Plaintiff knowingly participated in a plan that led to the murder of Paris Jackson." [Dkt. 337 at 40.] The Court agrees with Defendants that they must be able to argue that Plaintiff knew that RJ had a gun and was likely to shoot at the others in the park, and to argue that RJ actually killed Paris Jackson, and the Court does not understand Plaintiff to argue otherwise. Rather, the Court interprets MIL No. 8 to bar counsel or witnesses from

---

[5] The Court would consider questioning witnesses—Ocampo or others—before the trial formally begins, which may be preferable to conducting such examination during the trial. The Court will do everything in its power to ensure that the jury can stick to a roughly 9:15–4:30 schedule; proceedings conducted outside the presence of the jury would be conducted outside of those hours or during the lunch break.

gratuitously referring to Plaintiff as a convict, murderer, and so on. So construed, MIL No. 8 is granted. The trial will focus on what Plaintiff knew about RJ on August 30, 2008 and the Defendants' actions during their investigation. That Plaintiff was charged with and convicted of murder, and the conviction was later vacated, is largely beside the point. While the jury will necessarily hear some evidence about the criminal and postconviction proceedings, the Court will keep such evidence to a minimum.

## Plaintiff's MIL No. 9: Evidence of Defendants' Good Character

Plaintiff moves to bar evidence of Defendants' good character, including "work-related commendations, awards, complimentary history, promotions, or performance reviews." [Dkt. 335 at 38.] Defendants respond that they do not intend to offer such evidence to show their good character, except perhaps to rehabilitate themselves if their credibility or credibility is attacked. [Dkt. 337 at 42–43.] *See* Fed. R. Evid. 608(a); *Simmons v. City of Chicago*, 2017 WL 3704844, at *11 (N.D. Ill. Aug. 28, 2017). Defendants also argue that they should be able to testify about their promotions as background evidence. [Dkt. 337 at 43–44.] The Court agrees as to job history prior to the Paris Jackson murder and investigation; job history postdating that investigation is less relevant, but Defendants may offer limited evidence about it. In either case, the focus must be on Defendants' work history and job duties, not self-congratulatory accounts of the rise through police ranks or the reasons for attaining promotions. As explained here, Plaintiff's MIL No. 9 is granted in part and denied in part.

## Plaintiff's MIL No. 10: Probable Cause

Plaintiff seeks to bar discussion of the fact that there was probable cause to arrest him. [Dkt. 335 at 40–41.] He argues that the question of probable cause is not relevant to the questions that are before the jury. [*Id.* at 40.] At that level, the Court agrees. The existence or absence of probable cause is a legal issue that was addressed at summary judgment, and the Court sees no reason to insert this legal issue into the trial, which could confuse the issues. The parties should therefore stay away from the term "probable cause" and other collateral legal terms. However, Defendants have a point that the fact that Plaintiff's arrest was proper may affect how the jury evaluates whether Plaintiff's rights were violated during the interrogation or as a result of the fabrication or suppression of evidence, or whether any constitutional violation caused damages and the amount of damages. [Dkt. 337 at 45.] Rather than put the concept of probable cause before the jury, it is preferable to clarify the scope of the issues via preliminary and final jury instructions, opening statements, and closing arguments. The Court envisions giving more detailed preliminary instructions than it typically does, to help the jury understand the questions it will be called on to decide and those that are not at issue. The Court and parties will address jury instructions in greater depth at the final pretrial conference and afterward. For now, Plaintiff's MIL No. 10 is granted, but the parties may revisit the specifics of the ruling in connection with preparing jury instructions regarding what is and is not at issue at the trial.

## Plaintiff's MIL No. 11: Demonstrative Evidence

Plaintiff moves for an order requiring all counsel to produce demonstratives to the opposing side prior to using it in front of the jury, to avoid the jury seeing material that is ultimately objected to. [Dkt. 335 at 42.] Defendants argue that demonstratives need not be disclosed pretrial and that it would harm them to reveal demonstratives ahead of trial because it would prematurely reveal Defendants' case theory. [Dkt. 337 at 46.] They are correct that no Federal Rule of Civil Procedure specifically governs the pretrial disclosure of demonstrative evidence, but Federal Rule of Evidence 611(a) empowers the Court to "exercise reasonable control over the mode … of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth," and even the case Defendants cite contemplates requiring disclosure of demonstrative evidence. *See Rodriguez v. Village of Port Chester*, 535 F. Supp. 3d 202, 217–18 (S.D.N.Y. 2021) ("The Second Circuit has noted the great desirability of making demonstrative evidence available to the opposing party a reasonable time before trial, but there is no requirement for pretrial disclosure of such materials at a specific time. It is within the district court's discretion to require parties to make pretrial disclosures of such materials by specific deadlines to enable the opposing party to raise timely objections to the admissibility of potential exhibits." (cleaned up)). In its discretion, the Court declines to require either side to produce demonstratives they intend to introduce as substantive evidence and send back to the jury. Parties are not required to share their strategies prematurely, though this does not mean they can hold back evidence. *Cf. Morris v. BNSF Ry. Co.*, 969 F.3d 753, 765 (7th Cir. 2020) (explaining that the purpose of modern discovery procedures is to avoid conducting trials in the dark). The Court notes, however, that if it sustains an objection to a demonstrative, counsel must proceed without it; the Court would be unlikely to permit a party to delay or recall a witness to account for the exclusion of a demonstrative that counsel planned to use. This is the possible downside of waiting until the last moment to disclose a demonstrative. MIL No. 11 is denied.

