UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Marcel Brown,

    *Plaintiff,*

v.

City of Chicago, *et al.*,

    *Defendants.*

No. 19 CV 4082

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Plaintiff Marcel Brown was convicted as an accomplice to the murder of Paris Jackson based largely on a confession he made after over 30 hours in police custody. After his conviction was vacated, Brown sued several Chicago police officers and the City of Chicago, and his case will proceed to trial on some claims. *See id.* at *16 & n.20. Before the Court are the parties' *Daubert* motions. Brown moves to bar testimony from Dr. Mark Cichon, Dr. Michael Welner, and Willam Marsh. [Dkt. 306, 307, 310.] He also moves to strike a declaration from Dr. Welner that Defendants submitted in response to Brown's *Daubert* motion. [Dkt. 319.] Defendants move to bar testimony from Matthew Jones and Brian Cutler. [Dkt. 308, 309.] The motion to strike is denied, and all five *Daubert* motions are granted in part and denied in part.

I. **Legal Standard**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. This Rule provides that a qualified expert may opine on an issue relevant to a case where "the proponent demonstrates to the court that it is more likely than not that" (a) the expert's scientific, technical, or specialized knowledge will help the

1

factfinder determine a fact in issue; (b) the expert's testimony is based on sufficient facts or data; (c) the expert used reliable principles and methods; and (d) the expert reliably applied those methods to the fact of the case. Fed. R. Evid. 702; *see also Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024).

The role of district courts in evaluating expert testimony is one of gatekeeping, "to ensure that any proposed expert testimony 'is not only relevant, but reliable.'" *Artis*, 95 F.4th at 525 (quoting *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993)). Recent amendments to Rule 702 correct a common misunderstanding "that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." Fed. R. Evid. 702 Advisory Committee Notes to 2023 Amendments. The amendments do not, however, "impose[ ] any new, specific procedures" or change Rule 702's substantive standards. *Id.*

Thus, to determine whether proposed expert testimony is reliable, the Court focuses "on the expert's methodology, not his ultimate conclusions." *Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019). An expert's proposed testimony is relevant when it helps the factfinder "understand the evidence" or "determine a fact in issue." *Daubert*, 509 U.S. at 591. The Court must also evaluate whether the proposed expert is qualified to give each opinion. *See e.g.*, *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). The Court has "substantial latitude in making the findings necessary to fulfill this gatekeeping role." *Artis*, 95 F.4th at 525 (cleaned up).

## II.    Analysis

### A.    Dr. Mark Cichon

First, Brown moves to bar testimony from Dr. Mark Cichon. [Dkt. 306.] Dr. Cichon is an emergency medicine physician with decades of experience treating patients with traumatic injuries, including gunshot wounds, and substantial teaching experience. [*Id.* at 1; Dkt. 312 at 3.] Defendants propose to have Dr. Cichon rebut the testimony of Dr. Jonathan Arden, a forensic pathologist, who will testify that the location Jackson's body was found was not where Jackson died. [Dkt. 306 at 3–4.] Dr. Arden bases that opinion on three facts: Jackson's blood was not found in the area below the grate on which his body was discovered, which is consistent with him being placed there after death; his face had markings from the grate but not the bruising and abrasions that would be expected if he had fallen onto the grate, as opposed to being placed there; and there were just two drops of Jackson's blood leading to the area where he was found, rather than a trail of blood. [*Id.* at 3.] Dr. Cichon intends to offer his opinion that the evidence is consistent with Jackson being shot where his body was found. [Dkt. 312 at 2, 4; *see* Dkt. 306-3.] Brown moves to bar two of those opinions. [Dkt. 306 at 3–4.] The motion is largely denied; Dr. Cichon must limit his testimony to stay within the lane of his expertise, but he may testify to both opinions.

### 1.    Blood Under the Grate

Brown argues that Dr. Cichon is not qualified to "draw[ ] inferences from the evidence at the scene of a death as to events that led to or accompanied the death. Dr. Cichon has no expertise—no professional basis—to offer any opinion as to whether blood would accumulate beneath the grate …." [*Id.* at 6.] The Court observes

3

that Dr. Cichon's report does not directly opine that blood would not have accumulated beneath the grate if Jackson collapsed onto the grate rather than being placed there. Instead, his report contains the following opinions:

> Mr. Jackson sustained a GSW to the chest traversing his pulmonary and coronary artery. These wounds produced blood loss into his chest cavity and his pericardial sac. The location of these major vessels … and the surrounding structures would limit the external flow of blood. The amount of blood noted on the two shirts worn by the victim would represent the vast majority of the external loss of blood from these injuries.
>
> …
>
> I disagree [with Dr. Arden] that the injuries would have resulted in extensive external blood loss. … Mr. Jackson was found lying face down on the grate. The pressure from the grate would have applied pressure to the two shirts that Mr. Jackson was wearing and applied pressure to the chest wound. This pressure would have also reduced the amount of external bleeding as Mr. Jackson's body laid on the grate.

[Dkt. 306-3 at 4–5.][1] Although Dr. Cichon's report does not opine about the lack of blood accumulation beneath the grate in so many words, Brown moves to bar him from opining about whether or how much blood would accumulate beneath the grate. [Dkt. 306 at 5–6.] However, Brown concedes that "Dr. Cichon is no doubt qualified to opine regarding the amount of bleeding to be expected from the gunshot wound that Mr. Jackson experienced" because he has experience with "attempt[ing] to staunch bleeding and is … qualified to opine that the application of pressure to a wound can be an effective way to staunch bleeding." [*Id.* (citation omitted).]

---

[1]     Citations to briefs and paginated expert reports use the native pagination. Citations to other exhibits use the electronic pagination generated by ECF, which may differ from the printed-on pagination.

4

Defendants argue that Brown's concession "alone is sufficient experience for Dr. Cichon to form an opinion regarding the amount of blood, or lack thereof, under the grate." [Dkt. 312.] The Court agrees. If Jackson's expected amount of bleeding is within the ambit of Dr. Cichon's expertise, then the corollary opinion about how much blood he would expect to see somewhere besides soaked into Jackson's two shirts is also fair game. The latter opinion follows directly from the former, with no additional expertise needed besides a working knowledge of subtraction.[2] Drawing inferences from the facts is the province of the jury, so copious expert testimony about this kind of inference may not be helpful to the jury as required by Rule 702. *See, e.g., Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004) (affirming exclusion of expert testimony about the speed at which a machine could be run because the jury could view a video of the machine running, from which it could draw inferences). Still, there is wiggle room to allow expert testimony urging the jury to draw inferences from facts. *See, e.g., United States v. Brown*, 7 F.3d 648, 651 (7th Cir. 1993).[3] The Court will therefore permit Dr. Cichon to close the loop on his analysis and briefly testify that based on the amount of external bleeding that Jackson's wounds would produce, Dr. Cichon would not have expected blood to accumulate beneath the grate.

Dr. Cichon's testimony that he would not expect blood to be found under the grate must be limited in several respects. As Brown notes and Defendants do not

---

[2] The volume of external blood expected to be found somewhere besides Jackson's shirts equals the total amount of bleeding minus the amount of blood absorbed by the shirts.

[3] Because *Brown* was a criminal case, the limitation "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense" applied. 7 F.3d at 651; *see* Fed. R. Evid. 704(b). This limitation does not apply in civil cases.

dispute, he is not qualified to perform autopsies; conduct post-mortem examinations; distinguish between injuries that occur before, during, or after death; or analyze the scene of a death as such. [Dkt. 306 at 4–5; *see* Dkt. 312 at 7 ("Dr. Cichon's opinion does not require training in death investigations. Rather, Dr. Cichon's opinion is based on his experience in treating similar injuries of his own patients which includes an understanding of the amount of pressure it requires to stop bleeding and an understanding of the amount of external blood loss one would experience as a result of the injuries Mr. Jackson suffered.").] Nor does Dr. Cichon have training to evaluate how blood flows, drips, or pools as a matter of physics. [*See* Dkt. 306 at 6; Dkt. 321 at 2–3.] Dr. Cichon cannot opine on these matters; his testimony must be limited to his opinions based on the volume of external bleeding expected from Jackson's wounds compared to the amount of blood found in his shirts and beneath the grate. Further, because the absence of blood beneath the grate is a factual inference, Dr. Cichon's testimony must not belabor this point. Whether to draw that inference from Dr. Cichon's expert opinion is a decision for the jury to make.

The Court is mindful that Rule 702, especially after the recent amendments, requires a focus on an expert's qualifications and the reliability of his methodology. *See Kopplin*, 914 F.3d at 1104. But in light of Brown's concession that Dr. Cichon can opine about the amount of bleeding expected, the opinion about the absence of blood under the grate follows from that opinion. Weaknesses in Dr. Cichon's reasoning— such as that he has no experience with how an object like the grate affects bleeding

6

or that he did not analyze the absorbency or permeability of the fabric of the shirts—are subjects for cross-examination.

### 2. Jackson Lowering Himself onto the Grate

The second opinion that Brown challenges is Dr. Cichon's opinion that Jackson got progressively weaker during the 30–45 seconds he remained conscious after being shot, rather than suddenly collapsing upon losing consciousness. [Dkt. 306-3 at 5.] Brown argues that this opinion must be excluded because it is speculative and lacks scientific foundation. [Dkt. 306 at 7.] But here too, the core of Dr. Cichon's opinion is rooted in his experience in the emergency room, where he has observed patients with gunshot wounds lose consciousness and collapse gradually. [*See* Dkt. 312 at 8–10.] As Brown acknowledges, Dr. Cichon "has seen patients lose consciousness by the same basic mechanism as Jackson." [Dkt. 321 at 3.] True, Dr. Cichon's clinical experience is with patients with injuries that are not as catastrophic as Jackson's was because they are living when they arrive at the hospital [*see id.* at 3–4], but that distinction goes to the weight of his testimony, not its admissibility.

Rule 702 requires the Court to assess Dr. Cichon's qualifications, methodology, and application his methods to the issue at hand. *Kopplin*, 914 F.3d at 1104. *Gayton v. McCoy* teaches that "[t]he question [the Court] must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." 593 F.3d 610, 617 (7th Cir. 2010) (cleaned up). Here, that question is how a gunshot wound victim like Jackson loses consciousness. Dr. Cichon's experience treating patients with gunshot wounds and other injuries that cause similar blood loss provides a sufficient basis for his opinion that patients

7

with such wounds lose consciousness gradually and would be able to lower themselves to the ground rather than collapsing suddenly. [Dkt. 312 at 8–10.] As Brown concedes, Dr. Cichon has experience with "patients los[ing] consciousness by the same basic mechanism as Jackson." [Dkt. 321 at 3.] The fact that the similarities stop at that basic mechanism is ground that Brown can explore on cross-examination, but it does not warrant barring Dr. Cichon from opining about whether Jackson could have lowered himself to the ground gradually as he was losing consciousness.

