# Exhibit A

1

```
 1            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3
    MARCEL BROWN,                 ) Case No. 19 C 4082
 4                                )
                   Plaintiff,     )
 5                                )
              vs.                 )
 6                                )
    CITY OF CHICAGO, et al.,      ) Chicago, Illinois
 7                                ) August 26, 2024
                   Defendants.    ) 2:57 o'clock p.m.
 8

 9                      VOLUME ONE
            EXCERPT OF PROCEEDINGS - JURY TRIAL
10         BEFORE THE HONORABLE LINDSAY C. JENKINS

11
    APPEARANCES:
12

13  For the Plaintiff:        LOEVY & LOEVY
                              BY:  MR. JONATHAN I. LOEVY
14                                 MR. LOCKE E. BOWMAN, III
                                   MR. TOM KAYES
15                            311 N. Aberdeen Street, 3rd Floor
                              Chicago, Illinois  60607
16
                              MACARTHUR JUSTICE CENTER
17                            BY:  MS. VANESSA DEL VALLE
                                   MR. JONATHAN M. MANES
18                            160 E. Grand Avenue, 6th Floor
                              Chicago, Illinois 60611
19

20  For the Individual        GREENBERG TRAURIG, LLP
    Defendants:               BY:  MR. JOHN F. GIBBONS
21                                 MR. KYLE L. FLYNN
                                   MR. TYLER L. SALWAY
22                                 MR. QUINN FORD
                              77 W. Wacker Drive
23                            Chicago, Illinois  60601

24

25
```

```
 1   APPEARANCES (Cont'd):

 2
     Court Reporter:              JOSEPH RICKHOFF, CSR, RMR, CRR
 3                                Official Court Reporter
                                  219 S. Dearborn St., Suite 2118
 4                                Chicago, Illinois  60604
                                  (312) 435-5562
 5                                joseph_rickhoff@ilnd.uscourts.gov

 6                   * * * * * * * * * * * * * * * * * *

 7                   PROCEEDINGS RECORDED BY STENOTYPE
           TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Opening Statement - Loevy

3

1          (Proceedings heard in open court:)

2                    *    *    *    *    *

3              OPENING STATEMENT ON BEHALF OF PLAINTIFF

4     BY MR. LOEVY:

5              May it please the Court, counsel.

6              Before I begin, I want to thank you.  As Judge Jenkins

7     said, everybody's busy.  Everybody's got a lot of things going

8     on in their lives, responsibilities.  You have all agreed to

9     take time out of your lives and participate in the jury system.

10    And it is particularly important in a case like this where the

11    allegation is that someone's important constitutional rights

12    were violated, that someone had their rights violated by a

13    state actor, by the government.

14             He has a right to come to court and to have the

15    community decide what's justice.  The Chicago Police

16    Department's not going to decide what's justice.  Not even

17    Judge Jenkins is going to decide what's justice.  You are, the

18    community.  A cross-section of the community.  And it's a very

19    important check and a balance of power, and you're going to see

20    it's especially important in a case like this.

21             So, thank you for participating.  It only works if

22    people show up and do it.

23             My name is Jon Loevy.  You've heard this is Marcel

24    Brown.

25             Let me tell you a little bit about Marcel.  He

Opening Statement - Loevy

4

1   graduated from Oak Park High School.  He grew up on the West

2   Side.  He's a brother.  He's a son.  He is a father.  He'll

3   tell you in his own words, his child is about the most

4   important thing in his life.  He's had a longtime partner that

5   he's been in love with for about 20 years.

6           But the most important thing about Marcel Brown,

7   unfortunately, is -- the most salient thing is he's a

8   wrongfully convicted person.  He spent more than a decade in

9   the Illinois Department of Corrections for a crime he didn't

10  commit when he was just 18 years old.  Just 18 years old.  He

11  was falsely accused of a murder that he was in no way involved

12  with.  And after a trial that went terribly, terribly wrong, he

13  gets convicted and sentenced to 35 years.  Sent to Menard, one

14  of the difficult, toughest prisons in the Illinois Department

15  of Justice -- Department of Corrections.

16          Now, I'm going to tell you a story, but I'm going to

17  start at the end, because there's something of a happier

18  ending.  His conviction was overturned.  That's why he's here.

19  He's had some lawyers from the Northwestern Center on Wrongful

20  Convictions.  They helped him get back into court, and he was

21  able to overturn it and walk out of prison.

22          But he lost a lot.  He lost his entire 20s.  And

23  there's a big hole in his life.  So, he's coming here in court

24  seeking justice for what happened to him.

25          So, let me tell you his story.  I'll back up now.

Opening Statement - Loevy

5

1      He grew up on the West Side, like I said.  He went to

2  Oak Park-River Forest.  Normal childhood.  He's hanging out, he

3  had quite a bit of friends.  He's a social guy.  He had a lot

4  of cousins in the neighborhood.  He always worked from a young

5  age.  He always had a few bucks in his pocket.  Love in his

6  family.  He had sisters and a brother.  The sisters now, you'll

7  meet some of them, one of them works for the Post Office, one

8  of them works for Enterprise, and one of them's in college, his

9  youngest one.

10      He was extremely close to his mother.  You're going to

11  hear about that.  She worked for about 20 years on an assembly

12  line, if I'm not mistaken, a factory.  And she will come to

13  court and she will tell you about Marcel Brown.

14      So, Marcel was growing up, doing what he did, normal

15  life.  August 30th, August 2008, that's when Marcel's life

16  takes a different direction.

17      You're going to hear his mother decided to move the

18  family to Oak Park.  Oak Park is nearby where he lived.  He was

19  able to keep a lot of the same friends, but there were more

20  opportunities, better high school than what he was used to, a

21  different kind of people, and he was really excited and

22  energized by it.

23      He met a girl in Oak Park.  He's going to tell you, it

24  wasn't like the girls he knew before, and he really fell

25  deeply, deeply in love.  He was with her for about a

1    year-and-a-half, and it got to the point where he was spending

2    all his time with a her and his friends were like, Marcel, why

3    you're not hanging out with us.  But he was really, really in

4    love with her.

5            And he got a job.  He graduated high school.  He was

6    working at the Jewel in a warehouse.  Not for very long.  He

7    was trying to figure out where his life was going to go.  In

8    the fall he was seriously considering enrolling in Triton

9    College to better his opportunities.

10           So, everything goes wrong almost 16 years ago to the

11   day, end of August 2008.  Starts out like a normal day for

12   Marcel.  Saturday, he's a hanging out with his friends, his

13   family.  They're having a block party on the block, goes to the

14   block party.

15           Later that night he goes to the White Castle.  There's

16   a White Castle in the neighborhood.  It's where guys hang out,

17   people hang out, girls and guys.  Maybe 15 or more kids on

18   Saturday night in the summer hanging out at the White Castle.

19   He sees friends.  He's just carefree.

20           He gets a call from his sister.  His sister is over at

21   Amundsen Park a few miles away.  She says, hey, pick me up.  We

22   got a situation.  She's fighting with some girls and she's with

23   some of her cousins.  And, so, Marcel says, all right, I will

24   come pick you up.  He's got his mother's car.  She's his older

25   sister.  He's going to pick her up at Amundsen Park.

Opening Statement - Loevy

7

1          So, he gets over to get in the car.  And a couple of

2   his cousin come along, too.  It's hard to remember all the

3   names.  Believe me, by the end of this week you'll know all the

4   names.  It's like watching a TV show.  You get used to it.

5          But his cousin R.J. and his cousin T.J.  T.J. is about

6   his age.  Their buddies.  They spent quite a bit of time

7   together.  That's T.J.

8          R.J. is Marcel's younger cousin.  Kid's about 15 years

9   old.  They got different friend sets.  He's 18.  The cousin's

10  15.  But R.J. gets in the car, too, because both of his cousins

11  have sisters in the park, too.  So, they all -- and they got

12  calls, too, from their sisters.

13         So, they drive over to Amundsen Park, three, four

14  minutes, listening to music.  They get to the park, Marcel

15  parks.  T.J. and R.J., the cousins, get out of the car to go

16  pick up the sisters.  Marcel's sitting in the car waiting, and

17  nobody's coming back.  So, he decides to get out of the car,

18  too.  He's got to go over the gate because it's closed at

19  night.  And he's walking into the park.

20         This is Amundsen Park.  You'll see a lot about it.

21  Just to orient you, here's the park.  They park here along

22  Bloomington.  This is the fieldhouse.

23         MR. LOEVY:  I'm sorry, your Honor, we needed the Elmo.

24  BY MR. LOEVY:

25         This is the park.  Here's the fieldhouse here.  They

Opening Statement - Loevy

8

1    park on Bloomington.  And they jump over the fence and they

2    walk into the park.

3           So, Marcel's walking.  It's a Saturday night.  There's

4    a lot of people in the park, maybe 20, 50, who knows, hundred

5    people.  Everybody's doing their own thing.  Some people are on

6    the playground, people by the fieldhouse.  People are hanging

7    out in the park.  He knows some of them.  It's the

8    neighborhood.  And he walks into the park.

9           He gets about a hundred feet in, and he hears a

10   gunshot, multiple gunshots in front of him.  And, then, there

11   was gunshots from a behind him.  He hits the deck.

12          Now, Marcel -- this is a rough neighborhood.  He's

13   living in the Austin neighborhood.  Sometimes there's gunfire.

14   So, he hits the deck and he's on the ground.  And when the

15   gunfire stops, he gets up, runs back to his car.  He runs back

16   to his car.  He jumps in his car.

17          About then R.J. and T.J. also get in the car.  And he

18   hears one last shot that sounds close to his car.  So, he pulls

19   a U-turn, drives away.  What the heck just happened, he asked

20   his cousins.

21          R.J. -- remember the 15-year-old?  15-year-old says,

22   well, they were shooting at me and I shot back.  A guy named

23   Day-Day was shooting at me.  Day-Day is David Portis, the guy

24   from the neighborhood.  I shot back.  Marcel doesn't want

25   anything to do with that.  He just went to pick up his sister.

Opening Statement - Loevy

9

1      He drops off R.J.  R.J. gets out.  He goes home.  And

2   it's lucky for him because the police pull him over.  They

3   search.  There's nothing in the car.  He goes home.

4      The next morning all kinds of rumors going around.

5   His phone is lighting up about that shooting in the park.

6   Apparently, a boy got killed.  People are saying a guy named

7   Paris Jackson, another kid in the neighborhood.  Marcel knew

8   him.  Knew him from school.  Nice kid.  His body was found in

9   the park the next morning.  And there's rumors that A.J. --

10  that R.J. was involved and R.J. might have shot him and

11  nobody's sure what happened.

12     The next day, Marcel's at his house, and R.J., the

13  cousin, comes over and some of their parents come over and

14  everyone wants to know what happened and R.J. tells them.  A

15  kid named Day-Day was shooting at me.  I shot back.  That's

16  what happened.

17     Whatever happened it had absolutely nothing to do with

18  Marcel.  He was in the park, the shooting happens, he hits the

19  deck.

20     Now I want to break in here and explain a little bit

21  about criminal law.  You're going to have to become something

22  of an expert in criminal law, or at least get familiar with it.

23     If you shoot somebody in a premeditated way, that's

24  murder.  You go to prison for period.

25     R.J.'s got a problem.  He shot a gun.  That's murder.

Opening Statement - Loevy

10

1    What Marcel did is not murder.  If you drive somebody
2    someplace and you don't know what they're going to do, when
3    they get out of the car and they go commit a crime, you're not
4    guilty of murder, first degree murder.

5    For example, if I took Locke downtown, drove him to a
6    restaurant, he got out, got into a fight with somebody and shot
7    him, that's Locke's problem, not my problem.  Doesn't matter
8    that I drove him to the restaurant.  What would make me guilty
9    of murder is if I shared a plan with Locke.  If I said, hey,
10   Locke, let's go to this restaurant and shoot somebody, you got
11   a gun, I give him a gun or whatever, I drive him to the
12   restaurant and we're sharing a plan, then I'm guilty of murder,
13   too.  That's called accomplice liability.  You don't have to
14   actually pull the trigger, but you have to be involved.

15   So, you see, there's two different things.  There's if
16   I'm involved, I'm driving Locke, I know what the plan is, I
17   know he's got a gun, I know he's going to get him, I'm guilty
18   as he is.  But if I just drive my cousin to the park and nobody
19   knew anybody was going to shoot anybody and he does a dumb
20   thing, I'm not guilty of murder.

21   And that's, of course, Marcel.  Marcel is innocent.
22   He hasn't done anything wrong.  He gave his cousin a ride to
23   the park.  People are shooting.  It's got nothing to do with
24   him.

25   So, how does he end up guilty of murder?

Opening Statement - Loevy

1        Well, let me tell you what happens next.

2        Labor Day goes by -- again, almost 16 years to the

3  day -- then Tuesday, then Wednesday.  It's a normal Wednesday.

4        Now, at this point in Marcel's life, he has graduated

5  high school.  Every day at 5:00 a.m. for as long as he can

6  remember, he wakes up early and takes his mother to her car.

7  She works and it's a tough neighborhood, so he walks her to her

8  car.  And I tell you that not to tell you that Marcel's a

9  saint.  He's not a saint.  Nobody's a saint.  But he had a very

10  close relationship with his mother.  And later when he was

11  separated from her, it hurt him dearly.

12        So, he drives -- walks his mother to her car, goes

13  back, gets his brother and sisters ready for school, the

14  younger one.  You know, make sure they got the right backpack

15  and the right books and, you know, takes them to school.  He

16  drives them to school.  He drives his girlfriend to school.

17  That was around the time he's working for Jewel.

18        At the end of the day, he goes home.  His mother's

19  home.  The police knock on the door.  They're not terribly

20  surprised.  I mean, he might be a witness.  So he's got to talk

21  to the police.

22        The police come into the living room and, hey, Marcel,

23  we want to talk to you.

24        Now, Marcel, his family had previously been a witness

25  in a case.  Somebody had shot and a bullet went into their

Opening Statement - Loevy

1    house, so they had dealt with the police.  So, Marcel's like,

2    all right, let's talk right here.  I can talk to you.

3           And they're like, no, no, you got to come down.  Got

4    to come down.

5           Marcel doesn't have a choice.  His mother encourages

6    him to cooperate.  He's got nothing to hide.  He didn't do

7    anything wrong.

8           So, he gets in the car, he goes to the police station.

9           Now, there's some question that you're going to have

10   to resolve about whether Marcel was under arrest.  I mean, they

11   didn't tell him he was under arrest.  They made him think he

12   was going to be sort of a witness.  But, apparently, they had

13   already decided to arrest him for murder.  They sort of

14   prejudged him.

15          So, they put him in the station.  They put him in a

16   little interrogation room that is not much bigger than, say,

17   that witness box, ten by ten.  And he doesn't leave that room

18   for 34 hours.  34 hours.  September 3rd, all night; September

19   4th, all day, all night; into September 5th.  34 hours he is

20   interrogated.  They're trying to get him to confess to murder.

21          Now, there's a couple of problems with this murder

22   case against Marcel Brown.  Here's the first problem.  It's

23   kind of strange, but there's actually no body.  The boy who

24   died, Paris Jackson, they didn't find his body in the park till

25   the next morning.  So, that night when the gunfire happened,

Opening Statement - Loevy

1    nobody noticed that Paris Jackson got killed.  Nobody in the

2    park.  They talked to 20 people.  They're going to give you the

3    names.  50 people.  Not one person saw Paris Jackson get shot.

4    Nobody.

5            And if he was in the park -- it's not even clear he

6    was -- his friends would have seen him in the park.  Nobody saw

7    Paris shot.

8            The other thing they can't find, nobody finds that

9    night, is Paris' body.  And I'm sorry to show you the photos,

10   but here's Paris.  Here's where they find him the next morning,

11   lying by the fieldhouse I showed you.  Remember the fieldhouse?

12           So, Paris' body is lying by the fieldhouse at 9:00

13   a.m. that morning.

14           But the question is, why did nobody see Paris' body

