## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **MARCEL BROWN,** | |
| Plaintiff, | **No. 19-cv-4082** |
| v. | **The Honorable Lindsay C. Jenkins** |
| **CITY OF CHICAGO,** *et al.* | |
| Defendants. | |

## DEFENDANT OFFICERS' MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendants Michael Mancuso and Geri Lynn Yanow, as special representative for Kevin McDonald "Defendants"), by and through their undersigned counsel, file this Motion for Judgment as a Matter of Law pursuant to Rule 50(a). In support thereof, Defendants state as follows:

## INTRODUCTION

At the close of the evidence, Plaintiff abandoned any claim against Detective William Burke and dismissed all his claims but the following two claims against Detectives Michael Mancuso, Kevin McDonald, Garrick Turner, and Rubin Weber ("Detectives"): (1) a Fifth Amendment claim for allegedly coercing Plaintiff to make the incriminating statements he made, and (2) a Fourteenth Amendment due process claim alleging fabricated evidence relating to the plaintiff's statements that was introduced against plaintiff in his "criminal case."[1] Defendants are entitled to judgment as a matter of law as to both claims because Plaintiff failed to put forth evidence to establish the required elements of each claim or that Defendants caused Plaintiff's injuries and because the evidence shows Defendants are immune from any liability.

---

[1] Defendants objected to the use of "criminal case" when instructing the jury, because for a fabrication claim, a plaintiff must show use at the criminal trial. (Tr. 2248, 2461).

## LEGAL STANDARD

Federal Rule of Civil Procedure 50(a) states: "If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: resolve the issue against the party; and grant a motion for judgement as a matter of law, against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." The question the Court faces is "whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from the evidence is sufficient to find in favor of the plaintiff." *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008).

## ARGUMENT[2]

### I.   Defendants Are Entitled to Judgment as a Matter of Law on Plaintiff's Fifth Amendment - Coerced Incriminating Statements Claim.

Plaintiff's Fifth Amendment claim fails for the following reasons: (1) there is insufficient evidence demonstrating the Defendants who remained at the conclusion of the case knowingly compelled Plaintiff to be a witness against himself; (2) the detectives' action did not cause the introduction of his statements into evidence at trial, and concomitantly, did not cause his claimed damages; and (3) the individual detectives are entitled to qualified immunity. Plaintiff also was not entitled to pretrial detention damages as a matter of law.

### A.   There is insufficient evidence demonstrating that the Detectives knowingly compelled Plaintiff to be a witness against himself.

The evidence demonstrates that from September 3 at approximately 3 p.m. to September 5, at approximately, 1:30 a.m., Plaintiff was held in custody on suspicion of the murder of Paris Jackson (and that he was ultimately charged by the CCSAO on an accountability theory) and was

---

[2] All citations to trial transcripts are based on the daily transcripts. Given the transcripts are not yet final, Defendants anticipate the pin cites contained in this brief may change.

questioned periodically by CPD homicide detectives Mancuso, McDonald, Turner, and Weber until Cook County Assistant State's Attorney Michelle Spizzirri elicited Plaintiff's confession. The entirety of that time was recorded by the CPD's electronic recorded interview ("ERI") system. The entirety of Plaintiff's interrogation recorded by the ERI system was observed, documented, and known to the Cook County State's Attorney's Office, the independent prosecutorial entity that had the sole power to charge Plaintiff in connection with Paris Jackson's murder. Plaintiff was informed he was under arrest, was given *Miranda* warnings that both apprised him of his right to remain silent and his right to request an attorney and informed him that his statements could be used against him. Plaintiff acknowledged he understood those rights and communicated that to the detectives (with such communications being concurrently observed and documented by the CCSAO). Later, at his criminal trial, the State and Plaintiff stipulated that Plaintiff was given *Miranda* warnings, acknowledged those warnings, and spoke to the police voluntarily. (Tr. 2161:19-2163:2).

Throughout the course of Plaintiff's time at Area 5, Plaintiff was provided food, bathroom breaks, and water to drink. It was explained to Plaintiff that he could be charged for murder, he was repeatedly told to tell the truth but not to say or parrot things to the detectives because he thought that's what they wanted to hear. At approximately 10:20 P.M. on September 4, 2008, Plaintiff requested to speak with the state's attorney, and ASA Spizzirri interviewed Plaintiff.

The evidence is insufficient to demonstrate that any Detective, engaged in interview or interrogation tactics that overcame Plaintiff's free will. No reasonable fact finder on this record could find sufficient evidence otherwise. Certainly, there is no evidence to reflect that any detective knowingly coerced Plaintiff into making the incriminating statements that were used at his trial, or that they were the cause of his statements being used against him.

The bulk of the evidence Plaintiff presented relative to his interrogation was Plaintiff watching clips and having his counsel pepper him with questions on what he was thinking or feeling as he reflected some 16 years after the fact, including his claim that he "thought the truth they wanted to hear [him] say" was that "I knew R.J. had a gun." (*See, e.g.*, Tr. 346:17-19). Plaintiff's testimony that he did not understand his rights, adopted statements made by the detectives, and only said what he said because he thought he was just a witness against RJ are entirely beside the point. Nothing Plaintiff said to the detectives could have indicated to them what his thoughts were such that they knew that his will was overcome. ASA Spizzirri testified that she did not observe Plaintiff to have a will that was overborne or any warning signs that she should not question him. (*See, e.g.*, Tr. 1587:2-23).

Further, any evidence that Plaintiff presented at this trial that called into question the veracity of the witness statements the detectives had gathered, either prior to arresting Plaintiff or during the course of following up on statements Plaintiff was making (suggesting that witnesses somehow indicated that there was two shooters, or that David "Day Day" Portis was the shooter) or the forensic evidence associated with Paris Jackson's body (suggesting somehow that Paris was murdered elsewhere and not in connection with RJ shooting in the park) is wholly irrelevant to the question of whether Plaintiff was unlawfully compelled to be a witness against himself in violation of his Fifth Amendment rights.

