IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARCEL BROWN,                         ) Case No. 19 C 4082
                                      )
                    Plaintiff,        )
                                      )
              vs.                     )
                                      )
MICHAEL MANCUSO AND GERI YANOW,       )
Personal Representative of the        )
Estate of KEVIN MCDONALD,             ) Chicago, Illinois
                                      ) August 26, 2024
              Defendants.             ) 2:57 o'clock p.m.


VOLUME ONE
EXCERPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:        LOEVY & LOEVY
                          BY:  MR. JONATHAN I. LOEVY
                               MR. LOCKE E. BOWMAN, III
                               MR. TOM KAYES
                          311 N. Aberdeen Street, 3rd Floor
                          Chicago, Illinois  60607

                          MACARTHUR JUSTICE CENTER
                          BY:  MS. VANESSA DEL VALLE
                               MR. JONATHAN M. MANES
                          160 E. Grand Avenue, 6th Floor
                          Chicago, Illinois 60611


For the Defendants:       GREENBERG TRAURIG, LLP
                          BY:  MR. JOHN F. GIBBONS
                               MR. KYLE L. FLYNN
                               MR. TYLER L. SALWAY
                               MR. QUINN FORD
                          77 W. Wacker Drive
                          Chicago, Illinois  60601

APPEARANCES (Cont'd):

Court Reporter:                JOSEPH RICKHOFF, CSR, RMR, CRR
                              Official Court Reporter
                              219 S. Dearborn St., Suite 2118
                              Chicago, Illinois  60604
                              (312) 435-5562
                              joseph_rickhoff@ilnd.uscourts.gov

              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                  PROCEEDINGS RECORDED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

                    *       *       *       *       *

              OPENING STATEMENT ON BEHALF OF PLAINTIFF

BY MR. LOEVY:

       May it please the Court, counsel.

       Before I begin, I want to thank you.  As Judge Jenkins said, everybody's busy.  Everybody's got a lot of things going on in their lives, responsibilities.  You have all agreed to take time out of your lives and participate in the jury system. And it is particularly important in a case like this where the allegation is that someone's important constitutional rights were violated, that someone had their rights violated by a state actor, by the government.

       He has a right to come to court and to have the community decide what's justice.  The Chicago Police Department's not going to decide what's justice.  Not even Judge Jenkins is going to decide what's justice.  You are, the community.  A cross-section of the community.  And it's a very important check and a balance of power, and you're going to see it's especially important in a case like this.

       So, thank you for participating.  It only works if people show up and do it.

       My name is Jon Loevy.  You've heard this is Marcel Brown.

       Let me tell you a little bit about Marcel.  He

graduated from Oak Park High School. He grew up on the West Side. He's a brother. He's a son. He is a father. He'll tell you in his own words, his child is about the most important thing in his life. He's had a longtime partner that he's been in love with for about 20 years.

But the most important thing about Marcel Brown, unfortunately, is -- the most salient thing is he's a wrongfully convicted person. He spent more than a decade in the Illinois Department of Corrections for a crime he didn't commit when he was just 18 years old. Just 18 years old. He was falsely accused of a murder that he was in no way involved with. And after a trial that went terribly, terribly wrong, he gets convicted and sentenced to 35 years. Sent to Menard, one of the difficult, toughest prisons in the Illinois Department of Justice -- Department of Corrections.

Now, I'm going to tell you a story, but I'm going to start at the end, because there's something of a happier ending. His conviction was overturned. That's why he's here. He's had some lawyers from the Northwestern Center on Wrongful Convictions. They helped him get back into court, and he was able to overturn it and walk out of prison.

But he lost a lot. He lost his entire 20s. And there's a big hole in his life. So, he's coming here in court seeking justice for what happened to him.

So, let me tell you his story. I'll back up now.

He grew up on the West Side, like I said.  He went to Oak Park-River Forest.  Normal childhood.  He's hanging out, he had quite a bit of friends.  He's a social guy.  He had a lot of cousins in the neighborhood.  He always worked from a young age.  He always had a few bucks in his pocket.  Love in his family.  He had sisters and a brother.  The sisters now, you'll meet some of them, one of them works for the Post Office, one of them works for Enterprise, and one of them's in college, his youngest one.

He was extremely close to his mother.  You're going to hear about that.  She worked for about 20 years on an assembly line, if I'm not mistaken, a factory.  And she will come to court and she will tell you about Marcel Brown.

So, Marcel was growing up, doing what he did, normal life.  August 30th, August 2008, that's when Marcel's life takes a different direction.

You're going to hear his mother decided to move the family to Oak Park.  Oak Park is nearby where he lived.  He was able to keep a lot of the same friends, but there were more opportunities, better high school than what he was used to, a different kind of people, and he was really excited and energized by it.

He met a girl in Oak Park.  He's going to tell you, it wasn't like the girls he knew before, and he really fell deeply, deeply in love.  He was with her for about a

year-and-a-half, and it got to the point where he was spending all his time with a her and his friends were like, Marcel, why you're not hanging out with us. But he was really, really in love with her.

And he got a job. He graduated high school. He was working at the Jewel in a warehouse. Not for very long. He was trying to figure out where his life was going to go. In the fall he was seriously considering enrolling in Triton College to better his opportunities.

So, everything goes wrong almost 16 years ago to the day, end of August 2008. Starts out like a normal day for Marcel. Saturday, he's a hanging out with his friends, his family. They're having a block party on the block, goes to the block party.

Later that night he goes to the White Castle. There's a White Castle in the neighborhood. It's where guys hang out, people hang out, girls and guys. Maybe 15 or more kids on Saturday night in the summer hanging out at the White Castle. He sees friends. He's just carefree.

He gets a call from his sister. His sister is over at Amundsen Park a few miles away. She says, hey, pick me up. We got a situation. She's fighting with some girls and she's with some of her cousins. And, so, Marcel says, all right, I will come pick you up. He's got his mother's car. She's his older sister. He's going to pick her up at Amundsen Park.

So, he gets over to get in the car. And a couple of his cousin come along, too. It's hard to remember all the names. Believe me, by the end of this week you'll know all the names. It's like watching a TV show. You get used to it.

But his cousin R.J. and his cousin T.J. T.J. is about his age. Their buddies. They spent quite a bit of time together. That's T.J.

R.J. is Marcel's younger cousin. Kid's about 15 years old. They got different friend sets. He's 18. The cousin's 15. But R.J. gets in the car, too, because both of his cousins have sisters in the park, too. So, they all -- and they got calls, too, from their sisters.

So, they drive over to Amundsen Park, three, four minutes, listening to music. They get to the park, Marcel parks. T.J. and R.J., the cousins, get out of the car to go pick up the sisters. Marcel's sitting in the car waiting, and nobody's coming back. So, he decides to get out of the car, too. He's got to go over the gate because it's closed at night. And he's walking into the park.

This is Amundsen Park. You'll see a lot about it. Just to orient you, here's the park. They park here along Bloomington. This is the fieldhouse.

MR. LOEVY: I'm sorry, your Honor, we needed the Elmo.

BY MR. LOEVY:

This is the park. Here's the fieldhouse here. They

park on Bloomington. And they jump over the fence and they walk into the park.

So, Marcel's walking. It's a Saturday night. There's a lot of people in the park, maybe 20, 50, who knows, hundred people. Everybody's doing their own thing. Some people are on the playground, people by the fieldhouse. People are hanging out in the park. He knows some of them. It's the neighborhood. And he walks into the park.

He gets about a hundred feet in, and he hears a gunshot, multiple gunshots in front of him. And, then, there was gunshots from a behind him. He hits the deck.

Now, Marcel -- this is a rough neighborhood. He's living in the Austin neighborhood. Sometimes there's gunfire. So, he hits the deck and he's on the ground. And when the gunfire stops, he gets up, runs back to his car. He runs back to his car. He jumps in his car.

About then R.J. and T.J. also get in the car. And he hears one last shot that sounds close to his car. So, he pulls a U-turn, drives away. What the heck just happened, he asked his cousins.

R.J. -- remember the 15-year-old? 15-year-old says, well, they were shooting at me and I shot back. A guy named Day-Day was shooting at me. Day-Day is David Portis, the guy from the neighborhood. I shot back. Marcel doesn't want anything to do with that. He just went to pick up his sister.

He drops off R.J. R.J. gets out. He goes home. And it's lucky for him because the police pull him over. They search. There's nothing in the car. He goes home.

The next morning all kinds of rumors going around. His phone is lighting up about that shooting in the park. Apparently, a boy got killed. People are saying a guy named Paris Jackson, another kid in the neighborhood. Marcel knew him. Knew him from school. Nice kid. His body was found in the park the next morning. And there's rumors that A.J. -- that R.J. was involved and R.J. might have shot him and nobody's sure what happened.

The next day, Marcel's at his house, and R.J., the cousin, comes over and some of their parents come over and everyone wants to know what happened and R.J. tells them. A kid named Day-Day was shooting at me. I shot back. That's what happened.

Whatever happened it had absolutely nothing to do with Marcel. He was in the park, the shooting happens, he hits the deck.

Now I want to break in here and explain a little bit about criminal law. You're going to have to become something of an expert in criminal law, or at least get familiar with it.

If you shoot somebody in a premeditated way, that's murder. You go to prison for period.

R.J.'s got a problem. He shot a gun. That's murder.

What Marcel did is not murder. If you drive somebody someplace and you don't know what they're going to do, when they get out of the car and they go commit a crime, you're not guilty of murder, first degree murder.

For example, if I took Locke downtown, drove him to a restaurant, he got out, got into a fight with somebody and shot him, that's Locke's problem, not my problem. Doesn't matter that I drove him to the restaurant. What would make me guilty of murder is if I shared a plan with Locke. If I said, hey, Locke, let's go to this restaurant and shoot somebody, you got a gun, I give him a gun or whatever, I drive him to the restaurant and we're sharing a plan, then I'm guilty of murder, too. That's called accomplice liability. You don't have to actually pull the trigger, but you have to be involved.

So, you see, there's two different things. There's if I'm involved, I'm driving Locke, I know what the plan is, I know he's got a gun, I know he's going to get him, I'm guilty as he is. But if I just drive my cousin to the park and nobody knew anybody was going to shoot anybody and he does a dumb thing, I'm not guilty of murder.

And that's, of course, Marcel. Marcel is innocent. He hasn't done anything wrong. He gave his cousin a ride to the park. People are shooting. It's got nothing to do with him.

So, how does he end up guilty of murder?

Well, let me tell you what happens next.

Labor Day goes by -- again, almost 16 years to the day -- then Tuesday, then Wednesday. It's a normal Wednesday.

Now, at this point in Marcel's life, he has graduated high school. Every day at 5:00 a.m. for as long as he can remember, he wakes up early and takes his mother to her car. She works and it's a tough neighborhood, so he walks her to her car. And I tell you that not to tell you that Marcel's a saint. He's not a saint. Nobody's a saint. But he had a very close relationship with his mother. And later when he was separated from her, it hurt him dearly.

So, he drives -- walks his mother to her car, goes back, gets his brother and sisters ready for school, the younger one. You know, make sure they got the right backpack and the right books and, you know, takes them to school. He drives them to school. He drives his girlfriend to school. That was around the time he's working for Jewel.

At the end of the day, he goes home. His mother's home. The police knock on the door. They're not terribly surprised. I mean, he might be a witness. So he's got to talk to the police.

The police come into the living room and, hey, Marcel, we want to talk to you.

Now, Marcel, his family had previously been a witness in a case. Somebody had shot and a bullet went into their

house, so they had dealt with the police. So, Marcel's like, all right, let's talk right here. I can talk to you.

And they're like, no, no, you got to come down. Got to come down.

Marcel doesn't have a choice. His mother encourages him to cooperate. He's got nothing to hide. He didn't do anything wrong.

So, he gets in the car, he goes to the police station.

Now, there's some question that you're going to have to resolve about whether Marcel was under arrest. I mean, they didn't tell him he was under arrest. They made him think he was going to be sort of a witness. But, apparently, they had already decided to arrest him for murder. They sort of prejudged him.

