92

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                Plaintiff,             )
                                       )
            vs.                        )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) August 27, 2024
                Defendants.            ) 9:11 o'clock a.m.


                      VOLUME TWO
        TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
        BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Defendants:         GREENBERG TRAURIG, LLP
                            BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

93

APPEARANCES (Cont'd):

Court Reporter:                    JOSEPH RICKHOFF, CSR, RMR, CRR
                                   Official Court Reporter
                                   219 S. Dearborn St., Suite 2118
                                   Chicago, Illinois  60604
                                   (312) 435-5562
                                   joseph_rickhoff@ilnd.uscourts.gov

                  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                    PROCEEDINGS RECORDED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: 19 C 4082, Brown vs. Mancuso.

THE COURT: Good morning. Can I have the parties place appearances on the record, please.

MR. BOWMAN: Good morning, Judge, Locke Bowman for plaintiff.

Mr. Loevy is en route and has authorized me to proceed.

Mr. Kayes, Mr. Manes and Ms. del Valle are here, as well.

THE COURT: Good morning to you all.

Good morning, Mr. Brown.

Counsel for defense.

MR. FLYNN: Kyle Flynn, John Gibbons, Quinn Ford, and Tyler Salway on behalf of defendants.

THE COURT: Good morning.

Good morning, Mr. Mancuso.

MR. GIBBONS: Your Honor, for the record, the defendant Mike Mancuso is also in court.

THE COURT: Yes. Thank you.

A few things we need to address this morning.

We have one juror who is running about ten minutes late. So, I'm not as sensitive to time. I think it gives us a couple of minutes.

I have e-mailed to the parties a series of three

e-mails that we received yesterday evening and this morning.

One e-mail is from juror Adam Singh. Mr. Singh sent an e-mail to my courtroom deputy this morning at about 7:00 a.m. The e-mail says: My name is Adam Singh. I was selected on the jury yesterday for Brown vs. Mancuso in Judge Jenkins' courtroom. I want to report that I will be unable to serve as a juror. My spouse recently left me and I have two children, ages 4 and 1. I am the only caregiver at this point, which would make it impossible for me to serve. I'm sorry for the late notice. This just developed in the past day after selection took place.

And, then, he provides his telephone number.

I asked Ms. Deanes to have Mr. -- tell Mr. Singh via e-mail that he should report this morning for duty. And Mr. Singh responded with the same e-mail essentially saying, I've been instructed to appear at the courthouse this morning and speak with the judge, but I have two young children ages 4 and 1. As of now, it would be impossible for me to serve as a juror in this trial.

In the last 24 hours, my spouse has left me with sole responsibility of our children. I have no family, friends or alternative -- or alternate child care in place that I would trust with my children.

I realize this presents a massive inconvenience to a trial that has already begun, but there have been new

96

developments since my selection as a juror.

I wish for this e-mail to enter the official record as my presence in court is not possible. Thank you. Adam Michael Singh.

So, let's deal with Mr. Singh first. There's also an e-mail to deal with from Savoy Williams, but we'll get to her next.

So, in light of Mr. Singh's -- Adam Singh, because I think there's two Singhs. So, Adam Singh's e-mail correspondence, how do the parties wish to proceed?

MR. LOEVY: We have no position, your Honor.

MR. FLYNN: We also have no position. We're happy to do what the Court wants to do. But we would like to press on and not wait for him if he's not here.

THE COURT: All right. So, based on those positions, I will excuse Mr. Singh, Adam Singh, who was Juror No. 9 -- seated Juror No. 9.

To the extent that an explanation is required beyond what he already wrote, if the statements are to be believed -- and I have no reason to think they aren't -- his circumstance changed literally overnight, and his inability to make arrangements for child care, even for a day or two, let alone ten trial days or nine trial days, would be extraordinarily difficult.

So, without objection, Juror No. 9, Adam Singh, will

97

be excused.

The second juror issue relates to Savoy Williams, who was seated as Juror No. 12. My understanding is that Savoy Williams is here. She did report today, because we asked her to. But here are the e-mails to be read into the record.

So, the first e-mail is at -- was dated yesterday, Monday, the 26th, at 6:50 p.m. It was sent to my courtroom deputy.

Hello, my name is Savoy Williams. I was positioned to be a juror today. During their opening statements, I did fall asleep while the first man was speaking and couldn't catch up when I woke back up to know who all was involved and what the case they were pleading on their behalf.

Also, I recently watched a documentary called When They See Us, and it might alter my opinion just because, like I said, I didn't really hear the first man's statement.

I understand I'm already selected, but my mental health has been very anxious due to me not having a job or a car to move in and having two kids that I have to support on my own. And if anything, I'll just make rash decisions about -- just make rash decisions for the case to be over quicker.

Then at 9:33 p.m., Ms. Williams sent a second e-mail to my courtroom deputy that says: I do not feel comfortable being a part of this group and participating in this. Please e-mail or call me with any steps that I can take to help me in

98

this situation.  Thank you, please.

And as I just mentioned a moment ago, I've not seen her, but it's my understanding that Ms. Williams did report this morning.

Mr. Loevy.

MR. LOEVY:  Your Honor, you know, it does not sound like she wants to participate in this trial.

MR. FLYNN:  We agree, your Honor.

THE COURT:  Okay.  Without objection, I will excuse her.  And I will have Ms. Deanes inform her that she's been excused rather than bring her out into the courtroom, which I don't know that that's necessary in light of the fact that there isn't an objection.

I will just note in terms of reasons to be placed on the record, it did appear that Ms. Williams was perhaps sleeping, or at least nodding at various points yesterday.  I couldn't tell from my posture whether she was actually sleeping or just listening.  Sometimes that's a difficult thing to tell.

But she doesn't want to be here.  I think that much is absolutely clear.  And I don't know that we do anyone any favors by pushing someone who really doesn't want to be here to be here.  It just makes everybody miserable in some ways.  So, we'll excuse her.

That leaves us with ten jurors.  To the parties' credit, selecting 12 was clearly a good thing.  I'm also happy

we can get this piece of -- this sort of stumble hopefully out of the way early so we now have a constituted jury with the evidence to be presented to these ten.

MR. FLYNN: On that topic, your Honor, we're just concerned that the other jurors, there might be a cascading effect here. Is the Court planning to provide some kind of cautionary instruction that they were excused -- it was our decision to excuse them, something along those lines?

THE COURT: Yeah. So, thank you for raising that. And my plan, with your agreement, was to tell the jurors when the ten of them come out that two people -- I don't think we need to go into any detail -- have been excused for personal reasons, but that we intend to continue on with the trial. They need not concern themselves with that issue.

I'm happy to add anything more that you want. I don't want to draw too much attention to it, but I do think we need to say something. I mean, a sentence, just because you do sort of wonder, like, is this like I show up these days and other people show up other days. That's not what's happening here.

MR. LOEVY: Less is more, and I think you nailed it.

THE COURT: Right. So, I'll just say that, no more, and we'll be ready with our first witness.

Any issues we should address this morning?

MR. FLYNN: Yes, your Honor. We have two issues.

First, with respect to the hearsay, what the

detectives heard from the witnesses that we went back and forth on yesterday, we would just ask --

THE COURT REPORTER: Mr. Flynn.

THE COURT: Slow down.

MR. FLYNN: I apologize. I'm going to get better.

With respect to the hearsay issue that we were battling about yesterday, we don't think that issue is going to come up today based on the witnesses they're calling. We would just ask for leave to file a formal written response by tonight that provides our legal arguments on that issue.

THE COURT: That would be great. Thank you. That would be great.

MR. FLYNN: Issue No. 2, we are objecting to the first witness on their witness list, or that they plan to call today, being called.

A little bit of background. That witness is Greg Swygert. He was the second chair of the post-conviction team for Marcel. Greg Swygert was not really part of this case. He was not deposed in this case. We thought that he was added to the witness list a little later on to combat the 911 Brady violation issue, which has now been deemed inadmissible.

So, we were really unsure when we heard last night for the first time that they were planning to call him today. So, I got on the phone with Mr. Loevy and Mr. Bowman. And to their credit, they got me on the phone with Mr. Swygert and gave me

the opportunity to ask him some questions about what his testimony would be.

My understanding -- of course, they can correct me if I'm wrong, but my understanding is that the entirety of his testimony will be just telling the jury about the post-conviction process, about how his conviction got overturned, and how he was the attorney and how Cook County decided not to retry him.

Your Honor, that information is stipulated to -- or we're happy to stipulate to those simple facts. I said it on my opening statement that the conviction was overturned. To get into any more detail about that flies in the face of the Court's ruling with respect to the Certificate of Innocence. Because although they can get into those details, they can't get into the reason why his conviction was overturned. As the Court has ruled, that would be prejudicial to the detectives who had no role in that process.

So, based on that, we just can't see any relevant or non-prejudicial reason to call Mr. Swygert.

THE COURT: All right. Response.

MR. BOWMAN: So, Mr. Swygert was the second chair in the post-conviction proceeding. The first chair, Karen Daniel, passed away after this lawsuit was commenced and is not available to testify.

And as Mr. Flynn indicated, we had a conversation

yesterday evening in which we previewed the entirety of Greg Swygert's testimony. There is -- this is a five-minute witness. He is not going to talk about the Certificate of Innocence. He's been admonished that that is the third rail in this case. He's not going to go there.

He is going to explain that he represented Mr. Brown in post-conviction proceedings; that they terminated in Mr. Brown's favor; that Mr. Brown was, therefore, released from custody and went home to his family and that that was a joyous occasion.

There are three photographs that I plan to show Mr. Swygert during his testimony that provide some context for that event. And with that, my direct examination of Mr. Swygert is complete.

MR. LOEVY: And just to put a pin -- or emphasis on that, he is a damages witness. When Mr. Brown walked out of prison, there were observations that he made. He went from, you know, the euphoria and the ecstatic. This is not an unusual witness. We actually called two witnesses like that at the last trial. He's just a damages witness. He is not going to talk about why anything got overturned. This is part of the story.

As we told Mr. Flynn on the phone, there is advantages and disadvantages to being the defendant and advantages and disadvantages to being the plaintiff. One of the advantages,

we get to call damage witnesses, and this is his part of his damages. It's a very small and limited part of his damages, but it's part of his damages. And we will not go near the reasons for why it was overturned, notwithstanding what happened in opening statement.

MR. FLYNN: Your Honor, if I may reply?

THE COURT: Sure.

MR. FLYNN: Your Honor, they plan to call Marcel's mother and sister and maybe a couple cousins. Those are damages witnesses. People that knew Marcel before he went into prison and people that knew him when he got out of prison.

I asked Mr. Swygert yesterday, I asked, did you have any kind of personal connection with Marcel that you're going to testify about? And Mr. Swygert told me last night on the phone, no, just a normal connection that anybody would have with their client.

So, to call him a damages witness, I think, is misleading when they also have several other people that they plan to call to be their damages witnesses.

THE COURT: Okay.

MR. GIBBONS: Can I just --

THE COURT: Of course.

MR. GIBBONS: The Court maybe should see these photos. I just saw them four minutes ago. I mean, why don't we just put a big sign that says innocent, innocent, all over them, and

them doing a cartwheel down the hallway.

I mean, 403 covers those kind of photos, because that's what they're trying to use them for.

MR. LOEVY: That is a very pro defense way to look at it. We're saying he was very damaged by this wrongful conviction. There are photographs showing the impact of being released from prison. That is half the case. Whether the defense likes it or not, we get a case, too. And our case is that this affected him.

THE COURT: All right. So, because of the representation that the point of the witness and the testimony to be elicited from the witness will not go anywhere near the Court's rulings -- and I know that the parties will abide by those -- I will allow him for purposes of damages.

I am not in a position to tell either party, specifically the plaintiff, who he can and can't call on behalf of damages if he's proffered what appears to be a good-faith basis to call it. If he observed -- to call that witness.

If Mr. Swygert observed Mr. Brown in connection with his release, there is some value with regard to testimony about damages. And you, of course -- and you will. To the extent you wish to ask him questions on cross, you can probe the area you just mentioned vis-a-vis the fact that he did not know Mr. Brown in advance, if you think that's an appropriate line of cross.

So, the witness will be allowed to testify.

MR. FLYNN:  Your Honor, to save the fight over these in front of the jury, we also object to the admission of these photos for the same reasons.

THE COURT:  Any additional response?  I think you --

MR. LOEVY:  No.  Those are the photos.

MR. BOWMAN:  Those are the photos.

THE COURT:  They'll be admitted.

So anything else we should address this morning?  We have a couple minutes in case there are other matters.

MR. LOEVY:  We have a courtesy copy of a filing we made this morning, your Honor, on the door opening issue.

THE COURT:  Okay.

MR. LOEVY:  Here's a courtesy copy, but it's on the docket now.

THE COURT:  Thank you.

MR. LOEVY:  You have another matter in another case or are we starting right now?

THE COURT:  No.  I've already taken care of the other matter.

So, there is another matter.

First, are there any other matters I should take care of with the parties?  Because I don't want to cut off your flow.

MR. FLYNN:  Nothing for defense, your Honor.

MR. LOEVY: Nothing for the plaintiff.

THE COURT: Okay.

We have had a question posed to my courtroom deputy concerning Jennifer Katz, not because she's looking to get out of service. She is Juror No. 11.

My memory is that she testified about a work-related -- during voir dire she testified about a work-related trip. I don't have the dates convenient in front of me, but I have them in my notes in the back, which I'll get.

MR. LOEVY: I do.

MS. DEL VALLE: Next Thursday.

MR. LOEVY: It was next Thursday.

THE COURT: Okay. So, her question in sum was, does she need to reschedule that work trip based on what we know now?

I think the answer to that question is yes. This is just not a scenario in which I believe that there's any reasonable prospect that we wouldn't still be going next Thursday or Friday.

So, we can handle it one of two ways. One, I can bring her in here individually and just tell her that. Or, two, I can just tell Ms. Deanes exactly what we said and let her know she should plan to reschedule the trip.

I will do whatever the parties prefer. If they prefer to do it in open court on the record, I'll do that. Ms. Deanes

is also very capable of simply relaying that information. But I'll do whatever's you're comfortable with.

MR. FLYNN: Whatever's easiest for the Court.

MR. LOEVY: We trust Ms. Deanes, and maybe we can get rolling.

THE COURT: Yes, absolutely. So, Ms. Deanes will relay that information. She'll also excuse Ms. Williams.

Please have Mr. Swygert in the courtroom and ready to take the witness stand.

(Pause.)

(Jury in.)

THE COURT: Please be seated.

Good morning, ladies and gentlemen. Welcome back.

We are ready to begin with the testimony in the case.

Due to some personal reasons, two of the jurors have been excused. So, we will continue with the case with the ten of you.

So, thank you for your attention as we begin the testimony in the case.

As I mentioned, I anticipate taking a morning break, a lunch break, and then an afternoon break. The morning break will normally be sometime midmorning when it makes sense to naturally just take a comfort break.

So, with that, if plaintiff is prepared to call their first witness.

MR. BOWMAN:  Thank you, Judge.

Plaintiff calls Gregory Swygert.

THE COURT:  All right.  Mr. Swygert, please approach the witness stand.  I will have my clerk swear you in, so please raise your right hand before you take your seat.

THE LAW CLERK:  Please state your name for the record.

THE WITNESS:  Greg Swygert, S-w-y-g-e-r-t.

(Witness sworn.)

THE COURT:  Mr. Bowman, you may proceed.

MR. BOWMAN:  Thank you, Judge.

GREG SWYGERT, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. BOWMAN:

Q.   Sir, could you tell us your name one more time?

A.   Sure.  Greg Swygert, S-w-y-g-e-r-t.

Q.   And Mr. Swygert, what is your occupation?

A.   I am a clinical law professor -- associate clinical law professor and co-interim director of the Center on Wrongful Convictions, which is at Northwestern Law School.

Q.   In that position, are you also an attorney licensed to practice law here in Illinois?

A.   I am.

Q.   How long have you been at the Center on Wrongful Convictions?

A.   Yesterday was the start of my eleventh year.  So, I've been

there ten years.

Q.   Mr. Swygert, I want to take you back to a number of years ago and ask you if you were at any point part of the legal team representing Marcel Brown?

A.   I was.

Q.   And at what stage of Mr. Brown's legal proceedings did you become involved?

A.   I became involved at -- during one of his appeals called the post-conviction stage.

Q.   And is it correct to say that a post-conviction stage or a post-conviction petition is a form of appeal of a criminal conviction?

A.   Yes, that's correct to say.

Q.   In your work, just briefly without getting into any of the substance or details, what did your work involve?

A.   Our work involved investigating.  It involved filing briefs and motions.  And it also involved having a hearing in front of a judge.

Q.   And that hearing was in front of the judge in what courthouse?

A.   The courthouse at 26th and California, the criminal courthouse of Cook County.

Q.   At that hearing, was there a decision made on the appeal, the post-conviction proceeding that you were involved in?

A.   Yes, there was a decision that was made.

Q. What was that decision?

A. The decision that was made was that the conviction and sentence of Marcel Brown would be vacated because a constitutional violation was found.

Q. Now, I should have asked you, did you have co-counsel in that proceeding?

A. I did. I did have co-counsel, yes.

Q. And who was that?

A. That was the late Karen Daniel.

Q. And do you have a recollection of the seating arrangement amongst you, Karen Daniel and Marcel Brown at the time the judge in the criminal court rendered this decision?

A. Yes. Marcel was seated between us, and Karen and I were flanking him, I guess.

Q. As the decision was read, did you have an opportunity to see and observe Marcel?

A. I did.

Q. What did you see?

A. Marcel kind of held his hands down and looked down and was weeping quietly.

Q. As a result of the decision to vacate the conviction, was Marcel permitted to go home on that particular day?

A. No, he was not.

Q. And just to be clear -- I think I may have overlooked this, too -- what year was this?

Swygert - direct

111

A.   That was in 2018, to the best of my recollection.

Q.   So, Marcel did not go home that day?

A.   He did not.

Q.   What was the next step in Marcel Brown's criminal case?

A.   The next step was the state had to make a decision as to what to do with the case within -- well, within 30 days.

Q.   Did there come a point at which you went back to court for the purpose of hearing the state's decision?

A.   Yes.

Q.   When was that?

A.   That was about a month later.  I think in July of 2018.

Q.   Was Marcel there?

A.   He was there.

Q.   Was Karen Daniel there?

A.   Karen Daniel was there, as well.

Q.   And you also?

A.   I was.

Q.   What did the state announce on that day in July 2018?

A.   There were two things that the state announced.  The state announced that they would not appeal the decision of the judge, and the state also announced that it would decide to dismiss all charges and get rid of the case.

Q.   As a result of that, were the criminal proceedings against Marcel now finally over?

A.   The criminal proceedings were over as to that, yes.

Swygert - direct

112

Q.   And on that day --

A.   On that day.

Q.   -- did Marcel Brown get to go home?

A.   That day, he did get to go home, yes.

Q.   Now, what were -- you have a recollection, I assume, of Mr. Brown being released on that particular day?

A.   Absolutely, yes.

Q.   Can you tell us what arrangements you needed to make in order to enable Marcel Brown to walk out of the courtroom on that day in July?

A.   Yeah.  Well, oftentimes clients who have similar dispositions in their cases have to go through Illinois Department of Correction custody and be processed out.  The judge in this case said, there is no sentence, there is nothing that should hold him, so he should leave out the courtroom door.  This was new to us.  And, so, we had to prepare.  He did not have any clothes at that time that -- he was not going to walk out with IDOC clothes.  He'd probably get arrested if he did.  And, so, we had to get him clothes so that he could walk out of the courthouse.

Q.   You refer to IDOC clothes.  What are they?

A.   They're kind of baggy clothes that are issued by the Illinois Department of Corrections.  So, they see somebody who is wearing them, they assume that that person would be believed is, you know, in custody.

Q.   What did you do in order to address this clothing problem?

A.   We asked a -- somebody that we work with to go to the store -- the nearest store and get clothing for him.  And we asked Marcel what sizes and everything, and asked them to go get the clothing for him.

Q.   And that happened?

A.   That did happen, yes.

MR. BOWMAN:  Your Honor, if I may have the Elmo in order to --

THE COURT:  Certainly.

BY MR. BOWMAN:

Q.   I've placed on the screen, Mr. Swygert, and I trust you can see it, what's in evidence as Plaintiff's Exhibit 417-A.

Do you recognize the photograph?

A.   I do.

Q.   Can you tell us what it shows?

A.   It shows Marcel Brown walking -- backward -- a picture of him walking out towards the courtroom gallery in civilian clothes.

Q.   Specifically, the purple shirt, was that Marcel's information as to the sizing of that shirt?

A.   Yes.  We got the sizing from Marcel.  It is -- it's significant for two reasons.  One, it's not the right size. It's far too large.  But two, it's purple, which is the color -- one of the colors of Northwestern, which was done on

purpose.

Q. Now, Mr. Brown, when he walked out of the courtroom, in addition to being accompanied by his lawyers, did he also have family present?

A. Yes. And you can see some of the family in this picture in the background.

Q. Did folks who were present at this moment also take an opportunity to record Marcel with his family?

A. I'm sorry, could you state that question again?

Q. Yes. Terribly convoluted.

Did you take a picture of Marcel with his family?

A. We did, yes.

Q. Let me place on the screen what's in evidence as Plaintiff's Exhibit 417-B.

Can you tell us what that is?

A. That is a picture of Marcel after he left the courtroom but was still in the courthouse with the family members who attended that day.

Q. Do you see any family members that you recognize?

A. I recognize -- well, I recognize all of them, but by name -- I can tell you the relationships. I see his mother there. I see an aunt there. And -- yes, some other family members.

Q. Indicating the woman right next to Marcel Brown, who has a cane in her hand, is that Marcel's mother?

A.   Yes, that's Marcel's mother.

Q.   And her name is Debra Scott?

A.   That is correct.

Q.   Did you also take a picture of Marcel with you and Karen?

A.   We did in a similar area, yes.

Q.   Let me place on the screen next what's in evidence as Plaintiff's Exhibit 417-C.

Tell us what that is.

A.   That is the picture that I just referenced.  That is a picture of Karen Daniel on the far left, Marcel in the middle, and myself on the right.

Q.   Now, did you, at this particular point in time when Marcel was released out of the courtroom, have an opportunity to see and observe his emotional reaction at that time?

A.   I did.

Q.   And can you tell us what you saw?

A.   Joyous relief.  Just elation that -- yeah, elation.

Q.   After Marcel was released from prison, did that end your formal representation of him?

A.   No, it did not.

Q.   And not going further, at that point after he was released, did you continue to see Marcel from time to time?

A.   Yes.  The relationship continued.

Q.   Would Marcel stop by the Northwestern clinic?

A.   He would often do that, yes.

Q. And is there anything that Marcel would habitually express to you on those occasions when he stopped by?

A. Marcel was always eternally grateful to both myself, Karen, and actually students who had worked on his case, as well, and to Northwestern.

MR. BOWMAN: Thank you, sir. That's all I have.

THE COURT: Thank you, Mr. Bowman.

Cross-examination.

MR. GIBBONS: Very briefly, your Honor.

CROSS-EXAMINATION

BY MR. GIBBONS:

Q. Mr. Swygert, you've grown a beard --

A. I have.

Q. -- since 2018?

A. And I've lost some hair on top, too.

Q. You are an attorney at the Northwestern Center for unlawful convictions?

A. It's actually on wrongful convictions because we're not for them.

Q. That center for convictions, how are they funded?

A. We're funded both through the university, through -- well, it's a number of different ways. The university helps fund it. We get donations, as well. And we get what's called referral fees, as well.

Q. And it would be true that in cases like this, if

successful, the Center would get a share of those proceeds; is that right?

A.   Not always, but yes, at times.

Q.   You mentioned earlier that you were involved in the proceedings post-conviction; is that right?

A.   That's correct.

Q.   And those proceedings were handled by the Cook County State's Attorney's Office; is that right?

A.   That is correct.

Q.   And the state, meaning the Cook County State's Attorney's Office and their prosecutors, made the decision as to whether to retry Marcel Brown, right?

A.   That is correct.

Q.   That was a decision that was available to them; is that right?

A.   Wait, I'm sorry, say that again.

Q.   In other words, an appellate court didn't say, nobody can retry him.  It was a decision made by the prosecutors at the Cook County State's Attorney's Office?

A.   That's correct, yes.

Q.   And would it be fair to say that the Chicago Police Department detectives played no role in that decision?

A.   I don't know the answer to that.

Q.   In your experience, as a longtime lawyer in this arena, who do you believe makes the decision to retry a suspect for

murder, the Cook County State's Attorney's Office or the detectives for the Chicago Police Department?

A. Well, it comes down to the State's Attorney's Office. They are the ones who make the decision, yes.

Q. We saw some pictures.

A. Correct.

Q. I'm assuming you were not surprised by Marcel's reaction?

A. No.

Q. I mean, anyone would be happy when the Cook County State's Attorney's Office decides not to retry you for murder; fair to say?

A. I think that's fair, yes.

MR. GIBBONS: Thank you. Nothing more.

THE COURT: Thank you.

Any redirect, Mr. Bowman?

MR. BOWMAN: Very briefly.

REDIRECT EXAMINATION

BY MR. BOWMAN:

Q. Mr. Gibbons asked you some questions, Mr. Swygert, about the role of the Cook County State's Attorney's Office in a situation where a court orders the vacation of a criminal conviction. At that point, I think you said -- correct me if I'm wrong -- that the State's Attorney's Office has a decision to make, whether they re-prosecute or don't re-prosecute, right?

Swygert - recross

119

A.   Correct.

Q.   They could do either one?

A.   Correct.

Q.   In your experience, as a longtime actor in this field, does the Cook County State's Attorney's Office in these kinds of situations typically conduct their own reinvestigation of the facts and circumstances of a conviction in a criminal case in order to make that decision?

A.   Yes.

Q.   And in this particular case, what did the Cook County State's Attorney's Office decide with respect to Marcel Brown?

A.   They decided to dismiss the charges.

          MR. BOWMAN:   Thank you, sir.

          MR. GIBBONS:   Just one question, your Honor.

                    RECROSS EXAMINATION

BY MR. GIBBONS:

Q.   You don't have any personal knowledge as to what the Cook County State's Attorney's Office did or did not do to reinvestigate this case; is that fair to say?

A.   I mean, only what I was told by the prosecutor on the case, that they would be looking into it again.

Q.   You're aware of the concept of deliberative process, right?

A.   Sure.

Q.   Cook County State's Attorney's Office throws that up all the time, don't they?

A.   That they're going to look into something again?

Q.   And they won't tell you what goes into their decision, right?

A.   That's -- well, yes, that's right.

MR. GIBBONS:   Thank you.   Nothing further.

