339

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                           ) Case No. 19 C 4082
                                        )
                Plaintiff,              )
                                        )
            vs.                         )
                                        )
MICHAEL MANCUSO AND GERI YANOW,         )
Personal Representative of the          )
Estate of KEVIN MCDONALD,               ) Chicago, Illinois
                                        ) August 28, 2024
                Defendants.             ) 9:17 o'clock a.m.


                        VOLUME THREE
        TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
        BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Defendants:         GREENBERG TRAURIG, LLP
                            BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

340

APPEARANCES (Cont'd):

Court Reporter:                    JOSEPH RICKHOFF, CSR, RMR, CRR
                                   Official Court Reporter
                                   219 S. Dearborn St., Suite 2118
                                   Chicago, Illinois  60604
                                   (312) 435-5562
                                   joseph_rickhoff@ilnd.uscourts.gov

             *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                   PROCEEDINGS RECORDED BY STENOTYPE
         TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK:  19 C 4082, Brown vs. Mancuso.

THE COURT:  Good morning, everyone.

Can I get appearances on the record, please.

MR. LOEVY:  Good morning, your Honor, John Loevy and all the same appearances for the plaintiff.

THE COURT:  Good morning.

MR. FLYNN:  Good morning, your Honor, Kyle Flynn and all the same appearances on the record, as well as defendant Mancuso.

THE COURT:  Good morning.

And I see that both Mr. Mancuso and Mr. Brown are present.

MR. BROWN:  Yes.

THE COURT:  So, I wanted to check in with the parties to see what, if any, issues we should discuss before we resume trial this morning.  So, I'm happy to hear from either of the sides if there are matters we should discuss.

MR. LOEVY:  None from the plaintiff, your Honor.

MR. FLYNN:  We have one issue, your Honor.

With respect to the testimony of Mr. Swygert, we have a proposed cautionary instruction to be read to the jury as soon as possible.  I just provided Mr. Loevy a copy.  And I'm not sure what his take is on that yet, but --

MR. LOEVY:  Because we were going to get together and

meet and confer and get one together. I haven't seen this one yet, although glancing at it, I'm not going to agree to this one.

So, I think the preference would be to work one out, so we don't have to. But I think we should try to do that.

THE COURT: That's fine. I'm happy to have the parties confer. I'm also happy to review it at the appropriate time.

I appreciate that the defendants appear to have some sensitivity to getting that instruction out to the jury sooner rather than later. I assume that's the reason you're raising it now. And I'm sensitive to that. So, as soon as the parties can reach some sort of consensus on it, even if it's during breaks or this evening, I'm happy to do it as soon as I have something to review.

I just want to raise two somewhat related matters with you, just to make you aware of a few things that I've been made aware of.

Number one, we have two jurors who are running a little late this morning. Both of them indicated to Ms. Deanes that they anticipated arriving to the building at about 9:30 on the nose. Both of them were traffic-related issues. One involved an accident and one just involved Chicago. So, we may start a little later than 9:30 precisely.

I tell you that because this is the second day we've

had a bit of an issue on that. And, so, I just want you to be aware that a couple of the jurors, at least one of them, has been a little flustered -- I believe it's Ms. Katz -- to try to get downtown every day. She just may not commute that way for work. I don't know. But I raise that with you.

MR. LOEVY: Thank you.

THE COURT: The second issue I want to raise with you concerns one of the jurors, whose name I will get you -- I'll get you the name -- who indicated to us during selection that he had a non-refundable vacation scheduled to begin on September 10th. Tyler Campbell. Tyler Campbell, who is Juror No. 1.

His questionnaire indicated a non-refundable vacation from September 10th through the close of the trial, the 16th or something like that.

He inquired yesterday what, if anything, should he do about that. We did not give him an answer, obviously, because I can't do that until I consult with you.

My reaction is that there isn't anything we can tell him now definitively, but I thought that it would be appropriate to let you know what I knew so that you all can think about that.

I think the reality is we just don't know. And I don't think it's appropriate to excuse him now unless the parties think we should. And you don't even have to give me an

344

answer now. But I put it out there for your consideration and discussion.

MR. FLYNN: We agree with the Court, your Honor.

MR. LOEVY: Plaintiff, too. I hope we're not still here on the 10th.

THE COURT: I do, too, but I don't want to get his hopes up. And at the same time, I think we'll just know more, for example, this time next week.

Okay. I put it out there. And we'll sort of see where we are and update him as appropriate.

Okay. As soon as we have everyone assembled, we'll come back in and let you know and we'll take it from there.

MR. FLYNN: Thank you, Judge.

MR. LOEVY: Thank you, Judge.

(Recess from 9:22 a.m., until 9:45 a.m.)

THE COURT: All right. It sounds like the late-arriving jurors are here. So, if the parties are ready, we can get the jury lined up.

MR. FLYNN: Yes, your Honor.

THE COURT: Mr. Brown, can you please resume the witness stand?

MR. BROWN: Yes.

(Jury in.)

THE COURT: Good morning, ladies and gentlemen. Please be seated. Welcome back.

We will resume with the testimony of Mr. Brown.

Mr. Brown, you remain under oath.

And, Mr. Loevy, you may proceed.

MR. LOEVY: Thank you, your Honor.

MARCEL BROWN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. Mr. Brown, I'm going to move back now, cover back to the interrogation, the end of it, which we didn't cover.

Now, you were able to get a night's sleep last night?

A. Last night at my house? A little bit.

Q. Yes.

A. Yes.

Q. All right. How about back then? I want you to put back into the frame of reference in September of 2008. Can you put yourself back into 10:00 o'clock on day two, okay? That's where I want to go back to.

You have in mind everything that happened prior to that we heard about yesterday?

A. Yes.

Q. All right. At that time, what was your understanding of what the police wanted you to say is your ticket to go home?

A. To my understanding, the police wanted me to say that I knew R.J. had a gun, and that was the only way I would go home.

Q. And who did you think they were trying to get, you or R.J.?

A.   R.J.

Q.   All right.  Let's back up just a couple minutes for context.  I'm going to go to Clip 236.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   By the way, before this, how many times do you think you told them you didn't see R.J. with a gun, you didn't know he had a gun?

A.   About 50 to a hundred times.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  Do you remember that part of the conversation?

A.   Yes.

Q.   And, then, shooting ahead to 241 at about 10:11.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   What was it the truth you thought they wanted to hear you say?

A.   That I knew R.J. had a gun.

Q.   All right.  Let's go to 244 at -- Clip 244 at 22:17.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   Why were you in a hurry to talk to the state's attorney?

A.   Because I had adopted what they controlled as lies to lie and say R.J. had a gun, and he said if I said this, my way out.

Q.   All right.  Did you believe you had anything to hide or had done anything wrong?

A.   I didn't do anything, so I didn't have nothing to hide, and I just thought they wanted the case on R.J.

Q.   Showing you 245.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   What did you tell her?

A.   I said I believe I came in, like, two weeks ago with my mom.

Q.   When a dude shot in your mom's house?

A.   Yes, because they had finally caught him.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  Showing you 246.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   Did you know what a state's attorney was?

A.   No.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   So, if they told you that, why didn't you say, you know what, I think I would like an attorney free of charge, can I get an attorney?

A.   I didn't know my rights.  I didn't understand them at the

time.  And from the beginning of the interview, the detective told me, oh, we -- this just a formality we do to talk to everybody.

Q.  Let's look at 248.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  Was that good advice, no reason for you to be scared?

A.  No.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  Then showing you 249.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  All right.  You're telling her the story that night?

A.  Yes.

Q.  Okay.  Going to 250.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  And had that been a story that you had talked about with the detectives over and over and over again about the guys?

A.  Yes.

Q.  Showing you 251, the next part.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  All right.  Did you tell the state's attorney that?

Brown - direct

349

A.   Yes.

Q.   Continuing, 252.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   What did -- did that happen with the state's attorney, too,
sir?

A.   Yes.

Q.   Showing you 253.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  And continuing at 254.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   Where did that part of the story come from?

A.   Detective Turner.

Q.   And at what point did that become part of your story?

A.   Probably after he left the room.

Q.   All right.  Some point in the 30 or so hours you had been
there?

A.   Yes.

Q.   Can you do the math on how long you had been in the room
since 3:00 o'clock on day one at this point?

A.   No.  It felt like days.

Q.   And you didn't know day, night, you said, right?

A.   No.

Brown - direct

350

Q.   But if it was 3:00 o'clock on day one, and now you're at 11:00 o'clock on day two -- 11:00 p.m. -- that is -- hate to do the math on you, but it's at least 31, 30 hours or something, right?

A.   Yeah, something around that.

Q.   All right.  Let's continue.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   Going to 255.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  Showing that -- you're continuing your story with the state's attorney, correct, sir?

A.   Yes.

Q.   256.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  And showing you 260.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right, sir.  How much of that was true in the middle where you're like seeing him and a gun in his hands?

A.   That never would was true.  I never seen him with a gun.

Q.   Did you see him arguing with Edward Cane and his gun out, the whole business you were telling there?  Where did that come

from?

A.   The detectives are going, he was arguing, he pointed at the guys, started shooting.  None of it was true.

Q.   What was the truth?  When you got into the park, what happened?

A.   When I got in the park, I was looking for Eugene to talk to him to get the girls.  I never seen Eugene.  Shots ran out from the back of the park.  I got low.  Shots rang out behind me.

Q.   Shots in front of you, behind you?

A.   Yes.

Q.   Could you see who was shooting at either end?

A.   No.

Q.   So, why are you telling the police this story here?

A.   Because I told them the truth probably the first day I was in there, so I kept adopting everything they want to hear.  They, oh, that's not the truth.  So, they keep going.  We talk some more.  They got me to say R.J. was --

        THE COURT REPORTER:  I'm sorry?

        THE WITNESS:  I'm sorry.

BY THE WITNESS:

A.   They get me to say R.J. was the shooter.  We talk some more.  Then he just stuck on this gun thing.

BY MR. LOEVY:

Q.   All right.  At this point, you haven't admitted that you knew anything was going to happen, up to anything we've seen in

court, correct?

A. Correct.

Q. Let's go to 264.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. Showing you 265.

(Said video was played in open court.)

BY MR. LOEVY:

Q. Who's the "he" there?

A. The detective.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. Is there anybody involved who think you knew that -- what R.J. was on?

A. No.

Q. Did you understand intent for murder? Was this a subject you had any familiarity with at all?

A. I didn't understand nothing about a murder.

Q. All right. Showing you 266.

(Said video was played in open court.)

BY MR. LOEVY:

Q. Who's talking? Who is saying what to who, you to her or her to you?

A. Her to me.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. Is that what happened?

A. Yes.

Q. Showing you 269.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. Did you tell her that, too?

A. Yes.

Q. Showing you 280.

(Said video was played in open court.)

BY MR. LOEVY:

Q. By the way, did R.J. ever say that you knew he had a gun?

A. No.

Q. Did you know at the time she was lying to you?

A. I knew she was lying because I never knew he had a gun.

(Said video was played in open court.)

BY MR. LOEVY:

Q. What did you say there at the end?

A. Said I went to school with him.

Q. All right. Showing you 282-2.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. Showing you 283.

(Said video was played in open court.)

MR. LOEVY: Backing up a few lines.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Did T.J. ever say that he knew you had a gun -- or that you knew that R.J. had a gun?

A.   No.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  When she's saying "you and I talk only once," what did you fear?

A.   I fear if she left the room, I was going to prison.

Q.   Showing you 284-2, skipping ahead a little bit in the interrogation.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   The beginning there wasn't clear.  What did you say?

A.   I said I didn't know he had the gun until he hopped the gate.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Do you have any idea what she's talking about?

A.   No.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  What did you think she was trying to get you to say to go home?

A.   That he had a gun.

Q.   And who did you think that was going to be trouble for, you or someone else?

A.   R.J.

Q.   All right.  I'm going to show you 285.

     (Said video was played in open court.)

          MR. LOEVY:  And I think this is backing up.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   And, then, showing you 287.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   Did you hang out with R.J. hundreds of times when he didn't have a gun to your knowledge?

A.   My whole life, basically.

Q.   Showing you 288.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  We'll pick that up in a second.  But you pretty much told her what the score was, didn't you?

A.   Yes.

Q.   Was that truthful?

A.   Yes.

Q.   All right.  Let's show you what happens next.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  You told her you did feel that way, didn't you?

A.   Yes.

Q.   Showing you 290.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   So, let me break it down there.  You didn't accuse her -- or did you accuse her of just trying to get you to lie?

A.   Yes.

Q.   You said -- was it your belief that you weren't going to go home unless you told them as -- the truth as they were defining the truth?

          MR. GIBBONS:  Objection.  Leading.

          THE COURT:  Rephrase the question, Mr. Loevy.

BY MR. LOEVY:

Q.   What was it you thought would set you free that night?

A.   If I agree to her that I knew R.J. had a gun.

Q.   And was she giving you any indication which way she thought the truth was?

A.   She was pushing me towards the, you knew he had the gun.

Q.   And was it your understanding you were going to get out of the room if you told the -- what they were calling the truth or not if you told them --

          MR. GIBBONS:  Objection.  Leading.

          MR. LOEVY:  It's a bifurcated.  It's either-or.

Brown - direct

357

BY THE WITNESS:

A.   I believe if I told the truth that he didn't have a gun, I was going to jail.  If I told them he had a gun, I was going home.  And she always made it clear, I'm gonna leave the room.  Not gonna talk to me again.

Q.   Let's look at 291.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  That was a little hard to understand, but you saw the caption there.  What did you say?

A.   I said, I didn't know he had the gun till he got out, hopped the gate.

Q.   Showing you 292.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Where did you get that information?

A.   I got that information from the detective earlier.

Q.   And was that on the video where they're describing it to you?

A.   Yes.  He told me it was a Clint Eastwood gun, and he was describing guns.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  And showing you 293.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   What time was it here?

A.   11:41.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Did that make you scared?

A.   Yes.

Q.   Showing you 294.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   What are you doing there, sir?

A.   Crying.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Did they leave you alone?

A.   No.

Q.   Did you think about it?

A.   Yes.

Q.   All right.  They did leave the room, though; did they not?

A.   Yes.

Q.   What were you thinking?

A.   All sorts of stuff was going through my head.  I was going to jail for something I didn't do.

Q.   Let's look at 295.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   What are you doing there?

A.   Crying.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   That wasn't allergies?

A.   No.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   The detectives who weren't worried about the videotape weren't as friendly to you, were they?

A.   No.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Skipping here to the end.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Showing you 296, what happens next.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   What did you say there?

A.   I didn't know he had a gun.  I didn't know.

Q.   Showing you 297.

(Said video was played in open court.)

MR. LOEVY:  I'm sorry.  That's out of order.

BY MR. LOEVY:

Q.   That was a different encounter, wasn't it?

          MR. LOEVY:  Sorry.

BY MR. LOEVY:

Q.   That was different than the last time you knocked on the door.  Could you tell?

A.   I can't tell.

Q.   All right.  Showing you 298.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  This is getting close to midnight on day two?

A.   Yes.

Q.   Sir, could your 18-year-old self have handled another night in that room?

A.   Not with them double head snakes.

Q.   Showing you 300.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   Did you actually audibly answer any of those questions?

A.   No.

Q.   Who was doing the talking, you or her?

A.   Her.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   Showing you 301.

Brown - direct

361

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  Sir, was any of that true?

A.   No.

Q.   Did you think it was good for you or bad for you to give them more on R.J.?

A.   I thought it was good because they don't stop pressing me.

Q.   Are you proud of saying these things about R.J. that aren't true?

A.   No.  I just wanted to go home.  I didn't do nothing.

Q.   Would you give your 18-year-old self a break?

A.   Give myself a hug.

Q.   302.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   She said something about your best interest.  Did you hear that?

A.   Yes.

Q.   Would it have been in your best interest to have Ms. Spizzirri advising you or have Wham Cary, the attorney your mother hired, advising you?

A.   Wham Cary.

Q.   And you didn't -- hadn't met Wham Cary and didn't know he was outside that station, did you?

A.   No.

Q.   Showing you 303.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   What did you take the significance of her telling you she knew you didn't kill anybody?

A.   That I was gonna go home.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   That was -- showing you 304.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Did R.J. actually say those things?

A.   No.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Did you answer her when she was talking and asked you if you knew what she was talking about?

A.   No.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Showing you 305.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Were you thinking short-term, like, when am I getting out of here, or long-term, like, I wonder if I'm going to prison

forever?

A.   I was thinking both.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   You're mumbling right there.  What did you say?

A.   I said I just want to go home, I ain't do nothing.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   What did you say at the end there?  It got a little bit cut off, but --

A.   40 years long.

Q.   You said you won't get to see -- and I think it continues.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Who were you worried about not getting to see?  It got cut off between the two clips.

A.   My mama, my family.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Was there anything she had said to you that was not clear?

A.   Yes, everything.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  You said in front of the state's attorney that you want to use the phone, didn't you?

A.   Yes.

Q.   Showing you 308.

What time was it now?

A.   12 --

Q.   No, it's 2:00 a.m.  2:00 a.m. on day three, right?

A.   Yes.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   And, then, 311.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Had you already answered that question, sir?

A.   I answered that question over.  What I said, by him you should know.  Because when she was talking to me, she kept telling me she knew everything about her friends, what they do. So, I figured she want me to know everything about him and what he would do.

Q.   You might have been overthinking it?

A.   Yes.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Showing you 312.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Had you ever been up for two nights in a row?

A.   No.

Q.   Mentally, would that have been possible for you at that age of your life?

A.   No.

Q.   Showing you 313.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Showing you 314.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   Now, did you think you did anything wrong by when they're shooting at your car driving R.J. away from the scene?

A.   No.

Q.   Showing you 317.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   318 -- no, 319.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   320.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   What do you remember about that phone call, sir, when they finally gave you the phone call?

A.   I remember talking to my mom.  She told me they took my

car. I told her I was coming home, I ain't did nothing. And I believe I was fitting to get released.

Q. Why did you tell her you were coming home?

A. Because I didn't know nothing. I didn't do nothing.

Q. Showing you 321.

(Said video was played in open court.)

BY MR. LOEVY:

Q. Why did you ask that guy to look out for you?

A. Because him and state's attorney had my life in their hands.

Q. What's that?

A. Him and the state's attorney had my life in their hands.

Q. Had you told him pretty clearly that you didn't do anything wrong?

A. Yes. And I told him I didn't know about a gun, because I didn't, and I didn't do nothing wrong.

Q. Let's see what happened next.

(Said video was played in open court.)

BY MR. LOEVY:

Q. You can see your shoes without the shoelaces there. Do you know why they took your shoelaces?

A. No.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right, sir. We went a little out of order, but last

afternoon, yesterday, we talked about what happened next, right?

A.   Yes.

Q.   Just in one sentence, remind the jury, orient the jury where you got taken from that room.

A.   I got taken downstairs to a holding cell in lockup.

Q.   And, then, on to the county jail where you spent some time?

A.   Yes.

Q.   Now, I'm going to read you a sentence from Mr. Mancuso's police report and I'm going to ask you if this is true:

During the interrogation, did you state that you knew Branch had a gun when Branch got in the car to go to the park?

A.   That's not true.  I didn't know he had a gun.

Q.   Would that be an accurate summary in a police report?

A.   No.

Q.   So, they took you to the jail.  And you told us a little about the intake and such.  And I'm going to fast forward now.

Did some point realize you're not going home?

A.   Yes.

Q.   Did they bring you to the population and put you in a cell?

A.   Yes.

Q.   Is there a cell and a dayroom?  Explain it a little bit.

A.   It's like a pod.  There's 22 cells on one pod.  Upstairs, downstairs.

Q.   Did you leave the cell and go into the dayroom?

Brown - direct

368

A.   Probably the next day, the next night.

Q.   What happened the first day?

A.   I remember the CO asking me ask did I want to come out.  I told her no.

Q.   Why?

A.   I was scared.

Q.   So, they let you stay locked in your own cell?

A.   Yes.

Q.   Did anybody help you?

A.   There was a guy named Jerry who convinced me to come out to call my mom.

Q.   What do you remember?

A.   Him knocking on the door asking me what gang I was in.  I told him none.  Then he asked me where I was from.  I remember him, like, telling me, like, call your family, they need to know where you at.

THE COURT:  Mr. Loevy, at some point I'd like to take our morning break.  Is now a good time or do you want --

MR. LOEVY:  This is a good time.

THE COURT:  Okay.

Ladies and gentlemen, it's five minutes to 11:00.  Let's take a break until quarter after, just to give you all a chance to stretch your legs.  So, we'll resume promptly at 11:15.

Please don't discuss the case.

All rise.

(Jury out.)

THE COURT: You may be seated.

I just want to let the parties know that this morning a juror or two asked for a bit more frequent bathroom breaks. And, so, I'm just going to try to be a little more sensitive to that. I think with time they'll figure out to drink a little less and perhaps you need them a little less. But at least I want to try to honor that to the extent possible. And I'm sure you all need comfort breaks, as well.

Anything we need to take up?

MR. LOEVY: Not from the plaintiff.

MR. FLYNN: Not from the defense.

THE COURT: All right. I will see you at quarter after. Thank you.

(Recess from 10:57 a.m., until 11:15 a.m.)

THE COURT: All right. Mr. Brown, you can resume the witness stand, please.

Mr. Loevy, about how much longer do you have? I'm just thinking through our lunch break and next steps.

MR. LOEVY: I expect I will conclude sometime around the lunch break. We are going to cover, you know, the trial and Menard and then his post life. So, I don't think I'll finish before lunch. But not too much after lunch.

THE COURT: Okay. I'd like to break for lunch as

close to 12:30 as we possibly can, which, again, I'm trying to eek out every minute I can here.  This is a bit of a marathon.  So, we'll see where we are then.

MR. LOEVY:  Thank you, your Honor.

(Jury in.)

THE COURT:  Please be seated.

Mr. Brown, you remain under oath.

Ladies and gentlemen, just for your own planning purposes, or for you to know, I do plan for us to break for lunch at 12:30.  So, we'll go for about an hour and 15 minutes and we'll take our lunch break at that time.

Mr. Loevy, you may resume.

BY MR. LOEVY:

Q.   Shooting you back to the Cook County Jail.  When you would interact with people, did people ask you how old you were?

A.   Yes.

Q.   What do you mean?

A.   I looked younger than what I was.  I had a baby face.  And I was small.

Q.   And you mentioned a guy named Jerry.  Did he -- and you said he was helpful to you?

A.   Yes.

Q.   What kind of advice did he give you?

A.   Like, when I first got there, he told me, like, you got to get in the shower.  So, I was going to get in the shower and

Brown - direct

371

he's, like, no, you got to put these shoes on. You can't just walk in there. So, I had to put shower shoes on.

Q. Did you take your clothes off in the shower?

A. I took my DOC off, but I kept my underwear on.

Q. You showered with your underwear on?

A. Yes.

Q. For how long in Cook County Jail did you shower with your underwear on?

A. Probably about close to a year.

Q. And how would you -- how would that work procedurally?

A. I just take my clothes -- my DOC off, keep my drawers on, and just stand in the shower and wash up.

Q. And, then, dry them later when you were alone or --

A. No, I just keep them on. Squeeze them out a bit, keep them on.

Q. When you first got there, did you know anybody in the Cook County Jail?

A. No.

Q. Was it hard in the jail not being a gang member?

A. Yes.

Q. Can you tell the jury why?

A. The gangs control most of the jail. Some of them controlled the phones. People don't bother other people that they know that they can beat up because the gang, he might be part of a gang. So, if you fight him and they think it's

unfair, you got to fight all them.

Q. All right. You being a non-gang member, would that make you more vulnerable?

A. Yes.

Q. Was prison a violent -- I'm sorry. Was the jail a violent place?

A. Very.

Q. What kinds of things happened in the jail that were violent?

A. I seen riots. I seen people be stabbed. I got beat up a lot of times. People tried to take my food.

Q. What's an example of that?

A. I had a cellee which kept stealing. I confronted him. I had to fight him. I moved to another cell. He would just take it in my face, so I had to fight him. Then tried to just keep getting moved.

Q. Now, was it okay to share your food? I mean, why do you have to do something if people take your food?

A. I'll share it with you, but I don't want you just taking it.

Q. What happens if you let people take it?

A. They just gonna keep taking it.

Q. Did you have to stand up for yourself?

A. I tried, but --

THE COURT REPORTER: I'm sorry?

BY THE WITNESS:

A.   I said I tried.  Sometimes it don't do nothing.

BY MR. LOEVY:

Q.   You can try pulling the mic closer to you if that's easier.

A.   Sorry.

Q.   That's okay.  Let's just see if we can get the angle right.

Were there times when the whole jail would go up in violence?

A.   Yeah, the whole pod, yes.

Q.   What would happen then?

A.   People get stabbed, people get stomped out, blood everywhere.

Q.   How would -- would everybody, like, sort of riot sometimes or how would it go down?

A.   It'd be two gangs fighting, and just everybody running around the dayroom, hitting people with stuff, stabbing 'em.

Q.   If you weren't in a gang, were you in danger of gangs or fighting each other?

A.   Yeah, because some people would just prey on the weak or something like, oh, I helped fight.  I hit that guy.  I thought he was with 'em.

Q.   Are they supposed to fight if there's a fight going on?

A.   Yes.

Q.   And sometimes they want to find somebody who is --

A.   Yes.  Find somebody less willing to fight back.

Brown - direct

374

Q.   You said people got stabbed in there.  What kind of weapons they have in the Cook County Jail?

A.   Plastic knives out of trays.  They had metal shanks out of signs.

Q.   Was there a school in the Cook County Jail?

A.   Yes.

Q.   Now, you had graduated, right?

A.   Yes.

Q.   Did you get sent to school?

A.   I got sent over there probably about five months in.

Q.   Tell the jury what you mean.

A.   Five months into my incarceration.

Q.   Do you remember why -- why are you going to the school? Explain.

A.   Because of my age, and they said they needed space so they sent me to the school.

Q.   Was it a good school or bad school?

A.   It was a bad school.

Q.   Did you tell them you had already graduated?

A.   Yes.

Q.   Then what happened?

A.   They just sent me over there.

Q.   All right.  What was bad about the school in the Cook County Jail?

A.   It was a bunch of kids fighting all day.  They don't

listen.  It's very nasty.

