566

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                Plaintiff,             )
                                       )
            vs.                        )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) August 29, 2024
                Defendants.            ) 9:24 o'clock a.m.


                        VOLUME FOUR
          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Defendants:         GREENBERG TRAURIG, LLP
                            BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

567

APPEARANCES (Cont'd):

Court Reporter:                    JOSEPH RICKHOFF, CSR, RMR, CRR
                                   Official Court Reporter
                                   219 S. Dearborn St., Suite 2118
                                   Chicago, Illinois  60604
                                   (312) 435-5562
                                   joseph_rickhoff@ilnd.uscourts.gov

                    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                       PROCEEDINGS RECORDED BY STENOTYPE
              TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

568

(Proceedings heard in open court:)

THE CLERK: 19 C 4082, Brown vs. Mancuso.

THE COURT: All right. Good morning.

Can I have appearances on the record, please.

MR. LOEVY: Good morning, your Honor, John Loevy and all the same appearances for the plaintiff.

THE COURT: Good morning.

MR. FLYNN: Good morning, your Honor, Kyle Flynn and all the same appearances for the defendants.

THE COURT: All right. Good morning.

I'd like to just use a few minutes of our time here.

We are going to check on the status of our jurors to see who has arrived and who may be en route. But I want to address any issues the parties have. I do want to just hear from plaintiff in response to the ASA hearsay issue and the issues arising out of the motion originally filed on August 27th about hearsay.

So, if I can just hear from the parties on that. I just want to get a lay of the land on where things stand.

What I'm likely going to do is just take your requests under advisement and then give you a ruling at the lunch break. I just want to make sure that I'm clear on sort of where the parties are, and it gives me and my clerk an opportunity to make sure we're on the same page about it.

So, anything the parties want to raise now about the

ASA investigation hearsay issue, I'm happy to hear you now.

Mr. Loevy.

MR. LOEVY: Thank you, your Honor.

I mean, as Mr. Flynn pointed out yesterday, the issue is, how far it's going to go. And Mr. Mancuso, again, we're talking past each other. We have no problem if he says, we talked to a lot of witnesses. All those witnesses are telling us that R.J. was shooting in the park and Marcel Brown's car was there and Marcel -- some of them said Marcel Brown was there. That's hearsay, but they can say that's why we put them in a room and that's why we interrogated them.

And to the extent that they were saying, hey, R.J. wasn't shooting, that's why we pressed him because, you know, we have a lot of witnesses telling us R.J. is shooting.

That could be the totality of the hearsay that gets into this trial. They want to take it one, two, ten steps further, and they want to basically put on a case without witnesses. They want to say, here's what the next witness told us. Here's what another witness told us. Here's what another witness told us.

And it's not just for the core -- what I'll call the core issues, which is, were they in the park, do we have a right to put them in a room and interrogate them. They want to start proving other facts. They want to start saying, R.J. was waving a gun around. R.J. was making threats. R.J. -- you

570

know, things that R.J. disputes that weren't really part of the interrogation and that the witnesses aren't here to be cross-examined on.

So, we think the line should stop at, there was -- you know, there was a shooting and R.J. was involved and Marcel was involved. So, that's the subject matter. The subject matter shouldn't go much past that. And it really wouldn't take a question or two. You know, they have this envision that they're just going to parade it all. It's not disputed. Let me put it that way. We don't dispute that 20 witnesses are telling him roughly enough information to put these people in a room. So, the effect on the listener is satisfied.

The second point, your Honor, is what they really want to do is vouch for these witnesses, because the detectives could say, all right, the witnesses told me enough to make me suspicious of the plaintiff. They want to say, yeah, we want that, but we also want to call a state's attorney witness to say, I heard an out-of-court statement. And that's not relevant because what the state's attorney heard isn't relevant. It would only be relevant if it proves that it was true.

They want to say, well, we want to show this is reliable. We want to show this is -- you know, wasn't coerced. We want to show it was true. That's not a relevant purpose for this evidence.

This evidence isn't being offered for the truth because it is hearsay, because the witnesses who could have been called -- and we put that in our motion -- you know, they had six years to find these witnesses.  The Chicago police -- these aren't criminals.  The Chicago Police Department couldn't find these witnesses?  That was a -- even if it wasn't their fault, it's still hearsay.

And the final point, I guess, is what they really want to do is have the state's attorneys give it their imprimatur.  He said in court a couple times now, we want the state's attorneys to say, we wouldn't have taken a statement if it was coerced.  We wouldn't have taken a statement if it wasn't legit.  That is for the truth.  You know, they want the state's attorney to say, this is legitimate.  They can't -- it's an out-of-court statement.  That's an improper use.

The other --

THE COURT:  Can I ask a quick question about that?

MR. LOEVY:  Sure.

THE COURT:  And I apologize for interrupting you.

I just want to make sure -- and again, some of this is really line drawing, which makes it less pleasant for me in terms of trying to figure out in advance how to give you some guidance on it.

Here's my question:  If an ASA or a series of ASAs get on the stand and simply say, without getting into the detail of

the statement, the words that were spoken, without getting into the words that were spoken, I sat in a room with detective X, Y and Z. I observed this witness, this witness and this witness provide information. I memorialized some or all of that -- and the parties will dispute how much -- in a statement. And my observation of the witness and the interaction was that the witness was speaking with us voluntarily. I'm not eliciting the underlying hearsay, but I am giving my lay opinion, under 701, as to whether or not a witness is speaking with the police voluntarily. Not getting into the detail of the statement itself.

MR. LOEVY: Well, we would have a lot of problem with that on a lot of levels. I mean, that is -- that's like saying, I thought the witness was credible. That's like, I thought the witness was telling the truth. That's not something you usually come to court and give an opinion about.

THE COURT: But I wasn't talking about credible or truth. Just whether or not -- and maybe you don't draw a distinction.

MR. LOEVY: I don't.

THE COURT: That's fair if you don't.

Okay. Go ahead. I will let you finish.

MR. LOEVY: You usually wouldn't get another witness in the room say, yeah, I thought they were telling the truth, you know, or I thought they were legitimately voluntarily.

I guess my bigger point, though, is what's relevant is the first time the detectives talked to them, when the ASAs weren't there. As you know, a number of hours go by before the ASAs get there.

And I don't know how much familiarity you have with 26th and Cal, but there's this process where the police do their thing in the room, and then when they're done they bring the ASAs in and then they lock them in at the grand jury.

What's relevant is the first part, what the police did before the ASAs got there. So, how would the ASAs know what happened before they got there? So, if the police officers want to say, when I talked to the witness this is what they told me, the ASAs weren't even in the room.

THE COURT: Definitely. I don't think you could ask an ASA about those prior interactions where they weren't present. I agree with you. And I actually will be interested to hear if defense doesn't agree. But there wouldn't be -- there's no personal knowledge. It would be a foundation problem.

I'm talking about part two, where you have a witness who says, my own observation of the person sitting at the table was that the person was speaking with me, and there happened to be a detective in the room, of their own free will.

MR. LOEVY: I got -- I think I can clarify our position. The first point is, the second conversation is not

relevant. It's cumulative. It's 403. Because if the detectives talked to them, then they're -- it's satisfied. I talked to them.

The second conversation is relevant for at least two witnesses, because there are two witnesses who specifically say, I wasn't there voluntarily. Those two witnesses are Eugene Stanciel and Marisol Ocampo.

So, now I'm more connecting with your argument. If we are putting in dispute that these two people were there voluntarily, then I suppose that could be relevant evidence, for those two witnesses.

THE COURT: Right.

MR. LOEVY: But I would object to anything like, oh, the other 18 we thought they -- because it's not in dispute what they were doing there or why they were there. For the other 18, they should rely on what they were told before the state's attorneys got there. For these two, if we put it in dispute -- and I think my cross-examination of Mr. Mancuso will put in dispute Mr. Stanciel and Ocampo's voluntariness. And, then, you'll have to decide how far you let a state's attorney to rebut that.

I'm talking about voluntariness before the state's attorney got there. But you may or may not decide that a subsequent interview bears on that.

THE COURT: Okay. So, Mr. Flynn and Mr. Gibbons, I'm

interested in anything you want to say.  But, specifically, beyond Stanciel and Ocampo, because I think everybody agrees that there's some more latitude there.

And I'm sorry, Mr. Loevy, were you done?

MR. LOEVY:  I appreciate that, because my counsel handed me a note that's relevant.  Sorry to interrupt --

THE COURT:  That's okay.

MR. LOEVY:  -- but it's a very important point.

The state's attorneys testified at their depositions, they don't remember.  So, they can't say it seemed voluntary unless they're saying, it is my usual practice that I would never take an involuntary statement at the Chicago Police Department.

And if they're going to say it's my -- I know it was voluntary because why would I take a statement from somebody not voluntary, that would open a door that I don't think they want to open.

So, the bottom line is, how could the state's attorneys testify if they have no personal recollection?

THE COURT:  Okay.  So, now we have another issue.  I appreciate it, because I want to work it out, or at least make a ruling.

So, Mr. Flynn, I'm interested in -- and Mr. Gibbons -- in whatever you wish to add about this don't remember piece of it, because obviously that would resolve the issue.  If they

just testified before that they don't remember, I don't know how their memory would be different on the witness stand today.

Setting aside Stanciel and Ocampo, where I think everyone knows that we're going, what's your response to the cumulative, 403 argument, and what's your response regarding anything else you wish to say? But I'm interested in the cumulative, 403 piece of it. And I'll give you an opportunity to respond.

MR. FLYNN: So, with respect to the ASA handwritten statements, it's clear that they're going to argue that witnesses were coerced in this case. It's obvious. Mr. Loevy just talked about it. So, the fact that ASAs were speaking to other witnesses who were saying the same things supports our defense that this wasn't a big conspiracy to coerce statements against Mr. Brown.

With respect to their personal knowledge, at their depositions they were shown these ASA handwritten statements. They signed every single page, as the Court may be familiar. At the end of every one of those statements it says, did the police treat you properly? Are you being threatened? Are you being promised anything? All of them -- there's a dozen handwritten statements. Not all 20 give handwrittens. About a dozen. All of them say, no, I wasn't threatened, I wasn't promised.

So, all we would do with the ASAs that are called --

there would be two or three of them -- would be, you were in this room. You were with this witness. You were with this detective. If they don't remember, we will refresh their recollection with the handwritten. We will never seek to enter the handwritten. We won't go through what the witness said to them during the handwritten. But just simply that they were there. There was no evidence of coercion. It is my practice to ask these questions, and nothing that the witness told me would indicate that there was anything -- any foul play here with respect to that issue.

THE COURT: Okay.

MR. GIBBONS: Your Honor, just let me add, I think the Court hit it spot on on 701. These are my witnesses. I have no intention of eliciting from them what Mr. Loevy evidently is worried about, regurgitating facts that would stand for the truth of the matter asserted. No intention of doing that.

THE COURT: Okay.

Anything else on this?

MR. FLYNN: Yes, your Honor.

THE COURT: Yes. I'm sorry. I didn't know if you were finished. And I'll give you plenty of time. Go ahead.

MR. FLYNN: Putting the ASAs aside for a second and just what the detectives heard, we're all in agreement that we're not seeking to admit the police reports, we're not seeking to admit the ASAs' handwritten statements. And the

Court's already indicated that the Detective Mancuso, when he takes the stand, and perhaps other detectives, can get into the general substance of what he learned, the number of witnesses that he spoke to, the number that were telling him that they saw R.J. and saw Marcel. And those are undisputed facts.

But there's other information that they learned that's in our response with respect to the Malibu causing trouble around the park in the past and the rivalry between USDA and the Young Money Crew. That is also relevant, you Honor.

And again, we're not going to go in line by line and say, you know, what exactly did this witness say about that. But, generally speaking, Detective Mancuso should be able to explain that the moment that Mr. Brown came into the interview room, he already heard from witnesses about his gold Malibu causing trouble and about this rivalry between these two groups.

And why that's important to this case, as we saw with some of the videos yesterday that Mr. Loevy showed, as Mr. Brown is denying his knowledge that R.J. had a gun on the way to the park, they had this information from other witnesses that he wasn't just an innocent bystander, that this had been going on for some time -- the gold Malibu causing trouble and this rivalry between these two groups -- which informed Mr. Mancuso and the other detectives that what Mr. Brown was telling them was still probably a lie. The jury needs to hear

579

that information.

THE COURT: Okay. I'll give you the last word, and then we'll resume the testimony and I'll give you a ruling on this at lunch.

MR. LOEVY: Well, finishing up on the state's attorneys, if their only testimony is, I don't personally remember, but I would never take a coerced statement at the Chicago Police Department, so I know, therefore, I believe, then that would open a big door.

MR. GIBBONS: What door are you worried about?

MR. LOEVY: There's a lot of coerced statements going on in the Chicago --

MR. GIBBONS: Not for --

MR. LOEVY: Police Department.

MR. GIBBONS: These are --

THE COURT: Okay, not --

MR. GIBBONS: -- particular ASAs.

THE COURT: Not between the two of you. If you can direct your comments to me. I understand that you're -- that this is all very evolving.

MR. LOEVY: Yeah.

THE COURT: I'll let you finish, Mr. Loevy.

MR. LOEVY: So, I don't think that a witness who says, I don't remember this, but I really expect I wouldn't have taken a coerced statement. I don't think that's fair

testimony, and it's not fair in light of we would want to cross-examine that. So, we wouldn't -- you can't have it both ways.

They should allow us to cross-examine if they're going to have a state's attorney say that, that I know I would never coerce -- take a involuntary statement from a witness.

We were, I think, getting narrower until at the very end Mr. Flynn said, oh, by the way, we want to talk about some rivalry between these crews.

What I fear is if your Honor says, okay, well, we're going to draw the line here, and then they imply 20 people are saying there's a rivalry between these crews, that's made up.

There are two witnesses who are actual witnesses, Stanciel and Rufus McGee. Those two witnesses I'm not disputing, because they're going to testify or could testify. Those two. And, also, they're alleging that they were coerced.

There are two more witnesses, my understanding, saying it, neither of which gave a handwritten statement.

So, we do dispute that they should be able to say there's a rivalry between these crews. That's made up. There is no rivalry between these crews, and they should make a proffer what they're talking about.

THE COURT: Who is going to say there's a rivalry, or what's the basis for that assertion?

MR. FLYNN: There's two witnesses that spoke to the

detectives during the investigation.

MR. LOEVY: Who?

MR. FLYNN: Tytiana Williams. And the other name escapes me right now.

MR. GIBBONS: Your Honor --

MR. LOEVY: And there's no statement or GPR for those.

THE COURT: Can't talk over each other.

MR. GIBBONS: Your Honor?

THE COURT: Yes.

MR. GIBBONS: Your Honor, you asked the question. Eddie Stanciel's going to testify to that. He's their witness.

MR. LOEVY: Yeah, we're okay with --

MR. GIBBONS: In the deposition he said that.

MR. LOEVY: We're okay with Stanciel, I just said, because he's a witness in the case. And we're okay --

MR. GIBBONS: But Mr. Loevy said that's not a truthful statement. It is a truthful statement. Their witness has already admitted it.

MR. LOEVY: Yeah, our witness, Mr. Stanciel, says, I was coerced. There's no -- they're saying that there's other people who aren't saying they were coerced who said it, and that's what I'm saying doesn't exist.

And this person he just said, Tytiana Williams, there's no GPR. There's no handwritten statement. They can't

just say, someone told me that. There's no documents for that.

MR. FLYNN: See the report.

MR. GIBBONS: Your Honor, just one other thing, because you'll get to Eddie Stanciel. We obviously have a lot more knowledge than you do.

Eddie Stanciel, just so you know, gave a statement to the detectives, gave a handwritten, testified in Marcel's criminal trial, testified in front of the grand jury, all under oath, all consistent.

The first time he ever said that he was coerced was seven years later in 2015 under incredibly interesting circumstances. I would love to hear Mr. Stanciel explain how --

MR. LOEVY: That's part of the case.

MR. GIBBONS: -- he reversed his testimony.

THE COURT: So, look, on this rivalry issue, if I hear the parties saying that at least one witness who will be called in this case, Mr. Stanciel, or at least there's no dispute that at least one witness gives the parties some factual basis to believe that there was -- maybe "rivalry" is too strong a word, but I'm going to use it because the parties are using it, then you get some room on that.

But we're not -- the issues in this case are not about rivalries and what kids were doing what at what time, you know, at various points leading up to the events in question.

The claims at issue are what I want to focus on. And I'd like to get the directs of the witnesses moving toward those key points.

So, to answer the question about rivalry, if the witness Stanciel is -- and there isn't a dispute, will say some information about rivalries or disputes or whatever you want to call them, then there's -- then he has proffered a basis to say that there is -- there was a rivalry among these two groups.

I do not think that this should become a sideshow. I really think that we're talking about areas that are not particularly probative to the claims at issue. I don't expect there to be a long, drawn-out direct or cross on these topics. But it seems that there is some basis for, you know, believing or at least asking questions about a potential rivalry. And that will be it on the rivalry.

I'll look at the other matters with regard to the ASA, and I'll get you an answer to that after lunch, unless there's something else the parties wish to say that I haven't addressed.

MR. LOEVY: You know, I hope we're understanding each other, your Honor, but we don't -- haven't objected to Mr. Stanciel testifying to what he testified to. What our objection was, don't say other witnesses. He can't even remember their names.

THE COURT: Right. I get it.

584

MR. LOEVY: You know, there's another witness, I just can't remember their name, and I don't have a GPR.

Stanciel can be cross-examined. So, that's our point.

MR. FLYNN: Your Honor, with Mr. Mancuso on this point, what I need Mr. Mancuso to say, and what he should be able to say so jury understands this issue, is that he spoke to witnesses --

MR. LOEVY: Witnesses.

MR. FLYNN: -- who informed him of a rivalry.

I'm not going to say -- I don't need to get into every single statement that he heard from these witnesses. It's information Mr. Mancuso had before he ever met Mr. Brown.

THE COURT: Okay.

MR. LOEVY: That's exactly the problem.

THE COURT: So, here's the thing: If you believe that the answer to that question is supported by witnesses, plural, then you need to let Mr. Loevy know in advance, meaning at some point during the lunch break, or however you want to do it, who are the other witnesses who would provide a good-faith basis other than Stanciel, who is one witness?

MR. FLYNN: And Tytiana Williams.

MR. LOEVY: But --

THE COURT: But where in the --

MR. LOEVY: There's no GPR for Tytiana Williams.

MR. FLYNN: There is a report.

Brown - cross

585

THE COURT:  Then that's what needs to be exchanged between the parties.  Okay?

MR. FLYNN:  Thank you.

THE COURT:  All right.  And, then, we'll decide whether he can answer the singular or the plural.

MR. FLYNN:  Perfect.  Thank you.

THE COURT:  Okay.  Is the jury here?

All right.  The jury is here.

So, Mr. Brown.  If you can resume the witness stand.

(Jury in.)

THE COURT:  Good morning, ladies and gentlemen. Welcome back.  Thanks for your patience.  Please be seated.

Mr. Brown, you may be seated.  You remain under oath.

And Mr. Gibbons, you may continue with your inquiry.

MR. GIBBONS:  Thank you, your Honor.

MARCEL BROWN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. GIBBONS:

Q.  Good morning, Mr. Brown.

A.  Good morning.

Q.  Yesterday we broke, and I want to move ahead now to Wednesday, September 3rd, okay?

A.  Okay.

Q.  This is the day that the police came to your house and picked you up, right?

Brown - cross

586

A.   Yes.

Q.   Okay.  That was about four days after the shooting in Amundsen Park, right?

A.   I believe so.

Q.   Detective Weber was one of the detectives who came to your house?

A.   Yes.

Q.   And you knew Detective Weber, as you testified I think previously, from an incident that had happened at your mother's house, right?

A.   Yes.

Q.   And on direct, you testified that it was your preference to have been interviewed in your home.  Did I hear that right?

A.   Yes.

Q.   But Detective Weber persuaded you in some way to go to the police station, right?

A.   He put his hands around me and guided me.  He didn't persuade me.  He --

Q.   Okay.  And as he was guiding you, your mother said --

THE COURT REPORTER:  I'm sorry, Mr. Gibbons, I didn't hear the last part.

THE WITNESS:  I said "basically."  I'm sorry.

BY MR. GIBBONS:

Q.   And it was at that time your mother said, hey, Marcel, just go, right?

A.   Yes.   Because he didn't show any signs of stopping.

Q.   Okay.   And you listened to your mother and you went to the police station, right?

A.   Yes.

Q.   Okay.   In the day or days leading up to the police coming to your house, your mother and you had discussed what you should say to the police if they came and talked to you, right?

A.   She didn't discuss what I should say.   My mom only told me, if the police come, tell the truth.   You didn't do anything.

Q.   Okay.   And, then, when you got to the interrogation room, you didn't tell the truth, did you?

A.   I didn't want to be there because he forced me there.

Q.   My question is:   In the first 15 minutes of your interrogation, you didn't listen to your mom, you flat-out lied; isn't that true?

A.   I didn't flat-out lie.   I didn't tell the whole truth.   I said only one person was shooting when there was multiple people shooting, sir.

Q.   Is it your testimony you did not lie to the detectives in the first 15 minutes of that interrogation?

A.   I believe I only told them one person was shooting, sir. So, that was part of the truth.

Q.   Okay.   Let's go to the tape.

          MR. GIBBONS:   Maria, can you play.   Please --

          For the record, your Honor, we're going to be playing

PX 1, which is the first hour of the interrogation.  And it's been agreed to by the parties.

Also, I think next to Mr. Brown is PX 500, which is the transcript -- the agreed-upon transcript -- of the tapes we're going to be listening to.

BY MR. GIBBONS:

Q.  Mr. Brown, do you have that?  It's not your deposition.

MR. GIBBONS:  Your Honor, may I approach?

THE COURT:  Of course.

(Pause.)

MR. GIBBONS:  Okay.  Maria, can you please play 15:12:44 to 15:13:59, which is 73 seconds long.

(Said video was played in open court.)

MR. GIBBONS:  Can you continue to play that?

(Said video was played in open court.)

MR. GIBBONS:  Okay.  Can we put up now -- Exhibit PX 500, Page 5, please.

And, Maria, if you could zoom in on Lines 2 to 3 first.

BY MR. GIBBONS:

Q.  So, Mr. Brown, you were specifically told that you have the right to remain silent.  Do you understand that?

And you said, mm-hmm.

Do you see that?

A.  Sir, I didn't understand my rights at the time.

Q. Okay. So, when you said "mm-hmm," that's signifying you did not understand your right?

A. Sir, the detectives told me before that this is what he do to talk, this is like his formality. He didn't -- he basically said I just got to do this before we speak. He didn't break my rights down for me or make sure I really understood my rights.

Q. Okay.

A. He --

Q. But right here --

A. He didn't tell me I had a choice to talk. They was talking to me before. They put me in a police car, they was talking. He said it he when he got me. So, it wasn't, you have the right. He didn't break it down, sir. I didn't understand it.

Q. Okay. Would you agree with me that Detective Mancuso is breaking down your rights at this moment?

A. He's saying it, sir. But when I asked was I under arrest, he said this is something that I do to talk.

Q. Were you listening to him?

A. Not really.

Q. So, when you said "mm-hmm," you were saying mm-hmm to something you didn't listen to?

A. I was saying mm-hmm to a lot of stuff during this interrogation that's not true.

Q. But I'm only asking you about this question. When he said "you have the right to remain silent" and you said "mm-hmm,"

you weren't listening to him?

A.   No, because he said this is something he do to talk to me. So, I wasn't paying that any attention.

Q.   Okay.

MR. GIBBONS:  Maria, can we zoom in on Lines 8 to 11, please.

BY MR. GIBBONS:

Q.   Mr. Mancuso continued and he said to you, Marcel:  Do you understand you have a right to talk to a lawyer before we ask you questions and have him with you during the questioning? Understand?

Mr. Brown:  Mm-hmm.

Do you see that?

A.   I see it.

Q.   And is it your testimony you didn't listen to that one either?

A.   I was back to just, like he said, this is something I do to talk.

Q.   You know what a lawyer is, right?

A.   I didn't understand what a lawyer was at that point, sir.

Q.   You're an 18-year-old graduate from Oak Park-River Forest and you didn't understand what a lawyer was?

A.   Sir, I didn't study law.

MR. GIBBONS:  Maria, could you focus in on Lines 14 and 15, please.

BY MR. GIBBONS:

Q.   You were specifically told by Detective Mancuso the following, were you not:  That if you cannot afford or otherwise obtain a lawyer and want one, a lawyer will be appointed for you and we will not ask you any questions.  Do you understand that?

            Mr. Brown:  Mm-hmm.

            Did you not listen to that one either?

A.   Sir, going back to your same question, like I said before, he said this is a formality for him to talk to me.  I didn't understand it, sir.

Q.   So, when he specifically asked you the words "do you understand that," and you said "mm-hmm," you didn't say, hold on, I don't understand that?

A.   Sir, if I understood what he was saying, I would have remained silent, when he said that at the top.  I didn't understand that.  I would have never talked to him.

            MR. GIBBONS:  Maria, if we could focus in on Lines 17 to 19.

BY MR. GIBBONS:

Q.   Detective Mancuso then says:  All right, cool.  Do you want to talk about this situation?

            Mr. Brown:  I can.

            Do you see that?

A.   Yes, sir.

Brown - cross

592

Q.   No coercion was put on you in these first few minutes in the interrogation room to say, I can, I will talk to you, right?

A.   It happened over 34 hours, I believe, sir.

Q.   Okay.  We're going to get there.  We're in the first minutes right now.

Nobody's coercing you at this moment to talk to them, are they?

A.   Sir, I didn't want to be there.  They forced me to go.

Q.   I know you didn't want to be there.  But I'm asking a very specific question.  At this time in the interrogation room, seconds into the questioning, nobody was coercing you, right?

A.   I didn't understand my rights, sir.  So, no.

Q.   You didn't understand the right not to talk to the detective?

A.   No.  I didn't think I had a choice.

MR. GIBBONS:  Okay, Maria, can we move ahead now and play, still in the first hour, 15:15:53 to 15:17:32, which is about a minute and 45 seconds.

(Said video was played in open court.)

MR. GIBBONS:  Thank you.

BY MR. GIBBONS:

Q.   Mr. Brown, just for the record, we are in about the third or fourth minute of your questioning, okay?

A.   Okay.

Q.   You agree with that?

A.   Okay.

Q.   Okay.

          MR. GIBBONS:  Maria, can we put up Page 9, please.

          And if we could focus down towards the bottom,
starting on Line 18.

BY MR. GIBBONS:

Q.   Mr. Brown, during this snippet we just watched, you say:

          Mr. Brown:  So, we got back up there.  We came back up
there?

          Do you see that?

A.   Yes.

Q.   Who is the "we" that you were referring to there?

A.   Sir, I was lying.

Q.   You were lying in minute 3 here?

A.   Yes.

Q.   So, you're telling us that you and R.J. didn't circle the
park in the gold Malibu prior to the shooting?

A.   Sir, there's no way to circle the park.  The park is only
on a one-way street.

Q.   It's actually got three streets, right?  You can't circle
it on the north, right?

A.   Sir, you can't circle the park.  It's impossible.

Q.   Right.  Okay.  Let me rephrase the question.

          Are you saying you and R.J. did not go by the park

before the shooting?

A.   I don't believe R.J. was in the car with me that day, sir.

Q.   When you said "we were coming back," what did you mean?

A.   I just told you I was lying, sir.

MR. GIBBONS:   Maria, could you now go to Page 10, the next page, please, and focus at the top, please.

BY MR. GIBBONS:

Q.   At the top, Mr. Brown, it says, Detective Mancuso -- excuse me, Detective McDonald says:   Okay, well, we can try and figure -- do you know who Day-Day is related to or anything?

Do you see that?

A.   Yes.

Q.   You're talking about Day-Day, right?

A.   Yes.

Q.   You knew Day-Day prior to the shooting, right?

A.   Yes.

Q.   One of the boys you had gotten into a little bit of a fight with before, right?

A.   I was 15.  Me and him was friends then.  I think I was 15, 14.  It wasn't prior to this, sir.

Q.   But you and Day-Day had a couple of fist fights, right?

A.   We was hanging together when we fought, sir.

MR. GIBBONS:   So, now if we go to the bottom, Maria, down to 18, because we're talking about Day-Day.

BY MR. GIBBONS:

Q.   Mr. Brown, you then said, quote:  So, he was with, like, 30 dudes.

     Do you see that?

A.   Yes, sir.

Q.   You're telling the detectives that Day-Day was in the park with 30 of his dudes, right?

A.   I said 30 dudes.  I didn't say 30 of his dudes.  I said like 30 dudes.

Q.   When you said "30 dudes," what did you mean?

A.   He said who he was with and I said who he was with.

Q.   True?

A.   He was with 30 dudes, not 30 of his dudes.  I don't know what you trying to get into.

Q.   I'm just asking you if this is a lie or the truth.  Was Day-Day with 30 dudes?

A.   It was 30 dudes behind that fieldhouse, sir.

Q.   Now, yesterday you testified that you never saw Day-Day in the park on August the 30th, right?

A.   Yes.

Q.   That's true, right?  You never saw him?

A.   I never seen him.

Q.   So, when you told the detectives that you saw Day-Day in the park with 30 dudes, that's a lie?

A.   I believed Day-Day was back there because my cousin told me that was who was shooting at him.  There was shots being fired

from back there, sir.

Q. So, you don't think you lied to the detectives there?

A. I lied, but off the circumstantial evidence, I believed it was Day-Day, sir.

Q. Okay. Let's move down the page.

MR. GIBBONS: Maria, if you could focus in on Line 22 and 23, please.

BY MR. GIBBONS:

Q. 22, Mr. Brown, you say: Day-Day tell all his people to get in position.

Do you see that?

A. Yes.

Q. Was that a lie?

A. Yes, sir.

Q. You never heard Day-Day say anything --

A. I never seen Day-Day, sir.

Q. And you never heard Day-Day say anything to anybody, right?

A. No, sir.

Q. You made up this whole thing about getting in position, right?

A. Yes, because I didn't want to be there, and they kind of forced me there. So, I was giving the runaround.

Q. These were your words, get in position, right?

A. I just told you it was a lie, sir.

Q. But the detectives did not plant these words in your head,

right?

A.   They planted some other words in my head.

Q.   We're going to get to that later.  I'm here in minute 4.

Did they plant the words "Day-Day say to his boys get in position"?

A.   They didn't plant that part, sir.

Q.   Okay.

MR. GIBBONS:  Maria, could we put up Page 11, please.

BY MR. GIBBONS:

Q.   Mr. Brown, there's this following question and answer with you and the detectives.

Mr. Brown -- on Line 2:  And, then, he starts shooting.

Who did?

Day-Day.

Do you see that?

A.   You said page 11.  I don't see that on Page 11.

Q.   Okay.  Go to the top of Page 11.

A.   I'm at the top of Page 11, sir.

Q.   And starting on Line 2, do you see that?

A.   No.

THE COURT:  You may approach if --

MR. LOEVY:  It's on the screen, too, your Honor.

MR. GIBBONS:  It's on the screen.  Do you want to follow on the screen?

THE WITNESS:  You was confusing me.

MR. GIBBONS:  Thank you, Jon.

BY MR. GIBBONS:

Q.  Okay.  It's on your screen.  Do you see that, Page 11, Line 2?

A.  Yes.

Q.  Mr. Brown:  And, then, he starts shooting.

Detective:  Who did?

Day-Day.

Day-Day?

Yeah.  The little black dude.  Then he was shooting, like ducking behind the wall over there by the playground, got back over there and starts shooting.

Do you see that?

A.  Yes, sir.

Q.  That's a lie?

A.  Yes.  Day-Day was never by the playground, sir.  That's where R.J. was.

Q.  You don't know where Day-Day was because you didn't see Day-Day, right?

A.  I believed Day-Day was the person standing behind the fieldhouse because R.J. said that he was at shooting at him, sir.

Q.  At this point, you are trying to deliberately lay this on Day-Day, right?  This shooting, right?

A.   They trying to deliberately lay it on someone else.

Q.   You were saying this to the detective here in minute 4 or 5 to protect your cousin R.J., right?

A.   I didn't want R.J. to get in trouble because at that time I didn't believe R.J. killed Paris Jackson.

Q.   You were giving this set of lies to protect your cousin?

A.   Everything's not a lie, sir.  Someone else was shooting.

Q.   You were giving this specific set of statements to protect your cousin R.J., right?

A.   I didn't want him to get in trouble.  So, I wasn't protecting him.  I just didn't want him to get in trouble.

Q.   And you're laying the shooting on Day-Day, right?

A.   Because I believed that it was the other guy that was shooting.

Q.   But you never said R.J. was shooting, right?

A.   They never said Day-Day was shooting.

Q.   You're laying a murder rap on Day-Day, aren't you?

A.   I was laying it on the person I believe was the other guy shooting.

Q.   Pretty horrible thing when you're not an eyewitness to say you saw somebody shoot where the body ends up dead, isn't it?

A.   I don't believe the body ended up dead out there, sir.

Q.   This was a pretty calculated lie here in the minutes -- early minutes of your interrogation, wasn't it?

A.   It wasn't calculated, sir.  I just was making it up.  I

didn't want to be there at that moment.

Q. Detectives didn't suggest to you at all that Day-Day was the shooter, did they?

A. Later on when they suggested that he wasn't the shooter.

Q. I'm asking about this specific early exchange in the first minutes of your interrogation --

A. But you just said the detective did.

Q. Let me finish the question.

A. And I just answered your question to the best of my knowledge.

Q. Okay. We have to not talk over one another. So, let me try to finish my question --

A. Okay.

Q. -- and then I'll give you all the time you want to answer, okay?

A. Okay.

Q. Okay.

So, the detectives did not suggest in these early minutes that Day-Day was the shooter. Wouldn't you agree with that?

A. They asked me what happened, sir. I told them.

Q. My question is different. The detectives did not put this thought that Day-Day was the shooter in your head, did they?

A. No.

Q. Now, in this statement here, you're putting Day-Day behind

the wall by the fieldhouse; is that right?

A.   I said the wall by the playground, sir.  It's right there.

Q.   The wall by the playground?

A.   It's not a wall by the playground, sir.

Q.   Well, when you said on Line 7, "ducking behind the wall," what wall were you referring to?

A.   I was lying, sir.  You can clearly see.  It was never a wall by the playground, sir.

Q.   Okay.  That's a lie?

A.   Yes.

Q.   All right.  Let's continue on the same very page, starting on Line 9.  This is you speaking, Mr. Brown:  Then Edward ran toward him.  I thought Edward was trying to get a gun from him and come back shooting.  I got in my car.

