852

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                Plaintiff,             )
                                       )
            vs.                        )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) August 30, 2024
                Defendants.            ) 9:14 o'clock a.m.


                        VOLUME FIVE
        TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
        BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Defendants:         GREENBERG TRAURIG, LLP
                            BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

853

APPEARANCES (Cont'd):

Court Reporter:                        JOSEPH RICKHOFF, CSR, RMR, CRR
                                       Official Court Reporter
                                       219 S. Dearborn St., Suite 2118
                                       Chicago, Illinois  60604
                                       (312) 435-5562
                                       joseph_rickhoff@ilnd.uscourts.gov

                   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                      PROCEEDINGS RECORDED BY STENOTYPE
         TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

854

(Proceedings heard in open court:)

THE CLERK:  19 C 4082, Brown vs. Mancuso.

MR. LOEVY:  Good morning, your Honor.

THE COURT:  Good morning.

Our jury seems to be having a nice morning.

Can I have appearances on the record when you have a moment.

MR. LOEVY:  Good morning, your Honor, Jon Loevy and all the same appearances for the plaintiff.

MR. FLYNN:  Good morning, your Honor, Kyle Flynn and all the same appearances for the defendants.

THE COURT:  All right.  Good morning.

Issues that we need to take up today?

MR. FLYNN:  Nothing for defense.

MR. LOEVY:  A couple, your Honor.

We did provide everybody with that judicial notice statement that we were talking about.

THE COURT:  Yes.  Thank you for the reminder.

MR. LOEVY:  And we do need to prove this causation point that, you know, it was material, the statement.  And this is very good evidence of materiality.

The motion in limine order had a footnote saying, you know, maybe the parties can stipulate to it.  As your Honor's aware, we don't have to stipulate to it.  We'd rather prove it.  And this is sort of, like, basically a stipulation anyways.

So, we would ask that the jury receive this piece of information, too.

THE COURT: Response.

MR. FLYNN: Your Honor, the element of the coerced confession claim they're referring to is that the incriminating statements were used at his criminal trial.

What we would propose is a much more simple stipulation, something along the lines of, plaintiff's incriminating statements that he gave during his interview were used against him at his criminal trial.

We'll stipulate to that without having to get into hearsay from a judge, a ruling from another judge. None of that is relevant to this case.

MR. LOEVY: Well, we have to show causation, your Honor. And this is evidence of causation that the statements caused the problem.

MR. FLYNN: Your Honor, the stipulation gives them that.

THE COURT: Yeah, but so does the stipulation.

And the concern that I have, Mr. Loevy, is, you know, the paragraph you've highlighted, you know, I see why you've highlighted it. I see why you would prefer to use that. But my reaction is that a more neutral statement will get the work done and get the job done. And I understand it's an element you have to prove, but I'm not inclined to read in these three

sentences --

MR. LOEVY: Okay.

THE COURT: -- from the state court trial when it appears that a stipulation could get it done.

MR. LOEVY: Well, your Honor, then having ruled thusly, I suggest that we try to work out a stipulation. That's the first I'm hearing that language. But --

THE COURT: Fine. That's fair.

MR. LOEVY: -- we have your guidance. I'm confident we can find agreeable, neutraler language.

THE COURT: Okay. That sounds good.

MR. LOEVY: The second issue, your Honor, is Plaintiff's Exhibit 41, I showed some photos. And our assistant noted to me that I never actually moved them into evidence. It's Pages 47, 48, and 50 of Plaintiff's 41.

What is your practice or policy on how we're moving things into evidence? Are we doing it at the end of our case or as we go?

THE COURT: The parties have mostly been doing it as they're going, or moments before they intend to offer it, which is fine with me. But, obviously, if at the end of your case, or even at the end of both sides, you know, you want to make your record of that, I'm happy to have you do it.

I think the preferred practice, though, would be to do what you've been doing, which is move them in as you need them,

857

particularly if you're going to publish them. But, in general, try to move them in at the time.

MR. LOEVY: Well, I'd like to move these that I failed -- forgot to move in then.

THE COURT: Any objection?

MR. FLYNN: No objection.

THE COURT: All right. 47, 48, and 50 will be admitted.

MR. LOEVY: It's one exhibit, Plaintiff's 41, but it's pages -- those three pages.

THE COURT: Yes. You are right. Plaintiff's Exhibits 41, Pages 47, 48 and 50.

(Plaintiff's Exhibit 41, Pages 47, 48, and 50 received in evidence.

MR. FLYNN: And we do have one issue, your Honor.

MR. LOEVY: We have one more, but -- to finish ours, it's on the issue of the objections during my cross-examination. This is -- while it's direct, it's cross. It's an adverse examination. And there was a lot of leeway given to Mr. Gibbons. I would like some leeway to cross-examine. It felt like that were argumentative objections that, you know, didn't -- we're asking for some leeway to do cross-examination.

THE COURT: Which I will give you.

I'm happy to hear a response, but I'm confident that the answer is going to be something like, I should object when

I think I should object. But I'll let you speak for yourself.

MR. FLYNN: Without seeing the questions and answers, your Honor, what I recall from argumentative objections were Mr. Loevy injecting things into his questions regarding his theory of the case and then asking a factual question at the end. And that was my issue with those questions.

MR. LOEVY: You know, I am injecting into my questions. That's what I try to do. I'll try to fairly inject.

THE COURT: Sounds good.

MR. FLYNN: Your Honor, our one issue is that Rufus McGee --

THE COURT: Yes.

MR. FLYNN: -- they've decided not to call him. We may still call him, but it won't be Tuesday. We won't be in our case-in-chief.

So, we want the writ to stay in place, but we'd like to move it to either Thursday or Friday.

MR. LOEVY: It's not like that. If I could interrupt. Because if they're going to call McGee, we're going to call McGee.

I think the concern is, they're worried that -- about our case-in-chief. So, I mean, they got to make a decision. If they want McGee, he'll testify. If they don't, we're going to call hill -- or, well, what I said. If they're going to

call him, we're going to call him.  But we would call him on Tuesday if they're going to call him.

THE COURT:  Okay.  So, it sounds like, just trying to put these pieces together, that then you are going to call him --

MR. LOEVY:  Unless --

THE COURT:  -- Mr. Loevy --

MR. LOEVY:  Unless we have an agreement.

THE COURT:  Right.

-- based on the representation that the defense would call him.

The other sort of thing that I want to bring to your attention is, we've already -- and I think appropriately so -- adjusted the writ to have DuPage County officials bring him here on Tuesday.  We adjusted that from the original date that we selected, and I think for very good reason.  All parties agreed that we should do that.

I want to take into account the fact that writs require a lot of people, both from the U.S. Marshal Service and the DuPage County jail, to do a lot of shuffling to get someone here on the day that we tell them.  I've had it happen successfully during trials before, but I'm not insensitive to the fact that we are asking for resources within the building to make that happen.

So, unless there's a good reason, I'm not especially

860

inclined to move the date.  I'm not going to tell you the order in which you have to call him, but it sounds like some of this is going to work itself out, and that the only direction I would give is that it would seem that since Mr. Loevy is going to call McGee in light of defendants' representation a moment ago that they were going to call him, at least yesterday, that we're going to need to get McGee taken care of on Tuesday. Because it's not an easy thing to say, never mind, we're just kidding, we really want to do it on a different day.

MR. FLYNN:  Your Honor, we are totally fine sticking with the original plan.  We just want to make it clear that it's their witness that they're calling in their case-in-chief.

THE COURT:  Sounds good.

Any issue with calling him on Tuesday?  I think we just --

MR. LOEVY:  No, we already asked for that --

THE COURT:  Great.

MR. LOEVY:  -- so let's do that.

THE COURT:  Great.  Okay.  Terrific.

Other items?

MR. FLYNN:  Thank you, Judge.

THE COURT:  Okay.  We'll check to see if everyone's here, and we can get started here promptly.

Mr. Mancuso, if we can get him and then get him on the witness stand.  We've got a couple minutes, but I would love to

get started as close to 9:30 on the dot.

(Pause.)

(Jury in.)

THE COURT:  Please be seated.

Good morning, ladies and gentlemen.  Welcome back.

Prepared to resume the testimony of Mr. Mancuso.

Mr. Mancuso, you remain under oath.

THE WITNESS:  Yes.

THE COURT:  Mr. Loevy, you may resume your inquiry.

MR. LOEVY:  Thank you, your Honor.

MIKE MANCUSO, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q.  All right.  Mr. Mancuso, last night we were talking about the interrogation.  The purpose was, he was not trying to say that he was guilty of murder, right?  We agreed on that?

MR. FLYNN:  Objection.  Form.

THE COURT:  Overruled.

You can answer.

BY THE WITNESS:

A.  Okay.  Yes.

BY MR. LOEVY:

Q.  And your objective was to try to develop evidence that would implicate him in murder, right?

A.  Well, our objective is to get to the truth, to find out

Mancuso - direct

862

what the truth is.

Q. Of course, you had already arrested him for murder, right?

A. Right.

Q. And you had booked him for murder by the first day -- by the -- early into the second evening, right?

A. Okay.

Q. So, you were trying to develop the evidence that would support the murder charge; is that fair?

A. Right.

Q. All right. And he wasn't trying to cooperate with that, right?

A. Correct.

Q. So, you had to move him from Point A to Point B, right?

A. To a certain degree, yes.

Q. All right. One of the tactics you used to move him was the length of the interrogation. Would you agree with that?

A. No.

Q. This was a very long questioning, right?

A. Yes.

Q. And Mr. Brown, in that room, he had no way of knowing when it was going to end, right?

A. I don't know what he knew.

Q. Well, he was asking you, am I going to get to go home, and you weren't giving him any answers, right?

A. Correct.

Q.   And if you're in his chair, then he doesn't know if this is going to go another five hours, ten hours, day, two days.  He got no assurances that he'd ever get out of that room, correct?

A.   Correct.

Q.   You told him you were going to stretch him.  Those were the words that you used, right?

A.   Well, that was in response to him saying, you can only hold me 24 hours.  And I had said, well, we're going to stretch it a little.

Q.   So, you said there's no 24-hour rule, we're going to keep going right past that, right?

A.   Right.

Q.   All right.  Would you agree that every person has a breaking point at which their will can be overcome?

A.   I have no idea.

Q.   All right.  Well, Mr. Brown got pretty interested in when am I going home pretty quickly, didn't he?

A.   He was asking that all the time.

Q.   All right.  And at some point -- well, first he -- he was asking it into the midnight hours of the first day, right?

A.   I suppose.

Q.   And, then, all through the next day, right?

A.   At different times.

Q.   And, then, into day three?

A.   Okay.

Mancuso - direct

864

Q. Would you agree that it was easier to overcome his will as time passed?

MR. FLYNN: Objection. Argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. You were trying to overcome his will, right?

A. No.

Q. His will was telling him, I don't want to confess, right?

MR. FLYNN: Objection. Foundation.

THE COURT: Sustained.

BY MR. LOEVY:

Q. What words do you want to use, sir? You tell me what you were trying to do vis-a-vis him trying to tell you I don't want to confess.

A. Well, we were trying to get to the truth, what we believed was the truth.

Q. He, of course, told you, I'll tell you the truth. Drove to get my sister at the park. Didn't know there was going to be any shooting happen. Didn't know this guy had a gun. And that's all I can tell you.

He told you that, right?

A. Yes.

Q. And he said, that's the truth, right?

A. His truth.

Q. Yep.

A.   It wasn't the truth.

Q.   And he said it a hundred times, right?

A.   I don't know.  I didn't count.

Q.   So, now, I want your description so I don't ask the question bad for what it -- how would you describe you trying to overcome him trying to tell you his truth?

A.   We had an idea what happened based on at least 20 people telling us.  He's telling us something different.  He's lying. First 12 hours he had a --

Q.   Back to --

A.   -- outrageous --

Q.   -- my question.

A.   -- outrageous story.

Q.   Back to my question.

A.   So, we were trying to get to the truth.

          MR. FLYNN:  Your Honor, let the witness -- we ask that the witness be able to finish his answer.  He was answering the question.

          MR. LOEVY:  He wasn't answering the question, your Honor.  I just want the verb to overcome his resistance.

          THE COURT:  So, the objection is overruled.  The witness -- the objection is sustained in that the witness can finish the answer.  And, then, you can ask your follow-up question.

BY THE WITNESS:

A.   We were trying to get to the truth.  He was lying so much. We kept confronting him.

BY MR. LOEVY:

Q.   All right.  You had some advantages.  He didn't have a lawyer present, right?

A.   Correct.

Q.   That made it easier for you to get to what you're calling the truth, right?

A.   Yes.

Q.   He didn't get a phone call.  That also made it easier for you to get to what you're trying to get to, right?

A.   I don't know if it made it easy or not.

Q.   Well, you also had an asymmetry of information about the recording in the room, right?

A.   I don't know what you mean.

Q.   You knew the interrogation was being recorded?

A.   Yes.

Q.   And he didn't?

A.   I don't know if he knew it or not.  I mean --

Q.   You never told him, right?

A.   I don't think anyone told him.

Q.   And there's nothing on that video that suggests he knew it was being recorded, right?

A.   No -- well, there's a red light, it's up in the corner. There should be -- there's a red light.

Mancuso - direct

867

Q.   Is there a red light on that one?

A.   This has nothing to do with at our office.

Q.   I see.  I'm just saying --

A.   There was a red light and --

Q.   There might have been a box --

A.   And it looked like it was a pretty good size wedge of a camera, a lens.

Q.   All right.  Fair play might have required you to tell Mr. Brown, you know what, you're being recorded.  Wouldn't you agree?

A.   We're not required to.

Q.   Not required to.  I get that.  But I'm asking, wouldn't fair play have been, Mr. Brown, if you're trying on different things just talking to me at 2:00 in the morning, we're actually recording you.

     Wouldn't that have been fairer to have him know?

A.   You could probably say that.

Q.   You'd say that, too, wouldn't you?

A.   Maybe.

Q.   You knew, right?

A.   Knew what?

Q.   That the thing was being recorded.

A.   Of course.

Q.   Every word you said on that video you had in your mind, somebody might watch me say this, right?

A.   It's a reasonable belief someone's going to watch.  You know, these are all recorded for a reason.

Q.   So, you and your fellow detectives were very careful about what you said and how you said it, right?

A.   I wouldn't say that.

Q.   How about the camera?  Can other detectives watch what's going on in the room through that camera?

A.   There's a room with monitors.

Q.   So, not only is it recording, but if Turner's in there, you can go in another room and watch the interrogation?

A.   Yes.

Q.   And did you guys do that from time to time?

A.   I never did.  I don't know if anybody else did.

Q.   All right.  How about the temperature of those rooms?  That could help overcome someone's resistance to giving your truth; would you agree?

A.   I don't know.  I don't know what -- everybody's different.

Q.   Those rooms were very cold, right?

A.   I wouldn't say very cold.  I didn't find them cold at all.

Q.   They were kept cold by the Chicago Police Department intentionally.  Wouldn't you agree?

A.   No.

Q.   And the person in the room could not adjust the thermostat?

A.   We couldn't either.

Q.   And nobody could.  They were just --

Mancuso - direct

869

A.   It's the building.

Q.   -- on the temperature.

A.   It's an old building.  It's about 30 years old at the time.

Q.   Now, he was given blankets from time to time, right?

A.   He was given some kind of a blanket, yeah.

Q.   Yeah.  Where did that come from?

A.   I don't know.  I don't know -- I don't even know who gave it to him.

Q.   The department didn't have blankets available to give to people if they asked?

A.   No.

Q.   Do you agree that if someone was cold for a protracted period of time, that could weaken their resistance?

A.   Again, I don't know.

            THE COURT REPORTER:  Excuse me.  Could you --

            THE WITNESS:  Speak up a little bit?

            THE COURT REPORTER:  -- get closer to the microphone?

            THE WITNESS:  Yeah, for sure.

BY MR. LOEVY:

Q.   Another advantage you had is that he was being isolated; would you agree?

A.   I don't think he was isolated.  He was in a room.

Q.   I'm sorry?

A.   He's in a room.

Q.   All right.  But he -- except for going to the bathroom, he

Mancuso - direct

870

never left that room from September 3rd into early morning on September 5th, right?

A.  Correct.

Q.  And isn't it true, as a detective what you're trying to do is deliberately cut him off from the outside world?

A.  Not at all.

Q.  You're trying to shrink his universe down to just those four walls and try to make him more vulnerable; would you agree?

A.  Not at all.

Q.  The person who is in that room is completely under police control, right?

A.  Yes.

Q.  You get to decide when they eat?

A.  If they ask, we feed them.

Q.  Yeah, but you --

A.  Otherwise, we -- we usually provide food of some sort at some time.

Q.  Yeah, but he can't go to the fridge.  He has to ask you, right?

A.  Right.  Okay.

Q.  He's dependent on you for food?

A.  Yes.

Q.  He's dependent on you for the bathroom?

A.  Yes.

Mancuso - direct

871

Q.   And you pretty much dictate when he's going to sleep or not sleep, right?

A.   I don't know if I'd say dictate, but he can sleep at any time he wants while he's in there.  If we're not in there talking to him, yeah, you can sleep.

Q.   But if you walk in there at 3:00 in the morning and say, hey, Marcel, we're going to continue the conversation, never once did he say, I need to get some sleep, right?

A.   Right.  He didn't.

Q.   He just kept complying, right?

A.   Right.

Q.   Let's talk about food.  These interrogation rooms at the Chicago Police Department, they're not really set up to feed people.  Would you agree there's no system there?  I mean, there's no food service, right?

A.   Yeah.  I mean, you're talking about the room or the police department in general?

Q.   Well, there's a lockup where there's a food service, right?

A.   Right.

Q.   And there's a -- you know, there's a system in place if you're in the lockup in the basement where they bring you food, right?

A.   Yeah.

Q.   No such system in an interrogation room, right?

A.   No.  We get it from downstairs or we buy it on the outside

and give it to the person.

Q. So, if you're in that interrogation room, the only way -- if you're in there, the only way you're getting food is if the detective decides to bring you food?

A. Or if he asks or they ask, yeah, we'll feed them. We're not going to --

Q. The detective's got to go out of pocket to buy that food, right?

A. Yeah. Yes.

Q. Do you get reimbursed for that?

A. No.

Q. So, if he is going to eat at McDonald's, that was on your dime?

A. Yes.

Q. And if he's going to eat dinner on the second night, that's on your dime?

A. Yes.

Q. Of course, he didn't eat dinner that second night, right?

A. I don't know. I don't recall.

Q. All right. And you did offer Marcel chips and candy throughout, right?

A. Yes. Water and juice or soda.

Q. All right. Was that on purpose, to offer him candy and chips, maybe get him -- blood sugar thing, or not like that?

A. No.

Mancuso - direct

873

Q.   All right.  He had exactly one meal while he was in custody, right?

A.   He was given food from the lockup.  I think he chose not to eat it.

Q.   That's fair.  That's fair.  You guys gave him a sandwich into the second day, right?

A.   I believe, yes.

Q.   And you saw he never touched that sandwich, right?

A.   Correct.

Q.   And the reason -- he told you why, right?

A.   I don't recall.

Q.   You don't remember him saying on that video, I'm too scared to eat, I'm too nervous to eat?

A.   I don't recall that.

Q.   All right.  You were in court when it was played, right?

A.   Correct.

Q.   All right.  You don't remember from your memory, though, him telling you, I'm too terrified to eat that food?

A.   I don't know what words he used.  I know at one point he said he didn't like baloney.

Q.   You heard that on the tape?

A.   Somewhere I thought I remembered reading it or seeing it, that he didn't like the baloney.

Q.   All right.  You're not going to argue with me, though, if he said, really, I'm too scared to eat, right?

A.   I don't recall exactly --

Q.   All right.

A.   -- his words.

Q.   In any event, the whole 34 hours that Marcel was in that room, you saw him eat exactly one meal, right?

A.   Probably.

Q.   That was the McDonald's egg sandwich you brought him in the midmorning on the second day, right?

A.   Correct.

Q.   All right.  That could weaken someone's resistance if they don't have food, even if they're offered it; would you agree?

A.   All he had to do was ask.

Q.   Well, and he had food.  You gave him food?

A.   I gave him food that time, but later on in the evening if he's hungry he's just got to ask.

Q.   Right.  But my question, though, is if someone hasn't eaten over 34 hours, that could weaken their resolve to resist; would you agree?

A.   I don't know.

Q.   All right.  Let's talk about the lockup.  You mentioned it a minute ago.

     The lockup is not at the Cook County Jail.  That's in the police department, right?

A.   Yes.

Q.   There's a basement lockup area?

A. Correct.

Q. And in those lockup areas, there is food service, right?

A. It's not -- I don't know what you mean by food service.

Q. I mean, there's a system to feed people --

A. Yes.

Q. -- at regular intervals?

A. Yes.

Q. And there's bedding in the lockup, right?

A. Not bedding.

Q. Well, pillows and mattresses?

A. No.

Q. At that time, was there -- actually, there is bedding at the lockup?

A. Maybe now, but not then.

Q. All right. Well, where do people sleep in the lockup?

A. On a -- there's -- the cells have a steel plank, steel -- it's a steel --

Q. Bed?

A. You call it a bed, but it's not a bed. It's steel.

Q. But it's not like a bench. It's a bed?

A. No, it's a steel bench that's attached to the wall.

Q. But it's --

A. It's off the floor.

Q. It's designed for overnight, right?

A. Yeah. Sometimes they --

Mancuso - direct

876

Q.   That's why it's a lockup.

A.   Yeah.

Q.   And, so, at the Chicago Police Department lockup when they're putting people overnight, they provide them a place to sleep, right?

A.   Again, it's a steel plank attached to the wall, so --

Q.   Lots of people get sent to the lockup, right?

A.   Yes.

Q.   If you're drunk on the street and they arrest you and you're going to spend the night in jail, you go to the lockup, right?

A.   Nowadays, they write you a ticket.

Q.   Al right, but --

A.   You go home.

Q.   If you're sent to the lockup and it's expected you're going to go overnight, they give you a place to sleep, right?

A.   Correct.

Q.   All right.  And Mr. -- it's not uncommon for people that are in the interrogation rooms to get sent to the lockup for the overnight; would you agree?

A.   Usually they go down once they're charged.

Q.   All right.  This is your deposition.  Do you remember giving this answer to this question?

        MR. LOEVY:  This is page 404, Line 7 through 17.

        MR. FLYNN:  One second, Jon.

(Pause.)

MR. FLYNN: Okay.

BY MR. LOEVY:

Q. More times than not, they make calls from the lockup; would you agree?

A. Yes.

Q. And did you, from time to time when you were interrogating people, send people from the interrogation rooms to the lockup?

A. Yes.

Q. And Mr. Brown spent not one but two nights in that interrogation room, right?

A. I believe.

Q. All right. So, he probably should have been sent to the lockup, right?

A. Well, we were still questioning him, talking to him about, you know, the case.

Q. Of course, you're allowed to question him, send him to the lockup and then bring him back in the morning. That's allowed, right?

A. Sure.

Q. But in the lockup, he would have got a phone call, right?

A. Correct.

Q. And in the lockup, he would have been able to talk to other people, right?

A. Probably.

Mancuso - direct

878

Q.   It was probably better for you, what you were trying to accomplish, to keep him isolated in at that room; would you agree?

          MR. FLYNN:  Objection.  Argumentative.

          THE COURT:  Rephrase the question.

BY MR. LOEVY:

Q.   For what you were trying to accomplish, which we argued about, it was better for your objective to keep him in that interrogation room isolated than sending him to the lockup, right?

          MR. FLYNN:  Same objection, your Honor.

          THE COURT:  Overruled.

          You can answer.

BY THE WITNESS:

A.   I would not agree that was our -- what we were trying to isolate him.  I would not agree.

BY MR. LOEVY:

Q.   All right.  Let's talk about the tactics you and your fellow detectives used.

          You guys did use a tag-team approach, right?

A.   A what team?

Q.   Tag team.

A.   I'm not even sure what that is.

Q.   Well, one, two, three, four detectives took turns going into the room, trying to get Marcel from different angles.  You

did that, right?

A.   Different detectives spoke to him.

Q.   All right.  And some of you were playing some good cop, bad cop, weren't you?

A.   No.

Q.   What was your role, good cop or bad cop?

A.   I wasn't playing any role.

MR. FLYNN:  Misstates his testimony.

THE COURT REPORTER:  I'm sorry?

MR. FLYNN:  Misstates his testimony.

MR. LOEVY:  It's a question, your Honor.

THE COURT:  Overruled.  It's a question.

You can answer.

BY THE WITNESS:

A.   I wasn't playing any role.

BY MR. LOEVY:

Q.   All right.  Was -- was there anybody playing the role of a bad cop?

A.   No.

Q.   How about Mr. McDonald?

A.   I said no.

Q.   All right.  He had a little more aggressive interrogation style; wouldn't you agree?

A.   At one time for about a minute.

Q.   No, I'm talking about style.  His style was more

aggressive, right?

A.   It's hard to say.

Q.   He was a bit harsher than you, right?

A.   Maybe.

Q.   And sometimes Marcel said, hey, can you not talk so loud at me, right?

A.   He said that one time, yeah.

Q.   All right.  And the people who were taking turns, you wouldn't agree with me that sometimes people would come in and say, look, hey, I'm your buddy, you know, I told them you're okay, and some people were trying to maybe be harsher.  No contrasting in styles there?

A.   No.  Everybody's got their own personality as far as the detectives.  They talk differently, speak differently, different voice tones.  So, it's nothing that's planned.

Q.   All right.  Did you guys -- when you were taking turns, sometimes you were able to grab some sleep, right?

A.   At some point, we did go home, yes.

Q.   And, so, you would take turns sleeping and he would stay in the room, right?

A.   Yes.

Q.   For example, you went home somewhere in those -- September 3rd to September 5th and got some sleep, right?

A.   Yes.

Q.   And while you were home, other detectives were questioning

Marcel, right?

A.   I don't think so.

Q.   Well, you saw Mr. McDonald come in at 3:00, 4:00 in the morning asking him those questions, right?

A.   I was probably still there myself.

Q.   Let's talk about sleep.  Would you agree that sleep deprivation could lower someone's resistance to trying to maintain what they're trying to maintain?

A.   I would have no idea.

Q.   Have you ever been sleep deprived?

A.   Not that I know of.

Q.   All right.  Does it -- doesn't your -- have you ever been up all night?

A.   Oh, yes.

Q.   Doesn't it interfere with your judgment?

A.   Not that I recall.

Q.   You know, if you get a good night's sleep, you're not saying you're fresher and more on your game than if you've been up all night?

A.   I usually feel better with a good night's sleep, but --

Q.   Sure.

A.   -- I wouldn't say I'm any better or sharper or anything that you're saying.

Q.   How about two nights in a row?  You ever been up two nights in a row with just a little sleep in between?

A.   On this job, off and on at different times, yes.

Q.   All right.  Those benches are designed not to be slept on so good where -- in his room, right?

A.   Probably.

Q.   Probably you agree with me?

A.   Yeah, I -- yeah.

Q.   They're about four feet long or three -- three, four feet?

A.   Probably four feet.

Q.   So, too short to extend?

A.   Right.

Q.   And they're super narrow, right?

A.   Correct.

Q.   How narrow?  Four or five inches?

A.   Never measured them, but they -- probably a foot-and-a-half.

Q.   All right.  Most people couldn't even fit on them lying down; would you agree?

A.   Probably not.

Q.   All right.  So, they're not designed to sleep on?

A.   Correct.

Q.   And that floor is as hard as can be, right?

A.   As hard as a steel -- steel plank.

Q.   And, obviously, no pillow, no --

A.   No.

Q.   And over the course of those 34 hours, he got very little

sleep; do we agree?

A.   I'm not sure about that.

Q.   All right.  You guys would come in and out of the room well into the night, right?

A.   I know we did, but he also slept at some point six or seven hours.

Q.   Well, are we talking about -- the six- or seven-hour block, you're talking about McDonald's asking him questions at, like, 3:00, 4:00 -- 3:00 in the morning I think it was, right?

A.   I believe.

Q.   And, then, you're saying you guys didn't ask him questions again until 10:00 in the morning, right?

A.   Correct.

Q.   But when you went back in at 10:00 in the morning, he was actually sitting up on that bench, right?

A.   I don't remember.

Q.   Remember seeing the clip yesterday?

A.   I've seen a lot of clips.

Q.   All right.  That's fair.

     So, you're not claiming he was sleeping the whole time, right?

A.   I thought that it was noted that he did sleep.

Q.   He slept?

A.   Yeah.

Q.   But we don't know how much?

Mancuso - direct

884

A.   For some pretty solid hours, yeah.

Q.   We don't know how much he slept?

A.   I couldn't say offhand, but I thought it was in the six- to seven-hour range.

Q.   All right.  Would it have changed it if he didn't get six or seven hours?  Would you have done things differently?

A.   I don't -- no, nothing.

Q.   All right.  Do you remember those clips where McDonald's coming in at 3:00 in the morning when he's trying to sleep, and says, hey, I just got a few more questions?  That's what he did, right, he woke him?

A.   Probably.  I mean, I don't know if he was -- you know, I don't know.

Q.   All right.  Let's take a look then.

         MR. LOEVY:  Let's look at No. 141 of those clips.

