1105

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                Plaintiff,             )
                                       )
            vs.                        )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) September 3, 2024
                Defendants.            ) 9:04 o'clock a.m.


                        VOLUME SIX
         TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
         BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Defendants:         GREENBERG TRAURIG, LLP
                            BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

1106

APPEARANCES (Cont'd):

Court Reporter:                    JOSEPH RICKHOFF, CSR, RMR, CRR
                                   Official Court Reporter
                                   219 S. Dearborn St., Suite 2118
                                   Chicago, Illinois  60604
                                   (312) 435-5562
                                   joseph_rickhoff@ilnd.uscourts.gov

            * * * * * * * * * * * * * * * * * *

                 PROCEEDINGS RECORDED BY STENOTYPE
      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1107

(Proceedings heard in open court:)

THE CLERK:  19 C 4082, Brown vs. Mancuso

THE COURT:  All right.  Good morning, everyone.

Can I have appearances on the record, please.

MR. BOWMAN:  Good morning, your Honor.  For plaintiff, Locke Bowman, Vanessa del Valle and Tom Kayes.  Mr. Brown is here.  Mr. Loevy is en route, as is Mr. Manes.

THE COURT:  Okay.  Thank you.  Good morning.

MR. FLYNN:  Good morning, your Honor.  Kyle Flynn, John Gibbons, Tyler Salway, and Quinn Ford for defendants. Defendant Mancuso is here.  He is just in the other room.

THE COURT:  All right.  Good morning to you.

All right.  Feel free to be seated, unless there are any more urgent matters that we should talk about as we wait for Mr. Loevy and others.

I do just want to put on the record two things about juror issues, which we can discuss at the appropriate time.

I have forwarded the parties an e-mail we received this morning from juror Jennifer Katz.  Ms. Katz sent an e-mail this morning at 6:13 a.m. that said:  Hi, Jackie -- referring to Jackie Deanes, my courtroom deputy -- I hope you had a nice long weekend.  I'm sorry to say that I'm not feeling well.  My son was sick with a fever and a bad cold all weekend, and seems I now have the same.  I'll be staying home.  I don't know what this means for the trial or my continuing to serve as a juror,

but please let me know.  Thank you, Jennifer.

We did not respond one way or the other but did forward that message along to the parties.

I received an e-mail in response, it was a reply all to the e-mail that I sent out, on behalf of plaintiff's counsel indicating that the plaintiff's request was that the Court communicate that unless the juror felt better and can come in today, she cannot continue to be a juror.  And I assume that still remains plaintiff's position on the matter.

MR. BOWMAN:  It does.

THE COURT:  Is that right, Mr. Bowman?

MR. BOWMAN:  Yes.

MR. FLYNN:  We would just like to add, come in today by 9:30 or 10:00 a.m. so it's clear that she needs to be here now because the show must go on.  But other than that, we're happy with that e-mail.

THE COURT:  Okay.  Yeah, we did not indicate to her, to this juror, Ms. Katz -- we didn't respond in any way.  So, I would have no reason to believe at 9:07 a.m. that she intends to report, or could even if she's not feeling well, even if we were able to reach her.

So, it sounds like without objection -- or perhaps there is an objection.  I shouldn't speak for you, Mr. Flynn.  Perhaps I misunderstood.

MR. FLYNN:  No objection.

1109

THE COURT: Okay. I appreciate the clarification.

So, then without objection, we will excuse Jennifer Katz as a juror, which takes our number down to nine.

I do just want to flag for the parties something we'll be able to decide closer in time to the end of this week, is whether there is anything we can or should do with regard to Tyler Campbell, who indicated that he has a personal trip scheduled for the 10th.

So, we've got some time. No need to make decisions there. But Mr. Campbell did indicate that he has a trip and he asked whether he would be able to take that trip and we haven't given him any information on that.

So, just something to keep in the back of your mind, if there's even anything to do there. There may be nothing to do.

MR. FLYNN: With respect to that, your Honor, we do think -- we talked with opposing counsel over the weekend, and we do think that we can finish on Friday or Monday.

Is the 10th -- is that Monday or Tuesday?

THE COURT: Tuesday.

MR. FLYNN: Okay. So, I think it is likely -- you never know how long they're going to deliberate, but I think it is likely that he could potentially still make that trip.

THE COURT: Okay.

MR. GIBBONS: And the parties talked a number of

1110

times, and we've cut out a number of witnesses. And we're still working on maybe cutting more. And I agree with Kyle, and Mr. Loevy knows, so I'm going to say it, I do think we can get there Friday, or instruct on Monday and argue on Monday. But we're going to get this done.

THE COURT: Okay. That sounds --

MR. LOEVY: This week, I think, right?

MR. GIBBONS: We're trying for Friday. That's our goal.

MR. LOEVY: I think it's likely.

THE COURT: Okay. So, I think for purposes of our discussion today -- and I completely agree with the assessment of the parties that for now it doesn't make sense to relay anything to Mr. Campbell. We're all optimistic. And it may well be that we're in a good position to get things done where it won't be an interruption to his schedule.

And I'm happy to hear that the parties agree that there is some progress being made.

So, we'll just put him on the back burner for now and kind of see where we are at the end of the week.

We will excuse Ms. Katz.

I've also been informed that one juror is running late. He was having car trouble. That's Mr. Singh. Yes, Mr. Singh called to say he's just running about 15 minutes late. So, I fully expect that we'll be able to get started at

1111

9:45.

Okay. From my perspective, that's all on juror issues. I know there are a few things that we should discuss and that we had sort of on our checklist for this morning.

So, happy to hear from either of you, whoever wants to address matters first, on where things stand with some of the unresolved questions we had on Friday.

MR. LOEVY: Well, we may gave you a new one resolved. We filed our motion about Marisol Ocampo. So, that's hanging out there.

THE COURT: I've taken a look at it. And I don't mean to interrupt you, but I do just want to ask. I assume the defense wishes to respond. Do you wish to do that in writing? Do you wish to do that later in the day? I don't think we have enough time this morning to take that on full throttle, but I'm happy to hear your response in whatever way you prefer, Mr. Flynn.

MR. FLYNN: We're happy to discuss it with you today when we have more time. And we will likely also want to paper our response by tonight.

THE COURT: Okay. So, we'll table that issue. It may be that we'll have some time later this afternoon to address it. It also may make sense to just give you an opportunity to file something in writing and then we can address it tomorrow morning, whichever makes sense depending on our -- kind of

where we stand at the end of the day today.

But if you wish to file something in response, I'll ask you to do that -- I mean, could you file something by tomorrow morning first thing or even tonight?

MR. FLYNN: Yes, your Honor.

THE COURT: Okay. So, I'll ask you to file something by the end of the day today, Tuesday, the 3rd, just to give plaintiff's counsel an opportunity to review it, and perhaps we can just take it up tomorrow morning.

MR. FLYNN: Your Honor, on that point, to the extent that after the Court hears argument and reads our response that the Court determines that we need to issue a body attachment to have the U.S. marshals go out and bring Ms Ocampo in, do you know what the lead time on that is approximately?

THE COURT: I mean, typically, it's a lot more than a day or two. Typically, they like to plan out, as you would imagine, right, from a planning standpoint, they would probably wish to have as much lead time as possible.

So, I don't anticipate that that's something that they could do within a few hours.

MR. FLYNN: We were planning on calling her on Friday, whether it's by deposition video or in person, or potentially Thursday. I apologize.

THE COURT: Okay.

MR. FLYNN: And, so, we're happy to wait and table

this and take it up tomorrow if you think that will be enough time to still get her in here by Thursday, if that's the Court's order. If not, we're happy to argue it today. Perhaps we can resolve it without a written response, when the Court has more time.

THE COURT: So, why don't we do this, because I wasn't -- I didn't think ahead to the step of what if the answer is, let's try to get her in here.

Why don't we do this: Why don't I hear from the parties on it, your response to where things stand on it. I'm happy to do that now, since we have at least one juror waiting. We could also take a slightly longer lunch break. And by "slightly longer," I just mean maybe an extra 15 minutes and give you a chance to let me know your thoughts about it at the lunch hour.

So, I'll put the question to you, Mr. Flynn. Do you prefer to address it now or do you want me to just take 15 extra minutes at lunch and we can talk about it over the lunch break?

MR. FLYNN: I prefer the lunch hour, your Honor. I'd like to read some of the case law cited.

THE COURT: Okay. So, when we break for lunch, we'll do an hour 15 for lunch, and we'll come back a little early to discuss it all. It will also give me a chance -- I started to read some of it, but I didn't get through it. And, then, that

1114

way we can see if we can't resolve it by the end of the day today, and if there are steps that need to be taken, we can have an opportunity to do that.

I will ask Ms. Deanes to look into the matter, but I'm confident that the answer she gets from the Marshal Service will be, you know, we like a lot more time than you're giving us. But we'll do what we can to get the answer to that question.

Okay. So, that's the question of Ms. Ocampo and her availability.

What else should we discuss this morning?

MR. LOEVY: We have something from our side. This one's a little unfortunate. But they showed two written demonstratives to the jury, and you did say that they didn't have to show us in advance. But we have what apparently is a disagreement on whether they actually have to give us a copy.

So, these are things that were shown to the jury. And it's inexplicable to us that we wouldn't get a copy of something the jury has seen. We would like a copy, and we've asked for a copy, and we're surprised that we can't get a copy.

THE COURT: Response?

MR. FLYNN: I've got copies right here, your Honor.

MR. LOEVY: Oh, good. I'm glad it's resolved. Thank you.

THE COURT: Great.

1115

MR. LOEVY:  Sorry that that had to --

THE COURT:  No.  It's quite all right.

MR. LOEVY:  -- come to that.

THE COURT:  Quite all right.

MR. LOEVY:  Can I ask, this doesn't look like what we saw on the screen.  Is this the same one?

MR. FLYNN:  I was hoping to talk to you before the Judge came out, but the first one is a new one.  I'm just giving you a heads-up.

MR. LOEVY:  Okay.

MR. FLYNN:  The other two are ones that have already been shown.

MR. LOEVY:  Okay.  They're the exact copies of what was shown?

MR. FLYNN:  Exact copies.  And there's also a video that I was about to show on Friday --

THE COURT:  Right.

MR. FLYNN:  -- that's also been sent to them.  So, to the extent they have objections, I hope they're raised before Mr. Mancuso takes the stand.

MR. LOEVY:  So that video, the reason we objected because it's been manipulated.  You know, our understanding is anybody can show parts of the ERI transcript, and we intend to, but that one had, like, sort of a fast forward thing.

We have had a chance to look at it.  We have a counter

1116

where we're going to just use clips.  So, we've now seen it.

THE COURT:  Okay.  Great.  Sounds good.

MR. LOEVY:  All right.  And then -- all right.  Sorry, your Honor.

THE COURT:  No, please.

MR. LOEVY:  We had a proposal -- remember when we wanted you to take judicial notice of the Court's ruling. We've given them a one-sentence counter -- new proposal.  We haven't heard back, but, you know, we're going to start going downhill here, so we want to start moving things faster.  So, we're hoping we can get to an agreement on that.  If they just don't answer us, then we won't get to a stipulation.

So, I was wondering if we could get some timing on when we're going to get a response on that.

MR. GIBBONS:  Your Honor, just -- I think I'm the oldest one here, maybe not.  But that came in at 10:37 last night, p.m., and in all honesty, I was asleep.  So, when you get proposed stips at 10:37 p.m. on the day before trial, you know, we need to look at it.  We need to talk amongst ourselves with the team.

I just don't want to leave it hanging that we're ignoring them, which is what Mr. Loevy suggested.  It came in at 10:37 p.m.

MR. LOEVY:  And just to be clear, it's one sentence. Mr. Gibbons is right.  I'm not -- I'm just saying we've had a

pattern here, and I'm worried that we're just not going to get a response. So, I just want to make sure that we bring this all home before we close our case.

THE COURT: Fair enough. I appreciate both of your perspectives on it. And I'm more than prepared to give the defense team an opportunity to look at it and review.

I will add it to my list of topics to address with you all before we break for the day. If we can get to it during our afternoon break, fine, but we'll just put it on our list of things to be sure we touch upon this afternoon.

And if we're in a position to resolve it, or there's no disagreement, you can just let me know that. If there's something for me to decide -- that way I'll have an opportunity to take a look at it, too, and we can go from there.

So, we should add that to the list of things we'll talk about this afternoon.

MR. LOEVY: Great.

We had -- you know, there's a medical -- I'm sorry, an evidence technician deposition that's maybe 35, 40 pages. Last night late we sent them a proposed stip, because I think the jury in time -- it will be great if we can just get our points, they get their points, rather than read a deposition.

THE COURT: Okay.

MR. LOEVY: Hopefully we'll be able to reach agreement on that, too; do it by stip rather than by testimony. Because

we're all trying to finish by Thursday so we can close on Friday.

THE COURT: Okay.

MR. GIBBONS: That was part of the 10:37 p.m. transmission.

THE COURT: Okay. So, we'll add that to the list of things to talk about this afternoon before we break.

MR. LOEVY: That's it from our side, your Honor.

THE COURT: Okay.

MR. LOEVY: We have one more thing with a witness. R.J. Branch is going to testify today.

Well, I guess -- I haven't conferred with them yet. I'm going to confer with them, see if we can figure it out.

THE COURT: Okay.

MR. LOEVY: Thank you.

MR. FLYNN: Nothing from defense, your Honor.

THE COURT: Okay. So, the good news is, because we're waiting on a late juror, we have a few minutes. So, feel free to confer on anything you wish now. And if we need to take something up before the jury comes out, great. If not, we'll plan to bring them out as promptly and as close to 9:45 as we can, bearing in mind the timing isn't precise.

Yes?

MR. KAYES: I'm sorry, your Honor, one more item. The jury instructions.

1119

THE COURT:  Thank you.

MR. KAYES:  I think we sent those back, I believe, Monday.  We have not gotten them back on our side yet.

THE COURT:  Okay.

MR. KAYES:  If we could maybe set at this point some interim deadlines, that might be helpful.

THE COURT:  No, that is helpful.  In fact, I'm very glad you raised that, in part because we will need to -- if the goal -- and I understand that it's just a goal at this point. But if the goal is to try to get to closings on or around Friday, then we should set aside some -- today is already Tuesday.  We should set aside a pin on when we might want to sit down to have our jury instruction conference, just for planning purposes.

Do the parties -- I mean, one way we could do it is to tentatively plan to have the conference on Thursday at the end of the day.  Tomorrow seems like it's a little too soon if the parties haven't yet had an opportunity to go back and forth with their revisions.

So, one alternative would be Thursday afternoon we could stay a little later than we normally would.

Another alternative, although this sort of eats into your time, is have the jury come in a little bit later on Friday morning and we could do it on Friday morning.  But, obviously, that presents a bit of a problem with regard to your

preparations, right? It's always nice to know what is the judge going to say about the instructions before you have to actually stand up and say it and incorporate those into your presentation. So, I presume that that's a less preferable option.

MR. LOEVY: By a lot, especially since they always take longer than you think, and, you know, we'd hate to have closing kicked.

THE COURT: Right.

Thoughts on --

MR. GIBBONS: My only observation, your Honor, is we still don't know what the extent of their case is. I suspect that several claims will be dropped. I suspect Eddie Stanciel will not be called. Therefore, Detective Burke will not need to be called and the ASA will not need to be called in relation to the fabrication claim. The 911 fabrication claim has already been dismissed.

So, these instructions are effluent in the sense that I suspect other claims will be dropped. Don't know that now. I think this is turning into just a coercion case. But we don't know until the plaintiff gives us their final roster witnesses.

We can't have this jury conference until we know what the claims are, obviously. And, so, I think Thursday night at the earliest is probably the only time we can do this.

1121

THE COURT: Okay.

So, here's what I'm going to propose and I'll ask the parties to do. It's just a suggestion. I am very flexible. So, if this does not work, so be it.

I'd like to have the parties confer and provide their revisions to one another concerning the potential or proposed jury instructions in light of the revisions. You should exchange those so that you can have a set sent to me by Thursday morning.

I realize that things may continue to change and be fluid, but I'd like to have my law clerk, while we're proceeding with testimony, take a look at those just to get a sense of the framework on where we stand.

So, I'll need a draft by Thursday morning at 9:00 or 9:15, which means that at some point defense will need to provide their responses to the plaintiff's revised version of those instructions. Ideally, that would be sometime tonight or first thing tomorrow, so that the set that's sent over to me by Thursday morning at 9:00 is as close to the parties' presentation of that evidence as possible.

I'd like to have everyone tentatively hold Thursday for a jury instruction conference, but the reality is we just need to see where we are. If we're not close to finishing the evidence, then we'll need to push that conference to Friday. And if we push it to Friday, there's a good chance that --

1122

we'll just see where we -- how far we can get with the evidence on Friday, including the potential close out the evidence, spend the rest of the day amongst us ironing out the jury instructions, and then presenting closing arguments on Monday.

Obviously, that's not preferable if we can finish sooner, but a jury instruction conference is going to take some time. So, please hold Thursday after the end of the end of the testimony for that conference. If we're there or close, I'm happy to do it. But if we're not, then we'll need to finish the testimony on Friday and probably have the conference on Friday, with a plan to close on Monday.

It's just going to be fluid, and it's going to require flexibility. And that's my proposal, but I'm happy to be told otherwise if the parties think something else is achievable.

MR. LOEVY: Let's see how it shakes out.

MR. FLYNN: Agreed, your Honor.

THE COURT: Okay. All right. We're still waiting on one. So, we will see you in about 20 minutes, give or take.

MR. LOEVY: Thank you.

MR. GIBBONS: Thank you, your Honor.

MR. FLYNN: Thank you, Judge.

(Recess from 9:25 a.m., until 9:55 a.m.)

THE COURT: All right. I believe Mr. Singh, our juror who was running late because of car trouble, is here. So, hopefully we can get started here in a moment or two.

Mr. Mancuso, I'll ask you to resume the witness stand. Thank you.

(Jury in.)

THE COURT: Please be seated.

Good morning, ladies and gentlemen. Hope you had a wonderful holiday weekend, long weekend.

We are ready to resume with the testimony of Mr. Mancuso.

Mr. Mancuso, you remain under oath.

And, Mr. Flynn, you may resume your examination.

CROSS-EXAMINATION (Resumed)

BY MR. FLYNN:

Q. Good morning, Mike.

A. Good morning.

Q. I want to start today by talking about Marisol Ocampo. She was the witness who called while you were at the crime scene and said she had some information. It was the first main witness you interviewed?

A. That's correct.

Q. During your investigation, was Ms. Ocampo ever forced to stay at the police station?

A. No, she wasn't. She was free to leave.

Q. And Mr. Loevy asked you some questions about how she was at the police station for several hours before she gave her ASA handwritten statement. Why was that?

A.   Well, it just takes time to get the state's attorneys out there.  They want to make sure that we're ready, we've got as many witnesses as we can get.  So, it just takes time.

Q.   And during that time period when you were waiting for the ASA, state's attorney, to come out there, was Ms. Ocampo free to go?

A.   Yes, she was.

Q.   Mr. Loevy, during questioning, implied that there was evidence that Marisol Ocampo had stabbed someone in a separate event.

Are you aware of any evidence that Marisol stabbed someone?

A.   No, I'm not.

Q.   However, did the detectives hear from another witness who said that they saw Marisol Ocampo with a knife?

A.   I believe that happened.

Q.   And when the detectives interviewed the witness that discussed seeing Marisol Ocampo with a knife, was that interview with the other witness after you had already spoken to Marisol Ocampo?

A.   Yes, it was.  Hours later.

Q.   So, that other interview with that other person who said that they might have seen Marisol Ocampo with a knife, that couldn't have had any impact on what Marisol Ocampo had already told the detectives prior to that?

MR. LOEVY: Objection. Leading, your Honor.

THE COURT: Sustained.

Rephrase the question.

BY MR. FLYNN:

Q. Mr. Mancuso, the information that the detectives learned from the other witness about Marisol Ocampo potentially having a knife, could that have had any impact on what Marisol Ocampo told the detectives prior to the third-party interview?

A. It would have had no impact.

Q. Mr. Loevy also asked you some questions about another one of your 20 eyewitness, Eugene Stanciel. Do you remember that?

A. Yes.

Q. Okay. And he mentioned that Eugene Stanciel was arrested for the possession of a gun?

A. He did say that.

Q. Was there ever any shred of credible evidence that Stanciel was somehow responsible for the murder of Paris Jackson?

A. None.

Q. And if you did uncover any credible evidence that Stanciel was somehow connected to that murder, would you have arrested Eugene Stanciel?

A. Yes.

Q. I want to next discuss -- before we get back into some more of those ERI videos, I want to talk to you about another topic that Mr. Loevy asked you a lot of questions about, and that is

Mr. Brown's requests for a phone call. Do you remember those questions?

A. Yes.

MR. FLYNN: And if we could pull up a demonstrative, publish to the jury, please.

Would it be possible to zoom in on that at all?

Can everybody see that okay? Okay.

BY MR. FLYNN:

Q. Does this demonstrative detail the times that Mr. Brown requested a phone call?

A. I believe it does.

Q. Okay. Were the majority of those requests made prior to 5:50 p.m.?

A. Yes, they were.

Q. And what happened at 5:50 p.m.?

A. That's when R.J. came in with his father and his family.

Q. Okay. So, for the majority of these requested phone calls, is one of the reasons that --

MR. LOEVY: Objection. Leading.

THE COURT: Sustained.

Rephrase the question.

BY MR. FLYNN:

Q. Mr. Mancuso, what were one of the -- what was the reasons why, at least for these initial phone calls before R.J.'s at the station, as to why Mr. Brown wasn't allowed to make a call?

Mancuso - cross

1127

A.   Well, R.J. was still out there, and we didn't know if he was ever going to come in or we were going to find him, so we couldn't let him make calls to possibly warn him that he was caught.

Q.   Okay.  And, then, the call at 6:26 -- sorry, the request at 6:26 and the request at 7:21, are those requests made to you or to other detectives on the case?

A.   They were made to other people, other detectives.

Q.   And, then, if we -- you see here that there's no request for a phone call for over 28 hours, and then there's a request at 11:59.  Do you see that at the end?

A.   Yes, yes.

Q.   Was that request at 11:59 made by Mr. Brown after he had already made his admissions?

            MR. LOEVY:  Objection.  Leading.

            THE COURT:  Sustained.

            Rephrase the question.

BY MR. FLYNN:

Q.   When was that request for a phone call made?

A.   It was after Brown had already made his admissions.

Q.   And was Mr. Brown given a phone call?

A.   Yes.

Q.   What time?

A.   I believe it was a little after 1:00.

            MR. FLYNN:  If we could next pull up the timeline --

the other timeline demonstrative that we've used before.

BY MR. FLYNN:

Q.   So, where we left off on Friday was right around that 3:00, 3:30 mark there in the middle of the timeline.  Do you see that?

A.   Yes.

Q.   Okay.  And, so, at this point, Mr. Brown, you already testified, is in Phase 3 of his account of events.  Could you remind the jury what Phase 3 is?

A.   Well, Phase 3 is when he had finally told us that Day-Day was not shooting and it was strictly R.J. shooting.

Q.   Okay.  And during Phase 3, was Mr. Brown still denying that he had knowledge about the gun?

A.   Yes.

Q.   Okay.  I want to talk to you about that sleeping period. And I want to play a demonstrative that's going to have -- some of the spots in the demonstrative are going to be a time lapse.

But before we get there, were you and the detectives at any time trying to deprive Marcel Brown of sleep?

A.   No, we were not.

Q.   Okay.

MR. FLYNN:  So, we can play the demonstrative in one second.

And just so the jury's aware, this begins right around 3:30 and ends at 10:23.  There are portions of it that are sped

up, and you'll see a fast forward button like from an old VCR showing you what the time on the top, when the time's going by.

(Said video was played in open court.)

BY MR. FLYNN:

Q. Mr. Mancuso, I want to take that clip from the beginning.

First, towards the beginning Detective McDonald came into the room and asked him a question. Based on all your years working with Detective McDonald, do you think that Detective McDonald went into the room to purposely try to deprive Mr. Brown of sleep?

A. Not at all.

Q. And when you see kind of the light shift there, is that either you or Detective McDonald actually turning the lights off in the room?

A. That's correct.

Q. And when the lights are off in the room, is it pretty dark in there?

A. Yes.

Q. And we saw here that Marcel's in the room with the lights off for over six hours?

A. Correct.

Q. And the next morning towards the end of the clip, around 10:30, you come in to the room with breakfast from McDonald's, right?

A. Yes.

Q. Why did you give him breakfast?

A. Got to feed him and keep him happy and --

Q. You also ask him, is it warm, if it's not warm, I'll heat it up for you in the microwave, right?

A. That's correct.

Q. So, were you trying to keep Mr. Brown comfortable?

A. Absolutely.

MR. FLYNN: If we could switch back to the last timeline we were just looking at.

BY MR. FLYNN:

Q. And, so, going back to that sleeping period there, 3:30 to 10:23. On Friday, we discussed how you could have taken Mr. Brown down to the lockup, correct?

A. That's correct.

Q. And I believe you may have said this, I can't recall, that the lockup -- the conditions of the lockup are not much different than the conditions of the interview room?

A. They're not.

Q. Okay. So, I want to also discuss other reasons why you didn't bring Mr. Brown down to the lockup. Could you tell the jury why?

A. Well, I believe R.J. was already down in the lockup. So, we don't want them both in the same lockup talking to each other.

Q. Okay. Because at 3:30, it's just a half an hour after

Marcel admitted to you that him and R.J. had made up this story about Day-Day shooting. So, was there a concern that they might make up another story?

A. That's correct.

Q. Is there also the potential that during this time --

MR. LOEVY: Objection. Leading, your Honor.

MR. FLYNN: I haven't got the question out, your Honor.

THE COURT: Certainly. Finish your question. We'll see where we are.

BY MR. FLYNN:

Q. Is there also a potential that during this time that the ASA or an ASA would show up and want to speak to Marcel Brown?

A. Yes, that's correct.

Q. And if they wanted to speak to Marcel Brown, where would they need to do that?

A. Upstairs in our office somewhere.

Q. In that room that he's in?

A. In the room, yes.

Q. With the video playing?

A. Yes.

Q. So, I don't want to -- yet on Friday we already talked about that next time period there, which is the lineup. You already discussed what went into the lineup and what occurred in the lineup. And I believe we already discussed R.J. being

charged with murder at 4:15.

So, where I want to go next in this timeline is your next substantive interview of Marcel. And I'd like to play a clip.

MR. FLYNN: If we could play Mancuso 15. This is at 9:23 p.m., transcript 237, Line 15.

(Said video was played in open court.)

BY MR. FLYNN:

Q. In this feud -- excuse me. In this clip, are you discussing a feud between USDA and Young Money?

A. Yes.

Q. And at this time, what was your understanding as to who were the members -- who were some of the members of USDA?

A. Well, USDA was the three that showed up in the car.

Q. Mr. Brown, R.J., and T.J.?

A. Yes.

Q. Okay. And with respect to the other crew, Young Money that was mentioned here, generally speaking, who was part of this Young Money crew, to your knowledge?

A. Well, all the young guys in the park. Eugene Stanciel. I don't know if it was the guys that were -- that were sitting with Paris Jackson. I don't even know if he was part of it, but he was certainly sitting with those guys that were part of the group that claimed that territory at the park.

Q. And at the end of this clip, I think it's at Page 238, Line

5, Mr. Brown says, I don't want to go to jail for his plan.

Is that the first time that he mentioned to you that there was a plan?

A.   Yes.

Q.   Do you recall on Friday when we played that clip where Marcel said that R.J. always keeps his gun on him?

A.   Yes.

MR. FLYNN:  I want to play the next clip, Mancuso 16, and it's at 246, Line 5.

(Said video was played in open court.)

BY MR. FLYNN:

Q.   In this clip, Mr. Brown said that R.J. is like a pit bull and he goes crazy.  Did this raise your suspicions regarding whether Marcel would have known that R.J. had a gun on the way to the park?

A.   It did.

Q.   And prior to this clip, had Mr. Brown already told the detectives that Mr. Branch was a -- R.J. was a shit starter?

A.   Yes, he did.

MR. FLYNN:  If we could next go to Page 246, Line 24, and play Mancuso Clip 17.

(Said video was played in open court.)

BY MR. FLYNN:

Q.   In this clip, Mr. Brown is telling you about gun battles that he knows R.J. has been in prior to September 2008.  Did

that also raise your suspicions regarding whether Marcel knew that R.J. had a gun on the way to the park?

A.   It did.

MR. FLYNN:  If we could next go to Page 257, Line 15. I'm going to skip to Mancuso 19.

(Said video was played in open court.)

BY MR. FLYNN:

Q.   In this clip, you told Mr. Brown that the girls you had talked to said Taneshia starts trouble.  Was that true?

A.   Yes.

Q.   And Mr. Brown then tells you that R.J. is Taneshia's backup after she starts trouble, right?

A.   Correct.

Q.   Did that, again, raise your suspicions about whether or not Mr. Brown knew R.J. had a gun on the way to the park where his sister was in trouble?

A.   It did.

MR. FLYNN:  Okay.  If we could next go down to Page 265, Line 23.  We're going to play Mancuso Clip 20.

(Said video was played in open court.)

BY MR. FLYNN:

Q.   In this clip, and you can see it there on Line 19 and 20, Mr. Brown tells you that he thought R.J. was just going to stay in the car when they got to the park, right?

A.   Yes.

Q.   Okay.  So, at this point, Marcel had told the detectives that R.J. was a shit starter, he usually keeps his gun on him --

MR. LOEVY:  Objection, your Honor.  We're just restating the testimony in a leading way.

MR. FLYNN:  Your Honor, I can ask it a different way.

THE COURT:  Thank you.

BY MR. FLYNN:

Q.   Your Honor -- or, sorry.

Mr. Mancuso, based on all that information that we just went over in the clips about what Marcel was telling you about R.J., did you find it believable that Marcel would think that R.J. was just going to stay in the car?

A.   Not really.

MR. FLYNN:  If we could go to Page 283, Line 23.  I'm going to skip ahead a few minutes.  Same interview, but just a few minutes.  And we're going to play Mancuso Clip 22.

(Said video was played in open court.)

MR. FLYNN:  Maria, if we could go back up a page in the transcript, please.

You can go back down.  Line 15.

BY MR. FLYNN:

Q.   In this clip, Marcel tells you about a time that R.J. got locked up with a gun charge, right?

A.   Yes.

Q.   Okay.  And going back to this trial, you heard Mr. Brown's testimony that at this point of the interview, he's just trying to say anything he can bad about R.J. so he can get out of there?

A.   I believe so.

Q.   And he's just making stuff up about R.J.?  That's what he says anyway?

A.   Yeah.

Q.   But we now know that what he's telling you here about Mr. Branch, R.J., having a gun charge, that was true, what he's telling you?

A.   Correct.

Q.   There's also a time where Mr. Brown tells you that, hey, I can tell you that I knew he had a gun if that means that I can go home.  Do you remember that?

A.   Yes.

Q.   Did that concern you?

A.   It did.

Q.   How so?

A.   Well, he was -- seemed like he was trying to negotiate.

Q.   What do you mean by that?

A.   Well, tell me what he thinks I want to hear and maybe it will get him out the door.

Q.   Okay.  So, in other words, if I tell you he had a gun, I can go home?

A.   Yes.

Q.   Making a deal with you?

A.   Yes.

Q.   Okay.  And when he said something like that, what would be your response?

A.   Just tell us the truth.  Don't tell us what you think we want to hear.

Q.   Okay.  I want to skip ahead to the next interview.

At some point later in this night, did you come back and talk to Marcel along with an ASA, ASA Spizzirri?

A.   Yes.

Q.   Okay.  Why did you bring ASA Spizzirri into the room?

A.   Well, to introduce her to him, to Marcel, and see if there was going to be a handwritten statement, and the interview would be in the room where the camera's rolling.

Q.   Did you direct ASA Spizzirri to come into the room or is that a decision that she makes on her own?

A.   Well, it has to be done that way.  So, she might have said it and I might have suggested it, but --

Q.   Okay.  And when you brought ASA Spizzirri into the room -- we're going to play some clips from that interview -- did she start interviewing Marcel instead of you?

A.   I believe so.

MR. FLYNN:  Okay.  If we could go back to the transcript, Page 299, Line 3.  And we will play Mancuso Clip

23.

(Said video was played in open court.)

BY MR. FLYNN:

Q.   Is ASA Spizzirri, what we just watched, reading Marcel his Miranda rights?

A.   That's correct.

Q.   And is that the third time during this interview process that Marcel had been read his Miranda rights?

A.   Yes, it is.

Q.   And how does ASA Spizzirri begin the interview after she reads the rights?

Not in this clip, but do you recall, does she start right at the beginning with Marcel when she starts interviewing him?

A.   I believe she asked him to tell from the beginning.

MR. FLYNN:  Okay.  If we could go to Page 315, Line 6 of the transcript.  And we're going to play Mancuso 24.

(Said video was played in open court.)

BY MR. FLYNN:

Q.   In this clip, Mr. Brown's providing more information about what R.J. said in the car on the way to the park?

A.   Correct.

Q.   And he says that R.J. said, I want to F them N words up. Who did you understand he was referring to that were going to get F'd up?

A.   The guys in the park, the young guys, the males that were sitting near the girls.

Q.   Okay.  And in this clip, you're sitting in the corner being quiet and Ms. Spizzirri is in a chair.  Did you think that this was at all intimidating to Mr. Brown?

A.   I didn't think so.

MR. FLYNN:  Okay.  If we can go in the transcript to Page 336, Line 9.  Play Mancuso 25.

(Said video was played in open court.)

BY MR. FLYNN:

Q.   In this clip, ASA Spizzirri talks about how she has a voice in her head telling her that Mr. Brown likely knew more than he's letting on.  What did you understand her to mean by that?

A.   Well, sounds like she was telling him that he's -- that he knew or reasonably should have known what -- that R.J. had a gun.

Q.   Was it the same voice in your head throughout this interview when he was telling you he didn't know R.J. had a gun?

A.   Yes, it was.

MR. FLYNN:  Okay.  If we could go to the transcript 339, Line 19.  This is the same interview.  And we will play clip Mancuso 26.

(Said video was played in open court.)

BY MR. FLYNN:

Mancuso - cross

1140

Q.   In this line of questioning, ASA Spizzirri is talking to Mr. Brown about the guy in the park that he wanted -- he says he wanted to go talk to because he could potentially smooth over the situation with his sisters?

A.   Yes, that's correct.

Q.   Who's he talking about here?

A.   Eugene Stanciel.

Q.   Okay.  And, then, she asked him, why didn't you just call Eugene or get Eugene on the phone instead of going over there yourself?

A.   Yes, she did say that.

Q.   Did you think that was a good question?

A.   Yes.

Q.   Did he have a valid response as to why he needed to go over there himself?

A.   Not really.

        MR. FLYNN:  I'm going to try to skip some clips and just go to the transcript on the next one.  If we go to Page 362, Line 2.

BY MR. FLYNN:

Q.   Line 4, ASA Spizzirri says:  Listen to me, Marcel, I don't want you to tell me anything that's not true.  I'm not making you any promises.  If I've said anything to you that makes you think that you feel like you have to say something to get me to leave you alone, then tell me that.  That's not why I keep

Mancuso - cross

1141

asking you, okay? Do you feel that way?

Brown: About the gun thing.

Spizzirri: Okay. You think that I just want you to say that, whether it's true or not?

Brown: No, I think you want me to say that because you think it's true.

Spizzirri: I think it's true.

Brown: Mm-hmm.

Spizzirri: And I have reasons why I think it's true.

Mr. Brown: I know you have reasons.

ASA Spizzirri: If it's not true, then don't say it. I'm not telling you if you say that you're going to get out of here. I'm not telling you if you say that all of a sudden I'm going to believe everything. I just have to make sure.

Brown: I didn't know he had a gun until he got out of the car and hopped the gate.

Spizzirri: Well, wait. Were you saying a minute ago about it's all starting to make sense?

And I'll end it there.

So, in this line of questioning, is your understanding that ASA Spizzirri is making it clear to Mr. Brown that if he says R.J. has a gun, that does not mean that he's getting out of there?

A.   That's correct.

MR. FLYNN: If we could go now to Page 366, Line 5.

And we'll play Mancuso 29.

(Said video was played in open court.)

BY MR. FLYNN:

Q.  So, in this clip you again tell Marcel not to say something just because you think that might be what you want to hear, you want the truth?

A.  Correct.

Q.  Why convey that message to him again?

A.  Well, it's just letting him know -- I mean, we say it over and over again, we just want him to know we want the truth, not what he thinks we want to hear, or the state's attorney.

Q.  Okay.  And at the end of this clip, again, did you offer him food and water?

A.  Yes.

Q.  And were there times in this interview towards the end where Mr. Brown appeared to be emotional?

A.  Yes.

Q.  Did that concern you?

A.  A little bit.

Q.  Why did you think that he was getting emotional?

A.  Well, I think he was trying to hide his culpability and he's realizing what he said and what he's been saying.

Q.  He's realizing that he might be in a lot of trouble?

A.  Yes.

MR. FLYNN:  If we could go to Page 367, Line 4, and

play Mancuso Clip 30.

(Said video was played in open court.)

BY MR. FLYNN:

Q.   So, starting with Line 14 that we see there on the screen, Mr. Brown says:  I didn't know he had a gun.  I didn't know.