### DEFENDANT'S MOTIONS

## Defendants' MIL No. 1: Wham Cary

Defendants move to bar evidence that an attorney who was representing RJ, Stephen "Wham" Cary, asked unnamed police officers to speak to Plaintiff during his interrogation and was falsely told that Plaintiff did not want to speak with him. [Dkt. 333 at 2.] Defendants are correct that even if they prevented Cary from speaking to Plaintiff, it would not amount to a Fifth Amendment violation. *First Def. Legal Aid v. City of Chicago*, 319 F.3d 967, 968 (7th Cir. 2003) ("According to *Moran v. Burbine*, 475 U.S. 412, a suspect in police custody does not have a constitutional right to be notified that his attorney is at the stationhouse."). However, denying Plaintiff access to Cary might have violated Illinois law. [*See* Dkt. 333 at 12–13 (noting this argument by Plaintiff).] Defendants therefore ask the Court to exclude this evidence because it will confuse the issues, waste time, and carries a risk of unfair prejudice. [*Id.* at 11–

13.] The Court agrees to that extent, and it will not permit Plaintiff to argue that refusing to allow Cary to speak with Plaintiff or inform Plaintiff of Cary's presence violates state law. That would create a high risk of confusion and unfair prejudice given that the jury will need to consider questions of federal constitutional law, not state law.[6] The Court does not agree that the evidence related to Cary is wholly irrelevant, though. The Court agrees with Plaintiff that if Defendants turned Cary away, it is probative of their state of mind with respect to the investigation. [Dkt. 336 at 4–5.] The absence of an attorney is also relevant to the totality of the circumstances which the jury must consider in deciding whether Plaintiff's will was overborne. *See Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019).[7]

The fact that neither Cary nor any other witness identified any Defendant as having been involved with the denial of an attorney does not warrant excluding this evidence wholesale. [*Contra* Dkt. 333 at 10–11.] A jury would not need to find that one or more Defendants engaged in a conspiracy with unnamed officers to conclude that Defendants were involved in denying Cary access to Plaintiff. A jury could infer that if uniformed officers received a request from a lawyer to speak to someone being interviewed, they would pass that message along to the detectives. To be sure, there are weaknesses in that argument, and Plaintiff has no evidence directly tying any Defendant to the refusal to allow Cary to speak with Plaintiff, but those are matters to explore on cross-examination and in closing argument.

The Court therefore grants Defendants' MIL No. 1 in part and denies it in part. Plaintiff may elicit testimony about Cary asking to speak to Plaintiff and being turned away, but he may not argue that this violated Illinois law.

**Defendants' MIL No. 2: Defendants' Disciplinary History**

Defendants ask the Court to exclude evidence of disciplinary records, training records, lawsuits, and citizen complaints about Defendants as propensity evidence. [Dkt. 333 at 14–18.] *See* Fed. R. Evid. 404(b). Plaintiff agrees that this evidence is not admissible unless Defendants open the door to it, and he asks the Court to make a reciprocal ruling on this motion and on his motions regarding his criminal history and prior bad acts. [Dkt. 336 at 9.] As explained in the above rulings, the Court will exclude or limit evidence that is likely to be taken as propensity evidence unless there is a valid non-propensity reason to introduce it and it is not excludable under Rule 403. The Court takes the same approach and grants MIL No. 2 with the understanding that Plaintiff may attempt to offer such evidence if Defendants open

---

[6]     This evidence is also irrelevant to Plaintiff's state law conspiracy claim because the conspiracy at issue is a conspiracy to violate the federal Constitution. [*See* Dkt. 333 at 10.]

[7]     The Court uses the term "absence" because as Defendants observe, since Plaintiff was unaware that Cary was available, from his point of view during the interrogation he was not *denied* an attorney. [*See* Dkt. 333 at 7.]

the door or there is a non-propensity purpose. If so, Plaintiff should move to admit the evidence out of the hearing of the jury.

## Defendants' MIL No. 3: Violations of Internal Rules

Defendants move to bar references to any violations of internal CPD rules, regulations, orders, policies or procedures. [Dkt. 333 at 18–21.] This motion is entered and continued because the record is not sufficiently developed for the Court to make a firm ruling. *Cf. Brown v. City of Chicago*, 2023 WL 2640317, at *8 (N.D. Ill. Mar. 22, 2023) (granting a similar MIL but noting that it was without prejudice and could be reconsidered at trial). Defendants are correct that a violation of internal policy does not equate to a constitutional violation, and introducing evidence about such policies could confuse the jury. Still, evidence of policy violations can be admissible in some circumstances. *See United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) ("If, as here, an officer has been trained that officers should not do several things when confronted with tense situations, yet he does those things anyway, the fact that he broke from his training could make it more likely that he acted willfully."). Plaintiff suggests several reasons why policy violations are relevant to the issues at trial, but the briefing does not tee up the evidentiary issues with enough detail to resolve these issues now. Instead, the Court directs Plaintiff to identify the CPD rules and regulations that he wants to present evidence that Defendants violated and why that violation is relevant to the claims at issue here. Plaintiff must serve the list on Defendants by August 9, 2024, and Defendants must serve their responses by August 16, 2024.[8] Further, the Court notes that if Defendants offer evidence that they acted in compliance with CPD policy (including inferential evidence, such as describing ordinary practice without citing a specific policy), Plaintiff must be able to introduce evidence of policy violations to rebut the idea that Defendants acted in accordance with department rules and regulations. This is essentially a question of opening the door that is best addressed during trial. Finally, the Court agrees with Plaintiff that jury instructions about how internal policies and violations can be considered will likely be necessary, which can be addressed at the final pretrial conference or during trial. [Dkt. 336 at 12.]

## Defendants' MIL No. 4: Thoroughness of Investigation

Defendants move to exclude evidence concerning how thoroughly (or not) they investigated the murder of Paris Jackson. [Dkt. 333 at 21–23.] They argue that they were under no obligation to continue to investigate after they had probable cause to arrest. [*Id.* at 22.] They cite *Gramenos v. Jewel Companies, Inc.* for the proposition

---

[8] The Court envisions a chart with at minimum columns for the policy, the Defendant(s) who violated it, the relevance, and the Defendants' objection, if any. Copies of policies or the evidence supporting the existence of these policies should be attached. The Court also notes that while all rule violations may be relevant to the question of punitive damages, *cf. England v. Allen*, 2019 WL 2743481, at *5 (N.D. Ill. July 1, 2019), it is not sufficient to cite punitive damages as a blanket justification for introducing evidence about rule violations.