To be clear, Dr. Cichon's testimony on this topic cannot go beyond his opinion that it was likely that Jackson could have lowered himself to the ground as he lost consciousness based on his experience with injuries of this type. Dr Cichon cannot opine about aspects of the area where Jackson was found because he does not have expertise in evaluating crime scenes or deaths. For example, he cannot testify that Dr. Arden's view that Jackson was placed on the grate is inconsistent with the crime scene evidence. He can only offer his opinion that if Jackson had been shot in the area of the grate, he could have lowered himself onto the grate under his own power.

*   *   *

Subject to the limitations discussed above, Brown's motion to bar the testimony of Dr. Cichon [Dkt. 306] is denied.

### B. Matthew Jones

Second, Defendants move to exclude testimony from Matthew Jones, Brown's police practices expert. [Dkt. 308.] Brown seeks to have Jones testify as to opinions on three topics: (1) "whether the length of the interrogation of Marcel Brown goes well beyond generally accepted police practices that police investigators are commonly

8

trained in," (2) "whether other features of the interrogation of Marcel Brown put it well beyond generally accepted police practices that police investigators are commonly trained in," and (3) "whether the interrogation methods used and other aspects of the interrogation cast doubt on the reliability of Mr. Brow's statements, particularly with respect to the statements toward the end of the interrogation that were used against Mr. Brown at his criminal trial." [Dkt. 308-1.] Defendants argue that Jones is unqualified and should be barred from testifying as an expert entirely. They also challenge the reliability of each opinion. The motion is granted in part and denied in part.

### 1.    Jones's Qualifications

Defendants argue that Jones should be barred from testifying entirely because his proposed testimony strays too far into the realm of social science, on which he is not an expert. [Dkt. 308 at 3–6; *see id.* at 4–5 ("Jones admits he has no training in clinical psychology and is not an expert in false confessions.").] Defendants identify six facets of Jones's report that they contend demonstrate that his proposed testimony strays too far into "the complex social science of false confessions and coercive interrogations" without sufficient expertise in that field to qualify him to offer expert opinion testimony under Rule 702. [Dkt. 308 at 5 (quoting *Harris v. City of Chicago*, 2017 WL 3193585, at \*4 (N.D. Ill. July 27, 2017); *see id.* at 4 (listing objectionable parts of the report).] This lack of expertise, Defendants argue, requires barring Jones from "offering opinions about the impact of dispositional or situational risk factors on [Brown] or the voluntariness or reliability of inculpatory statements [he] made during the police interview"—that is, requires the Court to bar all of Jones's testimony. [*Id.*

9

at 6.] Brown responds that Jones is "qualified to opine on generally accepted police practices, and to inform those opinions by relying on his own research and the work of social scientists who have studied the relationship between interrogation techniques and false statements." [Dkt. 314 at 1.] With the caveat that Jones must frame his testimony at trial so as not to portray himself as an expert in social science or his opinions as being based on specific social science findings, as opposed to his areas of expertise, the Court finds that Jones is qualified to offer expert testimony.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton*, 593 F.3d at 616 (quotation omitted). The nub of the parties' dispute about Jones's qualifications comes down to categorizing the opinions he offers. Defendants do not dispute that Jones is an expert on police practices. [*See* Dkt. 308 at 3; Dkt. 323 at 1.] Instead, they argue that Jones "strays outside the area of police practices and attempts to offer scientific opinions regarding the psychological impact of certain risk factors that were allegedly present in [Brown's] police interview and whether [Brown's] inculpatory statements are ultimately reliable." [Dkt. 308 at 3; *accord* 323 at 1 (Jones "seeks to offer full-blown psychological opinions …").] Brown counters that "[w]hile Mr. Jones's opinions at times straddle the line between assessing police practices and analyzing the reliability of such methods, that is because this sort of cross-disciplinary analysis is precisely what" he is qualified to provide. [Dkt. 314 at 2–3.]

10

Defendants are correct that Jones's education, experience in law enforcement, and work on trainings and instruction manuals related to interrogation techniques do not qualify him to offer expert opinions about social science or false confessions *per se*. [Dkt. 308 at 4–6.] They are also correct that Jones cannot parrot findings from fields where he lacks specialized knowledge. [*Id.* at 6.] *See Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty."). But the Court disagrees that Jones's testimony strays so far from his area of expertise that his testimony should be excluded in its entirety.

When the Seventh Circuit has disapproved of one expert relying on another's expertise, essential content comes directly from another expert or a field in which the testifying expert lacks specialized knowledge. In *Dura*, the Seventh Circuit held that a hydrologist could opine that a "well field was contaminated by volatile organic compounds and that if [the defendant's] plastics plant was within the well field's capture zone some of the contamination may have come from that plant," but not that "the plant was within the well field's capture zone." 285 F.3d at 613–14. This was because to determine whether the plant was within the capture zone required creating a mathematical model of the groundwater system, a specialized task that the hydrologist lacked the expertise to perform. *See id.* at 614–15 ("[T]here were two crucial issues—the map of the capture zone and whether, if [the] plant was within it, how much if any of the contamination of the well field was due to the groundwater running beneath that plant. [The hydrologist] was not competent to opine on the first

issue, and without an expert opinion on that issue [the plaintiff] could not get to the second and so could not prevail."); *see also, e.g.*, *Hall v. Flannery*, 840 F.3d 922, 929–30 (7th Cir. 2016) (pediatric neurosurgeon could not opine about the likelihood a heart condition caused a death when the only basis for that opinion was reviewing several scientific papers); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723–24 (7th Cir. 1999) (material science and metallurgy expert could not offer an opinion that was "derived primarily, if not completely, from [a medical doctor's] expertise and was "rooted in medical knowledge and training which [the expert] did not have").

In contrast, the Seventh Circuit has approved the admission of expert opinion that touches on subjects outside the witness's area of expertise, as long as the opinion is rooted in the expert's field. In *Banister v. Burton*, the Seventh Circuit affirmed the admission of a treating physician's opinion that the plaintiff's gunshot wounds would not have prevented him from crawling or throwing an object, rejecting the plaintiff's argument that the physician was "not an expert in biomechanics or an orthopedic surgeon." 636 F.3d 828, 830–31 (7th Cir. 2011). This was because the opinion was based on a physical examination of the plaintiff and his wounds while treating him, and the doctor "was perfectly qualified, as both a trauma surgeon and the doctor who treated [the plaintiff], to testify as to [his] ability to throw or crawl at the time of the treatment." *Id.* at 832 ("[T]his type of knowledge is standard to all doctors …."); *cf. also Jones*, 188 F.3d at 724 (suggesting that a non-medical expert could offer expert testimony about "the toxicity of manganese in manganese fumes and the lung's ability to absorb manganese from those fumes" if he had "experience in assessing the

toxicology or other health effects of manganese on the body aside from his participation" in the research project whose findings he was trying to opine about).

Jones's testimony is sufficiently rooted in his training and experience to be admissible in large part. Jones's opinions are about a specific interrogation that he observed on video and whether it conformed to generally accepted police practices, about which his law enforcement experience gives him specialized knowledge. *Cf. Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (noting that "expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful"). In this sense, Jones is like the treating physician in *Banister* because he observed—although not in real time—the interrogation he opines about.[4] True, in forming his opinions about whether Brown's interrogation conformed to accepted police practices, Jones "utilized the findings of social science researchers who study confession voluntariness as it relates to instances of wrongful convictions," but that is only one of several bases for his opinions. [Dkt. 308-1 at 5.] Jones also explained, "In answering each of these questions, I relied upon my 21 years of law enforcement experience, including eleven years working within investigations units as a case agent, as well as my experience in developing and training interview curriculums and my experience from collaborating on research projects with false confession experts." [*Id.*] The Court finds that Jones's experience "collaborat[ing] with

---

[4] One might argue that reviewing a video recording of an interrogation provides a less sound basis for forming an opinion than physically treating a patient, but this point also cuts the other direction. Jones was able to review a record of the entire interrogation, whereas the doctor in *Banister* needed to rely on his memory of the treatment. Jones's lack of firsthand knowledge might be an area on which he could be cross-examined, but the Court finds that it does not render his opinion materially less reliable for *Daubert* and Rule 702 purposes.

social and cognitive psychology researchers on research projects related to science-based interviewing," "regularly present[ing] presentations … on science-based interviewing from a practitioner's perspective," and "participat[ing] in technical working groups developing new science-based interview curriculums" qualify him to comprehend social science literature, and his experience with interrogations provides a base of specialized knowledge that enables Jones to identify concepts discussed in literature in a real-world interrogation. [*See* Dkt. 314 at 2–3.]

Defendants' arguments to the contrary do not persuade the Court that Jones's testimony should be excluded in its entirety. They note, correctly, that "a person does not become an expert simply by reviewing an expert's reports or research." [Dkt. 308 at 6 (quotation omitted).] But as just explained, Jones does not merely parrot others' research or findings or rely wholly on a body of knowledge he lacks expertise in, as in *Hall*, 840 F.3d at 929–30, or the cases Defendants cite. *See Smith v. United States*, 2022 WL 3346557, at *6 (S.D. Ga. Aug. 12, 2022) (medical doctor could not read and testify about studies to make up for a lack of experience in the area of medicine in question); *Agnew v. Cater*, 2022 WL 313756, at *8 (N.D. Ill. Feb. 2, 2022) (a different expert provided the opinions at issue and when "counsel attempted to drill down as to the bases of [that expert's] opinion, [the testifying expert] punted").