15   the night before?  There was half a dozen police cars

16   dispatched there.  They're searching the scene.  They're

17   looking for evidence.  They're looking for people.  They're

18   looking for anybody hurt.  Nobody sees Paris' body.  No witness

19   sees Paris' body.

20           So, it's possible -- and I don't know what happened in

21   the park.  Nobody does.  It's possible that Paris' body was

22   dragged to the park or dumped in the park and wasn't shot

23   there.  There's very good evidence to believe why, and I'll

24   tell you.  There's no blood under Paris Jackson.

25           So, Paris Jackson was shot in the heart, and you're

Opening Statement - Loevy

14

1    going to hear from medical experts who are going to tell you,

2    that's a lot of blood.  A shot in the heart, blood's coming

3    out.

4          Now, when the police found him the next morning, they

5    searched this grate carefully.  And they actually opened the

6    grate, went down underneath there, looking for blood.  You know

7    how much blood they found?  Zero.  No blood at all.

8          So, you are going to hear tomorrow from Dr. Arden, who

9    is going to tell you, boy, if a guy gets shot IN the heart and

10   died that night, there would be blood because his shirt's

11   bloody, it would have touched the grate.  You can't get shot in

12   the heart, die -- run a little bit and then die and not leave

13   blood.

14         So, there's a good possibility that Paris Jackson

15   wasn't even shot in the park that night, the murder that the

16   police are investigating.

17         And you're going to hear about what the police

18   officers did or didn't do about that.

19         The bigger problem, though, in the case against Marcel

20   Brown is, he hasn't committed a crime.  He hasn't done anything

21   wrong.

22         If you're Marcel Brown -- and you're going to see the

23   interrogation video -- he's like, look, I drove my cousin to

24   the park.  I was picking up my sister.  I wasn't trying to hurt

25   anybody.  I didn't know anybody was going to get hurt.

Opening Statement - Loevy

15

1       If that's true, that's not murder.  That's not murder.

2   There's going to be no dispute that if you believe, and if the

3   police had believed Marcel, that all he did was drive his

4   cousin to the park, didn't know nothing was going to go down,

5   didn't have any plan, didn't even know the kid had a gun, then

6   he's not guilty of murder.

7       So, what the police did was they spent 34 hours

8   banging away at this kid trying to get him to admit he knew

9   something was going to go down, to admit something that wasn't

10  true.

11      It was not true.  He didn't know R.J. had a gun and he

12  didn't know about any plan.

13      You're going to hear about this interrogation.  They

14  denied him the right to a lawyer.  They denied him a right to a

15  phone call.  I've already told you how long it went.  They

16  isolated him in this little room.

17      You're going to see 18-year-old Marcel.  Marcel is

18  bigger now.  He's older.  He was 18.  He's a child.  An

19  18-year-old is a child.  And he's crying in there, and he's

20  trying to tell the police he doesn't know anything, and they're

21  just not accepting it.

22      I'm going to talk to you about the interrogation.  But

23  the interesting thing about the interrogation is, it's on

24  video.

25      So, they put him in this room.  And Marcel didn't know

Opening Statement - Loevy

1   it, but there was a camera in the corner.  See that -- that's

2   not a camera, but it's like nobody notices it.  And the police

3   knew there was a camera because they were recording it.  So,

4   there's this asymmetry here.  And you can tell the police are

5   being careful what they say.  They're even being polite because

6   they know this is going to be video.  Marcel doesn't know

7   there's a camera.

8           And on that camera, you can watch them over the course

9   of September 3rd, 4th and 5th coerce this kid.  And you can see

10  them violate his rights.

11          You know, they passed a law in the early 2000s that

12  you have to video record interrogations exactly for this

13  reason.  We don't have to argue about what happened in the

14  room.  We have videotape of what happened in the room.

15          And you will see that video.  You'll see a lot of it.

16  And it's agonizing.  Marcel has to watch it.  It's like

17  watching a child version of himself be abused.

18          They will not accept what he's telling them.  They

19  will not accept that he had nothing to do with this.

20          So, maybe 50 times, maybe more, he's on video and he's

21  telling the police, I don't know anything about the plan.

22  Here's all the times on the timestamps.  I didn't know anything

23  about a plan.  I didn't know anything about a gun.  Over and

24  over and over again.

25          And they just won't accept it.  And they're leaning on

Opening Statement - Loevy

1   him and they're trying to get him -- he thinks they're going

2   after R.J., his cousin.  So, eventually he makes some sort of

3   ambiguous statements about R.J., and I'll tell you how it went

4   down.  And they're like, ah-ha, now you falsely confessed.

5         So I'm going to talk about that.  I don't to get too

6   far ahead of it, but I want to introduce the concept of a false

7   confession.  We've heard false confession, wrongful conviction.

8   What is that?

9         If somebody confesses to a crime -- Marcel said, all

10  right, I knew he had a gun, that's a confession.  That's

11  against his interest.

12        For a long time in the criminal justice system we

13  thought, okay, you're guilty.  Who would confess to a crime if

14  you didn't commit the crime?  If you confessed, you're guilty.

15  So, everybody got convicted, end of the case.

16        What happened was in the '80s and the '90s, DNA

17  exonerations started happening.  In other words, you have a

18  crime, somebody would get convicted, say a rape.  And everybody

19  knew he was guilty because he's convicted and he confessed, et

20  cetera, et cetera.

21        And, then, remember the technology advanced.  Some of

22  the older people remember there wasn't DNA before.  And, then,

23  DNA happened and then they could actually go back and say, you

24  know what, did you rape that person?  And they test the DNA,

25  and they say, you know what, you didn't rape that person.  They

Opening Statement - Loevy

18

1  could prove to a scientific certainty that some people are

2  innocent.

3        So, that's not every case, but in some cases, you can

4  prove, if it's a rape case and the person didn't have sex with

5  somebody else and it's yes or no, they did or they didn't. And

6  they started learning that there are DNA exonerations.

7        So, Dr. Cutler and social scientists like him said,

8  this is a really interesting phenomena. I want to study this.

9  Why would people confess to something that they didn't do?

10        And they looked that subset of maybe 300 DNA

11  exonerations, the early subset. And in 24 percent of them,

12  somebody had confessed.

13        So, you got people that are definitely innocent, no

14  question they're innocent, in one-quarter of those cases the

15  person had given a confession. And the social scientists said,

16  well, that's fascinating. Why would somebody confess if we

17  know they're innocent? Again, no question they're innocent.

18  Why would they confess?

19        And they started looking at factors that cause false

20  confessions. And those factors are this case. Let me show you

21  what some of those factors are.

22        The first factor that correlates with false

23  confessions is a very young person.

24        When Marcel got put in that room, he is 18 years old.

25  He is not fully formed. I don't know how many of you have

Opening Statement - Loevy

19

1   18-year-olds.  I got three that used to be.  They're like

2   children but bigger.  They are not fully formed.  They don't

3   comprehend so good.  They don't have good judgment.  They

4   really are immature.

5           And it's not the same thing as interrogating a fully

6   formed adult.  And the people interrogating Marcel are fully

7   formed adults.  They're basically almost my age.  So, they've

8   done this hundreds of times.  It's a real imbalance here.

9           And when you're a child and they go at you like that,

10  sometimes bad things happen, particularly over 34 hours.

11          So, there's a lot of -- the false confessions tend to

12  correlate, tend to aggregate around very, very young people

13  like Marcel Brown.

14          Another factor is that Marcel was denied a lawyer.

15  Now, this is super messed up.  Marcel's in the police station.

16  He's in the interview room.  His cousin -- remember I told you

17  his cousin R.J., who actually shot a gun -- his parents decide

18  to surrender him.  His parents bring him to the station with a

19  lawyer.  The guy's name is Wham Cary.  He's a memorable guy

20  because he had a mohawk.

21          And Wham Cary surrenders R.J.  And they simply what to

22  talk to R.J., and Wham Cary says, no, you're not.  That is

23  America.  He has a right to remain silent.  You can talk to

24  him -- I'm going to talk to him.  You're not going to talk to

25  him.

Opening Statement - Loevy

1      In America, you've heard, you have a right to remain
2 silent.  You have a right to an attorney.  Those aren't just
3 words.  That means you have a right to an attorney.  You have a
4 right to remain silent.
5      So, Wham says, thank you very much, R.J. is not going
6 to be speaking to you today.
7      Marcel's mother's in the police station that day, too.
8 She says to Wham, can I hire you?  I need a lawyer, too.  He
9 says, well, it's going to cost you a few hundred bucks.  She
10 goes to the machine.  She can prove it.  She withdraws the
11 money.  She hires Wham Cary.  So, now Marcel's got a lawyer.
12      Marcel's lawyer walks in the police station, says, I
13 want to talk to my client Marcel Brown.  You guys got him in an
14 interview room up there on the -- you know, whatever floor.
15 And they say, hold on a second.
16      Then the Chicago Police Department does what the
17 Chicago Police Department's going to do.  And they would have
18 come to Mr. Mancuso.  He's the lead investigator.  Because
19 that's the way it works.  If there's an attorney there, they
20 contact the detective who is leading the investigation.  He's
21 not going to deny that.  It would have come to him.
22      So, then they come back to Wham Cary and they say,
23 listen, Marcel, he doesn't want to talk to his attorney.  He
24 doesn't want to talk to you.  That's what they tell Wham Cary.
25      Wham Cary says, I remember that because that's the

Opening Statement - Loevy

21

1    only time in my entire career I can ever remember someone

2    saying, I don't want to talk to my attorney.

3             So, they don't let him in.

4             And you know what?  That's not true.  We have a video

5    of the interrogation.  Nobody says to Marcel, hey, your

6    attorney's here, you want to talk to him?  Didn't happen.  We

7    have a video.

8             So, they lie to Wham Cary.  They lie to Marcel's

9    mother.  And they never tell Marcel.

10            So, he was denied an attorney, and he was denied an

11   attorney on purpose.  That is going to go to the totality of

12   the circumstances.

13            Another thing he was denied was a phone call.  Marcel

14   says right there on the video, almost right away, I need to

15   talk to my mom.  Can I call my mom?

16            Mr. Mancuso says, give us five minutes.  They had

17   taken his phone.

18            And Marcel was cooperative.  Gave him the password.  I

19   got to nothing to hide.  Here's my phone, here's my password,

20   you can go see who I called.  I didn't do anything wrong.

21            That's Marcel's only point.  I didn't do anything

22   wrong.  I was -- I was as surprised as anybody.  I didn't

23   murder anybody.  I didn't have anything to do with any murder.

24   You want my phone, you want my password, fine.

25            He says, I want to talk to my mother.

Opening Statement - Loevy

22

1        On that video, maybe five times, maybe more, maybe six

2   times, he's saying, listen, I want to call my mom.  Because

3   it's uncomfortable for him.  He's like, I didn't do anything.

4   They wouldn't accept it.  He's like, I didn't do anything.

5   They wouldn't accept it.  He's like, can I call my mom?  And

6   they keep telling him, five minutes, five minutes.

7        Well, 3:00 p.m. on September 3rd, September 3rd goes

8   by, doesn't get a call.  September 4th goes by, doesn't get a

9   call.  He's asking for a call.  On September 5th, after he

10  supposedly confessed, they're like, okay, time for your phone

11  call.  But by then it's too late.

12       So, these are not police officers playing fair.  What

13  the evidence is going to show you is that they cheated and that

14  they exploited this child when he was a child.

15       Another factor here is the 34-hour interrogation.

16       Now, you're not detectives, and you don't know how

17  long an interrogation is supposed to last.  But it ain't 34

18  hours.  You're going to hear from experts who are going to tell

19  you that the average interrogation is two hours in a felony

20  case like this.  Two hours.  The whole incident took a half an

21  hour, tops.  So, I mean, how many times can you ask the

22  question?

23       If you do an investigation properly, you ask all your

24  questions, you take your time, and then it's over.  You don't

25  keep going trying to break somebody's will.  This isn't the TV

Opening Statement - Loevy

23

1    and this isn't the movies.  You ask them the questions and then

2    you're done.

3           This didn't go two hours.  This didn't go four hours.

4    It went from September 3rd, starts about 3:00 o'clock, goes all

5    the way to midnight.  He's up all night.  They wake him 3:00,

6    4:00 in the morning.  Goes all the way through the 4th and into

7    the 5th.

8           You're going to hear Dr. Cutler, the wrongful

9    conviction guy, says any interrogation over -- remember they

10   studied the data for false confessions and wrongful

11   convictions, and they found when interrogations went over four

12   hours, when they went over four hours, that's when you started

13   having a problem with false confessions and wrongful

14   convictions.

15          This wasn't four hours.  This is 34 hours.  And you

16   can literally watch this boy -- he's not a boy now, he's a man,

17   but he's a boy then.  You can watch him decompose.  You can

18   watch him start crying, start talking to himself, freaking out.

19   He keeps telling them, I didn't do anything wrong, and they

20   keep not accepting that.

21          It's way too long.  They broke his will.

22          Another factor is the cold.  The first thing that

23   happens when Marcel gets in this room, they're like, wow, it's

24   cold in here.  And you can see him huddling with blankets.

25          It's cold on purpose.  It's by design.  He doesn't

Opening Statement - Loevy

1  have a thermostat in that room, he doesn't have any control of

2  this room. It's a little windowless room with a door covered,

3  completely black. You don't know what time it is, you don't

4  know anything. But it's cold in there on purpose.

5        They give him a blanket that doesn't -- you know, they

6  give him a blanket. And on interrogation he's asking more.

7  I'm cold, I'm cold, I'm cold. They give him a shirt, a

8  T-shirt. They're like, sorry, we can't find a blanket. So,

9  he's wrapped in a T-shirt.

10       He doesn't know he's on a videotape. This is a boy

11  trying to stay warm for 34 hours. And I don't like being cold,

12  maybe you don't. It wears you down. It wears down your

13  resistance. And that's why they did it to him. That's why

14  they did it to him on purpose, to try to break him down.

15       Another thing that broke him down was the lack of

16  sleep. Remember, he had been up at 5:00 a.m. on September 3rd.

17  Maybe he went back to sleep, got some sleep. But when he gets

18  to the police station, it's 3:00 in the afternoon. They

19  interrogate him all night. You can see it on the video.

20  They're talking to him at 3:00 in the morning. They're talking

21  to him at 4:00 in the morning. They're waking him.

22       He actually tries to get a little sleep. They knock

23  on the door at 4:00 o'clock.

24       And they can see. It's not just a recorder, they can

25  watch. So, when he goes to sleep, they bang on the door, they

Opening Statement - Loevy

1  come in, hey, didn't you say this?  Didn't you say this?  He

2  wakes up, you can tell -- he sits up.  He's like, okay.  You

3  could tell he's disoriented.

4          This is not a good-faith interrogation.

5          They wake -- so he gets -- in this room, there's no

6  bed.  There's no pillow.  There is a bench that's maybe four

7  feet, so you can't really sleep on it.  It's super narrow.

8  Fortunately, he was very narrow back then.  He weighed 105

9  pounds.  But it's a little, tiny bench you can't sleep on.  And

10 the floor -- it's a steel bench and it's a hard tile floor and

11 there's no pillow.  So, it's not designed to be a room that you

12 sleep in.  It's designed to be a room where they ask you

13 questions.

14         So, he is up all night that first night.  He lies down

15 for a few hours, but they're going back at him the next

16 morning.  He's up all day.

17         When he finally gives his confession, it's after

18 midnight on the third day.  So, that is sleep deprivation.

19         Sleep deprivation is real.  You know, if some of us

20 have pulled an all-nighter, this is like a pulling a double