At no point was there any indication to the Detectives, from any prosecutor or otherwise, that the length of Plaintiff's time in custody, the duration of any particular interview, the manner of questioning, or the types of statements made by any Detective were improper. Plaintiff was not a particularly vulnerable suspect and certainly nothing about Plaintiff would have or could have indicated to the detectives any particular characteristic rendered him incapable of making a rational

decision when he spoke to ASA Spizzirri. Plaintiff was 18 years old, a high school graduate, held a job, possessed a car, was legally able to purchase cigarettes in 2008, could vote in federal elections, could serve in the armed forced, intended to continue his education at Triton college, and did not suffer from any intellectual disabilities or conditions that made him unable to make a rational choice.  The tactics and settings were simply not inherently coercive such that the Defendants could have known as a matter of federal constitutional law that Plaintiff's statements were somehow involuntary.  Plaintiff was never threatened, not subject to any physical abuse, and was not promised anything in exchange for an incriminating statement.  Plaintiff informed the detectives that he understood his rights, never invoked his right to remain silent, and never requested speak to a lawyer. *Miranda* compliance does conclusively establish the voluntariness of a subsequent confession but "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20 (1984). Here, again, Plaintiff and the State stipulated at trial that Plaintiff received Miranda warnings, acknowledged those warnings, and understood them. (Tr. 2161:19-2163:2).  There simply is insufficient evidence to demonstrate that the detectives knew that Plaintiff was mentally exhausted or under some misapprehension such that his free will was overcome.

Further, the allegation that Plaintiff was not told Wham Cary was present or allowed to call his mom when he wanted to are totally irrelevant to an assessment of whether the Detectives can be found liable for money damages for a Fifth Amendment violation.  Plaintiff did not then and does not now have a Fifth Amendment right to be told there is a lawyer present to see him.  Plaintiff did not then and does not now have a Fifth Amendment right to be provided access to a telephone while being detained. There was no evidence any of the Detectives were told Wham Cary was

there to see Plaintiff. This point is underscored by ASA Spizzirri's testimony when she told the jury as much. (Tr. 1476:17-1477:7). And ASA Spizzirri not only *Mirandized* Plaintiff prior to speaking with him, she also knew that Plaintiff did not invoke his right to remain silent and did not request an attorney. (Tr. 1473:13-25). Further, any evidence about failing to provide Plaintiff a phone call (either within a reasonable time or purposely) is entirely irrelevant to the Fifth Amendment. The detectives' subjective motivations are not germane to whether they coerced Plaintiff. *See Hicks v. Hepp*, 871 F.3d 513, 527 (7th Cir. 2017) (noting proper standard for evaluating coercion is objective standard focusing on "reasonable person in the suspect's position"). Again, the evidence concerning Wham Cary and requests for a phone call is simply irrelevant to the issue of whether or not Plaintiff demonstrated that the Detectives' conduct violated his rights as a matter of law. Plaintiff never invoked his rights and had no right to be informed of Wham Cary or make a phone call.

The right at issue under the Fifth Amendment is the right to be free from self-incrimination. The conduct Plaintiff's claims are premised upon is not unconstitutional; whether in isolation or in totality. More importantly, the circumstances were completely known to the State. Plaintiff has argued that his constitutional rights were violated by the Detectives in the following ways: (1) because the Detectives engaged in "lies and trickery" and other improper interrogation techniques during the interrogation, (2) because the Detectives did not allow Plaintiff to call his mother during his interrogation, (3) because the Detectives did not inform Plaintiff that Wham Cary was there to see him (and allegedly turned away Wham Cary when he asked to see Plaintiff), and (4) because the Detectives questioned Plaintiff over the course of the thirty-four hours he spent in detention. But none of these factors reflect that Defendants knowingly violated Plaintiff's rights.

**First**, Plaintiff contends that the interrogation techniques utilized by the detectives were improper; however, the applicable case law clearly indicates that the techniques do not violate an individual's constitutional rights. Indeed, Seventh Circuit case law clearly establishes that custodial interrogation of a suspect is permitted and confirms that police officers are legally permitted to confront suspects with evidence of guilt; engage in accusatory questioning; play on their ignorance, anxieties, fears and uncertainties; make false and/or misleading statements to suspects about evidence of their guilt; pose as a "false friend"; make statements to suspects regarding the potential legal consequences of the crime being investigated; and provide promises to bring a suspect's cooperation to the attention of prosecutors. *See, e.g.*, *Dassey*, 877 F.3d at 304 ("In several cases, the Court has held that officers may deceive suspects through appeals to a suspect's conscience, by posing as a false friend, and by other means of trickery and bluff."); *United States v. Sturdivant*, 796 F.3d 690, 697 (7th Cir. 2015) ("We have repeatedly held that a law-enforcement agent may actively mislead a Defendant in order to obtain a confession, so long as a rational decision remains possible. We have also held that a lie that relates to the suspect's connection to the crime is the least likely to render a confession involuntary."); *United States v. Montgomery*, 555 F.3d 623, 632 (7th Cir. 2009) ("[P]recedent holds that a police officer may 'actively mislead' a suspect prior to obtaining a statement or confession so long as a rational decision remains possible.") *United States v. Villalpando*, 588 F.3d 1124, 1130 (7th Cir. 2009) ("[P]romises to seek favorable consideration from the prosecutor do not undermine the voluntariness of a confession."); *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) (trickery does not render confession inadmissible absent threats or promises by government agents); *Johnson v. Trigg*, 28 F.3d 639, 641 (7th Cir. 1994) ("Custodial interrogation is permitted [and] courts allow interrogators in these already coercive custodial

settings considerable latitude in playing on the guilt and fears of the person interrogated in order to extract a confession that he will shortly regret having given."); *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990) ("Harris objects that he was threatened with false and misleading evidence, but even if this is the case, it is well settled that police may use small deceptions while interrogating witnesses."); *Ray v. Duckworth*, 881 F.2d 512, 518 (7th Cir. 1989) ("An interrogating officer's act of merely informing the accused of the nature of the evidence implicating him, without more, does not constitute coercive police conduct."); *United States v. Hocking*, 860 F.2d 769, 775 (7th Cir. 1988) (accusatory questioning not in itself coercive).

**Second**, in 2008, a murder suspect did not have a right to make a phone call while they were being held in detention. *See, e.g.*, *Dietzen v. Mork*, 1996 WL 625605, at * (7th Cir. Oct. 26, 1996) ("Dietzen's federal constitutional rights were not violated by the temporary deprivation of telephone privileges. We decline to adopt Dietzen's assertion that he had an absolute constitutional right to a telephone call."); *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1145 n. 2 (7th Cir. 1983) ("[T]here is no constitutional requirement that a phone call be permitted upon completion of booking formalities."); *Baker v. City of Chicago Police Dept.*, 2000 WL 556619, at *4 n.4 (N.D. Ill. May 1, 2000) (quoting *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1145 n. 2 (7th Cir. 1983)) ("The Seventh Circuit has stated that there is 'no Sixth Amendment right to place a phone call, be it to an attorney or family members.'"); *see also Harrill v. Blount Cnty.*, 55 F.3d 1123, 1125 (6th Cir. 1995) ("The right to make a phone call immediately upon arrest is not a recognized property right, nor is it a traditional liberty interest recognized by federal law."). Even today, courts have not held that such a constitutional right exists. *Oaks v. Rowld*, 2023 WL 7280897, at *2 (S.D. Ill. Nov. 3, 2023) ("A temporary deviation of telephone privileges generally does not violate a person's federal constitutional rights."); *see also Curtis v. Rockland Cnty.*, 2022 WL 16540705, at

* (S.D.N.Y. Oct. 28, 2022) ("Plaintiff does not have a constitutional right to a phone call."). Accordingly, evidence that the Detectives did not allow Plaintiff to make a phone call on demand (or even purposely delayed it) does not matter relative to the voluntariness inquiry or whether the Defendant Detectives each knowingly coerced Brown's statements.