So, they put him in the station. They put him in a little interrogation room that is not much bigger than, say, that witness box, ten by ten. And he doesn't leave that room for 34 hours. 34 hours. September 3rd, all night; September 4th, all day, all night; into September 5th. 34 hours he is interrogated. They're trying to get him to confess to murder.

Now, there's a couple of problems with this murder case against Marcel Brown. Here's the first problem. It's kind of strange, but there's actually no body. The boy who died, Paris Jackson, they didn't find his body in the park till the next morning. So, that night when the gunfire happened,

nobody noticed that Paris Jackson got killed. Nobody in the park. They talked to 20 people. They're going to give you the names. 50 people. Not one person saw Paris Jackson get shot. Nobody.

And if he was in the park -- it's not even clear he was -- his friends would have seen him in the park. Nobody saw Paris shot.

The other thing they can't find, nobody finds that night, is Paris' body. And I'm sorry to show you the photos, but here's Paris. Here's where they find him the next morning, lying by the fieldhouse I showed you. Remember the fieldhouse?

So, Paris' body is lying by the fieldhouse at 9:00 a.m. that morning.

But the question is, why did nobody see Paris' body the night before? There was half a dozen police cars dispatched there. They're searching the scene. They're looking for evidence. They're looking for people. They're looking for anybody hurt. Nobody sees Paris' body. No witness sees Paris' body.

So, it's possible -- and I don't know what happened in the park. Nobody does. It's possible that Paris' body was dragged to the park or dumped in the park and wasn't shot there. There's very good evidence to believe why, and I'll tell you. There's no blood under Paris Jackson.

So, Paris Jackson was shot in the heart, and you're

going to hear from medical experts who are going to tell you, that's a lot of blood. A shot in the heart, blood's coming out.

Now, when the police found him the next morning, they searched this grate carefully. And they actually opened the grate, went down underneath there, looking for blood. You know how much blood they found? Zero. No blood at all.

So, you are going to hear tomorrow from Dr. Arden, who is going to tell you, boy, if a guy gets shot IN the heart and died that night, there would be blood because his shirt's bloody, it would have touched the grate. You can't get shot in the heart, die -- run a little bit and then die and not leave blood.

So, there's a good possibility that Paris Jackson wasn't even shot in the park that night, the murder that the police are investigating.

And you're going to hear about what the police officers did or didn't do about that.

The bigger problem, though, in the case against Marcel Brown is, he hasn't committed a crime. He hasn't done anything wrong.

If you're Marcel Brown -- and you're going to see the interrogation video -- he's like, look, I drove my cousin to the park. I was picking up my sister. I wasn't trying to hurt anybody. I didn't know anybody was going to get hurt.

If that's true, that's not murder. That's not murder. There's going to be no dispute that if you believe, and if the police had believed Marcel, that all he did was drive his cousin to the park, didn't know nothing was going to go down, didn't have any plan, didn't even know the kid had a gun, then he's not guilty of murder.

So, what the police did was they spent 34 hours banging away at this kid trying to get him to admit he knew something was going to go down, to admit something that wasn't true.

It was not true. He didn't know R.J. had a gun and he didn't know about any plan.

You're going to hear about this interrogation. They denied him the right to a lawyer. They denied him a right to a phone call. I've already told you how long it went. They isolated him in this little room.

You're going to see 18-year-old Marcel. Marcel is bigger now. He's older. He was 18. He's a child. An 18-year-old is a child. And he's crying in there, and he's trying to tell the police he doesn't know anything, and they're just not accepting it.

I'm going to talk to you about the interrogation. But the interesting thing about the interrogation is, it's on video.

So, they put him in this room. And Marcel didn't know

Opening Statement - Loevy

16

it, but there was a camera in the corner. See that -- that's not a camera, but it's like nobody notices it. And the police knew there was a camera because they were recording it. So, there's this asymmetry here. And you can tell the police are being careful what they say. They're even being polite because they know this is going to be video. Marcel doesn't know there's a camera.

And on that camera, you can watch them over the course of September 3rd, 4th and 5th coerce this kid. And you can see them violate his rights.

You know, they passed a law in the early 2000s that you have to video record interrogations exactly for this reason. We don't have to argue about what happened in the room. We have videotape of what happened in the room.

And you will see that video. You'll see a lot of it. And it's agonizing. Marcel has to watch it. It's like watching a child version of himself be abused.

They will not accept what he's telling them. They will not accept that he had nothing to do with this.

So, maybe 50 times, maybe more, he's on video and he's telling the police, I don't know anything about the plan. Here's all the times on the timestamps. I didn't know anything about a plan. I didn't know anything about a gun. Over and over and over again.

And they just won't accept it. And they're leaning on

him and they're trying to get him -- he thinks they're going after R.J., his cousin. So, eventually he makes some sort of ambiguous statements about R.J., and I'll tell you how it went down. And they're like, ah-ha, now you falsely confessed.

So I'm going to talk about that. I don't to get too far ahead of it, but I want to introduce the concept of a false confession. We've heard false confession, wrongful conviction. What is that?

If somebody confesses to a crime -- Marcel said, all right, I knew he had a gun, that's a confession. That's against his interest.

For a long time in the criminal justice system we thought, okay, you're guilty. Who would confess to a crime if you didn't commit the crime? If you confessed, you're guilty. So, everybody got convicted, end of the case.

What happened was in the '80s and the '90s, DNA exonerations started happening. In other words, you have a crime, somebody would get convicted, say a rape. And everybody knew he was guilty because he's convicted and he confessed, et cetera, et cetera.

And, then, remember the technology advanced. Some of the older people remember there wasn't DNA before. And, then, DNA happened and then they could actually go back and say, you know what, did you rape that person? And they test the DNA, and they say, you know what, you didn't rape that person. They

could prove to a scientific certainty that some people are innocent.

So, that's not every case, but in some cases, you can prove, if it's a rape case and the person didn't have sex with somebody else and it's yes or no, they did or they didn't. And they started learning that there are DNA exonerations.

So, Dr. Cutler and social scientists like him said, this is a really interesting phenomena. I want to study this. Why would people confess to something that they didn't do?

And they looked that subset of maybe 300 DNA exonerations, the early subset. And in 24 percent of them, somebody had confessed.

So, you got people that are definitely innocent, no question they're innocent, in one-quarter of those cases the person had given a confession. And the social scientists said, well, that's fascinating. Why would somebody confess if we know they're innocent? Again, no question they're innocent. Why would they confess?

And they started looking at factors that cause false confessions. And those factors are this case. Let me show you what some of those factors are.

The first factor that correlates with false confessions is a very young person.

When Marcel got put in that room, he is 18 years old. He is not fully formed. I don't know how many of you have

18-year-olds. I got three that used to be. They're like children but bigger. They are not fully formed. They don't comprehend so good. They don't have good judgment. They really are immature.

And it's not the same thing as interrogating a fully formed adult. And the people interrogating Marcel are fully formed adults. They're basically almost my age. So, they've done this hundreds of times. It's a real imbalance here.

And when you're a child and they go at you like that, sometimes bad things happen, particularly over 34 hours.

So, there's a lot of -- the false confessions tend to correlate, tend to aggregate around very, very young people like Marcel Brown.

Another factor is that Marcel was denied a lawyer. Now, this is super messed up. Marcel's in the police station. He's in the interview room. His cousin -- remember I told you his cousin R.J., who actually shot a gun -- his parents decide to surrender him. His parents bring him to the station with a lawyer. The guy's name is Wham Cary. He's a memorable guy because he had a mohawk.

And Wham Cary surrenders R.J. And they simply what to talk to R.J., and Wham Cary says, no, you're not. That is America. He has a right to remain silent. You can talk to him -- I'm going to talk to him. You're not going to talk to him.

In America, you've heard, you have a right to remain silent. You have a right to an attorney. Those aren't just words. That means you have a right to an attorney. You have a right to remain silent.

So, Wham says, thank you very much, R.J. is not going to be speaking to you today.

Marcel's mother's in the police station that day, too. She says to Wham, can I hire you? I need a lawyer, too. He says, well, it's going to cost you a few hundred bucks. She goes to the machine. She can prove it. She withdraws the money. She hires Wham Cary. So, now Marcel's got a lawyer.

Marcel's lawyer walks in the police station, says, I want to talk to my client Marcel Brown. You guys got him in an interview room up there on the -- you know, whatever floor. And they say, hold on a second.

Then the Chicago Police Department does what the Chicago Police Department's going to do. And they would have come to Mr. Mancuso. He's the lead investigator. Because that's the way it works. If there's an attorney there, they contact the detective who is leading the investigation. He's not going to deny that. It would have come to him.

So, then they come back to Wham Cary and they say, listen, Marcel, he doesn't want to talk to his attorney. He doesn't want to talk to you. That's what they tell Wham Cary.

Wham Cary says, I remember that because that's the

only time in my entire career I can ever remember someone saying, I don't want to talk to my attorney.

So, they don't let him in.

And you know what? That's not true. We have a video of the interrogation. Nobody says to Marcel, hey, your attorney's here, you want to talk to him? Didn't happen. We have a video.

So, they lie to Wham Cary. They lie to Marcel's mother. And they never tell Marcel.

So, he was denied an attorney, and he was denied an attorney on purpose. That is going to go to the totality of the circumstances.

Another thing he was denied was a phone call. Marcel says right there on the video, almost right away, I need to talk to my mom. Can I call my mom?

Mr. Mancuso says, give us five minutes. They had taken his phone.

And Marcel was cooperative. Gave him the password. I got to nothing to hide. Here's my phone, here's my password, you can go see who I called. I didn't do anything wrong.

That's Marcel's only point. I didn't do anything wrong. I was -- I was as surprised as anybody. I didn't murder anybody. I didn't have anything to do with any murder. You want my phone, you want my password, fine.

He says, I want to talk to my mother.

On that video, maybe five times, maybe more, maybe six times, he's saying, listen, I want to call my mom. Because it's uncomfortable for him. He's like, I didn't do anything. They wouldn't accept it. He's like, I didn't do anything. They wouldn't accept it. He's like, can I call my mom? And they keep telling him, five minutes, five minutes.

Well, 3:00 p.m. on September 3rd, September 3rd goes by, doesn't get a call. September 4th goes by, doesn't get a call. He's asking for a call. On September 5th, after he supposedly confessed, they're like, okay, time for your phone call. But by then it's too late.

So, these are not police officers playing fair. What the evidence is going to show you is that they cheated and that they exploited this child when he was a child.

Another factor here is the 34-hour interrogation.

Now, you're not detectives, and you don't know how long an interrogation is supposed to last. But it ain't 34 hours. You're going to hear from experts who are going to tell you that the average interrogation is two hours in a felony case like this. Two hours. The whole incident took a half an hour, tops. So, I mean, how many times can you ask the question?

If you do an investigation properly, you ask all your questions, you take your time, and then it's over. You don't keep going trying to break somebody's will. This isn't the TV

and this isn't the movies. You ask them the questions and then you're done.

This didn't go two hours. This didn't go four hours. It went from September 3rd, starts about 3:00 o'clock, goes all the way to midnight. He's up all night. They wake him 3:00, 4:00 in the morning. Goes all the way through the 4th and into the 5th.

You're going to hear Dr. Cutler, the wrongful conviction guy, says any interrogation over -- remember they studied the data for false confessions and wrongful convictions, and they found when interrogations went over four hours, when they went over four hours, that's when you started having a problem with false confessions and wrongful convictions.

This wasn't four hours. This is 34 hours. And you can literally watch this boy -- he's not a boy now, he's a man, but he's a boy then. You can watch him decompose. You can watch him start crying, start talking to himself, freaking out. He keeps telling them, I didn't do anything wrong, and they keep not accepting that.

It's way too long. They broke his will.

Another factor is the cold. The first thing that happens when Marcel gets in this room, they're like, wow, it's cold in here. And you can see him huddling with blankets.