THE COURT:   Thank you, Mr. Swygert.   You may step down.

(Witness excused.)

THE COURT:   Plaintiff may call his next witness.

MR. BOWMAN:   Your Honor, plaintiff's next witness is Dr. Jonathan Arden.

THE COURT:   All right.   Mr. Arden is prepared to take the stand?

MR. BOWMAN:   He is on his way.   He'll be here momentarily.

THE COURT:   Good morning, sir.

Please approach the witness stand.   I'll ask you to raise your right hand before you take your seat so that you can be sworn.

THE WITNESS:   Yes, your Honor.

THE CLERK:   Can you state your name for the record.

THE WITNESS:   I'm Dr. Jonathan Arden, A-r-d-e-n.

Witness sworn.

JONATHAN ARDEN, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

Arden - direct

121

BY MR. BOWMAN:

Q.   Good morning, Dr. Arden.  I won't ask you to state your name again.

         What is your profession, sir?

A.   I am a physician, and in particular I am a forensic pathologist.

Q.   You say you are a physician.  You hold a medical degree?

A.   I do.

Q.   From what institution?

A.   I received my medical degree from the University of Michigan in 1980.

Q.   And you are licensed to practice medicine?

A.   Yes.  I'm currently licensed to practice medicine in five states, including Florida, West Virginia, Virginia, Maryland, and New York.

Q.   And, Dr. Arden, you stated your particular area of practice.  Could you tell us again what that is?

A.   Forensic pathology.

Q.   And would you let the jury know what forensic pathology is?

A.   Well, first of all, the specialty -- the medical specialty -- of pathology is the area of practice that studies the changes or alterations of the former function of the human body.  And by changes, I'm talking about the effects of diseases or injuries.

         Pathology is then broken down into two major areas,

one of which is anatomic pathology. It studies the pathology or the changes of the anatomy, the structures of the body, including what you can see with the naked eye, hold in your hands, and also features that require the microscope for examination.

You then take the broad background of general medicine and anatomic pathology and apply it primarily to the process of investigating and certifying certain types of deaths. And in particular the deaths that forensic pathology addresses are those that are either violent, which means any death that is caused by any kind of injury under any circumstances, and forensic pathology also addresses deaths that occur suddenly, unexpectedly. So, people who die without a diagnosis or they die in public, that sort of thing.

Q. And do you have board certification, Dr. Arden, in your area of practice?

A. Yes. I am certified by the American Board of Pathology in both anatomic and forensic pathology.

Q. Can you give the jury just briefly an outline of the work that you have done over the many years since you became board certified in your area of specialization?

A. I've practiced forensic pathology for 40 years now. And the first 20 years of my career, I was a full-time government-employed medical examiner. I worked in four different jurisdictions, including nine years for the City of

New York where I finished as the first deputy chief medical examiner, and then about five-and-a-half years as the chief medical examiner for Washington, D.C.

I then subsequently spent about the next 20 years of my career largely serving as a consultant in forensic pathology and medicine, the type of work that brings me here today.

And I am also -- I currently have an appointment in a part-time position under the title of forensic pathologist with the Office of the Chief Medical Examiner for the state of West Virginia. And in that capacity, I perform the duties of their medical examiners, but I do it on a very part-time basis.

Q. Dr. Arden, you've talked about the objectives of forensic pathology and the circumstances in which your services come into play. Could you now please tell the jury how forensic pathologists go about making their analyses and forming their opinions?

A. Well, to start with, the process that the forensic pathologist uses as a medical examiner is subsumed under the title of medicolegal death investigation. And it's a process that basically amounts to figuring out how and why people have died under the types of circumstances that I referenced were addressed by forensic pathology.

So, the process begins with a death investigation of the history, the circumstances, quite frequently the death scene, as well. And that may be investigated directly by the

forensic pathologist. That may also be investigated on behalf of the forensic pathologist by trained investigators in the office.

And, then, the process proceeds to -- normally proceeds to include an examination of the dead body. Quite frequently that is a complete external and internal examination of the body. That's called an autopsy. The autopsy may be furthered, if you will, by additional testing, like laboratory testing.

And, then, the end result is that the forensic pathologist takes all of that information, from the history, to the scene, to the autopsy, to the laboratory studies, puts it all together, makes decisions about the cause and manner of death, which are the explanations of how the person died and why the person died.

Not to belabor this, but as a consultant forensic pathologist, I go through a very similar process. I am not the medical examiner handling the death from the beginning, but it's really the same process as a consultant in that I review the investigation, I review the photographs, I review the autopsy, and so on. And, then, I go through the same thought processes to make my own conclusions as to how and why that person died, and sometimes to answer additional related questions.

Q. I want to talk with you just for a couple more minutes

Arden - direct

125

about the process, focusing on death scenes.

What is a death scene exactly?

A.   Quite simply, literally the location, the scene where the person has died or is found dead.  And, you know, that can vary tremendously.  We have death investigations where older people with longstanding diseases are found peacefully dead in bed. That's one kind of death scene.  Then we have violent deaths where somebody may have died from a car crash or a shooting or other kinds of trauma.  And sometimes, quite frequently, the death occurs at the location.  So, the person isn't transported by EMS, for instance; doesn't die in the hospital.  And, then, there's an investigation to determine what the circumstances were, what evidence there is that relates to the type of death, the cause of death, the circumstances of death.

And the death scene is part of the bigger investigation.  You need the investigation to put the cause of death into context.  It's really quite similar to what happens if you go to your physician for treatment.  Your physician doesn't just say, all right, don't tell me anything, I'll figure it out.  No, you go and you say, I'm here because I have a fever and a cough or whatever.  Your physician knows the difference between whether your a 4-year-old girl or a 90-year-old man, because medically we're looking for different things.  Your physician knows your medical history and uses all that background.  That's your clinical physician's

investigation.

Well, in forensics, we do the investigation by seeing, how does the body relate to the scene? Is there blood evidence? Is there -- you know, some of this, of course, is done by police, as well. Is there a car crash? Are there bullets there? It's all a matter of creating the scene and the context.

Q. And I take it, Dr. Arden, without belaboring the point, that over the course of your long career, you have had extensive training and experience in investigating death scenes?

A. Oh, certainly. I -- first of all, I had training in my forensic pathology training about death scenes and I went to some death scenes. I had -- for instance, during my training year, I attended a weeklong seminar at the FBI Academy that was produced by the Armed Forces Institute of Pathology. Among the various topics that were addressed and that we were trained in was death scene and crime scene investigation. We actually worked, you know, model crime scenes to try to learn how to do this.

During my career, I've personally attended -- I don't have a count, but at least dozens of death scenes and crime scenes myself. Over the course of my years as a government medical examiner, I helped to train and supervise death investigators for the medical examiner's office. In my

part-time work in West Virginia, I still interact with and supervise the death scene investigators.

So, yes, it's been a regular part of my career for its entire 40 years.

Q.   Dr. Arden, we, on the plaintiff's side of this case, have retained you to examine some of the evidence in the homicide of Paris Jackson that occurred in August of 2008, and to provide your opinions about the circumstances of Mr. Jackson's death; is that correct?

A.   That is correct.

Q.   And in the course of your work for us, you have looked at some materials?

A.   Yes, sir.

Q.   Can you give us a brief sense of what you had the opportunity to review?

A.   The primary materials that I reviewed and relied on were the materials from the medical examiner's office concerning Mr. Jackson, his autopsy, and his death.  Primarily, the autopsy report, the autopsy photographs.  There were some death scene photographs from the medical examiner.  I also reviewed death scene -- or crime scene photographs from the police.

Aside from those materials, I also was accorded some trial testimony from the medical examiner, several deposition transcripts, including the medical examiner and Mr. Brown.

I believe that summarizes it.

Arden - direct

128

Q.   Did you also have an opportunity to look at the deposition testimony of the evidence technician who gathered evidence at the scene?

A.   Yes.   I think it was Mr. Heidemann, if I remember the name. And there were a few other laboratory reports that I received. Aside from the toxicology report from the autopsy, there were some serology and DNA reports that were received much later.

Q.   And obviously you have to get paid for your work; is that correct, Dr. Arden?

A.   I do, yes.

Q.   And we have paid you for the time that you have spent reviewing all of these materials; is that correct?

A.   Yes, sir.

Q.   Does the fact that it's our side, the plaintiff, paying your fee for your time and effort have any effect on the substance of your opinions and findings in this case versus if you had been paid by the other side?

A.   Absolutely not.   I am retained by both plaintiffs and defendants in civil matters.   I base all of my analyses and opinions on the facts and what's good medicine and my experience in forensic pathology.   Whoever hires me isn't the point.   You get the same opinion regardless.

Q.   So, Dr. Arden, getting in now to your opinions, were you able to, from your review of materials, determine the cause of Paris Jackson's death?

A.   Yes, sir.

Q.   And what was it?

A.   Cause of Mr. Jackson's death was a gunshot wound to his chest, entered in the back, exited his body in the front, and caused significant, ultimately fatal injuries internally that I can detail if you'd like.

Q.   Could you give us a sense, Dr. Arden, of the extent and location of Mr. Jackson's internal injuries?

A.   Yes.  Internally, the bullet pathway enters the back, goes through the soft tissues, and then internally it particularly injures the left lung and areas of the heart.  So, the bullet passed through the left lung, injured one of the major airways in its passage through there.  Then went through two portions of the heart.  First was one of the smaller pumping chambers. The heart has two small chambers and two large chambers, one of each on the left side and one of each on the right side.  This was the smaller chamber called the atrium on the left.  So, the bullet went in one side and came out the other of it, came out basically in the front of it.

The bullet pathway then continues to damage one of the major coronary arteries.  The coronary arteries are the arteries that supply blood to the heart muscle itself.  So, some portion of the heart muscle at that point was then deprived of receiving blood.

The bullet pathway then basically tears a hole in the

Arden - direct

130

root or the beginning of the pulmonary artery, which is the major blood vessel that comes off the right side of the heart, carries the blood from the heart to the lungs where it receives oxygen. So, that major blood vessel just where it comes off the heart itself has a roughly two-centimeter -- it's about three-quarters of an inch -- hole in it.

Then the completion of the pathway is through the soft tissues of the front of the chest and the exit wound.

Q. So, the bullet, just to be clear, goes in Mr. Jackson's back?

A. Back.

Q. Does this significant damage that you described and then exits Mr. Jackson's body through his front?

A. Correct.

Q. As a result of this injury, did -- following this injury, did Mr. Jackson have any prospects of recovering from his wound?

A. No. He really didn't. I mean, if he had been shot standing in the trauma center, there's a pretty good chance he would have died anyway. But in practical terms of receiving that gunshot wound out in public, the likelihood of survival is practically zero.

Q. And specifically, can you determine how many minutes or seconds of consciousness Mr. Jackson would have left after this gunshot?

A.   I can.

Q.   And can you tell the jury what that is?

A.   Yes.  It is my opinion that Mr. Jackson would have had about 15 seconds and up to about 30 seconds that he could have remained conscious.  And the basis for that is that when the bullet went through the heart and pulmonary artery, at that point he has somewhere between no effective circulation or very compromised circulation of blood.  He's got two holes in the smaller chamber on the left side of the heart and he's got a big hole in the pulmonary artery on the right side of the heart.  So, every time that heart beats, most of that blood is going out into free space inside the body cavity.  It's not being propelled through the blood vessels to serve and feed the organs of the body.

So, his circulation has been reduced to somewhere between very little and nothing from the time he has the gunshot wound.

If your circulation -- if your heartbeat just stops dead, you have about 15 seconds of remaining conscious, because there's still some blood left in the blood vessels in the brain and the brain keeps extracting the oxygen.  It's not normal, because the blood is supposed to be circulating, but the oxygen that remains in the blood in the brain when the heart stops allows you to stay conscious for just about 15 seconds.

So, adding on to that approximately 15 seconds, if he

has any circulation at all from his now damaged heart and pulmonary artery, that could give him a little more time. I think doubling that time is really pushing it to its maximum. That's how I came up with the estimate of 15 to 30 seconds of remaining conscious after he was shot.

Q. And when a person loses consciousness, can they continue engaging in purposeful activity?

A. No. Once you lose consciousness, you can no longer engage in purposeful activity. So, at that point, you're not conscious, you're not responsive, you are not able to walk or talk or respond.

Q. Or run?

A. Or run.

Q. And, Dr. Arden, stepping now from the period of consciousness to the period that Mr. Jackson would remain alive after he received this wound, is there a difference? And very briefly, can you explain what that difference is and what the period is?

A. There is a difference. Once you lose consciousness, you can still remain alive for a period of time, depending upon the reason you lost consciousness. In this circumstance where you have this bullet wound with the damage I just described and the impairment or absence of circulation, your body may continue to function. The organs may continue to function for a fairly brief period of time. So, you're unlikely to be alive more

Arden - direct

133

than a few minutes thereafter.

In his case in particular, his heart really would stop beating very quickly, because he's had damage to it, he's lost blood. He's also had damage to that coronary artery, so part of the heart muscle no longer is getting any blood supply.

So, outside time period of remaining alive, a few minutes.

Q. Dr. Arden, as a result of this injury, would Paris Jackson be bleeding?

A. Yes, sir.

Q. And can you describe in any terms at all the nature of the bleeding that he would experience?

A. Sure. I think there's two ways to address that. One is that he would be bleeding internally, because the damage to the structures I just described to you will cause bleeding. And it's likely that much of that blood will remain inside the body cavities. In fact, the autopsy demonstrated exactly that. The left chest cavity had 500 milliliters of blood and the pericardial sac, there's a sac around the heart, contained 120 milliliters of blood.

So, we have 620 milliliters of blood total that was collected. That's about somewhere in the neighborhood of 20, 21 ounces, that range total.

He would also bleed externally, because he now has a bullet hole in the front and a bullet hole in the back. And at

Arden - direct

134

least initially for a brief period of time, his heart continues to beat. So, some of that blood will be able to be expelled from the two bullet holes, one front, and one back.

Q. And as you reviewed the photographs of Mr. Jackson's clothing that was removed from him in the autopsy, did you see evidence that Mr. Jackson had been bleeding significantly as a result of his injury?

A. Yes. He had blood that was accumulated in both the front and the back of the shirts that he was wearing, which were identified at the death scene and also at the autopsy.

Q. Showing you --

MR. BOWMAN: Actually, Judge, I don't think there's an objection. This is Plaintiff's Exhibit 318. It's Page 17. So, I'll refer to it as 318.17. And I'd like to show it to the jury at this time.

THE COURT: Any objection?

MR. FLYNN: No objection, your Honor.

THE COURT: It will be admitted. You may publish it.

(Plaintiff's Exhibit 318.17 received in evidence.

BY MR. BOWMAN:

Q. So, what do we see here, Dr. Arden?

A. The photo that you just put on the scene is one taken from the autopsy. This is the white undershirt that Mr. Jackson was wearing when he was shot. And you can see it's put on a clean blue background and there's a large area visible with red and

dark red staining.  And that's the blood that he had externally bled from the gunshot wound that was now soaked up by that shirt.

Q.   And was that the only shirt that Mr. Jackson was wearing at the time of his death?

A.   No.  He had another darker shirt on the outside.

Q.   Showing you --

MR. BOWMAN:  Or actually, seeking admission of 318.16, the photograph of the black shirt.

THE COURT:  Any objection?

MR. FLYNN:  No objection, your Honor.

THE COURT:  It will be admitted.  You may publish it.

(Plaintiff's Exhibit 318.16 received in evidence.)

BY MR. BOWMAN:

Q.   Can you tell us what this is, sir?

A.   Yes.  The photo you've put on now is that outer mostly black shirt that Mr. Jackson was wearing when he was shot.  You can see the way it's being displayed here upright as if you were looking at a standing person.  You can see that there's darker staining centrally and going toward our left in the picture.  So, there's a fairly large area, as well.

Sparing, just for comparison to our right, you can see areas that do not appear to have blood, but there's a large area with the darker staining, which indeed is blood from his bleeding from the gunshot wound.

Q.   So, Dr. Arden, I want to ask you a hypothetical question. And for that purpose, I'm going to display Plaintiff's Exhibit 37.

MR. BOWMAN:  It's already been shown to the jury.

MR. LOEVY:  It's upside down, Locke.

MR. BOWMAN:  I'm sorry?

MR. LOEVY:  It's upside down.  Upside down.

MR. BOWMAN:  It is indeed.

BY MR. BOWMAN:

Q.   Dr. Arden, you're familiar generally with what's displayed here from your review of the materials, correct?

A.   Yes, sir.

Q.   And this is the fieldhouse of Amundsen Park, correct, which you see here?

A.   Yes, sir.

Q.   And you see behind the fieldhouse, a larger building that is the gymnasium that abuts the fieldhouse, right?

A.   Yes, sir.

Q.   Now, here comes my question, Dr. Arden:  The jury heard yesterday from Mr. Flynn that police believed that Paris Jackson was shot as -- at the moment when he passed this northwest corner of the gymnasium, and that after he was shot at that location, he ran or walked down a sidewalk that travels along the West Side of the gymnasium.  And that Mr. Jackson then collapsed and died on a grate located right here at the

corner of the gymnasium. Which if you look at the gymnasium, it's the southwest corner, right where it comes up against the main fieldhouse.

So, you understand that and have that in mind, sir?

A. I do. Thank you.

Q. And drawing on your review of the materials and your expertise as a forensic pathologist, do you have an opinion as to whether that scenario that the jury learned from Mr. Flynn is consistent with Mr. Jackson's injuries, the condition of his body and the evidence that was recovered at the scene?

MR. FLYNN: I object, your Honor. They're eliciting an undisclosed opinion at this point.

MR. BOWMAN: It's not undisclosed. It's not undisclosed.

THE COURT: Can we do a quick sidebar? I realize it might take a moment, but I do want to be sure.

(Proceedings heard at sidebar:)

THE COURT: Obviously, I'm reluctant to let the witness answer if there's some concern about disclosure. I'm hoping you can put your finger on it.

MR. FLYNN: Yes, your Honor. At no point has this expert ever provided any expert opinion that if Mr. Jackson was shot at the corner of the fieldhouse he would not be able to ambulate to the corner of the fieldhouse where his body was recovered.

MR. BOWMAN:  His opinion, Judge, is based on, number one, the absence of a blood trail down the sidewalk leading from the location where the shooting allegedly occurred to the location on the grate where the body was found.  That discussion -- there was extensive discussion about the blood trail in Mr. -- Dr. Arden's deposition.

MR. LOEVY:  Let me interrupt you, because there's a misunderstanding.  Mr. Flynn just thought he was going to say he couldn't have run that far.  That's not his opinion.  His opinion is going to be about the blood, which is what the report's about.

So, this is a misunderstanding on Mr. Flynn's part.

MR. FLYNN:  If that's the case, your Honor, we withdraw our objection.

THE COURT:  Okay.  Thank you.  Appreciate the clarification.

(Proceedings heard in open court:)

THE COURT:  Mr. Bowman, you may continue.

MR. BOWMAN:  Thanks, Judge.

BY MR. BOWMAN:

Q.  So, I'm going to ask my question again so we all have it in mind.

Do you, Dr. Arden, have an opinion, based on your review of the materials as to Mr. Jackson's injuries, the condition of his body when it was found at the location on this

grate and your medicolegal knowledge as to whether the scenario that we were talking about, shot here at this corner of the fieldhouse, found here at this corner of the fieldhouse, after running down this sidewalk here, whether that is consistent with the physical evidence and the medical evidence from this investigation?

A.   I do have such an opinion.

Q.   And there are, doctor, a number of reasons for your opinion; is that correct?

A.   Yes, sir.

Q.   And I want to take you through those reasons one by one.

The first thing I'd like to talk with you about is the condition of the sidewalk that runs along these two locations.

So, just to get us oriented, if you look quickly again at this side of the fieldhouse, I'm indicating a location right adjacent to the gym.

And, then, showing you -- actually, sorry.

MR. BOWMAN:  I move the admission of Plaintiff's 169.25.

MR. FLYNN:  No objection.

THE COURT:  All right.  It will be admitted.  You may publish.

(Plaintiff's Exhibit 169.25 received in evidence.)

BY MR. BOWMAN:

Q.   Showing you this exhibit, which is a photograph, is there

something about the condition of that sidewalk that leads you to the view you just expressed that Mr. Jackson didn't die the way Mr. Flynn described?

A. Actually, just to make the record clear, I don't think I actually expressed the opinion. I simply answered that I did have an opinion. But you are correct, my opinion is that the scenario, as depicted in that hypothetical question, is inconsistent with the physical and forensic evidence, in my opinion.

And, so, now directing my attention to the photograph on the screen, the sidewalk in that scenario would have been where Mr. Jackson had run after being shot. The important aspect here, forensically, is that once he was shot and he's then bleeding both front and rear from the gunshot wounds, as we saw from the blood that was at least partially deposited on the shirt, he would have been actively pumping his heart if he could be running down there.

You know, so the first thing is, could he actually stay conscious long enough to walk or run down that sidewalk, which, frankly, I think is not impossible but is doubtful. But he would have been leaving a trail of blood drops because he would be actively bleeding from the gunshot wounds front and rear. Because in order to be running down that sidewalk, he has to have consciousness, and he's only going to stay conscious for a brief period of time, as we've already

discussed.  And his heart is only going to continue beating for a brief period of time, even inefficiently.

So, he would be expelling blood from the wounds.  He would be dripping blood possibly even just from the shirt. There would be a blood trail showing his path as he walked or ran down that sidewalk.

There's no blood trail there.  So, the absence of a blood trail is strong evidence against the hypothetical scenario of being accurate.

Q.  Now, Dr. Arden, there is an evidence marker, you see this yellow thing sticking up here on the sidewalk in the foreground on the right with the number 4 on it.  I'm indicating it with my finger.  Yes, sir?

A.  Yes, sir.

Q.  From your review of the materials, can you tell the jury what that is?

A.  Yes.  This evidence marker number 4 is locating a very small drop of red material, which, to my knowledge, based on the materials at the time of the investigation and the autopsy, was simply identified as consistent with or possible blood drop at a much later time.

There are two other blood drops similarly that lead testing was done I think just last year to identify it as Mr. Jackson's blood.  But at this point, when this photograph is taken, it's a red spot -- small red spot that is at least

consistent with a drop of blood.

Q. And I'll show you, Dr. Arden, a close-up of the evidence marker.

Can you describe for the jury --

MR. BOWMAN: This is Plaintiff's Exhibit 169.22. I've already put it on the screen. I assume there's no objection.

MR. FLYNN: No objection.

THE COURT: All right. Without objection, it will be admitted and you may publish.

(Plaintiff's Exhibit 169.22 received in evidence.

MR. BOWMAN: And, Judge, I have three more, 169.28, 169.20, and 169.13 that I'll be using momentarily. I'd ask for --

MR. FLYNN: Can I just see those?

No objection.

THE COURT: They will be admitted and you may publish when you're ready to do so.

(Plaintiff's Exhibits 169.28, 169.20, and 169.13 received in evidence.)

BY MR. BOWMAN:

Q. So, returning to our discussion, Dr. Arden, what do you see here at the evidence marker number 4?

A. You can see evidence marker number 4 in this closer picture. It's straddling the border between the sidewalk itself and the dirt area to the side of it. And in the --

looks like a half a square cutout, the part that's flat on the ground, there is a small red area.  And it's not --

I think I can draw on the screen here.  I've just now put a yellow dot that's largely obscuring that small red area.

If you see the larger, darker area here, this is -- which I'm going try to circle with dots now, semi successfully. That's not what I'm indicating.  The larger, darker area is not the apparent blood drop later identified to be a blood drop.

There's other dark areas like that scattered elsewhere on the sidewalk when you look at the scene photos, but the first dot that I put that's inside the crook of that evidence marker is the red dot that was found there that looks like a drop of blood and later was identified to be a drop of blood.

Q.  I'm going to show you now, Dr. Arden, what's in evidence as plaintiff's Exhibit 169.20.

Tell us what you see in the foreground there, sir.

A.  The foreground you see another evidence marker, number 5. And then in the background you see another evidence marker, 6. And there's actually a third one, number 8, over on the right side.  The 5 and 6 I think are what we're looking at here.

Q.  Yes, focusing on the foreground, Dr. Arden, what do you see there?

A.  The evidence marker 5 is also encompassing another small dot that was discovered and looked like a drop of blood.

Q.  And, then, finally, I'm going to show you an image of

Arden - direct

144

evidence marker 6 that's a little more of a close-up.

And this is, for the record, plaintiff's Exhibit 169.28. Let's see if we can get a little closer to it.

Can you tell us, sir, what that is?

A.   Yes, 6 is, again, identifying a small area of red material that was deposited that was thought to be or looked consistent with blood and much later was identified to be blood.

Q.   Now, these three drops of blood, could they be the blood trail that Mr. Jackson would leave if he were alive, running down or walking down that sidewalk to the location where his body was found?

A.   No.   In my opinion, those three small blood drops that are widely scattered, two fairly close to his body, one farther down the sidewalk, are not consistent with the blood trail I would expect to see.   I would expect to see substantial drops of blood in a sequence that would depict or follow the pathway of him walking or running down that sidewalk while he was bleeding.   But we don't have that.   We have one tiny one over here, two small ones over there.   This is not a trail of individual drops following his path as he walked or ran.

Q.   Now, we looked at it a minute ago, and just briefly so that we can orient ourselves for this next question I'm about to ask you, Mr. Jackson was found on a grate; was he not?

A.   Yes.   The upper portion of his body was lying flat on the grate.

Q.   And from your review of the materials, did you learn what, if anything, was found on the grate underneath Mr. Jackson's body?

A.   I did.

Q.   And what was it?

A.   Nothing was found on the grate.  In other words, there was no blood from his body or shirt that was deposited on the grate.  And for that matter, there was no blood that was dripped or deposited through the grate to the stairway below.

Q.   From your review of the materials, did you ascertain whether investigators had walked down underneath the grate where Mr. Jackson's body was found to attempt to locate any evidence that might be down there?

A.   I did ascertain that.  And, in fact, that is what they did. They walked down the stairway that was below the grate and investigated for blood in particular to see if any of his blood had dripped through the grate onto the ground or the stairway below.  And they found none.

Q.   And is this evidence, the absence of any blood underneath Mr. Jackson's body on the grate, the absence of any blood underneath the grate consistent with the hypothesis that Mr. Jackson ran down the sidewalk, lost consciousness and collapsed on the grate?

A.   It is not consistent with that hypothesis.

Q.   Why not?

A.   Because if he had been able to run down the sidewalk after being shot and then collapsed onto the grate, he would have collapsed at a point where he was still bleeding and still had wet blood on his shirt that could have -- the bleeding itself could have caused blood to have dripped onto the grate and through the grate.  The wet blood on the shirt could easily have been deposited onto the grate itself by contact.  But we have none of that.