Q.  Were people doing sexual things in there, too?

A.  Yeah.  They used to be masturbating to the women COs.

Q.  Right out there in public?

A.  Standing on the dayroom tables.  It was just wild.

Q.  Was there any order in the classrooms?

A.  No.

Q.  Anybody learn anything in the classrooms?

A.  The work was like third grade work.

Q.  Was it dangerous in the school?

A.  They fight every day.  They fight about anything.  Somebody can't spell a word, a fight break out.

Q.  Were these kids who had had hard lives?

A.  Yeah, they had very hard lives.

Q.  Did you interact with any of them?

A.  A few of 'em.

Q.  All right.  Did you meet some who had a problem with reading, for example?

A.  Yeah.  There was a guy, he was all right, but I didn't too much talk to him.  We was going to school and he was calling me to the bathroom.  So, I thought, I got to fight this guy.  We get in the bathroom, he reached in his pants.  I kind of panicked, but he pulled out a letter and he was asking me to read it for him.  It was his family.

Q.  All right.  What do you mean?

A. He couldn't read.

Q. Did you know how long you'd be in the County?

A. No.

Q. Now, was there an arraignment hearing that it was decided that you were going to stay?

A. Yes. A bond hearing.

Q. And what was the evidence presented against you?

A. The state's attorney, she read the detective's notes.

Q. And what was the evidence?

A. Marcel Brown knew that Renard Branch had a gun. He said he tired of these niggas, he gonna fuck 'em up, they gonna die.

Q. And did the judge decide to hold you?

A. Yes.

Q. Were you hopeful that the thing would resolve your way?

A. The bond hearing?

Q. Yeah.

No, I mean the -- the whole charges, everything.

A. Yes.

Q. Did time start dragging on?

A. I didn't -- I didn't do nothing.

Yes, time start.

Q. When did the actual trial happen?

A. I believe a year later in November.

Q. November 2009?

A. Yes.

Q. Had you met your lawyer before the trial?

A. Yes.

Q. Was there a whole lot of preparing going on?

A. No.

Q. And just, Marcel, tell me what you mean.

A. No. Because every time I ask him about the case, he'll send somebody else. I'll talk to him about the case, he be like, they have nothing on you. Don't worry. I'm gonna beat it. I'm gonna beat it.

Q. When did the trial start?

A. Sometime in November.

Q. Right around Thanksgiving?

A. Yes.

Q. How does a person dress for trial? How did you dress for trial?

A. I just would the DOC.

Q. So, what would happen on a court date before trial?

A. I would sit in the bullpen, the judge call my named, I go out, sit down.

Q. What time would the day start?

A. 3:30 to 4:30.

Q. A.m.?

A. Yes.

Q. And tell the jury what would happen.

A. They'll wake us up. We'll have to go shower. They'll feed

us breakfast.  Then we'll go downstairs about 4:30.  We have to get strip searched again.  Then we have to shackle up.  We'll have to walk about a mile or two in the tunnels.

Q.   Shackle up is different than handcuffing?

A.   Yes.  We was supermax so they shackled all us up.

Q.   Some of us don't know exactly what that means.  But handcuff we all understand.

A.   I got handcuff.  I have a chain going to my feet, my feet shackled, and then I got another chain hooking me to somebody next to me.

Q.   So, you take this walk and then what happens?

A.   They'll lock us in the bullpen.

Q.   Then eventually you find your way in front of the judge?

A.   Yes.  I'll go in front -- to my assigned courtroom bullpen.

Q.   Do you, as the defendant, get to address the judge?

A.   No.

Q.   Did you ever get to talk to the court?

A.   No.

Q.   Who talks for you?

A.   My lawyer.

Q.   Was the process confusing, frustrating or upsetting?

A.   It was very confusing, because I ain't did nothing.  I just didn't understand what's taking so long to figure this out.

Q.   Did you ever decide to take a plea?

A.   No.

Brown - direct

379

Q. Were you guilty of anything?

A. No.

Q. When the trial started, were you nervous? I mean, what was your outlook? What was your thinking?

A. I was very nervous. I was scared. But I knew this the only thing I got to go through to get home.

Q. Who was there for you when the trial started? I mean, who was present?

A. My whole family.

Q. Who?

A. Mom, sisters, cousins, grandmother.

Q. Did anything happen that first day of trial?

A. Friends.

No.

Q. All right. What would the process of your trial be. Sort of tell us.

A. So, I used to get ready to go to trial. We'll prepare. My whole family take off work. We'll get in front of the courtroom. They'll be -- sometimes they can't find the witnesses. Sometimes the state have emergencies. Then they calendars stop aligning up with each other.

Q. Do you remember a continuance from November 24th, 2009, to March 24th, 2010, to June 8th, 2010, June 18th, 2010, June 22nd, 2010, June 25th, 2010? What was happening on all these court dates?

Brown - direct

380

A.   They'll give me long court dates.  We'll go.  They'll just keep giving me continuance.  Nothing.

Q.   July 19th, 2010, September 8th, 2010, September 21st, 2010.  Did the process continue?

A.   Yes.

Q.   September 30th, 2010, October 8th, 2010, December 22nd, 2010.

        Did the process last more than a year?

A.   Yes.

Q.   What did you feel like as that year's gone by?  18, 19 starting to slip on you.

A.   I just feel like my life was stuck in a time capsule.  Everybody was living and I'm stuck in here with animals.

Q.   Do you remember when the closing argument and the final ending was?

A.   I believe it probably was January 6th or January 8th, 2011.

Q.   All right.  So, the trial started in 2009, ended January in 2011.

        What do you remember about that day?

A.   My family, looking back at my family.  I remember closing arguments.  I remember a lot of bailiffs coming in the courtroom.

Q.   Had there been any witnesses presented against you?

A.   No.

Q.   Now, were you and R.J. tried separately or together?

MR. GIBBONS: Your Honor, putting the trial on -- I understand the effect on him. If we're going to get into trial counsel and things like that, I would have a continuing objection.

THE COURT: All right. The objection is overruled for purposes of allowing you to continue. But keep the objection in mind, please, Mr. Loevy.

MR. LOEVY: Sure.

BY MR. LOEVY:

Q. So, were you tried together with R.J. or separate from R.J.?

A. No, we went to court together. We sat the same table.

Q. I mean, but were you at the same trial or --

A. Yes, I was at the same trial.

Q. All right. Were there witnesses who said you did something wrong?

A. No.

MR. GIBBONS: Your Honor, objection again.

THE COURT: All right. For the same reasons, it's overruled.

You may continue.

BY MR. LOEVY:

Q. At the end of the trial -- by the way, was your confession or your statement -- was your statement introduced at trial in one form or another against you?

A.   His police report with a few lines was induced into trial.

Q.   And that was the suggestion that you had knew that there was a gun in the car?

A.   Yes.

MR. GIBBONS:  Same objection.

THE COURT:  All right.  It will be noted for the record.  Same ruling.

BY MR. LOEVY:

Q.   All right.  Was there any other evidence that you're aware of that implicated you having intent to create -- to commit first degree murder?

A.   No.

Q.   When the judge got ready to rule, who was in the courtroom?

A.   Everybody.

Q.   Tell us through that moment, if you could.

A.   My family, my mom, victim's family, all the cops, my lawyers.

Q.   What happened?  Walk us through.

A.   He told us to stand while he read the verdict.  He read the verdict for R.J.  He found him guilty.  Then he read the verdict for me.  I remember him saying, as I look at this case, this is a very, very weak case against --

MR. GIBBONS:  Objection, your Honor.

BY THE WITNESS:

A.   -- Brown.

MR. GIBBONS:  Hearsay, what a court said.

MR. LOEVY:  This goes to materiality, your Honor.

THE COURT:  It's a --

MR. GIBBONS:  Your Honor, there's also a stipulation to this.  If we need to be heard at sidebar.

THE COURT:  I think we do.  Let's just take one minute, please, to make sure we're on the same page.

(Proceedings heard at sidebar:)

THE COURT:  So, Mr. Loevy, I was trying to give you a little latitude to move through this portion of it, but if there is --

MR. LOEVY:  Here's what we're trying to elicit, your Honor.  We're trying to establish the materiality of the confession.  And what he's going to say is that the judge's ruling literally was that the confession and the statement in the police report summary are what caused his conviction.

You know, there's a lot of ways to prove that.  We could put in the transcript of the trial.  We could have a lawyer testify about it.  We could have a state's attorney testify about it.  I've been involved in trials where it got proved different ways.

It seems to me that testimony from someone is a viable way to prove the point we're trying to prove.

MR. GIBBONS:  Yeah, your Honor, there's a motion in limine or a stip, I can't remember which, which specifically

speaks to Judge Gainer's comments about this. And it was ruled inadmissible and no use.

And Mr. Loevy wants to try to find an admissible way towards this route. You know, he can try it. But he's trying to have Marcel Brown testify to a hearsay statement by a judge at 26th and California without any ability to cross-examine the judge. And, so, highly improper.

MR. LOEVY: Well, we have --

MR. GIBBONS: It's hearsay. If they want to try to find an admissible route to this evidence, they can try it. But I don't think there is a route there.

MR. LOEVY: We're okay with that, your Honor. I mean, there is a transcript of it. So, we don't need Mr. Brown to do it. And if Mr. Gibbons is right that I'm stepping on some line, then I just want to move on and not go near it.

THE COURT: Let's have you move on. We'll try to do this in a different way at a different way.

MR. GIBBONS: Thank you, your Honor.

(Proceedings heard in open court:)

THE COURT: All right. Mr. Loevy, you can ask your next question.

BY MR. LOEVY:

Q. Were you found guilty?

A. Yes.

Q. All right. What was emotionally going through your mind

when that happened?

A.   Felt like my life was over with, almost passed out.

Q.   How did you react physically?

A.   Started crying, just was defeated.

Q.   Where did you go next and what do you remember?

A.   I remember them taking me to the back, putting me in the bullpen, started crying, laying on the floor crying, crying, crying.  I remember them trying to give me a psych evaluation.

Q.   Did you get sentenced at a later date?

A.   Yes.  I got sentenced about six months later.

Q.   And what was the sentence?

A.   They gave me 35-year sentence.

Q.   And do you remember what R.J.'s sentence was?

A.   47 years.

Q.   Now, is that 50-percent time or hundred-percent time?

A.   Hundred percent.

Q.   Did you speak to your mother during this time?

A.   When I got back?

Q.   Well, between the conviction and the sentence.  What was going on with you and your mother?

A.   Yes.  It was a lot of her trying to tell me we gonna figure it out, try to motivate me to stay strong, but --

          THE COURT REPORTER:  I'm sorry?

BY THE WITNESS:

A.   I said it wasn't working.

Brown - direct

386

BY MR. LOEVY:

Q. After you're sentenced, do you get sent out of the jail and into the prison system?

A. Yes.

Q. What's your first stop?

A. My first stop was to Joliet.

Q. What's the name of that facility?

A. Stateville NRC.

Q. And is that like sort of intake?

A. Yes.

Q. Tell the jury a little bit about Stateville.

A. Stateville is -- have about 10,000 people. They send you there before they spread everybody out into the prison system. It's a lot of pods, lot of cells, no windows, very cold. The light stays on all day. Mices.

Q. Not a pleasant place?

A. Nah. Don't shower every day. We don't have no supplies. We just in intake. You can't use the phone. You can't go to store to buy hygiene or nothing.

Q. Now, did you know where you were going to get sent or find out where you were going to get sent?

A. I wanted to stay at Stateville, but I found out I was going to Menard.

Q. And why didn't you want to go to Menard?

A. Because I always heard stories about Menard in the County.

Q.   And, then, for the effect on you, why were you afraid of Menard?

A.   Because I seen some of the tough dudes cry when they had to go to Menard.

Q.   Tell us about the ride over to Menard.

A.   The ride over, when they took me outside, I remember seeing a coach bus.  I walk on a coach bus, everything still -- I'm shackled up.  They sit me on a hard slab of, like, steel bench-made seat.  They stick chains through everybody to connect us.  They give us a sandwich.  Have to eat it handcuffed the whole ride there.  It's a six-hour ride, but the bus takes 12.

     I remember stopping at other prisons.  And if we got to use the bathroom, you have to stand up while the bus moving, walk to the back, shackled up, and you got to piss in a bucket.

Q.   Did you feel fully human in this situation?

A.   No.  I felt like a slave.

Q.   When you got to Menard, what happened as you pull up and what do you see?

A.   I pull up, I see, like, a old-looking castle.  Take me inside.  I remember everybody smelling real bad.

Q.   Did they do anything to tell you that the rules from other places don't apply over there at Menard?

A.   Yeah.  It was a guy that had dreads.  And I remember they kept coming, big -- big white guards.  Real big.  Just

Brown - direct

388

southern. And they had a field day because he had dreads. And they, we got to cut this boy's hair. So, they -- he wouldn't let 'em cut his hair, so they go, you got to sit in seg until you get your hair cut. So, he let 'em. They was just cutting, ripping the dreads out his head.

I remember them telling us to look down. If they catch us looking at a woman, we going to seg for reckless eyeballing.

Q. What's that? Reckless eyeballing?

A. Yes. Like, if you look at a woman too long, you go seg for reckless eyeballing. They was installing fear in us, punching people, sticking us in our cells.

Q. Now, you mentioned the guards. Was there a culture shock between these rural guards and the inmates from Cook County?

A. Yes. It's like, we went into southern Illinois, like very country, very hot, like --

Q. You don't have any problem with people, but was there a culture shock?

A. Yes.

Q. Were they showing hostility and control to the inmates?

A. Yes.

Q. There's some nice guards?

A. Later on, it was.

Q. Tell us about the guards who were decent.

A. Oh, the guards who was decent, it was like the younger

Brown - direct

389

guards.  They was coming in at, like, 18.  So, they was -- it was different for them than the older guards.

Q.  How about the orientation?  What else do you remember about the orientation?

A.  I remember being placed in a small cell that's probably from like -- I can touch both walls with my hand.  No soap, no hygiene.  They put me and another guy in there.

I remember us always being on lockdown.  Can't call, let nobody know where we was at or nothing.

Q.  All right.  We'll talk about that.

When you -- you mentioned there was scary people in Menard.  Who gets sent to Menard in the Illinois Department of Corrections?

A.  Murderers, kidnappers, rapists, attempted murderers, robbers.  The dangerous people.

Q.  And if you are in another facility and you don't follow the rules, what happens to you?

A.  Well, you do go to seg, but you have to be a really, really problem to, like, send you to Menard.

Q.  So, Menard was the last stop for --

A.  Yeah.

Q.  -- real, real problems?

A.  It's called a pit.

Q.  You know, did people commit some heinous crimes, too, not just regular murders?

Brown - direct

390

A.   Yes.

Q.   What were some examples of the crimes that people would commit to get to Menard?

A.   People kill innocent people.  One guy, he was in there, stuck a baby in a microwave for ransom money.  Rapists.  We had serial killers.

Q.   Was prison a violent place?

A.   Very violent place.

THE COURT REPORTER:  I'm sorry, I couldn't hear you.

BY THE WITNESS:

A.   It was a very violent place.

BY MR. LOEVY:

Q.   How big had you gotten at this point?

A.   I had got to, I believe, 115.

Q.   And how about your height?

A.   It was about five-five then, five-six.

Q.   How tall are you now?

A.   Around five-seven.

Q.   You said something about a lockdown.  Was there a lockdown at the beginning of your time at Menard?

A.   Yes.

Q.   Did you lose weight?

A.   Yes.  I got down to about 103.

Q.   Why did you get so light?

A.   Because we didn't have any food, and the food they used to

send on lockdown, it was never cooked.

Q.   So, what -- you lost -- you got all the way down to a hundred pounds?

A.   Yeah, around a hundred pounds.

Q.   All right.  If someone attacks you in Menard, what are you supposed to do back?

A.   You can try and defend yourself, but if you ain't prepared, you can't do nothing back.

Q.   Did you sometimes lose fights?

A.   I lost a lot of fights at Menard.

Q.   Did you ever start fights?

A.   No.  I just tried to mind my business.

Q.   What was your strategy to avoid fights?  To avoid fights.

A.   My strategy, like, anytime something going on, I stay to myself.  I go in the yard, I try to watch everybody, try to see what everybody doing so if I come back out here and somebody's in a different spot not doing the usual, something's fitting to go down.  So, I had to be very observant and just keep my head low.

Q.   Did you get bigger over time with weights and such?

A.   Yes.

Q.   How heavy did you get from lifting weights?

A.   At Menard, I got to 155, 160.

Q.   How much do you weigh now, would you estimate?

A.   I weigh 190.

Brown - direct

392

Q. All right. In prison, is it a good thing to be nice?

A. Nah, you can't be nice in prison.

Q. Can you explain?

A. Because they feel like you nice, I could take advantage of you and -- nah. You have to be -- you got to become a part of the -- your environment to survive. It's the concrete jungle.

Q. Do people take kindness for weakness?

A. Yes.

Q. Sorry.

A. They take kindness for weakness all the time. They prey on you. So, if you talking to somebody, you look down, they think, oh, I got you. You talk, you don't look them in the eye, oh, I got you. You tuck your tail, I got you.

Q. You mentioned the gangs at the jail. Were there gangs in prison, too?

A. Yes. When I got to prison, gangs controlled everything.

Q. What does that mean?

A. So, the gangs -- we go to the yard, there's six phones. Each gang have their own phone and nobody can touch their phone. If they not on it, you can't walk up and get on it unless you ask one of them.

Q. And now you needed a phone to stay connected to home?

A. Yes.

Q. How about the commissaries or the libraries, did the gangs run those, too?

Brown - direct

393

A.   Yes.   The gangs distribute the commissary.   So, you go through the commissary line, you have gang members back there. So, they'll keep all the good stuff.   So, when they buddies come through the line, they give it to them and just give you the regular stuff.

Q.   Why not join a gang in prison for protection?

A.   Because, like, you join a gang in jail, they ain't gonna respect you in there.

Q.   I'm sorry, you got to talk clearer.

A.   You join a gang in the prison, they not going to gonna really respect you.   They gonna send you off.   You gonna keep getting in trouble being -- you gonna be their little flunky.

Q.   Was it -- make your life harder to not be in a gang?

A.   Yes.

Q.   Did it make your life more dangerous?

A.   Yes.

Q.   Can you explain?

A.   Because I used to have to fight other gang members come in my cell.   They be all, who you in the cell with?   Oh, I got a neutron in here.   Then they'll --

            THE COURT REPORTER:   I'm sorry?

BY THE WITNESS:

A.   They ask you who you in the cell with.   They'll be all, it's a neutron in my cell.   So --

BY MR. LOEVY:

Brown - direct

394

Q. Some of us don't know what a neutron is.

A. Neutron means somebody that's not in a gang.

Q. And that's you?

A. Yes.

Q. Was that common or uncommon?

A. It was really uncommon, but you got some people that's neutrons.

Q. All right. You can continue then.

A. So, they basically feel like they come in, oh, I can go on him. I can take his stuff. So, they -- back to me fighting again. Then I just hope I get a good cellee. Sometimes I get a good one that don't prey on people, and I get upset when they move us.

Q. Now, R.J. was in a gang, correct?

A. Yes.

Q. And he got sent to Menard, as well?

A. Yes.

Q. Did that give you any protection at all to know R.J.?

A. When R.J. was around, if he come in the same building, he find out where I'm at, he'll send kites to his buddies and be like --

Q. What's a kite?

A. A kite is a little note. He'll tell them, my little -- my cousin's over there, make sure nothing happen to him.

Q. All right. Were you actually housed with R.J. over time?

A.   Sometimes I will end up on the same pod, but -- I mean, the same gallery, but he always get moved.

Q.   All right.  You mentioned the guards.  Sometimes were they disrespectful or violent?

A.   When I first got there, they kept beating the police up. So, they sent a thing --

Q.   You said "beat the police up," you mean the guards?

A.   Yes.  The inmates will come out, because we been on lockdown so long and people used to be losing they mind. They'll come out, attack the guards.  And, then, they had a thing called orange crush.  They'll send them down there.

Q.   Would that cause trouble?

A.   The orange crush basically like the attack unit.  They come in riot gear.  They come to your cell, make everybody strip naked, put on a pants and a shirt, handcuff you to the back, and you got to arch your body down and bend your head down. It's called nuts to butt.  And they put all you in a line and they push you, and you walking.  You got riot sticks, helmets, shields.  They walk -- it's probably, like, 500 of them.  They walk on side of each person.  But we in a long line.

Q.   And you're nuts to butts is what you said there?

A.   That's what it's called, nuts to butt.

Q.   Are you wearing any clothes?

A.   A shirt and a pants.  No drawers.  No underclothes.

Q.   And you said you're bent over?  Everybody's bent over?

A.   Yes.  And you got to be up on the next man.

Q.   Like sort of --

A.   Yes.

Q.   All right.  And, then, what would happen?

A.   Then they'll come -- you look up, they punch you in the back of the head.  If you can't keep up in the -- with the nuts to butt, you get whacked in the back with a stick.

They'll know who's is who, who is what part of what gang, who caused the fight.  So, if you part of the gang, they'll grab you, throw you out of line, beat you.  Then they make us go to the chapel, stand up against the wall face forward, and we sit there for, like, six hours till they tear the whole cell house up.

Q.   What do you mean, tear up the whole cell house?

A.   The search everything.  Make sure no one has knives.  Take your commissary, bust it open.  Pour coffee on your legal papers.  They just squeeze all your toothpaste out.  They just tear your cells up.

Q.   Tear them up.  Okay.

And, then, eventually that would end sometimes?

A.   Yeah.  Anytime you hit a officer they come.  But they got -- somebody filed a lawsuit.  They stopped coming like that.  But they always come.

Q.   All right.  Did you get in disciplinary trouble in prison?  How did you do?

A.   I never got a ticket in the County.  I never got a ticket in -- when I got to prison.  I went to seg one time for an investigation.  They said it was for my safety.

Q.   All right.  But you didn't commit any infractions in prison?

A.   No.  I always was scared to go to seg.

Q.   Is it hard to go through prison and never get a ticket?

A.   Yes.

Q.   How common is that?

A.   People found out I never been to seg, they be like, you never been back there?  I'm like, no.

Q.   Is it easy to get a ticket in prison?

A.   You get a ticket for anything.  Get a ticket if you look at the guards.  If you come out, you walk past, if you stare at a guard, they give you a intimidation of threat.  If your pants fall down, you get a ticket.  You get caught cooking, you get a ticket.  You make a three-way phone call too many times, they catch you, you get a ticket.  You getting ticket for fighting.  You getting a ticket -- if they unlock your doors and you don't catch the door quick enough and go in the cell by the time they get on the gallery, you get a ticket.  So --

Q.   So, you avoiding all these tickets, did that help with your sentence at all?

A.   No.  I just wanted to stay out of trouble.

Q.   Were you able to reduce your sentence for good time?

A.   No.

Q.   Can you explain?

A.   My time was at a hundred percent.  There's nothing you can do to reduce it.

Q.   As far as the violent people in prison, were there some, like, serious sociopaths that just didn't care?

A.   There was a lot of 'em.

Q.   What were those people like?

A.   That was the first time, like, I really met some miserable people.  It was, like, every time you see them, there's violence.  Whenever they come, some of the gang members be, like, oh, we got this guy coming.

Q.   Were there guys who just didn't care and had nothing to lose?

A.   Most people accept their fate, so they just caused trouble all day.

Q.   How about mentally ill people?  Did you have to deal with mentally ill people?

A.   You have to deal with mentally ill people.  You have to know how to talk to them.  It's, like, really stay away from them.  They throw piss, shit on you if you come past they cell.

Q.   What do you mean?  And use -- maybe use the word "feces."

A.   I'm sorry.

     Like, the mentally ill people will defecate in milk cartons.  They'll ask you for something, you be, no, I don't

have it.  They'll be, okay, you ain't got it, you can't go back to your cell.  But they're in they cell, but you have to walk past.  They say they'll hit you with pee, feces.

Q.   Were there a lot of people in prison who were mentally ill?

A.   Yes.

Q.   How about medications?  Did some of these people -- did you consider medication?  Let's start there.

A.   Nah, I didn't take medication.

Q.   Tell the jury your thinking process right there.

A.   Because I seen too many people play with the psych medicine and they started to become what they was taking.

Q.   Did you have depression symptoms?

A.   I had depression symptoms.  I had anxiety symptoms.  But I wouldn't take none of the medicine that they prescribe.

Q.   Did it provide some people an escape?

A.   Yes.

Q.   Why didn't you want to escape?

A.   I didn't -- I had to always be on my feet, on my toes.  So, I didn't want to get off any medicine or something happen.

Q.   Did you witness people subjected to extreme violence?

A.   I seen people get stabbed over the phones.  I seen people fight at the basketball court.  I've been in fights at the basketball court.  I seen people fight on the weight pile.

Q.   Did people get killed in prison?

A.   Yes, people got killed.  I seen a guy --

Brown - direct

400

Q. How did they get killed?

Sorry to interrupt you.

A. They'll beat them to death, choke them out. Some guys was fighting in the shower, he hit his head, he died. I watched a guy on the yard get hit in the face with, like, a 20-pound dumbbell, broke --

Q. Tell us about that.

A. It was arguing. I was on the phone. I got off the phone. I was looking over there, but I was really, like, minding my business because I didn't want to be too involved. So, I was looking. And he had the dumbbell in his jogging shirt. The dude was talking, he dropped it, hit him in the face with it. The guy kind of, like, fell back unconscious. He got on top of him, kept punching him now. Then the guards came, all the nurses. They had to bring a real ambulance and take him outside the prison.

I seen a guy on the gallery, they was fighting. We was on lockdown for, like, a month. They got to fighting over noodles, him and his cellee fighting. He was choking his cellee, and his cellee snatched both his eyeballs out.

Q. His eyeballs?

A. Yes.

The guards came down, put his eyeballs in a evidence bag.

Q. And did you see a guy in the shower get beat up bad,

anyone?

A.   I had a cellee named Jerry.  He was a white guy.  He was cool.  I seen him fighting.  They beat him up.  He used the bathroom on hisself.

Q.   What's that?

A.   I said he used the bathroom on hisself.  He was scared.

Q.   You mean, they beat him up so bad that he defecated?

A.   Yes.

Q.   Where was that?

A.   In the shower.

Q.   Now, when there's a fight, I mean, do people -- are you supposed to help or what are you supposed to do?

A.   You can't help.  Like, you ain't a part of it.  Stay out of it.

Q.   Why is that the strategy?

A.   You want to get what he getting?

Q.   What would the guards do if there's a fight?

A.   When a fight break out, the guards will say, get down.  The people who's not involved in the fight, they'll get down.  Then the guards, yeah, they'll cock the gun.  Don't nobody move, they'll start shooting the gun.