Do you see that?

A.   Sir, I was lying.  You can clearly see it was a lie.

Q.   Well, you say it's clear it's a lie.  We're in the early minutes of the interrogation.  Do you think these detectives knew you were lying?

A.   They did some lying, too.

Q.   That's not my question, sir.  My question is, in early minutes of the interrogation, you're now confessing that you lied.  My question to you is, did these detectives know you were lying?

A.   Sir, I'm not confessing to anything because I just told you

it was a lie.  So, it's not like a confession.

Q.   Okay.  Do you have any indication that you believe these detectives knew you were lying?

A.   I don't know what they -- I don't know their thoughts at that time, sir.  So, I can't give you answer.

Q.   The truth is, you never saw Eddie Cane in the park that night, right?

A.   No, I never seen him, sir.

Q.   You never saw Eddie Cane run towards Day-Day?

A.   No, sir.

Q.   Yet you're trying to implicate Eddie Cane in all of this by saying you thought he was going to get a gun, right?

A.   That's what I said, sir.  I wasn't trying to implicate anybody.  I just wanted to go.

Q.   No detective ever tried to put into your head that Eddie Cane was involved; isn't that true?

A.   No.

Q.   In fact, did you know that Eddie Cane had already given a statement to the police days earlier?

A.   No.

Q.   Finishing up on Page 11, at the bottom, specifically starting on Line 20.  Are you with me?

A.   Yes.

Q.   Detective McDonald:  How about T.J., did he have a gun? Did he do any shooting?

No.

How about R.J.?

Nope.

A lie?

A.   I just told you that.

Q.   It's a lie, right?

A.   Yes.

MR. GIBBONS:  Maria, can you put up Page 13, please.

BY MR. GIBBONS:

Q.   Specifically, Mr. Brown, I'm going to refer to Lines 10 to 15.

Detective Mancuso:  Could R.J. have had a gun?

Mr. Brown:  He didn't have no gun.

Detective Mancuso:  No, but could he have, right?

Mr. Brown:  If he had one or we got pulled over soon as we left and they stretched us out and searched the car and let us go.

Did I read that right?

A.   Yes.

Q.   The first part is obviously a lie when you said R.J. didn't have a gun, right?

A.   I never seen R.J. with a gun, sir.

Q.   You said R.J. did not have no gun, right?

A.   Yes.

Q.   You knew he had a gun because R.J. admitted to you he had a

gun.  He admitted to the family he had a gun, right?

A.  That was afterwards.  You talking about at that moment I didn't know he had a gun.

Q.  We are afterwards now.  We're in the interrogation room. You've already had these admissions made by R.J.  You knew he had a gun.

A.  He was shooting, yes.

Q.  Not talking about shooting.  I'm talking about having a gun.

A.  At the park, yes.

Q.  Okay.  That's a lie, right?

A.  Yes.

Q.  You also then continue on here and you tell the detectives that you and R.J. were pulled over soon as you left the shooting, the car was searched and no gun was found, right?

A.  Yes.

Q.  That's a lie, right?

A.  Yes.

Q.  You had dropped off R.J. at the White Castle, right?

A.  Yes.

Q.  You were thinking pretty clearly here, right?  You're weaving in the police stop into this whole made-up weave of lies, aren't you?

A.  It wasn't lies, sir.  Someone else was shooting, too.  It wasn't just him.

Q. Not the question, Mr. Brown.

You were smart enough to weave in this police stop to try to show that the cops stretched you out, no gun was found, therefore R.J. couldn't have had a gun.

A. It wasn't I was smart enough. I just told him that. I can't tell you because I was smart enough.

Q. You agree with me, would you not, that no detective had ever mentioned a police stop of your vehicle prior to you offering up that little tidbit?

A. I told him I got pulled over, yes.

Q. I'm sorry?

A. Yes.

MR. GIBBONS: Maria, can we move over to Page 15, please, and focus in beginning at Line 13, please.

BY MR. GIBBONS:

Q. Mr. Brown, I'm on Page 15, starting on Line 13. Are you with me?

A. No.

Q. No?

A. There it goes.

Q. Okay. It's on your screen.

Mr. Brown: They ain't say -- nobody said Day-Day was shooting?

Detective Mancuso: No.

Detective McDonald: Nope.

Mr. Brown:  That's who was shooting.

Detective Mancuso:  But it's --

Detective McDonald:  Because the funny thing is, we've got a whole bunch of people saying R.J. was shooting.

Do you see that?

A.  Yes.

Q.  First off, Day-Day wasn't a shooter, that you knew of, right?

A.  I believed Day-Day was shooting, sir.

Q.  Okay.  But you don't know that, right?  You didn't see it?

A.  R.J. told me he shot at him.

Q.  Okay.  Detective McDonald is telling you here that they have a whole bunch of witnesses saying R.J. was the shooter, right?

A.  Yes.

Q.  This is in the first minutes of your interrogation, right?

A.  Yes.

Q.  And Detective McDonald is being honest with you, right?

A.  No.

Q.  You think he's lying about the fact that they have witnesses that R.J. was the shooter?  You knew that to be true.

A.  R.J. wasn't the only shooter, sir.  So, I don't know what he had.  I can't tell you his investigation, sir.

Q.  He's just saying that R.J. was a shooter, and you knew that to be true at this moment; did you not?

A.   Yes.

          MR. GIBBONS:  Maria, can we move to Page 17, please.

BY MR. GIBBONS:

Q.   Are you there?  We're going to be at Page 17, Line 17:

          Mr. Brown:  Everybody ran when Day-Day said "get in position."  That's when they ran.

          Detective McDonald:  See, because nobody else heard that.  A lot of people heard --

          Mr. Brown:  That's their park.

          Do you see that?

A.   Yes, sir.

Q.   When you said "that's their park," who is the "their" you're referring to?

A.   Those girls.

Q.   It was the girls' park?

A.   That's who they was getting statements from, sir.

Q.   It wasn't Young Money's park.  It wasn't Day-Day, Rufus and Eddie Cane's park.  Is that what you're telling us?

A.   Eddie Cane is not Young Money.  Day-Day's not Young Money, sir.

Q.   It wasn't their park that you were referring to there?

A.   Only Rufus is Young Money, sir.

Q.   Was it -- when you were referring to --

A.   I was talking about the girls.  That's the only people I know the police grabbed.

MR. GIBBONS: Maria, can you now play 15:22:57 to 15:23:30, please.

(Said video was played in open court.)

MR. GIBBONS: Thank you, Maria.

This is on Page 18 of the transcript. If we can have that put up, please.

BY MR. GIBBONS:

Q. Detective McDonald tells you: Well, we know everybody who was there. We know who was doing the shooting. Now we got to figure out is just how involved you are in this. You drove up there with R.J. and you drove away with R.J. Now what we've got to figure out is, did you know R.J. was going to do any shooting? Did you know R.J. had a gun even? Because if you didn't, then things get handled one way. If you did, then things get handled another way. You can be accountable for him.

Do you see that?

A. Yes.

Q. You've been in the interview room for about ten minutes now?

A. Yes.

Q. You understood the detectives are trying to figure out how involved you are in this shooting, right?

A. I didn't understand that, sir.

Q. Okay. He's telling you right here at the beginning of this

interview, they want to know what you, Marcel Brown, knew about the gun. That's what he told you, right?

A. I mean, you look on the next line, sir, I told them I ain't know nothing.

Q. I understand that. But they --

A. Why didn't he take that as true?

Q. They were telling you they want to know your knowledge, right?

A. And I gave them answers, sir.

Q. They told you very specifically, Marcel, you could be accountable if you knew R.J. had a gun.

A. And I told him, sir, very specific, I didn't know he had anything.

Q. I appreciate that. But they were telling you the potential consequences of your knowledge of the gun right here at the beginning of the interview, right?

A. And I told them at the beginning of the interview, sir, I didn't know he had anything.

MR. GIBBONS: Okay. Maria, can we put up Page 23, please.

BY MR. GIBBONS:

Q. Specifically, Marcel, I'm going to be reading from Lines 8 to 12. Are you there?

A. Yes.

Q. Okay.

Brown - cross

610

Detective McDonald:  We've got too many people telling us -- telling us --

Mr. Brown:  I know.  That's their hood.

Detective McDonald:  What happened, including --

Mr. Brown:  It's, like, their area.

Did you see that?

A.  Yes.

Q.  When you said it's their hood, their area, what did you mean?

A.  I'm talking about the girls, because I believe at that time that's the only person that they got statements from.  And all of 'em family.  That's --

Q.  How did you know they had statements from the girls?

A.  Because the police was going around.

Q.  So, you knew they had statements from the girls, but you didn't know they had a statement from Eddie Cane?

A.  No.

Q.  What other statements did you know about?

A.  Somebody getting stabbed.

Q.  Sorry?

A.  Somebody getting stabbed.

Q.  No, no, I'm not asking about the stabbing.  I'm asking, in relation to your last answer, what other statements did you know the police had?

A.  Just the statements on the girls and the stabbing.

Brown - cross

611

Q. Anybody else?

A. No.

Q. So, when you are saying their hood, their area, you're talking about the girls. What girls?

A. The girls Taneshia and them were arguing with.

Q. What girls?

A. I don't know all the girls.

Q. You don't know any of their names?

A. Marisol. I don't know the rest of them.

Q. But you were not talking about the guys, huh?

A. No.

MR. GIBBONS: Maria, can we move over to Page 27, please.

BY MR. GIBBONS:

Q. Mr. Brown, I'm going to ask you specifically about Lines 9 to 13.

Detective Mancuso: What are they saying?

Mr. Brown: That we shot Paris. How we gonna shoot -- come on, man. Paris was cool with me. Day-Day was shooting a gun and shot Paris. That's what happened.

Did I read that correctly?

A. Yes, sir.

Q. When you say "come on, man," what did you mean?

A. I didn't shoot nobody.

Q. Are you insinuating the detectives are being stupid?

A.   Can you play the video so I can get a better understanding, because you confusing me?

Q.   I'm just asking your memory.  Were you trying --

A.   Can you play the video and I can give you a better memory?

Q.   Sure, we can play the video, if it will help you understand it.

A.   At that part.

Q.   Sir?

A.   What you trying to ask, yes.

Q.   What?

A.   What you're trying to ask, yes.

        MR. GIBBONS:  Maria -- it may take us a second to get it.  It's around 15:29:00 to 15:29:45.

    (Said video was played in open court.)

        MR. GIBBONS:  Okay, Maria.  Thank you.  We just covered it.

BY MR. GIBBONS:

Q.   That help you, Mr. Brown?

A.   Yes, sir.

Q.   When you said, like my kids say to me, "what up, man" --

A.   I didn't say "what up, man."  I said --

Q.   Disrespectful?

A.   I wasn't being disrespectful.  I said, come on, man, we didn't shoot Paris.  That's what I said.

Q.   Okay.  So, you continue on in that sentence after you say:

Brown - cross

613

Come on, man, Paris was cool with me.  Day-Day was shooting a gun and shot Paris.  That's what happened.

See that?

A.  Yes.

Q.  That's a lie, right?

A.  I don't know if it's a lie, sir.  There was a lot of shots. We left, too.

Q.  You never saw Day-Day, you don't know if Day-Day shot Paris, that's a lie, right?

A.  I don't know who shot Paris, sir.

Q.  Correct.  You don't know who shot Paris.  So when you tell the detectives Day-Day shot Paris, that's a lie?

A.  He may have shot him.

Q.  Not what you said there.

A.  I'm telling you he may have shot him.  He was shooting. So, he may have shot him.

Q.  You don't know that he was shooting.  You didn't see him.

A.  One of them was shooting.

MR. GIBBONS:  Maria, can we go to Page 38, please.

BY MR. GIBBONS:

Q.  I'm going to concentrate on just two sentences, 11 and 12, middle of that page.  Are you there?

A.  Yes.

Q.  Line 11 and 12.

Mr. Brown:  I seen Day-Day shooting and I ran to my

car.

Do you see that?

A. Yes, sir.

Q. Bald-faced lie, right?

A. I seen someone shooting, sir, and I believed it was Day-Day, sir. So.

Q. So, when you say to the detectives, I seen Day-Day shooting, that stands for the proposition that you said somebody shooting?

A. Well, I'm telling you from the circumstantial evidence R.J. said Day-Day was shooting at him, I seen someone shooting, so I believed it was Day-Day, sir.

Q. Mr. Brown, I'm just asking if you said you saw it.

A. Saying it's a lie. It's not a lie. I seen someone shooting, sir.

Q. It's your testimony that this is not a lie to the detectives?

A. I seen someone shooting. Parts of it a lie, but the whole thing's not a lie.

Q. You're putting yourself in a position as being an eyewitness against Day-Day being a shooter in the park; are you not?

A. I never known -- if I was a eyewitness, they could have just talked to me at my house.

MR. GIBBONS: Maria, can we move over to Page 45,

please.

BY MR. GIBBONS:

Q.   Mr. Loevy played this snippet yesterday, so I kind of want to go over it.

At the top it says:

Detective McDonald:  What you think I want to hear, I don't want you telling me something down the line just because, well, if I tell the detectives that, he's going to shut up.  I want you to tell the truth.  Right now I don't think you're telling the truth.  I'll tell you that straight out.  You know why I don't think you're telling the truth?  Because I've got too many people telling me something else, including asking them, and you think -- it's not like we've done this -- haven't done this before.

Mr. Brown:  I know you're only going off of what you hear.

Did I read that right?

A.   Yes, sir.

Q.   You agree with me Detective McDonald was telling you something you already knew to be true, right?

A.   He's only going off what he probably heard there was only one shooter.  And I told him Day-Day was shooting, so he heard something else now.

Q.   He's telling you that he knows you're lying about R.J. not being a shooter, right?

A.  He's telling me that I'm lying about someone else shooting, too.

Q.  And you knew he was telling the truth because you knew R.J. was a shooter.

A.  He wasn't telling the whole truth, sir, because he only want to make R.J. as the shooter, no one else.

Q.  You're lying about the R.J. part still here, right, in the interrogation?

A.  Can you play the video and refresh --

Q.  No.

A.  -- my memory?

Q.  Are you still lying early in the interrogation?

A.  I'm not gonna answer something that I don't see the question to.

        MR. GIBBONS:  Okay, Maria, play -- let's play 15:51:44 to 15:52:55, please.  One minute, 11 seconds.

    (Pause.)

        MR. GIBBONS:  Maria's got a lot of pressure under her.

        If you could play, Maria, please, 15:51:44 to 15:52:55, please.

    (Said video was played in open court.)

        MR. GIBBONS:  Thank you, Maria.

BY MR. GIBBONS:

Q.  First, this is Detective Weber, right?

A.  Yes.

Brown - cross

617

Q. And this is the detective we talked about earlier who came to your house and you knew from a previous experience, right?

A. Yes.

Q. Okay. And he hands you a water here in the 39th minute of your questioning, right?

A. Yes.

Q. Okay. Did you think that Detective Weber would be friendlier to you because of your prior experience with him?

A. A little bit.

Q. Okay. And you're complaining here, my words, saying here to Detective Weber that the other detectives are trying to make you see something, see R.J. as the shooter, right?

A. No. The other detectives trying to make me see R.J. shooting, not as a shooter. See him shooting.

Q. Okay. First, Mr. Loevy asked you questions about the position of Detective Weber on direct examination. Remember those questions?

A. What do you mean about the position?

Q. So, Detective Weber enters the room. He sits on the bench next to you. Do you see that?

A. Yes.

Q. You're not feeling intimidated here, right?

A. When he asked me that question, I believe Weber had his foot cocked up on the bench, like blocking me in.

Q. Okay.

A.   I believed it wasn't at this part, sir.

Q.   Okay.  Maybe I misrecollected.

A.   Yes.

Q.   But here you're not feeling intimidated by Detective Weber, right?

A.   Nah.

MR. GIBBONS:  Let's put the transcript up, Page 54, please.

BY MR. GIBBONS:

Q.   And, specifically, on Line 14 -- are you there?  It's on your screen.

A.   I don't see 14.

Q.   Page 54, Line 14.

A.   I don't see it on the screen.  I see it now.

Q.   You see it now?

A.   Yes.

Q.   Thank you.

Mr. Brown:  They're trying to make me see R.J. shooting.  When I seen Day-Day shooting, I took off, ran to my car.

Do you see that?

A.   Yes.

Q.   Now, you never explained to Detective Weber that you didn't actually see R.J. shooting, but you know he was a shooter because of his admissions later to you, right?

A.   I was answering their question that did I see R.J.  They didn't ask me what R.J. told me.  They asked me did I see R.J., so I answered their question, sir.

Q.   Being very careful to listen to the exact words of their question and only answer that exact question, Marcel?

A.   That's all they asked me, did you see him shooting?  I didn't see him shooting.

Q.   And you never offered up, well, I didn't see him see him, but he told me he was the shooter?

A.   What I'm offering up some -- I'm just telling you what they asked and I gave an answer.

Q.   But you did offer up something else, didn't you?  What you offered up is right there on Line 15, which is, quote:  When I seen day shooting.  You offered that up, right?

A.   Because I seen someone shooting, sir.  So, I didn't offer it up.  I told the truth that I seen someone shoot, and I believed it was Day-Day at that time.

Q.   This is your definition of the truth, this statement:  "When I seen Day-Day shooting," that's what you're saying is the truth?

A.   It was someone else shooting, sir.  I seen someone shooting.

Q.   I didn't ask that question.  Is your definition of the truth this statement:  When I seen Day-Day shooting?

You're saying that's truthful?

Brown - cross

620

A.   It was part of my truth because someone told me it was Day-Day shooting.  I seen a guy shoot.

MR. GIBBONS:  Maria, can you put up Page 55, please.

BY MR. GIBBONS:

Q.   On the top there, concentrating on Lines -- well, we'll start at the top.

Detective Weber:  That's basically the question.

Mr. Brown:  If R.J. was shooting, I didn't see it. I'm saying if he was shooting, I didn't see him shoot.  From my eyes what I seen when Day-Day shot, that's what I seen.

Did I say that right?

A.   Yes.

Q.   That's still your version of the truth to the detectives?

A.   I just told you that's my version of the truth.  It's basically what happened.  I never seen R.J. shoot.  If he was shooting, I didn't see it.  I seen someone else shooting, sir. And I believe at that time Day-Day was shooting.

Q.   I hear that.  You never said any of that to the detectives, right?

A.   I just said it right here.

Q.   "When I seen Day-Day shooting," that's what you told them, right?

A.   You said something about R.J. and Day-Day, and I just summed the whole thing up right there.

Q.   And, then, here we go on Line 9:

Detective Weber: But if you're lying, you know that you're trying to-- they know that you're trying to hide something.

Mr. Brown: But I ain't lying, though.

Is that what you told them?

A. I wasn't lying. I didn't see R.J. shooting.

Q. Are you lying about lying?

A. How I'm lying about lying? I didn't see R.J. shooting. If you go up, that's what I just said. And I told 'em I didn't see R.J. shooting. They want me to see R.J. shooting. I never seen him shoot.

Q. You want to keep concentrating on R.J. You got a whole other thing you're lying on somebody else. You're lying a lot on Day-Day, right?

A. Because I believed Day-Day was the other guy shooting. I'm not laying it on just him. If you see, I said if R.J. was shooting, I didn't see R.J. shoot.

Q. Yeah, we've already covered this. You didn't see Day-Day at all in the park that night, right?

A. You don't to yell, sir. But you said I'm trying to lay it just on Day-Day. I said, if R.J. was shooting, I didn't see him. I didn't say, no, R.J.'s not shooting; only Day-Day was shooting. I said, if R.J.'s shooting, I didn't see him.

MR. GIBBONS: Maria, let's go to the second hour here, move ahead.

Can you put up Page 57, please.

BY MR. GIBBONS:

Q. Mr. Loevy covered this the other day. I'm not going to play the snippet again. But we see on the bottom of Page 57, Line 20 --

MR. GIBBONS: Maria, if we can go to 57, move down to Line 20.

Okay. Right there.

BY MR. GIBBONS:

Q. Mr. Loevy showed this the other day. This is Detective Mancuso entering at 1600. Do you see that?

A. Yes.

Q. Okay. That's 4:00 p.m., which is now about 48 minutes into this interview. Are you with me?

A. Yes.

Q. Okay.

MR. GIBBONS: Maria, could you please play 16:12:03 to around 16:12:25.

(Said video was played in open court.)

BY MR. GIBBONS:

Q. Okay. You're talking to Detective Mancuso here, right?

A. Yes.

Q. Starting to modify your story a little bit?

A. I was still telling him what I seen.

MR. GIBBONS: Can we go to Page 62, please.

BY MR. GIBBONS:

Q.   On Lines 13 to 15, you say the following, do you not, Mr. Brown:

        Mr. Brown:  I don't know if he shot or not.  I don't know if he shot or not.  But I'm telling you I seen Day-Day shooting.

        Did you say that?

A.   Yes.

Q.   Okay.  On Line 23, did you say again -- or let's start on 22:  But if they say he shot back, that Day-Day shot, that's what I seen.

        Did I read that correctly?

A.   Yes.

Q.   How many times did you repeat to the detectives that you seen Day-Day shoot?  50, hundred times?

A.   Sir, it was another person shooting, and at that time I believe it was Day-Day.

Q.   How many times did you tell him you witnessed Day-Day as the shooter?

A.   Sir, you're not playing the video, so I'm not able to count.

Q.   Again, no detective planted in your head, hearing hour two, that Day-Day was the shooter, right?

A.   I told them that he was shooting because I believe someone else was shooting, sir.

Q. Yeah, you've said that. I'm asking you a different question.

My question is: Did any detective plant in your head that Day-Day was the shooter?

A. I just told you, I said it.

Q. Not my question. Listen to my question.

A. If I said it, they didn't plant it in my head, sir.

Q. Thank you. That was my question.

There on Lines 19 to 21 you say -- well, Detective Mancuso asked you: Is it possible, is it possible that R.J. could have been a shooter?

You say: I don't know. Probably.

Do you see that?

A. Yes.

Q. It's a lie?

A. I said probably. So, it's not a complete lie, sir.

Q. It's a complete lie. R.J. had already told you he was the shooter. He clapped back. Told you that getting in the car. Told the family that at the family meeting.

A. Yes.

Q. You knew R.J. was the shooter. That's a lie, right?

A. Yes, I knew R.J. was the shooter.

Q. That's a lie, right?

A. Telling you what I seen. If you read it, I say, but I'm telling you what I seen. So, I'm only telling him what I seen.

Q. The question is simple. Was that a lie?

A. I said probably not. I'm telling you what I seen. So, it was no lie. I only told him what I seen.

Q. So, when you say --

MR. LOEVY: Objection. Asked and answered, your Honor.

MR. GIBBONS: He's not answered the question.

THE COURT: Sustained. He answered it earlier.

MR. GIBBONS: Okay.

Maria, let's play 16:19:45, please, to 16:19:59 or thereabouts.

THE COURT: Just to level set on expectations here, we started at about 9:45. So, we'll take our break at 11:00. So, another 20 minutes or so we'll take our break, thereabout.

Unless -- I should ask, if any of the jurors need a rest break, I'm happy to give it to you now. I certainly don't want to push you if you need to take a break. So, now would be a good time to tell me if anyone does. Feel free to raise your hand. There's no shame in it at all.

Okay. We'll go for another 20 minutes or so.

MR. GIBBONS: Thank you, your Honor.

Maria, play, please, 16:19:45 to around 16- --

(Said video was played in open court.)

BY MR. GIBBONS:

Q. All right. We have the same issue here, right? You're

Brown - cross

626

using the word "probably," and you're saying that that was a truthful statement in your mind?

A. Which part, sir?

Q. Well, let's just specifically look at it.

On Line 4, are you there on Page -- sorry.

A. I don't see anything.

Q. We'll get there.

A. Okay.

MR. GIBBONS: Transcript page 71, please, up at the top, Maria.

BY MR. GIBBONS:

Q. Are you there, Mr. Brown?

A. Yes.

Q. Okay. Line 4, Detective Mancuso: Okay. Let me just ask this: Is it possible R.J. could have had a gun with him that night?

Mr. Brown: Probably.

See that?

A. Yes, sir.

Q. We're back to the same semantical game. You're saying "probably" when, in fact, you knew he had a gun, right?

A. I didn't know he had a gun when he got in my car, sir.

Q. That wasn't the question. Question was, is it possible R.J. could have had a gun with him that night?

MR. LOEVY: Objection.

BY MR. GIBBONS:

Q.   He never asked about the car.

          MR. LOEVY:   Objection, your Honor.   He's talking about in Line 1 through 2 about when he shot.

BY MR. GIBBONS:

Q.   I'm going to ask the question.   Here's the exact question --

A.   You have a thing of not getting the whole context.   You just get this little part.   So, I don't know where my mind's at, and you trying to trip me up.   So, just play the video.

Q.   I'm not trying to trip you up.   We just played the video.

A.   But you going back and you not trying to get the whole context.   You go to this little part.   Then you don't go to the lines before.

Q.   Let's put aside any context.   If you said to the detectives at any time that R.J. probably had a gun, would you agree with me that's a lie?

A.   He had a gun that night.   So, I won't agree that it's a lie.

Q.   Okay.   You testified on direct that there were periods of time that you were left alone; is that right?

A.   Left alone, when?

Q.   In the interrogation room.

A.   Yes.

Q.   And, in fact, there were many, many hours you were left

alone; is that fair to say?

A. Not many, many hours. Longest I was left alone was probably that first night, about six hours. That's one time, but --

Q. Okay.

A. -- I don't remember many hours after that, sir.

Q. All right. And Mr. Loevy showed you yesterday or the day before, a couple of snippets about being woken up by Detective McDonald coming in the room. Do you remember that?

A. Yeah, he did that probably about two to three times in the middle of the night, sir.

Q. Okay. Putting aside those times, there were other times that hours went by where nobody came in and woke you up, right?

A. I'm not sure, sir.

Q. You don't remember?

A. I'm not sure.

Q. You're not sure because you don't remember, right?

A. I'm not sure. I just remember that one time. It was, like, six hours. But anything else after that, it wasn't several hours, sir, no.

Q. Okay.

        MR. GIBBONS: Maria, let's move ahead to hour 4, 5 now, JX 5. And if you would play, please, 19:18:10 to around 19:18:56.

        (Said video was played in open court.)

MR. GIBBONS: Thank you, Maria.

Can we put up transcript page 100, please. And specifically at the top, Lines, like, 2 to 16.

BY MR. GIBBONS:

Q. Do you have that in front of you, Mr. Brown?

A. 2 to 16, yes.

Q. Yeah, the top of the page. You got that?

A. Yes.

Q. Okay. This is a transcript of what we just heard on the tape. Are you with me?

A. Yes.

Q. Okay. Specifically there on lines, like, 8 to 10, you say: He told them leave the park. They were leaving. Day-Day came around the corner and shot at him and he shot back.

Do you see that?

A. Yes.

Q. When you said "he shot back," who were you referring to?

A. R.J.

Q. Is this the first time in four-plus hours that you --

A. I'm not sure, sir.

Q. -- told the detect- -- let me finish my question.

Isn't this the first time in four-plus hours that you finally said R.J. was a shooter?

A. I'm not sure, sir. When you just asked me that question about five minutes ago, I told you he probably could have shot,

but I didn't see him shoot.  So, that's not the first time that I will say R.J. was shooting.  I kind of said it back then.

Q.   And here we have -- if I could direct your attention to Line 9, where it says:  They were leaving.  Day-Day came around the corner and shot at him.

Do you see that?

A.   Yes, sir.

Q.   That's a lie, right?

A.   I don't know where he came, but Day-Day shot at him, so all of it's not a lie.

Q.   You don't know that Day-Day shot at him--

A.   What a person I believed to be Day-Day shot.

I'm sorry.

Q.   You didn't see anyone come around the corner, right?

A.   I didn't see anyone come around the corner, sir.

Q.   That was a lie?

A.   I was just summing the story up.  I was tired of talking to them.

THE COURT REPORTER:  I'm sorry.  Say it again, please.

BY THE WITNESS:

A.   I said I was summing the story up, sir.  I was tired of talking to them.

BY MR. GIBBONS:

Q.   You're making up tidbits of your story --

A.   I'm not making up tidbits.

Q.   -- to make the lie more believable to the detectives, right?

A.   I saying it's a lie, sir.  It's been proven someone else was shooting, so you can't say that's a lie.

Q.   A lot of other witnesses are going to tell you that's a lie.

A.   This has been proven, sir.

MR. LOEVY:  Objection, your Honor.  There's not a lot of other witnesses.

THE COURT:  Sustained.

BY MR. GIBBONS:

Q.   You are now trying to sell the detectives at this hour that there was a shooter coming around the corner and that's the reason R.J. shot back, right?

A.   I wasn't trying to sell 'em nothing, sir.  I told 'em what happened.  Somebody shot at him, he shot back.

MR. GIBBONS:  Maria, let's move ahead to hour 8 here. JX 8, please.  And play 22:03:30 to around 23 -- 22:03:45.

(Said video was played in open court.)

MR. GIBBONS:  Can we, please, put up transcript page 133.  Down towards the bottom, starting at around Line 15.

BY MR. GIBBONS:

Q.   Okay.  Do you have that in front of you, Mr. Brown?

A.   Yes, sir.

Q.   Detective Mancuso says:  Your sister Cierra called you on

your cell phone and said, come on over here, the girls are messing with us.

Do you see that?

A.   Yes, sir.

Q.   And your answer is:  Yeah.  She, like, she was going to fight the girl, but Edward act like he wanted to hit her.

Do you see that?

A.   Yes, sir.

Q.   Did I read that right?

A.   Yes, sir.

Q.   You're lying about that, right?

A.   Yes.  Edward didn't hit my sister.

Q.   That was a lie?

A.   That part, yes.

Q.   Yeah.  We're in hour 8, and you're still lying to the detectives, right?

A.   You talking about the fight.  Am I lying to them about the shooting?

Q.   Are you lying in hour 8?

A.   Can you play about the shooting?  This -- you going to a fight.  Go to the shooting.

Q.   Is it true, sir, that no one ever called you and said Edward wanted to hit your sister?

A.   No, sir.  I was coming to get her.

Q.   Is it true that none of the detectives planted in your head

that Eddie Cane was messing with your sisters?

A.   I don't believe so at that time, sir.

MR. GIBBONS:   Maria, can we move just slightly ahead and play 22:06:30 to around 22:07:21, about a minute?

(Said video was played in open court.)

MR. GIBBONS:   Thank you, Maria.

If we could put up first transcript page 137 which corresponds to this tape we just listened to.  And towards the bottom, please.

BY MR. GIBBONS:

Q.   You see, Mr. Brown, down at the bottom there, beginning on line 21, Detective McDonald is asking you:  Where was Day-Day? You're saying Day-Day was there.

Do you see that?

A.   Yes.

Q.   And, then, you start to describe in great detail where Day-Day was; is that right?

A.   Yes.   I described where the shooter was at, sir.  And at that moment I still believed Day-Day was the shooter, sir.

Q.   And you described the shooter -- and I'm just going to read this.  Mr. Brown --

MR. GIBBONS:   Can we move over to -- Maria, I'm going to read onto Page 138, too.  Stay on 137 for a sec.

BY MR. GIBBONS:

Q.   Mr. Brown:  He was -- this is the playground.  He was over,

like, in that -- on that side of the fieldhouse.

MR. GIBBONS:  Now move over.

BY MR. GIBBONS:

Q.  Like, back -- like, going up there by that little hill, he was back towards --

Mancuso:  Okay.

Mr. Brown:  And they was right there.

McDonald:  Can I --

Mr. Brown:  This is the fieldhouse.  This is the playground.

Right?  You're pointing out where this was to the detectives, right?

A.  Yes.

Q.  And, then, McDonald says:  Right.

And, then, you say:  I was right here.  Day-Day was, like, behind the fieldhouse, like, right over there.

McDonald:  Near the fieldhouse or -- because we've got the path with the bench.

Brown:  No, no, he -- excuse me.

Mr. Brown:  He was near the fieldhouse.  He wasn't near the path, because this --

Detective McDonald:  So, he was between the path and the fieldhouse?

Brown:  Yeah.

McDonald:  Closer to the -- closer to the fieldhouse,

not like he's on the other side of the path going over towards the baseball diamond and shit?

Brown: Yeah.

McDonald: Or going up the hill to the winding road, the snaky road?

Yeah, he was close to the fieldhouse.

You told us yesterday you didn't see the shooter -- the second shooter -- right?

A. I didn't see his face, sir. I seen the figure. I didn't see his face, sir.

Q. Now you're telling us you saw all this movement of the shooter?

A. That's not all movement. He telling me -- I was describing where the shooter was at. I didn't say the shooter ran here, ran there. I say he wasn't close to the hill. He was closer to the fieldhouse.

Q. And it wasn't Day-Day because you don't know that, right?

A. It could have been Day-Day. I believed it was Day-Day at that time.

MR. GIBBONS: Maria, let's move ahead to hour 13, JX 13, please. And if you'd play for us 03:03:59 to 03:04:27.

(Said video was played in open court.)

MR. GIBBONS: Okay. Now can you please put up, please, the transcript that correlates to this snippet.

BY MR. GIBBONS:

Q.   Mr. Brown, what you have in front of you is Page 159.

         MR. GIBBONS:  If we could scroll toward the bottom please, Maria.

BY THE WITNESS:

A.   Yes.

BY MR. GIBBONS:

Q.   Now, at the bottom, starting on Line 21, Detective McDonald says:  Did he say anything else at that point?

         Mr. Brown:  No, but he said he was getting tired of them.

         Do you see that?

A.   Yeah.  Can you keep scrolling?

Q.   I'm sorry?

A.   Can you keep scrolling so I can read everything and the contents?  Because I know what you trying to get to.

Q.   You have the whole thing there.

A.   I can't move my screen, sir.

Q.   What do you want to see?

A.   I want to know everything that I was saying so I can tell you -- answer your question to the best of my knowledge.

Q.   Gotcha.

         There's the entire transcript to your right.

A.   I can't move it.  I don't -- the pages don't line up, sir.

Q.   The pages don't line up?

         THE COURT:  So, I'm not sure there's a question

pending.  So --

MR. GIBBONS:  I'm just trying to help him.

THE COURT:  I understand.

THE WITNESS:  I don't understand.  I'm trying to get in the whole context.  You point me to a certain line.