         If you could -- we need the volume.

BY MR. LOEVY:

Q.   Also, this is at 3:15 in the morning on day two, right?

A.   Yes.

         MR. LOEVY:  All right.  Shoot to it the end, Lilia.

    (Said video was played in open court.)

         MR. LOEVY:  Nobody can hear it.

         THE COURT:  Try it again.

         MR. LOEVY:  About a third left, okay, Lilia?

         THE COURT:  We're working on it.

(Pause.)

THE COURT:  We're working on it.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  All right.  So, that's 3:15 in the morning you're telling him, see you in a couple minutes, right?

A.  Correct.

Q.  So he's not able to sleep, right?

A.  Well, I don't know.  Did I go back in in a couple minutes?

Q.  The point is, if you tell him, hey, we're going to just coming in and out, then he really can't plan to go to sleep, right?

A.  Maybe.

Q.  Right?

A.  Maybe.

MR. LOEVY:  All right.  Let's go to 142.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  All right.  So, did you know that was going to happen?

A.  What?

Q.  That your partner was going to go in there, wake him up and hit him with more questions?

A.  I can't say.  I mean, I might have still be in there, been in the hall.  I don't know.  It's too hard to answer.

Q.  Is that a proper tactic to interrogate someone from 3:00 in

Mancuso - direct

886

the afternoon until 3:00 at night, they finally try to get a little sleep, wake them up and hit them with questions? Is that a proper tactic?

A. It's not a tactic at all.

Q. Is it proper do that?

A. It's okay to do it. I mean, we're working our investigation.

MR. LOEVY: All right. Let's look at 143.

(Said video was played in open court.)

MR. LOEVY: Keep going there.

(Said video was played in open court.)

MR. LOEVY: Skip ahead then a little bit, Lilia. I think at the end is when -- okay.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. My next question, sir, why is it that nobody thought to turn off the light till 4:30 in the morning?

A. If we're still talking to him, we don't talk in the dark. So, I mean --

Q. So, this is okay with you, how this is going down?

A. I don't know what you mean by going down. What's going down?

Q. I mean, what's happening that night that we've just seen, that's okay with you, you're saying?

A. Well, we were still talking to him periodically. So --

Q.   Did you know that teenagers require more sleep than adults?

A.   I don't know that.

Q.   You said you do not have children?

A.   I don't know that.

Q.   You were --

A.   No.  No, I have step children.

Q.   Okay.  You were a child, though, once.  You were 18?

A.   Long time ago, yes.

Q.   Do you remember that people who are 18 need more sleep than the next adult?

A.   Don't really know.

        MR. LOEVY:  All right.  Let's turn to 144.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   This isn't right, is it?

A.   I don't know why he went back in there.  I can't answer for him.

Q.   All right.  If you would have known he was going to go do that and just keep waking this kid up with the same questions, would you have said, cut it out, McDonald?

A.   The only thing I can say, maybe the state's attorney wanted us to make sure that he's not changing his story again.

Q.   Of course, you're 12 hours away from talking to the state's attorney here, right?

A.   I don't know when they were there.  I mean, McDonald said,

we're talking to them.  I don't know if they were there.

Q.  Here's my question, though:  If McDonald would have said to you, hey, I'm going to go in there and wake him again and just ask him the same questions, would you have been okay with that or you would have said, you know, let's let this kid get some sleep?

A.  I don't think I would have been okay with it, but I think --

Q.  Why not?

A.  -- he went in there for a reason.

Q.  Why wouldn't you have been okay with that?

A.  Well, it seems like he just asked him the same question.

MR. LOEVY:  All right.  Finish playing.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  At the Chicago Police Department, you're allowed to interrogate people during daylight hours, too, right?

A.  Of course.

Q.  And you knew that he was going to be awake all day the next day, right?

A.  Hard to say.  People sleep during the day sometimes.

Q.  All right.  Let's talk about lies and trickery.

You're allowed to lie to a suspect, right?

A.  Yes.

Q.  And you're allowed to use trickery, right?

A.   I suppose, yes.

Q.   You're not required to lie to a suspect, right?

A.   No.  No.

Q.   And you're not required to use trickery?

A.   Correct.

Q.   It's really up to you whether you want to use those things?

A.   Correct.

Q.   Did you do any of that to Marcel Brown?

A.   No.

Q.   Well, is it your usual practice -- do you ever use lies or trickery during interrogation?

A.   I may have.  I can't recall right now.  But I may have.

Q.   All right.  Do you remember the clip, we've played it a few times, where at the beginning of the interrogation Marcel -- you start to read him his rights, he says, what, am I under arrest?  Am I locked up?  And you're like, no, no, no, these are just routine questions, right?

A.   Yes.

Q.   We don't need to play that again.  That's what you said?

A.   Right.

Q.   And you told him, hey, we always do this to witnesses. It's nothing unusual.  We always do this.

          That was your words, right?

A.   I don't know if I said witnesses.

Q.   Well, when we talk to people, we always do.

A.   Right, right.

Q.   All right.  So, you were giving him the impression that he had nothing to fear, this was just a formality, right?

A.   I assumed he knew he was under arrest.  We took him from his house.  He even said he didn't want to come.  He was taken.

Q.   Witnesses don't get Miranda rights, right?

A.   They can.

Q.   I mean, if somebody sees a crime and Vanessa's going to cooperate, you don't say to Vanessa, Vanessa, you have a right to remain silent, you have a right to an attorney.  You say, Vanessa, tell me what happened, right?

A.   Correct.

Q.   So, the reason he was getting his Miranda rights was because he was under arrest, correct?

A.   Correct.

Q.   And your intention in telling him that this was just a formality, your intention was to put him at ease, right?

A.   Yes.

Q.   That's not really fair; is it, sir?

A.   Well, I was also letting him know he's not charged, he's not locked up.  Locked up can have a few different meanings.  But he was not locked up like he's going away.

Q.   What I meant by not fair was, if he's under arrest for murder, he probably shouldn't be at ease, right?

A.   I don't know what you mean.

Mancuso - direct

891

Q.  What I mean is, if he's under arrest for murder, he probably has a right to be real clear that he's under arrest for murder; would you agree?

A.  I thought he was.

Q.  I know you thought he was.  But you agree with me that it should have been a hundred percent clear to him that this man had been arrested for murder, right?

A.  Yes.

Q.  Of course, he hadn't been handcuffed, had he?

A.  I think he was on the way in.

Q.  How can you prove that?

A.  I think we hear the cuffs coming off him before we enters the room.

Q.  All right.  You've watched the video and you think you took the cuffs off?

A.  I think that's what I heard, yes.

Q.  All right.  At 1:00 o'clock in the morning, he was booked for murder, correct?

A.  I believe so.

Q.  And he -- again, you gave him the impression this was just a formality, right?

A.  I don't know.

        MR. LOEVY:  Let's play 124.

    (Said video was played in open court.)

        MR. LOEVY:  Stop it right there.

BY MR. LOEVY:

Q.   You're like, yeah, right?  That's what you said, right?

A.   Yes.

Q.   So, he was -- it wasn't clear to him that he had been under arrest for 12 hours, right?

A.   I don't know what was clear to him.

Q.   It looked like you sort of didn't want to tell him he was under arrest, or am I misreading when you were, like, yeah?

A.   I thought he knew.

          MR. LOEVY:  All right.  Let's keep going.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  A lot depends, you told him, right?

A.   I guess so.

Q.   You kept telling him 50/50, could go either way, right?

A.   Correct.

Q.   He had to start telling you the truth as you saw the truth, right?

A.   What do you mean?

Q.   I mean, he told you his truth, right?

A.   At some point, he told us what --

Q.   Yeah.

A.   -- I think he --

Q.   When I say "his truth," over and over he was saying, I didn't know about a plan to shoot up the park.  I didn't know

Mancuso - direct

893

about a gun.  I was just picking up my sister.

That's what I'm going to define as his truth, okay?
Right?

A.  His truth progressed.

Q.  Well, he was always on that core, right, that he just went to the park to pick up his sister, he didn't have any plan to murder anybody and he never saw a gun.  That was always his truth, right?  That didn't progress?

A.  He used the word "plan" at one point, talking to us about R.J.'s plan.  I read it in a transcript somewhere.  He used it.

So, whether he knew there was a plan, R.J. was going to shoot up the place.

Q.  All right.  If the word "plan" was mentioned somewhere, would you agree with me that it might have been taken out of context?

I mean, we saw all those videos.  He is saying, I didn't know anybody was going to shoot anybody.  He is saying that consistently for the whole time, right?

A.  Maybe he didn't know the shooting, but we thought he knew that there was a gun, and that it was going to be used to F those people up.

Q.  Right.  And he kept telling you over and over -- we're not going to play it again -- I didn't know there was a gun.  He must have said that 50 times, right?

A.  I'm not counting.

Q.   Now, you told him at one point, hey, this is going pretty good for you.  Do you remember telling him that?

A.   Not specifically.

Q.   All right.  Take a look at 146 toward the end.

MR. FLYNN:  Is this the ERS?

MR. LOEVY:  You have the key now, Mr. Flynn.

MR. FLYNN:  I don't have the key.

You say 46?

MR. LOEVY:  146.

(Pause.)

MR. FLYNN:  Okay.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   11:07 on the second night, you told him everything's looking good, right?

A.   Yes.

MR. FLYNN:  Objection, your Honor.  That misstates the evidence.

THE COURT REPORTER:  Mr. Flynn, can you use the microphone, please?

MR. FLYNN:  Misstates the evidence, your Honor.  This clip is in the morning.

MR. LOEVY:  Oh.  I stand corrected.  11:07, the military time gets me every time.

THE COURT:  All right.  So, the objection is

sustained.

BY MR. LOEVY:

Q. 11:07 on the second day, you told him everything was looking pretty good, right?

A. Yes.

Q. That was a lie, right?

A. Not necessarily.

Q. All right. You had already arrested him for murder, right?

A. Correct.

Q. And you weren't going to let him out of that room until he got to your truth, right?

A. Until he told the truth.

Q. And the truth as you defined it was that he knew there was a plan, right? That was the truth?

A. Correct.

Q. So, it wasn't looking so good for him if he wasn't going to get out of the room until he admitted he was guilty of murder?

A. Lot of times we tell people to keep them calm, it's looking good, just relax.

Q. But it's trickery. I mean, if we're going to be honest about it, it's a little bit of trickery, right?

A. I guess you could say that.

Q. Yeah. How about telling him he's going to be able to use the phone in five minutes? Was that a lie or trickery?

A. We couldn't let him use the phone.

Q. All right. So, it was a lie then, right?

A. Trickery, maybe.

Q. Well, if you had no intention of letting him use the phone and you told --

A. Not early on.

Q. Well, you just said you couldn't let him use the phone. That's what you said?

All right. So, if you had no intention of letting him use the phone, why did you tell him over and over, you can use the phone in a few minutes? That's a lie, right?

A. I don't want to categorize it that way.

Q. We heard a lot of talk yesterday about lie, lie, lie. If you don't have any intention of letting him use the phone and you tell him six times, just be patient, we'll give you a phone, that's a lie, isn't it?

A. You know, when we would leave the room, we would get involved in things, sometimes we would forget. There were times I didn't know that he didn't get a phone call from one of the other detectives. I mean, we were five of us, four or five of us at given times working.

Q. Right. But you can't have it both ways, though. Either it slipped your mind to give him a phone call or you had absolutely no intention of giving him a phone call, but you told him you were going to give him a phone call. Pick one.

A. Well, it could be slipped my mind at times --

Q. All right. And --

A. -- and at other times --

Q. You lied?

A. You want to insist it's a lie.

Q. I just want to get -- you know, we had a lot of arguing today about what's a lie -- yesterday.

If you tell a man it's going to be a few minutes and you don't intend to give him a phone call, that's a lie, right?

A. I can't say I didn't intend, but early on we were not letting him use the phone. So -- we still had our shooter out there.

Q. Right. So, within a reasonable amount of time, though, there's no dispute he's entitled to a phone call, right?

A. Correct.

MR. FLYNN: Objection, your Honor.

THE COURT: Overruled.

BY MR. LOEVY:

Q. All right. Within a reasonable --

MR. FLYNN: Asked and answered, your Honor. We've already gone over this.

MR. LOEVY: Your Honor, this is relevant in the context here.

THE COURT: All right. We covered it yesterday, but I will give you some room to probe your area. But let's move forward.

Mancuso - direct

898

MR. LOEVY: All right.

THE COURT: Please.

BY MR. LOEVY:

Q. There's no dispute, though, that within a reasonable amount of time he's entitled to a phone call?

A. Correct.

Q. All right. Another lie you told him was, you said at various times, listen, Marcel, there was another kid in that car, T.J., right? You mentioned that to Marcel?

A. Yes.

Q. And you told Marcel, hey, T.J.'s saying you all knew about the gun. You told him that, right?

A. Specifically, I don't remember.

MR. LOEVY: Let's take a look at 97.

(Said video was played in open court.)

BY MR. LOEVY:

Q. This is Weber, not yourself, right?

This is Weber, not yourself?

A. That's Weber.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. That was Weber, not you, right?

A. Correct.

Q. That's a lie, what Weber's doing there, right?

MR. FLYNN: Objection. Foundation.

THE COURT:  Overruled.  He can answer.

BY THE WITNESS:

A.  I don't know what T.J. said to Weber.

BY MR. LOEVY:

Q.  All right.  You have seen the reports, right?

A.  Yes.

Q.  And T.J. was in the car with Marcel that night, right?

A.  Correct.

Q.  T.J. wasn't charged with murder, was he?

A.  Correct.

Q.  Because nobody said T.J. knew about that gun, right?
He wasn't charged?

A.  Right, right.

Q.  All right.  So, it's a lie to say that T.J. knew about the
gun, isn't it?

A.  I don't know.  He may have -- he may have told Detective
Weber what he -- you know, that he knew.

Q.  Okay.  That's not in the reports, though, is it?

A.  I'm not sure.  There's just too numerous of reports.

MR. LOEVY:  Let's take a look at 234.

BY MR. LOEVY:

Q.  Well, let me -- before we play it, T.J. never told you that
he knew there was a gun, right?

A.  Not that I can recall.

Q.  Because you would have arrested him, right?

A.   It would have been discussed.

          MR. LOEVY:  All right.  234.

     (Said video was played in open court.)

          MR. LOEVY:  Hit pause right there.

BY MR. LOEVY:

Q.   That's you telling Marcel that T.J. said that Marcel knew there was a gun, right?

          You want to play it again or do you agree that --

A.   Yeah, play it again.

          MR. LOEVY:  All right.  Play it again.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  We agree that's what you told him, right?

A.   Correct.

          MR. LOEVY:  All right.  Keep going.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  You lied to Marcel, right?

A.   About what?

Q.   Well, about telling him that his buddy had said that he knew about the gun.  That wasn't true, was it?

A.   Well, I don't remember if -- I thought I said, I think he said you might -- that you thought he knew --

Q.   Right.

A.   -- about the gun.  So, I don't know --

Q.   He didn't say he's saying you knew.  He's saying, I think maybe he said that.  That's what you said to Marcel, right?

A.   Correct.

Q.   All right.  Was it trickery then more than a lie or did you pick your words carefully?

A.   I don't know.  I don't remember what T.J. said.

Q.   It wouldn't have been fair to tell Marcel, hey, your buddy's saying you knew, after Weber just said, hey, you can be the witness or you can be the defendant.  That wouldn't have been fair to lie to Marcel; do we agree?

MR. FLYNN:  Objection.  Form.

THE COURT:  Overruled.

You can answer.

BY THE WITNESS:

A.   I don't know what would be considered fair.  I mean --

BY MR. LOEVY:

Q.   How about to you?  Do you think it's fair to put two guys in two rooms and say to Marcel, hey, your buddy's saying you knew, and right after Weber comes in and says, you can be a witness or you can be a defendant?  That's not fair, is it?

A.   Well, it's fair if the guy in the other room is saying --

Q.   But what if he's not?  What if you're lying?

A.   That, I don't know.

Q.   All right.  Well, he never -- T.J. never confessed to murder to you, did he?

A.   No.

Q.   And you would have written it down.  If T.J. knew there was a gun, he would have been prosecuted, right?

A.   He didn't -- he didn't do anything.  He didn't drive anybody to the park.

Q.   Did you just say he didn't do anything?

A.   T.J.

Q.   Under the hypothetical I just asked you, T.J. knew there was a gun and he was in a car with R.J. and they went to a park where R.J. shot.  That's the hypothetical, right?  Right?

A.   Right.

Q.   And now you're saying, well, he didn't do anything?

A.   His action -- he's in the car.  He got out --

Q.   That's Marcel, isn't it?

A.   He got out and walked in and then ran out.

Q.   That's Marcel, isn't it?  He's in a car, but --

A.   He drove the car.

Q.   He didn't do anything?

A.   He drove the car.

Q.   Oh, so driving.  I see.

          MR. LOEVY:  All right.  Well, let's play No. 98.

BY MR. LOEVY:

Q.   But before we do, that's the thing about interrogations, sometimes you can slip for, like, one second, right?

A.   I don't know what you mean.

Q.   He's writing down your words, right, sir?

A.   Correct.

        MR. LOEVY:  All right.  Let's go to 98.

        I'm sorry, 21.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   Now, that's a lie, isn't it?

A.   I don't know if it's a lie.  It might not be --

Q.   How about not true?

A.   Not correct.

Q.   All right.  So, there's not a lot of daylight between saying something that's not correct and saying something that's a lie, right?

A.   It's close.

Q.   All right.  Because you made Marcel think that just because he drove a car, he could go away for murder, right?

A.   I did say --

Q.   You made him think that, right?

A.   Yes.

Q.   So, then that was at 3:30 in the afternoon on day two, right?

A.   Yes.

Q.   That puts a lot of pressure on Marcel --

        MR. FLYNN:  Objection, your Honor.  That misstates the evidence again.

MR. LOEVY:  Did I get the time wrong again?

MR. FLYNN:  You got the day wrong that time.

MR. LOEVY:  All right.  This is --

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  It's 15:34 on 9-03, right?

A.  Correct.

Q.  And that would put a lot of pressure on Marcel if he thinks he could go to prison just for driving, that he's got to talk his way out of it; would you agree?

A.  Possibly.

Q.  That's trickery, isn't it?

A.  Could be.

Q.  All right.  You also told Marcel that you had spoken to R.J., right?

A.  Told Marcel that I talked to R.J.?

Q.  Yes.  A little bit.  A little bit?

A.  I did?

Q.  Yeah, you.

A.  Okay.  Maybe I did just to --

Q.  That's trickery, isn't it?

A.  If I talked to him.  I -- the only time I may have talked to R.J. was getting his name, date of birth, address, height and weight.

Q.  Marcel was saying at all times, go talk to R.J.  He'll tell

you what he did and he'll tell you I had nothing to do with it. That's what Marcel was saying, right?

A.   I believe.

Q.   And that's not consistent with being a guilty person saying, go talk to the shooter.  He'll tell you what he did and he'll say I didn't know nothing.  That's consistent with his innocence at a minimum, right?

A.   I don't know.

Q.   All right.  You also lied to Marcel about what everybody was saying as far as how many shots and how many shooters, didn't you?

A.   I wasn't lying, no.  He was lying.

Q.   All right.  Showing you 117.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   Now, you're not supposed to tell witnesses what the facts are, right?

A.   I don't know that that's a rule.

Q.   All right.  Well, you're supposed to receive facts, not feed facts, right?

A.   Maybe.

          MR. LOEVY:  All right.  Keep playing.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  Now, it's pretty clear to Marcel that if he

Mancuso - direct

906

wants to get to the truth, as you define it, he's got to say one shooter, and he's got to say not as many as ten shots, right?

A.   The number of shots didn't matter that much because there's echos or people have different perceptions of how many shots they heard.  So, that -- the number of shots wasn't that big of an issue.

Q.   The reason it was a big issue is because you were really invested in that there was only one shooter, right?

A.   Well, I just said it wasn't that big of an issue.

Q.   One shooter was a big issue, right?

A.   Yeah.  Because that's what we -- we believed there was.

Q.   And that's what you were trying to prove, is a one-shooter case, right?

A.   That's the truth.

Q.   And if there was as many as ten shots, that's not consistent with it, right?

A.   No, that could be one shooter.

Q.   Or it could be -- you know, some of the witnesses were saying three or four shots, right?  And that's where you guys were trying to steer to, just a few shots?

A.   No, we weren't trying to stay to anything.

Q.   Were you on that tape trying to get him to say there weren't that many shots?

A.   I don't think so.

MR. LOEVY:  Let's play it again.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  So, you guys didn't want there to be a lot of shots, right?

A.   We never discussed that.

Q.   No, you did discuss it.  We just heard it.  He said, no, there can't be as many as five shots, right?

A.   Who -- I don't know.  Who said that?

Q.   McDonald, in your presence.

A.   Okay.

MR. LOEVY:  All right.  Play it again.

(Said video was played in open court.)

MR. LOEVY:  Stop it right there.

BY MR. LOEVY:

Q.   So, you guys are pretty clearly telling Marcel that nobody is putting that many shots being fired, correct?

A.   That's what was said.

Q.   All right.  That wasn't true, right?

A.   What wasn't true?

Q.   Nobody is saying there were as many as ten shots fired, right?

A.   People told us there was a lot of shooting.  They -- nobody said there was a second shooter.  That's --

Q.   I'm talking about the number of shots.

Mancuso - direct

908

Did McDonald just say in that video, nobody's saying there's as many as ten shots; "Yes" or "No"?

A.   He said that, yes.

Q.   All right.  Was it true?

A.   That he said that?

Q.   Well, no.  Was it true that nobody said there were as many as ten shots?

A.   I'd have to look at reports to see what people said.  I don't know what specific --

Q.   You had --

A.   -- number of shots our witnesses said.

Q.   You had access to the 911 tapes, right?

        MR. FLYNN:  Objection, your Honor.  Hearsay.

        MR. LOEVY:  He had access to and relied on his investigation.

        THE COURT:  Overruled.

        You can answer.

BY THE WITNESS:

A.   I didn't have access to them.

BY MR. LOEVY:

Q.   Did you have access to the OEMC records?

A.   They are accessible.

Q.   Yes.  And, in fact, you noted them on the inventory in your own handwriting, correct?

A.   I may have.

Q.   All right.   And as part of an investigation of a murder, you would have looked at the records to see what information was available, right?

A.   Probably.

Q.   And you knew that people had called 911 and said 20 shots?

A.   Correct.

Q.   And multiple people had said more than ten shots, right?

A.   I believe.

Q.   And at least one caller on 911 said groups of people shooting, correct?

A.   I don't know.

Q.   All right.   So, it would not have been accurate to tell Marcel, hey, nobody's saying lots of shots.   Nobody's saying more than one shooter.   That's a lie, isn't it?

A.   I don't think it's a lie.

Q.   At one point, the state's attorney said to Marcel, no need to be nervous, Marcel.   Nothing to worry about, right?

A.   I believe.

Q.   That was made in your presence, right?

A.   Yes.

Q.   That was a lie, wasn't it?

A.   I don't think so.

Q.   He had plenty to be nervous about, didn't he?

A.   That would be up to him.

Q.   You're allowed to use lies and trickery, right?

A.   Okay.

Q.   Can you just admit that that's what you did, or are you going to say, no, we didn't do that?

          MR. FLYNN:  Objection.  Argumentative.

          THE COURT:  Overruled.

BY THE WITNESS:

A.   To my recollection, we didn't lie or use trickery.

BY MR. LOEVY:

Q.   All right.  Is it appropriate to feed factual information to the subject that they can then parrot back to you?

A.   What was the question, the beginning?

Q.   It's the contamination point.  Is it appropriate to feed information to a subject so that they might parrot it back to you?

A.   That's -- we didn't want to do that.

Q.   Why not?

A.   We wanted the truth to come from him.

Q.   Right.  Because it's not -- it doesn't work so good if the truth comes from the police --

A.   Right.

Q.   -- and, then, pressure is applied and then they give it back, right?

A.   Correct.

Q.   That's not the proper way to do an investigation?

A.   That's not what we did.

Q. Well, we've seen in the last two days a lot of video of you guys telling Marcel your theory of the case, haven't we?

A. We were telling him what we knew --

Q. Yeah.

A. -- and what we believed to be truth --

Q. And, then, you were --

A. -- about what happened.

Q. -- asking him to give you the truth back. That's what you were doing?

A. No. He kept lying to us --

Q. When you --

A. -- the first 12 hours.

Q. When you say "lying," it's because you kept telling him what the witnesses were saying the truth was, and he kept trying not to say that. That's what you're defining a lie as, right?

A. Nah, he was lying about Day-Day shooting, and we ran away.

Q. All right. We'll talk about that. But I just want to finish contamination.

Would you let another detective feed a suspect information in your presence or would you put a stop to that?

A. It would depend if I felt he was actually feeding him a story.

Q. All right. You didn't think at any point on the tapes we've seen the last couple days anybody was trying to feed

Marcel a story?

A. I couldn't say for sure.

Q. It sort of looked like they were, right?

A. I don't think so.

MR. LOEVY: All right. Let's play 203.

(Said video was played in open court.)

MR. LOEVY: I'm sorry, it's 350. Wrong number.

Oh, no, I'm sorry, it is 303 -- 203. Sorry. 203.

(Said video was played in open court.)

BY MR. LOEVY:

Q. So, you went in there and said, hey, you were talking to Turner before, right?

A. Right.

Q. You and Turner and Weber and McDonald, you were all working together, right?

A. Yes.

Q. Sharing information?

A. Probably.

Q. And, so, Turner had told you some stuff and now it's going to be your turn, right?

A. I don't recall.

MR. LOEVY: All right. Let's continue.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. So, that was you going in there after Turner

had gone in there, right?

A.   I guess so.

Q.   And Turner probably debriefed you?

A.   I can't recall specifically.

Q.   Do you remember if when Mr. Brown first said, R.J.'s in the backseat talking about popping off people and, you know, really being angry, if that came from Marcel or that came from Turner?

A.   No, Marcel told us that.

        MR. LOEVY:  All right.  Let's go to 350.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  Couple of questions about that.  This was at 20 o'clock on the second day, right?

A.   Yes.  20 -- 8:00 o'clock.

Q.   And Mr. Brown had told you over and over again that we were just listening to music back there.  We were just listening to music back there.  That had been what he had tried to say was his truth, right, in the car?

A.   I don't know what you mean listen to music back there.

Q.   In the car.  In the car on the way over.  His truth was, just a normal ride to the park.  That was his truth, right?

A.   I think he said that.

Q.   Yeah.  And, then, over time, you guys were able to move him over to, R.J.'s getting increasingly angry in the backseat.  Was that a fair summary?

MR. FLYNN:  Objection.  Argumentative.

THE COURT:  Sustained.  Rephrase your question.

BY MR. LOEVY:

Q.   Did you know that Turner was the first guy who came up with pop those N words off theory?

A.   I did not.

Q.   All right.  That changes the way you have to look at this case, doesn't it?

A.   No.  I thought I remembered R -- Marcel saying that --

Q.   Yeah, but doesn't it --

A.   -- at some point --

Q.   But doesn't it --

A.   -- before Turner.

Q.   Sorry.

But would it change your theory of the case if that was the first time in the case that pop those N words off came from Turner, not Marcel?  Then it's a different case, right?

MR. FLYNN:  Objection.  Argumentative.

THE COURT:  Overruled.

You can answer.

BY THE WITNESS:

A.   I don't think so.

BY MR. LOEVY:

Q.   All right.  Because then that's the police saying to Marcel, you're not getting out of this room until you start

telling our truth.  You're not getting out of this room until you start telling our truth.  You're not getting out of this room until you start telling our truth.  Here's our truth.

That's a different fact pattern than if he had just said it to you, right?

A.   I don't agree with that.

Q.   Is psychological coercion improper during an interrogation?

A.   I don't know what psychological coercion is.

Q.   Is it improper to conduct an interrogation in a manner where you overcome the suspect's will and his freedom to choose whether to make a statement or remain silent?  Is that improper?

A.   You got to repeat that again.

Q.   Is it improper to conduct an interrogation in a way that you overcome the suspect's will and you take away his freedom to make a voluntary choice whether to remain silent or give a statement?

A.   I wouldn't know how to do that.

Q.   Okay.  Is that proper or improper?

A.   I can't say.  I mean --

Q.   Can't say either way?

A.   Correct.

Q.   Is it wrong to tell a suspect if they don't cooperate, they're going to prison for a long time?

A.   I would never tell anybody that.

Q.   That's wrong, right?

A.   I would think so.

Q.   Is it wrong to tell a suspect, if they don't confess, they're going to suffer in prison, but if they do confess, then they get to walk and they get their freedom?  That's not proper either, right?

A.   I would think.

Q.   All right.  Do you remember at your deposition --

MR. LOEVY:  This is Page 62, Line 16 through 24.

MR. GIBBONS:  Jon, what's the page?

MR. LOEVY:  62, page -- Line 16 through 24.

(Said video was played in open court.)

MR. LOEVY:  62, Line 16 through 24.

MR. FLYNN:  Your Honor, this is improper impeachment.

THE COURT:  Okay.  You'll have to --

(Tendered.)