And ASA Spizzirri says:  Marcel, if that's the truth, that's what I want.

What did you understand her to mean with that response?

A.   Well, that she's telling him, don't -- don't say one thing if you mean another.

Q.   And the next line down -- on Line 21, I should say, Mr. Brown says, I don't want my life to be messed up for what he did.

Based on that, did that indicate to you that Marcel was aware that his admissions to the ASA could get him sent to prison?

A.   It appeared so, yes.

Q.   And when Mr. Brown took the stand in this case, he said that at this point, he just thought that he was going to be a witness for R.J., right?

A.   I think he said that.

Q.   Against R.J.?

A.   Yes.

Q.   Does this statement here contradict that he thought he was

just going to be a witness?

A.  Yes, it does.

MR. FLYNN:  I want to skip ahead a few minutes.  I'm only going to play two more clips, everyone's probably going to be happy to hear.

Skip ahead a few minutes to 11:47 p.m.  If we could go to the transcript 370 -- Page 370, Line 2.  And we'll play Mancuso Clip 32.

(Said video was played in open court.)

BY MR. FLYNN:

Q.  Mr. Mancuso, in this clip, Marcel tells ASA Spizzirri that on the way to the car, R.J. said he's getting tired of these people in the park and he's going to F them up?

A.  That's correct.

Q.  And did he explain what it meant to him when he heard R.J. say, I'm going to F someone up?

A.  Yes, he did.

Q.  What did he mean?

A.  He took it to mean he was going to shoot somebody.

MR. FLYNN:  If we could go to Page 374, Line 24, the final clip, and it's a short one.  We're going to play Mancuso 33.

(Said video was played in open court.)

BY MR. FLYNN:

Q.  So, in this clip, if we look at Line 7, Mr. Brown says that

Mancuso - cross

1145

R.J. says, I'm going to F these N words up, and he got to mumbling stuff. ASA Spizzirri asked him what was he mumbling. And, then, Mr. Brown, at Line 11 says, I'm tired of these Ns. These Ns touched my sister. They gonna die.

Correct?

A. Correct.

Q. And ASA Spizzirri then asks, see how I said I thought there were things that you weren't telling me, on Line 14 and 15?

A. Yes.

Q. And Line 16 and 17, Mr. Brown's response is: I thought that they would make me go to prison. I don't want to go to prison for his actions.

Do you see that?

A. Yes.

Q. Is this yet another indication to you that Mr. Brown was fully aware that these admissions could land him in prison?

A. That's correct.

MR. LOEVY: Objection. Leading again, your Honor.

THE COURT: Sustained.

You can rephrase the question, if you wish.

BY MR. FLYNN:

Q. Was this statement by Mr. Brown an indication to you that Marcel was aware that his admissions could land him in prison?

MR. LOEVY: Objection. Same objection, your Honor.

THE COURT: I think it was very close to the same

question.  So, sustained.

Mr. Flynn, you can rephrase.

BY MR. FLYNN:

Q.  Mr. Mancuso, Line 16 and 17, where Mr. Brown stated, I thought that would make me go to prison, I don't want to go to prison for his actions, what did that indicate to you?

A.  It indicated that he knew that by saying what he's saying at that moment, that he could go to prison for what R.J. did.

Q.  Mike, would you ever try to convince a suspect that if they confess to a crime, that that means they can go free?

A.  Never.

Q.  Have you ever tried to intimidate a suspect into giving a confession?

A.  Never.

Q.  Would you ever try to trick someone into giving a confession?

A.  No.

Q.  Would you ever try to coerce a confession?

A.  No.

Q.  Could you tell the jury why it is that you would never coerce a confession out of somebody?

A.  It just doesn't make sense.  If you're coercing someone, you're possibly leaving the real person out on the street.  We want the -- we want the right person.  I would never do that. It goes against everything that I've ever done as a police

officer.

MR. LOEVY:  Objection.  Opens the door, your Honor.

MR. FLYNN:  Your Honor, that's the end of my examination if we want to take that up.

THE COURT:  Okay.  I need to hear more from Mr. Loevy on his objection.  So, we'll hold that over.

Thank you, Mr. Flynn.

Mr. Loevy, why don't we begin your cross -- your redirect examination, and when we take a break, we can discuss any issues that we need to.

MR. LOEVY:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  All right.  Mr. Mancuso, we just saw the end of a 31-hour process, correct?

A.  Yes.

Q.  When he talked to Ms. Spizzirri, he had been rehearsing with you and the other detectives for the better part of two days, correct?

MR. FLYNN:  Objection.  Argumentative.

MR. LOEVY:  This is cross, your Honor.  I'm intending to be cross-examining.

THE COURT:  All right.  The objection is overruled.

You can answer.

BY THE WITNESS:

A.   I wouldn't say rehearsing at all.

BY MR. LOEVY:

Q.   All right.  Well, you understood that Mr. Brown understood this was his last chance to get out of the room, right?

A.   I don't know what he understood.

Q.   But you had been telling him over and over and over again whenever he asked if he could go home, that he's got to tell the truth, right?

A.   Yes.

Q.   And he kept telling you, I'm telling you the truth.  In clips we didn't see this morning, over and over and over again, he kept saying, I'm telling you the truth, right?

A.   He did.

Q.   And you kept telling him, no, no, no, not that truth.  You got to tell me the truth I'm trying to get to.  That was made very clear to Mr. Brown, wasn't it?

          MR. FLYNN:  Objection.  Argumentative.

          THE COURT:  Overruled.

          You can answer.

BY THE WITNESS:

A.   I don't agree with that.

BY MR. LOEVY:

Q.   When Mr. Brown would say, look, I didn't know he had a gun, can I go home now, you could have accepted that, right?

A.   We thought he was -- he was lying quite a bit in the

beginning.  We thought he was lying constantly through the interviews.

Q.  You said you would never coerce somebody or do anything coercive.  You could have accepted it when he told you the first 55 times that he didn't know he had a gun.  You could have accepted that, right?

A.  Well, again, his story was changing constantly.  We just thought he was lying again.

Q.  All right.  But you could have accepted it?

A.  I suppose.

Q.  All right.  Let's back up then and talk about how we got to the point with Spizzirri, and we'll double back to the Spizzirri because --

MR. LOEVY:  What time are we taking the midmorning break, your Honor?

THE COURT:  I was planning for about 11:15.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  Let's start on sleep.  Yesterday you said it's not uncommon to have people stay up all night in the interview room.

Did I get that wrong or correct?

A.  That I said that?

Q.  Yeah.  Did you say that or you didn't say that?

A.  I don't recall saying that.

Q.  Okay.  It was uncommon to have people spend all night in

that interview room, correct?

A.   It was uncommon?  No.

Q.   All right.  Have you ever worked for a police department other than the Chicago Police Department?

A.   No.

Q.   The timeline on the sleep --

        MR. LOEVY:  If we could have the document camera, please.

        The document camera.  Oh, you've got it.  Thanks.

        Can you can click over to the document camera?

BY MR. LOEVY:

Q.   Showing you the demonstrative that your counsel showed you, total time of sleep approximately nine hours.  Do you see that?

A.   Yes.

Q.   With a little icon of a bed?

A.   Yes.

Q.   That's probably a bad choice, right?

        MR. FLYNN:  Objection.  Argumentative.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  He didn't have a bed, obviously, right?

A.   Correct.

Q.   All right.  You -- in your estimation, he slept approximately six hours, I think you said, between 4:00 in the morning -- 3:00 -- what time did you say he was sleeping?

A.   Might have been around 4:00.

Q.   All right.

MR. LOEVY:   And, Lilia, if we can play 501, please.

BY MR. LOEVY:

Q.   We're going to show you what happened during the sped-up times there.  Because you showed a video where some of it was sped up, right?

A.   It was shown, yes.

Q.   All right.  Let's take it a little slower.

MR. FLYNN:   John, did you say 501?

MR. LOEVY:   501.

Locke gave you the new key.

MS. MARTINEZ:   501 is not on the key.

(Pause.)

MR. LOEVY:   Your Honor, 501 is a compilation of other clips.  It is nothing new.  It is not manipulated.  So, it's just, to speed it up, we've put clip after clip.  And we'll stop before each one.

THE COURT:   Any objection?

MR. FLYNN:   Your Honor, I tried to play my sleep demonstrative on Friday and he objected to it.  Now he's trying to play one that he didn't send me.  So --

MR. LOEVY:   This is not a demonstrative, your Honor.  Only it is is video of the clips -- clips of the interview.  It is not sped up or anything sped up.

Mancuso - redirect

1152

THE COURT: The objection is overruled. You may play the compilation or, whatever, 501.

(Said video was played in open court.)

BY MR. LOEVY:

Q. This shows 3:29, because you have him start sleeping at 3:30 on your timeline, right?

A. Yeah.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. This shows 3:30 here on the time.

MR. LOEVY: Stop, Lilia.

BY MR. LOEVY:

Q. He gets woken at 4:26, right?

A. Apparently.

MR. LOEVY: All right. Keep going.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. So, it wouldn't really be fair to say he's sleeping from 3:30 to 10:30 if he's awoken at 4:30, right?

A. Okay. You're correct.

MR. LOEVY: If we can fast forward it through a little bit through, Lilia -- not fast forward, but move it -- advance it.

(Said video was played in open court.)

MR. LOEVY: All right. That's good, Lilia.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  So, he's asking, as he did throughout this interview, he wants to talk to the state's attorney, right?

A.  I believe so, yes.

Q.  And your understanding was -- he's, like, I've already told you a hundred times I didn't know he had a gun.  I want to talk to the state's attorney and tell her I didn't do anything wrong, right?

MR. FLYNN:  Objection.  Argumentative, misstates evidence.

MR. LOEVY:  It's cross, your Honor.

MR. FLYNN:  Can't misstate evidence.

MR. LOEVY:  It's a question.

THE COURT:  Please rephrase the question.  Otherwise, the objection is sustained.

MR. LOEVY:  All right.  Let's move forward.  Play it.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  All right.  So, that's 4:29 he's still not sleeping, right?

A.  I think he was until the door opened.

Q.  So, between 4:28 and 4:29 he tried to fall asleep there, right?

A.  Apparently.

Q.  And he jumped when the door opened, right?

Mancuso - redirect

1154

A.   Yes.

Q.   All right.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   So, why was the light -- first thought of the light getting turned off at 4:30 in the morning?

A.   I think we were still talking to him prior to that.

Q.   All right.  And that shirt was for what purpose?  He hands him a shirt.

A.   Another layer, if he puts it on, and doesn't use it as a -- whatever he used it for.

Q.   He had to choose between pillow or blanket, right?

A.   He didn't have a choice.  I mean, they gave him whatever was available.

Q.   They gave him a shirt.  He had a choice, either use it for a pillow --

A.   Right.

Q.   -- or try to keep his body warm, one of those two things?

A.   Correct.

     MR. LOEVY:  All right.  This is 4:31.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  Would you agree with me it looks like he's intentionally trying to prevent him from sleeping, right?

     MR. FLYNN:  Objection.  Argumentative.

Mancuso - redirect

1155

THE COURT: Overruled. He can answer.

BY THE WITNESS:

A. I don't think so.

BY MR. LOEVY:

Q. In other words, doesn't it look like he wants Marcel to think at any moment somebody could come into the room and ask him isn't it true what was going on in the park?

A. I can't agree with that.

Q. You know, was there an urgent need at 4:32 to ask him the same question that had been asked a hundred times?

MR. FLYNN: Objection. Misstates evidence.

THE COURT: Overruled. He can answer.

BY THE WITNESS:

A. I do not know why he went in a second time.

BY MR. LOEVY:

Q. That was inappropriate, right?

A. He might have had some reason. Maybe the state's attorney says ask him again. I don't know.

Q. Can you answer whether you think that was inappropriate or not?

A. No.

Q. No, not inappropriate?

A. No.

MR. LOEVY: All right. Continue.

(Said video was played in open court.)

Mancuso - redirect

1156

BY MR. LOEVY:

Q. That was the same question he had asked that we sped forward through the first time, right?

MR. FLYNN: Objection. Asked and answered. This was all dealt with on Thursday, your Honor.

THE COURT: Sustained.

MR. LOEVY: Let's move forward.

All right. This is 4:51.

(Said video was played in open court.)

BY MR. LOEVY:

Q. Is he sleeping?

A. Seems like it.

Q. Probably seems like he's not sleeping, right?

A. Correct.

Q. All right. This was fast forwarded on the video Mr. Flynn showed you, right?

A. I'm sorry?

Q. This was part of the fast forwarded sleeping video, right?

A. I don't know. It might have been. I don't know.

Q. All right. Showing you 5:02, does it look like he was sleeping at 5:02?

Doesn't look like he was sleeping, right?

A. Correct.

Q. It's hard to sleep on that little bench, isn't it? Isn't it?

A.   It might be.

Q.   And just because someone's laying doesn't mean they're sleeping, right?

A.   Correct.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   Especially if they're cold, right?

A.   I don't know.

Q.   6:05, does it look like he's sleeping at 6:05?

A.   No, he's sitting up.

Q.   Was he up all night, sir?

A.   I don't believe so.

Q.   Looks like he's chosen blanket over pillow at this point?

A.   Not sure.

Q.   All right.  6:30 doesn't look like --

          THE COURT REPORTER:  Mr. Loevy, I can't hear you.

BY MR. LOEVY:

Q.   At 6:30 he's not sleeping, is he?

A.   Looks like he's moving around.

Q.   Can you answer the question, though?  It doesn't look like he's sleeping, does it?

A.   Correct.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   At 6:56, it doesn't look like he's sleeping -- it doesn't

look like he's sleeping then either, does it?

A. Correct.

Q. How about at 9:08? He's not sleeping at 9:08 either, is he?

A. At that moment, no.

Q. Just because someone's lying there, you can't tell if they're sleeping or not, right?

A. Correct.

Q. Same with at 10:05, right? Or 10:22?

A. Well, he's apparently up at 10:22. 10:05 he could have still been sleeping.

Q. All right. Or he was just trying to sleep, one or the other, right?

A. Correct.

Q. Would you agree with me that, based on what we've seen here, it looks like he was up all night?

A. I wouldn't say all night.

Q. All right. If you -- you know, if you're a teenager, continuous sleep to get into REM sleep is really the definition, right?

A. I'm not sure.

        MR. FLYNN: Objection. Foundation.

        THE COURT: Sustained.

BY MR. LOEVY:

Q. This boy never got into a deep sleep that night --

MR. FLYNN: Objection. Foundation.

BY MR. LOEVY:

Q. -- correct?

THE COURT: Overruled. That question can stand.

You may answer.

BY THE WITNESS:

A. I couldn't say.

MR. LOEVY: All right. Continue.

(Said video was played in open court.)

BY MR. LOEVY:

Q. That's when you came in with the McDonald's?

A. I believe it's coming, yes.

MR. LOEVY: All right. Thanks, Lilia.

BY MR. LOEVY:

Q. Now, he was basically up all night, wasn't he?

MR. FLYNN: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. If you had known he had been up all night, would you have treated his interrogation the next day differently?

MR. FLYNN: Objection. Assumes facts not in evidence.

THE COURT: Overruled. He can answer.

BY THE WITNESS:

A. We have to talk to him, so that's -- I couldn't say if he was sleeping when I get there in the morning. I'm not going to

know at that time that he did or didn't sleep all night.

Q. Of course, you had talked to him all day from 3:00 in the afternoon till 3:00 in the morning on day one, right?

A. Yes.

Q. Okay. So, you -- if you had known he had been up all night, would you have continued interrogating him on day two and brought him to see the state's attorney around midnight on day two, if you had known he had been up all night the first time?

A. We probably would have still done whatever -- what we did.

Q. Of course, by then he's going on his second night in a row without any sleep, right?

A. I can't say that.

Q. You did feed him McDonald's that morning, right?

A. Yes.

Q. That was the only meal that you saw him eat between September 3rd and September 5th, correct?

A. That's the only one I saw, yes.

Q. There was a question yesterday about whether Detective McDonald raised his voice, and you said it was only one time.

It was more than once, wasn't it?

A. One that I remember.

Q. Do you remember -- this is Page 92 of the transcript -- when McDonald, the one we saw, you're lying to me. I know you're lying to me. And he says, could you stop talking so

Mancuso - redirect

1161

loud?

You remember that one, right?

A.   Yes.

Q.   And, then, on Page 93, McDonald's telling him:  We're going to put you in a juvenile facility.  You might end up in prison.

And Brown says:  What am I getting charged for?  I ain't done nothing.

And McDonald said:  Well, you're going to be charged. I told you why.  You drove him up there.

And Brown says:  But I ain't even --

And, then, on Page 94, McDonald's yelling at him:  I told you from the get-go, we need the truth.

And he says:  What are you speaking loud for?

Do you remember that?

A.   Not specifically, no.

Q.   All right.  Even if that was the only times that Brown asked him to take it down, that doesn't mean he wasn't getting aggressive with Brown on other occasions, right?

A.   I couldn't say.

Q.   All right.  Yesterday Mr. Flynn asked you about Wham Cary, if you've ever laid eyes on Wham Cary.

If you knew Wham Cary was in the station, Mr. Brown had a right to be notified, correct?

A.   That's correct.

MR. FLYNN:  Objection, your Honor.  Goes to the motion

in limine.

THE COURT:  That question can stand and the answer can stand.  Overruled.

BY MR. LOEVY:

Q.  All right.  There's no dispute in your mind that you would have been notified if Wham Cary was trying to see Marcel, right?

A.  Yes.

Q.  Yes, you agree with me?

A.  Yes, I would have been notified.

Q.  Because if anybody in the police station got word that there was an attorney, it would have funneled its way up to the lead detectives, right?

A.  Correct.

Q.  There's just no dispute in your mind on that?

MR. FLYNN:  Objection.  Asked and answered.

MR. LOEVY:  This is in response to the questions Mr. Flynn asked him, your Honor.  It's also the last question.

MR. FLYNN:  He asked it two questions ago.

THE COURT:  It is asked and answered, but I will allow the witness to answer, since you just represented you're moving on.

BY THE WITNESS:

A.  Correct.

BY MR. LOEVY:

Q. All right. Let's talk about phone calls.

MR. LOEVY: If we could have the document camera back, please.

BY MR. LOEVY:

Q. If I understood what you said this morning, the reason he didn't get the phone calls the first five, six times he asked was because R.J. hadn't been arrested? Is that what you're saying?

A. That's correct.

Q. So, when you told Mr. Brown, hey, just a few minutes. We'll get you a phone call in just a few minutes, you were lying?

A. I wouldn't say I was lying.

Q. Well, you didn't -- I thought you said you had a reason you weren't -- there's no way this kid was going to get a phone call until R.J. was arrested, right?

A. Probably, correct.

Q. All right. So, when you said to him, okay, just a couple minutes, couple minutes, that was a lie, right?

A. I don't like to use the word lie.

Q. Well, you like to use it an awful lot when you describe what Mr. Brown's saying to you.

A. That's not true.

Q. There were two phone calls after R.J. was -- or two requests for phone calls after R.J. was arrested, correct?

A.   Yes.

Q.   All right.  You could have allowed Mr. Brown to use the phone then, right?

A.   He didn't request them to me.

Q.   All right.  Just to be clear, though, he absolutely should have been given a phone call within a reasonable period of time if he requested it in that room, right?

MR. FLYNN:  Objection, your Honor.

THE COURT:  Overruled.  The question can stand.

BY MR. LOEVY:

Q.   You need me to ask it again?

A.   No, he could get one in a reasonable --

Q.   No, he needed to get one, right?  It was your understanding that you had to give him a phone call within a reasonable time if he asked for it, correct?

A.   Correct.

Q.   And that would apply to all of his requests, right?  Within a reasonable time there's just no question he should have got a phone call, right?

A.   At some point.

Q.   At a reasonable point -- a reasonable amount of time, right?

A.   Correct.

Q.   Not after 34 hours and after you've subjected him to a state's attorney and gotten incriminating information.  That's

not reasonable amount of time, right?

A. Well, some of the requests were less than an hour after he even arrived at the station. So --

Q. All right. You can still honor that, right?

A. We had just got there.

Q. All right. But you didn't tell him, hey, buddy, you just got here, I'm not giving you a phone call, I got to ask you some questions. You certainly didn't tell him that, right?

A. I don't think so.

Q. You told him the opposite, right?

A. I don't know what I said to him.

Q. Well, you said over and over, sure, you'll get a phone call, just give me a minute, just give me a minute. That's what you said, right?

A. Correct.

MR. LOEVY: Now, if we could play 240 --

BY MR. LOEVY:

Q. You said there was no requests until after he asked that state's attorney. That's what this demonstrative shows?

A. I believe so.

MR. LOEVY: All right. Let's show 243.

MR. FLYNN: The transcript number?

MR. LOEVY: This is 243 on the key, Clip 243.

MR. FLYNN: We got multiple keys here, one second.

MR. LOEVY: It's the same one.

MR. FLYNN:  Is that the one we got this morning or last week?

MR. LOEVY:  243 remains the same, Mr. Flynn.  The one you got later adds more clips, but the clips are all the same.

MR. FLYNN:  Okay.

MR. LOEVY:  243.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  All right.  So, what time was that?  That was at 10:00 o'clock on day four, right?

A.  I'm not sure what day it was.

Q.  Well, take a look at the timestamp and see if you can figure it out.

2200 is 10:00 o'clock, right?

A.  Correct.

Q.  And I'm sorry, day two, September 4th, right?

A.  Day two, yes.

Q.  So, he asks for his phone at 10:00 o'clock, right?

A.  He asked if it was there.

MR. LOEVY:  All right.  If I could have the document camera back, please.

BY MR. LOEVY:

Q.  So, he is asking for -- you know, to get access to his phone at 10:00 o'clock before the state's attorney arrived, correct?

Mancuso - redirect

1167

MR. FLYNN: Objection. Misstates his testimony.

MR. LOEVY: It's a question.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Is that how you understood it, that he was asking for access to his phone at 10:00 o'clock, before the state's attorney arrived?

A. I took it he was just asking if his phone was there.

Q. Just inquiring on its well-being?

A. It's what he said.

Q. All right. And you think Mr. Brown might have sensed there was some futility to asking for his phone, if he had asked all these times and everybody kept lying to him, that he wouldn't keep asking? Know what I mean?

MR. FLYNN: Objection. Foundation. Argumentative.

THE COURT: Overruled.

You can answer, if you know.

BY THE WITNESS:

A. I don't know what he thought. I mean --

BY MR. LOEVY:

Q. Did you give him the impression that asking for his phone was sort of a futile exercise, that he wasn't going to -- you know, you guys kept telling him a few minutes and he never got it, eventually someone's going to give up asking, right? Do we agree on that?

A.    In theory, yes.

MR. LOEVY:  All right.  Your Honor, at this point, you did say that you were thinking about a break now.  This might be a good time.

THE COURT:  All right.  Ladies and gentlemen, we'll take a 15-minute morning break.

Please don't discuss the case.  We'll be back and ready to go at 11:30.

All rise.

(Jury out.)

THE COURT:  You may be seated.

Mr. Mancuso, you are excused from the witness stand.

Please don't discuss your testimony during the break.

THE WITNESS:  Leave the courtroom?

THE COURT:  Just for good measure, if you could.

(Witness excused from courtroom.)

THE COURT:  All right.  I'd like to give the parties their 15-minute break, as well.  I'm happy to take up anything we need to take up first.

I am curious, though, Mr. Loevy, about how much longer do you think you need on your redirect?

MR. LOEVY:  I'm hoping to finish before lunch.

THE COURT:  Okay.  I assume there will be some -- or can you tell me whether or not you anticipate some recross on behalf of the defense?

MR. FLYNN: As it stands, it will be less than five minutes.

THE COURT: Okay.

All right. So, Mr. Loevy, I'd like to go -- to finish your examination by the lunch break. We started a little late today, so I'm hoping we can get that done today so that we can finish with Mr. Mancuso's testimony at or near our lunch break, and we'll go from there.

MR. LOEVY: Thank you, your Honor.

As long as we're all here outside the presence of the jury, the objection was, he implied there was no way I would ever do anything improper at the Chicago Police Department. We think that opens the door to prior lawsuits and OPS complaints.

THE COURT: Response?

MR. FLYNN: Absolutely not, your Honor. He has a right to take the stand and defend these claims and explain to the jury why he would not do these things that he is accused of doing. It does not open the door to other things that he's done in other cases.

MR. LOEVY: Your Honor, you have the text of what the question was, but I think it was a pretty opening the door question.

THE COURT: I think it was awful close, but I'm not going to conclude that that opened the door. I think it was awfully close, but I do think he was simply defending his

experience in the case or his view of what happened.

So, I'll conclude that he has not opened the door. But obviously, that's not impossible that he wouldn't in future answers to questions.

Anything else, Mr. Flynn or Mr. Loevy, before the break.

MR. LOEVY: Not from the plaintiff.

MR. FLYNN: No, your Honor.

THE COURT: Okay. See you in 15 minutes.

(Recess from 11:16, until 11:36 a.m.)

(Jury in.)

THE COURT: Please be seated.

All right. Mr. Loevy, you may resume your examination.

BY MR. LOEVY:

Q. All right. Sir, I want to ask you some questions about Mr. Flynn's inquiry about whether Marcel knew he was under arrest.

I believe your testimony yesterday was you heard some clicking on that video and that meant something to you?

A. Which video?

Q. Just to be clear, Marcel was misled about whether he was under arrest for murder, correct?

A. No.

Q. We've seen those videos where he expressed genuine

surprise, right?

A.  I can't say if he was surprised.  I mean, I don't know.

Q.  But there was something about a clicking sound that made you think that that proved that he knew?

You don't remember that from yesterday?

A.  I do.

Q.  All right.  What was the clicking sound?

A.  Should have been handcuffs coming off his -- just outside the door to the room.

Q.  Didn't it just sound like that door just opening and closing?

A.  Well, I thought it was clicking of handcuffs.

Q.  Can't be sure, though, huh?

A.  No, I was pretty sure.

MR. LOEVY:  All right.  Let's show 123 -- Clip 123. If we can have the clips here.

BY MR. LOEVY:

Q.  In your mind, he knew he was under arrest.  That's what you're telling us?

A.  Yes.

MR. LOEVY:  We need the interrogation clip.  123.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  This is at 1:25 in the morning on day two, right?

MR. FLYNN:  Objection, your Honor.  Asked and

answered.  We've already gone over this clip.

MR. LOEVY:  It's responsive to Mr. Flynn's question.

THE COURT:  It is.  Overruled.

You may --

BY MR. LOEVY:

Q.  It is --

MR. LOEVY:  I'm sorry, your Honor.

THE COURT:  Go ahead.

BY MR. LOEVY:

Q.  1:25 on day two, right?

A.  On the 4th, yes.

MR. LOEVY:  Okay.  Continue.

(Said video was played in open court.)

MR. LOEVY:  Stop and back it up a little bit there.

BY MR. LOEVY:

Q.  I want to see your reaction there.  Didn't you look a little sheepish, like, yeah?

A.  I wouldn't call it sheepish.

Q.  Let's see what you said.

(Said video was played in open court.)

MR. LOEVY:  Back it up a little bit.  We didn't quite catch the question and the answer.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  All right.  So, he said, am I under arrest, at 1:30 in the

Mancuso - redirect

1173

morning, and you're, like, yeah, right?

A.   Yes.

Q.   You weren't like, hey, Marcel, you've known the whole time for the last 12 hours that you were under arrest, right?

A.   That's kind of what my expression and my comment was.

        MR. LOEVY:  All right.  Continue.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  You said to Mr. Flynn yesterday that you thought he was being aggressive and disrespectful to you at one point in the interrogation?

A.   There was a point.

Q.   Okay.  Because for about 31 hours, he was not -- neither aggressive nor disrespectful to you, right?

A.   I don't know how many hours.

Q.   But at no point was he disrespectful or aggressive to you; would you agree with that?

        MR. FLYNN:  Objection.  Misstates testimony.

        MR. LOEVY:  It's a question.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   At one point, he was.

BY MR. LOEVY:

Q.   All right.  Let's take a look at that.

        MR. LOEVY:  It's 32X, if you could play that.

BY MR. LOEVY:

Q. This was earlier in the interrogation, sir.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. This is at -- very early in the interrogation, right?

A. Yes.

Q. And he was a lot feistier at the very beginning, right?

A. Yes.

Q. Okay. McDonald's telling him, I've been doing this 25-plus years, right?

A. Correct.

MR. LOEVY: Continue.

(Said video was played in open court.)

BY MR. LOEVY:

Q. Now, that wasn't proper, right, to tell him what other witnesses were saying?

A. I don't think it was improper.

Q. And, in fact, that wasn't even true, was it?

A. Yeah, it was true.

MR. LOEVY: Let's continue.

We'll talk about that in a bit.

(Said video was played in open court.)

BY MR. LOEVY:

Q. He's telling you, look, I didn't see the shooting, right?

He's saying, you can't make my see what I was --

MR. LOEVY:  Back it up a little bit.  Let's see what he was saying.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  He had said to you, hey, you guys are trying to make me say I saw the shooting, right?

A.  I guess, yes.

Q.  And that's basically what you were trying to do, right? Make him say he saw the shooting?

A.  No, we weren't.

Q.  Because he told you, look, I walked into the park.  I'm looking for my sister.  They're shooting in front of me. They're shooting behind me.  I couldn't see either shooter and I hit the deck.

That was his story, right?

A.  That was one of his many stories.

Q.  All right.  And you made him say, through questioning and questioning, that he wasn't going to get out of the room until he said he saw it was R.J. with a gun, right?

A.  Not true.

MR. LOEVY:  Okay.  Continue.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  All right.  So, that comment, "I ain't down with this,

Joe," he's telling you -- he's telling you, I perceive you're trying to make me see something I didn't see. That's what he's not down with, right?

A. I don't know what he meant by that. It's a disrespectful way of talking to us. But I don't know what he was thinking.

Q. All right. But in the context of when he said it, he's saying, you guys are trying to get me to say I seen something that I didn't see. I'm not down with that, Joe.

That's the context, right?

MR. FLYNN: Objection. Asked and answered.

THE COURT: Overruled.

MR. LOEVY: He didn't answer.

THE COURT: Overruled.

BY THE WITNESS:

A. That's what he said.

BY MR. LOEVY:

Q. And that was the context, right?

A. I suppose.

Q. Was it disrespectful if he had just said, look, you're trying to get me to see something I didn't see, I'm not down with that? That wouldn't have been disrespectful, right?

A. It's how he says it.

Q. Well, how about if he had said it just like that? You're trying to get me see something I didn't see. I'm not down with that. Is that disrespectful, the way he said it?

A.   Somewhat.

Q.   All right.  The word "Joe" in that context means dude or -- it's not a derogative term, is it?  It just means, like, dude or man.

A.   When it's directed towards police officers, it's a negative.

Q.   All right.  You don't -- if it's directed at non-police officers, it's just dude or man, right?  If it's Joe, it's just another word for dude?

A.   You can say whatever you want about it.  It's --

Q.   But you don't know --

A.   It is what it is.

Q.   All right.  It is what it is.

     But would it -- let's say you were trying to get him to see something he didn't see.  That would be something that would justify pushback; wouldn't you agree?

     MR. FLYNN:  Objection.  Form.

     THE COURT:  Sustained.

     Rephrase the question.

     MR. LOEVY:  I'll move to another area.

BY MR. LOEVY:

Q.   You said -- you told Mr. Flynn yesterday that you had no doubt Mr. Brown knew there was a camera.

     Did you give that testimony?

A.   Not yesterday, but I did give it.

Q. All right. And I asked you, like -- can you say with no doubt whether that device up there is or isn't recording or you just stop thinking about it and don't know? Is that fair?

A. I don't know what you mean.

Q. Do you know if that device up there is recording?

A. I don't.

Q. All right. And do you know if Marcel knew if the device in the room was recording?

A. Well, there was a red light. That usually indicates it's operational.

Q. What if he didn't know if it was a red light, green light or blue light? It was not his device.

A. He should have known. I would think he probably did know.

Q. You know, one way he should have known is if you had said to him, Marcel, just to be clear to you, I'm going to be asking you some questions and we're going to be recording your answers. You could have done that on the tape, right? Could have. Just leave it at you could have, right?

A. It's not something we focus on. It just -- it's there, and we reasonably assume people know it's recording.

Q. Because if they didn't know it was recorded, it's really not fair; wouldn't you agree?

          MR. FLYNN: Objection. Form.

          THE COURT: Sustained.

          Rephrase the question.

BY MR. LOEVY:

Q. Fair play would indicate that both of you should know you're being recorded; wouldn't you agree?

MR. FLYNN: Same objection.

THE COURT: Overruled. That question can stand.

BY THE WITNESS:

A. We're not required to tell them they're being recorded.

BY MR. LOEVY:

Q. I didn't ask about requirement. I said sense of fair play. You know it's going to be recorded so you can watch every single word carefully, right?

A. Yes.

Q. So, fair play would have required that both of you would know it's recorded; wouldn't you agree?

A. It just never crossed our minds.

Q. Fair.

You were asked some questions yesterday about Mr. Brown making statements about a stolen brown Chevy. Remember those questions? That he said R.J. was in a stolen car and he's, like, oh, there goes -- you're lying. Marcel's lying. Do you remember that line of inquiry?

A. Referencing a previous incident?

Q. Yeah.

A. Circling the park?

Q. Yeah.

A.   Yeah.  He said it was a gold Chevy probably --

          MR. LOEVY:  Let's play --

BY THE WITNESS:

A.   -- probably stolen.

          MR. LOEVY:  Let's play 140.2.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   This is at 3:00 o'clock in the morning on the second day, right?

A.   Correct.

          MR. LOEVY:  Continue.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   Now, that probably wasn't true, right?

A.   What?

Q.   That he was out of town that summer.

A.   I have no clue.

Q.   All right.  But at some point if you keep asking him questions, you sort of force a person to explain things; would you agree?

A.   No.

          MR. LOEVY:  All right.  Continue.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   So, you told him, we got witnesses saying there's a gold

car messing with kids in the park, right?

A. Correct.

MR. LOEVY: Okay. Continue.

BY MR. LOEVY:

Q. And that's when he said he used to have --

(Said video was played in open court.)

MR. LOEVY: All right. Continue.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. See you in a couple minutes. At 3:14, he's not going to be able to go to sleep then, right?

A. I don't know. I mean -- I don't know.

Q. You're telling him, don't prepare for sleep because I'll see you in a couple minutes, right?

A. I didn't tell him that. I didn't say don't prepare. I told him -- I told him I'd see him in a couple minutes.

Q. All right. Now, back to the Chevy Cavalier. That was probably made up, right, that R.J. had stolen a gold car and was driving around. That was probably made up; wouldn't you agree?

A. Probably.

Q. All right. But if you say to him, look, I got witnesses that says that R.J.'s driving around in a gold car shooting people, don't you think someone -- a suspect after 12 hours of interrogation is going to have to try to start making stuff up

to explain himself?

A.   He was thinking pretty good because he was distancing himself from his gold car going around the park shooting, and all of a sudden conveniently R.J.'s got a gold Cavalier.

Q.   Pretty convenient, right?

A.   Right.

Q.   You said at one point, some kids aren't even good at lying, right?

A.   I may have.

Q.   Yeah.   Because, like, he's just guessing at stuff to try to just talk his way out of this, right?

A.   Distance himself maybe.

Q.   Because whatever he was doing, it wasn't getting him out of that room, was it?

A.   Correct.

Q.   All right.   You talked about some delay from the state's attorney.   You could not have called the state's attorney in at that point, right, 3:00 in the morning?

A.   They work around the clock.   We could have.

Q.   But at that point, you didn't have any evidence that he knew there was a gun, and you didn't have any evidence that he knew there was a plan, right?

A.   Correct.

Q.   So, if the state's -- if you had called the state's attorney at day one or halfway through day two, they would have

said to you, well, what evidence is there that he intended to commit murder?  That would have been the first question, right?

A.  Probably.

Q.  And you would have had to tell them, well, we have arrested him for murder, but we don't yet have the evidence.  That's what you would have had to tell them, right?

A.  Probably.

Q.  And they would have said, get back in there and get me some evidence, right?

A.  It's hard to say what they would have said.

Q.  But the delay wasn't because of a lineup.  It was because there was no evidence; isn't that fair?

A.  We were still working the case.  I mean --

Q.  All right.  Let's talk about the other witnesses.

T.J.  You don't recall speaking to T.J., correct?

A.  I can't remember if I did.  I might have spoke to him at some point.

Q.  But the point is, you have no recollection as you sit in that chair?

A.  Not specifically.

Q.  All right.  Let's go over what you understand you knew about T.J.

T.J. was at the White Castle, right?

A.  Yes.

Q.  He went with R.J. and Marcel over to the park, right?

A.   Correct.

Q.   And he got out with R.J.  Unlike Marcel, T.J. and R.J. walked into the park together, correct?

A.   Correct.

Q.   And, then, after the shots are fired, T.J. flees back to the car, right?

A.   Yes.

Q.   All three boys ran back to the car and drove away?

A.   Well, Marcel exited eventually and came into the park.

Q.   All right.  And T.J. got put into one of those interrogation rooms at the station just like Marcel, correct?

A.   I believe so.

Q.   And it had a video camera just like Marcel's, right?

A.   Should have.

Q.   Every word that T.J. said or didn't say, took place in a room that could have been recording, right?

A.   Correct.

Q.   And did you warn T.J. that he could be charged with murder for being in that car?

A.   I don't -- no, I didn't.

Q.   Did you start telling him, hey, he has to tell you the truth as you see it or he's going to be charged?

A.   I don't recall saying anything like that.

Q.   Probably gave him the same business you gave Marcel, right?

A.   Probably --

MR. FLYNN:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  At the time, a suspect had to be videotaped; do we agree?