that "the police need not automatically interview available witnesses, on pain of the risk that a jury will require them to pay damages," and while "[g]ood police practice may require interviews, … the Constitution does not require police to follow the best recommended practices." 797 F.2d 432, 442 (7th Cir. 1986). True enough for a claim that depends on the lack of probable cause, as the false arrest claim in *Gramenos* did, but Defendants already prevailed on the claims to which probable cause is a defense. For some of the surviving claims, Defendants' state of mind is relevant, and ignoring a promising lead is probative of whether Defendants had made up their minds about Plaintiff's guilt, which in turn could be relevant to whether they knowingly fabricated or suppressed evidence. [Dkt. 336 at 15–16.] Supporting a claim for punitive damages is another possible reason to admit this evidence. [*Id.* at 16–17.] The Court is less convinced that this evidence can be used to prove Plaintiff's innocence. [*Id.* at 13–15.] Such evidence should be introduced directly if relevant for that purpose, by calling a witness to testify that Jackson was alive after Plaintiff left the park, for example, not through Defendants' failure to investigate whether a witness would have said that. The indirect method is more likely to confuse the jury. Of course, if Defendants offer evidence to show that they believed Plaintiff was guilty based on certain investigative steps, Plaintiff can rebut that account by pointing out holes in the investigation.

Defendants' MIL No. 4 is therefore granted in part and denied in part. The Court will give Plaintiff some leeway to probe the quality of Defendants' investigation, but not *carte blanche* to relitigate the entire investigation. Evidence that Defendants ignored or suppressed evidence or leads is more likely to be admitted than evidence that if they had been more diligent, they would have found more evidence. The former suggests that Defendants consciously looked the other way when faced with clues that might have exonerated Plaintiff, whereas the latter suggests a lack of thoroughness, which is not itself actionable. [Dkt. 333 at 23; *see* Dkt. 336 at 17 (acknowledging that there is no constitutional right to a thorough investigation.]

**Defendants' MIL No. 5: Letter from Paris Jackson**

Defendants move to exclude a handwritten letter, seemingly written by Paris Jackson, that his mother found in his room after his death and brought to the police on September 9, 2008, a few days after Cook County prosecutors approved charges against Plaintiff. [Dkt. 333 at 24.] The motion is granted. Plaintiff makes reasonable arguments in favor of the letter suggesting that Jackson was killed by someone other than RJ, and the Court agrees that it is not hearsay because it is not offered for its truth. [*See* Dkt. 336 at 18–21.] But the timing of the letter considerably weakens its probative value. The jury will decide whether Defendants (1) induced Stanciel to provide a false statement via threats on August 31, (2) suppressed a statement from McGee that exculpated RJ and Plaintiff on August 31, and (3) coerced Plaintiff into giving a false confession during his September 3–5 interrogation. Any constitutional violation would have occurred days before Jackson's mother brought the letter to the police station. If the letter had been a smoking gun or strongly indicative of a different

killer, it would be highly probative that Defendants did not investigate it, but the actual letter merely hints at a possible alternative killer, so there is at best a weak inference that an investigator who had not violated Plaintiff's constitutional rights would chase down that lead. Plaintiff suggests that the letter's statements that "a lot of shit happen right about now" and "shit crazy" reflect Jackson's state of mind "in the days before he was shot and are admissible to show the jury as much." [*Id.* at 20–21.] The Court disagrees because the letter is not dated and there is no indication of when it was written. It would be too speculative to argue that the letter was from the days immediately before the shooting, and to the extent that Plaintiff could produce evidence to support this timeline, it would bog down the trial about a collateral issue of little significance. Therefore, the Court will exclude the letter and any mention of it under Rule 403, but primarily due to confusion and delay, rather than prejudice.

**Defendants' MIL No. 6: 911 Calls**

Defendants seek to bar Plaintiff from introducing 911 calls about gunfire in Amundsen Park on August 30, 2008. [Dkt. 333 at 27.] Some of these calls came at around 11:00 p.m., when RJ opened fire, but there is some indication that an 11:41 p.m. call reported gunshots, which Plaintiff contends was a separate shooting, which may have led to Paris Jackon's death. Defendants object on several grounds. The Court rejects some of these arguments and defers ruling on others. Defendants argue that this evidence is inadmissible hearsay and that Plaintiff cannot authenticate or lay a foundation for these materials. [*Id.* at 29–31.] The Court defers ruling on the authentication and foundation points until trial, and it generally agrees with Plaintiff's arguments that these materials are likely admissible to at least some degree under hearsay exceptions [Dkt. 336 at 28–34], but it holds off on making final rulings because whether specific documents or statements can be offered for their truth will require a case-by-case analysis. In any event, there is a valid non-hearsay use for this evidence because it bears on Defendants' state of mind at the time of the investigation.

Defendants also argue that this evidence is irrelevant and unfairly prejudicial because the quality of their investigation is not at issue per se, and this evidence would amount to Plaintiff unfairly nitpicking their investigative choices and would risk confusing or misleading the jury. [Dkt. 333 at 31–33.] The Court disagrees. As explained with respect to MIL No. 4 above, Defendants' investigation is relevant to Plaintiff's claims because whether they followed up on promising leads could shed light on whether they knowingly fabricated or suppressed evidence. Unlike the letter from Jackson, these 911 calls were made around the time of the murder, and the steps Defendants took to investigate them are relevant. The Court will not permit Plaintiff to go to extreme lengths in discussing the roads not taken during the investigation, and the Court expects to instruct the jury on how they may properly use investigative steps during their deliberations. These measures will mitigate the danger of unfair prejudice, confusion, or misleading the jury.

Therefore, Defendants' MIL No. 6 is denied, but without prejudice to reraising the issues of authenticity, foundation, and hearsay as to specific evidence at trial.