The cases Defendants cite where courts in this district have excluded experts from testifying about false confessions are distinguishable. [*See* Dkt. 308 at 5–6.] In *Harris*, the defense did not object to an FBI agent's "expert opinion concerning police practices, professional standards in relation to police practices, and the problems with

the investigation into [the murder victim's] death," but rather his "opinion testimony concerning false confessions." 2017 WL 3193585, at *3. The court found that the agent was not qualified to offer this expert testimony because "he lack[ed] specialized training, education, or experience in this particular field of social science." *Id.* A review of the agent's expert report reveals that he lacked much concrete evidence about the actual circumstances of the interrogation at issue and relied substantially on citations to social science research. 14-cv-4391, Dkt. No. 222-1 at 14–22 (N.D. Ill. Jan. 6, 2017) ("Since the detectives did not record their interviews and interrogations with the plaintiff, there is no way to know what interrogation techniques were used."). The "Types of False Confessions" section relies almost exclusively on social science literature, applied to the plaintiff's account of her interrogation. *See id.* at 17–22. Based on the materials available in *Harris*, the agent's experience conducting interviews played a diminished role because could not review the interview itself— his opinions about the reliability of the confession were based more on his application of social science principles. Here, because Jones reviewed a video of the interrogation, he could tap into his experience conducting interviews to a greater degree than the agent in *Harris*. If the *Harris* testimony was social science applied by an agent with interrogation experience, Jones's testimony is an evaluation of an interrogation informed in part by a social science framework.[5]

---

[5]     *Ezell v. City of Chicago* is similarly distinguishable, plus the witness's qualifications there were weaker than the agent's qualifications in *Harris*. The *Ezell* witness was an expert on the Reid interrogation technique but not a former law enforcement officer; he reviewed only documents, not a record of the interrogation itself; and he had conducted relatively few interviews himself, the vast majority of which occurred in decades before the interrogation at issue in the case. 2023 WL 5287919, at *7–8 (N.D. Ill. Aug. 16, 2023).

To be sure, the Court agrees with *Harris*, *Ezell*, and other cases to the extent that they support the proposition that because Jones is not an expert in social science, he is not qualified to testify about social science findings as such. *See Hall*, 840 F.3d at 929–30. [Dkt. 323 at 1–4.] The Court will go into greater detail on this point below, in connection with Defendants' challenges to the specific opinions Jones proposes to offer. By way of example, when discussing the role that age may play in the effect of an interrogation on a suspect, Jones must frame his opinion in terms of his training and experience, not "a consensus" of "social science researchers who study confession voluntariness" that age is a "dispositional risk factor." [*See* Dkt. 308-1 at 5.] That is, Jones may opine that he considers age a factor when evaluating an interrogation, and he may explain why he believes that Brown's age may have affected him, but he may not base that opinion on his understanding that "[i]t has been well documented in false confession research that a subject's youth is one of the more common risk factors for eliciting false statement." [*See id.* at 29.][6]

For the foregoing reasons, the Court finds that Jones is qualified to opine about the substance of most of the opinions he offers but that he is not qualified to cast that testimony in terms of social science research as such.

---

[6]     To be clear, the Court does not mean to imply that Jones cannot mention social science literature at all. As indicated above, the Court has found that Jones is qualified to consult social science literature and incorporate it into his analysis of Brown's interrogation, and when describing his qualifications to the jury he may testify that one aspect of his experience is his study of social science literature. What he cannot do is support opinions about certain aspects of Plaintiff's interrogation with findings from social science literature, which would require specialized training that Jones lacks. With that said, if Defendants choose to cross-examine Jones along the lines that his analysis simply parrots an unreliable social science field [*see* Dkt. 308 at 6], it may open the door for Jones to discuss in more detail how he uses social science research in his work.

## 2. Length of Interrogation

The Court now turns to the specific opinions Jones offers, beginning with his opinion that "[i]n looking at the duration of the interrogation of Marcel Brown, there were both situational and dispositional risk factors present which likely influenced the voluntariness of any admissions or confessions he may have provided." [Dkt. 308-1 at 6.] "Some experts suggest avoiding going over four hours as a general rule of thumb" and that the length of the interrogation, combined with physical attributes of the room in which Brown was housed, leaves "no doubt as to the influence that the amount of time he was held in isolation [34.5 hours] inside the interrogation room played into his willingness to provide inculpatory statements toward the end of the interrogation." [*Id.* at 6–7.] Defendants raise several two objections to this opinion.

First, they argue that "Jones is not qualified to opine on the supposed impact of 'situational risk factors' on [Brown] during his police interview." [Dkt. 308 at 6.] As indicated above, the Court agrees to the extent that Jones may not couch the effect of the length of the interrogation in social science terms or cite a consensus of social scientists to bolster his opinion that interrogation length can affect the reliability of a confession. But the Court otherwise finds that Jones is qualified to opine about how the interrogation length may have affected the truthfulness of Brown's confession.

Second, Defendants argue that this opinion is unreliable because there is no hard-and-fast rule that an interview must end at four hours; because police may detain a suspect for up to 48 hours; and because while Brown was held for over 30 hours, he was questioned for no more than 54 minutes at a time. [*Id.* at 6–8.] As there is no objective basis for Jones to say that the interview was too long and Jones admits

17

that the maximum proper length of an interrogation "depends," Defendants argue that this testimony constitutes no more than Jones's subjective say-so. [*Id.* at 8–9.] Indeed, an expert must "explain the methodologies and principles that support his opinion; he cannot simply assert a bottom line," *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (cleaned up), but Jones has articulated a sufficient basis to make this opinion reliable.

An opinion founded on specialized experience is not inadmissible on reliability grounds. *See id.* ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data." (citations omitted)); *United States v. Brumley*, 217 F.3d 905, 911 (7th Cir. 2000) ("[T]he record reveals that the agent's testimony was based not on his subjective belief or unsupported speculation but rather on his extensive experience investigating methamphetamine distribution crimes."). Nor must an expert opine that he is certain for his opinion to be admissible. *See Hall*, 840 F.3d at 928–30 (opinions about which cause of death was more likely, not certain); *Dura*, 285 F.3d at 613 (contemplating an expert opinion that contamination *may have* come from a certain source); *cf. Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (contrasting "subjective" opinion testimony with objective scientific opinion testimony). As Brown argues, Jones has substantial personal experience about the normal duration of police interviews, and he relies on this experience to inform his opinion about the proper length of an interrogation. [Dkt. 314 at 5.][7]

---

[7]    Defendants respond that Brown "argues that Jones can rely on his professional experience as a police officer as the basis for this opinion. The problem for [Brown] is that, by his own telling, Jones does not rely on his professional experience. Instead, Jones bases his

The fact that Jones does not opine that best police practices limit interviews to a specific length of time does not render his opinion unreliable. [*Contra* Dkt. 308 at 8–9; Dkt. 323 at 5.] Based on his experience, Jones can offer the opinions that "[m]ost interrogations last approximately thirty minutes to two hours" and in general, best practice is for interviews not to last substantially longer, although there is no hard and fast rule. [*See* Dkt. 308-1 at 6–7.] That opinion is sufficiently reliable, as is Jones's testimony about the specific impacts the long interrogation had on Brown because those opinions are based on Jones's direct observation of the interrogation, filtered through his experience. *See Artis*, 95 F.4th at 525 (requiring that "the expert has reliably applied the principles and methods to the facts"). Further, this testimony will be helpful to the jury because many laypeople will have no frame of reference for how long police interrogations do last or should last, or the effects of a long interrogation. While Jones's testimony will not be precise as to a specific duration of time, it will help jurors understand this topic in broad strokes.

Defendants argue that the time limit for interrogations should be interpreted to mean active questioning, not total time in custody [Dkt. 308 at 7–8; Dkt. 323 at 5–6], but that is a topic to be explored on cross-examination or in closing argument. [*See* Dkt. 314 at 5–6.] "That two different experts reach opposing conclusions from the

---

opinion on (1) a social science article on false confessions; (2) the Reid manual; and (3) unspecified trainings Jones has attended during his career." [Dkt. 323 at 5.] Defendants are correct that Jones cites those specific pieces of information in the section about the length of the interrogation, but Jones also incorporates his experience into all his opinions. [Dkt. 308-1 at 5 ("In answering each of these questions, I relied upon my 21 years of law enforcement experience ….").] That experience, which incorporates the other sources he cites as discussed above, provides a non-subjective basis for his opinion. *See Metavante*, 619 F.3d at 761.

same information does not render their opinions inadmissible." *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000) (citation omitted). The parties' experts and counsel can address that issue during examination and in argument.

Finally, although Jones's opinions on this topic are broadly admissible, some opinions must be excluded or rephrased. Jones's lack of qualifications in social science precludes statements like "[s]ome experts suggest avoiding going over four hours as a general rule of thumb" and "[r]esearch has shown." [*See* Dkt. 308-1 at 6.] Jones may, however, cite the Reid manual—he has received training in the Reid method, and the target audience is police officers, not scientists. Jones cannot cite the Reid manual as a definitive authority, of course, but he may mention the time frames discussed there with the qualification that the manual is an example.

### 3. Confrontational Interview Techniques

Defendants next challenge Jones's opinion that they used the "confrontational interview technique" when interrogating Brown. [Dkt. 308 at 8.] They offer several reasons why Jones's testimony on this topic must be excluded. The Court agrees that much of Jones's testimony must be excluded or trimmed down, but he may offer his opinions about specific interrogation techniques he observed during the interview and how they may have induced an unreliable confession.

*Naming interrogation techniques.* Defendants argue that Jones should be barred from testifying that they used the "confrontational interview technique," the "interrogation technique," or the "Reid interview," in contrast to a "science-based" "information-gathering technique." [*Id.* at 8 & 10 n.7.] Defendants submit that there is no evidence that they were trained on the "confrontational interview technique."

[*Id.* at 8.] Brown does not appear to defend Jones's ability to use this nomenclature, instead focusing on his ability to describe the techniques Defendants used and offer his expert opinions about the effects those techniques may have had. [*See* Dkt. 314 at 7 ("Mr. Jones is drawing upon his decades of experience in order to describe the interrogation methods Defendants are in fact using."), 9 ("Mr. Jones's testimony on this question will be helpful to explain to the jury the specific interrogation tactics that Defendants were choosing to use, the possible effects of those tactics in the interrogation room, and the alternative interview methods that the detectives could have used.").] The Court finds that Jones has not articulated a sufficient basis to call Defendants' interview techniques by these names; further, such testimony would not be helpful to the jury. *See* Fed. R. Evid. 702(a)–(b). This does not mean Jones must avoid the word "confrontational," but he cannot opine that some interrogations are "confrontational," and others are "information-gathering," or that Defendants used the former technique. He may, however, describe certain tactics as "confrontational."