21 all-nighter.  You lose your judgment.  It's disorienting.

22 Makes you feel sick and confused.

23         And that's what they did to him.  That is no way to

24 interrogate somebody.  They did it on purpose.

25         He also didn't eat.  You know, you can see on the

1   video, they keep saying to him, hey, you want some water?  You

2   want some chips?  They did offer him chips.

3           He gets no meal on the first day.  On the second day,

4   he got one meal.  He got a McDonald's in the morning.  They

5   said, here's an egg sandwich or something.  He eats it

6   midmorning.  He eats no food for the rest of the day and into

7   the next day.

8           Now, they're on video.  And believe me, the police

9   know they're on video.  So, they did offer him food.  Let's be

10   clear.  By maybe midafternoon they offered him some sandwiches.

11           They're like, Marcel, why aren't you eating that?

12   He's like -- he tells them, because I'm scared.  I'm terrified.

13   I'm thinking about survival.

14           Remember, this is an interrogation where they're going

15   after him, going after him, going after him.  They're saying,

16   you knew, knew you, you knew.  He said, I didn't know, I didn't

17   know, I didn't know.  He literally can't eat.

18           So, they weren't starving him, to be clear.  They gave

19   him those sandwiches on the second day.  But he was -- they

20   could see with their own eyes that this is a boy who hadn't

21   eaten in two days, a teenager, and he literally couldn't eat.

22   And they kept going and they kept going.

23           Isolation.  I told you, the room is four by four.  The

24   walls -- you know, there's no clock.  There's no windows.  Soon

25   he didn't know if it was day or night.  He's just in a

1    completely windowless room locked in there.

2            What they would do is they'd interrogate him a little

3    bit and then they'd leave.  Then they'd come back, and then

4    they'd leave.  And, then, somebody else would come in.  Three,

5    four, five detectives are tag teaming him.  One of them goes

6    home to sleep.  Another one goes in there.  Marcel didn't get

7    to go home and go to sleep.  They're tag teaming him.

8    Different detectives are coming in.  It's disorienting.  He is

9    socially isolated by design.

10           Because remember, he's not getting a phone call.  So,

11   what they're trying to do is just increase the pressure on him.

12   His entire universe became this room.  He is completely

13   dependent on the detectives.  He wants to eat, they got to feed

14   him.  He wants to go to the bathroom, he's got to knock on the

15   door.  They got to let him do it.  He wants to drink, they got

16   to give him water.

17           And you can see on some of these clips, they sort of

18   reward him with chips when he comes toward them.  He's

19   completely dependent.  He's completely isolated.

20           That's how wrongful confessions happen.  You don't

21   have to interrogate somebody that way.  You can sit them down.

22   You can take out a pen and ask them questions.  You can say

23   thank you very much, we're going to go out and do our job now.

24           This is not how they handled it.  They didn't respect

25   Marcel.  They thought they could get away with it.  And it was

1    not fair.

2           They kept him out of the lockup.  So, remember this

3    room is for asking questions.  There's a facility in the police

4    department called the lockup where you're supposed to take

5    people to go to sleep.  There's bedding and pillows in the

6    lockup.  There's phones in the lockup.  There's people in the

7    lockup.

8           So, when it got to be nighttime, they had a choice.

9    They could have said, Marcel, we're going to take you to the

10   lockup and come back in the morning.  They didn't do that.

11   They didn't do that.  Then he would have been able to sleep.

12   Then he would have been able to talk to people.  He would have

13   been able to maybe call his mother.  They kept him locked in

14   that room where there's no bedding and no pillows, and they

15   kept him there on purpose.

16          They used lies and trickery.

17          Now, I want to be clear.  They're allowed to lie to

18   suspects.  The judge is going to tell you that.  Now, you are

19   allowed to lie to suspects, but you're not required to lie to

20   suspects.  That's a choice that they made.  You can if you want

21   to because the law lets you.  But you don't have to.

22          And they certainly lied to Marcel.  They're telling

23   him all kinds of lies.  They're saying, hey, Marcel, we talked

24   to all these people and your cousin's saying you knew about the

25   gun.  He's like, no, he didn't, because I didn't know about the

1   gun.  I don't believe you.  You know, they're trying to get him

2   to say it.  He's like, no way.

3          They lied to him about how many shots there were.

4   They tell him, oh, we got witnesses saying there was just a few

5   shots and you're trying to tell us there was ten shots.

6          They had 911 tapes that were contradicting what they

7   were telling Marcel.

8          So, they were lying to him while they were

9   contaminating him, trying to get him to come over to their

10  story.

11         And what is contamination?  Contamination means, when

12  you do an interview and interrogation, if you do it the proper

13  way, you're supposed to say, you tell me what happened and I'll

14  write it down.

15         On that video, they spent all their time telling

16  Marcel what happened.  The detectives are like, oh, we talked

17  to 20 people, Marcel.  We talked to all these people.  Here's

18  what they're telling us.  They're telling us that R.J. this,

19  and they're telling us that you guys did this, and they're

20  telling us there was a boy.  And you could see Marcel's like,

21  okay.  But they're telling him.  Because what they're doing is

22  they're grooming him to try to be a witness.  They're hoping he

23  will be a witness.

24         Marcel basically knew nothing.  He walks into the

25  park.  He didn't see anybody shooting.  He didn't see R.J.

Opening Statement - Loevy

1    shooting, and he didn't see Day-Day shooting.  All he knows is

2    when he got back in the car, his cousin told him, Day-Day was

3    shooting at me, I shot back.  He didn't know anything about

4    anything.

5           So, the police on this video are feeding him all the

6    information one way.  He doesn't know anything.  They're

7    feeding it to him and trying to get him to parrot it back.

8           I've told you about the asymmetry of information.

9    They knew it was being recorded and Marcel didn't.  So, every

10   time you watch those video clips when the police are being real

11   careful about what they're saying, keep in mind, they know that

12   we're making a record, he doesn't.

13          And he does just fine.  He is honest and clear and

14   legit.  And the police -- at a few points, the police are like

15   pushing him too far, and he starts to say, look, if you guys

16   want me to lie, I'll lie.  I mean, I can tell you're trying to

17   get me to lie.  And they're like, no, no, no, we don't want you

18   to lie, we just want you to tell the truth.  Because they know

19   they're being recorded and they are pushing him to lie.

20          They also used threats.  And this is not a fair

21   tactic.  Bottom line is, they tell Marcel after those interview

22   that, listen, you're going to prison.  You're going to prison

23   for 30, 40 years, unless you start telling us what we want to

24   hear.

25          And Marcel says, I've told you 50 times what I know,

Opening Statement - Loevy

1  which is, I didn't know he had a gun.  I didn't know there was

2  a plan.  I didn't know.

3          And they're telling him over and over and over again,

4  you need to start changing your story.  You need to start

5  telling us R.J. had a gun, and you need to start telling us

6  R.J. had a gun, over and over, or you're going to prison.

7          And you're going to watch a lot of those videos, and

8  it's going to be long, because it's really -- really the case

9  is about what happened in that room.  So, you're going to

10  probably when it's all over have seen an hour or more of those

11  videos.  And you can see them saying to Marcel, we need the

12  truth, because they know the video's on.  And Marcel keeps

13  saying, I told you the truth.  And they keep saying, not that

14  truth, we need the other truth.  And Marcel keeps trying and

15  trying, and they're not just not accepting it.

16          Marcel does -- at some point they start to move Marcel

17  about R.J.  So, there's several phases of this interrogation.

18  When Marcel gets in the room, Marcel says, look, Day-Day was

19  shooting at R.J., R.J. shot back.  That's what Marcel had been

20  told.

21          And at some point after the first day, they say, we're

22  not going to accept that.  You're not getting out of this room

23  if you keep saying that.  And Marcel says, fine, I didn't see

24  it.  You know, whatever you say.  And he says, R.J. was

25  shooting.  I didn't know anything about Day-Day.  I didn't see

Opening Statement - Loevy

32

1    Day-Day.  R.J. was shooting.  Can I go home now?  I've told you

2    the truth.  I'm admitting R.J. shot.  He didn't actually see

3    R.J. shoot, but he's like, you guys want R.J., I will admit

4    R.J. shot.  Can I go home now?  And he still can't go home.

5           So, they push him, and he goes a little further.  And

6    he says, can I go home?  And he goes a little further, and he

7    says, can I go home?  They're like, nope, not going home yet,

8    not going home yet.

9           So, he starts saying things about R.J.  Yeah, R.J.'s a

10   trouble maker.  Yeah, R.J. would carry guns.  Yeah, R.J. sat

11   said in the backseat -- a police officer says to Marcel on

12   video, hey, wasn't he in the backseat saying I'm going to go F

13   those N words up?  The police officer says that to Marcel.

14   And, then, a few hours later Marcel says, okay, that's what

15   happened.

16          Marcel doesn't say it.  The police officer says it to

17   Marcel.  And, then, Marcel says, can I go home, can I go home?

18   And they say, no, no, no, and no.

19          And, then, hours later he says, okay, okay.  He was in

20   the backseat saying, I'm going to go F those people up.  Can I

21   go home now?

22          So, you just watch them push Marcel, push Marcel, push

23   Marcel.  You watch him just break down in front of your eyes.

24   He can't make it stop.

25          He's crying.  He's confused.  He's tired.  He's asking

Opening Statement - Loevy

1    them, what is going to get me out of this room?  What do I need

2    to say?  And they keep saying, you got to tell the truth.  And

3    he keeps saying, I did tell the truth.  I didn't know R.J. had

4    a gun.  R.J. shot, told me he shot.  That's all I know.

5         That truth's not good enough.  That truth's not good

6    enough.

7         Can I go home?  Can I go home?  No, no, no, no, no.

8         Well, who is going to decide?

9         And, then, they let him know that the state's attorney

10   is the one who is going to make the decisions.  State's

11   attorney is the lawyer, the charging person.

12        So, they tell him about 2:00 o'clock on day two --

13   because he keeps saying, can I go home?  What did I do to go

14   home?  I didn't do anything wrong.  I didn't do anything wrong.

15   What's it going to take for me to go home?

16        Well, the state's attorney's going to decide.

17        So, Marcel starts knocking on the door that afternoon

18   saying, can I talk to the state's attorney?  Which is a pretty

19   goofy thing.  It's sort of unusual.  Usually the guy in the

20   interrogation room doesn't want to talk to the prosecutor.

21   Prosecutor's the one who prosecutes.  He's banging on door, I

22   want to talk to the state's attorney, I want to talk to the

23   state's attorney.  He probably says it a half dozen times or

24   more.

25        Why do you want to talk to the state's attorney?

Opening Statement - Loevy

34

1    I want to tell the state's attorney what I know, which

2    is nothing, because the cops are saying, you got to get to the

3    truth, got to get to the truth.

4         So, he's asking over and over.  And finally, maybe

5    10:00 o'clock, 11:00 o'clock that night on night two they bring

6    the state's attorney.  And Marcel tells his story.  Basically,

7    they had been rehearsing for 30 hours at this point.

8         So, he tells them the stuff they want to hear about

9    R.J.  R.J. shot a gun.  R.J. was saying, F those people up in

10   the backseat.

11        And they ask him, hey, did you know there was a plan

12   and did you know there was a gun?  And he says, no.  I can't

13   help you.  I didn't know he had a gun.  And I didn't know there

14   was a plan.  And that's all it's ever going to be.

15        Now, at one point they push him too hard, because he

16   says over and over again, 50 times, I didn't know.  And he

17   says, listen -- and Marcel, you can tell, not super

18   sophisticated.  Smart guy.  Not -- you know, he is a very smart

19   guy, but he doesn't think as fast as the police are thinking

20   because he hasn't done this before.

21        So, at point he says, look, you guys are telling me

22   I'm not going to go home until I say what you want to hear.  If

23   you want me to say it, I'll say it.  But it's not true.

24        And they're like, whoa, whoa, I hope that didn't

25   happen on the camera, because they knew there was a camera.

Opening Statement - Loevy

1   But after, like, 30 hours he's like, we're going in circles,

2   guys.  If you want me to say I knew R.J. had a gun, I'll say it

3   if that's what it's going to take.

4              And they're no, no, no, we want you to tell us the

5   truth.  We want you to tell us a different truth.

6              So, they knew -- these police officers knew the score.

7   He was clear 50 to a hundred times: I didn't know he had a gun.

8              So, he tells the state's attorney the same story, and

9   she's like, not good enough.  I don't know if you're going to

10  be able to go home.  Last chance, Marcel.  Last chance.

11             Then she leaves.  Then she comes back and they're

12  banging on the door.  And he's talking to himself.  I just want

13  to go home.  I don't know if it's day or night.  I've been in

14  here since September 3rd.  I haven't slept since September 2nd.

15  What is it going to take?

16             So, they're basically psychologically torturing this

17  guy.

18             Now, to the extent he confesses, it really ain't much

19  of a confession.  I mean, they get him to say, all right, you

20  know, I guess I knew he had a gun because of the way he was

21  acting.  And, so, yeah, I probably could have figured out he

22  had a gun.

23             You could tell his heart's not in it because it's not

24  true.  But he's like, now can I go home?  And, you know, we'll

25  think about it.  We'll think about it, Marcel.  She leaves.

Opening Statement - Loevy

36

1          Then Mancuso comes back after midnight one more time.

2     He tries again.  I mean, you're going to see a video.  They

3     come at him from every angle a human can come at him, and he

4     just keeps telling him the truth.

5          Marcel knows not everything, but he knows something.

6     He knows his cousin didn't have -- he didn't know his cousin

7     had a gun.  And he knew he wasn't going to the park to cause

8     any trouble.  He was going to the park to pick up his sister.

9     That he knows.  And you will hear him and you will see that

10    video and you will believe that.

11         And you know what, that's not guilty of murder.

12    That's why they spent 34 hours with him.  Because if he was

13    just going to the park to his pick up his sister and he didn't

14    know R.J. had a gun in his pocket, then he ain't guilty of

15    murder.

16         So, they're going after him for 34 hours trying to get

17    him to change.  Mancuso goes in there one last time.  He's

18    like, I didn't know.  I didn't know.

19         He's saying, am I going to be charged?  Am I going to

20    be charged?  He's actually got it backwards.  He thinks they're

21    after R.J.

22         And if you want to understand the case, that's what's

23    going on.  He thinks they're after R.J.  He thinks that they're

24    trying to get him to say that so R.J. will get in trouble.  And

25    he's like, I told you the truth.  R.J. shot.  I didn't know he

Opening Statement - Loevy

1    had a gun.  I didn't know about any plan.

2         Then he says to that police officer, can you help me?

3    Are you going to help me get out of this?

4         Mancuso has played this kid, and he knows it.  He

5    doesn't even have the guts to tell him, you're not going to

6    anywhere.

7         So, where do they take him next?  They take him to the

8    Cook County Jail.  And Marcel is a little confused because he

9    thought he was going home because he's now explained, I didn't

10   do anything.

11        But they put him into Cook County Jail and he gets

12   processed.  And all of a sudden he's getting strip searched

13   with a bunch of -- 60 grown men.  And he's like, I've never

14   been naked in front of a man.  I'm just a child.  He's five-

15   four.  He's 105 pounds.  I'm 150, and he's two-thirds of me and

16   I'm not big.  He was five-four.  He was a little, little guy in

17   there with adults.

18        And he gets strip searched.  And, then, he gets thrown

19   into a Cook County Jail, a violent, dangerous place.  People

20   attack him.  There's -- people try to rape him.  People try to

21   hurt him.  And he doesn't understand why this is happening.