 **Third**, even assuming the Detectives had knowledge and purposely did not inform Plaintiff that attorney, Wham Cary, was at Area 5 requesting to see Plaintiff while he was in detention, that ignores the fact that a murder suspect did not have a constitutional right to "be notified that his attorney is at the stationhouse." *See, e.g.*, *Moran v. Burbine*, 475 U.S. 412, 422-34, 106 S. Ct. 1135 (1986) (holding Fifth Amendment does not "require that police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights"); *First Def. Legal Aid v. City of Chi.*, 319 F.3d 967, 968 (7th Cir. 2003); *Vainder v. Powell*, 2004 WL 1660618, at *9 (N.D. Ill. July 26, 2004) (concluding police do not violate a suspect's constitutional rights "by failing to inform him that counsel is present and asking to see him"); *Hill v. United States*, 2001 WL 185474, at *5 (N.D. Ill. Feb. 26, 2001) (applying *Moran* and finding law enforcement did not violate Fifth Amendment right by failing to inform suspect that attorney was trying to contact him); *Middleton v. Murphy*, 1992 WL 601890, at *4-5 (W.D. Wis. Jan. 27, 1992) (same); *cf. Lawrence v. Williams*, 2016 WL 930629, at *6 (N.D. Ill. Mar. 11, 2016) (thwarting attorney from seeing suspect did not impact validity of suspect's waiver of rights). Further, the Supreme Court has confirmed that whether an attorney was turned away is wholly irrelevant to the analysis surrounding whether a confession was voluntary. *Moran*, 475 U.S. at 422 ("Events occurring outside of the presence of the suspect and entirely known to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right."). Evidence that Cary was requesting Plaintiff at Area 5 has no bearing on whether his confession

was voluntary, and, as Defendants have repeatedly argued, such evidence never should have been permitted at trial in the first place.

**Fourth**, Plaintiff repeatedly argued that the length of his interrogation was improper and violated his constitutional rights. However, in 2008, the Detectives could have detained Plaintiff for 48 hours, were not under any obligation to set a time-limit on questioning Plaintiff, and could not have known that the length of detention was somehow overcoming Brown's ability to make a rational choice. As was alluded to many times through the trial, in 2008, an arrested person could be detained for 48 hours before a *Gerstein* probable cause hearing occurred. *Lopez v. City of Chicago*, 464 F.3d 711, 714, 719-22 (7th Cir. 2006) (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991)) ("*McLaughlin* established a general rule that persons arrested without a warrant must receive a judicial determination of probable cause within 48 hours."). Plaintiff does not argue and cannot show that he was held beyond the period permitted by law. Accordingly, the duration Plaintiff spent at the police station in insufficient to demonstrate knowing coercion on the part of the detectives.

### B. Plaintiff did not prove Defendants knowingly coerced his confession, their personal involvement, or that they were the cause of the coerce confession being used against Plaintiff at trial.

For Plaintiff to succeed against the Detectives on his Fifth Amendment Claim, Plaintiff had to demonstrate that the Detectives were personally involved in and knowingly coerced his confession. (*See* Jury Inst. Nos. 22, 28). Plaintiff also had to show that the Detectives were the proximate cause of the coerced confession being used against Plaintiff. Plaintiff has insufficient evidence to demonstrate those elements.

Here, ASA Spizzirri is the one who elicited the confession. Further, ASA Spizzirri independently decided to question Plaintiff after reviewing the log of the entire interview, including logging some of the interrogation herself. ASA Spizzirri confirmed that she did not

10

consult with the Detectives on how to question Plaintiff. She and her colleagues collectively watched the whole interview and took notes before she entered the interview room. At no time did any prosecutor identify any red flags. After ASA Spizzirri elicited the confession, the State's Attorney Office independently decided to charge Plaintiff and prosecute him, and independently decided to use the confession against Plaintiff in the criminal proceedings. Detectives were never found to have deliberately misled the prosecutors, the court, or defense counsel as to what occurred. Nor could they have—the interview was all on video.

Detectives McDonald, Turner, and Weber participated briefly in the interview but were not in the room when Plaintiff's confession was elicited, were not witnesses in Plaintiff's criminal trial, did not document the confession in a report, and did not influence or persuade the prosecutor into using Plaintiff's confession during his criminal proceedings. There is no evidence that McDonald, Turner, or Weber were aware of how the confession was ultimately elicited, that they knew that the methods used were coercive, or that they played any part in influencing ASA Spizzirri as to the techniques she used, in deciding whether or how to question Plaintiff, or in the decision to use the confession against Plaintiff.

Although Detective Mancuso was in the room and saw the confession elicited and ultimately testified about it, that is not enough to show he knowingly coerced the confession, was personally involved in coercing the confession, or that he was the cause of the confession being used against Plaintiff. According to ASA Spizzirri, he did not influence her in how or what to do when she entered the interview room. (Tr. 1584:3-8). He was not the legal expert; ASA Spizzirri and the other ASAs on the case were far more knowledgeable and decided to continue forward using the confession in the criminal proceedings. ASA Spizzirri decided to elicit the confession after having full awareness of what occurred prior to her entering the room. (Tr. 1576:25-1577:10,

1580:11-1581:19). The prosecutors who took over the case then decided to move forward with the use of the confession against Plaintiff in the criminal proceedings.[3] The prosecutors—not the Detectives—chose to use the confession at the bond hearing and to present evidence of the confession at the grand jury and criminal trial.

There was no evidence Detective Mancuso's report was used at the bond hearing, and though he testified to it at the grand jury proceeding, he has absolute immunity for any testimony, and his report was not referenced or used in evidence. At trial, Detective Mancuso testified regarding the confession, but that testimony was introduced by way of a stipulation by both the defense and the prosecution. Specifically, the State and Plaintiff stipulated to have Detective Mancuso read into evidence the summary from his supplemental report of the interviews conducted by ASA Spizzirri. (Tr. 2161:19-2163:2). As instructed by this Court, a stipulation is an agreement between the parties that something is true and admissible. (*See* Jury Inst. Nos. 2). The State had the ERI and knew the totality of the circumstances in relation to Plaintiff's questioning at Area 5, including that he was given his *Miranda* warnings, never said he did not understand his rights, and never invoked his rights. At his criminal trial, the State and Plaintiff's criminal defense attorney stipulated that Plaintiff had been read his *Miranda* rights by either Detective Mancuso or Detective McDonald, that Plaintiff acknowledged those rights, and agreed to talk to Detective Mancuso and Detective McDonald. (Tr. 2161:19-2163:2). Defense counsel did not raise an objection to the admission of the confession, stipulating to both the admissibility and content of the confession.