It's cold on purpose. It's by design. He doesn't

have a thermostat in that room, he doesn't have any control of this room. It's a little windowless room with a door covered, completely black. You don't know what time it is, you don't know anything. But it's cold in there on purpose.

They give him a blanket that doesn't -- you know, they give him a blanket. And on interrogation he's asking more. I'm cold, I'm cold, I'm cold. They give him a shirt, a T-shirt. They're like, sorry, we can't find a blanket. So, he's wrapped in a T-shirt.

He doesn't know he's on a videotape. This is a boy trying to stay warm for 34 hours. And I don't like being cold, maybe you don't. It wears you down. It wears down your resistance. And that's why they did it to him. That's why they did it to him on purpose, to try to break him down.

Another thing that broke him down was the lack of sleep. Remember, he had been up at 5:00 a.m. on September 3rd. Maybe he went back to sleep, got some sleep. But when he gets to the police station, it's 3:00 in the afternoon. They interrogate him all night. You can see it on the video. They're talking to him at 3:00 in the morning. They're talking to him at 4:00 in the morning. They're waking him.

He actually tries to get a little sleep. They knock on the door at 4:00 o'clock.

And they can see. It's not just a recorder, they can watch. So, when he goes to sleep, they bang on the door, they

come in, hey, didn't you say this? Didn't you say this? He wakes up, you can tell -- he sits up. He's like, okay. You could tell he's disoriented.

This is not a good-faith interrogation.

They wake -- so he gets -- in this room, there's no bed. There's no pillow. There is a bench that's maybe four feet, so you can't really sleep on it. It's super narrow. Fortunately, he was very narrow back then. He weighed 105 pounds. But it's a little, tiny bench you can't sleep on. And the floor -- it's a steel bench and it's a hard tile floor and there's no pillow. So, it's not designed to be a room that you sleep in. It's designed to be a room where they ask you questions.

So, he is up all night that first night. He lies down for a few hours, but they're going back at him the next morning. He's up all day.

When he finally gives his confession, it's after midnight on the third day. So, that is sleep deprivation.

Sleep deprivation is real. You know, if some of us have pulled an all-nighter, this is like a pulling a double all-nighter. You lose your judgment. It's disorienting. Makes you feel sick and confused.

And that's what they did to him. That is no way to interrogate somebody. They did it on purpose.

He also didn't eat. You know, you can see on the

video, they keep saying to him, hey, you want some water?  You want some chips?  They did offer him chips.

He gets no meal on the first day.  On the second day, he got one meal.  He got a McDonald's in the morning.  They said, here's an egg sandwich or something.  He eats it midmorning.  He eats no food for the rest of the day and into the next day.

Now, they're on video.  And believe me, the police know they're on video.  So, they did offer him food.  Let's be clear.  By maybe midafternoon they offered him some sandwiches.

They're like, Marcel, why aren't you eating that?  He's like -- he tells them, because I'm scared.  I'm terrified.  I'm thinking about survival.

Remember, this is an interrogation where they're going after him, going after him, going after him.  They're saying, you knew, knew you, you knew.  He said, I didn't know, I didn't know, I didn't know.  He literally can't eat.

So, they weren't starving him, to be clear.  They gave him those sandwiches on the second day.  But he was -- they could see with their own eyes that this is a boy who hadn't eaten in two days, a teenager, and he literally couldn't eat.  And they kept going and they kept going.

Isolation.  I told you, the room is four by four.  The walls -- you know, there's no clock.  There's no windows.  Soon he didn't know if it was day or night.  He's just in a

completely windowless room locked in there.

What they would do is they'd interrogate him a little bit and then they'd leave. Then they'd come back, and then they'd leave. And, then, somebody else would come in. Three, four, five detectives are tag teaming him. One of them goes home to sleep. Another one goes in there. Marcel didn't get to go home and go to sleep. They're tag teaming him. Different detectives are coming in. It's disorienting. He is socially isolated by design.

Because remember, he's not getting a phone call. So, what they're trying to do is just increase the pressure on him. His entire universe became this room. He is completely dependent on the detectives. He wants to eat, they got to feed him. He wants to go to the bathroom, he's got to knock on the door. They got to let him do it. He wants to drink, they got to give him water.

And you can see on some of these clips, they sort of reward him with chips when he comes toward them. He's completely dependent. He's completely isolated.

That's how wrongful confessions happen. You don't have to interrogate somebody that way. You can sit them down. You can take out a pen and ask them questions. You can say thank you very much, we're going to go out and do our job now.

This is not how they handled it. They didn't respect Marcel. They thought they could get away with it. And it was

not fair.

They kept him out of the lockup. So, remember this room is for asking questions. There's a facility in the police department called the lockup where you're supposed to take people to go to sleep. There's bedding and pillows in the lockup. There's phones in the lockup. There's people in the lockup.

So, when it got to be nighttime, they had a choice. They could have said, Marcel, we're going to take you to the lockup and come back in the morning. They didn't do that. They didn't do that. Then he would have been able to sleep. Then he would have been able to talk to people. He would have been able to maybe call his mother. They kept him locked in that room where there's no bedding and no pillows, and they kept him there on purpose.

They used lies and trickery.

Now, I want to be clear. They're allowed to lie to suspects. The judge is going to tell you that. Now, you are allowed to lie to suspects, but you're not required to lie to suspects. That's a choice that they made. You can if you want to because the law lets you. But you don't have to.

And they certainly lied to Marcel. They're telling him all kinds of lies. They're saying, hey, Marcel, we talked to all these people and your cousin's saying you knew about the gun. He's like, no, he didn't, because I didn't know about the

gun.  I don't believe you.  You know, they're trying to get him to say it.  He's like, no way.

They lied to him about how many shots there were. They tell him, oh, we got witnesses saying there was just a few shots and you're trying to tell us there was ten shots.

They had 911 tapes that were contradicting what they were telling Marcel.

So, they were lying to him while they were contaminating him, trying to get him to come over to their story.

And what is contamination?  Contamination means, when you do an interview and interrogation, if you do it the proper way, you're supposed to say, you tell me what happened and I'll write it down.

On that video, they spent all their time telling Marcel what happened.  The detectives are like, oh, we talked to 20 people, Marcel.  We talked to all these people.  Here's what they're telling us.  They're telling us that R.J. this, and they're telling us that you guys did this, and they're telling us there was a boy.  And you could see Marcel's like, okay.  But they're telling him.  Because what they're doing is they're grooming him to try to be a witness.  They're hoping he will be a witness.

Marcel basically knew nothing.  He walks into the park.  He didn't see anybody shooting.  He didn't see R.J.

shooting, and he didn't see Day-Day shooting. All he knows is when he got back in the car, his cousin told him, Day-Day was shooting at me, I shot back. He didn't know anything about anything.

So, the police on this video are feeding him all the information one way. He doesn't know anything. They're feeding it to him and trying to get him to parrot it back.

I've told you about the asymmetry of information. They knew it was being recorded and Marcel didn't. So, every time you watch those video clips when the police are being real careful about what they're saying, keep in mind, they know that we're making a record, he doesn't.

And he does just fine. He is honest and clear and legit. And the police -- at a few points, the police are like pushing him too far, and he starts to say, look, if you guys want me to lie, I'll lie. I mean, I can tell you're trying to get me to lie. And they're like, no, no, no, we don't want you to lie, we just want you to tell the truth. Because they know they're being recorded and they are pushing him to lie.

They also used threats. And this is not a fair tactic. Bottom line is, they tell Marcel after those interview that, listen, you're going to prison. You're going to prison for 30, 40 years, unless you start telling us what we want to hear.

And Marcel says, I've told you 50 times what I know,

which is, I didn't know he had a gun. I didn't know there was a plan. I didn't know.

And they're telling him over and over and over again, you need to start changing your story. You need to start telling us R.J. had a gun, and you need to start telling us R.J. had a gun, over and over, or you're going to prison.

And you're going to watch a lot of those videos, and it's going to be long, because it's really -- really the case is about what happened in that room. So, you're going to probably when it's all over have seen an hour or more of those videos. And you can see them saying to Marcel, we need the truth, because they know the video's on. And Marcel keeps saying, I told you the truth. And they keep saying, not that truth, we need the other truth. And Marcel keeps trying and trying, and they're not just not accepting it.

Marcel does -- at some point they start to move Marcel about R.J. So, there's several phases of this interrogation. When Marcel gets in the room, Marcel says, look, Day-Day was shooting at R.J., R.J. shot back. That's what Marcel had been told.

And at some point after the first day, they say, we're not going to accept that. You're not getting out of this room if you keep saying that. And Marcel says, fine, I didn't see it. You know, whatever you say. And he says, R.J. was shooting. I didn't know anything about Day-Day. I didn't see

Day-Day. R.J. was shooting. Can I go home now? I've told you the truth. I'm admitting R.J. shot. He didn't actually see R.J. shoot, but he's like, you guys want R.J., I will admit R.J. shot. Can I go home now? And he still can't go home.

So, they push him, and he goes a little further. And he says, can I go home? And he goes a little further, and he says, can I go home? They're like, nope, not going home yet, not going home yet.

So, he starts saying things about R.J. Yeah, R.J.'s a trouble maker. Yeah, R.J. would carry guns. Yeah, R.J. sat said in the backseat -- a police officer says to Marcel on video, hey, wasn't he in the backseat saying I'm going to go F those N words up? The police officer says that to Marcel. And, then, a few hours later Marcel says, okay, that's what happened.

Marcel doesn't say it. The police officer says it to Marcel. And, then, Marcel says, can I go home, can I go home? And they say, no, no, no, and no.

And, then, hours later he says, okay, okay. He was in the backseat saying, I'm going to go F those people up. Can I go home now?

So, you just watch them push Marcel, push Marcel, push Marcel. You watch him just break down in front of your eyes. He can't make it stop.

He's crying. He's confused. He's tired. He's asking

them, what is going to get me out of this room? What do I need to say? And they keep saying, you got to tell the truth. And he keeps saying, I did tell the truth. I didn't know R.J. had a gun. R.J. shot, told me he shot. That's all I know.

That truth's not good enough. That truth's not good enough.

Can I go home? Can I go home? No, no, no, no, no.

Well, who is going to decide?

And, then, they let him know that the state's attorney is the one who is going to make the decisions. State's attorney is the lawyer, the charging person.

So, they tell him about 2:00 o'clock on day two -- because he keeps saying, can I go home? What did I do to go home? I didn't do anything wrong. I didn't do anything wrong. What's it going to take for me to go home?

Well, the state's attorney's going to decide.

So, Marcel starts knocking on the door that afternoon saying, can I talk to the state's attorney? Which is a pretty goofy thing. It's sort of unusual. Usually the guy in the interrogation room doesn't want to talk to the prosecutor. Prosecutor's the one who prosecutes. He's banging on door, I want to talk to the state's attorney, I want to talk to the state's attorney. He probably says it a half dozen times or more.

Why do you want to talk to the state's attorney?

I want to tell the state's attorney what I know, which is nothing, because the cops are saying, you got to get to the truth, got to get to the truth.

So, he's asking over and over. And finally, maybe 10:00 o'clock, 11:00 o'clock that night on night two they bring the state's attorney. And Marcel tells his story. Basically, they had been rehearsing for 30 hours at this point.

So, he tells them the stuff they want to hear about R.J. R.J. shot a gun. R.J. was saying, F those people up in the backseat.

And they ask him, hey, did you know there was a plan and did you know there was a gun? And he says, no. I can't help you. I didn't know he had a gun. And I didn't know there was a plan. And that's all it's ever going to be.

Now, at one point they push him too hard, because he says over and over again, 50 times, I didn't know. And he says, listen -- and Marcel, you can tell, not super sophisticated. Smart guy. Not -- you know, he is a very smart guy, but he doesn't think as fast as the police are thinking because he hasn't done this before.

So, at point he says, look, you guys are telling me I'm not going to go home until I say what you want to hear. If you want me to say it, I'll say it. But it's not true.