So, in order for him to be able to fulfill the actions in the hypothetical scenario of running down the sidewalk and collapsing onto the grate, he would have to have had enough circulation to keep him conscious, and then even maybe his 15 seconds of no circulation, to continue any kind of purposeful activity.  He would have been actively bleeding during that time.

And, so, the issue about the absence of blood on or below the grate is very similar to the issue of no trail of blood.  It's contrary to him being up and moving and having circulation or heartbeat and active bleeding at any of those times.

Q.   Dr. Arden, if he had been on the grate under this hypothesis, he just collapsed there, would his heart have been beating at the point when he collapsed?

A.   It more likely than not would have been beating when he collapsed, yes.

Q.   And would that have resulted in the deposit of blood on the grate and dripping of blood beneath the grate?

A.   Exactly.  Yes, it would.

Q.   Dr. Arden, is there evidence from Mr. Jackson's face in death that bears on your opinion that this idea that he, Jackson, had been shot at the corner there, had run down the sidewalk and collapsed on the grate is or is not true?

A.   Yes, there is such evidence from his face.

Q.   And can you tell us what the evidence is?

A.   The evidence that was present on his face was an imprint or impression of the grate on the soft tissues of one side of his face.  And it is clear to me from the nature of that finding that that is a post-mortem imprint.

So, the positive evidence that we have is that the pressure of his face against the grate caused an impression from the grate that was a post-mortem phenomenon, meaning it happened after his death.  And that's not really consistent with him running there and then collapsing because he's still alive at that point.

And the flip side, if you will, of that is the absence of any injury to his face that indicates that he collapsed and struck his face onto the grate.  He has no bruising of the face, neither elsewhere on the face or in the actual imprint from the pattern of the grate.  He has no abrasion, which is scraping, which you frequently get if you fall onto a hard or

rough surface.  And the features of the impression on his face are clearly indicative that this is post-mortem.

So, he doesn't have any injury that suggests collapsing onto the grate, but he does have a finding, an anatomical finding -- it's not an injury -- that happened after he died.

Q.  And, Dr. Arden, you made these observations from examining a photograph of Mr. Jackson's face, correct?

A.  Yes, sir.

Q.  And what was the context in which this photograph was taken?

A.  Well, the photograph that is most important is one of the police crime scene photographs that were taken of Mr. Jackson after he was rolled over at the death scene.  So, it was what his face appeared like at the time he was discovered, which is particularly important, because if you compare that to the autopsy photographs, once he has been turned face up and then he's been transported and the next day he has the autopsy, the impression on his face is virtually gone.  Again, indicative of a post-mortem pressure phenomenon, not an injury.  If he had been injured to cause that by falling onto the grate, the injury would remain on the following day when the autopsy was done.  But it didn't.

Q.  Dr. Arden, the evidence in this case is that Paris Jackson's body was not found until the morning of August 31,

and that when investigators -- or sorry, police officers, came to the park at 11:00 p.m. on August 30, they did not see Mr. Jackson on the grate.  So, in light of that --

MR. FLYNN:  Objection, your Honor.  Assumes a fact not in evidence.

THE COURT:  Response.

MR. BOWMAN:  It's a hypothetical for the doctor.  It's not -- it's not contested.

MR. FLYNN:  It's not worded as a hypothetical, your Honor.

THE COURT:  Overruled.  The witness can answer.  Or you can finish your question and the witness can answer.

MR. BOWMAN:  Yes.  I'll restate it so we all have it in mind.

BY MR. BOWMAN:

Q.  The evidence in this case is that Paris Jackson's body is found on the morning of August 30.  When police investigators responded to the scene on the evening of August -- sorry, it was found the 31st.  When they respond on the 30th at 11:00, they don't see a body.  In light of that evidence --

MR. FLYNN:  Objection, your Honor.  Again, this is a fact that's not in evidence.

MR. BOWMAN:  It's the same question.

THE COURT:  Mr. Bowman, just rephrase it a bit as a hypothetical.

MR. BOWMAN: Yes.

THE COURT: So, your objection is sustained for the ruling.

BY MR. BOWMAN:

Q. If, hypothetically, it were true that Mr. Jackson's body was recovered the morning of August 31st at 9:00 a.m., and if it were also hypothetically true that on the evening of August 30 at 11:00 p.m. when police responded to the scene Mr. Jackson's body was not discovered, do you have a theory grounded in medicolegal expertise as to how Mr. Jackson's body came to rest in the location where it is found the next morning?

A. I do.

Q. And what is your opinion, sir?

A. It is my opinion that Mr. Jackson's body was placed in that location where he was found on the grate after he had been shot and after he had died.

And the basis of that is largely the testimony I've just given you about the -- the reasons why, in my opinion, the original hypothetical was inconsistent with the evidence.

So, without belaboring it, the absence of the evidence that would support that he had run down that sidewalk after being shot, the absence of evidence of any injury from collapsing onto the grate, the relatively short period of time he would have had to conduct any conscious or purposeful

activity after being shot, all of those elements go into answering your second hypothetical, namely, that had his body been placed there at a later time after he had died, when he's no longer bleeding, he's no longer bleeding onto the grate or beneath the grate, he -- his face is laid down onto the grate and he receives only a post-mortem, after-death impression in his face, not an injury, all of that is consistent with somebody who had been shot, had stopped bleeding and was then placed there at a later time.

MR. BOWMAN:  Thank you, sir.

I have no further questions.

THE WITNESS:  Thank you, sir.

THE COURT:  All right.  Thank you, Mr. Bowman.

Cross-examination.  Mr. Flynn.

MR. FLYNN:  Yes, your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. FLYNN:

Q.  Dr. Arden, nice to see you again.

A.  Good to see you, too, sir.

Q.  Now, you are aware in this case that the defense, we've hired our own expert that's also examined Mr. Jackson's injuries, correct?

A.  I know you've hired experts, yes.

Q.  And you've reviewed his report?

A.  I did.

Q.   His name's Dr. Cichon?

A.   I've forgotten his name, but yes, sir.

Q.   It is.

There are several issues that you and Dr. Cichon, our expert, agree on, and I just want to walk through some of those.

First, you agree that by the time that Paris Jackson's body was found on the morning of August 31st, 2008, it already had what you call well-developed rigor mortis?

A.   Yes, sir.

Q.   And that indicated to you that by the time his body was found that next morning, it had been there for several hours prior to that?

A.   Yes.  Had been there in that position for at least several hours.

Q.   You also agree with our expert that Paris Jackson suffered a single gunshot wound from the back and out through the chest?

A.   From the back out through the front, yes, both of which are the chest.

Q.   You agree with our expert that the bullet perforated Paris' left lung?

A.   Yes, sir.

Q.   You also agree that the bullet injured the pulmonary artery that feeds into the heart?

A.   Correct.

Q.   The pulmonary artery is at the end of the circulation system, right?  It feeds blood back in the heart to be then pumped back out by the heart?

A.   No, that's not correct.

Q.   Well, the pulmonary artery is at the end of the circulation system, correct?

A.   No.  First of all, there's no end of the circulation system.  It's a continuous loop.  It's actually two continuous loops.

Q.   Let's say that when the heart pumps blood and it first comes out of the heart, let's call that the start of the circulation system.  And by the time it gets back to the heart, that would be the end of the circulation system; is that fair?

A.   Again, nobody talks about the end of the circulation system.  But, yes, the heart on the left side pumps blood to the body.  Blood returns from the body to the right side of the heart, from which it is then pumped to the lungs, and that returns to the left side of the heart to start the process all over again.

Q.   I don't want to quibble with you, Dr. Arden.

We can agree that the pulmonary artery is the last place the blood is at before returning to the heart?

A.   No, we can't.  It's not anatomically or physiologically correct.  I'm sorry.

Q.   Do you agree with me that the pulmonary artery feeds blood

back into the heart?

A.   It does not.  It takes blood away from the heart.

Q.   Would you agree with me that the artery that was nicked is the pulmonary artery?

A.   Yes, sir.

It wasn't nicked.  It had a two-centimeter hole in it.

Q.   Sure.  "Nicked" is probably not the proper term.

You would also agree that -- with our expert, that Paris had abrasions on his left forearm, his elbow, and his knees, correct?

A.   Yes, sir.

Q.   You would agree those abrasions are consistent with someone being shot in the back and falling down?

A.   Well, first of all, some of those look more like post-mortem, so that takes them out of the same category.  But in general, abrasions in the arm and the knees are consistent with many different scenarios, which includes somebody being shot and falling down.

Q.   Okay.  You would agree that Paris would have likely remained conscious for somewhere between 15 to 30 seconds after he was shot, right?

A.   Yes, sir.

Q.   You also agree that after Paris was struck by that bullet, he would have been able to get up and run for another 15 to 30 seconds during this consciousness, right?

A.   He would have been able to conduct purposeful activity for some or all of the 15 to 30 seconds, which at least in the beginning would certainly include running.

Q.   So, I will ask my question again.  For the 15 to 30 seconds Paris -- after he was shot, Paris would have been able to run?

A.   Certainly in the beginning, yes, he would.  I mean, whether he can still run at the moment he collapses, I don't know.  But somewhere in that neighborhood of 15 to 30 seconds, theoretically, yes, he could run.

          MR. FLYNN:  Can we pull up Exhibit 41, please, of the map -- sorry, not Exhibit 41.

          MS. SCAVO:  37?

          MR. FLYNN:  Yes.  This is the map.

BY MR. FLYNN:

Q.   This is the map of Amundsen Park that Mr. Bowman showed you earlier?

A.   Yes.  The aerial photograph, yes.

Q.   Yes.

          You would agree that if Paris was shot at the corner of this fieldhouse, you had said that he'd be able to run for the 15 to 30 seconds or so, that would be enough time to get through the sidewalk down to the corner of the fieldhouse where his body was found?

A.   It might be, yes.  It's possible, yes.

Q.   You agree that when the autopsy was done of Paris' body,

the medical examiner found 500 milliliters of blood inside of his chest cavity?

A.   Yes, in the left chest cavity.

Q.   There was also another 120 milliliters of blood in his pericardial sac around his heart?

A.   Yes, sir.

Q.   There's also some blood that Paris breathed into his lungs after he was shot, correct?

A.   There is some blood that was what they call aspirated.  I think more likely was the result of the damage to the major airway and bleeding into it.  I don't think technically it was breathed in.

     But yes, there was a little bit of blood that went into the air spaces of that lung.

Q.   And in your report, you said -- you approximate about 700 milliliters of blood was inside -- was internal bleeding inside Paris' body, correct?

A.   I estimated approximately 700 milliliters of total bleeding, meaning internal, as well as what was in the shirts.

Q.   Okay.  And 700 milliliters, it can be difficult for some of us that grew up hating the metric system, that's about -- if you think of like a fifth of tequila, that's 750 milliliters, right?

A.   Yes, sir.

Q.   So, a little less than a fifth of tequila was blood that

Arden - cross

157

was inside his body and in his shirts?

A.   Yes, sir.

Q.   I want to talk to you about what happened inside Paris' body that led to his death.

You state in your report that 700 milliliters of blood was approximately 17 percent of what would be in Paris' body?

A.   Yes.   That's approximately 17 percent of his expected total blood volume based on his bodyweight.

Q.   And losing 17 percent of your blood is not enough for you to die from blood loss?

A.   Typically it is not, that's correct.

Q.   And it's your opinion in this case that Paris did not die purely from blood loss?

A.   Correct.

Q.   But that pericardial sac around Paris' heart that we talked about earlier that had the 120 milliliters of blood, as that fills up with blood, that begins to put compression around the heart; is that correct?

A.   That's correct.

Q.   And when that compression around the heart with that internal blood around it occurs, it's difficult for the heart to fill back up with blood?

A.   That's exactly right.

Q.   Okay.   And after that occurs, or when that occurs, that means there's less blood being sent back out to the vital

organs?

A. Correct.

Q. And that can lead to death?

A. It can, yes.

Q. And you believe that that did happen in this case, that he was experiencing that issue known as cardiac tamponade?

A. Yes. I believe he was experiencing acute cardiac tamponade, which is exactly the phenomenon you described, among other effects from the gunshot wound.

Q. Because blood was not getting to his vital organs, correct?

A. I'm not sure where the because -- what because of --

Q. Because of that cardiac tamponade, I think you just called it, there was not blood getting to his vital organs?

A. Cardiac tamponade limits the amount of blood that the heart can pump each time, so it diminishes the amount of blood going to the vital organs.

Q. And as that cardiac tamponade is occurring, there's less and less blood pressure behind every beat of the heart, correct?

A. Yes. Eventually it will cause lowering the blood pressure, correct.

Q. Because the blood's just not filling -- sorry, the heart is not filling up with as much blood?

A. Correct.

Q. You testified that there's three types of external

bleeding. Blood can be oozing, blood can be flowing, and blood can be spurting out of the body; is that correct?

A. I think I did make those distinctions, yes.

Q. And blood spurting out of the body, that's something like you might see in a Tarantino movie or something where it's spurting out?

A. If you open an artery to the outside, the arteries are the high pressure system of your circulation, arteries will spurt. So, yes, you can have effects or injuries to arteries that spurt in a pulsatile way.

Q. We would agree that the nature of the gunshot wound in this case Paris experienced would not have caused spurting of blood from Paris' body?

A. Correct, sir.

Q. Because the gunshot wound itself, Paris Jackson, out the front and the chest, was smaller than a quarter?

A. It was.

Q. It was less than a half-inch wide and less than a half-inch long?

A. Correct.

MR. FLYNN: Will you please pull up Exhibit 318.8? And not publish to the jury yet. We have to admit it into evidence.

Any objection?

MR. LOEVY: No.

Arden - cross

160

MR. FLYNN:  If we can publish to the jury, please.

THE COURT:  It will be admitted without objection.

(Exhibit 318.8 received in evidence.)

BY MR. FLYNN:

Q.  And you recognize this photo, correct?

A.  Yes, sir.

Q.  This was a picture taken by the medical examiner during the autopsy?

A.  That's correct.

MR. FLYNN:  Can we publish to the jury, please?

BY MR. FLYNN:

Q.  You recognize this, correct?

A.  Yes, sir.

Q.  And this is a photo of Paris Jackson's body that was taken when the autopsy was performed?

A.  Yes, sir.

Q.  And that wound that you see there just above that gray metal, for lack of a better word, sign, that's the gunshot wound that came out the front of his chest, correct?

A.  Yes.

Q.  And after Paris' heart had stopped, he would no longer have any active external bleeding?

A.  That's correct.

Q.  So, I want to go back --

MR. FLYNN:  You can take that photo down.

BY MR. FLYNN:

Q.   I want to go back to the pulmonary artery we were talking about earlier.

        You would agree that it was on the low pressure side of the circulation, correct?

A.   Yes.

Q.   And that artery, that pulmonary artery that was injured by that bullet, that's inside -- it's encased within Paris' chest cage?

A.   It's inside the chest, yes.

Q.   And it's also encased within layers of fat?

A.   Well, the body wall has layers -- a layer of fat, among other things.

Q.   Also layers of muscle it's encased within?

A.   Again, you're now really talking about the chest wall, not the internal structures.  But the body wall has fat -- skin, fat, muscle, connective tissue.  And, then, inside the body cavity where the injury you're talking about exists, you have the heart, the artery, the pericardial sac around it.

Q.   I'll ask my question again.

        The artery itself is -- between the skin and the artery, you have a layer of fat, you have a layer of muscle, multiple layers of muscle, correct?

A.   You have fat and muscle in the chest wall that is between the outside skin and the artery.  It's -- those things are not

Arden - cross

162

on the artery, if that's what you're asking.

Q.   So, we talked about the 700 milliliters of blood that you agree was inside of his body.  Internal bleeding, correct, and also in his shirt?

A.   Yes.  My estimate -- my estimate of 700 milliliters accounts for the internal bleeding and the blood in the shirt.

Q.   But yet it's your opinion that there would have been more blood outside of Paris' body if he was shot at Amundsen Park; is that right?

A.   No, I don't think I ever expressed that opinion.

Q.   Well, earlier Mr. Bowman walked you through the crime scene, Amundsen Park, and he showed you the spots of blood which you agree are blood, right?

A.   Yes, sir.

Q.   And it's your opinion that there would have been more blood at the crime scene?

A.   My opinion is that there would have been more blood at the scene had he been shot and run down that sidewalk and then collapsed on the grate, yes.

          MR. FLYNN:  So, if we could pull up Exhibit 41.56.

          I believe Mr. Bowman already entered this into evidence.

BY MR. FLYNN:

Q.   These are some of those spots of blood we talked about earlier?

A.   Yes, sir.

Q.   You agree that those are Paris' blood?

A.   I do.

Q.   If we could also --

THE COURT:   I believe -- is this the same photograph as 169?  My record doesn't show whether 41.56 is already in evidence.

MR. FLYNN:   No objection.

THE COURT:   It does appear to be -- okay.  No objection.

MR. BOWMAN:   It looks --

THE COURT:   So, it will be admitted.

MR. BOWMAN:   -- perspective.  No objection, Judge.

THE COURT:   All right.  Thank you.

You may publish it.

(Exhibit 41.56 received in evidence.)

BY MR. FLYNN:

Q.   And those two evidence markers there, one's number 5, those yellow markers, and then one's closer to Paris' body.

One here, you see the two spots of blood right here next to 6?

A.   Yes.

Q.   And you see the spots here next to 5?

A.   I do.

MR. FLYNN:   And, then, if we could next go to the same

Arden - cross

164

exhibit, but page 52.

THE COURT: Any objection? Looks like it's the same photo.

MR. BOWMAN: No objection.

THE COURT: It will be admitted.

(Exhibit 41.56, Page 52 received in evidence.)

BY MR. FLYNN:

Q. This is the other spot of blood we talked about earlier, correct?

A. Yes, sir.

Q. And just to be clear, this is the sidewalk that we were looking at. So, if we're at the Amundsen Park map again that we were looking at earlier, we're at the north end, and we're looking down the sidewalk. In this picture, Paris' body would be there in the corner just a little bit to the right of that garden area; is that right?

A. Yes, sir.

MR. FLYNN: Then if we could go to Page 55 of the same exhibit.

BY MR. FLYNN:

Q. This is the other photo that you were looking at earlier?

A. It is.

Q. I just want to be clear about this. I didn't quite understand you. You agree that part of this spot is blood, right?

A.   Yes.   The little red dots.

Q.   But the larger pool -- or larger pool area of red, you're saying that that's not blood?

A.   There is no larger pool area of red.   There's an area --

Q.   There's a larger --

A.   There is an area of darkening on part of the concrete, but that's not red and it doesn't look like blood.

Q.   It's your opinion that's not blood?

A.   Correct.

Q.   Just the little area is blood, but the bigger area is not?

A.   Correct.

Q.   Okay.

        MR. FLYNN:   You can take that down.

BY MR. FLYNN:

Q.   It's also your opinion that there would have been blood found underneath Paris' body, right?

A.   If he had been just shot and collapsed within seconds or 30 seconds on that grate, yes.

Q.   But it's your opinion that when Paris' body was put on the grate, his heart was no longer beating, right?

A.   Correct.

Q.   And when your heart's not beating, that means it's not pumping blood?

A.   Correct.

Q.   And that means that there's no pressure pushing the blood

from the heart; is that right?

A. Correct.

Q. We also agree that when Jackson -- excuse me -- when Paris was put on the grate, the majority of the blood would have remained in other parts of his body, right?

A. Well, the majority of his blood still remained in his bloodstream in other parts of his body, yes.

Q. Right.

So, when his body -- when he lays down on the grate, the blood's not all of a sudden going to rush out of that small, little, tiny chest wound, right?

A. No. If he were still -- if he still had liquid blood and he had blood in his cavity, he could still ooze or leak passively some blood out of the hole in the front of his chest that's now down relative to gravity. But he wouldn't be actively bleeding.

But if you're asking about the other blood in his body that you referenced, no, the other blood in his body isn't going to be going anywhere because it's still in his bloodstream.

Q. Right. Gravity is just going to keep it where it's at, right?

A. No, gravity is going to take it downward relative to gravity such that the parts of the body that are down will look redder, a phenomenon called lividity.

Arden - cross

167

Q.   And his chest was actually elevated from the rest of his body, right?  When you look at his body laying on the grate?

A.   A little bit.

Q.   Okay.  You would agree when someone has a gunshot wound, it's common to apply pressure to that wound?

A.   If you're talking about trying to treat a wound, yes.

Q.   You want to apply pressure to a gunshot wound because you want to stop the bleeding, right?

A.   Correct.

Q.   And with respect to someone who dies, who has an open wound, you could also apply pressure to that wound, and that would also stop any kind of leakage, right?

A.   Well, it makes an assumption that the part that you're pressing on the dead person is oriented such that there could be leakage.  So, theoretically, yes.  Could you put pressure on an open wound of a dead person and prevent any other blood from leaking out?  Sure.

Q.   So, you could put pressure on the wound of a dead person and keep blood from leaking out; we agree on that?

A.   If the wound is positioned in a way that would have been leaking otherwise, yes.

Q.   And we agree that when Paris' body was found, his chest was pressed up against the grate, right?

A.   It was.

Q.   Okay.  And we agree that would have applied pressure to his

chest from the grate, correct?

A.   It would have applied pressure along the metal slats of the grate.

Q.   Well, the metal slats would have applied pressure to his chest, but it also would have put pressure on the two shirts that he was wearing, right?

A.   Correct.

Q.   So, the combination of the metal grate, his body's weight and the two shirts would have applied pressure against his chest?

A.   Particularly along the slats of the grate.  Not -- you're demonstrating like the whole thing would have pressure.  It would have pressure where the metal of the grate was touching his shirts pressing on his skin.

Q.   Okay.  So, if I had a metal grate pressing right against the center of my chest here, you're saying that there's no pressure also here to the right or to the left?

A.   I'm saying the pressure is applied along the points of contact.  There's no pressure where there's no contact.

Q.   Well, you would agree that the most pressure is where there's a point of contact.  But to the left and to the right here, there's also some pressure, right?

A.   There's no pressure on the skin where there's no contact, no.

Q.   Okay.  We can move on.

THE COURT: Mr. Flynn, this might be a good time for a break, but if you only had a few more minutes, I'm happy to let you --

MR. FLYNN: I think I only have a few more minutes.

THE COURT: Okay. That sounds that's great.

MR. FLYNN: I take that back. We should take a break.

THE COURT: All right. We will take our morning break. We should plan for a 15-minute break. It's about 11:10. So, we'll resume at 11:25, and we'll plan to go about another hour before lunch, give or take.

Please don't discuss the case during the break.

You're welcome to leave your notebooks here. You can take them with you if you want.

But, please, the most important thing to remember is to not discuss the case.

All rise.

(Jury out.)

THE COURT: All right. Dr. Arden, please don't discuss your testimony with anyone during the break. You're welcome to leave the courtroom. But please don't discuss your testimony with anyone during the break.

THE WITNESS: Yes, your Honor.

THE COURT: Thank you.

Anything we need to address --

MR. FLYNN: Yes, your Honor.

THE COURT: -- this morning?

MR. FLYNN: Briefly.

THE COURT: Yes.

MR. FLYNN: Your Honor, with respect to Mr. Swygert's testimony, I just want the record to reflect that they went into exactly what I knew they were going to go into with Mr. Swygert. He blatantly said that it was overturned because of a constitutional violation. At that point, the toothpaste was out of the tube. I didn't want to object and cause even more attention to it. But it's exactly what we -- the Court told them not to do. It's what came out of Mr. Swygert's mouth.

MR. LOEVY: I got to agree. And I got to apologize. Because I -- there was a miscommunication with the witness or something. It had not been what we said to the Court he was going to do. I don't think he's wrong.

And we were going to withdraw the motion that we had to instruct the jury, because the jury just basically heard the flip side of what he said in opening.

I apologize to the Court. There was obviously a misunderstanding. It was not intentional. It was unfortunate. He's right. That shouldn't happen. I don't disagree with him.

It does cure the problem in opening. I think everybody should just stop talking about it. But it's a point well-taken right there. That shouldn't happen, in my view.

THE COURT: Okay. I appreciate the remarks, but I must ask, Mr. Flynn, is there anything more that you're asking for me to do?

I will just say this is becoming a bit of dangerous territory. So, to the extent that we think witnesses have been properly admonished, let's make double, triple sure. I completely understand that at times things happen. But it's a bit of a bumble out of the gate.

So, just to ensure that we don't find ourselves in this situation again, I just want to be sure that we're careful about that.

MR. GIBBONS: Your Honor --

THE COURT: Yes, counsel, in case there's anything more you wish to ask or say, I'll give you an opportunity to do that.

MR. GIBBONS: I'm sorry, I didn't mean to interrupt you.

THE COURT: Not at all.

MR. GIBBONS: Here's my thought: The Court instincts at our pretrial conference was to give them a preliminary instruction about this. Mr. Loevy objected, raised the same grounds we're all struggling with right now.

I think the state of the land right now is this jury's confused about what happened and why it's reversed. I think we all agree we'd like to stay away from it. And we should. But

there's confusion right now.

I would just, on behalf of the defense, ask the Court to consider thinking through whether it needs to say something, not now, but between now and the end of the trial, about that issue. I don't have an answer for it. But I think we all need to noodle through it a little bit.

MR. LOEVY: Why don't we take a crack at it together --

MR. GIBBONS: Okay.

MR. LOEVY: And see if we can present something to the Court.

THE COURT: I think that's a perfectly reasonable solution. I think it -- as I sit here now, it makes sense. We have a lot of testimony to go. And things can change. But I do think that there is probably some room for some language to be given to the jury to the extent that there could be room for confusion and so on.

So, we'll take that up at a later time. But I appreciate the parties' willingness to try to craft something together.

MR. LOEVY: And hopefully all witnesses can just stay away from this issue.

THE COURT: A hundred percent agree. I trust that you'll do what you're supposed to do.

Look, things happen. But let's just work hard to make

sure that that was our one test of the waters and not move forward with any more of that.

Anything else we should address before the break?

MR. LOEVY: Not for the plaintiff.

MR. FLYNN: No, Judge.

THE COURT: We will see you at 11:25. Thank you.

(Recess from 11:08 a.m., until 11:21 a.m.)

THE COURT: Mr. Flynn, about how long do you think you have?

MR. FLYNN: Approximately ten minutes.

THE COURT: And the next witness is Arden?

MR. LOEVY: No, Mr. Brown.

THE COURT: Mr. Brown.

MR. LOEVY: I'm aiming until about 12:30, right, your Honor?

THE COURT: Okay.

MR. LOEVY: Thank you.

THE COURT: Yes. That's about where I want to take our break, to go about an hour.