Q.   And is that a risk to you?

A.   Yes, because where they shoot the gun, the boards that's right by the cells -- so they on the catwalk -- they just stick it out the thing and shoot the board, or some of them shoot in

the air, shoot the ceiling. But it's concrete, so you always worried about, like, ricochetting.

Then I had a cellee that put some stupid thing in my head like, he moved us to the top gallery, so we like right in front of where they sit with the guns. And he kept saying, we don't need to be up here, we can't be up here. I didn't get what he was saying. He was, like, I'm not staying up here. But he was cool, so I didn't want to not go where he went because he was cool. He was, like, what if they have a bad day and just come in here and kill everybody? We dying first. We ain't got nowhere to run.

Q. Let's talk about the cells where you spent the time.

How big are the cells? Can you describe for the jury?

A. Menard cells, so if you stretch this arm out, you could put this arm on the wall like this.

Q. Without fully extending your arms?

A. No.

So, your mattress come about right here. So, you can't both be walking back and forth at the same time.

Q. There's not enough room for the bed and two men to stand in the cell?

A. Not unless you stand by the toilet.

Q. How deep is the cell? Give us some idea of dimensions vis-a-vis that witness box.

A. About from, like, right there.

Q.   You got to tell us in words because he's -- we've got to have a record.

A.   It's about to the panel right here, this brown panel, to about, like, a foot outside of this.

Q.   And, then, how wide?

A.   It's probably about five, six feet wide.

Q.   Two men in those cells or one man?

A.   Two.

Q.   And, then, what else is in the cell?

A.   The beds and the toilet and the sink.  The toilet and the sink is connected.

Q.   The toilet and the sink are the same thing?

A.   Yes.  And, then, it's a shelf at the back of the wall.

Q.   And how -- is there privacy for the bathroom?

A.   No.  We used to put up a sheet, but you have to look out because if you get caught with a sheet up, it's three months in seg.

Q.   So, you know, just to -- not to intrude, but how would you use the bathroom, then, if you got two men in there?

A.   You just got to go.  Or you just -- if he got to go, I'll walk to the door or the bars, just look out, and vice versa.

Q.   And did you have a problem with the bathroom with your stomach?

A.   Yes.  From the jail food, like, I have a problem to this day.  I can't go certain places and eat certain things because

my stomach start messing up and I have to go to the bathroom.

Q.   Did that cause a problem for you in the cells?

A.   Yes.  Sometimes I get some cellees, they be, man, I'm watching my TV, you steady got to use the bathroom.  Caused a few fights, but that's fine.

Q.   And the bathroom, you said that the toilet and the sink are together.  How did that work?  How do you brush your teeth?

A.   The sink, you just brush your teeth.  You got to spit in the toilet.  That toilet is like your kitchen.  You got to drink out of the fountain.  You got to make stuff.  That's the only source of water.

Q.   Was there a time you stopped going to chow to eat the food there?

A.   Yes, because the food was never cooked.  It was sometimes undone, and we'll be on lockdown so much that you get used to sitting in the cell all day.  And, then, it's always hot.  You didn't want to walk to chow.

Q.   Was there any privacy in prison?

A.   No.

Q.   How did that wear on you, having no privacy?

A.   Because they always in your business.  Everybody want to find everything out about you.

Q.   Is there a lot of -- any alone time?

A.   No.

Q.   You mentioned the strip searches.  Did you get used to the

strip searches?

A.   Over the years, it just become a normal part of everything. Everywhere you go outside the building, you got to get strip searched.

Q.   Was it humiliating even after you got used to it?

A.   Still is.

Q.   You mentioned the lockdowns.  Let's explain to the jury what a lockdown is.

A.   Well, Menard is like a 24/7 lockdown.  We don't have a dayroom.  So, only time we come out is to walk to chow twice a day.  That's for 15 minutes.  But we always on lockdown.  Or it's never enough COs, so they feed us in.

And we get yard two times a week, but if they come out and they fight a guard, it's a mandatory 30 days lockdown.

So, we'll get off lockdown.  They always used to -- like, the only thing people in jail cared about was commissary. So, they'll just make sure -- every building wants a commissary -- that somebody else attack the police.

Q.   Was it boring to sit in the cell all day, all day, all week?

A.   Yes.

Q.   So, how often would you get out of the cell?

A.   On lockdown, they only bring you -- you only can go to the shower one time a week.

Q.   One time how often?

Brown - direct

406

A.  Once a week.

Q.  How about the yard?

A.  There's no yards on lockdown.

Q.  No yard at all?

A.  No.

Q.  How would you go outside?

A.  You won't.

Q.  So, how long a period of time would you go without leaving going outside?

A.  Longest we ever went was four months.

Q.  Is that hard to go four months without going outside?

A.  Yes.

Q.  Were there temperature issues in the prison?

A.  Yes.  In the summertime -- so it's southern Illinois, so it gets about 110 some days.  And we in a old concrete building, so the building used to heat up and sometimes stay hot.

Q.  How hot?

A.  Hot where you just sitting and sweating all day trying to take your property box and fill it up with water and just sit in it.

Q.  Was the building built to stay cool?

A.  No.

Q.  Was there air-conditioning?

A.  No.

Q.  Would it get hotter inside a steel and concrete building

than it was outside?

A.   Yes.

Q.   Did it get dangerous?

A.   It always got dangerous.

Q.   Was it tough to breathe?

A.   When it get hot sometime.

Q.   Did it not do good with your allergies?

A.   Nah, it -- it sucked.

Q.   How about when it was cold?  Was it -- also get cold in the winter?

A.   Yes, it get real cold.  One winter the big blower broke, so we was without heat for, like, two weeks.

Q.   Would it be -- when there was heat, how would the temperature be?

A.   The temperature, sometimes it'd get hot, but the heat always rise to the top.  So, if you lower, it's still freezing.

Q.   Was it tough to be in a cell when it's really cold?

A.   Yes.

Q.   What would you do?

A.   I had bought me a blanket off commissary.  I'll wrap up in it.  I put on thermals.  I put on my jogging suit.

Q.   Which was worse, being too hot or too cold in prison?

A.   Too cold.

Q.   Why?

A.   Because you freezing.  You can't take a bath in the sink

every day.

Q. How about pests? Were there pests in the prison, spiders and snakes?

A. Yeah, spiders, snakes. We had armadillos. We had a lot of groundhogs. We had raccoons.

Q. Did you have a problem with a spider?

A. I got bit by a brown recluse.

Q. You know what kind of spider it was?

A. Yeah.

Q. Tell the jury what happened.

A. It was when I first got to the prison, I was showering. I felt a little bite. I knocked the spider off me. A few days later, it started hurting really bad. I was asking to go to the doctor. Wasn't happening. Then it turned red. Then over a week it turned to a big knot. Then my skin moved away and it was just oozing pus, but it kept getting bigger, bigger and bigger.

Then I was asking my cellee, like, what it look like. And he's like, it look like a gunshot. But it was on my lower back close to my butt, so I wasn't too comfortable, like, showing it.

So, I was squeezing it one day because it kept bleeding, bleeding, bleeding.

Q. Were you able to get medical care for this?

A. They kept telling me put in a medical slip. I did, but we

was on lockdown, so they really don't care.

Q. And, then, what happened?

A. I got some green stuff, like a big, oozy green stuff out of it. Then it stopped oozing for a few days.

My mom came to see me. I told her, like, I got blood and pus in my drawers. Can you keep calling down here so they can take me to the nurse?

Q. How about other medical care? Was it always a good thing or bad thing or --

A. No. They don't care. They just make you pay your $5 to go see the nurse and they'll just tell you drink water.

Q. How about dentists? Did you see a dentist in those ten years?

A. I put in for a dentist every day. I only seen a dentist twice. That was, like, my last two years in there.

Q. How about the food in prison?

A. The food was trash.

Q. What would be for dinner, say?

A. Just slop every day.

Q. What's slop?

A. Rice, overcooked meat. They'll give us chicken, but it was always undone.

Q. Was it real meat or could you tell what it was?

A. You can tell it was a meat, but don't got a taste.

Q. Did you -- was there hunger in prison?

Brown - direct

410

A.   Yes.   On lockdowns, sometimes they'll do hunger strikes.

Q.   Would everybody have to participate?

A.   Yeah.   If you don't participate, or you don't, it's like -- the gangs run everything, so they tell each other, like, hey, we going on a hunger strike today.   They have to send somebody back here to talk to us so everybody know.   And, then, they go tell all the neutrons, hey, we going on a hunger strike.

Q.   How about when there wasn't a hunger strike, was there hunger in prison?

A.   Yes.

Q.   How about the water?

A.   The water in prison was -- it was down south, so it tasted really bad.

Q.   Do you know anything about those 120-year-old pipes at the Menard?

A.   Oh, yeah.   The inmates -- well, Menard don't have anybody fix on anything.   So, the inmates have to learn how to fix everything.

Q.   Now, you said a minute ago that your health, you believe, in your stomach.   What kind of problem do you have in your stomach and why do you believe it's connected to prison?

A.   Because when I was in the County, I didn't have the problem.   When I got to Menard, I was eating the food.   Like, my stomach always hurting and I always have to use the bathroom.   I couldn't control it.   I went to the nurse a couple

times. They told me it was the food I was eating. But it was no other alternatives.

Q. Did you have these problems to this day and how much do they bother you today?

A. It bothers me a lot. I don't really like going too many places to eat. But I go, but I try to, like, determine what I can eat. Like, I don't think this will mess my stomach up. I can't eat cereal. I can't drink milkshakes. I can't do -- eat a lot of other stuff.

Q. Did you get a job in prison toward the end?

A. Yes. I became the cell house help.

Q. What does that mean?

A. So, when I first became cell house help, I used to have to collect everybody's laundry. Each cell house have 500 people. So, we used to have to collect the laundry, take it to the laundry room. I had to clean up.

When they feed us in, I have to feed all the inmates. I have to clean the shower.

Q. Did they pay you?

A. They paid me.

Q. How much?

A. $5 a month.

Q. All right. Did you do it for the money?

A. No.

Q. Did you enjoy it?

Brown - direct

412

A.   No.   I just wanted to get out the cell.

Q.   How long did you do it?

A.   I did it up until I was sent back to Stateville before I got released.

Q.   And were you eligible for this job when you first got there?

A.   No.

Q.   Explain.

A.   When you first get to prison, they give you IDs.  Each IDs have different colors.  So, you get red, blue.  I believe the last one's white.

     And when I got to Menard, it's my first time in prison, so they don't know anything about me, they gave me a red ID.

Q.   And, then, did you gradually work it down?

A.   Like, a year or two, I got a blue ID.

Q.   All right.  You mentioned segregation.  What did you do to get into segregation?

A.   I didn't do nothing.  Somebody dropped a kite on R.J.  He was in another building.  And I remember IA coming to talk to me.

Q.   IA is Internal Affairs?

A.   Yes.

Q.   And you were a witness, they thought?

A.   Yes.  It was something to do with R.J. and his gang.  And

they asked me, like, did I know what was going on. They talking somebody dropped a kite on R.J. We had just come off a visit. So, they was asking, so you didn't talk to him on a visit? I was, like, we talk to our family.

Q. It's deja vu?

A. Yeah, it was Mancuso again.

Q. But it wasn't literally Mancuso?

A. Yeah. So, they kept asking a bunch of questions. I kept telling 'em I don't know nothing about him and his gang. We in two different parts of the prison. But they was, like, he didn't tell you he was fitting to get ready to do something and go to seg? Hey, I want you to lock out.

I was telling 'em, like, me and R.J. back in court, so I don't think it's true.

Q. Did you end up waiting in segregation?

A. They sent both of us to seg and I called my -- I wrote my lawyer. I wrote my mom. So, my lawyer kept calling down there and they kept telling, oh, he's not in trouble. We have to make sure he's all right. He's safe.

Because the gangs, they thought maybe they thinking I'm telling on R.J. They stick me in seg.

Q. How long were you in seg?

A. 30 days.

R.J. got out in two weeks. My lawyer kept calling, so they made me do the long haul.

Brown - direct

414

Q. Is segregation hard on a person's mental health?

A. Yes, because that's where most of the psych patients is. So, I have to sit up and deal with them. So, they just -- from the time we wake up, they just yell all day, all day, all day. When one go to sleep, another one wake up, yell. They'll literally lay on the floor for hours and just kick the door all day, doom, doom, doom, doom, doom, doom.

Q. Did any of this feel fair to you experiencing any of this?

A. No. I didn't do nothing. I shouldn't have been in prison. So, no.

Q. I want to talk to you about the things you missed out on. And this is a little personal. But being in your late teens and then into your 20s, did you miss sex with the opposite sex?

A. Yeah, I missed sex with the opposite sex.

Q. Was there any ability to interact with women at all?

A. No.

Q. Any hugs or conversation or anything?

A. You get to hug your family on a visit when they leave just once.

Q. Was there any contact with women at all during that ten years?

A. No.

Q. How about education? Were you able to advance your education in prison?

A. No.

Q.   Did you try or want to?

A.   Menard, right, as being a supermax facility, they don't offer education, because they feel everybody that's here is not going home.

Q.   All right.  Did you -- was there any kind of programming?

A.   They had, like, anger management, fatherhood, Christian programs.  I'll go to those.

Q.   Did you take all those?

A.   Yes.

Q.   Why did you want to take those?

A.   Because sometimes I wanted to get out the cell.

Q.   How about the holidays?  When you were growing up -- by the way, in your summers, did you used to spend time in the country, too, when you were younger?

A.   Yes.

Q.   Tell us about that.

A.   My family's from Arkansas.  So, we'll drive down there.

Q.   Did you enjoy being outside in the --

A.   Yes.

Q.   -- the woods, in nature?

A.   Yes.

Q.   Did you miss that during prison?

A.   Yes.

Q.   How about the holidays?  When you were growing up, how were the holidays?

A.   Holidays always fun because whole family come around, people from out of town.  It was always fun.  See some of my cousins.

Q.   And, Marcel, how were the holidays during those 12 years in prison?

A.   Holidays suck the most, because you call home, if you get the phone.  Everybody's around.  You talk to people you haven't talked to in years.  Everybody always, hey, yeah, I'm gonna write you.  They never do.

Q.   Did they try to make it festive at Menard for, like, Thanksgiving or Christmas or something?

A.   Sometimes they give us pumpkin pie or they'll give us some processed ham or turkey.

Q.   Anything else festive for the holidays?

A.   No.

Q.   Were guys in a good mood or a bad mood around the holidays?

A.   They -- they always in the same mood.  It's like -- it's prison.  So, all days the same.

Q.   How about life events?  Did you miss out on life events that were happening on the outside?

A.   Yes.  I missed out on really becoming a man in a free world.  I missed out on my freedom.

Q.   How about, you know, life events, births and deaths, that kind of thing?

A.   Yes.  I have nieces that was born, four of them while I was

in prison.  My friends, some of my friends died in prison.  My uncles died.  My aunties died.  My dogs died.

Q.  Were you able to go to any funerals?

A.  No.  My niece died when I was locked up three months.

Q.  When you had just started being locked up?

A.  Yes.  They wouldn't let me go to her funeral.

Q.  That's before you were convicted?

A.  Yes.

Q.  Did you try to go?

A.  My mom tried to pay.  It was like $500.  But they said it wasn't my daughter so I couldn't go.

Q.  What happened to your niece?

A.  She was born prematurely, but she was able to come home. So, she was at home for a few months, and she had a trach and then she had complications and she died.  They really couldn't bring her back, so they had her on life support for a few months.

Q.  Why did you want to attend the funeral?

A.  Because I was close to her.  It was my only --

Q.  It was your sister?

A.  It was my first niece.

Q.  And how about -- which sister was it?

A.  My oldest sister.

Q.  All right.  Let's talk about religion briefly.

        Was there religion in prison?

Brown - direct

418

A.   Yes.

Q.   Had you been religious growing up?

A.   Yes.

Q.   Tell us a little about that.

A.   My family's Christian.

Q.   All right.  Did it change in prison because of your experience?

A.   Yes.

Q.   Tell us about it.

A.   First, like, when I first got to prison, like, I started -- I mean, when I first got arrested, I started, like, losing a little faith in God.  Like, I'll pray.  Then it's, like, steady fighting.  Guy tried to rape me.  I'm steady going through stuff.  So, it's like I ain't did nothing, so you kind of, like, lose faith in God.

Q.   Growing up had you attended church regularly?

A.   Yes.

Q.   Who would you go with?

A.   My mom, my grandma --

Q.   Do they --

A.   My stepfather.

Q.   Sorry.

        Do they have church or services in prison?

A.   Yes.  I'll try to go to some of them.

Q.   Did it give you -- what was your relationship with God

during this difficult time?

A. Like, it was tough because I stopped, like, believing. I started back believing in him in, like, 2015, three years before I got arrested.

Q. Were there any parts of the Bible that helped give you strength through this ordeal?

A. I didn't really understand. Like, I didn't know how to read it. So, it really started helping, like, 2015.

Q. Any stories in particular?

A. I used to be asking guys, like, I see the little Christian guys, the ones that act like they was holier than thou. So, I asked some of them, like, can you help me read the Bible? Like -- they'll be, like, just open it up. So, they wouldn't help me.

I asked my mom for a Bible. She sent me one. It was a study Bible. So, I'll read it. Then I, like, understand everything. So, I got really acquainted with God.

Q. How about Joseph? Did you relate to that?

A. When I first read the story of Joseph, it was in Genesis. So, it was in, like, the daily plan. I first read the story of Joseph, and I felt like my life was, like, in line with Joseph, because at the end, like, they sold him off. He was innocent. He was his dad favorite. I was my mom favorite. So, they sold him off into slavery because they didn't want to kill him. So, as he went through it, he always had favor. So, some of the

Brown - direct

420

guards showed me favor.  I used to, like, run into some inmates show me favor.

So, like, they had a famine and he only person that had the food in Egypt.  His brothers came back.  It's, like, they needed it.  They didn't know it was him.  So, they -- I mean, Joseph changed.  Like, he was humble.  He got more humble.  He didn't want to face 'em.  So, when they came back, he showed it was him.  Everybody thought he was gonna kill 'em.  But he's like, no, I forgave you.  Everything that you meant for good -- for bad, God made for good.

Q.  Did that help give you strength?

A.  Yes.

Q.  How about presently?  What is your present relationship with religion and God in light of what's happened?

A.  I go to church every Sunday.  I remembered that verse when I came home.  And I also remembered Peter when he was in a cell and he's praying, that God just open the door, his chain fell off.  I remembered that one because I didn't have to process out.  I was the first person to -- that I remember to, like, just walk out the courtroom.

So, I always thought, like, God kept his promises.

Q.  Let's talk about visits.  When you first got to jail, would your family visit you?

A.  When I first got to Cook County, my mom come every week.  So, my mom come every week until I got transferred to prison.

My girlfriend, she most used to come with my mom.  My cousins came in the beginning.  My sisters.

Q.   How about as you moved on to Menard, farther away?  You said it was six hours away.

A.   When I got to Menard, my mom used to come every week for the first two years.  Then no finances, so it broke down to once a month.  Then it went to twice a year to once a year.

Q.   When she was coming once a week, was that hard for her?

A.   Yeah, it was very hard, because she get off work.  She had to drive six hours.  Then sometimes they won't let her in because we'll go on lockdown.  Or if the visit room get too crowded, they'll kick us out.

Q.   So, how long would the visits last if they worked?

A.   Two hours.

Q.   That's the max?

A.   Yes.

Q.   Were they sometimes shorter?

A.   Sometimes they'll go a hour or 45 minutes.

Q.   Was it expensive to make that trip every week?

A.   Yeah, it was very expensive because she was too worried about me, so she'll come and she'll try to, like, take her little money, feed me from the vending machine.

Q.   Was there -- would you have to go through any ordeals to get to the visiting room?

A.   Yes.  I have to go through a lot.  They'll call my name.  I

Brown - direct

422

have to get dressed, get strip searched at my cell house, wait till a officer available to walk me to another building. Then I get in that building. He'll wait until, like -- he, like, five more visits before he'll strip search me. Then he'll take me down to the visiting room.

Q. How were the visits? Were they happy, sad? What were the visits like with your mom?

A. They was happy, but, you know, they turned sad at the end.

Q. Why?

A. Because it's, like, everybody I love walking out. I got to go back into the hell on earth.

Q. Were you allowed to touch?

A. Just keep your -- you got to keep your hands on the table. So, she'll hold my hand.

Q. Were you allowed to hug?

A. At the end.

Q. One hug?

A. Yes.

Q. Who had more hope, you or your mother?

A. My mom.

Q. When you first got arrested, did your younger sister come and visit you?

A. Yes. My younger sister always came.

Q. She would come with your mother?

A. Yeah. She was --

Q.   How old -- how old --

A.   She was three.

Q.   And your mother would bring her?

A.   Yes.

Q.   Did that give you joy?

A.   Yeah.  She was my baby.

Q.   How about your dad, your real dad, would he say he would visit you?

A.   He said he was gonna come.  He never came.

Q.   How about your girlfriend?

A.   Yeah.  She'd come a lot with my mom.

Q.   Over time did that change?

A.   Yes.  When I got to prison, you know, she started really, like, living her life.

Q.   Did she stop visiting?

A.   She came, like, twice.  Then visits stopped.

Q.   Was that hard for you?

A.   Yeah.

Q.   And we'll talk about that in a little bit once you get out.
     Who was there for you at the end of the day when the dust settles?

A.   My mom.

Q.   Who else?

A.   My little sister.

Q.   Anybody else?

A.   Not really, no.

Q.   Did you find it hard for people to invest into a relationship with someone who's going to be away for 35 years?

A.   Yeah, but, you know, I used to -- I had to understand her life.  But some of my family, I used to get mad, though, because they knew I was innocent, and I thought, like, family should stay there no matter what.

Q.   Would people call you and would you call them?  How would that --

A.   I called.  And sometimes, like, you call somebody on the phone, they'll be like, oh, I'm gonna call you right back.  It's like they'll forget that they can't call back.  But sometimes some people don't answer.  They be at work.  Sometimes the times don't add up.

Q.   They had lives?

A.   Yeah, everybody had to move on with life.

Q.   As you felt your 20s slipping away, were you getting upset?

A.   Yes.

Q.   How about as someone who was innocent in prison, was that unique or did you experience it differently?

A.   I experienced it differently, because most people in prison accept they fate, like, this a part of them.  Some people used to tell me, like, man, this will come with it.  Like, I'm here. I'm never going home.

Q.   Did you accept your fate?

A.   No, but it was kind of hard not to.

Q.   Does it make it worse to be innocent in prison?

A.   Yes.

Q.   Tell the jury why.

A.   Because I'm being punished for something I didn't do.  I'm enduring fights.  I'm losing my family.  I'm trying not to turn to what I'm around.  So, it was emotionally draining.

Q.   Would it have been different if you had known you were going to get out in ten years than if you're looking at 35?

A.   Yes.

Q.   Tell us why.

A.   Because when you have a out date, you got something to look forward to.  You know, like, this day at this time I'm getting out of prison.  Then to try to just remain hopeful.

Q.   All right.  A few more subjects before we break for lunch.

     This one's a hard one.  But was there sexual violence in prison?

A.   Yes.

Q.   Is it tough to live around that?

A.   Yes.

Q.   And when you were young at the County, did someone try to attack you?

A.   Yes.

Q.   Do you want to talk about it or --

A.   We can.

Brown - direct

426

Q. All right. Well --

A. I had a cellee, a swole dude.

Q. Swole means?

A. Big, buff.

He was weird, though. He came in the cell. He was just acting weird. It was in about three days. He was weird. They locked us up to do trays. I mean, he kept pushing me. And I was, like, what you want? He was pushing me. But I knew I wasn't gonna be a regular fighter. I was, like, something's not right.

So, he grabbed me and tried to spin me around. He was reaching for my pants. But I was trying to push him off. And I yelled. I kicked the wall. Asked for help.

Q. How old were you at the time?

A. I was, like, 19.

So, other guys started hitting the doors, kicking the door. I was asking for the officers. So, they came in. They let me out. She asked me was I okay. I told her I'm not going back in there. So, she sent me upstairs.

Q. Did you always have to worry that people were going to attack you?

A. Yes.

Q. Did people end their lives in prison and jail?

A. Yes. Guys hung theirselves. I seen a guy hang hisself in the County, but they got him -- they lifted him up.

Q.   How about at Menard?  People try to kill themselves at Menard?

A.   Yes, people killed they selves.

Q.   Any in particular you remember?

A.   I remember my mom came to see me one day, and it was a female guard.  They came got me off the yard because I had a visit.  My mom was trying to surprise me.

So, I went and I got dressed.  I went back.  I had my visit.  And I came back to the cell house.  Everybody's on the yard.  We walked past the cell, it had a sheet up.  So, she's yelling to take the sheet down.  I knew one of the guys that was in there.  So, I said his name, like, take the sheet down.  He didn't respond.

So, she got to pulling at the sheet, but it was tied.  So, she finally, like, yanked it.  And the guy was hanging.

Q.   Did you, sir, ever get so depressed that you thought about ending your life?

A.   I thought about killing myself at Cook County.

Q.   At what point in this ordeal?

A.   After I was found guilty.

Q.   Tell us what you remember.

A.   I remember just waking up the next day, like -- I woke up.  I had, like, no feeling, like, no purpose.  Like, everything when I wake up before time, I was like, okay, I'm gonna call my mom, call my friend.  I'm gonna go on the patio, play ball or

Brown - direct

428

something.  But this day I just didn't want to wake up.  I stopped eating.

Q.   How long did you stop eating for?

A.   For a few weeks.

Q.   Were you in real danger?

A.   Yes.  I had to start back eating.  But I just wanted to die.

Q.   What stopped you from taking steps?

A.   One of my cousins, I called him.  He was talking.  I just told him, I just want to end my life.  And he went, ran and told my mama.  And he told her.  My sister was right there.

Q.   Which sister?

A.   Devonna, the baby.

So, I remember my mom -- I called back and she was, like, why you gonna kill yourself?  I told her I didn't want to be here.  And I didn't say nothing else.  I hung up.

So, I called back home again and my little sister asked for me.

Q.   How old was she?

A.   Six.  She was, like, hold on.  I remember her running to her room.  She was, like, why you gonna kill yourself?  You gonna leave me?