THE COURT:  So, hold on.  Let's just see what the question pending is.

MR. GIBBONS:  The question is, is did he say this to Detective McDonald?

THE COURT:  Right.  So, the only question is whether you --

BY THE WITNESS:

A.  Yes.

THE COURT:  Thank you.

Ask your next question.

BY MR. GIBBONS:

Q.  The next question is, is, Mr. Brown, you stated on Line 23 there:

Mr. Brown:  No, but he said he was getting tired of them.

Do you see that?

A.  Yes.

Q.  The "he" there is R.J., right?

A.  And "them" could be his sisters that he called.  I told you that's not the first time they done called me or somebody else

and we removed them.

Q.   My question was, is the "he" in your answer there R.J.?

A.   Yes.

Q.   Okay.  And R.J. said he's getting tired of them?

A.   Yes.

Q.   Okay.  And it's your statement that the "tired of them" meant who?

A.   I said I'm trying to get in a better context.  He probably wasn't talking about his sister now.

Q.   Okay.  We can go to the top of the page if you want.  You want to read --

A.   Why don't you go down to the next page.

Q.   Okay.

        MR. GIBBONS:  Go to Page 160, Maria.

BY MR. GIBBONS:

Q.   Are you there?

A.   Yes.

Q.   Okay.

        Detective McDonald:  Okay.  What did you think was going to happen then when you got to the park?

        Mr. Brown:  Originally I thought it was going to be we get our sisters, but I thought one of them was going to try to say they want to see one-on-one fight, one of us -- basically a fight.

        Detective McDonald:  So, you thought it might end up

in a fight?

Mr. Brown:  Yeah, that's what I knew.

That's your answer, right?

A.   Yes.

Q.   Okay.  Now back to my question.

MR. GIBBONS:  On the bottom of 159, if we can go back there.

BY MR. GIBBONS:

Q.   R.J. said to you --

MR. GIBBONS:  Well, strike that.

Let's go up to 15.

THE WITNESS:  Nah, because you trying to --

MR. GIBBONS:  Let's go up to --

THE WITNESS:  -- say them.

MR. GIBBONS:  Hold on a sec.

THE WITNESS:  And he trying to refer to guys, but it don't say nothing about guys.

MR. GIBBONS:  Hold on.  There's no question pending.

Let's go up to Line 15 on Page 159.

BY MR. GIBBONS:

Q.   Detective McDonald:  Okay.  Now your guys are going up to the park.  Originally you're at Central and -- Central and North over by the White Castle.  You get this phone call.  You say you're going up there.  R.J. says he's going up there, too.

Mr. Brown:  Yeah.

Did he say anything else at that point?

Mr. Brown:  No.  But he said he was getting tired of them.

I asked you who the "them" was.  The "them" was the guys in Amundsen Park, right?

A.  No, sir.  I didn't say that they was the guys, sir.  It wasn't I'm getting tired of them.  I said I'm getting tired of them.  They be talking about his sister and them steady calling.

Q.  Well, you used the word "getting tired of them."  Who were you referring to?

MR. LOEVY:  Objection, your Honor.  Asked and answered.

BY THE WITNESS:

A.  I just answered your question.  I said no guys.

THE COURT:  Overruled.

Mr. Brown, you can answer the question about who the "them" was.

BY THE WITNESS:

A.  The them may have been his sister and my sister now.  It's not the first time we moved them from the situation.

BY MR. GIBBONS:

Q.  And, then, he follows that up with the -- where you just said:  Getting tired of them.

And, then, McDonald immediately asked on the top of

Brown - cross

641

160, what did you think was going to happen when you got to the park?

And you said you knew there was going to be a fight, right?

A.  I didn't say I knew it was going to be a fight.  I said thought.  Thought and knew is two different words, sir.

Q.  Okay.  I agree with you.

Go to Line 9 on Page 160.

Mr. Brown:  Yeah, that's what I knew.

A.  That's what --

Q.  Those are your words, right?

A.  When you read his line, you said, you thought it might end in a fight.  I said that's what I knew.

Q.  Yeah.

A.  Yeah.

Q.  There's a difference between --

A.  Yeah.

Q.  -- the word --

A.  Yeah.

Q.  -- "knew" and "thought," right?

A.  Yeah.

Q.  You used the word "knew," right?

A.  Yes.

Q.  And you didn't think the fight was going to be between R.J. and his sister, right?

A.   No.

Q.   You thought the fight was going to be between R.J. and the boys at Amundsen Park, right?

A.   No.

Q.   Who was he going to fight?

A.   I didn't say R.J. name right there, sir.

Q.   Who did you think the fight was going to be between, Mr. Brown?

A.   I said, if we got up there and one of them guys fight, it'd probably have been a one-on-one fight.  I didn't say nothing about shooting.

Q.   I didn't ask you about a shooting.  I said, who is the fight going to be between?

A.   If it was, it may have been a one-on-one fight if anybody wanted to fight.

Q.   I heard that.  Now my question is, who was the fight going to be between?

A.   Probably us and one of the guys, if it was gonna be a fight.  If it was a really fight, I had three of my friends at White Castle, don't you think we all would have went over there?

         MR. GIBBONS:  Your Honor, I think this might be a good time to take a break.

         THE COURT:  All right.

         Ladies and gentlemen, we'll take our morning break.

It's almost 11:00 a.m.  We'll take a break until 11:15.

Please don't discuss the case.

All rise.

(Jury out.)

THE COURT:  You may be seated.

Mr. Brown, please don't discuss your testimony.  You remain on cross-examination.

I'm going to ask and remind both you and Mr. Gibbons to do your best to please let the other finish their statement before you speak.  I realize that you're both trying to do that, but just a reminder to remember that for the benefit of the transcript.

MR. GIBBONS:  Yes, your Honor.

THE WITNESS:  Tell him keep his voice down.  He, like, yelling.

THE COURT:  That will be all.  You've said it enough times to Mr. Gibbons, and I'm sure he's heard you.

All right.  Unless there's anything else, I'll see you at quarter after.

(Recess from 10:58, until 11:15 a.m.)

THE COURT:  So, if we have everyone back in the room, my law clerk just handed me a note signed by one of the jurors, Calvin de Vries.  The note reads:  Judge Jenkins, is the entire interrogation transcript admitted into evidence?  Can the jury see the binder?  Thanks, Calvin de Vries.

Can you pass the note to the parties so they can read it?

MR. LOEVY:  Your Honor, I think -- are you asking for our --

THE COURT:  I am definitely.

MR. LOEVY:  I think --

MR. GIBBONS:  I said, what do you want to do?

MR. LOEVY:  One possibility would be to tell them, at the end of the case the evidence that has been received into evidence will be provided to you.  We certainly don't want them reading a transcript while we're trying to do what we're trying to do.

THE COURT:  Correct.

Any objection to that?

MR. GIBBONS:  Yeah, that was the reason I didn't want, you know, to have binders, doing page by page, because we all know that problem.

I think that instruction at this point is probably the right one.  And, then, maybe we can discuss whether we think it would be an aid to them.

Obviously, this transcript is agreed upon, except for six or seven instances, which are in one transcript.  And I think it would be an aid to them.  But I think we should noodle about that with the parties.

THE COURT:  Okay.  So --

MR. LOEVY: You could be ambiguous and say, when we decide what's admitted into evidence, you will receive it.

THE COURT: Okay. I'm just rereading what you said.

(Pause.)

THE COURT: Yeah. So, what I'll do is I'll tell them that I've received a note concerning the transcripts, and that at the end of the case, any and all evidence that's been received will be sent back for their consideration during their deliberations, and leave it at that. Because I don't want to make it seem like we're definitely giving it to them or not. It may well be sent back, but I realize we have some work do on that, and you don't want them to have it now. So, that's what I'll tell them.

MR. LOEVY: Thank you, your Honor.

MR. GIBBONS: Thank you.

(Jury in.)

THE COURT: You may be seated.

All right. Ladies and gentlemen, we just received -- or I just received a note from one of you, which I've shared with the parties, asking about the interrogation transcript and specifically the binder that Mr. Gibbons has been using to cross-examine Mr. Brown.

And the question was whether or not the transcript or that binder would be -- has been admitted into evidence.

Ultimately, whatever information -- material that is

admitted into evidence will be provided to you during your deliberations. And, so, at the appropriate time, specifically during your deliberations, you'll have all the material that's been received into evidence at that time. So, closer to your deliberations.

All right. Mr. Brown, you remain under oath.

And with that, Mr. Gibbons, you may resume.

MR. GIBBONS: Your Honor, thank you.

I just want to make it clear that what I'm using is Joint Exhibit 500, which is an agreed-upon transcript of what the tape contains, not -- you said, Mr. Gibbons is using. I just didn't want any confusion about this. This is a joint exhibit.

THE COURT: All right. Thank you. I appreciate that clarification.

BY MR. GIBBONS:

Q. Mr. Brown, I'm going to move ahead to hour 13, and ask Maria to play 03:07:04 to 03:09:15, a little over two minutes long.

(Said video was played in open court.)

MR. GIBBONS: Thank you, Maria.

If we could put up transcript page 163, which covers some of this colloquy.

BY MR. GIBBONS:

Q. Mr. Brown, I'm directing your attention to Page 163,

specifically up near the top starting on Line 6.

Do you have that in front of you?

A. Yes.

Q. Okay. Detective McDonald asks you, starting on Line 6: How did you guys all hook up again to be over by Parkside and North.

Mr. Brown: I think we walked over there, met over there. That's when we were talking to him.

Detective McDonald then says -- excuse me. Let me stop there.

We're talking about a meeting that occurs on Sunday morning, right?

A. I'm not sure I know what you talking about. How long was I here, what part was this?

Q. So, you didn't know when McDonald was asking you about hooking up again over at Parkside and North? We're talking about that corner meeting?

A. I don't remember going to Parkside and North -- I mean, le Moyne the next day, yes.

Q. Okay. Yesterday we covered that corner meeting, and I think you testified that you and R.J. didn't talk about the shooting at all at that Parkside meeting. Did I hear that right?

A. No.

Q. Did you talk about --

A.   We didn't talk about the shooting right there.

Q.   You didn't?

A.   No.

Q.   Okay.  It then continues then.  It says:  Detective McDonald -- beginning on Line 10.  Are you there?

A.   Yes.

Q.   -- what did R.J. have to say about it then?

Mr. Brown:  He was, like, I don't think I did that 'cause I was shooting, but he said Day-Day shot at him.  I asked him why he shoot -- why he shoot anybody, and he was, like, Day-Day shot at him he and he shot back.  And he said that everybody was gone out the park.

And, then, Detective McDonald:  Okay.  You saw Day-Day and Day-Day wasn't shooting at anybody?

Mr. Brown --

THE COURT REPORTER:  Mr. Gibbons.

MR. GIBBONS:  Thank you, Joe.  Sorry.

BY MR. GIBBONS:

Q.   Mr. Brown:  Naw, but he told me before I got over there, he shot at him.  I told him I didn't hear nothing.  He said because of his gun was louder.

Do you see that?

A.   Yes, sir.

Q.   I want to ask you about the last part of that.  When you say, I told him I didn't hear nothing, he said because his gun

was louder, did R.J. say that?

A.   Sir, how long was I locked up at this time?

Q.   I'm sorry?

A.   How long was I being interrogated at this time?

Q.   My question was --

A.   I'm trying to answer your question in the best contents.

MR. GIBBONS:  Your Honor --

BY THE WITNESS:

A.   I want to know how long I was there.

MR. GIBBONS:  -- the witness doesn't get to ask questions.

THE COURT:  So, Mr. Brown, you don't get to ask questions of Mr. Gibbons.

THE WITNESS:  Okay.  I'm gonna give him an answer.

THE COURT:  Please answer the question to your best --

THE WITNESS:  I'm gonna give him an answer.  Okay.

THE COURT:  Okay.

THE WITNESS:  You ready?

MR. LOEVY:  And I object to foundation, if it's not clear at what point -- what time of night this was.  He doesn't know -- it's not fair to make him answer.

MR. GIBBONS:  It's not the right -- okay, your Honor, I'm not going to fight this.  I already introduced this tape and tip -- snippet as hour 13:03:07.  I started with that. And, then, I said these are the pages that correlate to that

snippet.

BY MR. GIBBONS:

Q. So, without getting into it, Mr. Brown, the answer is we're in hour 13. Are you with me?

A. Okay. So, it would be 4:00 o'clock in the morning, sir.

Q. Okay.

A. Okay.

Q. The question is, though, when you said, "I told him I didn't hear nothing. He said because of his gun was louder," did R.J. say that?

A. Sir, I was lying. I was in the police station overnight. I was scared. I wanted to go home. They wasn't showing any sign of letting me go. So, I was adding to my story.

Q. Okay. So, would you agree with me it was you adding to your story, not the detectives putting these lines into your head?

A. Sir, they put some lines into my head. They got me to say Day-Day wasn't shooting. So, they put some more stuff in my head, too, sir.

Q. Let me ask you specifically about this: Did any detective put into your head that you didn't hear nothing and that R.J. was saying his gun was louder?

A. Sir, I can't answer that question because I don't know what happened in those 13 hours, sir, leading up. So, I can't focus on one part.

Q.   As you sit here today, do you have any recollection of any detective in the first 13 hours suggesting to you that R.J. said his gun was louder?

A.   Sir, a lot went on in that room, sir.  I was traumatized in that room.  This is a event that I tried to forget for 20 -- almost 20 years, sir.  So, I can't recall everything that happened within 14 hours.  I know what happened was right.

Q.   So, as you sit here today, you don't have any independent recollection?

A.   Sir, how can I have it if you have to play the whole video for me, I have to go through all those hours?

         But at this point, I know a lot was going on in those rooms at that time, and a lot of lies, a lot getting me to say this, getting me to say that.  So, I can't just answer that question, sir.

Q.   And just so we're --

A.   I don't know what happened the hour before.  He might have put that in my head.  I'm not sure.

Q.   Just so we're clear, this was a lie when you said, I didn't hear nothing, R.J. said his gun was louder?  That part was a lie, right?

A.   That part was a lie, sir.  I seen someone shooting at me, sir --

Q.   Okay.

A.   -- from behind the fieldhouse.  There was some more shots

behind me.

MR. GIBBONS:  Maria, let's move ahead.

BY MR. GIBBONS:

Q.  In that same 13th hour, now, Mr. Brown.

A.  Okay.

MR. GIBBONS:  Play 03:11 around 18 seconds to 03:11:51.

(Said video was played in open court.)

BY MR. GIBBONS:

Q.  Okay, Mr. Brown, I'm going to put up Page 167, which correlates to that snippet that we just heard.  Are you with me?

A.  Yes, sir.

Q.  Okay.

MR. GIBBONS:  Maria, we can have at least 3 to 13 on there.

BY MR. GIBBONS:

Q.  Okay.  Beginning on Line 3, Mr. Brown, Mancuso says to you: Do you know where does he normally hide a gun?  You guys are friends.  You guys hang together.

Brown:  He used to just having it on him.

Mancuso:  Where?

Brown:  Just --

Mancuso:  Just have it on him?

Mr. Brown:  Yeah.

Do you see that?

A.   Yes, sir.

Q.   Did I read that correctly?

A.   Yes, sir.

Q.   Is it true that R.J. used to just have the gun on him?

A.   Sir, that's not true.  He asked me where he have it at.
Specifically, he wanted me to say a location.  I didn't know,
so you could tell I was lying.  I was probably scared around
that time.  I been in here for hours.  It's the wee hours of
the morning.  I'm scared.  I want to go home.  I think he just
wants something on R.J., so I'm giving him anything he wants on
R.J., sir.  I don't know what was said before that, so I can't
just answer your question.  I don't see R.J. with a gun.  He
don't bring that stuff around me.

Q.   When you told the detectives this, what I just read, it was
a lie?

A.   Sir, that was a lie.  I don't see R.J. with a gun, sir.

Q.   All right.  Earlier in my questioning, you mentioned
something about having a recollection that you did -- you were
uninterrupted for hours.  Did I hear that right?  No one came
in the room for hours?

A.   We haven't got to that point yet, sir.

Q.   Okay.  You know the tape that well?

A.   No.  I just calculated the hours, and that will be in the
morning.  And I'm in from, like, 4:00 something to 10:00 from

reviewing the tapes.  It was the next morning when they came back in.

But what you're talking about, you said 13 hours.  So, I calculated in my head that was 4:00 in the morning.  So, those several hours couldn't have came yet, sir.

Q.  Wouldn't you agree with me from approximately 3:15 a.m. to approximately 10:30 a.m., you were left in the room alone with the lights out?

A.  No, I can't agree to that, because it showed that the detectives came in around 4:00 something again in another video.  So, no, I can't agree to this.

Q.  All right.  Besides that time, were you mostly left alone in those hours?

A.  From around 4:00 something to 10, I don't know if I went to the bathroom or not.  I'm not sure.  But I know when you look at the record, it shows next time I was interrogated.  So, I'm not sure if I was left alone.  I don't remember nobody checking on me or anything.  I may have needed to use the washroom or anything.

Q.  Okay.  Well, we'll have other witnesses going through the tape.

MR. GIBBONS:  Maria, can you put up Page 175, please.

BY MR. GIBBONS:

Q.  Mr. Loevy played this snippet yesterday.  I just want to get ourselves orientated.

Brown - cross

655

A.   Yes, sir.

Q.   It says here on Page 175 that Detective Mancuso, on line 5, enters at 10:23 in the morning.  Do you see that?

A.   Yes, sir.

Q.   You would agree that that happened?

A.   That was 10:00, yes.

Q.   All right.  And, then, there's this colloquy and Mancuso delivers you McDonald's, right?

A.   Yes, sir.

Q.   And it's fair to say that you were, in fact, given water -- at least offered water numerous times during this interrogation?

A.   Yes, water and food's two different things, sir.

Q.   I know that.  I'm asking about water first.

A.   Yes, I was given water, sir.

Q.   Okay.  And you were offered bathroom breaks repeatedly throughout the interrogation, right?

A.   I remember knocking getting a bathroom break, sir.

Q.   All right.  I'm going to move this ahead.

          MR. GIBBONS:  Strike that.

BY MR. GIBBONS:

Q.   There was a portion in the afternoon where you were moved out of the cell and had to participate in a lineup, right?

A.   I believe I went in a lineup, sir.

Q.   All right.  And you were out of the cell for a while to do

all that, right?

A.  I wasn't out of a cell.  I wasn't never in a cell, sir.

Q.  Well, you're right.  Terrible question.

A.  I went to another room and sat in another room, so I was under -- still under the same kind of stresses.  Not like I went home and I'm not under the same kind of stress anymore.

Q.  I gotcha.

You left the interrogation room for some period of time with detectives and participated in a lineup, right?

A.  I remember being stuck in the room -- another room -- for a long time.  Then I remember being snatched out of that room, sat down.  They told me stand up and they took me back and put me in another room.

Q.  All right.  Let's move ahead on the tape to hour 30, which is JX 30.

A.  Hour 30, what time would that have been?

Q.  It's 20:28:48 to 20:30:28.  I'm going to play about two minutes of a tape here.

Are you with me?

A.  No, because I don't see the time.

Q.  Okay, I'm telling you what we're playing.

A.  I'd like to see it.

Q.  It's on your screen, in a second.

A.  I don't see a time, sir.

(Said video was played in open court.)

MR. GIBBONS: Thank you, Maria.

BY MR. GIBBONS:

Q. First, while the video's up there, Mr. Brown --

A. Yes.

Q. -- we see a blanket on the floor. Do you see that?

A. Yes.

Q. Is that the blanket the detectives gave you?

A. That was a baby's blanket, yes.

Q. I'm sorry?

A. It was a baby's blanket, yes.

Q. But that's the blanket they gave you, right?

A. It was a very thin child's baby blanket, yes.

Q. I think the yes is they gave you that blanket, right?

A. They gave me the child blanket. I said yes.

MR. GIBBONS: Maria, can we put up page 215 and then we're going to go over to page 216.

On the bottom, first I'm going to concentrate down on the bottom of 215, if we can get to Line 22.

BY MR. GIBBONS:

Q. Mr. Brown -- well, start at Line 17. Give you your complete answer.

Are you there, Mr. Brown?

A. Yes, sir.

Q. Mr. Brown: No. I'm just driving, listening to the music.

A. Again, the line before that?

Q. Then --

THE COURT REPORTER: I'm sorry?

BY THE WITNESS:

A. Can you read the whole contents? I need to know what's going on, just not my answer. I'm trying to get --

MR. GIBBONS: Your Honor, I'm going to ask my questions. The witness --

THE WITNESS: I'm trying to get a better understanding, sir.

THE COURT: Mr. Brown, let me him read the portion to ask his question, and then you can answer.

THE WITNESS: All right.

BY MR. GIBBONS:

Q. Mr. Brown: No, I'm just driving, listening to the music. Then when we get to Amundsen Park, I pulled over where the entrance at. They got out the car and I was going over trying to find a park, and I was about to call my sister's phone, see if she -- see where she was. It was so many people in there. You couldn't see nothing. And it get loud. I hear R.J. and them yelling. So, I get out the car. I hop the gate and I see and go to Edward. And Edward started running. And I grabbed Edward, because -- let me holler at you, and he was finna tell me something. And, then, I turn around and I see R.J. just start open fire. And I ran. And Edward ran that way. And I got in the car looking for the keys.

Did I read that right?

A.   Yes, sir.

Q.   You mention Edward four times in that answer; do you not?

A.   Sir, at that time, I think I was locked up over a day-and-a-half.  Your detectives had did a number on me.  About four or five had been coming in the room.  My story --

MR. GIBBONS:  Your Honor, if I could have the witness answer my question and not go --

THE WITNESS:  I'm telling --

MR. GIBBONS:  -- off on a colloquy on his own.

THE COURT:  Gentlemen.  Thank you.

Please --

THE WITNESS:  You don't have to yell at me, sir.

THE COURT:  Please don't speak over one another.

And we can lower our voices.

THE WITNESS:  Thank you.

THE COURT:  So, Mr. Brown, please just answer the question that's asked and only the question that's asked.

BY MR. GIBBONS:

Q.   Do you want me to repeat the question?

The question was:  In this snippet that I just read, you mention Edward by name four times; is that right?

A.   Yes.

Q.   That's Eddie Cane, right?

A.   Yes.

Brown - cross

660

Q.   So, here we are in hour 30, and you are still lying to the detectives about seeing Eddie Cane in the park, right?

A.   Sir, around hour 30, sir, I was still lying.  But I wasn't lying about knowing somebody had a gun, sir.

Q.   You were lying about Edward Cane, right?

A.   Sir, I just said I was lying about a lot of stuff.  I may have been lying about Eddie Cane, sir, yes.  But I know I wasn't lying about knowing someone had a gun at hour 30, sir.

Q.   It's true, isn't it, that the detectives never suggested to you that Eddie Cane was involved in the shooting, right?

A.   The detectives never suggested that Eddie Cane was involved in the shooting, I don't believe so, sir.

Q.   This is stuff that you're making up here in this exchange with Detective Turner?

A.   Oh, I'm sorry, sir, I remember Detective Mancuso telling me he locked up Eddie Cane somewhere in the interrogation room.  I remember that.

Q.   What does that have to do with Eddie Cane --

A.   He keeps saying --

Q.   -- being involved --

A.   -- this is the first time I heard --

Q.   -- in the shooting?

A.   -- about him.

     He got locked up.  He told me that.  It was someone in the interrogation room.  I'm pretty sure.

Q.   Let me ask you a question, Mr. Brown.  And I'm going to specifically quote you on Line 3 and 4 on Page 216, where you say:  And, then, I turn around and I see R.J. just start open fire.

Did I read that right?

A.   Yes, sir.

Q.   Simple question.  Truth or a lie?

A.   That's a lie.  I never seen R.J. open fire, sir.  At that time, your detectives put that in my head, sir --

MR. GIBBONS:  Your Honor --

BY THE WITNESS:

A.   -- and I went along with it.

MR. GIBBONS:  -- I asked a simple question and now we let him ramble on.  I would ask the Court to admonish the witness to just answer my question.

THE WITNESS:  I answered it.

THE COURT:  Mr. Brown, please just answer the question that's asked.

THE WITNESS:  Okay.

THE COURT:  Mr. Gibbons, please re-ask your question or ask your next question.

MR. GIBBONS:  I think he answered it, your Honor, at the beginning part of his answer there.  Thank you.

Maria, let's move ahead to hour 31, please, which will be exhibit -- Joint Exhibit 31.  And play 21:48:02 to around

21:48:35.

(Said video was played in open court.)

BY MR. GIBBONS:

Q.   Now, Mr. Brown, you were specifically asked about going into the park, going into enemy territory.  Do you see that?

A.   I don't know anything about enemy territory right there, sir.

Q.   So, when Detective Mancuso asked you that -- he says on --

MR. GIBBONS:  Maria, can we put up transcript page 266, please, at the top.

BY MR. GIBBONS:

Q.   Mr. Brown -- are you there, Mr. Brown?

A.   I'm there.

Q.   Okay.

Mr. Brown:  Yeah, I think he had to have it because he messing -- he wouldn't just go up there.

Detective Mancuso:  Without it knowing that you're going into, like, enemy territory?

Mr. Brown:  Yeah.

Do you see that?

A.   Yes.

Q.   When he asked you about enemy territory and you said "yeah," what did you mean by that answer?

A.   I don't know what I meant by the answer.  At that time, your detectives was doing all the talking and I was answering

Brown - cross

663

the questions, sir. So, I don't know what I mean. He said it, not me, sir.

Q. Okay. So, we are in around hour 30. It was at this point when Mr. Loevy asked you some question that went something like this. Let me see if you remember. He said, "Mr. Brown, had the truth worked for you for two days?" And you said, "No."

Do you remember that with Mr. Loevy?

A. Yes, sir.

Q. Well, the reality is, in my questions, you've admitted that you've lied to the detectives repeatedly up to this point, hour 30; isn't that true?

THE WITNESS: Your Honor, he went with more questions. So, can I explain my answer better than just a "Yes" or "No," because he rambled on with his question?

THE COURT: So, Mr. Brown, he's allowed to ask you leading questions.

THE WITNESS: Okay.

THE COURT: So, you can answer --

THE WITNESS: So --

THE COURT: -- his question.

THE WITNESS: I'm gonna go answer.

BY THE WITNESS:

A. So, can you repeat yourself again, so I can answer this the best way?

BY MR. GIBBONS:

Q. Yeah. I mean, my question is, is you were lying up through hour 30, as we just went through, to the detectives. So, how would you know if the truth worked for you or not?

A. I told your detectives --

MR. LOEVY: Objection. It's too argumentative --

BY THE WITNESS:

A. -- the truth --

MR. LOEVY: -- to answer, your Honor.

BY THE WITNESS:

A. -- probably about three hours into the interrogation room. That truth didn't set me free, sir. And of all that time, if detective found that R.J. shooting somebody else, that still didn't set me free, sir. And your detective only cared that I knew somebody had a gun, sir. You can't sit here -- your detective did me wrong, sir. So, you sitting here --

MR. GIBBONS: Your Honor, this is not my question. We're going to get the colloquy of the detective --

THE WITNESS: I am just answering your question.

THE COURT: Okay. All right. All right.

THE WITNESS: You just playing with me --

MR. GIBBONS: Somebody's got to --

THE COURT: Mr. Brown --

MR. GIBBONS: -- cut him off.

THE COURT: Mr. Brown, please.

THE WITNESS: He don't know what I went through, man.

He just steady just trying to act like I was in here 30 minutes. That's because they, like, fucking played with my head, man. They did me wrong, man.

THE COURT: Okay. Let's take a break. Let's take our lunch break right now.

We will take our one-hour lunch break early. We will see you at 12:45 and resume as close to 12:45 as possible.

All rise.

(Jury out.)

THE COURT: All right. Mr. Brown, you are excused, please. You should leave the courtroom for a moment so I can speak with the lawyers.

Please don't discuss the substance of your testimony with your lawyers.

Everyone else may be seated.

I'm just going to say it so that we're all very clear. This is an extremely frustrating process. The witness and opposing counsel are sparring, speaking over one another. And each side is contributing to the friction and the tension in terms of the questioning.

Of course, Mr. Gibbons is permitted to ask leading questions of the witness. And the witness should answer.

But I thought the appropriate thing to do under the circumstances was to let the jury go for our lunch break earlier than I ordinarily would have, because tensions seem to

be getting a little high, and I think a breather is appropriate.

So, I think it makes sense for counsel -- plaintiff's counsel -- without discussing the substance, to please have a conversation with Mr. Brown.

Everyone in this room understands that this is a personal and specific thing to him -- issue to him. I don't mean to minimize it. But I think it would be appropriate for you to have a conversation with him, not about the substance, to just give him a chance to take a break, get something to eat, and give him a little bit of guidance about sort of the best way to handle some of this questioning, without the substance.

Does the defense have an objection to counsel doing that? I don't want to overstep here, and I don't want to create an issue where there isn't one, but I'd like to know if defense counsel has an objection to counsel doing that.

MR. GIBBONS: No.

THE COURT: Okay. I think it would be helpful.

MR. LOEVY: I'm optimistic I can get the point across to him.

THE COURT: Okay.

MR. LOEVY: I think you're right, it's very hard for him.

THE COURT: It is. And the tension in the room -- and

the jury is seeing it.  That's the other thing.  The jury is observing it.  Juries are observing.  You two are more experienced lawyers than most people I know, and you know that. And, so, I don't want any of this to bleed over into their impressions in a way that negatively affects either side, right?

MR. GIBBONS:  Your Honor --

THE COURT:  One thing I do want to ask --

MR. GIBBONS:  Oh, I'm sorry.

THE COURT:  -- and I will give you an opportunity to speak, Mr. Gibbons, and say whatever you wish -- is I'd like to get a sense of how much more time you think you need.  Not because I'm going to strictly hold you to it, but I think it would be helpful if we can all just get a sense of how much more you need to go, especially now that I've cut you off from the lunch break earlier than we would have.

MR. GIBBONS:  Yeah.  I had earlier told Mr. Loevy I thought I was going to be done by the original lunch break time, which we're just moving back an hour.  So, I think I'm within an hour of being done.

THE COURT:  Okay.  All right.  That's fair.

MR. GIBBONS:  The only thing I wanted to say, your Honor --

THE COURT:  Yes.

MR. GIBBONS:  -- is I do try to ask leading questions

on cross. And the witness, you know, after, you know, hours of listening to the -- yes, but, and the colloquy, then I cut him off. And yes, maybe not the right move. But I hate to look weak by constantly turning to the Court saying, can you admonish the witness. But, I mean, I'm going to have to do that, because he's not just answering my tight question. He's rambling.

THE COURT: I get it. And I appreciate that you don't want to turn to me to resolve the problem. I completely understand that, and I know why you want to do that. And that's actually part of the reason why after the umpteenth time it was appropriate to just take a break.

Mr. Loevy.

MR. LOEVY: Yeah, that wasn't a tight question. The one that set him off had, like, some -- had, like, a premise sort of packed in with, after you lied and did this and this, and then he asked him a question. And I actually objected to the question. It was -- I'm all about argumentative questions, but there is -- you know, they got to be fair, too.

THE COURT: Okay. I think it makes sense to take our break. We'll resume at 12 :45, 12:50. Why don't you all come back at 12:45, so we can just resolve this hearsay -- ASA issue, it's not so much a hearsay issue, this ASA issue. We'll get started at about 12:50.

Mr. Loevy, it will be helpful to know about how long

Brown - cross

669

you think you might have for redirect and whether we'll get to -- who is the next witness?  Is it Wham Cary?

MR. LOEVY:  Wham will go.  And my redirect will not be particularly long.

THE COURT:  Okay.  All right.  We'll take a break. All right.  See you in an hour.

(Recess from 11:50 a.m., to 12:45 p.m.)

*     *     *     *     *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Joseph Rickhoff                    August 29, 2024
Official Court Reporter

670

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                    ) Case No. 19 CV 4082
                                 )
             Plaintiff,          )
                                 )
             vs.                 )
                                 )
MICHAEL MANCUSO AND GERI         )
YANOW, Personal                  )
Representative of the            )
Estate of KEVIN MCDONALD,        ) Chicago, Illinois
                                 ) August 29, 2024
             Defendants.         ) 12:45 o'clock p.m.



                TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
             BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:      LOEVY & LOEVY
                        BY:  MR. JONATHAN I. LOEVY
                             MR. LOCKE E. BOWMAN, III
                             MR. TOM KAYES
                        311 N. Aberdeen Street, 3rd Floor
                        Chicago, Illinois 60607

                        MACARTHUR JUSTICE CENTER
                        BY:  MS. VANESSA DEL VALLE
                             MR. JONATHAN M. MANES
                        160 E. Grand Avenue, 6th Floor
                        Chicago, Illinois 60611


For the Individual      GREENBERG TRAURIG, LLP
Defendants:             BY:  MR. JOHN F. GIBBONS
                             MR. KYLE L. FLYNN
                             MR. TYLER L. SALWAY
                             MR. QUINN FORD
                        77 W. Wacker Drive
                        Chicago, Illinois 60601

671

APPEARANCES:   (Cont'd)

Court Reporter:          LAURA LaCIEN, CSR, RMR, F/CRR
                         SANDRA M. TENNIS, CSR, RMR, F/CRR
                         Official Court Reporter
                         219 South Dearborn Street
                         Suite 1728
                         Chicago, Illinois 60604
                         (312) 408-5032
                         laura_lacien@ilnd.uscourts.gov

          *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

               PROCEEDINGS RECORDED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

672

(Proceedings heard in open court; jury out.)

THE COURT:  All right.  We're back on the record.  We have all counsel for both sides present.

Anything we should -- any issues or other things we should discuss before we talk about this ASA issue?

MR. LOEVY:  Not from the plaintiff.

MR. FLYNN:  Yes, your Honor.  With respect to the instruction, the Greg Swygert issue, we had some confusion on our side what the instruction was just going to say.  If we could just hear that again.  We were hoping that after Mr. Brown is done testifying, that it could be read to the jury at that time.

THE COURT:  All right.  What I had said yesterday was you heard statements about -- what I had said yesterday or proposed yesterday was:  You heard statements about why Mr. Brown's conviction was overturned.  The reasons why a judge overturned Mr. Brown's conviction are not at issue in this case.  You should not speculate about why his conviction was vacated.

MR. FLYNN:  We just have one suggestion, and plaintiff might agree, is that after the first sentence, we add you should disregard those statements.

THE COURT:  I'm fine with that.