MR. LOEVY:  It's the same question, your Honor.

MR. FLYNN:  Go on to Page 63, your Honor.

MR. LOEVY:  He's given two answers, your Honor.

MR. FLYNN:  First answer is unclear.

MR. LOEVY:  First answer is hundred percent clear.

They're free to redirect, your Honor.

THE COURT:  It's allowed.  That's proper impeachment. You can redirect him on it -- or direct him on it.

MR. LOEVY:  Thank you.

Play that.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  You gave that answer under oath, right?

A.   Correct.

Q.   And you knew you were being recorded, right?

A.   Correct.

Q.   Sometimes during interrogation you got interrogated at that deposition, right?

A.   Yes.

Q.   Did you notice over the course of those three days that Marcel's physical demeanor and mood seemed to change and go down?

A.   I did not.

Q.   You didn't notice any change at all?

A.   No.

Q.   Did you notice the interrogation process start to wear down Marcel?

A.   Not really.

Q.   All right.  Let's show you a clip from the beginning.

MR. LOEVY:  This is No. 28, Lilia.

And what time is this?  This is 15:40 on day three, about 40 minutes into the interrogation.

(Said video was played in open court.)

BY MR. LOEVY:

Mancuso - direct

918

Q.   All right.   He had a lot more fight in him when the interrogation started; would you agree?

A.   He was a little -- yeah, little bit.

Q.   All right.   And by the end, he basically was sitting in the corner saying -- mumbling.   Would you agree with that?

A.   He mumbled a lot throughout the whole time.

Q.   All right.   Did you -- the clips we've seen, without showing them again, by four or five hours in, he was not -- he was not -- his demeanor did change, didn't it?

A.   Maybe a little.

Q.   All right.   You took -- somebody took his shoelaces, right?

A.   Yes.

Q.   The reason you take his shoelaces is so he won't hang himself, right?

A.   It's a procedure.   Belt and shoelaces and everything really out of the pockets come away from the prisoner.

Q.   Well, at some point there was a thought, you know what, better take this kid's shoelaces, right?

A.   No.   It's just a normal a procedure.   They always -- they just forgot to take them when they first brought him in.

Q.   All right.   Did you see the clips where Marcel by the end was crying in the room and talking to himself, talking to God?

         Let me be clear on the question.   Did you see them in court?

A.   I don't know if he was crying, but I did see the clips.

MR. LOEVY: All right. Let's show 160.

(Said video was played in open court.)

MR. LOEVY: And 161.

(Said video was played in open court.)

MR. LOEVY: And, then, 166.

(Said video was played in open court.)

MR. LOEVY: And, then, 164.

Which one did we play?

BY MR. LOEVY:

Q. Well, I'm going to show you ones -- there were some where he was crying in the presence of you and the state's attorney; were there not?

A. Might have been.

Q. All right. Did you think you had maybe taken things a little too far if he was crying during the interrogation?

A. No.

Q. During the first 30 hours, he did not break; do we agree?

A. I don't know what you mean by break.

Q. He didn't confess.

A. His story changed.

Q. But he didn't confess. I understand -- we're going to talk about changing stories. I'm saying, he didn't implicate himself in murder in the first 30 hours, correct?

A. I -- okay.

Q. You agree, right?

Mancuso - direct

920

A.   Yes.

Q.   And you could have accepted his truth, right?

A.   It was up to the state probably by that point.

Q.   You didn't have to keep going?

A.   We ran its course.  The state's attorney is the final step.

Q.   You could have called the state's attorney at noon on day two, right?

A.   Usually we wait till later.

Q.   No, usually, if you want to call a state's attorney, get him charged with murder, you need evidence that they've committed murder, right?

A.   Well, his story kept changing.

Q.   Changing story is not evidence of murder, right?

A.   Well --

Q.   So, if you need intent to prove first degree murder, and you talk to the state's attorney at noon on day two, the state's attorney would have said to you, well, did he know about the gun?  Did he know about the plan?  And you would have had to say no, right?

A.   They would have told us probably to continue the investigation.

Q.   Because you can't charge a guy with first degree intentional murder unless they say they knew about the plan, knew about the gun, right?

          MR. FLYNN:  Objection.  Misstates the law.

THE COURT: Sustained.

Rephrase your question, Mr. Loevy.

BY MR. LOEVY:

Q. The state's attorney in the middle of the day on September 4th told you or would have told you, there is insufficient evidence to charge him with murder unless he knew about a plan to kill somebody, knew about a gun, and there's some evidence that he intended to shoot somebody, right?

MR. FLYNN: Objection. Foundation.

MR. LOEVY: Foundation?

THE COURT: Overruled.

You can answer based on your experience in your field.

BY THE WITNESS:

A. We weren't ready to call the state's attorney that early on. We were still putting our witnesses -- we had a lot of work to do.

BY MR. LOEVY:

Q. Did you prejudge Marcel as guilty of murder?

A. No.

Q. Did you decide that the truth was that Marcel knew there was a gun and had been part of a plan? Did you believe that was the truth?

A. I thought he may.

Q. All right. Then it sounds like you did prejudge the situation.

A.   Well, I said he may.  I mean --

Q.   Isn't it true that until Marcel came to the truth that he knew there was a plan, he knew there was a gun, you were going to say he was lying?

A.   Well, he was lying.  The first 12 hours he was lying.  His story was just an outright lie.

Q.   An outright lie.

     When he told you, look, I went to the park to pick up my sister.  I got a call at the White Castle.  I was hanging out with my friends.  I went over there.  My cousins jumped in the car.  I walked in the park.  There's shooting going on.  I didn't know it was going to happen.  I didn't know there was any plan.  And I ran away.  That's not murder, right?  That's not murder.  We've already established that.

A.   Okay.

Q.   You agree, right?

A.   Okay.

Q.   And that's his truth, right?

A.   Well, again, his story was not consistent with what we knew.

Q.   Now, when you said you didn't prejudge him with murder, you did arrest him at 3:00 o'clock on day one, right?

A.   Correct.

Q.   What crime did you arrest him for?

A.   Murder.

Q.   And you did book him at 1:00 in the morning on day two, right?

A.   We did or didn't?

Q.   Did.

What happened at 1:00 in the morning when you handcuffed him?

A.   What day are you --

Q.   This morning we saw you handcuff him when you told him this is just a formality at about 1:00 in the morning on day two. What were you doing?  Why did you handcuff him?

A.   Brought him to the lockup to get, I believe, prints and photos and --

Q.   Right.  So, what do you call that?  Booking?

A.   That's booking.

Q.   All right.  So, had you prejudged him when you booked him for murder?

A.   No.

Q.   He hadn't confessed yet?

A.   No, but the investigation was still going.

Q.   So, how can you book him for murder if he hasn't confessed yet?

A.   Well, that's how it works and then --

Q.   That's how it works?

A.   Well, and then if the state doesn't approve the charges, they get released without charging.

Q.   So, you book somebody for murder without evidence of murder, and then you got -- you try to get the evidence, and if you don't get the evidence, then you unbook them?

A.   You're twisting it a bit.

Q.   Well --

A.   He was under arrest.

Q.   Right.  For murder?

A.   Right.

Q.   You didn't have any evidence yet, right?

MR. FLYNN:  Objection.  Misstates the evidence.

THE COURT:  Overruled.

MR. LOEVY:  It's a question, your Honor.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   You didn't yet have proof he had committed the crime of murder when you arrested him, right?

A.   We knew that he drove to the park --

Q.   We've covered that.

A.   -- and the guy got out of the park and shot and killed a kid.

Q.   Okay.  I get that.

A.   So --

Q.   And I'm not even talking about that.

     I'm just saying, to prove the crime of murder, you have to show that he had intent, he knew there was a plan, he

knew there was a gun, to prove the crime of murder, right?

MR. FLYNN: Objection, your Honor. Asked and answered.

MR. LOEVY: He's wrestling with it, your Honor.

MR. FLYNN: It's not a fair question.

THE COURT: Overruled. He can answer.

And, then, let's move on.

MR. LOEVY: Okay. I'll move on.

BY MR. LOEVY:

Q. So, you needed to get a confession after you booked him for murder, right?

MR. FLYNN: Objection. Argumentative.

THE COURT: Overruled.

BY THE WITNESS:

A. I don't know if we needed a confession.

BY MR. LOEVY:

Q. Well, you needed -- there was no other evidence, so you needed him to say that he knew there was a plan and he knew there was a gun, right?

MR. FLYNN: Objection. Misstates the evidence.

THE COURT: All right. Let's move on, please.

BY MR. LOEVY:

Q. All right. We've seen in court over the last few days evidence of Marcel's incriminating statement, right?

A. I believe.

Mancuso - direct

926

Q. You've been watching the video with all of us, right?

A. Correct.

Q. And you watched Mr. Gibbons show Mr. Brown lots of video, right?

A. Yes.

Q. And on some of that video, Mr. Brown made some incriminating statements, right?

A. Yes.

Q. Now, the statement that he knew there was a gun, knew there was a plan to shoot up the park, we've seen that video, right?

A. Okay. Yes.

Q. There's no secret video that you're aware of that's beyond what we've seen, right?

A. Correct.

Q. So, everything that Marcel said that admitted he knew there was a plan go to the park and he knew that that kid had a gun, that's the sum total of the video that we've seen in court, right?

A. Correct.

Q. And when did his confession happen, that he knew there was a plan and he knew there was a gun. That was with the state's attorney or at what point did that happen?

A. Well, it was with the state's attorney and it was with us at various times where he said, I was kind of sure he had it, I thought he had it because he always has one. So, it was

varying degrees of his knowledge of his cousin.

Q. Because didn't it look like every single time you guys tried to get him from every angle that you knew he had a gun, and he kept saying, I didn't know he had a gun, you know, maybe, but when he got over that fence, that's the first time I knew he had a gun? It seemed like he disagreed with you every single time, didn't it?

A. I don't recall if it was every time, but his story kept evolving.

Q. All right. But whatever the confession is, you're saying it happened with the state's attorney in the room?

A. Excuse me?

MR. FLYNN: Objection. Misstates the testimony.

BY MR. LOEVY:

Q. Whatever you're claiming the confession -- the incriminating confession was, it happened with the state's attorney in the room?

A. That and previous statements to us.

Q. What statement did he make to you that was a confession that he -- he told you and McDonald, he knew R.J. was going to go to the park and shoot people and he knew he had a gun?

A. You're using the word confession, but it's his knowledge, things he said: Well, I thought he might have had a gun because he was mad and he was talking about F'ing them people up. Those statements compiled together.

Mancuso - direct

928

Q.   At 12:03, after the state's attorney left the room -- and you were present when the state's attorney clips were played, right?

A.   Yes.

Q.   He told her his story, right?

A.   Yes.

Q.   And he had been asking to talk to the state's attorney, right?

A.   He had been.

Q.   Because he said, I'll tell her the truth, I can go home, right?

A.   I don't know if anybody answered that.

Q.   All right.

A.   He might have said that.

Q.   When he got in there in the state's attorney, he said what we've been saying:  Went to the park, didn't know he had a gun, didn't know any of this, didn't know there was a plan.  And she kept saying, Marcel, I'm going to leave, this is your last chance, and the little voice in my head.  And she kept saying that, right?

A.   I think she said something similar to that.

Q.   And he never really said that he knew there was a plan, did he?

A.   I know he used the word plan at some point when we were talking to him.

Q.   Okay.  And that's -- all right.

        MR. LOEVY:  Let's play 312.  This is --

BY MR. LOEVY:

Q.   Well, before we play it, after the state's attorney left, we saw him crying and such.  You went back in, right?  You went back in the room after she left?

A.   I think so.

        MR. LOEVY:  All right.  Let's play 312.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   This is at 12:07 on day three, right?

A.   Yes.

Q.   So, this is the state's attorney's taking what you're calling the incriminating statement.

        MR. LOEVY:  Let's keep going here.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   That wasn't true either, was it?

A.   I don't know.

Q.   Well, I mean, supposedly he had just confessed to murder, so something's changed, right?

        He's saying, you told me if I could tell the truth, I could go home.  Can I go home?  And you're saying nothing's changed.  But you just told us he had confessed to murder.

A.   He told the state's attorney that.  I don't use the word

confession.  But he said what she believed to be his knowledge.

Q.  All right.  Let's see what you told him then.

(Said video was played in open court.)

MR. LOEVY:  And, then, 310, backing up.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  So, there you go.  You're trying again after she's left, and you still can't get him to say he knew there was a gun, right?

A.  I was asking him.  I mean, I don't -- I guess this was after the state left the room?

Q.  Yeah, it's after midnight.

A.  Okay, so --

Q.  She's gone.

A.  I think she was --

Q.  And you went back in there to try again, right?

A.  I think she was still there.

Q.  All right.  You testified at the grand jury against Mr. Brown, correct?

A.  I believe so.

Q.  And you had an understanding that the effect of that proceeding was whether he was going to be held over or not, right?

A.  Correct.

Q.  This is in October 2008.

MR. FLYNN:  Object to hearsay, your Honor, to the extent he's going to get into the statements.

MR. LOEVY:  Just going to ask him if he testified that, in fact, there was a gun.

MR. FLYNN:  That would be hearsay.

MR. LOEVY:  It's not hearsay, your Honor.  It's not being offered for the truth.

THE COURT:  Yeah, it's not being offered for the truth.  Overruled.

BY MR. LOEVY:

Q.  Did you give this answer to this question at the grand jury:

"Did your investigation reveal that Defendant Brown gave a statement admitting that he drove Defendant Branch to the park, and that he knew that Branch had the intention of shooting someone that night?

"Answer:  Yes."

Did you testify that under oath?

A.  Yes.

Q.  That's a stretch, isn't it?

A.  Well, I don't write those questions.  The state --

Q.  No, but you answered them under oath.

A.  Yes.

Q.  And that's probably a not true answer; wouldn't you agree?

A.  Well, it was what we believed, what she wrote down that

with his knowledge, his comments of knowledge, of probably had the gun, all the indications that he thought he might have had the gun.

Q. You wrote a police report, too, right?

A. Yes.

Q. And in your police report --

MR. FLYNN: Objection. Hearsay.

BY MR. LOEVY:

Q. You intended --

MR. LOEVY: I'll just wait for the ruling, your Honor.

THE COURT: It's a hearsay objection.

MR. LOEVY: It's not being offered for the truth.

MR. FLYNN: Your Honor, may I be heard on this, perhaps at a sidebar?

THE COURT: Yes. Actually, why don't we do this, because it is close to 11:00, why don't we just go ahead and take our morning break now. It's 10:50.

Please don't discuss the case.

We'll take a 15-minute break, and be ready to go at about five after, ten after.

All rise.

(Jury out.)

THE COURT: You may be seated.

Mr. Mancuso, please don't discuss your testimony during the break.

THE WITNESS: I won't.

THE COURT: You may leave the courtroom if you wish, but please don't discuss your testimony.

All right. To close the loop on the objection, I don't think you were able to say in front of the jury what you were going to elicit from the report.

MR. LOEVY: I'll wait till he leaves.

THE COURT: Thank you.

(Pause.)

(Witness exits courtroom.)

MR. LOEVY: Mr. Mancuso wrote a report saying that Brown knew Branch had a gun. He knew that Branch had a gun when he got into his car to go to the park.

THE COURT: So, the same --

MR. LOEVY: Yeah. The false statement that he intended the state to rely on in making a charging decision and convicting Mr. Brown. It's admissible for lots of reasons. The one --

THE COURT: It's not offered for its truth, so it's not hearsay.

MR. LOEVY: It's offered for its non-truth, your Honor.

THE COURT: Right.

Okay. So, the objection is overruled.

You can re-assert the question to the witness when we

finish with the break.

I do want to get a sense of where we are. It's part of the reason why I went ahead and took the break now, because I assumed you had more than ten minutes to go. Maybe you don't.

Either way, how much longer do you think you have, Mr. Loevy?

MR. LOEVY: I'm going to try to get it done in a half an hour.

THE COURT: Okay. So, we'll get to Mancuso's direct, cross, whatever you want to call it, before the lunch break.

Mr. Flynn, I won't ask you now how much time you need. I do intend to try to get us to as close to 12:15, 12:20, 12:30 for the lunch break. We'll just sort of see where we are. And after the lunch break, maybe you'll be able to give me a sense then of how much more time you need. But at that point, you will have gotten started and we'll see where we are.

MR. FLYNN: I can let you know now, your Honor, that we're likely going to take the rest of the day. So, I know that there's the Taneshia Branch issue. Is that still an issue? Is she here?

MR. LOEVY: We're going to wait until they finish. We really don't want him going into next week. So, we'll hold back on Taneshia to try to finish.

MR. FLYNN: I'm explaining to the Court that he is

going to go to next week.  So, if they want Taneshia Branch to testify today --

MR. LOEVY:  I understand what he's saying, and I'm trying to be clear, too.  We want this witness finished today, so we will not call Taneshia, even though she flew in.

THE COURT:  See you in ten minutes.

(Recess from 10:52, until 11:08 a.m.)

(Jury in.)

THE COURT:  Please be seated.

Mr. Loevy, you may resume.

MR. LOEVY:  Thank you, your Honor.

BY MR. LOEVY:

Q.  Mr. Mancuso, before we broke, we were talking about the police report that you authored at the close of the investigation.  You're familiar with that report, correct?

A.  Yes.

Q.  And you wrote in your report:  Marcel Brown states that he knew Branch had a gun when he got in his car to go to the park.

You wrote at that in your report, right?

A.  I believe so.

Q.  That's at best an embellishment, isn't it?

MR. FLYNN:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  You testified in Mr. Brown's criminal trial, too, correct?

Mancuso - direct

936

A.   I think so, yes.

Q.   And you read from your report that statement to the jury;
did you not?

A.   I don't know what I did.  That's been a while.

Q.   Well, that was your intention when you created this police
report, was to create the evidence against Mr. Brown, correct?

A.   When I created that report, I thought it was -- it
represented what had happened.

Q.   And you gave that report knowing that -- you knew that the
state's attorneys would rely on it, right?

A.   Yes.

Q.   You knew that they would rely on it when they decided
whether or not they were going to pursue Mr. Brown's
conviction?

A.   That and the state's attorney's notes that came out to our
office.

Q.   I'm asking about your report.  You knew that your report
was going to lead to evidence that would assist in obtaining
Mr. Brown's conviction, correct?

A.   Yes.

Q.   Now, when you went back in the room after the state's
attorney left, and Mr. Brown told you again, I didn't know he
had a gun, I really didn't, you probably should have put that
in the report, too, right?

A.   He had been saying that off and on throughout, and then

he'd say things that led us to think that he did have a gun. He would go back and forth, so --

Q. I mean, the way the interrogation went was, he said to you over and over and over again, I didn't think he had a gun, and then you guys claim that he made the statement that we saw to the ASA. And, then, you went back in there and he still is telling you he didn't have a gun. That's the sequence, right?

A. It's on the video, yes.

Q. And you should have put in your report that he was being real clear, even after he supposedly gave the incriminating statement, that he didn't have a gun. That belonged in your report, didn't it?

A. It was on the video. I don't -- I didn't need to include it.

MR. LOEVY: All right. This is Page 449, Line 6 through 21 of the deposition.

(Said video was played in open court.)

MR. LOEVY: Keep going.

(Said video was played in open court.)

BY MR. LOEVY:

Q. You gave those statements under oath, right?

A. Yes.

Q. And the reason it probably should have, was because your report gave the State's Attorney's Office and the prosecutors the impression that he knew there was a gun. And you knew that

that was not really the case.  That's why you should have put it in the report, right?

A.   That represented my opinion at that time, three years ago.

Q.   It wasn't -- your report is the facts, right?  What happened, what people said.  You didn't say, it's my opinion. You reported it as a fact, that he knew there was a gun and went to the park, right?

A.   My report.  But this here, this deposition was my --

Q.   I see.

A.   -- you know, opinion at that time three years ago.

Q.   Let's cover a few more subjects.  I want to double back to this USDA name.

You remember Mr. Brown being asked a number of questions about the USDA by Mr. Gibbons?

A.   Yes.

Q.   You don't dispute that that is a group of kids, 14-, 15-year-olds, calling themselves the name of a rap group.  You have no information to dispute that, correct?

MR. FLYNN:  Objection.  Misstates evidence.

MR. LOEVY:  It's a question, your Honor.

THE COURT:  Overruled.  He can answer.

BY THE WITNESS:

A.   There are so many gangs in Chicago that have -- I mean, hundreds, if not more.

BY MR. LOEVY:

Q. But you'd never heard of the USDA?

A. I had not.

Q. All right. And you have no --

A. But it could have been a gang for all I knew.

Q. I mean, we could be in a gang for all you know, right?

A. Yeah.

Q. What if we call ourselves a crew? Does that make us a gang?

A. You're a crew, yeah.

Q. All right. And you had no reason to believe that the USDA rap group had engaged in any criminal activity? You have no reason to believe that, right?

A. I didn't know them to be a rap group.

Q. All right. You had no reason to believe that USDA, Marcel and his buddies, had engaged in any criminal activity, correct?

A. When?

MR. LOEVY: This is Page 375, Line 14 through 18.

MR. FLYNN: One moment.

MR. LOEVY: I'm looking for the line here.

MR. BOWMAN: 14 through 18?

MR. LOEVY: No. It keeps going to 24.

BY MR. LOEVY:

Q. Well, let me ask you this: Other than that these are kids in the park, you had no reason to conclude that this USDA group was a gang; isn't that true?

A.   You're asking me this now?

Q.   Yeah.

A.   I didn't know that they were not a gang.

Q.   All right.  But you didn't know that they were a gang?

A.   Correct.

MR. LOEVY:  All right.  Let's play --

BY MR. LOEVY:

Q.   You asked Mr. Brown some questions about it, right?

A.   I believe so.

MR. LOEVY:  Let's play 205.

(Said video was played in open court.)

MR. LOEVY:  Play 206, please.

(Said video was played in open court.)

MR. LOEVY:  Then skip ahead, Lilia, and you can see --

(Said video was played in open court.)

BY MR. LOEVY:

Q.   That's about all the evidence you developed that this was a criminal -- or doing anything illegal, right?

A.   I don't know what you mean.

Q.   It's just some kids who started when they were 14, 15 calling themselves the name of a rap group, right?

A.   Could be.

Q.   And you never developed any evidence otherwise?

A.   No.

Q.   And you don't -- you weren't familiar with the band USDA or

knew anything about it?

A.   No.

Q.   Now, there were other witnesses that you spoke to, correct?

A.   Plenty.

Q.   And about 20 names of people you spoke to?

A.   Give or take.

Q.   All right.  And none of them said anything about Marcel being guilty, correct?

A.   Being, what?

        MR. FLYNN:  Objection.

BY MR. LOEVY:

Q.   Marcel being guilty.

        MR. FLYNN:  Objection.  Misstates the evidence.

        MR. LOEVY:  It's a question, your Honor.

        THE COURT:  Overruled.  He can ask -- inquire about this.

BY THE WITNESS:

A.   I didn't hear your question.

BY MR. LOEVY:

Q.   Sure.

        Nobody was saying that Marcel was guilty of this crime, correct?

A.   Correct.  Just that he was there.

Q.   And there was a lot of people there, right?

A.   But he was there with the shooter.

Mancuso - direct

942

Q. Well, he actually wasn't there with the shooter, was he? Nobody saw Marcel and R.J. together when the shooting happened, right? Nobody.

A. They were near each other somewhere in close proximity.

Q. Well, they were both in the park, right?

A. Correct.

Q. But Marcel and T.J. were not near R.J. when he pulled the shots, right?

A. I don't know exactly where they were.

MR. LOEVY: This is Page 386, Lines 12 through 17.

(Said video was played in open court.)

BY MR. LOEVY:

Q. You gave that answer under oath, right?

A. Yes.

Q. Then you had lunch with Mr. Flynn, right, at the deposition?

A. I don't know when we had lunch.

Q. Did you change your testimony on that?

A. What are you talking about?

Q. I mean, do you stand by that answer, that no witness claimed that Marcel was near R.J. when the shooting happened?

A. That's what I said.

Q. All right. And there was a lot of witnesses in the park, right?

A. Yes.

Q. A lot of those witnesses didn't see the shooter, right?

A. Some didn't see the shooter.

Q. A lot of people didn't see the shooter, right?

A. Some.

Q. I said a lot didn't. There's a hundred people in the park, right?

A. We didn't talk to a hundred people.

Q. Of the people you talked to, a lot of people didn't see the shooter or shooters. We don't know how many shooters there were, right?

A. Some didn't see.

Q. And some just said, hey, I saw R.J. with a gun, or people had different accounts, right?

A. Yes.

Q. But if we were to summarize what those witness accounts were, there was plenty of evidence to suspect R.J. was the shooter, right?

A. Yes.

Q. You had enough reason to suspect -- you had evidence that people were saying R.J. could have been the shooter?

A. Yes.

Q. And some people were saying they didn't know how many shots, how many shooters, they just heard gunfire, right?

A. Yes.

Q. A lot of witnesses couldn't say there was one shooter, two

shooters, just gunshots, I ran?

A.   Correct.

Q.   Now, a couple people claimed they saw R.J.  Marisol Ocampo and Eugene Stanciel, correct?

A.   Yes.

Q.   Let's talk about Marisol Ocampo for a minute.

She was a suspect in a crime that night, correct?

A.   Not that I know of.

Q.   She stabbed somebody, right?

MR. FLYNN:  Objection, your Honor.  Hearsay and misstates the evidence.

MR. LOEVY:  It's not being offered for the truth.  She was brought to the police station in connection with the stabbing.

MR. FLYNN:  It's not true, and it is being --

THE COURT:  Okay.  We don't need to do the commentary. I appreciate the explanation, however.

The objection is overruled, but maybe phrase your question, given the witness' last answer that --

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   You were investigating the stabbing at the same time you were investigating the Paris Jackson shooting, correct?

A.   No.

Q.   This is your deposition, Page 150, Lines 13 through 24.

(Said video was played in open court.)

MR. FLYNN: Objection.

BY MR. LOEVY:

Q. All right. Did you give those answers?

MR. FLYNN: Objection. Improper impeachment. He said that the detectives were investigating the stabbing.

THE COURT: Overruled. You can explore it on cross.

BY MR. LOEVY:

Q. Did you give those answers?

A. Yes.

Q. Marisol Ocampo was a person of interest about a crime that happened in the park, right?

A. At some point, yes.

Q. Because somebody was saying she had stabbed somebody?

A. I learned later, correct, yes.

Q. All right. And her boyfriend also got arrested that night -- or her boyfriend got arrested that night, right? Eugene Stanciel?

A. I don't know that he was arrested.

Q. Well, there was at least one witness claiming, after the shooting, that Eugene Stanciel had a gun, correct?

A. Not that I'm aware of.

Q. You -- you had access to the police reports, right?

A. At some point later. Maybe the next day.

Q. So, you learned that Stanciel -- at least one witness was

claiming that he had a gun and the police wanted to talk to him, correct?

A.   Again, I don't recall.

Q.   Would it refresh your recollection if you saw the police report?

A.   Sure.

MR. LOEVY:  All right.  Your Honor, approaching with Plaintiff's 404.

(Tendered.)

BY MR. LOEVY:

Q.   Take a look at Page 2.

(Pause.)

BY MR. LOEVY:

Q.   Just Page 2.

A.   Okay.  You want me to read this?

Q.   Well, I think you can take a look at the second sentence. Doesn't it refresh your recollection as to whether somebody was claiming that on the night of the shooting, a guy named Stanciel had a gun?

Does that refresh your recollection, sir?

A.   I'm still reading.

MR. LOEVY:  May I approach, your Honor?

THE COURT:  Yes.

BY MR. LOEVY:

Q.   Does that refresh your recollection, sir?

Mancuso - direct

947

A.   Somewhat.  I'm trying to find the date of the arrest.  It's been eight years.  I don't remember where they're at on these reports.

Okay.  Date of arrest.

Q.   You did speak to Stanciel for 12 hours, right?

A.   I don't know how many hours -- he was in the station talking to us at some point.

Q.   May I have it back then, sir?

A.   Come and get it.

Q.   All right.  Does that refresh your recollection that somebody was saying Stanciel had a gun?

A.   Correct.

Q.   All right.  So, you got Marisol and Stanciel.  They were both in the park, both of them are in somewhat trouble, right?

A.   I don't know when they were in trouble.  That arrest report of him looks like they chased him.  There was -- they observed him, chased him, never lost sight of him and never found a gun.

Q.   Right.  So, they didn't find --

A.   So, they arrested him for reckless conduct.  They didn't find a gun.

Q.   So, in other words, they saw Stanciel.  He fled?

A.   Right.

Q.   Because they were -- there had been reports that he, on the night of the shooting in the park, he had a gun.  He fled.  They caught him.  They couldn't find a gun, right?

A.   Correct.

Q.   And, so, they brought him to the station, they charged him with the crime of recklessly running into traffic.  That's how they arrested him, right?