A.  Yes.

Q.  That's required.  You understood that was required, right?

A.  Correct.

Q.  All right.  Where is the video of the T.J. Scott interrogation?

A.  I don't believe one exists.

Q.  It should exist, right?

A.  I don't think he was viewed as a suspect.

Q.  He was in the car.  So, he would have heard whatever R.J. said in the car, right?

A.  Possibly.

Q.  I mean, if R.J. was just listening to music, then he had nothing to hide, right?

But I thought the theory was that they made a plan in the car.

A.  I don't know if that included T.J.

Q.  T.J.'s in the same car, right?

A.  Correct.

Q.  There's just three of them, right?

A.  Correct.

Mancuso - redirect

1186

Q.   All right.  Was T.J. ever arrested?

A.   No.

Q.   Was T.J. ever read his rights?

A.   Not that I know of.

Q.   Was T.J. ever treated as a suspect?

A.   I don't believe so.

Q.   All right.  But you guys did say to T.J., hey, you got to give us stuff on R.J., you got to give us stuff on Marcel, right?

A.   I don't know what was said to him.

Q.   Well, none of us know because you didn't turn on the video recorder, right?

A.   Correct.

Q.   Whose decision was it not to turn on the video recorder for T.J.?

A.   I don't recall.  I don't know.

Q.   Well, whose decision -- who would have been responsible for that decision?  You, right?  Lead detective?

A.   Me, myself, or McDonald.

Q.   All right.  Mr. Flynn asked you some questions about information you received from other witnesses in the park.  Do you remember answering those questions?

A.   Yes.

Q.   And you said you spoke to 20 witnesses, right?

A.   Correct.

Q.   Now, you didn't mean to imply that 20 witnesses said there was only one shooter.  You didn't mean to imply that, right?

A.   I don't think we did imply it.

Q.   All right.  Because, for example, the following people never said there was just one shooter:  Brandon Powell, Tytiana Williams, Marisol Ocampo -- at least not on August 31st -- Jasmine Jenkins, Krystine Jenkins, Krystal Jenkins, Ebony Jenkins, Shaquincia Williams, Amanda Moore, Shaniqua Grayer, Isaiah Davis, Sophia Bell, Deshaun Grayer, Brittany Williamson.  None of people said there was only one shooter, right?

A.   I think they all said there was only one shooter.

Q.   Not a single one of them in any GPR, in any report, does it say only one shooter.

          MR. FLYNN:  Objection.  Asked and answered.

BY MR. LOEVY:

Q.   Let's take them one at time.

          THE COURT:  Sustained.

          MR. LOEVY:  Okay.

BY MR. LOEVY:

Q.   Let's look at the first one.  Let's look at Ebony Jenkins.  Ebony Jenkins was a teenager, right?

          You took notes of your conversation, right?

A.   Correct.

Q.   And why is it important to take notes?

A.   Get their statement down.

Q. When it's fresh, right, so they can't change it later?

A. Correct.

Q. All right.

MR. FLYNN: You got an exhibit number, Jon?

MR. LOEVY: This is Exhibit 113.

MR. FLYNN: Thank you.

BY MR. LOEVY:

Q. And in the notes here -- by the way, did you ask how many people were shooting or just R.J. was shooting?

A. We probably asked both.

Q. And you're saying that they told you there was only one shooter?

A. Yes.

Q. All right. Let's go to the next one, Shaquina Grayer -- Shaniqua Grayer.

You took notes on your conversation with Shaniqua Grayer, right?

A. I may have.

Q. And you would have written down in your notes if you asked if anybody else was shooting or how many people were shooting, right?

A. Correct.

Q. All right. How about Sophia Bell? You would have written down if she saw more than one shooter, right?

A. I don't know who I talked to. I don't know if I talked to

all these people that you're mentioning, so --

Q.   How about Kema Davis?

        Well, we'll revisit the handwritten in a minute.

        But you're saying in all of the notes, you would have written down how many shooters there are and they would have told you how many shooters?

A.   Either in the notes or in their statements, if they gave handwritten statements.

Q.   I'm talking about their initial stories in the notes, not later.  Some of them had told different stories later, right?

A.   I don't know if they were different.

Q.   Well, some of them had inconsistencies, right?  They told you one thing and then when the state's attorneys got there they added details --

        MR. FLYNN:  Objection.  Form.

BY MR. LOEVY:

Q.   -- correct?

        THE COURT:  I didn't hear the basis for the objection, Mr. Flynn.

        MR. FLYNN:  Form.

        THE COURT:  Sustained.  You can rephrase.

BY MR. LOEVY:

Q.   All right.  You also didn't mean to imply that all those witnesses heard R.J. say what you told Mr. Flynn, that I'm going to get you or something like that, right?

All the witnesses were not saying that they heard that?

A.   That they heard, what?

Q.   You told Mr. Flynn yesterday that the information you received was that R.J. walked into the park and he was brandishing a gun and saying, I'm going to get you, or something like that, right?

A.   Right, right.  Some --

Q.   You didn't mean to imply that 20 people told you that, right?

A.   Correct.

Q.   Marisol Ocampo, at least on August 31st, Jasmine Jenkins, Krystal Jenkins, Deshaun Grayer, Alicea Hardiman, Vanessa Bell, Brittany Williamson, Kayla Kuykendoll, and David Portis, none of them said they heard him say anything like that, right?

A.   I don't know.

Q.   You didn't mean to imply that they were all saying that, right?

A.   I don't know -- I don't know who said what without looking at reports.

Q.   All right.  In any event, no one saw -- we established on my exam that no one saw Marcel with R.J. when the shots were fired, correct?

A.   Correct.

Q.   Now, you mentioned Marisol Ocampo, and you told Mr. Flynn,

Mancuso - redirect

1191

I think this morning, that she was free to leave, right?

A.   Yes.

Q.   Okay.  If someone had said she gave a knife to someone who got stabbed, then why was she free to leave?

A.   I don't think I was aware of that at that time.

Q.   Well, if you had been aware, she wouldn't have been free to leave, right?

A.   Probably.

Q.   So, in -- sometime in the 15 hours she was in the station, they never brought it to your attention that she was a suspect in the stabbing?

A.   Not until very late that evening.

Q.   All right.  So, why was she interviewed for that long?  Why did it take 15 hours to get her story?

A.   It didn't take 15 hours.

Q.   Why -- are you saying she voluntarily stayed in the station all that time?  She had nowhere she'd rather be?

A.   She stayed.

Q.   All right.  She was pregnant, right?

A.   Not that I know of.

Q.   And she had a one-year-old at the time, right?

A.   She did have a child.

Q.   And she just thought this was the only place she wanted to be was the police station?

          MR. FLYNN:  Objection.  Asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Her boyfriend also had been arrested that night, correct?

A. Eugene, I never knew he was arrested.

Q. But you did establish that you looked at the report and you learned he had been arrested for having a gun in the park when the shooting happened. Somebody was saying he had a gun, right?

A. Which he didn't have.

Q. Well, because when you arrested him, you couldn't find a gun, right?

A. Correct.

Q. And I'm not a detective, but that doesn't mean he didn't have a gun when the shooting happened, right?

A. I wasn't there that night, so I don't know. I don't believe he had a gun.

Q. And the report said, when the police went to talk to him, he ran from the police, right? That's what it said?

A. I believe so.

Q. That's why he got arrested, right?

A. For running.

Q. For running into traffic, right?

A. Yeah.

Q. Now, the Marisol Ocampo statement wasn't -- the one she eventually signed was typed, right?

A.   I don't know.

Q.   Take a look at --

           MR. LOEVY:   May I approach with 162, your Honor?

           THE COURT:   You may.

BY MR. LOEVY:

Q.   Just showing you, without going into details, does that refresh your recollection that it was a typed statement for the state's attorney?

     (Tendered.)

BY THE WITNESS:

A.   That certainly is typed.

BY MR. LOEVY:

Q.   All right.  So, at some point, Marisol Ocampo was given a choice, sign this or you're going to face charges, wasn't she?

A.   That's not true at all.

Q.   And she never was charged, correct?

A.   I believe the parties involved didn't want to prosecute --

Q.   She never was charged, correct?

A.   Correct.

Q.   And she never -- she testified against R.J., right?

A.   I believe so.

Q.   She was the witness who said, you know, R.J. was doing what R.J. was doing in the park, right?

A.   Correct.

Q.   But she didn't say anything about Marcel, correct?

Mancuso - redirect

1194

A.   At the time of her statement, it was that Marcel drove the car.

Q.   Right.

A.   And got out.

Q.   All right.  You were asked some questions about USDA and Young Money, that this was a territory thing.  That didn't pan out; is that fair to say?

MR. FLYNN:  Objection.  Form.

BY MR. LOEVY:

Q.   You didn't develop any evidence consistent with the theory that this was a USDA/Young Money thing, right?

A.   What we learned was from witnesses that it is a territorial dispute.

Q.   All right.  And as a matter of fact, Brandon Powell, Marisol Ocampo, Jasmine Jenkins, Krystal Jenkins, Krystine Jenkins, Ebony Jenkins, Shaquincia Williams, Amanda Moore, Shaniqua Grayer, Isaiah Davis, Sophia Bell, Johnella Dabbs, Deshaun Grayer, Tyrone Bailey, and David Portis, and even Marisol Ocampo in her GPR, all of them -- none of them said anything about a territorial dispute; do we agree?

A.   At some point they told us.  It may not be written down, but they told us.

Q.   All right.  But all --

A.   Several of them told us.

Q.   All of those people I just read, in the notes, it doesn't

Case: 1:19-cv-04082 Document #: 447 Filed: 09/30/24 Page 91 of 313 PageID #:25625

Mancuso - redirect

1195

say anything about this is a territorial dispute, right?

A.   I know I read it in one of the notes.

Q.   All right.  But you didn't mean to imply that 20 people told you that, right?  You think somewhere somebody told you that?

A.   Okay.

Q.   Could it have been Marisol Ocampo after she started cooperating?

          MR. FLYNN:  Objection to form.

          MR. LOEVY:  I didn't hear the answer.

          THE COURT:  There was an objection to form.

          Sustained.

BY MR. LOEVY:

Q.   All right.  You don't know what Young Money is, if I gathered your testimony from this morning, right?

A.   It's a group.  It's those guys, that crew that stays at the park, hangs out, that claims the park as their area.

Q.   Well, sir, it's a group of kids that are fancying themselves a rap group, right?

A.   They're not little kids.

Q.   Okay.  The group that this territory was was the Vice Lord Mafia.  That was the real gang in the neighborhood, right?

A.   That was the opposite side.  The --

Q.   No.

A.   -- USDA were -- some of them were Vice Lords.

Q.   Isn't it true that the only real gang in the neighborhood was Vice Lord Mafia?  We agree on that, right?

A.   I did hear Mafia Vice Lord mentioned, yes.

Q.   If you don't know, say I don't know.  But isn't it true that the only real gang in the area was Vice Lord Mafia?  Yes, no, or you don't know?

A.   I heard them mention -- that faction of Vice Lords mentioned.

Q.   That's got nothing to do with these rap groups, right?

A.   I think some of them are both.

Q.   All right.  Let's talk about enemy territory.

USDA didn't have any enemies.  They're rappers, right?

MR. FLYNN:  Objection.  Asked and answered.

MR. LOEVY:  Let me ask it again.

BY MR. LOEVY:

Q.   You're not aware of any enemies this rap group had, are you?

A.   You're saying USDA is -- they're not a rap group.  These guys at the park, they were not a rap group.

Q.   Okay.  You've heard Marcel say, USDA was a group of kids that when we were 14 -- 13, 14, 15, we called ourselves USDA.  That was the band of our favorite rapper, Young Jeezy.

You heard Marcel say that, right?

A.   Okay.

Q.   And he said, there's no criminal activity involved.  We're

kids who fancy ourselves rappers. That's what he said, right?

A. Rappers with guns.

Q. No. Marcel did not say, I'm a rapper with a gun. He said, I was with the kids and we called ourselves rappers, right?

A. Okay.

Q. And you have no reason to believe that this was, in fact, some kind of gang with enemies and guns, other than your prejudices; isn't that true?

MR. FLYNN: Objection, your Honor. Argu- --

THE COURT: Sustained. Sustained.

BY MR. LOEVY:

Q. All right. The idea here was that -- by the way, you have no reason to dispute that Marcel Brown walked into Amundsen Park all the time. You have no reason to dispute that, right?

A. I don't believe he ever did.

Q. Okay. But he told you, I'd go to picnics there. I'd go to softball games. My friends hung out there. Girls hung out there. Teenagers hung out there. Little kids hung out there.

That's what he told you, right?

A. He did say that.

Q. And you knew that Saturday night in late summer there were girls in the park, teenagers in the park, little kids in the park, people playing on the playground. That's what you knew to be true, right?

A. Correct.

Q. Did you have a preconceived notion that surely these must all be a hundred gang members?

A. From what we were told, they don't go in that park.

Q. All right.

A. Those three.

Q. So, of course, if Marcel doesn't go in the park, at least not without a gun -- that's what you're told, right?

A. More or less, yes.

Q. Okay. Of course, but what Marcel did was, he got out of the car and he walked into the park, right?

A. Correct.

Q. Okay. But I thought you just were told that Marcel doesn't walk into the park. That's what he did.

A. Well, with his friend who had a gun.

Q. No, he wasn't with his friend, was he? He walked into the park by himself, right?

A. After he got out of the car with R.J.

Q. Okay. If -- just thinking about whether the story made any sense, if he thought there was going to be a gunfight, would it make any sense that he would walk into a park and just, without a gun, just stand where there's going to be a gun fire? Does that even make any sense?

A. He walked in with his buddy.

Q. No. His buddy had walked in before, right? And in your mind, his buddy's planning a shootout, right?

A.   Correct.

Q.   So, wouldn't it make sense -- if this was true, wouldn't it make sense he'd be, like, the getaway guy that would stay in the car instead of walking into the crossfire?  Wouldn't that have made more sense, if he knew?

A.   He was part of the mentality of going in the park.

Q.   Right.  So, I'm just asking a different question, though.
          Wouldn't it have made a whole lot more sense to stay out of the crossfire if --

A.   It would have made more sense to not go there.

Q.   All right.  And another reason not to go there is because he drove a very distinctive car, right?

A.   It was noticed by everybody.  Everybody knew the car.

Q.   Everybody knew, Marcel Brown, he drives a gold Malibu, right?

A.   Correct.

Q.   So, if he was truly intending to go shoot up the park and hurt somebody, it probably didn't make a whole lot of sense that he drove his own car to the park, right?

A.   When people do these things, they don't think that far in advance.

Q.   All right.  It's also plausible that he drove his car to the park because he didn't know anybody was going to shoot anybody.  That's plausible, right?

A.   It's not plausible to go to a park that's under someone

else's domain.

Q.  What about all those other hundred people?  What about those teenage girls?  What about all those other boys?  Why is it plausible that these little kids are in the park?

A.  The girls went to the park after the block party.  Some --

Q.  The whole block party transferred to the park, right?

MR. FLYNN:  I just ask, your Honor, that the witness be allowed to finish his answer.

MR. LOEVY:  He's right.

MR. FLYNN:  He keeps interrupting.

MR. LOEVY:  He's right.

THE COURT:  Yes.  Thank you.

BY THE WITNESS:

A.  So, the girls went to the block -- from the block party to the park.

BY MR. LOEVY:

Q.  The whole neighborhood went from the block party to the park --

A.  Well --

Q.  -- right?

A.  -- from what I -- it could be.  But from what I understand, the group of girls that Marisol told us about, they were all friends.  Five of them were sisters.  They didn't say -- I think they went there to get away from, like, the parents and to go chill out at the park --

Mancuso - redirect

1201

Q.   Go play --

A.   -- by them- --

Q.   -- in the playground in the park, right?

A.   I didn't say play in the playground.

Q.   Well, that's what they did.  They went and played --

A.   They sat --

Q.   -- in the playground?

A.   They sat and hung out.

Q.   And I don't mean -- I mean, the teenage girl playground talking, right, not like playing on the swings?

A.   Right.

Q.   But there were actually little kids in the park playing on the swings, weren't there?

A.   I don't know.  I know some of the -- there were at least three children from the Marisol group that had -- that were there with their parents.  Some of those girls had -- I think three of them had children.

Q.   All right.  There were --

        MR. LOEVY:  Your Honor, at this time, plaintiff moves into evidence the event queries, which is Plaintiff Exhibit 416.

        THE COURT:  Any objection?

        MR. FLYNN:  One second, your Honor.  I'd like to see what he's talking about.

        MR. LOEVY:  Here is 416.

MR. FLYNN: Your Honor, we re-raise our objections to hearsay and foundation that were part of the motion in limine.

THE COURT: Okay. The parties will need to remind me where we came out on that.

MR. LOEVY: I'll lay some foundation, your Honor.

THE COURT: Okay. With that, I'll hold the ruling on the admission of the document until you lay some foundation.

BY MR. LOEVY:

Q. This is your investigation, right?

A. Yes.

Q. And it's your job to learn as much as you can about what happened in the park, right?

A. Correct.

Q. And one way to gather information is to determine what callers were saying about how many shots were fired, where they were coming from, that kind of thing, right?

A. Correct.

Q. And Mr. McHugh -- you know who Officer McHugh is at the police station, right?

A. Yes.

Q. Okay. He gave you a copy of the event history, didn't he?

A. I don't know if he gave it to me. It ended up in the file, I believe.

Q. All right. So, this is something you would have relied on as part of your investigation?

A.   Possibly.

MR. LOEVY:  All right.  We'd move it into evidence, your Honor, 416.

MR. FLYNN:  Same objection, your Honor.

THE COURT:  All right.  Overruled.  It will be admitted.

(Plaintiff's Exhibit 416 received in evidence.)

BY MR. LOEVY:

Q.   All right.  There were calls that night -- the Chicago Police Department memorializes these things, right?  If people call in, there's an event query created, correct?

A.   Yes.

Q.   So, for example, showing you Page 24, somebody called up and said, ten shots heard coming from the park area at 2300 and 43 seconds?

A.   That's correct.

Q.   Somebody else called at 23:59, said ten hot shots heard, calling from Bloomingdale and Merrimac?

A.   Correct.

Q.   This one was Bloomingdale and Melvina.

Now, at 23:06, someone called and said a group of male black with white T-shirt with guns, over 20 shots fired, right?

A.   Correct.

Q.   All right.  That says a group of males with guns, correct?

A.   Correct.

Q.   It sounds like a shootout, right?

A.   Not necessarily.

Q.   All right.  Well, it probably wasn't -- and you didn't -- did you make any effort to speak to any of these people, any of these witnesses?

A.   We did not.

Q.   You could have, correct?

A.   Could have.

Q.   All right?  You told -- and just to double back quickly on the question about whether Paris' body was there that night or the next morning, there was a call that came in about a shot at 11:41, correct?

A.   Correct.

Q.   And the demonstrative that you showed, showing you the demonstrative, somebody wrote no paper trail of this call.  Do you see that?

A.   Yes.

Q.   Okay.  How do you know it was at -- on McVicker if there's no paper trail, that call?

A.   I don't know how it's determined.

Q.   Well, why did you say there's no paper trail?

A.   We didn't have anything.  We just were told that a call came in five blocks away, 40 minutes later.  So, we thought, that's not connected to this.

Q.   Okay.  McVicker and Wabansia is not five blocks away, is

it?

A. Wabansia is a full block south of Bloomingdale, and then --

Q. McVicker.

A. Well, I'm talking about it's at -- it's at Wabansia.

Q. All right. There is a paper trail, correct?

A. I don't know.

Q. Let's look at --

MR. LOEVY: Your Honor, we'd move Plaintiff's 381 into evidence.

THE COURT: Any objection?

MR. FLYNN: One moment, your Honor.

(Pause.)

MR. FLYNN: Can I just take a look at what you're doing instead of trying to --

MR. LOEVY: Well, we're moving it into evidence, 381 into evidence, the dispatch.

MR. FLYNN: No objection, your Honor.

THE COURT: All right. It will be admitted.

(Plaintiff's Exhibit 381 received in evidence.)

BY MR. LOEVY:

Q. Did you review the dispatch transactions from the night before and the morning after?

A. I did not.

Q. That would have been part of your investigation?

A. Could be.

Q.   All right.  After the body was discovered -- the body was discovered the next morning, right?

A.   Correct.

Q.   And, then, it's not uncommon that there would be traffic on the police radio, correct?

A.   I don't know what you mean.

Q.   What is the dispatch vis-a-vis the police officers? Explain to the jury what the dispatch -- you know, where they communicate with dispatch.

A.   Well, when a citizen calls 911, it goes to our dispatch, which is many miles away.  And it gets reported.  And, then, they dispatch the -- they have a screen, and they can tell where every police car is at and they'll dispatch a car.

     So, that morning they dispatched a car that's either his -- that's his beat or there happen to be the closest, and they dispatch that car to the scene where the body is found.

Q.   And, then, showing you Page 19 of that dispatch transcript, this is an officer the next morning saying -- asking for the calls:  Check again, because I got a call earlier with shots fired from windows.  That was last night at 2259.  Did you get any other calls of shots fired?

     You know what, let me make sure before I give you this information.

     And, then, continuing, talking about the first one came in at McVicker, 2300 hours.  Then they had a call.  And

then, one of the last calls was 2341, McVicker and Wabansia, and states there was shooting there. If they put a 19B on this one, what's a 19 Boy? Sorry.

A. That's a code that there's no further information. When the officer shows up, they have to give a response to their assignment. 19 Boy means there's no one there on our arrival, no one there.

Q. All right. So, there was at least somebody calling that the police thought was related to the shooting in the park as late as 2341, correct?

A. Correct.

Q. All right. Just a few more. I'm going to go to the confession that we covered this morning.

The state's attorney told -- well, let me back up.

You told Marcel he wasn't going home until he told the truth, right?

A. Probably at some point.

Q. And he kept telling you at every point, I've told you the truth. I didn't know there was any plan to shoot anybody. I didn't know there was a gun. He kept saying that, right?

A. Correct.

Q. And you kept saying, you got to tell the truth. That's not working. You got to tell the truth, right?

MR. FLYNN: Objection. Form.

THE COURT: Overruled.

BY THE WITNESS:

A.   I never told him he was going home, first of all.  We just asked for the truth.

BY MR. LOEVY:

Q.   Right.

A.   And we felt he was lying --

Q.   And when --

A.   -- because he lied so much throughout the first half of the investigation.

Q.   And when the state's attorney got in the room, she told him what the truth was, right?

           MR. FLYNN:  Objection.  Form.

           THE COURT:  Overruled.

BY THE WITNESS:

A.   I don't know what you mean.

BY MR. LOEVY:

Q.   Remember when Mr. Flynn played that part:  I think the truth is that he had a gun?

           Do you remember the state's attorney telling Marcel that she thought that?

A.   I think so.

Q.   All right.  Let's -- Mr. Flynn actually, I think, read that part, didn't play it.

           MR. LOEVY:  Let's play 288.

      (Said video was played in open court.)

Mancuso - redirect

1209

BY MR. LOEVY:

Q. All right. That -- in the previous 31 hours of the interrogation, that's really the impression you all gave him; wouldn't you agree?

MR. FLYNN: Objection. Form.

THE COURT: Overruled.

BY THE WITNESS:

A. What do you mean that --

BY MR. LOEVY:

Q. In other words, he kept saying, I didn't know he had a gun, and you kept saying, you're not going home. And you kept telling him, got to tell us the truth, and he kept trying to tell you, I didn't know he had a gun.

You gave him the impression that he wasn't -- nothing was going to change until he told you R.J. had a gun; would you agree?

A. I don't know what he thought.

MR. LOEVY: All right. Let's go 289, the next.

(Said video was played in open court.)

BY MR. LOEVY:

Q. She said, if you think I'm trying to get you to say something, tell me. And he said, actually, I do. I feel like you're trying to get me to say the gun.

That's what he tells her, right?

A. He said about the gun thing, yes.

MR. LOEVY: Let's go to 290.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. So, just to be clear, if you're Marcel Brown, you're being told the truth is she believes that you knew there was a gun. That's what he's being told, right?

A. Yes.

Q. And he had been told -- how many times would you estimate he had been told, you're not going home until you start telling us the truth, and he kept saying, the truth is I didn't know I had a gun, and you kept saying to him, no, no, you're in trouble until you say a different truth?

That happened over and over and over again, right?

MR. FLYNN: Objection. Form. Compound question.

MR. LOEVY: It's a long question, but it's a proper question.

THE COURT: It is compound. So, sustained.

BY MR. LOEVY:

Q. Let's break it in half.

Over and over again he kept saying, the truth is I didn't know I had a gun, right -- he had a gun. He said that over and over, right?

A. He did say it several times.

Q. And at no -- he said it more than several. He probably said it more than 50, right?

Mancuso - redirect

1211

A.   I don't know.

Q.   All right.  And, then, at no point was he allowed to get out of the room, right?

A.   Correct.

Q.   And you kept saying to him, Marcel, you know, I think we need some truth here, we need some different truth.

You kept saying that to him, right?

MR. FLYNN:  Objection.  Misstates the evidence.

THE COURT:  Overruled.

BY THE WITNESS:

A.   I don't know if I said different truth.

BY MR. LOEVY:

Q.   All right.  The state's attorney told him what the truth is, right, in that clip we just watched; wouldn't you agree?

MR. FLYNN:  Objection.  Asked and answered.

THE COURT:  Overruled.

BY THE WITNESS:

A.   She said what she thought.

BY MR. LOEVY:

Q.   No, she said, if you want to convince me, I think the truth is you knew he had a gun.

We agree on that, right?

A.   I think she said that, yes.

Q.   And you had told him maybe 50 times, your ticket out of here is you got to convince that state's attorney you're

telling the truth, right?

You had told him that so many times.

A.   I don't know how many times.  Some times, yes.

Q.   Here he is, he was begging to talk to the state's attorney, right?

A.   Correct.

Q.   Over and over, right?

A.   A few times.

Q.   Because you led him to believe that the only way he was getting out of that room was if he convinced the state's attorney that he hadn't -- that he was telling the truth, right?

MR. FLYNN:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Now, when Mr. Brown said, I told you the truth, I didn't know, that state's attorney put some pressure on him, didn't she?

A.   I wouldn't call it pressure.

Q.   She said, are we done here, Marcel?  Are we done?  I'm leaving.  Are we done?  You got anything more to say to me?  We done?

She said that, right?

A.   Yes.

Q.   And he said, look, I don't know what to tell you.  I didn't

Mancuso - redirect

know he had a gun, right?

A.   He would go back and forth.

Q.   Well, at this point in the interrogation, he has been uniformly consistent that he didn't see a gun, didn't know there was a gun, right?

A.   At this point, I don't know what he -- I don't know what he was thinking.

Q.   All right.  And she said, listen, I got this little voice in my head saying you know more, right?

A.   Yes.

Q.   She's saying, I think you've told me everything, but I don't think you've told me everything, right?

A.   I think she said that.

Q.   And, then, she says, that's it, I'm leaving, right?  And she left, didn't she?

A.   She left the room.

Q.   And, then, you went in the room, right?

A.   Correct.

Q.   You tried to get him one more time to say he knew he had the gun, right?

         MR. FLYNN:  Objection.  Argumentative.

         THE COURT:  Sustained.

         MR. LOEVY:  Okay.  Let's show 311.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   Now, this is after you and the state's attorney have already worked him over, right?

MR. FLYNN:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  You went back in there to try one more time, right?

A.   He probably wanted to talk to me.

Q.   All right.  Well, she had told him, I'm leaving, I'm going home, right?

MR. FLYNN:  Objection.  Asked and answered.

MR. LOEVY:  That's a predicate question, your Honor.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   She had told him she was leaving, right?

A.   She did.

Q.   And Marcel was now facing the prospect of a second night without sleeping, right?

A.   I don't know.

Q.   And Marcel could have been forgiven for believing that you all were trying to prove R.J. was a murderer; wouldn't you agree?

MR. FLYNN:  Objection.  Form.

THE COURT:  Overruled.

BY THE WITNESS:

A.   We already knew about R.J.

BY MR. LOEVY:

Q.   Yeah, but if you're Marcel, the impression he was getting is you guys are squeezing him to say, you actually saw R.J. with a gun so you could put R.J. away.  That's the impression he thought you were trying to get him to do, right?

MR. FLYNN:  Objection.  Form.  Argumentative.

THE COURT:  Rephrase the question, Mr. Loevy.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   Mr. Brown didn't understand he was the one being interrogated at that point, right?

A.   He should have.

Q.   You were telling him -- in essence, giving him the impression that, he said he didn't see R.J. with a gun, but you needed him to tell you that R.J. had a gun, right?

A.   We weren't trying to tell him -- get him to say that.

MR. LOEVY:  All right.  Let's show 312.

(Said video was played in open court.)

MR. LOEVY:  May I have a moment to confer with Mr. Flynn, your Honor?

THE COURT:  You may.

(Pause.)

MR. LOEVY:  Your Honor, in the interest of finishing by lunch, I had proposed that I will stop my examination if we

could finish by lunch, and I'll let Mr. Flynn speak for himself.

MR. FLYNN: I told him I could get it in within ten or 15 minutes, if we're okay going that long.

THE COURT: Okay. I would like to finish the witness if we can.

So, Mr. Loevy, if you have any additional questions, now is the time. Otherwise, we'll tender the witness.

BY MR. LOEVY:

Q. You were asked some questions about whether he was emotional there, right?

Not in this picture, but there was a point where he started crying, right?

A. Yes.

Q. The place he started crying was, he kept saying, I didn't know he had a gun, I didn't know he had a gun. And she kept saying, are we done? I'm leaving, Marcel. Are we done?

And, then, he's, like, I didn't know. And, then, she left and then he started crying, right?

A. I believe so.

Q. And, actually, shortly before she left, she's like, if you can't tell me anything I'm going to leave, and then he lost it, right?

MR. FLYNN: Objection. Form. Asked and answered.

THE COURT: Overruled.

Mancuso - recross

1217

BY MR. LOEVY:

Q.   That's what happened, right?

A.   He started crying.

Q.   And, then, she left, and then a few minutes later he's knocking on the door.  He's, like, I want to talk more, I want to talk more, right?

A.   I believe so.

Q.   Because at that point, that kid was willing to say anything to get out of that room; wouldn't you agree?

A.   No.

MR. LOEVY:  All right.  I will turn it over to Mr. Flynn.

THE COURT:  All right.  Thank you, Mr. Loevy.

Mr. Flynn, you may resume.

MR. FLYNN:  Thank you, Judge.

If I could get the Elmo, please.

RECROSS EXAMINATION

BY MR. FLYNN:

Q.   Hey, Mike.  Mr. Loevy asked you about the lack of a paper trail regarding that 11:41 call.  Do you remember that?

A.   Yes.

Q.   Did you mean that there's no paper trail like this one that he showed you about the other calls?

A.   Correct.

Q.   Okay.  And, again, why were you not interested in that call

that occurred at 11:41?

A.   It was four to five blocks away and 41 minutes later.  It just -- we just didn't think it was connected at all.

Q.   Mr. Loevy asked you a question along the lines of, if you keep asking questions, people will start to explain things.  Do you remember that question?

A.   Correct.  Yes.

Q.   Is that literally your job description as a detective?

A.   It is.

Q.   Okay.  Mr. Loevy also asked you questions about what some witnesses did or didn't say.  Do you remember that, of the 20 eyewitnesses?

A.   Yes.

Q.   Okay.  I want to talk to you -- I'm going to list some witnesses and ask you if they did say these things.

     So, Marisol Ocampo, Ebony Jenkins, Amanda Moore, Shaquincia Williams, Shaniqua Grayer, Eugene Stanciel, Ashtin Warner, Tyrone Bailey, did all those witnesses specifically tell detectives that they saw someone they know as R.J. firing a gun in the park?

A.   I believe they did.

Q.   I'm going to list another set of names.

     Marisol Ocampo, Jasmine Jenkins, Ebony Jenkins, Krystine Jenkins, Shaquincia Williams, Shaniqua Grayer, Eugene Stanciel, Ashtin Warner, did all of those witnesses say that

Mancuso - recross

1219

they saw Marcel drive R.J. to the park in the Malibu seconds before the shooting?

A. Yes, they did.

Q. One more set of names.

Marisol Ocampo, Jasmine Jenkins, Krystal Jenkins, Ebony Jenkins, Krystine Jenkins, Amanda Moore, Shaquincia Williams, Shaniqua Grayer, Eugene Stanciel, Brittany Williamson, Ashtin Warner, Kema Davis, Kayla Kuykendoll, Tyrone Bailey, did all of those witnesses provide an ASA handwritten statement?

A. I believe so.

Q. Mr. Loevy also asked you questions about the rivalry between USDA and Young Money, the territorial dispute.

MR. LOEVY: Objection. Foundation. If there's any rivalry or territorial dispute.

THE COURT: Mr. Flynn, just rephrase the question.

BY MR. FLYNN:

Q. Mr. Loevy asked you about your understanding that there was a rivalry between USDA and Young Money?

A. Yes.

Q. Okay. Tytiana Williams, Ashtin Warner, Eugene Stanciel, they all told you about that territorial dispute?

A. I believe so.

Q. And Ashtin Warner was friends with Taneshia Branch, right?

A. Correct.

Case: 1:19-cv-04082 Document #: 447 Filed: 09/30/24 Page 116 of 313 PageID #:25650
Mancuso - further redirect
1220

Q.   Did she provide an ASA handwritten statement?

A.   I think she did.

        MR. FLYNN:  Nothing further, your Honor.

        THE COURT:  All right.  Anything else, Mr. Loevy, based just on that?

                    FURTHER REDIRECT EXAMINATION

BY MR. LOEVY:

Q.   From the territorial dispute, you said Eugene Stanciel. He's the guy who got arrested with Marisol Ocampo, right?

A.   Yes.

Q.   And, then, you mentioned Tytiana Williams.  Her statement changed between the GPR, the ASA handwriting -- I'm sorry, Warner, Ashtin Warner.  That person's testimony changed between the GPR, the ASA statement, then subsequent testimony, in material ways; would you agree?

A.   I'm not sure.

Q.   And Tytiana wasn't in the park, right?

A.   I don't believe so.

Q.   All right.  But nobody else said anything about territorial dispute or you would have written it down, right?

A.   They may have said things I just didn't write down.

Q.   All right.  But you didn't write down that anybody else said anything about that?

A.   I believe so.

        MR. LOEVY:  Okay.  No further questions.

THE COURT: All right. Mr. Mancuso, you --

Did you have anything further, Mr. Flynn?

MR. FLYNN: I do not.

THE COURT: Mr. Mancuso, you are excused.

(Witness excused.)

THE COURT: Ladies and gentlemen, we're going to take our lunch break. It's 12:31. We'll start with a fresh witness after the lunch break.

I need an extra ten minutes or so with the lawyers to resolve some issues, to discuss a few matters with them. So, I'm going to give you a slightly longer lunch break today. Let's be ready to go at 1:40 instead of 1:30.

Please don't discuss the case. Of course, you're free to leave the building, as you know.

And we'll see you back and ready to go at 1:40.

All rise.

(Jury out.)

THE COURT: Please be seated.

Okay. I just want to discuss sort of where we are and then talk about next steps for the matters we need to resolve over the lunch hour.

Our next witness is R.J.?

MR. LOEVY: R.J. Branch.

THE COURT: Okay. And after that -- and about how long do you anticipate Mr. R.J. -- Mr. Branch's direct

1222

examination will last?

MR. LOEVY: 40 minutes.

THE COURT: Okay. Obviously, you'll need some time for cross.

Who is the witness to follow Mr. Branch?

MR. LOEVY: Mr. Turner.

THE COURT: And do we anticipate he will be here today?

MR. FLYNN: He's in the building.

THE COURT: Okay. I would be shocked if we can't get to him.

Do you have another witness lined up for today?

MR. LOEVY: We do. Ms. Spizzirri has agreed to be on standby on one-hour notice. And it's my hope that we will get to her. Things might start moving faster because there's a lot -- yeah, things might move faster.

THE COURT: Okay.

MR. GIBBONS: Just so we're clear, I have Spizzirri. I've talked to her lawyer. At least an hour notice. I'm assuming that Jon may be able to tell us at the afternoon break, because I don't see how we're getting Spizzirri on and off the stand today. She's an important witness to both sides.

THE COURT: Okay.

MR. LOEVY: The hope is we will.

THE COURT: The hope is we will. And I appreciate

1223

that -- it's certainly unreasonable to expect that she'd be here with less than an hour's notice, given life.

Okay.  So, the matter that I'd like to discuss -- and we could do it after the lunch break if you prefer, because defense counsel may need an opportunity to confer -- is the Ocampo issue.  I'm happy to go ahead and take our lunch break now and we can resume a few minutes early on ruling on that, assuming that you'll need some time to discuss amongst yourselves.

MR. FLYNN:  We would prefer that, your Honor.

THE COURT:  Okay.  So, please be back in the courtroom ready to go at 1:20 so I can hear from you.  And it will give you a slightly short shorter lunch break, but we should have some room on the back end to hear from parties and we'll see where we are from there.

MR. LOEVY:  Thank you, your Honor.