## Defendants' MIL No. 7: Code of Silence or Blue Wall

Defendants move to exclude evidence of "generalized allegations of police misconduct" by the CPD, including terms like "code of silence," "blue wall," or "blue shield." [Dkt. 333 at 33–34.] Plaintiff agrees and has stipulated not to "introduce evidence regarding highly publicized incidents of police misconduct or other incidents of wrongful convictions." [Dkt. 336 at 35.] However, Plaintiff argues that it would be "overbroad" grant the motion because "it is impossible to say definitively at this stage that any and all references to reports of police misconduct have no place whatsoever at trial." [*Id.*] The Court does not construe Defendants' motion to "bar any inferences, even those supported by evidence, that witnesses who know and work with each other, and who may even be friends, can be biased in one another's favor and may even lie to help their compatriots." [*See id.* at 36.] The Court does not understand Defendants' motion to seek to preclude impeachment on the basis of bias or preference toward friends and colleagues; rather, the motion targets the implication that police generally—whether within the CPD or more broadly—have a practice or culture of lying to protect other police officers. [Dkt. 333 at 35–36 (collecting cases).] *See Torres v. City of Chicago*, 2016 WL 4158914, at *14–16 (N.D. Ill. Aug. 5, 2016) (discussing a closing argument referencing the police "testilying"). Such evidence and argument is irrelevant, inflammatory, and highly prejudicial. *See* Fed. R. Evid. 403. Construed to be limited to a general police culture of silence and inflammatory terms like "code of silence" and "blue wall," MIL No. 7 is granted. This ruling does not preclude Plaintiff from attempting to develop a broader bias-based theory at trial, but given the high potential for unfair prejudice, the Court expects Plaintiff to tread lightly. Specifically, Plaintiff's opening statement should not indicate, explicitly or implicitly, that the jury will hear evidence about a practice of concealing evidence or lying for other officers that extends further than the allegation that Defendants conspired with one another in this case specifically. If Plaintiff can build on this theory through evidence—likely previewed outside the presence of the jury—he may broaden it in closing argument.

## Defendants' MIL No. 8: Street Files

Defendants ask the Court to bar Plaintiff from arguing or implying that they maintained "street files"—secret files with information withheld from official reports, *Jones v. City of Chicago*, 856 F.2d 985, 989 (7th Cir. 1988)—containing exculpatory evidence. [Dkt. 333 at 36–37.] The motion is granted. Defendants argue that allowing Plaintiff to discuss street files would be highly prejudicial and of no probative value. [*See id.* at 37 ("Without having developed any evidence of a 'street file' in this case, Plaintiff's use of the term is inflammatory, confusing and unfairly prejudicial.").] The Court agrees. It has been established that the CPD routinely maintained street files in the 1980s, but that does not mean, as Plaintiff claims, that "it was the practice of the [CPD] during the relevant time period to maintain a parallel set of files outside

16

the 'official file' kept in the City's Records Division." [Dkt. 336 at 39.] Plaintiff cites no evidence that the practice was ongoing in 2008, nor do the cases he cites support that proposition. *See Jones*, 856 F.2d at 989 ("We use the past tense [in 1988] because the practice was discontinued following a class-action suit … to enjoin the practice."); *Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 775 (N.D. Ill. 2017) (applying collateral estoppel to bar the City of Chicago from arguing that it did not have a practice of maintaining street files "in the late 1980s"); *cf. Fields v. City of Chicago*, 981 F.3d 534, 541–42 (7th Cir. 2020) (conviction upheld on appeal in 1990); *Rivera v. City of Chicago*, 2016 WL 11807695, at *1 (N.D. Ill. June 15, 2016) (1988 murder). Further, the fact that other officers may have kept street files does not mean that Defendants did, and without a nonspeculative basis to believe that Defendants engaged in this practice, the Court will exclude evidence. The problem is not the name "street files," but rather the insinuation without evidence that Defendants routinely kept material information secret from prosecutors and defense attorneys. If Plaintiff has a basis to ask one or more Defendants about street files, he may present it outside the presence of the jury and seek to reconsider this motion, but otherwise the Court will exclude any mention of secret, unofficial files by any name.

**Defendants' MIL No. 9: Damages for Pretrial Detention**

Defendants argue that because they had probable cause to arrest Plaintiff, he should be precluded from arguing that he was wrongfully detained during—and is entitled to damages for—his pretrial incarceration. [Dkt. 333 at 37–38.] They argue that Plaintiff's remaining substantive claims—violations of the Due Process Clause of the Fourteenth Amendment for suppression and fabrication of evidence, and coerced confession in violation of the Fifth and Fourteenth Amendments—"arise out of the denial of a fair trial, and do not implicate any pretrial wrongdoing." [*Id.* at 38.] The Court agrees as to the due process claims but not the coerced confession claim.[9]

In *Manuel v. City of Joliet*, the Supreme Court clarified that a wrongful pretrial detention claim sounds in the Fourth Amendment "not merely for [the] (pre-legal-process) arrest, but also for [the] (post-legal-process) pretrial detention." 580 U.S. 357, 368 (2017). Post-*Manuel* Seventh Circuit precedent holds that unlawful pretrial detention violates the Fourth Amendment only. *See, e.g.*, *Lewis v. City of Chicago*, 914 F.3d 472, 479 (7th Cir. 2019) ("The injury of wrongful pretrial detention may be remedied under § 1983 as a violation of the Fourth Amendment, not the Due Process Clause."). Because a pretrial seizure with probable cause is reasonable under the

---

[9] Plaintiff argues that this is not a proper subject for an MIL, but should be raised in a motion for summary judgment or addressed via jury instructions. [Dkt. 336 at 42–43.] The Court takes no position on this as a general matter, but under these circumstances it is appropriate to address the issue now because there was already a summary judgment ruling that determined the claims that would go to trial, and the issue of jury instructions will be broached shortly. The record is sufficiently developed to allow the Court to rule, and the Court sees no reason to deny the motion now, later decide how the jury will be instructed as to damages, and require Defendants to reraise this issue in an MIL or by objecting at trial.