*Prevalence of techniques.* Defendants ask the Court to exclude Jones's opinion that the interrogation did not accord with generally accepted police practices because by his own admission, confrontational interview techniques were the norm in 2008. [Dkt. 308 at 9.] By contrast, Jones does not opine that the information-gathering technique was in common use as of 2008. [*Id.* at 10.] Brown responds that Jones's opinion is not that confrontational techniques were not in wide use in 2008, but rather that "the way Defendants employed those techniques went well beyond acceptable practice" through, for example, "the relentless and improper use of leading questions

… to press for particular admissions." [Dkt. 314 at 8.] Brown also points out that information-gathering interview techniques were developed in the 1990s. [*Id.* at 9.] Defendants reply that Jones states only that information-gathering techniques were *developed* in the 1990s, not that they gained general acceptance by 2008. [Dkt. 323 at 6–7.] The Court agrees with Defendants, although it does not conclude that wholesale exclusion of these opinions is warranted. Jones may not testify that confrontational tactics were not in widespread use in 2008 or that an approach aimed at gathering information was widely used at that time.

*Opinions about specific techniques.* Defendants object that Brown's response brief effectively rewrites Jones's testimony by arguing that Defendants' interview techniques were not *per se* improper but that the way Defendants employed those techniques crossed the line. [*Id.* at 7.] They argue that "Jones does not explain where the line is or apply any discernible methodology to reach his conclusion, so even accepting [this] rewrite of Jones' testimony, his conclusion is supported only by his own say-so, which is not reliable under *Daubert*." [*Id.*] For similar reasons to those stated above, *supra* at 17–20, the Court disagrees. While there is room for Defendants to cross-examine Jones regarding the lack of bright lines in his testimony, an opinion based on valid training and experience is not unreliable for Rule 702 purposes, *see Metavante*, 619 F.3d at 761; *Brumley*, 217 F.3d at 911, and Jones has explained the opinions he offers in terms of his training and experience. [*See* Dkt. 308-1 at 4 (noting that Jones relied on his training and experience), 11–27 (identifying and explaining tactics Defendants used).]

22

Jones may offer testimony about Defendants' interview techniques subject to the limitations discussed here. Jones should describe Defendants' actions in terms the jury can understand, rather than using jargon like "confrontational technique" or "Reid method." Jones should not imply that Defendants' use of these techniques was out of step with common practice at the time, although he may explain why the way they used these techniques went beyond ordinary usage. In doing so, Jones must not resort to social science findings for the reasons discussed above. In the same vein, Defendants do not specifically object terms like "proxemics," "minimalization," and "maximalization," Jones should avoid such social-science terminology because he is not a social science expert, and these terms will not be helpful to the jury.

### 4. Reliability of Confession

Turning to Jones's opinions about the reliability of the confession, Defendants find fault with this testimony for several reasons. The Court agrees in part.

*Credibility of witnesses.* Defendants first argue that Jones's opinions about the reliability of Brown's confession amounts to opinion about witness credibility, which is for the jury to decide. [Dkt. 308 at 10–12.] The Court agrees with Defendants that an expert offering his opinion that a witness's testimony is not credible would invade the province of the jury, and Brown does not dispute this principle. [*See* Dkt. 314 at 11–12.] Instead, he argues that Jones "will explain to the jury how features of Defendants' interrogation departed from accepted standards and were obtained under circumstances that could affect their reliability. He leaves it to the jury to decide whether Defendants actually coerced [Brown] and whether [his] statements were actually involuntary." [*Id.* at 11.] The Court agrees with Brown that, framed in

23

this way, Jones's testimony is proper. Identifying factors that *could* cause a statement to be unreliable and why does not invade the province of jury. Jones will effectively provide a framework under which the jury can evaluate the credibility of Brown's confession. *See Brown v. City of Chicago*, 2023 WL 2561728, at *10 (N.D. Ill. Mar. 17, 2023) ("Dr. Leo may testify regarding the hallmark features of false confessions and how to identify them, but he may not opine on the reliability of other witnesses (including Mr. Brown) or the deceased investigators' state of mind."). Some of Jones's statements cross the line into opinion about witness credibility, however, such as, "Because of the way these statements were elicited from Mr. Brown, it is my opinion that they should be viewed with a high degree of skepticism as to their reliability." [Dkt. 314 at 11.] Opinions along these lines will be excluded—the proper time to advance this interpretation of the evidence is during closing argument.

*Reliability of opinions*. Defendants next argue that the Court should exclude opinions about the reliability of Brown's inculpatory statements because they are based on unreliable social science research and speculation. [Dkt. 308 at 12–13.] As the Court has explained, Jones may not offer opinions about social science findings as such, but he may opine about police conduct. Thus, he may testify about how he as an expert in interrogation would understand certain conduct to the extent that such an opinion would be nonobvious to a lay jury. [*See* Dkt. 314 at 12–13.] But Jones must not opine about what witnesses are thinking or the credibility of their statements, because these are determinations for the jury. Thus, Defendants' request is granted in part and denied in part.

24

*Redundancy*. Defendants move to bar Jones's testimony as redundant because it covers much of the same ground as Dr. Brian Cutler, another expert. [Dkt. 308 at 14.] The Court declines to limit the scope of the testimony now. As Brown notes, it is not possible to know the precise scope of each witness's testimony before trial, so such a motion is best addressed during trial. [Dkt. 314 at 14.] Further, based on the limits the Court will place on Dr. Cutler's testimony, *see infra* at 39–48, there is unlikely to be significant overlap between the two experts' testimony.

### 5. Violations of Illinois Law

Defendants argue that Jones should not be permitted to testify that the refusal to allow Brown to make a phone call and denying Stephen "Wham" Cary, an attorney who represented RJ Branch, the ability to speak to Brown violated Illinois law. [Dkt. 308 at 14–15.] The Court agrees that these opinions are improper. Jones is not a legal expert, so he lacks the specialized training necessary to provide helpful testimony on this topic. *See* Fed. R. Evid. 702(a). The Court also agrees that allowing testimony about possible violations of Illinois law could mislead the jury because the claims at trial depend on whether Defendants violated the federal Constitution. *See* Fed. R. Evid. 403. [Dkt. 343 at 11–12 (barring evidence and argument about violations of Illinois law).] Jones may, however, testify that general police practices would have been to allow Brown to speak to an attorney retained by his family and to allow him to call his mother. [Dkt. 308-1 at 26–27.] These opinions are admissible because they are based on Jones's opinion that, in effect, police officers are trained to comply with state law. Jones may go no further, though. He cannot elaborate on the basis for these opinions (unless Defendants cross-examine him on this point). Nor may he testify to

25

his understanding that Brown was, in fact, denied the chance to speak to an attorney, because that opinion would not be helpful. *See* Fed. R. Evid. 702(a).

*    *    *

Thus, Defendants' motion to bar the testimony of Matthew Jones [Dkt. 308] is granted in part and denied in part. Jones may testify as provided herein.

### C.    William Marsh

Defendants retained William Marsh, a retired detective, as an expert to rebut the testimony of Jones. Brown moves to exclude Marsh's testimony in its entirety, as well as argues against specific opinions Marsh provides. [Dkt. 310.] The motion is granted in part and denied in part.

### 1.    Marsh's Qualifications

Brown argues that neither Marsh's education and training, nor his experience, qualifies him to provide expert opinions about generally accepted police investigation practices. [Dkt. 310 at 5–7.] The Court disagrees. Brown accurately notes that Marsh has received little formal education and training, but his lengthy experience as a police officer and detective qualifies him to testify on matters within the specialized knowledge that his law enforcement career gave him. Fed. R. Evid. 702(a); *see, e.g.*, *Trexler v. City of Belvedere*, 2023 WL 415184, at *3 (N.D. Ill. Jan. 25, 2023) (rejecting argument that a witness with decades of experience as a law enforcement officer in a different jurisdiction was unqualified to offer expert testimony). Sufficient experience may itself qualify a witness as an expert under Rule 702. *See Metavante*, 619 F.3d at 761; *Brumley*, 217 F.3d at 911.

Brown argues that Marsh's long experience is inadequate because "there is no indication that his experience educated him on national standards or generally-accepted interrogation methods, beyond the vague claim that he had sometimes collaborated with out-of-state agencies." [Dkt. 310 at 5.] In Brown's view, this is a key point: "when it comes to police practice experts, 'evidence of purely localized police procedure,' such as the practices of the LASD, 'is less likely to be helpful than nationally or widely used policy." [*Id.* at 5–6 (cleaned up) (quoting *United States v. Brown*, 871 F.3d 532, 538 (7th Cir. 2017)); *see also* Dkt. 322 at 12–13.][8]

The Court disagrees. The fact that Marsh's experience comes from working in a single law enforcement agency does not disqualify him from offering expert opinions in this case. When courts have excluded opinions on this basis, it was because the policies of a specific department are not relevant. *Brown* affirmed the exclusion of an expert who proposed to "take the jury through a frame-by-frame narration of [a] surveillance video and describe how the [CPD's] 'Use of Force Model' applied to [the] confrontation." 871 F.3d at 535. The Seventh Circuit explained that expert testimony about police policies "may be relevant in cases where specialized knowledge of law-enforcement custom or training would assist the jury in understanding the facts or resolving the contested issue," but this kind of testimony is most helpful when it concerns "standard practice across the country to train officers … in a particular way." *Id.* at 537. By contrast, "[e]vidence of purely localized police procedure is less

---

[8]     Brown points out that Marsh has never been qualified as an expert before. [Dkt. 310 at 6–7.] The Court does not give this fact weight in either direction. As Defendants note, there is a first case for every expert. [Dkt. 313 at 7.] If other courts had found Marsh unqualified, their analysis could be useful here, but Brown points to no such cases.

likely to be helpful than nationally or widely used policy" because in a Fourth Amendment case, "[t]he jury's task is to determine how a reasonable officer would act in the circumstances, not how an officer in a particular local police department would act." *Id.* at 538; *accord Paine ex rel. Eilman v. Johnson*, 2010 WL 785398, at *4 (N.D. Ill. Feb. 26, 2010) ("[W]here qualified to do so and where their testimony is otherwise relevant, experts may testify as to nationally accepted standards of police conduct, but not to policies and procedures of specific police departments."). The issue here is different: whether Marsh is qualified to opine about Brown's interrogation based on his experience working in a single law enforcement agency.