22        He finally gets to talk to his mother, but it's too

23   late.  And he spends two years in the county jail waiting for

24   his trial.  And the trial happened.  And the trial actually

25   takes more than a year.  Thank God that wasn't your -- but it

Opening Statement - Loevy

38

1   was more than a year because it kept getting continued.  He'd

2   show up, nothing would happen.  He would show up, nothing would

3   happen.

4        They finally have this trial.  There's no witnesses.

5   Because Marcel didn't do anything wrong.  You know, R.J. gets

6   convicted because he shot a gun.  But Marcel didn't do anything

7   wrong.  This is no witness against Marcel against Mancuso.

8        The police officer gets up there and he testifies --

9   first he testified at the grand jury that Marcel Brown gave a

10  statement admitting he drove Branch to the park, and that he

11  knew Branch had the intention of shooting someone.

12       That's not true.  You're going to see two hours of

13  video where he says no a hundred times.  Not true.

14       But the judge believes Mancuso, and Marcel Brown, in

15  front of his family, is found guilty.

16       And you can just imagine what's going on in his head.

17  What is happening?  I went to pick up my sister, people are

18  shooting, and I ran away.  Why did I just get found guilty and

19  why am I going to prison for 35 years?

20       He gets sent to Menard prison -- and I'll talk about

21  that -- for 35 years.  And his family is there.  His mother is

22  there.  And he's taken away.

23       And I told you that his conviction was overturned and

24  he was exonerated.  And he is now here seeking justice.  So,

25  he's got this lawsuit.

Opening Statement - Loevy

39

1        Let me tell you a little bit about the claims in this

2    lawsuit.

3        He's suing for a coerced confession.  He's suing for

4    the involuntary confession.  I've talked about the factors that

5    led to it.  It's a totality of the circumstances inquiry.

6        And you're going to find that he did have his will

7    overborne.  That was their intention, and that's what they did

8    to him.

9        You're going to hear about fabrication of evidence,

10   conspiracy, other claims.

11       There's another important claim, suppression of

12   evidence.  Let me tell you a little bit about that.

13       The police are obligated to turn over what's called

14   exculpatory evidence.  So, they're the investigators.  They

15   don't just turn over to the prosecution the stuff that's bad

16   for you, the stuff that points at your guilt.  They turn that

17   over to the prosecutors.

18       Remember, prosecutors, criminal defense attorneys.

19   They're going to have a trial, just like this trial, when they

20   clash and they try to win.

21       But the state has an obligation to turn over the

22   exculpatory stuff, too, the stuff that's good for you.  If they

23   discover evidence that helps you prove your innocence -- it's a

24   great country we live in -- they have to turn that over, too.

25       And the police did not turn over the good stuff.  They

Opening Statement - Loevy

40

1    had at least two witnesses saying that there was more than one

2    shooter, that there were a lot of shots.  And they had a

3    witness saying Paris Jackson was alive in that park after the

4    gunshots.

5          He is going to say that he told them this, that Paris

6    Jackson was alive.  Remember his body was found the next

7    morning?  The police didn't write that down.  Their police

8    report source is very ambiguous what he said.  They didn't

9    write that down.  They didn't write down the stuff that would

10   have been good for Marcel.

11         They wrote down 20 witness statements, and you're

12   going to hear about those witness statements a little bit.

13   They interviewed people in the park.  Nobody in the park's got

14   anything to say about Marcel.  Marcel was in the park.  He

15   didn't shoot anybody.  He didn't do anything.  He wasn't even

16   with R.J.  He was in the park.  None of the witnesses say

17   anything about Marcel Brown doing anything wrong.

18         They talked to 20 people, they talked to 50 people.

19   Nobody saw Marcel Brown do a single thing wrong.

20         So, the other two jury instructions I want to mention

21   really quickly.  You're allowed to use your common sense.

22   You're like, I never -- I'm not a detective, I never bumped

23   into any of this.  You're supposed to bring your life

24   experiences in and use your common sense.

25         The other instruction is the preponderance.  This is

1    not a criminal case.  There are no criminal implications for

2    anybody.  It's a civil case.  Justice between the parties.

3            So, in a criminal case you've heard beyond a

4    reasonable doubt.  That's not this case.  This is more likely

5    than not.

6            So, if you put all the evidence favoring the

7    plaintiff, all the evidence favoring the defendants, which one

8    is more likely true?  If it's a dead tie, the plaintiff loses

9    because we have the burden of proof.  But all you're trying to

10   decide is which side's making more sense to me?  And that's an

11   easy question here and it's going to be an easy question.

12           I'm going to talk about two more things and then I'm

13   going to sit.

14           But the first thing is the defendants' evidence, and

15   then I want to talk about damages.

16           So, what have the defendants got?  They got no

17   witnesses, because Marcel Brown didn't do anything.  They may

18   call a woman named Marisol Ocampo.  I don't think she's going

19   to show up.  We'll see.  She may, she may not.  She gave a

20   deposition.  She said, I don't want anything to do with this.

21           But back when she was young, 16 years ago, she was in

22   the park that night.  Apparently, she stabbed somebody, because

23   there was a police report saying that people were saying she

24   stabbed somebody.  So, she's either sort of under arrest --

25   this is the woman that gives the statement.

Opening Statement - Loevy

42

1      Not only that but her boyfriend, Eugene, he got

2  arrested, too, for having a gun.  There's a shooting in the

3  park and somebody's saying Eugene was one of the people

4  shooting.

5      So, you got two people in trouble, Marisol and Eugene.

6  And they had a baby in the park and she was pregnant.  And

7  somehow Marisol spent 15 hours in the police station.  She

8  gives a statement at 3:45 in the morning, and they're like, oh,

9  she was just witness.

10     They're going to try to pretend to you that she called

11  the police and said, I have information I would like to

12  volunteer.  I'm here voluntarily.

13     It's preposterous.  She was in trouble.  She was

14  accused of stabbing.  Her boyfriend was accused of having a

15  gun.  And she gives a statement.

16     Now, the statement is not good for R.J., the cousin.

17  She says, I saw R.J. shooting and doing what R.J. did.  She's

18  got nothing to say about Marcel.  Nothing.

19     But this is their witness, if she comes to court, and

20  she's going to say, yeah -- well, I don't know what she's going

21  to say.  At her deposition she said a whole bunch of strange

22  things.  But that's their witness.

23     They're going to refer to witness statements.  They

24  talked to 20 people and they're going to tell you 20 people's

25  names they talked to.  Not going to hear from any of those

1    people.  They're not going to bring those people to court to

2    sit on this witness stand and tell you what they saw.

3         They're going to tell you what they think those people

4    told you, but they're not going to call them as witnesses.

5         So, that's not even evidence.  It's hearsay.  But more

6    importantly, it's got nothing to do with Marcel.  Nobody's

7    saying Marcel did anything because Marcel didn't do anything.

8         So, Marcel gets sent to Menard.  And you can't undo

9    what happened to Marcel.  Can't turn back time.  He's got a

10   gaping wound.  But this lawsuit is about justice.

11        So, let me tell you, last thing I'm going to talk

12   about is how much he suffered.

13        Menard penitentiary, this 18-year-old kid -- well,

14   actually, he's 20 by the time he goes to Menard.  He's actually

15   lost weight because the county, the food is so bad that he's

16   down to -- he goes from 115 to 105.  He is a tiny boy sent to

17   Menard.

18        Now Menard is not for juveniles.  It's for adults.

19   It's for the worst criminals in the State of Illinois.  If

20   you're in Menard, it's because you murdered somebody, you raped

21   somebody, you chopped somebody's head off, you put a kid in a

22   microwave.  If you commit the worst crime you can commit, you

23   go to Menard.  There's not people who, like, did drug crimes

24   or, like, you know, robberies or burglaries.  It's the most

25   dangerous criminals.  The only people in there that are not,

Opening Statement - Loevy

44

1   like, rapists and killers are the people who were in other

2   prisons and they couldn't get along because they were fighting

3   everybody and stabbing people.  They were too dangerous so they

4   sent them to Menard.  So, this is not a nice place.

5           He goes in there a kid.  He doesn't know a soul in

6   this institution.  And it's violent.  And he's attacked.  And

7   he learns to try to defend himself.  He's small.  You know,

8   he's not small anymore.  He got big in prison over time.  But

9   he was small and he was scared.  And he kept saying to himself,

10  I didn't do anything wrong.  What am I doing here?

11          He got sentenced for 35 years.  He didn't know he was

12  going to get out in ten.  He didn't know his conviction was

13  going to get overturned.  It's one thing if you're in for ten,

14  you hold your breath for ten years.  He's saying to himself,

15  I'm not getting out until I'm this guy's age.  And when you're

16  18, 20, that's not any fun.

17          So, that's the stress he had to live with.  The

18  boredom, the monotony, the tedium.  The cells they live in, you

19  can touch both sides of the wall.  Two men can't stand in the

20  cell.  There is, as I said, violence, anger, awfulness.  He is

21  tortured.

22          He's in there thinking about the unfairness of it all.

23  If you commit a crime, you go to prison.  The world's fair.

24  You know, commit a crime, you do the time.  Right?  If it's

25  unfair, then your sense of the world gets unmoored.  Because

1   he's saying to himself, I went to pick up my sister at the park

2   and then somebody started shooting.  What am I doing in this

3   hell?

4           So, life's not fair.  It really rips your foundations.

5           It also rips your bonds with people.  He's going to

6   tell you that during that ten years, he lost connection with

7   his life.  At the beginning they're like, oh, Marcel, we got

8   you, we'll visit you, we'll call you.

9           You know, when you're in there for 35 years, people

10  stop investing in you.  They stop caring about you.  They go on

11  with their lives.

12          So, he loses friends.  People are starting to pull

13  away from him.  And he, you know, is kind of lonely.  He will

14  tell you, I know who was there for me, and it was very few

15  people.

16          His girlfriend is a big part of that.  Remember, he

17  was super close to his girlfriend.  She stayed with him until

18  he got convicted, she's like, you can beat this, you can beat

19  this.  She's hanging in there.  Then he gets convicted, 35

20  years.  She and Marcel had to talk about it.  He understood.

21  You know, she's young.  She can't wait 35 years.

22          But it's very painful for him.  He had intended to be

23  with her.  She went out.  She got another relationship.  She

24  had a child.

25          And when he got his conviction overturned, after about

Opening Statement - Loevy

46

1 a year, they got back together.  And they're very close now.

2 And they are very much in love.  And they have a child of their

3 own.  A two-year-old who, as I said, is really the focus of

4 Marcel's life.  He has adopted essentially her older child.

5 He's now become close with her, too.  He's basically her dad.

6 And he is -- they have a nice little thing.

7    But it is not how he planned it.  This is not how he

8 planned it, nor is it how he planned it with his mother.

9    His mother would visit him every week.  Menard's down

10 by St. Louis.  She would drive 350 miles.  That's six hours.

11 She worked all week.  She drove 350 miles to visit him for an

12 hour or two.  350 miles back.  Sometimes she'd drive there and

13 it would be on lockdown and she couldn't even see him.

14    And she did that because she knew her kid didn't do

15 anything wrong.  She knew he was innocent and he needed her

16 support.

17    And I'm not going to try to tell you about their

18 relationship.  Marcel's going to tell you about it.  You're

19 going to hear from his mother.

20    Over time she couldn't keep coming every week.  But

21 she was there for him and stayed there for him and they're very

22 close to this day.

23    So, Marcel got out.  He got released.  And he was

24 euphoric and he was happy.  You'll hear from witnesses who saw

25 that and saw the relief on his face and the happiness.

Opening Statement - Loevy

47

1         But that wears off. And now he has to make a life for

2 himself. And he's doing that. He's not a complainer. And

3 he's a go-forward guy. But it's not easy to transition. You

4 know, your 20s are when you build a foundation. It's when you

5 build a foundation. You build relationships. You build

6 professional. And he's got nothing. He's got this gaping

7 hole. He doesn't know how to act. He doesn't know how to be.

8 He doesn't have the relationships he should have.

9         And he's a survivor. And he's found a job. It was

10 hard to find a job. He works for Ceasefire, a violence

11 interruption organization. He's been there a year in

12 September. He tries to get in the community, build trust,

13 prevent problems. He's got a job and he's got a relationship.

14         So, he has recovered. But he suffers from depression.

15 He sees a therapist. He'll tell you about his struggles. I

16 can't do it justice. He'll tell you about it. His analogy --

17 I think it's a good one -- is I got a wound it's and it's like

18 putting a bandage on it, but it's not healed. It's, like, not

19 being dressed. It's, like, not healed. It's like this wound

20 that won't heal.

21         So, this trial, hopefully he'll get some closure.

22 Hopefully he'll get some justice. This is his chance. It only

23 works because you guys are going to participate in it. Super

24 grateful. Thank you very much. I hope you give him justice.

25         THE COURT: All right. Thank you, Mr. Loevy.

1      MR. FLYNN:  Could we just get a five-minute break,
2  stretch our legs?
3      THE COURT:  Yes.  We'll take a five-minute break.
4      Please don't discuss the case.
5      Give you an opportunity to use the restroom.  And we
6  will be back in five minutes.
7  (Jury out.)
8  (Recess from 3:52 p.m., until 3:59 p.m.)
9  (Jury in.)
10     THE COURT:  Please be seated.
11     I will acknowledge Mr. Flynn, once you're settled.
12     Counsel, you may proceed whenever you're ready.
13     OPENING STATEMENT ON BEHALF OF DEFENDANT OFFICERS
14  BY MR. FLYNN:
15     Good afternoon.
16     I want to thank you for spending the next two weeks
17  with us.  We're going to do our best to make it as painless as
18  possible.  We really do appreciate your time, taking this time
19  away from your busy lives to be here for these next two weeks.
20     Again, my name is Kyle Flynn, and along with John
21  Gibbons, Quinn Ford, and Tyler Salway we represent the
22  defendants in this case, including Detective Michael Mancuso,
23  who I'll introduce to you here in just one moment.
24     Paris Jackson.  Paris Jackson is the name of a
25  19-year-old man who was shot to death on the West Side of

Opening Statement - Flynn

49

1    Chicago on August 30th, 2008.

2           And although plaintiff kind of brushed over him in the

3    opening statement, it was Paris Jackson who was on the minds of

4    the detectives back in August and early September of 2008.  It

5    was Paris Jackson who deserved justice.  It was Paris Jackson

6    who deserved to have those who are responsible for his death,

7    for his murder, held accountable.

8           And we're going to talk about what really occurred on

9    August 30th, 2008.  And we're going to tell it to you through

10   the lens of the detectives.  What they learned in their

11   investigation of the Paris Jackson homicide, who was the true

12   victim in this case.

13          But before we discuss the investigation, I want to

14   introduce to you the detectives in this case.

15          First, Michael Mancuso.  Michael Mancuso was born and

16   raised in Chicago.  At the time of the investigation into the

17   Paris Jackson homicide, he had been with the Chicago Police

18   Department for 22 years.  And ten of those years, he had been a

19   detective.

20          Detective Mancuso worked for the Chicago Police

21   Department for a total of 30 years after this investigation

22   concluded, and he was able to retire in 2016.

23          Detective Mancuso was a co-lead detective in the Paris

24   Jackson homicide investigation.  The other co-lead detective,

25   Detective Kevin McDonald, the second defendant in this case.

Opening Statement - Flynn

1          Now, Detective Kevin McDonald, he passed away a few

2     years ago, before this lawsuit was ever filed.  But when this

3     investigation occurred into the Paris Jackson homicide,

4     Detective McDonald had been with the Chicago Police Department