---

[3] As explained below, the use of the confession at the pretrial proceedings is not relevant in this case, is not compensable where there was probable cause, and is not a violation of the Fifth Amendment, but for the sake of argument Defendants address it here.

The Detectives should not be liable because they did not elicit the confession or knowingly coerce it, given that the prosecutors, the legal experts here, did not believe it was coerced. Further, the prosecutors' conduct broke the causal link between the Detectives' actions and Plaintiff's injuries. For the purposes of § 1983 liability, the causal link between a police officer's alleged wrongdoing and the victim's injury may be broken if the prosecuting attorney is made aware of the police officer's conduct. *See Whitlock v. Brueggemann*, 682 F.3d 567, 583-84 (7th Cir. 2012) ("The causal link between a police officer's fabrication and the victim's injury may be broken if that police officer tells a prosecuting attorney before trial about the fabrication."); *Buckley v. Fitzsimmons*, 20 F.3d 789, 797 (7th Cir. 1994) ("Things would be different . . . if the prosecutors had known the truth and proceeded anyway . . . for then the immunized prosecutorial decisions would be the cause of the injury."); *Goudy v. Cummings*, 2013 WL 5487355, at *12 (S.D. Ind. Sept. 30, 2013) ("It is true that for purposes of § 1983 liability, [t]he causal link between a police officer's [withholding of evidence] and the victim's injury may be broken if that police officer tells a prosecuting attorney before trial about the [withheld evidence]."); *Buckley v. Cnty. of Dupage*, 1996 WL 10899, at *4 (N.D. Ill. Jan. 9, 1996) ("In other words, the causal relationship between the police officer's deliberately falsified information and Jones's injuries would have been severed if the prosecutors knew of the falsified information . . . and nevertheless proceeded with the prosecution."); *see also Higazy v. Templeton*, 505 F.3d 161, 180 (2d Cir. 2007) (Jacobs, J., concurring) ("the Fifth Amendment violation that flows from a coerced confession transpires only if and when the confession is used in court, and even then, the officer who coerced the confession is liable only if the officer conceals the coercion; absent concealment of the circumstances amounting to coercion, the error of the court in accepting the confession is treated as a superseding cause."); *Barts v. Joyner*, 865 F.2d 1187, 1197-98 (11th Cir. 1989) ("To hold that the decisions of

the prosecutor, juries and judge do not break the chain of proximate causation trivializes the importance of these post-arrest decisions, which do not merely pass on the correctness of the seizure or arrest by police but which, based on all the information then available to these court officials, determine the likelihood that a potential defendant is guilty of violating the law."). Here, the evidence at trial not only demonstrates that the prosecutors were fully aware of the conditions, tactics, setting, and circumstances surrounding the interviews of Plaintiff; the statements used against Plaintiff were those elicited by the State itself and were only introduced at trial by way of a stipulation by Plaintiff and the State for their introduction. It is a perversion of the facts to now suggest the Detectives caused their introduction. No reasonable jury could conclude otherwise.

ASA Spizzirri testified at length about what occurred at Area 5 and her questioning of Plaintiff, including the undisputed fact that before even interviewing Plaintiff or making the decision to formally charge Plaintiff with murder, she and other ASAs would have reviewed the entire ERI. (*See, e.g.*, Tr. 1563:8-1565:4; 1580:11-1581:19; 1582:1-6). Further, Spizzirri confirmed that ASAs would have reviewed the circumstances surrounding Plaintiff's statements and would have done something had they believed those circumstances were improper. (*See, e.g.*, Tr. 1613:18-23; 1630:9-12).

Not only were the prosecutors made aware of the circumstances surrounding Plaintiff's statements by way of the ERI, ASA Spizzirri was directly involved in the interrogation process and was the person who elicited Plaintiff's incriminating admissions. (*See, e.g.*, Tr. at 1520:3-21). ASA Spizzirri gave Plaintiff his *Miranda* warnings, and in response, Plaintiff agreed to be questioned. In addition, ASA Spizzirri pressed Plaintiff on his account and, frankly, told him she did not believe him. When Spizzirri elicited Plaintiff's admissions, she believed she was professionally capable of interviewing Plaintiff and had all relevant information concerning the

interrogation up to that point. (*Id.* at 1576:25-1577:10, 1580:11-1581:19). She was personally in charge of how she conducted the interrogation and what questions were asked. (*Id.* at 1584:3-8). She also personally observed Plaintiff's condition and concluded that it was appropriate to continue questioning. (*Id.* at 1587:2-23). Spizzirri, based on her knowledge and experienced, believed the confession was voluntarily. (*Id.* at 1610:14-1611:25). On this record, the Detectives cannot be found to have knowingly caused Plaintiff's incriminating statements to be used against him at trial (or at any other point in the process).

The prosecutors involved in this case, through the log-and-burn process and through Spizzirri's interactions with Plaintiff, unquestionably "[knew] the truth and proceeded anyway," which broke the causal link between the Detectives' actions and Plaintiff's injuries. *See Whitlock*, 682 F.3d at 583-84; *Buckley*, 20 F.3d at 797. Further, Plaintiff was required to show that the Detectives knowingly used improper coercion to elicit the incriminating statements at issue. (*See, e.g.*, Jury Instruction No. 22). It cannot be that the Detectives knew what they were doing was improper when the individuals specifically tasked with reviewing their conduct plainly thought otherwise. Rather, they joined the interrogation process and later decided, with full knowledge of the circumstances surrounding the interrogation, that the incriminating statements were appropriate to use in connection with Plaintiff's criminal proceedings. The prosecutors conduct precludes a finding of causation or knowledge, such that the Detectives cannot be found be liable under Plaintiff's claim for coerced incriminating statements.