And they're like, whoa, whoa, I hope that didn't happen on the camera, because they knew there was a camera.

But after, like, 30 hours he's like, we're going in circles, guys. If you want me to say I knew R.J. had a gun, I'll say it if that's what it's going to take.

And they're no, no, no, we want you to tell us the truth. We want you to tell us a different truth.

So, they knew -- these police officers knew the score. He was clear 50 to a hundred times: I didn't know he had a gun.

So, he tells the state's attorney the same story, and she's like, not good enough. I don't know if you're going to be able to go home. Last chance, Marcel. Last chance.

Then she leaves. Then she comes back and they're banging on the door. And he's talking to himself. I just want to go home. I don't know if it's day or night. I've been in here since September 3rd. I haven't slept since September 2nd. What is it going to take?

So, they're basically psychologically torturing this guy.

Now, to the extent he confesses, it really ain't much of a confession. I mean, they get him to say, all right, you know, I guess I knew he had a gun because of the way he was acting. And, so, yeah, I probably could have figured out he had a gun.

You could tell his heart's not in it because it's not true. But he's like, now can I go home? And, you know, we'll think about it. We'll think about it, Marcel. She leaves.

Then Mancuso comes back after midnight one more time. He tries again. I mean, you're going to see a video. They come at him from every angle a human can come at him, and he just keeps telling him the truth.

Marcel knows not everything, but he knows something. He knows his cousin didn't have -- he didn't know his cousin had a gun. And he knew he wasn't going to the park to cause any trouble. He was going to the park to pick up his sister. That he knows. And you will hear him and you will see that video and you will believe that.

And you know what, that's not guilty of murder. That's why they spent 34 hours with him. Because if he was just going to the park to his pick up his sister and he didn't know R.J. had a gun in his pocket, then he ain't guilty of murder.

So, they're going after him for 34 hours trying to get him to change. Mancuso goes in there one last time. He's like, I didn't know. I didn't know.

He's saying, am I going to be charged? Am I going to be charged? He's actually got it backwards. He thinks they're after R.J.

And if you want to understand the case, that's what's going on. He thinks they're after R.J. He thinks that they're trying to get him to say that so R.J. will get in trouble. And he's like, I told you the truth. R.J. shot. I didn't know he

had a gun. I didn't know about any plan.

Then he says to that police officer, can you help me? Are you going to help me get out of this?

Mancuso has played this kid, and he knows it. He doesn't even have the guts to tell him, you're not going to anywhere.

So, where do they take him next? They take him to the Cook County Jail. And Marcel is a little confused because he thought he was going home because he's now explained, I didn't do anything.

But they put him into Cook County Jail and he gets processed. And all of a sudden he's getting strip searched with a bunch of -- 60 grown men. And he's like, I've never been naked in front of a man. I'm just a child. He's five-four. He's 105 pounds. I'm 150, and he's two-thirds of me and I'm not big. He was five-four. He was a little, little guy in there with adults.

And he gets strip searched. And, then, he gets thrown into a Cook County Jail, a violent, dangerous place. People attack him. There's -- people try to rape him. People try to hurt him. And he doesn't understand why this is happening.

He finally gets to talk to his mother, but it's too late. And he spends two years in the county jail waiting for his trial. And the trial happened. And the trial actually takes more than a year. Thank God that wasn't your -- but it

was more than a year because it kept getting continued. He'd show up, nothing would happen. He would show up, nothing would happen.

They finally have this trial. There's no witnesses. Because Marcel didn't do anything wrong. You know, R.J. gets convicted because he shot a gun. But Marcel didn't do anything wrong. This is no witness against Marcel against Mancuso.

The police officer gets up there and he testifies -- first he testified at the grand jury that Marcel Brown gave a statement admitting he drove Branch to the park, and that he knew Branch had the intention of shooting someone.

That's not true. You're going to see two hours of video where he says no a hundred times. Not true.

But the judge believes Mancuso, and Marcel Brown, in front of his family, is found guilty.

And you can just imagine what's going on in his head. What is happening? I went to pick up my sister, people are shooting, and I ran away. Why did I just get found guilty and why am I going to prison for 35 years?

He gets sent to Menard prison -- and I'll talk about that -- for 35 years. And his family is there. His mother is there. And he's taken away.

And I told you that his conviction was overturned and he was exonerated. And he is now here seeking justice. So, he's got this lawsuit.

Let me tell you a little bit about the claims in this lawsuit.

He's suing for a coerced confession. He's suing for the involuntary confession. I've talked about the factors that led to it. It's a totality of the circumstances inquiry.

And you're going to find that he did have his will overborne. That was their intention, and that's what they did to him.

You're going to hear about fabrication of evidence, conspiracy, other claims.

There's another important claim, suppression of evidence. Let me tell you a little bit about that.

The police are obligated to turn over what's called exculpatory evidence. So, they're the investigators. They don't just turn over to the prosecution the stuff that's bad for you, the stuff that points at your guilt. They turn that over to the prosecutors.

Remember, prosecutors, criminal defense attorneys. They're going to have a trial, just like this trial, when they clash and they try to win.

But the state has an obligation to turn over the exculpatory stuff, too, the stuff that's good for you. If they discover evidence that helps you prove your innocence -- it's a great country we live in -- they have to turn that over, too.

And the police did not turn over the good stuff. They

had at least two witnesses saying that there was more than one shooter, that there were a lot of shots. And they had a witness saying Paris Jackson was alive in that park after the gunshots.

He is going to say that he told them this, that Paris Jackson was alive. Remember his body was found the next morning? The police didn't write that down. Their police report source is very ambiguous what he said. They didn't write that down. They didn't write down the stuff that would have been good for Marcel.

They wrote down 20 witness statements, and you're going to hear about those witness statements a little bit. They interviewed people in the park. Nobody in the park's got anything to say about Marcel. Marcel was in the park. He didn't shoot anybody. He didn't do anything. He wasn't even with R.J. He was in the park. None of the witnesses say anything about Marcel Brown doing anything wrong.

They talked to 20 people, they talked to 50 people. Nobody saw Marcel Brown do a single thing wrong.

So, the other two jury instructions I want to mention really quickly. You're allowed to use your common sense. You're like, I never -- I'm not a detective, I never bumped into any of this. You're supposed to bring your life experiences in and use your common sense.

The other instruction is the preponderance. This is

not a criminal case.  There are no criminal implications for anybody.  It's a civil case.  Justice between the parties.

So, in a criminal case you've heard beyond a reasonable doubt.  That's not this case.  This is more likely than not.

So, if you put all the evidence favoring the plaintiff, all the evidence favoring the defendants, which one is more likely true?  If it's a dead tie, the plaintiff loses because we have the burden of proof.  But all you're trying to decide is which side's making more sense to me?  And that's an easy question here and it's going to be an easy question.

I'm going to talk about two more things and then I'm going to sit.

But the first thing is the defendants' evidence, and then I want to talk about damages.

So, what have the defendants got?  They got no witnesses, because Marcel Brown didn't do anything.  They may call a woman named Marisol Ocampo.  I don't think she's going to show up.  We'll see.  She may, she may not.  She gave a deposition.  She said, I don't want anything to do with this.

But back when she was young, 16 years ago, she was in the park that night.  Apparently, she stabbed somebody, because there was a police report saying that people were saying she stabbed somebody.  So, she's either sort of under arrest --
this is the woman that gives the statement.

Not only that but her boyfriend, Eugene, he got arrested, too, for having a gun. There's a shooting in the park and somebody's saying Eugene was one of the people shooting.

So, you got two people in trouble, Marisol and Eugene. And they had a baby in the park and she was pregnant. And somehow Marisol spent 15 hours in the police station. She gives a statement at 3:45 in the morning, and they're like, oh, she was just witness.

They're going to try to pretend to you that she called the police and said, I have information I would like to volunteer. I'm here voluntarily.

It's preposterous. She was in trouble. She was accused of stabbing. Her boyfriend was accused of having a gun. And she gives a statement.

Now, the statement is not good for R.J., the cousin. She says, I saw R.J. shooting and doing what R.J. did. She's got nothing to say about Marcel. Nothing.

But this is their witness, if she comes to court, and she's going to say, yeah -- well, I don't know what she's going to say. At her deposition she said a whole bunch of strange things. But that's their witness.

They're going to refer to witness statements. They talked to 20 people and they're going to tell you 20 people's names they talked to. Not going to hear from any of those

people. They're not going to bring those people to court to sit on this witness stand and tell you what they saw.

They're going to tell you what they think those people told you, but they're not going to call them as witnesses.

So, that's not even evidence. It's hearsay. But more importantly, it's got nothing to do with Marcel. Nobody's saying Marcel did anything because Marcel didn't do anything.

So, Marcel gets sent to Menard. And you can't undo what happened to Marcel. Can't turn back time. He's got a gaping wound. But this lawsuit is about justice.

So, let me tell you, last thing I'm going to talk about is how much he suffered.

Menard penitentiary, this 18-year-old kid -- well, actually, he's 20 by the time he goes to Menard. He's actually lost weight because the county, the food is so bad that he's down to -- he goes from 115 to 105. He is a tiny boy sent to Menard.

Now Menard is not for juveniles. It's for adults. It's for the worst criminals in the State of Illinois. If you're in Menard, it's because you murdered somebody, you raped somebody, you chopped somebody's head off, you put a kid in a microwave. If you commit the worst crime you can commit, you go to Menard. There's not people who, like, did drug crimes or, like, you know, robberies or burglaries. It's the most dangerous criminals. The only people in there that are not,

like, rapists and killers are the people who were in other prisons and they couldn't get along because they were fighting everybody and stabbing people. They were too dangerous so they sent them to Menard. So, this is not a nice place.

He goes in there a kid. He doesn't know a soul in this institution. And it's violent. And he's attacked. And he learns to try to defend himself. He's small. You know, he's not small anymore. He got big in prison over time. But he was small and he was scared. And he kept saying to himself, I didn't do anything wrong. What am I doing here?

He got sentenced for 35 years. He didn't know he was going to get out in ten. He didn't know his conviction was going to get overturned. It's one thing if you're in for ten, you hold your breath for ten years. He's saying to himself, I'm not getting out until I'm this guy's age. And when you're 18, 20, that's not any fun.

So, that's the stress he had to live with. The boredom, the monotony, the tedium. The cells they live in, you can touch both sides of the wall. Two men can't stand in the cell. There is, as I said, violence, anger, awfulness. He is tortured.

He's in there thinking about the unfairness of it all. If you commit a crime, you go to prison. The world's fair. You know, commit a crime, you do the time. Right? If it's unfair, then your sense of the world gets unmoored. Because

he's saying to himself, I went to pick up my sister at the park and then somebody started shooting.  What am I doing in this hell?

So, life's not fair.  It really rips your foundations.

It also rips your bonds with people.  He's going to tell you that during that ten years, he lost connection with his life.  At the beginning they're like, oh, Marcel, we got you, we'll visit you, we'll call you.

You know, when you're in there for 35 years, people stop investing in you.  They stop caring about you.  They go on with their lives.

So, he loses friends.  People are starting to pull away from him.  And he, you know, is kind of lonely.  He will tell you, I know who was there for me, and it was very few people.

His girlfriend is a big part of that.  Remember, he was super close to his girlfriend.  She stayed with him until he got convicted, she's like, you can beat this, you can beat this.  She's hanging in there.  Then he gets convicted, 35 years.  She and Marcel had to talk about it.  He understood. You know, she's young.  She can't wait 35 years.

But it's very painful for him.  He had intended to be with her.  She went out.  She got another relationship.  She had a child.

And when he got his conviction overturned, after about

a year, they got back together. And they're very close now. And they are very much in love. And they have a child of their own. A two-year-old who, as I said, is really the focus of Marcel's life. He has adopted essentially her older child. He's now become close with her, too. He's basically her dad. And he is -- they have a nice little thing.

But it is not how he planned it. This is not how he planned it, nor is it how he planned it with his mother.