MR. LOEVY: Thank you, your Honor.

(Jury in.)

THE COURT: You may be seated.

Mr. Flynn, you may resume your cross-examination.

BY MR. FLYNN:

Q. Dr. Arden, I just want to go back to the blood evidence in

this case.

Just to be clear, it's not your opinion that there was an absence of blood at the scene, right?

A. Correct.

Q. You just think that there was less blood than there should have been?

A. Less blood, and not in the distribution I think there should have been under the hypothetical.

MR. FLYNN: If we could pull back up an exhibit I already showed you. It's Exhibit 41.52.

BY MR. FLYNN:

Q. Can you see that, Dr. Arden?

A. Yes, sir.

Q. So, we agree you see evidence marker number 4 there. That's the spot we looked at earlier that's got the smaller spot and then it's encompassed by the bigger spot, right?

A. Smaller red spot with the larger, darker area around it, yes.

Q. So, we agree we got blood there, right?

A. We do.

Q. And although you can't see them in this picture, we agree that Paris Jackson's body is there at the end of the sidewalk on the grate, correct?

A. Yes.

Q. We can pull them up again if we need to, but you saw the

other spots of blood at evidence markers 5 and 6 closer to the body, correct?

A.   Yes, sir.

Q.   We agree that's also blood?

A.   Yes, sir.

Q.   So, we're in agreement that you have Paris' blood here at 4, and Paris' blood closer to his body.  What's the distance between those two locations?

A.   I don't know the exact distance.  My recollection is that the distance that he allegedly ran was about 46 feet.  I don't know the exact distance between those two locations, though.

Q.   So, ultimately, you agree that you have these two different areas with blood in them, and ultimately your opinion is that there would be more blood between those two areas, right?

A.   Yes.  There would be a trail of spots of blood showing his progress.

Q.   And now --

        MR. FLYNN:  We can take that down.

BY MR. FLYNN:

Q.   And now I'd like to go back to the compression on his chest that we were talking about before the break.

        You reviewed materials in this case, including photos taken at the crime scene?

A.   Yes, sir.

        MR. FLYNN:  And, then, this is not in evidence, but

Exhibit 318.2.

THE COURT: Any objection?

MR. BOWMAN: I haven't seen it yet.

No objection.

MR. FLYNN: That's not it.

MR. BOWMAN: Oh.

No objection.

MR. FLYNN: If we could publish to the jury, please.

THE COURT: It will be admitted and you may publish.

(Exhibit 318.2 received in evidence.)

BY MR. FLYNN:

Q.   Dr. Arden, you recognize this?

A.   I do.

Q.   I know none of us want to look at these photos, but this is a photo of Paris after he was rolled off of the grate at the scene, correct?

A.   Yes, sir.

Q.   And you see those lines on his chest, right?

A.   Yes, sir.

Q.   They're imprints, so to speak. There's some horizontal lines and there's some vertical lines?

A.   Yes, that's the imprint of the grate.

Q.   It's like a crisscross pattern just like the grate was that he was found laying on, right?

A.   Correct.

Q.   And this would be consistent with his torso being pressed against the grate that he was laying on?

A.   Yes, sir.

Q.   And these lines are consistent with that grate creating compression against his chest?

A.   Yes.  Compression where the grate -- the lines of the grate are touching his skin, that's where the pressure is.

Q.   Okay.  And these lines are pretty close together, right?

A.   Fairly so, yes.

          MR. FLYNN:  We can take that down, please.

BY MR. FLYNN:

Q.   Dr. Arden, you haven't treated live patients since 1980?

A.   Correct.  I've been a forensic pathologist since then.

Q.   You've never treated a patient with a gunshot wound; is that right?

A.   Correct.

Q.   Now, looking over your CV that you provided to us in this case, the last time that you were actually a full-time medical examiner was in October 2003?

A.   Yes, sir.

Q.   And in that role, you were the medical examiner in Washington, D.C.?

A.   I was.

Q.   Isn't it true that you resigned from that position after a report came out from the Washington, D.C. officer of inspect --

the Office of Inspector General?

A.   Yes, sir.

Q.   That report that came out found that you had failed -- excuse me -- your office had failed in its basic mission, the prompt and complete investigation of unexpected deaths, correct?

A.   Yes, sir.

Q.   You resigned soon thereafter?

A.   I did.

Q.   Under your watch, as a medical examiner, back in the early 2000s out in D.C., there was a determination that there were 400 bodies with no cause or manner of death determination that had dated back as far as 1999?

A.   I don't remember the numbers.  There, indeed, were some bodies that we had not yet been able to make public disposition because they were unclaimed, and we did have some bodies that even predated my time there that -- for which the work had not been completed.  The office was highly dysfunctional before I took it over.

Q.   You were the chief medical examiner, correct?

A.   I was.

Q.   And the report came out that your office failed its basic mission of prompt and complete investigation of unexpected deaths?

A.   That was among the findings in that report, yes.

Q.   And, then, you resigned?

A.   I did.

Q.   And after you resigned as a medical examiner, you started really getting into this consulting or expert witness work, whatever it is you want to call it, right?

A.   I opened a consulting practice.

Q.   Okay.  And you started working in cases like this as an expert witness, right?

A.   I started working as a consultant for many different kinds of cases, both civil and criminal, some of which involve being an expert witness.

Q.   When you say "consultant," that means reviewing materials in a lawsuit and talking to the lawyers, right?

A.   Yes.

Q.   And ultimately, the goal is for you to eventually be an expert witness like you are today, right?

A.   No.  The goal is to provide them with opinions, and in a minority of those cases to provide testimony as an expert witness.  The goal is not to be the witness.  The goal is to provide them with the interpretation and opinions that will allow them to manage their legal matters.

Q.   When you say "consulting," what you really mean is you're helping attorneys out in their lawsuits, right?

A.   I'm advising the attorneys.  I'm providing assistance, yes.

Q.   And this work as, again, whatever you want to call it,

consulting or expert witness work, it pays a lot better than what you were making as a medical examiner, right?

A.   It pays better than government work, that's true.

Q.   And in the last ten years, the total compensation that you've made, over 90 percent of it is from this consulting expert witness work, right?

A.   It's from my consulting practice, yes.

Q.   And you mentioned earlier that you testify both for plaintiffs and defendants?

A.   I do.

Q.   And you were required to provide me a list of the cases where you were an expert witness in the past, right?

A.   For the past four years, yes.

Q.   And of those civil cases, would it surprise you that over 80 percent of them, you're testifying for a plaintiff?

A.   No.   My -- my civil case work as a consultant is divided about 60/40, plaintiff to defense.   The testimonial appearances are a bit more skewed just based on the nature of the cases and the opinions.

But that's the representation of what my consulting work is, is closer to 60/40.   It's probably 80/20 for testimony, but I don't control that.

Q.   So, 80 percent of the time that you testify as an expert in civil cases, it's for plaintiffs.   Do I have that right?

A.   Yes, I'm called by plaintiffs in the majority of the

Arden - cross

181

testimonial appearances in civil cases.

Q.   Dr. Arden, my question is very simple.  80 percent of the time that you've been called as an expert witness in civil cases is on behalf of plaintiffs?

A.   I think that's what I said, yes.

Q.   And as an expert witness, you've got some repeat customers, right?

A.   I do.

Q.   And one of those repeat customers are plaintiff's attorneys; is that right?

A.   I've worked a number of cases with those attorneys, yes.

Q.   Can you think of a single time where plaintiff's attorneys here have called you up and asked you for an opinion in one of their cases and you said no?

A.   Well, it depends upon what you mean by said no.  I don't think there's ever been an occasion when those attorneys called me and I said, I can't give you an opinion or I can't work with you.  I have -- I'm pretty sure I have given opinions to them that were not helpful.  I know there are cases I've worked with them where I was not asked to testify.

Q.   Okay.  How many times -- how many other different cases have you been an expert witness for your repeat customer here?

A.   Again, I haven't been an expert witness for all of them.  That's something of a misrepresentation you seem to be repeating.  I have been a consultant to them, I believe, in a

total of 16 cases over about 15 years.

Q.   16 other lawsuits, right?

A.   I believe 16 other cases.  16 cases I think in total, including this one, in 15 years.

Q.   And your relationship with them goes back over 15 years?

A.   It goes back about 15 years.

Q.   Pretty consistent work that you've gotten from plaintiff's attorney; is that fair?

A.   A case a year, if you want to call it consistent.

Q.   And you can't tell us specifically a single time in that 15 years where they've asked you to provide an opinion and you said no?

A.   Again, I'm not sure I understand what you mean by I said no.  I think I explained it, but I'm not sure what you're implying.

Q.   They asked you to provide an opinion in a lawsuit and you said, no, I'm not going to provide that opinion.

A.   I don't -- I cannot recall that happening.  That's true.

Q.   And I don't want to talk about all of the other work that you've done in this case.  I just want to talk about what you're doing today.  Just for your services today, just for coming here today, they're going to pay you $55 00?

A.   Yes, sir.

        MR. FLYNN:  Nothing further, your Honor.

        THE COURT:  All right.  Thank you, Mr. Flynn.

Redirect, Mr. Bowman.

MR. BOWMAN:  Thank you.

REDIRECT EXAMINATION

BY MR. BOWMAN:

Q.   Dr. Arden, you were asked some questions about the circumstances of your resignation from the Washington, D.C. Medical Examiner's Office?

A.   Yes, sir.

Q.   When you chose to resign from that office, was it as a result of any direct malfeasance on your part?

A.   No, sir.

Q.   And there was a question that was asked of you to which you responded that there were concerns about unresolved cases involving bodies.  Did that predate your time as medical examiner?

A.   Most of it did, as a matter of fact.  I inherited a mess. I spent about five-and-a-half years actively cleaning it up. We made a lot of improvements.  But I wasn't able to fix the place entirely.  And at some point it was unten- -- my position was untenable and it was better to move on.

Q.   And, Dr. Arden, to be clear, in Washington, D.C., there are a lot of shootings and a lot of bodies; is that right?

A.   Oh, yes.  We had a substantial homicide rate at the time, not to mention all the other deaths that we dealt with.

Q.   And indeed, Dr. Arden, part of the responsibilities of

being the boss of bosses is that you take the fall as a result of failures that happen on the part of those beneath you.  Is that a fair summary?

A.   It's a very fair summary.

Q.   Dr. Arden, Mr. Flynn just now asked you some questions about repeat customers.  And indeed, you've worked for our firm Loevy & Loevy on several matters over the years --

A.   I have.

Q.   -- as you testified?

Have you worked on a number of wrongful conviction cases like this one for our firm and other plaintiff's firms in the City of Chicago?

A.   I have.

Q.   And some of those -- many of those, actually, have involved allegations against the Chicago --

MR. FLYNN:  Objection, your Honor.

MR. LOEVY:  He's opened the door.

MR. BOWMAN:  The door's open.

MR. FLYNN:  He's clearly not getting into -- do we need a sidebar?

MR. BOWMAN:  Door's open.

THE COURT:  I'm just rereading the question.

Let's go to sidebar.  I just want to make sure I'm clear on this.

(Proceedings heard at sidebar:)

MR. FLYNN: Your Honor, I believe that they're about to elicit testimony regarding his work in other cases against the City of Chicago or CPD, and that's not admissible pursuant to one of your motions in limine orders.

THE COURT: Response?

MR. BOWMAN: The questioning on cross-examination was to imply that Dr. Arden is a hack who is looking for money and just works for us for nothing other than financial motives, and we're entitled to respond to that by eliciting from him that we employ him because we have cases against the Chicago Police Department in which he has opinions. And that's as far as we're going to go.

But we're entitled to repair this in order to correct the misimpression that this professional is nothing but a hack for us.

MR. FLYNN: Your Honor, the fact that he has a bunch of opinions for Loevy & Loevy against CPD does not rehabilitate what they're saying as him being a hack. What his opinions are and what those cases are about have nothing to do with my questions regarding Loevy constantly hiring him over the years.

THE COURT: I agree. I don't think it's a proper basis for the redirect. So, let's move on to the next topic.

MR. BOWMAN: Yes, your Honor.

(Proceedings heard in open court:)

BY MR. BOWMAN:

Q.   So, moving on, Dr. Arden, there were some questions that Mr. Flynn asked you about blood volume.  You talked about, in response to questions, 700 milliliters of blood that you could identify that Mr. Jackson had lost as a result of his injury, right?

A.   Yes, sir.

Q.   I think you said 700 milliliters is 17 percent of the blood volume in the human -- in Jackson's body?

A.   Yes.  A person of his bodyweight, that would represent 17 percent of his expected total blood volume.

Q.   So, in addition to that 700 milliliters, Mr. Jackson had a lot of additional blood that isn't counted up in that figure, correct?

A.   Yes.  There's -- the other 83 percent of his blood volume would still be inside his body in his blood vessels.

Q.   And some of that blood potentially was lost outside of his body, correct?

A.   Yes.

Q.   And are you in a -- is anybody in a position to quantify how much blood flowed out of Mr. Jackson's body as a result of his injury?

A.   No.  There is no good way to quantify that.  You know, in contrast, for instance, the blood that was collected in the chest cavity, the blood that was collected in the pericardial sac, the medical examiner could actually take that out, put it

into a container and measure it. There's no way to quantitate the other blood that was external, such as in the shirts, which is why I made what I thought was a reasonable estimate of that additional volume.

Q. And is there any question that as a person with Mr. Jackson's injuries walking along, he is going to be bleeding?

A. No, there's no question. He is going to be bleeding. In fact, we saw the evidence that he was bleeding.

Q. Is he going to be bleeding substantially?

A. Yes.

Q. Is there any doubt about that?

A. No, that's my opinion.

Q. And is that why you conclude what you do about the trail of blood?

A. Yes, sir.

Q. There was an autopsy photograph that you looked at showing Mr. Jackson's chest. Do you remember that?

A. Yes, sir.

Q. It showed no blood on the chest. Is that because typically the body would be cleaned in the autopsy process?

A. Yes. That photograph was taken after the clothing had been removed and the body was cleaned so you could see the features of the injury clearly without anything obscuring it.

Q. I want to turn to the subject of abrasions that came up when Mr. Flynn was questioning you.

And you indicated that some of the injuries on Mr. Jackson's body were what you described as post-mortem?

A. Yes, sir.

Q. Meaning, the injury occurred to the body after Mr. Jackson was already dead?

A. That's correct.

Q. Are people in your field able to make a distinction between an abrasion or some other kind of defect to the body that occurs after death and one that occurs before death?

A. Yes. Under most circumstances, that's part of the practice of forensic pathology, that you can, indeed, by the features distinguish something that happened before death versus after death.

Q. And what do you make, sir, of the -- first of all, describe for the jury the post-mortem, the after-death injuries that are observable -- were observable on Mr. Jackson's body.

A. There's really two things. One is -- and, frankly, I have -- I've forgotten exactly which one or two --

MR. FLYNN: This is outside the scope of my cross-examination, your Honor. I didn't ask him anything about this.

MR. BOWMAN: There was --

THE COURT: Yeah, I believe there was some questioning about post-mortem observable injury.

So, objection is overruled. You can ask your

question.

BY MR. BOWMAN:

Q. Go ahead.

A. Briefly, he had a few abrasions that were, I think, on his arm that were identified as being post-mortem, and I agreed with that when I saw the photographs.

And the more important post-mortem finding was the grate impression, the grate mark, if you will, on his face from where he was lying on that -- on that grate.

Q. And those injuries are consistent with your analysis; is that correct?

A. Yes, sir.

Q. There were a number of questions that Mr. Flynn asked you about your points of agreement with a Dr. Cichon that the defendants have hired. Do you recall being asked those questions?

A. I do.

Q. And have you, in the course of your work on this case, had an opportunity to review Dr. Cichon's opinions in the case?

A. I have.

Q. And as a result of your review, you've learned that Dr. Cichon has an opinion about -- to the effect that Mr. Jackson's body would not have been losing blood because pressure was being applied to his chest, correct?

A. Yes, sir.

Arden - redirect

190

Q.   And do you agree with that opinion?

A.   No.   Again, part of it is that the pressure on the chest isn't uniform.   Part of it is the evidence shows that he wasn't alive when he got into that positioning.

     For multiple reasons -- many of which we've already covered, I won't repeat -- I do not agree.

Q.   In your view, does Dr. Cichon's opinion about the pressure as the explanation for the lack of blood at this crime scene make any sense?

A.   It does not.

Q.   So, finally, Dr. Arden, turning to these three drops of blood that we've been talking about this morning.   Are the findings of those three drops of blood more consistent with Paris Jackson running or walking down the sidewalk on the one hand, or are they more consistent with Paris Jackson being carried by somebody else to that location and placed there after his death?

A.   They are more consistent with the latter, that he was carried or transported there after his death and then placed on the grate.   They are not consistent with him walking or running down the sidewalk just after he was shot.

          MR. BOWMAN:   That's all I have, Doctor.   Thank you.

          THE COURT:   Thank you, Mr. Bowman.

          MR. FLYNN:   Very brief recross, your Honor?

          THE COURT:   Yes.

MR. FLYNN:  If we could just zoom in on the sidewalk area.  A little bit more.  That's good.

RECROSS EXAMINATION

BY MR. FLYNN:

Q.  Dr. Arden, again, we agree that there's a spot of blood here, kind of in the corner, near the corner of the north side of the fieldhouse.  There's Paris' body is found here in the actual corner of the fieldhouse with some other spots of blood?

A.  Yes, sir.

Q.  But it's your opinion that his body was carried there, right?

A.  Yes, sir.

Q.  And you don't deny that the evidence in this case shows that R.J. Branch was shooting behind this fieldhouse?

MR. BOWMAN:  Objection.  Scope.  Foundation.

THE COURT:  Response?

MR. FLYNN:  Your Honor, they just went through the blood evidence again.

THE COURT:  You're asking about the shooting.

MR. FLYNN:  I can ask it a different way.

BY MR. FLYNN:

Q.  Dr. Arden, you agree that if the body was carried, as you opined that it was, it would have been carried from that direction, right, from the north side of the fieldhouse to the corner?

A.   Yes, sir.

MR. FLYNN:  Okay.  Nothing further.

THE COURT:  Thank you.  You may step down.

THE WITNESS:  Thank you, your Honor.

(Witness excused.)

THE COURT:  All right.  Plaintiff may call your next witness.

MR. LOEVY:  Your Honor, the plaintiff calls the plaintiff, Marcel Brown.

THE COURT:  Okay.  Mr. Brown, please approach the witness stand.

Before you have your seat, please raise your right hand so my clerk can swear you in.

THE LAW CLERK:  Please state your name for the record.

THE WITNESS:  Marcel Brown.

(Witness sworn.)

THE COURT:  Mr. Loevy, you can inquire.

MR. LOEVY:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. LOEVY:

Q.   Marcel, make sure the mic's close so we can hear you.

Why don't you state your name.

A.   My name is Marcel Brown.

Q.   How old are you, Mr. Brown?

A.   34.

Q. Where were you born?

A. Oak Park, Illinois.

Q. Where do you live now?

A. I live in Berwyn, Illinois.

Q. And who do you live with?

A. I live with my girlfriend and my two children.

Q. And who are your two children?

A. Tamia Smith and Malani Brown.

Q. And how old are they?

A. My youngest is two and my oldest is eleven.

Q. And you mentioned your girlfriend. Her name?

A. Tyasia Wills.

Q. All right. We'll talk about them, but tell us where you work.

A. I work for a CeaseFire organization called Institution of Non-Violence For Chicago.

Q. How long have you worked there?

A. One year.

Q. How many days a week do you work?

A. Four.

Q. And how many hours a day?

A. We work from -- we work six hours, sometimes eight.

Q. And how many people work for the organization?

A. Hundreds.

Q. What is the Institution for Non-Violent Chicago?

A.   The Institution for Non-Violent Chicago is like a crime preventive method where they place us in areas around Chicago, hopefully our presence can deter crime.  We interact with the community.  We feed people.  We give back.  We have back-to-school drives.  We help people in the community with bills.  If they late on bills, they can come down to the organization or we give them my supervisor number and they can contact them.

Q.   All right, sir.  Where did you spend the middle ten years of your life?

A.   In prison for a crime I didn't commit.

Q.   How old were you when you first got arrested?

A.   I was 18.

Q.   When was that?

A.   September 3rd, 2008.

Q.   And where did you go after you were arrested?

A.   I went to Area 5 homicide unit.

Q.   And, then, after the business at the police station, where did you go?

A.   Cook County.

Q.   The Cook County Jail?

A.   Yes.

Q.   How big were you at the time?

A.   I was five-four, and I believe I was 105 pounds.

Q.   Did the Cook County Jail, is there a special place for

Brown - direct

195

young people or is it all together?

A.   It's all together.

Q.   Did you have a trial?

A.   Yes.

Q.   And what happened after the trial?

A.   After the trial, I was found guilty of first degree murder with the intent to kill.

Q.   And where did they send you?

A.   They sent me to a supermax prison, like, six hours away called Menard Correctional Facility.

Q.   Who was at Menard?

A.   The most dangerous people on earth.

Q.   We'll talk about that, but did there come a time when you were released from prison?

A.   Yes.

Q.   Was your conviction overturned?

A.   Yes.

Q.   Were you happy?

A.   I was happy at first.

Q.   Has it been difficult for you, sir?

A.   It's been very difficult.

Q.   All right.  Let's back up.  Tell me about your childhood. Where did you grow up?

A.   I grew up on the West Side of Chicago in the Austin Community.

Brown - direct

196

Q.   And just, you know, in a little bit of a summary, how was your childhood there?

A.   To my knowledge, I had a great childhood.

Q.   What did you spend your time doing?

A.   I spent my time playing with my friends, trying to learn to play basketball, raising my dogs, playing video games, teaching my little brother stuff.  Like a normal, everyday kid.

Q.   Did you enjoy school?

A.   Yes, I enjoyed school.

Q.   What kinds of things did you like at school?

A.   I liked a lot of stuff that the school had to offer.  I liked the art.  When I got to high school, I really liked the automobile class I had.  We'd break down engines.  I liked the culinary arts.  I learned how to cook when I was 18.  And I liked the girls.

Q.   What did you do in the summers?

A.   Summers, I chill with my friends and I work with my stepfather.  We used to build gates, and he had a construction company.  We used to build wrought iron fences, wood gates, and I'd do those things.

Q.   Did you make some money in the summers?

A.   Yes.

Q.   How about your mother?  Was she a strong part of your family there?

A.   Yes.  My mother's the rock of my family.

Q. Where did she work growing up?

A. My mom worked -- I remember her working at a Brown's Chicken. Then she worked Fellows. It's a warehouse.

Q. And do you know what she did there?

A. I believe she worked on assembly line.

Q. How long did she work there?

A. Over 20-some years.

Q. When you were growing up with your siblings and your mother, would you guys -- would she cook dinner, would there be family dinners, family time together?

A. Yes, we had family dinners. We had a lot of family time.

Q. Let's talk about the neighborhood growing up. You said it was the Austin area?

A. Yes, sir.

Q. Was that a rough neighborhood?

A. It was a rough neighborhood.

Q. What did that mean?

A. It was violence, drugs, shootings.

Q. Was it okay, though, to grow up in that neighborhood?

A. As a kid, to me it was.

Q. What do you mean?

A. People didn't bother kids.

Q. All right. Did you know any other neighborhoods?

A. No, that was all I knew, Oak Park.

Q. Back in Chicago, were you -- you know, did it interfere

with you having a happy childhood to live in a rough neighborhood?

A.   No.

Q.   Who grew up in -- by the way, was it a neighborhood where people knew people?

A.   Yes.

Q.   Tell us a little about that.

A.   All my friends went there, all my high school friends.  My friends from elementary went there.  Majority of my family lived in Austin community.

Q.   How about growing up in the home?  Who lived in your home growing up?

A.   Growing up, my mom, my stepfather, my one brother, and my two sisters.

Q.   Were you close to your brother?

A.   Yes.

Q.   How about your sister?  Her name is Cierra?

A.   I was close to her till she started, like, becoming about 13, she start getting into guys.

Q.   So, you spent less time together after that?

A.   Yeah.  You know, she was kind of like -- she was older than me, so she taught me certain stuff.  But she kind of went to the other side.

Q.   What does she do now?

A.   She work for the Post Office.  She's a mail carrier.

Q.   The United States Post Office?

A.   Yes.

Q.   How about your sister Davisha, where does she work now?

A.   She works at Enterprise.

Q.   Did you have another sister?

A.   I have a baby sister.  She's --

Q.   Her name, what does she do?

A.   She's 20.  Her name is Devonna.  She's in college.  She's going for criminal justice.

Q.   Do you know what college she goes to?

A.   She goes to Concordia University.

Q.   Were you close to your -- was your real father part of your life growing up?

A.   No.

Q.   Did you have any understanding why?

A.   Not really.  Just --

Q.   And did you have a stepfather?

A.   Yes.

Q.   Tell us about that.

A.   That was my sister father, but he was in my life the whole time.  The only real definition I knew of a man.

Q.   And were you close to him?

A.   Very.

Q.   What did he do for a living?

A.   He had his own construction company.

Q. What would -- that's where you worked in the summer, you mentioned?

A. Yes.

Q. You said something -- what was your job, like, when you were 17 or 16 or 18 in the summers?

A. When I was 18, I worked at Jewel's. But the summers I spent with him, we'll build gates. That was his part-time job. But his full-time job was a construction company. So, we'll go to, like, the newly-developed suburbs and we'll put these big red beams and we'll lay the foundation. We got to measure the beams, make sure everything's right before the concrete truck comes and pour the cement to the basement.

Q. And what ages did you do that?

A. I probably did that from probably I was, like, 12 to about 17.

Q. How many hours a week would you work when you got older?

A. When I got older during the summer, we'll work sometimes all day.

Q. Did you make a few bucks?

A. Yeah, I made a lot of money with him.

Q. All right. What happened in 2017 to his company?

A. It was 2007 he lost it.

Q. What's that?

A. 2007, the company kind of got, like, bought out.

Q. All right. You mentioned something about build gates. Not

Bill Gates, build gates, right?

A. We used to build fences, wrought iron fences. Sometimes we connect wood to them.

Q. Did you learn skills in that?

A. Yes, sir.

Q. How about -- what other activities did you do with your stepfather growing up?

A. Growing up, my stepfather, he taught how to train dogs. We used to go to a Cook County Sheriff training facility, so they teach us how to train our dogs discipline.