So, I didn't do it.

Q.   You decided to be strong?

A.   Yeah.

MR. LOEVY: Your Honor, I'm not going to start another area, if that's okay.

THE COURT: All right. We'll take our afternoon break, our lunch break.

Ladies and gentlemen, it's 12:30. We'll take a break until 1:30.

Please don't discuss the case. And we will see you back in the jury room ready to go at 1:30 p.m. Enjoy your break.

All rise.

(Jury out.)

THE COURT: All right. Please be seated.

Is there anything we should discuss during the break?

I do want to just touch on about how long you think you have, Mr. Loevy, and then from the defense's perspective, its plan. I realize that you may not know precise times, but I just want to get a sense of where we are.

MR. LOEVY: Half an hour, your Honor.

THE COURT: Half an hour? Okay.

From the defense's perspective? I know you said yesterday it will be lengthy. I just want to get a sense of whether you think you'll take the rest of the day.

MR. GIBBONS: Oh, yeah.

THE COURT: Okay.

MR. GIBBONS: I'll be probably shorter than Jon, but I

don't know how much shorter.

THE COURT: Okay. Fair enough.

Anything else we should take up at lunch, Mr. Flynn?

MR. FLYNN: Yes, your Honor. I have two issues.

With respect to the instruction on Mr. Swygert, we're just not going to agree on language.

THE COURT: Okay.

MR. FLYNN: We have a totally different view about what happened.

I would propose that we submit to you our proposed version and they submit yours, and if you want to hear argument about it at the end of lunch, we're happy to do that then.

THE COURT: That sounds great.

MR. LOEVY: We have not yet conferred, your Honor. We sent them two proposals. But if Mr. Flynn believes it's hopeless, then it's sort of like settling. If one side doesn't want to, you can't do it.

THE COURT: Sure. No, I understand.

So, Mr. Flynn, can you give Mr. Matosian your version --

MR. FLYNN: Sure.

THE COURT: -- just so we can at least read what you have.

I'll look for something from plaintiff's counsel when you can do it.

And it's an issue that I would anticipate, if we can't get to it by the end of the day today, we'll get to it first thing tomorrow morning. There's a lot of moving parts and I understand that. But I do want to address it one way or the other when we can.

MR. LOEVY: Thank you, your Honor.

MR. FLYNN: Your Honor, the second is, R.J. Branch, Mr. Brown's cousin, he has an attorney that represented him in his deposition and throughout this case. And he's been in the room today. We just ask that he also be removed, sequestered just like R.J. Branch, because R.J. Branch will be testifying, I believe, tomorrow.

MR. LOEVY: Well, I am surprised to hear that R.J. Branch is here, because he ain't testifying today. It's probably a misunderstanding if he's here.

MR. BOWMAN: Yeah, it's a misunderstanding.

MR. LOEVY: So, we'll cut him loose. But, of course, he's sequestered. He can't watch.

THE COURT: Right.

MR. LOEVY: He probably thought -- originally he was going to testify on Wednesday. But I thought he was told -- I'm pretty sure he was told, but maybe he's confused.

THE COURT: Okay. Well, either way it sounds like something's --

MR. LOEVY: Oh, the attorney's here.

MR. FLYNN: The attorney.

MR. LOEVY: The attorney's here.

THE COURT: Yeah, I was just going to say, I actually think it's the attorney, not so much Mr. Branch.

MR. FLYNN: That's correct.

THE COURT: So, I think the request is whether Mr. Branch's attorney should be permitted to sit and listen.

MR. LOEVY: I don't know of any rule that would prevent an attorney from listening. I don't know what his intentions are. I'd be surprised if he wants to watch this afternoon. But there's attorneys for the City of Chicago in the back.

MR. FLYNN: It's different, your Honor. They're not witnesses.

THE COURT: All right. Let me give this some thought. I'll be able to speak to it after lunch.

I've actually never had a request to not allow an attorney for a witness who you anticipate at trial be able to sit and watch and observe. I mean, to be honest, it's a public courtroom. So, I'm going to have some reluctance to exclude people who should otherwise be permitted to sit and watch in open court.

But I'll have a final answer for you after the lunch break. I just would appreciate a moment to think about the question.

MR. FLYNN: Certainly, your Honor. Thank you.

THE COURT: Enjoy your lunch break. I'll see you in an hour.

(Recess at 12:31 p.m., until 1:30 p.m.)

*    *    *    *    *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Joseph Rickhoff                    August 28, 2024
Official Court Reporter

434

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                Plaintiff,             )
                                       )
            vs.                        )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) August 28, 2024
                Defendants.            ) 1:40 o'clock p.m.


            TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE LINDSAY C. JENKINS

APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Individual          GREENBERG TRAURIG, LLP
Defendants:                 BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

APPEARANCES (Cont'd):

Court Reporter:                    SANDRA M. TENNIS, CSR, RMR, FCRR
                                   LAURA LaCIEN, CSR, RPR, RMR, FCRR
                                   Official Court Reporters
                                   219 S. Dearborn St., Suite 2118
                                   Chicago, Illinois  60604
                                   (312) 435-5562

              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                    PROCEEDINGS RECORDED BY STENOTYPE
          TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE COURT: All right. We are back on the record from our lunch break. I'll observe that all the same parties with all the same appearances are here.

There were a few matters the parties wanted me to address after the lunch break, but in light of our tech issues, we'll take them up at our afternoon break so we can get going with the plaintiff's testimony.

So you may be seated. Or I guess you'll stand again in 30 seconds, or not even.

So you can bring in the jury.

(Jury in at 1:40 p.m.)

THE COURT: All right. You may be seated.

Mr. Brown, you remain under oath.

Mr. Loevy, you may continue with your direct examination.

MR. LOEVY: Thank you, your Honor.

MARCEL BROWN, PLAINTIFF, PREVIOUSLY SWORN,

DIRECT EXAMINATION

BY MR. LOEVY:

Q. All right, Mr. Brown. You're in prison. Do you continue to fight your case legally?

A. Yes.

Q. Did you try to do that without an attorney?

A. Yes.

M. Brown - direct

437

Q.   Is it easy to do without an attorney?

A.   No.

Q.   How about your direct appeal, are there deadlines for that?

A.   Yes, sir.

Q.   And did you pursue that?

A.   Yes.

Q.   Did you get a lawyer to help?

A.   Yes.

Q.   Who was that?

A.   A state public defender.  I believe his name was Todd McHenry.

Q.   All right.  Did he assist you with your appeal?

A.   Yes.

Q.   And were you -- before he got involved, were you trying to learn how to do it yourself, and how were you learning?

A.   I was trying to -- I was trying to learn all the steps, asking around, going to the law library.  But it really didn't help.

Q.   All right.  Did you -- did Mr. McHenry assist you in preparing the appeal?

A.   Yes.

Q.   Were there disappointments?

A.   It was disappointments because it took a long time for me to get my transcripts.  It was disappointments when we didn't

M. Brown - direct

438

win.

Q.   Was that hard?

A.   Yes.

Q.   Did you give up?

A.   No, I didn't give up because Mr. McHenry believed in me, and he was going the extra mile that everybody around me, attorneys, wasn't doing.

Q.   Did you get a new attorney for post-conviction?

A.   Yes.

Q.   Who was that?

A.   Karen Daniels.

Q.   And where did she work?

A.   At the Center of Wrongful Convictions at Northwestern.

Q.   All right.  Were you -- how did you get them to take your case?

A.   When I first had a talk with Todd, he told me he believed in me, he was going to do his best to get me out, and if he can't get me out, he know a woman who he can refer the case to.

Q.   How did you feel when Northwestern accepted the case?

A.   I was happy.  I was excited.

Q.   Did you begin a friendship with Karen Daniels?

A.   Yes.

Q.   Did there finally come, without getting into details, a breakthrough in the case?

M. Brown - direct

439

A.   Karen was discovering --

Q.   Without getting into what she was discovering, did you guys get a hearing?

A.   Yes.

Q.   Did you get your hopes up?

A.   Yes.

Q.   What happened at the hearing?

A.   At the hearing I got -- people got on the stand, they heard everything, and the judge overturned my sentence and vacated it.

Q.   Was that a dramatic moment in your life?

A.   It was probably -- I was very happy.  I was crying.  I was very happy.

Q.   All right.  Where did you get sent after that?

A.   I got sent back to Stateville.

Q.   And that was where you had started this journey?

A.   Yes.

Q.   Was that a difficult placement at that time?

A.   Yeah, it was difficult, but I was on cloud nine.

Q.   What did -- who was there when your conviction was overturned?

A.   My family, my team of lawyers.

Q.   Were you worried about getting disappointed again?

A.   Once it got overturned?

Q.   Yeah.  No, I mean before it got overturned, when you were

waiting for the announcement.

A.   It was a little bit.  But I had faith in my team.

Q.   All right.  Did Karen -- did you have any conversations with Karen after your conviction was reversed about whether you were going to get a bond?

A.   Yes.

Q.   Tell us about that conversation.

A.   When they reversed it, and I believe they had 30 days to appeal it.  And she said, I'm going to try to get you a bond when they send you back to the county.  Uh, what did she say?  Appeal bond.  So it should be very low.

Q.   What happened?

A.   I went back to Stateville for, like, 28 days.  I came back.  And I remember being in lockup downstairs, Karen coming down.  She was like:  Marcel, I got good news and I got bad news.

Q.   What was the bad news?

A.   She was like, you want to hear it first?  I told her, yeah, just give me the bad news, come on.  She like:  The bad news is you're not getting a bond today.  She said:  The good news is, you go home today.

Q.   Was that pretty dramatic?

A.   Yeah.  I was happy.

Q.   All right.  What happened next?

A.   I was happy, you know, crying a little bit.  I went back

into the holding cell with a bunch of guys, and I was asking, like: You want my gym shoes? He was like -- he thought I was playing a trick on him. I was like: I'm about to go home, man. He like: You going home? Yeah, give me your gym shoes. He had like the state shoes. I gave him my Nikes.

Q. Why did you give up your shoes?

A. I didn't need them. I was going home.

Q. These were prison shoes, or just --

A. It was -- they was some good Nikes.

Q. Why are you giving up your shoes?

A. I'm going home, and he had, like, the state-issued shoes. They was falling apart.

Q. All right. And then what happened next?

A. I go in front of a judge, and I remember, they was talking, they was doing a lot of talking. I was just excited. And they was trying to take me back to Stateville. And the judge told 'em, no, he's not spending another minute in there, he staying here. And his bailiff came on and said, I can't lock him up because he have no charges, like. And judge: Okay. Take his clothes off. He can walk out of here.

Q. In the uniform?

A. Yes.

Q. Just walk right out?

A. Yes.

Q. Were you expecting that?

A.   No.

Q.   Did you -- were you able to change clothes?

A.   Yeah, my attorneys went and got me some clothes.  And I remember going in the back to change, and I remember the -- all these people gave us a hard time.

Q.   Showing you Plaintiff's Exhibit 417, which is already in evidence.  Is this that courtroom?

A.   Yes.

Q.   Who was giving you a hard time?

A.   The judge told them, once I changed my clothes, to release me.  So the Stateville guard was right there, the Cook County sheriffs, all of them came.  And they was giving my lawyers a hard time, like, he can't be released.  They was saying a lot of racial things, disrespectful stuff.  My attorneys was like, just don't get upset.  I remember the officer from Stateville telling them, like, you know he a free man; right?  If he walk off, I can't do nothing to him.  I can't make him stay.  He's doing you a favor waiting on clothes, so you should talk to them better.

So they was still trying to give us a hard time.  But once I got the clothes, the judge came back, and he asked me: You still here?  I was like, yeah.  Then they was like:  Oh, we were just making sure he gets some clothes.  The judge like:  Just take that shirt off and walk out.  And my attorney is like:  No, we got some clothes coming.

Q.   Was this the same judge who convicted you?

A.   Yes.

Q.   Where did you go next?

A.   I remember walking out in the courtroom, walking downstairs, walking out to the outside world.  I seen the news people out there, seen some more family members.  I smelled cars.  I smelled the air.  Everything was, like, vibrant.  I remember walking to the car, getting in the car, and some of my family haven't made it there yet.  And I remember them calling.  Somebody handed me a phone.  And then like, it's like:  You're not out.  And I was like:  This is me.  And they was like:  No, it's not.  Then somebody FaceTimed.  I didn't know what it was then, but I looked at them like, whoa.

I was happy, though.  I went to my mom's house.  A lot of my family was there.

Q.   What happened at your mother's house?

A.   A lot of people just kept coming and coming and coming, and was kind of looking at me like I was some -- I don't know, they just kept looking.  I was a little nervous, though.

Q.   How long did -- were you all, you know, amped-up?

A.   I was amped-up all day, but it kind of went away because it's like -- it was like, I felt like I was 18 again.  Like I was in, like, a time capsule.  It was like everybody grown and looking at people, like.  And everybody changed.  So I didn't know, like, what to do next.

Q. Had your mother changed?

A. No, my mother was there every day, so. Her health probably changed. She got a lot older.

Q. How about the adjustment from prison? Has it been easy?

A. It has been hard.

Q. When you walked out, what did you own?

A. That purple shirt and those shoes and pants.

Q. What happened to all your stuff from when you were younger?

A. It got destroyed, old, throw away.

Q. Did you -- as time went by and you joined the world again, did you have difficulty operating on the outside?

A. Yeah, I didn't know how to use the phone, so. I was trying to call my girl. She was my girlfriend at the time, so I was trying to call her to let her know that I was out. She was at work, but she knew. And somebody had to help me with that. Everything was, like, technology now, so I really couldn't understand a lot of things.

Q. Did you have any -- any savings or money?

A. No.

Q. Did you have trouble, as time went by, getting acclimated?

A. It took me probably about two or three weeks to, like, sleep through the whole night. My first few days, I didn't go to sleep at all. I just, like, trying to stay woke. I'd doze off, I'd wake back up. It felt like a little dream. I was

M. Brown - direct

445

able to sleep, I was able to eat.

Q.   Was it -- is talking and interacting in prison different?

A.   Yeah, talking and interacting, like, when I first came home, like, people used to always telling, like, look up.  I'd talk to 'em, I'd look up.  So I told them I always, like, put my head down.  It was like a little habit.  But that happened from prison.

Q.   Do people literally use the same language on the inside and the outside?

A.   In the inside it's just like a lot of cussing.  So you, like, adapt to that language; just cursing, talking, cursing, but.

Q.   How about going places?  Were crowds tough?

A.   My first day coming home, my stepfather came, and he's like:  I have to go buy you clothes.  Like, this is a man I knew my whole life.  He's like:  Come on.  And I was like, uh.  Got like a little stuck.  And I was like:  Let me call my mom, she not here, she went to get some food.  Let me call.  And my sister come out of the house, like, you know you grown, right?  Like, you can go your own.  But I ended up going with him.

Q.   Did you know how to act as a man on the outside world?

A.   No.  It's, like, only definition I had was him, so.  He was out of my life, so.  Only thing I knew about a man was from, like, being in prison.  And their definition of a man is basically who can cause the most madness.  So, nah.

M. Brown - direct

446

Q.   Where did you go live?

A.   I went and lived at my mom house.  I slept on her couch for about a year-and-a-half.

Q.   Who else was living there in your mom's house?

A.   My three sisters and my two nieces.

Q.   As the excitement and the euphoria wore off, did it start getting old living in your mom's couch for a year-and-a-half?

A.   It got old within, like, about a week.

Q.   Did we establish that you are on the couch in her house, there?  Where were you living?

A.   I was living on the couch.  I had nowhere else to go.

Q.   All right.  When you say it got old, what do you mean?

A.   No privacy.  No interactions.  Staying woke all night. And people get up, come out of the room, I probably just went to sleep, and I have to wake up when the house wake up.

Q.   Did you bump into your sisters having, you know --

A.   Yeah, I bumped --

Q.   -- re -- reentry?

A.   I bumped into them a lot of times, but, yeah.

Q.   What was going on?

A.   Basically, like, the way they used to do things, the way they used to treat my mom.  The way I tell them to handle certain situations.  And it's just like, I just interrupted everybody life.

Q.   What do you mean by that?

A.   It's like, they was fine living there.  Everybody, like, had they life going on.  Then you place me in it, so people got to make adjustments.  And they're used to doing certain things.  And it's not what we grew up on.  And I'm telling them, we'd get into it.  It's like, I can only depend on my mom.  And she trying her best to make sure I got everything, but it's --

Q.   When you say it's not what we grew up on, what do you mean?  What was going on, as you saw it?

A.   Like how to respect my mom.  Like, how they was raised.  Like, they just was acting different.  And telling them something, they didn't listen, just run over my mom.  They just took her kindness for weakness.

Q.   All right.  You guys were probably too old to all be living together at this point?

A.   Yeah, I was too old to be living there.

Q.   Could you get an apartment?

A.   Nah.

Q.   Did you need -- were you able to go on dates?

A.   No.  I didn't have any money, so, no.

Q.   How about the fact that it was a controlled -- being in prison, is there something called institutionalization?  What's that like?

A.   It's like, having been in there so long, it's like you pick up on a lot of things.  And, you know, I was -- for the

last two years, somebody has been really telling me how my day is going to go, telling me everything. So by being free, it's like sometimes you forget you're free. You asking somebody stuff you don't have to ask for. You know, like, I want to go to this place, but, hey, dude, can I go there? But, like, you got to remind yourself, like, yeah, you can go there.

As far as, like, walking, I won't walk barefooted. I always have to put on, like, shoes. It took a while to, like, stand in the tub because I was so used to wearing shower shoes when I showered. So that took a while, then.

Q. How about -- you said you needed money. What did you do -- when did you start getting jobs?

Well, actually, may I withdraw that, your Honor?

THE COURT: Yes.

BY MR. LOEVY:

Q. Did your mother assist you in getting money to buy clothes?

A. Yes. My lawyer assisted me, and my mom.

Q. How did your mom assist you?

A. My mom had went and took money out of her 401(k).

Q. And what did she do with it?

A. She took me to buy clothes, shoes. Everything. Living stuff.

Q. Did you get some jobs?

A. She helped me get a car, too.

Q. And a car too?

A. Yes.

Q. Were you able to work?

A. Yes.

Q. Tell the jury about some of the jobs you had coming out.

A. I had to go to the temp jobs. So I worked at jobs for two weeks, the assignments would be over with. I probably was making, like, $10. One of them was $11. So I worked there. That end, that assignment. Then there was a good job that I tried to get, my cousins and that. It was, like, $16.

Q. What were some of the jobs?

A. A saloon. They was going to let me in, but my background kept popping up. So I'd take them all my paperwork, keep showing it, keep showing it. They didn't let me get in that job. I worked at another warehouse.

Q. Slow down on that first one. So you'd have a job. Where were you in that job?

A. I was always working for the temp agency. So they would send me different places until the assignment's over. But the other jobs they would send me to, you couldn't have a background.

Q. What was your background?

A. I didn't have one, but my murder kept popping up. The murder and my conviction, all that, kept popping up. So one time I was at work, I left, I tried to come back, they told me

don't. So I kept dealing with that. So I worked a temp job for two weeks.

The longest one I worked was like a cookie factory in Broadview. I worked there for like a month and a half. And then the assignment was over.

Q. Was there a meatpacker one, too?

A. Yeah, that was the very first one. That was the cold one.

Q. How about the hospital? Did you work at the hospital?

A. Yes, I worked at a hospital.

Q. What did you do there? Which hospital?

A. Northwestern Rehabilitation Center.

Q. What did you do there?

A. I worked there as a janitor, and then I collected the recycle.

Q. How about the furniture store?

A. The furniture store, I worked, I just had to load the trucks up, unload the trucks. They didn't pay nothing.

Q. How about your -- did you think about going back to school?

A. I wanted to, but I was too old. I ain't want to be embarrassed going up in there.

Q. What do you mean?

A. You know, people ask you questions, like, you 18, 20 -- 28, 29 and coming to school? Like, what's your deal? And I ain't just wanted to get into all of that.

Q. All right. Your present job, how long have you been at?

A. I've been there one year.

Q. And you talked yesterday about what it is, but just to remind us, what's the job called?

A. Chicago Institute For Nonviolence.

Q. And does your prison experience actually help with this job as opposed to the other jobs?

A. Yeah, I guess my background check helped with this one.

Q. Can you explain?

A. Because I been through prison, I been through something. So we're really involved with, like, the community. And so, like, when we talk to the younger guys, they probably, like, listen to me better than they listen to somebody else who never been through nothing they going through or went through and dealing with stuff every day.

Q. What do you try to do with the young people?

A. I try to talk to them about, like, what I went through in life. Tell them, like, don't -- choose another -- a better path. And sometimes I feed them when they ain't got no money, but.

Q. What is the actual job duty? What are you guys trying to do? Interrupting violence, what does that mean?

A. Well, we just trying to go places throughout Chicago. Hopefully our presence will be like a crime deterrent. Like, we get involved with the community, and we just let people --

M. Brown - direct

452

you know, like, if somebody trying to make a change.

Q.   How do you prevent violence?

A.   I see the kids fighting, I'll break it up.  By being in certain neighborhoods, you get to interact.  You see they appearing every day, coming to certain stores we used to stand in front of.

     And I would see the police come bother them.  They be getting reports of guns, so they come, grab one of 'em.  We'll intervene because some of the kids be yelling.  And we'll tell them, just let them search him.  Tell the officers, like, don't be so rough, you got the call, okay.  You got the call, search him, he ain't got none, let him go.

Q.   So you sort of mediate?

A.   Yeah.

Q.   You have to win the trust of both sides?

A.   You got to win the trust of the kids and the police.  So when they look at us, they not looking at us as a threat to the cops.  So what the kids looking at it, like, all right, we going to listen to you so we ain't going to sit and argue with them.

Q.   Do you like the job?

A.   Yeah, I love it.

Q.   How many people at your post?

A.   It's five at my post.  But we go through different posts in Chicago.

Q. All right. I want to talk about your girlfriend. In prison, you said you guys separated a bit?

A. Yes.

Q. Was there -- how long did she stay with you?

A. Probably, like, three years, three-and-a-half.

Q. And then did you guys have an agreement or an understanding how it was going to go?

A. We had an agreement, like, don't have kids, I'll be out of here one day. But, like, we always say to death do us part, but time did us part. So, we'd always say, when I get out of here, you going to be with me? Yeah, I'm going to drop everything and come running.

Q. All right. Did you understand she was going to move on with her life?

A. Yeah, you gotta understand it.

Q. All right. How did you learn that she wasn't going to -- not -- not wait for you?

A. Calls got shorter, longer. Dating different guys.

Q. How did you know?

A. People tell me. You can call, she'll tell me, I can't talk, my boyfriend's around. Dealing with stuff like that.

Q. How did that feel in prison?

A. It hurted, but I had to accept it, though.

Q. Did she have a relationship and a child?

A. Yes.

M. Brown - direct

454

Q.   How did you find out?

A.   Well, I called home one day, and one of my friends told me.

Q.   Did you move on emotionally?

A.   No.

Q.   When you got out, did you reconnect, or try to?

A.   I tried to.  She had a boyfriend, so.  She had talk to me. We'd see each other, but it wasn't going nowhere.  I was praying their relationship failed.

Q.   Just remind us, what is her name?  And this is the girl from high school, right, from Oak Park?

A.   It's Tyasia Wills.

Q.   Same girl from Oak Park?

A.   Yes.

Q.   And did her relationship fail?

A.   About a year later it did.

Q.   Then what happened?

A.   I told her I was over her, but.

Q.   Had you guys tried to be friends?

A.   Yeah.  I kept crossing the boundaries, so that wouldn't work.

Q.   Well, did it -- you tried to be friends and it wasn't happening?

A.   Yeah, it wasn't going to work.

Q.   All right.  Then what happened?

A.   She broke up with her boyfriend.  Somebody told me then. She kept coming bothering me.  And I told her, I learned how to live without you, just leave me alone.  She just kept bothering, like, you want to be together?  And I told her, like, yeah, you wish.  She kept, like, pushing.  But I knew where my heart lied at, so, I knew I was going to go back.

Q.   And did you?

A.   Yeah, I went back.

Q.   What happened then?

A.   We got together.  I moved out of my mom house.  And we started living together.  Then COVID came.

Q.   Who was that?

A.   COVID came.  So we was living together during those times. We had a child.  I mean, she got pregnant.  We lost our first child.

Q.   Was that a big -- big moment in your life?

A.   Yeah, because I just, you know, the -- like the failure part that just kept playing in my head.

Q.   What do you mean?

A.   Like, just nothing goes right.  Like, everything with my life just keep going bad.

Q.   What was your daughter's name?

A.   Malia.

Q.   You have a tattoo of that?

A.   Yes.

M. Brown - direct

456

Q.   Where is that?

A.   On my forearm.

Q.   What happened next?

A.   So we lost that child.  About a few months later, she's like, I'm pregnant.  I'm like, I think I touched you once, how you pregnant?  She like, I'm pregnant, so.  I was happy, but I didn't want to go through with it.  But she said she wanted it.  But I just didn't want the disappointment again.  So we went to see a lot of doctors.  They end up having to stitch her cervix up so she can carry the child.  So she had to stop working.  She had to stay off her feet.  So it was -- it was a hard time because she emotional.  And we was bumping heads a lot during that time because you got to do everything for her.  Then it's the fear, like, oh, I see blood, I see this.  So a million hospital visits.  So that was real rough.

Q.   Was your daughter born?

A.   Yeah, my daughter ended up being born.

Q.   What's her name?

A.   Milani.

Q.   How old is she now?

A.   She's two.

Q.   Is she an important part of your life, sir?

A.   Milani's my everything.  Like, Milani is the only thing I ever been happy for since being released.  Like, I was happy when I got released, but it was, like, reality sets in.  Like,

my daughter, that's, like, constant joy.  It don't end.

Q.   Where does she sleep?

A.   Her sleep in her room, but she sleep wherever I'm at.

Q.   And you guys spend a lot of time together?

A.   Yeah.

Q.   How about your girlfriend's other daughter, have you developed a relationship with her?

A.   Yeah, that's my baby, too.

Q.   Tell us about that.

A.   Her dad died, so she looks for me for everything.  I'm in her life, five, six years now.  So she looks for me for everything.  She rather be with me than go with her mom.  So she always with me.  I take her with my nieces, so.  Take her to school.  That's my baby, too.