MR. LOEVY:  I guess that's hard to argue with that.

THE COURT:  Okay.

MR. FLYNN: And then -- that's all.

THE COURT: Let me just -- if I don't write it down, we might have a problem.

MR. FLYNN: Sure.

THE COURT: Okay. You heard statements about why Mr. Brown's conviction was overturned. The reasons why a judge overturned Mr. Brown's conviction is not at issue in this case and you should disregard --

MR. LOEVY: All references.

THE COURT: Yeah, something like that, all references to the reasons. And don't speculate.

MR. FLYNN: Your Honor, after Mr. Brown is done testifying, they're going to call Wham Cary. I'm not sure if I'm going to have another chance to talk to you before that happens.

THE COURT: Sure.

MR. FLYNN: I just want to make sure that the parties are all clear that Wham Cary cannot discuss his role in the post conviction or have anything to do with the post conviction because that's going to get in again to the reasons why the conviction was overturned.

THE COURT: Response, Mr. Bowman?

MR. BOWMAN: That's -- that's correct. He is not going to discuss any prior testimony in my direct examination of him.

THE COURT: Okay.

MR. FLYNN: No discussion about why the conviction was overturned, correct?

MR. BOWMAN: No.

MR. FLYNN: Okay.

MR. BOWMAN: I doubt that he knows.

Just out of an abundance of caution -- I think this is fine -- I'm going to elicit from Mr. Cary that as a standard matter when he identifies himself as an attorney seeking to represent a person being questioned, that the procedure is that he has admitted to see the person.

THE COURT: I assume that's based on his experience, right, his own prior experience with that?

MR. BOWMAN: Yes, based on his experience.

THE COURT: Right.

MR. FLYNN: Mr. Cary won't get into anything about there being a right for a witness to see him or anything like that; correct.

THE COURT: Yeah. We don't want us referring to anything about law or anything like that about what he understands the law to be, et cetera.

MR. BOWMAN: I have cautioned him not to do that.

THE COURT: Okay. All right. So I will read this statement, this instruction, if you will, to the jury after -- when would defendants prefer that I read this?

MR. LOEVY: We prefer you read it now.

THE COURT: Okay.

MR. FLYNN: We don't want to interrupt Mr. Brown's testimony. We thought we'd wait until Mr. Brown is off the stand.

MR. GIBBONS: Yeah. I'd like to finish that examination.

THE COURT: Okay. That's actually what I was going to suggest so I'll do that. I'll read it --

MR. LOEVY: Can we --

THE COURT: Mr. Loevy?

MR. LOEVY: Can we do it at the end of the day then? I mean, I think they sort of want it right before Wham Cary, sort of, strategically?

THE COURT: I'm sure it's strategic and -- as it should be. That's what this whole process is about.

Look, I will read it at some point after Mr. Brown's testimony finishes, maybe before we take our afternoon break or something like that. I'll do it at a convenient spot somewhere, you know, where it makes sense.

MR. LOEVY: Thank you.

THE COURT: If I neglect to do it, and I won't -- I'll put it nice and large on my screen here to recall -- please remind me but I'll give the instruction at a natural pause or break when it makes sense to do so after we're done with

Mr. Brown's testimony.

MR. LOEVY: Thank you.

MR. FLYNN: Thank you, Judge.

THE COURT: Okay. On the ASA issue, I'm not going to allow you to go into that line of questioning. I agree with Mr. Loevy that it's improper vouching. You are welcome, as we've already discussed, to ask the detective witnesses about their investigative steps -- what they did, who they talked to in general terms, what facts they gathered, what they learned, how they learned it -- but I agree that asking the ASAs about that topic even through a handful of questions is vouching.

What's relevant here is the coercion question and that's why I'm going to let you ask the defendant -- the detectives, excuse me, all of them, about what steps they took and how they gathered facts. But I think asking ASAs to layer on top of that while theoretically they could be witnesses to that information is vouching. And even if I'm wrong about that, I do think there's a 403 concern which Mr. Loevy raised this morning and there would be some unfair prejudice there so I won't let you go into that area.

MR. GIBBONS: Your Honor, just for the record -- and I'm not sure how this is going to play out with testimony, but we may want to revisit that issue if they open the door.

THE COURT: Of course.

MR. GIBBONS: Two, we also may at some point make an

677

offer of proof for the Appellate Court in case we get there.

THE COURT: Certainly.

MR. GIBBONS: -- because we obviously respectfully disagree with the Court.

THE COURT: Fair enough.

MR. GIBBONS: Yep.

THE COURT: And, of course, this is a set-aside from Ocampo and Stanciel, which I think everyone agrees -- I should have said that at the outset, everyone agrees that's a completely different bucket because of other concerns about that. And Mr. Loevy has already said that, you know, he believes his line of questioning will go there and so I'll let you do it in that regard with those witnesses.

MR. LOEVY: Thank you, your Honor.

MR. FLYNN: Point of clarification on that, your Honor. When the detectives take the stand, can they discuss that some of these witnesses provided ASA handwritten statements and what that is.

THE COURT REPORTER: Please slow down.

MR. FLYNN: Sure.

Can the detectives testify about how some of these witnesses provided ASA handwritten statements and explain to the jury their understanding of what an ASA handwritten statement is?

MR. LOEVY: You know, I think we almost got to go

context-specific to -- I don't know if I'm going to object because if he's like, oh, the witnesses told me all these things and then they --

THE COURT: Yeah. I'm inclined to let the -- let the detectives testify that what's the procedure and steps that they followed, right; that part of what they did was bring in an ASA to, you know, prepare statements and some of those statements were handwritten, et cetera. I think that's fair. I think that's a fair explanation of what they did.

I mean, part of the issues here are the extent to which of course the statements were coerced and evidence was suppressed so I think that's fair. So you can -- you can elicit that testimony.

MR. FLYNN: Thank you, Judge.

MR. BOWMAN: Judge, one other brief matter. The Court issued a writ for the testimony of Rufus McGee. As we've assessed our state of progress here, we've determined that we're not going to call Mr. McGee.

THE COURT: At all?

MR. BOWMAN: At all.

THE COURT: Okay.

MR. BOWMAN: So we would --

THE COURT: Okay.

MR. BOWMAN: Right. I mean, I understand that raises issues for the defense; but from our standpoint, our motion is

to quash the writ.

THE COURT: Okay.

MR. LOEVY: You know, maybe we should have got a trade for it and got something for it but we're running out of time -- sorry. We didn't -- I have nothing.

THE COURT: We'll deal with the key issue at the afternoon break. Defense may wish to call him and so --

MR. FLYNN: Exactly, your Honor.

THE COURT: -- we'll --

MR. GIBBONS: I said that early on.

THE COURT: Yes. You did, actually. We will not. Ms. Deanes is listening. She will not quash the writ. She can hear very well me saying that and so we will not take any steps at all with regard to that until we decide whether you wish to go forward with your request to call him and, as it stands, he's on his way for next week.

MR. FLYNN: Okay.

THE COURT: All right. Mr. Brown, you may resume the witness stand.

Mr. Matosian, if you can please get the jury lined up.

And, Mr. Gibbons, I'm going to try my best to hold you to about an hour, not because I'm going to hold you to the moment but I want to keep things moving here. So if you need a little more, fine, I get it, but I do want to keep things moving here.

MR. GIBBONS:  I'll get it done.

THE COURT:  Yeah.  So again, I won't hold you to 60 minutes on the nose.

MR. GIBBONS:  I'll get it done.

THE COURT:  Thank you.  I do want to keep it moving.

(Proceedings heard in open court; jury in.)

THE COURT:  All right.  Please be seated.  Welcome back from lunch.  I hope everyone had a nice break.  We're ready to proceed with the cross examination -- to resume the cross examination of Mr. Brown.

Mr. Brown, you remain under oath.

Ladies and gentlemen, just for your sort of comfort, I hope to try to take an afternoon break as close to 2:15 or 2:30.  That's a rough estimate.  If you need a break sooner, please just raise your hand.  Obviously, this doesn't get any -- we don't get through it not by taking too many breaks and so that's kind of why I'm continuing to give you some guidance on where about we think we'll take a break.  If you need one sooner, just let me know by a hand raise.

Mr. Gibbons, you may proceed.

MR. GIBBONS:  Thank you, your Honor.

MARCEL BROWN, PLAINTIFF'S WITNESS, PREVIOUSLY DULY SWORN

CROSS EXAMINATION (Cont'd)

BY MR. GIBBONS:

Q.  Mr. Brown, I want to move ahead to when Assistant State's

Attorney Spizzirri comes into the room.  Okay?

A.   Okay.

Q.   And Mr. Loevy showed you snippets of that yesterday.  But to put it into context, this is about hour 32.  Okay?

A.   Okay.

Q.   You knew when ASA Spizzirri came into the room, she was with the State's Attorney's Office, right?

A.   I didn't know where she was.  I just knew he said she was a state's attorney.  I didn't know what office she was with.

Q.   I think you're going to have put the mic closer.  I'm having a hard time hearing that.

A.   I didn't know what office she was with.  I just know she was called a state's attorney.

Q.   Okay.  Did you know at the time that she was not part of the Chicago Police Department?

A.   I don't know -- I don't know nothing about who is a part of who at that moment.

Q.   Well, it's true, isn't it, that you had met ASA Spizzirri weeks earlier; is that right?

A.   I don't believe it was weeks.  I'm not sure.  I think it was two years earlier.

Q.   Okay.  You recall meeting ASA Spizzirri at some point in the -- in the past, right?

A.   Yes.

Q.   And at that time, you had a pretty good recollection of it

when she entered the room; would that be fair to say?

A.   I remember her face, yes.

Q.   Okay.

        MR. GIBBONS:   Maria, can we play Joint Exhibit 32 and specifically 223738 to 223821, about?  45 seconds.

        (Video played.)

BY MR. GIBBONS:

Q.   Okay.  Would it be fair to say when she enters the room that you were not scared of ASA Spizzirri?

A.   What do you mean "scared"?  I was scared.  I was -- I was scared, yes.

Q.   Well, my question is different.  Yesterday or during the direct examination, you -- you said often that you were scared. My question is very specific.  In relation to ASA Spizzirri, were you scared of ASA Spizzirri?

A.   I was scared of ASA Spizzirri and I was scared of Detective Mancuso.

        MR. GIBBONS:   Maria, can we play 2250 to 225038, please?

        (Video played.)

        MR. GIBBONS:   Maria, can you put up Page 299, please? And do we have Line 2?  And we're going to scroll down this.

BY MR. GIBBONS:

Q.   Do you have that in front of you, Mr. Brown?

A.   Yes.

Q.   Okay.  I'm not going to read this whole page but Spizzirri says basically, all right, now back to where we are.  And then she says on Line 6:  Before we talk, I'm going to advise you of what your rights are just like the detectives did, okay?  And you said "mm-hmm."  Do you see that?

A.   Yes.

Q.   And "mm-hmm" meant yes?

A.   Sir, I didn't understand my rights from the time I walked in that police station.  I didn't learn about rights over the course of those days.  I didn't understand my rights, sir.

Q.   Okay.  So when ASA Spizzirri in Line 10 says -- excuse me.  Let me strike that.

On Line 12, ASA Spizzirri says:  Do you understand you have the right to remain silent and you answered yes, you were confused?

A.   Sir, I thought she had to go formality just like your detective did so I was confused.  I didn't understand my rights at that moment.

Q.   And in Line 15, ASA Spizzirri says:  Do you understand that anything you can say will be used against you in a court of law and you say yes.  That's similar confusion there?

A.   Sir, like I repeated to the -- the question you just asked before, I didn't understand my rights at the time, sir.  And if I can recall when you -- somewhere in that video I didn't say nothing when she asked another part.  I just looked.

Brown - Cross

684

Q. At any point did you ask agent -- excuse me, ASA Spizzirri to -- to further explain what these rights were?

A. No, because your detective told me it was a formality, just something we do so I just thought that was just something she do, too.

Q. And that formality you're speaking of is when the detectives read your rights 32 hours earlier?

A. Yes. I didn't learn about my rights. Not on that day. I didn't have a book to go over it like I do in school to understand it.

Q. Isn't it true that this was the third time you were read your rights? Detective Turner also read you your rights when he came into the room, right?

A. Detective Turner also told me a bunch of lies, too.

MR. GIBBONS: Your Honor, if I can have the witness just answer my question.

THE COURT: Mr. Brown, please just answer the question that's asked. Your attorney will have an opportunity --

THE WITNESS: I'm not sure. If the record reflects that, then yes. But I'm not sure.

MR. GIBBONS: Maria, can you put up Page 300, please, at the bottom?

BY MR. GIBBONS:

Q. Mr. Brown, I'm on Page 300. Are you with me?

A. Yes.

Q. Okay. At the bottom beginning on Line 20, ASA Spizzirri says: So Saturday is when this happened. Saturday night going. Mr. Brown: Yes. Spizzirri: Into Sunday morning. Okay. Now, I don't know a whole lot about everything -- and then on to the next page -- that happened so we're going to have to start from the beginning. And better I just hear it from you than to have the police fill me in on that -- everything. Okay? I'd rather just hear it for the first time right from you. Okay? Marcel -- Mr. Brown, you say all right.

Do you see that? Did I read that right?

A. Yes.

Q. When you said "all right," did you agree to do that?

A. I agreed to tell them my story and I told them my story. She still didn't believe my story. She said that something in me, something, just this little piece so she -- they didn't believe nothing I said.

Q. ASA Spizzirri is in the room almost, you know, maybe a minute or two at this point. You had no previous contact with her in relation to this fact pattern and she's telling you, Marcel, I want to hear it in your own words. Did you take the opportunity at that moment to explain the truth to ASA Spizzirri?

A. At that time, I told a lie that it was only one person shoot and that ASA still said it's this one piece so I knew that she was lying about. She didn't know something about

this.

MR. GIBBONS: Maria, can we play 225904 to 230015, about a minute and 15 seconds?

(Video played.)

MR. GIBBONS: Okay. Thanks, Maria. Can we put up Page 315, please? And to the middle of the page on Line 11.

BY MR. GIBBONS:

Q. Mr. Brown, do you have Page 315 in front of you? Mr. Brown, do you have 315 --

A. Yes.

Q. Okay. On Line 11 it says, ASA Spizzirri: Okay. All right. So in the car, what's being said? Mr. Brown: T.J. was trying to find the new CD you just brought in on the glove -- in the armrest and R.J. was like I'm gonna -- I'm getting tired of these motherfucking Ns. Do you see that?

A. Yes.

Q. ASA Spizzirri asked you that question open-ended, right, what's being said, right?

A. Yeah. I was repeating what Detective Turner told me.

Q. I'm sorry. I need to have that repeated.

A. I was repeating what Detective Turner had said.

Q. So you're lying to ASA Spizzirri?

A. Every time I told you I don't know, they kept "come on, man, he said something."

MR. GIBBONS: Your Honor, can I have the witness

answer the question?  I asked if he was lying to ASA Spizzirri.

THE WITNESS:  I was telling her the detective's truth.

BY MR. GIBBONS:

Q.  Did you lie to ASA Spizzirri?

A.  Yes, I lied.  I was telling her you all truth.

Q.  This is her questioning now, right?  She's the one asking you questions, right?

A.  Yes, but I have been buttered up by the officers being mind played with and stuck in front of her.

Q.  And then on Line 20 to 22, ASA Spizzirri continues and says:  Okay.  What else was he mumbling about back there?  Mr. Brown:  He was saying stuff but I wasn't.  That's ASA Spizzirri now asking you an open-ended question, right?

A.  She's doing exactly what Detective Turner did.  I said I don't know.  She kept pressing.

MR. GIBBONS:  And then let's turn to Page 316, Maria, please.

BY MR. GIBBONS:

Q.  And then beginning on Line 6, Mr. Brown, Spizzirri says:  Okay.  Well, give me some of what he was saying.  Mr. Brown:  Oh, the fucking -- I'm tired of these motherfucking Ns.  Spizzirri:  Okay.  Mr. Brown:  And he said some stuff, some more stuff after that, but.  Spizzirri:  Well, come on.  I know you know.  Brown:  I don't know.  Spizzirri:  Listen, listen.  It's not my job to go and tell.  And then it continues from

there.  Do you see that?

A.  Yeah.  Do you see where I said "I don't know" either, right?

Q.  I'm sorry?

A.  Yes.  I see -- do you see where it says "I don't know, she just wouldn't want stop"?

Q.  Right.  So what I'm saying is Spizzirri was the one following up with you on your answers, right?

A.  That's what I was talking to; yes.

Q.  Right.  And in her question to you, Spizzirri never started with something like did R.J. say words like F those Ns up, right.  She asked you what did he say, right?

A.  I believe Detective Turner started with those words, sir, and I thought --

MR. GIBBONS:  Your Honor, if I can have the witness answer my question.

THE COURT:  Mr. Brown, please just ask the -- answer the question that's asked.  Your lawyer will have an opportunity to follow up with you.

THE WITNESS:  No.

THE COURT:  Thank you.

MR. GIBBONS:  Maria, let's move ahead and play 2306002, 230615, or so.

(Video played.)

MR. GIBBONS:  Okay.  If we could put up transcript

Page 325, please.

BY MR. GIBBONS:

Q.   Okay.   Mr. Brown, do you have Page 325 in front of you?

A.   Yeah.

Q.   Okay.   And I'm going to just cover that little snippet there.   It begins on Line 5.

     Spizzirri:   Okay.   So let's kind of focus a little bit on that situation.   No one else out there had a gun, right, Marcel?   Brown:   No.   It was just R.J.   Brown:   Yeah. Spizzirri:   Okay.   And once R.J. got in the car and put that gun in his pocket, there was no more gunfire, right? Mr. Brown:   No, no more.

     Did I read that right?

A.   You read it right.

Q.   And is that a lie?

A.   That's a big lie.   It was multiple guns out there.   It was multiple shots.   There was still shots when I will left.

Q.   But that's not what you told ASA Spizzirri, right?

A.   Because I told the detectives and they kept telling me, oh, I don't think she's going to want to hear that.

Q.   You believe the detectives told you on this tape that they told you ASA Spizzirri is not going to want to hear that?

A.   Yes.   And I told her if you want me to say this, I'm going to say it.   No, no, we just want the truth.   Well, I just told you the truth, but if this is what you want, I'm gonna to say

it.

MR. GIBBONS: Maria, can we play 231242 to 231409?

(Video played.)

MR. GIBBONS: Maria, if we could put up Page 366, please. 336. I'm sorry. And scroll down to where it begins on Line 19, please.

BY MR. GIBBONS

Q. Okay. This is the transcript of what we just listened to. ASA Spizzirri: Okay. All right. And how did you and R.J. end it? Like, did he tell you don't talk to the police, keep your mouth shut? What did he tell you? Mr. Brown: No, no. He said -- he tried to make up a story to tell us that Day-Day shot at him if the police get me and T.J.

Did I read that right?

A. Yes. You read it right, but at that time your detectives was telling me hours and days before that, yeah, that stuff gots to go. This stuff about Day-Day, that stuff gots to go.

Q. My question was did I read it right?

A. You read it right but I'm telling you my truth.

Q. Okay. So you're telling Spizzirri here that R.J. wanted you to make up a story that Day-Day shot at him. Is that what you said to her?

A. Yes.

Q. And this was, in fact, what was the central part of the discussion at the family meeting, right?

A. I don't know what the central part of discovery was because a girl got stabbed and almost died so they was talking about a lot of things at that meeting.

Q. Okay. Well, this was at least one of them, that R.J. shot and Day-Day shot in the park, that was discussed at the family meeting, right?

A. Yes.

Q. And you would agree with me that that is what you early in this interrogation told the detectives, right?

A. Yes. I told them the truth and they told me that Day-Day still have to go.

Q. You told them the truth that you witnessed Day-Day was a shooter but that actually wasn't the truth, right?

A. I witnessed it was another shooter and your detective told me, hey, the Day-Day stuff has to go.

Q. You're telling Spizzirri here that R.J. wanted you to make up a story; truth or a lie?

A. That was a lie. The detectives already got to me, brother.

Q. Thank you.

MR. GIBBONS: Maria, can you play the next seconds of that same tape, 231409 to 231550?

(Video played.)

MR. GIBBONS: Okay. Maria, can you put up Page 337, please?

BY MR. GIBBONS:

Brown - Cross

692

Q.   Spizzirri is asking you and trying to determine if there was anything you were worried about in relation to telling her the truth, right?

A.   Yes.  She asked me that question but a minute later you probably can see me crying in the video saying I don't know, I don't know what you want me to say.

MR. GIBBONS:  Judge, if I could just have the witness answer my question.

THE WITNESS:  I answered it.

THE COURT:  All right.  Mr. Brown, I'll let your answer stand but please just answer the question that's asked. Your lawyer will have an opportunity to follow up with you.

THE WITNESS:  Okay.

THE COURT:  Thank you.

BY MR. GIBBONS:

Q.   So the answer is yes, Spizzirri was trying to make sure you weren't worried about other things in relation to telling her the truth, right?

A.   I don't know what she was worried about.  I'm not a mind reader.

Q.   She used those words to say -- oh, let me don't paraphrase. Let me read you beginning on Page 337, Line 9.

Spizzirri:  Okay.  All right.  Marcel, let me ask you something, is there anything else that you're afraid of to not tell me now that I'm in here?  Did she ask you that question?

A.   She asked that question.

Q.   And then your answer on Line 12 was:  No, he gone now.
Spizzirri:  Because you're afraid of what?  Brown:  He gone.
         Do you see that?

A.   Yes.

Q.   "He gone" meant R.J., right?

A.   Yes.

Q.   You realized at this point that R.J. was going down for the
shooting, right?

A.   Yes; and the other detective wanted more on him.

Q.   And "he gone" meant you wouldn't have to worry about him on
the street anymore, right?

A.   I don't know what you mean by that.  I don't know what I
had to worry about at that point.  My mind was everywhere.

         MR. GIBBONS:  Maria, can you move over to Page 338,
please?  It begins on the bottom of Page 337.  If you want to
start there, Maria.

BY MR. GIBBONS:

Q.   Spizzirri:  Okay.  Are you worried about not telling me the
whole truth because you're afraid of what will happen to you?
Mr. Brown:  I'm telling the truth.  I ain't worried no more.
He told me don't worry about it.  Spizzirri:  Okay.
         Did I read that right?

A.   Yes.  The "he" was referring to your detectives telling me
stuff.

Q. Did I read that right?

A. Yes.

Q. Okay. Spizzirri specifically asked you were you telling her the whole truth and you said yes. My simple question to you is: Did you lie to Spizzirri?

A. Yes, sir. I did. She wouldn't believe the truth.

Q. Okay. Let's move towards the end of the questioning, at least my portion.

MR. GIBBONS: Maria, play 234825 to 235141. It's about a minute and a half.

(Video played.)

BY MR. GIBBONS:

Q. Okay. So we listened to about a minute and a half there and I think we heard that exact snippet from Mr. Loevy. A couple of questions.

MR. GIBBONS: Maria, can you put up Page 371, please?

BY MR. GIBBONS:

Q. Mr. Brown, this is the transcript of the conversation you were just having with Spizzirri. And I'm on Page 371 up there on the screen. Do you have that in front of you?

A. Yes.

Q. Okay. On Line 18, it starts off with -- well, let's go to 17. Spizzirri: But why? Brown: Because, like, he don't go into the park with me. And he knows nobody like him. Spizzirri: So it was just all of these circumstances you're

telling me that made it seem like he had a gun: Brown: Yeah. Did I read that right?

A. Yes. You read that right. But as you can see the double negative --

Q. That was my question, Mr. Brown.

A. Don't cut me off.

Q. Did I read that, right?

A. Yes. She got a lot of her own minds.

THE COURT: Mr. Brown, just answer the question.

MR. GIBBONS: Okay.

THE COURT: You can only answer the question that's asked.

BY MR. GIBBONS:

Q. When you say on Line 18 "because like he don't go into the park with me and he knows nobody like him," what did you mean by that?

A. That wasn't the truth. I was lying.

Q. And when Spizzirri says "it's all of these circumstances you're telling me about that made it seem like he had a gun," and you said yeah; truth or a lie?

A. That's a lie.

Q. Okay.

MR. GIBBONS: Maria, can we put up Page 372, please?

BY MR. GIBBONS:

Q. At the top, Spizzirri says on Line 4: Okay. Did he say

anything that added to that?  Brown:  I'm getting tired of these Ns, you know, fuck 'em up.

Do you see that?

A.  Yes.

Q.  That was in relation to an open-ended question that Spizzirri had asked you, right?

A.  I was lying right there.

Q.  Okay.  If we move down to Line 14 -- Maria, please -- same page, Spizzirri says to you:  Okay.  Does fucking people up to R.J. or do you mean shooting them or does fucking them up mean.  Brown:  When he say it, it means like shooting somebody.

Do you see that?

A.  I see it.

Q.  Those are your words, right?

A.  Yes.  I was lying.

Q.  And then you confirmed to Spizzirri that R.J. had used that term before, right?

A.  I don't know.  It says nodding.  I could have said no or yes.  So I got a video.

Q.  All right.  It's a lie, right?

A.  I said I don't know what I was doing.  It says nodding.  I could have nodded yes; I could have nodded no.

Q.  Let me -- let me ask you a question:  Prior to this, did the detectives ever insert these words of how to define "fucking people up" to you?

A.   Detective Turner inserted those words, yes.

Q.   And he -- it's your testimony that Detective Turner suggested that "fucking them up" meant shooting somebody?

A.   He put those words in my head?

Q.   "Fucking them up" meant shooting somebody?

A.   He put those words in my head.

Q.   Okay.  Mr. Brown, would you agree with me that no detective ever physically -- physically, I'm stressing that word -- physically abused you?

A.   They mentally abused me, sir.

Q.   I knew you were going to do that's.  That's why I said the word physically twice?

        MR. GIBBONS:  Your Honor, can I have the witness answer my question, though?

        THE COURT:  Mr. Brown, please just answer the question.

        THE WITNESS:  No.  No one put their hands on me.

BY MR. GIBBONS:

Q.   I've got to cover another area with you completely apart from your interrogation because of the next witness.  I'm supposed to do it all now, right?

        Wham Cary.  You heard that name before?

A.   Yes.

Q.   Okay.  That's an attorney that your family says they hired for you on September the 3rd, 2008, right?

A. Yes.

Q. That's the day that you were in the interview room, right?

A. Yes.

Q. Okay. And during your questioning, is it fair for me to say that no detective ever mentioned that Wham Cary was there to see you?

A. The detective told me nothing.

Q. Okay. Well, I understand they didn't tell you nothing. I just want this clear on the record.

No detective ever came into that interview room and said Wham Cary is here to see you, right?

A. No.

Q. We got a couple negatives there.

A. I said --

Q. Is it accurate --

A. You just asked a question. I gave an answer. I said no.

Q. Very -- very poor question on my part.

A. I can answer yes or no. No.

THE COURT: He's trying to rephrase the question.

MR. GIBBONS: I'm going to rephrase it.

THE COURT: Yeah. He asked a bad question so he's going to ask again.

MR. GIBBONS: I did; and I admit that.

BY MR. GIBBONS:

Q. Is it accurate for me to say that the name Wham Cary never

came up?

A.   I never knew that name.  No.  It never came up.

Q.   And then it would be fair to say you never declined to meet a person named Wham Cary, right?

A.   I never knew Wham Cary was there.

Q.   Okay.  Now during the examination of Mr. Loevy, you explained the relationship with your mother.  I don't want to go through that but it's been close for your entire life, right?

A.   Yes.

Q.   Okay.  And that included staying in regular contact with her while you were imprisoned at county, right?

A.   County and prison is two different thing.

Q.   Yeah.  I know that.

A.   That's not what you saying.

Q.   I'll ask it sweepingly.  While you were in the Cook County Jail or Menard, you stayed in regular contact with your mother, right?

A.   Yes, but I can't talk about my case in prison or at Cook County Jail.

        MR. GIBBONS:  Your Honor, I didn't ask that question.

BY MR. GIBBONS:

Q.   Yes you stayed in regular contact with your mom, right?

A.   Yes.

Q.   Okay.  So in the -- in the weeks and the months and maybe

even the years after you're questioning at Area 5, your mom never asked you not once why did you turn Wham Cary away, right?

A. My mom never talked about my case on the prison, on the Cook County phone or on a visit because people in there can listen and try to use stuff to go back, so no.

Q. Okay. I just want to make sure in the middle of all that I have my question answered. Your mom never once --

A. I said no.

Q. -- brought up that circumstance of why you would have turned Wham Cary away, right?

A. No.

Q. Okay. And your mother never once in that time frame asked you if the detectives said anything to you about Wham Cary, right?

A. Sir, my mom was concerned about getting me out of jail. She wasn't worried about what happened that day. She know I didn't like talk about what happened in interrogation room.

Q. Okay. It wasn't until almost seven years later that this issue arose in relation to Wham Cary and that's when you and your mom first talked about this, right?

A. Yeah. She had a phone call to that and you can see me asking her, mom, are you sure you hired this man because it's critical.

Q. And that's -- that was about seven years later, right?

Brown - Cross

701

A.   Yeah.   You got that phone call too, right?

Q.   As you were preparing your post-trial paperwork, right?

A.   Yes.

Q.   Okay.   You were active in trying to get your conviction reversed, right?

A.   Yes.

Q.   Okay.   And you talked to anyone you could who you thought had relevant information to provide affidavits in support of your position, right?

A.   Did I talk to who -- who do you mean if I talked to anyone I could?

Q.   Did you talk to anybody who you thought had relevant information?

A.   I only have -- I don't recall.

Q.   Okay.   Well, you did talk to T.J. Scott about giving an affidavit, right?

A.   T.J., Terry Scott, yes.   It's my cousin.

Q.   You talked to him about giving an affidavit, right?

A.   Yes, because he didn't know nothing and I didn't know nothing.   We was together.

Q.   And you were getting an affidavit from him, and others, to try to help convince a judge to listen to your case, right?

          MR. LOEVY:   Objection, your Honor.

          THE WITNESS:   I wasn't getting the affidavits from him.   T.J. was talking to my attorney so I didn't know nothing

about getting the affidavits from T.J.  T.J. was just talking to my attorney.

BY MR. GIBBONS:

Q.  Now you made --

MR. LOEVY:  Objection.

THE COURT:  Okay.  Hold on.  Yeah, I didn't hear the basis of the objection.

MR. LOEVY:  This opens the door to the subject.

MR. GIBBONS:  I asked about a case.  That's all I said.

THE COURT:  Okay.

MR. GIBBONS:  I'm not going anywhere else near there.

THE COURT:  Okay.  Thank you.  So that the answer will stand.

BY MR. GIBBONS:

Q.  You -- let me ask it frankly.  You didn't think T.J. was all that smart, right?

A.  T.J. wasn't all that smart, but T.J. know that I was innocent.

Q.  Well, you wanted to make sure that your 2015 story matched up with what his recollection was, didn't you?

A.  No.  I just -- we talked about what happened.  We didn't go over 30 calls.  We talked about it for probably ten seconds.

Q.  All right.

MR. GIBBONS:  I'd like to play at this point a call

that the Court has deem admitted already.  It's DX-396.  This is a call from Menard prison dated April the 12th, 2015.

MR. LOEVY:  Your Honor, the same objection, that we'd like to be able to explain the context if we're going to play the call.

THE COURT:  All right.  Let's do a quick sidebar, please.

(Proceedings heard at sidebar.)

THE COURT:  Those were the days when we did sidebars at sidebars.

MR. GIBBONS:  I'm too old.

THE COURT:  All right.  Your objection, Mr. Loevy, or explanation?

MR. LOEVY:  Sure.  If he plays this tape, it's a discussion with the two men about what happened then.  I can't just leave it hanging.  I would have to say why are you talking to T.J. and that would open the door to the subject that they've moved to bar, which is what happened on post conviction, why is this relevant to post conviction.  He's trying to win his post-conviction freedom.  That's why he's having this conversation.

THE COURT:  I'm a little concerned that the juice might not be worth the squeeze.

MR. LOEVY:  -- on the call either.

MR. GIBBONS:  Well, he's coaching T.J. up.

(Counsel conferring.)

MR. LOEVY: If there's going to be an allegation he's coaching, we should have --

MR. GIBBONS: Yeah. I mean, obviously I'd be very careful about, you know, the post conviction that didn't happen there. He's just coaching up his cousin. They're saying the same thing. His cousin's got it wrong. He coaches him up to get it right. I don't -- I'm going to make a decision I don't need it.

THE COURT: Okay.

MR. GIBBONS: We'll end it.

THE COURT: All right. Thank you.

(End of sidebar.)

THE COURT: All right. Mr. Gibbons, you may ask your next question.

MR. GIBBONS: Thank you, your Honor.

BY MR. GIBBONS:

Q. I'm nearly done, Mr. Brown. I'm sure that's welcome news to you.

Before your trial, Mr. Loevy went through, I don't know how many, continuances time after time after time. Do you remember that line of questioning?

A. Yes.

Q. Okay. And you were present for each of those court appearances, right?

A.   Sometimes I wouldn't come out.

Q.   Okay.  Could you hear when you were in the bullpen?

A.   No.

Q.   Isn't it true, Mr. Brown, that as a defendant, you had to personally say I'm okay with that continuance?

A.   No.

Q.   The Court never asked you that, is that your testimony?

A.   I don't say nothing.  My lawyer do all the talking.  I don't -- I can't say I don't want that continuance.  The judge is going to say talk to your attorney.

Q.   Did that ever come up?

A.   I don't -- I don't remember.  I don't recall nobody asking me every time are you okay with that continuance.  I don't remember that.

Q.   No memory of the court ever saying --

A.   I just told you I don't recall that.

Q.   -- Mr. Brown, give me --

A.   I don't recall.

Q.   -- that we can continuance the case --

        THE COURT REPORTER:  I'm sorry.

BY MR. GIBBONS:

Q.   Let me ask my question, Mr. Brown.  You're saying that you never agreed -- every time your lawyer was moving for a continuance, you didn't say I agree or didn't agree.  The court never asked you that?

A.   I don't recall being asked that.  My lawyer did all the talking.

Q.   Okay.  Now I want to make sure I'm right on this.  I could have heard it wrong.

     Did you testify on direct that there were no witnesses who testified against you at the criminal trial?