A.   Correct.

Q.   Because you need a reason to arrest somebody, right?

A.   I can't answer that.

Q.   I mean, you can't just bring someone to the station unless they're under arrest if they don't want to come, right?

A.   Again, I mean --

Q.   People are free to say, no thanks, right?

A.   Sure, sure.

Q.   Right.  So, he got arrested, he gets brought to the station.  And you talk to him for how long?

A.   I don't -- I didn't talk to him in regard to that arrest. I don't --

Q.   No, you talked to him about the shooting in the park, right?

A.   At some point, yes.

Q.   And how long did you talk to him?

A.   I don't know.  I --

Q.   You took his statement at 1:30 in the morning, right?

A.   Okay.

Q.   Do you remember that?

A.   On what day?

Mancuso - direct

949

Q.   After the shooting.

A.   So, that's the 31st.

Q.   And, then, into the 1st.

Well, you tell me, when did you take his statement?

A.   I'd have to see some notes.  I mean, I took, I don't know, 20, 30 statements.

Q.   All right.  What do you remember Stanciel telling you?

A.   He was in the park.  He saw Marcel and T.J. pull up in a car, and R.J.  They got out of the car, jumped a fence, came in the park and approached their group.  And as they were walking, R.J. pulled his gun out and started waving it, cursing and yelling, and then started shooting.

Q.   All right.  And Stanciel -- did you threaten to take his baby away?

A.   Don't be ridiculous.

Q.   All right.  You're aware that that's the allegation, though, right?

A.   I've heard it before, but that's ridiculous.

Q.   All right.  But you did say in T.J.'s statement that you had been talking to Stanciel for 12 hours, right?

A.   I said that in --

Q.   In handwritten --

A.   -- somewhere else?

Q.   Yes.  You said that, correct?

A.   I don't know.  I may have.

Mancuso - direct

950

Q.   Have you reviewed the documents to prepare for your testimony?

A.   I reviewed a box of a lot of documents, so --

Q.   And did you tell Marcel during the audiotaped interview that you had been talking to Eddie Stanciel for 12 hours?

A.   I may have said that.

Q.   Was it true if you said it?

A.   Of course.

Q.   All right.  And doubling back to Stanciel's girlfriend, did you tell Marisol Ocampo that you were going to -- that there was a chance she could lose her baby to DCFS because she had her baby out late in the park?

A.   Absolutely not.

Q.   The statement from Marisol Ocampo was taken at 2:43 in the morning, right?

A.   On what morning?

Q.   September 1st.

A.   Okay.

Q.   That was after 15 to 16 hours of questioning, correct?

A.   I don't know if she left, came back.  I just don't recall.
     Some of the kids were in our office, left for various reasons, promised to come back, and came back.  So, I don't know, she may have been one of those.

Q.   This is page --

A.   But she was more than cooperative.  There were no threats

to her.

Q.   Of course, she was a suspect in a serious crime, right?

A.   Not to me and not at that time.

Q.   I thought she was accused of stabbing somebody.

A.   I didn't even know about that stabbing.  I was never made aware of that incident.

MR. LOEVY:  This is Page 215, Lines 2 through 5.

MR. FLYNN:  One second.

(Pause.)

MR. FLYNN:  215, Lines 2 through 5?

MR. LOEVY:  Is that what I said?

MR. FLYNN:  I believe so.

THE COURT:  Yes, that is what you said.

MR. LOEVY:  We'd like permission to play that, then, your Honor.

MR. FLYNN:  For impeachment?

MR. LOEVY:  Yes.  As to whether she was in the station for 12 to 15 hours.

MR. FLYNN:  Is that the pending question?  If so, I withdraw.

THE COURT:  Okay.  Just to clarify, the pending question was, was she accused of stabbing somebody?

MR. LOEVY:  All right.  Let me ask the predicate question, then.

BY MR. LOEVY:

Mancuso - direct

952

Q.   Isn't it true that she was in the station at Area 5 for 15 to 16 hours before she gave that statement?

A.   She may have been.

Q.   All right.  And your claim is she was there voluntarily?

A.   Oh, absolutely.

Q.   And she had nowhere she'd rather be at 2:43 in the morning than giving a statement about R.J.?

A.   I don't know how she felt about that hour, but she contacted us --

Q.   That was --

A.   -- the day the body was found.

Q.   That's the story that you wrote up in your reports and the impression you gave, that this had been a voluntary witness who came forward to give information about R.J.  That was the impression you wanted to give, right?

A.   That is --

Q.   That she called the police?

A.   That is not a story.

Q.   All right.  But, in fact, she had been a person of interest in a stabbing, her boyfriend had been arrested in connection with having a gun, and they both spent more than 12 hours in the station before they gave these statements.  That's true, isn't it?

A.   She came in in the morning.  We picked her up.  She came in.  I wasn't even aware.  That was the morning the body was

found.  I was not aware of any stabbing, Eugene, involving her, any of that.

Q.   There is nothing in your police report about Marisol seeing Paris Jackson in the park, correct?

A.   I think she -- I think she saw him in there.

MR. LOEVY:  All right.  This is Page 209, Lines 15 through 22.

(Said video was played in open court.)

MR. FLYNN:  Could you pause, please?

MR. LOEVY:  Sorry?

MR. FLYNN:  209, 15 to 22?

MR. LOEVY:  Yes.

MR. FLYNN:  Again, it's not proper impeachment, your Honor.

MR. LOEVY:  It's the exact question, your Honor.

MR. FLYNN:  It's not the exact question.

THE COURT:  I would need to see a copy of the deposition transcript to be able to rule.

(Tendered.)

MR. LOEVY:  This is on Page 209, Lines 15 through 22.

(Pause.)

THE COURT:  Overruled.  He can answer.  It's impeaching.

(Said video was played in open court.)

BY MR. LOEVY:

Mancuso - direct

954

Q.   So, did you give those answers?

A.   Yes.

Q.   And all of a sudden when she gave a statement later, she remembered Paris Jackson being in the park, right?

A.   I don't know.  I don't know if she saw him.  She's one of eight or ten that saw --

Q.   Let's just talk about her.

A.   Well, let me finish.

     -- the shooter and Paris being in the park.  Several people saw --

Q.   Talking about her.

A.   Okay.

Q.   If you could just focus on her.

     Your explanation for why she didn't say Paris was in the park and then later she gave a statement that Paris was in the park, you said you made a mistake, right?

A.   I said that?

Q.   That's the question.

A.   Okay.

Q.   You got to answer.

A.   Okay.  I don't know if I said that or not.

Q.   All right.  Let's take a look at 209 --

     MR. LOEVY:  Play the next two lines, Lilia.

     So, 209, Lines 22 through --

     (Said video was played in open court.)

Mancuso - direct

955

MR. LOEVY: And, then, if you could play 210, Lines 6 through 10.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. Did you give those answers?

A. Yes.

Q. By the way, Marisol Ocampo never said she saw Marcel Brown in the park, correct?

A. Okay, yes.

Q. It's not in your report, is it?

A. What's not in my report?

Q. That Marisol Ocampo ever even saw Marcel Brown in the park.

A. If it's not in the report, it's not in the report. I don't have reports in front of me.

Q. All right. And, then, later Marisol Ocampo is giving a statement, and all of a sudden she's talking about Paris Jackson. Is that your memory?

A. Giving a statement where?

Q. To the state's attorneys and the prosecutors in a handwritten statement.

A. I suppose so.

Q. Did anybody ever come back to you and say, well, why is she now making these statements about Paris Jackson if she never said that during her 15-hour-plus at Area 5? Anybody ever come back to you and ask you to explain that?

A.   No.

Q.   After she gives her handwritten ASA statement, now R.J. is saying, who is F'ing with my sister?

She never said that during your interviews, did she?

A.   You're talking about Marisol?

Q.   Yes.

A.   I don't know.  I'd have to have my handwritten notes or the supp or something.

MR. LOEVY:  This is Page 224, Lines 2 through 10.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  Did you give those answers, sir?

A.   Yes.

Q.   She never got charged in connection with the stabbing, correct?

A.   Not to my knowledge.

Q.   And she ended up testifying against R.J. and Marcel, correct?  At the trial.

A.   At the trial, I believe so.

Q.   Although she didn't actually implicate Marcel in anything. She implicated R.J., correct?

A.   I believe so.

Q.   All right.  Just a few more subjects.

Marcel was telling you, talk to Day-Day, right?

A.   Yes.

Q. And you went and found Day-Day, right?

A. Yes.

Q. There should be a handwritten GPR statement documenting your interview with Day-Day, correct?

A. Should be.

Q. And it's missing, isn't it?

A. I don't know.

Q. It should exist. Can we agree on that?

A. A GPR?

Q. Yeah. Tell the jury what a GPR is.

A. That stands for general progress report. It's basically a -- like, similar to a sheet of notebook paper. It has lines across it all the way up and down, and a little box in the top where you put a title and who you're interviewing. It's just -- it comes on a pad. We use them to write notes as we're talking to people.

They usually are -- any time there's an interview, we -- they get included in the file. Things get misplaced. If he's saying there's not one --

Q. No, I stand corrected. It's the handwritten statement from Portis that doesn't exist. There should be a handwritten statement, correct?

A. I don't know if the state's attorney took one. I would think they probably did, but I couldn't say for sure.

Q. It should be in the file, right?

A.   Should be.

Q.   Now, isn't it true that in the course of your investigation, you learned that somebody had called 911 47 minutes after the 11:00 o'clock hour and reported shots in Amundsen Park?

A.   Yes.

Q.   So, that is at least another plausible possibility of who shot Paris Jackson in the park, correct?

A.   No.

Q.   Did you talk to the person who called 911 47 minutes after 11:00 o'clock and reported shots in the park?

A.   No.

Q.   You could have obtained the phone number of the person who called 911 47 minutes after R.J. ran away and asked questions about the shots in Amundsen Park?  You could have called that person, correct?

A.   We disregarded that as being too late after the fact.  47 minutes after the shooting --

Q.   What if it was a --

A.   -- someone's calling?

Q.   -- a different shooting?  What if it was a different shooting?

A.   It probably was a different shooting.

          MR. FLYNN:  Let him finish the answer, please.

          MR. LOEVY:  Yeah, he's right.

THE COURT: Let the witness finish the answer.

Thank you.

BY MR. LOEVY:

Q. Probably was a different shooting, right?

A. Probably.

Q. All right. So, didn't you want to find out, well, maybe somebody else shot Paris Jackson 47 minutes later?

A. We weren't on that theory at all, that he was shot somewhere else and, as you're saying, dropped off.

Q. I'm talking about a shooting in Amundsen Park 47 minutes later. Somebody called 911 and said shots fired in Amundsen Park, right?

A. And the call came from quite a distance, I believe, south and west of the park.

Q. So, you did investigate it?

A. No, we know the -- I believe we knew the location of where the call came from.

Q. I want to ask you some questions about counsel's opening statement.

There was a mention of Paris Jackson deserving justice. Do you remember that question or that statement?

A. By whom?

Q. By your attorneys.

A. Okay.

Q. All right. You agree that justice for Paris Jackson means

Mancuso - direct

960

getting the right people, right?

A.   Yes.

Q.   Not just getting somebody?

A.   Correct.

Q.   And you were -- also I heard during opening, it's not an easy job getting witnesses to cooperate.  That's sometimes true, right?

A.   Quite a bit.

Q.   But you have to do it the right way, right?

A.   I don't know what you mean by the right way.

Q.   You can't just lock people up until they start telling you what you want to hear, right?

A.   Correct.

Q.   And you have to treat them with dignity and respect, right?

A.   Treat everybody that way.

Q.   Including Mr. Brown.  He deserved to be treated with dignity and respect, correct?

A.   I thought he was.

Q.   Some question in your mind, though, huh?

A.   Pardon?

Q.   Some question.  You thought he was, but there's some question?

A.   No.

Q.   All right.  And during opening there was a mention that detectives don't make the final decision, the state's attorneys

make the decision. That's true, right?

A. Correct.

Q. But you decided to call the state's attorney and tell the state's attorney, I think we should pursue Marcel Brown for murder, right?

A. Told her -- I believe we just reported what we had, a homicide case and people in custody.

Q. But you made a decision to bring them in, right?

A. They have to come in.

Q. I mean, if you hadn't called them, if you would have said, boy, I sort of believe this kid, maybe he didn't know there was a gun, nobody calls the state's attorney, then it goes away, right?

A. Possibly.

Q. You made the decision to initiate the charges.

And, by the way, let me ask it this way: Who made the decision? Who said, I think this kid should go away for murder? Tell me every person that was involved in that decision.

A. I don't know. I mean --

Q. Well, you were, right?

A. Well, my partner and I were assigned the case.

Q. That's two.

Anybody else other than you and your deceased partner responsible for pursuing murder charges against Marcel?

A.   State's attorney.

Q.   I'm asking about the decision to bring in the state's attorney.

A.   Okay.

Q.   Was Weber and Turner involved, or did you guys make that decision without them?

A.   No.  It was ours.

Q.   All right.  On the issue of trust, Marcel was telling you over and over again that he didn't know about the gun.  We agree, right?

A.   He was saying that, yes.

Q.   Over and over?

A.   Okay.

Q.   Not okay.  I don't want you to just agree with me. Everybody knows in an interrogation, you can't -- you're just getting tired, just start agreeing with people, right?

          MR. FLYNN:  Objection, your Honor.  This is asked and asked.

          Sorry to cut you off.

          THE COURT:  It has been asked and answered.

BY MR. LOEVY:

Q.   Let me ask a different way.

          Just because you're getting tired because it's getting close to noon and you start saying "okay," that's what happens if you repeatedly question people, right?

Mancuso - direct

963

MR. FLYNN: Objection. Argumentative.

THE COURT: That's argumentative. Sustained.

BY MR. LOEVY:

Q. All right. You told Mr. Brown that if he told the truth, he could go home, right?

MR. FLYNN: Objection. Asked and answered.

MR. LOEVY: This is -- I'm summarizing, your Honor, to lead up to the point about trust.

THE COURT: All right. It is asked and answered, but because you tell me that you're finishing up here, I'll let you do that.

MR. LOEVY: Finishing on this area.

THE COURT: Overruled.

BY THE WITNESS:

A. I don't recall -- I told him if he tells the truth, he'll go home?

BY MR. LOEVY:

Q. You were intending to build up trust for Marcel Brown, right?

A. You could say that.

Q. And he started to trust you, right?

A. I don't know if he did or not.

Q. He started asking you on those videos, you know, you're going to look out for me, you know I didn't do anything wrong, right?

A.   I don't know if he said that, but --

MR. LOEVY:  Well, let's take a look at No. 132.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   So, you told him you were going to talk to a state's attorney, right?

A.   Yes.

MR. LOEVY:  And, then, continue, Lilia.

(Said video was played in open court.)

MR. LOEVY:  All right.  And, then, 180.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  You were giving Marcel the impression that you knew he didn't know there was any murder go down, and you were going to get the state's attorney and communicate that, right?

A.   I was giving him the impression?  I don't know what --

Q.   Well, you were -- a lot of interaction here, right?

A.   Yeah.

Q.   Did you want Marcel to find you truthful and trustable?

A.   Probably.

Q.   And do you think he started to build trust in you?

A.   It's hard to say.

Q.   I mean, you were being the good cop, right?  You were the guy he was supposed to trust?

MR. FLYNN:  Objection.  Asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Marcel started asking you if you were going to help him. You know, you knew that he didn't do anything. He started asking if you were going to help him, right?

A. I didn't know he didn't do anything.

MR. LOEVY: All right. This is Page 1 -- Clip 136, please.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. When you said you were going to tell the state's attorney what he said, you were giving him the impression you were going to tell the state's attorney he didn't know that R.J. had a gun, right?

A. I was going to tell the state's attorney what he's said all along. It's all part of the --

Q. Yeah, I understand that's what you're thinking in your head. But you gave him the impression that you were going to go to bat for him with the state's attorney that he didn't know the gun. Do you think he might have got that impression?

A. I wasn't intending. And I don't know what he -- what he thought.

MR. LOEVY: All right. Let's play 321 from much later on day three, much later in the morning. It's the second to last one. This is at 1:15 in the morning.

(Said video was played in open court.)

BY MR. LOEVY:

Q. So, this is after the state's attorney's left, after you did the part we saw before the break, where you said, are you sure he didn't have a gun? Remember when you came back in? Now we're at 1:15 in the morning.

MR. LOEVY: Play it.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. When he asked you, can you look out for me, you knew he was cooked at that point, right?

MR. FLYNN: Objection. Argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. You knew he was going to be prosecuted for murder at that point, right?

A. I think we might have known at that point. I'm not sure if the state had made their decision.

Q. Why didn't you have the guts to tell him?

A. Tell him what?

Q. That the state had made the decision that they were going to prosecute him for first degree murder.

A. They might have still been in the process of getting -- they have to call supervisors and they -- sometimes it takes them forever.

Q.   Now, you've mentioned a bunch of times that he kept changing his story, kept changing his story.  I want to just drill down on that before we finish your exam.

      Now, the phase one of this interrogation, first few hours, he clearly was not telling you the truth about R.J.'s involvement.  We agree with about that, right?

A.   Yes.

Q.   He said he didn't see R.J. shoot?

A.   Correct.

Q.   And the truth is, he may not have seen R.J. shoot, right?

A.   Those are your words.

Q.   He did say that Day-Day was shooting, right?

A.   That Day-Day, yes.

Q.   Yes.

      And he didn't mention that R.J. had confessed to him that R.J. had shot.  So, those things -- he said all those things to you, right?

A.   Yes.

Q.   And he was a little feisty.  He was, like, this is what he's saying, right?

A.   Correct.

Q.   But then hours go by.  He wants to go home.  He starts talking about going home, right?

A.   I believe so.

Q.   It starts dragging on?

A.   Whatever that means.

Q.   And you told him, hey, it's up to the state's attorney, right?

A.   Correct.  Correct.

Q.   And he thinks he's a witness against R.J. at that point; wouldn't you agree?

A.   I don't think so.

Q.   You certainly don't tell him he's under arrest.  We've established that, right?

     MR. FLYNN:  Objection.  Asked and answered.  Misstates testimony.

     THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  You tried to move him at that point by telling him, this R.J. stuff's not going to fly, and you can't -- you know, everybody's saying it's R.J.?

     MR. FLYNN:  Objection.  Asked and answered.

     MR. LOEVY:  Your Honor --

     MR. FLYNN:  Misstates testimony.

     MR. LOEVY:  This is the second to last area where I'm covering his repeated statement that he lied, he lied, he lied.  I'm trying to establish the context for the lie.

     THE COURT:  The objection is overruled.

     But, Mr. Loevy, let's finish it, please.

     MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  He then stops lying, says, all right, R.J. did it, right?

A.  He came around a little bit, yes.

Q.  So, he was initially not truthful, and then he admitted that R.J. did it, right?

A.  Yes.

Q.  And, then, he says, can I go home now?

A.  Maybe.  I don't know.

Q.  But he's already been arrested for murder, so he can't go home, right?

A.  Correct.

Q.  And, then, that's phase one, where he did lie about R.J.'s involvement.

Then comes phase two.  He's still saying Day-Day was the shooter, right?  Still saying that?

A.  Yes.

Q.  And he's saying there was two shooters, they were shooting back at each other at least ten shots, not just R.J.  He was saying that throughout phase two, right?

A.  I believe so.

Q.  And, then, you and Weber told him, this Day-Day stuff's not going to fly, you got -- we can't hear Day-Day or nobody's going to believe you, right?

A.  Correct.

Q.  And we don't have to play it again, but he's basically told

Mancuso - direct

970

to his face, nobody's going to believe you if you're talking about Day-Day shooting. You need to get off that.

I think that's the way Weber put it, right?

A. Yes.

Q. He said, there's too many witnesses saying it's just R.J., you need to think about your future, you don't want to go to prison, that kind of stuff, right?

A. Correct.

Q. So, eventually he does come around and say, fine, just one shooter, no more Day-Day. At phase two of the interview, he says just one shooter, right?

A. I believe so.

Q. And we've seen the McDonald clip where he wakes him up, just one shooter. He's done saying it was Day-Day, right?

A. Correct.

Q. Now, you're calling that changing stories and lying, but that doesn't mean he was lying about there being Day-Day. It just means you changed his story, doesn't it?

A. I changed his story?

Q. Yes.

A. No.

Q. In fact --

A. Not at all.

Q. -- what you're claiming is that he admitted he lied, is you actually moved him to a different story, right?

A.   Wrong.

          MR. FLYNN:  Objection.  Asked and answered. Argumentative.

          THE COURT:  Sustained.

BY MR. LOEVY:

Q.   It's not fair to say that he kept lying and kept admitting he was lying if you're the ones who are pushing him to change his story; wouldn't that be true?

          MR. FLYNN:  Objection.  Asked and answered. Argumentative.

          THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  You guys kept pushing him to give you more on R.J., right?

A.   Correct.

Q.   And he would certainly have been reasonable to have concluded that this investigation was trying to get R.J. convicted, right?

A.   It was the beginning.

Q.   You might have given him the impression that if he wanted to get out of here, he needed to start saying bad things about R.J.  That's clearly the impression he was getting, right?

A.   That didn't come from us.

Q.   It didn't come from you that you guys were after R.J.?

A.   It was all part of the investigation overall.

Mancuso - direct

972

Q.   And you started -- he started coming towards you, right?

A.   After about 12 hours he --

Q.   Yeah.

A.   -- he came around on, you know, R.J. shooting, yes.

Q.   No, he started saying R.J.'s a shit starter, you know, he's trouble, those conversations, right?

A.   At some point.  I don't know exactly when they came in.

Q.   Might have you given him the impression that if he started saying bad things about R.J., that would be deemed good cooperation as far as getting him out of the room?  Would that have been an unreasonable impression for him to have formed?

A.   It wasn't on our part.

Q.   Would it have been an unreasonable impression for him that it would be good for him to say, you know, R.J. was angry in that car.  Yeah, you're right, he was angry in the car.  Did you give him that impression?

A.   I don't know who I'm impressing.  I'm just- - I'm asking for the truth.  We --

Q.   Right.

A.   He wasn't giving it to us as we believed it to happen.

Q.   So, you gave him the impression that if he would say things like, R.J. was mumbling in the backseat, you know, R.J. was going to -- tired of this, R.J. was angry, he was going to pop those N words, you gave him the impression that's the kind of cooperation you were looking for, right?

A.   So -- we didn't say any of those things to put in his mouth.

Q.   Marcel did move toward those things, right?

MR. FLYNN:  Objection.  Argumentative.  Asked and answered.

THE COURT:  Sustained.

Mr. Loevy, please wrap up.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   It would not be fair to say that he kept changing his story, he kept lying, when, in fact, you guys were pressing him to do that?  Wouldn't that be an accurate summary?

A.   Not at all.

Q.   Now, this business about lying about changing his story. When he first came in, he protected his cousin.  He didn't want to get his cousin in trouble, right?

A.   That could be.

Q.   And, of course, he had a right to that, right?

A.   Sure.

Q.   As someone who's under arrest, he has a right to remain silent?

A.   Sure.

Q.   And if he had been advised by a lawyer, he could have said, in this country, I don't want to implicate my cousin, right?

MR. FLYNN:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right, sir, I'm going to --

MR. LOEVY:  Let's play Clip 26.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  All right.  What did you mean you were trying to give him an out?

A.  Well, if he stuck to that story, that he never got out of the car, he might not have any problems.

Q.  All right.  So, what does it mean to give him an out?  If he adopted that story, he wouldn't be in trouble?

A.  I'm not sure what I meant by that.  I mean, it's --

Q.  All right.  I'll give you an out, sir.  You know that report where you wrote in the report that he knew he had a gun?  That's your police report, right?

MR. FLYNN:  Objection.  Argumentative.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  That's your report, right?

A.  Yes.

Q.  Your name is listed first on it, right?

A.  Is this the final report?

Q.  Yeah.

A.  Yes.

Mancuso - direct

975

Q.   That means that the Chicago Police Department, that's supposed to mean you authored it, right?

A.   Yes.

Q.   Who wrote that report that had those information on it?

A.   Didn't we just -- I just answered that.

Q.   All right.

A.   I wrote that report.

Q.   Isn't it true you said at your deposition your name must have defaulted and actually McDonald wrote the report?

A.   I don't know which report.

Q.   Page 259 -- 2 -- the main report.  The report that implicated Mr. Brown.  You blame your dead partner, don't you?

MR. FLYNN:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   You blame your partner who was formerly alive?

THE COURT:  Sustained.  The objection that I know you're about to make, which is the same question, is sustained.

Mr. Loevy --

MR. LOEVY:  All right.

THE COURT:  -- please --

BY MR. LOEVY:

Q.   All right.  Who wrote the main report?

MR. LOEVY:  Sorry, your Honor.

MR. FLYNN:  Objection to what the main report is.

Mancuso - direct

976

There's a lot of reports.

BY MR. LOEVY:

Q.   The report that I read from today.  The main report where you summarized, cleared and closed on October 22nd, 2008.  You know what report I am talking about, right?

A.   If it's the cleared closed --

Q.   Yes.

A.   -- I believe I authored that one.

            MR. LOEVY:  All right.  This is Page 259, Lines 15 through 260, Lines 13.

      (Said video was played in open court.)

            MR. LOEVY:  I think we covered it, yeah.

BY MR. LOEVY:

Q.   All right.  Did you give those answers, sir?

A.   Yes.

Q.   And maybe it is confusing.

            But who wrote the report that put Mr. Brown in prison?

            MR. FLYNN:  Objection.  Argumentative.

BY MR. LOEVY:

Q.   Who wrote the report --

            THE COURT:  Overruled.

BY MR. LOEVY:

Q.   -- the closing -- October 22nd closing report with the summary that Mr. Brown knew?

A.   The closing report, I believe, is mine.  This report in the

deposition must be a different report.

Q.   With the benefit of hindsight, looking back, is there anything you would have done differently in this investigation?

A.   I don't think so.

Q.   Not one thing you can think of you would have changed?

A.   I don't think so.

Q.   Any remorse at all for any of your actions?

A.   I don't have any remorse.

Q.   Not even a little bit?

A.   I mean, I sympathize with Marcel, but I don't have remorse.

Q.   If you could do everything all over again, you'd do the exact same thing, even knowing what you know now, having watched and listened, you would do it exactly the same?

A.   Well, there's always little things you might change.

Q.   Would you have changed anything or not, sir?

A.   I don't -- I don't know.  I couldn't say now.

          MR. LOEVY:  All right.  I don't have any other questions, your Honor.

          THE COURT:  All right.  Thank you.

          Mr. Flynn.  We'll go about 20 minutes, 15, 20 minutes, and then we'll take our lunch break.

                    CROSS-EXAMINATION

BY MR. FLYNN:

Q.   Hey, Mike.

A.   Hello, Kyle.

Mancuso - cross

978

Q.   So, as everybody's now aware, they get to call you first in this case.  You didn't really get a chance to really introduce yourself.  I want to back up and just talk about who you are. You can tell the jury some bit about your background.

Where did you grow up, Mike?

A.   Northwest side of the city, Chicago.

Q.   Born and raised in Chicago?

A.   Yes.

Q.   And how old were you when you decided to join CPD?

A.   My early 30s, I think 32.

Q.   Okay.  What year were you at the academy?

A.   1986.

Q.   Did you -- after getting out of the academy and being a patrol officer for some short time, what did you do next?

A.   I -- after my first four years in uniform, I got moved into the -- they call it a tactical unit.  You wear plain clothes and you concentrate on specific gang crimes; gangs, drugs and guns.

Q.   Did you eventually get promoted to detective?

A.   Yes, I did.

Q.   What year was that?

A.   1998.

Q.   What were your job responsibilities initially when you were a detective?

A.   Well, the first two years, from '98 to 2000, I was sent to

the auto theft division. And, then, I transferred in 2000 to Area 5.

Q. Okay. And what happened when you transferred to Area 5 in 2000, what did you start doing then?

A. I was working on robberies at that time for a few years.

Q. So, for the first two years as a detective, you were investigating auto theft, and then the next two years when you went to Area 5, which is the area that we've been talking about in this case, you started investigating robberies? Is that what you said?

A. Robberies for --

MR. LOEVY: Your Honor, I'm going to assert an objection. He just literally took the testimony and said it again. And if we're going to get into that cadence, it's going to be a problem.

THE COURT: All right. Your objection is noted. I'll let that question and answer stand, with the benefit of Mr. Flynn having heard it.

You may proceed.

BY MR. FLYNN:

Q. At some point did you become a homicide detective?

A. Yes, in 2003, I believe.

Q. And as a detective, did you generally have a partner who you investigated cases with?

A. Yes.

Q.   In 2008, during the events at issue in this case, who was your partner?  Who was the other homicide detective that you partnered up with?

A.   That would be Kevin McDonald.

Q.   And that's the same Kevin McDonald that we've been seeing in the videos?

A.   Yes.

Q.   So, by 2008, the time of this investigation, how many witnesses would you say that you had interviewed as an officer of the law?

A.   Oh, God, probably say several hundred, few hundred.

Q.   So, you were experienced in interviewing witnesses?

A.   Yes.

Q.   So, I now want to shift focus to the events that are at issue in this case.

     How did you first learn about the body that was found at Amundsen Park on August 31st, 2008?

A.   Shortly after I arrived at work -- I started at 8:30 in the morning, and it wasn't maybe a half hour later when -- shortly after the body was found, the uniformed officers showed up there and notified the dispatcher and then they call us.