MR. FLYNN:  Thank you, Judge.

THE COURT:  Okay.  Thank you.

(Recess taken at 12:34 p.m., until 1:20 p.m.)

                    *     *     *     *     *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Joseph Rickhoff                        September 3, 2024
Official Court Reporter

1224

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARCEL BROWN,                          ) Case No. 19 CV 4082
                                       )
                Plaintiff,             )
                                       )
           vs.                         )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) September 3, 2024
                Defendants.            ) 1:20 o'clock p.m.


                TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
                BEFORE THE HONORABLE LINDSAY C. JENKINS

APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois 60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Individual          GREENBERG TRAURIG, LLP
Defendants:                 BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois 60601

1225

APPEARANCES (Cont'd):

Court Reporter:                    LAURA LaCIEN, CSR, RPR, RMR, F/CRR
                                   SANDRA M. TENNIS, CSR, RMR, FCRR
                                   Official Court Reporters
                                   219 S. Dearborn Street, Suite 2118
                                   Chicago, Illinois 60604
                                   (312) 435-5562

          * * * * * * * * * * * * * * * * * *

               PROCEEDINGS RECORDED BY STENOTYPE
    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1226

(Proceedings heard in open court; jury out.)

THE COURT: All right. Welcome back. Let's put appearances on the record, please.

MR. LOEVY: Good morning, your Honor. John Loevy and all the same appearances for the plaintiff.

THE COURT: All right. Good afternoon.

MR. FLYNN: Good afternoon, your Honor. Kyle Flynn; and all the same appearances for defendants.

THE COURT: Okay. Good afternoon.

Okay. So I wanted to set aside some time to talk about the Mari Ocampo issue. I'm also happy to take up anything else if you think we've reached some resolution on any of the other matters, but I promised the defendants until the end of the day so I'm happy to revisit any other topics this afternoon after we break for the day.

MR. FLYNN: I believe Ocampo is our only topic.

THE COURT: Okay. Sounds fair.

All right. So just to sort of set the table here, Mr. Brown has filed a motion to bar Ms. Ocampo's testimony, both her trial testimony and her past deposition testimony, in its entirety. That motion was filed yesterday. And so I've read it. I've also re-read some of my remarks related to the motion in limine that dealt with some of these issues although, you know, not kind of head-on.

So I'm happy to hear from you, Mr. Flynn or

1227

Mr. Gibbons, on whatever you'd like to say from it. I'll give Mr. Loevy an opportunity to respond and we'll take it from there.

MR. FLYNN: Yes, your Honor. Plaintiff's cited authority does not require an arrest warrant to use a deposition designation. It requires reasonable efforts to try to get the witness here. We did try to get her here. She very clearly said I'm not coming, they've been threatening me. That is in line with her sworn deposition testimony.

To the extent that the Court orders that the U.S. Marshals go and get her and bring her in, I think the Court should be aware as to what exactly she said at her deposition just because there is a personal safety issue here.

Reading from Page 232 in talking about R.J. and Marcel, she says, quote, I feel threatened by them if anybody cares. She's asked: Threatened that they might hurt you physically? Answer: Obviously. I'm still in Chicago. They're in Chicago.

We think we've put Ms. Ocampo through enough already in this case. We think that the deposition transcript as well as her criminal trial transcript gets the evidence in necessary from Ms. Ocampo. To the extent that plaintiff does not believe that they were prepared to cross examine here for her deposition, it was their deposition. They took her deposition so I think it would be difficult to argue that they were not

prepared for the deposition.

And then just the last point I wanted to make with respect to an assertion that was made in the motion is that the only evidence that Ms. Ocampo was coerced by detectives is an affidavit from their flipper witness Eugene Stanciel. That's it. Ms. Ocampo has never said anything like that. So to argue that she's actually threatened by the detectives because they coerced her into some statement, all of that is just based on Eugene Stanciel's affidavit and nothing else. Go ahead.

MR. GIBBONS: Your Honor, if I may, I'd just like to make two quick points. One, if it's not clear already, I -- we spent the time, money, and effort to -- to subpoena the witness for her appearance in a courtroom. To me, that's what lawyers do. That's what we have to do. I could see the argument if we called her and asked her to come and she didn't show up. We have her under legal compulsion to be here. In all the years I've been trying cases, that's what you do.

There's a lot of witnesses under the Court's background and some similarity with mine that they say to agents or lawyers I'm scared, I'm not coming. Most of the time they come. Here, she's clearly not coming. We went through this with her deposition --

MR. LOEVY: What's the year of the deposition -- the date on the deposition?

MR. GIBBONS: -- she didn't show up then. Marshals

had to go get her. All the parties now have been served because we all went through that exercise knowing this might be our only shot because she's a very reluctant witness. So everyone had their shot at her for seven hours and took it by asking a lot of questions. I think we've done our part in this.

I am concerned of a ruling that allows a party to say if -- if people do not show up, witnesses do not show up when served by lawful process that we're going to get a District Court to order U.S. Marshals to go get them because that's going to open the flood gates. That's going to happen a lot.

Now I understand in their brief that we got at 10:37 last night that they suggest this is a highly unusual case. To be honest with you, it's not that unusual. Witnesses are scared all the time. I mean, if you do any gang cases, if you do anything where there are people with animosity towards one another, this is not an unusual situation.

So I think involving the U.S. Marshals Service is risky to precedent in this building. Obviously, it's an option the Court has on reasonableness. I'm not suggesting I've ever worn your robe and know what to do. It is unusual in that circumstance. I just think it's a dangerous request.

The deposition transcripts exist. Both sides have had access to them. We've known about this issue since the pretrial. We stood up here -- Mr. Flynn up here and fronted

this very openly with the Court. They knew it was an issue. We knew it was an issue. Both parties have lawyers who have spent considerable time designating testimony. This isn't a surprise to anyone.

What this is is a pretty obvious effort to keep Marisol Ocampo off the stand and out of this case by deposition transcripts and I think it's -- it's not rooted in any law and we've done everything we could do to have her here. In fact, we'd like her here but this is not the right way to do it.

THE COURT: Okay.

MR. GIBBONS: With that, I'll sit down.

THE COURT: Thank you.

MR. LOEVY: This isn't a hard motion, your Honor. They haven't made any showing. I mean, there's plenty of times when you'd rather have someone by deposition than live because then they wouldn't get cross examined. We don't even have an unavailable witness. She's not in the wind. You know, the usual scenario is we can't find her. She's unavailable. They know where she lives. They know where she works.

The only thing they did was serve her with a subpoena. The records you have in front of you, they haven't even called her and say, hey, Mari, you know, can you. We don't even have any requests for her to come. We get that it is strategically more advantageous for them to want to play -- to read a deposition but they can't gain it. I mean, only one side is

1231

citing you law, your Honor. The law is clear, we have a presumption for testimony. If you want the indulgence and the privilege of reading a prior deposition, you got to make a pretty onerous showing and the reason I say it's easy for you is because they haven't made a pretty onerous showing. They haven't made any showing. They've literally made no showing that even asked her to come. They say they have a deposition from two years ago where she says I feel threatened. Now if it was that easy to get out of court, anybody would just utter the words "I feel threatened." Anybody can say that.

I will say that at the time, R.J. Branch's criminal charges were still pending so he had a murder case pending. That's been resolved. That case is -- who is going to threaten Marisol Ocampo for any reason at all? There are no circumstances that she have a legitimate basis to fear anybody. She has never said anything against Marcel Brown. You know, her testimony is not like she's got some gangbuster thing that, like, if she gives it, the whole case turns on her.

So she can't -- you know, she can say I feel threatened but it's not credible. What's credible about her feeling threatened for showing up and saying I saw had R.J. shoot up the park when R.J. says I fired a gun in the park. So it's not credible that she would actually believe that if she said whatever everybody has already admitted. What is she saying? She says R.J. shot. I saw Marcel drive up. It's not

1232

even disputed.

She doesn't want to be here. We get that she doesn't want to be here. That's not -- you know, they had a choice, they could have -- and it has been an issue since the pretrial conference. We're going to -- you know, when we make a record and if we ever argue about it, to quote Mr. Gibbons, both sides knew this was going to be an issue.

The law is clear what you've got to do. Judge Chang made it clear to us in the *Curry* case, you got to involve the Marshals early and often because they don't just jump. If you want the privilege of, you know, calling a witness, you got to actually show that they're unavailable. It would be error to allow them to just read a deposition without them even attempting to make a showing. They still -- they're saying we don't want you to ask the Marshals to go get her. Why should you even listen to them when they aren't trying -- they aren't calling her and they aren't sending the Marshals?

Now our view -- and the last thing I'll say -- is it probably is too late. They've probably blown it because if they wanted to read this deposition, they had to show that -- made efforts to get the Marshal -- the Marshals. Probably too late for the Marshal. Maybe it is; maybe it isn't. They aren't even asking you to do it but they should have had it done before trial.

THE COURT: Well, I think they were asking me this

morning.  Well -- and I don't mean to cut you off, Mr. Loevy. I just want to clarify the point and maybe you can just address it in your remarks but I think your -- to be technical or precise, I think your question this morning, Mr. Flynn, was do I need how much lead time the Marshals might require.  So you're right, that's actually not saying could you do it.  It was just --

MR. LOEVY:  Sure.

THE COURT:  -- more what kind of time frame would be necessary.

MR. LOEVY:  And under the law, they had to ask that question at the pretrial conference.  If they want the privilege of getting in somebody here without a deposition -- without cross examination, you got to try.  And I even said on the record, I think they're just strategically wanting to read her deposition.  You know, I said don't rule on this stuff because you can't do that.  And whether Mr. Gibbons knew it or not, you can't do that.  There is no showing that could justify this.

THE COURT:  Mr. Flynn and Mr. Gibbons, I'll give you have the last.

MR. FLYNN:  Just to correct a couple inaccuracies. First of all -- just to correct a couple inaccuracies by Mr. Loevy -- I won't read the whole thing again -- but Ms. Ocampo very clearly said that she feels threatened by them.

It's not an R.J. thing. It's a "them" thing. It's R.J. and Marcel. I'm happy to tender this to the Court.

Another inaccuracy, the deposition was given in August of 2022. That was several months after R.J.'s criminal proceedings were finished. He had pled guilty.

With respect to the Marshals Service, if the Court agrees with Mr. Loevy that her deposition designations cannot be read because she is not unavailable, he will of course ask the Court to send the U.S. Marshals to get her.

THE COURT: Okay.

MR. LOEVY: I suspect what they'll do is ask her to come if you say they can't because they haven't done that yet.

THE COURT: We don't need to bicker, gentlemen.

MR. FLYNN: Okay.

THE COURT: We really don't. It doesn't -- I appreciate it and I want to give everybody an opportunity to address your points. I'll let Mr. Flynn and Mr. Gibbons finish; and then, Mr. Loevy, I'll give you the last word, so.

MR. GIBBONS: Yeah. I just want to speak to this concept of, you know, we have to pick up the phone and try to talk to a witness. We all know that the party bringing her in this courtroom is not going to be looked at favorably by this witness. Calling her up brings a pox on our house. She doesn't want to be involved. She's made that very clear time and time again.

There's no ability to sweet talk Marisol Ocampo into the courtroom here. She's not our witness. She's not our client. She's an eye witness to a murder. So, I'm sorry, we -- nowhere in the law -- John keeps quoting the law -- does it say the lawyer seven days before has to call up a witness to see if the witness is going to abide by a legal service of a subpoena. That's not the law.

THE COURT: All right.

MR. LOEVY: I would suggest Mr. Gibbons hasn't read the cases because this is an easy call. I mean, they are so far outside the bounds. If you looked at the cases and our discussion of it, they got to do a lot. He has done zero. He has literally -- hasn't even asked her to come. I'm going to -- I don't usually -- I'm going to stop talking. There's nothing needs more to be said.

MR. FLYNN: Your Honor --

MR. LOEVY: There's nothing that needs to be said.

MR. FLYNN: Your Honor, we do not believe we have her phone number at all to call her. And as far as not doing anything, we sent a private investigator out and she crumbled it up and threw it back at him and said there's no way I'm coming, I feel threatened, which is in line with the statements that she made prior to her deposition in which she didn't come to and didn't -- and then eventually came to after we got the Marshals involved. I think we've done everything that we can

1236

do.

THE COURT: Okay. All right. So a couple of observations that I'm going to make and then I'll put a couple of choices to the parties based on my conclusions here.

Rule 32, Federal Rule of Civil Procedure 32 -- and specifically, 32(a)(4)(D) -- allows a party to use for any purpose the deposition of a witness if the Court finds that the party offering the deposition could not procure the witness's attendance by subpoena.

In our scenario, there is no dispute that an investigator or process server -- I think it's an investigator -- went out and after much effort found Ms. Ocampo, handed her the trial subpoena and she, you know, in sum and substance threw the subpoena back at the investigator and said I'm not coming. I appreciate Mr. Flynn and Mr. Gibbons's point that the reason or one potential reason for her not wanting to be here is because she felt threatened and she had security and safety concerns.

I think that in an ordinary case, perhaps that showing -- Mr. Loevy wouldn't agree, but perhaps that showing might, might be appropriate, might be finding that she -- might be sufficient to show that she's unavailable. I think it's probably questionable but I think you'd have a better argument, Mr. Flynn, if that were the facts but those aren't the facts.

In order for us to even get to the point where someone

1237

is serving Ms. Ocampo with a trial subpoena, you have to take into account what happened in August of 2022 where an -- in May of 2022 when this case was assigned to a different judge, that judge issued a writ of body attachment which essentially sent the Marshals out to go and get Ms. Ocampo and bring her into the building to have her deposition taken.

And so under the circumstances of this case on these facts on this record, I cannot conclude that the witness is unavailable, that that -- the proponent of the deposition could not procure her attendance by subpoena.

There was more than one opportunity to come into court and tell me that perhaps, you know, one or both parties needed assistance in getting her here to appear. I agree that I would not have used more forceful means out of the gate. That's a terrible precedent to set, but we're not in that scenario and I'm -- you know, not for nothing, but I agree with Mr. Loevy that the idea that you haven't attempted to find her or contact her in the ensuing days and weeks even by way of a phone call -- and I know that's easier said than done, it's not like you can just pick up the phone and call her. But in light of the fact that there's been no attempt to procure her presence since the subpoena was served on her leads me to conclude that she is not unavailable for purposes of the rule.

So let me make one other remark and then I'll tell you where we stand in terms of choices at least from my

1238

perspective. I reviewed Ms. Ocampo's -- I'm speaking mostly to her deposition testimony now, not so much her trial testimony because that presents a bit of a different question; but her deposition testimony. And as the parties I think agree, her testimony was all over the place on a number of topics; but the place that stands out significantly from my perspective is her testimony about the witness tampering.

It is confusing. It is unclear. It is internally inconsistent. There are just aspects about that testimony where it took me three or four times to read it over the weekend and certainly yesterday and again this morning to even follow who she's talking about, whether she's talking about communications with a relative of Mr. Brown's or whether she's talking about Mr. Blackman. It's all over the place.

And so even if we could get to a point where there was unavailability, I don't have any intention of allowing testimony about that witness-tampering piece into evidence. And again, I know that's a little bit inconsistent with what I've said so far because it kind of doesn't matter if she's not available -- or not unavailable.

So that brings me to the choice and the choice is knowing that I have not concluded that she is unavailable and knowing that I'm not going to allow testimony on this record about the witness tampering topics, the question is, do you want me to get -- to issue a writ of body attachment to have

1239

U.S. Marshals Service go out and try to find her? I'm told unofficially from my Courtroom Deputy that if we issue an order saying please go try to find her, the U.S. Marshals Service will go try to find her. And I would do that today, which is part of the reason I wanted to discuss this now so that the U.S. Marshals Service will have a day or two to see if they can find her.

And please keep in mind -- this is just one other, sort of, wrinkle that you'll need to keep in mind is that if and when they find her and they bring her to the courtroom, as I previously indicated in the motion in limine, there needs to be some voir dire of her testimony in the first instance both potentially by the parties and by myself to make sure that she's even in a position to be able to testify and that she understands what's happening and, for example, understands the oath and would give truthful testimony, et cetera, et cetera.

Now regardless of the conclusion anyone would reach in that scenario if she's found, that's not going to be an escape hatch to get back to her deposition testimony. I believe Mr. Loevy is right, the ship has sailed. The question would be if we can -- if we find her and we conclude that she's competent and she understands what's happening and can actually testify, if the parties are then prepared to direct and cross her.

MR. FLYNN: So yes, your Honor, we would move for a

1240

body attachment on Ms. Ocampo. We would expect to call her on Thursday or Friday. And if we can get some kind of lead time from them -- I'm guessing they won't know until they actually find her so it won't be, you know, a day in advance or anything but we would be prepared at that time.

THE COURT: Okay.

MR. LOEVY: Your Honor, our position would be that you should not use the resources of the United States to arrest her until they knock on her door and ask her if she will come, which apparently hasn't been done.

MR. FLYNN: We've already done that, your Honor, and she said there's no way I'm coming, she said they're threatening me. I've gone over this.

MR. LOEVY: Well, somebody -- you know, she got a subpoena. She threw it back. They also -- they don't have an investigator who has made any kind of proffer or any kind of testimony. I think the witness deserves to understand that this is her choices. It's really not fair for them to impose on her an arrest without having tried to get her here.

THE COURT: So, look, I have no idea whether or not the defense has -- or even the plaintiff for that matter, and I know it's not your witness. I'm not asking you to help, you know, procure a witness you don't want to testify; but I do think that it makes sense for someone on behalf of the defense to see if there isn't a way to contact her. I don't have any

idea when the last time is an investigator or someone or on her behalf or on the defense behalf has been to either of the location on Sedgwick which was used back in 2022 or some of more recent address. I assume it's a much more recent address knowing that witnesses are often moved and are in the wind. But I do think that it might make sense for the defense to see if there is a way to reach her. You may not be able to do that. That might be an impossible ask and, if so, so be it.

But what I'm going to have the parties do and specifically have the defense do is to let Ms. Deanes know the last known contact information that you have -- in terms of an address for Ms. Ocampo. Ms. Deanes will help -- perhaps during our afternoon break will get what she needs from you in order to issue the writ. It's going to take, you know, the afternoon and into tomorrow before anyone would be in a position to do it. And if they find her, they find her. And if they don't, they don't.

But I do think that it's only fair in light of this posture to -- and it's the right thing to do since the defense says they want her here and they tried, to see if we can find her. I think it's going to slow things down but that's okay. We'll get the work done and that will be the order.

MR. FLYNN: Your Honor, we just ask that if we do share Ms. Ocampo's new address that it be under seal and attorneys' eyes only.

MR. LOEVY: Well, that's a little that one-sided. That means they keep unilateral access to this witness.

THE COURT: So it can be under seal which just means that it won't be viewable on the public docket.

MR. LOEVY: Okay. That would work --

THE COURT: You would be able to see it. It just means that an, you know, outsider -- an outsider wouldn't be able to see that document just like when you click on things that sometimes say "this docket is restricted."

So you're welcome to -- you know, I'm welcome to -- I will encourage and ask Ms. Deanes to file anything we do under seal. I have no problem with that. It's someone's personal contact and residential information. I'm fine with that.

MR. GIBBONS: Your Honor, I just want to be clear. This is a Court order to provide this information in the form that we just talked about? Because I had been in situations where things happen and I want to make sure we're -- we are divulging this information --

THE COURT: By order of court; absolutely.

MR. GIBBONS: -- by order of court.

THE COURT: And I completely your understand reluctance to do it without the order, but we now have it. And during the lunch -- or our afternoon break, we'll be sure that Ms. Deanes has what she needs from you to get the order to the Marshals Service when they -- so that they can get about the

1243

business of trying to find her.

MR. LOEVY:  And we promise not to hurt Ms. Ocampo.

THE COURT:  Thanks.

MR. GIBBONS:  It's not John Loevy I'm worried about, your Honor.

MR. LOEVY:  Well, you shouldn't be worried about anybody.

THE COURT:  Okay.  And that will be that.

MR. GIBBONS:  Thanks, Judge.

THE COURT:  Yes.

All right.  Mr. Matosian, can you get the jury lined up?  And if we can have our next witness in the courtroom.

(Brief pause.)

(Proceedings heard in open court; jury in.)

THE COURT:  All right.  Please be seated.  All right. Welcome back, ladies and gentlemen.  Thank you for your patience.  We're trying very hard to keep on schedule to the extent possible.

Mr. Loevy, you may call your next witness.

MR. LOEVY:  Thank you, your Honor.  At this time the plaintiff, calls R.J. Branch.

THE COURT:  All right.  Mr. Branch, please approach the witness stand.  Up here.  Before you take your seat, sir, please raise your right hand so my Clerk can swear you in.

LAW CLERK:  Sir, can you please state your name for

the record?

THE WITNESS:  Renard Branch.

(Witness sworn.)

LAW CLERK:  You have been sworn.  You may be seated.

THE COURT:  Sir, you may take your seat.  Please watch the microphone in front of you.  You'll need to speak into the microphone so the court reporter can take down what you're saying.

THE WITNESS:  All right.

THE COURT:  Mr. Loevy, you may proceed.

MR. LOEVY:  Thank you, your Honor.

RENARD BRANCH, PLAINTIFF'S WITNESS, FIRST DULY SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q.  All right.  Sir, good afternoon.

A.  Good afternoon.

Q.  You introduced yourself as Renard, but you also go by the name of what?

A.  R.J.

Q.  All right.  R.J., where do you live?  Where do you live?

A.  Schaumburg, Illinois.

Q.  And how old are you?

A.  31.

Q.  Where do you work?

A.  Enterprise Holdings.

Branch - Direct

1245

Q.   What do you do at Enterprise?

A.   I do telecom, I pick customers up, I drop customers off, check their brakes, check the windshield wiper fluid.

THE COURT REPORTER:  I'm sorry.  Excuse me.

THE COURT:  Slow down a little bit for us.

THE WITNESS:  All right.

THE COURT:  Thank you.

BY MR. LOEVY:

Q.   And how long have you worked at Enterprise?

A.   Two years.

Q.   Where did you work before that?

A.   Jimmy Dean's Meat Company.

Q.   How long did you work at Jimmy Dean?

A.   Two years.

Q.   Tell the jury what you did there.

A.   I packed the meat, the case, and palletize.

Q.   Pallets you said?

A.   Yeah.

Q.   All right.  Did you have to take off work to come to court today?

A.   Yes.

Q.   Do you have any children?

A.   Yes.

Q.   And what are their names and ages?

A.   Aubray, four.  Royalty, two.

Q.   All right.  You're having a tough time.  You got to talk as clear as you can because she's writing it down.  Okay?

A.   Aubray, four years old.  Royalty, two.

Q.   Are you related to Marcel Brown, Mr. Branch?

A.   Yes.

Q.   How are you related?

A.   We cousins.

Q.   And what is your age difference?

A.   Three.  Three years.

Q.   All right.  I want to bring you back to when you were growing up.  Were you friends with Marcel when you guys were kids before all this happened?

A.   Yes.

Q.   Were -- you guys were three years apart then.  When you got arrested and he got arrested, do you remember how old you both were?

A.   He was 18.  I was 15.

Q.   Did you have the same friend groups at the time?

A.   Na-uh.

Q.   Who were your friends?

A.   My friend was in my age bracket.

Q.   All right.  Were you friends with Marcel's friends?

A.   They was cool.

Q.   Did you go to high school -- did you go to school with Marcel, high school?

A. Grammar school.

Q. How about high school?

A. No.

Q. Where did you go to high school?

A. I went to Orr.

Q. What would you -- what sort of things did you do for fun in your free time when you were a kid?

A. Basketball, football, rap.

Q. Rap you said?

A. Yeah.

Q. Did you do those things with Marcel?

A. No.

Q. Did you play basketball with him?

A. No.  He sucked.

Q. What's that?

A. No.  He sucked.

Q. All right.  Were you good at it?

A. Both of them.

Q. All right.  Rapping too?

A. Yeah.

Q. Was Marcel a rapper?

A. Nah.

Q. When you were a kid, did you get in fights in your neighborhood?

A. Yes.

Branch - Direct

1248

Q.   Was that on uncommon or, you know, is that how it went down?  Did people in your neighborhood get in fights sometimes?

A.   Yeah.

Q.   All right.  Were you making good choices or bad choices back when you were a kid?

A.   Bad choices.

Q.   What do you mean?

A.   Fighting, hanging with the wrong people.

Q.   Did you get arrested from time to time?

A.   Yes.

Q.   Were you -- when you were making bad choices, were you hanging out with Marcel or with other people?

A.   I was hanging out with my other friends.

Q.   All right.  Were you ever getting in trouble with Marcel?

A.   Nah.

Q.   Can you explain?

A.   My cousin was on two different paths.  He lover boy and --

Q.   He what?

A.   He a lover boy.

Q.   What does that mean?

A.   He liked the ladies and he just lover boy.  He was like he ain't into what I'm into.

Q.   He wasn't into what you were into?

A.   Yes.

Q.   And you were making some bad choices at the time?

A.  Yeah.

Q.  By the way, are you making any bad choices anymore?

A.  No.  I'm doing good.

Q.  Okay.

A.  I changed my neighborhood, church on Sunday, I had a job.
I had kids already.

Q.  All right.  You got to slow it down.  You got to talk
clear.  Okay?

All right.  I asked you if you were making bad choices
now that you've grown up and such.

A.  No.  I ain't making no more bad choices.

Q.  And you started to explain.

A.  I work a job, go to church on Sundays, I'm peaceful.
Normal.

Q.  All right.  Back then, you were not so much?

A.  No, not at all.

Q.  All right.  Did you get bullied as a kid?

A.  Yeah.

Q.  And did that influence you getting into fights?

A.  Yes.  That's where anger come from.

Q.  All right.  Do you recall what kinds of things Marcel liked
to do when you were making -- you were doing what you were
doing.  What was Marcel, how would he spend his time?

A.  Went out bowling, movies with the ladies, him and Terry.

Q.  Him and Terry would hang out?

A.    His name T.J.

Q.    T.J., right.

A.    Yeah.

Q.    Let's bring you back to August 30th, 2008, the night that these things happened.  Do you remember any more where you were the night before?

A.    White Castle.

Q.    That's the night when it all went down.  I'm saying how about the night before, you got any idea?

A.    I don't recall.

Q.    Do you remember what you did for lunch that day on the White Castle day?

A.    I don't recall.

Q.    Why not?

A.    It's so long ago.

Q.    All right.  You do remember being at White Castle that night, though, right?

A.    Yeah.

Q.    Who was out that night?

A.    It was a lot of people outside.

Q.    Was it uncommon or common for there to be people hanging at the White Castle?

A.    It's common.

Q.    What would you guys do there?

A.    Eat, try to talk with females, hang out.

Branch - Direct

1251

Q. All right. Did you tell anybody at the White Castle that you had a gun in your pocket that night?

A. No.

Q. Did you show anybody?

A. No.

Q. Did you tell Marcel?

A. No.

Q. Is there any reason Marcel would have known what you had in your pocket?

A. No.

Q. Had you been with Marcel earlier that day driving around before the White Castle?

A. No.

Q. What happened shortly around -- you know, after 10:00, before 11:00, do you remember something coming -- happening at the White Castle that caused you to change locations?

A. Yes. Somebody had called that my sister's calling him.

Q. And what was your understanding of what was going on with your sister?

A. They was at the park get into a fight so they told us to come get them.

Q. All right. Who was asked to come get who?

A. They was talking to Marcel. I don't know which one, but they called said come get them.

Q. All right. They were talking to you and maybe somebody

else?

A.   No, not me.  Marcel.

Q.   Who is Marcel's sister?

A.   Cierra.

Q.   And who is your sister?

A.   Taneshia.

Q.   All right.  Did you -- what did everybody decide to do?

A.   Go up there to get our sisters.

Q.   To get your sisters?

A.   Yeah.

Q.   Had you ever picked up your sister before?

A.   Yeah.

Q.   Is that an uncommon thing to do?

A.   Yeah.

Q.   All right.  Uncommon or common, to pick up your sisters?

A.   It was common to pick them up.

Q.   Did your sister Taneshia have a -- did she -- well, let me strike that.

         Did you ask Marcel to come or did you just come along?

A.   No.  I was in.  I'm hopping in the car.

Q.   How long does it take to go from the White Castle to the park?

A.   Like four minutes, five minutes.

Q.   Who was driving?

A.   Marcel.

Q. Who else is in the car?

A. Terry, T.J.

Q. Were you old enough to drive yet?

A. No.

Q. What do you remember about the ride over?

A. We was listening to Young Jeezy, the Recession.

Q. Now this is a question you've been asked a lot about over the years about the car ride, right?

A. Yeah.

Q. And how do you remember the car ride?

A. That we was listening to music, the new Young Jeezy album, The Recession.

Q. What's that?

A. The Recession.

Q. That's the name of the album?

A. Yeah.

Q. Was there conversation on the way over those few minutes?

A. No. We was involved to the music.

Q. Were you angry or upset?

A. Well, I was regular.

Q. All right. I need to ask you this. Was there any plan in that few-minute drive over there to go to the park and murder anybody?

A. No.

Q. Was there any plan to go over there and shoot anybody?

A.   No.

Q.   Did you on the car ride over say, hey, I'm tired of people messing with my sisters, I'm going to F those N words up or anything like that?

A.   No.

Q.   What who were you doing?

A.   I was listening to music.

Q.   All right.  You get to the park.  Do you remember where Marcel parked?

A.   Like by the old side of the park.

Q.   And what did you do?

A.   I got out the car.

Q.   Why?

A.   T.J. got out behind me.

Q.   Why?  What were you planning on doing when you got out of the park?

A.   To go get my sister out.

Q.   All right.  Were there a lot of people in the park?

A.   Yeah.

Q.   How many, you know, estimate?

A.   There's a lot of people, like.  They was all over the place.

Q.   What ages?

A.   All ages.

Q.   Give us more specificity, if you could.

A.   Seven, ten, 15, 20, 25, 30.

Q.   Little kids, too?

A.   Yes.

Q.   Teenagers, too?

A.   Yes.

Q.   Was it r uncommon for the park?

A.   It's common.

Q.   Even on a Saturday night?

A.   Yeah.

Q.   What would people do in the park?

A.   Some smokers, some drinkers, kids playing, some threw dice.

Q.   This is a Saturday night at the end of the summer?

A.   Yep.

Q.   Had you been to Amundsen Park before?

A.   Yes.

Q.   What would you do in the park?

A.   Sometimes I play ball, softball, my family took picnics up there on Sunday.

Q.   All right.  Was it -- when you walk in the park, was it light or dark?

A.   Some of -- some of it was light, like when you walked in and got the lights over there by the playground, that was light and then the rest was dark.

Q.   All right.  When you first got out of the car, how did you get into the park?

A.    I got out of car, jumped the gate.

Q.    Now why jump a gate?

A.    Because the entrance was all the way down.

Q.    So, in other words, tell the jury -- the entrance was all down I think you said?

A.    Yeah.

Q.    How far -- how tall was this kid?

A.    Probably like right here the size of this (indicating).

Q.    All right.  It's actually a little shorter on your end probably?

A.    Yeah.  But right here (indicating).

Q.    All right.  So it -- so why jump the gate instead of walking down and going around?

A.    Because that's like a long way down.

Q.    All right.  So you jumped over the gate.  And did you -- when you first got there, did you see the girls you were looking for?

A.    No.  It was people all over the place.

Q.    What did you?

A.    I got out and I walked -- I jumped the gate and then walked over to the playground area.

Q.    Did you find your sister and your cousins?

A.    Yes.

Q.    Where were they?

A.    They was by the playground area.

Branch - Direct

1257

Q. What was Marcel doing?

A. I don't know.

Q. All right. As you approached with your sister, did you see anybody with a gun?

A. No.

Q. Did you go get your sister?

A. Yeah. I told them come on.

Q. And what happened when you told her to come on?

A. They was -- they was arguing, but we -- had I told them come on.

Q. And then what happened?

A. Then a guy started shooting from the back of the fieldhouse.

Q. You said a guy starting shooting?

A. Yeah.

Q. And who was that?

A. Day-day.

Q. And describe for the jury where this person started shooting at you from?

A. He started shooting from the back -- from the back of the fieldhouse like between the bench.

Q. And who was -- could you see in the dark who he was with?

A. I didn't see him with nobody.

Q. What did you do next when he started shooting at you?

A. I grabbed Taneshia or Cierra, I pushed them down and I

started pulling my gun out and started shooting back.

Q.   What do you mean you pushed them down?

A.   I said I pushed them down.  I yanked them down to the ground and then I started shooting back.

THE COURT REPORTER:  I'm sorry.  I didn't get that.

THE WITNESS:  I yanked them on down and then I started shooting back at the guy that was shooting at me.

BY MR. LOEVY:

Q.   Did you have a gun in your pocket?

A.   Yes, I did.

Q.   How did you happen to have a gun in your pocket?

A.   I had the gun -- got the gun from the crack head earlier.

Q.   What do you mean?

A.   I got -- bought the gun from a crack head earlier.

Q.   What -- how did you buy a gun from a crack head?

A.   With the money I had.

Q.   Do you remember how much it cost?

A.   No.  I don't know how much it cost.  I don't remember.

Q.   Why did you buy it?

A.   Because something to have.

Q.   Something to have, you said?

A.   Yeah.

Q.   All right.  When did that happen?

A.   That happened earlier that day around like -- I can't give you the times because I don't really remember.

Branch - Direct

1259

Q. Do you remember anymore what kind of gun it was?

A. I guess a revolver.

Q. Are you guessing or you remember?

A. Revolver.

Q. Do you remember how many bullets were in the gun?

A. But it was bullets in there, though.

Q. Did you go buy more bullets or --

A. No.

Q. Is there a place to buy bullets if you wanted to buy bullets?

A. That time, I didn't know.

Q. All right. And --

A. At that time, I didn't know.

Q. And you had -- you had gotten the gun about what time that day?

A. I can't really remember but I bought it earlier in the day.

Q. Was it risky for you to carry a gun?

A. Yeah.

Q. Can you get in trouble for carrying a gun?

A. Yes.

Q. Had you carried guns other times in your life?

A. No.

Q. Was it common for you to carry a gun?

A. No.

Q. How many times did you fire back?

A.   I don't remember but I fired back, though.

Q.   And then what did you -- did you fear for your life when you shot?

A.   Yeah.

Q.   Was there -- what's going through your mind when you had to decide if you were going to shoot back?

A.   If I don't, they gonna kill me or my cousin and my sister.

Q.   Who were you trying to shoot back at?

A.   Day-Day.

Q.   Did you know this kid?

A.   Yeah.

Q.   Did you know a lot of people in the neighborhood?

A.   Yeah.  We all used to be friends.

Q.   Did you know kids in Amundsen Park?

A.   Yeah.

Q.   Would it have made any sense to walk in Amundsen Park and start shooting at people?

A.   No.

Q.   Would people have known who you were?

A.   Yeah.

Q.   Did you walk in Amundsen Park and unprovoked start shooting?

A.   No.

Q.   If you hadn't been defending yourself, would have shot a gun?

A.   No, sir.

Q.   Why not?

A.   Because I only came to get my sister.  I wasn't looking to cause no trouble, shoot or kill, or cause great bodily harm to nobody.

Q.   What, you wanted to hurt kids or girls or anybody else?

A.   I don't want to hurt nobody.  I was just come and get my family and leave.

Q.   So what happens next?

A.   After the shooting?

Q.   Yeah.

A.   I took off running.  Terry took off running.  That's when I seen Brown hopping the gate.

Q.   And where did you guys all end up?

A.   He got in the car, Terry got in the car, then I heard more shots.

Q.   You heard what?

A.   I heard more shots.

Q.   And could you tell where that last shot was coming from?

A.   I don't know where it came from, but I heard it.  It was close.

Q.   What did you do?

A.   I got in the car and then Brown pulls off.

Q.   And Brown is your cousin Marcel, right?

A.   Yeah, Marcel.

Branch - Direct

1262

Q. Did you tell them what happened back in the park?

A. Yeah. I said Day-Day was shooting at me and I shot back.

Q. And when that last shot happened, was it near your car or far from your car?

A. I don't know. It just sound close.

Q. So what did you do? What happened?

A. When I was getting in the car?

Q. Well, when you heard the close -- the shot that was close, what did you guys all do?

A. I got in the car. I got in the car, then he pulls off.

Q. He took off. Do you remember where he went?

A. He dropped me off.

Q. Do you remember where?

A. Parkside.

Q. All right. What did you do after you left, what did you do with that gun?

A. I broke it down and got rid of it.

Q. Why?

A. Because I was just shooting it.

Q. All right. The next day did you start hearing there was trouble that happened that night?

A. The next day, yeah.

Q. What did you start hearing?

A. Somebody got stabbed and all of that and then they said I killed somebody.

Q.   And did there come a time when your mother asked you what happened in the park?

A.   Yeah.  That was like the next day.

Q.   So some series of time has passed, right?

A.   Yeah.  Yes, sir.

Q.   Is it hard to remember the exact sequence or you remember the exact sequence?

A.   I remember some of it.

Q.   All right.  What happened with your mother?  And was there other family there?

A.   Yeah.

Q.   What do you remember?

A.   We came to my auntie house.  It was cooking.  And then they wanted to know why people saying I killed somebody.

Q.   And what did you tell them?

A.   I explained the situation to them.

Q.   Did there come a point where you turned yourself into the police?

A.   Yeah.  After they said they was looking for me.

Q.   Tell us about that.

A.   Well, I turned myself in because I knew I was shooting.

Q.   And where were you when you heard -- you know, was there -- were you at school or tell us what you remember.

A.   East.

Q.   Tell the story.

A.   Well, I was at Proviso East.  My mama called and said the police looking for you, they said you killed somebody.  And I said no, I didn't.  But I already explained it to my mama.  But she say they looking for you so I said okay, I turn myself in.