Fourth Amendment, probable cause is a defense to an unlawful pretrial detention claim. *Patrick v. City of Chicago*, 974 F.3d 824, 834 (7th Cir. 2020) (framing the right as "to be free from seizure without probable cause" (citation omitted)). The corollary is that a due process violation occurs only after trial and conviction. *See, e.g., id.* ("If fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due-process right to a fair trial." (citation omitted)); *Moran v. Calumet City*, 54 F.4th 483, 498 (7th Cir. 2022) ("The fabricated evidence must be material, which means there is a reasonable likelihood the evidence affected the judgment of the jury." (cleaned up)); *Saunders-El v. Rohde*, 778 F.3d 556, 560–61 (7th Cir. 2015) (reasoning that an acquitted defendant cannot bring a due process claim for having to stand trial because the trial is the process, but adding, contrary to the later decision in *Manuel*, that there could be a due process claim if fabricated evidence was used to secure pretrial detention). To be clear, if police fabricate or fail to disclose material evidence and a judge orders a suspect detained, the suspect may be able to sue under § 1983 based on the police's actions, but only if the upshot is that probable cause was absent. *Cf. United States v. Taylor*, 63 F.4th 637, 649–50 (7th Cir. 2023); *Bianchi v. McQueen*, 58 N.E.3d 680, 698–99 (Ill. App. Ct. 2016).

Taking the opposite position, Plaintiff cites *Avery v. City of Milwaukee* for the proposition that "a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of his liberty in some way." 847 F.3d 433, 439 (7th Cir. 2017) (cleaned up). But *Avery* was issued before *Manuel*, and the Seventh Circuit cases discussed above have held that there is no due process pretrial detention claim. Also unavailing is *McDonough v. Smith*, which Plaintiff says "entertained a due process theory related to fabrication of evidence in the same period of time, recognizing that the actions of a police officer who fabricates evidence may violate *multiple* constitutional provisions at once." [Dkt. 336 at 44–45 (citing 588 U.S. 109, 115–16 & n.2 (2019), and *Thompson v. Clark*, 596 U.S. 36, 43 n.2 (2022)).] Plaintiff notes that whether *McDonough* overruled the *Lewis* line of cases to the extent that those cases categorically state that an unlawful pretrial detention claim arises under the Fourth, not Fourteenth, Amendment has generated disagreement among district courts. [*Id.* at 45 n.11.] But *McDonough* (and *Thompson*) at best noted uncertainty about the proper source for an unlawful pretrial detention claim; those cases did not purport to abrogate contrary precedent. Perhaps Plaintiff has the best reading of *McDonough*, but this Court lacks the power to depart from Seventh Circuit precedent, which has—post-*McDonough*, although without analysis on this point—stated that "[a] claim for false arrest or pretrial detention based on fabricated evidence sounds in the Fourth Amendment right to be free from seizure without probable cause." *Patrick*, 974 F.3d at 834 (citation omitted); *cf. Haynes v. United States*, 873 F.3d 954, 955 (7th Cir. 2017) ("The Supreme Court has under advisement a case … that may reveal whether [Seventh Circuit cases] correctly applied [a Supreme Court case], but the district judge properly treated those decisions as controlling unless the Justices say otherwise."). Plaintiff may take this issue up on appeal and ask the Seventh Circuit to revisit its cases on this point.

18

Plaintiff is not completely out of luck, however, because he may seek damages for pretrial detention based on his coerced confession claim. "The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Johnson v. Winstead*, 900 F.3d 428, 434 (7th Cir. 2018) (quoting U.S. Const. amend. V). "The government violates the Self-Incrimination Clause by using coerced confessions at pre-trial hearings or trials in criminal cases." *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018) (citations omitted). If Defendants coerced Plaintiff's confession and used it at a pretrial hearing, then he can recover damages for any injury caused by that constitutional violation. *Cf. Hunter v. Mueske*, 73 F.4th 561, 567–68 (7th Cir. 2023) (noting that general causation principles apply to § 1983). Probable cause is not a defense to a coerced confession claim, and its existence does not preclude a finding that the coerced confession also caused the pretrial detention. *See Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) ("Often, events have multiple but-for causes."). Moreover, Seventh Circuit precedent indicates that the recoverable damages for a Fifth Amendment violation are different than the damages a plaintiff can recover for a Fourth or Fourteenth Amendment unlawful detention violation. In *Martin v. Martinez*, the Seventh Circuit explained that a prior case "contemplate[d]" a plaintiff recovering damages "arising from incarceration the … Fifth Amendment violation of admitting the statements at trial to secure a criminal conviction." 934 F.3d 594, 600 n.2 (7th Cir. 2019). The use of a coerced confession at a pretrial hearing violates the Fifth Amendment as well, *Jackson*, 888 F.3d at 265, so it stands to reason that damages for detention caused by that violation are recoverable.[10]

Defendants' counterarguments are unpersuasive. They note that the Court did not consider Plaintiff's confession when deciding whether Defendants had probable cause. [Dkt. 333 at 40.] This is correct, but the existence of probable cause—meaning Plaintiff *could have been* detained without the confession—does not mean that a jury could not find that Plaintiff *would have been* detained without the confession. *See Hunter*, 73 F.4th at 568 ("[I]n § 1983 cases, causation is typically a question best left for the jury." (citation omitted)). Nor are the cases Defendants cite contrary to the Court's analysis above. In *McWilliams v. City of Chicago*, the court explained that because there was "probable cause to arrest …, plaintiff cannot recover damages related to any pretrial detention that occurred after his arrest." 451 F. Supp. 3d 867, 879 (N.D. Ill. 2020), *aff'd*, 2022 WL 135428 (7th Cir. Jan. 14, 2022). But the claim in *McWilliams* was a Fourth Amendment claim, not a coerced confession claim, so this case does not help Defendants bar Plaintiff from seeking damages for his pretrial

---

[10]     *Martinez* also noted that the "expenses of defending [a] criminal trial prosecuted on the strength of the involuntary confession … arise directly from the constitutional violation and redress the precise interest the Fifth Amendment protects: the right not to be compelled in a criminal case to be a witness against oneself." 934 F.3d at 601. Those damages could not be recovered for a due process violation because the trial is the process, *see Saunders-El*, 778 F.3d at 560–61, and the Court doubts they could be recovered under the Fourth Amendment because they were not caused by the seizure.

detention under the Fifth Amendment. Defendants' other case, *Wrice v. Byrne*, shows why this question must be put to the jury:

> Defendants argue that even if Wrice suffered a Fifth Amendment deprivation at Defendants' hands—namely, the introduction of a coerced statement at his criminal trial—he cannot recover damages because he did not introduce any evidence that the use of the statement injured him. Defendants can make this argument because of the jury's "split" verdict: that Defendants coerced an inculpatory statement that was used at Wrice's trial, but that Wrice would not have been acquitted had that statement not been introduced. *Had the jury found that Wrice would have been acquitted in the absence of that statement, his damages would have been obvious: the years he wrongly spent in prison.* Wrice could not rely on his years of incarceration because the jury found those years would have spent absent Defendants' wrongdoing.