He is. As with Jones, the most helpful testimony Marsh can provide is his opinion about whether Brown's interrogation was suspect, and why. *See supra* at 13–14. While Marsh has less formal training than Jones, his decades of experience with interrogations give him specialized knowledge that a layperson lacks, and he reviewed the recording of the interrogation. Moreover, the mode of Marsh's testimony—"consist[ing] entirely of responses to the opinions provided by … Mr. Jones" [Dkt. 310 at 4]—supports his ability to offer his expert opinions. Both experts viewed the same interrogation video, and Marsh in effect testifies about where Jones's views about sound interrogation technique depart from his own. As with Jones, not all of Marsh's proposed opinions and the bases for those opinions will be admissible, which the Court addresses at greater length below. As an example, Marsh cannot testify that because the LASD had a certain policy or practice and Brown's interrogation complied with that policy or practice, it fell within generally accepted

28

police practices. *Cf. Brown*, 871 F.3d at 537–38. Instead, Marsh will need to analyze the interrogation conditions and the interrogators' conduct and explain why, based on his experience, they were appropriate.

The Court therefore finds that Marsh is qualified to opine about whether the interrogation here was consistent with generally accepted police practices, based on his experience, subject to the limitations discussed above.

### 2. Marsh's Methodology

Next, Brown argues that the Court should exclude Marsh's testimony because it is not "based on a sound methodology that is reliably applied to the facts of the case, rather than reflecting the expert's mere say-so." [Dkt. 310 at 7 (citing *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013)).] Brown's arguments on this point largely echo Defendants' arguments against Jones's methodology. [*Compare id.* at 7–8, *with, e.g.*, Dkt. 308 at 8–9 ("Jones' opinion amounts to nothing more than an unsupported personal opinion." (citations omitted)).] The Court rejected that line of attack above, and it does so here as well. *See supra* at 17–18. While it is true that an expert must "explain the methodologies and principles that support his opinion; he cannot simply assert a bottom line," an opinion founded on specialized experience is not inadmissible on reliability grounds, *Metavante*, 619 F.3d at 761 (cleaned up), and reviewing a complete video of the interrogation and offering opinions about it, in light of his law enforcement experience, is a sufficiently reliable methodology to pass Rule 702 muster.

Nor does the fact that Marsh bases his opinions on his experience rather than citing "manual[s], guideline[s], training program[s], or other set[s] of standards

governing police interrogation" render his methodology unreliable. [*Contra* Dkt. 310 at 7–8.] Again, a comparison with Jones is apt. While he cites sources, the Court determined that he is not qualified to offer the findings of, for example, social science literature to the jury as such. *See supra* at 17. [Dkt. 313 at 7–9.][9] Despite Jones's inability to cite social science findings to the jury, his methodology is still sound because his opinions are based on "direct observation of the interrogation, filtered through his experience." *Supra* at 19. Likewise for Marsh. There may be room to cross-examine Marsh about his lack of citations to such authorities or resources, but that does not require excluding his testimony on methodological grounds.

### 3. Length of Interrogation

Turning to the specific opinions Marsh proposes to offer, Brown asks the Court to bar Marsh from testifying that the length of his interrogation adhered to generally accepted police practices. [Dkt. 310 at 8–12.] The Court agrees that Marsh's opinion crosses the line in some respects, so it will bar him from opining about certain aspects of the length of the interrogation but not exclude this opinion in its entirety.

Brown argues that Marsh's opinion that the length of the interrogation—along with the other problematic features that Jones identified—fell within generally accepted police practices "lacks any foundation." [*Id.* at 8–9.] The Court disagrees. As Defendants note, Marsh reviewed the same video that Jones did and formed opinions based on his specialized experience as a law enforcement officer. [Dkt. 313 at 10.] A complete record of the interrogation at issue constitutes "sufficient facts or data" on

---

[9] For this reason, Brown's argument that Marsh's opinion "fails to engage with" sources Jones cited [Dkt. 310 at 10] does not warrant excluding his testimony.

which an expert opinion may be formed. Fed. R. Evid. 702(b). And contrary to Brown's assertions, many of the specific opinions Marsh offers are supported by more than his say-so—he offers reasoning to support his bottom-line conclusions, which satisfies the Court that he performed a "reliable application" of his method to the facts of the case. Fed. R. Evid. 702(d). The Court takes Brown's specific objections to Marsh's testimony in turn.

*Reasonableness of 48-hour detention.* Brown characterizes Marsh's opinion as that "it is generally acceptable practice for a police interrogation to last anywhere up to 48 hours," a view Brown describes as "patently untenable." [Dkt. 310 at 9 (citing Marsh's deposition testimony).] Under Brown's understanding, Marsh believes that active questioning for as many as 48 consecutive hours is generally acceptable police practice, but that this view confuses the permissible length of time a suspect may be detained under both California and Illinois law (48 hours) with a generally acceptable length of time to question a suspect. [*Id.* at 9–10.][10] Defendants respond that Marsh's

---

[10]    Brown suggests that the Supreme Court has held that incommunicado interrogations over similar lengths of time are involuntary, and he argues that "[a]n interrogation practice cannot be generally accepted when it is unconstitutional." [Dkt. 310 at 9.] However, the cases Brown cites do not support the proposition that an incommunicado interrogation over that length of time is always constitutionally suspect. In *Darwin v. Connecticut*, officers arrested a suspect on a Friday and questioned him until 9:00 p.m., resumed questioning the next morning until about 4:00 p.m., "when petitioner fell forward … either fainting or pretending to faint." 391 U.S. 346, 347 (1968) (per curiam) (cleaned up). The suspect was revived, questioning continued, and he confessed; the suspect also gave a second confession the next day. *Id.* The state court suppressed the first confession but not the second, but the Supreme Court reversed, writing: "The inference is inescapable that the officers kept petitioner incommunicado for the 30 to 48 hours during which they sought and finally obtained his confession. Considering the totality of the circumstances we conclude that the court erred in holding that the [second] confession … w[as] voluntary. The denial of access to counsel and the outside world continued throughout, and there was 'no break in the stream of events' from arrest throughout the concededly invalid confessions of Saturday … to the confession …

---

31

references to 48 hours refer only to custody, not active questioning. [Dkt. 313 at 10–11; *see* Dkt. 310-3 at 4 ("It should also be noted that there is a clear distinction between the length of a police interview and the length of time a suspect is in a custodial situation.").] Brown pushes back, arguing that at his deposition, Marsh "endors[ed] 48-hour incommunicado detention and interrogation." [Dkt. 322 at 3; *see* Dkt. 310 at 9.] The Court does not read Marsh's deposition testimony as Brown does. Counsel "spent considerable time questioning him on this point to ensure that his meaning was absolutely clear [Dkt. 322 at 3], but it appears that Marsh continued to answer based on length of detention despite questions phrased in terms of active questioning.[11]

---

of Sunday … sufficient to insulate the final events from the effect of all that went before." *Id.* at 348–49 (cleaned up). The length of the incommunicado interrogation and detention was relevant not because it rendered the second confession involuntary, but rather because it did not attenuate the taint of the first confession sufficiently to permit admission of the second.

In similar vein, *Clewis v. Texas* involved the admission of the last of three confessions procured after an apparently ill suspect was held incommunicado for 38 hours, denied adequate food and sleep, and confessed after intermittent questioning. 386 U.S. 707, 709 (1967). The interrogation continued over the next several days, during which the suspect was transported hundreds of miles, detained in several locations, and had very little to eat and little contact other than with police; the suspect confessed again three days after the first. *Id.* at 709–10. The suspect was detained for several more days during which he was neither interrogated nor permitted to speak to an attorney, but on the fifth day after the second confession, he was interrogated again and confessed a third time. *Id.* at 710. The trial court admitted only the third confession, but the Supreme Court reversed. Under the totality of the circumstances, there was "no break in the stream of events … sufficient to insulate the [third confession] from the effect of all that went before." *Id.* While the Court noted that "[t]he first statement was secured following an initial taking-into-custody which was concededly not supported by probable cause, followed by 38 hours of intermittent interrogation," this was just one of many factors that contributed to involuntariness. *See id.* at 711 (cleaned up).

[11] For example, after counsel stated that he was "looking for a unit of time," this colloquy occurred: Q. "Do you have a view as to the maximum outward limit that it is appropriate for police to engage in an interrogation of an individual in custody, and if so, what is it?" A. "My view is, they have the available time of 48 hours." Q. "[S]o to be clear, your opinion is that, so long as interrogators complete their interrogation within a 48-hour period, you would not

Brown argues that Marsh's own experience undermines his opinions because "the longest he had ever kept a person continuously locked incommunicado in an interrogation room was 25 hours," whereas Brown's interrogation occurred over the course of nearly 35 hours. [Dkt. 310 at 10.] But Marsh testified that 25 hours was the longest he kept a suspect detained in a single room, whereas on at least 10 occasions suspects were interrogated over the course of the 48-hour maximum. [Dkt. 313 at 11.] Brown protests "[t]he detectives here held Mr. Brown in their own interrogation room continuously for 34.5 hours so that they could control every aspect of his interrogation and prevent him from having any contact with anyone other than an interrogator." [Dkt. 322 at 4.] That is a distinction, but Brown does not explain why it renders Marsh's opinion unreliable or unsupported. In fact, Marsh offers explanations for why it was appropriate to detain and question Brown for so long, including that Brown's story changed and that he displayed a willingness to speak to the detectives. [Dkt. 310-3 at 4–5.] Brown has answers for these points [Dkt. 310 at 10–11], but the bottom line is that he disagrees with Marsh's opinions. This disagreement is not a basis for exclusion; rather, Brown may cross-examine Marsh on these points and argue them to the jury. *Cf. Walker*, 208 F.3d at 589.

*Conditions of the interrogation*. Brown next argues that Marsh's opinions are unreliable because he does not take the physical and psychological conditions of the

---

criticize the interrogation as being too long?" A. "That's correct." [Dkt. 310-4 at 105.] Unfortunately, counsel did not ask a question like, "If police actively questioned an individual in custody for 48 straight hours, would the interrogation be too long in your opinion?" Such a question might have resulted in Marsh stating a clear opinion about an appropriate length of continuous questioning. Regardless, the Court cannot agree based on Marsh's actual testimony that he approved of questioning a suspect for 48 straight hours.

interrogation room into account. [Dkt. 310 at 10–11.] Again, Brown accuses Marsh of ignoring important factors: (1) the small size of the interrogation room, (2) sleep deprivation, (3) the lack of adequate food, and (4) the refusal to call Brown's mother. [*Id.* at 10–12.] Marsh offers valid responses to some of these criticisms, but not all.