5     for 24 years, and had been a detective for ten.

6          And through these detectives' investigation, they

7     learned that the victim, Paris Jackson, was a 19-year-old man

8     born and raised on the West Side of Chicago.  He had a job.  He

9     worked at McDonald's.  He had just become a new dad.

10          And on August 30th, 2008, he worked at his job.  He

11     worked at McDonald's.  He got off work and he went to Amundsen

12     Park to go hang out with his friends.  And when he got there,

13     there were a ton of people out there.  Dozens -- some people

14     say maybe even over a hundred people in this park.  Amundsen

15     Park, it's a big park on the West Side of Chicago.

16          And some of the other people who were in that park

17     that night were Taneshia Branch and her friends, two of her

18     cousins and some other friends, and a large group of people who

19     came into the park.

20          And you're going to hear a lot of names.  We're going

21     to do our best to make it as easy as possible.  Here are some

22     names I'm going to talk about here in just the next couple

23     moments.

24          First you have Marcel Brown.  He's the plaintiff in

25     this case.  His cousin, R.J. Branch, who you heard some about

1    in the last opening statement and who was the shooter in the

2    park on August 30th, 2008.

3            Then they had another cousin, T.J. Scott, who was also

4    in the car with them that night and in the car with them

5    leaving the park after the shooting occurred.

6            And each of these three male cousins, Marcel, R.J. and

7    T.J., they each had three sisters: Taneshia Branch, Cierra

8    Jackson and Almanique Scott.

9            And on August 30th, 2008, Taneshia, Cierra, Almanique,

10   the three female cousins, along with some other friends, came

11   into Amundsen Park where, again, there were dozens of people.

12           An argument broke out.  There was some yelling.  And

13   at some point, Taneshia Branch stepped away from the dispute

14   and got on her cell phone.  She got on her cell phone and she

15   called her brother, R.J. Branch.

16           Cierra Jackson, she stepped away, she called her

17   brother, Marcel Brown.  Almanique called her brother, T.J.

18   Scott.  And all three of these individuals, the plaintiff and

19   his two cousins, happened to be all hanging out at their usual

20   hangout about a mile away from the park, the parking lot of a

21   White Castle.

22           The three male cousins got into Marcel's Malibu with

23   Marcel behind the wheel.  They hightailed it over to the park.

24   And R.J. and T.J. got out of the car.

25           This is a map of Amundsen Park.  Sorry we don't have a

1    better one, but this gives you a good idea of what the park

2    looks like.  And this large building that's there towards the

3    bottom, you can see the black roof.  That's called the

4    fieldhouse.  You're going to hear a lot about the fieldhouse.

5    That front part is about a story tall, and then that back part

6    is actually a gymnasium, two stories tall.

7           And on this evening, August 30th, 2008, just a little

8    before 11:00 p.m., Paris Jackson, the victim in this case, was

9    hanging out with his friends around some benches that are kind

10   of in this tree area.

11          Taneshia Branch, along with her two cousins and a

12   bunch of other friends, were hanging out in the playground when

13   that argument I told you about earlier broke out.  They made

14   those phone calls and their cousins came roaring over in

15   Marcel's gold Malibu.

16          Marcel stopped the car.  R.J. and T.J. got out and

17   they rushed into the park.  They ran into the playground to

18   where Taneshia Branch was.

19          Multiple witnesses told the detectives in this

20   investigation that R.J. came into the playground and yelled,

21   who is it?  Who is it?  Who's messing with my sister?  You'll

22   die.

23          MR. LOEVY:  Objection to hearsay, your Honor.

24   Hearsay, your Honor.  No such witnesses.

25          MR. FLYNN:  Your Honor, Ms. Ocampo will testify.

Opening Statement - Flynn

1         THE COURT:  Ladies and gentlemen, opening statements

2    are just a preview of what the lawyers believe the evidence

3    will show.  You will hear the evidence after the opening

4    statements conclude.

5         So, the objection is overruled in that regard.

6         Mr. Flynn, you may continue.

7    BY MR. FLYNN:

8         R.J. came running into the park, ran up to Taneshia

9    and her group of friends while all the other people were out

10   there and yelled, who is it?  Who is it?  Who's messing with my

11   sister?  You'll die.

12        By several accounts, he then pulled out a gun out of

13   his pocket.  He looked over to Paris and his friends who were

14   hanging out on the benches nearby with some guys who he knew,

15   we'll tell you about later.  And he went running after them,

16   revolver in hand, firing shot after shot after shot.

17        It was chaos.  Not only did Paris and his friends

18   scatter, run, get out of the park, fearing for their lives,

19   everybody in the park scattered.  Shots were ringing out.

20        Most of Paris' group ran northwest to an area known as

21   Snake Hill there on the top left of this map.  Paris Jackson

22   took a different path trying to dodge R.J.'s bullets.  He went

23   westbound, more towards where he lived.

24        Tragically, as Paris Jackson tried to make that corner

25   around the fieldhouse to get some cover from R.J.'s bullets,

1   one of R.J.'s bullets ripped through his back and out through

2   his chest.  One of those bullets nicked an artery connected to

3   his heart.  And the nature of that injury, experts will tell

4   you, it wouldn't have killed him instantaneously.  He would

5   have been able to get up and continue trying to get away from

6   Marcel's cousin.

7            And he made his way down this sidewalk into the corner

8   of the fieldhouse.  But that artery that had been nicked, blood

9   continued to fill up the cavity around the heart.  And that

10  blood weighing on the heart made it as such that the heart

11  could no longer bring any blood in, which meant no blood was

12  pumping out, which meant no blood was getting to his brain.  By

13  the time he reached the corner of that fieldhouse, he fell down

14  on a grate.  He fell down on a grate and he breathed his last

15  breath.  He died facedown on a cold metal grate in the dark

16  alone.

17           And for what?  Why did innocent Paris Jackson die on

18  the grate alone?  Because of a feud.  Because of a rivalry

19  between two competing crews in the West Side of Chicago.

20           One such crew, the U.S. Dopeboys of America, otherwise

21  known as USDA.  And when you hear "USDA," it's not U.S.

22  Department of Agriculture.  It stands for the U.S. Dopeboys of

23  America.  And that's a crew that Marcel Brown will take the

24  stand and testify he was a part of.

25           He was part of this crew, along with his cousin R.J.

Opening Statement - Flynn

55

1    Branch and his cousin T.J. Scott, the same three guys that were

2    in Marcel's Malibu on the way to the park, seconds before Paris

3    was shot to death, and the same three guys that got right back

4    in his Malibu and raced it back to White Castle seconds after

5    Paris was shot to death.

6          The other crew, it's the Amundsen Park crew.  That map

7    I showed you earlier, again, that's Amundsen Park.  And there's

8    a crew of guys that hung out there a lot back in 2008.  They

9    included guys like Eugene Stanciel, Rufus McGee, David Portis,

10   otherwise known as Day-Day.

11         And this rivalry that I was talking about was a

12   violent rivalry.  There was a violent past between these two

13   different groups on the West Side.

14         You'll hear Marcel take the stand and talk about that

15   in the months leading up to the shooting in August 2008, there

16   had been several fist fights between members of the USDA and

17   the Amundsen Park crew.

18         And some of these fights weren't just fist fights.

19   Some of these fights involved weapons.

20         You'll hear Marcel take the stand and you'll hear his

21   cousin R.J. Branch take the stand, and they'll talk about a big

22   fight that they had with Marcel and R.J. was included, where

23   R.J. pulled out some kind of a stick, busted it over the head

24   of somebody in the Amundsen Park crew, busted his head wide

25   open.

Opening Statement - Flynn

56

1          Again, this was a violent, violent rivalry in a

2   violent neighborhood.

3          And one thing was for sure in 2008, you did not go

4   into the other crew's hangout.  You did not go into Amundsen

5   Park if you were with the USDA.  And if you're Amundsen Park,

6   you're not going to go hang out in the White Castle parking

7   lot.

8          And on August 30th, 2008, the dispute between these

9   two crews, it came to a boiling point when Marcel, R.J. and

10  T.J. got word that their sisters were at Amundsen Park.  And

11  not only did they get word that the sisters were getting into a

12  fight with some girls, the sisters called them and said, some

13  of the guys here in Amundsen Park are trying to jump in, as

14  well.

15         And when they heard that, that was the straw that

16  broke the camel's back.

17         Of course Marcel Brown knew that R.J. had a gun in the

18  back of his car on the way over to Amundsen Park.  That was the

19  entire plan.

20         You'll hear evidence of Marcel saying that on the way

21  to the park, R.J. was saying things like, I'm going to go F

22  them up.  Those N words are going to die.  Of course Marcel

23  knew what R.J. was going to go do.  That's why they were going

24  over there to begin with.

25         And statements like this coming from R.J. in the car

1   on the way to Amundsen Park seconds before Paris Jackson was

2   shot to death, statements like this coming from R.J. would have

3   come as no surprise to Marcel Brown.  Marcel was fully aware of

4   R.J.'s violent nature.

5        Marcel will take the stand and he'll testify that he

6   knew R.J. was in a gang.  He knew that R.J. was a Vice lord in

7   August 2008.

8        Marcel will take the stand and testify in his own

9   words that R.J. was a hothead, a shit starter.  You'll see a

10  video of him saying that R.J. was a menace to society.

11       Marcel will take the stand in this trial and tell you

12  that prior to this shooting, prior to him driving him over to

13  the park, he knew that R.J. had had gun charges put on him.  He

14  had seen R.J. with a gun before.  Of course he knew R.J. had a

15  gun.  And of course he knew what the plan was on the drive over

16  to the park.

17       So, Marcel, R.J., T.J., they got to the park, they got

18  out.  R.J. unloaded his revolver on the male members of the

19  Amundsen Park crew.  They got back into Marcel's Malibu, and

20  they went back, raced it back to safety.

21       Let's back up for a second.  I think it's important to

22  understand what's undisputed in this case.  Things that you

23  don't have to worry about deciding whether they're true or not.

24  And I want to go back to this map.

25       It's undisputed that Marcel, R.J. and T.J. got calls

Opening Statement - Flynn

58

1   from their female -- from their sisters, said they were in

2   trouble, and raced over in Marcel's Malibu with Marcel driving.

3   It's undisputed that R.J. went into the park.  It's undisputed

4   that R.J. pulled a gun out and started shooting in the park.

5   And it's undisputed that Paris Jackson's body was found on this

6   grate the next morning.  Nobody disagrees over those facts.

7           And at this time, Paris Jackson no longer had a

8   heartbeat, and he no longer had a voice.  The people that could

9   speak for him now were the detectives who were assigned to his

10  case.  Like Detective Mancuso, Detective McDonald, and some

11  other detectives who you're going to meet throughout the course

12  of this trial.

13          And detectives have a very important role in a

14  law-abiding society.  Homicide detectives have an even more

15  important role in a law-abiding society because they speak for

16  those who are taken from us too early.  They speak for those

17  who are permanently silenced.

18          And detectives, their job is to get to the truth.  And

19  we as a society give them certain tools that they can use to

20  try to get to the truth, try to find out who was responsible

21  for the crimes that they are investigating.  Not only the

22  people that committed the murder, but also who aided and

23  abetted and assisted in the commission of the murder.

24          And it's not an easy job to be a detective, especially

25  in the City of Chicago.  It's difficult to get witnesses to

Opening Statement - Flynn

1   talk to you and be cooperative.  Some witnesses simply don't

2   want to get involved.  Some witnesses are intimidated.  They

3   don't want to be labeled as a snitch.  They don't want to be

4   hurt by whoever it is that they're talking about to the police.

5          So, detectives, they must be diligent and persistent.

6   Most people have a general idea of what detectives do to get to

7   the truth.

8          First, they got to move fast.  They got to gather

9   evidence.  They have to identify potential eyewitnesses.  Once

10  those eyewitnesses are identified, they need to speak to them

11  as soon as they can while their memories are fresh.  Once they

12  have gathered evidence, at some point that evidence leads them

13  to a suspect.  They find that suspect.  And they seek to learn

14  more information from that suspect and what their role might be

15  in the crime at issue.

16         And you'll hear evidence that in this case, the

17  detectives did exactly that.  In the first two-and-a-half days

18  of this investigation, after Paris Jackson's body was found,

19  the detectives spoke to 20 different eyewitnesses.  These are

20  20 different people who were at the park the night Paris

21  Jackson was shot.  Not just at the park the night he was shot,

22  they were at the park when he was shot, when the gunshots went

23  off.

24         And like one would expect, not all 20 witnesses

25  necessarily saw who it was that did the shooting.  Not all 20

1   witnesses knew who it was that did the shooting.  But we know

2   that ten of these witnesses told the detectives that it was

3   R.J. that came to the park with a gun when they heard gunshots.

4           Eight of these witnesses said they saw Marcel driving

5   the Malibu taking R.J. to the park.

6           The evidence from these eyewitnesses overwhelmingly

7   pointed to R.J. as the shooter and Marcel as the driver.

8           Like I said, most of these witnesses were younger

9   people hanging out in the park.  You can look at this list.  A

10  lot of these are females.  They were just young women hanging

11  out in the park on a Saturday night.  Saw someone come into the

12  park who they knew to be R.J., driven by someone who they knew

13  to be Marcel, and spoke to the detectives a day or two later

14  and told the detectives what they saw.

15          And some of these witnesses not only provided

16  statements to the detectives, they also provided statements to

17  the assistant state's attorney, an ASA.

18          MR. LOEVY:  Objection to relevance, your Honor.

19          THE COURT:  Response?

20          MR. FLYNN:  Yes, your Honor.  The fact that these

21  witnesses also spoke to ASAs and --

22          THE COURT:  We may need to do it at a sidebar, because

23  Mr. Loevy can't hear you.

24          MR. FLYNN:  Yeah.

25          THE COURT:  Can I just hear your response at a

Opening Statement - Flynn

61

1   sidebar, please?

2       (Proceedings heard at sidebar:)

3           MR. LOEVY:  To just be clear, hearsay and relevance.

4           MR. FLYNN:  My experience is that -- can you hear me?

5   Talk softer?  Okay.

6           My experience is that the fact that these witnesses --

7           THE COURT:  We're having a little bit of trouble

8   hearing you.

9           MR. FLYNN:  Is it too loud or too soft?  Is it too

10  loud or too soft?

11          THE COURT:  That's better.  Perfect.  Thank you.

12          MR. FLYNN:  The fact that these witnesses or some of

13  these witnesses provided ASA handwritten statements goes to

14  show that the accuracy and the truthfulness of their statement

15  with respect to the detective's state of mind -- excuse me, the

16  fact that these witnesses provided these statements to the ASA

17  and signed the ASA witness statements would lead the detectives

18  to conclude that they were not coerced and that the statements

19  themselves were truthful.

20          MR. LOEVY:  Then what's relevant is what they told

21  these detectives.  The detectives knew if they coerced it or

22  not.  Saying that they repeated the statement to somebody else

23  is just hearsay.  This is not being offered for the truth.

24  This is being offered for what the detectives were told.

25          MR. FLYNN:  Your Honor, if relevance is the issue,

1   some of the witnesses, they're going to argue, were coerced,

2   like Marisol Ocampo, Eugene Stanciel.  Both of those witnesses

3   provided ASA handwritten statements.  So, the fact that they

4   provided ASA handwritten statements is relevant to this case.

5           MR. LOEVY:  We agree.  Those two.

6           THE COURT:  So, it's pretty clear that the objection

7   isn't truly hearsay, because you just said that they're not

8   offered for the truth.  We're still in the opening statements

9   phase.  So, I'll allow a little bit of latitude here, but let's

10   just really hit this point and move on.  And this may be