### C. Plaintiff was not entitled to damages for pretrial detention.

This Court determined that Plaintiff could seek pretrial detention damages solely on the Fifth Amendment coerced confession claim. As the Detectives argued in Motion in Limine No. 9, and the motion to reconsider the denial of that motion *in limine*, Plaintiff should not be permitted

seek damages for pretrial detention. (*See* Dkt. No. 333, at 52-54; Dkt. No. 357, at 5-10). The Detectives argued that this Court's finding that probable cause existed as a matter of law, which resulted in dismissing the malicious prosecution and any claim for unlawful pretrial detention claim, prevents recover of any damages for pretrial detention. *See also Washington v. City of Chicago,* 98 F.4th 860, 873-74 (2024). his Court disagreed, and determined that Plaintiff could recover such damages if he proved that he *would* have not been detained without the inculpatory statements. Defendants maintain their objections to that ruling, and hereby incorporate their Motion *in Limine* No. 9, Dkt. No. 333 and motion for reconsideration of the denial of that motion, Dkt. N. 357. The Detectives in these motions argued, among other things, that the finding of probable cause precludes any recovery for pretrial detention; that Plaintiff's pretrial detention was "lawful" without his confession, which precludes the confession from being the but-for cause of the detention; and that the use of a confession in a pretrial hearing does not implicate the Fifth Amendment.

Thus as a matter of law Plaintiff's recovery of $10 million in pretrial detention damages must be reversed, awarding Plaintiff no damages for pretrial detention.

In addition, assuming the Plaintiff was entitled to pretrial damages, this Court instructed the jury that pretrial detention began at the time of arrest, but (a) his arrest occurred before the interrogation and confession and (s) the Plaintiff could not seek damages until the confession was used against him in a proceeding. (Dkt. No. 343, at 20 (specifying that Plaintiff could recover damages "[i]f the use of Plaintiff's confession at a pretrial hearing caused his pretrial incarceration[.]"). The earliest that occurred was at Plaintiff's bond hearing. Accordingly, Plaintiff was not entitled to damages for the period he was in detention prior to the first use of the confession.

### D. The Detectives are entitled to qualified immunity.

The Detectives are further protected from judgment against themselves because they are entitled to qualified immunity. Qualified immunity is a defense available to government officials performing discretionary functions that affords them protection from civil liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[4] "A two-part test is used to ascertain whether qualified immunity exists." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008). "First, the plaintiff must establish that the actions of the defendant violated his constitutional rights." (*Id.* (citing *Triad Associates, Inc. v. Robinson*, 10 F.3d 492, 496 (7th Cir. 1993)). "Second, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" (*Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Under this test, a plaintiff, to succeed on a § 1983 claim, "must show, on some level, that a violation of this right has been found in factually similar cases, or that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case." (*Id.* (citing *Borello v. Allison*, 446 F.3d 747, 746 (7th Cir. 2006)). Further, a plaintiff can only succeed if "the unlawfulness of their conduct was clearly established at the time of the alleged violation." *Davis v. Allen*, 2024 WL 3803041, at *4 n.3 (7th Cir. 2024).

Not only is none of the conduct at issue in this case independently unconstitutional, but Plaintiff will also be unable to identify any precedent that puts the unconstitutionality of the Detectives' conduct here, considered in its entirety, "beyond debate." *Gill v. City of Milwaukee*, 850 F.3d 335, 341 (7th Cir. 2017). Indeed, the opposite is the case, as the Seventh Circuit has applied the defense of qualified immunity in cases substantially similar to the instant case.

---

[4] The law clearly permits the defense of qualified immunity to be raised on a motion for directed verdict. *McGee v. Bauer*, 956 F.2d 730, 735 (7th Cir. 1992)

In *Gill*, the Seventh Circuit affirmed the application of qualified immunity to a coerced confession claim. *Id.* at 341. In *Gill*, the plaintiff, like Plaintiff here, alleged: that he was held in isolation for over forty hours; that he was questioned multiple times, including for a period lasting five-hours; that he professed his innocence more than 140 times; that he was not allowed to make a phone call; and that the questioning detectives lied to him, confused him, promised him leniency, and provided facts through leading questions (among other tactics) in order to coerce him to confess to a homicide he did not commit. *Gill v. City of Chicago*, No. 16-2864, Appellant's Br. Dkt. No. 10, at 14-19 (7th Cir. Oct. 11, 2016) (attached hereto as **Exhibit A**). The *Gill* plaintiff's allegations went beyond those made here: he alleged that he was disabled and unable to read or write; was actively denied the right to an attorney despite his requests for one; and was provided with a false polygraph test. *Id.*

Considering these facts, the Seventh Circuit was unable to identify "any precedent from the Supreme Court or this Circuit that puts the unconstitutionality of the officers' conduct here 'beyond debate.'" *Gill*, 850 F.3d at 341. This Court's analysis needs not go any further than *Gill*, as the conduct at issue here is less extreme and happened less recently than the conduct at issue in *Gill*. As no controlling precedent defeats the Detectives' qualified immunity defense, the Court must enter judgment in favor of the Detectives.

## II. Defendants Are Entitled to Judgment As A Matter Of Law On Plaintiff's Fabrication Claim.

In the end, Plaintiff's fabrication claim became very narrow: in his report, Mancuso allegedly fabricated the summary of Plaintiff's inculpatory statement. To prevail on his Fourteenth Amendment Due Process fabrication claim, Plaintiff is required to prove: (1) Defendants knowingly manufactured false evidence against Plaintiff, (2) the evidence was used at Plaintiff's criminal trial, (3) the evidence was material, and (4) Plaintiff was damaged as a result. *Brown v.*

*City of Chicago*, 633 F. Supp. 3d 1122, 1156-57 (N.D. Ill. 2022) (citing *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020)).

**A.    There can be no liability for use of the inculpatory statements at any pretrial proceedings.**

As the Court has already recognized, Plaintiff's fabrication claim is a due process claim rooted in the Fourteenth Amendment, and as such, Plaintiff cannot recover damages for any pretrial detainment based on his fabrication claim. (*See* Dkt. 343 at 17-18; *see also* Jury Instruction No. 26.) Nor can he prove his fabrication claim for post-conviction detention by showing that the evidence was used against him in pretrial proceedings. *See Patrick*, 974 at 835. Plaintiff here testified that a prosecutor quoted Plaintiff's confession at the bond hearing and that Detective Mancuso testified at the grand jury that Plaintiff confessed. Those cannot be the grounds for any liability because in addition to being pretrial uses, there was no evidence the report itself was referenced in those proceedings. There was no evidence the report, as opposed to the ERI, was used by the prosecutor at the bond hearing, and Detective Mancuso did not reference or read from his report during the grand jury proceedings. (Joint Ex. 298 at 7.)[5] So, there is no evidence the report was introduced at either proceeding, and Detective Mancuso is absolutely immune for any testimony. *Manning v. Miller*, 355 F.3d 1028, 1031-32 (7th Cir. 2004).