His mother would visit him every week. Menard's down by St. Louis. She would drive 350 miles. That's six hours. She worked all week. She drove 350 miles to visit him for an hour or two. 350 miles back. Sometimes she'd drive there and it would be on lockdown and she couldn't even see him.

And she did that because she knew her kid didn't do anything wrong. She knew he was innocent and he needed her support.

And I'm not going to try to tell you about their relationship. Marcel's going to tell you about it. You're going to hear from his mother.

Over time she couldn't keep coming every week. But she was there for him and stayed there for him and they're very close to this day.

So, Marcel got out. He got released. And he was euphoric and he was happy. You'll hear from witnesses who saw that and saw the relief on his face and the happiness.

But that wears off. And now he has to make a life for himself. And he's doing that. He's not a complainer. And he's a go-forward guy. But it's not easy to transition. You know, your 20s are when you build a foundation. It's when you build a foundation. You build relationships. You build professional. And he's got nothing. He's got this gaping hole. He doesn't know how to act. He doesn't know how to be. He doesn't have the relationships he should have.

And he's a survivor. And he's found a job. It was hard to find a job. He works for Ceasefire, a violence interruption organization. He's been there a year in September. He tries to get in the community, build trust, prevent problems. He's got a job and he's got a relationship.

So, he has recovered. But he suffers from depression. He sees a therapist. He'll tell you about his struggles. I can't do it justice. He'll tell you about it. His analogy -- I think it's a good one -- is I got a wound it's and it's like putting a bandage on it, but it's not healed. It's, like, not being dressed. It's, like, not healed. It's like this wound that won't heal.

So, this trial, hopefully he'll get some closure. Hopefully he'll get some justice. This is his chance. It only works because you guys are going to participate in it. Super grateful. Thank you very much. I hope you give him justice.

THE COURT: All right. Thank you, Mr. Loevy.

MR. FLYNN:  Could we just get a five-minute break, stretch our legs?

THE COURT:  Yes.  We'll take a five-minute break.

Please don't discuss the case.

Give you an opportunity to use the restroom.  And we will be back in five minutes.

(Jury out.)

(Recess from 3:52 p.m., until 3:59 p.m.)

(Jury in.)

THE COURT:  Please be seated.

I will acknowledge Mr. Flynn, once you're settled.

Counsel, you may proceed whenever you're ready.

OPENING STATEMENT ON BEHALF OF DEFENDANTS
BY MR. FLYNN:

Good afternoon.

I want to thank you for spending the next two weeks with us.  We're going to do our best to make it as painless as possible.  We really do appreciate your time, taking this time away from your busy lives to be here for these next two weeks.

Again, my name is Kyle Flynn, and along with John Gibbons, Quinn Ford, and Tyler Salway we represent the defendants in this case, including Detective Michael Mancuso, who I'll introduce to you here in just one moment.

Paris Jackson.  Paris Jackson is the name of a 19-year-old man who was shot to death on the West Side of

Chicago on August 30th, 2008.

And although plaintiff kind of brushed over him in the opening statement, it was Paris Jackson who was on the minds of the detectives back in August and early September of 2008. It was Paris Jackson who deserved justice. It was Paris Jackson who deserved to have those who are responsible for his death, for his murder, held accountable.

And we're going to talk about what really occurred on August 30th, 2008. And we're going to tell it to you through the lens of the detectives. What they learned in their investigation of the Paris Jackson homicide, who was the true victim in this case.

But before we discuss the investigation, I want to introduce to you the detectives in this case.

First, Michael Mancuso. Michael Mancuso was born and raised in Chicago. At the time of the investigation into the Paris Jackson homicide, he had been with the Chicago Police Department for 22 years. And ten of those years, he had been a detective.

Detective Mancuso worked for the Chicago Police Department for a total of 30 years after this investigation concluded, and he was able to retire in 2016.

Detective Mancuso was a co-lead detective in the Paris Jackson homicide investigation. The other co-lead detective, Detective Kevin McDonald, the second defendant in this case.

Now, Detective Kevin McDonald, he passed away a few years ago, before this lawsuit was ever filed. But when this investigation occurred into the Paris Jackson homicide, Detective McDonald had been with the Chicago Police Department for 24 years, and had been a detective for ten.

And through these detectives' investigation, they learned that the victim, Paris Jackson, was a 19-year-old man born and raised on the West Side of Chicago. He had a job. He worked at McDonald's. He had just become a new dad.

And on August 30th, 2008, he worked at his job. He worked at McDonald's. He got off work and he went to Amundsen Park to go hang out with his friends. And when he got there, there were a ton of people out there. Dozens -- some people say maybe even over a hundred people in this park. Amundsen Park, it's a big park on the West Side of Chicago.

And some of the other people who were in that park that night were Taneshia Branch and her friends, two of her cousins and some other friends, and a large group of people who came into the park.

And you're going to hear a lot of names. We're going to do our best to make it as easy as possible. Here are some names I'm going to talk about here in just the next couple moments.

First you have Marcel Brown. He's the plaintiff in this case. His cousin, R.J. Branch, who you heard some about

in the last opening statement and who was the shooter in the park on August 30th, 2008.

Then they had another cousin, T.J. Scott, who was also in the car with them that night and in the car with them leaving the park after the shooting occurred.

And each of these three male cousins, Marcel, R.J. and T.J., they each had three sisters: Taneshia Branch, Cierra Jackson and Almanique Scott.

And on August 30th, 2008, Taneshia, Cierra, Almanique, the three female cousins, along with some other friends, came into Amundsen Park where, again, there were dozens of people.

An argument broke out. There was some yelling. And at some point, Taneshia Branch stepped away from the dispute and got on her cell phone. She got on her cell phone and she called her brother, R.J. Branch.

Cierra Jackson, she stepped away, she called her brother, Marcel Brown. Almanique called her brother, T.J. Scott. And all three of these individuals, the plaintiff and his two cousins, happened to be all hanging out at their usual hangout about a mile away from the park, the parking lot of a White Castle.

The three male cousins got into Marcel's Malibu with Marcel behind the wheel. They hightailed it over to the park. And R.J. and T.J. got out of the car.

This is a map of Amundsen Park. Sorry we don't have a

better one, but this gives you a good idea of what the park looks like. And this large building that's there towards the bottom, you can see the black roof. That's called the fieldhouse. You're going to hear a lot about the fieldhouse. That front part is about a story tall, and then that back part is actually a gymnasium, two stories tall.

And on this evening, August 30th, 2008, just a little before 11:00 p.m., Paris Jackson, the victim in this case, was hanging out with his friends around some benches that are kind of in this tree area.

Taneshia Branch, along with her two cousins and a bunch of other friends, were hanging out in the playground when that argument I told you about earlier broke out. They made those phone calls and their cousins came roaring over in Marcel's gold Malibu.

Marcel stopped the car. R.J. and T.J. got out and they rushed into the park. They ran into the playground to where Taneshia Branch was.

Multiple witnesses told the detectives in this investigation that R.J. came into the playground and yelled, who is it? Who is it? Who's messing with my sister? You'll die.

MR. LOEVY: Objection to hearsay, your Honor. Hearsay, your Honor. No such witnesses.

MR. FLYNN: Your Honor, Ms. Ocampo will testify.

THE COURT: Ladies and gentlemen, opening statements are just a preview of what the lawyers believe the evidence will show. You will hear the evidence after the opening statements conclude.

So, the objection is overruled in that regard.

Mr. Flynn, you may continue.

BY MR. FLYNN:

R.J. came running into the park, ran up to Taneshia and her group of friends while all the other people were out there and yelled, who is it? Who is it? Who's messing with my sister? You'll die.

By several accounts, he then pulled out a gun out of his pocket. He looked over to Paris and his friends who were hanging out on the benches nearby with some guys who he knew, we'll tell you about later. And he went running after them, revolver in hand, firing shot after shot after shot.

It was chaos. Not only did Paris and his friends scatter, run, get out of the park, fearing for their lives, everybody in the park scattered. Shots were ringing out.

Most of Paris' group ran northwest to an area known as Snake Hill there on the top left of this map. Paris Jackson took a different path trying to dodge R.J.'s bullets. He went westbound, more towards where he lived.

Tragically, as Paris Jackson tried to make that corner around the fieldhouse to get some cover from R.J.'s bullets,

one of R.J.'s bullets ripped through his back and out through his chest. One of those bullets nicked an artery connected to his heart. And the nature of that injury, experts will tell you, it wouldn't have killed him instantaneously. He would have been able to get up and continue trying to get away from Marcel's cousin.

And he made his way down this sidewalk into the corner of the fieldhouse. But that artery that had been nicked, blood continued to fill up the cavity around the heart. And that blood weighing on the heart made it as such that the heart could no longer bring any blood in, which meant no blood was pumping out, which meant no blood was getting to his brain. By the time he reached the corner of that fieldhouse, he fell down on a grate. He fell down on a grate and he breathed his last breath. He died facedown on a cold metal grate in the dark alone.

And for what? Why did innocent Paris Jackson die on the grate alone? Because of a feud. Because of a rivalry between two competing crews in the West Side of Chicago.

One such crew, the U.S. Dopeboys of America, otherwise known as USDA. And when you hear "USDA," it's not U.S. Department of Agriculture. It stands for the U.S. Dopeboys of America. And that's a crew that Marcel Brown will take the stand and testify he was a part of.

He was part of this crew, along with his cousin R.J.

Branch and his cousin T.J. Scott, the same three guys that were in Marcel's Malibu on the way to the park, seconds before Paris was shot to death, and the same three guys that got right back in his Malibu and raced it back to White Castle seconds after Paris was shot to death.

The other crew, it's the Amundsen Park crew. That map I showed you earlier, again, that's Amundsen Park. And there's a crew of guys that hung out there a lot back in 2008. They included guys like Eugene Stanciel, Rufus McGee, David Portis, otherwise known as Day-Day.

And this rivalry that I was talking about was a violent rivalry. There was a violent past between these two different groups on the West Side.

You'll hear Marcel take the stand and talk about that in the months leading up to the shooting in August 2008, there had been several fist fights between members of the USDA and the Amundsen Park crew.

And some of these fights weren't just fist fights. Some of these fights involved weapons.

You'll hear Marcel take the stand and you'll hear his cousin R.J. Branch take the stand, and they'll talk about a big fight that they had with Marcel and R.J. was included, where R.J. pulled out some kind of a stick, busted it over the head of somebody in the Amundsen Park crew, busted his head wide open.

Again, this was a violent, violent rivalry in a violent neighborhood.

And one thing was for sure in 2008, you did not go into the other crew's hangout. You did not go into Amundsen Park if you were with the USDA. And if you're Amundsen Park, you're not going to go hang out in the White Castle parking lot.

And on August 30th, 2008, the dispute between these two crews, it came to a boiling point when Marcel, R.J. and T.J. got word that their sisters were at Amundsen Park. And not only did they get word that the sisters were getting into a fight with some girls, the sisters called them and said, some of the guys here in Amundsen Park are trying to jump in, as well.

And when they heard that, that was the straw that broke the camel's back.

Of course Marcel Brown knew that R.J. had a gun in the back of his car on the way over to Amundsen Park. That was the entire plan.

You'll hear evidence of Marcel saying that on the way to the park, R.J. was saying things like, I'm going to go F them up. Those N words are going to die. Of course Marcel knew what R.J. was going to go do. That's why they were going over there to begin with.

And statements like this coming from R.J. in the car

on the way to Amundsen Park seconds before Paris Jackson was shot to death, statements like this coming from R.J. would have come as no surprise to Marcel Brown. Marcel was fully aware of R.J.'s violent nature.

Marcel will take the stand and he'll testify that he knew R.J. was in a gang. He knew that R.J. was a Vice lord in August 2008.

Marcel will take the stand and testify in his own words that R.J. was a hothead, a shit starter. You'll see a video of him saying that R.J. was a menace to society.

Marcel will take the stand in this trial and tell you that prior to this shooting, prior to him driving him over to the park, he knew that R.J. had had gun charges put on him. He had seen R.J. with a gun before. Of course he knew R.J. had a gun. And of course he knew what the plan was on the drive over to the park.