Q. Did you grow close to your dogs?

A. Yes. I loved my dogs.

Q. What were their names?

A. Joy and Tyson, J-Rock.

Q. You and your stepfather would go to the sheriff, you said, and train them?

A. Yes. We'll go after school and when he get off work.

Q. When's the last time you saw your dogs?

A. I believe I seen my dog Joy September 3rd.

Q. Which is?

A. The day I got arrested.

Q. Were you close to your dog?

A. Yes.

Q. Tell the jury a little about that.

A. I got Joy when I was, like, 12. So, she was kind of like

Brown - direct

202

my first girlfriend.  I sleep in the bed with her.  And she just -- a dog give you different kind of love than a person can, because I was all she knew.  She got along with everybody else, but she craved me.

Q.   All right.  They don't let your dog visit you in the Cook County Jail?

A.   No.

Q.   How about your mother and your stepfather, how long were they together?

A.   They was together about ten years.

Q.   And how old were you when they split?

A.   Probably around 15, 16.

Q.   Were you able to stay close with him during that time?

A.   Yes.

Q.   How about when you got to prison?  Were you able to stay close to him in prison?

A.   Not when I got to Menard, because it was always on lockdown.  So, you know, time have, like, a crazy way of get in the way of things, and a lot of people started reliving life. And he had another family and he had another small child.  But I talked to him from time to time.

Q.   Do you have a relationship with him today?

A.   Yes.

Q.   What did your stepfather teach you?

A.   My stepfather taught me have integrity.  He taught me a lot

of things about really just, like, being a man, being true to yourself. If you believe you want to do something in life, don't let nobody else deter you from not doing it.

Q. Was he a role model for you?

A. The only one I knew.

Q. All right. Although your mother was a role model?

A. Yes. But that's a woman. But, like, far as a man.

Q. All right. Were you close to your friends?

A. Yes.

Q. Tell us about some of your friends in this time period of your life in your late teens. What were their names?

A. I was close to Jamel. He was, like, my best friend. Shug, the twins, Ira, Tone, T.J., Chucky, and a few more guys.

Q. Were you friends with Dominique or Terrell?

A. Yes, I was friends with Dominique, Terrell, Jay, Darrell.

Q. What would you do with your friends?

A. We grew up playing basketball, you know. I never was good at it. We had --

Q. A little bit?

A. No, I was a hack.

Q. What else would you guys do?

A. Ride our bikes. Sometimes they help me with my dogs. Play video games.

Q. Were you close to your friends?

A. Yes.

Brown - direct

204

Q.   Now, we heard in opening about a USDA.  Did you and your friends have a name for each other?

A.   We didn't really have a name for each other.  USDA was our favorite rap group.  We used to like the rapper Young Jeezy.  That was the name of his rap group.  More than enough of my friends want to be rappers.

Q.   All right.  Were you a rapper?

A.   No.  I wasn't good at it.

Q.   But this USDA, what does that even mean?  Were you guys a gang?

A.   No, wasn't a gang.

Q.   What was USDA?

A.   It was just something we called ourself because we liked the rap group.  Before that we used to call ourself G-Unit.

Q.   Call yourself what?

A.   G-Unit.  We used to like the rapper 50 Cent, but he started doing other things and Young Jeezy came out.

Q.   How old were you when and your friends started calling yourself the Young Jeezy, USDA?

A.   About 14, 15.

Q.   All right.  Was there anything criminal or illegal about calling yourself this rap group?

A.   No.

Q.   Did some of your friends rap?

A.   A majority of them.

Q.   Who was good at rap?

A.   T.J.  I really didn't like R.J. rapping.

Q.   What do you mean?  He rapped but --

A.   Just didn't make sense.

Q.   All right.  How about your -- in addition to your friends, did you have cousins, too?  Let's talk about your cousins.

A.   I have another cousin, Marquise, Michael.  I had a lot of girl cousins.

Q.   Were there cousins in the neighborhood you hung with?

A.   Yes.

Q.   You mentioned T.J.  Who's T.J.?

A.   T.J. is my closest cousin.

Q.   What kind of bond did you have with T.J.?

A.   Me and T.J., we was born about, like, nine months apart, so we always hung with each other.  Then T.J. moved to Texas for a year.  Then when he moved back, we kind of like re-embraced it. So, me and T.J. did, like, everything together.  Go swimming. Ride bikes.  Talk to girls.  And T.J. had a way with the women.

Q.   All right.  And were you interested in girls at that period in of your life?

A.   Yeah, but he had a little before me.

Q.   All right.  And where did T.J. graduate high school?

A.   I believe T.J. went to Morton West.

Q.   Did he have learning issues?

A.   Yes.

Brown - direct

206

Q.   What was that?

A.   I was a little smarter than Terry.  So, T.J. was in like -- kind of like not a hundred percent special needs, but, like, he had a few learning disabilities.

Q.   All right.  You had another cousin we're going to talk about named R.J., right?

A.   Yes.

Q.   How was he related to you?

A.   That's one of my mom's nephew.

Q.   Was he in your age group?

A.   Nah, he's three years younger than me.

Q.   So, you when you're 18, he's how hold?

A.   15.

Q.   What good can you tell me about R.J.?

A.   R.J. was good at basketball.  R.J., when he's younger, he used to be very adventurous, outgoing.

Q.   Would you and the 15-year-old R.J. hang out all the time?

A.   Not really.  We hung sometimes.  But when he was 15, I was mostly with my girlfriend or me and T.J.

Q.   Where did R.J. go to high school?  At 15, he must have been a freshman?

A.   R.J. went to Proviso East.

Q.   All right.  So, when you were hanging out with your friends until -- well, let me fast forward.

      Did there come a time when your family moved to Oak

Park?

A.   Yes.  My mom moved to Oak Park in about 2006.

Q.   All right.  How old would you have been then?

A.   About 15 or 16.

Q.   Why did your family move to Oak Park?

A.   It was better opportunity for my mom.  Her and my step daddy separated.  I believe she really wanted a new beginning for her kids.

Q.   Was it a far move?

A.   No.

Q.   What do you mean?

A.   It's really about five minutes, but it's a way -- it's a -- it's kind of hard to explain, but it's, like, a big difference. Like, Oak Park is the first suburb to Chicago.  So, there's, like, rich people in Oak Park.  It's a better environment. When you cross one street, you got trees; you cross another street, you got nothing.

Q.   Was it an interesting eye-opening experience to you?

A.   I was scared at first.

Q.   Did you make some new friends, too?

A.   Yeah.

Q.   Did your house living arrangements change?

A.   It changed a lot.

Q.   What do you mean?

A.   We went from a seven-bedroom house to a -- like, a

three-bedroom apartment.

Q.   Who fit into the Oak Park bedroom apartment?

A.   Me, my mom and my brothers, sisters and my new baby sister.

Q.   All right.  Being in a smaller apartment, were you guys all close?

A.   Yeah.  We was real close.  The house was really small.

Q.   All right.  How about the high school, Oak Park High School, what was that like?

A.   When I first went to Oak Park High School, I was a little nervous because I just came from the Austin community.  This is a better place.  First I was a little out of place, like I didn't want to fit in with people.  They was like -- I felt like they was a little better than us.

Q.   Did you get comfortable?

A.   I got comfortable about a couple weeks.

Q.   Was the opportunities better for you?

A.   The opportunities was great.

Q.   Tell me about that.

A.   I went to Steinmetz.  Steinmetz offered a lot, but Steinmetz didn't have a lot of money.  So, when I went to Oak Park, it was different.  I went from checking in -- Steinmetz, we come and have to scan my ID, walk through metal detectors, deal with security.  When I got to Oak Park, it felt like a college.  Like, it's no metal detectors.  You don't check in with nobody.  You just go to your classes.  Nobody tell you

what to do.  And they had tons of programs, like rebuild engines, break cars apart.  They had a culinary arts.  They had portrait.  They have spoken word.  They had debate classes. They offered a lot at Oak Park.

Q.  Did you play sports there?

A.  Nah.

Q.  How about girls?  Did you hang out with girls at Oak Park?

A.  Yeah.  Coming from Chicago is like -- the guys at Oak Park I met, they was cool, but they was like -- they was like I was a few years ago.  They ain't really like -- scared to talk to the girls.  I was a little more -- I had a little more confidence then.

Q.  All right.  Did you talk to girls?

A.  Yeah, I talked to the girls.

Q.  Did you enjoy that in that part of your life before you were arrested?

A.  Yes, I enjoyed it.

Q.  All right.  Did you meet a girl that you liked a lot?

A.  Yes.  I met my girlfriend.

Q.  And what's her name?

A.  Tyasia Wills.

Q.  Tell us about how you met her, briefly.

A.  I met her because when I first got to the school, her best friend locker was next to mine, but the paperwork said her locker was mine, and we couldn't find my locker, so I shared

lockers with her.  That's how I met her best friend.  And, then, she came to the locker one day and she was just the finest woman I ever seen.

Q.   Did you -- how did you start talking to her?

A.   I believe I started talking to her, asked her what's her name, did she have a boyfriend?

Q.   Did it go forward?

A.   It took a little persuasion.

Q.   And, then, what happened?

A.   It kind of went forward.

Q.   All right.  And did you guys start spending time together?

A.   We started spending a lot of time together.

Q.   Tell us about that.

A.   Like, I go to her house, she'll come to my house.  We'll sit around a lot.  She was just different from the girls I was used to.

Q.   Did you grow close to her?

A.   Yeah, I grew very close to her.

Q.   Tell us about that.

A.   By spending more time together and learning about her life, telling about my life, I start -- like this is the first girl who ever really, like, took my heart.  So, we grew a very good bond.

Q.   How much time did you start spending together?

A.   Mainly every day.

Brown - direct

211

Q. How old were you during this time period?

A. Like 16, 17.

Q. And did it continue after your 18th birthday?

A. Yes.

Q. Did it grow stronger?

A. Yes.

Q. Were you thinking about the future and what -- you and her being together?

A. Yes. We always talked about the future.

Q. What were her plans for the future?

A. My girlfriend plans was to be a registered nurse.

Q. And did she -- where is she today? What does she do today?

A. She's in the medical field.

Q. What's her job?

A. She's medical assistant.

Q. What do you remember about high school graduation? Was that a happy time?

A. Yes, it was very happy.

Q. After you graduated from Oak Park-River Forest, what was your first job?

A. My first job I started working at Jewel's warehouse.

Q. What was your responsibilities at the warehouse?

A. I worked on assembly line. We used to have to pick the orders that come through, read the paper and get the orders and put them on the line.

Q. All right. You graduated high school 2008, now you're working at the assembly line. Were you thinking you wanted to do that for the rest of your life?

A. No. It started to get hard.

Q. It started to get, what?

A. Very hard.

Q. All right. So, what were your plans?

A. I was planning to go back to school because my mom told me, if you don't want to go to work, you got to go back to school. So, I was going back to school.

Q. What school would that have been?

A. Triton Community College.

Q. And had you made arrangements to do that?

A. I had made some arrangements when I was in high school. That's where I sent the applications to. I didn't send them out of state.

Q. So, this all went down that summer, end of August near Labor Day, right?

A. Yes.

Q. Were you thinking about other colleges out of state or were you thinking about the local colleges?

A. No, I didn't think about out of state. I didn't want to go.

Q. And your younger sister -- where is Concordia?

A. Concordia is in River Forest.

Q.   All right, sir.  At this point in your life, right before all this goes down, what were your plans for the future?

A.   My plans for the future was to be with my girlfriend, get enough money, start my own construction company like my stepfather.

Q.   Was it an optimistic period of time?

A.   Yes.

Q.   Were you happy?

A.   Yes.  I was very happy then.

Q.   I want to turn you to the fall of 2008, right before Labor Day when this all happened to you.  What was your morning routine then when school started up again that fall?

A.   My morning routine was wake up 5:30, 5:00 o'clock, 5:30. Watch my mom out from work.  Go back to sleep, get up about an hour later.

Q.   What do you mean by watch your mom go back to work.  Can you explain?

A.   Because after her and my stepdaddy broke up, I used to always watch -- somebody always watch my mom out for work where we lived in Chicago.  So, it was a habit.  Sometimes she get stuck in the snow or anything.  So, I always watch her go to work.

Q.   Even if that meant waking up at 5:30?

A.   Yes.

Q.   Were you tight with your mom?

A.   Very close.

Q.   Would you say you were her favorite?

A.   That's what the other kids say.

Q.   What happened when she got off from work in -- no, I'm sorry.

        She would leave for work, and then would you help the kids get back to school?

A.   When she leave for work, I'll get my younger sister ready for school, my younger brother.

Q.   What did that entail?

A.   Making sure everybody got on the right clothes, got some lunch.  Make sure my brother not stealing my clothes.  And putting the younger one on the bus and taking my brother to high school.

Q.   Who else did you take to high school?

A.   My girlfriend.

Q.   All right.  I want to now move you forward to Saturday, August 30th, almost 16 years ago.  That's the day -- you remember that day, for obvious reasons, right?

A.   Yes.

Q.   Tell us what you remember about during the day.

A.   I remember about that day it was a normal day.

Q.   What -- was there an activity you remember doing that day?

A.   I remember stopping at a block club party with my mom around 4:00 o'clock.

Q.   And if you say "normal day," what was a normal day for you at that period of time of your life?

A.   Normal day, wake up, my girlfriend come over.  Sit in the house.  Let my dogs out.  Feed them.  Sit around with my little brother.

Q.   All right.  Did you go to the block party that afternoon?

A.   Yes.

Q.   Do you remember how long you spent there?

A.   I didn't stay long.  I was going to talk to my mom.

Q.   Later -- I'm going to fast forward you to later that night around -- sometime around 10:00 or 10:30 or something, did you end up in a place?

A.   Around 10:30, 10:00 o'clock, I ended up at White Castle.

Q.   And what is the White Castle?

A.   White Castle is a restaurant.  Right there where White Castle is, two of the biggest restaurants in our neighborhood, White Castle and El Gran.

Q.   Was this an uncommon or common place for you to hang out on a Saturday night?

A.   It's a common place.  A lot of people come there.

Q.   What do you mean?

A.   The liquor store is right there.  The best food in the neighborhood.  So, people always coming and going.

Q.   All right.  How about that day?  Who was there that day?

A.   Me and most of my friends, cousins.

Q.   And by the way, you said the liquor store.  At this point of your life, were you a person who drank alcohol?

A.   No.

Q.   Were you a person who smoked marijuana?

A.   No.

Q.   Had you ever tried marijuana?

A.   I believe I tried marijuana when I was, like, 12, 13.

Q.   But you didn't -- how come you didn't --

A.   I didn't like it.

Q.   All right.  Was there anything unusual about hanging out at the White Castle?

A.   No.

Q.   What do you remember about that night?

A.   About that night, I remember kicking it with my friends, doing our usual cracking jokes, talking stuff.  We was waiting on some girls to come.

Q.   How many people would you estimate were there?

A.   About 20.

Q.   All right.  What -- did something unusual happen that night shortly around 10:30 or something like that?

A.   Nothing unusual.  I got a phone call from my sister.

Q.   Tell us about that phone call.

A.   I was talking to my friends.  My sister called my phone and she said she was fighting with some girls, arguing and stuff.  And I told her to leave.  She told me to come get her.

Q. All right. Did you have a car at the time?

A. Yes.

Q. What car did you have?

A. I had a Malibu.

Q. And would your sister sometimes ask you for rides or pick her up places?

A. Yes. She didn't know how to drive.

Q. She did not have a driver's license?

A. She didn't know how to drive.

Q. Was she younger or older than you?

A. She was older.

Q. Was it unusual for her to call you on the phone and say, come get me and take me somewhere?

A. No.

Q. Did you think anything of it when she called?

A. No.

Q. What did you do when she said, hey, come pick me up?

A. I waited around, talked to my friends still. Then I went to pick her up.

Q. Now, you heard in opening statement yesterday that you rushed over to the park. Did you do any rushing?

A. No, that's not true.

Q. Any reason you would have rushed to the park?

Did you go to pick up your sister?

A. Yes.

Q.   Who went with you?

A.   I believe R.J. and T.J. got in the car with me.

Q.   Those are the cousins you mentioned earlier?

A.   Yes.

Q.   Do you know why they got in the car?

A.   No.  I believe R.J.'s sister may have called him and told him she was arguing, too.

Q.   All right.  So, did R.J. and T.J. also have sisters in the park?

A.   Yes.

Q.   What do you recall about the car ride over?

A.   The car ride over, we had just bought the new Young Jeezy CD from the bootleg man.

Q.   You better spell it for the court reporter.  What are you calling it?

A.   The bootleg --

Q.   No, Young Jeezy.

A.   Young Jeezy.

Q.   How do you spell Jeezy, do you know?

A.   J-e-e-z-y.

Q.   All right.  And so what were you doing in the car?

A.   We had the CD.  I believe I had it in my pocket or maybe T.J. had it in his pocket.  Soon as we got in the car we put the CD on.

Q.   How long is the drive over to the park?

A.   Probably two -- maybe two to five minutes.  Not long.  Very short.

Q.   How many blocks from the White Castle to the park?

A.   It's probably less than a mile.

Q.   All right.  Do you remember anything special in the car, anything at all?

A.   No.  We just listened to the new CD we bought.

Q.   What happens when you get to the park?

A.   When we get to the park, I was still in the car.  I told T.J., like, just go get the girls.

Q.   And did he?

A.   Yes.  He got out the car.

Q.   What did you do?

A.   I stayed in the car.  I was still listening to the music.

Q.   And, then, did some period of time go by?

A.   A couple minutes.

Q.   Then what did you do?

A.   They wasn't coming out the park, so I turned the car off and got out.

Q.   What did you do?

A.   Hopped the gate and I went in.

Q.   Why did you go in the park?

A.   Because the girls were still arguing.  They didn't show any signs of separating.  And I was looking for Eugene.

Q.   Who is Eugene?

A.   Eugene's my cousin's boyfriend best friend.

Q.   Why did it make sense to look for Eugene?

A.   Because the girls that my sister's arguing with is his family members and baby mama.

Q.   All right.  So, did you think Eugene was someone you could talk some sense with?

A.   Yes.

Q.   What was your thinking?

A.   I was going to tell Eugene to get the girls, and I'm fitting to get these girls so they can leave.

Q.   Did you ever find Eugene?

A.   No, sir.

Q.   As you're walking into the park, what do you see?

A.   As I am walking in the park, I see people drinking, people shooting dice.  It's about a hundred people out here.

Q.   What ages?

A.   All ages, to probably mid-20s.

Q.   Where are they in the park?

A.   Everybody's all over the park.  Some people by the benches. People in the playground area.  People on the sidewalk.  People spread out through the whole park.

Q.   Did you see your sister at some point?

A.   I believe I seen her by the playground.

Q.   All right.  Where were you looking for Eugene?

A.   I went first looking for Eugene by the dice game.

Q.   Is that something that was unusual in the park?

A.   No.

Q.   What's a dice game?

A.   A dice game people gambling, shooting dice for money.

Q.   All right.  Now, there was a suggestion yesterday that, hey, you wouldn't go to this park.  Is Amundsen Park a place you were afraid to go?

A.   No.  I went there probably every Sunday or every other Sunday with my family.

Q.   Well, for some period of time.  Not every Sunday of your life, right?

A.   No, but most of the time.

Q.   All right.  And how -- what would you do at Amundsen Park?

A.   I had a cousin, he used to hold picnics and softball games at Amundsen Park.

Q.   Was there any danger to you in Amundsen Park?

A.   No.

Q.   Did you know people in Amundsen Park?

A.   Yes.

Q.   Did you have any trouble with anybody in Amundsen Park?

A.   No.

Q.   There was a suggestion that you wouldn't walk into Amundsen Park by yourself.  Is there any truth to that at all?

A.   I go to Amundsen Park all the time, meet a girl, anything like that.

Q. Anybody in Amundsen Park you were afraid of?

A. No.

Q. Any reason you would have had to have been?

A. No reason at all.

Q. So, when you walk into the park, did anything -- at some point -- now we're fast forwarding the story, you're in the park, you're looking. Did something very unusual happen?

A. When I got to -- close to the back of the park, I seen a group of guys. Someone started shooting.

Q. And what happened when that person started shooting?

A. When he started shooting, I jumped down.

Q. What else happened?

A. Someone behind me started shooting.

Q. All right. So, you're in the middle, it sounds like?

A. Yes.

Q. And you got people shooting in front of you?

A. Yes.

Q. And people shooting -- or whatever, shooting front, shooting behind, right?

A. Yes.

Q. Could you see who was shooting in the dark?

A. No, sir.

Q. How do you know they're shooting?

A. I seen the flash from the gun. I heard the shots.

Q. You could hear the gunshots?

A.   Yes, sir.

Q.   To this day, do you know for personal knowledge who was shooting who?

A.   No.

Q.   Were you shooting anybody?

A.   No, sir.

Q.   What did you do when you heard these gunshots?

A.   When I heard the gunshots, I dropped down.  I stayed down a few seconds.  Gunshots stop.  I jumped up, ran back to my car.

Q.   Why did that make sense?

A.   Because it was like -- like a fight-or-flight situation and I ran.

Q.   All right.  When you get to your car, who is with you in the car there?

A.   I get to my car, I see T.J. jump the gate.  I got in the car after him.  Then R.J. got in the car.

Q.   All right.  What happened next?

A.   I started the car.  I heard more gunshots.  There was a gunshot in front of my car.

Q.   And was that shot close or far?

A.   It was close.

Q.   And what did R.J. say to you, if anything?

A.   R.J. said something to the lines of, they shot at me, I shot back.

Q.   And what did you do?

A.   I had -- I was fitting to pull off, but then I heard the shot in front of my car so I turned the other way.  I pulled a U-turn.

Q.   And where did you go?

A.   I drove back towards White Castle.

Q.   Now, did you commit any crime that day, sir?

A.   No, sir.

Q.   Did you do anything illegal?

A.   No, sir.

Q.   Did you have a gun?

A.   No.

Q.   Did you know R.J. had a gun?

A.   No.

Q.   Did you know that anybody was going to shoot at R.J. that day?

A.   No, sir.

Q.   Did you know that R.J. was going to shoot a gun?

A.   No.

Q.   Did you go to that park intending to break any laws?

A.   No, sir.

Q.   Did you break any laws that night?

A.   Busting a U-turn probably.

Q.   Other than that, did you break any laws?

A.   No.

Q.   You said you drove back to the White Castle?

A.   Yes.

Q.   How long did it take to get to the White Castle?

A.   Probably a minute or two.

Q.   And what happened then?

A.   On my way back to the White Castle, I believe as soon as I got by White Castle, my sister called and she asked was I all right.  I told her I was fine.  I asked was she okay.  She said, yeah, we was fighting the girls.

Q.   Did anybody -- when did R.J. get out of your car?

A.   He got out of my car as soon as we got in front of White Castle.

Q.   Why is that?

A.   Because he was just shooting, I wanted him get the hell out of my car.

Q.   Where did you go after that?

A.   I went home.

Q.   Anything happen on the way home?

A.   When I pulled back in front of White Castle, my cousin Michael came and got in the car with me.

Q.   And, then, what happened on the way home?

A.   I turned on North Avenue, probably, like, 30 seconds I get pulled over by the police.

Q.   And what happened then?

A.   He got me out the car, searched the whole car.

Q.   And did they find anything illegal in the car?

A.   No.

Q.   Did they let you go?

A.   Yes.

Q.   Then where did you go?

A.   I drove home.

Q.   And what happened at home?

A.   My girlfriend was still there.  My little sister, my brother.  I went in the room with my girlfriend.  Then my grandma came down and asked me to drop her off to the party.

Q.   Your grandma asked you to drop her, where?

A.   To the birthday party.  One of my uncles had a party that day.

Q.   Did you drive your grandma to the birthday party that night?

A.   Yes.

Q.   Were you hiding at that point?

A.   No.

Q.   Why did you go out again and drive your grandma to a birthday party?

A.   I didn't do nothing.  I had no reason to hide.

Q.   After you dropped your grandma off, what did you do?

A.   I came back home.

Q.   And what time -- well, let's go the next day.  What would have been the -- the next day would have been a Sunday.  Did you learn a little bit more about what happened in the park?

A.   That Sunday, my girlfriend stayed over.  So, that Sunday she woke me up because my phone kept ringing.

Q.   What did you learn?

A.   When I answered the phone, it was this girl named Chrissy. She called me and said somebody got killed at Amundsen Park and they saying R.J. did it.

Q.   All right.  Were there all kinds of people calling about what happened in Amundsen Park?

A.   They was calling about various locations.

Q.   Where did you go?  What did you do?

A.   I went in the living room.  R.J. was in there asleep, T.J. I woke them up.

Q.   Was it uncommon for your cousins to be sleeping at your house?

A.   No.  Sometimes they spend the night.

Q.   All right.  What did you tell them?

A.   They was also on they phone as I was waking them up and they was hearing the same thing that I heard.

Q.   Did you know Paris Jackson?

A.   Yes.

Q.   Was he a nice kid?

A.   He was pretty cool.  We went to school together.

Q.   Did you ever have any problems with him?

A.   No.

Q.   Did you ever have any classes with him?

A.   Probably like -- probably gym or something.

Q.   Any reason to have a beef with Paris Jackson?

A.   No.

Q.   All right.  The next night, Sunday night, was there -- did some of your relatives come to your house?

A.   I believe R.J. mom was there, T.J.'s father, R.J. father. And that's -- and my sisters.

Q.   What happened?

        MR. LOEVY:  And I'm almost done, your Honor, if I can just finish the area.

BY MR. LOEVY:

Q.   What happened that day?

A.   Around that time, it was confirmed that someone had been killed, and they were saying R.J. did it.  And our families came.  Their parents came and talked to them to figure out what was going on.

Q.   Was your mom there, too?

A.   Yes.

Q.   Had -- did you tell your mom what happened?

A.   I told my mom what happened.

Q.   What did you tell her?

A.   I told her I went to get her daughter, somebody started shooting and R.J. shot back.

Q.   How did you know R.J. shot back?

A.   Because he told me.

Q. What else -- did R.J. explain to everybody what happened?

A. He explained to them in the house what happened.

Q. What did he say happened?

A. He said he was going to get his sister, was trying to get them out the park, somebody started shooting and he shot back.

Q. Did he say who it was who was shooting at him?

A. He said it was Day-Day.

Q. Who is Day-Day?

A. Day-Day's somebody that lives by Amundsen Park.

Q. Do you know Day-Day?

A. Yes.

Q. You got any reason to disbelieve R.J.?

A. No, because I wasn't trying to figure out who was shooting.

Q. All right. But do you have any reason -- you don't know who was shooting?

A. I don't know. But I took what he said as the truth.

Q. Could you see from where you were who was shooting?

A. No.

Q. Was that a smart thing to do, to shoot in a park?

A. No.

Q. Why not?

A. It's a lot of people out here.

Q. It's never a smart thing, but particularly bad with people around, right?

A. Yes.

Q.   Were you ever part of any plan to shoot anybody in a park?

A.   No, sir.

Q.   Did you ever have any understanding or agreement with R.J., let's go to the park and shoot somebody?

A.   No, sir.

Q.   Is there any way you would have been part of such a plan?

A.   No, sir.

MR. LOEVY:   Your Honor, this might be a place to break for lunch then.