Q.   How old is she now?

A.   Eleven.

Q.   How about your relationship with your girlfriend?  You know, is it affected by what happened to you in prison?

A.   Yeah, it affected because we end up living together. Like, this is the first one I live with.  So she sees more of what goes on than anybody else.  So she knows something bothering that another person won't be able to pick up on. She know if I'm having a bad day.  But it took years, though, but, I had to go to therapy and, like, learn how to talk -- to talk to her about it.  But I had to break down, like, I went

M. Brown - direct

458

through something, so.  She got to understand that, like, my life been about survival.  So sometimes I got to get out of that mode and -- by being -- surviving, I -- in prison, I deal with all my problems alone.  And I always look for a solution, a way out of the problems, so.  She's a woman, so she's very emotional.  That's my heart, but sometimes she stays on the problem, not the solution, then.  By being in prison, I learned how to deal with stuff on my own.

Q.   So not involving other people, just yourself?

A.   Yeah.  So if I wake up depressed about something, or like -- it was -- it was a traumatic situation, so sometimes it hit me in different parts.  Like now, today, I'm just better with dealing with it.  But I never, like, being able to let it go.  I just get better at concealing it, dealing with it, and trying not to let it affect other people relationships around me.

       So she get it the worst.  It's unfair to her, though, but she's always with me.  So she'll be thinking she did something wrong to me, but I just be having a moment.  I'll wake up, sometimes I'll wake up angry, but, depressed. Sometimes I just want to go somewhere and be alone.  She don't understand, like, I dealt with this, everything in life this way for the last 10 years.  This is the only familiar way that I know how.  I don't know how to let you in.  I don't know how to tell you certain things.  I don't know how to do it.

M. Brown - direct

459

Q.   How is the state of your relationship today?

A.   It's good.  But in the back of my mind, not just with her, like with everybody, it's always a fear that everybody is going to leave.

Q.   Is that how you felt when you went to prison?

A.   When I went to prison, yeah.  Then everybody left, so it became a reality.

Q.   You mentioned therapy.  Has therapy helped?

A.   Yeah, therapy helped me a lot.  I didn't want to go because I ain't want to talk to nobody.  I thought, like, you can't help me, like.  But therapy helped.  We talked about my life.  Therapy helped me realize, like, you a survivor.  Like, don't look at yourself as being defeated.  It helped me face a lot of truth that I ran from.  It helped me deal with a lot of emotional issues.  And, like, you got to just deal with it.  You can't really run from it.  Just always tell yourself you a survivor.  So that's how I learned how to deal with all my problems, my depression, anxiety, fear of going places.

Q.   Do you have trust issues, trusting people?

A.   I do, to a certain extent because, like, I always think people will leave.  Like, if something happened to me, so maybe I might need somebody for something, to care for me in life, it's like, I don't think nobody going to be there.

Q.   All right.  Just a few more subjects, sir.  Do you ever dream of prison?

M. Brown - direct

460

A.   Yeah, I dream of prison a lot.

Q.   What are those dreams like?

A.   Those dreams be weird because I have, like, my outside clothes on.  I still have my everyday things going on, but I be in prison, and they be like:  Oh, it's time to lock up. And I be trying to:  No, I'm just here, I'm supposed to be out.  I wake up.

Q.   Losing your 20s, did that impair your ability to move forward?

A.   Yeah, it impaired when I first came home.  Still do it to this day because a lot of stuff the people talk about, I wasn't able to talk about.  People used to have a conversation when I came home, so I just, like, be quiet.  I don't know how to engage in it.  I wasn't around.  I didn't experience that.

     To see my friends, my family my age, like:  I'm going home to my family.  I got this.  I got to go do this.  And it's like, I'm sitting right here.  I don't even got a bank account.

Q.   How about anger?  Do you deal with anger?

A.   Yes.

Q.   Have you forgiven what happened?

A.   No.  How could I?

Q.   It's not good to be angry and not forgiving, sir.

A.   You can, but, this event messed up my whole life, my family.  I was a victim.  My mama was a silent victim.  So how

could I forgive? I want to, but how could I? Nobody's apologized. Nobody's, I'm sorry for -- nobody's doing none of this. Just, I got to deal with it. They let me out of prison that day, it's like I got shot by that detective. So they just took the bullet out that he implanted in me, but nobody ain't dressing the wound, so I patch it. I deal with it. I wear it. I try my best to deal with it. They implanted it, so it's like they threw me back out, nobody cares. He go home to his family every night. Nothing changed about his life.

Q. All right.

A. He sleep tight. I went through Hell, man. All because of them. I went through Hell, man.

Q. Do you have any closure on this?

A. No.

Q. What are you hoping to accomplish in this lawsuit?

A. I want them to pay for what they did so they can stop doing it to people.

MR. LOEVY: I don't have any other questions, your Honor.

THE COURT: All right. Thank you, Mr. Loevy. Cross-examination, Mr. Gibbons.

MR. GIBBONS: Your Honor, I think maybe it might be a good idea to take five minutes. Mr. Brown is clearly emotional. If we could take five --

THE WITNESS: I'm fine. Come on. This is how I get

through it.  Come on.

THE COURT:  We can -- we can begin, and we'll take our afternoon break around 3:00 o'clock, so about 45 minutes, since he indicates he's ready.

MR. GIBBONS:  Your Honor, I've got two volumes, I think, would be helpful.

THE COURT:  Certainly.

MR. GIBBONS:  We discussed this yesterday.

THE COURT:  Yes.  Mr. Brown, he's going to -- Mr. Gibbons is going to hand you some binders so that at various points you may need to refer to some documents.

THE WITNESS:  Okay.

THE COURT:  You can just keep them at your table.

MR. GIBBONS:  I have a set for the Court, too.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MR. GIBBONS:

Q.  Mr. Brown, I don't think we've ever formally met, but as you probably know by now, I'm John Gibbons, and I represent the defendant detectives in the case.

A.  Yes.

Q.  You've been questioned about your role in the shooting of August the 30th, 2008.

A.  I didn't have a role.

Q.  You've been questioned formally about a shooting in

Amundsen Park on August the 30th, at least three times formally; is that right?

A.   What do you mean three times formally?  I was questioned --

Q.   Well, the first time you were asked about the shooting of August the 30th was in early September, 2008, by Chicago Police Department detectives.  Is that right?

A.   Yes.

Q.   And you were also asked questions at that time by an Assistant State's Attorney.  Is that right?

A.   Yes.

Q.   That was videotaped, and we saw 200 snippets of that yesterday.  Fair to say?

A.   I wasn't counting, but, yes.

Q.   Okay.  You've had a chance before today to review the entire tape; is that right?

A.   No.

Q.   You haven't had a chance to do that?

A.   It's very emotional, so I never faced it.  I faced it in the courtroom.

Q.   Wasn't my question, Mr. Brown.  Did you have a chance to look at that whole tape?

A.   No.

Q.   Did Mr. Loevy not provide that to you?

A.   They did.

M. Brown - cross

464

Q. Second, you've given a sworn deposition in this case; is that right?

A. Yes.

Q. And that was done in September 7 and 8 of 2021; is that right?

A. I believe so.

Q. That was long after the interrogation of 2008; right?

A. Yes.

Q. And you were represented at that time by lawyers; right?

A. Yes.

Q. In fact, several of them that are here today at counsel table; right?

A. Yes.

Q. Okay. No detectives were present or pressuring you during that deposition; right?

A. He was.

Q. Listen to my question, Mr. Brown. Was -- Mr. Brown?

A. Can you just lower your voice. I'm talking to you nice, I respect the same in return. You said no detective or anyone pressuring you. He was.

Q. Mr. Brown?

A. You said it. I'm answering it.

Q. See that woman right there, Mr. Brown? She has to take down both of us talking.

A. Yes, I see it.

Q.   I will do my very best to let you finish your answers.
Okay?

A.   And can you talk with a little more respect?

Q.   And all I ask is that you let me finish my question.
Okay?

A.   And I ask for respect.  Okay?

Q.   I do too, Mr. Brown.

THE COURT:  Okay.  I think we've got the rules of the road.  Mr. Gibbons, you may ask your next question.

BY MR. GIBBONS:

Q.   My question was:  No detectives were sitting in that deposition with you in 2021; isn't that right?

A.   Yes.

Q.   And you had the opportunity to review that deposition transcript prior to today.  Is that fair to say?

A.   I probably went over it, but I didn't review it.

Q.   Tell us what you mean by that, you went over it, but didn't review it.

A.   I probably touched a couple bases about it, but I didn't just let me go over this whole transcript, no.

Q.   Was there a reason you chose not to review your sworn testimony from 2021?

A.   No.

Q.   Third time you've been asked about this case formally is when Mr. Loevy spent the last two days questioning you about

this case.  Right?

A.  Yes.

Q.  Would you agree with me that you have materially changed parts of your stories during those three sets of questionings?

MR. LOEVY:  Objection, your Honor.  Improper impeachment.

THE COURT:  Overruled.  You can answer.  It's cross-examination.  I'll give him some room.

BY THE WITNESS:

A.  You said I changed my story three times?

BY MR. GIBBONS:

Q.  No.  I said:  Would you agree with me that you have materially changed parts of your story during those three times you were questioned?

A.  Yes.

Q.  Let me flush out some of your background facts first.

You graduated from high school, right, in June of 2008?

A.  Yes.

Q.  That was a few months before this shooting; right?

A.  Yes.

Q.  And you spent the first three years of that high school education at Steinmetz; right?

A.  Parts of it.

Q.  When you say "parts of it," could you explain that,

please?

A. My junior year I went to Orr. I didn't like it. My mom moved to Oak Park, and I went to Oak Park.

Q. Okay. And you spent basically the last year of high school at Oak Park?

A. Most of my junior year, yes.

Q. Okay. And you graduated ultimately from Oak Park, River Forest?

A. Yes.

Q. And you were a pretty good student; right?

A. Yes.

Q. I mean, Mr. Loevy described you as a smart guy in 2021. Would you agree with that characterization?

A. Yes.

Q. And I screwed up the year. You were a smart guy in 2008. Would you agree with that characterization?

A. I was a smart kid.

Q. Now, on the direct examination, you testified, to my recollection, that you were working at the Jewel the summer of 2008?

A. Not that summer. Right before the case happened.

Q. Okay. So you would agree with me that you were not working at the Jewel for the entire summer of 2008?

A. Yes.

Q. You were -- had just started at that Jewel before the

shooting of 2008; is that right?

A.   Weeks prior.

Q.   Pardon?

A.   Weeks prior, yes.

Q.   Weeks prior, right.

Okay.  So other than those couple of weeks of work at the Jewel, you had no other employment in the summer of 2008; right?

A.   Not to my knowledge, no.

Q.   Okay.  You were mostly just hanging with your friends?

A.   Living everyday life with my family.

Q.   Okay.  You had your own car?

A.   Yes.

Q.   Okay.

Maria, can we put up Exhibit 41, which would be Plaintiff's Exhibit 41, Number 10 of 76.

Can you see that, Mr. Brown?

A.   Yes.

Q.   And, in fact, was that your car in the summer of 2008?

A.   Yes.

MR. GIBBONS:  Your Honor, I'd like to publish that to the jury, please.

THE COURT:  Any objection?

MR. LOEVY:  No, your Honor.

THE COURT:  All right.  You may publish.  It will be

admitted, and you may publish it.

(Plaintiff's Exhibit No. 41, 10 of 76 received in evidence.)

BY MR. GIBBONS:

Q. That's the gold, Chevy Malibu that you were driving in the summer of 2008; right?

A. Yes.

Q. With the steel rims?

A. Yes.

Q. Fairly recognizable car, would you say?

A. Yes.

Q. And that was the gold car that you drove to Amundsen Park on August the 30th, 2008; right?

A. Yes.

Q. You would agree with me that you drove that car almost every day in the summer of 2008; right?

A. I drive my mom car, too.

Q. Okay. Let's just talk about the gold one.

Would it be fair to say you drove that car almost every day in the summer of 2008?

A. Not every day. Sometimes I didn't have gas.

Q. Putting aside those occasions where you didn't have gas, or gas money, would you be in that car?

A. Unless I walk somewhere with my friends, get in a car with my friends.

Q.   That summer, you hung out with a group called USDA; did you not?

A.   Sometimes.

Q.   Okay.  And USDA, I think we heard on direct, stood for United States Dopeboys of America; right?

A.   That's what they stand for, but we took it from a rap group.

Q.   Okay.  And in your mind, this was just a group of friends who were rapping; right?

A.   Not in my mind.  That's the truth.

Q.   Okay.  And the people you identified during Mr. Loevy's questions included, tell me if I'm wrong, Jamel?

A.   Yes.

Q.   E.J.?

A.   Yes.

Q.   Shaq?

A.   No.

Q.   Shaq wasn't in the group?

A.   I don't know a Shaq.

Q.   Okay.  The twins, Ira and Tone?

A.   Tone, yes.

Q.   Oh, Tone.  Rel?

A.   Yes.

Q.   Now, yesterday in that question and answer, I don't believe you mentioned R.J.

M. Brown - cross

471

A.   I believe I said:  And some other people.

Q.   Okay.  Was R.J. in that group?

A.   Yes.

Q.   Did you purposely not want to mention him yesterday as being in that group?

A.   Like you said, I mentioned it on the other two records. Right?

Q.   I didn't hear that.

A.   I mentioned it before on the other records; right?

Q.   What other records are you talking about?

A.   My deposition; didn't I?

Q.   You remember that from your deposition?

A.   You said, why didn't I.  I said I believe if you look on there, you can see I mentioned it then.  I'm not running from that.

Q.   R.J. was, in fact, in this group in the summer of 2008?

A.   Yes.

Q.   And there was a number of nicknames of people in that group; is that right?

A.   Yes.

Q.   And your nickname was Main-Main; right?

A.   Main-Main, yes.

Q.   M-a-i-n, M-a-i-n; right?

A.   Yes.

Q.   Now, you and this group of friends had their own place to

hang out; did you not?

A.   We hung out everywhere.

Q.   Well, didn't you primarily hang out at the White Castle?

A.   We mostly go there at night sometimes, yes.

Q.   And that White Castle was about two blocks north of the Parkside house; right?

A.   About two to three, yes.

Q.   On North Avenue?

A.   Yes.

Q.   Maria, can we put up photo 349, please.

        For the record, this is Defendant's Exhibit 439, your Honor, 1 of 3.

        MR. LOEVY:  No objection, your Honor.

        THE COURT:  All right.  It will be admitted.

        MR. GIBBONS:  Okay.  If we could publish that, too.

        THE COURT:  You may publish, yes.

        MR. GIBBONS:  Please.  Thank you, your Honor.

    (Defendant's Exhibit No. 439 was received in evidence.)

BY MR. GIBBONS:

Q.   You recognize, do you not, Mr. Brown?

A.   Yes, I recognize that.

Q.   Tell us what that is.

A.   It's White Castle.

Q.   And that's where you and your friend group would hang out most days or nights in the summer of 2008?

A.   We would go there most nights.

Q.   I'm sorry?

A.   We would go there most nights.

Q.   This is the place that you would spend with your friends most nights in the summer of 2008?

A.   Yes.

Q.   There was another group of guys in that neighborhood called Young Money; right?

A.   Yes.

Q.   And you knew some of them; did you not?

A.   Yes.

Q.   Rufus McGee?

A.   Yes.

Q.   Jonathan?

A.   That was my friend.

Q.   Isaiah?

A.   What's his -- I don't know his real name.

Q.   Doesn't ring a bell?

A.   What's his nickname?

Q.   Don't know.

     Little Ed?

A.   Yes.

Q.   That group, Young Money, primarily hung out at Amundsen Park; did they not?

A.   They hung around there.  They lived right there.

M. Brown - cross

474

Q. Did they primarily hang out at Amundsen Park, like you guys primarily hung out at night at the White Castle?

A. No, they hang at their houses, right there, on the next block.

Q. Were they at their house, or were they in the park?

A. They hang out on the block of their house.

Q. That's not my question. Were they in the park or at the house?

A. I answered your question. You said, do they hang there? Hang mean they always there. They're not always in the park. They're always in front of their house on that block.

Q. You knew they were there; right?

A. They be through the whole neighborhood.

Q. Would you agree with me that nobody was in both USDA and Young Money?

A. I believe not.

Q. I'm sorry?

A. I believe not.

Q. These were separate groups?

A. Yes.

Q. There were other people who you knew hung out regularly at Amundsen Park; isn't that right?

A. Everybody hung out there.

Q. Everyone hung out there every day?

A. Not every day, but you saying hang out. Some, they go up

there.  I don't know where a certain person would be all the time.

Q.   How about Eugene Stanciel?

A.   He hung up there.

Q.   He hung out there every day; didn't he?

A.   He hung in front of the liquor store next to the White Castle, too, a lot.

Q.   But you knew that Eddie hung out in the park every day in the summer of 2008; didn't you?

A.   Most times, yeah.

Q.   Okay.  You knew that a guy named Day-Day hung out there at Amundsen Park, too; didn't you?

A.   No, Day-Day be there sometimes.  Day-Day live on the next block.

Q.   We already mentioned Rufus.  He was there sometimes; right?

A.   Yes.

Q.   Brandon Powell, he was there sometimes, too; right?

A.   Yes.

Q.   His nickname was D.U.; right?

A.   Yes.

Q.   D, as in dog; U, as in universe?

A.   Yes.

Q.   Okay.  It would be fair to say that you had some bad history with this group from Amundsen Park?

A.   What do you characterize as bad history?

Q.   Violent history.

A.   When?

Q.   Let's talk about D.U.  Okay?  You were there when D.U. and R.J. got into a fight; right?

A.   How old was R.J.?  Twelve, right?

Q.   Were you there when D.U. and R.J. got into a fight?

A.   They was fighting on the corner.  I was up the block.

Q.   Okay.  And that was before the Amundsen Park shooting; right?

A.   That was three years.  Way before.

Q.   And the fight was right in front of your house; right?

A.   It was on the corner.  I was in front of my house.

Q.   D.U. was there with 30 other guys; was he not?

A.   It was 30 other people, but all those people wasn't fighting.

Q.   Day-Day was one of them; right?

A.   Day-Day was right there, just watching.

Q.   D.U. and Day-Day hung together; right?

A.   I don't know if they hung together every day.  They used to live by each other.

Q.   All right.  Well, let's talk about the upshot of this little altercation.  Isn't it true that you saw R.J. crack D.U.'s head open with a stick?

A.   They was 12, 11.  I seen him hit him with the stick, yeah.

I didn't care.  I had nothing to do with it.

Q.   You don't have a lot to do with a lot of things, but did you witness R.J. hit D.U. with a stick and crack his head open?

A.   I just answered that question.

Q.   And -- and the answer is yes?

A.   If you check with her, you'll see.

          MR. GIBBONS:  Your Honor, can I have the witness answer the question?

          MR. LOEVY:  It wasn't asked and answered, your Honor.

          THE COURT:  Yeah, okay.

          So, Mr. Brown, you do need to answer Mr. Gibbons' questions.  You can't refer to checking the court reporter's transcripts, so.

          THE WITNESS:  Okay.  Your Honor.

          THE COURT:  Please answer the question.

BY THE WITNESS:

A.   Yes.

BY MR. GIBBONS:

Q.   And, in fact, D.U. was taken away in an ambulance; right?

A.   Yes.

Q.   A short while later, D.U. and a couple of his buddies jumped you; right?

A.   They tried to jump on me while I was at work.

Q.   It was a violent attack on you; right?

A.   It was an attack, it was a little violent.  It wasn't what you making it.

Q.   You were punched in the face?

A.   Yes.

Q.   You kept -- you kept getting punched, causing you to roll up in a ball; right?

A.   I believe I rolled up in a ball not to get punched.

Q.   Well, yesterday in Mr. Loevy's questions you said rolling up in a ball was a sign of submission; right?

A.   You talking about something when I was 14, 15.  When I described it to my lawyer, I was fighting grown man.

Q.   Did you roll up in a ball?

A.   Yes.

Q.   You didn't call the cops about this beating; did you?

          MR. LOEVY:  Objection to relevance, your Honor.

BY THE WITNESS:

A.   I was a kid, no.

          MR. LOEVY:  We're so far afield.  It's hard to even imagine --

          MR. GIBBONS:  Well, for seven hours we listened to things that were far afield.

          THE COURT:  Okay.  All right.  Commentary is not necessary.

          The objection is overruled.

          Mr. Gibbons, if you can re-ask your question to

Mr. Brown.

MR. GIBBONS:  Sure.

BY MR. GIBBONS:

Q.  Mr. Brown, you didn't call the cops after taking this beating; right?

A.  I was just a kid fighting, no.

Q.  You didn't call the police; did you?

A.  No.

Q.  You handled this kind of stuff on the street; right?

A.  I went back to work.

Q.  You also had fights with Day-Day, too, and his group; didn't you?

A.  In what year are you talking?  I was 15 and 14.

Q.  Anytime in your life, did you have a fight with Day-Day?

A.  I had a fight with Day-Day one time from him picking on my friend.

Q.  Day-Day's name is David Portis?

A.  It may be.  I know him by Day-Day.

Q.  In fact, would it be true that you had a couple of fights with Day-Day?

A.  Probably had one or two fights with Day-Day.

Q.  First one was Day-Day's group were picking on your friend, Jamel, who was part of your group; right?

A.  This was way before -- I don't even think the groups were started yet.  And it wasn't Day-Day and his group.  My cousin,

R.J.'s big brother, Day-Day cuz best friends. They were hanging together. And me and Day-Day was with them. And my friend, Jamel, came. I just met him in high school. He was very less fortunate. Day-Day kept talking about him, picking on him. Then he kept hitting him. And me and Day-Day got to, like, leave him alone, kept telling him, leave it alone. We had a little tussle. My cousins broke it up. We was actually together.

Q. Fisticuffs; right?

A. We probably threw a couple punches.

Q. You fought to protect someone in your group; right?

A. It wasn't a group then. Jamel just moved there. I was with Day-Day.

Q. Let's talk about the second fight. Day-Day was with a large group here, including D.U. and Kula (phonetic); right?

A. Yes.

Q. About 10 other guys; right?

A. Yes.

Q. You were hanging at Parkside near your house; right?

A. No.

Q. No?

A. I don't know where we was at. We was somewhere in the neighborhood.

Q. Why don't you take a look at your deposition transcript sitting next to you, which is Exhibit 215.

M. Brown - cross

481

Specifically referring to page -- Jon, page 89, line 15.

BY MR. GIBBONS:

Q. Mr. Brown, are you there?

A. You said 215; right?

Q. Yes.

A. Yes.

Q. And you were -- you were asked this question -- and I'm going to start up at line 8:

"Some of my friends.

"What are their names?

"Jamel, Damek, Ira, Tone.

THE WITNESS: That's not on 215.

THE REPORTER: I'm sorry, your Honor. Can I ask Mr. Gibbons to slow down.

MR. GIBBONS: Okay. Too fast?

THE REPORTER: Yes.

MR. GIBBONS: Okay. I'm sorry about that.

THE COURT: And Mr. Gibbons, you may need to point or restate the page number under Exhibit 215. It looks like page 89.

Mr. Brown, are you on page 89?

THE WITNESS: I'm on page 215.

THE COURT: Okay.

BY MR. GIBBONS:

M. Brown - cross

482

Q.   Mr. Brown, I'm in your deposition transcript.  Would you --

A.   215.

THE COURT:  There is another binder.  See if you can find it there.

BY MR. GIBBONS:

Q.   If you go to page 89, please.

A.   You said 215.

THE COURT:  It's Tab 215.

THE WITNESS:  I'm on page 89 in this binder.  This look like the interrogation.

MR. GIBBONS:  May I approach, your Honor?

THE COURT:  Of course you may.  Thank you for the assistance.

BY THE WITNESS:

A.   I was on 215 in here.

BY MR. GIBBONS:

Q.   Turn to 89.  See the numbers down at the bottom?

A.   Yes.

Q.   The numbers are down there?

A.   Yeah.

Q.   Okay.  Got it?

A.   Yes.

Q.   Okay.  Mr. Brown, are you there on page 89?

A.   Yes.

Q.   Now I need mine.

Okay.  Look at the top there, starting on page -- line 3.

"Question:  How many people were with him?

"Answer:  About 10.

"Question:  So it was him and 10 guys?

"Answer:  Yes.

"Question:  Who were you with?

"Answer:  Some of my friends.

"Question:  What are their names?

"Answer:  Jamel, Damek, Ira, Tone.

"Question:  TJ with you?

"Answer:  Can't remember.

"Question:  What about R.J.?

"Answer:  No.

"Where was this at?

"Answer:  On Parkside."

Do you see that?

A.   You said in front of my home.  Parkside is a long street. And that wasn't in front of my home.

Q.   So it was down the block from your home?

A.   No, I think that was on Waubansia, across the -- another busy intersection.

Q.   Okay.  So you were with how many guys, five or six?

A.   I believe, about, it says right here, five or six.

Q.   And a fistfight broke out; right?

A.   A couple guys started fighting, yes.

Q.   Okay.  Nobody called the cops; right?

A.   No.

Q.   You knew a guy named Buddha from the neighborhood?

A.   Yes.

Q.   Okay.  You had fights with him prior to the Amundsen Park shooting; right?

A.   I don't remember me and Buddha having a fight.

Q.   You don't remember having any physical fights with Buddha?

A.   No, I don't remember physical fight with Buddha, no.

Q.   Can you turn to page 80 of your transcript, please. Deposition Exhibit 215, but I'm on page 80.

A.   Yes.

Q.   Starting on line 2.

          "Question:  How many times?

          "Answer:  One, two.

          "Question:  And that would be around your neighborhood?

          "Answer:  Yes.

          "You would hit him with your fist?

          "Answer:  Yes.

          "He would hit you?

          "Yes."

          Did you give those answers to those questions?

M. Brown - cross

485

A.   I don't see the name of the person you're referring to.

Q.   Look at the bottom of page 78, please.

A.   Seventy-eight?  Yes, I'm there.

Q.   "So you know someone named Butta, but you don't know what their real name is."  Do you see that?

A.   That says Butta.

Q.   Then the whole next set of questions says Butta.

A.   It says Butta, sir.  Buddha is Day-Day's cousin.  Butta is a different guy.

Q.   Oh, you got the name mixed up.

A.   No --

          MR. LOEVY:  Objection.

BY THE WITNESS:

A.   -- you got the name mixed up.  I knew who I was fighting, and it wasn't him.

          THE COURT:  Okay.