A.   Nobody testified against me but his statement.

Q.   Okay.  Isn't it true that Eugene Stanciel testified at your criminal case?

A.   Eugene Stanciel can't say if I knew anybody had a gun. Nobody said Brown did anything.

Q.   Isn't that true that Marisol Ocampo testified at your criminal case?

A.   The judge said no one said Brown did anything.

Q.   Isn't it true that Amanda Moore testified at your criminal case?

A.   And half those people can't tell you where I was at.

Q.   Okay.  Last bit of questioning.  You went through something, an incident, involving a kite to R.J. that got you 30 days in seg; is that right?

A.   They put me in there for my safety.  Check your records.

Q.   I thought you had testified in relation to Mr. Loevy that it was R.J. and a kite --

A.   It had something to do with R.J. and I said they put me in there for my safety.  My lawyer called.  I didn't get in any

trouble.

Q. And isn't it true that Internal Affairs at the prison investigated?

A. They investigated it had nothing to do with me. I never got an infraction for ten years.

Q. And you did get disciplined for that, right?

A. I just told you it was for my safety. It wasn't for discipline, sir. Can you call IA and they'll explain their process to you?

Q. Did you feel like you were railroaded in that situation?

A. I felt like it was I was dealing with him again. That's what I felt like.

Q. Did you feel like you were railroaded by the Internal Affairs --

A. I been railroaded for ten years.

Q. Let me finish my questions. Did you feel like you were railroaded by the Internal Affairs at Menard prison --

A. It never stopped.

THE COURT REPORTER: I'm sorry.

THE COURT: You can't speak over each other. You cannot.

MR. GIBBONS: I've asked three times to let me finish my question, Judge.

THE COURT: Right.

BY MR. GIBBONS:

Brown - Redirect

708

Q.   It's the last question I have, Mr. Brown.  Did you feel like the Internal Affairs at Menard prison railroaded you?

A.   Yes, because they thought I knew something just like your detectives did.

          MR. GIBBONS:  Nothing else, your Honor.

          THE COURT:  All right.  Thank you, Mr. Gibbons.  Redirect, Mr. Loevy.

                    REDIRECT EXAMINATION

BY MR. LOEVY:

Q.   Mr. Brown, you came on a little hot on that cross examination, didn't you?

A.   Yes.

Q.   Without revealing too much confidence, is it -- had it been your intention to stay calm?

A.   Yes.

Q.   How -- was it difficult for you to answer hours of questions again about a shooting in Amundsen Park suggesting that you were guilty?

A.   Yes.

Q.   What happened the last time that a guy who looked like Mr. Gibbons asked you hours of questions about whether you were guilty of a shooting in Amundsen Park?

A.   I went to prison for a murder I didn't commit or participate in.

Q.   What is the difficulty of being reaccused?  Why is it hard

Brown - Redirect

709

for you to stay calm?

A. Because he putting me back in that situation. It feel like -- it just feel like something is going to happen to me.

Q. The last time you were in that situation, did you feel like you were treated with dignity and respect or the otherwise?

A. I wasn't treated with no respect.

Q. This time did you insist that you were treated differently?

A. Not from him.

Q. All right. Is it possible you went a little afar there?

A. Yeah, but I was treated different. But he reminded me of it.

Q. Last time did you feel like you were pushed and words were put in your mouth?

A. Yes.

Q. Was it your intention for that to happen again?

A. No.

Q. The last time it happened, were you a child or a man?

A. I was a child. I'm a man now.

Q. And would you have let it happened to you what happened to you in 2008 if you were grown?

MR. GIBBONS: Judge, calls for speculation.

THE WITNESS: No.

THE COURT: Overruled. You may answer.

BY MR. LOEVY:

Q. Were you sensitive to being tricked again?

A.   Yes.

Q.   I want to back up and cover some other subjects too; and I'll go back to the interrogation.  But Mr. Gibbons asked you if you agreed to have your trial continued from 2009 all the way through 2010 and then into '11.  Do you remember him asking you if that was your agreement?

A.   Yes.

Q.   Was it your desire and plan to stay in the Cook County Jail waiting for that trial for more than a year?

A.   No.  I was being tortured in there.  I wanted to go home.

Q.   All right.  Well, why didn't you talk and tell the Court can we have a trial?

A.   The judge don't allow you to talk.

Q.   Was it up to you?

A.   No.

Q.   Did you have any control over that process whatsoever as far as you're concerned?

A.   No.

Q.   Mr. Gibbons asked you about some witnesses at your trial. Explain to the jury who was tried that day.

A.   Me and R.J. was tried that day but nobody said I did anything.  Nobody seen me tell him to do anything.  Nobody said I did it.  The judge said I -- no one said I did anything.

Q.   All right.  Eugene, Marisol, and Amanda Moore, who did they say did something?

A.   R.J.

Q.   Did they say -- did any of those three people you listed say anything that you did wrong or illegal?

A.   No.

Q.   Mr. Gibbons asked you about Wham Cary.  Do you remember those questions he just asked you?

A.   Yes.

Q.   Did you understand at the time the significance of what you now know about Wham Cary?

A.   I didn't understand anything about law right then.

Q.   You have an understanding now, don't you?

A.   Yes.

Q.   Did you and your mother as you were talking ever talk about the significance of it at any time prior to, say, 2007?

A.   Before that?

Q.   Yeah.  Before that, did it even come up?

A.   My mom never -- I wasn't going to school for law so we never talked about that kind of stuff.

Q.   Did either of you understand the significance in any respect?

A.   No.

Q.   All right.  I want to back up to yesterday.  Mr. Gibbons asked you -- he had read your deposition and reviewed the whole thing.  658 pages is a lot of pages to review, isn't it?

A.   Yes.

Brown - Redirect

712

Q.   Did you read all 658 pages?

A.   No.

Q.   What was your plan?

A.   Just come up here and tell my truth.

Q.   The USDA group that got mentioned, Mr. Gibbons mentioned that.  Can you be real clear?  Is this a gang or a crew or what is it?

A.   This is just me and my friends.  Most of them want to be rappers and Young Jeezy was the best rapper at that time.  We liked listened to him and we used to call ourself that.

Q.   Starting at what age?

A.   15, 14.

Q.   Was this a gang that -- that engaged in criminal activity?

A.   No.

Q.   Did you have rivals or turf?

A.   No.  That turf was Vice Lords' turf.  We couldn't do nothing out there.

Q.   By "that turf," you mean the whole neighborhood -- there was a real gang in the neighborhood, right?

A.   That controlled everything.

Q.   And what was that gang called?

A.   The Mafias.

Q.   Mafia Vice Lords?

A.   Yes.

Q.   Did you have anything to do with them?

A.   No.

Q.   How about a little teeny bit, nothing?

A.   No.

Q.   All right.  But back to this USDA -- USDA was what you and your friends called each other?

A.   Yes.

Q.   Is that just a bunch of friends calling each other a name?

A.   Yes.

Q.   You -- he referred to your nickname as Main-Main.  Was that a gang nickname, sir?

A.   No, Main-Main.  It's -- I had that name myself as long as I can remember.

Q.   How old were you when your family started calling you Main-Main?

A.   Probably a baby.

Q.   Is that illegal or sinister or a gang?

A.   No.

Q.   In your neighborhood in your house, people are called nicknames, right, like many?

A.   Everybody have a nickname.

Q.   How about this group he's talking about Young Money, was that a rival of USDA?

A.   No.

Q.   Who is Young Money?

A.   Some guys I went to high school with, a few friends.

Q. What were they?

A. Just some more people that called their self. That's another rap group.

Q. Okay. Do you have any problem with the rap group guys Young Money rap group?

A. No.

Q. Are there other rap groups in the school too?

A. Other people call their selves -- some people call their self other rap groups; yeah.

Q. All right. Anything illegal or criminal or shooting people about rap groups?

A. No.

Q. This is kids?

A. Yeah. And the fights he was talking about, we was kids when we had those fights.

Q. We'll talk about that.

Was the Young Money or the USDA, was that rival territory or turf or anything like that?

A. No.

Q. Let's talk about the fights, I guess. Did you get in fights as a little kid?

A. Yes.

Q. Any more or less than the next guy?

MR. GIBBONS: Objection. Lack of foundation.

THE WITNESS: Probably a little more --

MR. LOEVY: You can't answer until the Judge rules.

THE COURT: It was a foundation objection. Mr. Loevy, can you just lay a little bit more foundation?

MR. LOEVY: Sure.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Would it unusual for kids in your neighborhood to get in little fights?

A. No.

Q. How common was it?

A. It was a common thing. We boys. We fought. Girls fight. Kids fight. People fought all the time.

Q. All right. When you would get in a fight with a kid, say that Butta fight that he mentioned, who is Butta?

A. Butta a guy from the neighborhood just like talking stuff all day.

Q. And then referring to your deposition, he read you from parts of Page 89. Do you remember saying a little bit further on on the same page -- this is Lines 23 and 24 -- how long --

MR. GIBBONS: John, let me get there.

MR. LOEVY: Sure. Page 89, Lines 23 and 24.

(Brief pause.)

MR. GIBBONS: Okay.

BY MR. LOEVY:

Q. How long did the fight last? Answer: About a minute. Did

you give that answer at the deposition?

A. Yes.

Q. All right. Was this significant in your life, to get into a little fight with a guy named Butta?

A. No, but I just had a fight with him.

Q. All right. At the deposition did they ask you 658 pages of questions about your life?

A. Yes.

Q. Did you answer them truthfully?

A. Yes.

Q. Did they ask you about fights you got in when you were a kid?

A. Yes.

Q. Did you lie or hold back or tell the truth?

A. I told them the truth.

Q. Would they have known anything about a fight you got in with somebody named Butta for a minute when you were a teenager if you hadn't told them?

A. No.

Q. Were you trying to hide anything?

A. No.

Q. Does the fight you got in with Butta or somebody else have anything to do with what you went to prison for for ten years?

A. Not at all.

Q. Let's talk about the park that night. You were asked

about -- a lot of questions about the gold Malibu.  Why were there rims on that car, sir?

A.   Because my uncle had rims on his car and I always --

Q.   You got to talk clear.

A.   My uncle had rims on his car and he always used to be you making sure you go to school and I always told him yeah.  And I told him I was going to graduate.  He said you graduate, I buy you some rims.  So I graduated and I was hounding him for the rims and he had finally bought them.

Q.   All right.  So was there anything illegal or sinister about your car?

A.   No.

Q.   Was it cool to have rims on your car?

A.   To me, it was.

Q.   All right.  And if you had wanted to go to a park and shoot and be part of a plan to kill somebody, would it have been smart to drive your car to the park?

A.   No.

Q.   Do people know your car?

A.   Yeah.

Q.   If it was your plan to go to the park and kill somebody or shoot somebody, would have driven your car right up to the park?

A.   I wasn't going but I wasn't driving my car.

Q.   You probably wouldn't have gone to the park to kill anybody

either?

A.   I ain't go in either.

Q.   After the shooting, you were asked if people were running. You know what you did, right?

A.   Yes.

Q.   What did you do?

A.   I ran.

Q.   All right.  Do you have any certainty what anybody else did other than yourself?

A.   No.  I just seen T.J. run in front of me and everybody else didn't show any signs of movement.

Q.   All right.  But were you -- you were running to your car?

A.   I wasn't trying to see what --

Q.   That's my question.

A.   No.

Q.   All right.  Now I'm interrupting you.  Sorry about that.

A.   That's all right.

Q.   Do you claim to know what person number 89, 93 and 94 were doing?

A.   No.

Q.   If they say they were running, would you argue with them?

A.   No.

Q.   All right.  You did -- you were asked -- you left your sister in the park.  Do you remember Mr. Gibbons asking you that yesterday?

A.   Yes.

Q.   What did you do as soon as you were in the clear?

A.   I called my sister.

Q.   And how did that call go?

A.   She told me she was all right.  She asked me if I was all right.  I said I'm fine.  And I remember her saying the girls fighting.  I told her --

THE COURT REPORTER:  I can't hear.

THE WITNESS:  I told her I was fine.  She said the girls was fighting.

BY MR. LOEVY:

Q.   All right.  Did you ask if she was okay, too?

A.   Yeah.  She told me she was okay.

Q.   All right.  Last question about the fights.  You were talking about a guy named Jamel and you said something about how that fight started.  What was that fight?

A.   Me and Day-Day, he says my rival, we was together and my friend Jamel came up -- Jamel is less fortunate.

Q.   What do you mean?

A.   Jamel was in a foster system.

Q.   And?

A.   So he didn't really have nice things.  So Day-Day kept bothering him.  I told him to leave him alone and so me and him got to fighting.

Q.   All right.  You were protecting your friend Jamel?

A. All of us was friends at the time.

Q. And did you -- was there any problem with Day-Day after that?

A. No.  We got done fighting, we sat down.

Q. All right.  How old do you think you were?

A. Probably 14, 15.  Just got in high school.

Q. All right.  You were asked some questions about a tape and about -- there was a question about the word on the tape, do you remember, did or did?

A. Yes.

Q. That's a tape you heard before, I take it?

A. Yes.  And I explained it in a deposition and I explained --

Q. All right.  Let me ask you a question because it sounds like you're a little hot about this tape, huh?

A. Yes.

Q. What bothers you about these questions about this tape?

A. That I hid, I hid -- hide because I didn't do anything and everyone else turned their self in.

Q. Where did the police find you?

A. At home.

Q. Were you hiding?

A. No.

Q. Were you at the address where the police could find you?

A. Yes.

Q. Did you go out after the shooting too and --

A.   I went out a lot of times after the shooting.  Drove the same car, too.

Q.   You were asked about R.J. and guns.  To be clear, how many times in your life have you seen R.J. with a gun?

A.   I probably seen R.J. with a gun one time when he was about 13.  And then I walked up because I was going to get my brother from a party and I seen R.J. in the police car and they say he got caught with a gun.

Q.   So those were two times?

A.   But I didn't really see the gun.  He said he got caught with a gun.  I seen the police there.

Q.   All right.  Did you see R.J. a lot of times when there wasn't a gun?

A.   Mostly every day I seen him he have a gun.

Q.   How many thousands of times did you see R.J. --

A.   Millions.

Q.   You were asked about enemy territory and Mr. Gibbons showed you some transcript here.  And this is Page 266 of the transcript he showed you.  And he put it up here and he said: Maybe without knowing, you're going into like enemy territory and you said yeah and he focused on the word yeah.

     Do you remember those questions?

A.   Yes.

     MR. LOEVY:  Let's play 351, Lillia, if we could. Let's listen to what was said.  Sorry to surprise you of that.

THE COURT: We probably got to switch to --

MR. GIBBONS: John, what are we playing?

MR. LOEVY: 351 is the same -- it's the same -- it's Page 267 -- 266 of the transcript. I believe it's the same one you used, 266.

BY MR. LOEVY:

Q. You don't need to worry about it, Mr. Brown.

A. Okay.

MR. LOEVY: Do you need the screen to play it?

Oh, your Honor, can we have the screen so that Lillia can see it? Thank you.

(Video played.)

BY MR. LOEVY:

Q. All right. So, you know, when you said yeah, were you like yeah or were you just like trying to get to the next point?

A. I was trying to get to the next point. He saying territory.

Q. Okay.

(Video played.)

MR. LOEVY: Okay. All right. If we can have that document camera back please, your Honor. All right.

BY MR. LOEVY:

Q. All right. So were there times where -- even though the transcript reads like it reads, it's basically like you and him are having different conversations?

A.   Yes.

          MR. GIBBONS:   Objection.   Form of the question.

          THE COURT:   Rephrase the question.

BY MR. GIBBONS:

Q.   Would that be a fair characterization that sometimes you and the detective were having two different parallel conversations?

A.   Yes.   She would tell me at points asked what happened.   And then before I tell him, he would give me all the information.

Q.   All right.   When you said "yeah" here as we just heard on that tape, did it sound like you were agreeing with him or just trying to get a word in?

A.   Trying to get a word in.

Q.   All right.   So the transcript is not always as clear as it looks on the page, right?

A.   Yes.   That's why he, like, used it.

Q.   Let's talk about the interrogation.   You were asked a lot of questions about whether you understood your rights.   Did you?

A.   No.

Q.   If you had understood that, hey, Marcel, you've told him what you want to tell him, you think all things being equal, guys, I think I'm done talking.   If you had truly understood that, what would you have done?

A.   I wouldn't have said anything.

Q.   If it had been -- if you had comprehended that you didn't have to talk to them without having Wham Cary or an attorney sitting next to you, what would you have done?

MR. GIBBONS:  Objection, your Honor.  This calls for --

THE WITNESS:  I wouldn't have said anything --

MR. LOEVY:  Hold on.  Don't answer.

THE COURT:  The objection is speculation.  Response?

MR. LOEVY:  I don't even understand the objection.

MR. GIBBONS:  What would you have done 12 years ago?

MR. LOEVY:  I can lay some foundation.

THE COURT:  Yeah.  Lay some foundation.

BY MR. LOEVY:

Q.   You're 18-year-old self if you would have understood you had a right to an attorney, would you have proceeded to get questioned without the attorney?

A.   No.  I would have asked for that attorney.

Q.   Now you were asked a lot of questions this morning about the beginning, the first 15 minutes of that interrogation.  It would be fair to say that you did come out trying to protect R.J., right?

A.   Yes.

Q.   What did you do?

A.   I lied and said R.J. wasn't shooting; just the other guy.

Q.   All right.  That's not the right thing to do, is it?

A.   No.   I didn't want to be there and they forced me to go there so I thought I just tell them that and they just let me go.

Q.   All right.   But you did tell them something that wasn't true, didn't you?

A.   Yes.

Q.   Although, did you know if R.J. shot?

A.   I didn't see R.J. shooting.   He told me he shot back, though.

Q.   So you had knowledge that he shot but you didn't see it?

A.   Yes.

Q.   Did you think it was immoral or uncommon or a terrible thing to do to not give up your cousin to the police on the first question?

A.   No.

Q.   Let me ask you a hard question.   It's a curve ball.   But if you were 18 and you could give yourself better advice and the police said, hey, did your cousin shoot somebody, would you have tried to protect your cousin again?

A.   I would have asked for a lawyer.

Q.   All right.   But you did try to say your cousin wasn't shooting, right?

A.   Yes.   I didn't believe he killed that guy.

Q.   All right.   Would you have been able to be a witness that saw R.J. shooting?

Brown - Redirect

726

A.   No.   They wouldn't let me.

Q.   Because you actually didn't see it, right?

A.   Yes.

Q.   Do you remember from your conversations with Mr. Gibbons how long you persisted in saying that you didn't want to say R.J. was a shooter?

A.   Yes.

Q.   How long about was it?

A.   Probably a couple hours.

Q.   All right.   And then for the next 30-plus hours, did you acknowledge that R.J. was the shooter?

A.   Yes.

Q.   Why did you finally say fine, R.J. was the shooter?

A.   Because they wouldn't let me call my mom or getting out the room so I told them the truth that it was two people shooting, then they wouldn't buy that truth.

Q.   Let's talk about the second person.   Who did you believe the second person was?

A.   I believe the second person was Day-Day.

Q.   Now you were asked -- that's an irresponsible thing by Mr. Gibbons that maybe you get Day-Day in trouble.   Do you remember those questions?

A.   Yes.

Q.   Why did you think it was fair?

A.   Because I know someone else was shooting and R.J. said

Day-Day shot at them. I don't know if he seen Day-Day before I got out of the car or what to determine if that was Day-Day but he was for certain that it was Day-Day.

Q. All right. Do you remember what the police were telling you about whether Day-Day was shooting in the park?

A. Yes.

Q. What was the gist of their response?

A. Day-Day wasn't shooting, that Day-Day stuff got to go.

Q. All right. I'm going to show you Page 55, Line 18 through Page 56, 12 of the interrogation. I don't have the video queued up so I'm going to show the question that Mr. Gibbons asked you. I'm not sure if Mr. Gibbons asked you this one. This is 55 -- Page 55, Line 18.

I was hoping, I was just starting to read this thick ass file -- this is Detective Weber; okay. So what I was hoping that you'll do is to tell them the truth because you're lying, it makes you look guilty. What's -- what that's, the file? Yeah. These are all statements. These are all different people's statements. I ain't started reading them. And you said they ain't got nothing on Day-Day, with a question mark.

Do you see that?

A. Yes.

Q. Were you surprised that other people weren't saying that Day-Day was the shooter?

A.   Yes.

Q.   Why were you surprised?

A.   Because it was the fact that someone else was shooting.

Q.   And did you believe that it was, in fact, Day-Day?

A.   Yes.

Q.   And you said a minute ago that the police told you cut it out with the Day-Day, other shooter, right?

A.   Yes.

          MR. LOEVY:  If we could play Clip 89; and I guess we need to flip back.

BY MR. LOEVY:

Q.   And while we're doing that, were the police telling you one gun or two guns?

A.   One gun.

Q.   And what did that mean about Day-Day?

A.   Day-Day wasn't the shooter.

          MR. LOEVY:  All right.  If you could play 89.

     (Video played.)

          MR. LOEVY:  All right.  If you can you play 119, Lydia -- Lillia.

     (Video played.)

BY MR. LOEVY:

Q.   All right.  Were they telling you what they needed you to say?

A.   Yes.

Q.   Was it -- were you able to get out of the room at this point at 10:00 o'clock at night on day two?

A.   No.

Q.   If you had persisted in saying there really were two shooters, was that going to get you out of the room as far as you understood it?

A.   No, because they kept saying Day-Day stuff got to go, they don't believe it.

Q.   All right.  And you don't know -- well, by 3:00 a.m., did you start telling the police version?

A.   Yes.

Q.   Why did you start telling the police version?

A.   Because I thought that was going to make me go home.

Q.   What if that means lying, that there was only one shooter?

A.   Yes.  I thought that was the only way out.

Q.   Mr. Gibbons said he told a lot of lies.  Who was urging you to lie about there being only one shooter or two shooters?

A.   The cops.

Q.   Mr. Gibbons played you a section of --

          MR. LOEVY:  Well, actually, can we show 141, 141?

     (Video played.)

          MR. LOEVY:  How about 142?

     (Video played.)

BY MR. LOEVY:

Q.   All right.  Whose story was that, yours or theirs, sir?

A.   That was their story.

MR. LOEVY:  And then one forty --

MR. GIBBONS:  Can I just object here?  We're going over the direct again.  These are the snippets played in direct.  He answered these identical questions on direct.  They're not rebutting anything I went through.  This is just regurgitating direct.

MR. LOEVY:  It is -- I will move on, your Honor, but it is rebuttal to what he did.

THE COURT:  I believe it is rebuttal but if we can wrap this portion of it up, Mr. Loevy.

MR. LOEVY:  Sure.

BY MR. LOEVY:

Q.   The police officer we saw in that room, can you identify him?

A.   Yes.

Q.   Which guy was that?

A.   His partner, McDonald.

Q.   McDonald?

A.   Yes.

Q.   Do you hold McDonald equally responsible with Mancuso?

A.   I hold him and his whole crew.

Q.   All right.  Were they playing an equal role as far as you could tell?

A.   All of them was.  They was sending each other in and out.

Q.   Now you told them over and over again that you didn't have a gun I think it's fair to say, correct?

A.   Yes.

Q.   Did they accept that truth?

A.   No.

Q.   I'm sorry.  You didn't know R.J. had a gun, right?

A.   Yeah.  They didn't accept that truth at all.

Q.   All right.  Mr. Gibbons asked you over and over and over again about -- whether you lied about seeing R.J. shooting and with a gun.  Do you remember those questions?

A.   Yes.

Q.   Had you told them over and over that you didn't see it?

A.   I told them over and over, yes.

Q.   All right.  This is -- this is 148.1.

     (Video played.)

BY MR. LOEVY:

Q.   All right.  What did you think the truth was that they were trying to get you to say to get you out of that room?

A.   I believe he wanted me to say -- well, I know for a fact he wanted me to say that I knew R.J. had a gun.  I just told him I didn't see it and he went on to describe it.

Q.   All right.  What were they telling you was going to get you out of the room, to do what?

A.   Well, tell the truth.

Q.   Did they define the truth for you through context?

A.   Yes.

Q.   All right.

MR. LOEVY:   If you can play 204.

MR. GIBBONS:   Your Honor, same objection.  This is just direct again.

MR. LOEVY:   It is rebuttal.

THE COURT:   It is rebuttal.

MR. GIBBONS:   But calling it rebuttal just because he's standing up --

THE COURT:   Mr. Gibbons --

MR. GIBBONS:   -- and arguing doesn't make it rebuttal.

THE COURT:   Mr. Gibbons, I've made may ruling.  Thank you for the objection.

(Video played.)

BY MR. LOEVY:

Q.   All right.  Did that happen as well?

A.   Yes.

Q.   Now when Mr. Gibbons was saying, hey, you lied, you lied, you lied in the interrogation room later, whose idea was it to lie?

A.   The detectives.

Q.   What did you want to do?

A.   I wanted to go home.  I told them over and over I didn't know he had a gun.

Q.   Did there come a point when you said you would say it if

they -- if they let you go, basically?

A. I told them that a few times.

Q. Is it fair to blame you for what they're calling lying?

A. No. It was fair to blame them.

Q. All right. You were asked a number of questions about whether you were getting tired, whether R.J. was getting tired of them and, you know, and whether you said to Spizzirri, hey, he was saying those bad things in the back seat, do you remember him asking those questions?

A. Yes.

MR. LOEVY: All right, if you can play 193.

BY MR. LOEVY:

Q. Well, before we play it, you said in response to Mr. Gibbons that that came from someone else, didn't you?

A. Detective Turner.

MR. LOEVY: All right. Play 193, please.

(Video played.)

MR. LOEVY: Try 350. Maybe it's the wrong one.

(Video played.)

BY MR. LOEVY:

Q. All right. Who said that, him or you?

A. Him.

Q. Is that the first time it had come up to your memory and recollection?

A. Yes.

Q. Later, did you adopt those words?

A. Yes.

Q. Why?

A. Because they kept putting stuff in my head and they was brainwashing me.

Q. Who did you think they were after?

A. R.J.

Q. What did you think you needed to do to get out of the room?

A. Make R.J. be a terrible person, put any and everything that I can think of on R.J.

Q. How many hours did it take into this interrogation until you started doing that?

A. Probably about five, I believe.

Q. And then what time was this one, can you see on the screen?

A. This was 8:00 o'clock the second night, 8:43.

Q. All right. Shooting ahead to the interview with Ms. Spizzirri, Mr. Gibbons asked if you were scared of them. Do you remember those questions?

A. Yes.

Q. And were you?

A. Yes.

Q. Why?

A. Because they kept playing with me, toying with my mind and blaming everything on each other, well, we got to decide if you going home or not. So I was scared -- and I was scared they

was sending send me to jail.

Q.   What was it explained to you that the ASA's role in that was?

A.   He said it was up to her.  She come in the room and said it's up to me and the detectives.  Then he come back, yeah, we got to look over all the paperwork, we got to determine that.

Q.   So when you -- do you remember yesterday you were asking to talk to the state's attorney, right?

A.   Yes.

Q.   Why were you asking to talk to a state's attorney?

A.   Because he kept telling me it's a 50/50, we got to wait until the state's attorney to get here and he wasn't buying my truth.  I wanted to tell her that I didn't know, too.

Q.   All right.  How did that conversation go?

A.   I remember after she asked what happened, I told her I didn't know.  So she started doing what they did, oh, there's just this one piece.  And I told her if you want me to say that, I'm going to say it.  And she said, no, I just want you to tell the truth.  Then I say I didn't know.  No, no, this one piece.

      And then I remember her saying something to, well, I knew everything about my friends so I knew what they gonna do before they did it so you knew he had a gun before he went up there.  I told her again I didn't know, can I go home.  But there's just this one truth, I just need that little bit,

Brown - Redirect

736

just -- just that little bit, come on, it's in there, Marcel, it's in there.  And he was over there encouraging me to, yeah, get a little truth --

Q.  And then --

A.  -- to tell a lie.

Q.  And you never actually said you knew.  You said, well, I sort of maybe suspect it could have been possible, or something.  We heard the video.

A.  I never said I knew for a fact that he had that gun when he got in my car.

Q.  Did you know that he had that gun?

A.  No.

Q.  All right.  When you were talking to Ms. Spizzirri, was she sometimes asking you leading questions, too?

A.  She basically told me the story but she said she didn't know nothing about it.

MR. LOEVY:  And if we can have document camera again.

BY MR. LOEVY:

Q.  Showing Page 325 that Mr. Gibbons showed, let's focus on the situation.  No one else out there had a gun, right, Marcel?  Did you know what answer they needed for you to say to go home?

A.  That R.J. only had a gun.

Q.  How did you know that?

A.  Because they been toying with me for hours to say that

Day-Day stuff got to go, so only say R.J. had a gun.

Q. How about the business about nobody liked R.J., do you remember when Mr. Gibbons showed you that?

A. Yes.

Q. What did you think they were trying to get you to do?

A. Just paint a picture of R.J. as a bad person.

Q. And as you got into hour 33, hour 34, did they explain to you what you needed to do to go home?

A. To tell the truth.

Q. And when you -- we all saw what happened on the screen there. Did they let you go home?

A. No.

Q. Could they have done this to you today?

A. No.

Q. How do you feel emotionally watching that?

A. Terrible.

Q. Put it into words if you can.

A. Terrible. They preyed on kids. Five, six trained people played on somebody that knew that didn't have nothing to do with it because Terry already told them. So they just -- they just want to call her. They looked at me as a case, not a human being, and I felt like an animal.

MR. LOEVY: I don't have any other questions, your Honor.

THE COURT: All right. Thank you, Mr. Loevy.

MR. GIBBONS: Your Honor, I have just about less than five minutes.

THE COURT: All right. I'll give you five minutes.

MR. GIBBONS: Thank you.

THE COURT: And then we'll take our afternoon break for about 15 minutes.

RECROSS EXAMINATION

BY MR. GIBBONS:

Q. Mr. Loevy showed you Page 55 of the transcript of your interrogation which is in the first hour and we've established already that you weren't telling the detectives that R.J. was a shooter in that first several hours, right?

A. Yes.

Q. And then he asked you were you surprised about the witnesses that you were being suggested they had witness statements from and my question to you is, why would you be surprised that no one was identifying Day-Day? You couldn't identify Day-Day.

A. I would be surprised that they said only R.J. was shooting and not two people shooting. That's why I was surprised.

Q. Mr. Loevy was asking you questions about Day-Day and you said, yeah, I was surprised no one was identifying Day-Day. But you couldn't identify Day-Day, right?

A. At that time I believe Day-Day was the shooter.

Q. Let me finish, sir. Let me finish. You couldn't identify

Day-Day, right?

A.   No.   I can identify somebody else's shooting.

Q.   And as you sit here today, you honestly can't ever say that Day-Day was the second shooter in that park, right?

A.   I don't know who that guy was that was shooting.

Q.   Mr. Loevy showed you for the second time the clip with you and Detective Turner, right?  Do you remember that clip we just saw about four minutes ago?

A.   Yes.

Q.   Okay.   And Turner in that clip and really never -- did he ever say to you fucking up, fucking them up means shooting, right?   That never came out of Turner's mouth, right?

A.   Turner said, yeah, he gonna pop 'em off, you're going to do something; right.

Q.   Turner never said fucking them up means shooting, right?

A.   Turner gave me the thought.

Q.   Last couple of questions.  Did I hear you say that when Spizzirri entered the room, ASA Spizzirri entered the room, you wanted to tell her the truth?

A.   I want to tell her I didn't know he had a gun.

Q.   Did you want to tell her the truth?

A.   That was the truth.   I didn't know he had a gun.

Q.   But you lied about other parts of the story to Spizzirri, right?

A.   The whole thing about Spizzirri, she only wanted to know

did I know if he had a gun and I told her I didn't.

Q. Did you lie to Spizzirri?

A. I told her the truth, that he didn't -- I didn't know he had a gun.

Q. So your answer is now you didn't lie to Spizzirri during her 54 minutes of questioning you?

A. Not about the gun. I didn't know he had a gun.

Q. I didn't ask about the gun.

A. You said did I lie. I told her -- I did tell her the truth.

Q. Did you lie?

A. I lied with all other statements that they put in my head and was telling me it wasn't the truth.

Q. I'm a little confused on the last part here.

A. You can always be confused.

MR. LOEVY: Objection, your Honor. It's covered.

MR. GIBBONS: Objection, what?

MR. LOEVY: It's covered. Asked and answered.

THE COURT: I think the topic has been asked and answered. He's given you his answer, Mr. Gibbons.

MR. GIBBONS: I didn't ask -- I'm sorry?

THE COURT: The prior -- the prior question he answered. And your indication was that you might -- I'll let you ask the next question. You're correct.

MR. GIBBONS: Okay. Thank you.

BY MR. GIBBONS:

Q. In the redirect by Mr. Loevy here, did you say that you did not know if R.J. had a gun that night?

A. I did not know R.J. had a gun, sir.

Q. Despite the fact that he admitted it to you when getting back in the car?

A. You said did I know that he had a gun that night. I did not know he had a gun that night, sir.

Q. I never said that night.

A. Well, you just said it.

Q. Let me ask it again because I didn't use the word "that night." I'm saying as you sit here now, you know R.J. had a gun, right?

A. As I sit here now, I know somebody shot at R.J. and he shot back.

Q. So R.J. had a gun?

A. Yes. And somebody else was shooting, too.

Q. Okay.

        MR. GIBBONS: I've got nothing else, your Honor.

        THE COURT: All right. Thank you.

        MR. LOEVY: Mr. Gibbons is not going to trick you into --

        THE WITNESS: He can't --

        THE COURT: Okay. We're done. Thank you.

        All right. Ladies and gentlemen, we are going to take

our afternoon break.  It's going to be a 20-minute break just to give everybody a chance to stretch your legs.  Please be ready to go at 2:35 and please don't discuss the case.  All rise.

THE WITNESS:  Your Honor, can I talk to my lawyer?

THE COURT:  Yes, just give me one moment.  As soon as we excuse the jury.

(Proceedings heard in open court; jury out.)

THE COURT:  All right.  Mr. Brown, you are free to speak with your counsel about anything, so.

THE WITNESS:  Sorry about arguing, Miss Jenkins.

THE COURT:  No worries at all.

(Witness excused.)

THE COURT:  All right.  Anything we need to talk about during the break?  All right.  I will see you all in about 20 minutes.  Let's be ready to go about 2:35 with Mr. Cary in the room and ready to go.

(Recess taken.)

(An exchange of reporters took place.)

(Proceedings heard in open court. Jury out.)

THE COURT:  All right.  We're back on the record.