Q.   Okay.  What did you do next?

A.   Proceeded to the park.

Q.   About what time of day was that?

A.   Probably around 9:00 a.m., shortly thereafter.

Q.   Shortly after the body was found at the park?

A.   Yes.

Q.   And when you arrived at Amundsen Park, what did you do?

A.   Well, we exit our vehicle.  We parked in the back.  We might have pulled up on that little drive, that little road that goes through the park.  And we proceeded over to view the body and started looking at evidence and that sort of thing.

Q.   Was the crime scene at the park taped off?

A.   Yes, it was.

Q.   Were there other people at the park who were investigating this crime?

A.   I believe our crime lab was either there or arrived shortly thereafter.

Q.   Okay.

     And when you say "crime lab," what kind of people are we talking about?

A.   Those are forensic investigators, guys that have had extensive training.  They're not just like an evidence technician.  They're more -- they're more highly trained for evidence gathering.

Q.   Were there multiple people from the crime lab that were at the crime scene?

A.   At least two for sure.

Q.   Anybody else that was out there with you investigating the crime that morning?

Mancuso - cross

982

A.   I think my lieutenant was there.  Not sure if a sergeant was there just yet.  I think he showed up later.

Q.   Was your partner there with you?

A.   Oh, yes, my partner was there also.

Q.   Was Detective Burke out there with you?

A.   Yes.

Q.   Did the medical examiner's office also show up?

A.   They eventually showed up, yes.

Q.   While you were at the crime scene, did you direct any of the detectives that were out there to canvass the area?

A.   Yes, I did.

Q.   Can you tell the ladies and gentlemen of the jury what that means when I say "canvass" an area?

A.   Whenever there's a crime or any type of violent crime or even just a body found, we knock on doors adjacent to the location to see if anybody could have seen anything out of their window or heard anything.  So -- and you usually go just within the area where it could be viewed, where somebody could look out the window.  You wouldn't go two blocks away down an adjacent street.

Q.   And when they perform that canvass of the area, were you able to learn much valuable information from anybody?

A.   No, nothing.

Q.   And at the time that you were at the crime scene that morning, did you have any idea that there were going to be

several eyewitnesses to this murder?

A.   Not at that time, no.

Q.   Now, you mentioned earlier that there was some crime lab people out there, and I think you said that that includes evidence techs.  What were they doing out there?

A.   There's -- I think -- I believe it was just the crime lab. They usually don't share a scene.  Evidence technicians go to smaller jobs, but this is a murder.  So, these guys were -- I think it was just the two of them.

Q.   Okay.  So, the two guys from the crime lab -- sorry for confusing that -- what were they doing out there that morning?

A.   Well, they usually start off photographing.  Then they start -- you know, they photograph whatever they see as evidence.  And sometimes we help point things out to them.  But then they'll take measurements, you know, from one corner to another, measure from where the body's found to where his likely path of -- you know, where he more or less came from, which would be the corner of the building in this particular case.

     So, measurements, photos.  Then they gather samples of blood and items -- articles that might be laying on the ground that could be -- could pertain to the case.

Q.   So, I want to talk about some of that evidence that was recovered.  But first, did they recover any shell casings or bullets at Amundsen Park that day?

A.   No.

Q.   And you said they were taking photographs; is that right?

A.   Yes.

MR. FLYNN:  If we could bring up Exhibit 41.

Your Honor, I know certain pages -- these are the crime scene photos.  Certain pages have been admitted.  I just move to admit all the crime scene photos, 15 through 70.

THE COURT:  Any objection?

MR. LOEVY:  I don't know that we agree to all 60 photos.  There might be some gruesome ones.

MR. FLYNN:  This has already been agreed to, your Honor.

MR. LOEVY:  Oh, if it's agreed, then we agree.

THE COURT:  Okay.  It will be admitted.  You may publish.  I would just ask if there's anything that you need to give a little heads-up to the jury about, please say so.

MR. FLYNN:  Okay.

(Exhibit 41, Page 15 through 70, received in evidence.)

BY MR. FLYNN:

Q.   You've seen these photos before, right?

A.   Yes.

Q.   And these are the photos of the crime scene?

A.   Yes.

Q.   Okay.  Now, I want to go to Photo 48.

What is this?

A.   That's Paris Jackson.

Q.   This is a photo taken of his body as it was found that morning?

A.   Yes.

Q.   And I see there there's a little yellow 6 on the ground. What is that?

A.   That's an evidence marker.

Q.   Okay.  And why was that placed there?

A.   Well, there are several blood drops right next to it and maybe under -- probably just next to it, next to the tag.

Q.   And did the team collect samples of this -- of these red spots?

A.   Yes, they did.

Q.   Has that been determined to be Paris' blood?

A.   Yes, it was.

MR. FLYNN:  And, then, if we could go to Photo 50.

BY MR. FLYNN:

Q.   And what is this?

A.   That's the walkway along the northwest side of the park fieldhouse.

Q.   Okay.  So, if I'm the person taking this photo, is Paris' body here to my left?

A.   Yes.

Q.   Okay.  And I see another evidence marker there, evidence marker No. 5.  What is that?  Why was that placed there?

A.   I believe there's some more blood drops there.

Q.   Okay.  And you heard Dr. Arden already testified in court that that was also Paris' blood; is that right?

A.   I think so, yes.

Q.   Okay.

        MR. FLYNN:  If we could go to 51, please.

BY MR. FLYNN:

Q.   And that's evidence marker No. 5 again.  Is that a zoomed-in photo of those red spots?

A.   It looks like it, yes.

Q.   Okay.

        MR. FLYNN:  Then if we could go to 55 -- excuse me, 52.

BY MR. FLYNN:

Q.   Okay.  And here I see -- well, first of all, what is this showing?

A.   The same walkway from the north side or the northern direction of the park.

Q.   Is this the reverse angle of that same walkway, the photo we were just looking at?

A.   Yes.

Q.   And, so, again, if I'm the individual taking this photo, Paris' body's at the end of this sidewalk and off a little bit to the right; is that right?

A.   Correct.

Q.  Okay.  And I see another evidence marker there, evidence marker No. 4.  Why was that placed there?

A.  There's a splotch, I guess you could call it, of blood and some kind of other kind of liquid in the same -- same circle.

MR. FLYNN:  If we could go to Photo 55.

BY MR. FLYNN:

Q.  And is that a zoomed-in photo of that blood spot?

A.  Yes.

Q.  Okay.  And you heard Dr. Arden testify that that was also Paris' blood?

A.  I think he did, yes.

Q.  Okay.

MR. FLYNN:  If we could go to 52, please.

BY MR. FLYNN:

Q.  So, I know it can be difficult to see here.  We already covered evidence marker No. 4, and I said where Paris' body. But do you see that other evidence marker at the end of the sidewalk there?

A.  All the way down to the left?

Q.  Yeah.  Down to the right, right at the end of the sidewalk. Maybe you can't see it.

MR. FLYNN:  Can we zoom in at all, near the doors?

BY MR. FLYNN:

Q.  I won't make this hard on you.  I know you got -- it can be difficult.

You see that yellow marker at the end of the right there?

A. On the right?

Q. Yeah.

A. I think that's marker 5.

Q. That's marker 5 we looked at earlier, right?

A. Right. Right.

Q. Okay.

MR. FLYNN: And if we can go to 57.

MR. LOEVY: Your Honor, objection to cumulative.

MR. FLYNN: I'm setting the scene, your Honor.

THE COURT: Okay. I will give you some room. But let's move through this quickly, as quickly as we can.

MR. FLYNN: Okay. If we could go to 59, please.

BY MR. FLYNN:

Q. So, again, this is Mr. Jackson's body as it was found on the grate.

Was his body pressed up against the grate when it was found?

A. It appeared to be, yes.

Q. Okay.

MR. FLYNN: And if we could zoom in on Mr. Jackson's left hand.

BY MR. FLYNN:

Q. Did it appear to you that he was gripping the grate?

Mancuso - cross

989

A.   Yes.

MR. FLYNN:  And if we could go to 67.

BY MR. FLYNN:

Q.   And this is the stairwell that we talked about earlier, right?

A.   Yes.

Q.   And Mr. Loevy's big gotcha question yesterday was whether you or somebody else went down the stairwell.  Do you remember that?

A.   Yes.

Q.   Do you recall whether it was you or somebody else?

A.   I don't remember going down there, so I want to say I probably didn't, because the crime lab people would not want us trampling down there if they're going to go down and try to gather whatever may be there.

Q.   Okay.  And, so, if you go down these stairs, that's underneath the grate where Paris' body was found; is that correct?

A.   Yes.

MR. FLYNN:  This would be a good time to stop, your Honor.  Did you say 12:15 before?

THE COURT:  I did.  That's fine.  We can stop now.

Ladies and gentlemen, we'll take our lunch break.  Please be back and ready to go at 1:15.

Please don't discuss the case.  And we'll see you in

an hour.

All rise.

(Jury out.)

THE COURT:  You may be seated.

Mr. Mancuso, you are excused.

THE WITNESS:  Yes, ma'am.

THE COURT:  Anything we should discuss?

MR. FLYNN:  Your Honor, I was just curious if the Court's a made a decision on whether we're breaking early today or not.

MR. LOEVY:  We are urging the Court not to, your Honor.  I'm really worried about the length of the trial.

THE COURT:  So, I'm going to answer the question in a bit of a roundabout way.

I'm just going to make this observation, not because I'm trying to tell either of you how to try your case, but this process is going extraordinarily slow.  I'm not putting the weight of that on anyone.  Both sides have had an opportunity -- a lengthy opportunity -- to direct and cross the most important witnesses in the case, right?  Mr. Brown and Mr. Mancuso, no question, are the most important witnesses in the case.  That's going to take a lot of time.  We're talking about a lengthy period to cover.

But this is going extraordinarily slow and both of you are covering lots of ground that we've heard a lot about.  A

lot about.

And, so, I'll tell you that -- while I am not going to do this with Mr. Mancuso, because it wouldn't be fair to Mr. Flynn -- if we don't pick up the pace as a general proposition, I'm going to impose time limits. I'm not going to do that with Mr. Mancuso, because that wouldn't be fair to you. But I'm just telling you for future planning, that if we're not going to kind of get to the matters and move on, I'm going to begin to impose and hold you to time limits, which I often do with parties, but I didn't do in this case.

Okay. So, why am I saying all that now? My preference would be to try to break an hour early today. It is the Friday before Labor Day. The jury has had a full week of testimony with jury selection. And we have gotten through -- I wrote it down -- one, two, three, four -- including Mancuso who we're not done with, we've gotten through five witnesses. That's a lot for the jury to do, and we're not moving at a clip that I think gets us to a point where we're going to be able to end by the 9th.

So, we are going to break early today, although it was not my intention to do so yesterday. Mr. Mancuso's first portion of his exam just took longer than I thought that it might. And, again, I'm not putting that on any party. And I anticipate that Mr. Flynn will take the rest of the day.

So, my expectation is that we will break sometime

992

between 3:30 and 4:00. I'm not going to put a hard end time on it at this moment. But I think it's only fair to the jury that we don't hold them till 4:45 or 5:00 o'clock on the Friday before Labor Day.

Mr. Flynn, I'll turn the question back on you. And I know that you've only gotten about ten minutes in. How much time do you anticipate you'll need, now that you've heard Mr. Loevy's direct?

MR. FLYNN: I think the direct went for, what was it, five or six hours? I think I'll be something close to that.

MR. LOEVY: One advantage to having a long direct was the jury has now seen all the videos, so we don't have to replay them.

MR. FLYNN: They've seen them, but -- sorry.

MR. LOEVY: We can -- well, you know, I'll be honest. Our concern is that they want to drag it so that it's Friday before Labor Day and then next week.

They're entitled to -- like I said early in the trial, everybody's got advantages and disadvantages. I can't whine about that. But I will be arguing if they're stalling.

MR. GIBBONS: Your Honor, I mean, it's hard for me just to listen that without saying something.

THE COURT: Mic. Thank you.

MR. GIBBONS: I mean, the plaintiff was on the stand for about eight or nine hours on direct. I mean, nobody

interrupted how Mr. Loevy wanted to present it. We listened to two hours of Menard. You know, he told his story.

Mancuso is accused of planting evidence, coercing people, suppressing evidence, fabricating things. I mean, this man needs to be heard.

And, you know, I get Mr. Loevy wants to rush now because now it's our case and now it's our chance to explain. But I think the Court has correctly observed that this is the key witness here. And it's not going to get done on our side by 3:30.

So, Mr. Loevy, I can guarantee you, having tried cases against Jon, is going to take a long time on recross. We're a not going to get that today.

THE COURT: Right. Which is actually the part that I was going to jump to, which is, under no circumstance, based on what Mr. Flynn is telling me, and I believe you. I have no reason to doubt what you've said, we're not going to finish with him today because you're going to need to redirect. I'm confident of that.

And, so, with that reality in mind, I'm going to let Mr. Flynn go. We'll take a natural break when we should. We'll probably take a short bathroom break, I'm sure, at some point, just a short one, ten minutes. And, then, we'll stop someplace between 3:30 and 4:00.

And, again, I'm not going to impose a limit on -- time

limit on Mr. Mancuso right now, because it's not fair to him. I didn't tell that you in advance. I didn't give Mr. Loevy one. But you've been now told, if we're going to continue to retread the same ground over and over and over on points that don't move things forward, I'm going to impose time limits on you because it's only fair.

This is a complicated case in the sense that it's old, right? There's a lot of material that has to get through. And none of that's intended to stymie the parties from presenting their case. But we have to move this case forward, to both of you -- to all of you. I shouldn't say just both of you. To all of you, we have to move the case forward.

Part of my job, part of your job is to observe the jury. I encourage you to do that as you're doing your directs and crosses. And I don't say that to interfere. I say that because I'm observing the jury, and many of them are showing signs that it appears that we're retreading the same ground in a way that doesn't move the case forward.

We'll go today until about 3:30, 3:45. If we can get close to the end at 4:00, great, I'll have you do that. And that will be where we are.

MR. LOEVY: Thanks, your Honor.

THE COURT: All right. Thank you.

(Recess at 12:22 p.m., until 1:25 p.m.)

*     *     *     *     *

995

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Joseph Rickhoff                          August 30, 2024
Official Court Reporter

996

                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                    Plaintiff,         )
                                       )
               vs.                     )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) August 30, 2024
                    Defendants.        ) 1:25 p.m.


                  TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
                BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Individual          GREENBERG TRAURIG, LLP
Defendants:                 BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

997

APPEARANCES (Cont'd):

Court Reporter:                  PATRICK MULLEN, OCR
LAURA LaCIEN, CSR, RMR, F/CRR
Official Court Reporters
219 S. Dearborn St., Suite 2118
Chicago, Illinois  60604
(312) 435-5562

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

PROCEEDINGS RECORDED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court.  Jury out.)

THE COURT:  All right.  Let's get appearances on the record for Mr. Mullen.

MR. LOEVY:  John Loevy and all the same appearances for plaintiff.

MR. GIBBONS:  John Gibbons and all other attorneys here, including Detective Mancuso.

THE COURT:  All right.  I think we're ready to proceed, but maybe there's something?

MR. GIBBONS:  Yeah.  Your Honor, I think it will please you to hear that Mr. Loevy and I talked at the break. We're going to cut Rufus McGee, and if the Court would indulge us by quashing the writ, it would be appreciated.  We are also in discussions about several other witnesses that we may cut which would take a day or two out of the trial.  We told Mr. Loevy we'd let him know at the close of today's session, and then we'll inform the Court at that time, too.

THE COURT:  Okay.  That's great news.  I'm happy to hear it.  We can talk more about kind of scheduling and other things, you know, Tuesday, but on the writ, speak now or forever hold your piece, because I'm going to have her let the marshals know and that's it.  I mean, we won't be able to rewind it.

MR. LOEVY:  Mr. Gibbons has nailed it, Your Honor.

THE COURT:  Great.  All right.  I will let her know,

and we can bring in the jury.  All rise.

(Jury in at 1:24 p.m.)

THE COURT:  All right.  Please be seated, ladies and gentlemen.

Mr. Mancuso, you remain under oath.

THE WITNESS:  Yes, ma'am.

THE COURT:  Mr. Flynn, you may resume your examination.

MR. FLYNN:  Thank you, Judge.

CROSS-EXAMINATION (Resumed.)

BY MR. FLYNN:

Q.  Mr. Mancuso, on cross-examination, you were asked some questions about blood on the grate.  Do you remember that?

A.  Yes.

MR. FLYNN:  Maria, if we could pull up Joint Exhibit 318, this is not in evidence, but Joint Exhibit 318, page 4.

BY MR. FLYNN:

Q.  Can you see that?

A.  Yes.

MR. FLYNN:  Can you zoom in just a little bit on the photo itself?

BY MR. FLYNN:

Q.  Do you recognize this?

A.  That looks like the grate that was in back of the park where Paris was lying on it.

Q.   Okay.  Is this a photo that was taken during the investigation of the crime scene?

A.   At some point, yes.

MR. FLYNN:  Okay, Your Honor.  At this time, I'd move to admit page 4 of Joint Exhibit 318.

THE COURT:  Any objection?

MR. LOEVY:  None.

THE COURT:  All right.  It will be admitted.

(Joint Exhibit No. 318, page 4, was received in evidence.)

BY MR. FLYNN:

Q.   And you said this is the grate where Paris's body was found?

A.   Yes.

Q.   And at the time this was taken, obviously, Paris's body has been removed from the grate?

A.   Yes.

Q.   And is his hat there that's still on the grate?

A.   Yes, it is.

Q.   Okay.  So when Paris's body was on this grate, was it beneath right where you see the hat, going left to right?

A.   Yes.

Q.   Okay.  If we can zoom in on those darker spots there by the hat, do you see those darker spots on the grate there?

A.   Yes.

Q.   What do those appear to be to you?

A.   Appear to be blood.

Q.   Okay.  I'm going through some more of the crime scene photos that the jury hasn't had a chance to see yet.  If we can go back to Joint Exhibit 41, I believe, Photo 35, could you tell us what you see here?

A.   That is the front of the park district fieldhouse.

Q.   Is that -- do you mean the parking lot?

A.   Well, it's the parking lot and the doors.

Q.   When you say "front," do you mean the north side?  Let me ask it this way.  Is this the corner where Paris Jackson's body was found?

A.   Yes, yes.

Q.   Okay.  And is Paris Jackson's body still on the grate in this photo?

A.   I believe it is.

Q.   Okay.  And so can you see Paris Jackson's body?

A.   No.

Q.   It's difficult to see?

A.   Yes.

Q.   Okay.  If we could go to the same exhibit, one second. Actually, if we could go to Joint Exhibit 37 and if we can zoom in a little bit on the fieldhouse, Mike, I just want to make sure that the jury understands everything.  I know we've already gone over some of this --

A.   Okay.

Mancuso - cross

1002

Q. -- but I want to have you channel your best John Madden, and are you able to draw on that screen? Can you make a dot where Paris's body was found?

A. Yes, it should be just to the left of the corner (indicating).

Q. Okay. And then can you make another line that shows the blood trail that we've gone over?

A. (Indicating.)

Q. Okay. And where is the -- of all the different blood spots we've already gone over, what was the largest spot to you? Where was that found?

A. That was found right on the corner of the building.

Q. Okay. On the northwest corner there?

A. Yes.

Q. Okay. We're going to get into all the witnesses you interviewed, but just generally speaking, based on your investigation, where was it on here, if you can indicate with some lines, where R.J. was shooting his bullets?

A. Somewhere in this treeline area, this way, that way, and that way (indicating).

MR. FLYNN: Okay. We can take that down.

BY MR. FLYNN:

Q. Mr. Loevy asked you some questions yesterday about police who responded to the shots fired calls on the night before at 11:00 p.m. Do you remember that?

A.   Yes.

Q.   When R.J. was shooting in the park?

A.   Yes.

Q.   Are you aware of any police officers -- is there any evidence that you've ever seen of any police officer going back behind the fieldhouse that night?

A.   None that I know of.

MR. LOEVY:  Objection, Your Honor.  Objection to foundation.  What other police officers?

THE COURT:  Sustained.  Just lay a little more foundation if you can.

BY MR. FLYNN:

Q.   Do you know that some of the police officers that responded were deposed in this case?

A.   Yes.

MR. LOEVY:  Objection, Your Honor.  That's hearsay.

MR. FLYNN:  Your Honor, it's his knowledge.

MR. LOEVY:  No, it's hearsay as to depositions.

MR. FLYNN:  It's a lack of knowledge, that he's not aware of any of those.

THE COURT:  Sustained.  He can answer the question of whether he knows.

MR. FLYNN:  So it's overruled?

THE COURT:  I'm sorry.  It's overruled.  I apologize. Yes, it's overruled.  I was rereading the question.  It's

overruled.

BY THE WITNESS:

A.  I'm not aware of any officers that drove through the park.

BY MR. FLYNN:

Q.  And even if someone did go into the back of Amundsen Park, we just saw a picture of the back of Amundsen Park in the middle of the day and you couldn't see Paris's body, is that correct?

A.  That's correct.

MR. BOWMAN:  Objection to argumentative and leading, Your Honor.

MR. FLYNN:  I'll move on.

THE COURT:  Thank you.

BY MR. FLYNN:

Q.  And, Mike, you've been sitting in this trial like the rest of us every day, and the theory that you've heard plaintiff put forth that Paris's body was brought there from some other location, based on your years of experience as a detective and your investigation into this very case, what are your thoughts on that theory?

MR. LOEVY:  Objection, Your Honor.

THE COURT:  Sustained.  Ask a different question or rephrase it.

BY MR. FLYNN:

Q.  Based on your investigation, is there any way that

somebody killed Paris Jackson somewhere else and then brought him to the park later on?

A. Not at all.

Q. If we could go back to that same exhibit of the crime scene photos and go to 29, what does this photo show?

A. That shows one of the benches where some of the young guys were sitting that night.

Q. Okay. So if I'm taking this photo, again, if I'm the evidence technician taking this photo, is Paris's body in the corner back to my right?

A. Yes.

Q. And so R.J.'s bullets, where you indicated on the map earlier, they'd be flying towards me?

A. Yes.

Q. So this is -- would you say this is an expansive area back there?

MR. LOEVY: Objection, Your Honor. He's using it for the truth on what people told him about what they say. That's being offered for a different purpose.

MR. FLYNN: I'll ask a different question.

THE COURT: Okay. Thank you.

BY MR. FLYNN:

Q. The back of the Amundsen Park fieldhouse or Amundsen Park behind the fieldhouse is photographed here?

A. Yes.

Q.   Would you view this as -- and you've been out there, right, multiple times?

A.   Yes.

Q.   Do you view this as an expansive area?

A.   Yes, I do.

        MR. FLYNN:  Okay.  You can take that down, please.

BY MR. FLYNN:

Q.   Mr. Loevy also asked you earlier today about a shots fired call at 11:41.  Do you remember that?

A.   Yes.

        MR. LOEVY:  11:47, 11:47.  Objection, Your Honor, mischaracterizes.  11:47.

        THE COURT:  It sounds like he's correcting you on the phone perhaps.  You all would know; I wouldn't.

BY MR. FLYNN:

Q.   Well, Mr. Mancuso, is there any paper trail of any such 911 call?

A.   No, there's not.

Q.   Okay.  You said on examination that that call didn't seem relevant to this investigation.  Can you tell the members of the jury why?

A.   It's probably two to three blocks away from the park, and 41 or 47 minutes after the initial shooting.  It just -- we didn't see that it was connected.

        MR. FLYNN:  Maria, do you have that demonstrative

ready with the 911 call?

MR. LOEVY:  Is this an exhibit, Your Honor?

MR. FLYNN:  This is a demonstrative.

MR. LOEVY:  We haven't seen it then, Your Honor.

MR. FLYNN:  Your Honor ruled that we didn't need to show demonstratives.

THE COURT:  Okay.  But could you show it to him now?

MR. FLYNN:  Sure.

MR. LOEVY:  And, Your Honor, I understood demonstratives you didn't have to show for opening or closing, not the middle of an examination.

MR. FLYNN:  That's not the case, Your Honor.

THE COURT:  Okay.  I don't recall, but for purposes of this one let's show it to him before you use it, and then we'll go from there.  Then we can revisit the issue during a break if we need to.

   (Brief pause.)

MR. FLYNN:  Any objection to using this as a demonstrative?

MR. LOEVY:  Well, it's an undisclosed exhibit, Your Honor.  I don't think it's proper.

MR. KAYES:  Your Honor, can we take that down for the jury?

THE COURT:  Yes, let's un-publish.  Can you un-publish?

MR. LOEVY: It's got hearsay, for example, in the bottom right corner that's inaccurate.

THE COURT: Can you un-publish, Nick?

MR. LOEVY: It's still published, Your Honor.

THE COURT: There we go. There we go. Now it's off the screen. Okay.

MR. FLYNN: Your Honor, this is a demonstrative that will aid the jury in understanding his testimony.

THE COURT: What's the objection, Mr. Loevy?

MR. LOEVY: Undisclosed exhibits. I mean, I guess this one is okay, but if they're going to start showing exhibits we haven't seen, we object.

THE COURT: Okay. This one will be allowed. We'll revisit the issue of demonstratives at a break, but for purposes of this demonstrative, you may use it and you may proceed.

BY MR. FLYNN:

Q. Mr. Mancuso, this is a picture of Amundsen Park just zoomed out a bit, right?

A. Yes.

Q. Google Maps?

A. Yes.

Q. And could you tell us a little bit about the stuff you see in there or what some of those items indicate in Amundsen Park?

Mancuso - cross

1009

A.   That indicates the fieldhouse.  The direction or I guess that yellow area arrow that's pointing north shows where Paris's body was found, where his friends were sitting, and then where R.J. entered the park.

Q.   Okay.  I don't want to belabor it.  I know the jury is well aware of the positioning, but can we move forward to the next slide -- not the next slide, but the next thing that comes up?

MR. FLYNN:  I think you just have to click.  That's fine.  We can do it this way.

BY MR. FLYNN:

Q.   So that alleged call that we talked about -- and it is 11:41, not 11:47 -- that call, where did that come in from?

A.   I believe it came in from the area of Waubansia and McVicker.

Q.   Okay.  So where this yellow marker indicates on the map (indicating)?

A.   Yes.

Q.   Okay.  And is that several blocks away from where Paris's body was found?

A.   It sure is.

Q.   And is that approximately 40 minutes after the shooting in the park?

A.   Yes, it is.

MR. FLYNN:  Okay.  You can take that down.

BY MR. FLYNN:

Q. Mr. Loevy also indicated in one of his questions to you that there was a 911 call saying that there was groups of people shooting. Does any such 911 call exist?

A. Not that I'm aware of.

Q. So going back to the crime scene that first morning that you were assigned to this case, did you get a call from your lieutenant, Lieutenant Hawkins, who was back at the police station?

A. Yes.

Q. And what did you learn?

A. He told us -- he told me that someone had called the station saying that they were inquiring about the shooting at the park with the dead body, and they said they were there last night and they knew everything about it.

Q. Did you find out who that individual was?

A. Yes.

Q. Who was it?

A. That was Marisol Ocampo.

Q. So did you next speak to Ms. Ocampo?

A. Yes. Once we left the park when the scene was done, we went and met with her.

Q. Okay. And where did you meet with Ms. Ocampo to interview her?

A. We went to her home on Division Street.

Mancuso - cross

1011

Q. Okay. And did you interview -- excuse me -- did you interview her at her home?

A. Just for a few minutes.

Q. Okay. And what did you do next?

A. We asked her if she would come into the station with us, and she agreed.

Q. Is it -- I'm not talking about this case. I'm talking about all your own experience as a detective. Is it unusual to meet with a witness and ask for them to speak with you or continue the interview at the police station?

A. No, that happens all the time.

Q. And why is that?

A. It's our normal way of conducting interviews. You know, a lot of people don't want to talk to the police by their house. It's easier in a station. The setting is safer. We have computers. We can pull up pictures, maps, different things like that.

Q. Okay. So going back to Ms. Ocampo, you're at the police station with her on day 1 of the investigation. Approximately what time of the day did you interview her? Not an exact time, but was it morning? Afternoon?

A. Sometime after noon, after 12:00, you know, in the afternoon.

Q. And you personally interviewed her?

A. I believe so.

Q.   And that's within the first few hours of the investigation?

A.   Yes.

Q.   What did you learn from Ms. Ocampo regarding what occurred the night before at Amundsen Park?

MR. LOEVY:  Objection to hearsay, Your Honor.

MR. FLYNN:  Your Honor, may I be heard?

THE COURT:  You may.  You can step to -- unless you think you can say it without --

MR. FLYNN:  Your Honor, Ms. Ocampo's statements were already gotten into during Mr. Loevy's examination, and this is an issue that we've dealt with earlier because Ms. Ocampo will be a witness in this case.

MR. LOEVY:  We would just ask for a summary, maybe even lead, but, you know, not to just drag hearsay through the trial.

THE COURT:  Okay.  So do the best you can, Mr. Flynn, of asking leading questions, and if we need to get to a sidebar we can do that.

BY MR. FLYNN:

Q.   Did you learn that Ms. Ocampo was at Amundsen Park around 11:00 p.m. when the shooting occurred the night before Paris's body was found?