Q.   Why did you think you hadn't killed anybody?

A.   Say it again.

Q.   Why did you think you hadn't killed anybody?

A.   Because I only was shooting at Day-Day.

Q.   All right.  But you turned yourself in with the police looking for you.

A.   Yeah.

Q.   Tell the jury that story.  What happened?

A.   Well, I came -- my mama came and got me and then I turned myself in.  My pops, Renard Branch, he had Wham Cary waiting on me.  And then I surrender myself to the police.  They cuffed me and took me to the second floor.

Q.   All right.  You had your father and your mother there?

A.   Yeah.

Q.   And did they have a lawyer there?

A.   Yeah, Wham Cary.

Q.   Did he facilitate the surrender?  Did he help you surrender?

A.   Yes, sir.

Q.   Wham Cary is the attorney?

A.   Yes, sir.

Branch - Direct

1265

Q. Do you remember what the guy looked like?

A. White guy with a funny mark.

Q. All right. Who else was at the police situation when you surrendered yourself?

A. My dad, my mama, my sister, my cousin Almanique, my cousin Cierra, my Auntie Debra, and Wham Cary and my Auntie Felicia.

Q. So some of Marcel's family was there, too?

A. Yes, sir.

Q. And some of T.J.'s family?

A. Yes, sir.

Q. Do you remember where they were in the station approximately or roughly?

A. When we walked in, they was right there.

Q. All right. Where did they take you?

A. They took me to the second floor.

Q. And where did they put you?

A. They put me in a holding cell.

Q. And did they let any family members in the room?

A. My daddy came on there 30 seconds but not that day. Like the next day.

Q. All right. Did they ask you questions about what happened?

A. Yeah.

Q. Had you gettin -- gotten advice from your lawyer Wham Cary?

A. Yeah. He told me not to talk unless he present.

Q. What's that?

A.   Not to talk unless he was in the room with me.

Q.   All right.  So your advice from the lawyer was not to talk unless you had your lawyer with you.

     Was he in the room with you when they tried to talk to you?

A.   No.

Q.   So what did you do?

A.   I ain't talk to him.

Q.   What -- what about when they were asking you questions?

A.   I won't answer.  I will just say get my lawyer.

Q.   Are you glad you had that lawyer's advice?

A.   Yeah.

Q.   How long were you in the room?

A.   I was in the room like a day and a half.

Q.   Did they come back and try to question you?

A.   Yeah.

Q.   Did they make any threats to you?

A.   They didn't make no threats.  They just tried to question me.

Q.   Tell us what you mean about tried to question you.

A.   Oh, well, if you don't tell us happened, you're going to be going to jail for a long time, you ain't gonna make it out until you this age or that age.

Q.   All right.  Did you get processed in court and taken away?

A.   Yes, sir.

Q.   Where did they take you?

A.   To 1100 South Hamilton.  The Audy Home.

Q.   Audy Home?

A.   Yeah, Juvenile.

Q.   Juvenile jail, sort of, right?

A.   Yeah.

Q.   All right.  Did you -- as the years and days, months passed, did you see Marcel in the Cook County Jail when you got to the Cook County Jail?

MR. FLYNN:  Objection, relevance.

MR. LOEVY:  It goes to damages, your Honor.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  Yeah.  I seen him with a black eye.

BY MR. LOEVY:

Q.   Did Marcel struggle in jail from what you saw and perceived and observed?

A.   Yeah.  Every time, black eye, busted lip.

Q.   Was Marcel built to survive in the Cook County Jail?

A.   No, sir.

Q.   Can you explain?

A.   He trying to get raped, got to pay to get on the phone, guy tried to rape him, getting beat up.  I can't help him because I ain't around.  He neutron so everything is at the bottom of the barrel for him.  He ain't like hundred pounds.  He hanging with grown mens.  He only 17, 18.

Branch - Direct

1268

Q. And you said "neutron." What does that mean?

A. That mean he ain't affiliated. He ain't in no gang.

Q. All right.

A. They could do whatever to him like trying to rape him, taking his commissary, got to pay to get on the phone, can't get in the shower, got to wait everything last.

Q. How about his personality from what you knew of him, was he the kind of guy who could survive in there?

A. No, because that ain't -- that ain't what he used to. He's just used to talking to girls, having fun, cracking jokes, that like -- the jail had furlough.

Q. All right. You were -- did better in there, huh?

A. Yeah.

Q. Why?

A. Because I'm solid and I'm a member.

Q. All right. Did a trial come eventually?

A. Yeah.

Q. Do you remember the date?

A. I think two thousand and, what, nine or eleven.

Q. Did it -- was it on a holiday --

A. My birthday.

Q. Were you tried together with Marcel or separately?

A. Together.

Q. How were you -- how were you found?

A. Guilty.

Q.   And what was your sentence?

A.   47 years.

Q.   All right.  Let me ask you to back up.  Did you tell Marcel or T.J. that night that you had a gun?

A.   I didn't tell nobody I had a gun.

Q.   Why not?

A.   Well, the thing -- I just didn't tell them.

Q.   Was it anybody's business?

A.   No.

Q.   Do you think they would want to hang out with a kid who had a gun?

A.   No.  I wouldn't never been able to get in his car with no gun.

Q.   What do you mean?

A.   If he knew I had a gun, he wouldn't never let me in his car.

Q.   He wasn't that kind of kid, you're saying?

A.   No.  He don't participate in them type of activities.

Q.   Did you have other friends that were tougher and --

A.   Yeah.  I would have told them like, yeah, I got a gun or --

Q.   All right.  Did you ever take that gun out of your pocket before the shooting?

A.   No.

Q.   Do you have any reason to believe T.J. or Marcel knew you

were carrying a gun?

A.   They didn't know because I ain't never tell them.

Q.   Was there ever any plan any -- whatsoever to shoot up on Amundsen Park?

MR. FLYNN:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  Did you go to the same prison as Marcel?

A.   I went to the Audy Home.

Q.   After you're convicted and you guys get --

A.   Menard?

Q.   Yeah, Menard.

A.   Yeah.

Q.   Was Menard a good prison for Marcel?

A.   Hell, no.

Q.   Can you explain?

A.   It's -- that's even worser than the county.  They stabbing people, they assaulting people, they taking his commissary, he can't sync his mp3 player up, he can't go to shower, he can't lift the weights, he can't do nothing because it's all ran by the gangs and he ain't in no gang.

Q.   Now you were in a gang?

A.   Yeah.

Q.   How old were you when you joined a gang?

A.   13.

Q. All right. What was the name of the gang?

A. Mafias.

Q. Mafias, you said?

A. Yeah.

Q. And that's part of what gang?

A. That is the gang, Mafia.

Q. If some people had said Vice Lords --

A. Vice Lords. I call it the Vice Lords.

Q. But you call it Mafias. Sorry.

A. It's a branch of the Vice Lords.

Q. Branch of the Vice Lords?

A. Yeah.

Q. Now this Mafias gang, when you're 13, is that the same thing as being in a gang when you're in your 20s?

A. Yeah.

Q. And do 20 year olds do different things than 13 year olds?

A. Yeah.

Q. Can you explain?

A. They is like, they're more -- they knee deep in it, like. When I'm 13, I'm just beginning. Like it might be something like hold the drugs or have the drugs. The other -- the older guys, then they got to really put in work.

Q. All right. Did T.J. have anything to do with this gang or anything to do with it?

A. No. Just me.

Q. Did Marcel have anything to do with this gang or anything to do with it?

A. No. Just me.

Q. All right. How long -- I think you said your sentence was 45 years, right?

A. 47 years at a hundred percent.

Q. All right. I'm going to lead you a little bit. Your conviction was eventually overturned, correct?

A. Yes.

Q. Was there talk about re-prosecuting you?

A. Yes.

Q. Did you decide to accept a plea?

A. Yes.

Q. As you sit here today, do you stand convicted of murder?

A. No.

Q. What do you stand convicted of?

A. Discharge of a firearm.

Q. Did you discharge a firearm that day?

A. Yes, sir.

Q. Just a few more subjects.

How many times did you go by Amundsen Park that night?

A. Once.

Q. Did you have any people you consider an enemy back when you were a kid there?

A. No.

Branch - Direct

1273

Q. And did you always carry a gun?

A. No.

Q. Did you carry a gun to school, for example?

A. No.

Q. Did you carry a gun when with your family?

A. No.

Q. How often did you carry a gun?

A. Just that night.

Q. Are you filing a lawsuit?

A. No.

Q. The police do anything to you?

MR. FLYNN: Objection, relevance.

THE WITNESS: No.

THE COURT: Sustained.

BY MR. LOEVY:

Q. I want to ask you about a group called USDA. Were you familiar with that group?

A. Yeah.

Q. What is that?

A. That's a rap group.

Q. Who is in it?

A. Me and a couple of my other friends.

Q. Was Marcel in the group?

A. No.

Q. All right. What if he fancied himself in the group, would

he -- could he -- was he sort of in the group?

A.   No, but he like -- he probably would have said like USDA, but like no.

Q.   Was he a rapper?

A.   No.   He wasn't a rapper.   He used to play some of the music that he liked it.

Q.   All right.   Did Marcel try to rap?

A.   No.

Q.   All right.   Was this a gang USDA rapper?

A.   No.   It was a rap group after Young Jeezy --

Q.   After Young Jeezy?

A.   -- he liked it, yeah.   So he was USDA so he just playing with the name and started rapping to it.

Q.   How old were you guys when you decided to be USDA like Young Jeezy?

A.   That was like probably like later on, like.   Like probably after like 13.   Yeah, I was still 13.   That was later one.

Q.   So you were like 13 so he would have been like 15?

A.   Yeah.

Q.   All right.   Was that uncommon for kids in your neighborhood to consider themselves in a rap group?

A.   No, because everybody was trying to rap via freestyle ballads and stuff like that.

Q.   Were you any good at it?

A.   Yeah.

Q. Was T.J. good at it?

A. Yeah.

Q. Was T.J. a dance -- could he dance a bit, too?

A. Yeah. He's a dancer too.

Q. All right. Was USDA a gang?

A. No. It was a rap group.

Q. Did it have any territory?

A. No.

Q. Did it have any enemies?

A. No.

Q. Is -- if you were in a gang -- you said you were in this Mafia gang, are you allowed to be in two gangs?

A. No. There's only one.

Q. How big a deal is that that you're only allowed to be in one gang?

A. That's a big deal.

Q. How about Young Money, have you ever heard of -- other kids call themselves Young Money?

A. Yeah. The guys at Amundsen Park.

Q. All right. Were there other kids in the neighborhood who used other rap groups?

A. Yeah. They rappers.

Q. Do you remember other names, people rap groups?

A. I don't know their other names but, yeah, rap -- like Day-Day rap, D.U. rap, Eddie Cane rap. True Troubadour came up

in the past.

Q. All right. Let me just see if I have anymore questions. Prior to August 30th, 2008, had you ever fired a gun?

A. No.

Q. Have you touched a gun since the day you were arrested?

A. No.

Q. Have you ever been in another situation in your life where someone shot at you?

A. No.

Q. Was there any plan to murder anybody that day or shoot anybody?

A. No.

MR. LOEVY: Okay. I don't have any other questions, your Honor.

THE COURT: All right. Thank you. Mr. Flynn, cross examination.

CROSS EXAMINATION

BY MR. FLYNN:

Q. Good afternoon, Mr. Branch.

A. Good afternoon.

Q. I want to back up a little bit and talk about some events that happened prior to the shooting on August 2008.

You'd already talked about how you had gotten into some fights with the guys at Amundsen Park, right?

A. I got into fights with other guys from other places.

Branch - Cross

1277

Q.   Okay.  I'm not asking you about guys from other places.
I'm saying you got in fights with guys from Amundsen Park?

A.   Got into one fight.

Q.   Just one fight?

A.   Yeah.

Q.   Okay.  Let's talk about that one fight that you want to
talk about or that you're willing to talk about.  Brandon
Powell was part of that crew, right?

A.   What crew?

Q.   The Amundsen Park crew.

A.   Yeah.

Q.   And he hung out a lot with Day-Day?

A.   Yeah.

Q.   Also part of the Amundsen Park group?

A.   Uh-huh.

Q.   And on the day of this big fight, they came over to
Marcel's house on Parkside?

A.   It was no big fight.  But yeah, they came over there.

Q.   My apologies.  It was -- it was a fight where they brought
30 or 40 guys, right?

A.   Yes, sir.

Q.   That's not a big fight to you?

A.   No.  There's only two guys fighting.

Q.   Okay.  So 30 and 40 guys were there, but just two of them
were fighting?

A.   Yeah.

Q.   Okay.  And that occurred outside of Marcel's house?

A.   No.  It occurred in the alley.

Q.   By Marcel's house?

A.   No.  He stayed three -- three or four houses off the alley.

Q.   Okay.  On Marcel's Street, can we agree on that?

A.   What?

Q.   The fight occurred on Marcel's street; is that correct?

A.   No.  In the alley.

Q.   Okay.  The fight occurred in an alley near Marcel's house that was a couple -- three houses down the street?

A.   Yeah.

Q.   Okay.  And you were outside and these guys started attacking you?

A.   I was playing basketball.  Ain't no guys attacked me.

Q.   They didn't attack you while you were outside?

A.   No.  Brandon.  Brandon -- Brandon say you want to fight.  I told him go ahead on, I ain't on it.

Q.   Is it your testimony that in that fight, they did not attack you while you were outside?

A.   He attacking me.  Brandon Powell.

Q.   Okay.  So he attacked you while you were outside?

A.   Yeah.

Q.   You ran inside?

A.   I never ran inside.

Branch - Cross

1279

Q.  Okay.

MR. LOEVY:  Objection, relevance, your Honor.

MR. FLYNN:  Your Honor, he brought up the fight.

MR. LOEVY:  No.  He brought up the fight.

THE COURT:  So, Mr. Flynn, I'll give you a couple of questions about the fight, but then let's move on.  So the objection is sustained.

BY MR. FLYNN:

Q.  Marcel and T.J. were there for this fight, right?

A.  Marcel and T.J. was in the house.

Q.  They came out during the fight?

A.  I don't know.  I was fighting.

Q.  Okay.  And in this fight, you decided to use a weapon?

MR. LOEVY:  Objection to relevance, your Honor; and relevance to what this has to do with the case.

MR. FLYNN:  Your Honor, this is the same fight that was discussed with Mr. Brown between the Amundsen Park crew and the USDA crew.

MR. LOEVY:  We object to the characterization, your Honor.

THE COURT:  Understood.  The objection is overruled, but let's ask the questions and then move on, Mr. Flynn.

BY MR. FLYNN:

Q.  You cracked Brandon Powell in the head with a stick?

A.  Yeah.

Q.   You busted his head wipe open?

A.   Yeah.

Q.   And this is just a -- this is just a quarrel among some rappers, is that all it was?

        MR. LOEVY:  Objection to the question.  Foundation.

        THE WITNESS:  I'm a rapper.

        THE COURT:  Overruled.

        You can answer the question, Mr. Branch, or he can --

        THE WITNESS:  I'm a rapper.

BY MR. FLYNN:

Q.   I know.  I know you say you're a rapper, Mr. Branch.

        This here was just a quarrel where you cracked his head open, you busted his head wide open, that was just a little fight between some rappers?

        MR. LOEVY:  Objection.  Asked and answered, your Honor.

        MR. FLYNN:  He didn't answer.

        THE COURT:  Overruled.  You can answer.

        THE WITNESS:  I hit him in his head 'cause he'll attack me.

BY MR. FLYNN:

Q.   Okay.  At the time of this shooting on August 2008, you've already admitted you were a member of a gang, the Vice Lords, right?

A.   Mafias.

Q. Okay. And that's a branch of the Vice Lords, right?

A. Uh-huh.

Q. Okay. And Marcel knew that you were a Vice Lord, right?

A. Yeah.

Q. Okay. And in addition to being a Vice Lord, you were also a member of the USDA?

A. I ain't no member. That's a rap group. You can't serve two gangs at one time. There's only one gang.

Q. I didn't call you USDA a gang, sir.

A. You did just said it earlier.

Q. I did not. I asked you if you were a member of the USDA in 2008?

A. I ain't no member. I'm a member of the Mafias.

Q. Were you part of the USDA?

A. What?

Q. Were you part of the USDA?

A. That's a rap group.

Q. Okay.

A. I ain't no member in that group. I'm a member of the Mafias, same Vice Lords.

Q. So what are you if you're not a member, you're just a rapper of the USDA?

A. Yeah.

Q. Okay. You're a rapper in the USDA?

A. Yeah.

Branch - Cross

1282

Q. Okay. And T.J. was, too?

A. Yeah.

Q. But Marcel, Marcel, he definitely wasn't a part of the USDA?

A. He can't rap.

Q. Okay. All right. So in December of 2006, you were arrested for the possession of a handgun?

A. Say it again.

Q. In December of 2006, you were arrested for the possession of a handgun?

MR. LOEVY: Objection, your Honor. Arrests. And also, it's not relevant for anything but propensity.

MR. FLYNN: Your Honor, we discussed this in the motions in limine. It goes to --

THE COURT: Right. And I think -- I think Mr. Loevy is correct.

MR. LOEVY: The police officers' knowledge would be in play, not what Mr. --

MR. FLYNN: It's Mr. Brown's knowledge.

THE COURT: Right. Okay. I'll give you a little bit of room to the extent that you're trying to move this up to Mr. Brown's knowledge.

MR. FLYNN: Okay.

BY MR. FLYNN:

Q. In December of 2006, you were arrested with possession of a

handgun?

A.   A handgun got put on me, yeah.

Q.   Okay.  In August 2007, you were charged with aggravated battery with a firearm?

A.   No, sir.

Q.   So your testimony that you were not arrested in August 2007 charged with an aggregated battery of a firearm?

A.   I never got charged with no battery or no -- none of that.

Q.   You were arrested for aggravated battery?

A.   I wasn't arrested.  I was --

THE COURT REPORTER:  I'm sorry.  One at a time.

THE WITNESS:  I was questioned for something like that but I wasn't charged with nothing.  I got let go right on that day.

BY MR. FLYNN:

Q.   Maybe we're talking past each other.

MR. LOEVY:  Objection, your Honor.  This is an arrest and it's not --

THE WITNESS:  Maybe you got the wrong person.

MR. LOEVY:  -- beyond Mr. Brown's knowledge.

THE COURT:  Hold on.  We can't all speak at the same time.

MR. LOEVY:  We've gone beyond Mr. Brown's knowledge.

THE COURT:  Mr. Flynn, can we please tie these questions to Mr. Brown's knowledge?  Otherwise, you'll need to

move on.

MR. FLYNN:  This was the exact gun charge that he discussed during the ER video that we watched this morning.

THE COURT:  Okay.  So put a question to him that relates to Mr. Brown's knowledge.

BY MR. FLYNN:

Q.  We discussed at your deposition that you were at a house party, a gun was found, and they put it on you, right?

A.  Yeah.

Q.  Okay.  And that was in August of 2007?

A.  That wasn't no 2007.  I was 13 when that happened.

Q.  Okay.  So you're saying that that was the 2006 charge?

A.  Yeah.

Q.  Okay.  That's where they put the gun on you?

A.  Yeah.

Q.  And you pled guilty to that gun charge?

A.  Yeah.

Q.  Okay.  Now you admit that you went to Amundsen Park on August 30th, 2008, with a gun?

A.  Yes, sir.

Q.  And you had a gun with you most of the day on August 30th, 2008?

A.  Yes, sir.

Q.  And it's your testimony that you bought that gun that same exact day?

Branch - Cross

1285

A.   I bought it from a crack head.

Q.   You bought it from a crack head.  And you say you bought that gun that afternoon in an alley?

A.   Uh-huh.

Q.   But you can't tell us who that person's name is who sold you the gun?

A.   I don't know the crack head now.

Q.   You don't know his name?

A.   Na-uh.

Q.   Okay.  Just a guy that was just selling a gun and you said, ah, I'll take one of those?

A.   That's my block.  That's where I'm from.

Q.   So is that a "yes"?

A.   Yeah.

Q.   Okay.  And you can't tell us how much the gun cost?

A.   No.  I don't remember.

Q.   But you can tell us -- the testimony -- excuse me.  But it is your testimony that you bought the gun with money that you got from your family?

A.   Uh-huh.

Q.   Okay.  And it's your testimony that when you bought this gun in an alley, it's the first time that you ever bought a gun?

A.   Yes, sir.

Q.   And it's your testimony it's the first time you ever

touched a gun?

A. Uh-huh.

Q. Despite the gun charges we talked about?

A. I ain't touch that gun. That gun got put on me.

Q. Okay. And you don't really know why you bought the gun that day?

A. No. I was a kid making a stupid decision.

Q. Just something you decided to do on a Saturday afternoon?

A. I bought the gun from a crack head.

Q. Okay. So you randomly buy this gun from some guy in an alley despite never touching a gun before and you go and you hang out with Marcel and T.J. at White Castle later that night?

A. I went to White Castle; yes, sir.

Q. Marcel and T.J. were there?

A. Yeah.

Q. And it's your testimony that you never told Marcel and T.J. that you had a gun?

A. I never told nobody I had a gun.

Q. According to you, you wanted it to be a secret?

A. Why would I be telling somebody I got a gun?

Q. So you wanted it to be a secret?

A. I just didn't tell nobody.

Q. Did you want it to be a secret?

A. No. I just didn't tell nobody.

Q. At your deposition, did you testify that you wanted the gun

to be a secret?

MR. LOEVY:  Objection, your Honor.  That's not proper impeachment.

MR. FLYNN:  I can impeach you if you want to.

THE COURT:  I think he's trying to get at the impeachment so I'll give you some room to --

THE WITNESS:  I don't recall.  I don't remember.

MR. FLYNN:  Can we pull up -- Maria, can we pull up Exhibit 248, Page 79?

BY MR. FLYNN:

Q.  Do you see that in front of you on that screen, Mr. Branch?

A.  It's moving up and down.

Q.  And if you look at Page 79, you'll see down the left-hand side there's some other numbers.  That's the line number.

A.  This one.

Q.  And I'd like you to start at Line 11 and read through Line 22 and let me know when you're done.

A.  Every time I tell you that --

Q.  Read it to yourself.

THE COURT:  You can read to yourself.  Don't read allowed.

THE WITNESS:  Okay.

THE COURT:  That's okay.

(Brief pause.)

BY MR. FLYNN:

Q.   So I'll ask you again, you wanted the fact that you had a gun, according to you, to be a secret?

A.   I didn't tell him.

Q.   Mr. Branch, I don't want to go back to this transcript again.  You just read yourself saying that --

MR. LOEVY:  Your Honor, this is not proper impeachment.  If you want to read --

MR. FLYNN:  I was trying to refresh.

THE COURT:  I think he's just -- I'm going to allow him to try to refresh on this point since it appears it could be helpful to his memory.

So, Mr. Flynn, you may ask the question.

BY MR. FLYNN:

Q.   Can you read Lines 20 through 22 just to be more specific?

A.   Uh-huh.

(Brief pause.)

BY MR. FLYNN:

Q.   You wanted the fact that you had a gun, according to you, to be a secret?

A.   I didn't tell nobody.

Q.   All right.  I'll move on.

So you're at White Castle with Marcel and T.J.  All three of you guys get a call around the same?

A.   I ain't get no call.  He got a call.

Q.   So you're saying it wasn't you that got the call?

A.   Uh-uh.

Q.   Okay.  So just Marcel got the call, is that your testimony?

A.   Yes, sir.

Q.   Who called him?

A.   I don't know who called.  Somebody called.

Q.   Did he tell you who called him?

A.   Uh-uh.

Q.   Okay.  So it's your testimony that you did not get a call while you were at the park -- or at White Castle?

A.   White Castle.  I was at White Castle; not the park.

Q.   Did you get a call while you were at White Castle prior to going to the park?

A.   I probably did.  I don't remember.

Q.   You just said you didn't, Mr. Branch.  Which is it?

A.   I probably did.  I really don't remember.  I know he got the call.

          MR. FLYNN:  If we can pull up Page 133 of his transcript.

BY MR. FLYNN:

Q.   You gave a deposition in this case, right?

A.   Yes, I did.

Q.   And when you gave that deposition, you were under an oath to tell the truth, right?

A.   Uh-huh.

Q.   When you gave the deposition -- look at me, Mr. Branch.

When you gave that deposition, you were under an oath to tell the truth?

A. Yeah.

Q. Okay. Now if we look at Page 133, Line 18:

"Question: Okay. Who did you get a call from?

"Answer: I don't know. I just know I got a call."

Do you see that?

A. I probably did get the call.

Q. Okay.

A. I don't remember. That's a long time ago.

Q. Well, this -- when you gave this, this was in 2022 when you gave this testimony, right?

A. I don't know what year it was.

Q. Do you see at the top of the page May 25th, 2022?

A. What top -- top of what page?

Q. Mr. Branch, I don't want to waste everybody's time but can we just agree that you --

A. I said like --

Q. -- got a call? I don't -- can we agree that you got a call while you were at White Castle?

A. I don't remember if I did or if I didn't.

Q. We can agree that --

MR. LOEVY: Objection. Asked and answered, your Honor.

BY MR. FLYNN:

Branch - Cross

1291

Q.   We can agree that in 2022 you stated that you got a call?

A.   I probably did say that.  I don't remember.

Q.   Okay.  I'll move on.

     Regardless of if you would admit that you got a call or it was him that got a call, you knew that your sister and your female cousins were at Amundsen Park, right?

A.   Yeah.  It was Amundsen Park.

Q.   Okay.  You, Marcel and T.J. decided to go to the park?

A.   No.  I jumped in the car with them.  Then we went to the park.

Q.   Marcel and T.J. were in the car?

A.   Yes.

Q.   Marcel was driving his gold Malibu?

A.   Yeah.

Q.   Okay.  And you can't recall what you guys all said to each other at White Castle as you got into the car?

A.   We didn't say no.  They got in the car.  I got in the car behind them.  We went to Amundsen Park.

Q.   So you're -- you're confident -- you don't remember a lot, but you remember that for sure you didn't say anything to them?

A.   If we said something, it probably was a sung like a song that was playing or something, like.

Q.   Something about music?

A.   Yeah.

Q.   Okay.

Branch - Cross

1292

A.   The album, the new album, The Recession of Jeezy.

Q.   Who were you planning to pick up when you got to the park, can you list the individuals?

A.   My sister Taneshia.  My other two cousins.

Q.   Okay.  So you're picking up three people and for the reason all three of you guys decided to go in Marcel's Malibu to pick up three more people?

        MR. LOEVY:  Objection.  Asked and answered, your Honor.

        THE COURT:  Sustained.

BY MR. FLYNN:

Q.   I want to talk to you about the car ride over to the park. It is your testimony that on the ride over to the park, there was absolutely no conversation between the three of you guys?

        MR. LOEVY:  Objection.  Asked and answered, your Honor.

        MR. FLYNN:  I asked about the White Castle, your Honor.

        THE COURT:  Sustained.

BY MR. FLYNN:

Q.   At the time in August 2008, Amundsen Park was a place that you stayed away from at night, right?

A.   No.

Q.   Well, it was definitely a place that you did not go often, right?

Branch - Cross

1293

A.   My family hold picnics there.  I played ball there.  I played football and softball there every other Sunday.

Q.   Mr. Branch, Amundsen Park was not a place that you went often back in 2008?

A.   Why you want to tell me?

Q.   I'm asking you.

A.   I'm telling you yes, I been there before.

MR. FLYNN:  If we go to Page 160, Line 14.

BY MR. FLYNN:

Q.   At that deposition in 2022 that we already talked about you were asked these questions and you gave these --

MR. LOEVY:  That's not impeaching, your Honor.

THE COURT:  Mr. Flynn, can you tell us where?

MR. FLYNN:  Yes.  It's Page 160, Lines 14 through 20.

THE COURT:  The objection is overruled.

BY MR. FLYNN:

Q.   At the deposition, you were asked these questions and you gave these answers.

"Question:  Did you go to Amundsen Park frequently before August 30th?

"Answer:  No.

"Question:  Had you been there before?

"Answer:  Had I been there before, yeah.

"Question:  Okay.  How often would you say you went?

"Answer:  Not often."

Branch - Cross

1294

So you get to the park and the car, Marcel's Malibu pulls up along Bloomingdale Street; is that right?

A.   Yeah, Bloomingdale.

Q.   Okay.  And so when you pull up in the Malibu on Bloomingdale, you could have -- or any of you guys could have called your sisters and said, hey, we're out front, let's go, right?

A.   Say that again.

Q.   Sure.

When you pulled up on Bloomingdale, you're right outside the park, you're in the car before you got out, you, Marcel, T.J. could have all got on your phones and called your sisters who were in the park and said, hey, we're out front, let's go.

A.   I went in to get my sister, though.

Q.   I know what you did, R.J.  I'm asking you what you could have done.

A.   I mean, I guess.

Q.   Okay.  Because at least one of you guys had just been talking to one of the -- one of the family members in the park, right, at the White Castle?

A.   I ain't talk to nobody.  Marcel got a call.

Q.   Okay.  You made the decision that you needed to go into the park?

A.   Me and T.J.  went into the park.

Branch - Cross

1295

Q.   Okay.   So you get into the park and you get to the playground inside the park where your sister Taneshia and a couple of the other cousins were hanging out?

A.   Yeah.

Q.   Marisol Ocampo was also at the park that night?

A.   Yeah, I think so.

Q.   Okay.   She was standing just a couple feet away from Taneshia and your cousins in that playground?

A.   I think so.

Q.   And you knew Marisol Ocampo at that point because prior to August 2008, she used to live with you and your family?

A.   Yes, sir.

Q.   And there were a ton of people in the park that night I think you already said, right?

A.   Yeah.

Q.   More than 50 people?

A.   Yeah.

Q.   Okay.   There were a lot of people just everywhere in the park?

A.   Yeah.

Q.   People in the playground area?

A.   Playground area, yeah.

Q.   People over by the benches?

A.   Yeah.

Q.   People behind the fieldhouse?

Branch - Cross

1296

A.   I don't know.  I ain't go back there.

Q.   Okay.  It's your testimony that while you were in the playground, you saw someone you know as Day-Day with a gun?

A.   I didn't see him with no gun until after he started shooting at me.

Q.   He was shooting at you with a gun, right?

A.   Yeah.

Q.   Okay.  And you say that he came running at you from behind the fieldhouse?

A.   I didn't say that.  I said I was shooting.  He was shooting from the fieldhouse.  I was shooting back at him.

Q.   When you're in the playground, you saw Day-Day come running at you from behind the fieldhouse, right?

A.   That was when I seen him run at me.  He was over there by the fieldhouse shooting.  I shot back.

Q.   I see.  So you didn't see him running.  You just saw him come out from behind the fieldhouse?

A.   Yeah.  He shot at me.  I shot back.

Q.   Got it.  So this is when you started shooting back and you can't tell us how many times you fired your gun that night.

A.   I don't know.  I pushed my sister down and I started shooting back.  My sister or my cousin.  One of them.

Q.   You don't know how many times you shot?

A.   No, no.  I was shooting at him.  I shot back at him.

Q.   But you do know -- you say that when you fired back at

Branch - Cross

1297

Day-Day, you didn't see anybody else standing around Day-Day?

A.   No.

Q.   Okay.  So as -- are you shooting at running at this point, you're trying to get away?

A.   No.  I shot a couple times.  I took off running.

Q.   So he shoots at you, you stand there, you shoot back, and then you run?

A.   Yeah.  I run off.

Q.   Okay.  And even though there's a ton of people in this park and, as you said, people are everywhere, you're certain that nobody is standing next to Day-Day?

A.   Nobody is standing next to him.

Q.   Okay.  And you believe that you did shoot Day-Day?

A.   What?

Q.   You believe that you did shoot Day-Day?

A.   I didn't shoot nobody.

Q.   So it's your testimony today that you did not shoot Day-Day?

A.   It's a proven fact I didn't shoot Day-Day.

        MR. FLYNN:  If we go to the Page 180, Line 12.  Sorry.  Line -- Page 180, Line 10.

        "Question:  Were you able to tell if you hit Day-Day?

        "Answer:  I don't know.

        "Question:  You don't know, you might have hit him?

        "Answer:  It turned out I did hit him."

Do you see that?

A.   No.   I don't see that.

MR. FLYNN:   Can we have Page 180 on the screen for Mr. Branch?

THE COURT:   Do you see the page and lines he's referring to?

THE WITNESS:   Yeah.  I see it, but that guy never got shot that day -- that day.  He never got shot.  So why would I say I shot somebody I know I ain't shoot?

BY MR. FLYNN:

Q.   Well, you did say it right here, right?

A.   I ain't never say nothing like that not a day in my life or allow myself.

Q.   Okay.  So you shoot back and you're running out of the park and you're still being shot at?

A.   When I got ready to get in the car, it was some more shots.

Q.   Okay.

A.   I got in the car.  Brown pulled off.

Q.   So it's your testimony that there's four rounds of shots?

A.   I don't know how many shots.  I just know it's shots.

Q.   I'm sorry.  Not to -- not number of actual bullets, but four different categories of shots.  And I want to describe them to you and you can tell me if I got it right.

The first round is Day-Day shooting at you, the second round is you shooting back, then there are more shots as you're

Branch - Cross

1299

running to the car, and then there were more shots once you got to the car.  Do I have that right?

A.  I just know he shot, I shot back.  When I went to get in the car, there was more shots.

Q.  So there were four rounds of shots or three rounds of shots?

A.  I don't know how many rounds of shouts there were.  There were shots, though.

Q.  Again, when I say -- I'm using a poor choice of words here. When I say "rounds," I don't mean bullets.  There were four groupings of shots?

A.  I just told you he shot, I shot, I ran back to the car.  I was on my way to getting in the car, it's was more shots.

Q.  Okay.  As you're running back, there was shots.  And then once you got to the car, you're saying there's more shots, right?

A.  You said when I was running back, there was more shots. That ain't what I just told you.

MR. FLYNN:  If we go to Page 210 of his deposition transcript, Line 13.

BY MR. FLYNN:

Q.  You were asked these questions -- or this question and you gave this answer.

"Question.  Okay.  So let me finish the question.  You don't know where the shots came from for the third round of

shots what you're calling the third batch; is that right?"

MR. LOEVY:  Objection, your Honor.  It's too confusing to know what batches he's talking about at the dep.  It's the same batches.

THE COURT:  So I think Mr. Flynn is trying to explain his question.  I'll give him some room to do that so overruled.

BY MR. FLYNN:

Q.  "Question:  You don't know where the shots came from for the third round of shots, what you're calling the third batch; is that right?

"Answer:  I just said the fourth round, man.  The first.  The first round is when Day-Day started shooting at me.  The second round is when I reply the shot.  The third round is when I'm running out of the playground.  And the fourth round is when I'm getting in the car."

So now that you've read this answer, would you agree that there were four different batches or groupings of shots?

A.  I told you he shot, I shot, I ran back to the car, there was more shots.  It was a shoot-out, like.  What more do you want me to tell you?  It was a shoot-out.  There was a lot of shots.

Q.  There were a ton of shots, right --

A.  Yeah.

Q.  -- in a park that you said was full of people or people everywhere, right?

A.   Yes, sir.

Q.   Is it odd to you that nobody -- there's this crazy shoot-out with all these shots and nobody got shot?

A.   Say that again.

Q.   Isn't it odd to you that if there's all of these shots getting fired going this way, going that way in a park full of, you say, over 50 people, isn't it odd that nobody got shot?

        MR. LOEVY:  I'll try an argumentative objection coming back, your Honor.

        THE COURT:  Overruled.  He can answer.

        THE WITNESS:  If somebody got shot, the police was up there.  Why didn't -- why didn't they discover it?

BY MR. FLYNN:

Q.   That's not my question, Mr. Branch.

A.   That's my answer, though.

Q.   Well, that could answer my question.

A.   That's my answer to the question.

Q.   Isn't it odd to you that with all those shots that you claim were flying in the park full of a ton of people everywhere that nobody got shot?

        MR. LOEVY:  Objection.  Asked and answered, your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  Nobody get shot.

BY MR. FLYNN:

Branch - Cross

1302

Q.   Is that odd to you?

A.   The police was up there.  They say nobody got shot so I went with the police, nobody got shot.

Q.   Okay.  I'll move on.

And in 2022, you already told Mr. Loevy that you signed a plea agreement with the Cook County State's Attorney regarding your role --

A.   What year?

Q.   2022.  You signed a plea agreement with the Cook County State's Attorney's Office regarding your role in a shooting at Amundsen Park on August 30th, 2008.

A.   Two thousand what --

Q.   2008?

A.   -- 22?

Q.   You signed the plea agreement --

A.   Yeah.

Q.   -- regarding your role in the shooting in August 30th, 2008, at Amundsen Park, right?

A.   Yes, sir.

Q.   You pled guilty to aggravated discharge of a firearm?

A.   Yes, sir.

Q.   So, in other words, you're admitting that you were shooting a gun in the park on the evening of August 30th?

A.   Yeah.  I was shooting a gun because he shot at me.

Q.   Okay.  Well, let's talk about that.  So are you saying that

it's just a coincidence that on the first day that you ever happened to touch a gun you go into a park --

MR. LOEVY:  Objection.  Argumentative, your Honor. This is just argumentative.