488 F. Supp. 3d 646, 676 (N.D. Ill. 2020) (emphasis added).[11] So too here: If the use of Plaintiff's confession at a pretrial hearing caused his pretrial incarceration, he can recover damages for that injury under the Fifth Amendment.

Plaintiff asserts that "[t]here will be ample evidence, starting with Defendants' own 'cleared/closed report' establishing that Plaintiff's coerced, false confession was 'used' to institute the criminal case against him." [Dkt. 336 at 44.] That evidentiary record is not before the Court, but if Plaintiff can produce such evidence, he will be permitted to argue that the jury should award him damages for the time he spent in pretrial detention based on his coerced confession claim.[12] Therefore, MIL No. 9 is granted as to the due process claims but denied as to the coerced confession claim.

## Defendants' MIL No. 10: Lack of Probable Cause

Defendants move to bar argument that they lacked probable cause to arrest Plaintiff and any argument that would effectively relitigate the existence of probable cause. [Dkt. 333 at 40–42.] Plaintiff acknowledges (but plans to appeal) the Court's ruling at summary judgment that probable cause exists and agree not to dispute at trial that probable cause existed. [Dkt. 336 at 46.] However, he does not agree not to "talk[ ] about probable cause as a concept." [*Id.* at 47.] For example, Plaintiff plans to argue that he is innocent of the murder of Paris Jackson and is concerned that barring any argument that would call the issue of probable cause into question would prevent

---

[11]   *Wince* went on to explain that the plaintiff could recover damages for the beating he suffered at the defendants' hands under the Fifth Amendment. 488 F. Supp. 3d at 675–78. That analysis is not relevant to the question raised here.

[12]   The Court anticipates that it and the parties will need to spend time on preliminary and final jury instructions, and the verdict forms, to ensure that the jury understands the questions it will be called on to decide, and it can make appropriate findings as to liability and, if necessary, damages.

him from doing so. [*Id.* at 47–48.] While the Court will bar most if not all discussion of probable cause as a concept—that is, the quantum of suspicion needed to arrest and detain a suspect—it does not think that the issue of probable cause impacts many arguments Plaintiff intends to make. It certainly does not bar him from arguing that he is innocent or that suppressed or fabricated evidence caused his conviction. Arrests "happen[ ] to the innocent as well as the guilty," *Michelson v. United States*, 335 U.S. 469, 482 (1948), and probable cause can exist without even a preponderance of the evidence. *See Doe v. Gray*, 75 F.4th 710, 718–19 (7th Cir. 2023); *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013). Nor does the existence of probable cause preclude Plaintiff from arguing that a constitutional violation occurred during the interrogation. All the probable cause ruling means is that Plaintiff cannot argue that the arrest, detention, or interrogation was unlawful. Thus, MIL No. 10 is granted. If Plaintiff is uncertain whether a specific line of argument would imply that probable cause is absent, he may raise that issue prior to or during trial.

### Defendants' MIL No. 11: Marisol Ocampo's Drug Use

Defendants move to exclude evidence of Marisol Ocampo's drug use and work as a stripper. [Dkt. 333 at 42–46.] Plaintiff agrees that Ocampo's work history is out of bounds, so the motion is granted as to Ocampo's employment history. As to drug use, cross-examination is proper when the witness's memory or mental capacity is "legitimately at issue," *United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir. 1990) (quotation omitted), an issue the Court will take up when it rules on Plaintiff's MIL Nos. 5 and 6. The Court therefore enters and continues Defendants' MIL No. 11 as to Ocampo's drug use.

### Defendants' MIL No. 12: William Marsh's Background

The Court will rule on this motion when it addresses the *Daubert* motions.

### Defendants' MIL No. 13: Judge Gainer's Statements

Defendants move to bar admission of statements made by Judge Gainer, the judge who presided over Plaintiff's criminal trial and postconviction proceedings as hearsay and unfairly prejudicial. [Dkt. 333 at 50–63.] Plaintiff agrees that the judge's findings and statements are inadmissible,[13] but he reads the motion broadly as

---

[13] The one possible use for the judge's statements the Court can see is to establish that Plaintiff's posttrial incarceration was caused by his confession. Section 1983 incorporates common law causation principles, so the constitutional violation must be both a but-for and proximate cause for any injury a plaintiff seeks to recover damages for. *See Hunter*, 72 F.4th at 567–68. Given the judge's findings in a bench trial, there seems to be no doubt that without the confession, Plaintiff would not have been convicted. Therefore, if Plaintiff proves that Defendants coerced a false confession from him, damages for posttrial incarceration necessarily follow. The parties have not submitted their stipulations yet; in the Court's view, the cleanest way to deal with this issue is likely a stipulation.

asking the Court to bar "all references to the post-conviction proceedings at all—even the fact that Plaintiff's conviction was overturned." [Dkt. 336 at 60–61.] The Court does not read the motion that broadly. Plaintiff may offer the evidence he seeks to, about the effect that the 35-year prison sentence, the stress of the postconviction process, and the sudden release from prison had on him, which are relevant to the question of damages. In doing so, counsel must be careful not to elicit testimony that gets into the substance of the evidence and findings in trial or postconviction proceedings, which are inadmissible hearsay and excludable under Rule 403. MIL No. 13, as described here, is granted. If either party seeks clarification on where the line is, the Court encourages them to raise it outside the presence of the jury.