First, while Marsh references the "physical attributes" of the interview room and states that they "were well within generally accepted police practices," he does not offer any specific opinions about the size of the room. [Dkt. 310-3 at 5.] Such a cursory endorsement of the physical attributes of the interrogation room does not satisfy Rule 702's requirements that an opinion be a reliable application of a method to the case and that expert testimony be helpful to the factfinder. It is too late to add to the expert reports, so Marsh will be barred from opining about whether the size of the interrogation room accorded with generally accepted practices.

Second, Marsh can offer some opinions about Brown's ability to sleep during the interrogation. Jones opined that Brown's sleeping posture, the lack of a warm blanket or pillow, and the fact that the lights remained on most of the night were factors that contributed to why the interrogation went beyond acceptable practices. [Dkt. 308-1 at 11.] Marsh may offer his countervailing opinion that the detectives treated Brown well and "attempted to make the room as comfortable as possible," and that Brown appeared to be able to sleep for a significant amount of the time he was in custody. [Dkt. 310-3 at 6.] But Marsh may not testify about his understanding of the symptoms of sleep deprivation and whether Brown was showing those symptoms. [*See* Dkt. 310 at 11.] He is not a medical professional and has not explained why his

training gives him specialized knowledge about the symptoms of sleep deprivation, nor can he simply repeat statements by medical authorities. *See Dura*, 285 F.3d at 614.[12] Marsh must not testify about these matters when discussing Brown's sleep.

Third, Marsh can opine that Defendants followed accepted practices in feeding Brown. Jones opines that Defendants did not give Brown "proper food" [Dkt. 308-1 at 11], and Marsh can offer his contrary opinion. Marsh must base this opinion on his experience regarding how much food is given to interview subjects; opinions about whether Brown received "enough" food either extends beyond Marsh's expertise (if he purports to opine about the amount of food or calories Brown needed) or would be unhelpful (if Marsh does no more than rely on a layperson's intuition).

Fourth, Marsh may explain why, in his opinion, it was appropriate for the detectives not to allow Brown to call his mother under the circumstances. [Dkt. 310-3 at 6–7.] He may explain why officers might be concerned about a phone call affecting the integrity of the investigation, and they might take the suspect's age and the fact that his family already knew about the interrogation into account. [*Id.*] Brown argues that Marsh "invents from whole cloth the notion that the Detectives were somehow seeking to 'protect the integrity of the investigation' by preventing him from" calling his mother, when this explanation is unsupported in the record. [Dkt. 310 at 11–12.] But Marsh was offering examples of reasons why officers might not permit a suspect to make a phone call at the first opportunity. Brown is free to cross-examine Marsh

---

[12]     Jurors can use common sense to determine whether Brown was irritable, drowsy, or in other ways consistent with not getting sufficient sleep. Tiredness and its effects are a part of almost everyone's life. Marsh's opinion about the symptoms of sleep deprivation would not be helpful to a jury who can use their own eyes and ears to assess Brown's tiredness.

about whether the detectives had such a reason in mind, which might undermine Marsh's credibility or the force of his argument. But even if the detectives' actual reason for not making the phone call is different than the reasons Marsh identifies, the bottom-line opinion that it is in line with generally accepted practices not to give a suspect an immediate phone call to his family is helpful to the jury. It may counter their intuition that police should immediately allow a suspect to call his family, which could impact how the jury views Defendants' conduct. As discussed above, however, whether Defendants violated Illinois law is not directly material, so Marsh must not opine on whether refusing the phone call was legal. *See supra* at 24–25.

To the extent described above, Marsh may offer his opinions about the length of Brown's interrogation.

### 4. Other Aspects of the Investigation

Brown asks the Court to bar Marsh's opinions regarding other aspects of the interrogation and investigation. The Court will do so, in part. Additionally, some of opinions are unnecessary in light of the above rulings regarding Jones's testimony.

*Confrontational interview style and risk factors*. Brown argues that Marsh opines that a "direct confrontation" style of interviewing was generally accepted practice during 2008, but he fails to engage with the situational and dispositional factors that created a risk that Brown would falsely confess. [Dkt. 310 at 13–14.] Brown argues that Marsh's report is unsupported on this point. While Marsh claims that Jones "puts undue weight" on these factors and "does not provide adequate explanation of any real support for the position" that they cast doubt on Brown's confession, during his deposition, Marsh acknowledged that these factors could make

a suspect more likely to falsely confess. [*Id.*] These opinions are excluded as unhelpful in light of the above ruling. The focus at trial will be on Brown's interrogation and whether he falsely confessed. The Court excluded generalized discussion of risk factors, *supra* at 16, so Marsh need not offer a competing view on this point.

*Refusal of an attorney.* Brown objects to Marsh's opinions that "it is in line with generally accepted police practices to allow an interviewee … to provide as much information as he wants to provide if the interviewee has not asked for an attorney. When an interviewee is willingly talking to an investigator and providing potentially helpful information, an investigator is not required to affirmatively or immediately end the conversation to ask if the interviewee wants to first talk to an attorney, even if the investigator has some knowledge that an attorney may be present." [Dkt. 310-3 at 9; *see* Dkt. 310 at 14–15.] Marsh may give this opinion, which could help the jury understand why investigators might choose not to affirmatively raise the possibility of attorney representation. This is as far as Defendants contend Marsh's opinion goes [Dkt. 313 at 15], and it must go no further. Brown notes that in his deposition, Marsh may have gone further, refusing to acknowledge Defendants' obligation under Illinois law to permit Brown to speak with an attorney if his family hired one. [Dkt. 322 at 4–5 & n.1; *see* Dkt. 310-4 at 156–57.] The Court takes no position because this opinion would not be admitted in any event. Whether Defendants violated Illinois law is not at issue in the trial, and expert testimony is unnecessary to help the jury determine whether Cary asked to speak to Brown or whether Defendants denied him that ability. *See supra* at 24–25. Marsh may therefore opine that not proactively asking if

37

Brown wanted a lawyer would have conformed to generally accepted police practices, but that is the extent of the opinion he may offer.

*Leading questions.* Brown argues that Marsh's opinions about Defendants' use of leading questions is unsupported because while he asserts that the use of leading questions is routine, "he fails to engage with the *volume* of such questions and the *manner* in which they were used here," he fails to grapple with Defendants' use of questions that "improperly suggested admissions they were seeking to obtain," and he fails to engage with the fact that "persistent demands for 'the truth' could itself serve as a pressure tactic, communicating to [Brown] that he needed to say something different to satisfy his interrogators." [Dkt. 310 at 15 (citing *Hurt v. Wise*, 880 F.3d 831, 847–48 (7th Cir. 2018)).][13] Despite the issues Brown raises, these opinions are admissible. In Marsh's opinion, Defendants asked leading questions only occasionally and the majority of the questioning followed common practices; if he is mistaken, it should be straightforward to cross-examine him with numerous examples of leading questions. The same goes for references to the truth. If Marsh's opinion that asking Brown to tell the truth was not an attempt to influence him into giving the preferred narrative as Brown argues, then he should be able to point to questions or behavior that indicates this aim.

---

[13] Marsh also gives an example of when he used leading questions. [Dkt. 310-3 at 13.] The parties go back and forth about this portion of Marsh's report [Dkt. 310 at 15; Dkt. 313 at 14–15; Dkt. 322 at 7–8], but it is unnecessary to wade into the dispute. This was not the only basis for the opinion about leading questions—it was just an example. Brown may be right that the comparison is a poor one, but that would not render Marsh's entire opinion inadmissible. Nor does the Court expect that this example will be relevant for the jury; the focus should remain on the questions that Defendants asked Brown.

\*     \*     \*

As explained above, Brown's motion to bar the testimony of William Marsh [Dkt. 310] is granted in part and denied in part. Marsh may testify as provided herein.

### D.     Dr. Brian Cutler

Brown designated Dr. Brian Cutler, a social psychologist, as a false confession expert. Dr. Cutler proposes to testify about the coerciveness of Brown's interrogation and the risks that the inculpatory statements Brown made were false. [Dkt. 309-1 ¶¶ 3–5.] In Dr. Cutler's opinion, "[t]he combination of personal and situational risk factors likely put Mr. Brown (if innocent) at high risk for false confession," and that the foregoing interrogation included "very high levels of contamination" regarding the key inculpatory points: whether Brown knew RJ had a gun when he drove RJ to Amundsen Park and whether he knew that RJ intended to inflict harm at the park. [*Id.* ¶ 5.] Defendants move to bar Dr. Cutler from testifying at all, as well as move to bar specific opinions. [Dkt. 309.] The motion is granted in part and denied in part.

### 1.     Complete Exclusion

Defendants argue that Dr. Cutler should be barred from testifying because his opinions (1) are not the product of reliable principles and methods and (2) will invade the province of the jury rather than help the jury. [Dkt. 309 at 3.] *See* Fed. R. Evid. 702(a), (c). The first argument itself has two prongs, that Dr. Cutler's methods have not been accepted in the scientific community and that the results cannot be applied or tested and have no error rate. The Court takes each argument in turn.

*Lack of acceptance in scientific community*. Under the *Daubert* framework, one factor in whether proposed expert testimony is reliable is "whether the theory has

39

been accepted in the relevant scientific community." *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017) (citation omitted). Defendants argue that Dr. Cutler's methods are unreliable because much of the research in the field of false confessions has resulted from classroom and laboratory experiments that "have been widely critiqued by federal courts," some of which "have observed that these analyses have not been accepted in the academic community." [Dkt. 309 at 4–5 (citations omitted).] Moreover, Defendants argue that Dr. Cutler incorrectly represents that work in this field is generally accepted within the scientific community because one article Dr. Cutler cites—"[a] recently published survey that ... found nearly universal agreement between forensic psychological experts on the risk factors for false confessions" [Dkt. 309-1 ¶ 11 (citations omitted)]—is the product of an "echo chamber" of a small number of like-minded academics, and therefore does not reflect a scientific consensus. [Dkt. 309 at 5–6 (citing *Austin v. Brown*, 2024 WL 1602968, at *23 (D. Colo. Feb. 22, 2024)).]