11   something we need to resolve before we get to this issue during

12   the presentation of the evidence.

13           So, the objection is overruled.

14     (Proceedings heard in open court:)

15   BY MR. FLYNN:

16           You're going to hear a lot about ASA handwritten

17   statements in this case.  You're going to hear a lot about

18   ASAs.  That stands for assistant state's attorney.

19           And the assistant state's attorneys, they work for the

20   Cook County State's Attorney's Office.  That's an entity that's

21   separate from the City of Chicago.  It's separate from the

22   Chicago Police Department.

23           And you're going to meet some of these ASAs.  They're

24   going to come in here and take the stand, the ASAs that were

25   assigned to the Paris Jackson homicide investigation.  And

1    those ASAs are not maybe what you think about when you think of

2    an ASA, an assistant state's attorney working for Cook County.

3    A lot of people think ASAs, they think of those that are

4    prosecuting criminals and they're in a courtroom.

5           They also have ASAs who are part of a unit called

6    felony review.  And ASAs on felony review, they play an

7    important role in an investigation of a homicide, because ASAs

8    in the Felony Review Unit travel to the police stations and

9    they review the evidence that the detectives are collecting

10   with respect to these investigations.

11          MR. LOEVY:  Objection, your Honor, to them reviewing

12   the evidence.  He's supposed to move quickly through this here.

13          MR. FLYNN:  Again, your Honor, this goes to --

14          THE COURT:  Look, the objection is overruled.

15          Let's make the point, Mr. Flynn, and move on.

16   BY MR. FLYNN:

17          And you'll meet ASA Spizzirri, who you already heard a

18   lot about in this case.  ASA Spizzirri was assigned to the

19   investigation of Paris Jackson.  She went into the room with

20   Marcel Brown and she asked her own questions.

21          And not only did the ASAs get involved in that sense,

22   they also get involved with ASA handwritten statements where

23   they actually speak to the witnesses, which you'll hear more

24   about later.

25          So, at this point in the investigation, the detectives

Opening Statement - Flynn

1    had spoken to 20 eyewitnesses.  You see the list on your

2    screen.  And the evidence overwhelmingly pointed towards R.J.

3    as the driver -- R.J. as the shooter and Marcel as the driver.

4           So, what did good detectives do next?  They go out and

5    they find R.J. and Marcel.  That's exactly what they did.

6           On September 3rd, the detectives were able to find

7    Marcel Brown first, in the afternoon of September 3rd.  And

8    they did what detectives do.  They put him under arrest.  They

9    brought him into the police station.  And they put him in an

10    interview room.

11           Now, Mr. Loevy wants you to believe that the interview

12    room is the size of that witness stand.  It's certainly not.

13    It's much bigger than that.

14           They put him in the interview room and they do the

15    first thing that you do.  You give him the Miranda warnings.

16    You tell him his rights.  You have the right to remain silent.

17    Anything you say can and will be used against you.  And you

18    have the right to an attorney.

19           And at no point during this entire interview of Marcel

20    Brown does he ever ask for an attorney.  You'll see no evidence

21    of that.  At no point does Marcel Brown say, I don't want to

22    answer your questions anymore.  That never happens once.

23           In fact, much to the contrary, you'll see multiple

24    instances, most interactions between Marcel and the detectives

25    or the ASA, it's him initiating it.  It's him knocking on the

1   door saying, I want to speak to the detectives about what I

2   know.  I want to speak to ASA Spizzirri.

3          And it's also important to note that from the very

4   beginning, the detectives in this case, it was Mancuso and

5   McDonald, the first two detectives in the room with him.  They

6   didn't hide the ball.  They told him straight up, right from

7   the beginning, that we've got a bunch of eyewitnesses who said

8   they saw R.J. shooting in the park and they saw you driving him

9   there.

10          And just so you know, Marcel, by you driving him

11  there, and being part of this, you could be held accountable

12  for murder, too, just the same as if you pulled the trigger.

13  They told him that from the beginning.

14          And despite all this, Marcel Brown began this

15  interview with just bold-faced lies.

16          And you'll hear -- you've already heard from Mr. Loevy

17  about the 34 hours of the interview, and we'll talk all about

18  that.  Now 34 hours, the length of that interview was not a

19  byproduct of anything the detectives were doing.  It occurred

20  because of all of the lies that Marcel Brown told the

21  detectives over and over and over.

22          They're really all -- there are really four phases of

23  Marcel's lies in total.  His first phase, he came into the

24  interview and said, R.J. wasn't shooting in the park.  R.J.

25  wasn't shooting at all.  It was this guy named Day-Day.

Opening Statement - Flynn

1       The detectives had a difficult time believing that

2  because they had spoke to so many witnesses who had seen R.J.

3  shooting in the park that night.

4       So, they said, Marcel, that just doesn't really add

5  up.  That doesn't really -- it's not really corroborated by all

6  these other people in the park that told us that R.J. was

7  shooting.

8       And remember, ladies and gentlemen, this is all on

9  video.  You will not need to guess what occurred in that

10  interview room.  And we're ecstatic about that.  We're happy

11  that this is all on video, because the video shows the

12  detectives doing their job.  The detectives have nothing to

13  hide.

14       Now, we're, of course, not going to make you watch

15  this 34 hours of video.  But if you did, you would not see a

16  single shred of physical abuse.  They treated Marcel Brown with

17  dignity and with respect throughout the interview.

18       But Marcel started with the big lie that R.J. wasn't

19  even shooting in the park.  It was this guy named Day-Day.

20       And even though the detectives had not heard anything

21  about somebody seeing Day-Day shooting in the park, they could

22  have said, Marcel, you're full of it, we know you're lying.

23  No.  They gave him the benefit of the doubt.  They did what

24  detectives do.  They said, okay, you say this guy named Day-Day

25  was shooting in the park.  We want to find out who is actually

1   responsible for this murder.  So, if you're saying there's some

2   other guy shooting in the park, tell us more about him.  We'll

3   investigate.  What's his name?

4          Well, I don't know his name.  I just know his name's

5   Day-Day.

6          Okay.  Well, we'll go figure it out on our own.

7          And that's what they did.  They left Marcel in the

8   room.  They went out.  The found out Day-Day was the guy named

9   David Portis.  They went out, they found him, they bring him

10  into the police station, just like they did with Marcel Brown,

11  and they put him in an interview room and they started asking

12  him questions.

13         And he not only denied that he was shooting in the

14  park, but his story about what occurred was consistent with the

15  other eyewitness accounts that they had.

16         So, when Marcel realized, about four-and-a-half hours

17  into his time in the police station, that his big lie, the big

18  lie that R.J. wasn't shooting in the park, when he realized

19  that that just wasn't going to fly, that there was too much

20  evidence pointing the other way, he went into Phase 2 of his

21  account of events.

22         He admitted that R.J. was shooting in the park, but it

23  was only in self-defense.  It's still that Day-Day guy

24  shooting, R.J. just shot back.

25         Marcel went from a big lie to a half lie.

1          Now, at this point in 2008, Detective Mancuso and the

2     other detectives, they were trained detectives.  Mr. Mancuso

3     had been a detective for ten years.  And he still had trouble

4     believing this, this new account of events about Day-Day

5     shooting and R.J. shooting back.

6          And as Marcel was working through his different phases

7     about what he was going to tell the detectives happened in the

8     park that night, the detectives were doing other detective

9     work.

10          They went out and they found T.J.  Remember, T.J. is

11     the third cousin.  He was in the car with Marcel and R.J. on

12     the way to the park and then left the park with them, as well.

13          They brought T.J. in and T.J. started with the same

14     lie: it was Day-Day shooting in the park.  And as the

15     detectives continued on with that interview, T.J. eventually

16     came clean.

17          T.J. eventually came clean.  Not only said that

18     Day-Day wasn't shooting in the park, only R.J. was shooting in

19     the park, he also told the detectives a new bit of information

20     they hadn't heard yet.  T.J. told them that on the morning

21     after the shooting, when Paris Jackson's body was found, word

22     was getting around -- all around the neighborhood that a body

23     was found in the park.  And, of course, people were saying R.J.

24     did it because dozens of people had just seen R.J. shooting in

25     the park feet away from where Paris' body was found.

1    And what did T.J. tell the detectives about what they

2 did?  First, they got out of the house.  They were afraid the

3 police were coming to get them.  And they went and they all met

4 up, T.J., R.J. and Marcel.  They all met up and they said, oh,

5 man, if the detectives come and pick us up, if the police come

6 and get us, we got to lie.  We got to tell them that it was

7 that Day-Day guy, that's part of the Amundsen Park crew.  We

8 got to say that he was shooting.  And that's exactly what they

9 did.

10    Marcel lied and said it was Day-Day.  T.J. lied and

11 said it was Day-Day.  And with that information, the detectives

12 went back into the room with Marcel.

13    This is now about 12 hours into the interview.  They

14 said, Marcel, we know you're lying.  T.J. just told us about

15 how you guys all got together and concocted this story about

16 Day-Day.

17    And at that point, Marcel knew that the jig was up.

18 It was at that point that he entered into Phase 3 of his story.

19 Phase 3 that, yeah, R.J. was the only shooter, but I, I had no

20 idea.  I could have had no idea that R.J. had a gun on the way

21 to the park.  How could I have known R.J. was planning to go

22 shoot up the park?

23    Having heard this new story that Marcel was now

24 telling, you'll see the video of the detectives, Mancuso and

25 McDonald said, that would have been nice to know hours ago when

Opening Statement - Flynn

1    we first brought you in here.

2          You will hear Detective McDonald tell Marcel, okay,

3    start all over.  Start from the top.  What exactly is your

4    story now?  Let's hear it.

5          And you'll see that pattern throughout this interview.

6    One of the reasons that this interview went as long as it did

7    was because Marcel kept telling a new story about what occurred

8    on August 30th, 2008.  And whenever that happened, the

9    detectives had to go back and say, all right, what exactly is

10   your story now?  We can't keep it straight.  It's difficult.

11         And having gone through these three different phases

12   of Marcel's story, like you see in the timeline before you, it

13   was now 3:00 a.m. and it was time to get some sleep.

14         The detectives, you'll see the video, gave him a

15   blanket.  They turned the lights out for him.  And he pretty

16   much sleeps uninterrupted for seven hours.  You can see on the

17   timeline from 3:30 to 10:30.

18         And Mr. Loevy made a big deal about how he was up to

19   3:30 in the morning and that must have been sleep deprivation.

20   Well, Marcel Brown will take the stand and tell you that back

21   in August of 2008 that was his normal bed time.  He was

22   normally going to bed around 3:00 a.m.

23         So, 3:00 a.m. might be kind of late in the night for

24   you and me, it wasn't late in the night for him.  That was the

25   normal time for him to go to sleep.

1        So, he goes to sleep and wakes up at 10:23 to

2   Detective Mancuso.  Detective Mancuso, you'll see the video,

3   knocks on the door, is bringing him some hot breakfast from

4   McDonald's.  He hands him the egg sandwich, whatever else is in

5   there, the hash browns and says, is it warm?  Is the food warm?

6   If not, I'll warm it up for.  Are you good?  Okay, okay.

7        And you'll see a lot of that.  Like I said, they

8   treated him with respect.

9        You see the statistics there at the bottom of the

10  timeline.  He was offered or given food 16 times.  Offered or

11  given something to drink 45 times.  And he's asleep -- or

12  appears to be asleep for about nine hours of his time in the

13  room.

14       And I think it's also important to note that even

15  though plaintiff is going to stress the 34 hours -- and the

16  timeline that he showed you of the interview was pretty bare

17  bones.  There's pretty much no information on that timeline,

18  unlike this timeline.  Because they don't want you to know why

19  it actually went 34 hours.  They just want you to think about

20  the 34 hours and that's it.

21       But in reality, of the 34 hours, only five of those

22  hours was somebody actually in the room with him talking to

23  him.  This is not what Mr. Loevy was indicating it was, where

24  you had a detective coming in and berating him with a question

25  and another detective would come in and berate him with

1      questions.  No.  You'll see no evidence of that.

2           Over the course of 34 hours, they treat him with

3      respect and they only interviewed him a total of five.

4           And one last point is that of the 34 hours,

5      two-and-a-half hours he's out of the room.  He's taken to the

6      bathroom whenever he needs to go to the bathroom.  He's taken

7      down for a lineup you'll see, you'll hear about that occurred

8      in the afternoon during Phase 3.  He's taken down to get his

9      fingerprints done.

10          It's not a situation where the witness was being

11     tortured into a statement.

12          So, in Phase 3 of the investigation, remember, what

13     Marcel's talking about here, what Marcel's current account of

14     events is, is that R.J. was the only shooter, but he had no

15     idea that R.J. was shooting.  Had no idea that R.J. had a gun.

16          Well, the detectives had difficulty believing Marcel

17     during Phase 3, as well.  And you might ask why.  It's really

18     two main reasons.

19          First one, it's a big one.  He had just spent hours

20     and hours and hours boldly lying to their faces in an interview

21     room about a very serious topic, about a murder.  I don't know

22     about you, but if somebody lied to me for hours and hours and

23     hours, I'm going to have a difficult time now just believing

24     every single word out of their mouths.

25          Second reason is that this new story that Marcel was

1   telling, it just didn't really add up with the rest of the

2   facts.

3           You heard about that competing rivalry of those two

4   crews, and how Amundsen Park was the hangout, the territory of

5   the Amundsen Park crew.  And it was difficult for the

6   detectives to believe that R.J., Marcel and T.J., just three

7   guys, would roll into the park without packing heat.

8           You'll hear Marcel say, when he takes -- excuse me, at

9   his ERI, that out there with Day-Day, the Amundsen Park crew,

10  there were 30 dudes out there.  It was tough for the detectives

11  to believe that they would just roll into their park three on

12  30 without a gun.

13          You'll also hear testimony from Rufus McGee in this

14  case.  Rufus McGee was one of the members of the Amundsen Park

15  crew that was there that night.  And he'll testify that that

16  night when he saw R.J. come out of Marcel's Malibu and come

17  running into the park, Rufus McGee knew R.J. was packing heat.

18  Rufus McGee will take the stand up here and he'll tell you,

19  there's no way that R.J. would come into that park without a

20  gun.

21          And if Rufus McGee, R.J.'s enemy at the time, knew

22  that R.J. had a gun as he came to the park, of course Marcel

23  knew it.

24          And, then, as this interview progressed, Marcel

25  continued telling the detectives more and more about R.J.  They

Opening Statement - Flynn

74

1   told -- he told the detectives that R.J. always keeps his gun

2   on him.  He's a pit bull.

3          He tells the detectives that Taneshia Branch, R.J.'s

4   sister, the one that was at the park, that she's often starting

5   stuff with other people and R.J. goes over there as her backup.

6          This cat-and-mouse game continues until ASA Spizzirri,

7   the one I spoke about earlier, came into the interview room.

8   She had watched some of the videos of Marcel's interview.  She

9   had analyzed some of the police file.  She came into the room

10  with Marcel and she said, I'm the assistant state's attorney.

11  I'm with the Cook County State's Attorney's Office.  Tell me

12  what happened.

13         She didn't say, hey, I already know what happened, the

14  detectives already told me.  No.  She came in and said, Marcel,

15  what happened?

16         And it was during this interview, this interview

17  between Marcel and ASA Spizzirri that he made the most damning