**B.    Plaintiff failed to show that the use of the report constituted fabrication.**

Defendants are entitled to judgment on Plaintiff's fabrication claim for several reasons: (1) Plaintiff failed to present evidence that Defendants fabricated police reports or Plaintiff's incriminating statements; (2) Plaintiff failed to prove the requisite causation; (3) Plaintiff failed to

---

[5] Defendants have filed the criminal trial transcripts, the grand jury transcripts, and the ERI transcript as part of an Offer of Proof. (*See* Dkt. 430 (providing ERI Transcript as Exhibit A, criminal trial transcripts and exhibits as Group Exhibit B, and grand jury transcripts and exhibits as Group Exhibit C.) The citations provided in Defendants' Motion correspond to the labeling on the exhibits themselves. For Joint Exhibit 298, *see* Dkt. 430 at Group Exhibit C.

prove that the allegedly fabricated evidence was material; and (4) even if Plaintiff provided evidence sufficient to prove his claim, Defendants are nonetheless immune from liability.

> **1.**      ***Plaintiff did not present evidence that Defendants manufactured false incriminating statements.***

To prove his fabrication claim, Plaintiff was required to offer evidence showing Defendants "created evidence they knew to be false." *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) Plaintiff failed to show that Defendants created any evidence they knew to be false about Plaintiff's incriminating statements.

Again, Plaintiff's sole basis for his fabrication claim is that the police report drafted by Detective Mancuso that summarized Plaintiff's incriminating statements is false and that Detective Mancuso was asked to read portions of the report at Plaintiff's criminal trial (pursuant to a stipulation). But the evidence adduced at trial shows that the police report was not false. The following portion of Defendants' police report was read by Defendant Mancuso at Plaintiff's criminal trial:

> Marcel Brown states that he knew [RJ] Branch had a gun when he got in his car to go to the park. Brown stated that when Branch said he was gonna go fuck them up, he knew Branch meant he was going to go shoot them. Brown said that Branch used that phrase in the car on the way to the park. He said that he knew Branch had the gun when he was in the car. Brown said that Branch said I'm tired of these n****s messing with my sister. They're going to die.

(Trial Tr. at 2162-2163; *see also* Joint Ex. 328 at 34-35.[6])

The ERI video of Plaintiff's interrogation shows that the summary of the interviews Detective Mancuso documented in his supplementary report is not false. Moreover, nothing in the record demonstrates this the summary Detective Mancuso wrote was knowingly false or

---

[6] For Joint Exhibit 328, *see* Dkt. 430 at Group Exhibit B.

manufactured.  Rather, the police report reflects the statements Plaintiff made to ASA Spizzirri and Defendant Mancuso at about 11:45 p.m. on September 4, 2008:

> SPIZZIRRI:   Marcel, did he say more than what you're telling me in the car, and you just thought there ain't no way he's going to follow through with this shit, there ain't no way? Did he say more?
>
> BROWN:   He said. ***I'm going to fuck these n\*\*\*as up***, and he got to mumbling stuff.
>
> SPIZZIRRI:   And what was the mumbling? I know you heard more, Marcel. Come on.
>
> BROWN.   ***I'm tired of these n\*\*\*as. These n\*\*\*as touch my sister, they gonna die***.

(Pl. Ex. 500 at 375:3-12 (emphasis added).) Further, although Plaintiff denied knowing RJ Branch had a gun at various times during the interrogation, Plaintiff clearly admitted to ASA Spizzirri and Defendant Mancuso that he knew RJ Branch had a gun while they were in Plaintiff's car on the way to Amundsen Park:

> SPIZZIRRI:   I can't hear you.
>
> BROWN:   I didn't bother to ask.
>
> MANCUSO:   You didn't ask him?
>
> BROWN.   Did he have a gun on him. ***But I think he – he had it on him***.
>
> …
>
> SPIZZIRRI:   Okay. So you think RJ did have the gun because his sister was up there, his sister was in some trouble?
>
> BROWN:   ***Yeah.***
>
> …
>
> MANCUSO:   Are you saying that now that you're thinking he had it, looking back, or are you saying that –

BROWN:          Just over the whole thing, like, him getting in the car with me to go
                up there.

MANCUSO:   Well, you have to explain…Did you know he had it at the time you
                knew he had a gun, or you're thinking now well, it seems like he
                must have had it?

BROWN:          **No, at the time.**

SPIZZIRRI:    There's a difference.

BROWN:          At the time I didn't ask did he have it, but **I kind of figured that he
                had it on him.**

(Pl. Ex. 500 at 370:5-371:16 (emphasis added).) The police report makes clear it is "a summation

of [Plaintiff's] interview and is not considered verbatim." (Joint Ex. 328 at 34.) Especially given

this caveat, the ERI video clearly shows that the police report that Defendant Mancuso was asked

to read did not contain fabricated material; rather, Plaintiff made the statements attributed to him

by the summary contained in the police report. As the ERI shows too, no one created that

confession, and they did not have reason to believe it was false because the confession was

consistent with what they had been told by witnesses at the scene, including Marisol Ocampo.

(*See, e.g.*, Tr. 2180 ("[RJ] said who fucking with you, sis, I got these N-words."; "The gun was

hanging out of [RJ's] pocket."); *id.* at 2200 ("Who is fucking with you because I kill a N-word for

my sister."); *id.* at 2202 ("R.J. asked the boys which one is fucking with my sister, I will kill all

you N-words.").)

At various times at trial, Plaintiff's counsel suggested that the police report was false

because it was the product of coercion or because the report failed to disclose that they used

allegedly coercive tactics in questioning Plaintiff or that Plaintiff at times denied being involved

in the shooting. These allegations cannot render Defendants' police report false or fabricated.

It is well-settled that a fabrication claim is distinct from a coercion claim; even assuming Plaintiff proved Defendants coerced Plaintiff's incriminating statements that were memorialized in the police report, that **cannot** render those statements fabricated. *Anderson*, 932 F.3d at 510 ("[C]oercion and fabrication are not synonyms"); *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) ("[A] claim that an officer coerced a witness to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due-process rights."); *Olson v. Cross*, No. 18 CV 2523, 2024 WL 361200, at *8 (N.D. Ill. Jan. 30, 2024) (rejecting attempt to recast coercion claim as fabrication claim and noting it "is like trying to fit a square peg into a round hole"). Likewise, Plaintiff's claim that Defendants omitted any mention of Plaintiff's early denials of involvement or Defendants' alleged coercion from their police report also **cannot** transform the police report into fabricated evidence. *O'Doan v. Sanford*, 991 F.3d 1027, 1045 (9th Cir. 2021) ("Deliberate fabrication, in other words, must mean something more than a mere omission."); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (explaining that withholding potentially exculpatory evidence may be a *Brady* violation but cannot support a **fabrication** claim). In other words, Plaintiff has to show that, at no point, did he admit to knowing RJ Branch had a gun or make the statements contained in the police report. As explained above, Plaintiff did not (and cannot) make such a showing.