So, Marcel, R.J., T.J., they got to the park, they got out. R.J. unloaded his revolver on the male members of the Amundsen Park crew. They got back into Marcel's Malibu, and they went back, raced it back to safety.

Let's back up for a second. I think it's important to understand what's undisputed in this case. Things that you don't have to worry about deciding whether they're true or not. And I want to go back to this map.

It's undisputed that Marcel, R.J. and T.J. got calls

from their female -- from their sisters, said they were in trouble, and raced over in Marcel's Malibu with Marcel driving. It's undisputed that R.J. went into the park. It's undisputed that R.J. pulled a gun out and started shooting in the park. And it's undisputed that Paris Jackson's body was found on this grate the next morning. Nobody disagrees over those facts.

And at this time, Paris Jackson no longer had a heartbeat, and he no longer had a voice. The people that could speak for him now were the detectives who were assigned to his case. Like Detective Mancuso, Detective McDonald, and some other detectives who you're going to meet throughout the course of this trial.

And detectives have a very important role in a law-abiding society. Homicide detectives have an even more important role in a law-abiding society because they speak for those who are taken from us too early. They speak for those who are permanently silenced.

And detectives, their job is to get to the truth. And we as a society give them certain tools that they can use to try to get to the truth, try to find out who was responsible for the crimes that they are investigating. Not only the people that committed the murder, but also who aided and abetted and assisted in the commission of the murder.

And it's not an easy job to be a detective, especially in the City of Chicago. It's difficult to get witnesses to

talk to you and be cooperative. Some witnesses simply don't want to get involved. Some witnesses are intimidated. They don't want to be labeled as a snitch. They don't want to be hurt by whoever it is that they're talking about to the police.

So, detectives, they must be diligent and persistent. Most people have a general idea of what detectives do to get to the truth.

First, they got to move fast. They got to gather evidence. They have to identify potential eyewitnesses. Once those eyewitnesses are identified, they need to speak to them as soon as they can while their memories are fresh. Once they have gathered evidence, at some point that evidence leads them to a suspect. They find that suspect. And they seek to learn more information from that suspect and what their role might be in the crime at issue.

And you'll hear evidence that in this case, the detectives did exactly that. In the first two-and-a-half days of this investigation, after Paris Jackson's body was found, the detectives spoke to 20 different eyewitnesses. These are 20 different people who were at the park the night Paris Jackson was shot. Not just at the park the night he was shot, they were at the park when he was shot, when the gunshots went off.

And like one would expect, not all 20 witnesses necessarily saw who it was that did the shooting. Not all 20

witnesses knew who it was that did the shooting.  But we know that ten of these witnesses told the detectives that it was R.J. that came to the park with a gun when they heard gunshots.

Eight of these witnesses said they saw Marcel driving the Malibu taking R.J. to the park.

The evidence from these eyewitnesses overwhelmingly pointed to R.J. as the shooter and Marcel as the driver.

Like I said, most of these witnesses were younger people hanging out in the park.  You can look at this list.  A lot of these are females.  They were just young women hanging out in the park on a Saturday night.  Saw someone come into the park who they knew to be R.J., driven by someone who they knew to be Marcel, and spoke to the detectives a day or two later and told the detectives what they saw.

And some of these witnesses not only provided statements to the detectives, they also provided statements to the assistant state's attorney, an ASA.

MR. LOEVY:  Objection to relevance, your Honor.

THE COURT:  Response?

MR. FLYNN:  Yes, your Honor.  The fact that these witnesses also spoke to ASAs and --

THE COURT:  We may need to do it at a sidebar, because Mr. Loevy can't hear you.

MR. FLYNN:  Yeah.

THE COURT:  Can I just hear your response at a

sidebar, please?

(Proceedings heard at sidebar:)

MR. LOEVY:  To just be clear, hearsay and relevance.

MR. FLYNN:  My experience is that -- can you hear me? Talk softer?  Okay.

My experience is that the fact that these witnesses --

THE COURT:  We're having a little bit of trouble hearing you.

MR. FLYNN:  Is it too loud or too soft?  Is it too loud or too soft?

THE COURT:  That's better.  Perfect.  Thank you.

MR. FLYNN:  The fact that these witnesses or some of these witnesses provided ASA handwritten statements goes to show that the accuracy and the truthfulness of their statement with respect to the detective's state of mind -- excuse me, the fact that these witnesses provided these statements to the ASA and signed the ASA witness statements would lead the detectives to conclude that they were not coerced and that the statements themselves were truthful.

MR. LOEVY:  Then what's relevant is what they told these detectives.  The detectives knew if they coerced it or not.  Saying that they repeated the statement to somebody else is just hearsay.  This is not being offered for the truth. This is being offered for what the detectives were told.

MR. FLYNN:  Your Honor, if relevance is the issue,

some of the witnesses, they're going to argue, were coerced, like Marisol Ocampo, Eugene Stanciel. Both of those witnesses provided ASA handwritten statements. So, the fact that they provided ASA handwritten statements is relevant to this case.

MR. LOEVY: We agree. Those two.

THE COURT: So, it's pretty clear that the objection isn't truly hearsay, because you just said that they're not offered for the truth. We're still in the opening statements phase. So, I'll allow a little bit of latitude here, but let's just really hit this point and move on. And this may be something we need to resolve before we get to this issue during the presentation of the evidence.

So, the objection is overruled.

(Proceedings heard in open court:)

BY MR. FLYNN:

You're going to hear a lot about ASA handwritten statements in this case. You're going to hear a lot about ASAs. That stands for assistant state's attorney.

And the assistant state's attorneys, they work for the Cook County State's Attorney's Office. That's an entity that's separate from the City of Chicago. It's separate from the Chicago Police Department.

And you're going to meet some of these ASAs. They're going to come in here and take the stand, the ASAs that were assigned to the Paris Jackson homicide investigation. And

those ASAs are not maybe what you think about when you think of an ASA, an assistant state's attorney working for Cook County. A lot of people think ASAs, they think of those that are prosecuting criminals and they're in a courtroom.

They also have ASAs who are part of a unit called felony review. And ASAs on felony review, they play an important role in an investigation of a homicide, because ASAs in the Felony Review Unit travel to the police stations and they review the evidence that the detectives are collecting with respect to these investigations.

MR. LOEVY: Objection, your Honor, to them reviewing the evidence. He's supposed to move quickly through this here.

MR. FLYNN: Again, your Honor, this goes to --

THE COURT: Look, the objection is overruled.

Let's make the point, Mr. Flynn, and move on.

BY MR. FLYNN:

And you'll meet ASA Spizzirri, who you already heard a lot about in this case. ASA Spizzirri was assigned to the investigation of Paris Jackson. She went into the room with Marcel Brown and she asked her own questions.

And not only did the ASAs get involved in that sense, they also get involved with ASA handwritten statements where they actually speak to the witnesses, which you'll hear more about later.

So, at this point in the investigation, the detectives

had spoken to 20 eyewitnesses. You see the list on your screen. And the evidence overwhelmingly pointed towards R.J. as the driver -- R.J. as the shooter and Marcel as the driver.

So, what did good detectives do next? They go out and they find R.J. and Marcel. That's exactly what they did.

On September 3rd, the detectives were able to find Marcel Brown first, in the afternoon of September 3rd. And they did what detectives do. They put him under arrest. They brought him into the police station. And they put him in an interview room.

Now, Mr. Loevy wants you to believe that the interview room is the size of that witness stand. It's certainly not. It's much bigger than that.

They put him in the interview room and they do the first thing that you do. You give him the Miranda warnings. You tell him his rights. You have the right to remain silent. Anything you say can and will be used against you. And you have the right to an attorney.

And at no point during this entire interview of Marcel Brown does he ever ask for an attorney. You'll see no evidence of that. At no point does Marcel Brown say, I don't want to answer your questions anymore. That never happens once.

In fact, much to the contrary, you'll see multiple instances, most interactions between Marcel and the detectives or the ASA, it's him initiating it. It's him knocking on the

door saying, I want to speak to the detectives about what I know.  I want to speak to ASA Spizzirri.

And it's also important to note that from the very beginning, the detectives in this case, it was Mancuso and McDonald, the first two detectives in the room with him.  They didn't hide the ball.  They told him straight up, right from the beginning, that we've got a bunch of eyewitnesses who said they saw R.J. shooting in the park and they saw you driving him there.

And just so you know, Marcel, by you driving him there, and being part of this, you could be held accountable for murder, too, just the same as if you pulled the trigger. They told him that from the beginning.

And despite all this, Marcel Brown began this interview with just bold-faced lies.

And you'll hear -- you've already heard from Mr. Loevy about the 34 hours of the interview, and we'll talk all about that.  Now 34 hours, the length of that interview was not a byproduct of anything the detectives were doing.  It occurred because of all of the lies that Marcel Brown told the detectives over and over and over.

They're really all -- there are really four phases of Marcel's lies in total.  His first phase, he came into the interview and said, R.J. wasn't shooting in the park.  R.J. wasn't shooting at all.  It was this guy named Day-Day.

The detectives had a difficult time believing that because they had spoke to so many witnesses who had seen R.J. shooting in the park that night.

So, they said, Marcel, that just doesn't really add up. That doesn't really -- it's not really corroborated by all these other people in the park that told us that R.J. was shooting.

And remember, ladies and gentlemen, this is all on video. You will not need to guess what occurred in that interview room. And we're ecstatic about that. We're happy that this is all on video, because the video shows the detectives doing their job. The detectives have nothing to hide.

Now, we're, of course, not going to make you watch this 34 hours of video. But if you did, you would not see a single shred of physical abuse. They treated Marcel Brown with dignity and with respect throughout the interview.

But Marcel started with the big lie that R.J. wasn't even shooting in the park. It was this guy named Day-Day.

And even though the detectives had not heard anything about somebody seeing Day-Day shooting in the park, they could have said, Marcel, you're full of it, we know you're lying. No. They gave him the benefit of the doubt. They did what detectives do. They said, okay, you say this guy named Day-Day was shooting in the park. We want to find out who is actually

responsible for this murder. So, if you're saying there's some other guy shooting in the park, tell us more about him. We'll investigate. What's his name?

Well, I don't know his name. I just know his name's Day-Day.

Okay. Well, we'll go figure it out on our own.

And that's what they did. They left Marcel in the room. They went out. The found out Day-Day was the guy named David Portis. They went out, they found him, they bring him into the police station, just like they did with Marcel Brown, and they put him in an interview room and they started asking him questions.

And he not only denied that he was shooting in the park, but his story about what occurred was consistent with the other eyewitness accounts that they had.

So, when Marcel realized, about four-and-a-half hours into his time in the police station, that his big lie, the big lie that R.J. wasn't shooting in the park, when he realized that that just wasn't going to fly, that there was too much evidence pointing the other way, he went into Phase 2 of his account of events.

He admitted that R.J. was shooting in the park, but it was only in self-defense. It's still that Day-Day guy shooting, R.J. just shot back.

Marcel went from a big lie to a half lie.

Now, at this point in 2008, Detective Mancuso and the other detectives, they were trained detectives. Mr. Mancuso had been a detective for ten years. And he still had trouble believing this, this new account of events about Day-Day shooting and R.J. shooting back.

And as Marcel was working through his different phases about what he was going to tell the detectives happened in the park that night, the detectives were doing other detective work.

They went out and they found T.J. Remember, T.J. is the third cousin. He was in the car with Marcel and R.J. on the way to the park and then left the park with them, as well.

They brought T.J. in and T.J. started with the same lie: it was Day-Day shooting in the park. And as the detectives continued on with that interview, T.J. eventually came clean.

T.J. eventually came clean. Not only said that Day-Day wasn't shooting in the park, only R.J. was shooting in the park, he also told the detectives a new bit of information they hadn't heard yet. T.J. told them that on the morning after the shooting, when Paris Jackson's body was found, word was getting around -- all around the neighborhood that a body was found in the park. And, of course, people were saying R.J. did it because dozens of people had just seen R.J. shooting in the park feet away from where Paris' body was found.