THE COURT:   All right.  So, we will pause the testimony here for our lunch break.

Ladies and gentlemen, please do not discuss the case, even amongst yourselves, during the lunch break.

You are welcome, as you were yesterday, to leave the building for lunch if you wish.  You don't have to.  There's a second floor cafeteria, as you know.

Please be back in the jury room at 1:30 and we will resume testimony promptly thereafter.

(Jury out.)

THE COURT:   Please be seated.

Counsel, is there anything we need to address during the break?

MR. LOEVY:   Not from the plaintiff, your Honor.

MR. FLYNN:   Not from defense, your Honor.

THE COURT:   Okay.  Look at that.  I will see you all

Brown - direct

231

at 1:30.

(Recess from 12:27 p.m., until 1:30 p.m.)

                    *    *    *    *    *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Joseph Rickhoff                    August 27, 2024
Official Court Reporter

232

```
                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION


MARCEL BROWN,                        ) Case No. 19 C 4082
                                     )
                Plaintiff,           )
                                     )
            vs.                      )
                                     )
MICHAEL MANCUSO AND GERI YANOW,      )
Personal Representative of the       )
Estate of KEVIN MCDONALD,            ) Chicago, Illinois
                                     ) August 27, 2024
                Defendants.          ) 1:30 p.m.


                TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
              BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:        LOEVY & LOEVY
                          BY:  MR. JONATHAN I. LOEVY
                               MR. LOCKE E. BOWMAN, III
                               MR. TOM KAYES
                          311 N. Aberdeen Street, 3rd Floor
                          Chicago, Illinois  60607

                          MACARTHUR JUSTICE CENTER
                          BY:  MS. VANESSA DEL VALLE
                               MR. JONATHAN M. MANES
                          160 E. Grand Avenue, 6th Floor
                          Chicago, Illinois 60611


For the Defendants:       GREENBERG TRAURIG, LLP
                          BY:  MR. JOHN F. GIBBONS
                               MR. KYLE L. FLYNN
                               MR. TYLER L. SALWAY
                          77 W. Wacker Drive
                          Chicago, Illinois  60601
```

233

APPEARANCES (Cont'd):

Court Reporter:                    MR. PATRICK MULLEN
                                   MS. SANDRA TENNIS
                                   Official Court Reporters
                                   219 S. Dearborn St., Suite 2118
                                   Chicago, Illinois  60604
                                   (312) 435-5562

                    * * * * * * * * * * * * * * * * * *

                 PROCEEDINGS RECORDED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings in open court.  Jury out.)

MR. BOWMAN:  Your Honor, sorry.  Could we raise one issue before the jury comes in?

THE COURT:  Sure.  Let me make sure the --

MR. BOWMAN:  Okay.  I take it back.  We're good.

THE COURT:  Oh, are you sure?

MR. BOWMAN:  Yes.

MR. LOEVY:  Yes, because we've got to go.

(Discussion off the record.)

THE COURT:  Are we ready to proceed?  Because I'd like to get the jury lined up.

MR. LOEVY:  We are, Your Honor.

MR. FLYNN:  Ready for the defense.

THE COURT:  Mr. Brown, you can retake the stand, please.

(Witness resumes the stand.)

THE COURT:  We're still waiting on one juror to come back, so now would be a good time to take up any issues the parties may have.

On behalf of plaintiffs, can I just have you place your appearances on the record again?  Just say your names, please.

MR. LOEVY:  Sure.  Can I say John Loevy and the same appearances, or do you want all six?

THE COURT:  That's fine.

MR. LOEVY: Thank you.

MR. FLYNN: Kyle Flynn and same appearances, Your Honor.

THE COURT: All right. Thank you.

One issue, you said?

MR. FLYNN: One issue. We still need to discuss what happened with Mr. Swygert this morning. We can talk about that later, but just one thing I wanted to make sure that we're all in agreement on is that the word "exoneration" is not going to be used during Mr. Brown's testimony.

THE COURT: I would imagine it's not even --

MR. LOEVY: It's not going to come up with Mr. Brown.

THE COURT: All right.

MR. LOEVY: Although Mr. Brown's conviction was overturned. I went back because he said that I violated the motion in limine. We looked. There was no motion in limine on the word "exoneration," so we didn't violate a motion in limine.

THE COURT: Do we agree that we will not use the word "exoneration" going forward?

MR. LOEVY: Fair enough, Your Honor.

MR. FLYNN: Very good, Your Honor.

THE COURT: Terrific. Thank you.

(Discussion off the record.)

THE COURT: Mr. Bowman, can you let Mr. Loevy know

that our juror is here?

MR. BOWMAN:  I'll do that.

THE COURT:  I think he may have just stepped out. It's fine, you know.

MR. BOWMAN:  I think it was --

THE COURT:  Yes.

(Jury in at 1:37 p.m.)

THE COURT:  All right.  Please be seated.

(Brief pause.)

THE COURT:  All right.  Welcome back from lunch.

Mr. Loevy, you may resume your direct examination.

MR. LOEVY:  Thank you, Your Honor.

MARCEL BROWN, PLAINTIFF HEREIN, PREVIOUSLY DULY SWORN,

DIRECT EXAMINATION (Resumed.)

BY MR. LOEVY:

Q.  All right.  Where we left off, we talked about the events at Amundsen Park.  Do you remember, was the following Monday a holiday?

A.  Yes, sir.

Q.  What holiday was that?

A.  I believe Memorial Day.

Q.  Memorial Day or Labor Day?  I get them confused.

A.  Yeah.

Q.  Same idea, but what did you guys do that day?

A.  I stayed around the house, probably went outside.  I

probably was with my girlfriend, the usual.

Q. All right. How about that Monday and Tuesday? Were you back to the routine that you described this morning?

A. Yes. That Tuesday, I was back to the routine with waking my mom, making sure she get out. I mean, waking my sister and brother, taking them to school, nothing out of the ordinary.

Q. Were you lying low or hiding in any way?

A. No, I was still going outside.

Q. Any reason you had to hide?

A. No, I didn't do nothing, so it wasn't a reason for me to hide.

Q. All right. What happened on that Wednesday?

A. That Wednesday? Everything went normal up to about somewhere between 2:30, 3:00 o'clock.

Q. What happened then?

A. I was going to pick my girlfriend and my brother up from school and let my mom in the house. I remember letting her in the house -- I mean, excuse me -- her car coming down the street. She's getting ready to come in. I seen three detective cars coming up the block and stop in front of the house and get out.

Q. And then what happened?

A. My mom came in, and as she was coming in, I was walking back towards the living room and they kind of like forced their way in the house.

**M. Brown - direct**

238

Q.   Who did?

A.   Detective Weber and three other cops.

Q.   Now, this Detective Weber, is that a detective that you had known from the past?

A.   Yes, sir.

Q.   What were the circumstances?

A.   Someone had shot in my mom's house.

Q.   And did the police respond?

A.   Yes.

Q.   Were you a witness that time?

A.   Yes, sir.

Q.   What happened?  And, by the way, how much before was that to this?

A.   A couple years before.

Q.   And what had happened on that occasion when the police came to your house back a couple years earlier, Detective Weber?

A.   I believe he spoke with me in my living room.

Q.   Did you tell him what you knew at that time?

A.   Yeah, I just answered his questions, told him what I knew, and that was it.

Q.   All right.  And then did that -- were you allowed to terminate the encounter after that.

A.   Yes, it was over with after that.

Q.   All right.  How about this time?  Fast-forward to that

Wednesday, September 3rd.  What happened that time?

A.   That time, he came in the house and he said:  Hey, I want to talk to you.

I told him:  I don't want to talk to you.

I ain't did nothing, so I didn't want to talk to him. Then he said:  Uh, now you gotta come to the station.

And my mom kept asking him:  What do you want?  Why are you here?

Then he was -- he came around and put his arms around me:  Oh, you can come down to the station and talk.

I told him:  No, we can talk in the living room if you just want to talk to me.

I just got to ask you a few questions.  You'll be back.

And I was telling him:  I want to talk right here.

But he kind of like put his arm around me and forced me out of the door.

Q.   All right.  Did you resist?

A.   I was trying to put up a little struggle, and my mom told me not to, to just go.

Q.   When you say "a little struggle," I mean, did you literally fight it, or were you just going with the situation here?

A.   I was trying to tell him I'm not coming, but he's a bigger guy than me.  He kind of --

Q. So you were coming.

A. Yeah.

Q. All right. And your mother encouraged you to cooperate?

A. When she seen it was finna go to where I didn't want to go, she just told me: Just go.

Q. And that's what you did?

A. Yes.

Q. What happened in the car?

A. In the car ride, he started asking me questions about Amundsen Park. He asked me where R.J. and T.J. was, and he took my phone.

Q. Did you give it to him?

A. Yes, I gave it to him when he asked.

Q. Did he ask for your password?

A. Yes, sir.

Q. Did you give him your password?

A. Yes.

Q. Why?

A. I ain't did nothing. I just gave it to him.

Q. Where did they take you?

A. They took me to Grand and Central.

Q. And where in the station did he take you?

A. He walked me upstairs to the second floor, to an interrogation room.

Q. And when you say an interrogation room, can you describe

it for the jury?

A.   It's a little, small cold room, bright lights, no windows, no way to see out of it.  It's not pretty big, small.

Q.   All right.  What were you thinking when they put you in there?

A.   I didn't want to be here.

Q.   All right.  I'm going to show you the first clip.

MR. LOEVY:  Your Honor, this is the exhibit.  I'm going to label them by clip number because the transcript will reflect it.  This is Clip No. 1.  I'm going to play this, and I believe it should be set up for the audiovisual.

THE COURT:  All right.

MR. GIBBONS:  Your Honor, I don't mean to interrupt Mr. Loevy's examination, but "Clip 1" is not helping us understand the foundation of this at all.  I don't know what hour this is or what, so if we can lay a little foundation.

MR. LOEVY:  This is --

THE COURT:  Yes, if we can lay a foundation for the clip, that would be great.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   I'm going to show you the clip from as soon as -- the very first part of the transcript when you're put into the room, and if we can show it on the screen here, it shows -- do you see this 9.03?

A.   Yes.

Q.   That's September 3rd, I'll represent to you.  And 15:00 in military time, do you know what time that is?

A.   3:00 o'clock.

Q.   All right.  Is that about the time you got into this room?

A.   Yes.

MR. LOEVY:  All right.  And I can later -- I have all the page numbers for the clips, but I'm not going to say the page numbers every time if that's okay.

THE COURT:  It's fine with me.  I assume there's no objection to that.  We can tidy it up later.

MR. GIBBONS:  Yeah.  I was confused because the first clip I saw on the screen was Spizzirri in the room.

THE COURT:  Right.

MR. GIBBONS:  So I'm confused.

MR. LOEVY:  Yeah, that's not the case.

THE COURT:  Okay.  Thank you very much.  You may proceed.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  There's a specific reference there to if you're cold.  Did you hear that on the tape?

A.   Yes.

Q.   What do you remember about that temperature?

A.   It was always very cold in there.

Q.   Did the temperature ever change?

A.   No, sir.

Q.   Were you able to control the temperature?

A.   No, sir.

Q.   How long did you end up spending in that room?

A.   The course of over three days.

Q.   This weekend, did you have an opportunity to review some of the video?

A.   Yes.

Q.   What do you remember saying to yourself after they left when you were talking alone?

A.   I remember some parts.  I said I had nothing to do with it.  I remember crying, praying to God.

Q.   Do you remember asking to talk to your mother?

A.   Yes, I remember asking to talk to my mom, kicking the wall, saying I want to go home.

Q.   All right.  Let's take a look at Clip 37.  This is -- this is at 15:46, 3:46, about 15 minutes in.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  Did you make a request there?

A.   Yes.

Q.   What was your request?

A.   To call my mom.

Q.   And what did the detectives tell you?

**M. Brown - direct**

244

A.   Just sit tight for a couple minutes, I believe.

Q.   All right.  And did you get a phone call in a couple minutes?

A.   No, sir.

Q.   Showing you 65, this is at 4:30.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  Did that happen repeatedly throughout this interrogation?

A.   Yes, sir.

Q.   Why were you asking to call your mother?

A.   Because I want my mom to come get me.

Q.   Did the couple of minutes ever come when you were going to get that call?

A.   No, I believe days went by.

Q.   All right.  I'm going to show you No. 3.  This is back toward the beginning of the interrogation.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  What did you make of it when you said "am I locked up," and they said "no, no, no, we just do this all the time"?

A.   Because when Weber came to my house, I asked him was I under arrest, and he said:  No, we just want to talk to you.

       He never put me in handcuffs, so he was like:  You

not under arrest.  We just want to talk to you.  You'll be back soon.

So when he's saying it, I'm asking him like:  Am I under arrest?

And basically this detective told me:  No, we just, we just do this to talk to people.

Q.  All right.

A.  So I thought this was just a talk.

Q.  Let's listen to it.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  Now, did you know that you were under arrest for murder at this time?

A.  No, sir.

Q.  Did anybody tell you that you were under arrest for murder at this time?

A.  No, sir.

Q.  Do you feel tricked?

A.  Yes.

Q.  Okay.  I'm continuing.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  All right.  Did you answer him when he said that?

A.  No, I was like -- I didn't really understand the question. I just thought this was --

Q.   Sorry.

A.   I just thought he was just moving along.

Q.   Let's hear it again.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Now, did you want this guy sitting this close to you right there?

A.   No, sir.

Q.   Did you get a choice on having your personal space like that?

A.   No, sir.

Q.   Was this man bigger than you?

A.   Yes.

Q.   How did you feel to have him, you know, that close to you during this?

A.   Nervous, a little scared.

Q.   When you first started talking to the police, who did you tell them was the person shooting?

A.   I believe I told them Day-Day was shooting.

Q.   And why did you tell them that?

A.   Because R.J. said Day-Day shot at him.

Q.   R.J. said what?

A.   Day-Day shot at him.

Q.   All right.  And did you tell the police to go talk to Day-Day?

A.   Yes.

Q.   And when watching the videos, did you do that a number of times?

A.   Yes.

Q.   Why did you tell the police to go talk to Day-Day?

A.   Because I knew someone else was shooting at the park and I believed it was Day-Day because R.J. told me.

Q.   Did you think it would be good for you if they talked to Day-Day?

A.   Yes.

Q.   What did you think would happen if the police went and talked to Day-Day?

A.   I believe once the police talked to Day-Day, they will know that Day-Day was shooting and R.J. was shooting and I had nothing to do with it.

Q.   All right.  Did the police try to get you to say that R.J. was the only one with a gun?

A.   Yes.

Q.   I'm going to play you Clip 15 here.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Who is Renard?

A.   That's R.J.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. So did the police tell you that?

A. Yes.

Q. What was their message to you about what they believed the truth was?

A. That only R.J. was shooting.

Q. How many times did they tell you that?

A. A lot, all through that day.

Q. All right. Did you ask at some point -- did this go in circles with the detectives?

A. Yes.

Q. At any point, did you ask for Detective Weber?

A. Yes.

Q. Why?

A. Because I had a familiar history with him from the past incident and I thought he could just tell them that I have nothing to do with it, and he said: I'm not going to be here. I'll be back.

Q. All right. Now I'm going to show you No. 25.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q. And 26.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. What did you say there at the end?

A. I ain't have nothing to do with nothing.

Q. Now, were you trying to figure out if it would be good for you to be in the car or out of the car or taking it out? Were you trying to figure out what he was talking about?

A. No, because I knew I didn't do anything.

Q. All right. And did you get out of the car or stay in the car?

A. I got out of the car.

Q. And did you tell the police what you did?

A. Yes.

Q. So what about when the police were trying to say that maybe it's good for you if you stayed in the car? Did you change your story?

A. I guess he wanted me to paint a picture.

Q. Let's take a look at Clip 27.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. What did you tell him that precipitated that? What did you say?

A. I told him I had nothing to do with it.

Q. What did he tell you in response?

A. Basically: You didn't have nothing to do with it? You going to prison.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. What did you think he was trying to get you to say other

than:  I didn't have anything to do with it?

A.  I believe he wanted me to say R.J. was the only person shooting and I knew what was finna -- like I planned on doing this with him.

Q.  Let's look at the next clip, 28.  By the way, we're still now at 3:40 in the afternoon.  This is just getting warmed up, right, sir?

A.  Yes.

Q.  And watching your demeanor or observing yourself, were you still relatively fresh at this time?

A.  Yes.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  All right.  A few questions here.  Did you know that it was being recorded?

A.  No, sir.

Q.  All right.  Next question:  Did you argue or try to argue back with the police officers a little bit on this one?  You tried to hold your ground?

A.  Yes, tell him I didn't know nothing.  He basically wanted me to say I seen R.J. shoot, and I never seen R.J. shoot.

Q.  And did you feel like he was trying to get you to say that?

A.  Yes.

Q.  Let's take a look at the next clip.

M. Brown - direct

251

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Now, who was giving information, you giving it to them or them giving it to you?

A. They basically fed me information the whole time I was there.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. Did it work when you tried to tell them you didn't know anything?

A. No.

Q. Showing you 31, I think the -- well, let's play 31. Sorry.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Sorry. Let's try it again.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. What did you mean there?

A. I ain't down with him and his partner talking to me because I ain't had nothing to do with what happened at Amundsen Park.

Q. All right. Did you get a phone after that request?

A. No.

Q. Were you hiding where R.J. was?

A.   No.

Q.   I'm showing you Clip 34.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Why were you telling him to go find R.J.?

A.   Because R.J. was the one shooting and that's the one he wanted from the investigation.  He talking about him, go get him.

Q.   Did you think it would be good for you or bad for you if they talked to R.J.?

A.   I thought it would be great for me because R.J., when they question him, he's going to tell them I had nothing to do with nothing.

Q.   All right.  Let's continue.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  Showing you the next clip, Clip 137 we're at.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   I think we showed that one at the very beginning of your exam.  I'm going to skip to 40.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   I'm going to skip ahead here.  You're just sitting in the room?

**M. Brown - direct**

253

A.  Yes.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  All right.  He said hold on, and you didn't get a phone, did you?

A.  No.

Q.  Showing you the next one, 41, who came in?  Let's see if you can identify him.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  Who is that guy, do you remember?

A.  Detective Weber.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  All right.  You said he told you:  I'm telling them you're not a bad guy.

        Did you catch that?

A.  Yes.

Q.  All right.  Was this -- what did you or what do you now as an adult understand what's going on there?

A.  He was trying to reel me in to butter me up for the next set of detectives.

Q.  All right.  Let's see what No. 42 shows.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. What did you say there?

A. I told him I ain't did nothing.

Q. And when he said they're now trying to put you away, what did you think?

A. Well, he must be trying to put R.J. away.

Q. All right, showing you the next one.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Did they -- they were showing you what there?

A. Their statements from everybody he said he got from the park.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Now, you asked a question there. What did you say?

A. I basically asked him: So they ain't saying nothing about Day-Day?

Q. And did that surprise you?

A. Yes.

Q. Why?

A. Because it was two people shooting in the park.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. Now let's see the next clip, what happens next.

(Said video clip displayed in open court.)

M. Brown - direct

255

BY MR. LOEVY:

Q.  Who was it, your understanding, who controlled whether or not you got your phone?

A.  The detective.

Q.  Which detective?  Did you know his name back then?

A.  No, it was -- I didn't know how to pronounce it.  I know it now.

Q.  All right.  Let's go to the next one, 46.

(Said video clip displayed in open court.)

MR. LOEVY:  I just deleted 46.  Can you undelete that?

(Discussion off the record.)

MR. LOEVY:  All right.  Good work.  Thank you.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  All right.  And this is now what time, almost 4:00 o'clock?

A.  Yes.

Q.  Let's see what happens next, 47.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  And you were asking him to find Day-Day, right?

A.  Yes.

Q.  Let's go to 49.

(Said video clip displayed in open court.)

M. Brown - direct

256

BY MR. LOEVY:

Q.   What was it that they were trying to get you to say from your understanding of the context?

A.   That R.J. was the only one shooting.

Q.   And that who -- that R.J. was shooting?

A.   Yes.

Q.   Did you actually see R.J. shoot?

A.   No.

Q.   All right.  Let's go to 53.1.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Now, here it's getting after 4:00 o'clock.  Were you getting a little less fight here at 4:00 o'clock on day 1?

A.   Yes, I wanted to go.

Q.   All right.  Did he ask you if you checked R.J. for guns before he got in the -- actually, I'm going to play 57.  Let's play 57.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  What was going on there?

A.   He was asking me do I search people basically when they get in my car, R.J.

Q.   Do you search people or R.J. before they get in your car?

A.   No.

Q.   59.2.

M. Brown - direct

257

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Now, when he kept saying that you've got to come around to the truth, what did you understand he wanted you to do?

A. To my knowledge, I understand that he wanted me to say R.J. was shooting in the park.

Q. All right. This is -- you've been in custody for how long at this point, about three hours and 23 minutes?

MR. GIBBONS: Your Honor, objection, leading.

THE COURT: Rephrase the question.

BY MR. LOEVY:

Q. I didn't want to force you to do the math, sir, but you're going to have to do the math.

A. Oh, that's fine.

MR. GIBBONS: Because the math is wrong. He got arrested at 3:00. It's 4:23. It's a little over an hour at this point.

MR. LOEVY: All right. Lucky you had it. Maybe you're better at math than me. I'm sorry.

BY THE WITNESS:

A. It's military time, so I have to add it.

BY MR. LOEVY:

Q. So you hadn't even been in there two hours.

A. Yes.

Q. You look kind of tired.

MR. GIBBONS: Objection, leading.

THE COURT: Mr. Loevy --

BY THE WITNESS:

A. I was real --

THE COURT: Hold on, Mr. Brown.

Try not to lead. Please don't lead. Rephrase the question.

BY MR. LOEVY:

Q. All right. I'm going to show you Clip 61.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. What did you hear him say?

A. We gonna stretch it.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right, 63.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Hold on. How did that start?

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. So what was going on there?

A. He was telling me about a gun everybody said R.J. had.

Q. Did you know about that gun?

A. No.

M. Brown - direct

259

Q. Which way was the information going, you to the police or the police to you?

A. He was giving me that information.

Q. All right. Showing you 65, if you could say the time in military time on that for the record.

A. 4:30, I believe.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Were there times when they would just make you sit in the room, too?

A. Yes.

Q. I'm showing you 66.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. So what would they tell you when they'd leave you alone?

A. What would they tell me when?

Q. When they'd leave you alone, did they want you to be still thinking about --

A. They always told me to think long, clear: Think about the truth. We don't want to hear that. We'll give you time to think about it.

Q. All right. What would happen when you'd try to get a little sleep?

A. I'd always be interrupted.

Q. Let's show you 68.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  Did you know that they could monitor you when you were -- from out of the room on that camera?

A.  No.

Q.  All right.  What did he do there in the video?

A.  I believe he gave me pictures of R.J. and T.J.

Q.  What were you doing when he interrupted you?

A.  Trying to go to sleep.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  Do you know why he woke you?

A.  No.  He gave me those pictures to show me R.J. and T.J. was there.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  All right.  Showing you 69, let's see what happened next.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  What did he say in response to your question, sir?

A.  I can't even remember.  I can't understand what he was saying.

Q.  Let's hear it again there.

(Said video clip displayed in open court.)

BY THE WITNESS:

M. Brown - direct

261

A.  It sounds like he said:  I'll talk to her.

BY MR. LOEVY:

Q.  Let's just try it one more time.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

A.  He said:  I'll let you talk to her.

Q.  All right.  Let's go to No. 70.  Do you remember the African-American cop coming in to the --

A.  Yes.

   (Said video clip displayed in open court.)

Q.  All right.  It looks like that's Detective Turner.  Do you remember him?

A.  Yes.

Q.  And what time is this now?

A.  I believe 7:00 o'clock.  I'm not sure.

Q.  So 7:00 o'clock on night 1, correct?

A.  I believe so.

Q.  All right.  Let's see what happens.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  Does your voice sound a little different?

A.  Yeah.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  What happened right there?

A.   That was the first time I'd been told I was under arrest.

Q.   You thought something different?

A.   I thought he was just questioning me about what happened.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Let's go to 71.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   How did you feel when he told you that?

A.   I was surprised because I didn't do anything.

Q.   Did you want to get un-arrested?

A.   Yes.

Q.   Was there a time when Mancuso suggested to you whether -- you know, if it's a fight or it's a murder?  Do you remember anything like that?

A.   Yes.

Q.   What was going on there?

A.   I remember him telling me:  A fight is one thing.  If you go up there and fight, hey, it's a fight, but murdering somebody is something different.

Q.   All right.  Let's -- let's see what Mancuso told you next about why you were under arrest.  This is Clip 72, and we'll skip a little bit ahead to about here.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   I guess you're in the room here.  You're in the room.
You're in the room.  You're in the room.

    (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Sorry.  Sorry to jump around.  I'm doing my best here.

          Were you knocking on the door every five seconds?

A.   No.

Q.   All right.  Did you do quite a bit of knocking, though?

A.   Yes.

    (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Oh, this is a repeat of what we saw.

    (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Why did you say "fight"?

A.   Because earlier the detective said when he questioned me:
If you went up there to fight, that's something different but.

Q.   Let's look at the next one.

    (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Why did you ask him to stop talking loud?

A.   Because I was scared and he kept yelling at me.

Q.   Let's look at 76.

    (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Had you told him you hadn't done anything?

A.   I told him multiple times over and over I ain't did nothing.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   It went pretty quick in there.  Did you catch what you said?

A.   Yeah.  It looks like I told him:  I told you.  What do you want me to say?

Q.   Let's see it.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   And then showing you No. 79, by the way, let's orient the time again.  It looks like 7:15 p.m. on the 3rd, right?

A.   14.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  Did you intend for somebody to get shot up there?

A.   No.

Q.   Let's take a look at 81.1.  By the way, which way was the information going, you to him or him to you?

A.   He was feeding me information.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Could you tell what story he was trying to get you to adopt?

A. His story.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. Did you know what they wanted you to say?

A. I know they wanted me to say no one else was shooting, just R.J.

Q. All right. Let's look at 82. By the way, were you willing to say what he was talking about there? Did you adopt that at any time?

A. Later on, I did.

Q. Let's look at 82.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. How about 83?

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. Were you too old to talk to your mama?

A. No.

Q. Let's look at 86. By the way, did you know your mother was in the police station for at least some of that afternoon?

A. No.

Q. Did anybody tell you at any time that your family was trying to speak to you?

A.   No.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   When he said it was going to take a couple days, did you want to spend a couple of days in that room?