BY MR. GIBBONS:

Q.   How do I pronounce B-u-t-t-a?

A.   Well, in a slang word, that's Butta.

Q.   Is that how you called him?

A.   That's how -- do you have the video from my transcript?  It clearly I said Butta.

Q.   Did you view that?

A.   I didn't see the video, you had it.  That was recording me.

Q. Did you get in a fight with him?

A. With who, Butta?

Q. Yeah.

MR. LOEVY: Objection to relevance.

BY THE WITNESS:

A. It says right here I did.

MR. LOEVY: Objection to relevance, your Honor. We're going to go through every fistfight he's ever been in as a kid?

MR. GIBBONS: We're going to show this as a violent neighborhood prior to the Amundsen Park shooting, yes.

THE COURT: Okay. The objection is overruled. I'm going to give you some room on that. You can ask your next question.

BY MR. GIBBONS:

Q. You had several fights with him; didn't you?

A. I believe I had one fight. It says one or two, right here, not several, sir.

Q. Dejarius Gomer.

THE REPORTER: I'm sorry, what?

MR. GIBBONS: Dejarius, D-e-j-a-r-i-u-s, I think.

BY MR. GIBBONS:

Q. Do you know of him?

A. That's my friend.

Q. J?

A.   That's my friend.

Q.   Fistfight with him; didn't you?

A.   We was friends.  I been knowing J since I was 12, so of course we probably had a couple run-ins.  We're friends.

Q.   That was on Parkside in front of your house?

A.   That's my friend.  We was at my house when it happened.

Q.   Did the fight happen on Parkside in front of your house?

A.   I just said we was at my house when it happened.

Q.   R.J. was there; right?

A.   I can't remember.

Q.   In your mind, you beat J up and won that fight; didn't you?

A.   Yes.

Q.   Twenty, 30 minutes, J's uncle came back to get even; didn't he?

A.   No.  J uncle was a lunatic.

MR. LOEVY:  Your Honor.  We object.  Can we be heard here?  Please, your Honor.  We'd like to address the Court.

THE COURT:  All right.  Let's have a brief sidebar.

(Proceedings heard at sidebar:)

MR. LOEVY:  It has to be connected to the case.  And there's a propensity argument, there's a Rule 403 argument.  I mean, they're just going through every violent thing that Mr. Brown has acknowledged, every fight.  They're just trying to paint an inference of a guy who would be in a -- you know,

commit violence. This is connected because this is the thing that Weber investigated. It's already been established, fine, there was a situation. Why -- why are they allowed to just say that people are shooting and fighting each other? We haven't gone anywhere near the case yet.

MR. GIBBONS: Your Honor, you cannot separate out what happens in this neighborhood from what happens in the park. The whole investigation, at least the back end of this investigation by the detectives, was to determine whether it was even plausible that these guys would go to Amundsen Park -- a rival turf battle, they had violent episodes in the past -- without packing any weapons. It's a major issue in the case. If the jury doesn't understand the history between these two groups, there's no way to put that into context.

THE COURT: So, Mr. Gibbons, I'm going to give you some room to develop this argument because I see the relevance to the underlying circumstances. And I don't think we've yet reached the area of 403, but I do think that this is an area where, let's finish up the questioning on it, to the extent there are other disputes you want to probe, and let's move forward. I'll give you some room on it.

MR. LOEVY: And if I could just make one more point while we're at sidebar?

THE COURT: Certainly.

MR. LOEVY: The thing -- what they're going through

right now is a deposition, everything that Marcel described that the cops didn't know about. So if -- you know, the cops don't know about Young Money or USDA, which they don't. They say, we don't know if it's a gang, we don't know anything about it. So they're proving things that the police don't know to show that violence happened. That's propensity.

MR. GIBBONS: Not true at all. That is exactly what they were investigating.

THE COURT: You don't need to argue about it. I've made my ruling. I'm going to give you some room, and that will be that. Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Mr. Gibbons, you may proceed.

MR. GIBBONS: Thank you.

BY MR. GIBBONS:

Q. We were just talking about J's uncle; right?

A. Yes.

Q. He came back 20 or 30 minutes after this fistfight that you had with J and shot up your house; right?

A. He didn't shoot up my house. He shot some cars, and a bullet went in my mom's house.

Q. Fired about six shots; right?

A. Yes.

Q. In fact, one of those bullets hit very close to you inside the house; right?

A.   The only bullet that came in our house, yes.

Q.   Prior to the Amundsen Park shooting, sir, you had been shot at two to three times; is that right?

A.   I believe so.  But we would be standing somewhere, somebody just get to shooting.  So I never seen nobody point a gun at me and shoot.  It just gunshots, people run, I run.

Q.   And one of those episodes you were standing on Parkside with your group; right?  Somebody came up and shot at you; right?

A.   They didn't shoot at me, it was gunshots.  Everybody ran. I ran.  I didn't see nobody shooting at me like:  Hey, Marcel. No.

Q.   Never called the cops; right?

A.   Cops don't do nothing when we do call.

Q.   Never called the cops; right?

A.   No.

Q.   Kept it on the street; right?

A.   I did not kept it on the street.  I didn't know who was shooting.

Q.   You've witnessed one of your friends actually get shot; right?

A.   Yes.

Q.   Shaq?

A.   Who.

Q.   Who got shot that you witnessed?

M. Brown - cross

491

A.   You telling me, you should know.  My friend got shot.

Q.   Who was your -- who was your friend who got shot?

A.   He just told you.

     MR. GIBBONS:  Your Honor, can I ask the witness to answer the question?

     THE COURT:  Mr. Brown, your only job right now is to answer his questions.

     THE WITNESS:  Okay.  I'm sorry about that.

     THE COURT:  I understand.  Please just listen to the question and answer the question.  And you don't need to comment on who said what -- what co-counsel said to Mr. Gibbons.

BY MR. GIBBONS:

Q.   Who was shot?

A.   Shug.

Q.   Can you spell that for the court reporter?

A.   S-u-g-e.  You can spell it several ways.

Q.   It happened near the White Castle; didn't it?

A.   No, it happened on -- can you tell why he got shot, though?

Q.   Did it happen near the White Castle?

A.   No, it happened blocks away.  Can you tell why did he get shot, though?

Q.   It happened in 2008?

A.   Yes.  Can you say why, though?

THE COURT: Mr. Brown?

MR. GIBBONS: Your Honor, can I have the Court instruct the witness --

THE COURT: Hold on.

MR. GIBBONS: -- that this is a question-and-answer format.

THE COURT: Hold on.

Mr. Brown, Mr. Gibbons is asking the questions now. You don't get to tell him what to ask you. Your lawyer will have an opportunity to ask you questions when he's done.

THE WITNESS: Okay.

THE COURT: So please just answer his questions and only his questions.

THE WITNESS: Okay.

THE COURT: Thank you.

BY MR. GIBBONS:

Q. Would you agree with me that in and around the summer of 2008, you would hear gunshots all the time in your neighborhood?

A. Yes, I heard gunshots. Yes.

Q. And you would agree with me that gangs were active in your neighborhood in the summer of 2008; right?

A. Yes.

Q. I want to switch gears to R.J. now. His real name is Renard Branch; right?

A.   Yes.

Q.   R.J. is, and was, your cousin; right?

A.   Yes.

Q.   Your moms are sisters?

A.   Yes.

Q.   In 2008, R.J. was 15 years old; right?

A.   Yes.

Q.   And you were 18?

A.   Yes.

Q.   Now, on direct, did you mean to suggest that you and R.J. were not close during the summer of 2008?

A.   We was close, but we did a lot of different things.  I mainly chased girls, hang with girls.  R.J. go other places. We didn't hang together every day.  He didn't:  Hey, where you at?

Q.   Are you purposely trying to distance yourself from R.J. in the summer of 2008?

          MR. LOEVY:  Objection, your Honor.  It's not a fair question.

BY THE WITNESS:

A.   No, we starting to get --

          THE COURT:  The question -- the objection is overruled.  I'll let the witness answer.

          So I think the question was:  Are you purposely trying to distance yourself from R.J. in the summer of 2008?

BY THE WITNESS:

A.   No.   Our lives was taking really two different turns.

BY MR. GIBBONS:

Q.   The reality is that you were fairly close to R.J. in the summer of 2008; right?

A.   I just answered we was -- Kula's my cousin, yes.

Q.   And, in fact, in the summer of 2008, R.J. came over to your house on most days; is that right?

A.   Yes, he come over.

Q.   And R.J. would sleep at your house a lot.  Is that fair to say?

A.   Yes.

Q.   All right.  We've already heard that the shooting of Amundsen Park happened on a Saturday night, August the 30th. Do you have that date in your mind?

A.   Yes.

Q.   Okay.  I want to talk about what you knew about R.J. prior to the shooting.  Okay?

A.   Okay.

Q.   Prior to the shooting, you knew R.J. to be a shit starter; did you not?

A.   He started little fights in the neighborhood, yes.

Q.   And you had previously described him, that action, as being a shit starter; right?

A.   Yes, he started little fights, yes.

Q.   Without getting into the details, you had seen R.J. in
fistfights with other people in the neighborhood; right?

A.   I grew up with him his whole life, yes.

Q.   And R.J. had a penchant for ripping off his shirt and then
getting into the fight; right?

A.   No.

Q.   You never saw that?

A.   I don't believe I've ever seen R.J. rip his shirt.  You
saying, like, he just:  No, let me rip my shirt off.  No.

Q.   You knew that R.J. had been arrested in 2006, for
aggravated assault with a dangerous weapon.  Isn't that fair?

A.   I believe they planted a gun on R.J. in 2006.

Q.   Who planted a gun?

A.   The police.

Q.   R.J. didn't do it?

A.   They found the gun.

Q.   Was R.J. arrested in 2006, for aggravated assault with a
dangerous weapon?

A.   I don't believe that was an assault because they only --
he only got locked up for a gun.

Q.   In 2007, you are aware, are you not, that R.J. was
arrested for aggravated battery with a firearm?

A.   I only -- I only -- I only remember him getting locked up
for a gun once.

Q.   You're telling us you were not aware that he had several

M. Brown - cross

496

gun charges prior to the shooting at Amundsen Park?

A.   I know for a fact that R.J. only had one gun charge.

Q.   How do you know that for a fact?

A.   Because that was the only time I remember him going to jail for a gun.  It was something big.

Q.   Well, in fact, you witnessed him being arrested for one of the gun charges; right?

A.   I only seen him get arrested for the only gun charge he had.  I walked up.  He was getting arrested.

Q.   Prior to the shooting, you had actually seen R.J. with a gun; right?

A.   I seen R.J. with a gun probably around 2006, 2005, once.

Q.   When he's, like, 12?

A.   He was about 13 when he got locked up with that gun, yes.

Q.   And you saw him on one or two occasions with a gun around Parkside and Le Moyne?

A.   We was somewhere probably around that area, yes.

Q.   Near the White Castle?

A.   That's about a block up.

Q.   You had seen R.J. prior to the shooting put this gun in and out of his waistband; right?

A.   I seen him over there fidgeting with something when I looked over.

Q.   And that's a way one would hide a gun; right?

A.   I don't --

M. Brown - cross

497

Q.   Making the cops traveling around the neighborhood around the White Castle; right?

A.   I don't know what he was doing with that gun.  I didn't say nothing to him about it.  He was -- he had the gun, it was on him.

Q.   In fact, in 2008, in your mind, R.J. may have always been carrying a gun.  Isn't that fair to say?

A.   No.

Q.   Turn to your transcript, please.

MR. LOEVY:  Page?

BY MR. GIBBONS:

Q.   Specifically page 542.

MR. LOEVY:  And the lines?

MR. GIBBONS:  Line 7.

MR. LOEVY:  It's not impeaching, your Honor.

MR. GIBBONS:  Your Honor, on page 542, I'm going to read it, please.

MR. LOEVY:  Well --

BY MR. GIBBONS:

Q.   "Question:  So back in --"

THE COURT:  Hold on, Mr. Gibbons, because I think opposing counsel is indicating that it's not impeaching, so.

MR. LOEVY:  Correct.  That's our objection.  Line 7 is not impeaching.  That's our objection, your Honor.

MR. GIBBONS:  Seven to nine, your Honor, is

absolutely impeaching.

THE COURT: Okay. Let's take our afternoon break. It is 2:55. So we're very close to where I would have asked to take a break anyway. Let's take a 20-minute break. I believe there is something for you to snack on. We will plan to resume at 3:15, so 20 minutes. Please don't discuss the case. And thank you for your continued attention.

All rise.

(Jury out at 2:55 p.m.)

THE COURT: All right. Please be seated.

All right. Just to put this particular issue to bed, can I -- actually, I have it right here. Give me one second. Can you remind me -- I know it's line 7 to 9 -- but what page we're on?

MR. GIBBONS: We're on page 542, your Honor.

MR. LOEVY: It actually continues to 15, your Honor.

MR. GIBBONS: My predicate question was: In fact, in --

THE REPORTER: Mr. Gibbons? Can you just start over, and a littler slower for me. Can you say it again for me, please.

MR. GIBBONS: Sorry. Sure. My question to the witness was: "In fact, in 2008, in your mind, R.J. may have always been carrying a gun?"

MR. LOEVY: And then line 7 through 15 isn't even

remotely impeaching of that, your Honor.

MR. GIBBONS: I didn't say 15, I said seven to nine.

MR. LOEVY: But it's taken out of context. Your Honor will see. It's 542, lines 7 through 15.

THE COURT: Yeah, I don't know if this is impeaching in the way that you are intending, Mr. Gibbons.

MR. GIBBONS: When he says "he may have"?

MR. LOEVY: "He may have, I don't know. Just two times."

THE COURT: "He may have, I don't know."

"To your knowledge, did you see him carrying a gun?

"I seen R.J. with a gun before."

MR. LOEVY: "Just the two times."

THE COURT: He talked about yesterday? Yeah. Reference to two times doesn't impeach the statement that I think you're getting at, which is in 2008 R.J. was always carrying a gun, so.

MR. LOEVY: Your Honor, on the question of depositions, you know, the impeachment format that I'm used to is, you've got to say, you know, do you remember being asked this question, giving this answer, and then calling out the question and the line so I can object to impeaching. Not just start reading somebody's deposition to a jury.

THE COURT: So, Mr. Gibbons, when you impeach, you should make sure that you've made a record, as I know you

will, of the line you're going to refer to to give Mr. Loevy an opportunity --

MR. GIBBONS: I will, your Honor.

THE COURT: -- to object.

Mr. Brown, you can step down from the witness stand. You may wish to take your break as well, and I don't want to prevent that.

Okay. There are a few other issues that I wanted to just touch on briefly. I'm not going to be able to get to the judicial notice issue during this break because I want to make sure that you all have a break.

But here is what I'd like to -- I'm going to return to the issue of a potential jury instruction to the jurors in light of the statements yesterday and the day before concerning the use of the phrase exoneration, you know, the issue of the conviction. And the parties have provided me with printed copies of their dueling proposed jury instructions. Plaintiff has proposed a more fulsome instruction to give the Court, which I am not prepared to give. It just gives more information than I think we should to cure the issue that defendants have raised. The parties have proposed alternative, simplified versions of a potential instruction that I could give the jury this morning.

MR. LOEVY: An alternative?

MR. FLYNN: No.

THE COURT: So, to be clear, plaintiff has proposed one lengthy cure -- one lengthy curative instruction. And then the sheet that I've been given says: In the alternative, the judge could simply instruct as follows. And it's, you know, three or four sentences.

I've reviewed that, and I've also compared it to the defendants' proposed instruction, which actually makes reference specifically to Swygert's testimony yesterday.

Here is the instruction I'm prepared to give. If you have revisions, please speak now. It's basically a trimmed-down version of both of your simpler proposed instructions. Here is the proposal:

"You heard statements about why Mr. Brown's conviction was overturned. The reasons why a judge overturned Mr. Brown's conviction is not an issue in this case. You should not speculate about why this conviction was vacated."

It gives you each a little bit of what you suggested. I'm not going to use phrases. I don't want to specifically to refer to any person's testimony. So I don't want to refer to Swygert specifically because then I'd need to potentially make reference to opening statements, and I don't want to do that. I think it makes more sense to keep it a little more neutral. So the instruction that I'm prepared to give, if the defendants still wish to give one, is what I just read. I'm happy to read it again, if you'd like me to.

M. Brown - cross

502

MR. FLYNN: Your Honor, respectfully, we think it needs to go further than that. I think comparing what was or wasn't said during opening statements to what actually came in as evidence is apples and oranges. What the jury saw was someone who, as an attorney, who they're going to assume is an expert on the law, tell them within the first two minutes of this entire case that there was a constitutional violation. I -- respectfully, I don't think that that instruction is going to be enough to repair this.

MR. LOEVY: The other person who said it was also an attorney.

THE COURT: And so that's part -- I understand your point, Mr. Flynn, I do. But the concern that I have is the other reference to the statement came in opening statements by the defense. And so rather than get into too much detail about it and identify which specific statements we want to put a spotlight on and say, please don't consider exactly what he said, and in light of what plaintiff has proposed in their more fulsome instruction, I want to keep it as simple and streamlined as possible.

So I appreciate your objection to it, but that's what I'm prepared to give. That would instruct the jury that, to the extent they have heard anything related to the reasons why his conviction was overturned, don't concern yourself with it.

MR. LOEVY: That sounds like an appropriate

compromise.

THE COURT: So you can think about whether you want me to give it. We don't have -- we certainly don't have to resolve it now. I just wanted to tell you what I'm prepared to do. And, again, we don't have to resolve it at this moment. It's not urgent in that sense.

MR. FLYNN: Thank you, Judge.

THE COURT: Okay. Unless there's anything else we should deal with right now, you should take your break, and we will see you at 3:15.

(Recess taken.)

(Proceedings heard in open court; jury out:)

MR. LOEVY: Where do you want Mr. Brown?

THE COURT: Say that again.

MR. LOEVY: Where do you want Mr. Brown?

THE COURT: On the witness stand. Thank you.

And I will put this on the record in a moment or we can put it on the record now -- I'll say it again -- I am going to have to end today as close to about 4:35 as possible. We may have some issues to discuss but I'm just letting you know that we'll need to go about an hour 15, an hour 20 and then we'll stop for today. All right.

THE COURT: All right. We're ready. All rise.

(Proceedings heard in open court; jury in.)

THE COURT: All right. Please be seated.

All right.  Mr. Gibbons, you can resume your examination.

MR. GIBBONS:  Thank you, your Honor.

BY MR. GIBBONS:

Q.  Mr. Brown, just a few more questions about R.J.  prior to August the 30th, you were aware that R.J. had also been shot at; is that fair to say?

A.  I believe so.

Q.  Okay.  And you knew in that summer that R.J. was part of a gang; is that right?

A.  Yes.

Q.  I think you had testified to Mr. Loevy that he was a member of the Vice Lords; is that right?

A.  Yes.

Q.  And you would actually see R.J. from time to time hanging with members of the Vice Lords; is that right?

A.  Yes.

Q.  All right.  Let's talk about August the 30th, 2008.  You were driving your gold Malibu that day, right?

A.  Yes.

Q.  While driving around during the daylight hours, you recall driving by Amundsen Park at a time or two, right?

A.  Yes.

Q.  You saw lots of people in the park, right?

A.  I believe so.

Q.   50, 100 people.  Right?

A.   I wasn't counting at that time.

Q.   Okay.  Lots of people, though, right?

A.   It was people; yes.

Q.   Sorry?

A.   It was people.

Q.   Okay.  R.J. was in the car with you, right?

A.   I don't believe so.

Q.   You don't believe he was in the car when you drove by Amundsen Park?

A.   He may have.  I don't think so.

Q.   Okay.  You can't recall one way or the other?

A.   I don't -- I don't recall.

Q.   Now on direct when Mr. Loevy was asking you questions, you thought you had gotten to the White Castle around 10:30 p.m. Did I -- Did I hear that right?

A.   I said I got there earlier.  But I left her, go back to White Castle, I leave, go see a girl, come back.  So the time when I first got to White Castle probably was around 7:00 or something, I'm not sure, but I always go to White Castle.

Q.   Okay.  So you recall that you might have been coming and going from the White Castle that evening?

A.   Yes.  I left White Castles to see somebody and came back; yes, sir.

Q.   And at some point when you were hanging at the White

Castle let's say around 10:00 p.m. or so, a lot of the guys in your friend group were there, right?

A.   Yes.

Q.   R.J.?

A.   Yes.

Q.   T.J.?

A.   Yes.

Q.   The twins, right?

A.   Yes.

Q.   About 30 people in all; would that be fair to say?

A.   It was other girls there, yes.

Q.   But about 30 in total?

A.   About 20 to 30, yes.

Q.   Okay.  Now on direct you said that you were kicking it with friends.  Did I record that right?

A.   Yes.

Q.   Okay.  And when you say "kicking it," it means you were just relaxing?

A.   Relaxing, talking, cracking jokes.  Just normal day stuff.

Q.   Okay.  And -- and while you were doing that, you got a phone call; is that right?

A.   Yes.

Q.   And you got a phone call either from your sister Cierra or one of your cousins Taneshia or Almanique; is that right?

A.   It was Cierra or Almanique, but I believe it was Cierra.

Q.   So you believe it's Cierra who placed a phone call to you?

A.   I believe it was her or Almanique; but most likely, Cierra.

Q.   And on that phone call it was reported to you that the girls -- meaning your sister Cierra -- and your cousins Taneshia and Almanique were in a fight in Amundsen Park, right?

A.   It was R.J. getting into it with some girls, yes.  They wasn't fighting yet.

Q.   Okay.  And your sisters mentioned in that call that some guys were trying to get involved, didn't they?

A.   No.  She said she was fighting with the girls in that call.

Q.   So you don't believe in this phone call that your sister mentioned that some guys were trying to get involved?

A.   I don't recall that, sir.

MR. GIBBONS:  Your Honor, I'm going to go to the transcript now, Deposition Exhibit JX-215, and I'm going to ask the parties to turn to Page 244.  Mr. Brown.

MR. LOEVY:  And the line, counsel?

MR. GIBBONS:  Lines 13 to 17.

THE WITNESS:  What page?

MR. GIBBONS:  244.

BY MR. GIBBONS:

Q.   My question to you -- tell me when you're there.  Are you

Brown - Cross

508

there?

A.   Yes.

Q.   Okay.   Were you asked this question -- strike this.

In this deposition you were under oath, right?

A.   Yes.

Q.   Okay.   And were you asked this question and did you give this answer?

"Question:   And then did you say something about guys jumping in?

"Yes.

"What did she say about that?

"Answer:   Some guys was trying to get involved."

Was that your testimony back in 2021?

A.   Saying getting into it, yes.

Q.   Sorry?

A.   Yes.

Q.   Now if guys were jumping in to the fight with your sisters in Amundsen Park, that's a whole different phone call, wouldn't you agree with me?

A.   They wasn't fighting.   They was arguing so it wasn't no fight, like nobody was hitting no women.

Q.   If some guys were getting into the argument with your sister at Amundsen Park, that's a different phone call than girls just fighting amongst themselves, wouldn't you agree with me?

A.   No, because nobody hit my sister so it wouldn't be a different phone call.

Q.   Well, you could hear yelling over the phone; isn't that fair to say?

A.   It's not the first time she will be calling me when I hear yelling.  It's just girls arguing.

Q.   Whoever called you, the caller -- whether it be your sister or your cousin -- were yelling for you to come get them; is that fair to say?

A.   She wasn't yelling for me to come get me.  She was yelling so I can hear her.

        MR. GIBBONS:  Your Honor, I'm going to go back to the transcript again, Exhibit 215, and specifically Page 249.

BY MR. GIBBONS:

Q.   Tell me when you're there.  We're going to go Lines 1 through 6.  Are you there, Mr. Brown?

A.   Yes.

Q.   Were you asked this question and did you give this answer?

        "Question:  But you were on the phone with her and she's yelling at you to come get her, right?

        "Answer:  Yes.

        "Question:  So you were worried about her safety?

        "Answer:  Yes."

        Did you give those answers?

A.   Yes, but you just stated was she yelling at me like

desperate. I said she was yelling so I can hear. It's loud.

Q. You were, in fact, worried about her safety, weren't you, Mr. Brown?

A. I want to remove her from the situation; yes.

Q. This was not a phone call like "hey, brother, I need a lift, come get me," right?

A. This would not be the first time she was yelling with girls when I picked her up and dropped her off at home so it wasn't no life or death matter.

Q. The guys in Amundsen Park were not your friends, right?

A. I have some friends up there.

Q. They were not your friends that hung in that park on a daily basis; isn't that fair to say?

A. Jonathan Serchy (phonetic) hung in that park. That was my friend; yes.

Q. Wasn't it true that the guys in Amundsen Park were in rival territory?

A. What is rivalry? This is not a gang so I don't understand what rivalry you're getting at.

Q. Well, we've already gone through some of the fistfights you've had with members that hung in that park; did we not?

A. You're talking from three years prior. I see these guys on a daily basis at liquor stores, house parties, dice games. I didn't have a fight with them there.

Q. Now on direct you stated that when you got this phone

call, you hung out for like five minutes, right?

A.   I said I hung out for a few minutes.

Q.   Despite the fact that you were worried about your sister's safety, it chilled for a few minutes; is that what I'm hearing?

A.   Again, when you asked about her safety, I said I wasn't worried about her safety.  I been down this road before.  I was just going to remove her from the situation, probably take her wherever she wanted to go, home, to her baby father, any -- it wasn't a life or death like, oh, my God, my sister. It wasn't one of those moments.  I wouldn't still been talking to my friends so I just, okay, I'll go get her, remove her from the situation.

Q.   What were you doing in those couple minutes?

A.   I just told you, still talking to my friends.

Q.   R.J. was standing next to you or close by you, right?

A.   He was standing in the vicinity.  He was not standing next to me or close by me.

Q.   T.J. was pretty close by you, wasn't he?

A.   He was in the vicinity.

Q.   And on direct when Mr. Loevy asked you this question, you believe one or both of them got the same sort of call from their sisters in the park, right?

A.   Yes, sir.

Q.   Now you don't dispute any longer, do you, that R.J.

actually had a gun with him on August the 30th?

A.   No.   I don't dispute that fact, sir.

Q.   And you don't dispute any longer that R.J. shot his gun in the park on August the 30th, right?

A.   Yes.   When he was shot at, sir.

Q.   You would agree with me as we look at it now that R.J. had a gun with him when you drove him to Amundsen Park, right?