Because we have a minute or two before we resume, I just want to talk briefly about scheduling.  We can pick this conversation up after we let the jury go for the day, but the one thing I want to just talk about is -- and you can be

seated, I apologize -- is scheduling for tomorrow. I think it does make sense to let the jury know today if we're going to agree to let them go a little early tomorrow in light of Labor Day. I think just for planning purposes, people need to know that. And it also puts minds at ease when there's some anxiety or uncertainty around there.

So can I get a sense from the parties on witness order and where we might be able to say roughly that the jurors can plan to have the day end tomorrow?

MR. LOEVY: Well, we're moving slower than hoped.

THE COURT: Yes.

MR. LOEVY: I would hope we don't lose the time, or at least not all of it. We're not going to -- we're going to start Mancuso after Wham.

THE COURT: Right.

MR. LOEVY: And that's not going to finish tonight.

THE COURT: Right.

MR. LOEVY: And then I expect it'll take much of the morning, you know, between the redirect and the -- finishing the cross.

We also -- likely to call R.J. tomorrow, if you'd let us, in the afternoon. And Taneshia is flying in from out of town. So we really do want her to go tomorrow because she's -- is -- Taneshia is en route from --

MS. del VALLE: En route from Florida.

MR. LOEVY:  From Florida.

So at a minimum, if you did decide to break at the half day, your Honor, we'd ask that she get -- we break in for her.

THE COURT:  About how long do you believe Taneshia's testimony would be, roughly?

MR. LOEVY:  Half hour on direct.

THE COURT:  About how long -- I know you don't know for sure, but just so --

MR. FLYNN:  Less than that.

THE COURT:  Okay.  All right.  So there's no reason we can't get her on and off tomorrow, especially if she's flying here.  I completely understand that.  It might mean that the R.J. piece of this has to adjust some.  I'm sure no one wants to start a fresh witness only to break and then not resume until Tuesday.  Although, you know, we -- obviously we have to push here to kind of get this moving along.  So what -- we'll continue to move things along.

So do the parties have a proposed time frame, or what's the parties' positions on this?  Look, I'm not suggesting that, you know, we can't keep them a little bit longer than normal, but I really just want to be sensitive to everyone's -- and by everyone, I also mean the jury's time here.  So I'm open to suggestion.

MR. LOEVY:  We'd like a full day, if you'd allow it

because, otherwise, we're talking about taking their time in week 3. You know, so it's -- they get a -- they might -- they might be better off just pushing than coming back for a third week. Our hope is that we go the whole day. And since we're negotiating, anything short of that is, you know, if you let them out a little bit early.

But we have a lot of short witnesses for Friday. McHugh and Halpern are half-hour witnesses, probably with both halves. We'd like to finish them. We could get a lot done in the afternoon.

THE COURT: Okay.

MR. FLYNN: Your Honor, Mr. Mancuso is going to be up there a long time. Maybe we'd get an hour with him tomorrow. And we would be happy to break and have Taneshia go tomorrow morning, first thing, and then get back to Mancuso. But even if we go a full day, I think it's going to be all Mancuso between their examination and our examination.

With respect to letting the jury out early, we're happy to do that. If we want to break at 2:00 or 3:00, or something like that. We think we're going into week 3 regardless, so.

THE COURT: Right. Okay. Here's what we'll do. I'm not going to say anything to the jury now, other than to say that we're trying to, you know, move through some witnesses, and we'll have a better sense tomorrow whether or not we'll

have a complete full day of testimony, but that they should plan, for purposes of their own schedules, to be here for the full day tomorrow. It's always nice to give people a pleasant surprise rather than, you know, disappoint because they've made some plans or arrangements.

I will tell you now that, depending on -- depending on how Mancuso goes and some of these other witnesses, there may come a point in the afternoon, midafternoon, where I'll -- rather than let you start somebody new or start something different, we'll just break for the day. No one's pushing harder to get witnesses on and off the stand than me, but, you know, I am sensitive to the optics of what we're doing here. So we'll just play it by ear. I won't make any promises to the jury tomorrow.

I do think that it makes sense for the parties to have a conversation about whether getting Taneshia on and off makes sense. I think anybody who has flown in, you know, for this, we should do everything possible to get it done. And I appreciate the potential accommodation, understanding that we're still in plaintiff's case. So please try to talk about that. For purposes of planning, though, I just won't make any promises to the jury right now, other than to say we won't know more until tomorrow and see where we are. All right?

MR. BOWMAN: Your Honor, very briefly?

THE COURT: Certainly.

Do you want to get the jury lined up?  Thank you.

MR. BOWMAN:  Before the jury comes in, I'm, without objection, moving into evidence Plaintiff's Exhibit 390, page 45; Plaintiff's Exhibit 395, page 8; Plaintiff's Exhibit 390, page 42; Plaintiff's Exhibit 395, page 25; and Plaintiff's Exhibit 146.

THE COURT:  All right.  Any objection?

MR. FLYNN:  No objection.

THE COURT:  All right.  Those will be admitted, and you may publish when you wish at the appropriate time.

(Said Plaintiff's exhibits received in evidence.)

THE COURT:  Anything else we should talk about?

MR. FLYNN:  Yes, your Honor.  I believe you asked us on the lunch break to remind you about that cautionary instruction.

THE COURT:  As soon as I said it, I remembered that I didn't do it.  So I'll do it now as soon as the jury comes in, and then we'll get going with Mr. Cary.  Is he ready?

MR. BOWMAN:  Yes, he's here.

THE COURT:  Sir, can you please approach the witness stand.  I will have you stand at the witness stand now.

Are we ready?

MR. BOWMAN:  Yes.

THE COURT:  All right.

(Jury in at 2:39.)

THE COURT: All right. Please be seated. Ladies and gentlemen, before we call the next witness, I just want to instruct you on something. You heard statements about why Mr. Brown's conviction was overturned. The reasons why a judge overturned Mr. Brown's conviction is not an issue in this case, and you should disregard all references to that reason. You should not speculate about why Mr. Brown's conviction was vacated.

And with that, I will ask the witness in the witness stand to please stand and raise your right hand, I'll have my clerk swear you in.

THE CLERK: Please state your name for the record.

THE WITNESS: Stephen Wham Cary.

(Witness sworn.)

THE COURT: All right. You may be seated. You have been sworn.

Counsel, you may inquire, Mr. Bowman.

MR. BOWMAN: Thank you.


STEPHEN WHAM CARY, PLAINTIFF'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. BOWMAN:

Q. Good afternoon, sir. Mr. Cary, could you tell us what your occupation is?

A. A defense attorney.

Q.   You are licensed to practice law in the State of Illinois?

A.   Correct.

Q.   And when you say you are a defense attorney, what does that mean exactly?

A.   It means I'm a licensed attorney in the State of Illinois with a practice, a specialty, in criminal defense.

Q.   Do you work primarily in Cook County, sir?

A.   I do.

Q.   And as a criminal defense lawyer in Cook County, do you occasionally go to police stations in order to meet with people who are being questioned in those police facilities?

A.   Yes, I do.

Q.   And these are occasions where the family has hired you?

A.   Yes.

Q.   Have you also gone -- sorry.  In those circumstances, sir, do you have standard -- well, sorry, I got confused for a second.  Let me start over.

     Do you have standard experience as to what happens when you request the police for an opportunity to go into the police station to talk to somebody they're questioning?  What usually happens?

A.   Yes.  In my experience, practicing in Cook County for nearly 25 years, I have a very good idea what the typical protocols of the police are and the attorneys and what almost each party expects.

Essentially, I would go into a police station and talk with someone at the front desk, request permission to see them, or surrender an individual, and usually talk to a detective or someone who is personally handling the case. And then it goes from there, whether I'm surrendering someone or visiting someone.

Q. And in the situation where you're visiting someone, do you have a custom or a practice as to what you say to the individual by way of legal advice?

A. Absolutely. The primary aspect of my duty is to indicate to someone their right to remain silent. And, of course, that means they don't need to talk to police officers. And that's my main progress.

Q. Sir, I want to take you back to September 3, 2008. On that particular date, did you receive contact from anyone in the family of R.J. Branch?

A. I did.

Q. Do you recall who it was?

A. It was likely Renard Branch.

Q. Being Mr. R.J. Branch's father?

A. Correct.

Q. And did they make a request of you?

A. Yes. I was requested to go to the police station and surrender him. And it's apparent that the police were looking for him. And I made arrangements to meet them at the -- at

Grand and Central, I think. That's 555 West Grand. There's a police station there.

Q. And did you have an opportunity to speak with R.J. Branch before you surrendered him?

A. Yes.

Q. Did you give R.J. Branch advice as to what the procedure would be that you would be undertaking on his behalf?

A. Absolutely. I gave him details of my opinion of what he would be expecting and what the whole, I guess, process would entail when he goes into police custody and what to expect. That he wouldn't be able to talk to others and that he wouldn't be able to talk to family. Likely that the police would come and ask him questions, that he should invoke his right to remain silent, and based on since I was an attorney, surrender him. There also goes with that a presumption that he does not want to talk to the police. So we went through all those kind of ramifications.

Q. And following your giving him advice, what happened?

A. Well, I was professionally retained. There were quite a few family members there. We all talked, and we proceeded into the police station. I advised front desk I was there on his behalf. And I believe the detectives came and -- and took him. I don't remember specifically who did, or any aspect of that. I just know that I took him into the police station and met with the family, talked with him, and then proceeded inside.

Cary - direct

752

Q.   And when you say that you were professionally retained, explain for the jury what that involved for you, sir.

A.   That means getting paid for my services to appear and meet someone at a police station and bring someone into the police station who was surrendering.  And, of course, put my name on it, being that I'm an attorney and that I'm an attorney of that individual who is being surrendered into the police station.

Q.   And then after you accomplished the surrender of R.J. Branch, did you have further conversation with the individuals in the family who were -- who were gathered there at the police station?

MR. GIBBONS:  Objection.  Lack of foundation.

THE COURT:  Sustained.  Just ask a couple more foundational questions.

MR. BOWMAN:  Sure.

BY MR. BOWMAN:

Q.   There were, Mr. Cary, a number of family members who had gathered at the parking lot of 5555 West Grand.  Correct?

A.   Correct.

Q.   And they -- and you and R.J. gathered around and spoke; correct?

A.   Yes.

Q.   And you surrendered R.J., as you just testified.  And then did you go back into the parking lot area at that point?

A.   Yes.  There was still several family members there.  And

Cary - direct

753

it's a small parking lot area that holds about 20 vehicles, or so. And so we were kind of at the beginning of the police station but in the parking lot area, surrounded by family members. We discussed opportunities and potentials and procedures of the criminal process and what to expect.

Q. And did someone in that group make a request of you in relation to another individual?

A. Yes. I was requested to also visit Marcel Brown.

Q. Do you have a recollection of who among the family that was?

A. Who requested for me to see him?

Q. Yes.

A. I believe it was probably his mother.

Q. And when that request was made of you, what was your response?

A. Oh, I just indicated I need additional fees to see him, as he is a different person that I was -- that I originally came down to represent. And that I would go in and visit with him because it was my understanding that he was already in custody, as opposed to Mr. Branch, who was surrendering into the police. And it all seemed like this was all part of a same circumstance/situation investigation.

Q. And did you, in fact, receive additional monies?

A. I did.

Q. And following your receipt of additional monies, what was

Cary - direct

754

your status in relation to Marcel Brown?

A.   I was his attorney at that point.  I had been hired to represent him.  So I went into the police station to try to obtain a visit.

Q.   And tell us where you went in the police station.

A.   Well, I walked to the front desk, I indicated that my name -- I'm not sure if they already had my credentials earlier from surrendering Mr. Branch, but usually they ask for attorney registration and disciplinary card.  They ask for usually Cook County photo ID, which I provided them.  And they usually typically take pictures of that.  And then normally someone from that front desk area calls the detective or whatever police officer is assigned to the case and advises them that an attorney is here.  And then typically you wait for a few moments, and that individual comes, and he escorts you up, and you try to go see that individual.

Q.   So pausing for just a minute.  If I could have the document camera, please.

You indicated that at some point that afternoon you provided your credentials to the police; correct?

A.   Yes.

Q.   And you're not sure exactly at what point in the process that was; correct?

A.   Yeah, it was somewhere in the beginning.

Q.   Let me show you what's in evidence as Plaintiff's

Exhibit 146.  Do you recognize what's displayed here?

A.  Yes.  That's my information.  Those are my identification cards.

Q.  And specifically it's your attorney card, your attorney registration and disciplinary commission identification down at the bottom here; right?

A.  Correct.

Q.  As well as the card that gets you into the courthouse without going through security; right?

A.  Correct.

Q.  And your business card?

A.  Yes, that's correct.

Q.  And this is the photocopy, is it not, of your credentials that was made on September 3, 2008; correct?

A.  Those are accurate.

Q.  So you said that you went up to the desk.  How did you identify yourself?

A.  I don't recall exactly.  I'm sure it was something said that:  I am attorney Wham Cary, I'd like to see my client, whoever.

Q.  And that would have been in this particular instance who?

A.  Marcel Brown.

Q.  And what were you told?

A.  I was told that -- well, first of all, I was, I guess, paused or related while they tried to find the appropriate

Cary - direct

756

detective on the case.  Eventually I was given the okay to go upstairs because there's an upstairs area in that police station.  I know that's where the detectives work.  I went up there, and I was told from the detectives, I don't remember who or what person said, but they said that he did not want to speak to me.

Q.   And showing you Plaintiff's Exhibit 395.25 in evidence.  Is this a photograph of that upstairs area to which you went seeking to speak with Marcel Brown?

A.   That's correct.

Q.   And there are several doors here in the background.  Based on your experience in visiting police stations over the years, do you know what's behind those doors?

A.   Yes, I agree with that photo, and I am familiar with those rooms.  I've been in them on previous occasions.  And they're usually -- some are used to hold detainees, people under investigation.

Q.   They are interrogation rooms; are they not?

A.   Yes.

Q.   How many times do you believe you went -- you made this request to speak with Marcel Brown?

A.   I would say at least two, and very likely more.

Q.   Why did you repeat your request more than once?

A.   First, I was taken back, somewhat astonished, that he didn't want to speak to me.  It's definitely a surprise when

someone doesn't want to speak to your lawyer.

And then second of all, I knew that I also had been hired or paid from the family to visit him, and I need to try to fulfill my obligation or reason for getting paid.

Q. In all of your years practicing law and coming to these police stations to represent people being questioned there, have you ever had any other occasion where the police told you the guy doesn't want to speak to me?

A. Negative.

Q. And is that one of the reasons why this sticks in your mind all these years later?

A. The only reason it sticks in my mind.

Q. Mr. Cary, if you had been granted access to speak with Marcel Brown, would you have followed the standard protocol that you described earlier in your testimony?

A. Yes, absolutely. I'd indicate he should remain silent, he should talk to no one, he should only talk to me. And the police have to conduct their investigation, and he should just sit there and wait.

MR. BOWMAN: Thank you, Mr. Cary. That's all I have.

THE COURT: All right. Cross-examination. Mr. Gibbons.

CROSS-EXAMINATION

BY MR. GIBBONS:

Q. Good afternoon, Mr. Cary.

A.   Afternoon.

Q.   We have not met before; have we?

A.   I don't think so.

Q.   Maybe crossed at 26th Street, but I don't remember.

A.   Potentially right.

Q.   I represent the detectives in this case.  You're aware of that?

A.   I am.

Q.   Okay.  We've not discussed your testimony before this?

A.   Correct, yes.

Q.   We're discussing September 2008; right?

A.   Yes.

Q.   Sixteen years ago?

A.   Yes.

Q.   Fair for me to say you don't have a great recollection of the specifics of that day in relation to the Brown family?

A.   Absolutely fair.

Q.   Okay.  Fair for me to say you don't have a recollection of talking with any specific detective on September 3, 2008?

A.   I talked to a detective.  Specifically, I do not know who, or how many.

Q.   Okay.  You don't have any independent recollection of talking to or seeing Detective Mancuso -- he's sitting in court -- is that correct?

A.   Who's Mancuso?  I'm sorry.

Q. Well, let me just ask you: Do you see a guy you know as Detective Mancuso sitting in court?

A. Well, when I walked in here I thought he looked familiar. There's some familiar faces. But if I were to put a name with a face, I couldn't do that.

Q. All right. Let's go back to my question. Do you have any independent recollection, as you sit here today, of talking with a detective named Mancuso?

A. No.

Q. Same question in relation to Detective Burke?

A. No.

Q. Same question in relation to Detective McDonald?

A. No.

Q. Same question in relation to Detective Turner?

A. Nope.

Q. Weber?

A. Nope.

Q. Fair to say in relation to those answers that you don't have any independent recollection of asking any of those five detectives about wanting to see Marcel Brown that day?

A. All I know is I asked someone I want to see him. I was denied access, or said he didn't want to speak to me. I have no recollection of who I spoke to or who said that.

Q. And I appreciate that. I just need to get this clear because this is very important in this case.

Cary - cross

760

Do you have any independent recollection speaking to these five detectives?

MR. LOEVY:  Objection.  Asked and answered, as well --

BY MR. GIBBONS:

Q.   About wanting to see Marcel Brown.

THE COURT:  With that clarification, he can answer.

BY THE WITNESS:

A.   I do not.

BY MR. GIBBONS:

Q.   Thank you.

I'm assuming you have no knowledge -- well, let me ask it differently.

Is it true you have no direct knowledge that anyone ever informed those five main detectives that you were at Area 5?

MR. BOWMAN:  Objection.  Foundation.

THE COURT:  Overruled.  He can answer.

BY THE WITNESS:

A.   I'm sorry, could you repeat that?  I just want to make sure I fully understand.

BY MR. GIBBONS:

Q.   Yeah, absolutely.  So you've testified that you spoke to some unidentified person you think is a detective and said: I'm here for Marcel Brown.  Did I hear that right?

A.   No, I absolutely know it was a person of police personnel.

I don't know who it was, but it was some personnel, though.

Q. Okay. So let's go with that. You talked to somebody who you believed here was a police personnel and said, I'm here for Marcel Brown. Right?

A. Correct.

Q. That person who you spoke to, you have no knowledge that that person ever delivered that message to any of the five named detectives I just went through. Isn't that fair?

A. That's fair.

Q. Okay. Back in September 2008, you're a fairly busy professional?

A. Yes.

Q. Running a solo practice; right?

A. Correct.

Q. Only way to make money is to bill your time; right?

A. Correct.

Q. Time is money in your game; right?

A. Absolutely.

Q. Doing almost all criminal work at the time?

A. Right again.

Q. Doing almost all criminal work at the time?

A. Correct.

Q. Running from courthouse to courthouse?

A. Correct.

Q. Various police stations across the city?

A.   Yes.

Q.   Area headquarters?

A.   Yes.

Q.   Meeting your prospective clients wherever they'd meet with you; right?

A.   Absolutely.

Q.   Could be your office?

A.   Correct.

Q.   Could be in a parking lot of a police station?

A.   Yes.

Q.   Could be in a jail cell?

A.   Correct.

Q.   Could be in an interrogation room?

A.   Correct.

Q.   Okay.  Agree with me you had no set hours back in September of 2008?

A.   Unfortunately not.

Q.   You worked whenever the opportunity arose.  Fair to say?

A.   Exactly.

Q.   Okay.  Sometimes you'd work all day long, if you had to; right?

A.   You are correct.

Q.   All right.  I think on direct you said you were a lawyer for now, what, 20, 25 years?

A.   Correct.

Cary - cross

763

Q.   And how --

A.   How old?

Q.   I'm formulating the question.

A.   Oh, how old am I?

Q.   You handled hundreds of cases a year.  Fair to say?

A.   Yes.

Q.   All right.  Agree with me that looking back on a matter 16 years ago, it's hard to remember the specifics of any one case?

A.   Sure.

Q.   Okay.  And in this case, your engagement in relation to Marcel Brown lasted how long?

A.   Not very long at all.  I mean --

Q.   Under two hours?

A.   Yes.

Q.   Okay.  Now, you testified that you were retained in this case.  And if I heard you right, you recall being retained by R.J.'s dad; right?

A.   Yes.

Q.   A phone call?

A.   Yes.

Q.   You had a prior relationship with Renard Brown, Sr.?

A.   Yes.

Q.   I got the name wrong, I think.  Renard, Sr.; right?

A.   Correct.

Cary - cross

764

Q.   Now, do you have an independent recollection of that call?

A.   No.  I know a phone call was made for me to dictate my actions, but, I have no details of the phone call.  I don't recall specifically.

Q.   All right.  Would it be fair to say that you didn't get a phone call in advance of you going to Area 5 on September 3rd from anyone in Marcel Brown's family?

A.   I can't say for sure.  I don't believe so, but I can't say for sure.

Q.   You can't say for sure because you honestly don't recall; right?

A.   Exactly.

Q.   Okay.  When you arrived at the police station, one of your responsibilities and retention duties was to surrender R.J.; right?

A.   Yes.

Q.   Okay.  And when you arrived -- strike that.  Do you recall approximately when you arrived at Area 5?

A.   I would say early evening.

Q.   Well, it was after business hours; right?

A.   Well, yes.  Right.

Q.   After 5:00?

A.   After the typical 9:00 to 5:00, right.

Q.   Okay.  And we see -- this has been admitted into evidence. And at the bottom it says:  Arrived Area 5, 1800 hours.

Do you see that?

A.   Correct.  I see that.

Q.   We've all been dealing in military time here for the last couple days.  That's 6:00 PM; right?

A.   Correct.

Q.   Any reason to think that that's inaccurate, that you arrived and presented that identification card at 6:00 PM?

A.   I don't understand the question.

Q.   Sure.  I'm just trying to figure out when you got to Area 5.  And I'm trying to see if this exhibit helps you figure that out.

A.   Well, I believe I was there probably about that time.  I don't recall specifically.  And I have no personal recollection of the time I got there.  And there's no reason for me to believe that whoever wrote this 1800 hours fabricated it, so I assume it to be true.

Q.   Okay.  So you have no reason, as you sit here today, to think that that's inaccurate, that you would have presented your credentials at the Area around 1800 hours?

A.   Sure.  I mean, it's what I would assume to be true.

Q.   Now, before you presented your credentials, you would have met with the family in the parking lot; right?

A.   Absolutely.

Q.   Okay.  How much time did you spend in the parking lot with the family before going into the Area to present these

credentials?

A.   I don't know.   I would say enough time to accurately give them an idea of the situation and try to assess the situation and gain information from the family about what they knew prior to going in and being able to consult Mr. Branch about what to expect before he goes into custody.

But as you indicated, it's hard to remember specifics. I can remember generals.   And I know that would be my general procedure.   But I can't say how long we all spoke.

Q.   Okay.   So you can't recall specifically how long you all spoke.   But how long, generally, would this spiel last about, you know, the process of turning your client in and going through what would happen to the client when they take the Fifth?

A.   Well, it depends on the inquisitive nature of the people I'm representing.   Some people know how things work and some people want more detail.   So sometimes it could take 15, 20 minutes.   Sometimes it could take 45 minutes, or more.

Q.   Okay.

A.   And the problem with this situation is I do remember that there were a lot of people there.   There was more than just, you know, one or two family members.   There was probably, you know, roughly at least 10, or so, family members.

So then once you get talking to multiple family members, of course everybody usually has their own questions

and wants to chime in all the time, which makes the process a little bit longer.  But I can't give exacts.

Q.   Okay.  Do you know who the family members were?

A.   Mom, dad.  Relatives.  Aunt, uncles, brothers.  I don't know specifically.  I don't know their names.

Q.   Mr. Cary, we're not asking you to guess or speculate.  I'm asking if you have an independent recollection of who you talked to on September 3rd in the parking lot?

A.   No.

Q.   Okay.  Understanding that time is money, you would have been sensitive to how much time you spent there; right?

A.   Right.  I didn't want to stay there all night long.  I wanted to get the job done and go back home, for sure.

Q.   All right.  And that job was to turn R.J. into the detectives, tell him he's taking Five, don't talk to my client, and get out of there; right?

A.   Correct.  But, of course, with the same process you had to extend courtesy to the family and build rapport with them to let them know, you know, you're there to try to help.

Q.   But on that retention -- strike that.

     You weren't retained at that moment to see this through with R.J.; right?

A.   No.  And that's one of the reason why you continue to talk to the family in hopes to be hired later on, if the case proceeds further.

Q.   Yeah.  But at this particular moment, you're just getting some cash to turn R.J. in at the police station; right?

MR. BOWMAN:  Objection to the form of the question.

THE COURT:  Just rephrase the question, Mr. Gibbons.

BY MR. GIBBONS:

Q.   You were being paid just for the singular engagement of turning R.J. Branch into the police?

A.   Yes.  In my capacity as attorney to invoke his -- make sure he invokes his rights, et cetera, properly.

Q.   Right.

A.   Exactly.

Q.   Fair to say you don't have any recollection of how much money you were paid for that engagement?

A.   Not really.

Q.   When you say "not really," what does that mean?

A.   Well, I can estimate what it probably would have been based on my experience and how I paid them.  But specifically, I'm not just going to guess.

Q.   Yeah, and I really appreciate that.  We're not asking you to speculate.  So let me ask it a different way.

Do you have any independent recollection as you sit here right now how much you were paid for that engagement?

A.   No.  Sixteen years ago, as you indicated.

Q.   And fair to say you don't have any documentation reflecting how much you were paid for that engagement; right?

Cary - cross

769

A. Correct.

Q. No written retainer agreement with Marcel Brown or his family; right?

A. No, it wasn't a retainer, since I was just coming to the police station.

Q. No written retainer with R.J. and his family; right?

A. Correct.

Q. Okay. Do you have any specific recollection actually walking R.J. into the station?

A. Probably not specifically.

Q. Okay. Fair enough. Thank you.

Do you remember a T.J. Scott?

A. No.

Q. Do you have any recollection as to whether you were representing T.J. Scott on that day?

A. It doesn't ring a bell to me.

Q. Do you recall going up to the front desk and asking questions about T.J. Scott?

A. I do not.

Q. Last question about T.J. Do you recall discussing turning T.J. in to any detective?

A. Don't recall.

Q. Okay. At some point on direct you testified you did go up to the front desk on the first floor and identified yourself as a lawyer for Marcel Brown; right?

Cary - cross

770

A.   Correct.

Q.   Okay.  So you believe at that point you -- strike that.

Do I have it correct that at that point you would have been retained by Marcel Brown's family?

A.   Yes.

Q.   Because you don't work for free; right?

A.   Exactly.

Q.   And in the criminal defense game, if you don't get your cash upfront, you're not getting it; right?

A.   Pretty much.

Q.   Okay.  So we can safely assume you would have been paid by the Brown family before you went up to the desk to tell somebody you represented Marcel Brown; right?

A.   Correct.

Q.   Okay.  Do you recall who paid you?

A.   I do not.

Q.   Okay.  Now, you testified on direct that you believe that Marcel's mother hired you.  Do you have any independent recollection of that?

A.   Not independently.

Q.   And you don't remember how much you were paid; right?

A.   Correct.

Q.   You don't remember the form of payment.  Is that fair to say?

A.   I'm sure it was cash.  I was only taking cash.  And it

wasn't Zelle or anything else like that back then.

Q.   And you don't remember the amount?

A.   Correct.

Q.   Fair to say when you went up to the front desk you have almost no memory of who specifically you talked to?

MR. LOEVY:  Objection.  Asked and answered, your Honor.

THE COURT:  Sustained.

MR. GIBBONS:  The front desk?

THE COURT:  You asked that question at the beginning of your examination.

MR. GIBBONS:  Okay.  I don't know the answer.

THE COURT:  Mr. Gibbons --

MR. GIBBONS:  All right.

THE COURT:  Yes, thank you.

BY MR. GIBBONS:

Q.   All right.  Do you recall how many people were behind the desk?

A.   I do not.

Q.   Okay.  Do you recall what the folks behind the front desk on the first floor were dressed like?

MR. LOEVY:  Objection to relevance, your Honor.

THE COURT:  Overruled.  He can answer questions about who he recalls and what they were wearing, what the people he saw might have been wearing.

BY THE WITNESS:

A.   I don't recall any specificity as to personnel, dress, officer, height, weight, race, et cetera.  The only thing I really recall from this is that I was trying to get and see Marcel Brown, I was denied and indicated that he did not want to see me.  And it stuck in my mind because I had to try to justify getting paid when I wasn't able to see someone.  And so that's pretty much the only details I really remember.

BY MR. GIBBONS:

Q.   Okay.  So I just want to take this in a little slower baby steps.  Okay?

A.   Sure.  No problem.

Q.   I'm speaking about the first floor area at Area 5, where you introduce yourself to somebody at the front desk; right?

A.   I understand, yes.

Q.   Did you go up to that reception area?

A.   I'm sure I did.  I have no specific recollection of that.

Q.   Okay.  And then there's another reception area on the second floor where the detective division is; right?

A.   Correct.

Q.   And there's another officer up there acting as a receptionist; right?

A.   There's a second floor area.  I'm not sure if there's an officer as a receptionist, but it's an officer kind of -- I don't know if he is overseeing it, but I think it's just one of

the detectives there who takes obligation to try to -- to facilitate anybody coming in and out. I don't know their personal job, so.

Q. Where were you told that Marcel Brown did not want to see you? First floor? Second floor?

A. Second floor. I do remember that.

Q. So you remember at some point getting up to the second floor?

A. Yes, I do remember that.

Q. Fair to say you don't remember speaking to anyone in particular on the second floor?

A. Correct. There was an individual, a live person, I know that. But I don't know who.

Q. Okay. When you went to the second floor, and you were told that Marcel did not want to see you, was anyone else with you?

A. I don't recall that.

Q. Was Marcel Brown's family with you?

A. I don't think so. They may have been inside the police station on the first floor.

Q. Now, you testified on direct that you were -- I don't remember the words -- surprised that a client declined to see you as their lawyer; right?

A. Yes.

Q. Okay. Now, you are, and were, experienced criminal defense lawyer in 2008. We've established that; right?

A. Yes.

Q. And you know that Chicago Police Department, quasi military, has a chain of command; right?

A. Correct.

Q. All right. You know that there are lieutenants, watch commanders, at all of these areas and police stations; right?

A. Yes.

Q. All right. And at an Area 5, there might even be a higher person in the chain of command, given it's an area headquarters; right?

A. Yes, that's fair.

Q. All right. And on other occasions prior to September 3, 2008, when you had been given a runaround or told something by, you know, an unidentified police officer and you didn't like it, you went up the chain of command to challenge that; didn't you?

A. Yes. You would ask for a sergeant, right.

Q. And here, you're being told something that has never happened to you in your entire career, and you did not seek out anyone higher in the chain of command at Area 5. Isn't that true?

A. Yes, I believe I just reiterated the point. And I just had a reason to believe I was being told the truth that he didn't want to speak to me for some reason.

Q. And you accepted that, turned around, left. Right?

Cary - cross

775

A. Yes, after I made the inquiry a couple of times. And then, of course, I needed to speak with the family to explain that he didn't want to speak to me so we could -- because, of course, they want to see something for your money when you pay for it. So we had to go over -- discuss I'm sure ramifications like that.

Q. Yeah, okay.

A. So, yeah --

Q. So you leave the police station --

A. -- I eventually left. Right.

Q. I'm sorry, I didn't mean to cut you off.

A. No, I'm sorry. I said, yeah, I eventually left after that.

Q. All right. So you leave the police station. Do you recall having this wrap-up conversation with the family inside the police station or out in the parking lot?

A. I'm sorry, I can't recall where it was, but I'm sure -- I don't recall any specific conversation, but I'm sure there had to have been one.

Q. Okay. You're guessing there was one, or do you have an independent recollection of having one?

MR. LOEVY: Objection. Asked and answered, your Honor.

THE COURT: I'll allow him to clarify the answer. It's a little confusing, so.

BY THE WITNESS:

Cary - cross

776

A.   I know there was absolutely a discussion made with myself and the family because I had to explain that I did not see, you know, their son, their family member, when I was paid to go and see him.  So I know I had to explain what happened and why I did not have any information about how he was doing or how he was feeling, or if he was nervous or if he was thirsty, hungry, et cetera, things like that.

Q.   Okay.  And at this meeting, as you're explaining why you couldn't get in and see Marcel, they asked for their money back; didn't they?

A.   I'm sure they did.  I don't recall specifically that.

Q.   You didn't return the money; did you?

A.   Probably not.

Q.   Do you recall telling the family in this parking lot anything about 72 hours?

A.   I'm sure I said that.  That's elementary.

Q.   Explain that to the jury, please.

        MR. LOEVY:  Objection, your Honor.

        THE COURT:  Mr. Gibbons, where are we going with this one?

        MR. GIBBONS:  I just would like to know what he told the jury (sic) because we're going to set the expectations of what's happening here.

        THE COURT:  Okay.  Can we have a quick sidebar on this because I just want to make sure we're in bounds.

Cary - cross

777

(Proceedings heard at sidebar:)

THE COURT: So, Mr. Loevy, can I have you articulate your objection to make sure I'm clear.

MR. LOEVY: Before a lawsuit that actually, coincidentally, was filed by our firm in *Dunn vs. City of Chicago* --

MR. GIBBONS: Jon, I can't hear you.

MR. LOEVY: Can you guys hear me?

John, is your mike going?

The City of Chicago Police Department apparently believed they could hold people 72 hours. And the criminal defense bar apparently believed it, too. If he believed it was 72 hours and told the family that, I suppose I could see some incremental, minimal relevance. But it would certainly open the door to, if we're going to talk about what the law is, then, you know, he's opening the door to what the law is.

THE COURT: So that's what I'm concerned about here, is that we're opening the door to what the law is.

MR. GIBBONS: Yeah, I don't want to do that.

THE COURT: Right. So that's the reason why I wanted us all to have a little conversation here. I just want to be really careful here after all the --

MR. GIBBONS: I don't need it.

THE COURT: Okay. Thank you.

(Proceedings heard in open court:)

Cary - cross

778

THE COURT: Mr. Gibbons, you can ask your next question.

MR. GIBBONS: Thank you, your Honor.

BY MR. GIBBONS:

Q. I'm nearly done, Mr. Cary.

While you were at Area 5, do you recall the police ever coming out and telling you and the family they needed to leave the police station?

A. I don't recall that specifically.

Q. Do you recall it at all?

A. Very well could have happened, but I can't recall 16 years ago, like we say.

Q. Mr. Cary, with all due respect, a lot of things could have happened. I'm asking if you have any recollection of any police officer coming out telling you and the family to get out of Area 5?