A.   Yes, I did.

Q.   Did she tell you about a dispute between her -- sorry --

between some people in the park and a group of Taneshia Branch and her friends?

A.  Yes, she did.

Q.  Okay.  Did she tell you anything about Taneshia Branch making a phone call?

A.  Yes.

Q.  Did she tell you that Taneshia Branch did make a phone call?

MR. LOEVY:  Objection to hearsay, Your Honor, and telling the whole story.

THE COURT:  Mr. Loevy, he is leading the witness through the area that you previously indicated you wanted to be careful about, so I'll give him some latitude.

The objection is overruled.  Your question can stand.

BY MR. FLYNN:

Q.  Did Ms. Ocampo tell you that Taneshia, after the dispute broke out at the park, stepped away and made a phone call?

A.  Yes, she did.

Q.  And did she say a few minutes later a gold Malibu arrived at the park?

A.  That's correct.

Q.  Did she tell you that she knew who the person was driving the gold Malibu?

A.  Yes.

Q.  Who did she say it was?

Mancuso - cross

1014

A.   She said it was Marcel Brown or Main-Main.

Q.   Okay.  And did she say whether anyone else was with Marcel Brown in the gold Malibu?

A.   Yes.

Q.   Who?

A.   R.J.  I think she said T.J. was there, but I know she said R.J.

Q.   Did she say if R.J. came into the park upon the Malibu arriving at the park?

A.   Yes.

Q.   What did she say R.J. did when he got into the park?

A.   He jumped the fence, came into the park, and immediately came over by his sister, started talk to her briefly and then had pulled a gun out.

Q.   What did she say occurred after he pulled the gun out?

A.   He just walked towards the group of young men that were on a couple different benches and started cursing at them and just started shooting.

Q.   What did she say everybody did when he started shooting?

A.   She had said everybody scattered.  Everybody ran in multiple different directions out of the park.

Q.   Did Ms. Ocampo explain to you how she was able to identify Marcel as the driver and R.J. as the shooter?

A.   She said she knew them, knew them for years.

Q.   Did she say anything else about their relationship?

A. I think she said she knew they were cousins.

Q. Did Ms. Ocampo live with R.J. and Marcel for a short time?

A. She did live with them, his family, for a period of time.

Q. And did you show a photo array to Ms. Ocampo?

A. I believe I did.

Q. Could you explain what a photo array is?

A. That's when we go into a computer and pull up mugshots and we try to get -- if there's a suspect, we try to find similar-looking individuals. Usually it's a -- sometimes it's a six- or sometimes a nine-picture photo array, small, where you've got all nine pictures, and sometimes we'll do the larger photos and just have them printed up and laid out individually so that the people can get a good look at the face.

Q. And did she identify R.J., T.J., and Marcel?

A. Yes.

Q. Did Ms. Ocampo tell you why she felt compelled to reach out to the police station and say that she had information about the shooting?

MR. LOEVY: Objection, Your Honor. This is beyond for the effect on the listener, and we'd also request an instruction about the purpose this evidence is being admitted for.

THE COURT: Okay. We can get to the instruction or potential instruction at a break.

Mr. Flynn, what's the response?

MR. FLYNN: Your Honor, Mr. Loevy is arguing that Ms. Ocampo was somehow coerced.

MR. LOEVY: That would go to the truth then of what she's claiming. It's being offered for a different purpose.

MR. FLYNN: The fact that she provided this information, because what I was -- well, I don't want to get into the answer, but the fact that this answer was given to Mr. Mancuso shows that she was a credible witness.

MR. LOEVY: That's for the truth.

THE COURT: Okay. Objection sustained. You can move to your next question.

MR. FLYNN: Okay.

BY MR. FLYNN:

Q. When you were speaking to Ms. Ocampo and you took her information down, how did you take it down? What did you write on or write in?

A. I believe I wrote a GPR on her.

Q. Okay. What's -- I know maybe you explained this a little bit earlier, but what's "GPR" stand for?

A. General progress report.

Q. And are these reports that, as a detective, you were filling out every day when you were interviewing people?

A. Yes.

Q. Okay. And the GPR, it's handwritten?

A.   Yes.

Q.   And is it supposed to take down every single word that's said?

A.   It's a brief summary.

Q.   Okay.  While you filling these GPRs out, is it while you're asking the questions and getting the answers?

A.   Sure.  Yes.

Q.   Okay.  You said earlier with Mr. Loevy that Ms. Ocampo then provided an ASA handwritten statement.  Do you remember that?

A.   Yes.

Q.   Could you explain what exactly an ASA handwritten statement is?

A.   That's when a state's attorney comes out and they talk to a witness or anybody, actually.  They write everything down when they talk to them, get all the person's information. Then they just start asking questions, and the state's attorney writes it all down.  It's almost always handwritten. Then at the end, they'll ask them questions, how were treated by the police and this and that, and it's just in a multipage form.

Q.   Okay.

A.   Handwritten, though.

Q.   And these ASA handwritten statements, they are prepared in conjunction with the witnesses by an ASA?

A.   Yes.

Q.   And what's that stand for again, ASA?

A.   Assistant state's attorney.

Q.   Okay.  And they work for who?

A.   They work for Cook County, the prosecutor's office.

Q.   Is that separate from the Chicago Police Department?

A.   Yes, it is.

Q.   So why is an ASA getting involved in an investigation?

         MR. LOEVY:  Objection, Your Honor.  Objection to what vouching --

         THE COURT:  Overruled.  You can answer the question.

BY MR. FLYNN:

Q.   Why does an ASA get involved in an investigation like they did in this one?

A.   Well, they're the office that actually prosecutes the case, brings it to trial and those sorts of things.

Q.   Okay.  And with respect to ASA handwritten statements, is it your decision?  Do you tell the ASA to go take the handwritten statement of that witness?

A.   No, we don't.

Q.   Who makes the decision?

A.   The state's attorney.

Q.   They decide which statements to take?

A.   Yeah, based on who they think is important enough.

         MR. LOEVY:  Objection, Your Honor, relevance and it's

off target at this point.

THE COURT:  So overruled as to relevance.  We've heard a lot about ASAs, so I'll allow it.

BY MR. FLYNN:

Q.  You can answer.

A.  They determine who's important enough to, you know, lock in.  That's another term they use, to lock them in, so that they can't change their, you know, their statement later.  You know, so it's always locked in, signed off by a detective, by the person, and the state's attorney themselves.

Q.  When an ASA handwritten statement is taken, is it primarily or usually is the statement read aloud to the witness?

A.  Yes, it is.

Q.  Is the witness given the opportunity to correct any inaccuracies or anything that needs to be added?

MR. LOEVY:  Objection, Your Honor.  This is beyond for the effect on the listener at this point.

MR. FLYNN:  Your Honor --

THE COURT:  It's not eliciting hearsay, so it's not an effect on the listener issue.  I'm hoping we can move through this piece of it, Mr. Flynn, because I know there will be some additional testimony about this.  So the objection is overruled, but let's move through this portion of it, if you can.

BY MR. FLYNN:

Q.   Are they able to correct anything that's inaccurate about their handwritten statements?

A.   Yes, they are.

Q.   And did they sign every page of the handwritten statement?

A.   Yes --

Q.   -- to attest to its --

A.   Yes, they do.

        THE REPORTER:  Please take it easy.

BY MR. FLYNN:

Q.   Take it easy, Mike.  Did they sign every page to attest to the truthfulness?

A.   Yes, they do.

Q.   Okay.  And you were asked by Mr. Loevy about statements that Ms. Ocampo made during her ASA handwritten statement?

        MR. LOEVY:  Objection to relevance.  He didn't -- it should be his interview with Ms. Ocampo that's relevant, Your Honor.  Otherwise, it's just hearsay.

        MR. FLYNN:  Your Honor, Mr. Loevy asked him about what she said in the ASA handwritten statement.  I need to be able to probe that same statement.

        MR. LOEVY:  Your Honor, he was asked about the statement he took of Ms. Ocampo.

        THE COURT:  Right, which is the subject matter that I believe Mr. Flynn has asked about.

MR. LOEVY: But going beyond that to a different statement to somebody else is just pure hearsay and no longer offered for a limited purpose.

MR. FLYNN: Your Honor, if I may?

THE COURT: You may.

MR. FLYNN: They indicated that Ms. Ocampo provided additional information in her ASA handwritten statement regarding Paris being shot at in the park.

MR. LOEVY: You know, that's true. Actually, I'm withdrawing the objection.

THE COURT: Okay. Thank you.

All right. Hopefully we've sorted this out. Go ahead, Mr. Flynn.

BY MR. FLYNN:

Q. Mr. Mancuso, let's try it again. When she provided the ASA handwritten statement, who did she provide that to? Do you recall?

A. I don't know which state's attorney was taking it.

Q. ASA Hogan?

A. Hogan, yes.

Q. Okay. And were you also in the room?

A. Yes.

Q. Okay. And in her ASA handwritten statement, did she say anything about Paris Jackson?

A. Yes.

Q.   What did she say?

A.   She said she saw him in the park.

Q.   Did she say whether or not he was being shot at?

A.   Yes, she said he was running.  He looked like he was being shot at.

Q.   By R.J.?

A.   Yes.

Q.   Okay.  And Mr. Loevy said that there were issues with how maybe that wasn't in your GPR and it was in the handwritten statement.  Is it possible that she said it to you during your interview and it just didn't make it into your GPR?

A.   It's certainly possible.

Q.   Do those things happen?

A.   Yes.

Q.   Is your GPR full of other information she was providing you?

A.   Yes.

Q.   Ms. Ocampo, did she also provide you the names of 12 other individuals who were at the park that night?

A.   Yes, she did.

Q.   So with that information, what did you do next?

A.   We proceeded to go locate those people in person or on phone calls.

Q.   Now, were you able to interview a good number of those witnesses?

Mancuso - cross

1023

A.   Yes, we did.

Q.   And just to be clear, is it you interviewing all these witnesses, or who's doing these interviews?

A.   My partner, and we had other detectives helping us because of the volume that we had to deal with.

Q.   And who are -- other than you and Detective McDonald, who were the other detectives assigned to the case?

A.   Detective Burke helped us, Detective Weber, and Garrick Turner.

Q.   Okay.  So that team of detectives was helping you interview some of these witnesses in addition to your interview of some of these witnesses?

A.   Yes.

Q.   And we're going to walk through some of these interviews. All of these witnesses that we talk about that you or your team interviewed, were you interviewing them in a group, or were they all interviewed individually in a room by themselves?

A.   By themselves, individually.

Q.   Okay.  And for some of these interviews, because you said there's multiple detectives doing them, are they interviewing these witnesses simultaneously?

A.   They could be, yes.

Q.   Okay.  When the other detectives interviewed some of these witnesses, after the interview, would they come -- since you

were the lead detective, would they come to you and give you an update on what they learned?

A.   Yes, they would.

Q.   Was there an interview conducted at the crime scene?

A.   Yes.

Q.   Of Tytiana Williams?

A.   Yes.

Q.   And was she at the park at the time of the shooting?

A.   I'm not sure if she was there that night.

Q.   Okay.  I want to talk to you about additional witnesses that you interviewed on the first day of the investigation. We talked about Marisol Ocampo earlier?

A.   Yes.

Q.   Tytiana Williams.  And in that first stretch of the first day -- excuse me.  In the entire first day of the investigation, you interviewed another eight eyewitnesses.  Do you remember who they were?

A.   There were a bunch of sisters.  Their last name was Jenkins.

Q.   Is your memory exhausted as to the names of some of these individuals?

A.   Yes, yes.

MR. FLYNN:  Okay.  Could we pull up Exhibit 91, not publish it to the jury, just to refresh his recollection?

THE COURT:  Yes.

BY MR. FLYNN:

Q.  Mike, can you see that okay?

A.  Yes.

Q.  I don't mean for this to be a memory game, but I'm going to show you page 10 through 14.  Do you see the names of the witnesses?

A.  Yes.

Q.  Okay.

MR. LOEVY:  Your Honor, if we can speed it up, we have no problem with him just reading the names.

MR. FLYNN:  Oh, perfect.

BY MR. FLYNN:

Q.  On the first day of the investigation, did you interview Krystine Jenkins?

A.  Yes.

Q.  Krystal Jenkins?

A.  Yes.

Q.  Ebony Jenkins?

A.  Yes.

THE REPORTER:  Counsel.

MR. FLYNN:  I apologize.

BY MR. FLYNN:

Q.  Jasmine Jenkins?

A.  Yes.

Q.  Amanda Moore?

A.   Yes.

Q.   Shaquincia Williams?

A.   Yes.

Q.   Eugene Stanciel?

A.   Yes.

Q.   Shaniqua Grayer?

A.   Yes.

Q.   And were all eight of those individuals at the park during the time of the shooting?

A.   Yes, they were.

Q.   And did you interview those witnesses at the police station?

A.   Yes.

Q.   Okay.  Did your team start interviewing these witnesses around 4:00 p.m. on day 1 of the investigation?

A.   That sounds about right.

Q.   So this is approximately six hours into your assignment into the investigation of Paris Jackson?

A.   More or less, yeah.

Q.   And you're talking to these witnesses less than 24 hours after the 11:00 p.m. shooting at the park, is that right?

A.   Yes.

Q.   All right.  Without getting into hearsay statements, what did you generally learn about what happened at the park at 11:00 p.m. on August 30th, 2008?

A.   Well, generally we learned there were two groups of girls there that knew each other but were not necessarily friends. They were sitting on benches not -- in close proximity to each other.  Some kind of arguing took place, and then some boys kind of got involved.  Then one of the girls, one or a couple of the girls on the Branch side of that group got on their phones and called their brothers.

Q.   What did you learn generally about what happened next?

A.   Shortly after these girls made their phone calls, the gold Malibu arrived in the park, probably within, within ten minutes.

Q.   Okay.  Generally did you learn that Marcel was driving the Malibu?

A.   Yes.

Q.   Generally from these witnesses did you learn that R.J. was in the Malibu?

A.   Yes.

Q.   What did you learn occurred next?

A.   That both of those subjects exited the car, one before the other, and went into the park.  Then R.J. approached his sister, started talking to her, and then soon thereafter pulled a gun or maybe pulled it before, but had a gun out in his hand that he took from his person.

     MR. LOEVY:  Your Honor, I'm sorry.  We object to any implication that eight witnesses told this story.  I guess I

realize we have a problem with the format, but it's hearsay.

THE COURT: So it's for the effect. So I'm sure Mr. Flynn will follow up as he can, but I'll let the witness summarize to avoid the hearsay issue we discussed earlier.

BY MR. FLYNN:

Q. So back to your account, generally from these witnesses that you spoke to, R.J. came into the park, he pulled out a gun, and what happened next?

A. And he started approaching a group of young men that were sitting on two different benches in close proximity to where the girls were at and just started saying things to them, and then pulled the gun out or had the gun out and started shooting in their direction.

Q. And did these witnesses also provide an ASA handwritten statement?

A. I believe so.

Q. So sticking with the first day of the investigation, you also -- one of the individuals who you said you interviewed was Eugene Stanciel. Do you remember that?

A. Yes.

Q. And Mr. Loevy already asked you about Mr. Stanciel, is that right?

A. Yeah, I think he did.

Q. He did. What did you learn from Mr. Stanciel about what occurred at Amundsen Park?

Mancuso - cross

1029

A.   He basically said the same thing that others were saying, that the girls were arguing and a couple of the boys -- a young boy, I think he was 13, started throwing these little crab apples that fell off the trees, throwing at the girls. They were basically going back and forth, and the one group called their brothers.  Those guys showed up, Marcel and his cousin, and they approached him.  They approached these guys. It was kind of all, you know, at one time because Eugene was with these guys and going back and forth between the girls and the guys.  So he saw that these guys came in and that the gun came out, and they all started running and the shooting happened.

Q.   Based on this interview of Mr. Stanciel, did you learn about a rivalry between USDA and people in Amundsen Park?

A.   Yes.

Q.   Did Mr. Stanciel provide an ASA handwritten statement?

A.   I believe he did.

Q.   Did Mr. Stanciel sign every page of his handwritten statement to attest to its truthfulness and accuracy?

A.   Yes.

Q.   Did Mr. Stanciel confirm in writing that the detectives had treated him well?

        MR. LOEVY:  Your Honor, this is again going into the truth.

        MR. FLYNN:  This is a witness.

MR. LOEVY: You know, I think we should have moved on a long time ago. It's just pure hearsay.

THE COURT: It's for the effect on the listener as a part of his investigation. I'll allow him to proceed.

You can answer.

BY MR. FLYNN:

Q. Mike, did Mr. Stanciel confirm in writing that he had been treated well by the detectives?

A. Yes.

Q. Did he confirm in writing that the detectives had not made any promises or threatened him in the making of the statement?

MR. LOEVY: Objection, Your Honor, same objection.

THE COURT: And the same ruling, you may answer.

BY THE WITNESS:

A. Yes, correct.

BY MR. FLYNN:

Q. Did Mr. Stanciel confirm in writing that he was not under the influence of drugs and alcohol?

A. Yes.

Q. Did Mr. Stanciel confirm in writing that he was giving the statement freely and voluntary?

A. Yes.

Q. And like I said earlier, was Mr. Stanciel provided the opportunity to make any corrections to his statement?

A. Yes.

Mancuso - cross

1031

Q.   Okay.   I want to -- before we move on to day 2 of your investigation, do you recall a couple days ago when Mr. Brown was on the stand he testified that when the shooting occurred in the park the people in the park just stayed in the park?

A.   I remember that.

Q.   Based on all your years as a detective in that neighborhood and your experience, does that make any sense to you?

A.   None.

Q.   And based on your experience, if people are shooting in a public place, what do people normally do?

A.   Run for their lies.

Q.   Because people don't like getting shot at, is that fair?

A.   That's correct.

Q.   Okay.   So let's take a pause here.   Day 1 of the investigation is finished, and you have interviewed nine witnesses who were at the park when the shooting occurred, right?

A.   Yes.

Q.   At that point in your investigation, did any witness say anything about another individual they saw shooting in the park other than R.J.?

A.   No.

Q.   Did several witnesses report that Marcel drove R.J. to the park?

Mancuso - cross

1032

A.   Yes.

Q.   And in that first 24 hours of your investigation, did your team interview four more witnesses:  Isaiah Davis, Rufus McGee, Sofia Bell, and Johnella Dabbs?

A.   Yes.

Q.   Were they able to provide any new information that you didn't already know?

A.   Not that I'm aware of.

Q.   But they were at the park during the shooting?

A.   Yes, they were.

Q.   So let's move to day 2 of your investigation.  Did you begin day 2 of your investigation by interviewing Deshawn Grayer?

A.   Yes.

Q.   Was he at the park at the time of the shooting?

A.   Yes.

Q.   Did he provide you any new information, or was it a lot of the same stuff?

A.   The same basic story.

Q.   Okay.  So at this point, starting day 2 of the investigation, you've interviewed 14 witnesses who were at the park.  Did you feel like you had enough witness statements at that point?

A.   Well, we thought we could get some more.

Q.   Were there specific witnesses that you wanted to speak to

in addition to the 14 that you had already spoken to?

A.   Yes.

Q.   Was there a specific category of witnesses?

A.   We thought we would try to reach out to some of the girls that were on the Branch side that were kind of involved in the original little verbal battle.

Q.   Okay.  So of the 14 witnesses that you had spoken to at that point, most of them, were they part of the Amundsen Park crew?

A.   The larger group?  Yes.

Q.   Yeah.  And you're saying that you wanted to speak to people that were part of Taneshia Branch's crew?

A.   Yes.

Q.   Did you do so?

A.   Yes, we did.

Q.   Did you speak to on day 2 Vanessa Bell, Brittany Williamson, and Ashtin Warner?

A.   Yes.

Q.   And were these women part of Taneshia's group that night?

A.   Yes, they were.

Q.   And why was it important to speak to people from Taneshia's group?

A.   Well, try to get their side of the story as to what happened.

Q.   And did these witnesses generally provide the same

information that you had already heard?

A. Yes.

Q. And did some of those witnesses provide ASA handwritten statements?

A. That I'm not sure of.

Q. Did Ashtin Warner provide a handwritten statement?

A. She might have.

Q. Okay. So day 2 of the investigation, you've now interviewed 17 witnesses who were at the park at the time of the shooting, correct?

A. Correct.

Q. Let's move to day 3 of the investigation. This is now September 2nd, right? On August 31st, Paris's body is found, so this is now September 2nd, day 3 of the investigation?

A. Yes.

Q. Okay. On that day, did you interview three more eyewitnesses: Kema Davis, Kayla Kuykendoll, and Tyrone Bailey?

A. Yes.

Q. And were all those witnesses present during the time of the shooting?

A. I believe they were.

Q. And did all those witnesses also provide ASA handwritten statements?

A. I believe so.

Q.   And did you learn anything new, or was it still that same information you already had received from other witnesses?

        MR. LOEVY:  Your Honor, again, objection as he's implying that all these opinions are telling the same story, I mean, all those details that he elicited, and it's not the case.

        THE COURT:  All right.  The objection is overruled. To the extent you can appropriately do so, you can explore that on redirect.

BY MR. FLYNN:

Q.   So these three witnesses, witnesses 18, 19, and 20, were they also providing the same information about what occurred in the park that night?

A.   Yes, basically the same.

Q.   So by the end of day 3 of your investigation, you had spoken to 20 people who were at the park at the time of the shooting, is that right?

A.   That's correct.

Q.   And in all of your years as a detective prior to this investigation and since this investigation, have you ever had an investigation where you had 20 eyewitnesses who were willing to speak to the police?

A.   No.

Q.   Of those 20 witnesses, how many informed you that they saw R.J. shooting a gun in the park?

Mancuso - cross

1036

A.  I think eight or nine.

Q.  How many of these witnesses told you that they saw Marcel drive R.J. to the park?

A.  A similar amount, maybe six or seven.

Q.  And out of all these witnesses that you spoke to, did any of them say anything about seeing somebody else shoot in the park other than R.J.?

A.  No, no one.

Q.  And at this point in your investigation -- and let me back up.  At this point in the investigation, had you learned information -- you mentioned from Eugene Stanciel -- about a rivalry between USDA and Young Money?

A.  Yes.

Q.  Had you learned additional information about that rivalry from other witnesses?

A.  Yes.

Q.  Okay.  So now that you have all these witnesses who had identified R.J. and Marcel as being involved with the shooting in the park, what did you do next?

A.  Well, we decided to go out and start looking for the two guys involved.

Q.  Okay.  And which one did you find first?

A.  We found Marcel first.

Q.  And so this is now day 4 of the investigation, September 3rd, is that right?

A. Correct.

Q. Okay. And did you go to Marcel's house?

A. Yes.

Q. And was that around 2:50 p.m.?

A. Yeah, around then.

Q. Okay. And you put Mr. Brown under arrest?

A. Yes.

Q. Okay. You brought him to the police station?

A. That's correct.

Q. And the first thing that you did was you put him in an interview room and turned on the video?

A. Yes.

Q. Okay. Throughout this -- I want to talk about the video for a second and the camera. Throughout this trial, you've heard Mr. Loevy make accusations that you were doing or saying certain things because you knew that the camera was rolling. Do you remember those accusations?

A. Yes, I do.

Q. Is there absolutely anything that you said or did in this entire investigation that was influenced or impacted at all by the fact that there was a camera videotaping the entire investigation -- or interrogation?

A. Not at all.

Q. And this idea that the camera was this hidden camera in the corner that Mr. Brown couldn't have known about, could you

tell us about what this camera looked like if you were inside that room?

A.   It's located in an upper corner which is not that -- it's maybe a seven or eight-foot ceiling, maybe, and it's in the corner.  It's about -- it's a wedge that's white.  It's about that big (indicating).  You know, it's a wedge like that has a big lens, a black lens, and there's a red light somewhere right near it indicating that the camera is rolling.

Q.   Is there any doubt in your mind that Mr. Brown knew that there was a camera in the corner with that big lens?

A.   There's no doubt.

Q.   Okay.  So you placed Mr. Brown in the interview room around 3:00 p.m., and I know there's some back-and-forth about whether he knew he was under arrest, right?

A.   Correct.

Q.   Well, you had put him in handcuffs, right?

A.   Yes.

Q.   And you mentioned on Mr. Loevy's examination that one of the reasons you know he was in handcuffs is because you could hear the handcuffs being taken off of him at the beginning of the ERI, the beginning of the video?

A.   Yes.

        MR. FLYNN:  Okay.  I want the jury to be able to hear that noise if we could play the very beginning of the ERI, the video.

MR. KAYES: Your Honor, can we take down the hearsay document that hasn't been admitted before we show the video?

THE COURT: Yes, I think it's down now.

MR. KAYES: Thank you.

MR. FLYNN: I don't know if we have the sound on.

(Said video clip displayed in open court.)

BY MR. FLYNN:

Q. Is that the sound of the handcuffs?

A. I believe so, yes.

MR. FLYNN: And, Maria, if we could play Mancuso 7, the clip Mancuso 7.

BY MR. FLYNN:

Q. I'm not going to skip around a bunch on this video like Mr. Loevy did, but I'm going to do it just this one time. This video is from 1:25 in the morning on the first night, and this is the one that Mr. Loevy showed you where you're handcuffing Mr. Brown to bring him in for fingerprints. Do you remember that?

A. Yes.

Q. I'd like to play that clip just so we can hear the sound of those handcuffs in that video as well.

(Said video clip displayed in open court.)

BY MR. FLYNN:

Q. Is that the same sound?

A. I believe so.

Mancuso - cross

1040

Q.   Okay.  It's safe to --

THE COURT:  Mr. Loevy, just watch the microphone.

MR. LOEVY:  Thank you, Your Honor.

MR. FLYNN:  Yeah, it's a little distracting.

BY MR. FLYNN:

Q.   Based on the fact that he was then in handcuffs, that you put him in handcuffs when you took him away from his house and brought him to the police station, in your mind Mr. Brown had to have known he was under arrest?

A.   He should have.

Q.   Sir, if we could pull up the video of the ERI on the left, we're going to stick with this clip and then put the transcript on the right.  If our tech skills are as good as we think they are, we'll be able to play some videos and have the transcript on the right for everyone to see.  We'll see if we can pull it off.  Sir, again, this is at 1:25 in the morning, and I'm reading from the transcript at page 150, line 22.

(Said video clip displayed in open court.)

BY MR. FLYNN:

Q.   Sir, in this clip, similar to a clip that we've seen already where you played the Miranda warnings -- sorry -- where you informed him of his Miranda warnings at the beginning of the interrogation, he asked you is he under arrest or is he being locked up, right?

A.   Yes.

Mancuso - cross

1041

Q.   What did you understand that to mean?  What was he actually asking you?

A.   I think he was asking if he was charged.

Q.   Okay.  And your response here that this was a formality that we're getting fingerprints, why did you tell him that?

A.   Put his mind at ease.  We were going downstairs for prints and photos.

Q.   You were explaining to him that at that time he's not being charged?

A.   Right.

Q.   Okay.  And like I promised a moment ago, we're going to go back to the beginning, and I'm going to try my hardest not to play clips that we've already played but there are -- some I have to because we need to hear your story.  And like I said, I'm going to play them chronologically.  I'm not going to bounce around.

        I want to start with 15:13.  That's 3:13 p.m., and in the transcript it's page 4, line 19.  While she's looking for that, you've already seen the video of you giving Mr. Brown his Miranda warnings?

A.   Yes.

Q.   All right.  Why do you read those to Marcel at the beginning of the interview?

A.   Give him his warnings.  He's under arrest.  Let him know, you know, what his rights are.

Q. Okay. And Mr. Brown indicated to you that he understood his rights?

A. Yes.

Q. I don't think we need to play it again, actually. I've changed my mind. I think the jury has seen it, and it's Friday.

After you gave Mr. Brown his Miranda rights, did you ask Mr. Brown if he'd be willing to speak with you?

A. Yes.

Q. And what did he say?

A. He said he can.

Q. Okay. And after you gave him his Miranda rights, at any point throughout the interview did he ever tell you or to your knowledge any detective that he no longer wanted to answer any more questions?

A. No, he didn't.

Q. Did he ever say: I demand to have an attorney?

A. No, he didn't.

Q. And if he did make those demands or refused to answer questions, would you have accepted that and -- go ahead.

A. Yes, I would.

Q. There was some confusion yesterday about whether Marcel as an 18-year-old adult had the right to have his mother in the room with him. Did he have any such right?

A. Not really.

Q.   Okay.   Because he was an adult?

A.   Correct.

Q.   So what was your primary objective going into this interview of Marcel Brown from the beginning?

A.   To get to the truth of what happened.

Q.   Okay.   And in the first few hours of the interview, what I called phase 1 in my opening and I think what Mr. Loevy is calling phase 1 now, too, what's Marcel's story that he's telling detectives about what happened on August 30th?

A.   That they went to the park and some people, specifically Day-Day, were shooting at them as they walked into the park, and then they ran out.

Q.   Okay.   Did he say that Day-Day was there with 30 dudes?

A.   I believe he did.

Q.   And did he tell you anything about R.J. shooting in the park?

A.   Nothing.   He didn't say he -- nobody was shooting but Day-Day.

Q.   Okay.   If we could go to the transcript of the ERI, to page 10, line 17, again, I'm trying to move these through instead of going through the clips again.   I'll take over the mouse here.   So right here Mr. Brown says:

          "So he was with like 30 dudes."