MR. FLYNN:  This is cross examination, your Honor.

THE COURT:  Okay.

MR. LOEVY:  It's argumentative.

THE COURT:  The objection is overruled.  The witness can answer the question when Mr. Flynn finishes asking it.

BY MR. FLYNN:

Q.   Are you saying -- are you telling the ladies and gentlemen of the jury that it was just a coincidence that on the first day that you ever even touched a gun, you went into the park and somebody you know as Day-Day started shooting at you?

A.   Day-day started shooting at me.

Q.   Is that a "yes"?

A.   He started shooting at me.

Q.   Did you feel like the luckiest guy in the world that you just bought a gun --

MR. LOEVY:  Objection, your Honor.  It's still argumentative.

THE COURT:  That is argumentative.  Sustained.

BY MR. FLYNN:

Q.   So this guy who randomly shot at you in the park, you know him as Day-Day?

Branch - Cross

1304

A.   Yeah.

Q.   And you don't -- you didn't even know his real name back then, you just know him as Day-Day?

A.   Yeah.  I don't know his real name.  I didn't go to school with him.

Q.   You didn't know his real name?

A.   No.

Q.   You still don't know his real name?

A.   I did, but I forgot about it now.

Q.   Isn't -- wasn't it important for you back then at least to know who this guy was who was shooting at you in the park with your females cousins and sister around you?

A.   I know that guy used to play ball with Day-Day.

Q.   You didn't know his real name?

A.   I don't know his real name.  I didn't go to school with him.

Q.   You never reported to the police that this guy Day-Day was shooting at you with your little sister and your cousins out there, you didn't tell the police about that?

A.   My sister older than me.  My cousins older than me.

Q.   Okay.  Your older sister and your cousins.  You never told --

A.   I did tell the police that.

          THE COURT REPORTER:  Sorry.  One at a time, please.

BY MR. FLYNN:

Q.   Go ahead, Mr. Branch.

A.   I did tell the police that but clearly they didn't want to try to hear nothing that I was saying.

Q.   Where did you tell the police that?

A.   I told the police that when Wham Cary -- when they talked to Wham Cary.

Q.   I thought you just said that you never spoke to the police?

A.   I said Wham Cary.

Q.   You told Wham Cary that?

A.   Yeah.

Q.   Okay.  I was talking about the police.

A.   I told Wham Cary that.

Q.   You told Wham Cary that it was Day-Day shooting at you in the park?

A.   Yeah.  That's why I started shooting back.

Q.   And that would have been when surrendered yourself?

A.   Yeah.

Q.   Because that was four days after the shooting?

A.   You say what?

Q.   That was four days after the shooting?

A.   I ain't for sure.

Q.   You surrendered --

A.   -- of days.

Q.   The shooting was on August 30th, 2008, can we agree on that?

Branch - Cross

1306

A.   Yeah.

Q.   And you turned yourself in on September 3rd?

A.   I don't know what day, but I definitely turned myself in.

Q.   Do you remember that it was several days later?

A.   It wasn't that many days later.  It was like --

Q.   You know -- do you know that it was the same day?  Can we agree that it was the same day that Marcel Brown was arrested?

A.   No.  I can't agree with that because I ain't for sure. Like I don't remember but I tell them I was a van.

        MR. FLYNN:  I'll move on.

BY MR. FLYNN:

Q.   And you have no idea why this guy who you know as Day-Day would be shooting at you in the park?

A.   That's something you could ask them.

Q.   You don't have any idea?

A.   I don't know.

Q.   And you never did anything to try to figure out why this guy Day-Day was allegedly shooting at you in the park?

A.   Like, why would I be trying to figure out somebody shot at me?  I shot back.

Q.   So if somebody shoots at you with your little -- with your biggest -- your older sister and your cousins around you, you don't really see any reason why you want to figure out why?

A.   So you want me to go ask them why you shooting at me?

Q.   You don't want to do anything to try to figure it out?

A.   The police figured it out.

Q.   And it's your testimony that on that night at Amundsen Park when you were firing your gun, you definitely didn't shoot Paris Jackson, right?

A.   It's a proven fact I didn't shoot him.  I'm out of prison.

Q.   Well -- and you're certain -- you're certain that you didn't shoot Paris Jackson because you were shooting at Day-Day; not Paris?

A.   Absolutely.

Q.   Okay.  And on the night of the shooting, you were 15 years old?

A.   I was 15.

Q.   And it was the first time you had ever shot a gun?

        MR. LOEVY:  Objection.  Asked and answered, your Honor.

        THE COURT:  Sustained.

BY MR. FLYNN:

Q.   It's safe to say that in 2008 you had never been trained on how to shoot firearms?

A.   Uh-uh.

Q.   Is that a no?

A.   Never been trained to shoot a firearm.

Q.   You're not considered an expert marksman?

A.   No.  I'm a kid.

Q.   But you're certain that in a crowd full of dozens and ton

of people in the middle of the night, there's no way that one of your bullets hit Paris Jackson?

MR. LOEVY: Objection. Asked and answered and argumentative, your Honor.

MR. FLYNN: I'll move on.

THE COURT: Thank you.

BY MR. FLYNN:

Q. One last question. It has never occurred to you maybe one of your bullets did hit Paris?

A. It's a proven fact none of my bullets hit Paris. That's why I'm out of jail.

Q. Okay. So you run back into Marcel's Malibu -- you, T.J. and Marcel -- you get in Marcel's car and Marcel drives you off, right?

A. Yeah.

Q. Is it your testimony -- I'm a little confused. Is it your testimony that in that car ride away from the park that there were -- there was a discussion or there were no statements? Which one is it?

A. I said something. I said something when we was leaving.

Q. So there was a conversation when you left the park in this car?

A. Well, no conversation. I just said Day-Day was shooting at me and I shot back. That was it.

Q. So your testimony is today that in that car ride, you

discussed the shooting with Marcel?

MR. LOEVY: Asked and answered, your Honor. He just answered that.

THE COURT: Sustained.

MR. FLYNN: If we can go to Page 233 of your transcript.

MR. LOEVY: That's not impeaching, your Honor.

MR. FLYNN: It most certainly is.

THE COURT: Can you help me with the line?

MR. FLYNN: Sure. Sorry, your Honor. I thought I said it. Page 233, Line 4.

MR. LOEVY: It's Line 3, your Honor.

MR. FLYNN: No. It's Line 4.

MR. LOEVY: 3 is what makes it not impeaching.

THE COURT: Okay. Give me a second.

(Brief pause.)

THE COURT: I'm not sure I see how it's impeaching.

MR. FLYNN: I asked him if he had a conversation with Marcel about the shooting in the car as they left the park and he said yes.

THE WITNESS: No, I didn't. I said --

THE COURT: No. That wasn't his testimony. I don't think that was his testimony.

THE WITNESS: You keep putting words in my mouth.

BY MR. FLYNN:

Branch - Cross

1310

Q.   What was the conversation that you had in the car?

A.   There wasn't no conversation.

Q.   What did you say to Marcel when you left the --

MR. LOEVY:  Objection.  Asked and answered.

THE COURT:  Okay.  Mr. Loevy, just give us a second to get through this to figure out whether it is actually impeaching.

Mr. Flynn, you asked a question about whether they had a conversation and the witness's answer was "no, I didn't.  I said."  And then you asked a follow-up question about what was the conversation and his answer was "there wasn't no conversation" so I don't think that that's impeaching.

MR. FLYNN:  Okay.  If we can go to Page 397, Maria, Lines 12 through 15.

MR. LOEVY:  No.  That's not impeaching because it's very ambiguous what he's even saying.

MR. FLYNN:  I think it's pretty clear, your Honor.

(Brief pause.)

THE COURT:  Okay.  That is impeaching.  You may ask that question.

MR. FLYNN:  Sorry I didn't start there, your Honor.

BY MR. FLYNN:

Q.   So Page 397, Line 12.

"Question:  You testified earlier that you and Marcel did not speak in the car after leaving the park; is that

correct?

"Answer:  I told him, I'm telling you, no."

MR. LOEVY:  Objection to how it was read there, your Honor.

THE COURT:  Overruled.

BY MR. FLYNN:

Q.  Did you ask that -- were you asked that question and did you give an answer?

A.  Say what?

Q.  Were you asked that question and you gave that answer what I just read off?

A.  I don't remember.

Q.  Okay.  So you guys left Amundsen Park in the Malibu and Marcel dropped you off on Parkside?

A.  Yeah.  I got dropped off on Parkside.

Q.  Is it your testimony that on the day after the shooting you never met up with Marcel and T.J. on Parkside?

A.  Say it again.

Q.  On the day after the shooting August 31st, did you meet up with Marcel and T.J. over on Parkside?

A.  I was in the house with them.  We end up going to Parkside.

Q.  Okay.  So you did go to Parkside with Marcel and T.J., is that what you're saying, on the morning after the shooting?

A.  I went -- I went to -- that was the next day.

Q.  Okay.  Page 401, Lines 4 through 7.

"Question:  Did you meet up with T.J. and Marcel the morning after the shooting at Amundsen Park on Parkside?

"Answer:  No."

Were you asked that question and did you give that answer?

A.  I didn't meet up with them because I was already with them.

Q.  Okay.  Now it's your testimony that you've never had a conversation with Marcel about the shooting in the park?

A.  When?

Q.  At all.

A.  I mean, after all they said what happened, I told my mama I don't know why he was around when I said that part, yeah.

Q.  So it's your testimony today that you did have a conversation with Marcel about what happened in the park?

A.  I didn't have a conversation.  I was talking to my mama and them saying what happened.

Q.  Listen -- Listen to my question, please.  Did you and Marcel Brown ever have a conversation about the shooting in the park?

A.  No.  There ain't no conversation, no.

Q.  It's just not something that ever came up between you and Marcel?

A.  No.  I was in the car; no.

Q.  So if Marcel said that --

MR. LOEVY: Objection, your Honor. That's not a proper question. Introduce other people's testimony.

MR. FLYNN: I'll move on, your Honor.

THE COURT: Thank you.

BY MR. FLYNN:

Q. And it's your testimony that you never talked to T.J. either about what happened at the park?

A. I only talked to them when we was at 90600 which is like I think the next two days when my mama explained it, but that's when I talked and I told everybody what happened.

Q. So you say you surrendered yourself to the police because you were shooting in the park. Is that what you told Mr. Loevy?

A. Yeah. I was shooting in the park. After he shot at me, I shot back and then I turned myself in from Proviso East.

Q. You turned yourself in days after the shooting?

A. Yeah.

Q. After you heard the police were looking for you?

A. Yeah, after they said they was looking for me.

Q. Your dad got you a lawyer to go with you to the police station?

A. Wham Cary.

Q. Wham Cary. And you knew Wham Cary because he had previously fought your dad's case?

A. I don't know him but I seen him.

Q.   Okay.  You knew of Wham Cary because of his relationship with your dad?

A.   Like I don't know him but I seen him.

Q.   You got to the police station and they put you in an interview room and they read you your Miranda rights?

A.   I think so.

Q.   I want to talk to you about whatever happened to that gun that you had that you were shooting in the park.  At some point after you shot your gun in the park that night, you dumped it in a sewer, right?

A.   No.  I broke it down.

Q.   You broke it down?

A.   Yeah.

Q.   What does that mean?

A.   Like the shell -- I broke it down, like the shell casings and then I threw it in, what's that called, in a -- I think that's like a river or pond, something like that.

        THE COURT REPORTER:  I'm sorry?

        THE WITNESS:  I threw it like in a river or a pond, something like that.

BY MR. FLYNN:

Q.   What do you mean you broke it down?  I don't understand.

        MR. LOEVY:  Objection.  Asked and answered, your Honor.

        THE COURT:  Overruled.

Branch - Cross

1315

THE WITNESS: Just took the shell, like dumped the shell casings out, the bullets out.

BY MR. FLYNN:

Q. Okay. So you dumped the shell casings out and then you threw the gun in a sewer?

A. You said I threw it in sewer. I just told you what I did with it.

Q. What's your testimony today as to what you did with this gun?

A. I just told you.

Q. Could you tell me again? I didn't understand.

A. I dumped the bullets out and I threw it in the pond or the ocean, whatever you call it.

Q. Your testimony today is that you threw the gun in a pond?

A. Pond or ocean. One of them.

MR. FLYNN: Can we go to Page 76, please, Line 17?

BY MR. FLYNN:

Q. "Question: What happened to that gun?

"Answer: You said what happened to it?

"Question: Yeah.

"Answer: I dumped it in the sewer.

"Question: Which sewer?

"The sewer around Parkside.

"Parkside and what?

"Answer: LeMoyne."

Branch - Cross

1316

Is it still your testimony today that you put the gun in a pond?

A.  I don't remember what you reading.

Q.  Is it difficult to remember where you're -- you're telling people where you dump the gun the first time you ever touched it?

A.  No.  I know I got rid of the gun.

Q.  Okay.  And you got rid of the gun in the sewer either that same night of the shooting or maybe it was the next day?

A.  I got rid of it.  I don't recall what day but I know I got rid of the gun.

MR. FLYNN:  We really don't have to keep doing this, but if we go to Page 215, Line 12.

BY MR. FLYNN:

Q.  "Question:  Within 12 hours, you got rid of the gun, right?

"Answer:  I don't know.  I don't know nothing about the hour but I got rid of the gun.  I threw it in the sewer.

"Question:  On the night of the shooting, correct?

"Answer:  I don't know if it was the night of the shooting.  It probably was 12:00, 1:00 o'clock, the next day. I don't know but I got rid of it."

MR. LOEVY:  Objection.  Not impeaching, your Honor.

MR. FLYNN:  I haven't finished, your Honor.

BY MR. FLYNN:

Q.  "Question:  All right.  But within a few hours of the

shooting, you got.

"Answer: I got rid of it. I don't know if it was the day -- that day or the next day. I got rid of it, though."

MR. LOEVY: Objection. Same objection, your Honor. That's what he said in court.

THE COURT: Sustained. That is the same.

BY MR. FLYNN:

Q. Mr. Branch, you're not sure if you threw the gun in the sewer or a pond?

A. I got rid of the gun.

Q. And you're not sure if it was the day of the shooting, the next day or another day?

MR. LOEVY: This is repetitive.

THE COURT: Okay. Overruled. I will let you finish that line of questioning and then let's move on to the next topic.

BY MR. FLYNN:

Q. You're not sure if you got rid of the gun the day of the shooting, the next day, or maybe some other day?

A. I don't know what day but I got rid of it.

Q. It's your testimony that you got rid of the gun because you just didn't need it anymore?

A. I didn't need it because I wasn't shooting with it.

Q. You had already shot it so you didn't need it anymore?

A. I didn't need it.

Branch - Redirect

1318

Q.   And your reason getting -- for getting rid of the gun had nothing to do with the fact that you were just shooting the gun in the park?

A.   I shot the gun.  I got rid of it.

Q.   Right.  And your reason for getting rid of it had nothing to do with you shooting it in the park?

A.   I got rid of it; yeah.

Q.   And when you were deposed in this case in 2022, that was the first time that you ever told anyone where you disposed the gun?

A.   I can't recall or remember.

Q.   You don't recall ever telling anybody else where you disposed of the gun until you told me in 2022?

A.   I got rid of the gun.

Q.   Answer my question, please.

A.   Yeah.  I got rid of it.

Q.   Okay.

        MR. FLYNN:  Nothing further.

        THE COURT:  All right.  Thank you.  Mr. Loevy, redirect.

                    REDIRECT EXAMINATION

BY MR. LOEVY:

Q.   Just backing up to that point, whether you threw that gun in the ocean or a pond or the sewer, did you get rid of the gun?

A.   I got rid of the gun.

Q.   Is there any question in your mind?

A.   Say that again.

Q.   Is there any question in your mind that you, in fact, had a gun and got rid of the gun?

A.   Yeah.  I got rid of the gun.

Q.   And the fact that you don't remember, does that mean you're lying?

         MR. FLYNN:  Objection, leading.

         THE WITNESS:  I don't remember.  That was 16, 17 years ago.

         THE COURT:  Overruled.

BY MR. LOEVY:

Q.   All right.  Let's back up.  How often -- you were asked a lot of questions about how often you would go to Amundsen Park. Was that a place you had any reason to avoid?

A.   No.  That's the hood, like.  That's our hood.

Q.   How close was that to your home?

A.   Like five, six blocks away.

Q.   All right.  Would you find yourself in the park sometimes?

A.   Yes.  Sometimes, yeah.  Like all these guys that he's naming, we grew up.  I helped them fight; they helped me fight. We would party together.  We playing football together, basketball, gamble, rap ballads.

Q.   These are your friends in the park?

Branch - Redirect

1320

A.   Huh?

Q.   These are your friends in the park?

A.   They ain't my friends, but like we grew up, like.  That's all our hood.  Like some of them I went to school with.  Some of them went to school with him.  We played basketball together, gambled, shoot threes or dice.

Q.   Do you have any reason to avoid that park?

A.   No.  Ain't now archenemies.  If anything, that's my hood. I'm Mafia.  It became Mafia.  That ain't Mafia.

Q.   All right.  Let's break that answer down.  You were in a gang called the Mafias, right?

A.   Yeah.

Q.   Was this technically this neighborhood Mafia neighborhood?

A.   Yeah.  All that's -- all that -- ain't no going against each other like, none of that.  There's rules and regulations.

Q.   All right.  Was that park technically your gang park?

A.   Yeah.

Q.   Were you unwelcome there or anything like that?

A.   How?  If I'm Mafia and they Mafia, I welcome.

Q.   All right.  You were asked a number of questions by Mr. Flynn about who got the call and he read you from your deposition I just know I got the call.  Do you remember him reading you from your deposition?

A.   Yeah.

Q.   Well, let me read you the -- what continues.

MR. LOEVY: This is Page 133, Lines 18 continuing on to the next page, Line 1.

BY MR. LOEVY:

Q. Did you give these answers to these questions?

"Who did you get a call from?

"Answer: I don't know. I just know I got a call."

MR. FLYNN: This is not a proper way of asking questions.

MR. LOEVY: This is -- this is the rest of the answer that he read half of, your Honor.

THE COURT: So I'll allow for completion.

BY MR. LOEVY:

Q. And then after you said "I don't know. I just got a call," "Question: You have no idea who it was?

"Answer: I don't know who it was. It had to be -- it was one of them up there at the park.

"Question: All right. When you say one of them up at the park, who?

"Answer: Taneshia, Almanique or Cierra."

Did you give those answers?

A. When?

Q. At the deposition, sir.

A. Say it again.

Q. Sure. Well, let me ask you this question. Are you sure anymore who called who about which sister and that business?

Branch - Redirect

1322

A.   They called but like a lot of -- like a lot of this stuff, that's just 17 years.  I been through so much pain in here like a lot of that I can't remember but I can remember me coming to the park.  Day-day shooting at me.  I shot back.  I ran.  It was more shots.  Like I could remember that but I can't remember everything.  That was 17 years ago.

Q.   All right.

A.   I don't really like speaking and talking of this type of stuff because it's all behind me.

Q.   But you knew at the time that one of your sisters at least had said --

A.   Somebody called, yeah.

Q.   All right.  That's all I'm asking.

Now the gold Malibu -- he asked you some questions about the gold Malibu.  If you were going to shoot the park, would you have driven the gold Malibu to shoot the park?

A.   If I was going to do any shooting, it wouldn't have been with that guy right so he can tell on me.

Q.   All right.

A.   I'm gonna do it with Mafias.

Q.   All right.  Were you shooting people?

A.   No.

Q.   When you say he's the last guy in the world you would go with, what do you mean?

A.   Why would I go with a guy that I -- two guys, Terry and

Branch - Redirect

1323

Marcel, they don't -- they not on the streets. They don't be with me like. I be with them on girls. They don't be with me everyday. I be on Parkside and LeMoyne, Central and LeMoyne with the Mafias. Gangbangers, that's stuff that they do so why would I even try to put this on them or put this in them. It ain't never -- I know these people. These my blood cousins.

Q. You were asked at your deposition -- Mr. Flynn was asking you a lot of questions about whether it was a secret. Do you remember those when he was asking you a minute ago was it a secret, a secret that you had a gun?

A. Yeah. I remember him saying that.

Q. All right. I'm going to continue the answer. This is Page 79, Lines 11 through 22.

Did you also say "why didn't you tell Marcel that you had it?

"Answer: It was none of his business.

"I'm sorry?

"I just kept it to myself. It wasn't his business.

"It's not his business?

"Yeah.

"Why didn't you tell T.J.?

"Answer: I didn't tell nobody. I just told myself.

"So you wanted it to be a secret?

"Yeah."

Is that the full context of your answer?

A.   That -- I mean, that probably sound like something I said. But like, once again, that shit was 17 years, 16 years ago.  A lot of this stuff I don't remember.  Like I remember there were portions of the case like I came to the park.  He's stoshing them.  That guy stoshing him back.  I went back.  They stoshing him.  I remember stuff like this.  It's impossible for me to remember every detail, okay, what kind of hat he had on, what shoe he had on, okay, did you have a Dre coat, okay, was you with the Fours.  Like, I don't remember a lot of stuff, like.

Q.   Sure.  Did you end up graduating high school?

A.   No.  They kicked me out of the school.  When I was in Division 9, they kicked me out because I had got found guilty.

Q.   And that's in the jail you're saying?

A.   Yeah.

Q.   So you tried to go --

        MR. FLYNN:  Objection.  Relevance.  Outside the scope.

        MR. LOEVY:  His education is at issue, your Honor.

        MR. FLYNN:  No.  Well, then you should have asked about it.

        MR. LOEVY:  He's answering questions.

        THE COURT:  Okay.  Thank you.  The Objection is sustained.  Move on.

BY MR. LOEVY:

Q.   All right.  You asked -- Mr. Flynn asked you if Ocampo lived with your sister for a minute.  Do you remember those

questions?

A.   Yeah.

Q.   Do you remember that, in fact, happened?

A.   Yeah.  She stayed with us until the end.

Q.   You took her in when she got -- or your mom --

A.   My stepdad kicked her out.  I didn't kick anyone out.  My stepdad kicked her out.  She had nowhere to go.  I guess my sister talked to my mama.  And then yeah, she -- somehow she end up staying with us for like two, three years.

Q.   All right.  And you were asked a question about Brandon Powell.  Oh, it was that long?  It was years, you said?

A.   Yeah.  She was with us for like two years or something like that.

Q.   In and out or --

A.   No.  She was staying there like, staying there.

Q.   And Brandon Powell, how old were you when you had that fight that he was asking you about?

A.   Like 13, 12.

Q.   Is that uncommon to get in fights with kids in the neighborhood?

A.   Uh-uh.  I mean, no.  They like -- I used to get bullied so --

Q.   Okay.

A.   -- I started playing back.

Q.   Do you have any problem with Brandon Powell?

Branch - Redirect

1326

A.   As of right now?

Q.   Yeah.

A.   No.  He was just at my uncle house I seen him.

Q.   What's that?

A.   He was just at my uncle house I seen him.

Q.   You still know him from the neighborhood?

A.   Yeah.  We from the same neighborhood.

Q.   All right.  When you get in a fight with a kid, might you make up the next day?

A.   Yeah.  We might even be shooting dice.  We might be fighting somebody else on that day.

Q.   All right.  You were asked a lot of questions about confusion at your deposition about whether Day-Day got shot. Do you remember him trying to say that --

A.   He tried to say that but that man ain't never got shot.

Q.   Is Day-Day still alive?

A.   Yeah.

Q.   Does he got any bullets holes in him to your knowledge?

A.   No.  You ain't gonna find none of that paperwork that say that that guy shot.

Q.   Okay.  Just a few more areas here.  You mentioned your gang and you said you were part of a gang.

A.   Yeah.

Q.   Did that have anything to do with Marcel at all?

A.   No.

Q.   Was that his style at all?

A.   If that's his style, he wouldn't have been getting raped in jail or trying to get raped or nobody beating on him and taking his commissary.  He would have been able to use the phone how I use it.  He would have been able to sync his mp3 player machine like I use it.  He wouldn't have had none of them problems he had if he was in a gang.

Q.   I understand the problems he had for not being in a gang. But when you knew him as a kid, was he running around with people who were in gangs or trying to cause gang kind of problems?

A.   No.

MR. FLYNN:  Asked and answered.

MR. LOEVY:  Last question then, your Honor, if I could.

BY MR. LOEVY:

Q.   What kind of kid was he?

MR. FLYNN:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  He was a kid.  He was doing good in life.  He went to Oak Park.  He graduated.  He was a lover boy with the ladies, a lovable person, a funny guy.

MR. LOEVY:  I don't have any other questions, your Honor.

THE COURT:  All right.  Anything else on that -- based

1328

on that, Mr. Flynn?

MR. FLYNN:  No further questions, your Honor.

THE COURT:  All right.  Mr. Branch, you may stop down.  You're free to go.  Thank you.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  All right.  Ladies and gentlemen, it is 3:00 o'clock so we will take our afternoon break.  Please don't discuss the case.  We'll be ready to resume testimony at 3:15.

All rise.

(Proceedings heard in open court; jury out.)

THE COURT:  All right.  You may be seated.

MR. GIBBONS:  Your Honor, can we just take this up?  We have a lawyer Spizzirri --

THE COURT:  Yes.

MR. GIBBONS:  -- right, who is an hour away.  These witnesses are always going 15 to 30 minutes longer than anyone estimates.  I mean, we can bring her here but John estimates 30 minutes on Turner.  We got at least 45 minutes.  Then John is going to have some mop-up.  We're getting -- we're getting to Spizzirri at 4:30.  I mean, we want to bring a lawyer over for that?  I mean, I just don't think it's fair professionally to have her -- because she's got to come back tomorrow, we know that.  She's not going to wrap up today.

MR. LOEVY:  I think we can get -- if Turner starts at

1329

3:15, I'm done at 3:45 or a little bit after that. He's -- no, 3:15 --

MR. GIBBONS: If he starts at --

THE COURT: ALL right. So if we -- I'm just sitting here doing this very simple math. If we resume at 3:15 and you go 30 minutes, that's 3:45.

MR. GIBBONS: Ish.

THE COURT: Fair. 3:45 to -- if it's 45 minutes of cross, that will take us to 4:30.

MR. GIBBONS: And John will definitely have recross.

THE COURT: I thought Mr. Gibbons said 45 minutes but maybe I misunderstood him. So either way, we're between about 4:15 and 4:30 before Mr. Gibbons is done. That's 4:15 or 4:30. And that assumes no redirect by you, Mr. Loevy?

MR. LOEVY: It does. I hate to lose even 20 minutes at this point trying to finish this thing.

THE COURT: I do as well but I also am -- as I've said, you know -- and I know everyone else is with me on this, I'm also a realist and I don't know that it makes sense to have someone, any witness, come down for 15 minutes of questioning if we know we're not going to finish with her today. I don't suppose there's anyone else or any other person who will be able to get started or who is here, right?

MR. LOEVY: You know what, that's an interesting point. We have the evidence tech. We could bang out that

1330

testimony unless we had a gentlemen's understanding that we will work out a stip. I don't think we should bore the jury with 45 minutes of evidence tech reading.

THE COURT: And that's a deposition --

MR. LOEVY: That's the deposition.

THE COURT: -- that we did?

MR. LOEVY: Yeah.

THE COURT: Okay.

MR. LOEVY: Can we -- if we -- you know, we'll be very agreeable on any fact they want in the deposition can be in the stip. But if they're not going to agree to that, then I guess we would read the evidence tech right there.

MR. GIBBONS: Yeah. I don't think we're ready to work on a stip in the next 12 minutes.

THE COURT: Yes. Well --

MR. LOEVY: I'm asking for a --

MR. GIBBONS: The answer is no, we're not going to work on the evidence tech.

THE COURT: I get it. Well, based on where we are -- and I have no reason to think that anyone is saying anything other than their best estimate of how long the testimony will be -- it will be 4:15 or 4:30 before we finish with Turner at best. And as much as I hate to waste time, I don't know that it makes sense to have someone come down for 15 minutes when we know that that person is going to resume tomorrow.

1331

I certainly hope that if the parties are able to reach some sort of agreement to read in some testimony, great. I'm happy to have the jury do that. But I don't think it makes sense to have someone come down for 10 or 15 minutes.

MR. LOEVY: I get that. I don't disagree with you, your Honor. I think I might have been misunderstood what I meant about the evidence tech. I'm saying we won't waste that 15 or 20 minutes. We'll read the dep. Unless we can have an agreement in principle that -- I'm not asking him to agree to the stip. I'm saying whatever facts from the dep they want in the stip they can have. I won't read it --

THE COURT: You can begin with the reading of the deposition testimony is what you're saying?

MR. LOEVY: No. I'm saying in lieu of reading the deposition testimony --

THE COURT: I see.

MR. LOEVY: -- I don't want to read 40 minutes or 30 minutes of testimony. I'm saying if -- all I need from them is we can reach a stip because I won't say any fact that's in that dep can be in the stip so I will be, you know, completely agreeable.

I'm not asking them to agree now. I'm asking can we get an agreement in principal. I won't read the evidence tech if we're going to figure out how to turn it into a stip. That's what I'm asking about.

1332

THE COURT: And that's fine with me but you -- obviously a stipulation requires an agreement. It's fine with me but you need their agreement.

MR. GIBBONS: Well, we'll talk to Mr. Loevy at the break here about that.

THE COURT: Okay.

MR. LOEVY: Okay. Then I guess I probably won't speed to get through Turner in a half an hour but we will finish Turner this afternoon.

THE COURT: All right. Last thing, can I have one of the defendants write down the address, last known address for Ms. Ocampo so I get that on the writ paperwork?

MR. FLYNN: Yes. We'll get that for you, Judge.

THE COURT: And I'd like it at the top of the break, if I can, so we can get working on it.

MR. FLYNN: Of course.

THE COURT: Thank you.

MR. LOEVY: Your Honor, sorry to do this to you at the end of the break but Tom, my co-counsel here, informs me that you can't issue a writ without holding her in contempt first and they can't be in contempt without an opportunity to be heard, notice and opportunity. That's what we're being -- and we have a case to cite you, *SEC versus Hyatt*, 621 F.3d 687.

THE COURT: So wasn't her notice an opportunity to be -- well, let me look at the case. Can you restate the case

citation?

MR. LOEVY: Sure.

MR. GIBBONS: Your Honor, we're also going to do a motion tonight. As you know, this was filed at 10:57 last night. We told you we were going to file some paperwork on this. They just keep throwing things at us in the middle of trial so we're going to have to paper this ourselves.

THE COURT: Okay. For now, please let me have the address and we'll -- I'll take a look at the case during the break and we'll take it from there.

(Recess taken.)

(Exchange of reporters took place.)

(Proceedings heard in open court. Jury out.)

THE COURT: All right. Please be seated. We will take up the issue with regard to the writ at the end of the day. I don't want to slow up the testimony. And I'd also like an opportunity to read the case that was provided and give the defense an opportunity to respond here in court.

Are we ready for Mr. Turner?

MR. LOEVY: I believe we are, your Honor.

THE COURT: Okay. Mr. Turner, you may step forward and take the witness stand as we gather and assemble the jury.

And, yes, if you can actually step up on the stand. That way you'll be ready to go.

All rise.

(Jury in at 3:20 p.m.)

THE COURT:  All right.  You may be seated.  We're ready for our next witness.

Mr. Turner, can you please stand to be sworn.

THE WITNESS:  Yes.

THE COURT:  Please raise your right hand and I'll have my clerk swear you.

THE CLERK:  Please state your name for the record.

THE WITNESS:  Garrick Turner.

(Witness sworn.)

THE CLERK:  You have been sworn.  You may be seated.

THE COURT:  Mr. Loevy, you may inquire.

MR. LOEVY:  Thank you.  Your Honor.

GARRICK TURNER, PLAINTIFF'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. LOEVY:

Q.  All right, sir.  If you'd state your name for the record.

A.  Garrick Turner.

Q.  What do you do for a living?

A.  Currently I'm on leave.

Q.  You used to work for the Chicago Police Department?

A.  That is correct.

Q.  When did you retire from the Chicago Police Department?

A.  I retired in February of 2020.

Q.  And you were part of the investigation that led to the

murder conviction of Marcel Brown; correct?

A.   That is correct.

Q.   And you get some of the credit for securing that conviction.  Do we agree?

        MR. FLYNN:  Objection.  Argumentative.

        THE COURT:  Sustained.  Rephrase the question.

BY MR. LOEVY:

Q.   Were you part of the decision to arrest Marcel for murder?

A.   I was not a part of the decision to arrest him.

Q.   That was the question.  So the answer is no?

A.   I was not a part of the decision to arrest him.

Q.   All right.  Who was?

A.   I would say the lead detectives.

Q.   Who would that be?

A.   Mr. McDonald and Mr. Mancuso.

Q.   Were you part of the decision to book Marcel for murder, to book him at 1:00 in the morning on day two?

A.   I was not.

Q.   Were you part of the decision to bring in the state's attorneys and seek charges against him?

A.   I was not.

Q.   You were part of the investigation; right?

A.   That's correct.

Q.   You had talked to him; right?

A.   I did not give the final decision on doing that.

Turner - direct

1336

Q. Of course. I didn't ask about final decision, I said, were you at all consulted in part of the decision to seek charges against Marcel?

A. I was involved in the investigation. Yes, I was.

Q. All right. You were involved in the investigation. So the follow-up question is: Were you involved in the conversation that the police officers had about whether they were going to call in the state's attorney and seek charges? That happened with you, or it didn't happen with you?

A. I wasn't involved in the conversation with the state's attorney.

Q. No, I'm talking about the conversation to bring in the state's attorney. Were you consulting with Mancuso and McDonald about that conversation?

A. About which conversation?

Q. At some point the police department -- the police department doesn't charge people with murder; right?

A. The state's attorney is responsible for that.

Q. All right. So the state's attorney is doing what the state's attorney does until they get a call saying, can you come over here and approve charges. Right?

A. To some degree.

Q. That's the felony review process; right?

A. That's part of it.

Q. All right. So the police department has to decide if

they're going to call the state's attorney and seek murder
charges against Marcel.  Do we agree?

A.   Correct.

Q.   Okay.  That presumably involved some consultation among
police officers about whether they're going to initiate the
process; right?

A.   Whether or not they're going to initiate the process?

Q.   Of bringing in the state's attorney to seek murder charges
against Marcel.

A.   That's correct.

Q.   Okay.  Did you give input suggesting that Marcel should be
charged with murder?

A.   No, I did not.

Q.   Your -- yourself didn't actually develop any evidence that
would implicate Marcel in murder, yourself personally; correct?

A.   I do not recall.

Q.   Now, you have some issues with your memory, if I
understand; correct?

A.   I do.  It has been quite some time.

Q.   No, I mean separate and apart from that.

A.   Regarding?

Q.   At your deposition, did you suggest that you have two
parents with Alzheimer's and that you believe your memory is
impaired?

A.   Not really.

Turner - direct

1338

Q.   All right.

A.   To some degree at times, occasionally, to forget things.

MR. LOEVY:   Your Honor, I'd like just the witness's screen, if I could, for Mr. Turner's deposition.  This is Exhibit 232.

THE COURT:   All right.  That will be just to the witness.

MR. LOEVY:   And that's page 18.

BY MR. LOEVY:

Q.   Can you see it on your screen, sir?

Yeah, this will be -- well, this will be Exhibit 232, just for the witness.  I'll use the document camera.

MR. GIBBONS:   Are we publishing this, your Honor?

MR. LOEVY:   No.  I said just for the witness.

THE COURT:   No, it's just for the witness.

MR. LOEVY:   Is it --

THE COURT:   I think if you put it on, it will be just to the witness.  That's correct.

BY MR. LOEVY:

Q.   Can you see it, sir?

A.   I see a document in front of me.

Q.   All right.  Take a look at your answer between lines 11 through 18.

Does that refresh your recollection that at the deposition you said:  Listen, I have two parents who suffer

from Alzheimer's, and I find myself suffering from memory loss.

A.   With the profession that I was in, I felt good about it, being able to recall things, minute things.  But now at this age and not being in the department any longer, it's very difficult.

MR. LOEVY:  Your Honor, I guess -- I'd like permission to show the whole answer to the jury, then.  He's reading -- this is the part --

MR. FLYNN:  We object, your Honor.

MR. LOEVY:  All right.  How about if I just impeach him?

THE COURT:  I think that's the safer course.

BY MR. LOEVY:

Q.   Do you remember being asked this question and giving this answer:

Did reviewing any of those documents refresh your recollection of the case?

Answer:  To some degree, but not specifics.  13 years is a long time ago.  I have two parents who suffer from Alzheimer's.  And I'm at the age of 59, and will be 60.  I find myself suffering with memory loss.  So it's sad not recalling a lot.

And then you continued, and you explained that in the profession you were in:  I felt good about it being able to recall things, minute things.  But now, at this age, not being

in the department any longer, it's very difficult.  And it's just sad.

        And you continued.

        That was the answer you gave; right?

A.   Sure.

Q.   All right.  And you did say a little bit later you believe your memory had failed you; correct?

A.   I don't recall the total of where it says.  And you've taken it off the screen.

Q.   All right.  Take a look at page 19.  And you were asked the follow-up question, 15 through 24:  So I'm trying to understand if you believe --

        MR. GIBBONS:  Your Honor, this is not impeachment at this point.  He hasn't answered the question.