**Defendants' MIL No. 14: Undisclosed Theories of Liability**

Defendants move to prevent Plaintiff from introducing undisclosed theories of liability at trial that he did not allege in his complaint, disclose during discovery, or argue at summary judgment. [Dkt. 333 at 64.] The Court agrees with Plaintiff that it cannot adjudicate this motion in the abstract [Dkt. 336 at 62], so it is denied without prejudice to challenging specific theories of liability. As Plaintiff notes, the Court has discretion to allow amendments that would not cause prejudice or undue delay. *See, e.g.*, *Crest Hill Land Dev., LLC v. City of Joliet*, 396 F.3d 801, 804 (7th Cir. 2005). But late disclosure is itself often prejudicial, and if a party has represented that it will proceed on one argument or theory, the Court would be disinclined to permit the late addition of a distinct theory. *Cf. Moran*, 54 F.4th at 497–98 (refusing to consider categories of allegedly suppressed evidence that the plaintiff did not identify in interrogatories). *But cf. Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 645–46 (7th Cir. 2022) (explaining that if a party "consistently present[s] the heart of" an argument, it does not waive the opportunity to present that argument "in a more sophisticated form" later (cleaned up)). Both parties should review representations they made in interrogatories, pleadings, and elsewhere about the arguments they would make. There is still time to amend pleadings and discovery materials to ensure that they identify the parties' theories in their current forms. *See* Fed. R. Civ. P. 26(e)(1). As long as the substance of these theories has been produced [*see, e.g.*, Dkt. 336 at 65 n.18 (arguing that this is the case as to the failure to disclose 911 call logs)], amendments are unlikely to prejudice the other side. But the duty to supplement is serious, *Morris*, 969 F.3d at 766, and the Court has little tolerance for the argument there was no need to amend or supplement a disclosure or discovery response because the information was otherwise available to the opposing party. *See Stephenson v. City of Chicago*, 2024 WL 3252332 (N.D. Ill. July 1, 2024).

**Defendants' MIL No. 15: Certificate of Innocence**

Defendants move to bar Plaintiff from mentioning his certificate of innocence ("COI"). [Dkt. 333 at 66–67.] The motion is granted. Defendants offer several reasons to keep the COI out, the most persuasive of which is that it is not relevant because none of Plaintiff's remaining claims require him to prove that his prosecution was

favorably terminated. [*Id.* at 68–69.] *Cf. Patrick*, 974 F.3d at 832 ("The judge admitted the certificate of innocence largely because he concluded that it was highly relevant to Patrick's case—in particular, to his malicious-prosecution claim. Under Illinois law a plaintiff in a suit for malicious prosecution must prove not only that his conviction was vacated but that the prosecution was favorably terminated in a manner indicative of innocence." (citation omitted)). While the COI may be relevant to some issues—a low bar, to be sure—the delay, and possible confusion and prejudice, that its admission would bring tip the scales in favor of exclusion under Rule 403.

Plaintiff argues that the COI is relevant because it "completes the story of Plaintiff's wrongful conviction." [Dkt. 336 at 67.] He notes that in *Bolden v. City of Chicago*, the court observed that "[a]s a practical matter, it seems difficult to tell the story of the case without" the COI, but the fuller context of that statement referenced the requirement that the plaintiff's conviction have been favorably terminated:

> Plaintiff can offer the Certificate of Innocence to address whether the dismissal was indicative of innocence. That is, the issuance of a Certificate of Innocence is at least some evidence that the dismissal was indicative of innocence. Under the statute, one of the requirements for the issuance of a certificate of innocence is a finding, by a preponderance of the evidence, that the "petitioner is innocent of the offense charged." *See* 735 ILCS 5/2-702(g); *see also Harris v. City of Chicago*, 2018 WL 2183992, at *3 (N.D. Ill. 2018) ("Plaintiff's certificate is relevant and admissible to demonstrate that Plaintiff's underlying criminal proceedings were terminated in her favor in relation to her malicious prosecution claim ....") (St. Eve, J.). As a practical matter, it seems difficult to tell the story of the case without it.

17-cv-417, ECF No. 467, at 26 (N.D. Ill. Sept. 22, 2021). In cases Plaintiff cites where the court admitted a COI, there was a claim that required favorable termination or the plaintiff's innocence was undisputed. *See, e.g.*, *Kluppelberg v. Burge*, 84 F. Supp. 3d 741, 745–46 (N.D. Ill. 2015); *Harris*, 2018 WL 2183992, at *3; *Chatman v. City of Chicago*, 2018 WL 11426432, at *1 (N.D. Ill. Oct. 11, 2018); *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1170–71 (N.D. Ill. 2022).[14] Since none of Plaintiff's claims require him to show favorable termination, this relevance argument does not apply.

Plaintiff next argues that he would be prejudiced if he cannot introduce the certificate: "There is no question that the jury will learn about Plaintiff's arrest,

---

[14]     In *Rivera v. Guevara*, it was undisputed that the plaintiff was innocent, 319 F. Supp. 3d 1004, 1015 (N.D. Ill. 2018), and the COI was admitted to avoid "distract[ion] by questions about why plaintiff was released." 2018 WL 11468911, at *1 (N.D. Ill. May 30, 2018). *Newsome v. McCabe* featured the admission of a pardon where it was undisputed that the plaintiff was innocent of the charged crime. 2002 WL 548725, at *5–6 (N.D. Ill. Apr. 4, 2002), *aff'd*, 319 F.3d 301 (7th Cir. 2003). These cases are distinguishable because if Plaintiff's innocence were undisputed here, that fact would come in through evidence or a stipulation.

conviction, and post-conviction proceedings. It would be unfair and misleading to leave out the last chapter—Plaintiff's receipt of the COI. That is, if the jury will be told Plaintiff was found guilty, they should also be told they Plaintiff was later found innocent." [*Id.* (citations omitted).] This is a fair point, but the prejudice to Plaintiff is mitigated by the fact that the jury will hear not only that he was convicted, but also that his conviction was vacated and that the State declined to retry him. Further, since the Court will exclude the COI, it will also bar Defendants from implying that the prosecution could have secured another conviction but declined for a reason other than Plaintiff's guilt or innocence. Doing so will open the door to the COI. Either both sides may address the substance of posttrial proceedings or neither side can. Further, the Court expects to instruct the jury about issues involving the proceedings that followed the criminal trial and conviction and explain what the jury may and may not consider. Jurors are presumed to follow their instructions. *See, e.g., United States v. Garcia*, 81 F.4th 691, 698 (7th Cir. 2023).