The Court agrees with Defendants on the echo chamber point. A survey finding that a large majority of "experts on the psychology of false confessions" approve of their field is weak evidence that this area of study has gained general acceptance in the field of psychology or social science. *See Austin*, 2024 WL 1602968, at *23. If that were Dr. Cutler's only basis for asserting that his methods are widely accepted, the Court would be inclined to exclude Dr. Cutler's opinions as unreliable, but it is not. [Dkt. 309-1 ¶¶ 11–12 ("Research on interrogation and confession is routinely included in psychology textbooks and courses, presented at national and international

40

psychology conferences, and adopted as a research topic of master's theses and doctoral dissertations. … Several professional associations have in various ways embraced and endorsed the research on interrogations and false confessions.").] The inclusion of false confession research in these sources, which Defendants do not address, speaks to the general acceptance of this discipline more than the survey.

Turning to the criticism of Dr. Cutler's methods—and Dr. Cutler himself—by other courts, the Court disagrees that these courts' analyses establish that the field of false confessions research is not generally accepted. In response to Defendants' citations, Brown marshals cases where false confessions research was found to be reliable. [Dkt. 311 at 4 (collecting cases).] In their reply brief, Defendants argue that Brown "cites a laundry list of cases where other experts were permitted to testify, but he does little to explain why those cases have any connection to the instant case." [Dkt. 324 at 1.] However, the same goes for Defendants' opening brief, which cites cases where courts criticized and excluded false confessions research. For every case saying that laboratory studies are inadmissible because they "were not conducted by law enforcement, were not part of a criminal investigation, did not involve actual suspects, and did not present the students with a serious penalty," *United States v. Deuman*, 892 F. Supp. 2d 881, 886 (W.D. Mich. 2012) (quotation omitted), there is one saying that such weaknesses are properly explored on cross-examination, *Caine v. Burge*, 2013 WL 1966381, *2 (N.D. Ill. May 10, 2013). The bottom line is that "the facts of the case and the particular expert report and testimony drive the *Daubert*

41

analysis," *Harris*, 2017 WL 243616, at *7 n.2, and Defendants have not provided a basis to throw Dr. Cutler's testimony out in its entirety on acceptance grounds.

*Inability to test or apply methods, and lack of error rate.* Under *Daubert*, factors bearing on the admission of expert testimony include "whether the proffered theory can be and has been tested" and "whether the theory has been evaluated in light of potential rates of error." *Baugh*, 845 F.3d at 844 (citation omitted). Defendants ask the Court to exclude Dr. Cutler's testimony as unreliable because his methods cannot be applied or tested, and they have no error rate. [Dkt. 309 at 6.] The Court disagrees that Dr. Cutler's testimony must be wholly excluded on this basis.

There is no requirement that expert testimony be falsifiable or have a specific error rate. No *Daubert* factor "is either required in the analysis or dispositive as to its outcome." *Baugh*, 845 F.3d at 844 (cleaned up). The reality is that research into actual false confessions cannot be done in a controlled, scientific environment, and precise error rates cannot be calculated, and it would be hard to square excluding Dr. Cutler's testimony in its entirety with the Seventh Circuit's general acceptance of these sorts of methods. *See, e.g.*, *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996) (while there may be "analytical and practical difficulties for courts attempting to apply Rule 702 and *Daubert*" to social science evidence, "social science testimony is an integral part of many cases"); *Harris v. Thompson*, 698 F.3d 609, 631 (7th Cir. 2012) (citing false confessions research); *see also Corley v. United States*, 556 U.S. 303, 321 (2009) (citing a false confession study for the proposition that "there is mounting empirical

42

evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed").[14]

District courts have gone both ways on whether false confession testimony is admissible when experts cannot opine about how it applies to a given case. [*Compare* Dkt. 309 at 6–7, *with* Dkt. 311 at 5–7 (citing dueling cases).] The Court thinks the soundest approach is to analyze specific opinions for reliability of methodology and helpfulness to the jury, which it views as faithful to Seventh Circuit precedent. *See, e.g.*, *Andersen v. City of Chicago*, 2020 WL 1848081, at *3–4 (N.D. Ill. Apr. 13, 2020) (denying request to exclude false confession testimony in its entirety, but trimming unreliable or unhelpful opinions). The Court discusses specific opinions below, and Defendants are welcome to cross-examine Dr. Cutler about the over-arching flaws in his methods. [*See* Dkt. 311 at 6.]

*Helpfulness.* Defendants' last broad attack on Dr. Cutler's opinions is that they are unhelpful and instead will invade the province of the jury. [Dkt. 309 at 8–10.] The Court agrees in part. Laypeople lack Dr. Cutler's specialized knowledge regarding situational and psychological factors that can induce a false confession, so Dr. Cutler's testimony will be helpful to the extent that he lays the foundation for how to evaluate whether Brown's confession was true or false. *See, e.g.*, *Andersen*, 2020 WL 1848081, at *4 (permitting an expert "to testify as a general matter false confessions happen and explain the risk factors that can lead to a false confession" because this testimony

---

[14] Defendants distinguish the Seventh Circuit's decisions in *Hall*, *Harris*, and *United States v. West*, 813 F.3d 619 (7th Cir. 2015), another case Brown cites, and rightly so. [Dkt. 324 at 1–3.] None of these cases is on point, and the Court does not cite them as controlling.

will help the jury). Further, he may testify in general terms about the factors that in his opinion were present during Brown's interrogation. [*See* Dkt. 309-1 ¶ 5.] *Caine*, 2013 WL 1966381, at *3 ("Dr. Leo will be permitted to testify to various factors that can cause false confessions, and to their presence in this case.").

However, little would be gained from allowing Dr. Cutler to walk through the entire video of the confession and identify the factors that he believes are risk factors for a false confession. Because Dr. Cutler "does not (and cannot) opine as to the likelihood that any of the identified risk factors or interrogation techniques will produce a false confession or the likelihood that Brown's confession was false" [Dkt. 309 at 8], he lacks the "specialized knowledge" necessary to testify as an expert as to the application of those factors to Brown's confession in particular. *See* Fed. R. Evid. 702(a). [Dkt. 309 at 8–10.] For example, Dr. Cutler may explain that using rapport-building techniques such as small talk may "enhance the suspect's susceptibility to misleading information" because understanding this finding of social science may not be obvious to a lay jury. [Dkt. 309-1 ¶ 57.] Dr. Cutler may not, however, point out instances of small talk on the tape [*id.* ¶ 78], because jurors can determine whether small talk affected the truthfulness of a confession without expert assistance. *See Harris*, 698 F.3d at 631–32 (noting that if jurors are aware of facts bearing on the reliability of a confession, they can evaluate its credibility); *Harris*, 2017 WL 2436316, at *16 (noting that expert testimony about false confessions is "helpful to explain why false confessions happen and how to recognize false confessions, thus allowing the jury to use this framework to apply to the facts of this case"); *cf. Kirk v. Clark Equip.*

44

*Co.*, 991 F.3d 865, 877 (7th Cir. 2021) (explaining that *Daubert*'s purpose is keeping unreliable expert testimony from a jury that might give it undue weight); *United States v. Bard*, 73 F.4th 464, 477 (7th Cir. 2023) (noting the risk inherent in a witness offering testimony as both an expert and a fact witness).[15]

In his response brief, Brown argues that Dr. Cutler should be able to give this testimony, but he does not appear to argue that Dr. Cutler must be allowed to dissect the interrogation video at the same granular level his report does:

> Dr. Cutler will be able to inform the jury about commonalities between the interrogation of Plaintiff and interrogations of persons known to have confessed falsely. He will identify for the jury's benefit specific tactics that Defendants employed during Plaintiff's interrogation that were found to have pressured innocent persons to confess in known false confessions cases. This testimony will not invade the jury's province any more than it would be unhelpful; instead Dr. Cutler's testimony will provide the jury with a useful framework to make their own evaluation of evidence in this case.

[Dkt. 311 at 10 (citations omitted); *see id.* at 11 (noting that Defendants can cross-examine Dr. Cutler about the fact that "no competent scientist could opine on whether specific factors in Plaintiff's interrogation caused him to confess falsely").] There may be specific factors that are complicated enough to warrant some further exploration by Dr. Cutler, so Brown may ask outside the presence of the jury if Dr. Cutler can discuss specific portions of the video. But as a general matter, a lay jury can identify

---

[15]    The Court notes that in *Andersen*, an expert was "permitted to apply the known risk factors to Andersen's case as he did in his report, such as the length of the interrogation, sleep-deprivation, physical maltreatment of Andersen, the interrogation tactics used, and more." 2020 WL 1848081, at *4. This may have been because the confession occurred decades earlier and likely was not videotaped. *See id.* at *1. The Court's findings on helpfulness are specific to this case, in which there is a video of the interrogation for the jury to view.

many of the factors that Dr. Cutler cites on their own. [*See, e.g.*, Dkt. 309-1 ¶¶ 34–36 (noting factors such as fatigue, hunger, and physical discomfort).]

With the limitations discussed above, Dr. Cutler may testify as an expert.

### 2. Specific Opinions

Defendants also ask the Court to bar Dr. Cutler from testifying about several specific opinions. [Dkt. 309 at 11–15.] Only some of these opinions will be excluded.

*Factors not present*. Defendants ask the Court to bar Dr. Cutler from testifying about factors that may induce false confessions but that are not present here, such as physical abuse and mental illness. [*Id.* at 11–12.] They contend that such testimony would be irrelevant and allowing it might cause the jury to misunderstand which factors Dr. Cutler believes were present in Brown's interrogation. This concern is well taken, but the Court will permit Dr. Cutler a bit of leeway to "educate the jury" about false confessions generally before turning to the factors that are at issue here. [Dkt. 311 at 12.] The fact that there are factors Dr. Cutler believes bear on the reliability of confessions that are not present could be important to help the jury evaluate his credibility—it will not have the impression that every risk factor that exists happens to be present, a potentially suspicious coincidence. With that said, Brown must be careful not to allow ambiguity to creep into the testimony. If he chooses to ask Dr. Cutler to briefly state the full range of factors that can affect the reliability of a confession, he must ask Dr. Cutler to identify the factors that he does not think are present before turning to an in-depth discussion of the factors that are present. Defendants' request to bar this opinion is thus granted in part and denied in part.