18  admissions.  It was during this interview that he told ASA

19  Spizzirri that on the way to the park, R.J. was saying things

20  like, I'm going to go F them up.  They're going to die.  I'm

21  going to go F them up, which was a phrase that Marcel had heard

22  R.J. say before.  It was a phrase that Marcel knew, when R.J.

23  said it, it meant we were going to shoot people.

24         The evidence in this case will be overwhelming that

25  Marcel has a pattern when it comes to telling lies.  He starts

Opening Statement - Flynn

1    with a big lie, he works his way down to a half lie, and then

2    he finally tells some semblance of the truth.

3         Take R.J., for example, whether he was shooting in the

4    park.  He came into the interview room with a big lie.  R.J.

5    wasn't shooting at all, it was just Day-Day.  He then went to

6    the half lie.  All right, R.J. was shooting, but it was Day-Day

7    shooting first.  Finally, in Phase 3, he came around to the

8    truth, that R.J. was the only shooter.

9         And he did the same thing with his self-preservation.

10   Once he knew there was nothing he could do to save R.J., he

11   started trying to save himself in Phase 3.  And he started with

12   the big lie.  The big lie was that I had no idea R.J. had a

13   gun.  How could I have any idea that that was his plan to go

14   over there and shoot up the park?

15        And as that interview progresses, which you'll see, he

16   went to the half lie: well, R.J. does always have a gun on him.

17   And he is very violent.  And I know about his gun charge.  And

18   he is always backup for his sister.  The half lie.

19        Until finally, he came around to the truth, which was

20   that on the way to the park, R.J. was saying things like, we're

21   going to go shoot those people.  And Marcel knew and was fully

22   aware that they were going over to Amundsen Park to kill a

23   member of the Amundsen Park crew.

24        After the State's Attorney's Office in September 2008

25   determined there was enough evidence to charge Marcel with

Opening Statement - Flynn

1    being an accessory to the death of Paris Jackson, Marcel was

2    charged with murder.  The State's Attorney's Office made that

3    decision to charge Marcel without any determination that he was

4    coerced by the detectives.  Nobody at the State's Attorney's

5    Office ever made a determination that he was coerced by the

6    detectives.

7          And Marcel was convicted and he served a total of ten

8    years in prison.  And as you heard earlier, Marcel was released

9    from prison in 2008 -- 2018, after his conviction was

10   overturned, for reasons that are unrelated to this case.

11         You must not speculate into this case as to why

12   plaintiff's conviction was vacated.

13         You'll also hear that the Cook County State's

14   Attorney's Office after he was released in 20- -- or after his

15   conviction was overturned in 2018 made the decision not to

16   retry him.  And, again, in this case, you must not speculate as

17   to why the Cook County State's Attorney's Office decided not to

18   retry him for murder in 2018.  Those are decisions based on

19   different legal issues than what are presented in this trial.

20         And what I want to make clear is that this case is not

21   about whether the punishment that Mr. Brown received for his

22   role in the murder of Paris Jackson, whether that was a fair

23   punishment.  This case is about whether the detectives violated

24   Marcel's constitutional rights.

25         Those detectives did not decide whether or not Marcel

Opening Statement - Flynn

1    should be charged with murder.  Those detectives did not decide

2    whether Marcel should be convicted of murder.  Those detectives

3    did not decide what Mr. Brown, Marcel's sentence should be

4    after he was convicted of murder.  Those were all decisions

5    that were made by other people who are not defendants in this

6    case.  And those are not issues in this case.

7            All that is at issue is whether the detectives

8    violated his constitutional rights.

9            And Mr. Brown is going to bring in a few witnesses.  A

10   few witnesses that are going to have some tall tales.

11           Wait until Eugene Stanciel takes the stand and hear

12   about how many times he's lied under oath.

13           They're going to have some fantastical stories.  And

14   all of them seem to remember everything when it comes to making

15   the detectives look bad.  But when you ask them any other

16   information about what in August 2008, their memory's just real

17   fuzzy.

18           Plaintiff will also spend a lot of time in this case

19   discussing what the detectives could have done in the

20   investigation.  But plaintiff will fail to make -- they'll fail

21   to look at all the things that the detectives did do, like

22   speak to 20 eyewitnesses who were there on the night of the

23   shooting.

24           As much as plaintiff wants this case to be a who done

25   it, this case is not a who done it.  It's a they did it.  R.J.

Opening Statement - Flynn

1    and Marcel.

2            Finally, you'll hear a lot about that 34-hour

3    interview of Marcel.  I want to first state that holding a

4    murder suspect in a police station for 34 hours is decidedly

5    not a constitutional violation.  And despite that, plaintiff

6    will still argue that 34 hours was too long.  The detectives

7    took too long to get to the truth.

8            And we just ask that you consider, when looking at the

9    34 hours, if the length was actually caused by Marcel's pattern

10   of lying, starting with big lies, working to half lies, and

11   finally getting to the truth.

12           And we are confident that after you've heard all of

13   the evidence and testimony in this case, you will return the

14   correct verdict of no liability against the defendant

15   detectives, because the detectives did their job.  They got to

16   the truth, and they gave Paris Jackson the justice that he

17   deserved.

18           Thank you.

19           THE COURT:  Thank you, Mr. Flynn.

20           All right, ladies and gentlemen, that concludes the

21   opening statements by both of the parties.

22           We will begin with the presentation of evidence

23   tomorrow.

24           Please don't discuss the case.

25           You can leave your notebooks, to the extent that you

1    chose to make any notes, in the jury room.

2          We will ask you to report tomorrow morning at 9:15.

3    You will take the elevators up and then buzz the buzzer that

4    says "Judge Jenkins" on the side, and someone within our staff

5    will let you into the jury room.  We'll have breakfast for you

6    available then.

7          So, please report at 9:15, and we will begin with the

8    presentation of evidence at about 9:30.

9          And Ms. Deanes will get you set up.  She may ask you

10   for contact information in case we need to reach you.  The

11   important thing to remember each day is that if you are running

12   late, if something happens and you're delayed, it's important

13   to let us know by contacting Ms. Deanes about that, because we

14   can't get started until everyone's here.  So, just keep in

15   communication if there's any bumps along the way.

16         Have a good evening.  We'll see you tomorrow morning.

17     (Jury out.)

18         THE COURT:  We're back on the record.

19         I'd like to know if there are any matters we should

20   discuss before I let you go for the day?

21         One thing I would like to understand, in light of the

22   objections raised during openings, is how we -- the lay of the

23   land, if you will, on sort of where things stand with regard to

24   ASA statements and testimony.

25         I mean, to be candid with you, part of the reason I

1   overruled the objection is because I know that there is at

2   least one ASA who is on the witness list.  So, as a reactionary

3   matter, not knowing what she will say, I anticipated that there

4   would be some testimony from Ms. Spizzirri or maybe others

5   concerning her observation of events and the information she

6   took.

7          So, perhaps I'm missing something and you all can

8   enlighten me on that.  But it was a little -- I was confused

9   because of the fact that I know that Ms. Spizzirri, for

10  example, is one of the witnesses on the list.

11         Mr. Loevy, if I can hear from you.

12         MR. LOEVY:  Thank you.

13         THE COURT:  And, then, I'll give you an opportunity to

14  respond.

15         MR. LOEVY:  You're exactly right.  Ms. Spizzirri's

16  interaction with the case is part of the case.

17         What was done during that opening was an attempt to

18  paint a picture that the 20 names he put up there and the

19  police are receiving all this information, the story he was

20  telling us, it's not just us that heard it, the state's

21  attorney's went there, they have an important part of the

22  system.  The state's attorneys are hearing from these

23  witnesses.  And they're trying to prove the truth of it.

24  They're saying it's reliable.  They told it to somebody else.

25         It's not being offered to show that it's true.  It's

1   being offered because the detectives heard it.  So, if the

2   detectives want to say, I talked to a witness, you're going to

3   decide how far to let them go with that hearsay.

4        What he did during opening is like, oh, by the way,

5   third parties heard it and they blessed it and they're third

6   parties and they're prosecutors and they heard it too, and they

7   would have had a problem if they didn't hear it.

8        That's like bolstering it in a way that's completely

9   irrelevant.  It's just not -- and I agree that it was sort of

10  vague and it was probably intentionally so.  He's like, these

11  state's attorneys, they're legit, and they heard the witnesses,

12  too.  And, then, he's like, well, I'm just talking about

13  Spizzirri, and I'm just talking about the two witnesses who are

14  at issue, Stanciel and Ocampo.

15       It's probably not an issue now that openings are over,

16  because you'll be able to decide it in the exact context.  But

17  it didn't feel fair to us to try to have it bless everybody,

18  because that's really what I think he was trying to do.

19       THE COURT:  Okay.  Response.

20       MR. FLYNN:  Your Honor, it's not just ASA Spizzirri

21  that's on our witness list.  We have multiple other ASA

22  Spizzirris that took some of these handwritten statements.

23       And the Court may be aware of this.  These ASA

24  handwritten statements are not just given between the witness

25  and ASA.  There's a detective in the room, as well, that's also

1       part of that process.

2              And, again, the fact that these witnesses were

3       providing ASA handwritten statements, and then providing in

4       writing that they were not treated poorly by the detectives,

5       and that they were giving this statement freely and

6       voluntarily, goes to the credibility of each of these

7       witnesses.

8              Plaintiff is going to attack the witnesses that we

9       brought in, not only for questioning, but also those that

10      testified at the criminal trial, such as Marisol Ocampo and

11      Eugene Stanciel.  If we can only get into those witness

12      statements, it will look like we just had two witness

13      statements and that was it and that they have their issues.

14             Whereas, that just wasn't the case.  We had 20

15      eyewitnesses, ten of which saw R.J. shooting in the park.

16             MR. LOEVY:  We're not objecting to them saying, I

17      talked to 20 people or 50 people or whatever they want to say.

18      We're objecting to them saying, oh, by the way, the state's

19      attorneys talked to them and they told the state's attorneys

20      they weren't coerced and that they told the state's attorneys

21      that it was voluntary and we weren't treated poorly.  That's

22      hearsay.

23             The only thing that this is admissible for is when the

24      detectives say, this is the information I received, and you're

25      going to decide how far you're going to let them go.

1    Why do we have a state's attorney come in and say,

2    it's true?  They told me -- it's legit.  They told me that they

3    weren't mistreated.  That is hearsay and we've strayed away

4    from the purpose for which it's being admitted.

5    MR. FLYNN:  If I may, your Honor?

6    THE COURT:  You may.  And, then, I think we can wrap

7    that piece up.  Yes.

8    MR. FLYNN:  Just to be clear, we will not be seeking

9    to admit the actual handwritten statement documents.  I think

10   everyone's on the same page on that.

11   With respect to the ASAs that took the handwrittens,

12   they're not going to come in here and say, yep, that's what

13   they said, yep, and then they said that, and then they said

14   that.  That's not the purpose of the ASAs.

15   The purpose of the ASAs is to say, yes, I spoke to

16   that witness that the detectives also spoke to.  They provided

17   me their summary of events, and they told me that they were

18   giving this statement freely and voluntarily.

19   MR. LOEVY:  That's for the truth.  That's for the

20   truth.

21   If they want to say -- if they were present when the

22   detectives were there, then I suppose they could say, yeah, I

23   heard it, too.  But if they want to say -- the detectives have

24   now told the jury this is what I heard and this is why it was

25   relevant to me.  Now they want to bring in somebody saying, no,

84

1    this person wasn't mistreated, because they told me they

2    weren't mistreated.

3              THE COURT REPORTER:  Mr. Loevy.

4              MR. LOEVY:  Sorry.

5              THE COURT:  Just slow down for me.

6              MR. LOEVY:  They weren't mistreated, because I, ASA,

7    not in the presence of the detectives, they told me they

8    weren't mistreated.  That sounds like for the truth, they

9    weren't mistreated.  That's hearsay.

10             The detectives get what the detectives got.  They

11   don't need the state's attorneys to say, well, we blessed this

12   information.  That's outside of what's admissible.

13             THE COURT:  Okay.  I appreciate your thoughts on it.

14   I'll rule on it in a moment.  It's helpful to me to sort of

15   understand the scope here.  But we'll take it from there.

16             Other matters that we should take up this evening?

17             MR. FLYNN:  Nothing from defendants.

18             MR. LOEVY:  We have one.

19             MR. GIBBONS:  Your Honor, just a housekeeping matter.

20             THE COURT:  Sure.

21             MR. GIBBONS:  So, I think Marcel will hit the stand

22   tomorrow.

23             MR. LOEVY:  Yes.

24             MR. GIBBONS:  As will a lot of witnesses that have

25   very lengthy deposition transcripts.  I suspect there will be a

1     fair amount of potential impeachment.

2           I know the Court's preference is to put those pages

3     up.  But I would suggest that each of the witnesses have a hard

4     copy of the whole -- because some of these are 3 or 400 pages

5     long.  Of course, with the Court having one so we can get to

6     the page, line.  All the parties have these.

7           I think it will move the process.  That would be my

8     intent, to have Marcel's deposition transcript up there next to

9     him.  If I ever need to use it, I'll use it.  But if not -- I

10    don't want to start going, Maria, can you put up --

11          THE COURT:  No, that's fine.

12          MR. GIBBONS:  -- Page 200?

13          THE COURT:  That's fine.  I think to the extent that

14    it's feasible to have copies of exhibits that you know you will

15    probably need to refer to, depositions, other things, you

16    should have that ready and available.  It saves time and

17    incrementally it makes things much easier.

18          In terms of reading in deposition testimony, I don't

19    have any preference at all on how that's done.  You all will

20    arrange for the right people to be seated in the right places

21    to read that in.  And if you want to publish it on the screen

22    because you've agreed or it's fine to do that, that's fine with

23    me.  I don't have any strong preference on that at all.  And

24    you should do it in the way you all see fit.

25          We'll start with Mr. Brown tomorrow --

1            MR. LOEVY:  No.  We've shifted the order a little bit.

2            THE COURT:  Okay.  That was going to be my question,

3  is witness order tomorrow so that we're prepared.

4            MR. LOEVY:  Olson is a police officer and the

5  defendants have facilitated his cooperation.  We appreciate

6  that.  He'll be in the morning.

7            THE COURT:  Okay.

8            MR. LOEVY:  We've decided not to call the deposition.

9  We were going to read the deposition.  We're going to save that

10  instead.  We're going to try to get it moving faster.

11           Dr. Arden will testify in the morning.  And, then,

12  Brown will be the next witness.  He will not finish.

13           THE COURT:  Right.

14           MR. LOEVY:  And we are going to try to get in touch

15  with Mr. Swygert and have him testify before Olson.  He would

16  be our first witness.  We haven't told the defense that yet,

17  but we are still 24 hours in advance.  So, we're telling them

18  that.

19           THE COURT:  So, Olson, Arden, Brown, and potentially

20  Swygert are -- in some order --

21           MR. LOEVY:  Yes.

22           THE COURT:  -- are the first four witnesses?

23           MR. LOEVY:  Yes.

24           Plaintiff would be the last of those, because

25  plaintiff's going to go a long time.