### 2. *Plaintiff did not present evidence that Defendants acted knowingly.*

Additionally, Plaintiff was required to prove that "Defendants knew, 'with certainty,' that the evidence [at issue] was false." *Mims v. City of Chicago*, No. 18-CV-7192, 2024 WL 1075152, at *12 (N.D. Ill. Mar. 12, 2024) (quoting *Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019)). "This is a high bar to clear." *Coleman*, 925 F.3d at 344. Even assuming the portions of the police report read by Defendant Mancuso at the criminal trial were false, Plaintiff still failed to

produce evidence showing the Defendants knew, with certainty, that the police report was false. In fact, the evidence compels the opposite conclusion: Defendants believed the police report accurately summarized Plaintiff's incriminating statements. Prior to questioning Plaintiff, Defendants had learned the following through their homicide investigation: (1) Plaintiff and his cousin, RJ Branch, were called to the park by their sisters who were in an altercation that involved a group of young men that included Paris Jackson; (2) Plaintiff and RJ had an ongoing dispute with the group of young men who were in the park; (3) Plaintiff drove RJ to Amundsen Park in a gold Malibu; (4) while in the park, RJ fired shots at the group of young men; (5) Plaintiff drove RJ away from the park after the shooting; (6) RJ was known to have a gun and had been arrested prior to the shooting for gun-related offenses; and (7) witnesses told police the gold Malibu known to be driven by Plaintiff had been driving around the park causing problems in the recent past.

Additionally, Defendants knew that, in the early stages of the interrogation, Plaintiff had repeatedly lied that his cousin never shot a gun in Amundsen Park and that another person, Day-Day (David Portis), was the only shooter.[7] Against this backdrop, the only reasonable conclusion to draw from the evidence is that Defendants concluded that Plaintiff's denials of knowing RJ had a gun were false while Plaintiff's later admissions were, in fact, true. Plaintiff's insistence that he lacked knowledge of RJ's intentions are entirely beside the point. "Many putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established. *See Young v. City of Chicago*, 987 F.3d 641, 644-45 (7th Cir. 2021). At most, Plaintiff's denials gave Defendants a reason to momentarily second guess his incriminating statements, but that is not sufficient to prove the knowledge

---

[7] Detectives investigated Plaintiff's false story. Evidence presented at trial shows that Detectives interviewed David Portis and ruled out that he was shooting in the park because Portis denied any involvement, and no other witness stated that they saw David Portis shooting a gun in Amundsen Park.

requirement of a fabrication claim. *Mims*, 2024 WL 1075152 at *12 ("It does not satisfy the knowledge requirement to show that the officers had reason to doubt the evidence."). Accordingly, Plaintiff failed to present evidence sufficient to prove that Defendants knowingly fabricated any evidence, and judgment as a matter of law is appropriate.

### C. Plaintiff failed to prove causation and failed to prove any personal responsibility on behalf of Defendants.

Putting aside Plaintiff's failure to prove that Defendants knowingly fabricated evidence, Plaintiff also failed to prove that any fabricated evidence ***caused*** his injury. In order to prevail on his fabrication claim, Plaintiff is required to prove that the fabricated evidence at issue was both the "but-for cause" and the "proximate cause" of his injury. *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) (explaining Section 1983 incorporates standard tort principles of causation). Here, Plaintiff failed to introduce evidence from which a reasonable jury could conclude fabricated evidence was the proximate cause of his injury.

A plaintiff fails to prove proximate cause where the evidence shows there is a break in the causal chain due to a superseding or intervening cause. *Id*. at 583-84. The evidence in this case clearly establishes two superseding causes that prevent Defendants' police report or Defendant Mancuso's testimony from causing plaintiff's injury: (1) the Cook County State's Attorney's first-hand knowledge of and participation in the interrogation where Plaintiff made the incriminating statements, and (2) Plaintiff's criminal attorney agreeing by stipulation that the portion of the police report read by Defendant Mancuso reflected what was in the ERI video.

As the Seventh Circuit observed in *Whitlock*, the causal link between a police officer's fabrication and the victim's injury is be broken if prosecutors are aware of the allegedly fabricated evidence. *Id*. at 583. That is precisely the case here. ASA Spizzirri was present for—and elicited— Plaintiff's incriminating statements which were then summarized in Defendants' police report that

25

Plaintiff claims is fabricated. ASA Spizzirri also testified that multiple other prosecutors reviewed the evidence gathered by Defendants—and the ERI video—during the process of deciding whether to approve murder charges against Plaintiff. In other words, at Plaintiff's criminal trial, prosecutors had knowledge of exactly what transpired during Plaintiff's interrogation and, with that knowledge, still chose to have Defendant Mancuso testify using the police report—i.e., "prosecutors [knew] the truth and proceeded anyway." *Id*. (quoting *Buckley v. Fitzsimmons*, 20 F.3d 789, 797 (7th Cir. 1994)). The Cook County State's Attorney's Office's actions are a superseding cause.

The conduct of Plaintiff's criminal defense attorney amounts to a separate, superseding cause. During Plaintiff's criminal case, the prosecutor and the criminal defense attorneys agreed that the ERI system was working during Plaintiff's interrogation, and the parties stipulated to instead allow Defendant Mancuso to read portions of the police report regarding Plaintiff's incriminating statements. (Trial Tr. at 2162-2163.) Importantly, after Defendant Mancuso read the portions of the police report that Plaintiff now contends are fabricated, ***his criminal defense attorney stipulated that the report reflected what was on the ERI video***:

> WIENER:    I'd stipulate that's what's in his police report and that's what he was reading from and that's accurate.
>
> KERBIS:    ***That is also what is reflected on the ERI video.***
>
> WIENER:    ***So stipulated.***
>
> KERBIS:    Thank you. Thank you, Detective.

(Joint Ex. 328 at 36 (emphasis added).) Even assuming Detective Mancuso's summary was somehow fabricated (it is not; it is a summary of a recorded interview), the prosecutor and Plaintiff's own criminal defense attorney are responsible for any injury caused by its introduction at trial because the prosecutor and the criminal defense attorney ***agreed*** the police report reflected

what happened during Plaintiff's interrogation and ***approved*** of the contents of the police report being used against Plaintiff at his criminal trial. *See Whitlock*, 682 F.3d at 584 ("A superseding cause is something culpable that intervenes . . . , some action of a third party that makes the plaintiff's injury an unforeseeable consequence of the defendant's [actions].") The actions of Plaintiff's criminal defense attorney constitute a second superseding cause. Relatedly, Plaintiff's criminal defense attorney's voluntary stipulations during the criminal trial amount to a judicial admission that the police report reflects the ERI video and was a permitted substitution for the ERI video; Plaintiff is bound by this judicial admission and cannot now claim the contrary. *See Moran v. Calumet City*, 54 F.4th 483, 494 (7th Cir. 2022); *see also Whitlock*, 596 F.3d at 412 ("A judicial admission trumps evidence.").