And what did T.J. tell the detectives about what they did? First, they got out of the house. They were afraid the police were coming to get them. And they went and they all met up, T.J., R.J. and Marcel. They all met up and they said, oh, man, if the detectives come and pick us up, if the police come and get us, we got to lie. We got to tell them that it was that Day-Day guy, that's part of the Amundsen Park crew. We got to say that he was shooting. And that's exactly what they did.

Marcel lied and said it was Day-Day. T.J. lied and said it was Day-Day. And with that information, the detectives went back into the room with Marcel.

This is now about 12 hours into the interview. They said, Marcel, we know you're lying. T.J. just told us about how you guys all got together and concocted this story about Day-Day.

And at that point, Marcel knew that the jig was up. It was at that point that he entered into Phase 3 of his story. Phase 3 that, yeah, R.J. was the only shooter, but I, I had no idea. I could have had no idea that R.J. had a gun on the way to the park. How could I have known R.J. was planning to go shoot up the park?

Having heard this new story that Marcel was now telling, you'll see the video of the detectives, Mancuso and McDonald said, that would have been nice to know hours ago when

we first brought you in here.

You will hear Detective McDonald tell Marcel, okay, start all over. Start from the top. What exactly is your story now? Let's hear it.

And you'll see that pattern throughout this interview. One of the reasons that this interview went as long as it did was because Marcel kept telling a new story about what occurred on August 30th, 2008. And whenever that happened, the detectives had to go back and say, all right, what exactly is your story now? We can't keep it straight. It's difficult.

And having gone through these three different phases of Marcel's story, like you see in the timeline before you, it was now 3:00 a.m. and it was time to get some sleep.

The detectives, you'll see the video, gave him a blanket. They turned the lights out for him. And he pretty much sleeps uninterrupted for seven hours. You can see on the timeline from 3:30 to 10:30.

And Mr. Loevy made a big deal about how he was up to 3:30 in the morning and that must have been sleep deprivation. Well, Marcel Brown will take the stand and tell you that back in August of 2008 that was his normal bed time. He was normally going to bed around 3:00 a.m.

So, 3:00 a.m. might be kind of late in the night for you and me, it wasn't late in the night for him. That was the normal time for him to go to sleep.

So, he goes to sleep and wakes up at 10:23 to Detective Mancuso. Detective Mancuso, you'll see the video, knocks on the door, is bringing him some hot breakfast from McDonald's. He hands him the egg sandwich, whatever else is in there, the hash browns and says, is it warm? Is the food warm? If not, I'll warm it up for. Are you good? Okay, okay.

And you'll see a lot of that. Like I said, they treated him with respect.

You see the statistics there at the bottom of the timeline. He was offered or given food 16 times. Offered or given something to drink 45 times. And he's asleep -- or appears to be asleep for about nine hours of his time in the room.

And I think it's also important to note that even though plaintiff is going to stress the 34 hours -- and the timeline that he showed you of the interview was pretty bare bones. There's pretty much no information on that timeline, unlike this timeline. Because they don't want you to know why it actually went 34 hours. They just want you to think about the 34 hours and that's it.

But in reality, of the 34 hours, only five of those hours was somebody actually in the room with him talking to him. This is not what Mr. Loevy was indicating it was, where you had a detective coming in and berating him with a question and another detective would come in and berate him with

questions. No. You'll see no evidence of that.

Over the course of 34 hours, they treat him with respect and they only interviewed him a total of five.

And one last point is that of the 34 hours, two-and-a-half hours he's out of the room. He's taken to the bathroom whenever he needs to go to the bathroom. He's taken down for a lineup you'll see, you'll hear about that occurred in the afternoon during Phase 3. He's taken down to get his fingerprints done.

It's not a situation where the witness was being tortured into a statement.

So, in Phase 3 of the investigation, remember, what Marcel's talking about here, what Marcel's current account of events is, is that R.J. was the only shooter, but he had no idea that R.J. was shooting. Had no idea that R.J. had a gun.

Well, the detectives had difficulty believing Marcel during Phase 3, as well. And you might ask why. It's really two main reasons.

First one, it's a big one. He had just spent hours and hours and hours boldly lying to their faces in an interview room about a very serious topic, about a murder. I don't know about you, but if somebody lied to me for hours and hours and hours, I'm going to have a difficult time now just believing every single word out of their mouths.

Second reason is that this new story that Marcel was

telling, it just didn't really add up with the rest of the facts.

You heard about that competing rivalry of those two crews, and how Amundsen Park was the hangout, the territory of the Amundsen Park crew. And it was difficult for the detectives to believe that R.J., Marcel and T.J., just three guys, would roll into the park without packing heat.

You'll hear Marcel say, when he takes -- excuse me, at his ERI, that out there with Day-Day, the Amundsen Park crew, there were 30 dudes out there. It was tough for the detectives to believe that they would just roll into their park three on 30 without a gun.

You'll also hear testimony from Rufus McGee in this case. Rufus McGee was one of the members of the Amundsen Park crew that was there that night. And he'll testify that that night when he saw R.J. come out of Marcel's Malibu and come running into the park, Rufus McGee knew R.J. was packing heat. Rufus McGee will take the stand up here and he'll tell you, there's no way that R.J. would come into that park without a gun.

And if Rufus McGee, R.J.'s enemy at the time, knew that R.J. had a gun as he came to the park, of course Marcel knew it.

And, then, as this interview progressed, Marcel continued telling the detectives more and more about R.J. They

told -- he told the detectives that R.J. always keeps his gun on him. He's a pit bull.

He tells the detectives that Taneshia Branch, R.J.'s sister, the one that was at the park, that she's often starting stuff with other people and R.J. goes over there as her backup.

This cat-and-mouse game continues until ASA Spizzirri, the one I spoke about earlier, came into the interview room. She had watched some of the videos of Marcel's interview. She had analyzed some of the police file. She came into the room with Marcel and she said, I'm the assistant state's attorney. I'm with the Cook County State's Attorney's Office. Tell me what happened.

She didn't say, hey, I already know what happened, the detectives already told me. No. She came in and said, Marcel, what happened?

And it was during this interview, this interview between Marcel and ASA Spizzirri that he made the most damning admissions. It was during this interview that he told ASA Spizzirri that on the way to the park, R.J. was saying things like, I'm going to go F them up. They're going to die. I'm going to go F them up, which was a phrase that Marcel had heard R.J. say before. It was a phrase that Marcel knew, when R.J. said it, it meant we were going to shoot people.

The evidence in this case will be overwhelming that Marcel has a pattern when it comes to telling lies. He starts

with a big lie, he works his way down to a half lie, and then he finally tells some semblance of the truth.

Take R.J., for example, whether he was shooting in the park. He came into the interview room with a big lie. R.J. wasn't shooting at all, it was just Day-Day. He then went to the half lie. All right, R.J. was shooting, but it was Day-Day shooting first. Finally, in Phase 3, he came around to the truth, that R.J. was the only shooter.

And he did the same thing with his self-preservation. Once he knew there was nothing he could do to save R.J., he started trying to save himself in Phase 3. And he started with the big lie. The big lie was that I had no idea R.J. had a gun. How could I have any idea that that was his plan to go over there and shoot up the park?

And as that interview progresses, which you'll see, he went to the half lie: well, R.J. does always have a gun on him. And he is very violent. And I know about his gun charge. And he is always backup for his sister. The half lie.

Until finally, he came around to the truth, which was that on the way to the park, R.J. was saying things like, we're going to go shoot those people. And Marcel knew and was fully aware that they were going over to Amundsen Park to kill a member of the Amundsen Park crew.

After the State's Attorney's Office in September 2008 determined there was enough evidence to charge Marcel with

being an accessory to the death of Paris Jackson, Marcel was charged with murder. The State's Attorney's Office made that decision to charge Marcel without any determination that he was coerced by the detectives. Nobody at the State's Attorney's Office ever made a determination that he was coerced by the detectives.

And Marcel was convicted and he served a total of ten years in prison. And as you heard earlier, Marcel was released from prison in 2008 -- 2018, after his conviction was overturned, for reasons that are unrelated to this case.

You must not speculate into this case as to why plaintiff's conviction was vacated.

You'll also hear that the Cook County State's Attorney's Office after he was released in 20- -- or after his conviction was overturned in 2018 made the decision not to retry him. And, again, in this case, you must not speculate as to why the Cook County State's Attorney's Office decided not to retry him for murder in 2018. Those are decisions based on different legal issues than what are presented in this trial.

And what I want to make clear is that this case is not about whether the punishment that Mr. Brown received for his role in the murder of Paris Jackson, whether that was a fair punishment. This case is about whether the detectives violated Marcel's constitutional rights.

Those detectives did not decide whether or not Marcel

should be charged with murder. Those detectives did not decide whether Marcel should be convicted of murder. Those detectives did not decide what Mr. Brown, Marcel's sentence should be after he was convicted of murder. Those were all decisions that were made by other people who are not defendants in this case. And those are not issues in this case.

All that is at issue is whether the detectives violated his constitutional rights.

And Mr. Brown is going to bring in a few witnesses. A few witnesses that are going to have some tall tales.

Wait until Eugene Stanciel takes the stand and hear about how many times he's lied under oath.

They're going to have some fantastical stories. And all of them seem to remember everything when it comes to making the detectives look bad. But when you ask them any other information about what in August 2008, their memory's just real fuzzy.

Plaintiff will also spend a lot of time in this case discussing what the detectives could have done in the investigation. But plaintiff will fail to make -- they'll fail to look at all the things that the detectives did do, like speak to 20 eyewitnesses who were there on the night of the shooting.

As much as plaintiff wants this case to be a who done it, this case is not a who done it. It's a they did it. R.J.

and Marcel.

Finally, you'll hear a lot about that 34-hour interview of Marcel. I want to first state that holding a murder suspect in a police station for 34 hours is decidedly not a constitutional violation. And despite that, plaintiff will still argue that 34 hours was too long. The detectives took too long to get to the truth.

And we just ask that you consider, when looking at the 34 hours, if the length was actually caused by Marcel's pattern of lying, starting with big lies, working to half lies, and finally getting to the truth.

And we are confident that after you've heard all of the evidence and testimony in this case, you will return the correct verdict of no liability against the defendant detectives, because the detectives did their job. They got to the truth, and they gave Paris Jackson the justice that he deserved.

Thank you.

THE COURT: Thank you, Mr. Flynn.

All right, ladies and gentlemen, that concludes the opening statements by both of the parties.

We will begin with the presentation of evidence tomorrow.

Please don't discuss the case.

You can leave your notebooks, to the extent that you

chose to make any notes, in the jury room.

We will ask you to report tomorrow morning at 9:15. You will take the elevators up and then buzz the buzzer that says "Judge Jenkins" on the side, and someone within our staff will let you into the jury room. We'll have breakfast for you available then.

So, please report at 9:15, and we will begin with the presentation of evidence at about 9:30.

And Ms. Deanes will get you set up. She may ask you for contact information in case we need to reach you. The important thing to remember each day is that if you are running late, if something happens and you're delayed, it's important to let us know by contacting Ms. Deanes about that, because we can't get started until everyone's here. So, just keep in communication if there's any bumps along the way.

Have a good evening. We'll see you tomorrow morning.

(Jury out.)

THE COURT: We're back on the record.

I'd like to know if there are any matters we should discuss before I let you go for the day?

One thing I would like to understand, in light of the objections raised during openings, is how we -- the lay of the land, if you will, on sort of where things stand with regard to ASA statements and testimony.

I mean, to be candid with you, part of the reason I

overruled the objection is because I know that there is at least one ASA who is on the witness list. So, as a reactionary matter, not knowing what she will say, I anticipated that there would be some testimony from Ms. Spizzirri or maybe others concerning her observation of events and the information she took.