A.   No.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Let's look at 87.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Why were you mumbling at that point, sir?

A.   I was tired and I was scared.  They was playing with my mind, one telling me I'm charged with murder, and then when he come in there he say:  No, we ain't made that decision yet.

Q.   Let's look at No. 89, the next one, and again let's just make sure we've got the time.  Now we're getting at 10:00? 8:00 o'clock?  8:00 o'clock, 8:11.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   So let you -- oh, the pictures, okay.  Sorry.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Did you believe or have reason to believe that Day-Day was one of the shooters?

A.   Yes.

Q.   Let's look at -- and were they telling you that that was going to be acceptable or not?

A.   No, they ain't want to believe that anybody else was shooting at the park.

Q.   Let's look at 90.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   And this is now 8:15.  Had you eaten?

A.   No.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Now he said "in here."  Did you catch that?

A.   Yes.

Q.   Let's hear it again.  I didn't go back enough.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   What did you take that to mean?

A.   Like basically that's all you gonna get in this room.

Q.   And you did ask for chips, right?

A.   Yes.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   When you asked for chips, what was his next question?

A.   Who shot?

Q.   And let's hear that.   Just to be clear, did you understand that the food was being tied to the questioning?

A.   No.

Q.   They did give you chips, correct, sir?

A.   Yes.

Q.   Let's take a look at 91.

    (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   And then 92.

    (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Why did you say that about fighting?

A.   Because I believed what the other detective had told me: If it was just going up there to fight, you not in any trouble.

Q.   Had you told them a bunch of times before that you were just picking up your sister?

A.   Yes.

Q.   Let's take a look at 94.

    (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Now, when he was saying nobody is going to believe it, what did you understand?

A.   That nobody was going to believe that I didn't know R.J. had a gun.

Q.   And you had admitted at this point that R.J. was shooting because R.J. had told you that, right?

A.   Yes.

Q.   Let's look at 96.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  And do you remember when they started talking about T.J.?

A.   I believe so.

Q.   And did you believe T.J. was good for you or bad for you?

A.   I believed T.J. was good for me.

Q.   Why did you think that?

A.   Because me and T.J. didn't do anything.  We didn't know anything was going to happen.

Q.   He was in the car that day, right?

A.   Yes.

Q.   So if the police asked T.J. was there any talk or any gun, what was your understanding of what T.J. would say?

A.   T.J. would tell him no.

Q.   Let's take a look at 97.  Now we're still at about 8:15 on night 1.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  What did he tell you right there?

A.   He told me that T.J. said that he knew -- I mean, that I

knew that R.J. had a pistol and that's what we was going up there for.

Q. Was that true?

A. No.

Q. Was he telling you the truth?

A. No.

Q. Did T.J. ever say that?

A. I don't believe so.

Q. Did you know the police were allowed to lie to you?

A. No, I ain't know nothing about this.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Did you understand whether they were letting you pick to be a defendant or a witness? Was this going over your head, or did you understand what they were doing?

A. I didn't understand what they was doing. I just thought they wanted more on R.J.

Q. All right. Let's just listen to what exactly you said.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. You didn't know what he was saying, did you?

A. No.

Q. Did T.J. ever get charged?

A. No.

Q. Let's look at No. 103. You still don't know what he was

saying, do you?

A.   No.

Q.   If he would have offered you an opportunity to say, hey, all you've got to do is be a witness and then you don't have to be a defendant, would you have accepted that and started telling lies?

A.   Yes, to go out of the room.

Q.   What lies?  Well, let's be specific.

A.   I would have just told him R.J. was the only one shooting.

Q.   All right.  Would you have admitted that T.J. had anything to do with it?

A.   If he would have told me I was going home, yeah.

Q.   Let's look at 103.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  Did you sign the search warrant thing?

A.   Yes.

Q.   Why?

A.   Because I didn't do anything and I wanted to go.

Q.   All right.  I'm forwarding it to the end here.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Well, I think I missed it, but did you give him the code?

A.   Yes.

   (Said video clip displayed in open court.)

M. Brown - direct

BY MR. LOEVY:

Q.  Let's look at 105 and see what he told you.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  I'm backing it up.  Sorry.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  All right.  What did you understand he was telling you there about the other police officers?

A.  He was basically telling me like:  You got two good guys.

Q.  All right.  Was he asking you to trust them?

A.  Yeah, he wanted me to trust them, to adopt their truth.

Q.  Let's look at 109.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  Now you're mumbling at this point, sir.  Can you say what you said right there?

A.  I said I didn't know he had a gun.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  All right.  What was he telling you there?

A.  He was just basically telling me to come -- to be honest and lie, basically, and say I knew R.J. had a gun.

Q.  Well, let's go to 110 and skip ahead a little bit on the time.

**M. Brown - direct**

273

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Why did you tell the police to ask R.J. if you knew?

A.   Because I believed R.J. will tell them didn't know he had a gun.

Q.   Were you afraid that if they talked to R.J. that R.J. was going to implicate you in some plan you had on the way over to the White Castle?

A.   No, because there wasn't a plan.

Q.   All right.  Let's go to 111.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Now, when he said to do that, you didn't ask any questions.  You just did it.

A.   Yeah, I was ready to go.  I was tired.

Q.   Are you someone who is or isn't obedient to authority?

A.   I'm obedient.

Q.   Let's see what happens.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   I mean, weren't you wondering why he's asking you to take off your shoelaces?

A.   At that time, I just wanted to go home.  I wasn't thinking.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  Let's take a look at 112.  What time are we at?  21 is almost 9:30, right?

A.   Yes.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Why were you asking to speak to the detectives at various points that evening?

A.   Because I wanted them to let me go.

Q.   Did you think you had anything to hide?

A.   No.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   It's now what time?  Can you see the military time?  What time is it there?

A.   10:00 o'clock.

Q.   All right, showing you 117.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  What did you say right there?

A.   There was more than ten shots fired all together.

Q.   Was that your understanding and belief at that time?

A.   Yes.

Q.   Did they like that answer?

A.   No.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Now, when he said nobody is saying more than ten shots, did you know about the existence of 911 tapes?

A. No.

Q. Did you learn about them later?

A. Yes.

Q. That's in this litigation, right?

A. Yes.

Q. At the time when he said nobody is saying there's more than ten shots, did you know that people had called 911 and reported more than ten shots?

A. No.

Q. Let's go to 115.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Had you told him the truth?

A. Yes.

Q. This is 120.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. What was going on there?

A. He told me to think of my future.

Q. What did you say?

A. I am thinking of my future. I ain't trying to go to jail.

Q.   All right, showing you 122.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   They offered you chips, right?

A.   Yes.

Q.   They did offer you chips throughout?

A.   Yes.

Q.   All right.  Let's go to No. 124.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   First of all, let's look at the time.  Can you see the time?

A.   1:25 in the morning.

Q.   So now we're over into September 4th, right?

A.   Yes.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   What are they doing to you there?

A.   Handcuffing me.

Q.   Did he tell you why?

A.   No.  I asked him was I under arrest or was I being charged with anything, and he said no.

Q.   He said it was just a formality.

A.   Yes.

   (Said video clip displayed in open court.)

M. Brown - direct

277

BY MR. LOEVY:

Q.   What did you say there?

A.   Am I getting charged?

Q.   I think you said -- I think you started to think you were.
Let's see what you said exactly.

   (Said video clip displayed in open court.)

Q.   What did you say?

A.   I'm going to get charged?

Q.   What did he say in response?

A.   Can you let it play?

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  Showing you --

A.   He said:  A lot depends on what you talk to us about.

Q.   Let's go to 127.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   What time was this, sir?

A.   3:00 in the morning.

Q.   All right.  Let's go to 128.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  I guess I played the wrong one.

         Did you start talking about maybe your sister and a
fight?

A.   Yes.

Q.   Who had brought up that?

A.   Detective Mancuso.

Q.   All right.  Let's go to 132.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Can you -- you were hard to understand.  What did you say?

A.   I told him me and T.J. didn't know nothing about this was going to go down.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   What were you saying there, sir?

A.   I was telling them I wouldn't have been worried about going to get my sister, because if something happened it would probably be a one-on-one fight, and I was going to talk to Edward so he --

Q.   Did you -- sorry.

A.   -- so he can tell his girlfriend and his cousins to go ahead on.

Q.   Did you expect or worry about getting in any kind of a fight going into Amundsen Park?

A.   No.

Q.   This is 133.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

**M. Brown - direct**

279

Q.   This is the same one.  I'm going to play 134, the next one.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   And 135, we're at 3:11 a.m.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Did he seem to accept it sometimes when you said it?

A.   Yes.

Q.   136.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   It's hard to understand you, but can you say what you said?

A.   I said I don't want to go to jail for something I didn't do.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   What did you ask him?

A.   Do he think he could help me get out of this.

Q.   Why are you asking Mancuso that?

A.   Because he kept saying it's up to the state's attorney.

Q.   All right.  And had you told him that you hadn't done anything wrong?

A.   I told him the truth.  I ain't do anything.

M. Brown - direct

280

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Were you hoping he would tell the state's attorney what you said?

A.   Yes.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   And then 138, was there talk about being a snitch?  What's a snitch?

A.   Somebody that tell on somebody.

Q.   And did you want to be a snitch?

A.   No.

Q.   Was it safe for you if you were a snitch?

A.   No.

Q.   Were you -- was R.J. your cousin?

A.   Yes.

Q.   All things being equal, did you want to be talking about R.J. admitting he shot?

A.   No, 'cause I didn't think he killed nobody.

Q.   All right.  Let's go to 139.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   At this point, what was your understanding you needed to say to get out of the room that they were trying to get you to say?

A.   That R.J. was shooting and that I knew he had a gun.

Q.   Did you know either of those things to be true?

A.   I know R.J. was shooting from him telling me, but I didn't see him shoot.

Q.   All right.  Let's go to 141.  Can you see what time it is?

A.   It's 3:15.

Q.   3:15 on the 4th, day 2.  Let's listen.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Now, are you able to sleep if he's going to keep coming back every couple of minutes?

A.   No.

Q.   Let's play the next one, 142.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   What time is that?

A.   4:26.

Q.   Had you been trying to sleep there on that bench?

A.   I was trying, but I couldn't.  I had too much on my mind.

Q.   Is that bench good for sleeping?

A.   No.

Q.   Explain why.

A.   It's probably like ten inches wide.

Q.   Is it tall enough for you even as a short person?

A.   No, it's cold, hard.

Q. All right. At 4:30, do you remember which cop this guy is, the older guy with the white hair, or do you know now?

A. McDonald.

Q. All right. Hold on. Were you sleeping when he came back in, or trying to?

A. I believe I was probably asleep.

Q. I mean, there were a few times when you fell asleep, weren't there?

A. Yes.

Q. What's the most amount of time you think you stayed asleep for?

A. No more than an hour.

Q. All right. Let's see what happened when you were sleeping here at 4:30.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q. It looked like you got sort of startled there, didn't it?

A. Yes.

Q. Does that suggest that maybe you were sleeping between -- sometime between 3:15 and 4:30?

A. I may have.

Q. All right. Let's see what happened.

   (Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. Were you thinking super clearly there in

getting woken up at 4:30 in the morning?

A. No.

Q. Let's go to 144, I think. Let me see if this is the right one. Yeah, let's skip what we just saw.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. So had you -- were you adopting the police story at this point?

A. Yes.

Q. All right. Let's see what -- let's watch it again.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Why didn't you stand up and start arguing with this man?

A. I was tired and scared, and I just wanted to tell him what he wanted to hear so I can go home.

Q. Did you have any idea what time of the day or night it was at that point?

A. No, sir.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. Did he -- all right. This is what time? Can you see the time at the bottom?

A. 3:15.

Q. Then let's go to 144. Did he let you go back to sleep?

A. No, I believe they woke me up again.

M. Brown - direct

284

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   I can't tell if this -- I might have got the wrong clip. This might be a repeat.  Sorry.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   This was going backwards.  I apologize, sir.  I'm trying to go forward, not backwards.

Let's go to 145, and we will skip to the middle. This is -- oh, that's the next morning.

MR. LOEVY:  Your Honor, this might be a good time to take the break and I can fix it.

THE COURT:  I was just going to say I'd like to take our break at the top of the hour.

So, ladies and gentlemen, we'll take our afternoon break.  It's about 2:55.  We'll resume at quarter after 3:00. Please don't discuss the case.  I believe Ms. Deanes has arranged for something in the back for you to eat, and we'll see you at quarter after 3:00.  All rise.

(Jury out at 2:54 p.m.)

THE COURT:  All right.  Please be seated.

Anything we need to address during the break that can't be addressed at the end of the day or that we should talk about now?

MR. LOEVY:  Not from the plaintiff.

MR. FLYNN: Not from the defense.

THE COURT: Okay. See you at quarter after. Thank you.

And, Mr. Brown, same rules. Please don't discuss your testimony with anyone, including your lawyers. You can speak with your lawyers, but please don't discuss your testimony.

THE WITNESS: Okay.

THE COURT: All right. Thank you.

(Recess at 2:55 p.m. Change of reporters.)

(Proceedings heard in open court. Jury out.)

MR. FLYNN: Your Honor? We agreed --

THE COURT: Let me just make sure we're on -- yep, go ahead.

MR. FLYNN: As I said this morning, we agreed on ERI transcript. And with the handful, or so, of times where we don't agree on what's actually said, that's going to be submitted, and we're going to use that. However, the subtitles which were probably done -- of these videos that were probably done before we made that agreement, don't -- they have plaintiff's version of --

THE COURT: Okay.

MR. FLYNN: -- those issues. So we'd like some kind of instruction to the jury that the subtitles are not evidence, or it's not actually what's being -- necessarily

what's being said, but the transcript that you see is actually the evidence.

MR. LOEVY: I'm not sure a transcript is evidence either. I don't know if a transcript goes into evidence or it goes back to the jury. But the captioning, they apparently use some program that, you know, may or may not. So we can tell them at the appropriate time that they should rely on their hearing.

THE COURT: Right. The question is, do I say anything about that now.

MR. LOEVY: You could say right now if the jurors --

THE COURT: That the evidence is the actual words being spoken and not necessarily the transcription that you see at the bottom. And we can address that issue later.

MR. LOEVY: And, Jurors, if you think you hear something different than the caption, go with --

THE COURT: Rely on what you've heard.

MR. LOEVY: Let's do that. That sounds --

THE COURT: So I'll do that now, unless the --

MR. GIBBONS: Well, but tomorrow I don't intend to play, like, as many snippets as this. I intend to use the transcript to ask question and answers to Marcel. And so, I mean, I'm comfortable with whatever his answers are. He can say, I didn't say that, and then I've got to go up and prove it with an audio.

THE COURT: Right.

MR. GIBBONS: They're going to have the audio.

THE COURT: Right.

MR. GIBBONS: But I'm going to use the transcript. Because this is, to me, very difficult to understand at times.

Now, I want to ask Marcel very specific questions that the agreed-upon transcript bears out.

MR. LOEVY: Can we proceed now, though? Because I don't want to lose anymore time. This sounds like an issue we could solve --

MR. GIBBONS: Well, I'd like to solve it. I've got to cross him in the morning, so I'd like to know it now.

THE COURT: Right. So, look, I think that it's safe to say, for right now, for purposes of today, and we can discuss this after the break -- or, you know, for purposes of tomorrow, that the evidence is the actual audio words being spoken on the recording. Then once the jury is out, we can discuss what we're -- how we're going to handle this for purposes of tomorrow and your cross.

But I do want to just let them know that the actual evidence in this moment, for purposes of their listening on direct, is -- is the evidence -- the words being spoken. And then to the extent that we've agreed on a transcript, or we can get that settled, you know, for purposes of tomorrow, we'll deal with that during the break. And I'm happy to make

sure that it's resolved --

MR. GIBBONS:  I think we're all saying the same thing.  I mean, the audiotape's the evidence.

THE COURT:  Right.

MR. GIBBONS:  And that's 32 hours long.  And, if need be, I can sit here and play 45 minutes of it and then put up transcripts.  I'd rather not do that.

THE COURT:  Right.

MR. GIBBONS:  But, okay.

THE COURT:  Okay.  So that's what I'll do for now, and we can take this up after the break.

You want to bring in the jury.

(Jury in at 3:19 p.m.)

THE COURT:  All right.  You may be seated.

All right.  Ladies and gentlemen, as you take your seats and before Mr. Loevy resumes his testimony, I'll ask Mr. Brown to resume the witness stand.

(Witness resumes the stand.)

THE COURT:  Ladies and gentlemen, I neglected to tell you earlier that we are watching a video.  And it's important that you know that the testimony is the audio version of the words being spoken by the witnesses.  You may see, and you have seen, transcriptions at the bottom, or words printed at the bottom that may or may not align with the words being spoken in the video recording.  But what's important for you

to know is that the audio, that is, the actual questions being put to Mr. Brown and Mr. Brown's answer, his audio answers, are the evidence. And so that is something that I'd make sure that -- just to draw to your attention, that it's the audio of the words being spoken.

All right. Mr. Brown, you are still under oath.

Mr. Loevy, you may resume.

BY MR. LOEVY:

Q. Thank you. And I think I have cleared up the confusion. This is clip 142. Can you see the time? 4:26; correct?

A. Yes.

Q. All right. Let's play this again and make it clear.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. So his words right there: I just want to get clear in my mind.

Do you hear that?

A. Yes.

Q. Because there's another clip that sounds like it, but you heard: Just want to get this clear in my mind.

Let's see what happens.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. All right. Now showing you clip 144, which looks like about six minutes left at 4:32. Do you see this -- there's a

M. Brown - direct

290

confusion about the stamp.  Do you see the 4:32 there?

A.   Yes.

Q.   All right.  This is actually a different clip.  Watch
this.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  Did you -- were you able to get a little rest?

A.   No.  He keeps coming in the room.

Q.   All right.  Let's see what he said this time.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  So were you able to sleep at that point, sir?

A.   No.

Q.   Was it a good night's sleep, if you were able to get any
sleep at all?

A.   No.

Q.   I'm going to fast-forward you to about -- actually, I'm
going to show you one more, 143, which is the same thing, but
is the end of it.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   And then fast-forward.  Oh, I'm sorry, let's get it to the
end of it.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

M. Brown - direct

291

Q.   Skipping ahead.  Does he come back in a bit?

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   What were you supposed to do with that shirt?

A.   I guess wrap myself up with it.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  Did the light go out?

A.   Yes.

Q.   And this is 4:27.  And then I went -- now it goes 142, 143, now 144.  This is the one after you -- at 4:32, do you know why you were up instead of sleeping?

A.   I couldn't sleep.

Q.   And this is the one where he came in and said:  Hate to bother you.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   We saw that one.  Let's skip ahead to the morning.  145. Do you see the timestamp now on the second day, September 4th?

A.   Yes, 10:23.

Q.   All right.  Were you sleeping at 10:23?

A.   No.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Had you had a meal yet?

A.   No.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   That was their shirt, man.

A.   I had allergies, and they wouldn't give my medicine.

Q.   What do you mean?

A.   I had allergy medicine with me.  They took it.

Q.   All right.  Let's skip to 123, I think.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Let's show 147.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   By the way, you did eat McDonald's; right?

A.   Yes.

Q.   I'm sorry, let me -- that was a little choppy.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  Why were you asking to talk to the state's attorney?

A.   Because I finally adopted their story of what happened, and I wanted to talk to the state's attorney and tell her so I can go home.

Q.   Showing you 148.

((Said video clip displayed in open court.))

M. Brown - direct

BY MR. LOEVY:

Q.  Had you said that over and over?

A.  Yes.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  And showing you 150.  What time are we at now?

A.  12:33.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Did you have any idea what day, time, it was at that time?

A.  No.

Q.  Did you know if it was day or night, or what day it was?

A.  No.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Did it?

A.  Yes.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Could you have made it another couple days, sir?

A.  No.

Q.  Let's go to 153.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  What was he -- did you think he was trying to get you to

say?

A.   I guess he wanted me to say that I seen the gun before and I knew he had it.

Q.   Let's see what happens.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  So were you clear with him at that point you didn't see the car -- gun when he got in the car?

A.   Yes, I was telling him that I seen the gun when we left, but I never seen the gun.

Q.   That wasn't even true; was it?

A.   No.

Q.   Why were you trying out new stories here?

A.   Because he basically stayed talking to me.  I adopted your one story that R.J. is the only shooter.  I want to go home.  And instead, he questioned me, like, give you something else.  I don't know what else to give.

Q.   Let's see Number 156.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  What time did you understand the state's attorney was going to get there?

A.   Yesterday.  But they just said 2:00 o'clock.

Q.   So that was about an hour-and-a-half from when you're talking to him on day two, right there?

A.   Yes.

Q.   Did that happen?

A.   No.

Q.   Did you believe him, that the state's attorney would be there in about an hour-and-a-half?

A.   Yes.

Q.   What was good -- why did you want the state's attorney to be there?

A.   Because I had adopted their story, and they kept saying the final decision is up to the state's attorney.

Q.   All right.  Did you think you did anything wrong?

A.   I know I didn't do anything wrong.

Q.   Let's talk to -- let's see 157.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   By the way, what time is this?

A.   3:54.

Q.   On day?

A.   Two.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  158.  What time is it now?

A.   4:24.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

**M. Brown - direct**

296

Q.   And you wait in there.  Why did you ask for a detective?

A.   Because he told me he would be back with the state's attorney at 2:00.

Q.   Did you think it would be good for you to talk to the state's attorney or bad for you to talk to the state's attorney?

A.   I thought it was going to be good because I adopted the story that they wanted me to say.

Q.   And did you have anything to hide?

A.   No.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  Let's see what happens next.  159.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   It seemed like you were losing a little focus at that time?

A.   Yeah, I did.

Q.   I'm showing you 160.  What are you doing in this one?

A.   Crying.

((Said video clip displayed in open court.))

Q.   Showing you 161.

((Said video clip displayed in open court.))

Q.   What did you say?

A.   I said I ain't know nothing.

M. Brown - direct

297

THE REPORTER:  I'm sorry, say it again.

BY THE WITNESS:

A.  I said I didn't know nothing.

MR. LOEVY:  I didn't know nothing.

BY MR. LOEVY:

Q.  Who were you talking to there?

A.  God.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Why are you trying to knock on the door?

A.  I wanted to go.

Q.  Showing you 166.  What are you doing in this one?

A.  Talking to God.

Q.  Could you hear if you were crying?

A.  Yes.

Q.  Showing 168.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  You do have a trouble talking loud sometimes; don't you?

A.  Yes.

Q.  Why did you want to talk to Mancuso at 17:55?

A.  Because T.J. went home.  He ain't do nothing, I ain't do nothing.  I wanted to go.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Showing you 169.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   What did you say right there?

A.   I told them they got him.

Q.   Who did you mean?

A.   They locked R.J. up.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   What did you mean by that?

A.   I was stuck where they -- I got to the car, there was another shot.  I kind of panicked.  I just wanted to get out of there.

Q.   Had you done anything wrong?

A.   No.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Showing you 173.  What time are we at now?

A.   Sixteen --

Q.   Eighteen.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   What did you say?

A.   I told him I was just scared.

((Said video clip displayed in open court.))

M. Brown - direct

299

BY MR. LOEVY:

Q.  And 175.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Now it's what time?  What time, Marcel?

A.  7:15.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  At this point, were you thinking about food?

A.  No.  I was crying.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Showing you 178.  By the way, did you eat those
sandwiches?

A.  No.

Q.  All right.  Continuing the tape at roughly the next --

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Why did you ask if he told the state's attorney that?

A.  Because that's what they kept asking me, the only
question.  I just wanted him to tell the state's attorney, I
finally told y'all what y'all wanted to hear.  Just let me go.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Then 180.  He comes back at what time?  Can you see the

time?

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Sorry, I didn't stop it.

Can you see the time, Marcel?

A.  Yes.

Q.  What time is that?

A.  7:23.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  181.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Were you getting straight answers on whose decision it was?

A.  They kept giving me a runaround.  It was 50/50.  It was up to them, the state's attorney.

Q.  Did you want to tell the state's attorney that you didn't know there was a gun and you didn't do anything wrong?

A.  Yes.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  So they told you a few minutes at what time?

A.  7:41.

Q.  Showing you 184.  Was it a few minutes?

M. Brown - direct

301

A.  No.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  185.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Did you ever eat those sandwiches?

A.  No.

Q.  All right.  Mr. Turner came back in, eventually.  Do you remember either way?  Let's look at 186.

A.  Yes.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  What did you say there in response to the attorney?

A.  I asked for the state's attorney.

Q.  Let's hear that again there.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Did you understand that the state's attorney was probably not the attorney you should have been asking for?

A.  No, they just said it was up to the state's attorney.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Did you ever answer that question?

A.  No.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. Were you having trouble concentrating at that point?

A. Yes.

Q. Let's show you a longer clip here of Detective Turner taking you through it. Take a look at this one. 188.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. What did you ask him there?

A. If you think I can get out of here.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. Where did "the dude" come from?

A. The detectives told me that.

Q. Was there any dude involved that night?

A. No.

Q. Why did you put a dude into the story here at 8:20 on day two?

A. I was adopting everything they said, grabbed out there and grabbed -- I added to my story.

Q. Why are you grabbing stuff?

A. Because they don't want the truth no more. They kept telling me what the truth was, and I just kept grabbing and thinking, that's what they want to hear.

Q. Was what you were telling them before you were grabbing

working?

A.   No.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Is Edward Eugene?

A.   Yes.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   What's Edward's nickname?

A.   Eddie Cane.

Q.   Otherwise known as Eugene Stanciel?

A.   Yes.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Were you really excited about going to pick up your sister when on Saturday night you had something else to do?

A.   No, I just wanted to have something to do.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   You know, did you remember four days later what R.J. was wearing?

A.   No.

Q.   Well, did you answer him any ways?

A.   Yes.

Q.   Why?

M. Brown - direct

304

A.  I just wanted to go.

Q.  Let's see what you said.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Where did you get that memory of skinny pants, what he was wearing four days before?

A.  I think I said Miskeen pants.

Q.  Oh, what kind of pants?

A.  Miskeen.

Q.  All right.  That's a different word than skinny?

A.  Yes.

Q.  Did you later describe them differently in the video?

A.  Yes.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  What did you mean by that?  Why would people stand with guns?

A.  We on a busy street, and we in front of the restaurants. There's a lot of traffic.  And the police came there before, a few times.

Q.  Would they sometimes surge?

A.  Sometimes, but they really call us to the car, get our names, and fill out some contact cards.

Q.  All right.  Let's continue.

((Said video clip displayed in open court.))