A.   I didn't know he had a gun, sir.   But yes, he had a gun but I didn't know.

Q.   Yeah.   No; I appreciate that.   But that was my question.

As we look at it now today looking backwards, you don't dispute that when you drove R.J. to the park that night, he had a gun with him?

A.   I didn't know R.J. had a gun.   Yes, he had a gun.

Q.   The distance from the White Castle to Amundsen Park is about a mile, right?

A.   It's not that far.   About a mile, sir.

Q.   Take you three, four, five minutes to drive there, right?

A.   Three.   Not long.

Q.   Well, I said three, four, five.   I don't care.   Pick one.

A.   Three.   I don't -- I'm not sure on that timing.   It's just very quick.

Q.   On August the 30th after this phone call, three of you got in the car, right?

A.   Yes, sir.

Brown - Cross

513

Q. T.J. was in the front passenger seat?

A. Yes, sir.

Q. R.J. jumped in the back seat?

A. Yes, sir.

Q. You were the driver?

A. Yes, sir.

Q. Of the gold Malibu?

A. Yes.

Q. And it's your testimony that as you drove over there, you never discussed any sort of plan, right?

A. There wasn't a plan.

Q. You were listening to this new rapper young Jeezy?

A. Yes. I was -- we was very excited about the CDs, so. We just bought it.

Q. I heard about it.

On that drive over, you knew R.J. was a hothead, right, we've established that?

A. I never said he was a hothead. I said R.J. used to started little shit. He started little shit with my brother. He started little shit with his brother but --

Q. Okay. He was a shit starter?

A. With fights, yes.

Q. Okay. R.J.'s sister Taneshia was in the park?

A. Yes.

Q. Your sister Cierra was in the park?

A.   Yes.

Q.   With another of your cousins Almanique?

A.   Yes.

Q.   On that drive over, whether he was falsely accused or not, R.J. had suffered a gun arrest, right?  You knew that?

MR. LOEVY:  Objection.  Asked and answered.

THE WITNESS:  You say what?

MR. LOEVY:  Asked and answered.

THE COURT:  Sustained.

BY MR. GIBBONS:

Q.   You had seen R.J. once or twice with a gun in his possession, right?

MR. LOEVY:  Objection, your Honor.

THE COURT:  Sustained.

BY MR. GIBBONS:

Q.   Now when you arrived at the park, you parked on Bloomingdale, right?

A.   Yes, sir.

Q.   All right.  And --

MR. GIBBONS:  Maria, can we put up the map that was used in opening?  I think it's 439.

MR. BOWMAN:  37.

MR. GIBBONS:  What?

MR. BOWMAN:  It's 37.

MR. GIBBONS:  37.  Thank you.

BY MR. GIBBONS:

Q.  Okay.  Do you see that in front of you?

A.  Yes.

Q.  And you parked on Bloomingdale as you said, right?

A.  Yes.

Q.  And you parked near Moody; is that right?

A.  I parked right here by this alley.

Q.  Right there by the fieldhouse?

A.  Somewhere up between this alley?

        THE COURT REPORTER:  I'm sorry.  Excuse me.

        THE WITNESS:  I'm sorry.

        Somewhere between the alley.  I parked on the Bloomingdale Street but it was along the alley because I turned around in that driveway.

BY MR. GIBBONS:

Q.  But you were pretty close to the fieldhouse, right?

A.  Yes.

Q.  Okay.  And from where you parked to the fieldhouse, there was a fence that separated you, right?

A.  This is a short gate, yes.

Q.  I'm sorry.  Short fence?

A.  Yes.

Q.  Okay.  And when you parked your car, you said something to the effect of go get them; is that right?

A.  I said something like go get the girls, go get 'em,

something like go get the girls.

Q.   Well, there's a difference.  Did you say go get the girls or go get them?

A.   I'm not sure of my exact words but it was referring to the girls.

Q.   And you directed that to who?

A.   Probably T.J.  He was sitting next to me.

Q.   How about R.J., did you direct it to R.J.?

A.   I just said it so it wasn't like "hey, Terry, go get the girls."  It was just "go get 'em."

Q.   Why didn't you go get them yourself?

A.   I was still listening to the music.  I told you I was excited about the CD.

Q.   Did you -- did you have some leadership position in your friend group that you could tell your buddies to go do something?

A.   Like we're not a gang.  We don't tell each other what to do.

Q.   And when you said "go get 'em," in your mind you didn't think that meant to R.J. go in that park and do what you got to do, be a shit starter?

A.   How would I tell him to go be a shit starter, no.  I wasn't telling him that.

Q.   But you lagged behind so you could listen to the rest of the new CD?

Brown - Cross

517

A.   It wasn't a state of emergency, sir, so I was listening to my radio.  We found a good song.  I was listening to it.  It's my favorite artist.  I want to hear what he's talking about.

Q.   Where did that worry about your sister go?

A.   Like I told you, my sister, I didn't feel that she was in a life-or-death situation.  I removed her from a situation once before.  I didn't get out the car that time.  I just told her "hey, I'm out here, right here, come get me."

Q.   You testified on direct that you wanted to go into the park and find Eugene Stanciel.  Did I hear that right?

A.   Yes.

Q.   You believed he could settle this fight between the girls, right?

A.   I believe that Eugene can get his girlfriend, her friends.  R.J., T.J. and me can get my sister, their sisters, their friends, make them leave, end of the day.

Q.   Why did you need to seek out Eugene Stanciel if you weren't worried about the situation?

A.   Because apparently R.J. and T.J. went in the park to get them and they still wasn't coming out.

Q.   You would agree with me that Amundsen Park was Eugene's turf, right?

A.   It's no turf.  It's a neighborhood.  It's just a hangout.  You steady turf like gangs.

Q.   Well --

A.   If you get into gangs, that's R.J.'s turf then with his gangbanging homies.  If you get into gangs, it's not anything with turf.  It's nobody's turf but the gang members' turf.

Q.   You -- let me just clear this up.  Eugene Stanciel goes by Eddie Cane, right?

A.   Yes.

Q.   You knew that Eddie Cane -- Eugene Stanciel -- was a gang member, right?

A.   Him and R.J. is in the same gang, sir.

Q.   Yeah.  He was in the Vice Lords also, right?

A.   They're in the same gang, sir.

Q.   The Vice Lords, right?

A.   Mafia Vice Lords; yes.

Q.   And your testimony on direct was that before you could find Eugene, the shooting started?

A.   Yes, sir.

Q.   You testified on direct that someone was shooting, right?

A.   Yes, sir.

Q.   I mean, that's not completely accurate, right?

A.   Someone was shooting.  It was multiple people shooting, sir.

Q.   Well, you know R.J. was shooting, right?

A.   If you want to get into those terms, I didn't see who was shooting.

Q.   As you sit here now, you know R.J. was a shooter, right?

A.   As I sit here now, I know that it was two people shooting, sir.

Q.   My question was a simple one.  As you sit here now, you know R.J. was a shooter?

A.   As I sit here now, I know R.J. was one of the persons shooting in the park.

Q.   Now you have lied about that fact multiple times in the past, haven't you?

A.   When would you say in the past, sir?

Q.   Have you lied about the fact that R.J. was a shooter multiple times in the past?

A.   I believe in my interrogation, sir.

Q.   I'm sorry.  What was the answer?

A.   I believe in interrogation.

Q.   One of the reasons you lied to the detectives was -- that R.J. was a shooter was because you didn't want to get R.J. in trouble, right?

A.   That was one of the reasons, yes.

Q.   Another reason you lied to the detectives about R.J. being a shooter was because you didn't want to be labeled a snitch, right?

A.   That was one of them and I didn't know -- I don't believe that R.J. killed that guy.

Q.   It wasn't my question, sir.

     My question was:  One of the reasons you lied to the

detectives about R.J. being a shooter was because you didn't want to be labeled a snitch?

A.   Yes.

Q.   R.J. was in the Vice Lords and you knew at the time that snitching on a Vice Lord could get you in physical trouble?

A.   Yes.

Q.   Now you testified on direct that you heard about ten shots fired in the park; is that right?

A.   Yes.

Q.   And your testimony on direct was that came from two separate areas, the cumulative ten shots, right?

A.   Ten.  Probably a little more.  Probably it wasn't one or two.

Q.   Okay.  Whatever the numbers -- 10, 11, or 12 -- you believe they came from two separate areas, right?

A.   Yes, sir.  I know that.

Q.   One area was towards the back of the fieldhouse.  Is that what you're testifying to?

A.   Yes.

Q.   And that is south of this baseball diamond we see here?

A.   What do you mean "south"?

Q.   So you see the baseball diamond?

A.   Yes.

Q.   See where my red arrow is?

A.   South on this map is --

Brown - Cross

521

Q.   Was the shooting -- was the other shooting -- the first shooting scene we're talking about, whoever was shooting from there, was that the general location they were shooting from?

A.   Yes, somewhere beyond those trees.

Q.   Okay.  And the second shooting area -- strike that.

Back to this first shooting area, you're testifying here today that you could not see the shooter, right?

A.   I couldn't really see no one's face.  It's dark back there.  You just see bodies.  You know it's people but, you know, it's not really lights right there where you can "oh, that's this person, that's that person," no.

Q.   So it was the darkness that was causing you not to see the identity of the shooter in this area?

A.   The darkness and the distance too, sir.

Q.   What was the distance?

A.   I'm not sure but they was quite a bit away from me.

Q.   Now you testified, I believe, that the second shooting -- shooting area was by the playground here.

A.   It was behind me.

Q.   Was it by the playground area?

A.   I'm assuming it could have been but it was behind me.

Q.   And when you say it was behind you, was the playground area behind you?

A.   Yes.  It was to my back when I was walking towards the back.

Q. And, in fact, in the seconds before the shooting, that's the area that you saw R.J. in, in the playground area, right?

A. I never saw R.J. The only person I probably got a glimpse of in that area may have been my older sister.

Q. So you never saw R.J. and you never saw the shooter by the fieldhouse, that's your testimony?

A. I was not looking for R.J. to be "where is R.J."

Q. Shooting is breaking out right around you and you can't see either shooters' identity, that's your testimony?

A. When the shots went off in front of me, sir, I got down. Shots went off in back, I didn't turn around and say "oh, who is that." No, sir.

Q. Keeping the identity on the street, Marcel?

A. Where do you get this keeping it on the street method from? Like what does that mean?

Q. Do you know what "keeping it on the street" means?

A. No. Can you explain it more to me?

Q. Have you ever used those terms?

A. I probably used the term before "just leave it alone, keep it in the streets," yes.

Q. You've used those terms and you know what it means, don't you?

A. You may not know what it means so I want a better idea of what are you saying.

Q. Why don't you tell the jury what it means "to keep it on

the street"?

A.   Like the times I got shot at, the times they were shooting, I didn't call the police.  I left it in the street. I just went on about my way.  It didn't mean I was "let me go do something," no.

Q.   The victim was Paris Jackson, right?

A.   Yes.

Q.   It is true that you never saw Paris Jackson in the park that night, right?

A.   Yes.

Q.   So there's no way you could know one way or the other if R.J. was shooting in the direction of Paris Jackson, right?

A.   I don't know where he was shooting at, sir.

Q.   Since you don't know in what direction R.J. was shooting in and you didn't witness it, you can't say one way or the other whether R.J. shot Paris Jackson that night, can you?

A.   I don't know who shot Paris Jackson, sir.

Q.   After the shooting, you ran back to your car, right?

A.   Yes.

Q.   The car parked on Bloomingdale, right?

A.   Yes, sir.

Q.   It was still parked there, right?

A.   Yes.

Q.   You had the car keys?

A.   Yes.

Brown - Cross

524

Q.   You got back to your car before R.J. did, didn't he?

A.   I believe so.

Q.   And you would agree with me that you drove the car and R.J. did not, right?

A.   Yes.

Q.   So let me say that simpler.  R.J. never drove your car after the shooting, right?

A.   R.J. didn't have a license.

Q.   R.J. didn't have a license to do a lot of things but that didn't seem to stop him, did it?

A.   He's not going to drive my car.

Q.   You had come to the park to get your sisters, right?

A.   Yes, sir.

Q.   You didn't see your sister or cousins after the shot rang out, right?

A.   I didn't turn to look.  I ran.

Q.   You don't know if they ran into the park or not, right?

A.   To my knowledge, the only person I seen running was T.J. because he was in front me.

Q.   You didn't personally get your sisters out of the park that night, right?

A.   How could I?  People shooting.

Q.   You ran out, not towards your sisters, right?

A.   Why would I run towards her?  She's not a -- made of steel.

Q. You fled the shooting scene that night to protect R.J., didn't you?

A. No, sir. When I got to my car, I had no choice but to leave. There was more gunfire. I couldn't determine where it was coming from and I'm not finna sit here and let me look out. I was trying to get away so --

Q. You're a smart -- excuse me. Are you done?

A. Yes.

Q. Sorry to interrupt you.

You're a smart guy. You knew the cops would be coming, right?

A. I wasn't running from the cops, sir. I didn't do anything.

Q. Are you telling this jury that a priority of yours in those moments was not to protect R.J. to get him away from the shooting scene?

A. It was not in my priority, or whatever you just said, to protect R.J. I was getting myself out of harm's way.

Q. Right after the shooting when you, R.J. and T.J. got in the car --

Are you with me?

A. Yes.

Q. -- R.J. admitted he busted back, right?

A. R.J. said something along those lines that someone shot at him and he shot back.

Brown - Cross

526

Q.  Well, sir, let me just explore that answer a second. Isn't it true that what R.J. said was "I busted back"?

A.  He said something along those lines.  I don't know for -- word verbatim, sir.

Q.  So at that very moment it was clear in your head that R.J. had a gun, right?

A.  It was clear that he shot a gun; yes.

Q.  And that he had a gun in your car?

A.  He probably could have gave or dished it off.  I wasn't thinking do he still got the gun.  That wasn't my thought, sir.

Q.  R.J. had just shot up a park with a lot of people in it, right?

A.  R.J. had exchanged gunfire with somebody; yes.

Q.  There was a lot of people in that park during this gunfight, right?

A.  Can you please stop yelling, sir?  Please.  There was a lot of people in the park, sir.

Q.  Little kids?

A.  There was little kids there, sir.

Q.  Babies?

A.  I didn't see any babies, sir.

Q.  Your sister?

A.  Yes.

Q.  Cousins?

Brown - Cross

527

A.   Yes.

Q.   And you were driving R.J., the shooter, away from the park, right?

A.   I drove R.J. away from the park; yes.  I drove myself, too.

Q.   And when you drove away from the park, you knew he was a shooter?

A.   I knew R.J. was one of the people shooting at the park, sir; yes.

Q.   And as you're driving him away, you never asked him why did you shoot?

A.   R.J. just basically told me someone shot at him and he shot back, sir, something along those lines.

Q.   Did you ask him anything else?

A.   I don't recall.

Q.   Did you say "where did you get the gun"?

A.   I don't -- no.

Q.   Did you say "hey, I'm three years older than you, why you shooting in the direction of your sister and my sister and our cousin"?

A.   I don't know where R.J. was shooting, sir; and I didn't say that.

Q.   Did you see the gun in his hand?

A.   No.  I was driving.

Q.   Did you care where the gun was?

A. At that moment, I was trying to get from right there because people was still shooting, sir.

Q. Did you care where the gun was?

A. I cared about my safety, sir.

Q. And after the shooting, you drove away from the park with R.J. and T.J. in the car, right?

A. Yes.

Q. You drove back to your hangout there at the White Castle, right?

A. I drove back on Parkside where the White Castle is.

Q. And your friends were still there, right?

A. Friends, more family members; yes, sir.

Q. You went back to the White Castle because you were afraid at that moment that the boys from Amundsen Park would be coming back after you guys, weren't you?

A. Why would I be afraid that someone is coming after me, sir? I didn't do anything.

Q. Because R.J., your cousin, had just shot up their turf and you were driving him away?

A. You steady give into turf, sir. I'm not in a gang. R.J.'s in the gang. And if you keep saying "turf," that whole strip is R.J.'s turf. It's not my turf, sir.

Q. You weren't worried about retaliation?

A. Retaliation for what? I haven't done anything.

Q. You do admit you drove the shooter, a shooter away from

the park?

A.   I drove --

        MR. LOEVY:   Objection.  Asked and answered, your Honor.

        THE COURT:   Sustained.

BY MR. GIBBONS:

Q.   On direct, you testified you dropped R.J. off at the White Castle, right?

A.   Yes.

Q.   Did you know where the gun was at that moment?

A.   No.

Q.   You dropped T.J. off at the White Castle, too?

A.   Yes.

Q.   Do you recall picking up somebody else at the White Castle?

A.   I believe my cousin Little Michael got in the car with me.

Q.   And you started to drive home?

A.   Yeah.  I got turned on North Avenue, yes.

Q.   As you were driving home, a cop stopped you, right?

A.   They stopped me basically as soon as I turned onto North Avenue.  Probably 30 seconds later.

Q.   So the answer is yes, as you were driving home, the cops stopped you?

A.   Yes.

Q.   You were still in the gold car, right?

A.   Yes, sir.

Q.   You had to have figured that the witnesses in the park had identified your car, right?

A.   Sir, I get pulled over in this car a lot.

Q.   On this night in particular, you had to have figured that the cops had got a description of your gold Malibu, right?

A.   No, sir.  The car is very flashy so no telling what they was going to pull me over for, sir, so I didn't figure nothing in my mind.  I just pulled over.

Q.   Well, in fact --

A.   I didn't try and get away.

Q.   In fact, when the cops stopped you, though, they told you that your car had matched the description of a vehicle involved in a shooting in the park, right?

A.   They said it matched the vehicle of someone shooting; yes.

Q.   That was, in fact, true and you knew it, right?

A.   It wasn't what you saying.  No one shot out of my car, so. Somebody probably seen my car leaving but nobody shot out to -- as you trying to, like, the car is involved in the crime; no.

Q.   The cops told you, sir, that your car matched the description of a vehicle involved in a shooting, right?

A.   That's what they say, yes.

Q.   And your involvement in the shooting was driving R.J. away?

A.   I didn't have any involvement in the shooting.  I didn't play "hey, R.J., when you shoot someone, I'm gonna drive you away," no.

Q.   The cops told you that they were looking for a gun, right?

A.   They didn't tell me they was looking for a gun, sir.

Q.   Did they search your car?

A.   They always search my car.

Q.   Did they search your car that night?

A.   Yes.

Q.   And it's your testimony that they did not tell you they were looking for a gun?

A.   I don't recall them saying they was looking for a gun, sir.

Q.   They could have told you that?

A.   I don't recall that, sir.

Q.   Well, let's see if we can refresh your recollection.  Okay?

A.   Yes.

Q.   Let's go to your transcript, which is Exhibit JX-215.  This is your deposition taken in 2021.  Please turn to Page 328.  I'm not going to read this out loud.  I'm just going to ask you to read it to yourself.  Okay, Mr. Brown?  I'm going to ask you to read --

A.   What page?  I'm not there yet.

Q.   -- Page 328, please, of your deposition transcript.

A.   328.

Q.   Are you there?

A.   Can you read --

Q.   I would like you to read Lines 13 to 17 to yourself, please.

     (Brief pause.)

BY MR. GIBBONS:

Q.   Have you read that?

A.   Yes, sir.

Q.   Does that refresh your recollection as to whether the police officer asked you whether you had a gun in the car?

A.   Yes, sir.

Q.   And they did ask you that?

A.   It says right here; yes, sir.

Q.   Well, it says right there because that's the truth, right?

A.   I just said it says it's right there, sir.

Q.   And that's what you testified to in your sworn deposition in 2021?

A.   Yes.  I can't remember all the details from that conversation, sir.

Q.   Now what you didn't tell the cops at that moment was R.J. had the gun 30 seconds away from here, did you?

A.   I didn't tell the cops that there was multiple people engaging in a shootout, either.

Q.   Why didn't you tell the cops that R.J. had the gun 30

seconds away?

A.  Because I got robbed by a stickup man before.  I told the police.  They drove off.  They didn't do anything.

Q.  Any other reason?

A.  Not at that time; no, sir.  I just wanted to go home.

Q.  Protecting your own wasn't one of the reasons?

A.  You steady saying protecting the home like I'm in a gang, sir.  I'm not in a gang.  I'm not protecting anybody.

Q.  R.J. was your cousin --

A.  But you saying --

Q.  -- family?

A.  You saying own.  You steady making it a gang.  I'm not in a gang, sir.  I wasn't protecting anybody.  I was getting pulled over.  I got pulled over.  They searched.  They didn't find anything.  I went home.

Q.  My question was --

A.  I wasn't protecting anybody.  I wasn't protecting anybody, sir.

Q.  I didn't use the word "gang."

A.  I wasn't protecting anybody.

Q.  After the police stopped you, you drove the gold Malibu home, right?

A.  Yes, sir.

Q.  Parked it in the garage?

A.  That's where I always park.  It's Oak Park.  You can't

park on the street at a certain time.

Q. And later that night, I think you testified that you drove either your mother or your grandmother to a party?

A. I drove my grandmother, sir.

Q. You didn't drive the gold car, did you?

A. I don't believe. I probably didn't have any gas in it. I drove my mom car. It's not something I wouldn't always do.

Q. Later that night -- we're still in Saturday night --

A. Yes, sir.

Q. -- after the shooting. Are you with me?

A. I'm with you.

Q. R.J., T.J., Cierra, Taneshia, and a few of their girlfriends came back to the house, right?

A. Yes, sir.

Q. You were aware they came back to the house, right?

A. I just answered the question. Yes, sir.

Q. You were up in your room, right?

A. I was in the room with my girlfriend. Yes.

Q. And you never came downstairs, right?

A. My room is on the first floor, sir.

Q. Okay. I'm sorry. I did not know that.

You never came out of your bedroom to talk to that group, did you?

A. I came out of my room.

Q. To talk to them that night, that night?

A.   I came out.  I finna come out the room.  Yes, sir.

Q.   And did you go over the details of the shooting?

A.   No.  When I came out the room, I seen that my girl -- I believe my girlfriend came out with me and to my -- best of my knowledge, my sister had my ex-girlfriend with her so when I seen her, I was like "shit."

Q.   Okay.  Got it.  My question was:  Did you go over the details of the shooting?

A.   No.  I began arguing with my girlfriend because she thought the girl was coming this late thinking I called her over here what was going on.  So we was in the room.  They was in there talking.  I went back in the room with my girlfriend, so.

Q.   So the problem with the girlfriend and ex-girlfriend thing took precedence over trying to figure out what really happened in the park in relation to a shooting?

A.   Sir, I wasn't too concerned because I haven't done anything so that if someone want to figure out, that would have been on R.J.

Q.   R.J. was there?

A.   Yes, sir.

Q.   Did you ask R.J. "hey, cousin, what did you do with the gun"?

A.   I just told you I went back with my girlfriend because I was really trying to tell her that I didn't call this girl

over here.

Q. But in the brief time that you were out there with the group, did you say to R.J. "what did you do with the gun"?

A. I wasn't thinking about a gun, sir. I just told you what was on my mind.

Q. Well, you knew in the previous minutes to hours the cops were searching your car for the gun?

A. When the cops pull me over, they always ask me "you got guns, drugs." They get the same answer, no, and they always search me, sir. So I don't know if they was looking for a gun from that shooting, sir. They just said "you got a gun, no; you got drugs, no." He searched the car.

Q. You didn't discuss what you should say if the cops came calling, huh?

A. Sir, at that moment, I don't believe I knew anyone was dead. I don't believe anyone was dead at that moment, sir.

Q. It was just a shooting in the park with a lot of people in it as far as you know -- knew at that moment?

A. Sir, when I left out that park, all those people stayed in that park, sir.

Q. I'm sorry?

A. When I left out of the park, all those people stayed in the park, sir.

Q. Well, when you left out of the park, you ran to your car. You didn't see anything, right?

A.   I didn't see anyone running but T.J.  I ran past other people that was still standing there.  When I turned around, no one was running out of the park into the street.  Everyone was still in the park, sir.

Q.   It's your testimony that when these 10, 11, 12 shots went off nobody else was running out of the park but you guys?

A.   I believe everyone can testify to that, sir.  Yes.

Q.   No.  What do you testify to?

A.   No.  I just told you, no one ran but me and T.J.  That's the only people I seen ran, and R.J. -- he popped up -- so I believe he ran too, sir.

Q.   Okay.  It's true that night, Saturday night, R.J. and T.J. both he slept in your house, right?

A.   I believe they stayed there, sir.

Q.   Both stayed the night, right?

A.   Yes.

Q.   Okay.  Let's move ahead to Sunday morning.  Okay?

A.   Yes, sir.

Q.   I think you testified on direct you were in bed that morning, right?

A.   Yes.

Q.   And you started getting phone calls that somebody was shot and killed in Amundsen Park, right?

A.   I got a phone call that somebody was shot and killed at White Castle.  I got a phone call somebody was shot and killed

Brown - Cross

538

at Oak -- Amundsen Park.  I got another phone call somebody was shot and killed somewhere else; yes.

Q.   Okay.  But at this time, you were actually in the park where people were shooting guns, right?

A.   I was at home, sir, at that time.

Q.   No.  The night before you were in the park when people were shooting, right?

A.   I believe people were shooting up there more than just when I left, sir --

Q.   Well --

A.   -- so I wasn't there through all those events, sir.

Q.   -- when one of the callers said that there was a dead body found at Amundsen Park, did you get concerned, even a little bit?

A.   No, sir, because it was still -- like I said, it was still a hundred people in that park, sir.  Nobody was running, sir.

Q.   Some of the callers, or caller, were saying that R.J. was the killer; isn't that true?

A.   Someone called and said somebody got -- they saying somebody got shot and they said R.J. shot him; yes.

Q.   Did that bother you even a little bit?

A.   I woke up, sir.  I got fully awoken.

Q.   You got fully awoken and you walked to where R.J. and T.J. were sleeping, right?

A.   Yes, sir.

Q.   They were sleeping in your living room, right?

A.   Yes, sir.

Q.   And it's true that R.J. and T.J. were both getting similar type of phone calls, right?

A.   I believe so, sir.

Q.   And when I said "the street was talking," do you know what I mean by that?

A.   Yes.

Q.   Tell the jury what I mean by that.

A.   Everybody was talking saying what they believed to have went down, sir.

Q.   And the street was saying Paris was dead, right?

A.   Yes.

Q.   Paris was shot, right?

A.   Not at that time, sir.  Nobody know who was shot at that time, sir.

Q.   Well, Paris was dead.  How did they think he died?

A.   Nobody know who the individual was at that moment, sir.

Q.   You talked to R.J. at that time -- we're on Sunday morning now -- about what the street was saying, didn't you?

A.   Yes; and he told me what the streets was saying, too.

Q.   And R.J.'s response was "I didn't shoot nobody," right?

A.   Yes.

Q.   You didn't respond back?

A.   I don't believe so.  I don't recall, sir.

Q. Well, in fact, you couldn't respond back because you didn't see R.J. shoot, you didn't see where Paris was, you didn't see where the victims were, you didn't see anything so you couldn't even respond back; fair to say?