A. Not -- not from this instance.

Q. I don't understand what that means, from this distance. What does that mean?

A. From this instance, I'm saying --

Q. Oh, "instance."

A. Instance. Not from this occasion.

Q. And police stations are public facilities; right?

A. Correct.

Q. It probably would have wrangled you if some police officer

told you to get out of a public facility; right?

A.  I'm sorry, would have wrangled me?

Q.  Yeah.  It would have upset you, it would have irritated you.  Probably something you wouldn't (sic) remember because it probably never happened in your life; right?

A.  I've been -- people have been rude to me a lot of times throughout my life.  I don't remember every instance because I don't -- I pass it off.  I just know that's human nature.  So, I'm not going to go down that road.

Q.  I'm just asking if you were ever thrown out of Area 5 on September 3rd?

MR. LOEVY:  Objection.  Asked and answered, your Honor.

THE COURT:  Overruled.  He can answer.

BY THE WITNESS:

A.  I don't believe so.  I conduct myself in a professional manner.  I don't think it's going to lead to any kind of situation like that.

MR. GIBBONS:  That's all I've got.

Thank you, your Honor.

THE COURT:  All right.  Any redirect, Mr. Bowman?

MR. BOWMAN:  Thank you.

REDIRECT EXAMINATION

BY MR. BOWMAN:

Q.  So Mr. Cary, you were asked several questions about your

Cary - redirect

780

recollections, the extent of them.  You said you did not recall the precise amount of money you were paid in this particular circumstance.  What was your expectation as to what you would get?

A.  Well, I'm sure it was probably about -- back in 2008, I would think it's probably around $500, or so, to go to a police station and to surrender somebody.  And for someone else to piggyback and do another task while I'm already there, I probably charged less out of consideration, but I don't specifically recall.

Q.  Mr. Cary, there is an ATM station at the -- or there was back in the day -- at Grand and -- at 5555 West Grand; right?

A.  Yeah, I do think I remember one there.

Q.  Do you recall either way whether Debra Scott, Marcel Brown's mother, withdrew money from the ATM station at Grand and Central at about 7:39 PM on this particular afternoon?

A.  Could very well happen.  I can't remember those kind of things specifically.  Just trying to keep it straight from what I can remember.

Q.  Sure.  It has been a long time ago; correct?

A.  Yes.

Q.  So you are familiar from all your years as a criminal defense lawyer with -- Mr. Gibbons asked you this -- the structure of the Chicago Police Department, at least some level; correct?

Cary - redirect

781

A.   Yes.

Q.   And you understand from your many years in criminal defense that, in any investigation, there is a lead detective; right?

A.   Correct.

Q.   And from -- well, let me ask you.  Mr. Gibbons asked you if you had specific knowledge that Mr. Mancuso or his partner, Mr. McDonald, were informed of your presence on Marcel Brown's behalf that evening.  Do you recall those questions?

A.   Yes, I do.

Q.   If I were to tell you that those two individuals were the lead detectives in the investigation that ensnared R.J. Branch and Marcel Brown, would it have been your expectation from your experience that those lead detectives would be informed?

MR. GIBBONS:  Objection.  Lack of relevance.

THE COURT:  Response?

MR. BOWMAN:  Well, it's a -- it's a door that's opened.  There were a number of questions as to what he was -- and, again, the issue of who was informed is -- is -- has been made central in Mr. Gibbons's cross-examination.

THE COURT:  On relevance ground, the objection is overruled.  You can answer.

BY THE WITNESS:

A.   Yes, I -- that's a very fair statement.  I mean, and doing these investigations and talking with officers and when surrendering someone or trying to speak with someone, it's very

often that that lead detective needs to be there. And sometimes I've had the occasion where that lead detective was out on the streets, or something, and I potentially have to wait for them to come back to the station before I could talk to someone. So it wouldn't surprise me. I would expect that would be likely.

Q. In any event, your intention and your purpose was to speak with the decisionmaker who was deciding whether you got in to speak with Marcel Brown, or not; correct?

A. Well, it was my intention just to speak to Marcel Brown. I didn't really care who was going to let me do it or who was going to give me that: A-Okay. , go back to the room and talk to him, Attorney. I didn't care. I just wanted to go back there. And I was told that he did not want to talk to me, which is the only reason I can remember this whole situation whatsoever because I'm like, what the -- just surprised.

MR. BOWMAN: Thank you. That's all I have.

MR. GIBBONS: Just one question, your Honor.

THE COURT: Certainly.

BY MR. GIBBONS:

Q. Lead detective or not, you don't know who, if anyone, was told in the detective division that you were there trying to see Marcel Brown. Fair?

A. Correct. The only thing that I know is that I talked to someone who purported to be a detective or an officer of the

Chicago Police Department in the upstairs area, and they indicated that he did not want to talk to me. That's all I know.

Q. Detective or officer, you don't know which one. Right?

A. Correct.

MR. GIBBONS: Fair enough. Thank you.

No more, your Honor.

THE COURT: All right. Mr. Cary, you are excused. Thank you very much.

THE WITNESS: Thank you, Judge.

THE COURT: I'm sorry, was there another question?

MR. BOWMAN: We're done.

THE COURT: Okay. You are excused.

(Witness excused.)

THE COURT: All right. I will ask for convenience, does the jury need a bathroom break? If anyone does, I'm happy to give it.

(No response.)

THE COURT: Okay. Plaintiff can call their next witness.

MR. LOEVY: All right. At this time we call Mr. Mancuso, your Honor.

THE COURT: All right. Mr. Mancuso, please approach the witness stand. Before you take your seat, please raise your right hand so you can be sworn.

LAW CLERK:  State your name for the record.

THE WITNESS:  Mike Mancuso, M-a-n-c-u-s-o.

(Witness sworn.)

THE CLERK:  You have been sworn.  You may be seated.

THE COURT:  All right.  Mr. Loevy, you may inquire.

MR. LOEVY:  Thank you, your Honor.

MICHAEL MANCUSO, PLAINTIFF'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. LOEVY:

Q.  State your name, please.

A.  Mike -- Michael Mancuso.

Q.  What do you do for a living?

A.  I'm retired from the Chicago Police Department.

Q.  How many years did you work for the Chicago Police Department?

A.  Thirty years.

Q.  And when did you retire?

A.  2016.

Q.  Now, taking you back to 2008, you and your partner, Mr. McDonald, were the lead investigators for the case that we've been talking about here this week; correct?

A.  Yes.

Q.  What does that mean to be the lead investigator?

A.  The case was assigned to us.  It was -- we somewhat led the investigation.

Q.   Well, somewhat.  You were in charge of it; right?

A.   Yes.

Q.   You and McDonald jointly are responsible for the investigation.  Fair to say?

A.   Yes.

Q.   Neither you nor McDonald had lead over the other?

A.   Correct.

Q.   And you got assistance from others; correct?

A.   Yes.

Q.   Now, you and Mr. McDonald managed to close the case; right?

A.   Yes.

Q.   That resulted in the prosecution and conviction of, among other people, Marcel Brown; right?

A.   Yes.

Q.   In fact, it was your work during that interrogation that developed the evidence that was used to prosecute and convict Mr. Brown; correct?

A.   It was our work?

Q.   Your work.

A.   Yes.

Q.   And you were the one who was, I would say -- would you say primarily responsible for developing the evidence that sent Mr. Brown to prison.  Would you agree with that?

A.   No.

Q.   Who -- who in addition to yourself would be primarily

Mancuso - direct

786

responsible?

A.   Well, Detective McDonald.

Q.   The two of you were primarily responsible for developing the evidence that sent Mr. Brown to prison.  Would you agree with that?

A.   With assistance from other detectives.

Q.   And, in fact, had you not gotten those statements in this interrogation, Mr. Brown couldn't have even been prosecuted; correct?

        MR. FLYNN:  Objection.  Foundation.

        THE COURT:  Sustained.  Ask a few more questions to lay a foundation.

        MR. LOEVY:  I'm going to actually move on and double-back to that.

BY MR. LOEVY:

Q.   Let's talk about your investigation.

        What dates did you learn of the murder -- or, I'm sorry, of the shooting that happened in the park there?

A.   We learned that on Sunday morning, the 31st of August.

Q.   So the day after the shots were fired in the park; right?

A.   Yes.

Q.   Was that before or after Paris Jackson's body was discovered that you learned about it?

A.   It was after the body was discovered.

Q.   All right.  There had been shots fired the night before,

August 30th, Saturday night; right?

A. Yes.

Q. And what day did you -- how did you begin your day the next day, Sunday morning? What did you do?

A. Well, we arrived at work, and almost immediately we were told to go out to the scene, that there was a body found.

Q. And that scene was Amundsen Park; right?

A. Yes.

Q. I'm showing you the screen. You've been in court where we've shown it; right?

A. Yes.

Q. This is Amundsen Park?

A. Yes.

Q. Okay. And this is a park you were familiar with from your beat and your time at the CPD?

A. I really wasn't familiar with it. I knew where it was, but I didn't have any investigations there, or any activity there.

Q. Fair enough. The body was discovered sometime around 9:00 a.m. Sunday morning?

A. I believe so.

Q. And do you remember what time you responded to the scene?

A. Immediately.

Q. Now, this is the parking lot here, where my pen is pointing; correct?

A. Yes.

Mancuso - direct

788

Q.   All right.   And you can get your car into the parking lot?

A.   Yes.

Q.   And that's what you did?

A.   Yes.

Q.   And do you remember what else you did at the scene?

A.   Well, we examined it, you know, looked at the body.   The crime lab I think might have already been there, or were there shortly thereafter.   And there was a uniformed beat officer there that was assigned the investigation.

Q.   And you would have got a briefing at that point?

A.   Yes.

Q.   Now, there were some issues and problems with the theory that Paris Jackson had been shot the night before; weren't there?

          MR. FLYNN:   Objection.   Form.

          THE COURT:   Rephrase the question.

BY MR. LOEVY:

Q.   Paris' body was found right where my pen is, right, in the corner of the fieldhouse area of the parking lot?

A.   A little bit -- a little bit west of the corner.

Q.   West.   So a little bit -- somewhere around there.

A.   Yeah, probably four, five -- four feet, yeah.

Q.   Well, we'll look at it, but that general area.

          And it was found on Sunday; right?

A.   Yes.

Mancuso - direct

789

Q.   And your operating theory, when you were interrogating Mr. Brown, was that he had been shot the night before when R.J. discharged a gun in the park; right?

A.   Yes.

Q.   All right.  There were some problems with that theory; weren't there?

A.   Not that I'm aware of.

Q.   None?

A.   No.

Q.   How about the fact that five police officers, five police cars, responded to the shooting at 10:00 PM the night before?

MR. FLYNN:  Objection.  Facts not in evidence.

MR. LOEVY:  That's a fact, your Honor.

THE COURT:  But I don't know that its been admitted into evidence, so sustained.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   Let me ask you this.  I'll ask a foundation question.

You reviewed the reports as part of your investigation; right?

A.   Yes.

Q.   And the reports indicate the cars that respond to the shooting; correct?

A.   I don't -- I didn't see reports immediately from the night before.  That would be something -- that would be something

that would be developed later, printouts showing --

Q.   You would have got the printouts; right?

A.   Eventually, yes.

Q.   So over the course of your investigation, you learned that five different beats had responded to Amundsen Park that night; right?

A.   I'm not sure right now as I sit here.

Q.   All right.  Did you talk to any of those police officers?

A.   No.  They worked the night before, so wouldn't be available.

Q.   So there had been a call about 10:00 PM for shots fired; right?

A.   What time?

Q.   Maybe 11:00 PM.  I'm sorry.  11:00 PM?

A.   About 11:00, yeah.

Q.   11:00 PM.  And the police responded.  And exactly none of those police found Paris's body that night; correct?

A.   No, it was discovered in the morning.

Q.   So the five police cars that -- or however many police cars responded that night, if they responded to the shooting and parked in the parking lot, exactly how many of them found Paris's body?

        MR. FLYNN:  Objection.  Form.  It's a hypothetical turned into a fact.

        THE COURT:  Overruled.  He's trying to lay the right

foundation, so. You can answer, sir.

BY THE WITNESS:

A. Well, I'm not aware of any cars that drove into that parking lot. They may have driven down the street, crossed a grassy area. I don't know anybody that may have specifically gone into the back of the fieldhouse.

BY MR. LOEVY:

Q. All right. Well, police responded to the shots fired; right?

A. Right.

Q. Chicago Police Department takes shots-fired calls seriously; correct?

A. Sure.

Q. They have to determine if anybody has been injured; right?

A. Sure.

Q. That's why they respond; right?

A. Right.

Q. All right. So showing you -- this is Plaintiff's Exhibit 41, page 47. Here's a closer one, page 48. And here's another one, page 41.

This is, in fact, the corner of the fieldhouse; right?

A. Yes.

Q. So where these doors are depicted in the photograph, this is exactly right here; correct?

A. Yes.

Mancuso - direct

792

Q.   So you learned in the course of your investigation that, although Chicago police responded to the call the night before, exactly none of them saw a body lying outside the fieldhouse; correct?

A.   Correct.

Q.   Did you ask any of those responding police officers, well, you know, did any -- how did -- how did we miss the body in the parking lot?

A.   I didn't see those police officers.

Q.   All right.  You could have spoken to those police officers; correct?

A.   Eventually, sure.

Q.   And they closed the scene about 1:11 AM; correct?

A.   I don't know when they closed it.  They drove by, and I don't know what happened after that.

Q.   All right.  So even as you sit here today, you never knew there was an issue that maybe the body wasn't shot the night before?

A.   No.

Q.   First your hearing is this conversation we're having right here, right now?

A.   I heard it alleged before that --

Q.   Okay.

A.   -- something along those lines.

Q.   Because there was a lot of people in the park, too; right?

A.   From what we were told, yes.

Q.   How many?

A.   Anywhere from 20, 30 to 50 to 100.  I mean, various numbers.

Q.   Sure.  Of those 20 to 50 to 30 to 100 people, exactly how many of them saw Paris Jackson get shot when R.J. allegedly, I don't know, exchanged gunfire or shot a gun?

A.   I don't think any of them saw that.

Q.   So exactly zero saw Paris Jackson get shot in the park that night; right?

A.   Correct.

Q.   And you never identified anybody who saw Paris Jackson get shot?

A.   Correct.

Q.   And, in fact, there were people who didn't see Paris Jackson in the park that night; right?

A.   Out of the ones we talked to, there were a couple that said he may have been there, but I didn't see him.  But that there were a lot of people.

Q.   All right.  And if Paris was in the park that night, presumably he was with somebody; right?

A.   Sure.

Q.   Did the people Paris was with see Paris get shot?

A.   Many people said they saw -- Oh, not that they saw him get shot, but they saw him in the park.

Q.   Yeah, okay.

Now, you cannot -- as an investigator, you can't rule out that he didn't get shot that night but he got dumped later, his body got dumped there; right?

A.   The question is what?  We couldn't rule it out?

Q.   Yeah.  I mean, either when there was an exchange of gunfire at 11:00 PM, Paris was shot and nobody saw it, or, his body was dumped there later.  That's two possibilities; right?

A.   I guess anything is possible, but we were not following -- the thought didn't even enter in our minds that he was dropped there.  It just didn't fit.

Q.   Well, did it enter your mind to check for blood under the grate?

A.   I believe we did.

Q.   You had an autopsy report; right?

A.   Yes.

Q.   And you could see with your own eyes that the man had been shot in the heart?

A.   Shot in the back, and I think it nicked his heart and exited his chest.

Q.   Now, you use that word "nicked," but apparently it put a two-centimeter hole in the artery; right?

A.   Oh, okay.

Q.   You documented in your report that -- all the blood evidence that you located at the scene; right?

A.   Yes.

Q.   And you -- you checked the grate where the body was; right?

A.   Yes.

Q.   And, in fact, you guys lifted the grate and went down the stairs; didn't you?

A.   I think they got in -- I didn't go down there.  They got in through the park fieldhouse.  I think on the inside there's a stairway that goes down there.  I didn't personally go down there.

Q.   All right.  This is -- this is your deposition.  Do you remember giving a deposition, sir?

A.   Yes.

Q.   This is page 179, line 24 through 180, line 10.

        And, your Honor, if we could have the document camera.

        Do you remember giving these answers and --

        MR. FLYNN:  One second.  179, 24?

        MR. LOEVY:  179, 24 to 180, 10.

        Your Honor, then we would need the impeachment screen.

        MR. FLYNN:  Your Honor, it's improper impeachment.

        MR. LOEVY:  It's the exact question, your Honor.

        THE COURT:  Mr. Loevy, your question I think was about the stairwell and the stairs?

BY MR. LOEVY:

Q.   Did you go down the stairs?

A.   I don't personally recall going down the stairs.

Q. All right. Well, then, I'd like to play the impeachment.

MR. FLYNN: Again, he said that his team went down the stairs and he didn't go down the stairs. So this is improper impeachment.

THE COURT: Okay. I don't think I'm actually looking at what you're looking at.

MR. LOEVY: I will show you page 180, your Honor.

THE COURT: What's the defense's response to this? It looks like the answer relates to going down the stairs.

MR. FLYNN: Yes, your Honor. He's trying to impeach him and saying that he didn't go down the stairs, and he doesn't say here that he did go down the stairs.

THE COURT: Okay. I'll allow it. It's proper impeachment.

MR. LOEVY: Okay. Can we play it, please.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. Did you give those answers under oath?

A. Yes.

Q. All right. I'm guessing from your counsel's objection that you didn't mean what it sounded like it meant?

A. Yeah, I don't believe I went down the stairs. I may have said "we," meaning police personnel.

Q. I got you.

All right. But the police department made it a point

to get in there and look for blood; right?

A.   Sure.

Q.   And they found exactly zero traces of blood underneath that body; right?

A.   Correct.

Q.   And if Paris Jackson had run in the manner described -- I'm sorry, Paris Jackson, yeah, had run down the sidewalk and collapsed with a hole in his heart, even gravity alone you'd expect to find at least a little bit of blood somewhere; correct?

            MR. FLYNN:  Objection.  Improper opinion.

            THE COURT:  Overruled.  He can answer based on his experience.

BY THE WITNESS:

A.   Um, you would think maybe, but he was wearing a couple of shirts, and his heart stopped.  I mean, he's -- he died, so I'm thinking not pumping blood anymore, he's just -- and he's pressed up against a grate.

BY MR. LOEVY:

Q.   Of course, you guys did find a drop of blood over here; right?

A.   We found several.

Q.   All right.  So it's not like you weren't looking for drops of blood?

A.   Correct.

Q.   You just couldn't find any underneath his body?

A.   Correct.

Q.   And on the grate itself, he's got a bloody shirt; right?

A.   I believe he was wearing two shirts.

Q.   All right.  And they were bloody; right?

A.   Right.

Q.   So wasn't it odd that there was no blood transferred from the shirt to the grate?

A.   I mean, I'm not an expert in this, but I think if he's pressing up against it, it might not be dripping through.

Q.   I'm not an expert either, but don't you think if I lie with a bloody shirt on a grate and then they take me off that there would be blood on the grate?  Unless it had dried previously.

A.   I don't know if there's any on the grate, but I know they didn't find any droplets down below the grate.

Q.   And they didn't find any on the grate either; correct, sir?

A.   I'm not 100 percent sure at this time.

Q.   Well, it is clear that there was no blood located other than what was documented; correct?

A.   Okay.

Q.   I mean, they were looking for blood; right?

A.   Yes.

Q.   So there's at least some question that maybe this body wasn't actually shot that night but somebody had dumped it here at a different time; right?

A.   We didn't think that at all.

Q.   All right.  You know, as a police officer, sometimes things aren't as they seem; right?

A.   Of course.

Q.   And so you have to keep an open mind; right?

A.   Yes.

Q.   Can't pre-judge the situation?

A.   Right.

Q.   Sounds like in this case, though, you pretty much decided that whoever shot that gun at 11:00 PM, that's who killed Paris Jackson; right?

          MR. FLYNN:  Objection.  Argumentative.

          THE COURT:  Sustained.

BY MR. LOEVY:

Q.   I mean, did you come to that conclusion, that the shooting the night before was the cause of the death?

A.   Based on everything that we had that we learned, we believed he was shot in the park, ran, dropped.

Q.   Without getting into hearsay statements, it's fair to say that some witnesses gave you the reason to believe that maybe R.J. Branch was involved in the shooting; right?

A.   Yes.

Q.   There was plenty of good reasons.  People were saying:  I think I saw that kid with a gun shooting; right?

A.   Yes.

Q.   And so you wanted to talk to R.J. Branch?

A.   Sure.

Q.   And he turned himself in; right?

A.   Correct.

Q.   And he must have gotten wind that the police wanted to talk to him, or?

A.   Probably.

Q.   Or he just turned himself in.  Do you remember which way?

A.   There were officers out looking for him at various addresses.  He probably learned that way, and his father brought him in.

Q.   All right.  Do you remember his lawyer, Wham Cary?

A.   I don't think I've ever seen that man in my life.

Q.   Did you remember him -- do you remember that R.J. Branch had a lawyer?

A.   I had heard he did, yes.

Q.   All right.  You know he did, you're saying?

A.   Yes.

Q.   All right.  Do you remember him?

A.   No.

Q.   Did you put R.J. Branch into one of those interrogation rooms?

A.   I didn't, no.

Q.   Did R.J. Branch end up in one of those interrogation rooms?

A.   Yes.

Q. And did you interview him?

A. No.

Q. Why not?

A. I believe somebody else did, got his identifiers. They knew he did not want to speak to anybody. Or they asked him if he wanted to talk, and he said not without his attorney, and there was no attorney there. So somebody else talked to him, spoke to him, and got his identifiers for his arrest report.

Q. R.J. Branch invoked his right to silence; right?

A. Yes.

Q. And he invoked his right to counsel; right?

A. Yes.

Q. So nobody talked to him; right?

A. Correct.

Q. Because you're not allowed to ask people questions if there's a lawyer saying --

A. Correct.

Q. All right. So, and R.J. Branch never gave a statement; right?

A. Correct.

Q. Now, that's absolutely his right, would you agree?

A. Yes.

Q. Very important right. Right?

A. Sure.

Q. Now, that interfered with your investigation; didn't it?

Mancuso - direct

802

MR. FLYNN:  Objection.  Argumentative.

THE COURT:  Rephrase the question.

BY MR. LOEVY:

Q.  All right.  All things being equal, you wished you could have talked to R.J. Branch; right?

A.  Yeah, probably.

Q.  All right.  Were you frustrated that you had an attorney saying --

A.  No.

Q.  -- can't talk?

A.  No.

Q.  He's allowed to do that; right?

A.  Of course.

Q.  All right.  How about Mr. Brown.  You went and arrested Mr. Brown; correct?

A.  Yes.

Q.  He wasn't hiding?

A.  No.

Q.  You found him where you might expect to find him; right?

A.  At his house.

Q.  All right.  He was -- had you ever been there before?

A.  No.

Q.  Based on your reports, do you have a memory of what time you got to his house?

A.  I think it was around 3:00 PM.

Mancuso - direct

803

Q.   And you didn't tell him he was under arrest; correct?

A.   I didn't.  I believe one of the other detectives did.

Q.   Well, let's slow down here.  You personally never told him he's under arrest; right?

A.   Not at that time.

Q.   And you said:  I believe maybe somebody else did.

Is it fair to say you don't remember, or you're just guessing?  Or what are you saying?

A.   I think I remember Detective Weber.  You know, I can't remember exactly, specifically who.  I think there were four or five of us there.

Q.   So you're just guessing?  Or what are you saying?

A.   I don't remember specifically.

Q.   All right.  Isn't it true nobody told Mr. Brown he's under arrest?

A.   No, that wouldn't be true.

Q.   Because that would have been very improper, wouldn't it have been?

A.   Of course.

Q.   Yeah, because if he was being arrested for first-degree murder, he'd have a right to know that; right?

A.   Sure.

Q.   All right.  And if we could play clip No. 6.

And if we could go back to the interrogation, your Honor.

MR. GIBBONS: Jon, can we get some foundation on that?

THE COURT: Yeah, so --

MR. LOEVY: This is when you got him back in the room.

MR. GIBBONS: No. What's the time of the tape?

MR. LOEVY: Sure. This is the very beginning of the interrogation. This is almost your first question to him when you read him his rights. But this is clip 6.

John, I'm going to give you my key so you'll have the transcripts. So this is the transcript pages.

May I confer, your Honor?

THE COURT: You may, with your notepad, yes.

MR. LOEVY: Sorry. Then we won't --

All right. Can we play clip 6, your Honor?

THE COURT: Yes.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. So that was your younger self in there talking to him; right?

A. Correct.

Q. And he said -- he's basically saying what's -- you know, I thought I was a witness. Right?

A. No, he didn't say that.

Q. But he's saying: What do you mean I'm locked up? And what did you tell him?

A. Well, I said no, this is -- we got to do this. But what I

Mancuso - direct

805

meant was he's not charged.  This is early in the investigation, so he's not charged.  Locked up could -- would indicate you're locked up, you're going into the lockup and you're gone.

Q.   Later --

A.   So he's not locked up.  He was arrested.

Q.   Later on he learned he was under arrest, and he was genuinely surprised; wasn't he?

A.   I don't recall.

Q.   All right.

Play clip 70, please.

MR. FLYNN:  One second, please.  We've got to get to the transcript.  Okay.

(Said video clip displayed in open court.)

MR. LOEVY:  Then showing you 71.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  You would agree with me that it appears that Mr. Brown is genuinely surprised at 7:00 PM on that first day to learn that he was under arrest; right?

A.   I think he was confused.

Q.   All right.  It would not have been proper for him to have been held all those hours without knowing he was under arrest.  Would you agree?

MR. FLYNN:  Objection.  Improper opinion.

THE COURT: Overruled. You can answer.

BY THE WITNESS:

A. Would he -- he was under arrest, so he should have understood. I thought he did.

BY MR. LOEVY:

Q. Yeah, because if he didn't, that's a real problem in your mind. Right?

A. Not necessarily.

Q. Would you interrogate somebody for four hours for murder without telling them they were under arrest for murder?

A. We always tell them they're under arrest.

Q. Right. So I get that you would have told him, but because -- now, my question is: If you hadn't told him and you interrogated him for four hours for murder without telling him he's under arrest, that's a problem; isn't it?

A. I can't agree to that.

Q. You cannot agree to that.

Don't you think it would be tricking somebody to arrest them for murder, not tell them they're under arrest, and then interrogate them?

A. He was under arrest. We thought he understood he was under arrest. He was told that at the house at some point when we first got there.

Q. And not to argue, but, when you say he was told that at the house, you say: I believe, maybe. Right?

Mancuso - direct

807

A.   No, he was.  I just don't recall which officer told him.

Q.   And it wasn't you?

A.   Not that I recall.

Q.   All right.  How about his right to a lawyer.  He was advised that he had a right to a lawyer; right?

A.   Yes.

Q.   When you told him:  Sir, you have a right to speak to an attorney, were you kidding?

A.   No.

Q.   That's a serious thing; right?

A.   Yes, of course.

Q.   It's not just you're reading your card.  I mean, he had a right to a lawyer; right?

A.   Yes.

Q.   That's a very important right; isn't it?  Do you agree with that?

A.   Yes.

Q.   Okay.  I'm sorry.

        Do you agree that it was critical that Mr. Brown understood that?

A.   Yes.

Q.   Now, if you knew that Wham Cary represented had been retained by Mr. Brown's family was trying to talk to him, you would have been obliged to make that happen; right?

A.   Absolutely.

Q. And you would have made it happen; right?

A. Yes.

Q. And you would have been required to make that happen?

A. Yes.

Q. And isn't it true that if anybody had said to Mr. Cary that the plaintiff doesn't want to talk to you, that would be an untrue statement; right?

A. It had to be. I just don't know who would say that.

Q. Yeah. Because he never said he didn't want to talk to a lawyer; right?

A. No.

Q. And he certainly was never asked: Hey, there's a lawyer who wants to talk to you, you want to talk to him? And he said: No thanks. That didn't happen; right?

A. No.

Q. And if it did happen, it would be on videotape; right?

A. Yes.

Q. So if Mr. Cary -- and you don't know if he was or wasn't -- if he was told Mr. Brown doesn't want to talk to his attorney, that is a false statement; right?

            MR. FLYNN:  Objection.  Foundation.

            THE COURT:  Overruled.  He has laid the foundation.

BY THE WITNESS:

A. Say it again.

BY MR. LOEVY:

Q. If somebody told Mr. Cary that: Mr. Brown doesn't want to talk to you, Mr. Cary, doesn't want to talk to you, that would have been false?

A. Right. Correct.

Q. Now, you knew Mr. Cary was in the station with R.J.; right?

A. No, I didn't.

Q. All right. This is your deposition. If we could go back to the deposition, page 411, line 17 through 412, lines 3.

THE COURT: And defense counsel can let us know when you're there.

MR. FLYNN: Yep.

THE COURT: For purposes of an objection.

MR. LOEVY: Sure. 411, line 17 through 412, line three. Actually, we can go all the way to line 8.

MR. FLYNN: Okay.

THE COURT: All right. Mr. Loevy, you can continue.

MR. LOEVY: You can play it.

(Said video clip displayed in open court.)

MR. LOEVY: No, Lillia this is 411, line 17 through 412, lines 3.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. So you do recall Wham Cary and interacting with him; correct?

A. I don't recall interacting with him. I might have been

aware he was there.  I don't -- right now as I'm thinking, I don't recall seeing him.  I remember seeing the father, I remember, because I know R.J.'s father from years ago.

Q.   Well, let me ask you this:  Did you give that answer at the deposition, sir?

A.   Can I see it again?

Q.   All right.

Well, you really can't answer if you gave that answer at the deposition?

A.   Oh, I gave that answer.  I just can't recall --

Q.   Okay.  That was the question.  Did you give that answer?

A.   Yes, obviously.

Q.   All right.  If Mr. Cary had been asking to speak to Marcel Brown, you would have been told as the lead detective; correct?

A.   Yes.

Q.   Why do you say that?

A.   Because it just would have -- if he was there and was asking and somebody told me, it would be the right thing to do, and I would have.

Q.   No, no.  I said, if Mr. Cary had been at the police station --

A.   Uh-huh.

Q.   -- and he said, I want to talk to Marcel Brown, there's no universe where you, the lead detective, isn't notified, hey, we got an attorney wants to speak to a guy in a room that you're

811

in the room with.  You get notified.  That's not in question; right?

A.   Correct.

Q.   Because at the Chicago Police Department, the lead detective is in charge of the interrogation; right?

A.   Correct.

Q.   It's your show; right?

A.   Correct.

Q.   So if somebody, we don't know who, if this happened, would have knocked on the door, found you and said, hey, listen, you know, this kid's got an attorney out here.  There's no doubt in your mind that would have come to your attention?

A.   For sure.

Q.   And you absolutely, if you were told that this kid's got an attorney out here, attorney wants to talk to him, you would have had an obligation to be honest about that; right?

A.   Correct.

Q.   And you're saying you never asked Marcel:  Hey, you want to speak to Mr. Cary?  And you never asked him that; right?

A.   Never.

Q.   And Mr. Brown had a right to know, didn't he, if there was --

        MR. FLYNN:  Objection, your Honor.

        MR. LOEVY:  I'll rephrase it slightly.

        THE COURT:  Thank you.  Yes.

Mancuso - direct

812

BY MR. LOEVY:

Q.  You have a subjective understanding in your own head, you believe that if Mr. Brown had an attorney out there trying to speak to him, that he should have been told that; right?

A.  Yes.

Q.  Why?

A.  Because it's his right.

Q.  Why is it a good idea if he's in the room and there's an attorney saying, I want to speak to my client, why should you tell that person?

MR. FLYNN:  Objection, your Honor.  Again.

THE COURT:  I think he has answered the question, Mr. Loevy.  He answered it.

MR. FLYNN:  Can I have a sidebar, your Honor?

THE COURT:  Yes.

MR. FLYNN:  Thank you.

(Proceedings heard at sidebar:)

MR. FLYNN:  Mr. Loevy is trying to backdoor in evidence that you have clearly stated over and over again is not admissible; and that is, that there is any kind of state constitutional right to Wham Cary being able to see Mr. Brown.

MR. LOEVY:  No.  It's quite the opposite, your Honor. You kept out the law because my understanding is you believe the evidence was going to be undisputed that, what I just said with this witness, is that he can't deny it and he subjectively

knows it. And this is pretty powerful evidence of bad faith on his part if he's -- you know, we're saying he overcame Marcel's will? And if he knew all these things and knew he should have and didn't, you know, I get that it's bad for them, but this is very relevant.

THE COURT: I would just like to go back and read the answer again.

All right. The objection is sustained. You can ask your next question. We're too close to the line here.

MR. LOEVY: What was the question that was sustained to?

THE COURT: Your question was: Why is it a good idea if he is in the room and there is an attorney saying I want to speak to my client, why should you tell that person?

MR. LOEVY: Okay.

THE COURT: Thank you.

MR. LOEVY: Thank you.

(Proceedings heard in open court:)

BY MR. LOEVY:

Q. All right. You don't dispute that if an attorney gets access to his client, a lot of times that's pretty much the end of the interrogation. That was your experience; right?

A. Yes.

Q. As soon as the client understood there was an attorney in there to see him, they stop talking; right?

A.   Correct.

Q.   And that made it harder to solve crimes; right?

MR. FLYNN:  Objection.  Argumentative.

THE COURT:  Overruled.  You can answer that.

BY THE WITNESS:

A.   Not necessarily.

BY MR. LOEVY:

Q.   All right.  But it -- incrementally, you had to go out and solve the crime a different way than getting an admission; right?

A.   Correct.

Q.   All right.  And that's not a good reason to deny the person access to an attorney.  Would you agree with me?

A.   There's never a good reason to deny an attorney for somebody.

Q.   Did you deny people their attorneys as a matter of practice back, then?

A.   Absolutely not.

Q.   If it happened in this case, it would have been an exception?

A.   Didn't happen in this case.

Q.   Well, he didn't get an attorney; did he?

A.   One never came in for him.

Q.   How about phone calls.  Someone in Mr. Brown's shoes also had a right to make a phone call; correct?

MR. FLYNN: Objection, your Honor. Same issue, just all over again.

THE COURT: So I think the question about -- if we can move, Mr. Loevy, to the facts of this case, that would be preferable so that we're not anywhere near the issues we discussed.

MR. LOEVY: May I try to ask --

THE COURT: Yes. Yes.