          Is he referring to Day-Day here?

A.   Yes.

Q.   "Then we get in the park and I tell my sister come on" --

THE REPORTER:  Counsel.

MR. FLYNN:  You got it.  Sorry.

BY MR. FLYNN:

Q.   "Then we get in the park and I tell my sister come on, they like get in position."

Do you see that?

A.   Yes.

Q.   Is he referring to Day-Day and his crew in saying "get in position"?

A.   Yes.

Q.   Did it make any sense to you that that would be something that a young man in a park would say?

A.   Not at all.

Q.   And we now know from Mr. Brown's testimony here a couple days ago that no such phrase "get in position" was said to him that he heard, right?

A.   That's correct.

Q.   So this was a lie.

A.   Yes.

Q.   Okay.  And did it sound at the time to you like a made-up story?

A.   Absolutely.

Q.   Did you specifically ask Marcel whether R.J. had a gun that night in this early part of the interview?

A.   I think I did.

MR. FLYNN:  If we could just go to page 11, line 14, I'll take over.

BY MR. FLYNN:

Q.   So he denied that he had a gun, he denied T.J. had a gun, and he specifically denied that R.J. had a gun, is that right?

A.   Correct.

Q.   So based on all of the interviews that we talked about and just your investigation in general by the time that Mr. Brown is in this room, did you believe his statement that R.J. didn't have a gun that night?

A.   No, I didn't.

Q.   Why not?

A.   We had too many people telling us he did, describing it, what happened.

Q.   I'd like to play a clip, Mancuso 2.  This is from the same day, first interview.  It's 3:30 in the afternoon, and it's the transcript at page 29, line 5.

   (Said video clip displayed in open court.)

BY MR. FLYNN:

Q.   Mr. Mancuso, this is again the first interview that you were having with Mr. Brown, is that right?

A.   Yes.

Q.   And that part there where you're asking Marcel some questions and he says "what is you failing to realize," do you

remember that?

A. Yes.

Q. Did that strike you as an aggressive response?

A. Somewhat.

Q. Okay. And also when Mr. McDonald in this clip and others is asking him questions, does he sometimes interrupt you detectives?

A. Yes.

Q. Okay. Did it seem that Mr. Brown was intimidated by you detectives?

A. Not at all.

Q. Did it seem like he was adamant in these initial hours about pushing this story about Day-Day being the only shooter?

A. Yes.

Q. And back to any kind of intimidation, Mike, how tall are you right now, and how much do you weigh?

A. Five-nine, 160.

Q. And what about back then?

A. Probably a little heavier.

Q. Back then you were heavier?

A. Probably about the same. I'm actually lighter now.

Q. Okay. But the same height?

A. Yes.

Q. So is it fair to say you didn't have an intimidating build?

A.   No, not at all.

Q.   Okay.  If we could play clip -- let's go to the transcript at 18, page 18, line 10.  This is again in that first interview, and it's Mancuso Clip 1.

     (Said video clip displayed in open court.)

BY MR. FLYNN:

Q.   Mike, what's it mean that you're explaining to him there that he can be accountable for him?

A.   Well, that his actions are the same as the shooter's.  He could be charged the same as the shooter.

Q.   So this is the very beginning of the interview.  He's been in that interview room for 23 minutes.  Does that sound about right?

A.   Yes.

Q.   And are you and Mr. McDonald immediately telling him the truth about his potential responsibility --

A.   Yes, we are.

Q.   -- or consequences?  Were you attempting to hide the ball from him?

A.   No.

Q.   If we could go in the transcript to page 15, line 34 -- I'm sorry -- page 35, line 12, and if we could play Mancuso Clip 3.

     (Said video clip displayed in open court.)

BY MR. FLYNN:

Q. So I apologize. I know that you've seen that video. We've all seen that video, but I want to give you the opportunity to explain what it is that you're trying to convey to Marcel in these first few minutes of the interview?

A. We're telling him to try to -- to come and tell the truth, tell us what happened, who was shooting, who knew what.

Q. And at this point he's denying that R.J. was shooting at all, is that right?

A. Yes.

Q. Okay. And you tell him in that clip that it kind of depends on whether he knew it was going to happen or not, right?

A. Correct.

Q. So again, from the very beginning you're not trying to hide anything from Marcel, right?

MR. LOEVY: Objection, leading, cumulative, and argumentative.

MR. FLYNN: I'll rephrase.

THE COURT: All right. Thank you.

BY MR. FLYNN:

Q. So based on this clip --

THE COURT: Sustained.

MR. FLYNN: I apologize.

BY MR. FLYNN:

Q. Based on this clip, is this another example of you guys

not trying to hide the ball?

MR. LOEVY: Same objection, Your Honor.

BY THE WITNESS:

A.   Correct.

MR. LOEVY: Argumentative and leading.

THE COURT: Overruled. I'll allow him to answer.

BY THE WITNESS:

A.   Correct.

BY MR. FLYNN:

Q.   If we could go to the transcript, I won't play the video, but just page 46, line 11. So again you can see the time stamp here at line 10 that it's now 3:42. Again, in the very first hour of this interview, you state to Mr. Brown "we're going to go look for Day-Day's picture," right?

A.   Yes.

Q.   So at this point nobody had told you that they saw Day-Day shooting in the park.

A.   That's correct.

Q.   Mr. Brown is now telling you that, right?

A.   Yes.

Q.   Now you already said that you had a difficult time believing that, but here you say you're going to go look for Day-Day's picture. Why would you go do that?

A.   Just to identify who Day-Day is because eventually we're going to have to talk to him.

Q. And we'll get there a little bit later, but just generally speaking, if you ever found credible evidence in this case that there was a second shooter in the park, would you have any reason not to also pursue that second shooter?

A. Absolutely correct.

Q. If we could play -- well, if we can just go to the transcript, line -- page 46, line 11. Never mind. We're already there. In the interest of time, do you remember the clip we played earlier in the early part of the interview where you're leaving the room and Mr. Brown says "I ain't down with that, Joe"?

A. Yes.

Q. What does it mean to you when he says "I ain't down with that, Joe"?

A. It's kind of a disrespectful term. It just means he's not -- he's not having this, and then "Joe" is kind of a term a lot of people in the street call the police.

Q. Okay. So based on your experience in that neighborhood, is that a disrespectful term that people in that neighborhood use for the police?

A. Yes.

Q. Okay. So again does this show you that he's not intimidated?

A. Yes.

Q. Sir, despite your -- if we could go to the transcript,

page 28, line 6, sir, despite your disbelief about Day-Day shooting in the park -- you mentioned that already -- you said you went out and you tried to find Day-Day?

A.   That's correct.

Q.   Okay.  And at the same time, were you also trying to find R.J. and T.J.?

A.   Yes.

Q.   Why?

A.   Well, we reasonably knew R.J. was a shooter, and T.J. was there so we needed to speak to him.

Q.   Okay.  Again, in the interest of time, we won't go forward, but in that -- or we won't show the video, but in the next video -- excuse me.  In the next hour, in the 4:00 p.m. hour, do you know the video where it's you and him in there and you're now wearing a bulletproof vest?

A.   Yes.

Q.   Why were you wearing a bulletproof vest?

A.   We were getting ready to go out to look for R.J.

Q.   Okay.  So is it in that 4:00 o'clock hour or so where you left Marcel in the room and you went out to find R.J.?

A.   Yes.

Q.   Okay.  And yesterday, in some of these early hours of the interview -- and I won't show them again because we've all seen them -- the statements that you made to Mr. Brown like, you know, if you keep up with that you're going to take the

road down 55 to Joliet, you might end up in prison, you might be looking at 35 years, those statements you made to Mr. Brown, do you know which ones I'm talking about?

A. Yes.

Q. Now, are those the types of statements made in phase 1 of the interview?

A. Yes.

Q. In the first few hours?

A. Yes.

Q. Okay. So when you were making those statements to him about how he could go to prison if he doesn't come to the truth, you were referring to whether or not R.J. was actually shooting in the park?

A. Yes.

Q. Because at that time Mr. Brown was still saying R.J. wasn't shooting in the park?

A. Correct.

Q. Okay. Did you ever tell Marcel that if he doesn't come around and say he knew R.J. had a gun that he's going to go to prison?

A. No, I don't think so.

Q. That wouldn't be right.

A. No, of course not.

Q. While you were out with your team searching for R.J., the shooter, Marcel's cousin, what happened with R.J.?

A.   R.J. ended up coming into the station with his father and a couple other family members.

Q.   Okay.  And was that around 6:00 p.m. as we've seen from a document yesterday?

A.   Yes, yes.

Q.   Okay.  At that point, did you come back to the police station when you heard R.J. had turned himself in?

A.   Yes.

Q.   And when you got there, was R.J. already in a different interview room?

A.   Yes.

Q.   Okay.  You know now that when R.J. came to the police station he had an attorney with him, right?

A.   Yes.

Q.   His name is Wham Cary?

A.   Yes.

Q.   He testified yesterday.

A.   Correct.

Q.   Was yesterday the first time you have ever laid eyes on Wham Cary?

A.   I believe so.

Q.   And at any point on September 3rd, 2008, did anybody indicate to you that Marcel had an attorney that was trying to see him?

A.   Not at all.

Q.   And if that information was conveyed to you, if it were true, would you have gone and told Marcel Brown?

A.   Yes.

Q.   If we could go in the transcript to page 92, line 8, I want to ask you some questions about it.  It's awhile before you get back in the room with Marcel, but there's a couple times that Mr. McDonald comes into the room, and since he's not here to defend himself I want to ask you a couple questions.

   (Discussion off the record.)

BY MR. FLYNN:

Q.   Mr. Mancuso, you were asked -- earlier today, Mr. Loevy asked you about anybody yelling at Mr. Brown, right?

A.   Yes.

Q.   And you said that you were aware of one time that that happened, that someone raised their voice?

A.   Yes.

Q.   Who was that?

A.   My partner, Detective McDonald.

Q.   So I'm going to show you that clip, if I'm lucky.

   (Said video clip displayed in open court.)

BY MR. FLYNN:

Q.   Is this that one time in the entirety of the interview where anybody raised their voice?

A.   Yes.

Mancuso - cross

1055

Q.   And what did Mr. McDonald do when Mr. Brown asked him to quiet down?

A.   He stopped, and then he apologized and explained himself.

Q.   So I want to go back.  Going back to the phases like I talked about in my opening statement, phase 1, we already talked about, right, where R.J. wasn't shooting in the park, that it was only Day-Day.  Was it at 7:18 p.m. that Marcel first said that R.J. was shooting in the park?

A.   Some point about 12 hours later.

Q.   No, I'm not -- I'm talking about phase 2 at 7:18 p.m.

A.   Right.

Q.   Is that the first time that Marcel said anything about R.J. shooting?  I can show you the clip if we need to.

A.   That's fine.  Yes, it was.

Q.   Okay.  At that point, at 7:18 p.m. when he first tells you that R.J. was shooting in the park, was he continuing to say that Day-Day was also shooting?

A.   Yes.

Q.   During the course of this investigation, you mentioned earlier how you had the desire to or you felt compelled to interview witnesses -- excuse me -- compelled to interview witnesses who were part of Taneshia's group and that you did interview some of those witnesses.  We already talked about that.  Did you also try to interview Taneshia Branch herself?

A.   Yes, we did.

Q.   Did you interview Marcel's sister, Cierra Jackson, who was part of that group?

A.   Yes.

Q.   Did you try to interview Marcel's other cousin that was part of that group, Almanique Scott?

A.   Yes.

Q.   Did they participate in an interview with you?

A.   They all turned us down.

Q.   Did that raise your suspicions about Marcel and R.J.?

A.   A little bit, yeah.

THE COURT:  Mr. Flynn, let's take a very short break.

MR. FLYNN:  Sure.

THE COURT:  Ladies and gentlemen, we are going to end a little early today, but I would like to just take a short bathroom break.  There's something back there for you to eat. It's just to let you stretch your legs.  Like I said, we will get out of here a little early today, but let's just take a very short break, about ten minutes.  Please don't discuss the case.  We'll see you in about ten minutes.  All rise.

(Jury out at 2:30 p.m.)

THE COURT:  All right.  You can be seated.

Mr. Mancuso, you can step down.  You remain on examination.  Please don't discuss your testimony.

(Witness excused.)

THE COURT:  Anything we should discuss?  I do want to

make one comment to the parties about the demonstrative issue, but other than that I'm happy to talk about anything we should talk about.

MR. LOEVY: Yeah, we have a hearsay instruction that I'm just tendering to the defense now. They haven't seen it, but that was more than we thought and understood was going to be allowed. I mean, basically -- well, I'll leave it at that. We thought it was going to be very short, and basically they walked the jury through it.

And just to add to the points, Your Honor, he started then with the demonstrative saying: Which way was R.J. shooting? That's not -- they can't prove which way R.J. was shooting with hearsay. They used it for the wrong purpose. Now it's a subtle difference between: In your investigation, what did you assume?

But it's just like, in other words, I'm going to tender the instruction to the Court. It's based on a pattern.

THE COURT: Okay.

MR. LOEVY: We'd ask that as soon as possible you read it so it's clear or you explain to them that what they heard about what witnesses may or may not have said isn't being offered because it's true.

THE COURT: Right. So, look, I'm happy to take a look at it. I know counsel will need an opportunity to take a look at it, considering he's in the middle of an examination.

You know, some of this related to testimony that, you know, we discussed. You know, some of this is coming from, you know, Ocampo and other people where there will be some disputes about who said what, but I want to make sure I give defense counsel an opportunity to respond.

We certainly will not be able to give this instruction during the break. You know, I think in an ideal world perhaps we'll be able to reach some consensus on it to the extent we can. I'll give you an opportunity to read it and respond.

Other matters we should take up during our short break?

MR. FLYNN: Just in response to that information with respect to the bullets flying through the back of the fieldhouse, Mr. Loevy asked Mr. Mancuso questions about how he couldn't rule out that he was shot somewhere else and that there's evidence showing that maybe he was shot somewhere else. So the effect on the investigation and what led him to the steps, that information is relevant.

THE COURT: Okay.

MR. LOEVY: Sorry. I'll let you finish unless you --

MR. FLYNN: All right.

MR. LOEVY: We're missing each other. You can rebut that, but you can't rebut it with hearsay because, yes, it is an issue which ways the bullets were flying, but what Mancuso

claims a witness told him about which way the bullets were flying is not a rebuttal to that. That's hearsay.

MR. FLYNN: Your Honor, he's saying it's a shoddy investigation and that they didn't look into this, that, or the other, and this information is information they had which is why they didn't look into these other things.

THE COURT: Okay. We'll take it up in connection with the proposed instruction.

MR. FLYNN: One other item. I hope he's not doing it on purpose, but there are times when Mr. Mancuso will say things and I can hear them behind me. I don't know if it's the mike or maybe I'm just close, but I'll hear them saying things like "that's not true," things like that.

MR. LOEVY: We will double-down to be silent.

THE COURT: Yes, and I realize some of it is just, you know, you're working hard and doing a million things. But it is a little audible, and I encourage you to just be sensitive to that.

The last thing I just want to say about the demonstratives is to just encourage the parties to reread the motion in limine order. It doesn't preclude the use of demonstratives without sharing them in advance, but it lays out some of the downsides of doing so, including if an objection is sustained then you'd need to move on without the demonstratives. So just a reminder on that.

MR. FLYNN: Thank you, Your Honor. Understood.

MR. LOEVY: Are there more?

THE COURT: Don't go anywhere. I didn't realize we had a note; otherwise, I would have read it earlier.

Okay. My law clerk just handed me a note which says two things. It's not signed by anyone, but we can figure this out if we need to. The note says:

"1. Can we get clarity on exactly what we are supposed to be assessing and determining" question mark.

"A. Is it if, in fact, Marcel Brown's constitutional rights were violated by Detective Mancuso and team" question mark.

"B. Not to determine if what Marcel saw or what he was charged with, right" question mark.

"2. Will we hear or see all the witnesses interviewed" question mark. "Their statements," question mark.

I'm going to ask my clerk to hand that to each of you so you can take a look at it.

(Discussion off the record.)

THE COURT: Let's take our break so that you all can talk about it for a few minutes. Please don't do anything with the note other than hand it back to Mr. Matosian when you have a chance. So we'll take a break and take this up in a moment.

MR. LOEVY:  What time did you tell the jury we were coming back, Judge?

THE COURT:  I told them ten minutes, but it's going to be a little longer than that.  We may just need to finish with some testimony and take this up after our break.  We'll just need to see.  But to answer your question, I told them 2:40.  I told them 2:40.  So we'll take at least another -- you know, we'll go until at least 2:45 before we call them back in.

MR. LOEVY:  Thank you, Judge.

(Recess at 2:36 p.m.  Change of reporters.)

(Proceedings heard in open court; jury out.)

THE COURT:  All right.  We're back on the record.  I warn you now that I am having a little trouble connecting to realtime so my use of the realtime transcription might be limited.

During our lunch -- our afternoon break, my clerk handed me a second note from Juror Number 3 that reads as follows:  Judge Jenkins, is there a difference between being arrested and being charged?  If so, how long can someone be -- can someone arrested be held without being charged, question mark.  Thanks, Juror Number 3.

Here's my recommendation on this:  My recommendation, because it's 2:45 on Friday, is that we tell the jurors when we bring them back in that we received their note and we're

going to work on getting them some answers because I don't want anyone to feel like we're not being attentive to what they're asking about.

We will need to work together cooperatively, all of us, to figure out what the answers to those things would be. I don't know that anyone is in a position now to offer and read language on what we could tell the jurors immediately. Unless someone has a suggestion right now, I don't -- I certainly don't want to rush this and say or do the wrong thing.

MR. FLYNN:  I would just ask, your Honor, if I can ask Detective Mancuso to explain question number two.  Not to say there's a juror question or anything like that but I'll just come back and ask him, by the way, we were talking earlier about arrests --

THE COURT REPORTER:  Please slow down.

MR. FLYNN:  I apologize.  I've been doing that all day.

I'll just ask Mr. Mancuso to explain in his view what the difference is between an arrest and a charge.

MR. LOEVY:  You know, I suppose that Mr. Flynn can do whatever he wants, right?

THE COURT:  Right.  And, you know, so I think now that you've heard the question, to the extent that within bounds you think you can address some of these things, you're

free to.  I also think that -- to try, I should say.  But I also think that it makes sense to at some point figure out if there's something we should or shouldn't say to the jury in response to these questions.  We -- I don't understand -- I don't know that there could be a way in which we do that today.

MR. GIBBONS:  My only thought, your Honor, is, you know, there's a lot more of this trial to come.  These questions are slightly premature.  I mean, I get why they're asking them because we're kind of a third of the way into the case but we're going to have ASAs testifying here.  I'm assuming John is going to call Spizzirri.  A lot of these questions are probably going to come up.  You're there for what reason, who -- who approves charges, what's a charge, what's your authority.  I mean, that's all going to be answered by an ASA.

THE COURT:  Right.  And so perhaps then I'll say:  We received both of your questions, I've relayed those questions to the parties, please keep in mind that you've only heard a portion of the evidence, there's more evidence to come, and including next week.  The answer to some of your questions may be forthcoming.  If we, you know, but -- and at the end of the case, we will instruct you on the claims and the law.

Please don't.

MR. LOEVY:  Have you guys lost power before?

THE COURT: Yes. I had a fire alarm go off during a hearing, so.

MR. LOEVY: Well, let's hurry.

THE COURT: Yes, exactly. So I think I'll say something to that effect now. We can do another, you know, hour, give or take, and then we can just re-caucus on where things stand. I just -- I don't want this to slow down when we're not going to be able to give them any answers today.

MR. LOEVY: Thank you.

MR. FLYNN: Sounds good, your Honor.

THE COURT: Okay? All right. Mr. Matosian.

(Proceedings heard in open court; jury in.)

THE COURT: All right. Please be seated. Thanks for your patience. Before I have Mr. Flynn resume, I just want to acknowledge that I've received a couple of notes from a couple -- from a couple of you. I've relayed your questions in those notes to the lawyers. Some of your questions will be answered over the course of the remaining evidence and testimony that will be presented over the course of the case. Please just keep an open mind. We will do our best to answer your questions as we can but I just want to remind you that the evidence is still ongoing so you will hear answers to some of these questions and, of course, I will instruct you on the law in the end. So I think that's all a way of saying continue to be patient as you already have been and we'll

provide you with answers as we can.

And with that, Mr. Mancuso, you remain under oath. Mr. Flynn, you may proceed.

BY MR. FLYNN:

Q.   Mr. Mancuso, just to go back to a couple of quick items, we were talking earlier about Mr. Brown being under arrest and then being charged.  Do you remember that?

A.   Yes.

Q.   What is the difference between being under arrest for murder and actually being charged with murder?

A.   Well, under arrest, he's -- he's detained.  He's brought in.  He's going to be there for a while, up to 48 hours. Could be released; could be charged.  Charged means he's got charges placed against him and in some cases he's held.  Other cases, he's let to bond.

Q.   And I think you mentioned this already in Mr. Loevy's examination but in Cook County, who makes the decision whether or not to charge a suspect with murder?

A.   State's Attorney's Office.

Q.   Okay.  I want to move back now to Day-Day.  So we talked about how at the beginning of the interview, for the first 12 hours, Marcel was telling you that Day-Day was shooting, right?

A.   Correct.

Q.   And at the beginning, we talked about how you were asking

him questions about Day-Day like what's Day-Day's real name?

A. Yes.

Q. And why were you asking him those questions?

A. We wanted to try to find him, talk to him.

Q. Did you find out Day-Day's real name?

A. Yes.

Q. David Portis?

A. Yes.

Q. Okay. And I'm going to back up and make sure I said something clearly before. Of the 20 eyewitnesses that you interviewed, I asked you before if any of them saw Day-Day shooting, right?

A. Correct.

Q. And none of them saw Day-Day shooting?

A. None of our 20, the original 20.

Q. Okay. But did any of those witnesses out of the 20 say that they heard somewhere that they heard Day-Day was shooting?

A. Yes.

Q. Okay. And was that one of the witnesses that was part of Taneshia's group?

A. Yes.

Q. Okay. So you eventually found out Day-Day's name, David Portis. What did you do with that information?

A. Well, we identified him, I think we found him in the

computer system, and then we -- someone went out and found him, picked him up, and brought him in for an interview.

Q. Did you bring -- did you bring him to the same police station that Marcel was at?

A. Yes.

Q. Did you put him in an interview room?

A. Yes.

Q. Okay. And did he get to the police station around 11:45 p.m. on September 3rd?

A. That's all I recall, yes.

Q. So this is the same night you first brought Marcel in, right?

A. I believe so.

Q. So within a few hours of Marcel telling you it was Day-Day shooting, you had Day-Day there and you were interviewing him?

A. Correct.

Q. And was Day-Day willing to speak to you about what occurred on August 30th, 2008?

A. Yes, he did.

Q. Did he tell you he was at the park during the shooting?

A. Yes.

Q. Did he deny that he did any shooting in the park?

A. Yes, he did.

Q. Did his account of events line up with other information you had?

A.  Yes.

Q.  And I'm sorry if I asked you this before.  I can't remember if I did or not.  If at any point in this investigation you had any substantive evidence that Day-Day was shooting in the park, would you have arrested Day-Day and sought more evidence regarding his potential role in the crime?

A.  Yes, we would have.

Q.  By the way, was Day-Day friends with Paris Jackson, the victim?

A.  I think they knew each other.

Q.  Are you aware of, after the shooting occurred in August 30th, 2008, Paris's friends attempting to contact him?

A.  Yes.

Q.  Were they able to?

A.  No.

Q.  So we now know that we've got R.J. turned himself in around at 6:00 p.m., he's in an interview, Marcel is an interview room, you're interviewing David Portis.  There's one other individual you mentioned earlier is T.J.  What happened with T.J., were you able to talk to him?

A.  I believe we did.

Q.  Okay.  Did you speak to him at the police station?

A.  Yes.

Q.  And in an interview room?

A. Most likely, yes.

Q. Did you put T.J. under arrest?

A. No.

Q. Why not?

A. We didn't believe he had any actual involvement in the shooting.

Q. Okay. So you had heard that he was in the car but what's -- what made him different than Marcel?

A. Well, he didn't drive him there. He was there and then ran out of there.

Q. Okay. And when T.J. first came to the police station, what did he tell you occurred on August 30th, 2008?

A. I believe he told us that they -- they all received -- he and the other two guys received phone calls from their sisters and there was some kind of problem, some issue at the park and they were going to go there to get their sisters or take care of -- take care of the problem.

Q. Let me stop you there, Mike. In the interest of time -- again, I know it's Friday -- when T.J. -- when you first interviewed T.J. at the police station, did he tell you that it was Day-Day that was shooting?

A. No.

Q. Did he -- T.J., Scott?

A. Right.

Q. When you first interviewed him at the police station, did

he tell you that it was Day-Day who was shooting in the park?

A.   I think he did -- he did tell us initially.

Q.   Okay.  And I can show you the reports anytime if you don't recall.

A.   Okay.  Okay.

Q.   And this story about Day-Day shooting, was that the same story that Marcel was telling you for the first 12 hours of his interview?

A.   Yes, it was.

Q.   And did T.J. originally tell you that when he got to the park and Day-Day opened fire, that Day-Day said get in position?

A.   Yes.

Q.   Had you heard that phrase just a few hours before?

A.   Yes.

Q.   Who from?

A.   Marcel.

Q.   Okay.  So Marcel told you in the first couple hours that Day-Day at Amundsen Park said get in position and then T.J. in the first couple hours of his interview told you the same thing?

A.   Yes.

        MR. LOEVY:  Your Honor, it's the same thing with the rephrasing the same testimony.  He just asked the question.  Cumulative.

THE COURT:  Objection, cumulative.  Sustained.

BY MR. FLYNN:

Q.   Did it seem -- did it raise your suspicions that Marcel independently said this phrase "get in position" and T.J. separately said that Day-Day said this phrase "get in position"?

A.   Yes.

Q.   Did it seem to you like they were getting their stories -- that they got their stories straight before they got interviewed?

A.   It seemed rehearsed, yes.

Q.   Now we know again based on Marcel's testimony that such a phrase "get in position" was never actually said at the park?

A.   Correct.

Q.   Okay.  And as your interview continued on with T.J., did he eventually come clean with you about what occurred in the park?

A.   Yes, he did.

Q.   Did he tell you that Day-Day wasn't shooting?

A.   Correct.

Q.   Did he also tell you additional information about a meeting that he had the day that Paris's body was found?

A.   That's correct.

MR. LOEVY:  Objection.  Hearsay, your Honor.

MR. FLYNN:  Your Honor, it's not offered for the

truth.

THE COURT: All right. Overruled. The answer can stand.

BY MR. FLYNN:

Q. What was your answer? I missed it.

A. Yes.

Q. Okay. And what did he tell you?

MR. LOEVY: Objection, hearsay.

THE COURT: Your objection is noted. It's overruled. The answer -- the witness may answer.

THE WITNESS: They all got together and talked about what happened and came up with a story to say in case the police come and get them.

BY MR. FLYNN:

Q. And what was the story that they were supposed to tell the police?

A. That they entered the park and Day-Day was shooting at them and they ran away.

Q. Did T.J. provide an ASA handwritten statement?

A. I believe he did.

Q. And that was with, again, a separate ASA?

A. Yes.

Q. Okay. And was -- like the other ASA handwritten statements, was it read aloud to him and he was allowed the opportunity to correct any inaccuracies?

A.   That's correct.

Q.   And did T.J. sign every page of the handwritten statement?

A.   Yes.

Q.   And did he confirm in writing all those things that we talked about about the statement being given freely and voluntarily?

A.   Yes.

Q.   And that he hadn't been promised or threatened?

A.   Correct.

MR. FLYNN:  So if we can go back to the transcript in the ERI video, the electronically recorded interview, I want to go to ERI transcript Exhibit 500, Page 155, Line 13.  I'd like to play Mancuso Clip 8.

(Video played.)

BY MR. FLYNN:

Q.   Mike, did this conversation happen right after that conversation that you had with T.J. that we talked about just a minute ago?

A.   Yes, it did.

Q.   Okay.  And you're describing that to Mr. Brown?

A.   Yes.

Q.   Okay.  And is this the first time in the 12 hours that Mr. Brown has been in custody that he admitted to a detective that he never saw Day-Day shooting in the park?

A.   I believe it is.

Q.   You then heard Detective McDonald.  Let me see if I can find it here.  I'm highlighting a part of the transcript.  See that there?  Well, you see where I'm talking about, Line 10?

A.   Yes.

Q.   It says now let's go back from the very beginning, you tell me everything and this time tell me nothing but the truth.  Do you see that?

A.   Yes.

Q.   Was that an ongoing pattern throughout your interview of Mr. Brown?

A.   Yes, it was.

Q.   Would he change his story and he'd have to start over from the beginning?

A.   Yes.

Q.   And when a suspect changes their story in an interview like this, why do you have to go back to the beginning and start over?

A.   Well, try to get him to tell the truth from the beginning.

Q.   If a suspect makes a material change to their account of events, is it important to know whether or not other details of what they told you before are also changing?