        MR. LOEVY:  I believe he did.  Should I ask it again, your Honor?

        THE COURT:  I think he did answer the question.

BY MR. LOEVY:

Q.   You were asked:  So I'm trying to understand if you believe that your memory of the events, and I apologize if this is touching a nerve, but I'm just trying to understand if you believe that your memory of the events is worse than it might otherwise be because of some of the organic process that might have occurred.

        And you answered:  I believe my memory has failed me.

Turner - direct

1341

I don't believe that I've recalled as much as I would like to.

Did you give that answer, sir?

A.   Yes, I did.

Q.   And in addition to these problems, it has been a long time; right?  13 years?

A.   It has been a long time.

Q.   So let's talk about Wham Cary.  Actually, let's talk about Marisol Ocampo.  You were the lead detective in another investigation that was going on at the same time as the Paris Jackson shooting; correct?

A.   That is correct.

Q.   That was the stabbing investigation?

A.   That is correct.

Q.   And by the way, you've had an opportunity to prepare for your testimony; right?

A.   Yes, I had.

Q.   You've had meetings with defense counsel; correct?

A.   Yes, I have.

Q.   Nothing improper about that; right?

A.   No.

Q.   And how many meetings would you estimate you've had?

A.   Perhaps three, two.  Two to three.

Q.   Were some of the other police officers at some of those meetings?

A.   Yes.

Turner - direct

1342

Q.  Did you all get together and decide, hey, this is how we're going to say things?

A.  No.

MR. FLYNN:  Objection, your Honor.  Argumentative.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  Was there a discussion that, at these meetings, that, hey, whenever we're asked about Marcel, we should say, well --

MR. FLYNN:  Object, your Honor, to the extent that he's seeking attorney/client information.

THE COURT:  I'm confident Mr. Loevy will be very careful here.

So please maybe rephrase the question.

BY MR. LOEVY:

Q.  Were all these meetings in the presence of your counsel?

A.  Yes.

Q.  Have you had any meetings with the other officers where counsel wasn't present?

A.  No.

Q.  All right.  How many hours would you say you've spent reviewing the papers to, you know, to refresh your recollection?

A.  Which particular document are you speaking of?

Q.  I mean all of them.  You said these two or three meetings. How much time would you say you've spent going over the

Turner - direct

1343

transcripts and the documents to help yourself prepare for your testimony?

A.   Some I've studied longer than others.

Q.   I mean totality, total.  Have you spent 20 hours getting ready for your testimony?  10?  30?  You tell me.

A.   I'd have to approximate, sir.

Q.   If you could.

A.   Perhaps 15.

Q.   Okay.  So part of your memory today is, then, from refresh -- reviewing things; correct?

A.   That is correct.

Q.   And you know from reviewing things that in this stabbing investigation, some of the witnesses were the same.  They were witnesses in the stabbing and the shooting; correct?

A.   Correct.

Q.   One such person was Marisol Ocampo; right?

A.   I don't know if she was in the stabbing.

Q.   Well, she was the person who allegedly gave the knife to Johnella Dabbs; correct?

A.   That's not correct.

Q.   Would it refer -- refresh your recollection if you saw your report?

A.   Surely.

Q.   All right.

          If we could put this just on the screen for the

witness.

Take a look at the last three lines there. Do you see this one in particular? Does that refresh your recollection that there was an allegation that Marisol Ocampo gave the knife to Johnella Dabbs before Dabbs stabbed her? That was the allegation.

A. This is Sophia Bell --

Q. She's making the allegation. I'm just asking, without saying if it's true, or it's hearsay, there was an allegation that Marisol Ocampo had supplied the knife; right?

A. There was a statement given, yes.

Q. So that made Marisol Ocampo a suspect; correct?

A. No.

Q. That's a serious thing, to hand the knife to somebody before they stab somebody. That's a crime; isn't it?

A. Are you asking, what is a crime, or are you asking specifically about Marisol Ocampo?

Q. All right. Was Marisol Ocampo treated as a person of interest in this stabbing?

A. Not at that time.

Q. The lead detectives from the Paris Jackson investigation, they would have been aware of the information that Marisol Ocampo being a suspect in the stabbing. Wouldn't you agree?

A. No.

Q. Okay. This is -- do you remember giving a deposition, the

one we just talked about, back in 2021?

A.   Yes.

Q.   Do you remember being asked these questions?  This is page 99, 21 through 100, lines 18.  Do you remember being asked those questions and giving those answers?

If we could have the document -- or the impeachment, your Honor.

THE COURT:  You said:  Can we have the impeachment, your Honor.

MR. LOEVY:  Yeah, the video impeachment -- camera.  I guess I assume my own conclusion.

MR. FLYNN:  Your Honor, it should just be read, as we were reading R.J. Branch's.

MR. LOEVY:  We have video available.

THE COURT:  Right, in the way we did with Mancuso.  So this will be fine.

MR. FLYNN:  With it being published?

THE COURT:  He's trying to impeach, so -- is -- what is your objection?

MR. FLYNN:  Objection to the video being published.

MR. LOEVY:  It's video impeachment, your Honor.

THE COURT:  Correct.  In the same way that we impeached when appropriate with other witnesses by video, that will be appropriate.  So the objection is overruled.

(Said video clip displayed in open court.)

MR. LOEVY: It keeps going then, Lilia.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. All right. Did you give those answers under oath?

A. Yes, I did.

Q. Because, of course, the lead detectives in the Paris Jackson shooting, if they were relying on Marisol Ocampo, would have needed to know that she was in the police station because she was a suspect in a crime; right?

A. They would need to know, is what you're asking?

Q. Yeah.

A. They would need to know at a specific time, if it was true. But it had to be verified because it was hearsay.

Q. All right. Did anybody --

A. Because someone had stated that someone else saw --

Q. I got you.

A. -- that Marisol Ocampo. So there's no truth in that. Let's bring out the facts.

Q. Right. So what did Marisol Ocampo say when somebody asked her if she gave the knife that was stabbed?

A. The first step is to find out whether or not Marisol Ocampo did do so.

Q. Right. Nobody asked Marisol Ocampo --

A. It was not time to ask Marisol Ocampo.

Q. All right. Just to get the question out. Isn't it true

Turner - direct

1347

there's no documentation anywhere that anybody so much as asked Marisol Ocampo if she had supplied the knife? That's true; right?

A. That is true, to the fact that Vanessa changed the story and said that she never saw anyone stab or hand a knife to anyone.

Q. All right. So that's --

A. So if her own sister changed the story, why do we talk to Marisol Ocampo if it's not true?

Q. I get it, but I'm just -- want to establish that nobody asked Marisol Ocampo if she supplied the knife; right?

A. That's correct.

Q. All right. And Marisol Ocampo did give a statement against R.J. -- R.J. Branch; correct?

A. I believe she did.

Q. And her boyfriend, Eugene Stanciel, had been arrested that night as well; correct? Do you remember that?

A. I don't recall that.

Q. He had been arrested for somebody allegedly said he had a gun on the night of the shooting. Do you remember that?

MR. FLYNN: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Do you remember Ms. Ocampo being in the station at least 15 hours?

A.   No, I do not recall that.

Q.   Would that have been improper for her to have been in the station for that long?

A.   I could not answer that.  I don't -- wouldn't know why she would be there.

Q.   I mean, was she there -- I'm sorry.  Was she there voluntarily, or was she under arrest?

A.   I could not answer that, sir.

Q.   Well, just based on your investigation, was she in the station because she wanted to be, or because she was under arrest?

        MR. FLYNN:  Objection.  Asked and answered.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   I can't state why or what she was doing.  I wasn't involved in that part.

BY MR. LOEVY:

Q.   Do you remember what time she gave a statement in the Paris Jackson shooting?

A.   No, I do not.

Q.   All right.  Take a look at Plaintiff's Exhibit 126.

        May I approach, your Honor?

        THE COURT:  You may.

BY MR. LOEVY:

Q.   If you could just take a look at what's circled in red

there to see if that refreshes your recollection on the time that she gave the statement.

A.   Okay.

Q.   Can I have it back?

What time did Marisol Ocampo give the statement against R.J. Branch?

MR. FLYNN:  Objection, your Honor.  Foundation. There's no evidence that Mr. Turner was involved at all with this statement.

MR. LOEVY:  She's his witness, your Honor.

MR. FLYNN:  I'm not sure I understand what that means.

THE COURT:  Unfortunately because I don't have what you've shown the witness, I'm a little bit at a loss.  So perhaps -- are you just doing this to refresh his recollection?

MR. LOEVY:  Yes.

THE COURT:  Okay.  That will be fine.  The objection is overruled.

BY THE WITNESS:

A.   That's the first time I've seen that document.

BY MR. LOEVY:

Q.   Do you know what time she gave a statement?

MR. FLYNN:  Objection.  Asked and answered.

THE COURT:  Overruled.  The witness can answer, if he knows.

BY THE WITNESS:

Turner - direct

1350

A.   The document that you just tendered to me was circled in red and it says 243.

BY MR. LOEVY:

Q.   A.M.?

A.   Yes.

Q.   All right.  So do you have any understanding for why -- you were the one who interviewed Marisol Ocampo, right, for the stabbing incident?  Oh, I'm sorry --

A.   You just asked me that.

Q.   Yeah, I stand corrected.  Let's just -- let's just --
         To sum it up, Marisol Ocampo was never charged in connection with the crime that she was -- may or may not have been involved in; right?

A.   That is correct.

Q.   All right.  You also -- Marisol Ocampo provided names of other people who were in the park; correct?

A.   Could you repeat that question?

Q.   Did Marisol Ocampo provide names of other people who were in the park?

A.   I believe she did.

Q.   Did you interview Amanda Moore, a 14-year-old girl named Amanda Moore?

A.   I do not recall interviewing Amanda Moore.

Q.   Did you pick her up at her grandmother's house and bring her to the station?

Turner - direct

1351

A.   I do not recall.

Q.   Would your practice have been to have an adult present if a witness was 14?

A.   Probably.

Q.   And if there had been an adult present, it should have been noted on the GPR; right?

A.   Depending on whose GPR it is.

Q.   How about yours?

A.   If I did a GPR, it would be.

Q.   And there were other juveniles you spoke to that night, too; right?

A.   Possibly.

Q.   Shaniqua Grayer was 15.  Ebony Jenkins was 16.  Shaquincia was 16 -- Shaquincia Jenkins -- Ebony Jenkins.  Do you remember -- first of all, do you remember speaking to these girls?

         MR. FLYNN:  Objection.  Form.

         THE COURT:  Overruled.  You've now asked the right question, so I'll let the last question stand.

BY MR. LOEVY:

Q.   Do you remember speaking to these girls?

A.   I don't recall, counsel.

Q.   All right.  They should have had a parent at the police station; correct?

A.   That would be nice.  I'm assuming that they would have.

Q.   And that would be noted on the GPR if it happened; right?

A.   Possibly.  Not necessarily.

Q.   You don't remember these interviews anymore; right?

A.   I don't remember all of them, no.

Q.   Because how could you, it's 13 years ago, and this is what you did every day when you went to work.  Right?

A.   Thirteen years ago, this is what I did every day at work? I'm sorry, I don't understand that question.

Q.   Good question.  Let's break it in half.

     First of all, it was a long time ago; right?

A.   That's correct.

Q.   And it was also just another day at the office for you. Interview people, that's what you did on a regular basis; right?

A.   Correct.

Q.   So it's hard -- unless something stands out in your mind, surely you can't remember all the interactions; right?

A.   Some you can, yes.

Q.   And that's even if you had a perfect memory; right?

A.   Some are more memorable than others.

Q.   All right.  Do you remember speaking to any of the people I mentioned?

     MR. FLYNN:  Objection.  Form.  He's mentioned a lot of different people.

BY MR. LOEVY:

Q.   Any of them.

Turner - direct

1353

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  Do you remember speaking to Shaniqua Grayer?

A.  No, I do not.

Q.  Do you remember speaking to Ebony Jenkins?

A.  No, I do not.

Q.  Do you remember speaking to Amanda Moore?

A.  I'm sorry, I don't.

Q.  Shaquincia Williams?

A.  No.  If there's a report that would refresh my memory.  No.

Q.  You can read it in the report, but you don't remember; right?

A.  That's correct.

Q.  And, in fact, you've reviewed the reports before you testified today; correct?

A.  No, I did not.  All the reports, no, I did not.

Q.  Did you review some of the reports?

A.  I reviewed some of the reports.

Q.  All right.  You were also assigned, with the -- assisted with the interrogation of Marcel Brown; correct?

A.  That is correct.

Q.  And do you agree that if a person is being interrogated and there's a lawyer for that person present in the station, the lawyer should have an opportunity to speak to that person.  You don't disagree with that; right?

A.   Could you repeat that question?

Q.   Sure.  If the person you're interrogating, there's a lawyer in the station that wants to talk to them?

A.   If there is a lawyer that would like to speak with --

Q.   Yes.

A.   -- his client?  What about him?

Q.   Then that lawyer is supposed to be allowed to speak to the client; right?

A.   That lawyer will be able to speak to his client.

Q.   You say "will," as in no discretion; right?

A.   That is most definitely.

Q.   Tell me why you say that.

A.   Because that is the law.  We allow that.

Q.   All right.  You allow a lawyer to speak to their client?

A.   When they state that they have a client in the station and they would like to speak with that -- their client, we would allow that.

Q.   And that's a big deal; right?

A.   I'm sorry?

Q.   That's a big deal.  You took that real seriously?

A.   I think it's important.

Q.   You took it real seriously?

A.   It's to their rights.

Q.   All right.  You also agree that if a person is in the room, they have a right to know if the lawyer is out there wanting to

Turner - direct

1355

talk to them.  Would you agree with that?

A.  Yes.

Q.  Did you also find in your experience that once a suspect speaks to an attorney, they stop cooperating with detectives. Was that your experience?

A.  Could you repeat that?

Q.  Sure.  If someone you're -- you're interrogating somebody, interviewing them, and after they talk to a lawyer, they would almost universally say:  You know what, I think I'm done talking to you, my lawyer, we're done.  That's what would happen when they'd get access to a lawyer; correct?

A.  That's confusing.

Q.  All right.  Do you remember giving a deposition?  This is page 51, lines 7 through 19.

    (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  All right.  Did you give those answers?

        MR. FLYNN:  Objection.  Improper impeachment.  That had nothing to do with the question.

        MR. LOEVY:  That was the question, your Honor.

BY MR. LOEVY:

Q.  Whether you've had a suspect who communicated with his lawyer and then decided to speak to you about the case.  Your answer is no, that's never happened?

        MR. FLYNN:  His answer was:  That is a confusing

question.

THE COURT: Okay. Hold on. Let me just --

That is improper impeachment. That's not the answer he gave.

BY MR. LOEVY:

Q. All right. Has that ever happened, where somebody talked to their lawyer and then kept talking to you? That's never happened in your career; correct?

A. No.

Q. No, you agree with me?

A. I agree with you prior to 2008.

Q. Okay. Now, although, you know, memory being what it is, do you remember an attorney named Wham Cary?

A. Yes, I do.

Q. And you know that because you photocopied his ID; correct?

A. Yes.

Q. All right. I'm showing you the document camera.

This is Plaintiff's 146. It's in evidence.

Have you reviewed this document before you testified today?

A. Yes.

Q. Whose handwriting is that?

A. I have no idea.

Q. Is it your handwriting?

A. No, it is not.

Q.   All right.  This is the ID of a Wham Cary and his proving he's an attorney; correct?

A.   Most definitely.

Q.   And that's the protocol.  If someone comes to the police station, they say they want to talk to a person in the station, they got to prove they're an attorney; correct?

A.   Correct.

Q.   Otherwise, anybody can come to the station and say, hey, I'd like to talk to that guy, I'm an attorney; right?

A.   Correct.

Q.   So the Chicago Police Department said:  Show us an ID, we're going to copy it, and we're going to make a record. Right?

A.   That's correct.

Q.   And apparently that's what happened with Wham Cary; right?

A.   Yes, sir.

Q.   So there's no dispute that Wham Cary was at the police station that afternoon, at least at 1800 hours; correct?

A.   At least.

Q.   Okay.  Now, by the time -- judging by that time, when you met -- did you meet Wham Cary that day?

A.   Yes, I did.

Q.   And Marcel was already in custody; correct?

A.   That's correct.

Q.   Now, it was not uncommon for you to interact with

Turner - direct

1358

attorneys; correct?

A.   That's correct.

Q.   Just another day at the office; right?

A.   Correct.

Q.   Do you remember any attorneys you met with earlier that year?

A.   I remember speaking with some attorneys, correct.

Q.   All right.  Do you remember who you met with in August or July of 2008?

A.   Specifically, no.

Q.   Because it's just another day in the office, it's been too long; right?

A.   Correct.  Well --

Q.   Now, you don't claim to actually remember the interactions with Wham Cary, I take it?

A.   Yes, I do.

Q.   There's no contemporaneous document where you made notes about your interactions with Wham Cary.  Do we agree about that?

A.   No.

Q.   You know what I mean; right?  There's no notes where you recorded your interactions with Wham Cary; right?

A.   Outside of receiving his identification --

Q.   Right.

A.   -- and -- no.

Turner - direct

1359

Q. And there's no report, et cetera?

A. None that I was to make, no.

Q. So it's all going off memory?

A. Correct.

Q. Had you started having memory problems by 2018?

A. 2018?

Q. Yeah.

A. The amount of memory, it's back and forth.

Q. All right. I'm sorry?

A. No, go ahead.

Q. You did give testimony in 2020 about Wham Cary; correct?

A. Yes.

Q. But that was 12 years after the fact from memory; correct?

A. Correct.

Q. You testified that you never actually saw Wham Cary leave the station that day; didn't you?

A. Yes.

Q. Do you stand by that?

A. Yes.

Q. So you saw him come in?

A. Surely.

Q. But you don't know when he left or what happened after you interacted with him?

A. No idea.

Q. Now, you also saw Mancuso and McDonald come back to the

Turner - direct

1360

station around the time you interacted with Wham Cary; right?

A.   It was subsequent to.

Q.   All right.  And I realize you're saying that nobody asked to talk to Marcel, but, if anybody asked to talk to Marcel, those are the two guys that would have been notified; right?

A.   Probably.

Q.   Would you say probably or unequivocally?

A.   Without a doubt.

Q.   Yeah.  Because those are the lead detectives; right?

A.   Correct.

Q.   And it's their decision if -- and I don't know if it happened, you don't know if it happened.  But if an attorney asked to speak to someone who is in a room, there is no doubt that the decisionmakers would have been the lead detectives, and they would have been notified; right?  Correct?

A.   They would be notified.

Q.   And then who would make the decision about whether the attorney was going to get to speak to the client, or not?

A.    I'm not quite sure if there would be their total decision. If there's a supervisor there, the supervisor would say -- could -- could also allow.

Q.   I'm not sure I understand.  So let's say Mancuso and McDonald said:  You know, there's an attorney trying to get in, but I don't really think I want him to get in.  Then the supervisor could order them to do it?

Turner - direct

1361

A. Well, if they're not there, the supervisor could -- may allow. It has happened before, but.

Q. The supervisor wouldn't exclude the attorney under any circumstances; right?

A. I don't believe so.

Q. There's really no circumstances where you should be excluding the attorney. Do we agree?

A. I agree.

Q. And you can't even fathom a circumstance where an attorney wouldn't have access to his client, if he was asking for it?

A. If an attorney said that he represented a particular client, then he should be able to see his client.

Q. All right. And, in fact, R.J. Branch spoke to Wham Cary, at a minimum; right?

A. Wham Cary brought R.J. Branch into the station.

Q. And R.J. said he wasn't going to be talking to the police; correct?

A. R.J. Branch stated that. Is that your question?

Q. Yes.

A. I don't know if R.J. Branch stated that. I know the attorney did.

Q. And R.J. -- the attorney said his client would not be -- maybe I misspoke. The attorney said his client was not going to be answering questions, is your understanding?

A. That's correct.

Turner - direct

1362

Q.   And truth be told, you don't actually remember any other conversations with Wham Cary that may or may not have happened anymore.  Is that fair?

A.   That's not fair.

Q.   All right.  This is page 148, lines 3 through 19.  And we need that one.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Did you give those answers?

A.   My response to your question was:  That's not fair.

Q.   That's not fair?

A.   That's what you asked me.  You said:  Is it fair?  And I said:  No, that's not fair.  And now you played me exactly what I stated.

Q.   And isn't it true you really don't remember this anymore?

A.   I remember this.

Q.   All right.  If Wham Cary came back to the station, you don't remember what might or might not have happened; right?

A.   I'm sorry.  If he came back to the station?

Q.   Yeah.  Let's say he left R.J., talked to Marcel's mother, Marcel (sic) took money out of the ATM, retained him, then came back.  You don't remember whether that happened?

A.   I wasn't there, counsel.

Q.   Okay.

A.   I wouldn't know what she and he did.

Q.   All right.  You did some interrogating of Marcel; correct?

A.   I interviewed Marcel, yes.

Q.   Well, if I define an interrogation as trying to move someone from denial to admission, do you understand my definition of interrogation?

A.   If that's your definition, yes.

Q.   All right.  Is that --

        MR. FLYNN:  Object to form.

        THE COURT:  Sustained.  Rephrase the question.

BY MR. LOEVY:

Q.   Were you, in the course of speaking with Marcel Brown, trying to move him from denial to admission?

A.   To tell the truth.

Q.   All right.  The truth as you defined it; right?

A.   Just to tell the truth.

Q.   All right.  And he told you many, many times:  The truth is, I went to the park to pick up my sister.  I didn't know anybody was going to shoot anybody.  I didn't know anybody had a gun.  And, I haven't done anything wrong.  That he said, and that's the truth.  That's what he told you; right?

A.   No.  He changed his story.

Q.   Well, you kept going; right?

A.   He changed his story.

Q.   Have you have an agreement with the defendants that every time the questioning gets tough, you're supposed to say:  Hey,

Turner - direct

1364

he lied before he changed his story.  Was that an agreement that you reached?

MR. FLYNN:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   You've had some advantage in this interrogation; correct?

A.   I don't understand the question.

Q.   He was very young; right?

A.   And that's an advantage?

Q.   Yeah.  You're an adult, he was a child.  Would you agree?

A.   I didn't place him in this particular incident with the foolishness of killing someone, so.  That's not an advantage.

Q.   Well, in the course of questioning him, he was naive to the ways of the criminal justice system in a way that you weren't. Would you agree with that?

A.   I don't know that.

Q.   All right.  You knew that he didn't have a lawyer; right?

A.   He knew what was right from wrong.

Q.   All right.  And I just asked you if you knew that when you were talking to him, he didn't have a lawyer with him; right?

A.   He knew he had no one else with him.  Correct.

Q.   And you knew he hadn't slept the night before when you talked to him there on day two; right?

A.   No.

Q.   Would you have done it differently if you had known he had

Turner - direct

1365

been up all night?

A.   I'm sorry, counsel.  I don't understand that question.

Q.   Would you have done the way you handled this interrogation differently if you had known he had been up all night the night before?

A.   I don't -- I don't believe he was up all night.

Q.   Well, I'm telling you hypothetically if he was, would you have done it -- would you have kept interrogating him?

        MR. FLYNN:  Object to form.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   It's a hypothetical.  If, hypothetically, he was up all night, and you knew that -- you don't know if he was or wasn't; right?

A.   I'm not sure what I would have done.

Q.   All right.  You might have just proceeded to interrogate him anyways?

A.   I'm not sure what I would have done, counsel.  We're hypothetical.

Q.   All right.  Did you go in there with a predetermined opinion about whether Marcel was guilty?

A.   I knew what witnesses had stated.

Q.   So really focus, though.  I mean, you believed he was guilty.  Can we agree on that?

A.   I knew what witnesses had stated.

Turner - direct

1366

Q.   And witnesses had stated that Marcel and R.J. went to the park, and that R.J. did what R.J. did.  That was the gist of the witnesses; right?

A.   We're talking about Marcel and R.J., yes.

Q.   Right.  But no witness said that Marcel knew there was going to be any shooting happening or Marcel knew there was going to be a gun.  No witness said that.

A.   A witness said that he was involved.

Q.   Well, what do you mean "involved"?  He drove the car.

A.   Correct.

Q.   All right.  Did you go in there with a predetermined view that this boy was guilty of murder?

          MR. FLYNN:  Objection.  Asked and answered.

          MR. LOEVY:  He didn't answer yet.

          THE COURT:  He did.  Sustained.

BY MR. LOEVY:

Q.   All right.  Did you -- you believed that the truth was other than what he was telling you.  Is that true?

A.   He had lied previously.

Q.   All right.  You believed that the truth was other than what he was telling you; correct?

A.   That there was more, and I wanted the truth.

Q.   All right.  And you knew he had been arrested for murder; right?

A.   No.

Turner - direct

1367

Q. Nobody told you he had been arrested for murder?

A. He was being held for investigation.

Q. All right. But you -- at what point did you learn he had actually been arrested for murder?

A. Sometime after the investigation -- after my interview.

Q. Would you have done it differently if you had known that actually he got arrested at 3:00 PM the day before?

A. Had I done what differently?

Q. Anything differently. If you knew he had actually been arrested for murder the day before, as opposed to he was just being in the room.

A. Can you give me specifics? What would I have done?

Q. Let me ask you this: A person who's being interrogated for murder, don't they have a right to know they've been arrested for murder?

A. At times, yes.

Q. I mean, at all times; right?

A. Possibly. Because that may change.

Q. Sure. It would be not fair to interrogate somebody for murder without telling him: By the way, sir, you're under arrest for first-degree murder. Do we agree?

A. Possibly.

Q. At no time did Marcel ever in any way tell you that he was aware that R.J. had a gun; correct?

A. Yes, he did.

Q.   Okay.  This is page 238, lines 11 through 19.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  You did agree with that, correct, sir?

A.   For the section that she had showed me.  He later states that he had a gun.

Q.   All right.  I'm just asking, you answered that question; right?

A.   Oh.  Yes, I did answer that question.

Q.   And she asked you quite clearly, the exact question was, page 238, lines 9 through 13.  I lost the page.

     She asked you:  I'm specifically asking about before they got to the park, at the White Castle or on the way to Amundsen Park.  My understanding is that Marcel never told you that, during the course of your interrogation of him, that during that critical period he was aware that R.J. had a gun on him?

     Now, you didn't just answer that, you looked at documents to answer that; right?

A.   Had I read further, he does state that he had -- he always carries a gun.

Q.   He always carries a gun.  He goes nowhere without a gun, is your testimony?

A.   That's what Marcel stated.

Q.   I see.  Okay.  But you're not saying that he actually made

an admission to you that he knew R.J. was going to the park with a gun; correct?

A.  I don't recall him saying that.

Q.  All right.  We'll take a look at what he said to you, but just a few questions first.

If you could play number 70, please, Lilia.  It's the clips.

So we need the clips again, your Honor.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.  Why didn't you tell him what he was arrested for?

A.  Because I wasn't certain what he was arrested for.

Q.  When you went in there with the arrest report, you didn't know what was said on there?

A.  If there were additional charges or not.

Q.  All right.  You knew --

A.  I'm not going to -- I'm not going to just blurt out something and it's later changed.

Q.  Got it.

All right.  If we could play -- you went in there and interrogated him at some point; right?

A.  I went in to interview him at some point.

Q.  All right.  Was it your understanding he was there voluntarily, or, he wasn't free to leave?

A.  No, he was not free to leave.  He was under arrest.

Turner - direct

1370

Q.   Right.   And at that point you knew that everybody else had struck out before you; right?

MR. FLYNN:   Objection.   Argumentative.

THE COURT:   Sustained.   Rephrase your question.

BY MR. LOEVY:

Q.   What time did you go in?

A.   I can't recall.

Q.   Do you remember if it was the first day or the second day?

A.   I can't recall.   It had to have been the second -- well, I've gone in several times, so.

Q.   When you went in for the interrogation, or the interview, excuse me.

A.   My interview?   I believe it was the second day.   I'm not certain.

Q.   All right.

A.   I believe it was the second.

Q.   And you were told by Mr. Mancuso that:   We can't get him to say he knew he had a gun.   You were told that; correct?

A.   I don't believe it was Mancuso --

Q.   Or McDonald?

A.   -- that had told me.   Or McDonald.

Q.   Well, at that point, Marcel was pretty adamant that he didn't know anybody had a gun, he didn't know any shooting was going to happen.   He kept saying it over and over.   That's the background for you going into that room; right?

Turner - direct

1371

A.   To see if he would change his story again because he had lied previously.

Q.   All right.  But the background was, he had said he didn't know anything about a gun, didn't know anything about a shooting; right?

A.   I don't know about background.  I believe he was telling a lie, so.

Q.   All right.

A.   That's why I asked questions.

Q.   Let's go to 388.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Now, you had no reason to believe he was telling you anything that was untrue in this clip so far; right?  From the beginning of the story.

A.   I'm just asking him a question.

Q.   Yeah, but you didn't think he was lying to you; did you?

A.   I had -- could only assume.  I don't know.

Q.   All right.  Let's continue.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  You didn't have any reason to doubt that story; did you?

A.   It's just him giving a story.

Q.   Okay.  But I asked, you didn't have any reason to doubt the

truth of that; right?

A.   Not at that time.

Q.   All right.   This is 389.

A.   I never questioned it.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   He said he was going to holler at a guy, Eddie Cane; right?

A.   That's what I read here.

Q.   And do you remember Eddie Cane was a guy you could talk some sense into.   He was going to try to make sure there was no problems, get his sister to go home.   Was that the gist of it?

A.   I don't think he said that.

Q.   All right.   Let's go to 391.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Now, that was you.   He didn't say R.J. was angered, you did; right?

A.   I'm just asking a general question.

Q.   Okay.   It sounded like you're telling him; didn't it?

A.   I'm getting to a question.

Q.   Okay.

(Said video clip displayed in open court.)

MR. LOEVY:   Can you back it out?

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Now, this was -- had been rehearsed with Mr. Mancuso, this "I'm tired of it" issue; right?

MR. FLYNN:   Objection.   Argumentative.

BY MR. LOEVY:

Q.   Were you aware?   Were you aware that this had come up with Mr. Mancuso previously?

I think that means you're supposed to answer, sir.

THE COURT:   He rephrased the question before I could rule on the objection.   I apologize if I made you think I was going to say.   So, I was going to sustain the objection, and now he has rephrased it.

BY THE WITNESS:

A.   All right.   Could you repeat it?

BY MR. LOEVY:

Q.   Sure.   Mr. Brown, the first, second, third, and fourth time said:   Look, nothing happened in the car.   We were listening to music.   Nobody said anything.   Was that your understanding of how he originally described the car ride?

A.   No.

Q.   And then over time, Mr. Mancuso kept telling him, R.J.'s pissed back there, R.J.'s pissed, and got Marcel to say, fine, R.J. was mad.   Do you remember that's the sequence?

A.   I'm sorry, you're saying Marcel got R.J. -- R.J. got Marcel to be pissed?

Q.   Here's what I'm saying:   Did you understand that the theme

of the interrogation was they were trying to make Marcel --

A.   They?

Q.   -- give up -- they, the police officers, McDonald and Mancuso, they were trying to get Marcel to get -- implicate R.J. as having been angry, having been, I'm tired of this shit. They were trying to move him toward implicating R.J.  Was it your understanding that that's what was going on?

A.   We're just merely trying to get him to tell the truth. He's changed his story so many times.

Q.   All right.

          Keep playing there.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   So this is after he has been told that this Day-Day's stuff gotta go.  Can't say there's another shooter, nobody's going to believe that?

A.   I'm sorry, counsel, you said after he's been told?

Q.   Right.  After Mancuso and Weber told Marcel Brown, nobody's going to believe you about the two shooters.  Nobody's going to believe you about two shooters, it has to be one shooter.  Was it your understanding that he had been told that?

A.   Then he's now changing his story.

Q.   Okay.  Was it your understanding that he did change his story from, Day-Day was shooting first, to, there was only one shooter, after Mancuso and Weber told him:  Stop with the

Turner - direct

1375

Day-Day stuff, nobody's going to believe it --

A.   Because the witnesses have stated?

Q.   Yeah.

A.   Is that what Mancuso said?

Q.   Yes.

A.   And you say McDonald, both told him that the witnesses said that this had occurred?

Q.   And they told him, nobody's going to believe you.  The state's attorneys not going to believe you --

A.   Because of what the witnesses said.

Q.   -- if you say there are two shooters?

        MR. FLYNN:  Objection.  Misstates testimony. Misstates the evidence.

BY MR. LOEVY:

Q.   Was it your understanding that was the gist of what Mancuso and Weber were telling him?

        THE COURT:  The objection is sustained.  You may now answer his question.

BY THE WITNESS:

A.   My understanding is is that he changed his story.

BY MR. LOEVY:

Q.   All right.  Let's keep going.

     (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  Last clip.  I'm going to try to finish this in

five minutes, sir.

If you could play 392.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. He was making it up; wasn't he?

A. Pardon me?

Q. He didn't know guns. He was just trying to give you something that he saw R.J. with in the park; correct?

A. Oh, no, he has his guns.

Q. How would he have seen -- if he's in the park and he says he's seeing R.J. do the shooting, how would he know -- make a note of what gun it was?

A. He's seen the gun before.

Q. All right. That's your -- that's your belief when you walked in the room?

A. Well, he said that. He said that he -- R.J. always carries a gun.

Q. All right. That's your testimony. And we've seen the video, you understand that. In this court, we've watched the video.

A. Okay.

Q. All right. Let's continue. Is it ready?

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. You just kept trying at him; right?

MR. FLYNN: Objection. Argumentative.

THE COURT: Sustained.

MR. LOEVY: Keep playing.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q. Now, that is the exact language that ended up in his confession; wasn't it? So tired, he's going to pop those "N words" off?

MR. FLYNN: Objection. Misstates the evidence.

BY MR. LOEVY:

Q. That was the --

THE COURT: Sustained.

BY MR. LOEVY:

Q. That came from you, not him; right? Pop those "N words" off. That was not something that he said to you before you said it to him. Do we agree?

A. Correct.

Q. So you just invented that?

A. I asked him a question.

Q. No, you said -- you suggested to him that he was so tired he was gonna pop those "N words" off. That was your suggestion; right?

A. I asked him a question.

Q. All right. But he hadn't previously said anything like that to you?

A.   Just the fact that he's a shit starter.

Q.   All right.

And back it up a little bit and see how he answered.

(Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   Did you hear what he said at the end there?

A.   Something about would he be talking to the state's attorney.

Q.   No, he said -- the last words were:  I ain't have nothing to do with this, man.  Did you hear that?

A.   Can you roll it back?

(Said video clip displayed in open court.)

BY THE WITNESS:

A.   Can I talk to the state's attorney.  I ain't have nothing to do with this, man.

BY MR. LOEVY:

Q.   Now, at this point, Mr. Brown was led to believe that he really needed to say that R.J. was the kind of kid who would be associated with a gun, if that was going to get him out of the room.  That's what the impression he was getting; correct?

A.   Just to tell the truth, counsel.  Just to tell the truth. That's all.

Q.   He tried the truth for a number of hours; hadn't he?

All right.  I don't have any other questions, your Honor.

THE COURT: All right. Thank you.

Mr. Gibbons, or Mr. Flynn?

MR. GIBBONS: No, this one is Mr. Flynn.

THE COURT: Okay. Mr. Flynn.

MR. FLYNN: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. FLYNN:

Q. Hello, Mr. Turner.

A. Mr. Flynn, how are you?

Q. Doing okay.

Before we get into your background and talking about your participation in the interview, I want to talk about a couple topics that were briefly hit on by Mr. Loevy.

First, with respect to Wham Cary at the police station. Do you remember those questions?

A. Yes.

Q. You remember when Wham Cary surrendered R.J. to the police?

A. That is correct.

Q. Do you recall having a conversation with him that day?

A. That is correct.

Q. At any point did Wham Cary ever tell you that he was also there to represent Marcel Brown?

A. No. Never.

Q. At any point during this investigation did you ever learn from anybody that Wham Cary was allegedly there to represent

Marcel Brown?

A.  No, not at all.

Q.  Mr. Loevy also asked you some questions about a stabbing that you investigated.  Do you remember those questions?

A.  Yes.

Q.  Okay.  I want to talk to you a little bit more about that. Were you able to solve that crime?

A.  It was suspended.

Q.  Could you tell us a little bit about the investigation and how it unfolded?

A.  Certainly.  The officers that responded wrote a report. They wrote their report, and in their report, tactical officers followed up on it and made an arrest.  They arrested a Ms. Dabbs based upon what information they had.

The case later was assigned to me.  From there, I spoke with one of the key witnesses at that time, which was Sophia Bell.  After speaking to Sophia Bell, in her statement she stated, and hearsay, that her sister, Vanessa Bell, had told her that she had seen "campo" hand Dabbs a knife.

Q.  Did you go and speak to her sister, Vanessa Bell, about this issue?

A.  I did not.

Q.  I'm sorry, did one of the detectives on the team?

A.  Yes, they did.

Q.  And what did they learn from Vanessa Bell, the sister?

A.   Mr. -- detective Man -- not Mancuso, but McDonough (sic) had stated that she had changed that -- that Vanessa said that she never seen anyone hand anyone a knife or seen anyone stab Dabbs.

Q.   So Sophia Bell told you her sister said that she saw Marisol with a knife, and someone talked to the sister, and the sister said no, she never saw that?