Plaintiff suggests that the COI may be relevant to his due process claims. [Dkt. 336 at 69.] He does not develop this argument beyond citing *Kluppelberg*, 84 F. Supp. 3d at 747, and *Harris*, 2018 WL 2183992, at *3, but in both of those cases, there was a malicious prosecution claim that formed the heart of the COI's relevance, but such a claim is absent here. Without further explanation about how Plaintiff's COI could be relevant to his claims, the Court cannot see how it could have more than minor relevance.

Plaintiff's best argument concerns damages. He is correct that a plaintiff's guilt or innocence can be relevant to the question of damages in a § 1983 case. [Dkt. 336 at 68–69.] *Parish v. City of Elkhart*, 702 F.3d 997, 1001 (7th Cir. 2017). Still, evidence related to damages is admissible subject to Rule 403. *See Parish*, 702 F.3d at 1001. The Court concludes that the COI should be excluded under Rule 403. On one side of the balance, the probative value is low. True, a jury may award more damages to an innocent plaintiff, but the COI is unnecessary on that point. A jury is very likely to decide Plaintiff's guilt or innocence when deciding liability. If it finds that Plaintiff's confession was false, it presumably will view him as innocent, and the COI would be unnecessary to compute damages for an innocent person. If the jury finds that the confession was truthful, then it will have decided that he was guilty, and will award damages to a guilty person who nevertheless suffered a due process violation. The COI will therefore only matter on the margins to the damages question. On the other side, even setting aside the risk of unfair prejudice, the delay and confusion is enough to substantially outweigh the COI's probative value under Rule 403. If Plaintiff can introduce the COI, Defendants will be able to attack it, lengthening the proceedings on a side issue. *See Bolden*, ECF No. 467 at 26 ("Defendants can offer evidence about the basis for the Certificate of Innocence."). This trial will already be a complex one, and the more the Court can focus the jury's attention on the questions it must decide, the better. Mixing in questions of why a state court granted a COI on state-law

grounds adds much potential confusion with little payoff in terms of probative value.[15] The COI is therefore excluded under Rule 403.

**Defendants' MIL No. 16: Matthew Jones's Opinions on the Investigation**

The Court will rule on this motion when it addresses the *Daubert* motions.

**Defendants' MIL No. 17: Passage of Time**

Defendants move to bar evidence or argument relating to the amount of time from Jackson's murder to the trial and conviction, or the length of the criminal trial, which began in November 2009, ended in January 2011, and resulted in a conviction in June 2011. [Dkt. 333 at 80–81.] The motion is granted in part and denied in part. Defendants are correct that they were not responsible for the length of the trial or any delays, and there is a risk of unfair prejudice if the jury is given the impression that the trial took "too long" or there were unwarranted delays. Plaintiff may not offer evidence or argument insinuating that the trial took longer than it should have or that Defendants bear any responsibility for the length of the trial. However, Plaintiff may introduce evidence about the time he spent in pretrial detention to support his claim for damages during that time, as described above. In doing so, he may explain how that period of incarceration affected him, and he may describe the effect that the looming criminal trial and uncertainty about its outcome had on him. [Dkt. 336 at 78.] But he must avoid characterizing the proceedings as having "delays" or being excessively long. Such testimony poses too great a risk of confusing the jury about the source of those delays, given that only Defendants are on trial, not the actors in the state judicial system. This limitation should not hamper Plaintiff's ability to present his narrative, and Plaintiff is welcome to seek clarification about whether certain comments would cross the line into impermissible territory.

\*     \*     \*

As explained above, the Court rules on the parties' MILs as follows:

| Motion | Ruling | Remaining Matters |
|---|---|---|
| Pl's No. 1 | Granted, denied, entered and continued in part. | Ruling on admissibility of IDOC calls. |
| Pl's No. 2 | Granted, denied, entered and continued in part. | References to gangs on IDOC calls. |
| Pl's No. 3 | Granted, denied, entered and continued in part. | References to criminal activity on IDOC calls; may renew motion to limit scope of prior police encounters. |

---

[15] Plaintiff argues that introducing the COI would clear up confusion as in *Rivera* [Dkt. 336 at 71], but there, the issue of innocence was undisputed, while here, broaching the topic of the COI would open up new disputes unnecessary to deciding the claims before the jury.

| Motion | Ruling | Remaining Matters |
|---|---|---|
| Pl's No. 4 | Granted, denied in part. | None, but issues may recur at trial. |
| Pl's Nos. 5, 6 | Entered and continued. | Entirety of both motions. |
| Pl's No. 7 | Granted, denied in part. | None. |
| Pl's No. 8 | Granted. | None. |
| Pl's No. 9 | Granted, denied in part. | None. |
| Pl's No. 10 | Granted. | Relevant jury instructions. |
| Pl's No. 11 | Denied | None. |
| Defs' No. 1 | Granted, denied in part. | None. |
| Defs' No. 2 | Granted. | May move to offer such evidence at trial if door opened or non-propensity. |
| Defs' No. 3 | Entered and continued. | Address as to specific policy violations before or at trial. |
| Defs' No. 4 | Granted, denied in part. | None. |
| Defs' No. 5 | Granted. | None. |
| Defs' No. 6 | Denied. | May raise specific objections at trial. |
| Defs' No. 7 | Granted. | May revisit specifics at trial. |
| Defs' No. 8 | Granted. | None. |
| Defs' No. 9 | Granted, denied in part. | None. |
| Defs' No. 10 | Granted. | None. |
| Defs' No. 11 | Granted and entered and continued in part. | Resolve issue of Ocampo's drug use on her testimony. |
| Defs' No. 12 | Entered and continued. | Resolve after *Daubert* motions. |
| Defs' No. 13 | Granted. | None. |
| Defs' No. 14 | Denied. | May renew as to specific theories. |
| Defs' No. 15 | Granted. | None. |
| Defs' No. 16 | Entered and continued. | Resolve after *Daubert* motions. |
| Defs' No. 17 | Granted, denied in part. | None. |

Enter: 19-cv-4082
Date: July 30, 2024

_____
Lindsay C. Jenkins
United States District Judge