*Coercive interrogation*. Defendants next ask the Court to bar Dr. Cutler from opining that "Brown was subjected to a highly coercive interrogation." [Dkt. 309 at 12–14.] This request will be granted in large part. The Court agrees with Defendants that using the term "coercive" could cause confusion, since one of the questions that the jury will be called on to answer is whether the confession was coerced within the meaning of the Fifth Amendment. Dr. Cutler's definition is not a legal one, and it is cleaner to avoid that term. [*Id.* at 13.] Instead, when describing how certain tactics can coerce false confessions, Dr. Cutler should offer a descriptive definition like the one that appears in his report. [*See* Dkt. 311 at 13.] Further, the discussion of coercive tactics must be framed in the abstract—how such tactics *can* induce false confessions, but not that Brown's confession was likely or may have been induced by such tactics. That is a question for the jury, as the Court has explained. *See supra* at 43–45.

*Contamination*. Finally, Defendants move to bar Dr. Cutler from opining that "Brown's confession is plagued by a 'high level of contamination' such that 'the markers of true confessions are not present in this case and the risks of false confession are high.'" [Dkt. 309 at 14–15.] This request is granted to the extent that Dr. Cutler will be barred from opining about contamination in Brown's interrogation for the reasons explained above, *supra* at 43–45, but he may opine that contamination is a marker of false confessions and provide the jury with the "framework" for how to identify it. *See Harris*, 2017 WL 2436316, at *16. Brown argues that Dr. Cutler can "make the point that there is a difficulty assessing the reliability of the confession, not that the confession is or is not reliable." [Dkt. 311 at 14–15.] The Court agrees to

an extent, but the testimony must be framed as being about *a* confession, not *the* confession, because the jury can determine whether contamination prevents it from accurately assessing whether Brown's confession was true or false.

*    *    *

Defendants' motion to bar the testimony of Dr. Cutler [Dkt. 309] is granted in part and denied in part. Dr. Cutler may testify as explained herein.

### E.    Dr. Michael Welner[16]

Defendants offer Dr. Michael Welner, a forensic psychiatrist, as a rebuttal expert who will respond to testimony from Jones and Dr. Cutler. [Dkt. 307-2 at 1–3.] Brown moves to bar Dr. Welner's testimony in its entirety. [Dkt. 307.] In Defendants' response brief, they rely in part on a declaration from Dr. Welner that he prepared after he was deposed. [Dkt. 316-2.] Brown moves to strike the declaration. [Dkt. 319.] For the reasons stated below, the motion to strike is denied, and the *Daubert* motion is granted in part and denied in part.

### 1.    Motion to Strike

The Court begins with whether to strike Dr. Welner's declaration. Rule 37(c)(1) provides, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Brown argues that the declaration is an "attempt to shore

---

[16]    Brown's motion to cite supplemental authority [Dkt. 356] is granted.

up the deficiencies" in Dr. Welner's report with information that was not previously disclosed, so it should be stricken under Rule 37(c)(1). [Dkt. 319 at 2–3.]

The Court's guiding principle in deciding whether to strike the declaration is the sham affidavit rule. This rule "permits a judge to disregard a 'sham' affidavit—typically an affidavit that contradicts prior deposition testimony," but a witness may provide "a supplemental affidavit that clarifies ambiguous or confusing deposition testimony." *James v. Hale*, 959 F.3d 307, 315–17 (7th Cir. 2020) (citations omitted). The rule comes from summary judgment practice, but the underlying principle—"to weed out unfounded claims, specious denials, and sham defenses," *id.* at 317 (cleaned up)—applies with equal force to a party's attempt to slip an unqualified expert or unreliable opinions past the *Daubert* gatekeeper.

The Court declines to strike Dr. Welner's declaration. First, the Court agrees that to the extent that the declaration elaborates on qualifications that Dr. Welner disclosed in his report, the declaration should not be stricken. [Dkt. 327 at 2–3.] *See Chatman v. City of Chicago*, 2018 WL 11426158, at *2 (N.D. Ill. Oct. 30, 2018) (declining to strike a declaration by Dr. Welner that "rather than adding additional items of experience, … merely explain[ed], in greater detail, the qualifications already disclosed"). Second, the declaration at least to some extent elaborates on methodology that the report disclosed. [Dkt. 327 at 4–5. *Compare, e.g.*, Dkt. 307-2 at 1 ("I have conducted a forensic assessment of the behavioral science aspects of the interrogation …."), *with* Dkt. 316-2 ¶¶ 58–61 (summarizing the forensic assessment process as described in the report).] A decision about whether to strike a declaration is conducted

49

on a paragraph-by-paragraph basis, *see Dunn v. Menard, Inc.*, 880 F.3d 899, 910–12 (7th Cir. 2018) (striking only contradictory portions of an affidavit), which the Court can determine by comparing portions of the declaration to Dr. Welner's report and deposition testimony. Therefore, the motion to strike [Dkt. 319] is denied.

### 2.   Dr. Welner's Qualifications

Turning to Brown's *Daubert* motion, he first argues that Dr. Welner should be barred from testifying because he is unqualified. [Dkt. 307 at 4–9.] After emphasizing the validity and widespread acceptance of false confessions research, Brown argues that Dr. Welner, a medical doctor and psychiatrist, lacks the requisite qualifications to opine about this area of study. [*Id.* at 6–7 (noting Dr. Welner's lack of training as a social scientist, degree in this field, publications, expertise in police practices, and in another case his unfamiliarity with the work of prominent social psychologists and inability "to define basic social psychology terms employed regularly in the false confessions literature").] Because Dr. Welner lacks training or education in this area and "is not in the business of collecting and assessing empirical data about false confessions," Brown argues cannot "assess [the] interrogation of [Brown] against what Dr. Welner terms 'the empirical evidence' as to what motivates false confessions and what specific interrogation techniques may be deemed 'coercive.'" [*Id.* at 7–8.]

Defendants highlight Dr. Welner's experience treating and examining criminal defendants, and assessing their experiences in police custody, decisions to confess, and appraisal of evidence against them. [Dkt. 316 at 3–4.] Dr. Welner has reviewed the false confessions literature and, to put it mildly, has strong views about that field and its practitioners. [*Id.*] Defendants also argue that Dr. Welner's lack of familiarity

with certain social scientists and social science during a deposition in an earlier case does not undermine his qualifications here because Brown has established neither that those subjects are relevant to this case nor that Dr. Welner remains ignorant of them. [*Id.* at 5–6.]

The Court finds that Dr. Welner is qualified to offer expert testimony in this case. Brown acknowledges that "Dr. Welner does not lack expertise as a general matter" and that "experts from different fields may weigh in on the same subject matter. But they must opine within the confines of their training and experience." [Dkt. 320 at 3.] The Court agrees, but it finds that Dr. Welner's qualifications are sufficient for him to offer expert opinions about false confessions, given his medical training, his work with criminal defendants related to confessions, and his research into this subject, albeit from a different scholarly background than Dr. Cutler. Brown may cross-examine Dr. Welner about his lack of familiarity with certain social science research and the noncompletion of confession-related projects, but Dr. Welner's training, education, and experience make him qualified for purposes of Rule 702.

Dr. Welner's testimony will be limited, as described below and in line with the Court's rulings with respect to other experts, but the Court finds that he is qualified.

### 3. Reliability of False Confessions Research

Brown next argues that the Court should exclude Dr. Welner's opinions about the field of false confessions research. [Dkt. 307 at 9–10.] Dr. Welner's report makes no attempt to disguise his low opinion of social science generally and false confessions research in particular. [*E.g.*, Dkt. 307-2 at 22 (opining that "social scientists proudly claim that if social scientists agree on something as it relates to justice, no research

51

is needed and the science is settled"), 34 ("Dr. Cutler's summary above and the rhetoric that accompanies it illustrates how objective scientific and research rigor is substituted by dramatic, provocative expression. Such advocacy employs market-tested hot-button language to gin up disturbed reactions to the altogether ordinary, all the while repetitively bleating about police being socially and psychologically manipulative.").] The Court agrees with Brown to an extent that these opinions are improper.

Brown is correct that the reliability of social science and false confessions research is a question of law that the Court has resolved in his favor, and Dr. Welner cannot testify that Dr. Cutler's methods are "unreliable" within the meaning of Rule 702. [Dkt. 307 at 10.] *See Harris*, 2017 WL 3142755, at *5. Defendants respond that Dr. Welner will not opine that Dr. Cutler should not be permitted to testify, but rather that he will critique Dr. Cutler's methodology, which is proper. [Dkt. 316 at 11–12.] *See, e.g.*, *Chatman*, 2018 WL 11426158, at *5. The Court agrees, but identifying gaps or weaknesses in another expert's methods does not give Dr. Welner license to launch into a diatribe about how unscientific the field of social science is. The fields of social science and false confessions research are not on trial, so Dr. Welner's testimony at trial should focus on flaws in Dr. Cutler's analysis of the risk factors that were present in Brown's interrogation. The Court expects this testimony will include Dr. Welner's opinion about the importance of empirical research, a common thread throughout his report, but he should not belabor the point. The jury will already be aware that false

confessions research does not employ this methodology, so Dr. Welner should be able to make his main points about empiricism and then move on.

With these limitations, Dr. Welner may offer opinions about the weaknesses in Dr. Cutler's methodology and opinions.

### 4.    Brown's Mental State, Credibility, and Thought Process

Brown's remaining arguments target Dr. Welner's opinions about his mental state, his credibility, and his thought process. [Dkt. 307 at 10–16.] This request is granted. Given the limitations the Court has placed on Jones's and Dr. Cutler's opinions with respect to interpreting the interrogation footage, the Court does not expect to allow Dr. Welner to provide rebuttal opinions along these lines. For example, the Court has barred Dr. Cutler from testifying that in his opinion the interrogation was "coercive" either in so many words or through a description of what coercion entails. *See supra* at 47. Thus, it will be unnecessary for Dr. Welner to offer his opinion that the interrogation was not "aversive" or "toxic." [Dkt. 307 at 12.] To the extent that Dr. Welner will provide the jury with abstract framework from which to evaluate the confession, he may, but the jury needs no help reviewing the interrogation footage and determining whether Brown's confession was coerced or not and truthful or false.

The parties should expect that Dr. Welner may testify about weaknesses in Brown's experts' methodology and offer his opinions about the factors that Dr. Cutler believes may create a risk of false confessions. But Dr. Welner may not interpret the interrogation or offer his opinion that Brown's confession in this case was not coerced.

## III. Conclusion

For the foregoing reasons, the *Daubert* motions [Dkt. 306–310] are granted in part and denied in part, and the motion to strike [Dkt. 319] is denied.

Enter: 19-cv-4082
Date: August 13, 2024

_____
Lindsay C. Jenkins
United States District Judge

54