```
 1            THE COURT:  Okay.

 2            MR. LOEVY:  Your Honor, we did have an issue, too.

 3            THE COURT:  Okay.

 4            MR. LOEVY:  During opening, counsel said that the

 5    conviction was overturned for reasons unrelated to this case.

 6    And I had stayed away from saying why, saying anything about

 7    it.  And the conviction was overturned at least, in part,

 8    because he was denied access to a lawyer.  And it is an issue

 9    in this case.  It's part of the totality of whether he had

10    access to a lawyer.

11            So, that has opened the door to why it was overturned.

12    Otherwise, he just said it was overturned for reasons

13    unrelated.  That tells the jury something very unfortunate, you

14    know, because now they have to say, whatever it was, it has

15    nothing to do with what plaintiff is talking about.  And that's

16    not fair.  They shouldn't have done that.

17            THE COURT:  Response.

18            MR. FLYNN:  Your Honor, during the opening statement,

19    Mr. Loevy also came very close to the line and told the jury

20    that he was exonerated, which was in violation of the order, as

21    well.

22            MR. LOEVY:  What I -- the conviction was overturned

23    and he wasn't retried.  And they could have retried him.  I

24    believe that's been elicited by both sides.  So, those are the

25    facts.
```

88

1          None of that goes into why he was exonerated.  He

2     was -- he was exonerated and then his conviction was

3     overturned.  I didn't talk about why.  Then counsel for the

4     defense has now told the jury it has nothing to do with what

5     plaintiff is alleging, which isn't true.

6          THE COURT:  Okay.  I think we're awfully close to the

7     line on that one.  So, I won't -- because opening statements

8     are not evidence, I am not going to conclude that the door has

9     been opened.

10         But, again, I think we're super close to the line

11    here.  You've got a little chalk dust if we're talking about

12    line drawing.  So, I think it probably makes sense to think

13    through how you're going to -- and by "you," I mean the

14    defense, but I think both parties -- how you're going to

15    describe this.  Because if that testimony is given in some way,

16    shape or form -- received into evidence through the answer of a

17    witness -- I think the door will have been opened.

18         So, because opening statements are not evidence, I

19    won't conclude that it has been opened, although it could be.

20    There's no reason why you couldn't make that finding.  But I do

21    think the parties need to think carefully about how they're

22    going to address that so that if you're going to open the door,

23    the consequences are what they will be.

24         MR. LOEVY:  Thank you, your Honor.

25         MR. FLYNN:  Yes, your Honor.

1          MR. LOEVY:  That's the only issues we have for

2  tonight.

3          MR. KAYES:  I'm sorry, your Honor.

4          THE COURT:  Certainly.

5          MR. KAYES:  Just one quick thing on timing.

6          The agreement that was discussed this morning

7  necessitates some changes to the language of the jury

8  instructions.  I think the teams are pretty close --

9          THE COURT:  Great.

10          MR. KAYES:  -- on that.

11          I think it would help us, though, to have a deadline

12  to get new versions of the jury instructions and verdict form

13  to you based on what you sent us this evening.  But I think if

14  you give us a deadline, give us a target with all the chaos.

15          THE COURT:  I mean, how much -- the reality is, for my

16  purposes, I don't know that I'll be in a position to turn back

17  to the jury instructions before next week.  I do want to be in

18  a position where we can take a look at them to get some comfort

19  with where we are.

20          So, if I ask you to submit something to me on

21  Monday -- I'm sorry, not Monday, which is a holiday.  Perhaps

22  Tuesday, is that --

23          MR. KAYES:  I think that's perfect.

24          THE COURT:  Okay.  So, I think if we can just plan for

25  you to respond to the e-mail from my clerk with your revisions

1   in light of the stipulations, if you can do that by Tuesday

2   morning at 9:00 a.m., we'll have, you know, the work that we

3   can do from there.  And that will give us a couple days to iron

4   out what we do so that we can plan on a jury instruction

5   conference ideally toward the second half of next week.  I

6   don't have a specific date in mind because we just don't know

7   when that will all be ready.

8           MR. KAYES:  Thank you, your Honor.

9           MR. FLYNN:  One last minor housekeeping item.

10          In the spirit of cooperation, we we've agreed to use

11  the same transcript for the ERI as opposed to having competing

12  transcripts.  But the transcript that we're going to use has

13  five or six different areas where the defendants disagree and

14  it's just notated to the side.  We'd like to use that as the

15  agreed exhibit.  Would it be better to substitute that for one

16  of the transcripts or just file it as a new exhibit in the

17  exhibit software?

18          THE COURT:  File it as a new exhibit.

19          MR. FLYNN:  Yes, your Honor.

20          THE COURT:  Just so that there's no confusion.

21          MR. LOEVY:  Speaking of new exhibits, the defendants

22  and the plaintiffs have dropped some photographs on each other.

23  They got a nice picture of the White Castle, and we have some

24  photographs.  So, both sides are adding photographs.

25          THE COURT:  So, just add them, and we will carve out

1    some time when the case is sent to the jury to make sure that

2    everybody is on the same page with the exhibits and the right

3    ones are in and the right ones are going back.

4         So, put them in as we go, and obviously confer with

5    each other as you do so, so that there's no surprise.  But

6    we'll just need to take some time before this is all said and

7    done to make sure that all the right material is in, what's

8    been admitted goes back, et cetera.

9         MR. LOEVY:  Thank you, your Honor.

10        THE COURT:  So, I have one short matter at 9:00 a.m.

11   that will only take a couple of minutes.  I'd like to just

12   check in with you call at quarter after 9:00 to make sure there

13   are no issues.  If there are, we'll have 15 or 20 minutes to

14   resolve anything that has come up.

15        Otherwise, have a good evening.  I'll see you

16   tomorrow.

17        (Adjourned at 4:58 p.m. until 8/27/24 at 9:15 a.m.)

18                        *    *    *    *    *

19

20   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

21

22
     /s/ Joseph Rickhoff                    August 26, 2024
23   Official Court Reporter

24

25