Further still, plaintiff failed to prove that either Defendant was personally responsible for Plaintiff's alleged injury relating to the fabrication claim. Of course, the "guiding principle" behind section 1983 is that "liability is premised on the wrongdoer's personal responsibility." *Kuhn v. Goodlow*, 678 F.3d 552, 555-56 (7th Cir. 2012). An official cannot be held liable for damages "'unless he caused or participated in an alleged constitutional deprivation,'" *id*. at 556 (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)), or the deprivation occurred "'at his direction or with his knowledge and consent,'" *Wilson v. Warren County*, 830 F.3d 464, 469 (7th Cir. 2016) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). Put differently, a plaintiff must establish "an affirmative link" between the official and the challenged conduct. *Wolf-Lillie*, 699 F.2d at 869. Here, again, Plaintiff's fabrication claim is based solely a portion of a police report drafted by Detective Mancuso. Accordingly, Plaintiff has not shown Detective McDonald was involved in any way on this claim. Regarding Detective Mancuso, the evidence shows that, if Plaintiff suffered any injury, it was due to the conduct of the prosecutors and the

affirmative acquiescence of Plaintiff's criminal defense attorney; accordingly, Plaintiff also fails to prove Detective Mancuso bears any personal responsibility.

There is no proof that any Detective misled the prosecutors or defense counsel about the contents of the ERI and confession. Based on the foregoing, the evidence in this case shows there are at least two superseding causes that break the causal chain, and accordingly, Plaintiff has failed to prove the causation on his fabrication claim.

> ### D. Plaintiff failed to prove the allegedly fabricated evidence was material to his conviction.

Judgment as a matter of law on Plaintiff's fabrication claim is also appropriate because Plaintiff also failed to prove that the allegedly fabricated evidence was material. "To state a claim for fabrication of evidence, the fabricated evidence must have been used at trial and it must have been material…Evidence is material if 'there is a reasonable likelihood the evidence affected the judgment of the jury.'" *Olson v. Cross*, No. 18 CV 2523, 2024 WL 361200, at *10 (N.D. Ill. Jan. 30, 2024) (quoting *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020)).

Plaintiff's claim is that the summary was not an accurate reflection of the ERI, but as demonstrated above the difference, if any, was not material—it was not offered to be verbatim and the difference between what was actually said and the summary was minimal. In addition, the prosecution called multiple witnesses at Plaintiff's criminal trial—including Marisol Ocampo, Eugene Stanciel, Amanda Moore, Krystine Jenkins, and Jasmine Jenkins—to offer their accounts of the shooting that occurred at Amundsen Park on the night of August 30, 2008. (Trial Tr. at 2161-2162.) Those witnesses testified that Plaintiff drove RJ Branch to and from the shooting and that the shooting was precipitated by an altercation between Plaintiff's and RJ's sisters and a group of young men with which RJ Branch did not get along. Accordingly, Plaintiff failed to prove that

any inaccuracy in the portion of the police report read by Defendant Mancuso was material to the judge's decision to find Plaintiff guilty.

### E. Immunity shields Detective Mancuso from liability on Plaintiff's fabrication claim.

As explained above, Plaintiff abandoned all Fourteenth Amendment Due Process claims based on alleged fabrication of evidence except the claim that Detective Mancuso police report contained fabrications and that Detective Mancuso testified about the police report at Plaintiff's criminal trial. Given Plaintiff's narrowed claim presented at trial, Defendants are entitled to absolute immunity. It is well established that a police officer is absolutely immune from civil liability for any testimony provided at criminal trial. *Manning*, 355 F.3d at 1031-32 (7th Cir. 2004) ("[W]hen a witness commits perjury, he or she is granted absolute immunity from civil liability…[W]hen police officers testify as witnesses, they have the same protections."); *Brisco v. LaHue*, 60 U.S. 325, 331-32 (1983).[8] Accordingly, Defendants are entitled to absolute immunity on this claim.

Alternatively, Detectives McDonald and Mancuso (the only individual Defendants) are entitled to qualified immunity on Plaintiff's fabrication claim, shield them individually from judgment. As explained above, in order to overcome qualified immunity, Plaintiff must show that the contours of the right he claims Defendants violated were clearly established at the time of the alleged violation. (*Supra* at 17-18.) Again, to make such a showing, Plaintiff must demonstrate that a violation of the same right had been found in factually similar cases so that Defendants would have known their actions violated Plaintiff's rights. *Lee*, 533 F.3d at 512. Plaintiff can make no such showing. The factual scenario for Plaintiff's fabrication claim is this: Defendants drafted

---

[8] Defendants have maintained absolute immunity as an affirmative defense in this case. (*See* Dkt. 141 at 28.)

a report summarizing Plaintiff's incriminating statements provided in questioning by ASA Spizzirri during an interrogation that was recorded (and was thus available to prosecutors and Plaintiff's criminal defense attorney). By stipulation of the parties at the criminal trial, Defendant Mancuso was directed to read a portion of the police report, after which Plaintiff's criminal attorney stipulated that the contents of the report were reflected by the ERI video. Plaintiff can point to no case with remotely similar facts, let alone a case finding such conduct under the circumstances was a due process violation based on a fabrication theory. Accordingly, Defendants are entitled to qualified immunity on Plaintiff's fabrication claim.

## **<u>CONCLUSION</u>**

Based on the foregoing reasons and the reasons, Defendants ask the Court enter judgment in favor of Defendants on both of Plaintiff's claims.

Respectfully submitted,

Dated: September 16, 2024       **DEFENDANT OFFICERS**

By:   */s/ Kyle L. Flynn*

      One of Their Attorneys

John F. Gibbons
Kyle L. Flynn
Thomas Quinn Ford
Tyler Lynn Salway
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
gibbonsj@gtlaw.com
flynnk@gtlaw.com
fordq@gtlaw.com
salwayt@gtlaw.com


**DEFENDANT CITY OF CHICAGO**

By:   */s/ James P. Fieweger*

     One of Its attorneys

James P. Fieweger
Carolyn E. Isaac
Ashni Gandhi
Special Assistant Corporation Counsel
MICHAEL BEST & FRIEDRICH LLP
444 W. Lake Street, Suite 3200
Chicago, IL 60606
jpfieweger@michaelbest.com
ceisaac@michaelbest.com
ashni.gandhi@michaelbest.com

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that the foregoing document was served on all counsel via CM/ECF on September 16, 2024.

*/s/ Kyle L. Flynn*_____