So, perhaps I'm missing something and you all can enlighten me on that. But it was a little -- I was confused because of the fact that I know that Ms. Spizzirri, for example, is one of the witnesses on the list.

Mr. Loevy, if I can hear from you.

MR. LOEVY: Thank you.

THE COURT: And, then, I'll give you an opportunity to respond.

MR. LOEVY: You're exactly right. Ms. Spizzirri's interaction with the case is part of the case.

What was done during that opening was an attempt to paint a picture that the 20 names he put up there and the police are receiving all this information, the story he was telling us, it's not just us that heard it, the state's attorney's went there, they have an important part of the system. The state's attorneys are hearing from these witnesses. And they're trying to prove the truth of it. They're saying it's reliable. They told it to somebody else.

It's not being offered to show that it's true. It's

being offered because the detectives heard it.  So, if the detectives want to say, I talked to a witness, you're going to decide how far to let them go with that hearsay.

What he did during opening is like, oh, by the way, third parties heard it and they blessed it and they're third parties and they're prosecutors and they heard it too, and they would have had a problem if they didn't hear it.

That's like bolstering it in a way that's completely irrelevant.  It's just not -- and I agree that it was sort of vague and it was probably intentionally so.  He's like, these state's attorneys, they're legit, and they heard the witnesses, too.  And, then, he's like, well, I'm just talking about Spizzirri, and I'm just talking about the two witnesses who are at issue, Stanciel and Ocampo.

It's probably not an issue now that openings are over, because you'll be able to decide it in the exact context.  But it didn't feel fair to us to try to have it bless everybody, because that's really what I think he was trying to do.

THE COURT:  Okay.  Response.

MR. FLYNN:  Your Honor, it's not just ASA Spizzirri that's on our witness list.  We have multiple other ASA Spizzirris that took some of these handwritten statements.

And the Court may be aware of this.  These ASA handwritten statements are not just given between the witness and ASA.  There's a detective in the room, as well, that's also

part of that process.

And, again, the fact that these witnesses were providing ASA handwritten statements, and then providing in writing that they were not treated poorly by the detectives, and that they were giving this statement freely and voluntarily, goes to the credibility of each of these witnesses.

Plaintiff is going to attack the witnesses that we brought in, not only for questioning, but also those that testified at the criminal trial, such as Marisol Ocampo and Eugene Stanciel. If we can only get into those witness statements, it will look like we just had two witness statements and that was it and that they have their issues.

Whereas, that just wasn't the case. We had 20 eyewitnesses, ten of which saw R.J. shooting in the park.

MR. LOEVY: We're not objecting to them saying, I talked to 20 people or 50 people or whatever they want to say. We're objecting to them saying, oh, by the way, the state's attorneys talked to them and they told the state's attorneys they weren't coerced and that they told the state's attorneys that it was voluntary and we weren't treated poorly. That's hearsay.

The only thing that this is admissible for is when the detectives say, this is the information I received, and you're going to decide how far you're going to let them go.

Why do we have a state's attorney come in and say, it's true? They told me -- it's legit. They told me that they weren't mistreated. That is hearsay and we've strayed away from the purpose for which it's being admitted.

MR. FLYNN: If I may, your Honor?

THE COURT: You may. And, then, I think we can wrap that piece up. Yes.

MR. FLYNN: Just to be clear, we will not be seeking to admit the actual handwritten statement documents. I think everyone's on the same page on that.

With respect to the ASAs that took the handwrittens, they're not going to come in here and say, yep, that's what they said, yep, and then they said that, and then they said that. That's not the purpose of the ASAs.

The purpose of the ASAs is to say, yes, I spoke to that witness that the detectives also spoke to. They provided me their summary of events, and they told me that they were giving this statement freely and voluntarily.

MR. LOEVY: That's for the truth. That's for the truth.

If they want to say -- if they were present when the detectives were there, then I suppose they could say, yeah, I heard it, too. But if they want to say -- the detectives have now told the jury this is what I heard and this is why it was relevant to me. Now they want to bring in somebody saying, no,

this person wasn't mistreated, because they told me they weren't mistreated.

THE COURT REPORTER: Mr. Loevy.

MR. LOEVY: Sorry.

THE COURT: Just slow down for me.

MR. LOEVY: They weren't mistreated, because I, ASA, not in the presence of the detectives, they told me they weren't mistreated. That sounds like for the truth, they weren't mistreated. That's hearsay.

The detectives get what the detectives got. They don't need the state's attorneys to say, well, we blessed this information. That's outside of what's admissible.

THE COURT: Okay. I appreciate your thoughts on it. I'll rule on it in a moment. It's helpful to me to sort of understand the scope here. But we'll take it from there.

Other matters that we should take up this evening?

MR. FLYNN: Nothing from defendants.

MR. LOEVY: We have one.

MR. GIBBONS: Your Honor, just a housekeeping matter.

THE COURT: Sure.

MR. GIBBONS: So, I think Marcel will hit the stand tomorrow.

MR. LOEVY: Yes.

MR. GIBBONS: As will a lot of witnesses that have very lengthy deposition transcripts. I suspect there will be a

fair amount of potential impeachment.

I know the Court's preference is to put those pages up.  But I would suggest that each of the witnesses have a hard copy of the whole -- because some of these are 3 or 400 pages long.  Of course, with the Court having one so we can get to the page, line.  All the parties have these.

I think it will move the process.  That would be my intent, to have Marcel's deposition transcript up there next to him.  If I ever need to use it, I'll use it.  But if not -- I don't want to start going, Maria, can you put up --

THE COURT:  No, that's fine.

MR. GIBBONS:  -- Page 200?

THE COURT:  That's fine.  I think to the extent that it's feasible to have copies of exhibits that you know you will probably need to refer to, depositions, other things, you should have that ready and available.  It saves time and incrementally it makes things much easier.

In terms of reading in deposition testimony, I don't have any preference at all on how that's done.  You all will arrange for the right people to be seated in the right places to read that in.  And if you want to publish it on the screen because you've agreed or it's fine to do that, that's fine with me.  I don't have any strong preference on that at all.  And you should do it in the way you all see fit.

We'll start with Mr. Brown tomorrow --

MR. LOEVY: No. We've shifted the order a little bit.

THE COURT: Okay. That was going to be my question, is witness order tomorrow so that we're prepared.

MR. LOEVY: Olson is a police officer and the defendants have facilitated his cooperation. We appreciate that. He'll be in the morning.

THE COURT: Okay.

MR. LOEVY: We've decided not to call the deposition. We were going to read the deposition. We're going to save that instead. We're going to try to get it moving faster.

Dr. Arden will testify in the morning. And, then, Brown will be the next witness. He will not finish.

THE COURT: Right.

MR. LOEVY: And we are going to try to get in touch with Mr. Swygert and have him testify before Olson. He would be our first witness. We haven't told the defense that yet, but we are still 24 hours in advance. So, we're telling them that.

THE COURT: So, Olson, Arden, Brown, and potentially Swygert are -- in some order --

MR. LOEVY: Yes.

THE COURT: -- are the first four witnesses?

MR. LOEVY: Yes.

Plaintiff would be the last of those, because plaintiff's going to go a long time.

THE COURT:  Okay.

MR. LOEVY:  Your Honor, we did have an issue, too.

THE COURT:  Okay.

MR. LOEVY:  During opening, counsel said that the conviction was overturned for reasons unrelated to this case. And I had stayed away from saying why, saying anything about it.  And the conviction was overturned at least, in part, because he was denied access to a lawyer.  And it is an issue in this case.  It's part of the totality of whether he had access to a lawyer.

So, that has opened the door to why it was overturned. Otherwise, he just said it was overturned for reasons unrelated.  That tells the jury something very unfortunate, you know, because now they have to say, whatever it was, it has nothing to do with what plaintiff is talking about.  And that's not fair.  They shouldn't have done that.

THE COURT:  Response.

MR. FLYNN:  Your Honor, during the opening statement, Mr. Loevy also came very close to the line and told the jury that he was exonerated, which was in violation of the order, as well.

MR. LOEVY:  What I -- the conviction was overturned and he wasn't retried.  And they could have retried him.  I believe that's been elicited by both sides.  So, those are the facts.

None of that goes into why he was exonerated. He was -- he was exonerated and then his conviction was overturned. I didn't talk about why. Then counsel for the defense has now told the jury it has nothing to do with what plaintiff is alleging, which isn't true.

THE COURT: Okay. I think we're awfully close to the line on that one. So, I won't -- because opening statements are not evidence, I am not going to conclude that the door has been opened.

But, again, I think we're super close to the line here. You've got a little chalk dust if we're talking about line drawing. So, I think it probably makes sense to think through how you're going to -- and by "you," I mean the defense, but I think both parties -- how you're going to describe this. Because if that testimony is given in some way, shape or form -- received into evidence through the answer of a witness -- I think the door will have been opened.

So, because opening statements are not evidence, I won't conclude that it has been opened, although it could be. There's no reason why you couldn't make that finding. But I do think the parties need to think carefully about how they're going to address that so that if you're going to open the door, the consequences are what they will be.

MR. LOEVY: Thank you, your Honor.

MR. FLYNN: Yes, your Honor.

MR. LOEVY: That's the only issues we have for tonight.

MR. KAYES: I'm sorry, your Honor.

THE COURT: Certainly.

MR. KAYES: Just one quick thing on timing.

The agreement that was discussed this morning necessitates some changes to the language of the jury instructions. I think the teams are pretty close --

THE COURT: Great.

MR. KAYES: -- on that.

I think it would help us, though, to have a deadline to get new versions of the jury instructions and verdict form to you based on what you sent us this evening. But I think if you give us a deadline, give us a target with all the chaos.

THE COURT: I mean, how much -- the reality is, for my purposes, I don't know that I'll be in a position to turn back to the jury instructions before next week. I do want to be in a position where we can take a look at them to get some comfort with where we are.

So, if I ask you to submit something to me on Monday -- I'm sorry, not Monday, which is a holiday. Perhaps Tuesday, is that --

MR. KAYES: I think that's perfect.

THE COURT: Okay. So, I think if we can just plan for you to respond to the e-mail from my clerk with your revisions

in light of the stipulations, if you can do that by Tuesday morning at 9:00 a.m., we'll have, you know, the work that we can do from there. And that will give us a couple days to iron out what we do so that we can plan on a jury instruction conference ideally toward the second half of next week. I don't have a specific date in mind because we just don't know when that will all be ready.

MR. KAYES: Thank you, your Honor.

MR. FLYNN: One last minor housekeeping item.

In the spirit of cooperation, we we've agreed to use the same transcript for the ERI as opposed to having competing transcripts. But the transcript that we're going to use has five or six different areas where the defendants disagree and it's just notated to the side. We'd like to use that as the agreed exhibit. Would it be better to substitute that for one of the transcripts or just file it as a new exhibit in the exhibit software?

THE COURT: File it as a new exhibit.

MR. FLYNN: Yes, your Honor.

THE COURT: Just so that there's no confusion.

MR. LOEVY: Speaking of new exhibits, the defendants and the plaintiffs have dropped some photographs on each other. They got a nice picture of the White Castle, and we have some photographs. So, both sides are adding photographs.

THE COURT: So, just add them, and we will carve out

some time when the case is sent to the jury to make sure that everybody is on the same page with the exhibits and the right ones are in and the right ones are going back.

So, put them in as we go, and obviously confer with each other as you do so, so that there's no surprise. But we'll just need to take some time before this is all said and done to make sure that all the right material is in, what's been admitted goes back, et cetera.

MR. LOEVY: Thank you, your Honor.

THE COURT: So, I have one short matter at 9:00 a.m. that will only take a couple of minutes. I'd like to just check in with you call at quarter after 9:00 to make sure there are no issues. If there are, we'll have 15 or 20 minutes to resolve anything that has come up.

Otherwise, have a good evening. I'll see you tomorrow.

(Adjourned at 4:58 p.m. until 8/27/24 at 9:15 a.m.)

*      *      *      *      *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Joseph Rickhoff                    August 26, 2024
Official Court Reporter