**M. Brown - direct**

305

BY MR. LOEVY:

Q.   Now, I want to back up for one sec.  Who said:  These MF'ers are not going to fuck with me.  You or him?

A.   Detective Turner.

Q.   That exact phrase, these MF'ers are not going to fuck with me, had you ever said to him before he said it to you?

A.   No.

Q.   Did that later become part of something that you said at the interrogation?

A.   Yes.

Q.   Who said it first?

A.   The detective.

Q.   Let's hear it again.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Now, where did that come from?

          Tired of messing with his sister.

          Is that -- at 20:25 on day two, is that the first time you said something about, tired of messing with sister?

A.   Yes.

Q.   Where did that come from?

A.   I was just trying to answer his question.

Q.   He offered you:  Those MF'ers are not gonna F with me.

          And then you came back with what?

A.   He said he tired of messing with his sister.

Q.   All right.   Was that even true?

A.   No.

Q.   Why were you playing this game with this cop?

A.   Because he kept pushing me to say more, and I just thought, if I say some more, they gonna let me out.

Q.   Had the truth worked for you for the first two days?

A.   No.

     ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.   Now you've said that T.J. was going to go to the park, and he's tired of people getting his sister.   You said that; right?

A.   R.J.   Yes.

Q.   Was it even true?

A.   No.

Q.   All right.   Let's go to 190.

     ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Who are you talking about, the victim there?

A.   Yes.

Q.   You were telling him, hey, you had no problem with that guy?

A.   Yes.

     ((Said video clip displayed in open court.))

BY MR. LOEVY:

**M. Brown - direct**

307

Q. Why are you asking a police officer if he can help you?

A. So they steady coming in the room, steady questioning me, then holding the state's attorney over my head, and steady telling 'em I didn't know he had a gun.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. All right. Let's take a look at 194. Can you read the timestamp?

A. Yes. 8:42.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. Did R.J. tell you he was going to kick somebody's ass and start some shit?

A. No.

Q. Let's play -- let it keep playing.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. Was that even true?

A. No. You've seen my answer keep changing to what he said.

Q. Were you negotiating with the police officer?

A. I just kept trying to feed him what he wanted because he kept questioning me about it.

Q. Who did you think they were after at the time?

A. I just thought they wanted more on R.J.

((Said video clip displayed in open court.))

M. Brown - direct

308

BY MR. LOEVY:

Q. Now, that's an important statement; isn't it?

MR. GIBBONS: Objection. Form of the question.

MR. LOEVY: All right. I'll withdraw it, your Honor.

THE COURT: All right. Thank you.

BY MR. LOEVY:

Q. Did -- who was the first person that ever said that R.J. said: I'm going to go up to that park and I'm going to pop those "N" words off. You or Turner?

A. Detective Turner.

Q. Had you ever said anything before this guy said it to you?

A. No.

Q. Let's back it up.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. Do you know how long time went by until you adopted the phrase, pop those "N" words off?

A. Probably a few hours. I'm not sure.

Q. Did that come from you in any way, shape, or form?

A. No.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. All right. Let's show you 195. We're now at 20:43.

((Said video clip displayed in open court.))

BY MR. LOEVY:

M. Brown - direct

309

Q.   Was that even true?

A.   I never seen the gun.

     ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Why did you think R.J. maybe had a gun?

A.   I didn't think R.J. had a gun days before.

Q.   All right.  Had you ever in your life known R.J. to have a
gun, or known of him to have a gun?

A.   I seen R.J. with a gun probably a few years before that.
And he got a gun charge.

Q.   He had a gun charge?

A.   A few years before that.

Q.   All right.  Let's go to 198.

     ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   You're mumbling there, but what did you say?

A.   He told me I was upset, jumped in the car.  And I told him
I was just going to see what's up with my sister.

Q.   Were you upset?

A.   No.

Q.   Were you mad?

A.   No.

Q.   Did you jump in your car and race over there to go get
somebody?

A.   No.

M. Brown - direct

310

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. He called you his brother there, or Brother Brown, huh?

A. Yeah. He was trying to butter me up.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. What did you ask him?

((Said video clip displayed in open court.))

BY THE WITNESS:

A. I believe I asked him when I'm going to go.

BY MR. LOEVY:

Q. All right. What did you say right -- what was that last thing you said, right there?

A. Can I talk to the state's attorney.

Q. And then what did you say after that?

A. I ain't had nothing to do with this.

Q. Did you want to explain that to the state's attorney?

A. Yes.

Q. All right. This is what time?

A. 8:45.

Q. Showing you clip 199.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. Why are you asking to talk to the detective?

A. Because the state's attorney ain't came back, and I

remember him saying he was going to come with her.

Q.   Why didn't ask you for a phone call?

A.   I been asking to call my mom all day.  They wouldn't let me, so I just stopped.

Q.   Showing you 201.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Were you nervous?

A.   Yes.

Q.   Now we're at 9:18 on day two?

A.   Yes.

Q.   Why didn't -- why were you nervous and eating?

A.   I was scared and nervous.  I couldn't eat.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   What did you say?

A.   I told him on what.  I told them everything that happened.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  What did you understand he was saying to you there?

A.   That he didn't want to say he want me to say it, but he basically want me to come out and say it.

Q.   All right.  This is a complicated question, but you didn't know that he knew that you didn't know that it was being

M. Brown - direct

312

recorded; right?

MR. GIBBONS:  Objection to the form of the question.

THE COURT:  Well, you knew that was coming.

MR. LOEVY:  He's probably right.  All right.

THE COURT:  Rephrase the question, Mr. Loevy.

BY MR. LOEVY:

Q.  I'm just going to go to 204, if that's okay, your Honor.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Did you think he was going to accept if you said you didn't know R.J. had a gun?

A.  No.  He --

Q.  Who did you think they were trying to get by getting you to admit that you saw R.J. with a gun?

A.  R.J.

Q.  All right.  Let's go to 207.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Had you ever shot into the park?

A.  No.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Did you hang with him all the time?

A.  No.

Q.  Who's saying that, you or him?

**M. Brown - direct**

313

A.  Him.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Was that a theme for this detective?

A.  Yes.

Q.  In this and other clips, was he always trying to get you to say R.J. was trouble?

A.  Yes.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Now, there's that phrase "menace to society."  We heard that in openings.  Why did you say menace to society?

A.  Because the person he just described, they be basically a menace to society.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Were you part of any mafia?

A.  No.

Q.  Was R.J. part of a group that called themselves the mafia?

A.  That was -- yeah.

Q.  And that was a gang?

A.  Yes.

Q.  Did you have anything to do with R.J.'s gang?

A.  No.

Q.  Let's go to 209.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   What did you say there?

A.   I said if I knew he had a gun, I wouldn't let him go in the park.

Q.   There was kids out there, and stuff?

A.   Yes.

Q.   213.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   That's what happened right there?

A.   No.

Q.   All right.  215.  More about R.J.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Did you think it was good for you to start saying bad things about R.J.?

A.   I thought that's what the detectives just wanted me to keep painting a bad picture of R.J.

Q.   Why in the world would you have gotten that impression, sir?

A.   Because he's still questioning me, and he told me what happened.  I adopted his truth of what happened.  But he keep telling me something missing, and I don't know what's missing.

Q.   Let's keep going here.

**M. Brown - direct**

315

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   What were you saying there?

A.   I said he said:  Man, bye, shut up talking to 'em.

Q.   But what were you saying about your two moms?  What was your point?

A.   I was trying to paint a -- keep eye into his picture that R.J. is a terrible person.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  Let's go to 216.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   I'm going to skip ahead to keep going here.

By the way, are you getting tired watching these tapes for a few hours?

A.   Just emotional.

Q.   Was it harder and longer and more tiring in realtime?

A.   No.

Q.   Let's see what happens next.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Now, you said tired of those "N" words, right there; right?

A.   Yes.

Q.   And that was the first time you said it?

A.   Yes.

Q.   Where did that come from?

A.   Detective Turner.

Q.   That was the clip we showed earlier where Detective Turner said it?

A.   Yes.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   I'm going to back this up.  I apologize.  I'm going to play the beginning until we get to that.  Excuse me.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  That's the phrase.  This is after Mancuso said:  It's getting late and you're running out of time.

          Remember, at the beginning of the clip?

A.   Yes.

Q.   And then showing you clip 350, this is what Turner said to you several hours later.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Why didn't you hold out and just stay with your truth, sir?

A.   I wasn't getting out the room.

Q.   All right.  I'm going to show you 221.  Back to the

sequence.  This is what time?  What time?

A.  9:44.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  All right.  What were they -- were they trying to move you toward that gun, sir?

A.  Yes.

        MR. GIBBONS:  Objection.  Form of the question.

        THE COURT:  Rephrase the question, Mr. Loevy.

        MR. LOEVY:  May I withdraw it and show another clip, your Honor?

        THE COURT:  You may.

BY MR. LOEVY:

Q.  224.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Did it seem like there was a lot of repetition?

A.  Yes.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.  Were you telling the truth, sir?

A.  I was talking about girls.  He kept telling me what I was doing.

Q.  225.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. Can you explain what you meant there, sir?

A. I was just lying to him. My mama never told me nothing about covering up. I had a conversation with my mom probably after it happened, told her I didn't none. My mama always told me just tell the truth.

Q. All right. I'm going to show you 232.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. So he's asking you what if somebody tells us that you knew he had the gun. Were you scared that that could happen?

A. No.

Q. Why?

A. Because nobody knew he had the gun.

((Said video clip displayed in open court.))

BY MR. LOEVY:

Q. What rims did you have on your car, sir?

A. My uncle bought me some rims when I graduated high school.

Q. All right. Did that sometimes mean the police would pull you over?

A. Police would pull me over because I had a baby face. Then look at my rims, drew a little attention. So they would pull me over, ask me do I got a license.

Q. All right. Would you have wanted trouble in your car?

A. No.

M. Brown - direct

319

Q.   Showing you 236.

  ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   What did you say right there?

A.   I told him I could say I knew R.J. had the gun, if that would get me out.

Q.   Who did you think they were trying to get?

A.   R.J.

  ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  What --

A.   He basically just told me, if I say R.J. had the gun, that would get me out.  But I told him, that ain't true, but I could say it.

Q.   Let's look at 238 one, a few minutes later.

  ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Did that seem good for you, if you were going to say you didn't know he had the gun?

A.   No.

  ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  What were you saying there?

A.   I was telling him, you want me to say that he had the gun, I'm going to say it because I know the state's attorney coming

in.

Q.   241.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  What was going on there?

A.   He basically thought that I was going to -- he thought he had me.  And the state's attorney was coming, and I was telling him, well, I just tell her that he had the gun when he hopped the gate.

Q.   Did it feel like the police officer was trying to tell you that, to say that?

A.   Basically he wanted me to say it, yeah.

Q.   Let's see.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  Then showing you 244.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   All right.  I'm going to fast-forward in the story, sir, because we're going to have to pick up some interrogation in the morning.

        After you were done in the interrogation room, what time was that?

A.   The wee hours of the morning.

Q.   And where were you taken?

A.   Downstairs to a holding cell.

Q.   And what were you feeling and experiencing at that time?

A.   I was scared.  I was nervous.

Q.   Were you tired?

A.   Very tired.

Q.   If this is September 5th, when's the last night of sleep you got?

A.   September the 2nd night.

Q.   All right.  Where did you get taken after the room?

A.   He took me downstairs in the basement to a holding cell.

Q.   And immediately prior to that -- I'm going to show you 301.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   And then showing you -- showing you 308 at midnight -- no, at 2:09.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   And then showing you Number 314.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   And then showing you 321.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   What did you ask him there?

A.   Can you look out for me.

Q.   Why did you ask him that?

A.   Because I ain't telling him the truth, and telling him everything he want me to say.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Last one, 1:30 a.m. on day three.

   ((Said video clip displayed in open court.))

BY MR. LOEVY:

Q.   Mancuso ever tell you you were being charged?

A.   No.

Q.   So you got to the lockup.  What happens?

A.   I asked Mancuso, am I going home.  He said no, we got to do some little talking, or something.  Then he told me -- I asked him was I being charged.  He told me to say my prayers.

Q.   Then what happened?

A.   He put me in a holding cell.

Q.   And after that?

A.   About 5:00 or 6:00 o'clock, they let me out.  I seen my property and a lady coming out with handcuffs.

Q.   Did you think you would go home at that point?

A.   I thought I was going home.

Q.   Had you done anything wrong?

A.   I haven't done nothing wrong.

Q.   What happened next?

M. Brown - direct

323

A.   They said, well, you're going in front of the judge.  They put me in handcuffs, put me in a paddy wagon.

Q.   Were you scared in the paddy wagon?

A.   Yeah, I was scared.  I was shaking the whole time.

Q.   Were there other men in the paddy wagon?

A.   There was probably like 20, 30 people.

Q.   Were you among the youngest and the smallest?

A.   Yes.

Q.   What happened next?

A.   Crying.  All the crack heads talking about they going to get paid $100 a day for sleeping on the floor.

Q.   All right.  What happens when you get to the county?

A.   I get to the county, the guards yelling.  They tell us to strip search.

Q.   Was that a traumatic experience?

A.   Yes.

Q.   Was there anybody having trouble with it?

A.   There was a Mexican guy next to me.  He didn't speak English well.

Q.   What happened?

A.   He was watching everybody to understand what to do.  I remember the guards coming, punching on him, hitting him.

Q.   Had you ever been strip-searched before?

A.   No.

Q.   Was that -- what kind of experience was that?

A.   It was an awful smell.  Smelly.  Embarrassing.

Q.   How many men were strip-searched right there?

A.   It's a long line.  Probably 100 people.

Q.   Where did they put you?

A.   Kept putting me in more cells.

Q.   What were the cells called?

A.   Bullpens.

Q.   Were they dangerous, or did they feel dangerous?

A.   Yes.

Q.   How big were you at the time?

A.   105, five-four.

Q.   Was there violence in the cells?

A.   There was violence outside the cells with people that had on IDOCs.

Q.   Where did you go next?

A.   They kept moving me around bullpens, and I ended up in front of a judge.

Q.   What do you remember happening then?

A.   I remember going in there, going to the back.  I remember lawyers coming out.

         THE REPORTER:  What coming out?

BY THE WITNESS:

A.   Public defenders.  I remember asking me -- call my name. He was asking me, do I work, do I got kids.  I was asking, like, what am I being charged with.  He told me, like, don't

play fucking dumb with me, murderer.

Q. Were you playing dumb with him?

A. No.

Q. What happened then?

A. My world starting spinning. I thought I was going to faint.

Q. Had you murdered anybody?

A. No.

Q. Had you been part of any plan to murder anybody?

A. No.

Q. What happened next?

A. They calling people out. Then they called my name. They called R.J. name. And I see R.J.

Q. Then what happened?

A. He kind of looked at me, like, what you doing here.

Q. Were you crying?

A. Yes.

Q. What happened next?

A. They took me in front of a judge. They got to reading off the charges and what happened. I remember asking him: What about Brown? Then the state's attorney read off Detective Mancuso police report.

Q. What was read?

A. Brown knew R.J. had a gun before he got to the park. Brown said R.J. told him: I'm tired of these niggas, and I'm

M. Brown - direct

326

gonna fuck 'em up.  They gonna die.

Q.  Was any of that true?

A.  No.

Q.  Were you looking for any relatives in the court?

A.  I was looking for my ma.

Q.  What do you remember happening?

A.  They kept telling me to turn around, turn around.  Look straight.

Q.  And then what did the judge do or say?

A.  They gave me a $300,000 bond.

Q.  Were you able to make a $300,000 bond?

A.  No.

Q.  How much would you have had to pay to get out?

A.  30,000.

Q.  Did your family try to raise that money?

A.  My mom did.

Q.  Was she able to do it?

A.  No.

Q.  Did you hire -- your family hire a criminal defense attorney?

A.  Yes.

Q.  Who hired him?

A.  My mom.

Q.  Was that an easy thing for your mother to do?

A.  No.

Q. What was the lawyer's name?

A. David Wiener.

Q. Where did they send you after court?

A. When they let me out of there, they stuck me in a bunch more bullpens, so I was -- kept going to bullpens.

Q. What's the next facility you went to?

A. I remember going to the bullpen, and they kept writing numbers and -- writing numbers all over my body.

Q. What do you mean?

A. Kept writing numbers on my hand and words on my arm.

Q. Writing?

A. With markers.

Q. And what did it say?

A. I didn't understand it. And then when I got in the last bullpen, a guy that was in the -- another bullpen asked, what division you going to. And he looked at my arm, he's like: What the fuck you going to max for? What you do?

Q. Where did you find out you were getting sent?

A. To a maximum division.

Q. What do you remember about getting there?

A. When I lined -- when they told all the max to line up, I lined up. I remember they grabbed me out of line, some old guys, and told me I was going to super max.

Q. Super max?

A. Yes.

M. Brown - direct

328

Q.   And how did you get there?

A.   I had to walk probably a couple miles through a tunnel, shackled up.

Q.   How were you shackled?

A.   Hands, feet.

Q.   What does that mean?

A.   You got shackled up, then I get cuffed to somebody next to me.

Q.   Did you change into a uniform?

A.   When I got to Division IX, I changed to a uniform.

Q.   Do you have any idea what time that was?

A.   It was in the wee hours of the morning.

Q.   What did they give you?

A.   They gave me some real big clothes.  They gave me a mattress with a wool blanket, I believe a sheet.

Q.   What do you remember about the walk?

A.   I remember the walk, I was slowing everybody down because I couldn't carry the mattress.

Q.   What do you mean?

A.   The mattress too -- it was rolled up.  I couldn't get my arms around it.

Q.   Where did you go next?

A.   They took me to a pod.

Q.   What happened?

A.   I remember them telling me to go upstairs to a cell.  I

got there.  There was two people already in there.

Q.  Were you afraid?

A.  Yes.

Q.  Why?

A.  I was small.  I ain't did nothing.  I shouldn't have been in there.

Q.  Did you show emotion?

A.  I was trying not to, but I know they seen it.

Q.  What did they see?

A.  Probably the fear.

Q.  Did you cry?

A.  Yes.

Q.  Is it good to show weakness in that jail?

A.  No.

Q.  What happens if you show weakness?

A.  Just, you show any kind of weakness, it's just like dropping blood in the water.  All the sharks just, like, come out.

Q.  What do you remember about finally putting your head down on a pillow?

A.  When I finally got in there, I went to sleep.

Q.  What was going through your mind?

A.  I was still scared.  I wanted to call my ma.

Q.  Did you finally get to talk to your mother?

A.  Yes.

M. Brown - direct

330

Q. What did you find out?

A. I called her. She told me just hold on, she going to bond me out.

Q. Was she able to do that?

A. No.

Q. How long did you end up spending in the county jail?

A. A few years.

Q. Was it difficult?

A. Yes.

Q. Was it violent?

A. Very.

Q. Was it dangerous?

A. Yes.

Q. Were you attacked from time to time?

A. Yes.

Q. What did you do when you were attacked?

A. Try to fight back or I'd ball up.

Q. What's that?

A. I'd ball up or try to fight back.

Q. What does it mean to ball up?

A. Just submit.

Q. And what do you mean to fight back?

A. I tried, I just thought, if I fight back, maybe they'll leave me alone.

MR. LOEVY: All right. Your Honor, this might be a

place to break at the quarter-to hour.

THE COURT: Yes.

All right. Ladies and gentlemen, we'll break for the day. Please return tomorrow morning by 9:15 a.m. Same drill as yesterday and today. Please don't discuss the case, and please hold off on any judgments until all the evidence is received. You are excused for the day. We'll see you tomorrow morning. All rise.

(Jury out at 4:45 p.m.)

THE COURT: All right. Mr. Brown, you may be seated.

Mr. Brown, the same rules apply. You may not discuss your testimony with your lawyers. You can discuss any other matter you wish with them between now and when you retake the stand, but please do not discuss your testimony.

Is that -- any questions about that?

MR. Brown: No.

THE COURT: Okay. Thank you.

MR. LOEVY: May I ask you a question about that?

THE COURT: Of course.

MR. LOEVY: Because some judges, if you're not on adverse examination, we can talk to them.

We are asking permission to -- since there's nothing to -- you know, danger, we want to talk to him about cross-examination.

THE COURT: Okay. Let me get the defense's position

on that.

MR. FLYNN:  Yeah, we have no objection --

THE COURT:  Okay.

MR. FLYNN:  -- if there's no adverse examination.

THE COURT:  I take it back.  We'll wait until you're on cross before to give you that admonition, so you can speak with your lawyer about anything you wish.

MR. LOEVY:  I suspect that's because they think it's gong to go both ways, which is fair; right?

THE COURT:  Absolutely.

Okay.  Should we take up issues concerning transcripts and audio-recording?  I know that Mr. Gibbons raised this issue, but I'm happy to talk about that or anything else you think we should discuss before we break today.

MR. GIBBONS:  Well, I mean, they've got a style and -- very fast, with a lot of videos, with scrolling scripts below it.  That's their choice.

I'm going to do it differently, but I'm going to use the same thing, tapes and transcripts.  And I need to see if we're going to have any issues.

MR. LOEVY:  It's going to be audio with the -- I mean --

MR. GIBBONS:  No.  I'm going to show him transcripts. And I'm going to ask him about words.  Words matter.

Jon blurred over a lot of words by stopping in mid-sentence, and I'm going to explore those words in a transcript.

THE COURT: Sounds like cross-examination to me.

MR. LOEVY: I mean, really my question is, usually a jury wouldn't see a transcript. And I'm not sure I have an objection, but may I confer with counsel? And I don't know how you're going to rule on it, but --

THE COURT: You -- of course you can --

MR. GIBBONS: They've already seen the transcripts. You had 223 snippets with transcripts on the bottom.

MR. LOEVY: That's a fair point. I guess the transcript was embedded in our video, so --

THE COURT: Right. Right.

MR. LOEVY: Fair point.

MR. GIBBONS: I like to make fair points.

MR. LOEVY: Sometimes you do.

THE COURT: All right. So we'll table the issue, and if there's something else that I need to talk about tomorrow, let's just talk about it in the morning. Otherwise, I think we're all clear on the rules of the road for that.

Other issues? Questions? Topics?

MR. LOEVY: Not from the plaintiff.

MR. BOWMAN: Actually --

MR. LOEVY: Oh, sorry.

MR. BOWMAN: Judge, I had a point thinking ahead to Dr. Brian Cutler's testimony, which was going to come tomorrow. We read your *Daubert* ruling as very substantially limiting Dr. Cutler's testimony. That he would be permitted to talk about the phenomenon of false confessions and the circumstances that researchers have found are associated with false confessions, from the standpoint of personal characteristics and interviewing style.

Our intention is to adhere strictly to your ruling. We are not going to spend any time with Dr. Cutler talking about the facts and circumstances of Mr. Brown's interrogation. We're sort of literally going to ask Dr. Cutler for his insight as to how to evaluate whether a false confession might have been engendered by the -- by -- by -- by a particular interrogation, and then he'll respond in general terms.

I assume that the cross-examination of Dr. Cutler is going to be similarly limited. And that, by doing that, I'm not opening up Dr. Cutler to a cross-examination that's going to expand and ask Dr. Cutler's views on particular facts and circumstances that we saw this afternoon.

THE COURT: So -- so that was my understanding. You know, the attempt was sort of to limit both parties from doing that.

But if counsel has some clarification or objection,

happy to hear it.

MR. GIBBONS: That is the way I understood your order, your Honor. But until I see and hear the examination, I can't tell you I won't move off of what Locke just said. But I don't intend to use specific examples if Mr. Bowman is not using specific examples. So I think we're reading it all the same.

THE COURT: That sounds good to me.

MR. GIBBONS: I don't know if we get to Cutler tomorrow, though, to be honest with you.

THE COURT: So this takes me to the question that I will try to remember to ask you each day at the end of the day. Mr. Brown remains on the witness stand. Can I just get your next two witnesses, understanding that Mr. Brown, I assume, is going to go for quite some time tomorrow.

MR. LOEVY: He's going to go at least probably an hour-and-a-half to two hours on direct.

THE COURT: Okay.

MR. LOEVY: Then the cross -- you know, I hate to throw it back at him, but it depends on how long the cross is going to be. But our next witness after that is probably going to be Cutler.

MR. BOWMAN: Or R.J.

MR. LOEVY: Or R.J. Either R.J. or Cutler, depending on the timing. If we could get an estimate on the timing of

the cross, that would help.

MR. GIBBONS: Well, Jon, just -- I don't know, I didn't add it up yet, but five or six hours. So if we get seven or eight hours of direct, I would imagine we have seven hours of cross.

MR. LOEVY: All right. Well, then, we aren't going to get our expert to not come tomorrow, I think is what we're thinking.

MR. GIBBONS: I think that's fair. I don't see getting to Cutler tomorrow. That's why I was being honest.

MR. LOEVY: Seven hours? You're going to re -- replicate the interrogation?

MR. GIBBONS: I can't because I didn't understand it. But I'm going to do it my way.

THE COURT: I think that, given your estimate and the length of the trial day, it seems very unlikely we will get to another witness tomorrow. Obviously if some miracle happens in the C's part, you know, maybe, we'll need to make other arrangements. But, you know, it seems like we got a lot more work to do with Mr. Brown, which is fine with me.

Okay. So from my perspective, that's everything we should discuss today. But same as yesterday, if you can be here at 9:15, just in case there are matters we need to resolve, we will do our best to get started promptly at 9:30. I don't have anything else tomorrow, so we'll have some time

to resolve any issues that come up.

MR. GIBBONS:  Great.

MR. FLYNN:  Thank you, Judge.

MR. GIBBONS:  Thank you, your Honor.

MR. LOEVY:  I do have a question.  Maybe it's a little annoying, but, if we don't agree on talking to our client and it goes both ways, what is your presumption, then, if nobody -- if we don't talk to our client?

THE COURT:  Say it one more time.  Give me the question again.

MR. LOEVY:  Could we enforce a rule where neither side could talk to their client while they're on the stand?

THE COURT:  That is my default practice.  But if the parties agree otherwise, I don't --

MR. FLYNN:  We just did agree, your Honor.

THE COURT:  Yeah, I don't ever stop parties if they agree -- I shouldn't say ever.  I don't try to interfere if the parties agree.  So they've objected, and that will be -- that will be that, so.

MR. LOEVY:  Thank you.

THE COURT:  Yep.  All right.  Have a good night.

MR. GIBBONS:  Thank you, your Honor.

THE COURT:  See you in the morning.

(Court adjourned at 4:53 p.m.)

                    *   *   *   *   *

338

C E R T I F I C A T E

        We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


        /s/ Patrick Mullen
_____


        /s/ Sandra Tennis                        August 27, 2024
_____        _____
        Official Court Reporters                      Date
     United States District Court
    Northern District of Illinois
         Eastern Division