A. That's not what I'm saying, sir.

Q. Was it because you actually thought "oh, my God, R.J. maybe did shoot somebody in the park"?

A. No. I was trying to see was it true, sir.

Q. You were trying to do what?

A. Find out was it true, sir.

Q. And did you talk to R.J. about that?

A. No. I believe at that moment, sir, I believe I called his mother.

Q. His mother wasn't in the park shooting, right?

A. No.

Q. She wasn't an eyewitness to the shooting, right?

A. No.

Q. But your first thought was "let's not talk to R.J., let's call his mother," right?

A. I called his mom because she's his legal guardian and I believe that she needed to know that someone saying her son was shooting, possibly shot someone.

Q. So you placed a phone call to R.J.'s mom?

A. Yes, sir.

Q. And then you headed out of the house, right?

A.   No.   I believe I got dressed.

Q.   Well, that's always a good idea before you leave.   But after you got dressed, you left the house, right?

A.   Well, one of my friends came over and picked me up.

Q.   Dominique?

A.   Yes.

Q.   You had to have figured that the cops were coming and going to try to at least question you and R.J., right?

A.   Sir, at this time I don't believe anybody got shot.   I was trying to see was it true so I wasn't thinking about any cops.

Q.   Isn't it true -- sorry.   You done?

A.   Yes, sir.

Q.   Sorry to interrupt you.

     Isn't it true at that moment you left the house and went and hid?

A.   Sir, why would I hide on Parkside?   I know the area where I'm always at.

Q.   So your testimony is you did not go and hide?

A.   What was I hiding for?   I haven't done anything to hide, sir.

     MR. GIBBONS:   Your Honor, at this time I would like to play a recording of an IDOC call that you have deemed admissible.   It's Exhibit DX-389 and we will only play 40 seconds of it that you have deemed admissible from 11:35 to 12:10.   I'll give Mr. Loevy a second if he has any objection.

MR. LOEVY: Well, if this one was on the admissible list, then I don't have an objection to it.

THE COURT: All right. With that caveat, it will be admitted and you may publish it.

MR. GIBBONS: Okay. Before we play that, Maria --

BY MR. GIBBONS:

Q. Mr. Brown, this is a call from Menard prison. Okay?

A. I believe I went over this call.

Q. Okay. So you know the call I'm talking about.

A. Yes.

Q. You also knew that these calls were recorded, right?

A. Yes. And what you saying is not true, sir.

Q. The calls weren't recorded?

A. It's not going to say anything about me hiding, sir.

Q. Okay.

A. You can play it, though. You can play it.

MR. LOEVY: Your Honor, can we establish some foundation for a date and time?

MR. GIBBONS: Yeah, yeah. I -- it -- I was just about to do that --

MR. LOEVY: Thank you.

MR. GIBBONS: -- but we were caught.

BY MR. GIBBONS:

Q. This is an IDOC call on October 23rd, 2013, that is placed from Menard and your --

Brown - Cross

543

A.   Yes.

Q.   -- voice will be heard on the tape, right?

A.   Yes, sir.

Q.   Okay.

MR. LOEVY:  Although it is 2015.  Mine says 15.

(Counsel conferring.)

MR. LOEVY:  Oh, I'm on the wrong call.  Thank you.
Sorry.  I don't trust you.

MR. GIBBONS:  Okay.  Let's do this again.

BY MR. GIBBONS:

Q.   It's a -- it's an October 23rd, 2013, call from Menard.
Are you with me?

A.   Yes.  I'm with you, sir.

Q.   Okay.  We're only going to play 40 seconds of it.

MR. GIBBONS:  Maria, if you can play 11:35 to 12:10,
please.

(Recording played.)

THE COURT:  You may need to --

(Recording played.)

THE COURT:  It may be a volume issue.

(Brief pause.)

THE COURT:  All right.  Try it again.

(Recording played.)

MR. GIBBONS:  Thank you.

BY MR. GIBBONS:

Q. That's your voice, right?

A. Yes. And I said "we did." I didn't say "we hid" and we went over there and I thought we were straight, like I just told you. I didn't say "we hid." How can I hide on Parkside, sir, standing on the corner?

Q. My question was that's your voice, right?

A. Yes. And I answered the part where you said I said I hid. I said we grabbed everything, we got dressed, we did, we went on Parkside.

Q. You were talking to Dominique, right?

A. I was talking to a girl.

Q. Was her name Dominique?

A. I'm not sure what was her name.

Q. And you're saying you did not say on that tape that you hid, h-i-d?

A. Sir, where can I hide standing on a boulevard on the corner in broad daylight? Where can I hide, sir?

Q. That's not my question, sir. On the tape --

A. Where can I hide? I didn't say I hide -- hid. I said "we did" and we left.

Q. Remember we got that deal: I'm not cutting you off and you're not cutting me off?

A. You been cutting me off all morning.

Q. Are you done?

A. Yes.

Q.   Okay.  On the tape, did you say you guys went and hid?

A.   No, sir.  We did not hide.  I said "we did," sir.  I talk with an accent so you cannot tell me what I said.

Q.   That's for the jury to decide.

You want to hear it again?

A.   I don't have to hear it again.  I know what I said.

Q.   Okay.

MR. GIBBONS:  Maria, can you play 1717 to 1733 of that same call on October 23 of 2013?

(Recording played.)

BY MR. GIBBONS:

Q.   Did you hear that, sir?

A.   Yes, sir.

Q.   "You're gangbanging and you're killing, it is what it is," huh?

A.   I believe I been in jail with some terrible people, sir, so two gangbangers kill each other, that's something else. When you kill somebody innocent, I believe you deserve to go to jail.  But if those two people want to shoot at each other, let them.

Q.   And if one gangbanger kills another, you just keep it on the street, huh?

A.   Yes.

Q.   R.J. was in a gang, right?

MR. LOEVY:  Objection.  Asked and answered, your

Honor.

THE COURT:  Sustained.

BY MR. GIBBONS:

Q.   In your mind when you're making those statements on that call, is that what R.J. did?

A.   In my mind, Paris was my friend so I didn't see Paris to be a gangbanger, sir.  And we was pretty cool when we was in high school.  So I didn't consider him to be a gangbanger. And I don't know who the other person was shooting at R.J. so I can't tell you two gangbangers shooting at each other, sir.

Q.   Let's go back to Sunday morning.  You left out of your house, right?

A.   Yes, sir.

Q.   Went to Parkside?

A.   Yes.

Q.   Didn't drive your gold Malibu, right?

A.   I didn't drive.  My friend dropped me off.

Q.   You didn't drive your gold Malibu, right?

A.   No.  My friend dropped me off.

Q.   Smart enough to know that the cops would be looking for that gold Malibu, right?

A.   The cops would be looking for me, sir.  If you trying to distinguish why I didn't try and drive it because I didn't believe it had gas in it.

Q.   I'm sorry.  I didn't hear the last part.

Brown - Cross

547

A.   I didn't believe it had gas in it.  Remember the night before I told you I dropped my grandmother off in another car?

Q.   And the friend who picked you up, was that the same person we just heard on the tape?

A.   The friend who picked me up was a male, sir.  That was a woman.

Q.   Did Dominique pick you up on that morning?

A.   My friend Dominique from Oak Park; not the other Dominique, sir.

Q.   And is Dominique a male or a female?

A.   He's a male.

Q.   They just share the same, sort of, name?

A.   Dominique is a common name, sir.

Q.   Got it.  And you were dropped off over on Parkside near Lemoyne?

A.   Yes.

Q.   That's near the Ella Flagg school there, right?

A.   Yes.

Q.   Close to T.J.'s house?

A.   Yes.

Q.   Pretty close to the White Castle, too, right?

A.   About a block to the White Castle, half a block to T.J.'s house.

Q.   And so at this moment, it's you, R.J., and T.J., right?

A.   It was a few more people out there.

Q.  Oh.  Who?

A.  I can't recall but I remember it was other people being out there.

Q.  So you weren't in private?

A.  How I'm private standing on a public sidewalk, sir?

Q.  I'm asking who you were with.  You were with T.J., you were with R.J.  We know that, right?

A.  I came with R.J. and T.J. but it was other people out there, sir.

Q.  Okay.  And did you have some time to talk about the unfolding events?

A.  No.  We was just standing out there.

Q.  You weren't talking about Paris Jackson in the park, dead body, R.J. shooting in the same area, that didn't come up?

A.  Sir, like I told you, I didn't know Paris died at the time.  I didn't believe anybody got killed.  I called R.J.'s mom.  She said she will go up there and see.

Q.  While you're out there on the corner, did you tell R.J. that you didn't hear anyone else shooting?

A.  I didn't believe I said anything to R.J. on that corner about the shooting.

Q.  In the interview with the detective later, you did make that statement.  Do you remember that?

A.  I wasn't lying.  In the interview, I said we all met up on Parkside but we all left.  And you could see from the phone

Brown - Cross

549

call, we all went to Parkside together.

Q.  So as you're sitting in here today, you're telling us that you did not speak with R.J. that morning -- on that corner saying "hey, R.J., I didn't hear anyone else shooting"?

A.  Sir, we didn't even know no one died at that time, sir, so we just thought people were spreading rumors and lying.  So no, we didn't say anything.  There wasn't a plan.  We didn't meet up to discuss this; no.

Q.  Well, when you say you didn't know anyone had died, you had all gotten calls while you were waking up that morning that there was a dead body in the park, right?

A.  I got a call somebody died at White Castle behind the currency exchange.  I got a few calls, sir.

Q.  So did you or did you not lie to the detectives when you told them that R.J. said -- that you said to R.J. "hey, I didn't hear anyone else shooting"?

A.  Can you tell me what time of the interrogation that was, sir?

Q.  Okay.  You don't remember?

A.  I told you I may have said but I would like to know what time so I can put it into better context for you.

Q.  We'll get to that.  I'm asking for your recollection right now.

A.  If you're asking them, I'll give you the answer, sir.

Q.  Fair enough.  I'm just asking if you have a recollection.

Brown - Cross

550

A.   You're still asking the same question, though.

Q.   Okay.  Was it while you were standing on this corner area that R.J.'s mom pulled up?

A.   No, sir.

Q.   Where did she pick you up?

A.   We stood out there for a while.  Then we walked to T.J. house.  He had to get something from the house, I believe, so we ended up walking to Terry's house.

Q.   Okay.  So you're standing on the corner for a little while and then you head over to T.J.'s house?

A.   Yes.

Q.   Okay.  And is that where R.J.'s mom picked you up?

A.   That's where R.J.'s mom pulls up; yes.

Q.   All right.  And that's Sarah Scott, right?

A.   Yes, sir.

Q.   And all three of you got into Sarah's car at that point, right?

A.   No.  I started talking to Sarah before we got in the car.

Q.   Okay.  How long did that conversation last?

A.   Probably about a minute or two.  Not long.  It was very short.

Q.   And did you talk about the details of the shooting at all?

A.   Like with Sarah, I told you, like I said, she said she was going up to the park and other places where they said the police was that.  And she said I just went there, people was

Brown - Cross

551

out there barbecuing and I didn't see any polices, they lying, I don't think nothing happened, somebody is lying.

Q. So what precipitated Sarah Scott to drive around Amundsen Park to look to see if cops were investigating?

A. No. I told you I called her and I said someone said her son killed somebody here, here, and here. She went to all of those locations because someone called to say that the police was at those locations so she went to see.

Q. And then she reported to you, oh, it looks okay because I don't see any cops investigating in Amundsen Park?

A. Sir, she never said it looks okay. She said I don't believe anybody got shot anywhere to be saying her son did it.

Q. What time was this?

A. I'm not sure. It was probably mid morning or afternoon. I'm not sure.

Q. You know that Paris's body was found in Amundsen Park around 9:00 o'clock in the morning, right?

A. At that time, sir, I didn't know.

Q. Okay. To your knowledge, was this the first time that R.J. was seen or talking to his mother?

A. To my knowledge, I'm not sure. He probably called on the phone but I'm not sure.

Q. And then you spent a couple minutes talking to her; is that what you said?

A. I said we talked for about a minute or two.

Q. Okay. A minute or two. And then what happened?

A. I remember she parked. I stood out there for a minute. I walked down the street. Probably got me something to eat.

Q. Probably got what?

A. Probably got me something to eat. You see how you didn't hear that but you heard "hid"? It kind of go hand in hand.

Q. Are you being a wise guy or --

A. No. I'm just showing you. Sometimes you can't understand what I say so I have to break it down for you.

Q. I was born and raised in New York. People -- I've had that problem my whole life, Mr. Brown.

A. So why did you just ask me?

THE COURT: All right. Let's please focus on the question.

BY MR. GIBBONS:

Q. At some point you all got in the car, right?

A. I believe Sarah dropped me back off at home.

Q. Did all three of you get in the car?

A. I'm not sure. We may have.

Q. You don't remember either way?

A. It's not like something I was --

Q. Did you discuss anymore details about Amundsen Park?

A. No, because I just took it as people was just lying.

Q. People were what?

A. Just lying. Nobody got shot. Nobody is at Amundsen Park.

Nobody is at White Castle. Nobody is behind the currency exchange.

Q. Nobody was talking about a body found at Amundsen Park, right?

A. No.

Q. When you got back to your house, who was there?

A. When I got back to my house, the same people was there when I left. I believe my mom came from church probably somewhere around that time.

Q. Okay. Who else was there? Can you list the names, please?

A. I believe my brother, sister's girlfriend, Little Mike. Probably Cierra is in her room. I'm not sure, sir.

Q. This is late morning on Sunday morning?

A. This is probably somewhere in the afternoon, sir.

Q. And nobody is talking about the fact that a body has been found in Amundsen Park?

A. Nobody has said Paris Jackson is dead yet.

Q. I understand that. That wasn't my question. I didn't ask about Paris. I asked whether anyone was talking about a dead body found in Amundsen Park.

A. No. I believe I went back in the room with my girlfriend.

Q. So no one talked about it, you went back in the room with your girlfriend and what, went to sleep?

A. No. It was daytime. I was up.

Brown - Cross

554

Q. How long did you stay in the room for?

A. I'm not sure, sir.

Q. At any point prior to going in your bedroom with those people you just mentioned in the room, did you guys discuss the fact that R.J. was a shooter in the park?

A. What do you mean did we discuss? I went in my room. Like, we wasn't talking about the thing anymore since we left out the room.

Q. You have R.J.'s mother there. You have other people in the house now.

A. Who is the other -- the only other person is my mom that came home.

Q. Okay. Let's just say your mom. Did you say to your mom "R.J. was shooting in the park last night"?

A. I don't believe so. I don't remember even talking about my -- talking about this whole situation with my mom at that time.

Q. You just went to bed?

A. I didn't go to bed. It's probably in the afternoon, sir. I was doing stuff around my house.

Q. How long did you stay in the room for, sir?

A. I'm not sure, sir. I went on with my everyday life.

Q. Isn't it true you stayed in the room until this big family meeting occurred in the early evening hours?

A. No, sir.

Q.   You got out --

A.   I --

Q.   -- and left your room?

A.   Yes.

Q.   What did you do?

A.   I just told you I don't know.  I was going about my merry way.

MR. GIBBONS:  Can I have a minute, your Honor?

THE COURT:  Certainly.

(Brief pause.)

BY MR. GIBBONS:

Q.   Do you recall a family meeting occurring in the house on that day, that Sunday late afternoon early evening?

A.   I remember the families coming over about 7:00, 8:00 o'clock, sir; yes.

Q.   Okay.  And do you remember -- well, strike that.

Who came over?

A.   I remember T.J.'s father coming over, R.J.'s father.  I believe R.J. mother may have came back but she was there.

Q.   R.J. was there?

A.   Yes.

Q.   T.J. was there?

A.   Yes.

Q.   Cierra was there?

A.   Cierra, Taneshia, Almanique.  Probably some more of their

friends.

Q. And we believe Renard Branch, Senior, was there?

A. I already said R.J.'s dad.

Q. Also known as Rabbit?

A. Yes.

Q. And you believe Debra Scott, the mom was there, right?

A. I know she was there.

Q. And you all met in the living room, did you not?

A. That's where everyone was; yes.

Q. Now we are a long way from a body being found at Amundsen Park that morning, right?

A. Yes.

Q. At this point, the word on the street was it was Paris Jackson, right?

A. Yes. Everyone was saying Paris was killed yesterday; yes.

Q. And he was killed, Paris Jackson was killed in the exact same area that R.J. was shooting in, right?

A. I'm not sure where he was killed at, sir.

Q. The body was found by the fieldhouse, right?

A. His body was found in a whole nother area, sir.

Q. I'm sorry?

A. His body was found in a whole nother area, sir.

Q. Back behind the fieldhouse, right?

A. That's a whole nother area, sir.

Q. Okay. But we're in Amundsen Park, right?

A.   You asked what area his body was and I told you.

Q.   Okay.  You guys were close to the fieldhouse, right?

A.   I don't know where they was at, but I was close to the fieldhouse.

Q.   All right.  And the shooting you heard from the direction of R.J. was also close to the fieldhouse, right?

A.   It was by the playground area, sir.

Q.   Okay.  And at this family meeting, R.J. admitted shooting, right?

A.   I believe so.

Q.   R.J. admitted to the family that he went to the park with a gun?

A.   I don't even know if that came up like "hey, I went to the park with a gun."  I believe they was talking about a stabbing and the shooting.

Q.   Did anyone ask R.J. where he got the gun?

A.   I don't believe so.  I'm not sure.

Q.   Did anyone ask R.J. why he brought a gun to the park?

A.   I don't know.  I'm not sure.

Q.   Did anyone ask R.J. where was the weapon?

A.   I don't know, sir.

Q.   You didn't ask him?

A.   Why am I asking for R.J. got shot at?  He shot back. That's between that person who was shooting and R.J.

Q.   R.J. told the family that Day-Day shot at him and he shot

back, right?

A.   Yes.

Q.   R.J. never said who was standing around Day-Day, right?

A.   I'm not sure, sir.  I don't know if I asked that kind of question.

Q.   R.J. never said if Paris Jackson was standing next to Day-Day when Day-Day was shooting, right?

A.   I just told you I don't know.

Q.   Did anyone ask?

A.   I don't know, sir.

Q.   You didn't say anything about Day-Day, right?

A.   I didn't really say too much about nothing.  It had nothing to do with me.  I haven't done anything.

Q.   You were in the park, right, sir?

A.   Sir, I didn't pull the trigger, sir.  I didn't go to the park with a plan to kill anyone, sir.  I didn't do anything.

Q.   We've heard that.  I'm just asking:  Were you in the park?

A.   The majority of people that was in the house that day was in the park, sir.

Q.   Okay.

A.   Most of them wasn't even talking.

Q.   Okay.  It's true you never saw Day-Day in the park, right?

A.   I never seen Day-Day, but R.J. said the guy that was shooting was Day-Day.

Q.   R.J. saying Day-Day was a shooter but you never

independently saw that, right?

A.   No, but I know someone else was shooting and it's not to my knowledge who R.J. seen before he walked into the park, sir.  So me, personally, I never seen who was shooting but I know that it was multiple shooters out there, sir.

Q.   Yeah.  My question is a really simple one:  You never --

A.   I like to break it down for you.

Q.   Sorry?

A.   I just like to break it down for you.

Q.   What were you breaking down for me?

A.   You asked a question and I broke my answer down for you.

Q.   Oh.  You never saw Day-Day in the park that night, right?

A.   No.

Q.   Therefore, you never could be a witness to Day-Day shooting a weapon that night, right?

A.   I could be a witness that someone else was firing and R.J. said it was Day-Day.  So with the circumstantial evidence, I took it as it was Day-Day.

Q.   That wasn't my question.

A.   I'm just breaking it down for you, sir.

Q.   My question is you never witnessed Day-Day shooting a weapon --

A.   To this day, I don't know who that guy was so it may -- it could have been Day-Day.  It may could not have been Day-Day. I don't know.

Q. At that family meeting, did anyone ask R.J. why he shot with that many people in the park?

A. I remember someone saying something what happened. I remember R.J. saying they started shooting at him first and he shot back.

Q. That was the key theme, right, somebody shot at him --

A. It wasn't a thing, sir. It was a fact.

Q. Let me just finish my question.

That was the theme at this family gathering, right, somebody shot and R.J. shot back, right?

A. I don't know what a theme may be, sir. But at the family when everybody was talking, they was only stating facts about what had happened.

Q. People are trying to build a self-defense defense for R.J., right?

A. Nobody is building a self defense, sir.

Q. Isn't it true that R.J.'s dad, Renard Branch, Senior, brought up the concept of self defense?

A. Yes.

Q. And there was a discussion about that, right?

A. No. R.J. dad said so. Day-Day started shooting at you first and somewhere along the lines he said yes to the discussion. He's like, oh, that's a self-defense case, like something around that. I wasn't too concerned what was going on, sir.

Q.   Would you agree with me that no one said "hey, let's go to the police with our self-defense case"?

A.   Do I believe that -- I don't know what anybody else said about going to the police.  I remember the police -- I'm not sure, sir.

Q.   Okay.  After this meeting, you, R.J. and T.J. go into the kitchen alone, don't you?

A.   There's probably some more people in the kitchen, sir, but R.J. and T.J. was in the kitchen; yes.

Q.   My question is:  Did you go in there alone?

A.   You said alone.  I'm telling you it was other people in the kitchen too, sir.  Probably.  I'm not sure if we went in there alone.  We probably walked in there alone.  But to say no one else is in the kitchen, no, I'm not sure.

Q.   Did you talk about the shooting when you were in the kitchen?

A.   R.J. was still talking, but I think I was in the kitchen making me something to eat something.  I'm not sure.

Q.   Okay.  Let's move ahead.

          MR. GIBBONS:  Your Honor, it's 4:30.  I'm going to start another area.  I know you wanted to break at 4:30 or 4:35.

          THE COURT:  Yes.  So I'm -- let's break here for the day.  I need to attend to something else and so I need to break about 15 minutes earlier than we ordinarily would.  I

appreciate your patience. Please don't discuss the case. We'll see you tomorrow morning 9:15 and we'll start as close to 9:30 as we can. All rise.

(Proceedings heard in open court; jury out.)

THE COURT: All right. You may be seated.

Mr. Brown, you are excused but you are now on cross and so you may not discuss your testimony with your lawyers. You're welcome to discuss any other matter but not the substance of your testimony.

THE WITNESS: Okay.

THE COURT: All right. Thank you.

(Witness steps down.)

THE COURT: All right. Before we talk about the lay of the land for what's next, are there matters or issues we should discuss this afternoon before I let you go?

MR. LOEVY: Not from plaintiff.

MR. FLYNN: Are you still planning to call Mancuso after the plaintiff?

THE COURT REPORTER: Are you on the record? I didn't hear you.

MR. LOEVY: We can maybe talk scheduling. It was a scheduling question he had for counsel so we can address the Court with that. So we have a good faith estimate for Mr. Gibbons and he thinks we'll be done in the morning on his cross.

563

THE COURT: Okay.

MR. GIBBONS: I'm hopeful, your Honor. There's a lot of tapes here. I don't -- I'm not intending to go over as many as John did; but depending on where the witness goes, I might need to play more. So I'm going to strive to be done by lunch, but I can't promise it.

THE COURT: Understood. I appreciate the good faith estimate and it's just an estimate.

MR. LOEVY: We are going to call Wham Cary because he has a schedule. He is going to be here.

MR. BOWMAN: Yes. Mr. Cary is on our list for tomorrow. He is an attorney. He has cleared his calendar for tomorrow and --

THE COURT: Okay. We'll get him on tomorrow. We'll do our best to.

MR. LOEVY: And then we have asked that the best lawyer -- what's the name of the guy, the scheduling guy?

MS. DEL VALLE: Jim.

MR. LOEVY: Jim. We've asked for Halpern and McHugh. If we are moving slowly, we will not call those two witnesses so they're going to be on standby. We'll have them by phone, you know, on standby because I know your Honor wants to err on the side of having somebody.

THE COURT: All right.

MR. LOEVY: If we're running out of time, we're going

564

to go straight to Mancuso.

THE COURT: Okay.

MR. GIBBONS: And just so we're all on the same page, I don't really want to break up my examination of Mr. Brown because Attorney Wham Cary is here.

MR. LOEVY: No. We won't have -- we're not asking for that.

THE COURT: Okay.

MR. GIBBONS: Just making sure of that.

THE COURT: Great.

MR. LOEVY: But we'll be done with plaintiff tomorrow, so.

THE COURT: Mr. Flynn --

MR. FLYNN: Thank you.

THE COURT: -- who has been trying to say something for, I think --

MR. FLYNN: I get a word in every once in a while.

With respect to Mr. Mancuso, the hearsay issue that we filed a response to last night, if we could get a ruling on that tomorrow morning just because I think it's going to be an important part of his testimony.

THE COURT: Absolutely. I --

MR. LOEVY: We need to respond, too. They filed it. We just --

MR. FLYNN: It was a response to your motion.

THE COURT: Yeah. It was a response to the motion so I didn't intend to allow replies, which you may have guessed from some of my orders.

So what I'll do is I will review it this evening, we'll address it tomorrow morning, and I'll give you an opportunity to address anything you want to address on the record in the morning. I have a short call at 9:00 a.m., very short matters, and so we'll be able to take this up 9:10, 9:15, and we'll be ready to go and I'll give you a ruling then.

MR. LOEVY: Thank you, your Honor.

THE COURT: All right. Thanks very much. We will see you in the morning. Have a good night.

(Proceedings concluded at 4:38 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled matter before the Honorable Lindsay C. Jenkins at Chicago, Illinois, on August 28, 2024.


/s/*Laura LaCien*___                    August 29, 2024
Official Court Reporter                 DATE

/s/*Sandra Tennis*                      August 29, 2024
Official Court Reporter                 DATE