BY MR. LOEVY:

Q. Mr. Brown was asking for phone calls; right?

A. He asked a few times.

Q. During the interrogation; right?

A. Yes.

Q. And he should have been granted access to the phone.

MR. FLYNN: Objection, your Honor. Your Honor, can I have another sidebar?

THE COURT: We should discuss at sidebar.

(Proceedings heard at sidebar:)

MR. FLYNN: Your Honor, Jon -- Mr. Loevy is literally doing what you just told him not to do with the Wham Cary issue, and now he's getting into the jury's head that there's a right to make phone calls. Again, just completely violating your orders in motion in limine.

THE COURT: All right. So I want to stay away from the idea that he has a right to that. But I think it's fair,

Mancuso - direct

816

and I hope where Mr. Loevy is going is that the facts of what we saw in the video, which is that he was -- he asked multiple times about making phone calls and was told in a minute, in a minute, in a minute.  So where are we going, Mr. Loevy?

MR. LOEVY:  Where we're going is exactly what he's saying, which is -- that's half of it, he was asking, asking, asking.  The other half of it is this defendant subjectively was aware he can't deny him that and nonetheless did.

We're trying to prove a coerced confession claim. We're trying to show that he was trying to overbear his will. And you have barred only -- a ruling we disagreed with but are abiding -- that we can't say Illinois law was the source of his right to a phone call.  But that's not the same thing as saying -- I thought that you barred it because we were able to say that the general order prohibits a phone call.  You know, we briefed on the motion in limine.  You can bring in general orders because it's evidence of bad faith, it's evidence of intent.  If he's knowingly violating the rules to deprive him of a phone call, that's a very different scenario than -- it's just like, I don't think you should get a phone call.  He's trying to exploit this, well, I can't bring up a statute, which I should be able to bring up.  But there's -- I have to be able to say, you denied him a phone call knowing it was wrong to do that.

So if you don't want me to say it was illegal to do

that, I won't say it was illegal. But I have to be able to get the bookend of that, that it was wrong. That he knew you can't deny it. And if he denies that, I should be able to say it violated the law.

MR. FLYNN: Your Honor, you already ruled on this very issue during motions in limine, that they cannot get into Mr. Brown having any kind of right. It's not just the law that they can't get into, they can't get into having any kind of right. They can get into the facts, we don't object to that. But they are clearly back-dooring evidence that you've already deemed inadmissible.

MR. LOEVY: That would be just wrong. You know, we can get in a general order. You did say that a violation of a rule could be evidence --

THE COURT: Look, I think we're -- we're on very thin ice here. But I think Mr. Loevy is correct, that, with regard to the general order, and I issued something on that yesterday, you know, you can get into the fact that the general orders allow that, for example, within a reasonable period of time.

But let's be very careful here, Mr. Loevy, because I just -- my ruling with regard to the right under the law is very clear, and I just want to be --

MR. LOEVY: I can phrase it as, it would have violated department rules to deprive him of a phone call.

THE COURT: So that's fair because of the ruling that

I made yesterday.

MR. LOEVY: Okay.

THE COURT: The department policy issue.

MR. FLYNN: Your Honor, your ruling yesterday, you ruled that some of those policies were admissible, but the phone call policy was specifically inadmissible.

MR. LOEVY: How could that be? If he's -- what if he says: Hey, I deprived him of a phone call.

THE COURT: Okay. Let's take a quick break here because I'd like to look back at it. So let's take a break.

(Proceedings heard in open court:)

THE COURT: Ladies and gentlemen, I need to look into something that's been brought to my attention, so let's just take a 10-minute bathroom break. I'll look into it while we do it, and we'll resume in 10 minutes.

Please don't discuss the case. All rise.

(Jury out at 4:03 p.m.)

THE COURT: So now that the jury is out of the room, I wanted to -- I was seeing Mr. Gibbons shake his head no, and so it made sense for me to just take a look back at what I said with regard to the rule on phone calls. And there were so many pieces -- there were so many pieces, I just wanted to be sure that I'm not conflating one topic versus another.

MR. GIBBONS: So, your Honor, my understanding from --

MR. LOEVY: Do we want the witness to hear that?

THE COURT: One second.

Mr. Mancuso, can I ask you to step out of the room. You're welcome to use the restroom, just don't go very far. Sorry about that.

MR. GIBBONS: No problem.

My understanding is they had to identify --

MR. LOEVY: Wait until he clears the room.

MR. GIBBONS: Oh, sorry.

(Witness exited the courtroom.)

THE COURT: All right.

MR. GIBBONS: Your Honor, I think your orders were they had to identify policies by a certain date. They had a chance to object, then the subject of motions and rulings. And my understanding is that they didn't identify this telephone policy as being one. Too late now. Way too late.

MR. LOEVY: You know, it doesn't matter if it's a law or policy. All that matters is, in his mind, he will admit that you can't deny someone a phone call. And he did it any ways. That's relevant to the claim that's on trial.

THE COURT: Right. That's relevant to the coercion claim.

With regard to the motion for reconsideration, what I said and what I stand by is, we're not going to get into the fact that that's a violation of state law, which -- and I don't think Mr. Loevy's question referenced that -- as I indicated in

my minute entry from yesterday at 397, there were certain CPD rules and regulations that, you know, were fair game. And that, to some degree, a limiting instruction or other things might be available -- might be appropriate in light of how this information can be used. And I'm just looking here to see if there is a reference -- which of the internal orders or rules related to phone calls?

MR. LOEVY: You know, I think I can simplify it, your Honor. I think he will admit that the rules of the department required him. We don't even -- I don't even need to cite a specific rule. He's not disputing that he can't do that.

MR. GIBBONS: Well, what was the purpose of the Court's order asking the plaintiffs to identify general orders that they would think were going to be used at trial. Then we objected to them, then the Court ruled on them. This wasn't identified.

Now, they made a mistake, I get it. But now you can't correct the mistake by just orally asking now a detective, who now is going to think he has to answer this question based on general orders that have not been ruled admissible in this case.

MR. LOEVY: Your Honor, we have -- it's not -- you know, we don't need the state law because you won't let us do it. We don't need the general order if he's got a problem with it. All I need to ask him is, he knows you can't do that. He

knows you can't do that. You can't -- what if he says: Yeah, I did it. You know, I did it because I wanted to do that. If he knows it's prohibited --

THE COURT: Right. Then he should just be able to answer the question yes or no and whether or not he knows it's prohibited and not talk about the underlying source --

MR. LOEVY: Source. Fine.

THE COURT: -- or where that right comes from.

Look, the reality is there is a coerced confession claim in the case. And with all the guardrails that I've put in place, I do think that it's appropriate for the witness to just simply say whether or not he was aware he could deny him a phone call. That's it. That seems like a very straightforward question that he can answer simply based on his understanding of the rules and protocols at the time without identifying the source or reason for that --

MR. LOEVY: Fine.

THE COURT: -- understanding. Was he aware of it or not? That seems very relevant to a coerced confession claim.

MR. LOEVY: Especially because he did deny a phone call. When you put those two things together. Your Honor, if he denies it, then we're going to have another sidebar, or we could have it now, because then we've got a problem. I don't think he's going to deny it.

THE COURT: And I would appreciate defendants'

response on this in part because part of what you raised in your motion for reconsideration and part of what we -- you know, I anticipated here is that -- well, this issue has been complicated in a number of ways, so I'll give you an opportunity to respond.

MR. FLYNN:  My understanding of your ruling, your Honor, is that we get into the facts of him asking for a phone call and the detectives not giving him a phone call.  By getting into Detective Mancuso's thought process of whether he had a right or didn't have a right, or whether that was right or whether that was wrong, that's, again, just the way to backdoor in this evidence that's already been briefed on for months as inadmissible.

MR. GIBBONS:  Your Honor?  The other thing, having been through a million of these cases, reasonableness is part of what these detectives have to do in relation to phone calls.  There are so many reasons you don't give a phone call.  People tipping off the cohorts.  People burying evidence.  People destroying evidence.  Okay?  We're going to open up a hornet's nest here.  The jury has already heard multiple times --

THE COURT:  Right.

MR. GIBBONS:  -- all the phone calls, he asked seven times.  Mr. Flynn put up a chart with them all.  Jon has gone over them ad nauseam.  We saw every clip of Marcel Brown asking for a phone call.

He can ask him: Did Marcel Brown ask for a phone call? Many, many times. But to then get into, well, you denied it, now tell us why, is going to walk into a hornet's nest.

MR. LOEVY: Your Honor, the reason they're flipping out is because this is really powerful evidence. Because if we're saying, you coerced Marcel Brown's confession, and he's saying no, I'm just a nice guy, if he knowingly deprived Marcel of access to a lawyer and then spent 34 hours doing what we say we did, that's super relevant.

And Mr. Gibbons just said: Well, there's lots of reasons you deny a phone call. It's against the law --

MR. GIBBONS: No. No.

MR. LOEVY: -- to do what he just said.

We should tell the jury what the law is within a reasonable amount of time. You know, we don't have to say the source of the law. I'm going to ask him: Isn't it true you knew -- not only did you deny a phone call, you knew you're not supposed to do that? I won't get into the source.

THE COURT: It is fine for you to ask the witness: Did you know that you could not deny him a phone call? And that's it, we're moving on. And that's it. You cannot talk about the source of that.

MR. LOEVY: I won't.

THE COURT: You cannot talk about, you know, anything

else about it. That is the question you may ask, he will answer it yes or no, and then we're going to move on to the next topic.

You know, we're going round and round about the same point over and over. My rulings are what they are. We're not going to talk about the source of it. You may simply ask whether or not he knew the question Mr. Loevy just put on, which is: Isn't it true you knew -- not only did you -- sorry.

Isn't it true you knew not only did you deny a phone call, you're not supposed to do that?

MR. LOEVY: Not supposed to do that.

THE COURT: You're not supposed to do that. That's the part I was trying to get at. That's it. That's the question he can ask, and the answer will be what it is, and then we're going to move on to the next topic.

MR. FLYNN: Mr. Loevy said that if his answer is no, then we're going to get another sidebar. I think his answer might be no. Because it's not as simple as just, can you deny a phone call. It's a reasonable period.

THE COURT: Then we're going to have you move on to the next topic. We can revisit this when we finish the testimony.

MR. LOEVY: There you go.

THE COURT: And this may be something we will have to revisit this afternoon or this evening for purposes of

continuing his testimony tomorrow morning.

But I'm going to tell you, Mr. Loevy, I think you're just stuck with the answer, and that's going to be -- that's going to be it because there's too much about the follow-up that's going to get into areas that I've said you can't get into.

MR. LOEVY: Well, I -- you know, I will ask him the question. I don't think he will deny it. If he does, then, you know, we will file the appropriate motions, and you'll rule.

THE COURT: Right.

MR. LOEVY: Okay.

MR. GIBBONS: Your Honor, I need two minutes to go to the bathroom.

THE COURT: Of course. Of course.

(Brief recess.)

MR. GIBBONS: Thank you.

MR. LOEVY: What time are we going to today, your Honor?

THE COURT: 4:45.

MR. LOEVY: Thank you.

THE COURT: So I just want to go back on the record here really quickly. I just looked back at the ruling from Sunday on the motion for reconsideration. I'm standing by my ruling, but I do want to just be clear: The statute at issue,

which we will not reference, concerns the right to make a phone call within a reasonable time. That's under the Illinois law. And so I think because of what I said in the motion for reconsideration concerning denial of the right, et cetera, et cetera, specifically the statement where I said: Should defendants deny or disagree any of these duties, the Court will consider appropriate next steps, which is what I said in the order, which is a bit of the territory that we're in here, I think it needs to be clear in your question, Mr. Loevy --

MR. LOEVY: Reasonable amount of time?

THE COURT: Correct.

MR. LOEVY: Okay.

THE COURT: Because it's not just --

MR. LOEVY: Right.

THE COURT: -- at any time, ever; right? But you've got to add -- right. I think you've got to incorporate that into your question.

MR. LOEVY: All right.

THE COURT: That it has to -- you knew you had to do that within a reasonable amount of time; right?

MR. LOEVY: Got it.

THE COURT: Right? Not like the first time he asked you, for example.

MR. LOEVY: I can incorporate that, your Honor.

THE COURT: Okay. Thank you. With that

clarification, I appreciate it very much.

MR. LOEVY: Thank you.

THE COURT: Thanks.

(Jury in at 4:16 p.m.)

THE COURT: All right. Please be seated. Ladies and gentlemen, we're going to resume testimony for 30 minutes, and we'll be -- we'll end today at 4:45. So I appreciate your patience.

Mr. Loevy, you may inquire.

MR. LOEVY: Thank you.

BY MR. LOEVY:

Q. Sir, when we left off, we were talking about people in the interrogation room asking for phone calls. Do you remember we were talking about that?

A. Yes.

Q. That happens from time to time; right?

A. Yes.

Q. If someone in the interrogation room has to, you know, call out of the room, they're supposed to get that phone call within a reasonable amount of time. Do we agree?

A. Correct.

Q. They have to be permitted to do that?

MR. FLYNN: Objection, your Honor.

THE COURT: Overruled. Because he's just confirming the answer to the question, so overruled.

Mancuso - direct

828

BY MR. LOEVY:

Q. All right. Now, we -- you were in court when there was a number of requests by Mr. Brown to make that required phone call; right?

A. A few.

Q. Do you remember there was seven?

A. Over a period of time there were. A few early on, and then a few later.

Q. All right. Each time you told him, ah, five minutes, five minutes. Right?

A. Correct.

Q. And he didn't get a phone call in five minutes; did he?

A. Correct.

Q. And he should have?

MR. FLYNN: Objection, your Honor.

THE COURT: Sustained.

BY MR. LOEVY:

Q. In your mind, subjectively, did you feel that you were supposed to get --

MR. FLYNN: Objection, your Honor. Can I get another sidebar?

THE COURT: Rephrase the question, Mr. Loevy. Before we do a sidebar, we'd like to get through this testimony --

MR. LOEVY: All right. When you --

THE COURT: -- so rephrase the question.

Mancuso - direct

829

MR. LOEVY:  Sorry, your Honor.

BY MR. LOEVY:

Q.  When you told him he'd get a phone call in five minutes, were you lying to him?

A.  I don't think I said five minutes, but, in a little -- in a little bit.  Or did I say it?  I'm not -- I can't recall.

MR. LOEVY:  Play number 31, please.

Your Honor, can we have the clip screen?

THE COURT:  Yes.

MR. FLYNN:  If I could just have a moment, please.

Okay.

(Said video displayed in open court.)

BY MR. LOEVY:

Q.  Can you read the timestamp, then?

15:42 on day one; right?

A.  Right, 15:42.

Q.  You told him five minutes; right?

A.  Yeah, a few minutes.

Q.  Okay.  37, please.

(Said video displayed in open court.)

BY MR. LOEVY:

Q.  All right.  Finish it.

(Said video displayed in open court.)

BY MR. LOEVY:

Q.  All right.  Was it true that the phone was just outside?

Mancuso - direct

830

A.   It must have been if I said it.

Q.   All right.   Number 40.

     (Said video displayed in open court.)

BY MR. LOEVY:

Q.   All right.   44.

     Did that -- by the way, when Weber was coming in, were you guys working in tandem?

A.   I can't recall.

Q.   If Weber got a request to use the phone, you as the lead detective, would you have been notified?

A.   Maybe.

Q.   Whose decision is it to allow him to make that phone call, yours as the lead detective, or the assisters?

A.   That would be us, the lead.   Myself and McDonald.

Q.   So he would ask you:   What do we do about this phone call request; right?

A.   Who, Weber?

Q.   When Weber got this request, I want to use the phone, he would have had to go to you and say, should we give him a phone call; right?

A.   Probably.

Q.   All right.   How about 44?   Was that 40 or 44?

     (Said video displayed in open court.)

BY MR. LOEVY:

Q.   All right.   I'll ask them, it's their case, Weber is

saying.  Who's the "them" in that sentence?

A.   That would be myself and McDonald.

Q.   All right.  How about 46?

     (Said video displayed in open court.)

BY MR. LOEVY:

Q.   All right.  Were you lying when you said:  Give us five minutes?

A.   I was putting him off because we still had R.J. out in a wind.  You have to understand this, we can't let him call R.J. and warn him that, hey, I'm caught --

          MR. LOEVY:  Objection, your Honor.  That opens the door.

BY THE WITNESS:

A.   -- get going.

Q.   Were you --

          Well, can I ask a question, then?

          THE COURT:  Yes.

BY MR. LOEVY:

Q.   You're not saying you were intentionally denying him a phone call for reasons of investigation; are you?

A.   We don't normally let people have their phones in an interview room, where just sitting on their phone while we're trying to conduct an investigation.

Q.   Let me ask this, though:  You agree that you're supposed to give him a phone call within a reasonable amount of time;

right?

A.  Right.

Q.  And you have --

MR. FLYNN:  Objection.

THE COURT:  He's allowed to ask that question.  He's already asked it.  The witness has already answered that question.

BY MR. LOEVY:

Q.  All right.  53.2?

THE COURT:  So we can move on.  Thank you.

(Said video displayed in open court.)

MR. LOEVY:  65.

(Said video displayed in open court.)

BY MR. LOEVY:

Q.  When you said:  We'll let you call her in a little bit, were you lying?

A.  No.

Q.  Of course, you didn't let him call her in a little bit; right?

A.  Correct.

Q.  In fact, you didn't let her call him -- call her for the rest of day one; right?

A.  I don't know when -- I don't know exactly when.

Q.  It didn't happen on day two; did it?

A.  Not that I recall.

Q.   Shooting ahead, let's go before -- let's go one more, 69.

MR. FLYNN:  One second.

(Said video displayed in open court.)

MR. LOEVY:  Stop.  Sorry.  I apologize.  69.

MR. FLYNN:  Okay.

(Said video displayed in open court.)

BY MR. LOEVY:

Q.   Could you make out what he said there?

A.   Not really.

Q.   All right.  Let's go to 243, advancing it much further in time, right before Ms. Spizzirri comes in.  243.  Sorry.

(Said video displayed in open court.)

BY MR. LOEVY:

Q.   This is -- I'm sorry.  This is 10:00 o'clock -- no, it's 2200 on 9/4, on day two.  Do you agree with that?  Do you see it?

A.   Yes.

MR. LOEVY:  All right.  Let's play it, Lillia.

(Said video displayed in open court.)

BY MR. LOEVY:

Q.   All right.  You heard Turner say:  I'll take a look.  Right?

A.   Correct.

Q.   All right.  Was he -- is that a trick you guys used, or was he really going to take a look for his phone?

Mancuso - direct

834

A.   I can't speak for him.

Q.   All right.  But you worked with the detectives; right?

A.   Correct.

Q.   Would you guys play tricks on the interrogation suspects, pretend you're looking for their phones when you're really not?

A.   No.

Q.   All right.  Let's go to 307.  This is midnight on day two.

     (Said video displayed in open court.)

BY MR. LOEVY:

Q.   All right.  When he said that in front of the state's attorney, that's when he got his phone call; right?

A.   I believe he got it after that.

Q.   And that's at -- you were the one who gave him his phone call at 1:10 a.m. on day three; right?

A.   I don't know if it was me.

Q.   This is clip 320.

     (Said video displayed in open court.)

BY MR. LOEVY:

Q.   All right.  It was you; right?

A.   Yes.

Q.   Now, he should have got a phone call much earlier; shouldn't he have?

          MR. FLYNN:  Objection.

          MR. GIBBONS:  No.  Come on.

          THE COURT:  Sustained.  Next question.

Mancuso - direct

835

BY MR. LOEVY:

Q. Did you intentionally, intentionally, make it so that Mr. Brown could not have access to the outside world so that you could coerce his confession?

A. No.

Q. He should have got a phone call, though; right?

MR. FLYNN: Objection. Asked and answered.

MR. LOEVY: All right. I'll move on, your Honor.

THE COURT: Sustained. Thank you.

BY MR. LOEVY:

Q. He should have -- just because he's 18, that doesn't mean he's not entitled to talk to his mother; right?

A. Correct.

Q. If his mother was in the station, should his mother have been allowed to talk to him?

A. Yes.

Q. And did you know that Marcel's mother was present at the police station?

A. No, I didn't.

Q. You didn't, or you're not sure?

A. Don't recall.

Q. All right. At the deposition, didn't you say you're not sure either way?

A. Yeah, well.

Q. All right. She should have been given access to Marcel;

Mancuso - direct

836

correct?

A.   I suppose, if she was there.

Q.   If she was there asking to talk to her son, she should have been allowed in that room; right?

A.   Correct.

Q.   And that didn't happen; did it?  She didn't get access to the room?

A.   No.

Q.   Now, you understood --

You said 4:45, not 4:30; right?

THE COURT:  Correct.

BY MR. LOEVY:

Q.   You understood accomplice liability; correct?

A.   Accomplice liability?

Q.   Yes.  You wanted to get Mr. Brown for murder; right?

MR. FLYNN:  Objection.  Argumentative.

MR. LOEVY:  No, this is just a question, your Honor.

THE COURT:  Overruled.  He can answer.

BY THE WITNESS:

A.   We were taking the investigation where -- where it would go.

BY MR. LOEVY:

Q.   No, you had already arrested him for murder; right?

A.   Right.

Q.   At 3:00 o'clock?

A.   Right.

Q.   On day one.

        So you did want to get him for murder; right?

A.   Well, we had to take the investigation as far as it would go.

Q.   All right.  So, but I'm just asking if you wanted to prove a case for murder against the man that you arrested for murder?

A.   We knew he was there.  We wanted to take it where it would go.

Q.   All right.

A.   Where it would lead.

Q.   And you knew pretty early on, you believed him that he didn't shoot anybody; right?

A.   Reasonably.

Q.   I mean, that was consistent with all your witness statements, everything.  He didn't pull any trigger on any gun; right?

A.   Correct.

Q.   So if you've arrested him for murder, it's for doing an accomplice; right?

A.   Correct.

Q.   So you needed him -- to be guilty of murder, you needed intent; right?

A.   Correct.

Q.   If he just drove somebody to the park and didn't intend for

Mancuso - direct

838

murder to happen, that's not murder; right?

A.   Well, to the park and back?

Q.   Right.

A.   Away from the park?

Q.   You have to intend the crime; right?

A.   Okay, yes.

Q.   You're a sophisticated detective, right, at this point?

A.   Yes.

Q.   You've been investigating murders for 20 years?

A.   Correct.

Q.   So you knew that if you're going to prove the case against Mr. Brown, you have to show that he shared a plan and had knowledge that it was going to go down or he's not guilty of murder; right?

A.   Correct.

Q.   So Mr. Brown was trying to tell you, I didn't know about any murder; right?

A.   At one point, yes.

Q.   No, he was pretty firm at all points that he didn't know anything about anybody murdering anybody; right?

A.   His story kept changing.

Q.   Okay.  But he was consistent about one thing, which is, he didn't kill anybody, he didn't know anybody was going to get killed, and he wasn't intending to kill anybody; right?

A.   Okay.

Q.   I mean, not at one point, that was his universal truth. Right?

A.   Okay.

Q.   And you tried to move him toward, you knew there was a murder going; right?

A.   We didn't try to move him.

Q.   Well, you spent 34 hours trying to get him from point A to point B; right?

A.   His story kept changing, the investigation was changing.

Q.   All right.  Your goal was to break his will; right?

A.   No.

Q.   He was trying to tell you, I didn't intend to commit murder.  We agree about that; right?

A.   I don't know if he said it in such a manner.

Q.   What he said was, he didn't know anybody had a gun, he didn't know R.J. was up to no good.  That's what he said; right?

A.   Among other things, yes.

Q.   And you're trying to move him over toward, you knew he had a gun.  That -- I mean, let's be square.  I mean, that's what you were trying to do; right?

A.   We were trying to get the truth.

Q.   All right.  And he told you, I told you truth, I didn't know he had a gun.  He told you that a number of times; right?

A.   He told us a lot of things.

Q. But he told you that repeatedly: I didn't know R.J. had a gun. Right?

A. Correct.

Q. And you decided that wasn't the truth?

A. Not from what we --

Q. All right. So you wanted to get him off that story?

MR. FLYNN: Objection. Argumentative.

THE COURT: Sustained. You've explored this, and it is argumentative.

BY MR. LOEVY:

Q. So, was this an interrogation or an interview?

A. It started as an interview. In my opinion, it was an interview almost the whole time.

Q. All right. And if you were going to get him to confess, you were going to need to overcome his will. Do we agree?

MR. FLYNN: Objection. Argumentative.

MR. LOEVY: It's the facts of the case, your Honor.

MR. FLYNN: It's definitely not a fact.

THE COURT: Sustained as to argumentative. Rephrase the question.

BY MR. LOEVY:

Q. All right. He was trying not to confess; right?

MR. FLYNN: Objection. Improper opinion. Foundation.

THE COURT: Overruled. Based on his -- his -- he's a participant to the interview. He can answer.

Mancuso - direct

841

BY MR. LOEVY:

Q. You were there; right, sir?

A. Yes.

Q. And you were trying to say: Hey, you knew he had a gun. Right?

A. We were asking him. We weren't telling him.

Q. He was trying to say: I didn't know. Right?

A. He did say that.

Q. He said it a lot; right?

A. Correct.

Q. So you're trying to figure out a way to overcome his resistance to admitting that. That's a fair summary; right?

A. No.

Q. All right. He was very young; right?

A. He was 18.

Q. How old were you at the time?

A. Fifty -- early 50s.

Q. You had been a police officer for decades at that point?

A. Twenty-two years, I think.

Q. And you had interviewed hundreds of witnesses, probably?

A. Probably.

Q. Now, you would agree that someone who's 18 is more defenseless in an interrogation like this, right, in a, say, a person in their 30s or even mid 20s?

        MR. FLYNN: Objection. Argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Is a person just 18 more vulnerable to manipulation?

A. Not necessarily.

Q. How about this person? Did he seem, as an 18-year-old, that he wasn't -- that he was vulnerable to manipulation?

A. I couldn't say that.

Q. Would you agree with me that a child is easier to manipulate than an adult?

MR. FLYNN: Objection. Relevance.

THE COURT: Overruled.

BY THE WITNESS:

A. Maybe a child.

BY MR. LOEVY:

Q. Yeah. Wasn't Mr. Brown a lot closer to 18 to a child than an adult?

MR. FLYNN: Objection. Form.

THE COURT: Overruled.

BY THE WITNESS:

A. I thought of him as a young man.

BY MR. LOEVY:

Q. All right. He was a few months past his 18 birthday; right?

A. Correct.

Q. Do you have experience, or did you have experience with

young people in that age group?

A. I had dealt with, you know --

Q. Had you had some?

A. -- 17-and-18-year-olds, yes.

Q. Do you have some?

A. No.

Q. Oh, but you've dealt with them?

A. Oh, yeah.

Q. And you know that they're sometimes not fully formed?

A. I couldn't -- I couldn't decide that.

Q. All right. Even though he wasn't technically a juvenile -- by the way, there's different rules that govern juveniles; right?

A. Correct.

Q. And you're aware of those rules?

A. Yes.

Q. And you're not required to dispense with those rules for an 18-year-old; right?

A. I don't know what you mean.

Q. Fair point. You could have allowed him access to a youth officer; right?

A. Not at 18. We wouldn't normally --

Q. If he had been a few months younger, there would have been protections in place; right?

A. If he was 17, yeah, we would have to get somebody to be

there for him.

Q.   Now, did it feel like Mr. Brown had never been interrogated before?

A.   I couldn't tell.

Q.   Had you -- well, let me -- we have 10 minutes here, so I'm going to maybe -- we're going to have to come back to some of this in the morning.  But let me see what we can cover here.

This was a very long interview; was it not?

A.   The total?

Q.   Yeah.

A.   Yes.

Q.   In fact, in your entire career, have you ever been involved in a longer interrogation?

A.   I've had some that have gone into the 40 hours.

Q.   If we could play 46.

Do you remember being asked -- this is page 46, lines 14 through 47, line 3.

And if counsel tells us when he's ready, I'd like to play that.

MR. FLYNN:  One second.

MR. LOEVY:  Sorry Lillia, 46, 14.  47, 3.

MR. FLYNN:  I'm there.

(Said video displayed in open court.)

BY MR. LOEVY:

Q.   All right.  Did you give that answer, sir?

Mancuso - direct

845

A.   I got it.

Q.   Was it true?

A.   I've been in longer investigations, but not necessarily interviews.

Q.   Was that answer true?  I guess was the question.

A.   Yes.

Q.   All right.  You told Mr. Brown throughout that if he persisted in denying knowing about the gun and about R.J.'s intentions, that he was going to prison.  Is that a fair summary?

A.   I don't recall saying that.

Q.   All right.  This is your deposition, page 334, line 14 through 335, line 24.

        MR. FLYNN:  One moment.  Okay.

    (Said video displayed in open court.)

        MR. FLYNN:  Your Honor, objection.  Improper impeachment.  This is referring to an earlier part of the interview.

        MR. LOEVY:  It's the exact question that was asked, your Honor.

        THE COURT:  It is the exact question that was asked, so, overruled.

BY MR. LOEVY:

Q.   Did you give that answer?

A.   Yes.

Mancuso - direct

846

Q.   And that is what you were conveying at the interrogation, that if he persisted in denying knowing about the gun and about R.J.'s intentions, that he was going away for 30 years.  That was the gist of what you were telling him; right?

A.   I think I said he could.

Q.   All right.  And you also told him if he kept denying that R.J. had a gun and he denied that -- knowing that R.J. intended to use it, that that was going to send him to prison, too; correct?

A.   I think that's what it said.

Q.   And you were conveying to Marcel that he was in control of whether he went home or not; right?

A.   I don't know if that's what I was conveying or not.

Q.   All right.  This is page 352, line 22 through 353, 9.

     (Said video displayed in open court.)

BY MR. LOEVY:

Q.   Did you give those answers under oath?

A.   Yes.

Q.   And you were -- McDonald, your partner, was reinforcing the message that the only way Marcel was getting out of that room was to basically say what you guys were saying; right?

A.   I don't know what McDonald said.

Q.   You were present when he was in the room; right?

A.   Yes.

Q.   And that was his message as well?

A.   I don't know.

Q.   Well, you were there.

A.   Right, but I don't recall.  I mean, I can't remember everything.

Q.   All right.  But the bottom line, I guess I can end it here, is that, you made it very clear to Marcel Brown that if he tried to -- if he didn't start saying that he knew that R.J. had a gun, he was going to prison.  You made that very clear to him; correct?

A.   I don't think that was the intention.

Q.   But that's what you said; right?

A.   Yes.

          THE COURT:  All right.  Let's break there.

          Ladies and gentlemen, we'll break for the day.  Thanks for your continued attention.  Please don't discuss this case. We will see you tomorrow morning, 9:15, to get started at 9:30. Have a good evening.  All rise.

     (Jury out at 4:44 p.m.)

          THE COURT:  All right.  Please be seated.

          Mr. Mancuso?

          What's the parties' positions regarding discussion of the testimony?

          MR. LOEVY:  He's on adverse.

          THE COURT:  Yeah, he's on adverse exam, so I just want to make sure --

MR. LOEVY: That's the agreement.

MR. FLYNN: That's the agreement.

THE COURT: Okay. Please don't discuss your testimony with anyone. You can certainly speak to your lawyers about other matters but not the substance of your testimony. Understood?

THE WITNESS: Yes.

THE COURT: All right. Thank you. And if you can exit the courtroom, that would be preferable, just in case there is something we need to discuss outside of your hearing.

(Witness exited the courtroom.)

THE COURT: All right. In light of kind of where we are and where things stand, I just didn't say anything at all to the jury about tomorrow and timing, which I think is the wiser course. And we'll just plan to go as long as we should and need to tomorrow to get through as much as we can.

Matters that we should address this evening before we break?

MR. LOEVY: Nothing from the plaintiff.

MR. FLYNN: If we could just get their lineup for tomorrow.

THE COURT: Yes.

MR. LOEVY: We'll be going Mancuso, and then they'll be going Mancuso. And if they -- you know, do you guys have -- do they have an estimate of how long they're going? I would

849

say I have two hours. So that takes you to 11:30.

MR. FLYNN: I can -- I could potentially take the rest of the day, especially if we're going to break early.

MR. LOEVY: Well, then, we just got to make sure Taneshia gets in there.

I'm surprised to hear that Mancuso could take the rest of the day, unless they plan to walk through --

THE REPORTER: Slow down.

MR. LOEVY: -- a whole bunch of hearsay.

Sorry.

THE COURT: All right. Look, I think there's a lot of -- and I mean this in the right way. There's a lot of strategy with regard to how much. And you won't know until you hear the close of the rest of the, you know, adverse or the direct.

The one request I have and the one thing I'd like to try to do is to get the witness who's traveling here on and off. So, you know, it may be, Mr. Loevy, that in light of your presentation of evidence that we may need to stop Mr. Mancuso to allow her to get on and off.

Does the defense have an objection to that?

MR. FLYNN: I would prefer, instead of breaking up my direct examination, if they want to go that route, what I proposed before was that Taneshia Branch starts the day, or perhaps after your cross, if that's what you prefer.

MR. LOEVY: No, our preference would be to see if we finish Mancuso. I don't think it's realistic that he has a whole day of testimony. If he doesn't finish, then we'd ask to break in. But I think we should try to finish him. That's our request.

MR. FLYNN: Your Honor, I don't want to feel rushed just to get their witness in.

MR. LOEVY: You don't have to rush.

MR. FLYNN: So I think it's better just to get her in.

THE COURT: Look, I totally agree that no one needs to feel rushed. I think you all need to just bear some of this in mind as you're doing your preparations for tomorrow. It's my goal to get Taneshia on and off, in light of the representation that she has traveled here. And so if that means that we have to have a full day tomorrow, so be it. If it means that we don't get to any other witnesses tomorrow, so be it.

I won't -- I won't require the parties to break up testimony. That's not fair to the defense, in light of the fact that plaintiffs won't be required to do that. So if it just means that we have to go all day, then that's what we will do.

MR. LOEVY: Fair enough. Thank you, your Honor.

THE COURT: That's what we'll do. We need to get the work done, so we will get the work done.

All right. See you tomorrow morning at 9:15 for any

issues, and we will start promptly at 9:30. Have a good evening.

MR. LOEVY:  Thank you.

MR. GIBBONS:  Thank you, your Honor.

(Proceedings concluded at 4:48 p.m.)

*   *   *   *   *

C E R T I F I C A T E

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Laura LaCien*
_____

*/s/ Sandra Tennis*                    August 30, 2024
_____    _____
          Official Court Reporters                    Date
        United States District Court
        Northern District of Illinois
             Eastern Division