A.   That's correct.

Q.   Okay.  And is that what's happening here?

A.   It appears to be, yes.

Q.   Okay.  And we see here Marcel's new story is that R.J. was

the only shooter but he didn't know R.J. had a gun; is that right?

A.   Correct.

Q.   Okay.  So in the transcript if we can go down in the same conversation -- Page 159, Line 15 -- here Detective McDonald said, okay, so now you guys are going up to the park, you're at Central and North by the White Castle, you get the phone call, you say you're going up there.  R.J. says he's going up there, too.  Mr. Brown:  Yeah.  Detective McDonald:  Did he say anything else at that point?  Mr. Brown:  No.  But he said he was getting tired of them.

Is that the first time that he started providing you information about what Mr. Branch, R.J., said in the car on the way to the park?

A.   Yes.

Q.   During this same --

MR. FLYNN:  If we can go down in the transcript to Page 162, Line 5.  And again, I'm trying to save everybody on the videos here but you can see the transcript.

BY MR. FLYNN:

Q.   Mr. Brown, on Line 8, he starts talking to you about the day that they found out Paris was dead.  Do you see that?

A.   Yes.

Q.   He said people were calling his phone.  He answered the phone.  They found out a boy dead in the park and they're

saying they think R.J. did it from yesterday when he was shooting. But I didn't think nobody got shot because after that the shooting, it was a big fight. She got stabbed. I got pulled over. And I didn't think like anybody -- I didn't think that anybody got shot.

Do you see that?

A. Okay.

Q. Is this the same story that T.J. had told you about getting together the next day?

A. Yes.

MR. FLYNN: And then if we can go to Page 164, Line 9. And this is the same conversation and play Mancuso Clip 9.

(Video played.)

BY MR. FLYNN:

Q. At this point, is he putting the shooting all on R.J.?

A. Yes.

Q. And Detective McDonald said that this would have been nice to know eight hours ago. What did you understand him to mean?

A. Well, it would be nice to know the truth from the beginning.

Q. Marcel had been lying to you for several hours?

A. Yes.

Q. And in response, Marcel said that he was scared. Do you have any idea what he was referring to?

MR. LOEVY: Objection. Foundation, your Honor.

THE COURT: You can ask some additional questions if you want to try that.

MR. FLYNN: I can move forward. We can get to that next.

Skipping ahead in the transcript to Page 166, 21. And if we can play Mancuso Clip 10.

(Video played.)

BY MR. FLYNN:

Q. So at the beginning of this clip, you asked Marcel if he knew what R.J. did with the gun. Why did you ask him that?

A. Well, it would be good to get the gun off the street.

Q. So you were just trying to get a little more information about where it might be?

A. Right.

Q. You also asked him if there's a place that R.J. hides his gun and Marcel said that he just usually has it on him -- he used to just having it on him. Line 630. Do you see that?

A. Yes.

Q. How did you understand that -- what did you understand that statement to mean?

A. That sounded to me that he always carries a gun.

Q. R.J. does?

A. Yes. R.J. always has a gun.

Q. And did that raise your suspicions regarding whether Marcel would have known that R.J. had a gun on the way to the

park?

A.   Well, it kind of led us to think that he probably would know.

Q.   Did you think this was an accidental slip by Mr. Brown?

A.   Yes.

MR. FLYNN:  So if we can go down to Page 168, Line 6, and play Mancuso Clip 11.

(Video played.)

BY MR. FLYNN:

Q.   So going back to my question a minute ago -- a minute ago and based on this, why was Marcel scared?

A.   He was afraid to be labeled a snitch.  He was afraid of his own cousin R.J.

Q.   At this time did you know that R.J. was a Vice Lord?

A.   Yes.

MR. FLYNN:  If we can go down to page -- well, stick on 169 and go to Line 21 and play Mancuso Clip 12.

(Video played.)

BY MR. FLYNN:

Q.   So just -- I'll take over control.

Just to orient the jury, this is the first night of his interview, right?

A.   Yes.

Q.   Okay.  And one of the questions you ask him here is have you ever been with -- has Marcel ever been with R.J. driven

around the park and just firing gun shots out.  Do you see that?

A.  Yes.

Q.  And his response says I been out of town over the summer. Did that response seem like an odd response to that question?

A.  Yes, it did.

Q.  What's odd about it?

A.  He is distancing himself from any driving around the park firing shots.

Q.  And did you say anything about them driving around in the summer firing shots?

A.  No.  I just said just driving by the park at any time.

Q.  And you also mentioned that there's reports of a gold car driving around the park.  Mr. Brown says he used to have stolen cars.  He probably was in.  You said stolen car that happened to be gold.  Cavalier.  Why.  He got one?  No, he had one.  Stolen cavalier.  What color was it?  Gold.

So here you're conveying information that you learned about a gold Malibu driving around the park.  And what's Mr. Brown's response?

A.  Well, coincidentally R.J. was driving around with a gold Chevy Cavalier that was probably stolen.

Q.  This also sound like a made-up excuse?

A.  Yes, it did.

Q.  Was R.J. -- did it seem to you like R.J. -- or, excuse me.

Did it seem to you like Marcel was trying to distance himself from R.J. as much as he could at this point?

A.   Yes.

MR. FLYNN:  If, in the transcript, we could go to Page 171, Line 1.  In the interest of time, I'll move on.

BY MR. FLYNN:

Q.   So this is about 3:15 a.m. and we've already seen some of these clips of Marcel sleeping around this time of night. You've heard Mr. Loevy's arguments that you were depriving Mr. Brown of sleep.  Is that true?

A.   No, we weren't.

Q.   Okay.  And Mr. Loevy also made the argument that you guys were watching the video from another room and when you saw him sleeping, you would pop in and wake him up?

A.   Not true.

Q.   Even if you guys were these sinister detectives doing these evil things, would you even have time to sit there and watch this video?

A.   No.

MR. FLYNN:  I'd like to show another demonstrative, your Honor.  This is of the ERI video but portions of it are sped up.

MR. LOEVY:  It sounds like something we should have seen in advance, your Honor.

THE COURT:  Can you -- are you in a position

to -- well, is it a video -- you said "sped up," what does that mean?

MR. GIBBONS: It's the video but portions of it, you'll see a fast-forward button that shows the time moving faster while he's sleeping to show all the time that he's asleep.

THE COURT: But it's of the --

MR. FLYNN: Of this video.

THE COURT: -- of the interrogation video?

MR. LOEVY: Our objection would be, your Honor, if it's going super fast, you couldn't tell if he in the middle gave a sign that he wasn't sleeping.

THE COURT: So, Mr. Flynn, let me ask you this question, is this a matter we can explore at a different time or is it important for you to do it now?

MR. FLYNN: It can wait.

THE COURT: All right. Thank you. And we'll revisit it.

BY MR. FLYNN:

Q. We will get back to that topic.

Those blankets and other coverings we've looked at, were those provided to Mr. Brown? That blanket, was that provided by the detectives?

A. Yes.

Q. And you may have covered this this morning when Mr. Loevy

was examining you. Could you control the temperature of that interview room?

A. Not at all.

Q. Who was in control?

A. Probably the building engineers.

Q. Okay. Do you recall that interview room or any of your other interview rooms being uncomfortably cold in early September 2008?

A. Not at all.

Q. I believe Mr. Loevy said something about a 24-hour rule during this examination of you. Is there any such thing as a 24-hour rule?

A. I believe --

MR. LOEVY: I didn't say anything about any such rule. I believe Mr. Brown might have mentioned it.

THE COURT: Okay. To the extent that's an objection, you can explore that on your redirect. You can answer.

BY MR. FLYNN:

Q. Mr. Mancuso, is there any such thing as a 24-hour rule?

A. I believe it applies to juveniles in custody.

Q. Okay. But with respect to Mr. Brown, there's no rule that you can only keep him for 24 hours?

A. No.

Q. There's been some discussion regarding why Mr. Brown slept that first night in the interview room. Do you know what I'm

talking about, some of the questions that were asked about Mr. Brown sleeping in the interview room that first night?

A.   I remember him sleeping.

Q.   Okay.  Is it uncommon in other investigations for you to have suspects that sleep in these interview rooms?

A.   Oh, all the time.

Q.   Okay.  And Mr. Loevy asked you some questions about what he was referring to as the lockup, right?

A.   Yes.

Q.   Okay.  And these are -- when you think of the lockup, is it what I think of when I think of a jail cell?

A.   Yes.

Q.   Okay.  And you got into this a little bit, but could you tell us about, if he did take him to the lockup in one of these jail cells, what the conditions would be in the lockup?

A.   It would probably be similar, temperature wise, and just maybe a big -- slightly bigger steel bench.

Q.   Okay.  So we're skipping past the time from 3:30 to 10:30. We'll get back to that on Monday and we can show the demonstrative that I mentioned but I want to get in now to day 2.  So 10:30, you brought him McDonald's.  We talked about that.

A.   Yes.

Q.   We'll talk -- we can talk about that when we see the demonstrative.  I'm going to talk about what happened now this

Mancuso - cross

1084

next day, day 2. You bring him the McDonald's and at that point did you determine that it was time to conduct a lineup?

A. Yes.

Q. Okay.

A. Yes.

Q. And so what do you have to do to conduct -- or what did you do to conduct the lineup in this case?

A. Well, you have to first contact your people that are going to view the lineup, make sure they're available. And then you have to start finding what we call fillers, people that look similar; race, height, age.

Usually, you can go in your lockup if we were in a bigger station. The Area 5 was a -- the home to the 25th District as well as the area so there was some bigger police facility as -- there's usually people in custody there. So we'd have to go and find people or go on the computer or find people that may be in custody at another station, have them transported over to stand in a lineup to help us out.

Q. Okay. And so on the afternoon of day 2 -- we're now talking about September 4th -- did you put together a lineup that was seen by four witnesses?

A. I believe I may have participated in that.

Q. And were those witnesses Jasmine Jenkins, Ebony Jenkins, Shaquincia Williams, and Krystine Jenkins?

A. Correct.

Q. So did it take some time to go out and get those witnesses and bring them in?

A. Yes.

Q. Did it take some time to find fillers to be in the lineup with them?

A. It does a lot. Sometimes.

Q. And then after they view the lineup and the lineup is complete, what do you have to do with respect to an evidence technician?

A. Well, we have to call an evidence technician to come out and photograph the lineup as it was, as it took place, sitting, standing, turning their heads right or left and then that's pretty much it. But sometimes you wait for hours for an evidence technician.

Q. Okay.

MR. FLYNN: If we can pull up the timeline demonstrative. It's -- I used it during opening statements so it has been shared.

THE COURT: All right.

BY MR. FLYNN:

Q. Okay. So this is the timeline that I had in my opening statement. Do you remember this?

A. Yes.

Q. Okay. And we talked about what Phase 1 was, and Phase 2, and Phase 3. Do you see that section there that says 3:30 to

10:30, sleeping?

A.   Yes.

Q.   Or 3:30 a.m. to 10:23 a.m.?

A.   Correct.

Q.   Well, that's the demonstrative that we'll show you on Tuesday.  But is it your understanding that Mr. Brown was mostly sleeping during this time period?

A.   I believe that's correct.

Q.   Okay.  And then we just had discussed the lineup.  You see that indicated here at 11:07 a.m. to 3:38 p.m.?

A.   Correct.

Q.   Is that all the time that it took you to put together this lineup, conduct the lineup, and then have it also photographed by the evidence technician?

A.   It looks like it was.

Q.   Okay.  And you've seen parts of the video of the interview, right?  Not just here in trial, but also before the trial?

A.   Yes.

Q.   Okay.  And is it at 3:38 p.m. that Marcel Brown is put back into the interview room?

A.   I believe so.

Q.   Okay.  And then R.J. Brown -- excuse me, R.J. Branch is charged with murder on -- at 4:15?

A.   Yes.

Q. Okay. Across the bottom here, I know that you haven't opened up the video and counted all these but does it seem about right to you that he was interviewed for about five hours in total?

A. Yes.

Q. And does it -- based on your experience and viewing some of these videos, did it seem like you were offering or giving him food 16 times?

A. Yes.

Q. Offering and giving him drinks 45 times?

A. Yes.

Q. There's also a question I think Mr. Loevy asked you about how Mr. Brown was never let out of this room during this 34 hours. That's not necessarily true, correct?

A. That's correct.

Q. He was let out of the room for two and a half hours.

A. Correct.

Q. And that was for things like the lineup, right?

A. Yes, lineup.

Q. For bathroom breaks?

A. Bathrooms.

Q. Time to getting his fingerprints done?

A. Correct.

Q. Okay. So before we continue much further, I want to talk to you about R.J. Branch being charged with murder at 4:15

that you see here.

A.   Yes.

Q.   Do you see that on the timeline?

A.   Yes.

Q.   So this is hours before Mr. Brown makes his incriminating statements, correct?

A.   Correct.

Q.   Have you heard plaintiff's counsel's argument in this case that you were in some kind of a hurry to close this case and solve this murder?

A.   I heard that, yes.

Q.   Okay.  First of all, did that -- did closing or clearing this case have any impact on your investigative decisions with respect to Mr. Brown?

A.   No.

Q.   And by the time -- by this time on the afternoon of September 4th that you see here on the timeline, the Cook County State's Attorney's Office had already charged R.J. with the murder of Paris Jackson?

A.   Correct.

Q.   Okay.  So there's already somebody being charged with Paris Jackson's murder?

A.   Yes.

Q.   So this idea that you were railroading Marcel Brown in trying to put him down for the murder of Paris Jackson just so

you can solve a case, does that make any sense to you?

MR. LOEVY:  Objection, your Honor.

THE COURT:  Overruled.  He can answer.

THE WITNESS:  No, it doesn't.

BY MR. FLYNN:

Q.  Yesterday you were asked a question if you had ever had an interrogation last longer than this one and I just want to make sure that your answer came clear -- or came through clearly.

Have there been other investigations where you've kept suspects in custody for up to 48 hours?

A.  Yes.

Q.  Approximately how many?

A.  A dozen or so just off the top of my head.

Q.  Okay.  So after the lineup is done, Mr. Brown is put back into the interview room, R.J. is charged with murder, what happens next?  Are you waiting for an ASA to come speak to Marcel?

A.  I believe so.

Q.  Did this take quite a bit of time?

A.  Yes.

Q.  In a perfect world -- well, first, why did it take quite a bit of time?

A.  State's attorneys are not available on a -- real easily. They work set shifts; and if it's towards the end of one

shift, they don't want to come out.  They want to wait for the next shift to start so there's varying reasons why it takes time.

Q.   And I'm sorry if we covered this, but you don't have any control over these ASAs?  You can't say I need you to come out here in the next hour, nothing like that?

A.   No.  No, not at all.

Q.   And in a perfect world, could this process of having the ASA, the Assistant State's Attorneys, come into the station and speaking to the suspects, in a perfect world, could that process be quicker?

A.   Oh, of course.

Q.   And -- but that's out of your hands?

A.   Yes.

Q.   All right.  Now during this time period in the afternoon and going into the evening of September 4th that we've been looking at in the last few minutes here, are the detectives checking in on Marcel, letting him use the bathroom, asking if he needs food and drink?

A.   I believe so.

Q.   So I'd like to go to your next substantive interview. This is after the lineup is conducted.

        MR. FLYNN:  If we could go in the transcript to Page 233, Line 4, and if we could play Clip 14, Mancuso 14.

   (Video played.)

Mancuso - cross

1091

BY MR. FLYNN:

Q.   So this is what we're calling Phase 3 and it's in this phase that he's admitted that R.J. was shooting but he's denying that he knew R.J. had a gun.  Why are you at this -- at this point in the investigation at this point of the interview having a difficult time believing Marcel's account of events?

A.   Well, he lied to us so much, we kind of figured he was still holding back what he knew.

Q.   Any other reasons?

A.   (Nodding.)

Q.   Did his account of events that he did --

        MR. LOEVY:  Objection.  Leading, your Honor.

        MR. FLYNN:  I haven't even asked a question.

        THE COURT:  I'll let you finish the question -- or stating the question.

BY MR. FLYNN:

Q.   Did Marcel's account of events during Phase 3 make any sense to you?

A.   Not really.

Q.   Why not?

A.   Well, the fact that he said they went to the park and we know that's the enemy territory, if you will, and they went there unarmed and it just didn't make sense.  It wasn't plausible.

Q.   And Marcel had told you that he was -- that Day-Day was there with 30 dudes in the park, right?

A.   Correct.

Q.   And how many dudes or people were -- was Marcel with when he came to the park?

A.   Three.

Q.   Okay.  And did it make -- so it didn't make any sense to you that they would go there without a weapon?

A.   Correct.

        MR. FLYNN:  Your Honor, did you say 3:30?  I can't remember.

        THE COURT:  If this is a good place for you to stop, we can stop here.

        MR. FLYNN:  It's a good place.

        THE COURT:  All right.  Okay.

        All right.  Ladies and gentlemen, it's 3:30.  As I indicated, we're going to end a little early.  I appreciate your indulgence to try to get as much of the testimony in today as possible.  You've been incredibly attentive and patient given that we selected you all to serve on the jury just on Monday.

        As I told you and as you know, Monday is a holiday so we'll report on Tuesday morning at 9:15 so we can begin promptly at 9:30.  Please don't discuss the case and I hope that you all can do something completely unrelated and not at

all think about this matter at all.  You should keep an open mind.  We have not heard all the testimony or the evidence and so please enjoy your weekends with your family and loved ones and I will see you on Tuesday.  Have a good weekend.  All rise.

(Proceedings heard in open court; jury out.)

THE COURT:  All right.  Please be seated. Mr. Mancuso, you can step down.

(Witness steps down.)

THE COURT:  You know the rules.  You've heard me say it plenty of times and we'll see you on Tuesday.  You can step out of the courtroom.

(Brief pause.)

THE COURT:  All right.  A couple of things on my list, but I'm interested to hear what the parties wish to discuss before we break for the weekend.

MR. LOEVY:  Your Honor, the pattern hearsay instruction says that it should be given as close in time to the hearsay as possible so we would like to iron that out before the testimony begins again --

THE COURT:  Yes.

MR. LOEVY:  -- whether now, or although we're all exhausted, or before.

THE COURT:  That was on my -- one of the items on my list.  I took a look at your proposed limiting instruction

which I take you at your word. I have no reason to think you haven't pulled this proposed instruction from the pattern instructions. I don't -- I am -- obviously we won't be giving the jury anything today but I am prepared to hear anything the parties want to say but I do think this is a matter we should be prepared to resolve first thing Tuesday before the testimony resumes.

MR. FLYNN: Agreed, your Honor.

THE COURT: Okay. So here's what I'd like to have the parties do on this, please review it and confer amongst yourselves and then together. As I said, this instruction looks awfully close to the pattern and so it strikes me as reasonable but there may be things I'm missing and I'm happy to have you tell me but I'll make sure we do that first thing on Tuesday when the jury comes in.

Other issues and topics before I go through my list?

MR. FLYNN: Nothing for defense.

MR. LOEVY: We'll give you the lineup, your Honor.

THE COURT: Thank you. That's on my list.

MR. LOEVY: All right. We're going to call Dr. Cutler. We're going to bring back R.J., Marcel's mother Debra Scott, and we're going to try to line up his very short witnesses Spizzirri and Turner, although we'd need their cooperation with Turner.

And then we talked to defendants about eliminating

police practices. John told me he'd let me know at the end of the day. Do you guys have a position --

MR. GIBBONS: It's not the end of the day yet, John. We're going to call -- I'm sorry.

THE COURT: I'm sorry. Hold on.

MR. LOEVY: It's not the end of the day yet. We'll give him a call.

THE COURT REPORTER: I'm sorry. I didn't hear.

MR. LOEVY: All right.

MR. GIBBONS: I'm sorry. My bad. I did tell John I'd get back to him by the end of the day but this is Mr. Flynn's decision who has been on his feet. We haven't had a chance to talk but we will call you tonight so we're not going to burn your weekend if we're going to call him off.

MR. LOEVY: Thanks. So we'll plan on him probably be Wednesday if he testifies so he won't go on Tuesday regardless.

THE COURT: Okay.

MR. LOEVY: And -- sorry.

THE COURT: No, please.

MR. GIBBONS: Taneshia?

MR. LOEVY: Taneshia I haven't yet talked to. I've never talked to but I suspect it's going to be hard to get her to stay. But let's put her as a standby on Tuesday, although same courtesy. If she ain't staying, I'll let you know so you

don't spend any time.

MR. FLYNN: Thank you.

THE COURT: All right. That's -- I love the cooperation. Cutler, R.J., Scott, Spizzirri, Turner.

MR. LOEVY: That gets us through the day.

THE COURT: Okay. And I -- particularly because we still have work to do on Mancuso.

About how long do you think Cutler's testimony on -- on direct might be?

MR. LOEVY: We're hoping to shrink it to half an hour.

THE COURT: Okay.

MR. LOEVY: You know, you've limited what the false confession people could do. I don't think it's going to serve anybody's interest to be showing clips. And, you know, as long as that's both ways, they're going -- he's just going to give his opinions and get out.

THE COURT: Okay. All right. I just wanted to get a sense of that. Okay.

MR. FLYNN: We don't think that there's any chance that Turner would go --

THE COURT REPORTER: I'm sorry.

THE COURT: Yeah. We're just having a little trouble hearing. It's okay. I just want to make sure she's not -- she's able to get us down. Mr. Gibbons -- or Mr. Flynn. I'm

sorry.

MR. FLYNN: When you add the remainder of Mancuso on top of the other witnesses, I think there's no way we get to Turner and I so -- if Mr. Loevy agrees with that, we would ask Turner to come on Wednesday but other than that, we can -- I guess the rest of the witnesses are theirs, so.

MR. LOEVY: Well, we can agree that he be at the end of the day. What I suggest is he's on standby in case a miracle of all miracles happens. You know, I'd hate to burn any time but I think it's unlikely given this lineup.

THE COURT: Okay.

MR. LOEVY: It might depend on how much what Mr. Mancuso we got left. I give Mr. Flynn credit, he did fast forward in places. You know, we're almost three quarters of the way through the transcript.

MR. FLYNN: I tried. I was moving fast.

THE COURT: I was going to say, I think Mr. Flynn can die happy now.

No, really. Look, here's the thing. Unless -- this seems like a very ambitious lineup to get through all of these people on Monday but my request is if at, for example, the lunch hour we seem to be moving at an amazingly fast speed, I may ask that you get Turner -- you know, we'd give him a lead, a heads up. I think it's very unlikely we will get to him on Tuesday, but with the caveat that in the unlikely event we

feel like a lot of progress is being made, we might need to have him available sooner rather than later.

MR. FLYNN: Understood.

MR. GIBBONS: The only -- I'm not going to ask Mr. Loevy to go into detail but he said Spizzirri is going to be short and she's a very important witness in the case and so I'm -- I mean, maybe they intend to be very short with her. But to be honest with you, I've got to cover some ground with her because she's important to the process here and she's not a detective so I don't want to hide the ball here but Spizzirri is probably not a short witness in my mind.

THE COURT: Okay.

MR. LOEVY: That's his prerogative.

THE COURT: Fair enough, Yeah. I appreciate the heads up on your thoughts on the longer witnesses. Frankly, as you tell me names going forward, I am going to want to know who are the folks on the longer side and who are the folks on the shorter side. I'm confident you all can continue to work together but it's helpful to know time frame.

Okay. Other issues? I have one or two more things I want to raise but --

MR. KAYES: Your Honor, very minor.

THE COURT: Sure.

MR. KAYES: You had given us a deadline Tuesday at 9:00 a.m. to return the jury instructions. There's been some

Mancuso - cross

1099

back and forth.  I think that's maybe a little unrealistic and I was hoping that with the developments over the week, we might get a fresh deadline with a little more slack.

THE COURT:  Of course.  That makes -- that makes a lot of sense.  How about this, please tell me on Tuesday at some point what you think is realistic and achievable in light of your work over the weekend?  I don't like fake deadlines so I don't want to just pull a date out -- you know, a day that's not realistic based on what you -- what work you do over the weekend.

MR. KAYES:  We'll confer and report on Tuesday morning.

THE COURT:  Perfect.

MR. LOEVY:  Your Honor, I would kick myself for not asking, but without requiring them to give away anything too much, it seems to us that a lot of the important witnesses have been disclosed.  I mean, we'll have a few more on Wednesday.  They have some experts but the experts are going to shrink.  There aren't too many more important, important people.

You know, from our perspective, we still got a shot to finish this this next week.  I'd be curious if the defendants were willing to share their thoughts on that.

MR. FLYNN:  I think it's possible, but that's about as far as I can go.

MR. GIBBONS:  I don't think we have a lot of surprise witnesses.  I mean, we have our clients.  And depending on -- you know, I asked John at the break, you know, about Eddie Cane.  He doesn't know yet.  That involved Detective Burke.  If those two are out, that cuts a day out probably or at least five or six hours.  So it's hard to predict here, but I agree most of this case is pretty much --

MR. FLYNN:  In the books.

MR. GIBBONS:  -- into the books, yeah.  I agree with that.

THE COURT:  I'm glad to hear you say that and for what it's worth I tend to think that's right.  I'd be surprised if anyone said, you know, there were four or five days' worth of things that -- you know --

MR. LOEVY:  You haven't heard?

THE COURT:  -- left.  That would be a little unpleasant but I -- well, look, we'll get it done.  You all are working very, very hard.  That is so apparent and I appreciate it.  I'm confident the jury observes that and I think the work you'll do over the next three days is kind of nice actually from your perspective to have an extra day to continue to work together.

MR. GIBBONS:  Yeah.  The only thing -- I want to bring it up now because I know we -- if I don't raise it now, I know I'm going to get that next Friday.  I have a 6:30

flight next Friday. My very close nephew is getting married in Maryland. I purposefully booked the 6:30 p.m. flight because of the Court's schedule ending at around 4:30. I just don't want to be in a position where closing arguments are set Friday at 4:00 and I can't make that flight.

MR. LOEVY: Friday at 4:00? We're not closing at Friday at 4:00.

MR. GIBBONS: Okay. I just want to make sure --

THE COURT: I mean, if you want to sit here and do it, it's an open courtroom --

MR. GIBBONS: Okay.

THE COURT: -- have at it but I -- we will not be doing that.

MR. GIBBONS: Okay.

THE COURT: All right. I appreciate you putting that on the record, though, and we can keep it in mind. I -- you know, the goal is not to jam you up. It is to put this through in a way that keeps you all as fresh as you can be knowing that it's trial, which is just going to be a lot of work full stop.

Okay. The demonstratives issue, because there was an objection about this speed-up thing, I think it might make sense for you all to just figure out what you want to do with that.

MR. FLYNN: We'll show him that one.

THE COURT: Okay. All right. It seems to me that, you know, there may be some foundation that you can provide to him to allow it to be admissible and we can -- or usable and then we can deal with it on Tuesday.

Please give some thought to whether or not we need to give any additional instruction to the jury next week on Monday -- or Tuesday about the notes that we received. The notes have been added to the docket but I don't know if you can see them. Sometimes they have -- I'm pretty sure notes have to be sealed so you might not be able to see them.

If, for any reason, you need to know or you weren't able to get down what the note said, please just send a collective email to the proposed order box and we'll -- we will just reproduce that information to you so you can have it. If you think anything needs to be told to the jury on Tuesday morning, we can just deal with it on Tuesday morning and then provide any instruction, if necessary, together with any issue about the hearsay. Just please think on that. If nothing more needs to be done, then -- and we've addressed it sufficiently, then so be it.

I think -- I think that's probably plenty for you all to hear from my end. I mean, at some point next week, we'll need to start thinking about jury exhibits and getting them loaded into jurors but we'll figure that out. Ms. Deanes knows what she's going and I don't want to overload you with

things that kind of come toward the tail and you got enough work to do. I suppose -- unless there's anything else -- well, why don't we plan to report on Monday at 9:00 just to make sure -- on Tuesday at 9:00 just to make sure that, you know, whatever it is that's going to come up over the next three days, we have plenty of time to iron that out. I don't -- as you know, I'm trying really hard to keep other matters at bay so that we can use that time wisely.

So if we can start Tuesday at 9:00 with just us, we'll have the jury in at 9:30 and be ready to go. All right. Have a good weekend.

Oh, sorry. One other thing I should say: To the extent things come up that you think need my attention and you don't file it on the docket -- although obviously the docket is the cleanest most public way to do it -- please include the proposed order box in any emails. I think the end of last week an email got to Ms. Deanes but the proposed order box wasn't included and so I didn't get it until like Monday morning or whatever the time frame is.

So to the extent that there's any activity in your emailing, please just include the proposed order box but I can access that from anywhere. Okay?

MR. LOEVY: Thanks, Judge.

THE COURT: Great. Have a good weekend.

(Proceedings concluded at 3:43 p.m.)

C E R T I F I C A T E

    We, Patrick Mullen and Laura LaCien, hereby certify

that the foregoing is a complete, true, and accurate

transcript of the proceedings had in the above-entitled matter

before the Honorable Lindsay C. Jenkins at Chicago, Illinois,

on August 30th, 2024.


/s/*Patrick Mullen*                    August 30th, 2024
Official Court Reporter                      DATE


/s/*Laura LaCien*__                    August 30th, 2024
Official Court Reporter                      DATE