MR. LOEVY:   Objection, your Honor, to the restating of that again.

THE COURT:   Overruled.

BY MR. FLYNN:

Q.   So you talked to Sophia Bell, and she said:   My sister, Vanessa, said she maybe saw Marisol with a knife that night. You go and talk -- or, sorry.   Detective McDonald goes and talks to Vanessa Bell?

A.   That's correct.

Q.   And she says:   No, I didn't see anybody with a knife.

A.   Correct.   To the best of my recollection.

Q.   Okay.   And did you go back, then, to Sophia Bell and say: Hey, Vanessa says she didn't see anything?

A.   Well, subsequently we first -- I had to get an identification.   So I went to the hospital where the victim was and spoke with Ms. Hardiman, who, she was reluctant to speak; however, she did, subsequently, and identified the subject from a photo array.   I explained to her that detectives, myself and

others, would have to speak with her at some time later in the future regarding this matter.

Q. Just to be clear, when you said that the victim identified somebody, who are you referring to?

A. She identified Dabbs.

Q. Okay. She never identified Marisol Ocampo as having any role in this stabbing; right?

A. She never identified Marisol.

Q. Okay. So going back to Sophia Bell, who said she might have heard from Vanessa, her sister, about Ocampo, you talked to Vanessa. Vanessa says, no, I didn't see anything. Did you go back to Sophia Bell?

A. Yes.

Q. What did you learn from that interview?

A. Sophia Bell then, she changed her entire story and said simply that it was someone else, a neighbor, that told her that a guy named Tony was the one who saw the stabbing.

Q. Okay. So going back to the first time you talked to Sophia Bell, when she mentioned Ocampo potentially having a knife and then all of the interviews you did after that in regard to that issue, did you find that the evidence wasn't credible?

A. That's correct.

MR. LOEVY: Objection, your Honor. Leading.

THE COURT: Sustained. Rephrase the question.

BY MR. LOEVY:

Q. Mr. Turner, based on everything we just discussed, did you think that the statement that Sophia Bell initially provided to you regarding Marisol Ocampo having a knife was credible?

A. No.

Q. Okay. And did you investigate this stabbing for weeks?

A. That's correct. Myself and the state's attorney went out to attempt to speak with others regarding it. Specifically who they are. My report would refresh my memory, but.

Q. One last question about the stabbing. When Sophia Bell first told you that she might have heard that her sister saw Marisol with a knife, when she told you that, had Marisol Ocampo already provided her statement to the police about the shooting?

A. My understanding is that she did.

Q. Okay. I just wanted to clear those topics up.

And now we can start back. We didn't really get a chance to meet you yet, Garrick. Where did you grow up?

A. City of Chicago, south side.

Q. And how old were you when you joined the CPD?

A. Approximately 27, 26 --

Q. Okay.

A. -- years of age.

Q. What year did you go to the academy?

A. 1990.

Q. And what did you do with the CPD after graduating from the

Turner - cross

1384

academy?

A.   I did two years in tactical.  And from there I went into narcotics and went undercover.

Q.   So you did some undercover work for the CPD?

A.   For a very long time, yes.

Q.   What year did that start when you were doing the undercover work?

A.   Approximately 1995.

Q.   Okay.  And what kind of stuff were you doing undercover?

MR. LOEVY:  Objection to relevance, your Honor.

MR. FLYNN:  Your Honor, this is directly relevant to statements that are made to Mr. Brown in the ERI.  I'm happy to go to a sidebar, if you need to learn more.

THE COURT:  Yeah, can we just discuss briefly?  I am --

MR. FLYNN:  Sure.

THE COURT:  -- not sure I understand the relevance.

    (Proceedings heard at sidebar:)

MR. LOEVY:  It's partly time, too.  You know, undercover buys is really what we've got to be talking about right now?

MR. FLYNN:  Your Honor, first of all, Mr. Loevy said he was going to take 30 minutes and he took 70.  So I'll start there with respect to time.

Now, with respect to the relevance, one of the main

reasons Mr. Turner is here today is with respect to statements that he asked Mr. Brown about in the ERI, such as, pop them "Ns" off, I got that gat. Things of that nature. The reason that Mr. Turner was asking Mr. Brown some of that information and asking if those were statements that were made was because this -- Mr. Turner worked undercover for 11 years working amongst people in gangs, people who sold drugs, people who used guns. So he had a better sense than most police officers regarding the types of, you know, slang, the types of statements that people in the shoes of R.J. and Marcel would have been using during that time, which is why he asked him those questions. It's important for the jury to understand that background. And that explains why he was asking those questions.

MR. LOEVY: That's ridiculous.

THE COURT: So -- so you can put to him the question about how he came to understand, or what formed the basis of his understanding of his conversation. But we don't need to get into the background and details of his undercover work. So the objection is sustained.

MR. FLYNN: Your Honor, I'm not sure I understand. So when I get to the ERI and I ask him why he's asking those questions, he can explain because of his undercover work?

THE COURT: He can explain the basis for which he believed he understood the answers Mr. Brown was giving, how it

Turner - cross

1386

is that he believes he understood that.  But we don't need to have a --

MR. LOEVY:  Bell wasn't in gangs, drugs, or these other things that he's talking about.

MR. FLYNN:  R.J. was, and that's who the statements were referring to when he was asking Mr. Brown what R.J. was saying in the car.

THE COURT:  So let's move forward.  We don't need to get into any additional detail now about the undercover work. But if you believe during your examination that part of his answer's going to go to his undercover work, and as to how he understood what statements were made to him, then he can explain why or the basis on which he believes he understood -- how he understood the answers, or why he understood anyone's answers to be what they were, what's the basis for his understanding.  If that happens to relate to some of his undercover work, so be it.  But we're not going to get into his knowledge of gangs.  Certainly not now.

MR. LOEVY:  Okay.

THE COURT:  I don't think it's relevant, and I -- I don't think you need to get there to have the witness explain how he understood what the witnesses were saying to him.

MR. FLYNN:  And just to be clear, I want to make sure that my explanation is clear.  It's not his understanding of what the witnesses were saying to him, as in, that's how he

understood Marcel is because Marcel's potential activity. Instead, it's the portions of the ERI where --

MR. LOEVY: I hate to interrupt, but we aren't at the ERI. You told him when we get to the ERI, we'll deal with it. I ask can we go forward.

MR. FLYNN: I ask you not to interrupt me, Mr. Loevy. I don't interrupt you.

But I just want to make sure your Honor understands that what I'm referring to here is that, when Mr. Turner is saying things to Mr. Brown in the room where he's asking him about what R.J. said on the drive to the park, he says things like, he didn't say things like, you know, I got my gat, I'm going to pop them "Ns" off. The reason that he's asking him whether R.J. said those statements is based on his experience as an undercover officer around individuals like R.J.

THE COURT: Okay. I appreciate that that's where you intend to go with it. The objection is sustained. It's not relevant, and I won't let you go there.

MR. FLYNN: Thank you, Judge.

(Proceedings heard in open court:)

THE COURT: Okay. Mr. Flynn, you can ask your next question.

BY MR. FLYNN:

Q. Did you -- I believe you already said you retired with CPD in 2020?

Turner - cross

1388

A.   That's correct.

Q.   Did you work for any other law enforcement agencies between 1995 and 2020?

A.   Yes.

Q.   What law enforcement agency?

A.   The Drug Enforcement Administration, DEA.

Q.   Okay.  And after you worked for the DEA, you came back to the CPD?

A.   That's correct.

Q.   When you came back to the CPD, were you eventually promoted to detective?

A.   That's correct.

Q.   What year was that?

A.   December 2006.

Q.   What were your job responsibilities as a detective?

A.   I was assigned to homicide.  So we investigated deaths in the north side of Chicago, in that area.

Q.   Did you take pride in your job as a detective?

A.   Yes.

Q.   I want to focus now on the events of August 30, 2008, and your role in the investigation.  And I want to talk to you about your time in the interview room.  We saw some clips of that already.

     First, the question, I know some of the clips we were looking at were from September 4th, that's day two.  But did

Turner - cross

1389

you also go into the room during the first day that Marcel was there?

A.   Yes, I did.

Q.   Was there any substantive interview during that first day between you and Marcel?

A.   Not that I recall.

Q.   What was the purpose of you going into the room during those other instances on day one?

A.   Just to ensure the fact that information was recovered. Also to see if he was okay, needed anything to drink, or to eat.  I think I just asked for his overall comfort level at that time.

Q.   So I want to then turn to your first substantive -- or your only substantive interview with Marcel.  We already saw some clips, I'll try not to play too many repeats here, but it's September 4th.  This is around 8:15 PM.

Maria, if we could get access to the computer.

And, your Honor, just let me know when it's 4:45.  I won't finish today.

THE COURT:  Certainly.

BY MR. FLYNN:

Q.   And if we could go to page 200, line 15.  And we're going to play clip Turner 1.

(Said video clip displayed in open court.)

MR. LOEVY:  Can we turn off the --

(Said video clip displayed in open court.)

BY MR. FLYNN:

Q.   Mr. Turner, at the beginning of this clip you read Mr. Brown his Miranda rights; correct?

A.   That's correct.

Q.   Why?

A.   To ensure he understood that he had the right to stop talking to me and ask for an attorney, if necessary.

Q.   Did he indicate to you that he understood his rights?

A.   Yes, he did.

Q.   And did you know that other detectives had previously read him his rights, too?

A.   Yes.

Q.   In this clip, if we scroll up just a little bit so we can get the top two lines of this page, as well as the bottom few lines of the -- yep.  In this clip, Mr. Brown said:  I was scared.  He then says:  I just thought that if I get out, something will happen to me.  Do you understand what he meant by that?

A.   He was scared of the streets.

Q.   Scared of R.J.?

A.   R.J. and company.

Q.   Did you ask Marcel about what happened on Saturday night in this interview in general?

A.   I believe I did.

Turner - cross

1391

Q. And were you focused on a specific time period of Saturday night?

A. I believe I was. I'd need to go further.

Q. Were you more focused on the time period before they got to the park?

A. Correct.

Q. Why is that?

A. Because I wanted to know his demeanor at the time.

Q. At the time, he had admitted that R.J. was the only shooter in the park; is that right?

A. Correct.

Q. Okay.

MR. FLYNN: Your Honor, this might be a good stopping place.

THE COURT: You took the words out of my mouth.

So we will stop here. Ladies and gentlemen, we'll break for the day. Thanks for your continued patience and attention. Please don't discuss the case. And we will see you tomorrow morning at 9:15 so we're ready to go at 9:30.

All rise.

(Jury out at 4:45 p.m.)

THE COURT: All right. You may be seated.

Mr. Turner, you are excused, but you remain on cross-examination, so please don't discuss your testimony, even during the evening break. You're welcome to talk with your

lawyers about other matters, but please don't discuss your testimony.

THE WITNESS:  Yes.

THE COURT:  Okay.  And you're free to leave the courtroom.

THE WITNESS:  Thank you.

MR. LOEVY:  Your Honor, can I raise a scheduling issue?

THE COURT:  Yes.  Give me one second.  We'll just have Mr. Turner leave the courtroom for good measure.

   (Witness exited the courtroom.)

THE COURT:  All right.  Okay.  Let's talk -- I think there were a couple of topics we want to touch upon to see where we can reach some resolution, or otherwise have to make some decisions.

So you raised witnesses, Mr. Loevy?

MR. LOEVY:  Yes.

THE COURT:  Or order of testimony.  So let's start there.

MR. LOEVY:  Yes.  It is still my hope and belief that we can close on Friday, and there are some moving pieces.  So if we finish Turner in the morning and finish Spizzirri in the morning, then we only -- we could narrow our remaining case to Cutler, who Locke estimates is a 45-minute witness, and Debra, plaintiff's mother, who also has testimony that's not crazy.

1393

So if we finished that tomorrow, we would agree not to call any further witnesses if the case ended on Thursday. My understanding, the reason I'm raising it is, you should be advised, your Honor, that the parties have agreed not to call the police practices experts. So that leaves them with Welner and Cichon. I'm not sure there are any other witnesses, but I don't want to commit to finishing tomorrow if it's for naught. Because if we're going to close next week, I may as well call more witnesses and fill the week.

MR. FLYNN: Your Honor, we're not going to wheel-and-deal on, if we don't call these witnesses, you won't call these witnesses. We're going to put our case on as we think is best fit. We do have more witnesses than just the two he listed. And we can't say for certain that we would be through with those witnesses in one day after his case-in-chief takes six.

MR. LOEVY: Well, at some point --

MR. GIBBONS: And just so you know, your Honor, Jon and I had this exact conversation, almost word-for-word, 24 hours ago. And I said: Jon, we can't do that. So it's a hollow offer.

MR. LOEVY: And at some point they have to tell us who these witnesses are. And I guess that "some point" is the end of the day tomorrow.

THE COURT: Okay. So, look, most of what has been put

1394

on the record, I appreciate knowing it. It's certainly something I was going to ask, but it's really for the parties to do their best to work out on their own. You know, I take Mr. Gibbons at his word that Spizzirri will take some time. I don't know how much longer we'll have for Turner, but I would like to just get an estimate from Mr. Flynn roughly about how much longer do you think you have. Again, you know, I'm not going to hold you to it by pinpoint, but I just want to get a sense of the length.

MR. FLYNN: Less than a half an hour, your Honor. But I would like to revisit the issue on sidebar because that will -- if you want to do that.

THE COURT: Yes. My record was horrible, and so I appreciate -- and I figured because of the closeness of the close that we could get -- I could get a better sense from you, you were trying to make a record at sidebar, which I think is a difficult thing. So it would be helpful to me to get a better sense of what it is that you had hoped to and still hope to discuss with Mr. Turner about his undercover work and how you would tie that into other aspects of his testimony concerning the interrogation.

So we'll give every one, including me, an opportunity to readdress the issue. We could do it now if you have a moment to address the question.

MR. FLYNN: Yes, your Honor. What is a major part of

1395

plaintiff's case is that Mr. Turner came in there and put words into his head about what R.J. was saying in the park that they believe Mr. Brown then adopted later on with Spizzirri in the room. And they've hit Mr. Turner with these statements and asked him, why did you -- why did you -- not just asked him, said: You put these in his head. You wanted him to adopt these statements.

And so, again, we think it's important for the jury to understand where Mr. Turner was getting these statements from, or getting these ideas from. He didn't just go in there with a blank slate and say: R.J. probably said this. R.J. probably said that. He was basing that on his 11 years working undercover with the CPD and the DEA, working amongst people like R.J. who were in the Vice Lords, who carry guns. And based on that experience, he was asking Marcel if that's the type of stuff that R.J. was saying in the car on the way to the park.

THE COURT: I see. So your argument -- I'm simplifying it way more than you would want to, but your argument is essentially that part of his background work as an undercover, with DEA, through whatever sources, is part of what led him to ask the questions that he did of Mr. Brown in a way that plaintiff has argued is him putting words in his mouth. So you're trying to use his background as a way to elicit some of the reasons why he understood and asked the questions that

1396

he did.

MR. FLYNN: Correct.

THE COURT: Okay.

MR. LOEVY: All right. Then that is a pretext. You know, what he's saying is, I want to say why I said he's going to go pop those "N words" off, and that you knew he had a gun. Those are the two statements.

He is then, therefore, going to explain: Listen, I've been in the DEA. I've chased drug dealers all around the globe. And I know that drug dealers and serious criminals say things like pop those "N words" off, and he probably had a gun. I mean, it just doesn't connect, doesn't even connect at all. R.J.'s not a drug dealer. There's no allegation he has ever sold a drug in his life. Marcel is not a drug dealer.

The allegation is, you knew he had a gun or didn't have a gun. Maybe they could justify one question. You know: In your experience as a police officer, do people on the street talk that way?

THE COURT: Okay.

MR. FLYNN: It's more than that.

THE COURT: Okay. So, look, I appreciate Mr. Flynn's taking this opportunity now to explain and allow me to better understand where you're going with this. I think, in light of Mr. Loevy's questions of multiple witnesses, not just of Mr. Turner, about use of certain phrases and sort of putting --

you know, putting ideas out there, that there is room for some questions regarding Mr. Turner's background and how it is that he came to, you know, understand or know some of the -- all of this is -- you know, all very much after the fact. But I think there is some room for a few questions concerning his background and how it is that that informed his discussion with Mr. Brown in the interrogation room. Part of what it is that's being attacked is, you know, use of some of these phrases, and, you know, putting words in Mr. Brown's mouth. And so the defense needs to have a reasonable opportunity to rebut that.

I have no doubt that we will get through that topic relatively quickly. And by that I don't mean to suggest that you have to rush through it, but I don't think we need to dwell on it beyond your ability to ask him some questions about his background and how that informed his interaction with Mr. Brown, including, you know, some of the discussion about what happened in the moments leading up to all of these individuals arriving at the park, et cetera, et cetera.

So you will have some room to do that tomorrow. I appreciate your raising it. And with that clarification, I'll allow that line of inquiry of Mr. Turner when he resumes the witness stand.

MR. FLYNN: One other issue with Mr. Turner is you instructed him that he can't speak with counsel. We did have an agreement that when he's on direct examination, we can.

THE COURT: Fine.

MR. FLYNN: I didn't want to talk to him and then -- okay.

THE COURT: I shouldn't stick my -- I think that's just a reactive matter for me. So assuming that there is no objection, you can discuss his testimony with him because, you're right, technically he's your witness, and he's now on direct through you, but it's technically cross, et cetera, et cetera, so.

MR. LOEVY: I do not object because we had an agreement. Although, I think it's fair game to ask him if he talked to his counsel, as long as it's suggested that he's allowed to. He can choose -- Mr. Flynn can choose to talk to him, or choose not to talk to him, but.

THE COURT: I will honor your agreement. It sounds like you're aware, Mr. Flynn, that that question may be asked, and you'll respond in kind -- or in turn, as you ordinarily would.

Okay. All right. I think that takes care of Turner. I think that takes care of witness order, roughly.

A couple of other topics that we wanted to turn back to were the question of judicial notice and a potential stipulation that we talked about briefly this morning. If there's any update on either of those topics or anything related to sort of where things stand, I'm happy to take that

1399

up with you now.

MR. LOEVY:  We still think you should take judicial notice of that sentence.  We haven't yet heard a counter.  At some point, we're going to ask you to take judicial notice of it.

THE COURT:  Right.

MR. FLYNN:  The judicial notice piece, there's a lot flying around here, is that the Judge Gainer?

MR. LOEVY:  We substituted -- instead of having the Judge Gainer's language, which the Court said she didn't want, we gave you guys the sentence that this was the evidence against him at the trial.

Do you have the exact sentence, Locke?

MR. FLYNN:  My understanding, your Honor, was that I offered the sentence, and I'm happy to read it again, and your Honor seemed to think that that would be good, but we were waiting for Mr. Loevy:

The plaintiff's incriminating statements that he gave during his interview were used against him at his criminal trial.

MR. LOEVY:  And ours is a modification of that.  And it's still my hope that the parties will get together and see if they can agree.

MR. FLYNN:  I must have missed the modification.

MR. LOEVY:  Yeah, that was the stipulation that was

entered.

THE COURT: Okay. So here's what I'd prefer to do with this, unless you're in a position to show him now and give him a chance to read it, this will be the very first thing we take up tomorrow morning. Not because I don't want to resolve it now, I do want to resolve it now.

But if you have it handy, Mr. Loevy, it would be helpful if you could just read it, or Mr. Bowman. I know I'm putting you on the spot, but.

MR. LOEVY: It would be great if we could read it now, maybe get it resolved.

MR. BOWMAN: I have it right here, Judge.

MR. LOEVY: Ours reads: At Mr. Brown's criminal trial, the only evidence against him of intent to commit murder was Mr. Mancuso's testimony about the statements he made during the interrogation.

It should say the statements Brown made during the interrogation.

MR. FLYNN: We're certainly never going to agree to that, your Honor. There was evidence from the witness -- other witnesses regarding his role in the murder. I understand that he's injected the word "intent," but that's just to confuse the jury.

THE COURT: Okay.

MR. GIBBONS: Your Honor, just for background, there

1401

were eight or nine witnesses at the criminal trial. Some of them talked about the circumstances that led Spizzirri to question in that line. We've all seen that snippet. So it's too simple to say, was there this direct confession.

A lot of these criminal trials are built on circumstantial evidence. And certainly Marcel's was built on circumstantial evidence, to some extent. So we can't stipulate to that. If we want to bring in the whole criminal transcript, then we should talk about that.

THE COURT: Right. And I don't want to do that. I don't think anyone wants to do that.

So I'll ask that the parties -- and I know your to-do list is growing. Please don't think that that's lost on me. I appreciate that. But I don't think this is the right time to try to reach resolution on the issue. So talk about it, we'll revisit it in the morning.

I'll just say, as I said before, that this is -- does seem like something where we can come to hopefully an agreement on some language that could be provided to the jury on this proof issue. If it -- if it -- if we can't reach an agreement on it, fine. You know, it seems like the kind of thing where I could take some version of judicial notice, but I will not be prepared to adopt the statement that the judge used in the transcript that was provided for me about it being a weak case, et cetera, et cetera. I'm not going to go that far with it.

1402

So do your best to try to come to some agreement.  We'll table it until the morning.  And if you can't come to an agreement, then we'll just -- I'm telling the parties now that I will take notice of some version, some sanitized, modified version of the finding.  And I'm confident that you all can try your best to get to something close.  And if you can't --

MR. LOEVY:  That's perfect.

THE COURT:  -- I will -- I will resolve it, and I'd like to resolve it tomorrow so that that piece of things is -- continues to move along.  I realize that that's part of Mr. Loevy's burden in the case.

MR. LOEVY:  We won't leave the courtroom without at least trying from our side, your Honor.

THE COURT:  Okay.

So I'm happy to hear or discuss any other topics the parties wish to raise.  I do want to re-visit the -- not the Mancuso issue, the Mari Ocampo issue, in light of Mr. Loevy's case that he brought to my attention before our afternoon break.  So if there are other topics we should talk about, now is a good time to raise them, and we'll go from there.

MR. GIBBONS:  I just have two minor ones.

THE COURT:  Sure.

MR. GIBBONS:  We're at that bewitching hour where they have to tell us who their witnesses are tomorrow.  I think I heard their lineup, but I just want to make sure of that.

1403

Their lineup is going to be:  Spizzirri, Cutler, and Deb Scott.

MR. LOEVY:  Turner, obviously, is first.

MR. GIBBONS:  Turner is on the stand.

THE COURT:  Right.

MR. LOEVY:  That's correct.

THE COURT:  To be followed by Spizzirri, Cutler, and then Debra Scott.

MR. LOEVY:  And what we'd ask, your Honor, is if they tell us who their witness would be if we do finish at 4:00 o'clock.

THE COURT:  Say that again.

MR. LOEVY:  It's their turn.  We would consider closing at -- if it was 4:00 o'clock, if they would tell us who their leadoff witness would be if we finish early.

THE COURT:  I see.  So you're saying after Scott, you anticipate resting, give or take.

MR. LOEVY:  But we've got this moving part thing going.

THE COURT:  Of course.  I completely understand that.

MR. GIBBONS:  I can't answer that right now.

THE COURT:  Okay.

MR. GIBBONS:  You know, I do love Jon, but I'll believe Jon when he rests, not when he tells me he's going to rest.

1404

THE COURT: Okay. Here's the deal. I truly appreciate that there is strategy that goes into this, so here's what we're going to do. At the lunch break tomorrow, we will see where we are. If we are at a point where it's clear that Turner has been on and off and we're moving through quickly with Spizzirri, or we think we're in a position to know where she's finishing and all we have left is Cutler and Scott, I'm going to ask the defense to at least indicate who their first witness, or two, will be, and we'll go from there. I'm not going to --

MR. LOEVY: Although, your Honor, then we will not be able to prepare. We have tonight. I'd like to prepare. We've been super on the table every day with who might get called tomorrow. What is the great secret to who their witness is so we can prepare tonight?

MR. GIBBONS: Let me just ask this: If that's their three witnesses and Jon's saying, that's it, they're done, I think tonight we'll be able to call him with who our first witness will be tomorrow. But if he tells me in a phone call tonight, we're not sure we're going to be done, well, then, I'm not going to start divulging who our witnesses are going to be.

MR. LOEVY: I guess that's fair, your Honor. I'll withdraw.

THE COURT: Yeah, because there is some element of sort of strategy based on how the evidence in the plaintiff's

case comes in, and I respect that. I encourage the parties, and you have been doing a great job of this, of talking to one another. I think that is hugely helpful. But if we're at a point where there is still some uncertainty, then at the lunch hour tomorrow, we'll see where we are.

It sounds like, no matter what, the plaintiff's case is going to go through the lion's share of the day tomorrow. I'm not saying every moment of the day, but the lion's share of the day. So I don't think this is going to deprive you, Mr. Loevy, of the opportunity to prepare, understanding that everyone would benefit from knowing sooner rather than later. That's just, you know, the nature of the trial, and I certainly understand that.

Okay. So you said there were two things, Mr. Gibbons. So one was witness?

MR. GIBBONS: Yeah. The second one I just want to raise, you know, the pretrial ruling in relation to Marcel's criminal history was left open if he opened the door. Jon asked a very specific question, I have it in notes, to Detective Turner.

Detective Turner, you were aware that Marcel was naive to the criminal justice system.

He has now inserted Marcel Brown's naivety with the criminal justice system into the trial, which was exactly the cornerstone at which the Court said, I'm keeping my ruling open

in relation to his criminal background.

I think Jon has opened the door. I would encourage the Court to look at that tonight, and I'll talk to the team as to whether we want to call Marcel Brown in our case in chief on that limited basis. But I think Jon has opened the door on that.

MR. LOEVY: He was arrested for a traffic, and what was the other one?

MR. GIBBONS: Gun.

MR. LOEVY: Reckless conduct which means -- no, he was not arrested --

MR. GIBBONS: Bullet gun; right?

MR. LOEVY: No, a BB gun, yeah. A BB gun. And he -- they called it reckless conduct. It's the same thing Eddie Stanciel did, where you run into traffic, and they arrest you for that. That's not the same as being interrogated by -- for a murder. I mean, it's a BB gun, it's a traffic offense, and it's running into traffic. So we don't think we've opened the door to that.

MR. GIBBONS: Your Honor, I'm just going to -- the Court has already had briefing on this. No need to revisit what it all is. It's in the Court's motion in limine order. I'm just referring to that order and those guardrails that were put on the examination. And I think Mr. Loevy has now opened the door by going outside those guardrails.

MR. LOEVY: And our position is in the context of the questions, we're talking about being interrogated on the second day for a violent felony. So that's our position. We don't think we've opened the door to traffic and a BB gun and running into traffic.

THE COURT: Okay. I'll give you a ruling on that tomorrow, depending on where things stand. I do think that, you know, asking questions like being naive to the -- I don't know if it was issue, or the system, arguably does open the door, particularly to that limited issue of his knowledge.

If you think, Mr. Gibbons, that it makes sense for you to recall him in your case, I may be willing to give you some latitude on that. But we will save a final decision until it's time to make a decision on it. But I do tend to think that that opened the door.

MR. GIBBONS: Thank you.

THE COURT: All right. Other topics or questions by either side before we touch on the Ocampo issue?

MR. LOEVY: Not from the plaintiff.

THE COURT: Okay. So just to close the loop here, at the break, I indicated that I was prepared to issue a writ of body attachment. I haven't taken any steps on that in light of the case that was brought to my attention and to give defendants an opportunity to respond. I think we made a record of the case that plaintiffs cite to, it's *SEC vs. Hyatt*. It's

a Seventh Circuit case from 2010. And essentially the gist of the argument, as I understand it, is that I may not be permitted to issue a writ without first giving Ms. Ocampo notice or an opportunity to appear and respond or otherwise attempt to comply with the trial subpoena, essentially, which is a court order for her testimony.

Now, it may be more appropriate, in light of this case, and perhaps others, to give her an opportunity to appear and comply, or at least be given notice of the potential consequences if she does not appear to -- appear and comply prior to issuing a writ of body attachment.

And I've taken a look at the case you cited, and there are a number of factors that the Seventh Circuit talks about in that case and generally that the case law speaks to. The one I'm most interested in, and I'll give defendants an opportunity to respond, is, I've taken a look at the subpoena that was served on Ms. Ocampo, it listed Monday, August 26th, the first day of trial, as the day of her appearance. That's typically what trial subpoenas do, unless there's a reason to otherwise list at a later date. Obviously it is well beyond August 26th. But the question, I think, is, in terms of -- in the language of the factors, whether or not Ms. Ocampo has failed to make -- well, let me read it in terms of the factors. Here are the factors that -- that the case that Mr. Loevy cited identified.

The four factors are: The Court sets forth an

unambiguous command. The alleged contemnor violated that command. Third, that the violation was significant; meaning, that the alleged contemnor did not substantially comply with the order. And four, that the alleged contemnor failed to make a reasonable and diligent effort to comply.

So if I were to issue the writ today, or first thing tomorrow, the question would be, has Ms. Ocampo actually violated the command to appear, and has she failed to make a reasonable and diligent effort to comply.

Obviously if I'm missing something, you should alert me to that. But the question I think for my purpose is, do we need to take an intermediate step to try to allow someone, i.e., the defense, to notify, or reach out to, or call, or attempt to communicate with Ms. Ocampo to say: Look, if you don't comply, the judge might issue, essentially, for your purposes, an arrest warrant to have you show up in court.

MR. KAYES: Your Honor, may I -- this is Tom Kayes. May I briefly? Because I think the issue is a little bit before that.

THE COURT: Sure.

MR. KAYES: I think what SEC says is that, before you hold someone in contempt, that person must have notice and opportunity to respond to the issue of whether they are going to be held in contempt.

THE COURT: Right.

1410

MR. KAYES: And from what I understand your question for defense to mean is, well, do we think there's enough here that you can hold Ms. Ocampo in contempt. And I think that that's a separate question.

THE COURT: Right. My question actually is, and I don't mean to cut you off, but I just want to make sure we're all singing from the same sheet of music. My question is, before going to the question of contempt and issuing things like a writ, do we need to take an intermediate step to attempt -- to essentially let Ms. Ocampo know there is the real possibility that someone could come knocking on your door and say: I have permission to arrest you, come with me. Should we take an intermediate step to let her know, ma'am, you may want to take steps to try to comply.

MR. KAYES: And just so the record is clear --

THE COURT: Sure.

MR. KAYES: -- I'm not trying to step on their toes. It is our position that that's absolutely what the *SEC* case requires. That that -- that can happen. You know, you file a motion to compel. That can happen if the person is there, they just need the opportunity to say, no, I had a really good reason.

THE COURT: Correct. I didn't get notice, I misunderstood, here's my really good reason. Exactly.

So I think the question is, and I appreciate you

1411

clarifying because I certainly don't want to get this wrong, I don't think anybody wants it to be done incorrectly, is, do we need to do anything in the interim, and by the interim, I just mean the next day or two, to see whether or not there is a way to notify Ms. Ocampo that, you know, that thing you sort of blew off, you may not want to do that. You should, at a minimum, attempt to let the Court know that I had a good reason not to comply, or I didn't get notice, or whatever the explanation may be.

MR. FLYNN: Your Honor, any additional attempts will be futile. First of all, with respect to her having notice what might happen if she didn't show up here last Monday, she knows better than 99 percent of the people in the world because the same thing happened to her with the deposition. She got a very similar subpoena, she didn't show up, and they came knocking on her door. So this idea that she doesn't know that she might be held in contempt, it's just not the case.

And we think the cases like this one, perhaps this one makes sense, that this was just a witness that forgot they got the subpoena, didn't show up. Maybe somebody like that shouldn't be held in contempt. Maybe they should be given an extra step.

But here, we know Ms. Ocampo knows the process. And despite that, she took the subpoena, she threw it back, and said, I'm not coming, they're threatening me. That additional

1412

step we do not think is necessary.

MR. SALWAY:  And, your Honor, to add in that case, the third party did attempt to comply with the subpoena and contended that they had satisfied the requirements of the subpoena.  And that's not the case with Ms. Ocampo.

MR. KAYES:  Well, your Honor -- Tom Kayes again -- I think that it -- you know, the case actually makes I think pretty clear what we have to do here.  I mean, you had a sophisticated company that got a subpoena from the SEC, they disagreed with the SEC about whether they complied with it, there was a hearing set.  The notice of motion was kind of ambiguous as to whether at that hearing, you know, this company could be held in contempt.  And even though it was a sophisticated company with lawyers, nobody disputes they got notice of something was going to happen.  After the subpoena, notice of something separate.  The whole reason the Seventh Circuit said, no, we can't do it that way is because it was so important to give specific notice that, hey, at that hearing, there was a risk that you will be held in contempt, and the contempt finding is a prerequisite to the remedies for contempt, like a writ of body attachment.

So I think there does have to be a separate notice that, hey, somebody is saying you failed.  Somebody wants you held in contempt.  Now you've got to speak your peace or the guys with badges are coming.

1413

THE COURT: Understood. And I just want to be clear that if we're going in this direction, which I'm fine and happy to do, then what I would require is for the defendants to make some effort to notify Ms. Ocampo that she must appear voluntarily on Thursday. And if she doesn't appear voluntarily on Thursday, then I will issue an order indicating that she will be arrested and she'll have to appear for testimony on Friday or Monday. And, again, I say these dates with, you know, uncertainty as to our close time in mind. It's too late, I think, for purposes of actually trying to give someone some reasonable period of time to be notified. I think it's too late on Tuesday, the 3rd, to say you must be here tomorrow morning at 9:00 a.m. But I don't think it's too late to say, we're on an expedited schedule here, and so, you know, to the extent that there has been a misunderstanding or you wish to offer an explanation, Ms. Ocampo, you must appear on Thursday morning at 9:00 a.m. And if you don't, then I'll issue a potential order for your arrest. And I say arrest, knowing that it's really a body attachment. And so she may be called here to -- may be forced to be here on Friday morning at 9:00 a.m. Which I say that because, you know, our timetable here is pretty short.

And I also appreciate that the defense is probably thinking, I don't have any way to actually let her know these things. You know, we served her with a subpoena in July, and

1414

that didn't go well, and her explanation on the bottom of the -- or the explanation offered on the bottom of the subpoena return indicates that she said, I've got kids, I don't have anything I want to say, I've been threatened, I'm not talking to anybody, and I, you know, refuse to comply. But it may be that, in order to be absolutely, positively certain that she's given an opportunity to comply, that we delay this by a day, or two. Not because I don't have comfort issuing writ of body attachments, but I get the point that it's really only fair to make double/triple sure that this woman has been given an opportunity to walk in here freely and voluntarily, if that's what she wishes to do.

MR. BOWMAN: To be clear, there was reference to the earlier procedure with respect to her deposition that I was up in the middle of a couple of years ago. And I had at least one conversation with Ms. Ocampo. I think others on our team also spoke with her. We came into court on a motion for a rule.

THE COURT: Correct. And I just looked that up. I don't mean to cut you off, but I just looked that up to make sure that my predecessor, whoever it was, actually did issue a date and time for Ms. Ocampo to appear. And if she didn't appear, she said, I'm going to issue a writ. And when she didn't appear, that's exactly what she did.

MR. BOWMAN: It was Judge Ellis, and that's exactly the process.

1415

MR. FLYNN:  Our only concern, your Honor, is, and we're happy to follow the Court's direction on this, but our concern is that, if we give her this information tomorrow, she's going to go to another state for a couple days and evade the Marshal service.

MR. LOEVY:  I think we covered that, is, that's why you're supposed to do it at the pretrial conference.

THE COURT:  So I appreciate, I really do, the defendants' position on this.  I get it.  This is a bit of a rock in a hard place.  But I think, when all is said and done, the best remedy is to proceed with some caution.  I certainly don't want to be in a position where, you know, we're not giving a person any opportunity to appear and remedy the circumstance on their own.

So I will ask and direct that the defendants make their best effort to notify Ms. Ocampo.  And this will be in the order that's issued later today, if not first thing tomorrow.  But I'm telling you now so that you know what the directions are, that -- that Mari Ocampo is directed to order, and ordered to appear in court to answer for the failure to appear on the trial subpoena on Thursday the 5th at 9:00 a.m.  And if she does not appear at 9:00 a.m., then we will have the writ ready to go.  And then I think we're in a position to have the Marshal service execute that writ for a return on Friday the 6th.

1416

MR. FLYNN:  Thank you, Judge.

MR. LOEVY:  Your Honor, we do ask that the defense counsel not, when they have this conversation, try to blame us. Because I did hear Mr. Flynn say he's worried she's going to hold it against him.  It would be inappropriate and unfair to say the plaintiff is going to have you arrested if you don't appear.

MR. GIBBONS:  Yeah, that's a very fair request.  I would never do it, but.  I'll stipulate to it.

THE COURT:  I know.  I don't believe that that's -- anything that anyone would intentionally do.  I take your point.  But we all know the rules of the road, and we'll -- I'll do my best to have someone enter that order this evening so that you have what you need.

But I think the -- you're clear on the direction, which is, get your butt here by 9:00 a.m. on Thursday, to put it colloquially, and we'll see where we are from there.

MR. FLYNN:  Thank you.

THE COURT:  All right.  Thanks.

MR. GIBBONS:  Thank you, your Honor.

*   *   *   *   *

1417

C E R T I F I C A T E

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Laura LaCien

_____

/s/ Sandra Tennis                    September 4, 2024
_____    _____
Official Court Reporters                      Date
United States District Court
Northern District of Illinois
Eastern Division