1418

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                 Plaintiff,            )
                                       )
            vs.                        )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) September 4, 2024
                 Defendants.           ) 9:24 o'clock a.m.


                     VOLUME SEVEN
        TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
        BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Defendants:         GREENBERG TRAURIG, LLP
                            BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

1419

APPEARANCES (Cont'd):

Court Reporter:                    JOSEPH RICKHOFF, CSR, RMR, CRR
                                   Official Court Reporter
                                   219 S. Dearborn St., Suite 2118
                                   Chicago, Illinois  60604
                                   (312) 435-5562
                                   joseph_rickhoff@ilnd.uscourts.gov

                    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                    PROCEEDINGS RECORDED BY STENOTYPE
          TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1420

(Proceedings heard in open court:)

THE CLERK: 19 C 4082, Brown vs. Mancuso.

THE COURT: All right. Good morning.

MR. LOEVY: Good morning, your Honor, John Loevy and the same appearances for the plaintiff.

THE COURT: Good morning.

MR. FLYNN: Good morning, your Honor, Kyle Flynn and the same appearances for defendants.

THE COURT: All right. Good morning.

Okay. I think we're still waiting on a couple of jurors. It's not quite 9:30, but they may be here.

Couple of things I just wanted to touch base on before we see where the parties are.

First, defendants have filed a response to the motion regarding Ms. Ocampo. We'll take that response and anything else up at a later time. I've had an opportunity to briefly review it this morning, but for purposes of keeping things moving forward, I do just want to know by the end of the day if you've had any success with having anybody reach Ms. Ocampo for purposes of the show cause hearing that I set for tomorrow.

So, we don't need to get into the substance of that unless there's something -- unless there's something you think I need to be updated on about that now.

MR. LOEVY: Well, from our perspective, we would ask that they make a record of what's transpired, because I think

it's going to be important, what efforts they've made.

THE COURT: Okay.

MR. FLYNN: Happy to, your Honor.

Our private investigator, like I mentioned yesterday, we don't have a phone number for her, but we understand that he had phone numbers for some of her family members. And, so, last night he made several calls trying to contact her via that method. Unsuccessful.

And currently as we speak, I believe he's driving to her home.

THE COURT: Okay. All right. We'll put a pin in that and see where we are at the end of the day. I appreciate the update.

For now, I don't think there's anything to do. I don't want that issue to delay us, because we really just need more information, unless someone else has something else on Ocampo.

MR. LOEVY: Not from the plaintiff.

THE COURT: Okay.

MR. FLYNN: Not from defense.

THE COURT: Okay.

Two other motions were filed yesterday on behalf of intervenors with regard to some of the ASAs who have been subpoenaed in the case. The intervenor has filed a motion to intervene and a motion for a protective order. I was hoping to

1422

get just a short update on whether or not the parties, and specifically defendants, have been in contact with anyone or whether this is an issue we can set over and maybe discuss more either later today or tomorrow, perhaps even if we need to have counsel on behalf of the intervenors present.

MR. GIBBONS: Your Honor, that's a pretty for pro forma motion by the State's Attorney's Office. I've seen it word for word before.

With that said, we have no intention of getting anything close to deliberative process-type questions with any ASA. In fact, Spizzirri will testify. She may be the only ASA that testifies. We're very cognizant of your guardrails regarding calling other assistant state's attorneys to just say they just took handwrittens, truthful, honest. I think the jury's heard it forever now.

So -- and Spizzirri, obviously, is a fact witness. But she's also going to cover the ground of what an ASA does and things like that. But we're not going to get into deliberative process. We're not going to get into reasons they charged and their processes about that.

But we will get into, he was charged by the Cook County State's Attorney's Office, period, stop.

THE COURT: Okay.

MR. LOEVY: All right. And, your Honor, from our perspective, on the state's attorneys issue, I appreciate the

1423

acknowledgment that the grounds for having state's attorneys testify at all has really, really gotten considerably narrower, particularly since Rufus McGee isn't going to testify. You know, there was going be a state's attorney say we didn't do what he said. And Ocampo very well might not testify, so we don't need that state's attorney. And it doesn't look likely that Eddie Stanciel is going to testify.

So, now we're just talking about the park witnesses. The facts that are relevant are now in the case.

THE COURT: Right. Okay.

MR. LOEVY: But to the extent that Spizzirri -- and I was going to add that, to the extent they're asserting a work product, then there's truly nothing left to ask them. But that applies to Spizzirri, too, you know. And I think -- if the way Mr. Gibbons just explained it, we're probably safe.

But we would -- when we're going to be objecting, she can't have it both ways, start talking about strategy or what she would have done and such when she's asserting a work product privilege. So, she should be strictly a fact witness.

THE COURT: Right. My expectation, without knowing, you know, what the parties' positions were going to be, is that Spizzirri is a fact witness. She was sitting in the room and her name has been tossed around in this trial quite a bit.

I'm confident the parties can do their best to navigate this. And I'm also confident you'll raise objections

1424

or otherwise ask to be heard if you think something is going in a direction that it shouldn't.

And I'm also sure that, to the extent necessary -- I'm hopeful, certainly, that Ms. Spizzirri probably has done this before and would know sort of the areas to stay away from and the areas in which she may testify. I would fully expect her testimony to be largely fact based as a fact witness.

MR. GIBBONS: Yes, your Honor.

Your Honor, let me just make sure we're real clear on that. It will be a fact-based examination, but process is important. The jury -- I don't want the jury confused about who does what. I'm not going to get into the substance. I'm not going to get into, what did the state's attorney consider before they charged. But I will need to outline process here, without getting into deliberative process.

THE COURT: Well, the steps of the process would be --

MR. GIBBONS: Right.

THE COURT: -- fine, right? I'm making these up, but how is it that you get roped into investigations? What are the steps necessary in order to take a case to the point of charging, right, before the grand jury? So, what the steps are --

MR. GIBBONS: Right.

THE COURT: -- is fair. We've heard about that already from other witnesses, to some degree.

1425

MR. LOEVY: So, it would be, I assume, pretty short and straightforward. What I'm worried about is they're going to say, look, your office wouldn't charge unless you were confident, unless you had satisfied yourself. That would open the door to her deliberative privilege. Well, what about this?

MR. GIBBONS: I agree. No, we're not going to argue with that.

MR. LOEVY: Okay.

MR. GIBBONS: But there's --

MR. LOEVY: As far as --

THE COURT REPORTER: Hold it.

MR. LOEVY: My fault.

THE COURT REPORTER: One at a time.

MR. LOEVY: My fault on that one.

MR. GIBBONS: Joe, I apologize, too.

THE COURT: Go ahead.

MR. GIBBONS: I agree with that. But there's narrow questions in there you can ask on the process. Did the State's Attorney's Office have available evidence to them? What would be that evidence in a case? That's process. I'm not going to get into, did they read 20 witness statements. But did they have it available to them. That's a process question, in my mind.

MR. LOEVY: Well, you know, what's relevant here? It's a coerced confession case. It's not a malicious

1426

prosecution case. You know, if we think they're going too far, we're going to object. It's pretty narrow what's relevant on this. It's, did the confession get coerced, not, what did you have for the charging decision and all that.

THE COURT: Okay. I appreciate hearing in advance both parties' perspectives. I think there's not -- I'm hopeful that there's not a lot of daylight between your positions. And I'll do my best to rule on the objections as they come, if they come. So, I appreciate that perspective.

We'll take up any intervenor issues at a later time, if we even need to, because it's not clear that you're even going to call the witnesses. But we can circle back to that issue --

MR. GIBBONS: Your Honor, I just want to make sure we put a bow on this.

There is a count and a claim that Marcel Brown's interrogation was either singularly or used during his grand jury proceeding, during his bond hearing, which has caused him, you know, to be charged and then convicted. That needs to be put into context, okay? Because they're going to argue that the singular reason that Marcel Brown was both charged, indicted and convicted was his -- was his statements. That's just simply not true.

And I'm not going to get into the detail of that. But the State's Attorney's Office has a file. Do they have all

that evidence gathered?  That's all I'm going to do.  I'm not going to say who evaluated it.

MR. LOEVY:  Of course, they've asserted a privilege over that file.  So, that's part of the problem, too.

MR. GIBBONS:  They haven't asserted privilege over the file.  They asserted privilege over what they were thinking as they --

THE COURT:  Right.

MR. GIBBONS:  -- looked at the file.

THE COURT:  Correct.  The work product piece of what goes into the deliberative process of deciding whether to charge or not charge.  Those analyses.

MR. GIBBONS:  I'm not going to go into that.

THE COURT:  Yeah.

So, here's where we're -- I appreciate all the making the appropriate record.  We'll deal with it as we come.  If we have to take a break or otherwise dig into this a bit more, we will.

And I think that takes care of what's most recently filed on the docket.

Other matters we should take up this morning before we bring in the jury?

MR. LOEVY:  Your Honor, we still -- it does not look like we're going to be able to reach an agreement on the stipulation about the -- what the judge found material or not.

1428

We have a couple of proposals.  We showed them to the defense last night.  I just tendered them to you.  You're probably going to have to arbitrate this one and make your own --

THE COURT:  Okay.

MR. LOEVY:  -- judicial notice.

So, I added "at the bond hearing," the language that I showed them last night based on what Mr. Gibbons just said.

THE COURT:  Okay.  I'll take a look at that and we will deal with it either at the break or at the lunch break.  I haven't had a chance to review it, and I do want to make sure I'm weighing the competing proposals.  So, I'll --

MR. FLYNN:  Your Honor, we also have our proposal, if we could tender that.

THE COURT:  Yes.

MR. FLYNN:  And we would like to be heard on this issue.  I understand that might be later --

THE COURT:  Yes.

MR. FLYNN:  -- just to give us a chance to --

THE COURT:  We will plan to take it up at the lunch break.  Similar to yesterday, we'll just carve out some time to make sure we have an opportunity to give you both a chance to be heard on that.

MR. LOEVY:  All right.  Well, let's try to make some progress today.  We have a reasonable chance of finishing plaintiff's evidence.

1429

THE COURT: All right.

MR. LOEVY: Do we know if the jurors are here?

THE COURT: We'll check now.

And we can get Mr. Turner back on the stand.

(Pause.)

THE COURT: It looks like we're one short.

Mr. Turner, you can be seated because we're waiting on one juror.

I just received a note, which I will read to you now.

To close the loop, we are waiting on one juror, Anmolpreet -- I think that's Anmolpreet Singh -- who is parking now. So, we do anticipate he will be here momentarily.

All right. The note that I received says: Judge Jenkins, do you have a sense of whether or not we're ahead or behind of schedule? We'd like to make appropriate accommodations/planning. Thanks, Juror No. 3.

So, Juror No. 3 -- I actually don't have my list in here, so I'm not sure who Juror No. 3 is, but I can get you a note on that, on who that is.

I'm open to suggestions, but --

MR. LOEVY: I think that --

THE COURT: Go ahead.

MR. LOEVY: I think we should tell them that we're ahead of schedule.

You know, at some point the defendants are going to

have to put their cards on the table. And, actually, that is today. If we finish our evidence today, which is possible, by my count they have two short experts. Now that we acknowledge that the state's attorneys are small, if anything, there ain't too many witnesses. And that could finish us by morning tomorrow. Not out of the question.

MR. FLYNN: We will not be finished by morning tomorrow. I can assure you of that.

I think it's safe to tell the jury that they can expect to be begin deliberations by Monday at the latest.

THE COURT: Okay.

MR. LOEVY: That would be the conservative thing.

Your Honor, it is the day before at this point. So, they really should tell us who they're calling.

THE COURT: So, here's what we're going to do -- and I realize we're waiting for a juror, so I appreciate that.

Juror No. 3 -- I want to be sure that it's right. So, regardless, here's what I'm going to do: When the jury comes out this morning, I'm going to tell them that we anticipate having a better sense of where things stand by the end of the day today, and that we commit to providing them with a reasonable estimate of where we believe we are by the end of the day. Which means that, for the afternoon break, we'll need to be on the same page about where things stand.

I just don't know that it makes any sense to give them

estimates that will change or are not accurate, even if it's a good-faith estimate.

So, I'll let them know as soon as they come out we'll give them that update at the end of the day. It's my commitment to do that. And that the timing is something that we're all sensitive to, even though cases take what they're going to take, right?

So, that's what we'll tell them for purposes of now. We'll have better information at 4:40 than we do at 9:40, and we'll go from there.

MR. LOEVY: Although consider a little optimism, your Honor, because I think by both estimates some of the worst case scenarios aren't going to happen.

THE COURT: Fair enough. And I'm happy to convey that optimism this afternoon. Today I will just -- or this morning I will just simply say, we will provide an update this afternoon. We'll have a better sense. I think that's an accurate and fair way to approach it.

Okay. So, as soon as I get word that the late juror is here, which I expect will be any minute, we'll be ready to go. So, just stay close by.

MR. LOEVY: Your Honor, can we use this time to raise one other issue?

THE COURT: Certainly.

MR. LOEVY: The hearsay limiting instruction got

deferred, and the pattern says you're supposed to give it as close to the evidence as possible. So, we've proposed that pattern. We haven't seen a counterproposal yet. But we'd like you to give that instruction. This would not be inapplicable right now.

THE COURT: So, when we broke on Friday, I think part of the plan was to give defendants an opportunity to weigh in on what instruction to give. And you're right, Mr. Loevy, that my recollection is that the hearsay instruction that you proposed was close to the pattern.

So, what's the defense's position on that?

MR. FLYNN: Your Honor, we're happy to agree to the pattern instruction, but the instruction that they proposed to us specifically highlights Mr. Mancuso, specifically highlights his specific testimony.

Instead, we think it should be a general limiting instruction regarding hearsay based on the pattern instruction.

MR. LOEVY: The whole point is to draw their attention. Jurors are not lawyers. So, if you tell them, hey, hearsay things are not considered for the truth, they're going to be, like, what? What part of what I've heard is hearsay and what is not?

If anything, the instruction should have bullet points. It should be real specific. What the officer claims he was told by people in the park, you know, it should list

1433

names or it should be just general. But you have to give them some idea what you're talking about before you tell them the evidence isn't truth. It will be very confusing to not point them to what you're talking about.

THE COURT: So, I tend to think that that's right. I mean, we've heard a lot of testimony. And I think in light of the fact that Mr. Loevy has raised a concern about a specific aspect of Mr. Mancuso's testimony, that we should, in fairness, refer to that when providing the instruction.

Unfortunately, I don't have the instruction in front of me. It's at my desk. If someone has a copy. If not, I can get a copy.

Because we have a minute, I'm going to just see if I can grab it, because I just saw it.

MR. LOEVY: Great.

THE COURT: Don't go anywhere.

MR. LOEVY: If you come back with jurors instead, your Honor, we'll take the trade.

THE COURT: Actually, never mind. I have it right here.

All right. So, plaintiffs have proposed the following instruction: The evidence you have heard concerning what witnesses said to Mr. Mancuso about what may or may not have happened in the park is to be considered by you for the purpose of understanding the course of his investigation and his state

of mind only, and for no other purpose.  You may not consider that evidence as proof that the things said to Mr. Mancuso were true.

MR. FLYNN:  Two things, your Honor.

First, if this is read, we ask that it not be read in the middle of Mr. Turner's testimony.

And second, your Honor, I haven't been super close to this issue, but I understand that this would change the appellate standard as to hearsay.  I don't have the pattern instruction in front of me.  It's something we looked at last Friday and it just kind of fell through the cracks.

So, since this wouldn't be read right now anyways, we ask that we perhaps revisit this during the morning break.

MR. LOEVY:  Our point is, your Honor, the pattern says read it as close as possible.

THE COURT:  Right.  But Mr. Mancuso's been off the stand for about a day now.

I certainly want to get it right, and I'm not going to read it in a way that conveys improper information.

So, here's what we'll do:  When we resume from our morning break, I would like to read the instruction.  So, any changes or proposals that the defense has, please get it to me.  And you need to confer with the other side.  But get it to me as promptly as you can, because I'm prepared to read this or something close to this when we get -- when we finish with our

morning break.

MR. GIBBONS: Your Honor, I just want to make sure the record's clear in case this goes up on appeal at any point, that we do object to that plaintiff-proffered instruction so that the appellate court knows we're not agreeing to it.

THE COURT: Yes.

MR. GIBBONS: Thank you.

THE COURT: Any changes, though, you'll let me know and we'll go from there.

MR. LOEVY: And Mr. Kayes points out that it should also say Turner. Mancuso and Turner both are claiming to have heard things from witnesses.

MR. FLYNN: I don't know that Turner was.

MR. LOEVY: About the stabbing.

MR. FLYNN: Well, that's their hearsay, Judge, that they're getting in.

MR. LOEVY: But it's hearsay.

MR. FLYNN: If we could discuss that on the morning break, as well, please.

THE COURT: Yeah. Look, we'll discuss it and we'll take it up so that the instruction can be given at the break -- when we resume from the break, okay?

MR. FLYNN: Thank you, Judge.

(Pause.)

THE COURT: Our juror is here. He's just getting

Turner - cross

1436

settled.  So, we'll bring them out in one moment.

(Jury in.)

THE COURT:  All right.  Please be seated.

Good morning and welcome back, ladies and gentlemen.

We're getting ready to resume the testimony of Mr. Turner.

I will just let you know that we're all sensitive to the amount of time that will be required for the trial.  And, so, I've discussed with the parties that we will provide you with a timing update, which will be our best guesstimate, at the end of the day today.

You know, obviously, every moment that we make progress is helpful.  So, we'll provide with you that timing update as best we can by the end of the day today.

All right.  With that, Mr. Turner, you remain under oath.

Mr. Flynn, you may resume your examination.

GARRICK TURNER, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. FLYNN:

Q.  Good morning, Mr. Turner.

A.  Good morning, sir.

Q.  Where we left off yesterday was your one substantive interview with Mr. Brown on -- around 9:00 o'clock on September 4th.  Do you remember that?

A.   Yes.

Q.   Before we get into more of that substantive interview, yesterday you discussed that you worked with the CPD, the DEA, and then you went back to the CPD; is that right?

A.   That's correct.

Q.   And during your time with the CPD and the DEA, did you ever work undercover?

A.   Yes, sir.

Q.   How many years did you work undercover?

A.   I would say a total of 12 years.

Q.   Okay.  And in your experience working undercover, did you spend much of your time around gang members?

A.   Quite often.  Practically always.

Q.   Okay.  So, I'd like to go back to your substantive interview now.

          MR. FLYNN:  If we could pull up Exhibit 500, Page 211, Line 3.  And we're going to play clip Turner 2.

     (Said video was played in open court.)

BY MR. FLYNN:

Q.   Mr. Turner, in this clip, you're asking Mr. Brown about what R.J. Branch said in the car ride on the way to the park, correct?

A.   Correct.

Q.   Okay.  And you're asking him whether -- in this clip, whether Mr. Branch said something along the lines of, these

mother F'ers aren't going to mess with me, I got my gat.

A.   Correct.

Q.   Why are you asking Mr. Brown these questions?

A.   Because that's generally the street lingo, and perhaps it would stir up his memory to tell the truth, that perhaps this is what he said or something in general to that.

Q.   Okay.  And what do you mean by street lingo?

A.   I would say it's not the King's English.

Q.   Okay.  So, based on your experience working undercover, are these the type of statements you think might have been made by R.J. on the way to the park?

        MR. LOEVY:  Objection.  Leading, your Honor.

        THE COURT:  Sustained.

        Rephrase the question.

BY MR. FLYNN:

Q.   Why were you asking Mr. Brown about whether R.J. was making these statements?

A.   Because of the fact that it very well could have been the statements that he would have said, or utilizing the same verbiage.

Q.   Because at this time you knew R.J. Branch was in a gang?

        MR. LOEVY:  Objection.  Leading.

        THE COURT:  Sustained.

        Rephrase the question.

BY MR. FLYNN:

Q. Mr. Turner, at this time, did you know Mr. Branch was in a gang?

A. I knew to some degree that there was -- he was a part of a gang.

MR. FLYNN: If we could next go to Page 227, Line 21, and play clip Mancuso 4.

(Said video was played in open court.)

BY MR. FLYNN:

Q. So, in this clip, Marcel told you that people were out to get him. Was he referring to R.J.?

A. Yes, he was.

Q. And who did you understand him to mean the people were that were out to get R.J.?

A. Rival gang.

Q. You asked Mr. Brown if R.J. said something in the car ride over along the lines of, I'm going to kick their ass and start some shit. Remember that?

A. Correct.

Q. Why did you ask him that question?

A. Because of the fact that he knew that there was another rival gang at that particular park. His sister had informed him that there was problems at the park. He knew the individuals up there would, in fact, cause a problem if he were to go up there because that's not his general territory.

Q. And, then, I think maybe the clip cut off here, but you can

see it there in the transcript at Line 12 and 13.  You ask Mr. Brown if R.J. said something like, he's going to go pop them Ns off.

Do you see that?

A.  Yes.

Q.  Why did you ask Mr. Brown if R.J. said that on the car ride to the park?

A.  Because of the fact that with him receiving information that there's a problem from his sister, he's now angered, and he feels that now that he has the gun, you know he has a gun, he normally carries a gun, as you've stated before, that, okay, did he say that, hey, this is what I'm going to do, let's go.

Q.  When you say here, did he say something like pop them Ns off, why did you use those choice of words?

A.  Because that would be the lingo that I'm asking him, would this be what he said.

Q.  Were you at any time during this interview trying to plant statements in Mr. Brown's head?

A.  No.

MR. FLYNN:  And, then, if we could go to Page 229, Line 1.

This will be the last clip I play for you.  It's Turner 5.

(Said video was played in open court.)

MR. FLYNN:  If we could pull up that transcript,

Exhibit 500, Page 229, Line 1.

BY MR. LOEVY:

Q.   While we're pulling that up, in this clip Mr. Brown says he didn't necessarily know R.J. had a gun, but everyone knows he has a gun.  Do you remember that?

A.   Yes.

Q.   Did that raise your suspicions as to whether or not Marcel would have known that R.J. had a gun on the way to the park?

A.   Correct.

Q.   Then at the end of this clip -- I believe it's down on Page 230, Line 7 through 8 that was at the end of this clip, you say:  Okay, you're not just saying that because I said it, right?

     Why did you ask him that question?

A.   To ensure the fact that he's telling the truth from his words -- not mine, but from him -- and that I'm not implanting anything in his head, that he's telling me the truth.

Q.   As a detective when you're interviewing a suspect, is that important to you?

A.   Most definitely.

Q.   Now, we also discussed yesterday about your role of the surrender of R.J. Branch, the shooter.  Do you remember that?

A.   Correct.

Q.   When R.J. Branch was surrendered, did you put him into an interview room?

Turner - redirect

1442

A.   The tactical officers brought him up and they placed him in.   I was responsible for turning on the ERI.

Q.   So, you turned on the video in his room similar to the video that we saw of Mr. Brown?

A.   That's correct.

Q.   Okay.   And you did that immediately as soon as he got to the room?

A.   That's correct.

Q.   And did the detectives Mirandize Mr. Branch, read him his rights?

A.   I read him his rights.

Q.   Okay.   And at that time, did the detectives ask R.J. if he was following his attorney's instruction not to speak to detectives?

A.   That's correct.

Q.   Okay.   And was there ever any attempt by any detectives to substantively interview R.J. Branch?

A.   Absolutely not.

Q.   Why not?

A.   That would be in violation of his rights and that would be unethical for us to do.

          MR. FLYNN:   Nothing further, your Honor.

          THE COURT:   All right.   Thank you.

          Mr. Loevy, redirect.

                         REDIRECT EXAMINATION

BY MR. LOEVY:

Q.   Marcel Brown had the same rights as R.J. Branch, correct?

A.   Most definitely.

Q.   And if Marcel Brown had been advised that he had a right not talk to the police, the police would have had to respect that, too, right?

A.   I'm sorry, could you restate that question?  It sounded like you were saying that he was never advised.

Q.   Well, if Marcel Brown had known there was an attorney who wanted to talk to him, and he had talked to that attorney and asserted his rights, the police would have had to respect Marcel's right -- Marcel Brown's right to remain silent, too, correct?

A.   There was not an attorney that requested to speak with him.

Q.   Well, sir, all you can say is, to the best of your memory, you don't remember speaking to an attorney who made the request, right?

A.   I didn't speak to any attorney that requested to speak with Marcel Brown.

Q.   Right.  So, let's qualify your statement.

You can't say no detective talked to an attorney.  All you can say is, to the best of your memory, you don't remember speaking to an attorney.  Is that fair?

A.   I did not speak to any attorney that requested to speak with Marcel Brown.

Turner - redirect

1444

Q.   Fair enough.  Let's back up.

Yesterday when you started the exam with Mr. Flynn, you started telling that story about the stabbing, somebody's sister told somebody's cousin and stabbing.  Remember when you were describing the police report?

A.   Yes.

Q.   Okay.  Your memory seemed really sharp when you were telling that story, didn't it?

A.   Yes.

Q.   Was that from memory or is that something you had studied to say on the stand?  In other words, do you actually remember all those things?

A.   I had the opportunity, as you had asked me prior to, to review the report.

Q.   All right.  In any event, regardless of whether it was hearsay or whether it was true or not, Marisol Ocampo was never asked a single question about her involvement in that stabbing; do we agree?

A.   To the best of my knowledge, no.

Q.   All right.  You were asked this morning about your training with the CPD and the DEA, and you met some very tough people, it sounds like, huh?

A.   I would say so.

Q.   All right.  But Marcel Brown was a kid who just graduated from Oak Park-River Forest who had nothing to do with gangs and

Turner - redirect

1445

drugs; would you agree?

A.  I wouldn't quite say that.

Q.  All right.  You had never met the kid, right?

A.  I had seen him before.

Q.  You had seen him in the neighborhood?

A.  No.

Q.  You had met Marcel Brown before?

A.  Yes.

Q.  All right.  Did you stereotype or prejudge or jump to conclusions that this was a dangerous gang kid?

A.  No.

Q.  Okay.  Did you assume he was just a kid trying to do what he was trying to do, going to Oak Park-River Forest High School, getting a job, hanging out with his girlfriend?  Did you assume he was just a normal kid?

        MR. FLYNN:  Objection.  Compound question.

        THE COURT:  Sustained.

        Rephrase.

BY MR. LOEVY:

Q.  All right.  In any event, you said that the reason you mentioned the gat is because that's how you expected people like Marcel would talk.

        MR. FLYNN:  Objection.

BY MR. LOEVY:

Q.  Did I understand that correctly?

MR. FLYNN:  Objection.  Misstates testimony.

MR. LOEVY:  That was --

THE COURT:  Overruled.

You can answer.

BY MR. LOEVY:

Q.  Is that why you said, hey, gat, gat, gat, because you thought he thought -- he'd talked that way?  Did I misunderstand you or was that your testimony?

A.  I did not say that Marcel Brown would talk that way.

Q.  All right.  Marcel's original story was there was nothing said in the car, we were in the -- we were listening to rap music, we're going over to the park, nobody's angry.

Did you know that going into the interrogation?

A.  Could you repeat that, sir?

Q.  Had you been briefed before you went into the room?

A.  Yes.

Q.  So, you learned, did you not, that when Marcel, the first, second, third time he told the story, he said, I got a call from my sister, was hanging out at the White Castle, my cousins jump in the car, we're listening to music.  Nobody said anything about being angry or tired of these N words.  Nobody said anything like that.

That was his original story, correct?

A.  He changed his story so many times.  So --

Q.  Sir, I'm just asking if his original story was, we were

just listening to music, right?

A. Possibly, yes.

Q. And when you say "he changed his story so many times," isn't it true that's because the police kept going back at him, kept going back at him, saying, look, we know you know more about R.J. We know you know he's a shit starter. You got to implicate R.J. Isn't that what prompted him to come toward the police?

A. He was questioned and explained that we had the facts, and the facts were that witnesses, numerous witnesses, had known the story and knew what actually occurred.

Q. Mr. Flynn showed you some parts of the testimony where he talked about a gun that he believed R.J. had. Do you remember just answering those questions and seeing that clip?

A. Okay.

MR. FLYNN: Objection, your Honor. I believe that's his -- Mr. Loevy's testimony. It's outside the scope. Mr. Loevy's examination.

MR. LOEVY: I'm asking about the clip Mr. Flynn just played.

THE COURT: Right. So, overruled. He can ask about within the scope of what you just asked, Mr. Flynn.

BY MR. LOEVY:

Q. All right. If you're sitting in Marcel's chair in that room, or on his bench, he thinks they're trying to get

information about R.J. being guilty in the shooting, right?

A.   I don't understand the question, sir.  You said he.

Q.   Yeah.  He, Marcel Brown, thought he was just a witness.  He wasn't supposed to be in trouble.  If you're Marcel Brown, you're getting the impression they just want to sink R.J., right?

A.   That's not true.  McDonald had already explained to him.

Q.   You think anybody explained to Marcel Brown that he was the one they were trying to put in prison?

A.   I believe that was stated to him by McDonough.

Q.   All right.  When you started interrogating Brown about whether R.J. had a gun, the part that Mr. Flynn played, he said, you know, I ain't never seen it, right?  He said, I've never seen any gun with R.J., right?

A.   He changed his story.

Q.   No, I'm talking about what we just played.  He said, I've never seen it, right?

A.   Can you replay it again?

Q.   I'm just going to read it.

         Mr. Brown said on Page 229, Lines 18 through 19 of that part where you're pressing him about the gun:  I ain't never seen it, but that was my first time seeing it -- meaning in the park -- but I knew he had a gun, though.

         That was what he said, right?

A.   He stated also that he had seen it before.

Q. Because you just kept pressing him, right?

A. Well, that means that he's lying about it.

Q. All right. You obviously gave him the impression that what he was telling you was insufficient and he had to give you more, right?

A. We're asking a question.

Q. Then he clarified for you, he knows he had a gun because he once got locked up for having a gun. That's what he's talking about, right?

A. At that time.

Q. All right. But you are -- when you say he's lying, you're pressing him, pressing him, pressing him to give you more, more, more, and to cooperate, cooperate, cooperate, right?

            MR. FLYNN: Objection. Form.

            THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. You were asked that maybe Marcel going into Amundsen Park would cause a problem for him. You had no information at all that Marcel Brown didn't hang out in the park all the time, did you?

A. No, I did not.

Q. He might have gone there for picnics, softball, hang out on Saturday night. This could have been a regular part of his neighborhood, right?

A. Possibly.

Q.   And, in fact, there were a lot of kids who hung out in Amundsen Park on a Saturday night, weren't there?

A.   Pos- -- yes.

Q.   Girls, little kids, teenagers.  It was a hangout spot, right?

A.   Possibly.

Q.   Now, Mr. Flynn asked you about that tired of this shit, so tired he's going to pop those N words off.  That was your words, right?

A.   Yes.

Q.   And eventually Mr. Brown adopted words like that, correct? In the interrogation?

A.   It's not as if he didn't hear it before.

Q.   Because he heard from you, right?

A.   I'm quite sure he's heard it prior to me saying it.

Q.   But in --

A.   I mean, it was in my question.

Q.   Yeah.  But in that interrogation, the first time anybody talked about R.J. Branch in that backseat wanting trouble with those N words, that came from Mr. Turner, correct?

A.   Yes, it did.

            MR. LOEVY:  I don't have anything further.

            THE COURT:  Anything based on that?

            MR. FLYNN:  Very briefly.

                        RECROSS-EXAMINATION

BY MR. FLYNN:

Q.   Mr. Loevy asked you about your knowledge regarding whether Mr. Brown would go into Amundsen Park, not go into Amundsen Park.  You were not the lead detective in this investigation?

A.   No, I was not.

Q.   Okay.  So, you didn't get briefed on what all the witnesses were telling the lead detectives?

A.   Correct.

Q.   So, there was some things that witnesses told the lead detectives that you would not be aware of?

A.   That's correct.

        MR. LOEVY:  Objection.  Leading, your Honor.

        MR. FLYNN:  I'll rephrase.

        THE COURT:  Objection -- okay.  You said you'll rephrase.  Thank you.

BY MR. FLYNN:

Q.   Are there things that the lead detectives may have heard from other witnesses that you would not be aware of?

A.   Yes.

        MR. FLYNN:  Nothing further.

        THE COURT:  Thank you.

        Mr. Turner, you are excused.  Thank you.

        THE WITNESS:  Thank you, your Honor.

     (Witness excused.)

        THE COURT:  The plaintiff may call his next witness.

MR. LOEVY: All right. We're going to call Ms. Spizzirri.

THE COURT: Ms. Spizzirri, if you can please approach the witness stand.

Please remain standing while my clerk swears you in.

THE LAW CLERK: Please raise your right hand and state your name for the record.

THE WITNESS: Michelle Spizzirri.

(Witness sworn.)

THE COURT: All right. Mr. Loevy, you may inquire.

And, Ms. Spizzirri, do your best to keep the microphone to your -- as close to your mouth as you can.

THE WITNESS: Yes, Judge.

THE COURT: Thank you.

MICHELLE SPIZZIRRI, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. All right. If you'd state your name for the record.

A. Michelle Spizzirri.

Q. What do you do for a living?

A. I'm an attorney.

Q. And who do you work for?

A. The Cook County State's Attorney's Office.

Q. How long have you worked for the State's Attorney's Office?

A. Close to 24 years.

Spizzirri - direct

1453

Q.   Now, you're the state's attorney who participated in taking the statement that resulted in Marcel Brown going to prison for a number of years, correct?

A.   I took his statement, yes.

Q.   And you were involved in the process that led him getting convicted for murder, correct?

A.   I took his statement.

Q.   All right.  You have worked for the State's Attorney's Office for, I think you said, 20-plus years?

A.   Yes.

Q.   I want to bring you back to September 4th and 5th, 2008.
          You were in what division at the time?

A.   I was assigned to a unit called felony review.

Q.   And felony review is part -- a subdivision of the State's Attorney's Office?

A.   That's correct.

Q.   Would it be a fair summary that the police investigate crimes?

A.   Yes.

Q.   And, then, if they make a decision that they want to pursue criminal charges, they involve the prosecutor's office?

A.   That is correct.

Q.   And, then, the prosecutor's office comes in and you have to approve or not approve the murder charges, correct?

A.   That's one of our roles on felony review, yes.

Spizzirri - direct

1454

Q. And you served in felony review from 2006 to 2009?

A. I served on felony review on three separate occasions, I believe. But during the time period you just referred to, yes, I would have been in felony review. And that's approximate, but I would say that's accurate.

Q. And you wanted to advance beyond felony review --

A. I did.

Q. -- and get into the courtroom, right?

A. Yes.

Q. And one way to advance is to do good work in felony review; do we agree?

A. We're expected to do good work in all of the units, but yes.

Q. And the way the State's Attorney's Office measures good work is build criminal cases, put people in prison, right?

A. No, I would disagree with that assessment.

Q. You do -- the State's Attorney's Office tries to get convictions, right?

A. Convictions are a part of our job, yes. I don't know that that's always our goal.

Q. Well, the prosecutors like to win, right?

A. I guess it depends who you ask. I like to see that justice is done.

Q. Winning beats losing when you're a lawyer in court, right?

A. I guess that's -- I could agree with that, sure.

Q.   All right.  And the prosecutors, when they're trying to win murder convictions, they align closely with the police department; would you agree with that?

A.   Not necessarily.

Q.   All right.  I'm going to talk to you about this case.

You've spent quite a bit of time preparing for your testimony, right?

A.   I have spent some time, yes.

Q.   How much time have you spent?

A.   I spent one day last week -- one full day last week -- and then I spent probably a total of two to four hours on my own time.

Q.   And the first was a meeting?

A.   Yes, it was.

Q.   With who?

A.   My attorney.

Q.   Have you met with Mr. Gibbons or Mr. Flynn?

A.   I have not.

Q.   Have you spoken to them on the phone?

A.   I have not.

Q.   Before your deposition, you spent about 11 hours getting ready reviewing the facts, right?

A.   Yes.

Q.   So, this reviewing, what does that look like?  Just reading the transcripts again, reading the reports?

Spizzirri - direct

1456

A.   Reading -- I didn't read any reports.  I did review -- I didn't even review the -- well, I'm sorry.  I reviewed a transcript of my deposition.  So, that would be correct.  I did look at a felony review folder, a photocopy of that.  And I did watch the electronically-recorded interview between myself and Marcel Brown.

Q.   Did you watch the part before you got there or just the part that you were involved in?

A.   In preparation for this, I did not watch anything prior or after my being in the room with Mr. Brown.

     And I do want to add, I did look at some of the log and burn sheets that were available.

Q.   All right.  How's your recollection of this event from 2008?

A.   Somewhat refreshed.  Some things I remember.  Some things I don't.  It's been a long time.

Q.   Would you describe your recollection as very poor?

A.   Poor, yes.

Q.   Would you say you remember very little?

A.   I'll do my best.  I'll do my best.

Q.   I mean, that's what you described at your deposition, though, right?  A poor recollection, you remembered very little?

A.   Independently, yes, that is true.  With the use of the exhibits that I was able to look at, it helped somewhat.  But

independent recollection, I agree, very poor.

Q. But you -- just so we're clear on our terms, at the time this was just another day at the office for you, right?

A. Yes.

Q. And, in fact, at the beginning of the tape, Marcel says, I know you, we interacted two weeks ago, and you said, I don't remember you, right?

A. That's correct.

Q. Because that's not unusual. You talked to a lot of people in those days.

A. That is correct.

Q. And the next day you talked to somebody else and then somebody else, right?

A. Yes, sir.

Q. So, you pass a decade and you really don't remember; is that fair?

A. That's fair.

Q. All right. But you have studied it, so you're fresh in your mind what happened?

A. Fresher, yes.

Q. All right. Let's talk about what would have happened then.

You would have responded to the police station at some point, right?

A. Well, I did. I know that I did.

Q. You know that you did. You don't remember it, but you know

that it happened. So, therefore, you know that it happened?

MR. GIBBONS: Objection to form of the question.

THE COURT: Sustained.

Rephrase the question.

BY MR. LOEVY:

Q. Do you know from the records what time you responded to the police station?

A. I believe it was approximately 7:00 p.m.

Q. All right. And you would have spoke to the detectives and reviewed the evidence, correct?

A. Well, not really. The purpose of me going out that night initially was to -- I was tasked with the assignment of doing what we refer to as log and burn, which means sitting in a room watching previously-recorded video of statements, and then logging or writing out, much like a court reporter would do, what is being captured in the video.

So, it wasn't necessary at that point for me to learn everything about the case.

Q. Were you there to approve charges?

A. No, I was not.

Q. All right. At the time they had not requested murder charges against Marcel Brown, to your understanding?

A. They had not.

Q. So, at 7:00 p.m. on September 4th, no one was asking to put him in prison?

A.   That's correct.

Q.   And they could have if they wanted to, obviously, right?

A.   They could have.

Q.   All right.  Are you sure that nobody asked to put charges on him, but they didn't have any evidence?  Is that possible that happened?

A.   I know with certainty that nobody asked me to review any -- make any decisions or review anything for charges.  If calls were made outside of my presence during the time I was there, that was never communicated to me either by my office or the police.

Q.   All right.  Insufficient evidence at that point in time, 7:00 p.m. on the 4th?

            MR. GIBBONS:  Objection to form of the question.

            THE COURT:  Sustained.

            Rephrase the question.

BY MR. LOEVY:

Q.   All right.  Who did make the request for charges when the charges were requested?

A.   I believe that it was an individual, also a state's attorney, named Fabio Valentini.  And the reason that I say I believe, is I did not ever contact anyone in my office for the approval of charges.  After reviewing the felony review folder, our common practice was to put an N in a circle, and then the individual's name who's contacted for those charges.

Spizzirri - direct

1460

In this case, there was the letter N and then the name Fabio Valentini.  So, I assume Mr. Valentini was the one who was at some point contacted.

Q.   Okay.  I think you misunderstood my question.  I just asked you --

A.   I'm sorry.

Q.   -- who sought the charges?

A.   I don't know which detective.  I know what detectives I think were assigned on the case.  I don't know who called or if any of them spoke to Fabio.

Q.   Did anybody ask you to approve murder charges?

A.   They did not.

Q.   At any point that night, did anybody say to you, you're the felony review state's attorney, we think we have enough evidence to put him in prison?  Did anybody say that to you?

A.   No, sir.

Q.   All right.  Let's talk about what you did know.

You knew that when Marcel had first got to the station, he said he didn't see any shooting, he didn't see his cousin shooting, right?

A.   In summary, yes.  I believe when he first got there, he was denying any involvement in any shooting, and actually said somebody else had been the shooter.  So, correct.

Q.   About four hours in, he said, all right, you know what, my cousin was involved, right?

A.  I can't honestly say how much time in.  But, yes, at some point his story changed.

Q.  And when we call his story changed -- by the way, that phrase, "his story changed," he went from denying his cousin was involved to saying, you know what, my cousin was involved, okay?  So, that's -- that's the question I'm asking.  That happened, right?

A.  That did happen.

Q.  All right.  You were not there for the first 30 or so -- or 29 or so of his hours of his interrogation, correct?

A.  Correct.

Q.  But you had an understanding of what happened, right?

A.  I did.

Q.  I'm going to ask you a series of questions, and they're designed hopefully to be answered "Yes" or "No," and you'll tell me if not.

But was it true that he didn't -- he was not originally told that he had been arrested for murder?  Did you understand that?

MR. GIBBONS:  Objection.  Lack of foundation.

MR. LOEVY:  Her understanding, your Honor.

THE COURT:  Overruled.  She can answer as to what she understood.

BY THE WITNESS:

A.  I don't recall.

BY MR. LOEVY:

Q. So, you might have been told he hadn't been informed he was arrested for murder, you might not have?

A. I don't recall.

Q. Wouldn't it have raised a flag for you if you're talking to a guy after 24 hours in custody and it wasn't -- it wasn't clear to him when he was first arrested that he was arrested?

A. When I entered the room to speak with Mr. Brown, it was very clear to me that he knew why he was there.

Q. Okay. I guess by then, it was pretty clear.

But I'm asking, wouldn't you have expected, if someone got arrested for murder on September 3rd, that somebody would have explained to him, you're under arrest for murder? That would be the expectation, right?

A. Yes.

Q. All right. Did you have any awareness that he had not been so informed?

MR. GIBBONS: Objection. Asked and answered.

BY THE WITNESS:

A. I don't --

THE COURT: Sustained. She's already answered the question.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. Was it your understanding they had been giving Marcel the

impression that he was just a witness against his cousin?  Yes, no, or you don't remember?

A.   Can you say that one more time, please?

Q.   Sure.  That Marcel was being given the impression at the time that he was just a witness against R.J., he was not the --

MR. GIBBONS:  Objection.

BY MR. LOEVY:

Q.   -- focus of attention?

MR. GIBBONS:  Lack of foundation.

MR. LOEVY:  It's a question about her understanding, your Honor.

THE COURT:  Overruled.  She can answer.

BY MR. LOEVY:

Q.   Yes, no, or I don't remember?

A.   I can't say what his impression of their interactions -- they meaning the police -- was with him.

Q.   All right.  You interacted with the police, right?

A.   I did.

Q.   They briefed you, right?

A.   They did.

Q.   All right.  Did you get the impression from talking to the police that he had -- it had been communicated to Marcel if he cooperated, he could go home?

A.   Never.

Q.   Did you understand that they kept telling him he was going

Spizzirri - direct

1464

to go to prison if he didn't tell them what they wanted to hear? Yes, no, or I don't remember?

A. That did not happen.

Q. It didn't happen in your presence, right?

A. I don't recall seeing any evidence of it ever happening. To the contrary, I think he was told the exact opposite.

Q. All right. How about, no matter how many times Marcel said the truth -- that he wasn't intending to shoot at the park, he didn't know about any plan, he didn't know that R.J. had a gun in advance -- no matter how many times he said that, the police didn't accept that; is that true, not true or you don't remember?

A. Not true.

Q. All right. And isn't it true that repeatedly Marcel was given the impression he could only go home after he admitted the police's truth?

A. Sir, I can't speak to his impression. I know what he was told. I know what he answered back. I don't know what his impression was.

Q. And that he wasn't going to get out of the room until he started saying what the police thought was the truth? That was --

A. That was never told to him.

Q. And isn't it true that he was never told when it was actually going to end?

A.   That might be fair.  I don't know that anyone knew the answer to that.  So, I don't think he was ever told with any specificity, this is how long you'll be here, this is how long it will take.  No.

Q.   So, it could have gone on and on and on if you're Marcel Brown, right?

A.   No.

Q.   Well, I mean, Marcel Brown doesn't know the law or the rules.  All he knows is nobody's telling him when he's going to leave, right?

A.   I don't know what he knew.

Q.   All right.  Isn't it true that the police were giving -- before you got there, from what you reviewed -- him the impression that this was going to go on and on and on until he started telling them what the police viewed was the truth?

A.   No.  My impression of what happened was he was giving them information and they were seeking to either corroborate or disprove the information he was giving.  And that was what was taking time.

Q.   All right.  You knew that although he had been offered food, he had only eaten exactly one meal when you went to talk to him, correct?

A.   I know that when I walked in, he did have food with him that appeared to not have been eaten.  I don't recall honestly if he had been given other things prior to that.  The video

Spizzirri - direct

1466

would speak to that.

Q.   Did you know -- it sounds like you know that because you've watched the video, right?

A.   Correct.

Q.   All right.  Did you know at the time -- at the time you hadn't watched the video, right?

A.   Can you just ask me that again?

Q.   When you walked into the room --

A.   Yes.

Q.   -- did you know that he had only had -- he had only eaten one meal since September 3rd?

A.   I may have known that.  I don't specifically recall.  That probably would be something I would have looked at before I went in.

Q.   All right.  Did you know that he had been in the room close to 30 hours before you met him?

A.   I'm sure I would have been told the time of his arrest, yes, and how long he had been there.  And I knew when I was there.  So, yes.

Q.   Did you know that the police department had kept this 18-year-old boy just a few months out of high school socially isolated and cut off from the outside world between the 3rd, the 4th and then into the evening of the 5th?  Did you know that?

A.   Yes.

Q.   Did you -- when you interacted with him, did you treat him as an adult despite the fact that he was just a couple months out of high school?

A.   I did.

Q.   Now, you have children of your own, correct?

A.   I do.  I have three.

Q.   And the youngest is now 18?

A.   That's correct.

Q.   But back then, you didn't have experience with 18-year-olds, right?

A.   Not at home I didn't, but I did in my professional realm.

Q.   You now have more experience with 18-year-olds in your home, correct?

A.   I do.

Q.   And if you had an 18-year-old, and your 18-year-old, would you expect them to be treated like an adult or like a child?

A.   I would expect them to be treated the way I treated Mr. Brown.

Q.   So, you wouldn't have any problem with your child in that room without a lawyer, without a phone call, after 31 hours, you wouldn't have any problem your child going through that?

A.   All of his rights were observed when he was spoken to.

Q.   You knew he hadn't slept, correct?

A.   I don't specifically recall.  Again, the video would speak to that.

Spizzirri - direct

1468

Q.   All right.  Did you watch the video?

A.   I did not watch the parts that occurred prior to my entering or after I left.

Q.   All right.  If you had known that Marcel had been arrested on the 3rd, had been up at 5:00 that morning, got arrested, stayed up all night and then stayed up all day, and now you're interrogating him close to midnight on the second night -- did you know that?

MR. GIBBONS:  Objection.  Mischaracterizes the evidence.

MR. LOEVY:  I think we've seen the evidence, your Honor.

THE COURT:  Overruled.

You can probe it on cross if you wish.

BY THE WITNESS:

A.   I don't recall if I specifically knew that.

BY MR. LOEVY:

Q.   Would you have done things a little differently if you had known this kid was going on his second all-nighter when you're interrogating him -- second consecutive all-nighter?

A.   When I enter a room, an interview room, interrogation room to speak with somebody, there's a number of things and factors that I'm looking for.  All of those things considered alerts to me on my assessment of the individual whether it is appropriate at this time to continue in conversation.

Whether or not Mr. Brown slept, I don't specifically recall. I know that when we had the conversation, it appeared voluntary, willing, knowing. And, so, there were no red flags to me at the time to stop that conversation.

Q. Do you remember my question?

A. I think I do.

MR. GIBBONS: Objection, your Honor. That was his question --

MR. LOEVY: No.

MR. GIBBONS: -- and that was the answer.

BY MR. LOEVY:

Q. My question was: If you had known that he had stayed up all night and now was working on his second all-nighter, would you have handled this any differently?

A. Not if he presented himself the same way he did to me, no.

Q. It was your usual practice to have a private conversation with suspects outside the police presence to confirm that the suspect had been treated properly, correct?

A. Not in cases where the interviews are electronically recorded. In cases where they are not and there's nothing preserved on video, yes, I will speak to them alone regarding treatment.

Q. And this is your deposition, Page -- do you remember giving a deposition?

A. I do.

MR. GIBBONS: Your Honor -- hold on.

MR. LOEVY: This is Page 70.

MR. GIBBONS: Your Honor --

MR. LOEVY: I'm just going to read the page --

MR. GIBBONS: Jon, I need a cite, please.

MR. LOEVY: That's what I'm trying to read. 70, Page 17 through 23 -- sorry. Page 70, Line 17 through 23.

MR. GIBBONS: Just give me a minute, please.

(Pause.)

MR. GIBBONS: What lines, John?

MR. LOEVY: 17 through 23.

Can we play it, Lilia.

MR. GIBBONS: No, no.

Hold on, your Honor, I don't think it's impeaching.

MR. LOEVY: I'm not saying to play it now. I'm just asking if we could play it.

MR. GIBBONS: It's not impeaching, your Honor. These are two different episodes.

She's already said there's a difference between a witness statement taken by -- a handwritten statement and ERI.

THE COURT: I'll need a copy of the pertinent lines to make a ruling.

MR. LOEVY: It's Page 70.

(Tendered.)

MR. GIBBONS: I would ask the Court to start reading

on Line 13, please.  It sets the context for that answer.

(Pause.)

THE COURT:  I don't think that's impeaching, so the objection is sustained.

BY MR. LOEVY:

Q.  Didn't you over and over and over again at the police department make it a practice to talk to suspects outside the police presence to make sure that they had been treated fairly?

A.  Only when it wasn't captured on an electronically-recorded interview.  Otherwise, I could just watch how they were treated.

Q.  How come it was important to ask suspects outside the presence of the police how they had been treated?  Why was that an important part of the process in those cases when you did?

A.  Because I would want to know if there was anything that was said to them, done to them, any factors that I needed to consider about the voluntariness of their statement, that they might either be afraid to tell the police or they would be accusing the police of doing.

So, outside of the police presence, I would ask them about that.  But when it's on video, I simply can watch the interaction.

Q.  I just want to ask you about the times you did do that.  It sounds like --

By the way, this is the first video case you took,

Spizzirri - direct

1472

right?

A. That's probably correct.

Q. So, every single time in your career before Marcel Brown, you sat down with the criminal defendant and you said, hey, the police aren't here. I just want to make sure you're not afraid of anything. You can talk to me in front of the police. Every single time in your career prior to Marcel Brown that happened, right?

A. When a suspect would wish to speak with the police or the state's attorney, the answer is yes.

Q. All right. And the reason every single time in your career prior to Marcel Brown you made sure to take them away from the police and have a one-on-one with them was to make sure that, hey, is it cool? Are you saying that just because the police are here? That kind of thing, right?

A. That's correct.

Q. And even though you could watch a video, you still could have done that with Marcel Brown. You could have said, Marcel, I've seen what you said, but are you afraid? Do you want to talk to me without the police? You could have done that?

A. Well, there's a statute in Illinois that requires all interviews and interrogations with those accused of murder to be captured on electronically-recorded interview. And there is not under the law allowed to be any conversations outside of that.

Q. Of course, you could have had that conversation in the room with the video going. You could have said, Mr. Mancuso, I'd like you to step out. I want to talk to this kid. Just like you did every other case. You could have done that?

A. I could have done that.

Q. Now, you had an advantage in this interrogation because you were a lawyer and he didn't have a lawyer. Do we agree that was an advantage?

MR. GIBBONS: Objection. Form of the question.

THE COURT: Sustained.

Rephrase the question.

BY MR. LOEVY:

Q. You were aware he did not have a lawyer present in that room, right?

A. I was aware he was offered an attorney and didn't want one.

Q. Who told you that?

A. He did when I advised him of his rights.

Q. He said he didn't want a lawyer. He said he was -- there was a lawyer, he was offered a lawyer, he said he didn't want a lawyer?

A. I informed him of his right to an attorney and that if he couldn't afford one, one would be appointed. At no time during our conversations or any prior conversations, because that's something I would have looked for, did he ever ask for an attorney.

Spizzirri - direct

1474

Q. All right. If a lawyer is in the station trying to talk to a suspect, the suspect is supposed to be told that, right?

A. He should be, yes.

Q. There's no equivocation or question in your mind, right?

A. No.

Q. Absolutely under all circumstances if a lawyer wants to speak to the guy, the guy should have access to his attorney?

MR. GIBBONS: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. If Marcel had a family -- his family had hired a lawyer and they were not -- you know, asking the police to talk to him, Marcel should have been apprised of that, right?

A. Yeah, I think he should be told if an attorney is at the station.

Q. Asking for him.

A. And then given the choice. I mean, I don't think you automatically give access. It's still his right to ask for the attorney or to refuse representation. But informing him would be a good idea.

Q. More than a good idea. You have to tell him there's an attorney that wants to see you; would you agree?

A. Yes, I would recommend that, yes.

Q. All right.

A. That should be done.

Spizzirri - direct

1475

Q.  In your experience at the Chicago Police Department, did they sometimes not tell people there was an attorney?

A.  Not on cases I was out on.

Q.  All right.  It was your experience in felony review that once a suspect talked to an attorney, they generally stopped cooperating with the police and the state's attorney, correct?

A.  Not always.

Q.  All right.  Do you remember -- you can't recall a single time when they did keep talking after an attorney, correct?

A.  I've proffered many individuals -- proffered meaning spoke to individuals in exchange for information with their attorney present on countless occasions.

Q.  All right.  Do you remember -- this is Page 130, Line 2 through 18.

MR. GIBBONS:  Just give me a second, please.

MR. LOEVY:  Sure.

MR. GIBBONS:  I don't think it's impeachment for this line of questioning.

MR. LOEVY:  Line 15 and 16 in particular, your Honor.

THE COURT:  Overruled.

You may -- it is impeaching.

BY MR. LOEVY:

Q.  So, I'll just break it down so it's fair to you.

A.  Okay.

Q.  You have a situation where a defense lawyer met a suspect,

Spizzirri - direct

1476

and then the suspect after meeting their lawyer says, you know what, I'll keep talking. That's something, to the best of your recollection, you have never experienced, correct?

A. I need to clarify. My answer here that you're pointing out says where a defense lawyer met with a suspect under investigation. I have never in my assignment on felony review met with a suspect present with his attorney.

However, in my role as a trial attorney, I have met with people already charged, no longer under investigation, who wished to speak to me for various reasons with their attorney present.

Q. So, just focusing on the first part of that answer, when you're in felony review, if they have an attorney, they're not talking to you, right?

A. They still have the right to. I never experienced talking with a suspect and his attorney while in that unit.

Q. All right. Did any police officer inform you that Marcel's mother had hired an attorney named Wham Cary to speak to Marcel?

A. No.

Q. If you had known that, you would have allowed Marcel access to the attorney, correct?

A. Yes. I know Wham.

Q. And hypothetically, if Wham Cary had been hired to speak to Marcel Brown and that had been hidden from Marcel Brown, you

would have had a real problem with that, right?

A.   Yes, I would have inquired what was going on, what happened, why, yes.

Q.   You wouldn't have proceeded to take a statement of Marcel if you knew there was an attorney trying to see him that the police blocked?

A.   No.   That would have been a concern of mine.

        But, again, it's the right of the individual.

Q.   Just focused on, you wouldn't have taken the statement if you knew that, right?

A.   I would have asked more questions.  Maybe it would have proceeded on to taking the statement and maybe it would have stopped right there.  I would have needed to know more information, yes.

Q.   All right.  You knew from reviewing the tapes that Marcel had made a lot of requests for a phone call, right?

A.   Yes.

Q.   And did you ever get any information about whether Marcel was allowed the phone call or wasn't allowed the phone call?

A.   I don't believe he was allowed the phone call.

Q.   And you didn't know either way, though, right?

A.   Not for certain, but I don't believe he was allowed the phone call.

Q.   Did you consider getting the phone call to be the responsibility of the police or the state's attorney?

A.   Of the police.

Q.   Why is that?

A.   Access to a phone call at the time was not a constitutional right guaranteed to him.  And when I go in and speak to a suspect, I'm looking for voluntariness, willingness.  Are there any factors here that are red flags to me that this person should not be speaking to me under these circumstances right now.

The phone call and the prevention of that I did not see as something I needed to offer to make that determination of voluntariness.

Q.   That's on the police?

A.   Yes.

Q.   All right.  And you said it's not a constitutional right there, but there is an absolute obligation, as you understood it, to get him a phone call within a reasonable time if he requested it, correct?

A.   Yes.

Q.   Did you know that he had requested a phone call shortly before you got there, before you started talking to him?

A.   I don't recall what time, but I know he had asked for a phone call.

Q.   Before you got there?

A.   I believe so.

Q.   All right.  And you went in there and interrogated him

anyways, right?

A.   Yes.

Q.   Could have allowed him to have a phone call?

A.   I could have.

Q.   Now, at the end when he said right there on tape, you know, I'd really like to talk to my mom, right?

A.   I don't specifically recall, but if it's on tape, I'll agree with you.

Q.   You remember Mancuso said, you know, five minutes, five minutes.  Remember that?

A.   I don't specifically recall, but if it's on the tape, I'll agree with you.

Q.   And, then, when you on tape were -- he mentioned he wanted to talk to his mom, you said, get him a phone call?

A.   I don't recall ever saying that.

Q.   This is --

         MR. LOEVY:  Play 307, please.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   So, he said maybe in a little bit, Mancuso says, right?

A.   I agree that's what he said, yes.

Q.   He's been saying that for the better part of 30 hours, right?

         MR. GIBBONS:  Objection.  Lack of foundation.

         MR. LOEVY:  She saw the tapes, your Honor.

THE COURT:  Overruled.  She can answer.

BY THE WITNESS:

A.   I don't know how many times that happened, sir.

BY MR. LOEVY:

Q.   You knew there was a camera going, right?

A.   I did.

Q.   All right.  And how did you respond?

A.   Having myself being audio and videotaped doesn't change my demeanor or how I handle a situation.

Q.   When he asked for the phone call, how did you respond?

A.   I don't specifically recall.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   That's how you responded, right?

A.   Yes, I did.

Q.   Because you knew a phone call was required, right?

          MR. GIBBONS:  Objection.  Form of the question.

          THE COURT:  Overruled.

BY THE WITNESS:

A.   I said that I would talk to the detectives about getting him a call.

BY MR. LOEVY:

Q.   All right.  There was something unusual about Marcel's desire to speak with you, the prosecutor; would you agree?

A.   I wouldn't say it happens the majority of the time, but it

does happen.  So, it wasn't completely out of the realm of, you know, what I've seen.

Q.   What was weird was, he -- whenever they'd say you have a right to an attorney, sometimes he would say, hey, I want to talk to the state's attorney, right?

          MR. GIBBONS:  Objection to the form of the question.  Weirdness.

BY THE WITNESS:

A.   I think he would ask to talk to --

          MR. GIBBONS:  Objection, your Honor.

          THE WITNESS:  I'm sorry.

          THE COURT:  That's okay.

          THE WITNESS:  Sorry, Judge.

          THE COURT:  That's okay.

          MR. LOEVY:  Should I substitute strange?

          Let me ask a new question.

          MR. GIBBONS:  Same objection.  Argumentative.

          THE COURT:  Okay.  Sustained.

          Please rephrase the question, Mr. Loevy.

BY MR. LOEVY:

Q.   It was strange and unusual that someone who had been arrested for murder would be begging to talk to the prosecutor, right?

A.   No.

Q.   Isn't it true that you understood that -- and you had been

Spizzirri - direct

1482

apprised -- that he was anxiously awaiting the prosecutor because he had been told that was the key to him going home? You knew that, correct?

A.   I think that mischaracterizes what he was told.

Q.   All right.

        MR. LOEVY:   This is Page 202, Lines 15 through 23. May we play this, your Honor?

        MR. GIBBONS:   Your Honor, it's not impeachment.

        MR. LOEVY:   This is Page 202, Lines 15 through 23.

        MR. GIBBONS:   I think you need to read through the first part of 203.

        MR. LOEVY:   Your Honor, that's the exact question, 15 through 23.

        THE COURT:   I understand.   I'm just reading what Mr. Gibbons directed me to.

        MR. LOEVY:   I can keep reading after that.

        THE COURT:   Okay.   The objection is overruled.   It is impeaching.

        But you should paint the full picture there, Mr. Loevy.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   Did you give those answers under oath?

A.   I did.

Q.   So, you understood that his fate, as he understood it,

having been in that room for all those hours, was dependent on convincing you that he should be -- that he didn't do anything wrong?

MR. GIBBONS:  Objection to form of the question.

THE COURT:  Sustained.

Rephrase.

BY MR. LOEVY:

Q.  Did you understand his fate, as it had been set up for him, came in your hands, you were the decision maker?

A.  No, I won't agree with the way you're characterizing that.

What he knew about what my involvement specifically was going to be, you'd have to ask him.  I knew he wanted to speak to a state's attorney.  I would think that part of that reason may be that he wants to know what the decision is.  I don't know what he knows about the protocol between the police department and the State's Attorney's Office that we're the one that makes charges.  So, I can't really say, sir.

Q.  Before you went in the room, did you watch the video?

A.  Yes.

Q.  All right.  So, you knew from watching --

A.  Well --

Q.  -- that video --

A.  Well --

Q.  You knew from watching that video --

A.  I need to -- no, I'm sorry.

Spizzirri - direct

1484

Q. Clarify --

A. I need to correct myself.

Q. Please do.

A. I looked at the logs and burns from the previous ASA who was out before me who took the notes and wrote down what was captured in the video. So, I reviewed that and spoke to the detective before I went in.

Now, whether or not I watched -- I was watching the portions that I was logging and burning. So, yes. I just don't remember where this -- these portions came in.

Q. Because you did believe at your deposition that you had watched video from before you got there, before you went in the room, right?

A. Right. Because I was logging and burning, yes. Yes. But there were some of it that was logged and burned by another ASA, and that's all I'm saying. I didn't watch that part.

Q. All right. Thank you for --

A. That's what I meant.

Q. -- clarifying.

So, let me ask you this, then: Did you know before you walked in the room that over and over and over again Mr. Brown said, I didn't know R.J. had a gun? Did you know that?

A. He did say that, yes.

Q. No, I'm saying over and over and over again.

A.   Yes.

Q.   Did you know that?

A.   Yes.

Q.   And did you know Mancuso acknowledged that he had said over and over and over again that he didn't know R.J. had a gun when you walked in?

A.   Yes.

Q.   All right.  Did you know that he had been told, we need you to tell the truth if you want to get out of here, right?

A.   No.

Q.   You didn't know that?

A.   I knew he was told to tell the truth.  He was never told his freedom or getting charged hinged on what he said.

Q.   Let's back up to the time before you got there.  I'm going to play some of the clips, and I'm going to ask you if you knew this.

        MR. LOEVY:  If you could play 203, please.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   You said, you're still on this.  He said, I'm on what?  I told him I didn't know.

        Something like that, right?

A.   That's correct.

Q.   Okay.

    (Said video was played in open court.)

Spizzirri - direct

1486

BY MR. LOEVY:

Q.   All right.  Did you see that video?

A.   Yes.

Q.   All right.  He kept trying to say, this is what happened, and the police kept trying to say, no, no, no, you got to say what really happened.  That was the dynamic, right?

A.   Right.

Q.   And he was told if he cooperated and told the truth, it would get better for him, right?

            MR. GIBBONS:  Objection.  Asked and answered.

            THE COURT:  Sustained.

            MR. LOEVY:  All right.  Let's play 204.

       (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  Had you seen that video before you went in?

            By the way, this looks like it's 9:00 o'clock, right?

A.   Yes.

Q.   Would you have had the opportunity to review that before you went in the room?

A.   Yes.  This might have been part of what I logged and burned.  I'm not sure.

Q.   All right.  So, you remember that the police just kept pushing him, give me more on R.J., more on R.J., more on R.J. That's the truth, right?

A.   Characterization of pushing, I wouldn't agree with.  But,

Spizzirri - direct

1487

yes, they kept asking him questions.

Q.  Did you know that at one point Marcel said to Mancuso, look, I've told you a hundred times I didn't know he had a gun. If you want me to say I had a gun, I'll say it.

Did you know that came up?

A.  Yes.

Q.  Had Mancuso told you that?

A.  No.  I saw that Mancuso told him several times not to just say something if it didn't happen, or however he characterized it.  He was informed multiple times not to say something that wasn't true, by Mancuso and by me.

Q.  But when you watched that video, it became obvious to this kid that he's told you a hundred times what happened, and he's saying to the police, look, I know you know the score here.  If you want me to just say it, I'll say it.

A.  That's --

Q.  That's --

MR. GIBBONS:  Objection.

BY MR. LOEVY:

Q.  -- what was going on on that tape, right?

MR. GIBBONS:  Objection to form of the question.

THE COURT:  Sustained.

MR. LOEVY:  Let's play 236.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   He said, no, that ain't what happened, but if that can get me out.  That's what he said, right?

A.   That's what he said, yeah.

MR. LOEVY:  All right.  Keep going.

I guess that's the end of it.

BY MR. LOEVY:

Q.   And, then, did you talk to Mancuso about, you know, are we pushing this kid too far?

A.   No, we didn't have that conversation.

Q.   All right.  When you did walk in --

MR. LOEVY:  Let's play 248.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  There was a lot of reasons for him to be scared, right?

A.   Maybe.

Q.   I mean, you were attempting to develop evidence that would put him in prison for the better part of his adult life, right?

A.   I was there to take his statement.

Q.   Okay.  Was it your goal to try to develop evidence that would put him in prison for the rest of his life?

A.   No.  I was there to take his statement.

Q.   He had a lot of reasons to be nervous, didn't he?

A.   I'm sure he did.

Q.   And you lied to him when you said, it's cool, don't be

nervous, we're just going to talk, right?

MR. GIBBONS: Objection. Asked and answered.

MR. LOEVY: That was a lie, is the question, your Honor.

MR. GIBBONS: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Did you intend to be untruthful?

A. Never.

MR. LOEVY: All right. Play the rest of it.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. You would not have said that to a grown man -- nothing to be scared of, I'm just going to interrogate you about murder -- right?

A. My informing him that there was nothing to be scared of was with respect to our interaction. There was nothing to be scared of in having a conversation with me.

Q. And my question was, you wouldn't have said that to a grown man: I'm going to interrogate you for murder, you don't have to be scared?

A. The law saw him as a grown man.

Q. But you wouldn't have said that to an adult because it would have been nonsensical, right?

MR. GIBBONS: Objection. Argumentative.

MR. LOEVY:  She hasn't the answered the question in three tries.

THE COURT:  Okay.  Overruled.

The witness can answer the question.  It's not argumentative.

BY THE WITNESS:

A.  He was a grown man, and I would say that to another grown man.

MR. LOEVY:  Your Honor, what time do you intend to take the break, because this would be a natural stopping point? Or I could continue.

THE COURT:  Let's go for another ten minutes, and then we will take our break at five after.

BY MR. LOEVY:

Q.  All right.  Let's talk about the story that you elicited.

MR. LOEVY:  If we could play 357.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  That was the story he told you, right?

A.  Yes.

Q.  You had no reason to disbelieve any of it, right?

A.  To this point, no.

MR. LOEVY:  All right.  Let play 358.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  All right.  That was basically the story, that he gets this call from his sister, right?

A.  Yes.

MR. LOEVY:  Okay.  359.

(Said video was played in open court.)

MR. LOEVY:  All right.  Then if you could play 361.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  Now, at this point in the interrogation, did you know that Marcel had spoken with Detective Turner?

A.  Yes.

Q.  And did you know that Detective Turner had raised the suggestion that maybe R.J. was in the backseat saying, I'm going to pop these MF -- N words and stuff like that?

A.  I don't recall Detective Turner's specific words, but I knew there was dialogue between the two of them.

Q.  And you knew over the past 30 hours Marcel's story had basically been rehearsed up from, nothing was said in the car, to R.J. was getting angrier and angrier.  That was the gist of the progression, right?

MR. GIBBONS:  Objection.  Form of the question. Argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  You keep saying he changed his story.

A.   Yes.

Q.   The gist of it was, he went from, nothing unusual in the backseat, to the change in his story was, after talking to the police officers, R.J. is getting angrier and angrier in the backseat, right?

        MR. GIBBONS:  Objection.  Form of the question. Argumentative.

        THE COURT:  Overruled.

        You can answer that.

BY THE WITNESS:

A.   No.  The gist of the tone of the conversation and the progression was that first he told the police what his cousin told him to tell the police if they got caught, and then it progressed from there and changed.

BY MR. LOEVY:

Q.   I see.  And then he did adopt Turner's words, correct?

        MR. GIBBONS:  Objection.  Form of the question.

        MR. LOEVY:  That's a straight question, your Honor.

BY THE WITNESS:

A.   I don't know.

        THE COURT:  Hold on.

        THE WITNESS:  I'm sorry.

        THE COURT:  It's okay.

        Overruled.

        You can answer.

BY THE WITNESS:

A.   I don't know.

        MR. LOEVY:  All right.  Play 362.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  That's basically the story he told you, right?

A.   Yes.

Q.   And, then, they got to the park, right?

A.   Yes.

        MR. LOEVY:  And, then, play 363.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  And at that point, you began to interrogate him, correct?

A.   We talked, yeah.

Q.   I'm going to define interrogate as trying to get someone to move from a denial to an admission.  Is that a fair definition of interrogation?

A.   No.

Q.   Did you interrogate him?

A.   Not if that's your definition.

Q.   You weren't trying to get him from denial to admission?

A.   I was trying to get to the truth of what happened.

Q.   And he had told you up to that point in time -- we're at what time now?  We're at 11:00 o'clock on day two, right?

A.   Correct.

Q.   Had he made any admission about knowing there was a gun until that point in time?

A.   Up till this point, no, I don't believe so.

Q.   He had denied it for closing in on 30 hours, right?

A.   Yes.

Q.   And he hadn't admitted to being part of any plan to kill anybody or shoot anybody, right?

A.   He did not admit that, no.

Q.   And if we're to be honest, you were actually trying to get him to incriminate himself, weren't you?

        MR. GIBBONS:  Objection.  Form of the question.

        MR. LOEVY:  This is the heart of it, your Honor.

        THE COURT:  Overruled.

        MR. GIBBONS:  To be honest?

        MR. LOEVY:  I'll take that part off.

        THE COURT:  Thank you for pointing out the issue.

        Sustained.

        Rephrase.

BY MR. LOEVY:

Q.   You were trying to get Marcel to incriminate himself, correct?

A.   No.

Q.   You were trying to get him to say words on tape that would cause him to be convicted of murder, right?

Spizzirri - direct

1495

A.   Absolutely not.

Q.   All right.  Did you tell him, hey, there's a little voice in my head saying, you know, Marcel, what you're telling me, it's just not quite enough.

Did you tell him that?

A.   I don't think I used the word enough, but I did tell him something was telling me --

Q.   Needed more, huh?

A.   Not needed more.  I don't remember my exact words.  And I'm trying to recall them, but I don't remember specifically what they were.

Q.   Basically, when he told you a story that made him not culpable, you said to him, Marcel, it's good, but a little voice in my head says, I think you knew, I think you were guilty, right?

A.   No.  I don't think I ever used those words.

Q.   All right.  But you implied it?

A.   No.

MR. LOEVY:  Let's play 370.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   So, you told him, a lot of people are saying you knew, right?

A.   Yes.

Q.   That's a lie?

Spizzirri - direct

1496

A.   A lot of people knew -- yeah, I don't believe that that was -- there were any witnesses who said what he knew.  I believe that that statement was based on the totality of the circumstances.

Q.   Okay.  That was a lie, though.  When you said, hey, a lot of people are out there saying you knew, that was an untrue statement, right?

A.   That's true.

          MR. LOEVY:  All right.  Continue.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  Now you had the little voice in your head.  You were trying to get him to give you more, right?

A.   Not necessarily.

          MR. LOEVY:  All right.  Skip to 45 seconds left.

          THE COURT:  Mr. Loevy, after this clip, we can take our break.

          MR. LOEVY:  Sure.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   And the question before we break --

          MR. LOEVY:  Can I ask a few questions?

          THE COURT:  Of course.

BY MR. LOEVY:

Q.   Why was it so implausible that he was going to pick up his

Spizzirri - direct

1497

sister?

A.   It wasn't implausible that he was going to pick up his sister.

Q.   All right.  You pressed him with, surely you could have resolved it on the phone.  You must have gone to the park because you had other purposes?

A.   My understanding was the girls called because they were having trouble with some boys at the park.  So, it wasn't just like, hey, I need a ride home.  It was, we need you to get over here, we're having a problem with some guys.

So, that, coupled with the call for a ride, tells me there's more going on there.

Q.   And Marcel said, look, I knew this guy, Edward.  You can talk sense to this guy.  I'm going to talk some sense to him, I'm going to get my sister.

That was not crazy story, was it?

A.   No.  And that's what I was trying to figure out.  Why didn't you just call him?

MR. LOEVY:  All right.  I can break here then, your Honor.

THE COURT:  Okay.

Ladies and gentlemen, we'll take our morning break.  We'll take a 15-minute break and be ready to go at about 11:25.

Please don't discuss the case.

All rise.

(Jury out.)

THE COURT: You may be seated, Ms. Spizzirri.

You are excused for purposes of our break. You are free to leave the courtroom. And we'll see you in about 15 minutes.

THE WITNESS: Thank you, Judge.

THE COURT: All right. Very briefly on an unrelated topic to Ms. Spizzirri's testimony, I want to just give you my thoughts on two issues and hear anything we need to discuss now.

One, on the hearsay limiting instruction, unless the defendants have anything to suggest in the alternative, I'm prepared to read the limiting instruction that I read this morning with reference to both Mr. Mancuso and Mr. Turner and the purposes for which their testimony could be considered, specifically what witnesses said to Mr. Mancuso and Mr. Turner and how they -- how the jury can use that evidence.

So, I think you've made an objection as a general proposition to this instruction. But unless you have something specific to propose in the alternative or some other argument I haven't heard, I'm prepared to give that instruction to the jury.

MR. FLYNN: Yes, your Honor. We have a new proposal. We're happy to share it with Mr. Loevy. We did it while we were all on our feet. I can share it now, as well.

THE COURT: Okay.

MR. LOEVY: Can I look over your shoulder?

MR. FLYNN: Sure.

You have heard evidence concerning witness statements that were given to the detectives in connection with their investigation of the murder of Paris Jackson. These witness statements are to be considered by you for the purpose of understanding what the detectives knew throughout the course of their investigation and for no other purpose.

We believe that tracks the pattern instruction.

MR. LOEVY: That leaves out the part that says not for the truth.

MR. FLYNN: That's not part of the pattern instruction.

That's the pattern instruction.

MR. KAYES: There's two patterns. There's the end-of-the-case-pattern and there's in the committee notes.

THE COURT: I also need to take a short comfort break. So, perhaps the parties can spend a moment to review that and see if they can come to some consensus.

I'll just say one other thing while you're pulling that up with regard to the judicial notice piece of this. And I know I'm switching topics. But Mr. Loevy has proposed two options for this judicial notice piece of it. Defendants have proposed a more simplified version.

So, as it stands with regard to the judicial notice question, I would be prepared to give a version of Mr. Loevy's request that's closer to option No. 2 specifically. And I'm giving this to you now so you can think about it. It would revise his option No. 2 as follows: At Mr. Brown's criminal trial, portions of Mr. Mancuso's and Mr. McDonald's police reports were introduced into evidence, including the representations in that report that Brown knew Branch had a gun when he got into the car, and Brown knew that Branch intended to go to the park to shoot people.

So, it is a slimmed down version of his proposal. I would not include the last sentence in option 2. That gets into a post-conviction topic that I just don't think is necessary, and injects an additional issue in that I'm not prepared to instruct the jury on.

MR. LOEVY: And, your Honor, we had made the edit on the fly that instead of just saying "at Brown's criminal trial," we also say "and at the bond hearing," because there's that extra line of damages that you've agreed with the defendants to insert on the pretrial detention.

THE COURT: So, my concern with that is -- and perhaps I'm -- I mean, you're asking me to instruct the jury that that was part of what a judge found at the bond hearing, and I don't -- I mean, part of what we've going back and forth on on the rulings is that I don't actually know that.

MR. LOEVY:  All right.  I see.

THE COURT:  That's really for you to prove and argue.  So, I don't want to give my blessing, if you will, to that --

MR. LOEVY:  Thank you, your Honor.

THE COURT:  -- without knowing.

MR. FLYNN:  We agree with the Court regarding the bond hearing.

With regard to the instruction itself, we have a major issue with this objection because it brings in a whole host of other issues that the jury will need to know, such as what witnesses were there to testify, what other evidence came in during the grand jury and the criminal trial transcript.  And, then, even more importantly -- and perhaps the Court's not aware of this -- the reason that Mr. Mancuso read from a summary -- and he says that in his transcript.  I have a copy for you.  That this is a summary, not verbatim, of what Mr. Brown said.

But the reason that occurred is because there was a stipulation between the state's attorney and Mr. Brown's criminal defense attorney that they had the ERI video, and that the ERI video reflects what Mr. Mancuso was saying.  So, Mr. Mancuso was asked by the state to do it that way.

And, so, by reading in this instruction, the jury's left to believe that Mancuso just went into the criminal trial and said, jury -- or, Judge, this is all you need to know, and

Spizzirri - direct

1502

that that's all that there was, that maybe didn't even know about the ERI. And that's just simply not the facts.

THE COURT: Okay. So, that adds an extra layer, because obviously if the parties stipulated to it at the criminal trial --

MR. LOEVY: Your Honor?

THE COURT: Yeah.

MR. LOEVY: It doesn't say in here that Mancuso testified. So, that would cure that problem. Because originally, yeah, Mancuso testified by agreement. But it just says, portions were introduced, and it doesn't matter how or why they got introduced. We're just saying they got introduced.

MR. FLYNN: It's leaving out most of the story.

And, again, the jury's just left to believe that Mancuso went up there and introduced reports.

THE COURT: Yeah, I mean, I do think that's a bit misleading. It makes it seem like detectives provided this evidence, and without some sort of agreement by Mr. Brown's criminal lawyer. And I'm not prepared to leave that fact out.

MR. LOEVY: It could say by agreement at Mr. --

THE COURT: I think you've got to at least try to add something that would suggest by agreement or by stipulation.

MR. LOEVY: That could be a clause at the beginning of the sentence, your Honor.

MR. FLYNN: Your Honor, I don't think the jury's going to understand that, and they would still need to know that the defense counsel had the ERI and agreed that the statement that Mr. Mancuso read accurately reflected what was in the ERI. That's Mr. Brown's attorney.

MR. LOEVY: Well, we're not telling the defendants how to prove their case or not prove their case, you know. He is dead. We are asking you to take judicial notice of this fact.

And we would not object to, by agreement at Brown's criminal trial, this came in, or by stipulation even. But we're just -- we need to elicit that this evidence got in.

THE COURT: Right. No, I get it.

MR. FLYNN: Your Honor, if there's judicial notice of that, then there needs to be judicial notice of all the witnesses that testified against Brown, the fact that Mr. Brown's attorney had the ERI and agreed that it reflected what Mr. Mancuso said. There's just all kinds of facts that got to come in.

And if that's where we're going, we'll go there. But we can't just pick out what they like and then not give the rest of the story to the jury.

MR. LOEVY: Well, your Honor --

THE COURT: But you're saying that simply saying plaintiff's statements at his interview with detectives and the ASA were used against him at his criminal trial gets that job

done?

And I know you're not trying to do their work for them, but you've proposed a counter stipulation that says statements -- his statements to the detectives and the ASA were used at his criminal trial.

MR. FLYNN:  To meet that element of the Fifth Amendment claim -- which is not the only remaining claim that's going to be left here, but it's the main claim -- they need to show that his statements were coerced, and that those statements were used against him at his criminal trial.

So, they're getting there.  Everything else that they want to add is just painting more of a picture.  And if there's going to be more of a picture painted, we need to add our paint to that picture.

MR. LOEVY:  Well, used against him is what we're trying to say.  And this sentence does that.

THE COURT:  Okay.  Let me chew on what you just said. We'll take our break and resume with the testimony of Ms. Spizzirri.  I'd like to consider what you've argued in light of this information about the fact that it was a stipulation.

MR. LOEVY:  Your Honor, the only thing I would add to that is, we started with, the judge said it was material.  That solves all the problems.  Then you don't need to say what was in, what wasn't in.  The judge said this made a difference.

So, you could still revert to that. It's the defendants who asked you not to revert to the judge saying this statement controlled the outcome, you know. That would be an alternative, where we started. The defendants didn't want to do that.

THE COURT: Right.

MR. FLYNN: It's because, your Honor, if the judge is saying it's material, we need to then, again, inject the other information that the judge had, that we believe was material, such as what you determined was -- showed probable cause.

THE COURT: Right. Okay. Thank you for your input. I'll let you know.

MR. FLYNN: Thank you, Judge.

MR. GIBBONS: Are we back in four minutes?

THE COURT: You have ten minutes.

MR. GIBBONS: Ten minutes?

THE COURT: Ten minutes, yes.

MR. GIBBONS: Thank you.

(Recess from 11:19 a.m., until 11:33 a.m.)

THE COURT: Ms. Spizzirri, you can resume the witness stand.

Mr. Loevy, about how much longer do you think you have on direct?

MR. LOEVY: I can answer you as soon as Lilia answers me.

Spizzirri - direct

1506

(Pause.)

MR. LOEVY:  About 45 minutes.

THE COURT:  Okay.

And about how long, Mr. Gibbons, do you anticipate?  I know you don't know the full extent because you haven't heard his full direct.

MR. GIBBONS:  Well, if you add Mr. Loevy's hour and ten that began the session, 45, he's going to be about two hours, I'll be shorter.

MR. LOEVY:  Because I'm going to play a lot of it.

MR. GIBBONS:  I'll be shorter.

THE COURT:  Okay.

I just received the following note:  Judge Jenkins, in the initial summary, there were several defendants stated, although stipulated that only Mancuso is present.  Can you please remind the jury of the total list of defendants in the case?  Thanks, Juror No. 3.

MR. LOEVY:  I have to laugh, because we were, like, they'll never notice.

THE COURT:  They'll never notice, yeah.

MR. GIBBONS:  You know, the seriousness of that question, though, is illuminated by the fact that there were claims that started this case that have now been dropped by the plaintiffs.  And the only claim left is the coercion claim.

So, all those names of detectives that had nothing to

do with the coercion claim have now polluted that opening instruction. And that's a problem. That is a real problem.

MR. LOEVY: I don't have any idea what he's talking about because they referenced in the note, people identified as defendants, and that was four or five people.

That's -- I think you should tell them, your Honor, that will be answered at a later time. I mean, you know --

THE COURT: Yeah, I'm not going to address this question now. When we address them at the end of the day, I'll -- with the parties' input, we'll address it.

But you're right, it is -- yeah, it's an issue for us to tell them about. We won't do it now, because it's just going to be too rushed to do so.

MR. LOEVY: Okay.

(Jury in.)

THE COURT: Please be seated.

Ms. Spizzirri, you remain under oath.

THE WITNESS: Yes, Judge.

THE COURT: Mr. Loevy, you may resume your examination.

MR. LOEVY: Thank you, your Honor.

BY MR. LOEVY:

Q. All right. It would be fair to say, would it not, that over the ensuing parts of the interview, you kept trying again to get him to incriminate himself, kept trying to get him to

Spizzirri - direct

1508

implicate himself; wouldn't you agree?

A. No.

Q. Would you agree that's how it looks on the tape?

A. Not to me.

Q. Although I hear a little voice in my head. You haven't been given me everything. I need a little more, need a little more. You weren't saying stuff like that?

A. I did say stuff like that.

Q. All right. You were giving him scenarios trying to get him to adopt them; would that be true?

A. No.

        MR. LOEVY: All right. Let's look at 375. We'll start it in the middle here.

    (Said video was played in open court.)

BY MR. LOEVY:

Q. All right. You were trying to get him to -- attack him from different angles, right?

A. I wouldn't use the word attack.

Q. If he had admitted, well, I knew he had a gun, but I didn't think he was going to use it, he's sunk, going to prison, right?

A. Not necessarily, no.

Q. But you just couldn't get him to admit it, right?

A. All I wanted was the truth.

Q. All right. Did you make him feel like he wasn't the one in

trouble?

A.   No.

Q.   Made him feel like, just trying to get R.J. with that gun, you don't have anything to worry about?

A.   No.

        MR. LOEVY:   All right.   Let's look at 378.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.   So, you gave him the impression that he wasn't the one looking at murder charges, right?

A.   That's not true.   When I said, killing this kid, I meant shooting this kid.

Q.   Sure.   Because you had been to law school, right?

A.   I had.

Q.   Marcel had not?

A.   To my knowledge, no, he had not.

Q.   So, he might have thought that you're telling him, look, you're not the murderer, we all know you're not the murderer, you got nothing to worry about, right?

A.   I didn't say that.

Q.   All right.   Did you trick him about -- making him think that maybe R.J. had implicated him?

A.   No.

Q.   In fact, R.J. hadn't said anything, right?

A.   I never spoke to R.J.

Q.  R.J. had invoked his right to remain silent, right?

A.  I believe so, yes.

MR. LOEVY:  All right.  Let's play 379.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  So, you were saying, how do I know it's not true that R.J.'s saying you knew?

Let me ask this:  Those were your words, right?

A.  Those were my words, yes.

Q.  All right.

MR. LOEVY:  Continue then.

(Said video was played in open court.)

BY MR. LOEVY:

Q.  You did tell him you had a hard time swallowing his innocence, right?

A.  No.  I had a hard time believing that he didn't know about the gun, and that's what I told him.

Q.  Right.  So, if he didn't know about the gun, he didn't know about a plan, he's innocent, right?

You told him you had a hard time swallowing it?

A.  I did.

Q.  All right.  At this point, it's now what time, about 11:28?  Is that right?  Close to 11:30 p.m. on night two?

A.  Yes, sir.

Q.  And he wants to go home, right?

A.   Clearly.

Q.   And he started saying, look, you guys said if I told the truth, I could go home, right?

A.   If he said that, he was immediately corrected by either myself or Detective Mancuso.

Q.   And that's why it might have made more sense to not have Mancuso in the room, right?

A.   Mancuso was not participating in the conversation when I was speaking to him.  The dialogue was between Mr. Brown and myself.

Q.   But Mancuso jumped right in, right?

A.   There were times, I think, where he did answer a question or interrupt, yeah.

        MR. LOEVY:  Let's play 380.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  It was this suspect's belief that if he told the truth, he could go home.  You pretty much accepted that, right?

A.   I don't know what he believed.

Q.   But you know what he told you, right?

A.   I know what he told me, yes.

Q.   And he said he had told you the truth, right?

A.   He said that at the time he was not being truthful to the detectives earlier, as well.

Q. So, you were trying to move him, right, because you didn't believe him?

MR. GIBBONS: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Did you lie to him about T.J., also?

A. Not that I recall.

MR. LOEVY: Okay. Keep playing.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. I guess that's not necessarily a lie because you asked it hypothetically, right?

A. Correct.

Q. T.J. was not saying he knew there was a gun in the car.

A. I never spoke to T.J., and I don't believe I was ever told by anyone that he said that.

Q. All right. So, it's trickery then, right?

A. It's a hypothetical.

Q. All right. You're trying to get him to implicate himself by saying, your cousin might have given you up?

A. I'm trying to get him to tell the truth.

Q. And he didn't take the bait, right? He said, the truth is, I didn't know anything about a gun?

A. Right. He corrected me when I was wrong.

MR. LOEVY: Okay. Keep going.

(Said video was played in open court.)

BY MR. LOEVY:

Q. Did you make him think he was running out of time to tell the truth, as you saw it?

A. No.

MR. LOEVY: Okay. Continue.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. You told him, hey, it's your only chance, right?

A. I didn't say that.

Q. You said -- what did you say?

MR. GIBBONS: Objection. The tape speaks for itself, your Honor. We can replay it.

BY MR. LOEVY:

Q. You said, we only speak once, right?

A. I did say that.

THE COURT: Okay. So the objection is sustained.

BY MR. LOEVY:

Q. You were attempting to put pressure on him to tell you what you wanted to hear by saying, we only speak once, right?

A. That wasn't the intent of my statement, no.

Q. All right. You told him that the truth, as you saw it, was that he knew there was a gun, didn't you?

A. I did not use those words.

Spizzirri - direct

1514

Q. And not only did you tell him that the truth as you saw it was that he knew, but you told him he needed to tell you the truth?

A. I did tell him to tell the truth, yes.

Q. And you told him what the truth was, right?

A. I did not ask him to regurgitate back what I said. To the contrary, I told him, don't say things that you think I want to hear. Tell me what happened.

MR. LOEVY: Let's play 381.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. You had lied to him; had you not?

A. About what specifically, counsel?

Q. Well, we already talked about the R.J. lie, right?

A. About what if R.J. was saying this?

Q. Were you allowed to lie at the time?

A. I was allowed to, yes.

Q. Did you make that your practice, to lie to suspects?

A. No.

Q. You were trying to move him, weren't you?

A. Like you're doing to me now?

Q. Exactly.

A. No, I wasn't.

MR. GIBBONS: Objection. Asked and answered, your Honor.

Spizzirri - direct

1515

BY MR. LOEVY:

Q.   Of course --

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Of course, you're an adult who got a full night's sleep who understands your rights on that stand, right?

A.   I don't know about the sleep part, but I knew the law, yes.

Q.   Were you nervous about testifying today and defending what you did in 2008?

A.   Absolutely not.

        MR. LOEVY:  All right.  Let's continue it.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   Try it again, right?

A.   We were continuing in the conversation, yes.

        MR. LOEVY:  Okay.  Continue.

    (Said video was played in open court.)

        MR. LOEVY:  Continue.

        Finish.

    (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  He said right there -- you asked him why he's scared.  He said, I'm scared if I don't tell you -- if I say I didn't see him with a gun, I didn't know he had a gun, then I'm going to jail, but if I tell you that R.J. had the gun, I'm

Spizzirri - direct

1516

going to go home.

He explained that to you, right?

A. He did.

Q. So, that was obviously the impression he was getting?

A. Sounds like it, yes.

MR. LOEVY: All right. Continue.

(Said video was played in open court.)

BY MR. LOEVY:

Q. So, you said, hey, if you feel like I've got to -- you've got to say something to get me to leave you alone, tell me. And he said, well, actually, I do. I do feel like I have to say something about the gun thing, right?

A. Yes.

Q. That's what happened?

A. That's what he said. And I cleared that up.

Q. All right. You told him what the truth was, right?

A. No, that's not true.

(Said video was played in open court.)

(Pause.)

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. So, that's it. You told him that you, the decision maker, think it's true that he had a gun, right?

A. Well, I wasn't the decision maker, and I did believe that he knew he had the gun.

Q.   And you told him, the truth, as I believe it, is that you had a gun, right?

A.   I did tell him that I believed that, yes.

Q.   So, if he had been told for 30 hours that he couldn't go home until he told the truth, you just told him what the truth was?

A.   Not true.

MR. LOEVY:   Let's continue.

(Said video was played in open court.)

MR. LOEVY:   If could you skip forward a little bit. Let's go to the end of this.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  You were trying to put pressure on him, right? He had to start telling you the truth, as you saw it?

A.   That is not true.

Q.   You understood that he believed he wasn't getting out of the room, right, until he told you --

A.   I don't know what he believed.  I kept trying to clarify what the status of the situation was to him.

MR. LOEVY:   Continue.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  You wouldn't say that to a grown man, are you going to eat for me, right?

Spizzirri - direct

1518

A.   I was trying to be nice.

Q.   Yeah, this was a high school kid who was reduced to tears on his second midnight, right?

A.   I saw the sandwich sitting there.  I knew it was offered to him and he wasn't eating.  That was my way of saying, hey, you should eat, go ahead and eat.

Q.   All right.  Without playing another clip, you guys did --

           MR. LOEVY:  Well, let's just finish that one.

      (Said video was played in open court.)

BY MR. LOEVY:

Q.   The situation's still the same as 8:00 o'clock this morning.  He's in there indefinitely, right?

A.   The police were investigating, talking to witnesses, gathering evidence.  It wasn't that it was stagnant, counsel.

Q.   No, but if you're Marcel, you're being told, this is not going to end?

A.   He's not being told that.

           MR. LOEVY:  Continue.

      (Said video was played in open court.)

BY MR. LOEVY:

Q.   He said right there, I didn't know he had a gun, I didn't know, right?

A.   Right.

Q.   You guys could have accepted that?

A.   I accepted whatever he had to say.

Spizzirri - direct

1519

Q.   All right.   And you told him, hey, I'm leaving, last chance, right?

A.   I told him I was leaving, yes.

        MR. LOEVY:   Continue.

     (Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.   You're allowed to interrogate guys and put pressure on them, right?

A.   I don't put pressure on anyone.

Q.   But you're allowed to try to squeeze them into making an admission, right?

A.   I don't squeeze anyone.   I have a conversation.   I'm allowed to ask questions.   I'm allowed to ask pressing questions.   I'm allowed to clarify.   I'm allowed to ask for explanations.   I'm allowed to test what they're telling me. Yes, I do all of that.

Q.   I'm just trying to see -- you know, there's really two ways to do it.   Either you go in there and you just say, tell me what happened, I'm just writing it down, or you go in there with the intention of eliciting incriminating information.   It sure seemed like you were doing the latter, wasn't it?

        MR. GIBBONS:   Objection to the form of the question.

        THE COURT:   Sustained.

        MR. GIBBONS:   Argumentative.

BY MR. LOEVY:

Q.   Were you doing the latter?

A.   No.

Q.   All right.  You went back in the room, right?

A.   He asked for me to come back in the room.

Q.   And you guys had another go that looked just like the last, right?

MR. GIBBONS:  Objection.  Argumentative.

MR. LOEVY:  I won't play it again, but --

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Basically, another similar interaction, right?

A.   Not really.

Q.   At some point -- he still at this point has not told you there's a gun, right?

A.   To the point where you stopped the video?

Q.   Yes.

A.   That's correct.

Q.   Now, you did get what you believe is a confession about F those N words up, right?

A.   I don't characterize it as a confession.  He told me what R.J. said in the car.

Q.   All right.  Let's talk about that.

MR. LOEVY:  If we could have the document camera, please, your Honor.

BY MR. LOEVY:

Spizzirri - direct

1521

Q.   On the way to the park --

MR. LOEVY:  Your Honor, if we could publish this demonstrative for the jury, too.

BY MR. LOEVY:

Q.   He said, I'm tired of these N words.  That was his original story -- well, his middle story, right?

A.   I know it was something -- yes, like that.  Exactly, I don't know.  But I think you're correct --

Q.   That's on the way to the park?

A.   -- in summarizing that that's what he said.

MR. LOEVY:  And if you could play 373, Lilia?

Actually, even without the screen, can you just do it with the audio?

Oh, they already saw this.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   So, that's on the way to the park, right?

A.   Correct.

Q.   And, then, he said, after the shooting, after somebody had shot at R.J., R.J. said, I'm going to F those N words up, right?

A.   I don't recall.

MR. LOEVY:  Play 366.

(Said video was played in open court.)

BY MR. LOEVY:

Q. All right. So, that -- his telling, the 50th time he told it, after they drove away from the shooting, he said, I'm going to F those N words up, right?

MR. GIBBONS: Objection to the form of the question. Argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. That's in the car after the shooting, right?

A. Yes.

Q. All right. When you told the story to Marcel, you moved -- by the way, F those N words up, you later got Marcel to admit that means go shoot them, right?

A. I asked him what his definition of --

THE WITNESS: Excuse me, Judge.

BY THE WITNESS:

A. -- fucking someone up meant. It could mean different things to different people.

BY MR. LOEVY:

Q. Right. And you got him to say that meant he was going to shoot them, right?

A. That's what he told me his understanding was.

Q. You said to him, like, hey, sometimes when you say, do a lick, that can mean something else. And you got him to say, F those N words up meant shoot them, right?

A. I did not get him to say that. I asked for his

Spizzirri - direct

1523

understanding of that phrase.

Q. All right. But then you put the F the N words up into on the way to the park, didn't you?

A. I'm sorry, I don't understand your question.

MR. LOEVY: Play 372.

(Said video was played in open court.)

BY MR. LOEVY:

Q. So, you said, I'm tired of these Ns, I'm going to fuck them up in the car, right?

A. I repeated back to him what he said, and then I said, is that what you said? And he corrected me.

MR. LOEVY: All right. If we could put the document camera back on.

BY MR. LOEVY:

Q. I'm going to F those N words up, that's after the shooting that he supposedly learned those words, right?

A. To be honest, counsel, I'm confused now on where you're at with when he said R.J. said this and when he didn't, because we keep breaking it and going back to it. And I don't want to be misleading in my answers, but I'm confused at the order in which -- or where you're going with this. I don't understand.

Q. The whole conversation with Marcel was confusing as heck, wasn't it?

MR. GIBBONS: Objection. Argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q.   We're trying to follow the flow of very confusing conversation, right?

MR. GIBBONS:  Objection, your Honor.  Argumentative.

We're playing snippets out of order, backwards, in ten-second snippets.  The witness is saying she's confused on the order Mr. Loevy's playing them in now.

THE COURT:  Right.  So, the objection is sustained.

Mr. Loevy --

MR. LOEVY:  Last question on this area, then.

THE COURT:  Thank you.

BY MR. LOEVY:

Q.   I wrote it down on this screen correctly when we played the snippet, right?

MR. GIBBONS:  Objection to form of the question.

BY MR. LOEVY:

Q.   I mean, I didn't make this up.  You were with me when I wrote that.

THE COURT:  Overruled.

You can answer.

BY THE WITNESS:

A.   If that's what the video says, and that's what you wrote, then yes, I'll agree with that.  I just don't independently recall.

So, yes, if you're saying you wrote it down as it

appears, okay.

BY MR. LOEVY:

Q.  Now, at this point in the interrogation, you still don't have him knowing that there was a gun, correct?

A.  I think that's correct.

MR. GIBBONS:  Objection.  That calls for a legal conclusion, your Honor.

MR. LOEVY:  It's a fact, and she answered it.

THE COURT:  Overruled.

You can answer to the extent you knew based on your --

BY THE WITNESS:

A.  I think --

THE COURT:  -- time there.

BY THE WITNESS:

A.  -- at the point where we're at, that's correct.

But, again, I've kind of lost a little bit of track of where we are in our conversation.

BY MR. LOEVY:

Q.  Close to midnight, right?

A.  I don't remember at what point in our conversa- -- like, what time it was when these things happened.

Q.  Well, you saw the timestamps?

A.  I did, yes.

Q.  All right.  And did you go back in and try again?

A.  I went back in because he asked to talk to me.

Spizzirri - direct

1526

Q.   All right.  Did -- after you were done, did you send Mancuso back in to try again?

A.   No, I didn't.

MR. LOEVY:  Okay.  This is 385.

If we could have the document cam.

BY MR. LOEVY:

Q.   And if we could just note the time.  The time now is 12:03 on day three, September 5th, right?  Do you see it?

A.   Oh, that's -- I'm sorry, yes, that's correct.

Q.   So, that's after you're done -- you told him, I'm done, right?

A.   Yes, I believe so.

MR. LOEVY:  Okay.  Continue.

(Said video was played in open court.)

BY MR. LOEVY:

Q.   All right.  Did you know that Mancuso went back in there again and failed again?

A.   I might have known he went back in.  I'm sure I did.  I just don't know if I knew that before he went or after he went.

Q.   Did he come out and say, you know, this kid still didn't know there was a gun.  Did he tell you that?

A.   No, I don't recall that happening.

Q.   Did you approve the -- or seek the charges?

A.   I did not.

Q.   Did you have anything to do with seeking the charges?

Spizzirri - direct

1527

A.   I did not.

Q.   Who made the decision to seek the charges, as you understand it?

A.   Again, based on the felony review folder, I believe it most likely was Fabio Valentini.

Q.   Did you brief Fabio Valentini?

A.   I have not -- oh, at this -- on this night?

Q.   Yeah.

A.   I don't recall.  I will say this:  Before I would have gone in to speak with Mr. Brown, I would have had to call somebody for the authority to do so.  Given my status in felony review as a line assistant, I did not have -- it was not protocol.  It was not within my purview of duties to go in and speak with suspects.  That was for higher-level assistant state's attorneys.

And, so, I would not have chosen to go in and speak with him without notifying somebody and making sure that it was okay.

Q.   All right.

A.   Now, if that person was Mr. Valentini, as you asked, I don't recall if it was him or if I contacted a trial supe.  I don't know.  A trial supervisor.

Q.   Mr. Mancuso tried again at 12:10 a.m. on September 5th --

MR. GIBBONS:  Objection.

BY MR. LOEVY:

Spizzirri - direct

1528

Q. -- correct?

MR. GIBBONS: Form of the question. Argumentative.

MR. LOEVY: It's a question.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Did Mr. Mancuso try again at 12:10 on December -- September 5th?

MR. GIBBONS: Same objection. Same question.

THE COURT: Sustained.

BY MR. LOEVY:

Q. What time were the charges sought?

A. I don't recall.

Q. 12:18 a.m.?

A. It should be reflected in the -- either the felony review folder or I'm sure the detectives have notes of what time they called review.

Q. All right. You had a big role in this or a small role?

A. Given the context -- excuse me -- a context of all of the witnesses involved, as well as offenders, I would say a very small role, as Mr. Brown was the only individual that I spoke to.

Q. Very small role?

A. Yes.

Q. Who had a very big role?

A. I don't think any one person did. I think it's a totality

of the circumstances.

Q. So, Mancuso, McDonald, Weber, and Turner, they had a very big role, right?

A. I don't know what each detective independently did. It's an investigation of the police, and then the state's attorney comes in and takes statements and charges are sought.

Now, you want to prioritize or put one person as more important of the other, I don't see how you can do that because it's looked at as a whole.

Q. Somebody gets the credit for building a case that resulted in a murder conviction, right?

MR. GIBBONS: Objection to form of the question. Argumentative.

THE COURT: Sustained.

MR. LOEVY: All right. I have no further questions.

THE COURT: All right. Thank you.

Mr. Gibbons, let's begin your examination. We'll break for lunch in about 15 or 20 minutes.

CROSS-EXAMINATION

BY MR. GIBBONS:

Q. Good afternoon, Ms. Spizzirri.

A. Good afternoon.

Q. I'm John Gibbons. I'm one of the lawyers who represents the detectives in the case. Do you understand that?

A. Yes, sir.

Q. We've never met before?

A. We have not.

Q. We've not had one interaction about this case; is that right?

A. We have not.

Q. I have not tried to coach you at all about your testimony here today; is that fair to say?

A. I've received no communications from you or your office.

Q. All right. I'd like to flush out some of your background.

You grew up here in the area, Mother Guerin High School?

A. Grew up in River Grove, got married, moved to River Forest for a while, now live in Elmhurst.

Q. Okay. Jumped ahead of me pretty quick.

A. I'm sorry.

Q. Where did you go to college?

A. Yes, I went to Mother Guerin High School. You mentioned that. Went to DePaul University. And, then, I went on to John Marshall, which I think is now UIC.

Q. And did you take certain law courses at night?

A. I did. I went to law school at night.

Q. Could you explain the circumstances that made you do that route?

A. Yes. I held a full-time job at McMaster-Carr, an industrial supply company in Elmhurst. They were paying 100

percent of my tuition with no exchange in return for that. It was a benefit of the company.

I worked there from 6:00 a.m. to 2:00 p.m. At 2:00 p.m., I would leave. I would go to 26th and California. I would clerk as a -- they had night court at the time for, like, a drug court, night narcotics, they called it. I would clerk there for two to three hours, and then I would go to John Marshall and take class at night.

Q. Somewhere in there, you had to do some reading?

A. Yes.

Q. Homework in law school?

A. Yes.

Q. Long days?

A. Yes.

MR. LOEVY: Objection, your Honor. This is really far afield here.

THE COURT: Overruled. I'll allow some background.

BY MR. GIBBONS:

Q. Probably didn't get much sleep --

A. No.

Q. -- during those years?

A. Did not.

Q. Graduated from law school in what year?

A. Oh, boy.

Q. Approximately.

Spizzirri - cross

1532

A.   My gosh.   2000, '99, 2000.

Q.   24, 25 years ago?

A.   Yeah.

Q.   Okay.   So, you've been a lawyer for that whole time?

A.   Yes, sir.

Q.   And did I hear it right, you worked at the State's Attorney's Office for the entire time?

A.   There was a short period of time, I think it was prior to law school, that I did some internship at a general practice firm, mainly worked with the criminal defense attorneys.   But I was kind of a runner and just clerking.   I did that for maybe a year, year-and-a-half.

Q.   Then at some point you applied for and obtained the position at the Cook County State's Attorney's Office?

A.   Yes.

Q.   And do you remember approximately what year you were sworn in?

A.   2001.

Q.   Okay.   In your role as an assistant state's attorney, who do you represent?

A.   The people of Cook County.

Q.   That's your client?

A.   That's correct.

Q.   Is that important to you?

A.   Yes.

Q.   Could you explain why --

MR. LOEVY:  Objection, your Honor.

BY MR. GIBBONS:

Q.   -- to the ladies and gentlemen of the jury?

THE COURT:  Overruled.  She can answer.

BY THE WITNESS:

A.   It was a difficult decision for me to decide to pursue such a career where I would have to be outside the home quite a bit. I wanted children.  I wanted a family.  I married an Italian man who had very traditional values, that I shared.  And, so, me taking a full-time job outside of the home was kind of an issue.

When I decided that that is what I wanted to do, I wanted to make sure that I was doing the work and taking a job that I wouldn't have any regrets about.

BY MR. GIBBONS:

Q.   And over the last 25 years, have you had any regrets?

A.   No.

MR. LOEVY:  Objection, your Honor.

THE COURT:  Overruled.  But we can move forward.

MR. GIBBONS:  I am, your Honor.

BY MR. GIBBONS:

Q.   Mr. Loevy asked you questions about advancing your career. Do you remember that line of questioning?

A.   Yes.

Spizzirri - cross

1534

Q.   It seemed to have a implication that you would advance your career at any and all costs.  Do you remember that insinuation?

A.   Yes.

Q.   How would you like to respond to that?

A.   I'll answer that with something my dad taught me when I was little.  If you're going to do anything, whether you're going to pick up garbage, whether you're going to be an attorney, drive a truck, whatever you're going to do, do it with everything you've got.  Do it right and do your best.  And that's how I approach everything.

So, yes, I aspire to work hard at my job and to advance within my office.

Q.   Would you ever railroad a suspect to further your career?

MR. LOEVY:  Objection, your Honor.

BY THE WITNESS:

A.   No.

MR. LOEVY:  Opens the door, among other things.

THE COURT:  Sustained.

BY MR. GIBBONS:

Q.   You testified on direct of Mr. Loevy that you had young children in 2008?

A.   Yes.  My oldest would have been eight.

Q.   And did you have more than one that was --

A.   So, I had one born in 2000, 2003, and 2005.

Q.   Okay.  So, you had three little kids at home in September

of 2008; is that right?

A.   Yes.

Q.   Okay.   Mr. Loevy was asking you questions about, well, they weren't 18 at the time.   Do you remember that line of questioning?

A.   Yes.

Q.   And you said something to the effect of, but I had professional interactions with 18-year-olds.

A.   Yes.

Q.   Could you explain briefly what you meant by that answer.

A.   So, there's somewhat of a hierarchy in our office of how you move about.   The theory behind that being, you're just getting acclimated to different units in our office and dealing with different types of cases and different types of people.

Prior to being assigned to felony review, I spent approximately three years at the juvenile court.   About a year-and-a-half of that was -- there's two sides to it, a civil division and a criminal division.   About half of it is spent in the criminal division doing much of the same work that you would be doing in adult criminal courts.   And, then, the other half is considered civil, but it deals with termination of parental rights and civil actions regarding children and foster care and allegations against parents.   But it's considered civil in nature.

Q.   So, during that stint in the State's Attorney's Office, you

had numerous interactions with younger adults?

A.   Yes.

Q.   And took the form of questioning some of them?

A.   Yes.

Q.   Okay.  But at 18 years old -- in September of 2008, Marcel Brown was 18 years old, right?

A.   Yes.

Q.   In the eyes of the law, was he considered an adult?

A.   Yes.

Q.   All right.  You had mentioned doing a stint in juvie -- juvenile court.  I want to go through quickly your background so the jury has a better understanding of your last 24 years.

Did you start in appeals?

A.   I did.

Q.   And how long were you in appeals?

MR. LOEVY:  Objection to relevance, your Honor.

THE COURT:  Sustained.

MR. GIBBONS:  They have a --

THE COURT:  Sustained.

MR. GIBBONS:  -- a right to understand who she is.

THE COURT:  Sustained.

You've given the background.  Let's move forward.

MR. GIBBONS:  Can she answer that question?

THE COURT:  She can, and then let's move on.

MR. GIBBONS:  You said sustained.

THE COURT: I apologize. The objection is overruled.

You can answer the question about appeals.

But then let's move forward.

BY THE WITNESS:

A. I was there at least six months. It could have been longer. I don't exactly remember. It was my first assignment.

BY MR. GIBBONS:

Q. Okay. Then you move into traffic?

A. Yes.

MR. LOEVY: Objection, your Honor. I thought that's what -- we were going to move on past background.

MR. GIBBONS: I'm not going to move past background. I'm going to move very quickly through her assignments, because it's very relevant, her experiences leading up to September 4th, 2008.

THE COURT: Okay. So, to clarify, I will give you some room to move through her assignments, which you're going to do quickly, as you've said, and then we'll move on to the next topic.

So, traffic I think is the question you asked about the next assignment.

BY THE WITNESS:

A. That was my next assignment, yes.

BY MR. GIBBONS:

Q. Did you get trial experience while in traffic court?

MR. LOEVY:  Objection to relevance, your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A.  It was limited, but yes.

BY MR. GIBBONS:

Q.  I'm going to move on, then.

You had an experience in juvenile court.  You've already explained that, right?

A.  Yes.

Q.  Then you went to felony review, right?

A.  Yes.

Q.  You said you had three stints of felony review, right?

A.  That's correct.

Q.  I'm going to come back to that, because the jury -- we want to hear more about felony review.

After felony review, did you go to Branch 66 grand jury?

A.  Yes.

Q.  Could you briefly explain the responsibilities of an assistant state's attorney in Branch 66?

MR. LOEVY:  Objection, your Honor.  Relevance.

THE COURT:  Overruled.

MR. GIBBONS:  Hugely relevant.

BY THE WITNESS:

A.  So, when you were in Branch 66, that's where mostly

homicide and sex offenses would come in.  They were a little bit more complex cases.  And you would prepare those cases for either bond court and/or being presented to the grand jury.

So, it was a very initial stage of when a case would first be introduced to the criminal system.

BY MR. GIBBONS:

Q.  Okay.  So, in a case like this one --

A.  Yes.

Q.  -- Marcel Brown, where -- and R.J., where murder charge is approved, that case then moves on to Branch 66 for presentation to the grand jury; is that right?

MR. LOEVY:  Objection --

BY THE WITNESS:

A.  Yes --

MR. LOEVY:  -- your Honor.

BY THE WITNESS:

A.  -- that's correct.

MR. LOEVY:  She wasn't personally involved, so it becomes like expert testimony.

THE COURT:  Overruled.  It's not --

MR. GIBBONS:  Process question.

THE COURT:  It's not expert testimony.  So, the objection is overruled.

You can answer.

BY THE WITNESS:

A.   Yes.

BY MR. GIBBONS:

Q.   Okay.  Now, are there different ASAs assigned to the grand jury room as opposed to those like you out on felony review?

A.   Yes.  It's a whole diff- -- considered a whole different unit.

Q.   So, that's a separate ASA who puts on the evidence in the grand jury in a murder investigation seeking charges from a grand jury, right?

A.   Correct.

Q.   Okay.  Briefly, you then move on from Branch 66 grand jury work to the felony trial division, right?

A.   Correct.

Q.   And at the State's Attorney's Office, you start as a third chair, then a second chair, and then you become the first chair?

A.   That's correct.

Q.   Okay.  So, in this case, when Marcel Brown's case gets to the courtroom, that's tried by one of the chairs -- an ASA in the courtroom with an assigned judge; is that right?

A.   That is correct.

Q.   Okay.  That would not be someone like you who started the process at felony review, right?

A.   No.  Again, a different unit, different assignment.

Q.   And a different ASA who has to look at the evidence and

decide what to put in in the criminal trial; is that right?

A.    That's correct.

MR. GIBBONS:  Okay.  Your Honor, I'm going to cover felony review.  It's going to be about five minutes, because we've heard a lot about it.  Do you want me to -- it could be five to ten minutes.

THE COURT:  Let's take our lunch break now.  It's about 12:30.  It's as natural a place as anywhere to stop.

We'll take a one-hour break.  So, we'll be back and ready to go as close to 1:30 as we can.

Please don't discuss the case.  And I'll see you at 1:30.

All rise.

(Jury out.)

THE COURT:  You may be seated.

Ms. Spizzirri, you may step down.  You are also on break.  You're obviously free to speak to your own attorney. But please don't speak to -- and you haven't been speaking to -- any of the counsels who have been examining you.  All right?

THE WITNESS:  Thank you, Judge.  Yes.

THE COURT:  Thank you.

I'd like to just go over a couple of things with the parties and then give you your lunch break so that we're ready to resume as close to 1:30 as we can.

Have the parties made any headway on the hearsay issue

1542

and the limiting instruction with regard to hearsay?

MR. LOEVY: None. Although, in fairness to everybody, we were busy. But we haven't heard anything back from the defendants.

THE COURT: Okay. All right. A question for the defendants, to pivot to the limiting instruction, because I just really want to make some decisions on some of these so we can scratch them off of our to do list.

As a preview to what the defendants intend to do, do you intend to call witnesses in your case concerning evidence that was put on at Mr. Brown's criminal trial?

And if so, what are the general categories of how you think you're going to do that? Are you going to call some witnesses to talk about the kinds of evidence that was presented? I'm just trying to figure out how to limit or parse this instruction on the judicial notice issue.

MR. FLYNN: Your Honor, it partly is based on your ruling on this issue, as well as what we were discussing earlier regarding the probable cause and all of the witnesses that testified at the trial.

At this time, we do have the ASA that prosecuted the case, Karen Kerbis, prepared to testify regarding what information she had, such as the ERI video.

THE COURT: Okay. So, that would indicate that -- if that's what you intend to do, that plaintiff's counsel can

1543

inquire on cross-examination about other categories of evidence presented at his trial, including the incriminating statements. Is that right?  The use of the incriminating statements?

MR. LOEVY:  Well, if they are calling Karen Kerbis, I think we're going to have to have some conversations with you about the parameters for an exam like that.  That would be a little bit of an unusual exam.

But we would like to close our case with the evidence by the Court taking judicial notice.

THE COURT:  I know you do.  And I'm trying to get to an answer on that.  But it seems to me that the answer to my question is yes, that you would have an opportunity then -- and I understand that it's in the defense's case.  So, I appreciate that there is a distinction there.  That you would have the opportunity to probe with that witness or any other witness -- but let's focus on this one -- the extent of evidence presented against Mr. Brown, which would include statements from the recording, right?

MR. LOEVY:  I guess so.  And if we were going to get down that road, we could call Kerbis to elicit that.  It's our preference to do it by stipulation.  You know, if they wanted to add to the stipulation, we've said repeatedly we're open to that.

THE COURT:  So, here is where I come out on this -- and I did want to just make sure that there was some -- what

1544

the plan was with regard to other evidence on this topic.

There is not a lot of daylight or difference between the following two proposals. Defendants' proposal is, plaintiff's incriminating statements at his interview with detectives and the ASA were used against him at his criminal trial.

That's the sum total of defendants' proposal.

The first two sentences -- or actually the first sentence in plaintiff's proposal at option 2 is -- and I'll turn that off for you so you can put your -- maybe that didn't work. There you go.

Plaintiff's option -- sorry, defense option -- I'm sorry.

So, I just read the defendants' proposal on the stipulation.

Plaintiff's proposal on option 2, the first sentence is: At Mr. Brown's criminal trial, portions of Mancuso and McDonald's police reports were introduced into evidence.

There's not a lot of difference between those two things. And to be honest with you, to avoid some of the concerns that I have, both about the fact that some of this stuff was stipulated to, and defendants' point about painting a full picture, I'm not inclined to do a lot of the work here. It's a little complicated, for the reasons we discussed before the break. And I think it is at least a fair statement that

1545

plaintiff's incriminating statements at his interview with the detectives and the ASA were used against him at the criminal trial.

You'll have an opportunity, through the witness that they've identified, to probe the topic.

MR. LOEVY: So, therefore, you are --

THE COURT: At most I'd be willing to give the defendants' proposed stipulation, which, as I've just said, is not all that different from your option No. 2.

I realize, Mr. Loevy, that you want to add --

MR. LOEVY: I see what you're saying.

THE COURT: -- the phrase about what he knew. But you can probe that on cross.

MR. LOEVY: Your Honor, if you were inclined to do that, the word "incriminating" is a little gratuitous. I mean, that's an adjective that's descriptive. I think it should just be his statements.

THE COURT: Fine. I will be prepared to say, plaintiff's statement at his interviews with detectives and the ASA were used against plaintiff at his criminal trial.

MR. FLYNN: No objection.

THE COURT: Thank you. I appreciate that.

It doesn't seem like there's a whole lot of dispute about it, but that's the extent of what I'm willing to do. You all can probe whatever you wish to probe.

1546

MR. LOEVY: All right. Your Honor, Mr. Kayes reminds me that we probably do want the word "incriminating" because it tracks the jury instructions, so we won't try to delete it.

MR. FLYNN: No objection.

THE COURT: All right.

MR. LOEVY: So, is that in lieu of putting on testimony about what happened at the trial? Because that's going to get tricky.

THE COURT: Well, but the problem is that the defense is going to want to put on evidence that there was other evidence that incriminated him at trial. I mean, that's -- I don't speak for you, but that's the defense, right? The defense is, there is other evidence, and the statement, that you allege is coerced, is not the cause of the conviction, right? That's sort of the point.

So, I'm not going to cut them off from presenting evidence in defense of the idea that you haven't established that the coerced confession was the cause, the reason for the conviction, right? I mean, that's their whole defense.

MR. LOEVY: Okay.

THE COURT: I'm not speaking for them. So, you should -- the defense should speak if I misunderstand it. But I thought that's where we're going.

This stipulation or judicial notice, if you will, prevents you from having to put on a lot of evidence about what

happened at the trial or even trying to read in that portion of the judge's finding. But that doesn't stop anyone from putting on some evidence about other evidence that was presented at the trial.

MR. LOEVY: All right. We --

THE COURT: Yeah.

MR. LOEVY: We'd probably call Kerbis, then.

But we will talk to the defendants about if we can stip this out. I just think it gets a little fraught when you start --

MR. GIBBONS: This one sounds like an area we should stip in. Kerbis can cut both ways. But --

MR. LOEVY: Yeah.

MR. GIBBONS: -- we've not been able to come together on many stips, so --

THE COURT: Okay. Well --

MR. LOEVY: Did you say we have or have not?

MR. GIBBONS: Not.

THE COURT: You know where I am on it. I encourage you to work together and see what you can do, and we'll go from there.

I said at lunch we would get a sense of next steps. So, when we finish with Spizzirri, we then have Cutler, and then Ms. Scott; is that right?

MR. LOEVY: Yes.

THE COURT: Okay.

MR. LOEVY: And, your Honor, can we ask the defendants how much Spizzirri we got?

THE COURT: Yes.

MR. GIBBONS: I think maybe an hour.

THE COURT: Okay.

MR. GIBBONS: You know, it could go quicker if I cut tapes. The jury's heard a lot of these. But the context matters sometimes. So, could be an hour.

THE COURT: Okay. So, roughly an hour.

We know there will be some redirect and perhaps a bit of recross. Then we're going to call --

MR. LOEVY: Cutler.

THE COURT: -- Cutler. How long do you expect him?

MR. LOEVY: We have a 45-minute exam, we think, for Cutler?

MR. BOWMAN: Hopefully a little less.

THE COURT: And, then, Ms. Scott, how long are you expecting her?

MR. LOEVY: About the same. Maybe a little longer.

THE COURT: Okay. So, I think it's safe to say that that will take through the end of the day.

Because I want to get you thinking about the information we need to give the jury at the end of the day, who are the defendants' first three witnesses for tomorrow?

MR. FLYNN:  Well, first I want to make clear that -- are they adding more witnesses?  It sounded like they might be adding Kerbis, maybe some others.

MR. LOEVY:  We're going to add Kerbis if she's going to testify either way.  Because she doesn't lengthen the trial, we might as well do it ourselves.  But if we reach a stipulation, then she won't go.

You know, we had a gentlemen's understanding that at the end of today -- at the end of today, we are going to consult and see if we jointly believe we can finish the evidence on Thursday.  And if we do, plaintiff's going to pare the heck out of our list.

THE COURT:  Okay.

MR. LOEVY:  And I guess I'd ask the defendants if we're still thinking about that or if that's out the window.

MR. GIBBONS:  No.  I think we're still thinking about that.  But the reality, your Honor, is everything keeps moving here.

THE COURT:  Right.

MR. GIBBONS:  And we've told him who our first witness is going to be, as a matter of courtesy, before.  And that is --

MR. FLYNN:  Dr. Cichon.

MR. GIBBONS:  But right now, I don't know who 2 and 3 are going to be.  I'm not prepared to say that right now.

1550

THE COURT: Okay.

MR. LOEVY: Although they'd have to be at the end of the day because --

MR. GIBBONS: Yes.

MR. LOEVY: -- putting it on the table.

MR. GIBBONS: I agree.

THE COURT: That's fair. That's totally fair.

We're going to take a 20-minute break in the afternoon so that everybody gets a bathroom break. This will be our afternoon break. And, then, we can spend ten minutes ironing this stuff out, so that we -- I'm going to keep my word. And I know you want to keep your word to the jury that we'll give them some guidance.

So, take your lunch break. We'll see you at 1:30.

Plan for a 20-minute afternoon break so we can --

MR. KAYES: Hearsay limiting instruction?

THE COURT: So, you all should try to exchange your view on that. I think you didn't hear back from the defense. So, we'll need a response from the defense so we can get to the limiting instruction -- sorry, to the hearsay question at the break -- at the end of the lunch break.

See you all at 1:30.

(Recess from 12:38 p.m., until 1:30 p.m.)

                    *     *     *     *     *

1551

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Joseph Rickhoff                    September 4, 2024
Official Court Reporter

1552

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                 Plaintiff,            )
                                       )
            vs.                        )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) September 4, 2024
                 Defendants.           ) 1:28 o'clock p.m.


                    TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
                  BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Individual          GREENBERG TRAURIG, LLP
Defendants:                 BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

1553

APPEARANCES (Cont'd):

Court Reporter:                    SANDRA M. TENNIS
                                   PATRICK MULLEN
                                   Official Court Reporters
                                   219 S. Dearborn St., Suite 2118
                                   Chicago, Illinois  60604
                                   (312) 435-5562
                          joseph_rickhoff@ilnd.uscourts.gov

                * * * * * * * * * * * * * * * * * *

                  PROCEEDINGS RECORDED BY STENOTYPE
         TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1554

(Proceedings heard in open court:)

THE COURT: So I'd like to go back on the record.

Good afternoon. Can I just get counsel to acknowledge their appearances for all the same counsel and parties.

MR. LOEVY: Good afternoon, your Honor. Jon Loevy. Same appearances for the plaintiff.

MR. FLYNN: Kyle Flynn. Same appearances for the defendants.

THE COURT: All right. During the break, one of the lawyers asked who Juror No. 3 was. And I'll just confirm that that's Calvin, I think it's De Vries, or De Vries. And he is the juror who asked the question today about the defendants, and so forth. So we can take that up at our afternoon break, along with kind of scheduling and planning. Unless there's something we should discuss now on any topic before we bring the jury back in.

MR. LOEVY: We have a very quick issue, and we're cognizant of time, but this witness testified that she has no regrets in 25 years working at the Cook County State's Attorney's Office. As soon as the copy is made, we're going to tender opposing counsel and your Honor a copy of a newspaper story that Michelle Spizzirri, prosecutor, was involved in a case where a man named Dashonn Maggette was accused of -- was accusing the Chicago police of framing him. And the critical ballistic report was undisclosed. And, you know, the details

1555

are in this story.

But she has opened the door by saying, I have no regrets of 25 years. You know, I never did anything wrong. That opens the door to cross-examination on this subject.

THE COURT: Response?

MR. GIBBONS: Well, your Honor, I don't know anything about it. So we'd have to do an investigation as to what those allegations are. A newspaper report, as we all know who've tried cases in the press, are wholly untrustworthy most of the time. If that's his basis, I would object on that. But then we'll have to recall the witness. If he -- if the Court's going to allow that, I'm going to have to investigate that and get to the truth of it. Because if she doesn't have any regrets, that doesn't mean she did anything wrong. This is a very hierarchal office. A lot of detectives. A lot of production issues. So, I mean, he just can't ask that based on a newspaper article.

THE COURT: Yeah. I mean, I think, Mr. Loevy, it's a bit of a going down a rabbit hole and just creates a side issue when we don't really have enough facts, at least I certainly don't, to really be able to move to the heart of the matter. You know, I appreciate that you have an article, and perhaps there's true statements in it that, in another circumstance, might be relevant. But I just think it's a side issue that's going to unduly delay the trial. And so absent more

1556

information, I'm not inclined to allow you to do it.

MR. LOEVY: Your Honor, may I reserve the right? They've said they have reserved the right to ask questions about Mr. Brown when the door got opened. Once we do tender it and proffer it, we'd ask that you just reserve deciding whether we --

THE COURT: I'm definitely happy to look at -- certainly happy to look at anything you'd want to put forward. But as Mr. Gibbons acknowledged, he may also wish to do some digging into it, and we'll take it up if you have something to propose. But based on what's been said to me now, it's a no.

MR. LOEVY: Thank you, your Honor.

THE COURT: Okay. Unless there's anything else, we can resume with Ms. Spizzirri. If we can ask her to resume the witness stand.

And we'll get the jury lined up.

MR. GIBBONS: Thank you, your Honor.

MR. LOEVY: I'm going to tender that article, your Honor.

THE COURT: Okay. You can just put it in front of Mr. Matosian's desk, and he will hand it to me. Thank you.

(Jury in at 1:32 p.m.)

THE COURT: All right. Please be seated.

Okay. Ms. Spizzirri, you remain under oath.

Mr. Gibbons, you may resume your examination.

Spizzirri - cross

1557

MR. GIBBONS:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. GIBBONS:

Q.  Ms. Spizzirri, I want to cover in about five minutes felony review, since it's playing a large part in this case.

If I understood you correctly, you did your first stint on felony review between the years 2006 to 2008.  Did I hear that right, thereabouts?

A.  Approximately, yes.

Q.  Okay.  And then you did other stints later in your career; is that right?

A.  That's correct.

Q.  Okay.  But in 2008, when you were there for the first time, you had been a prosecutor for about six years; is that right?

A.  Closer to seven.

Q.  Okay.  And in those seven years, you've already described your experiences in the state's attorney's office; right?

A.  Yes.

Q.  Okay.  Now, on August the 30th, you were a member of a felony review team; is that right?

A.  Yes.

Q.  Could you describe for the jury what a felony review team is?

A.  So at the time -- the makeup is a little bit different now just in terms of numbers and size, but it's essentially the --

otherwise the exact same.

At the time there was ideally 10 ASAs on the team. Your team could be as short as six, but 10 was the ideal number. And usually seven of those, maybe eight, again, depending on staffing, would be line assistants. And those line assistants would be comprised of ASAs from two different divisions. You'd have a group of ASAs who were, like me at the time, coming off of those earlier rotations in your career before you went to the trial division. And then you'd have mixed into that third chair ASAs who were visiting review for the second time. And there was no ratio or requirement as to how many from which division there had to be. It was just a mix of us. Those would be line ASAs, and that would be the bulk of the team.

The team would then have two, sometimes three, trial supervisors. Those were almost always first chair trial attorneys from the trial division. And by first chair, I mean they were more, like, supervising lawyers in the courtrooms. They would oversee prosecutions, trials, of their younger, less-experienced partners, and they would run the call in front of the judge, and they would ultimately make decisions about how things would happen in the courtroom. You would have to go back to felony review, sometimes as a second chair, more often a first, and supervise those different teams. There were four teams at the time, Team A, B, C and D --

MR. LOEVY: Object to the relevance, your Honor. We're really far afield here.

THE COURT: So she's describing the felony review team. So I'm going to overrule the objection and allow the witness to finish.

BY THE WITNESS:

A.   There were two to three trial sups, and those would work the same shift hours as the rest of the team. The shifts, we were on call 24/7. Our home base was 26th and California, where we would occupy an office there on the 13th floor.

Shifts would work, at the time I think it was 5:00 a.m. to 5:00 p.m., or, 5:00 p.m. to 5:00 a.m. You would work 28 days straight on days, three days on, three days off. And then 28 days on nights, three days on, three days off. And you would continue that rotation for whatever period of time you were assigned to felony review.

Q.   Okay. So I just want to make sure I understand a couple points here. This was basically shift work?

A.   It was.

Q.   Correct?

A.   Yes.

Q.   And you explained that the team would be three days on, three days off, 12-hour shifts?

A.   Correct.

Q.   So taking interviews or doing work at police stations at

Spizzirri - cross

1560

2:00 or 3:00 in the morning?

A.   Yes.

Q.   Common or uncommon?

A.   Common.

Q.   City doesn't sleep?

A.   There's a lot of crime in the city.

Q.   Okay.  You explained line assistants has a mixture of those in your position, coming up through those positions that you described; right?

A.   Yes.

Q.   And some of the more experienced people who were the first, second -- excuse me, the third chairs in the courtroom?

A.   That's correct.

Q.   Doing actually felony trials in courtrooms?

A.   Correct.

Q.   Okay.  Trial sups, supervisors, sit above them?

A.   Correct.

Q.   They're a little more experienced than line assistants; right?

A.   That's correct.

Q.   They're there for your consultation as a line assistant, if you need it?

A.   Yes.  And they would sometimes determine, you know, assigning cases during the night to who -- who was going where, at what time.  And checking in, if people needed help.  Things

Spizzirri - cross

1561

like that.

Q. And sitting above the trial sups are deputies; right?

A. That's correct.

Q. Two or three at the time in 2008?

A. I believe there were three.

Q. Okay. And you mentioned a gentleman by the name of Fabio Valentino; right?

A. Yes. Valentini.

Q. Valentini, yeah. Valentini. Was he a deputy at the time?

A. I think so.

Q. And you don't think he -- and then there's a head of the unit; right?

A. Correct. There would be one single boss, he was the chief. And then there would be three deputies, trial sups, and then ASAs.

Q. In the approval of a murder charge, the deputies or head of the unit would often be involved; is that right?

A. Yeah, almost always. It would be rare if they weren't.

Q. Okay. And so when you were describing your role as a line assistant, you were making a distinction between your ability as a line assistant to approve murder charges without a deputy or a more senior person in the chain of command approving it. Is that right?

A. That's correct.

Q. I want to speak very briefly about the relationship between

felony review and the police department.

A.   Okay.

Q.   In your own words, briefly describe that relationship.

A.   So, felony review assistants would get called out by the police.  They would call a dispatch center at felony review, and they would say, we're seeking an assistant state's attorney to come out.

     There would be various reasons that we would go out to the police station.  A couple we touched on here was logging and burning.  Being the scrivener for things that were memorialized in the form of a video.  We'd also go out and take statements from witnesses or victims of crimes.  We also went out to approve or reject charges.

     And so there would be different reasons we would go out there.  Sometimes things would go smoothly, and sometimes things were very hotly debated about our position on a particular case.  Theirs would be different, and it would, you know, butt heads.

Q.   You know, as some commentators say, prosecute -- prosecutors prosecute and police detectives investigate.

     Would that generally fairly sum up the roles?

A.   Yes.

Q.   As a line assistant in felony review, did you take orders or directions from detectives?

A.   No.

Spizzirri - cross

1563

Q.   And vice versa?  You as a line assistant in felony review, did you feel like you had the authority to give orders or directions to a detective?

A.   No.

Q.   Two separate offices with separate responsibilities, doing their own thing; right?

A.   That's correct.

Q.   Okay.  You briefly described the functions of -- the main functions of felony review.  I just want to -- because we've heard a lot about this term log and burn.  Could you give us more of a description of what that is?

A.   So now I believe the law covers many more offenses than it did back in 2008.  But in 2008, if you were a suspect in a homicide investigation, it was required by Illinois law that in your conversations, your interview, your interrogation, however you want to describe it, with police, had to be electronically captured by both audio-and-video capabilities.

         The different areas within the city, detective areas, have rooms that have audio and video.  And that's how you're able to watch the interview with Mr. Brown here today.

         At some point, theoretically, detectives are going to be calling felony review in cases for approval or rejection of charges.  Or they might call someone to come out and take to -- talk to witnesses, or victims, or whatnot.

         In order to have an understanding of what you're

Spizzirri - cross

1564

doing, you would need to be caught up to speed on, one of the things is, what is a suspect saying. What's going on in there. What are they saying happened.

Line ASAs would go out, go into its -- its own room with lots of video equipment. It was freezing cold in there. You'd usually be by yourself. Put headphones on. You'd be watching a TV and writing down, as closely as you could, it was in summary fashion, but as closely as you could the summary of what was taking place between the detectives and the suspect. And then those would be made available for the individual ASA reviewing the case.

Q. Okay. And the log and burns were being done sequentially by ASAs if the interrogation went longer than a shift. Fair to say?

A. That's correct. Or it would be started sometimes hours after an interrogation began. So you were already hours behind. So, yes, it would -- it would go into different shifts, yes.

Q. So the log and burns were not meant to be a contemporaneous reflection of what was happening in the interview room, it was always a catchup process, for the most part?

A. For the most part, yes.

Q. Okay. And the log and burning is being done on the ERIs; right?

A. Yes.

Q.   Electronic Recording Interviews?

A.   Yes.  And just -- just to be clear, the logging is the writing, and the burning is, we're also capturing it onto a DVD.  So that's a burn to a disk.

Q.   Okay.  And for purposes of our trial, all these snippets you've seen and we've been playing, that's -- that's known as the ERI; right?

A.   Yes.  Electronic --

Q.   That's the tape?

A.   That's correct.

Q.   Okay.  And the protocol at the time was:  Murder suspect enters an interrogation room, ERI camera flips on immediately; right?

A.   That's correct.

Q.   I can't resist.  You said the rooms sometimes were freezing cold?

A.   They were always freezing cold.  I think because of the equipment, it had to be a certain temperature in there.

Q.   Got it.  You weren't speaking of the interrogation itself?

A.   No, I'm specifically talking about the log-and-burn room, that you could literally feel like the heat come off the equipment.  And so the temperature in that room was always drastically different than the rest of the area.  And it was very cold in there.

Q.   While we're talking about temperatures, you were in that

interrogation room for about 54 minutes. Does that sound about right?

A. Sure.

Q. Did you feel like the temperature was unusually cold or freezing?

A. No. I'm always cold, and so I -- no, it was fine.

Q. Okay.

A. For me to say it's fine, it was -- it was fine.

Q. Okay. And I realize you were only in there 54 minutes, as opposed to multiple hours. But in that time span, you felt the temperature was fine?

A. It was -- it was comfortable.

Q. Okay. All right. You said one of the other functions, and we've heard a lot about this, is ASA handwritten statements?

A. Yes.

Q. Okay. Could you just generally tell the jury what an ASA handwritten statement is?

A. So if one of your assignments on felony review was to go out and speak to a witness or a victim on a case, you would generally start that conversation by having an oral statement with them.

After that oral statement took place, there would be a determination whether or not to memorialize the statement. And by memorialize, it would mean to capture in some more concrete fashion, other than just jotting down a summary. One of those

ways would be a handwritten statement.

Do you want me to get into how that was done, or --

Q.   We will in a second, but -- so let's -- let's say a detective takes interviews of a suspect, and they think they have relevant information, they ask an ASA to get involved.  Is that how it normally works?

A.   Yes.

Q.   And so the ASA comes on, and then the ASA decides whether they want to take a handwritten statement, or not, or just an oral statement?

A.   Well, it's -- the person is asked.  So it's really the person who's giving the statement is in control of how it's memorialized.  We're doing the offering, and they're doing -- they can reject it, and they can say no, I don't want to do this.

Q.   And between you and the detective, whose decision would be -- would it be to memorialize a handwritten statement in writing?

A.   The state's attorney.

Q.   And could a detective ever, let's say, instruct you as an ASA in felony review, hey, hey, I want this witness's statement handwritten?

A.   Normally just, I'm speaking in general terms, it wouldn't happen that way.  The state's attorney would make the decision. If the detective disagreed for some reason, they might say,

Spizzirri - cross

1568

hey, why aren't you doing this?  Or, hey, you should be doing this.  And then that conversation would take place.  Ultimately it is the decision of the ASA.  And then after that decision is made by our office, the person giving the statement is given the option to participate in that, or not.

Q.   Okay.  And in an ASA handwritten statement that you've participated in, how many times?

A.   I'm going to just ballpark 100.

Q.   Okay.

A.   Okay?

Q.   And in every handwritten statement that you're aware of, does it normally end with you, the ASA, asking the witness a series of questions about threats, promises, coercion, et cetera?

A.   That's correct.

Q.   Why are those questions asked of the witness?

A.   One of the factors that we consider as state's attorneys about whether or not to memorialize a statement are various oral statements can be used in court differently than handwritten statements or video-recorded statements.  And so with an eye towards using this type of evidence later in court, voluntariness, right, it becomes important.  Because if a statement is not voluntary, it's not -- it's probably going to be subject to some form of motion practice in the future.

You want to make sure that when you're speaking to an

Spizzirri - cross

1569

individual that they are speaking to you voluntarily, willingly, that they're not under any threats or promises, that they haven't been beat, they haven't been, you know, withheld something.

So you want -- you want to make sure. And then you want the person to acknowledge that in the handwritten, that they were asked these questions. And if there's a problem, then we'll put it in there, and we'll address it. And if there isn't, we want them to acknowledge that.

Q. Now, in questioning by Mr. Loevy this morning, there was some questions about whether a detective would be in the room or not in the room. And I'm only speaking now of these handwrittens. Was it generally true that the detective would be asked to step out of the room at that time?

A. Yes.

Q. And then you would ask these questions about threats, promises, coercion, you know, voluntariness; is that right?

A. That's right.

Q. Why would you ask the detective to leave the room at that point?

A. Because I wouldn't want there to be any barrier from an individual telling me, who is from a different office, who has a different role in the case, if there was a problem up to that point and if the detective had something to do with that. Or if not the detective, arresting officers or other police in the

department.  And by asking them to leave the room momentarily, it gave them an opportunity to voice that without the detective interjecting.

Q.   And when you -- strike that.

Is it normally the ASA, him or herself, who is writing the witness's statement out?

A.   Yes.

Q.   And then when that is done, is the witness afforded an opportunity to review each and every page of the handwritten statement?

A.   Yes.

Q.   Are they afforded the opportunity to make edits, let's say you got something wrong, edit the statement in some way?

A.   Yes.

Q.   Explain how that works.

A.   So as I stated, when we would first talk to a witness or a victim, it would start with an oral conversation.  And that would, you know, be question and answers back and forth about what they had to say.

Once the determination and agreement was made to memorialize that statement in some fashion, the state's attorney would be the scrivener of the document.  It would be done right in the presence of the person.  So I never left the room, went somewhere else and came back with a completed copy. We would go through it and write it together.  Well, I'm going

to use the term "I." Okay? I would be writing it, they would be speaking it.

After that was done, we would go through it page by page. They would be able to read the document themselves. I would ask them to read some of it out loud. And the reason for that would be to ensure to me that they could read and write English and understood what it was that was on the written page. And that they would demonstrate that to me and not just pretend to be reading it. Or not be able to read my handwriting because maybe it was illegible to them.

If they accepted everything on each page, they were asked to sign the bottom of the page. At any time they wanted to add something or say that's not correct, they would scratch it out, or tell me what to write there, initial each change or correction, until the end of the page.

Does that answer your question?

Q. It does. Thank you.

Okay. Let's move to September 4th, 2008. What was your original assignment that day that got you out to Area 5?

A. To go out and log and burn.

Q. Okay. Log and burn specifically the questioning of Marcel Brown?

A. Correct.

Q. Okay. Had there been ASAs out there before you?

A. Yes.

Q.   Do you recall who they were?

A.   I don't have independent recollection, but I now know from reviewing things, I believe Lisa Longo, Kevin DeBoni.  I believe Kevin was the one who had been logging and burning prior to me getting there.  I'm not sure.  Honestly, I'm not sure.

Q.   Would it help you to refresh your recollection if I showed you the felony review folder for this case?

A.   Yes.

          MR. GIBBONS:  Your Honor, this has been previously marked as Joint Exhibit 171.  I've tendered a copy to Mr. Loevy.  If I could approach?

          THE COURT:  Certainly.

BY MR. GIBBONS:

Q.   Now, I will confess, Ms. Spizzirri, that this is very light ink.

A.   Uh-huh.

Q.   Very hard to read.  I'm going to have limited questions.

          But at the top, on page 1, does it list the ASAs involved?

A.   Yes.  I can see, last name Longo, initial L.  That's Lisa Longo.  There's --

Q.   Let me just stay with that.

A.   I'm sorry.

Q.   Was Lisa Longo out there, at least the first time, from

Spizzirri - cross

1573

831 -- on 8/31, from 5:20 p.m. to 7:35 p.m.?

A.   Yes.

Q.   Okay.  And then the second line also lists Lisa Longo?

A.   Yes.

         MR. GIBBONS:  I'm going to lead through this, your Honor, because I've read it before.

BY MR. GIBBONS:

Q.   Does the second line say Lisa Longo on 9/1, between 4:00 p.m. and 2:30 a.m.?

A.   Yes.

Q.   Third line, Longo back out there on 9/2, and it says, start 5:00 p.m., but no finish?

A.   That's correct.

Q.   Then underneath that, does it say ASA Hogan?

A.   Yes.

Q.   Okay.  So that means another ASA was also out there?

A.   That's correct.

Q.   So there were previous -- excuse me.  There were more ASAs out there logging and burning, looking at the interrogation tapes and doing their job before you got there?

A.   Correct.

Q.   All in relation to the tape that they're looking at of the detective's interview of Marcel Brown; right?

A.   Yes.

Q.   Okay.  If I asked you to quickly just turn -- I think it's

page 4.  Page 5.  It has got a Bates stamp on the bottom, 894. Do you see that?

A.  894?

Q.  894.

A.  Oh, yes, I see that.  Yes.

Q.  Okay.  At the top, is that your handwriting?

A.  It is.

Q.  And what does that reflect?

A.  By putting my name there, it's acknowledging that I've come out on the case, the date that I came out, which says September 4, 2008.  The start time is the time in which I begin my assignment for this job, which I have 1900 hours, which is seven -- 7:00 p.m.  And finish time is 0030.  That's 12:30 a.m.

Q.  Okay.  So does this signify to you that you were in Area 5 beginning your assignment here at around 7:00 p.m. and ending at around 12:30 a.m., on September 4th, into September 5th?

A.  Yes, sir.

Q.  Now, I generally just want to speak about sections of this. I do not want to get into any substance.  Okay?

A.  Okay.

Q.  There is, on these pages -- and this is a very lengthy felony review folder, would you agree?

A.  Yes, I would.

Q.  What causes the length of a felony review folder?

A.  A variety of things.  Number of witnesses would take up

more space, and so those are documented within the folder. So there are -- on these pages, there's certain areas to put certain information, one of them being witness boxes and --

Q. Okay. Let me just stop you there.

A. Sure.

Q. So there are boxes for witnesses to be identified; is that right?

A. That's correct.

Q. And then in those boxes, I see a notation, oral or handwritten. Do you see that?

A. Yes.

Q. Who fills that out?

A. The state's attorney does.

Q. And they fill that out per witness that is being interviewed in relation to a case?

A. Yes.

Q. Okay. I don't think I have anything else about the felony review folder. Thank you.

Okay. Now, when you got out there to Area 5 at around 7:00 p.m., you started to do your assignment of logging and burning?

A. Yes.

Q. Okay. And at some point, did that assignment change?

A. Yes.

Q. What triggered that change?

A.   I don't know specifically, but I can tell you, based on my review of everything now, I'm certain that I was asked to come in and speak to Mr. Brown.

Q.   Okay.  You would not have -- in your capacity as a line assistant, kind of the lower rung of a felony review team, you would not have decided on your own, hey, I'm going to go in and talk to Marcel Brown?

A.   No.

Q.   At some point, even though you don't have a recollection, you're believing that you would have gotten authority from a more senior member to be able to go in and do that function?

A.   Yes.  I would have contacted either my trial sup -- the hierarchy and the protocol always, contact your trial sup first.  If there's an issue getting ahold of them or a disagreement, then you could go above the trial sup.  But we tried very hard to observe the hierarchy in the office.

Q.   And before you went into the interview of Marcel Brown, you were an experienced ASA; right?

A.   Was or was not?

Q.   You were.

A.   Yes.

Q.   Six years under your belt -- six or seven years under your belt at that point?

A.   Yes.

Q.   Okay.  Did you feel, as you went into that room, that you

were professionally capable of doing an interview like that?

A.   Yes.

Q.   Explain why.

A.   I knew at that time what an individual's rights are when speaking to them.  I know what the factors are in determining voluntariness.  I knew the elements of certain crimes.  I just knew how to talk to people and have conversations.  I mean, you don't check your common sense at the door, you just go -- you know.  So, yes, I don't think there was any skill that was called upon me at the time that I was unprepared for.

          MR. GIBBONS:  May I have one moment, your Honor?

          THE COURT:  Certainly.

          MR. GIBBONS:  Maria, could you please put up page 18, please, at this point.

          MR. LOEVY:  Eighteen of which exhibit?

          MR. GIBBONS:  Oh, I'm sorry.  You're right.  Joint Exhibit 500B, the ERI transcript.

          MR. LOEVY:  Thank you.

BY MR. GIBBONS:

Q.   What we're putting up is a transcript that is a joint exhibit of the tape of Mr. Brown.

A.   Okay.

Q.   Okay.  Now, I'd like to direct your attention to page 18, lines 11 to 19.  This is Detective McDonald in about the first 15 minutes of the interview of Marcel Brown.

He says:  Well, we know everybody who was there.  We know who was doing the shooting.  Now, what we got to figure out is just how involved you are in this.  You drove up there with R.J., and you drove away with R.J.  Now, what we've got to figure out is, did you know R.J. was going to do the shooting?  Did you know R.J. had a gun, even?  Because if you didn't, then things get handled one way.  If you did, then things get handled another way.  You can be accountable for him, you know.

Do you see that?

A.   Yes.

Q.   Now, Mr. Loevy was asking you questions early on about the fact that you were a trained lawyer and you understood the law of accountability.  And that was probably true at the time; right?

A.   Yes.

Q.   Now, did you have an awareness that Detective McDonald, very early in the interrogation, actually explained the concept of accountability to Marcel Brown?

A.   That he explained it?  No, I don't know that there was an explanation.  I'm not sure.  If you're asking based on this paragraph, he does say:  You can be accountable for him, you know.

Q.   If you knew that R.J. had a gun.  Right?

A.   Yes.

Q.   Okay.  So if you knew R.J. had a gun, you could be

accountable. You could be in trouble?

A. Yes, if you -- yes. I see what you're saying. Then, yes.

Q. Maria, can we skip ahead now to page 296 of the transcript, please.

Do you have that in front of you, Ms. Spizzirri?

A. Yes. It's 297, maybe.

Q. Sorry?

A. It looks like page 297. Did you say six? Oh, here it is. Yes, okay.

Q. 296.

A. Got it.

Q. Here on line 15 and 16, it states that ASA Spizzirri enters at 22:37:38. Do you see that?

A. Yes.

Q. That's 10:37 p.m.?

A. Yes.

Q. I think that's consistent with you telling Mr. Loevy you went into the interview room around 10:30 PM; is that right?

A. Yes.

Q. Okay. I think you answered this, but let me ask you: Was it unusual that you would be going, talking to a suspect or a witness at 10:37 p.m.?

A. No.

Q. And could you explain why?

A. Unfortunately things seem to get busier at night in terms

of crime. There's more criminal activity, and, therefore, there's more arrests. There's more people in custody in the later hours than there normally is in the daytime. So that's why that wouldn't be uncommon.

Q. And Mr. Loevy asked you questions about what you knew before you went in and spoke to Marcel; is that right?

A. Yes.

Q. And you did familiarize yourself, to some extent, about what had been going on; right?

A. Yes.

Q. You were part of the log-and-burn team; right?

A. Yes.

Q. And so you had the ASA's previous logs there for you to look at; right?

A. Yes.

Q. Okay. And you had the opportunity to talk to detectives; right?

A. Yes.

Q. Would that be something improper, to do that?

A. Improper?

Q. Would it be improper for you to have gotten --

A. No.

Q. -- the lowdown from the detectives?

A. No.

Q. And what was the purpose of getting that information from

the detectives?

A. Well, even if you're just there to log and burn, a lot of times nicknames are used. You're trying to familiarize yourself with where are we talking about, who are the players here. To just kind of get yourself acclimated so that -- because of the length of, you know, the interview, more than one person is involved in doing this. And so they might be -- you're catching up. They might be writing it in a certain way and summarizing in a certain way. You need some basic parameters just to know, what is this case about? Who are we talking about? And so you had to get yourself familiar, even for the purpose of log and burn.

Q. So part of the purpose in speaking to the detectives was to complement what you were going to do in relation to logging and burning?

A. Correct.

Q. Certainly complement your knowledge before you go in and start to question a suspect; right?

A. Correct.

Q. Let me ask this very directly. Was one of the purposes in speaking to the detectives in this case to figure out a way how to break Marcel Brown?

A. No.

Q. Did that ever happen?

A. No.

Q.   Now, Mr. Loevy asked you questions about, did you know how long the interrogation had gone on.  Do you remember that line of questioning?

A.   Yes.

Q.   And you did have some general idea that this had been going on for -- for a while; right?

A.   I did.

Q.   Okay.  And were you aware that Marcel Brown had lied for a significant number of hours prior to you going in and interviewing him?

A.   Yes.

Q.   Did you know that he had actually lied early on about being an eyewitness to a guy named Day-Day doing a shooting?

A.   Yes.

Q.   Okay.  In your role as a prosecutor, when somebody says I'm an eyewitness to somebody shooting in the area where they find a dead body, is that a serious allegation?

A.   Yes.

Q.   Could you explain why?

A.   The whole point of interviewing people and talking to people is determine that the appropriate people are charged and to get a -- as true and clear a picture as you can as to what happened out there.

       When there are -- the more people that are involved in things, the more details, versions, perceptions, that come into

Spizzirri - cross

1583

play.  And so you need to take all of that into account and make decisions based on what you're hearing.

Q.  How, if at all, would the credibility of a person be in your mind as a prosecutor if they say:  Hey, I actually saw Day-Day shoot, and Paris Jackson ended up dead.  And then they, hours later, say:  Yeah, you know what, that's all a lie.  What does that do to that person's credibility?

A.  Significantly disparage it.

Q.  Prior to going into the interview room, were you aware that Marcel Brown had a whole set of statements about talking to, meeting with, and interacting with Eddie Cane?

A.  Yes.

Q.  And at some point, did you realize -- strike that.  At some point, were you aware that Marcel Brown said, yeah, you know, those are lies, too?

A.  Yes.

Q.  Does that further impact your belief into the credibility of a person who does that?

A.  Yes.

Q.  Prior to going into the interview room, did you strategize at all with the detectives on how to approach Marcel Brown?

A.  No.

Q.  That was your call?

A.  Yes.

Q.  Did the detectives at all tell you what questions they

wanted you to ask?

A.   No.

Q.   Fair to say that this was your interview and you were in charge of your interview?

A.   Yes.

Q.   When you went into the interview, did you go with any premeditated questions?

A.   No.

Q.   Why not?

A.   It was important then, it's always important to me, to at least at the onset, at the beginning of the conversation, to let the individual tell me what they want to tell me and say what they want to say.  From there, I may begin to question what you're telling me.  I may confront you with evidence that I know about.  I may ask things that don't sound plausible to me.

But initially, I want to hear what the person has to say, and I want to make sure, as they're telling it, I understand what they're saying to me because sometimes there's just difference in the way people explain things.  And I don't want to get confused on, for example, when he used the word -- excuse me -- fuck 'em up, I've heard that many times before, and it means different things to different people.  I want to clarify what you're saying what it means.

Q.   Okay.  Thank you.

Mr. Loevy asked you questions about interrogation, versus interviewing, versus questioning. Do you remember that?

A. Yes.

Q. And he gave you I think what his definition of interrogation was; right?

A. Yes.

Q. Did you consider yourself a trained interrogator --

A. No.

Q. -- when you went in and saw Marcel Brown in September of 2008?

A. No.

Q. How would you have described yourself back then?

A. Can you -- can you maybe ask a different way?

Q. Yeah, sure. If I was asking about, you know, this trained interrogation technique type of person, versus you walking in there.

A. Okay.

Q. So I was really trying to get to you, what was your style of trying to question a suspect in 2008?

A. My style. I like to think I'm a good listener. I like to think -- my style. I don't -- sorry, this is a tough question. I can say this --

Q. It's probably a terrible question. I'm sorry.

A. I mean, I didn't go through any training, ever, to interrogate people, to interview people. Okay. You learn --

Spizzirri - cross

1586

at the state's attorney's office, you learn on your feet, you learn on the job. You learn things by getting yelled at by judges. You learn things by, you know, it's trial by fire. Okay? So there was no plan. You go with it. You go in there. You try to be a skilled listener and a skilled communicator. So I would hope that I was at least that.

Q. Okay. Let me ask this wrap-up question of this area.

Mr. Loevy asked you questions about your career path and how that might be influenced in doing good jobs. Did you have any goal in going into the questioning of Marcel Brown of getting a quote-unquote confession from him?

A. No.

Q. Maria, can we play 22:37:38 to around 22:38:51, please.

(Said video clip displayed in open court.)

BY MR. GIBBONS:

Q. Okay. Fair to say this is your first live interaction with Marcel Brown; right?

A. Yes.

Q. And when you walked into the room and you had this opening colloquy, dialogue, what was your impression of him?

A. Um, I don't know if I know how to answer that. I mean, it seemed friendly. I was very surprised by the fact that he recognized me because, honestly, even to this day, after having looked at this now a few times, I don't have any recollection of having met him earlier in the month, or year, or whenever he

had indicated it occurred. He seemed open to speaking with me.

Q. Okay. Did Marcel Brown -- this is in the first 20 seconds, 30 seconds of you talking with him, did he seem beaten down at all to you?

A. No.

Q. Did he seem exhausted, either physically or mentally?

A. No.

Q. Did he seem incapable of having a dialogue with you?

A. No.

Q. Did he seem impaired in any way?

A. No.

Q. Did you see any red flags that Marcel Brown was incapable of continuing a conversation with you?

A. No.

Q. If you had, what would you have done?

A. I would have done one of two things. I would have asked him about that. Hey, what's going on? Have you slept? You know, why are you acting like this? What is -- is there an issue? Or I may have just ended the conversation there and taken a break and maybe tried again if he wanted to talk. Maybe not. I don't know.

Q. Fair enough. None of that happened; right?

A. No.

Q. Okay.

Maria, can we play 22:49:54 to 22:50:38, please.

If we can -- no, let's play it first.

(Said video clip displayed in open court.)

BY MR. GIBBONS:

Q.   Okay.  ASA Spizzirri, why did you explain who you were early on in this conversation with Marcel Brown?

A.   I wanted to make it clear to him that I was not there to advise him or represent him.

Q.   Did you have any doubt that he understood who you were?

A.   No.

Q.   In fact, he had recognized you, as you said earlier, from a previous interaction you had with him?

A.   Right.  When I was a state's attorney as well.

Q.   Okay.  You then read him his Miranda rights.  Right?

A.   That's correct.

Q.   Was it your understanding that this is the third time Marcel Brown is receiving his constitutional Miranda rights?

A.   Yes.

Q.   Why did you read them to him?

A.   It's a comfort level for me.  I know that people -- these are their rights when they give interviews.  I knew that he had been advised of them by the detective.  But as you pointed out, I'm the one talking to him now, and I'm going to make sure that I give them to him and that I see that he understands them.

Q.   Maria, can we put up transcript 299.

This is a page of what we had just listened to.  And

this is your reading of the constitutional rights.

You made Marcel Brown verbally respond to each of those rights; did you not?

A.   I did.

Q.   Why did you do that?

A.   Because "mm-hmm," even I'm sure to the court reporter here, is not a sufficient answer to a question as important as this, let alone any question.  But I wanted to be clear, is it a "yes" or is it a "no?"  Because "mm-hmm" to you might mean "maybe" or "no." So it's "yes" or it's "no."

Q.   Okay.  And did you have any hesitation at that moment of believing that Marcel Brown understood his Miranda rights?

A.   No.

Q.   All right.  Maria, let's put up page 300, the next page, please.

ASA Spizzirri, beginning on line 23, all the way down at the bottom -- are you there?

A.   Yes.

Q.   You say:  Into Sunday morning, okay.  Now, I don't know a whole lot about everything that happened, so we're going to have to start from the beginning.  And better I just hear it from you than to have the police fill me in on that -- everything.  Okay?  It's just I'd rather just hear it for the first time right from you.  Okay?

Now, you did know something about the case; right?

Spizzirri - cross

1590

A.   I did.

Q.   But why did you want to hear, and why did you tell Marcel, hey, I want to hear it from your mouth?  Why did you say that to him?

A.   Because as an individual is talking to me, one, whatever I learned going into the room was most likely in summary fashion, whether it was based on a conversation or reviewing a report, or a combination of the two.  So there's that.  And now I'm here for details.  So I want to hear it from the person.

I'm also assessing credibility as I speak to somebody.  So I'm giving them a lengthy opportunity to give me a narrative.  And as they're telling me, I'm assessing what they're saying in light of the other evidence.

Q.   And you used the word "narrative."  I mean, these things don't normally go by narrative, they normally go question and answer; right?

A.   They do.

Q.   And was that your experience with Marcel, that there was question-answer, question-answer?

A.   Yes.

Q.   Maria, can you put up page 315, please.

I'm skipping over the tapes on some of these, ASA, because the jury has heard these snippets multiple times right now.

On page 315, beginning on line 11, you say:  Okay.

All right. So in the car, what's being said?

Mr. Brown: T.J. was trying to find the new CD he just bought on the glove in the armrest and R.J. was like, I'm getting tired of these mother-fucking "Ns."

Do you see that?

A. Yes.

Q. And then you say: Okay.

Mr. Brown: He wasn't paying no attention. He put the CD in and he cut the radio up. And he was just driving.

ASA Spizzirri: Okay. What else was he mumbling about back there?

Mr. Brown: He was saying stuff, but I wasn't --

Do you see that?

A. Yes.

Q. Why were you asking Marcel Brown these questions?

A. These questions and his answers went to what, if anything, he knew about the reasons why they were going to the park and what would happen when they get there.

Q. Were you trying to trick him at all?

A. No.

Q. Maria, could you put up page 159 of the transcript, which is about 10 hours earlier in this interview.

ASA Spizzirri, were you aware many, many hours earlier Detective McDonald -- and going down to the bottom on page 21, line 21 to 24. Detective McDonald asked him a similar type of

question, where he said: Did he say anything else at that point?

Mr. Brown: No. But he said he was getting tired of them.

Do you see that?

A. Yes.

Q. Is that -- were you aware that it was Mr. Brown who was saying R.J. -- early on in this interrogation was saying R.J. said "tired of them"?

A. Yes.

Q. Okay. The difference between "tired of them" and "tired of MFs" is just how you further describe the word "them;" right?

A. Yes.

Q. The concept of being tired was introduced by Marcel Brown many hours earlier. Isn't that fair?

A. That is true.

Q. Okay. Maria, can you go back to page 316, please.

Okay. On lines 6 through 23. And Mr. Loevy played you these snippets. If you need us to replay them, we can. But in the transcript, it says:

Spizzirri: Okay. Well, give me some of what he was saying.

Mr. Brown: Oh, the fucking -- I'm tired of these mother-fucking "Ns."

Do you see that?

A.   Yes.

Q.   ASA Spizzirri:  Okay.

        Mr. Brown:  And he said some more stuff after that, but --

        Well, come on.  I know you know.

        Mr. Brown:  I don't know.

        Spizzirri:  Listen.  Listen.  It's not my job to go and tell R.J. what you tell me; right?

        Brown:  Yeah.

        Spizzirri:  You think I'm going to go tell him what we talk about?

        Mr. Brown:  Yeah.  No.

        Spizzirri:  I'm not.  Okay?

        Mr. Brown:  He was like, I want to fuck them "Ns" up.

        Do you see that?

A.   Yes.

Q.   Why were you asking him these questions?

A.   Again, it went to what he knew before the shooting happened at the park, what he thought the purpose of them going to the park was.  What the intent was.  What was about to happen. Whether he facilitated it.  Whether he tried to stop it. Things like that.

        So I'm trying to get -- I'm trying to break down exactly what's going on in the car.

Q.   And you said earlier in your testimony you were a pretty

good listener. Were you trying to follow-up on what Mr. Brown was telling you about R.J. being in the backseat mumbling?

A. Almost every statement he made I think I asked him sort of clarifying question.

Q. When you were asking him these clarifying questions, as we just went over on pages 315 and 316, were you trying to trick Marcel Brown?

A. No.

Q. Were these fair questions, fair follow-up questions, in your mind?

A. I thought so.

Q. On line 13, Mr. Loevy I think asked you about this on direct, you specifically say: Well, come on. I know you know.

Do you see that?

A. Yes.

Q. Why did you say that?

A. Again, as I said earlier, when I'm having a conversation with someone listening to someone, anybody, it's not in a vacuum. You have your own common sense. You think about these things. You're in a car with somebody. You can hear what your passengers are saying. And he already indicated to me that he heard portions of conversation but seemed to be holding back and wanting to tell me the rest of it for reasons I was trying to find out.

But a car is a small, tight space. They're on their

way together to a heated situation. I didn't find it credible that there wasn't more conversation in the car about it.

Q. At this time -- and we've already talked about the lies that you knew Marcel had uttered for hours. Did his earlier lying play any role in how you were framing these types of questions?

A. Yes.

Q. Could you explain that to the jury, please?

A. In summary fashion, without quoting him exactly, earlier in the interview, he had talked about -- reasons that he lied to the police was, I believe R.J. told him, hey, if we get caught or if we get stopped, this is what you need to see -- say is what happened to them.

And then that there would be some sort of repercussions if R.J., or family, or people found out that he talked to the police. They were cousins. They were family. He is the one that elicited a concern about giving a statement and what the consequences of that would be.

Q. And going into that room, did you have awareness that Marcel Brown had said, hey, hey, R.J.'s a Vice Lord?

A. I'm sorry, could you repeat that?

Q. Yeah. Did you have some awareness -- you know, you're very late in the game of questioning. Excuse me. Strike that.

You're very late in the interviewing of Marcel Brown; right?

A.   Yes.

Q.   Did you have an awareness that up -- at earlier in the interrogation that Marcel Brown admitted that R.J. was a Vice Lord?

A.   Yes.

Q.   And he was dangerous?

A.   Honestly, I don't recall that word specifically.  I -- I do remember there being portions of the conversation where he talked about in the past knowing R.J. carried a gun, seeing R.J. with a gun, seeing R.J. use a gun.  So this wasn't a foreign territory in terms of whether or not R.J. had a gun and would use one in his presence.

Q.   Okay.  And specifically on lines 15 through 23, you're telling Marcel:  Hey, I'm not going to go and tell R.J. any of that.

        Do you see that?

A.   Yes, I see that.

Q.   Not my job to go tell R.J. what you tell me.  Right?

A.   Yes.

Q.   Yeah.

        You think I'm going to go tell him?

        Yeah.  No.

        Do you see that?

A.   Yes.

Q.   Okay.  Why did you feel that you needed to tell R.J. to

tell Marcel, hey, I'm not going to tell R.J. any of this?

A.   As I stated, he had articulated some fear, concern, reluctancy about being forthcoming with what happened because of R.J.  And so I wanted him to know he could talk to me without me reporting it back to R.J.  And I thought, in telling him that, he would be more honest about what happened.

Q.   And in your almost seven-year experience at that point as a state's attorney and a prosecutor, had you had some experience with retaliation, that it actually is real amongst gang members?

A.   It is very real.

Q.   Maria, if you could put up page 336, please.

     All right.  We're moving ahead now just a couple minutes, down on lines 19.

     And ASA Spizzirri says:  Okay.  All right.  And how did you and R.J. end it?  Like, did he tell you, don't talk to the police, keep your mouth shut?  What did he tell you?

     Mr. Brown:  No.  He said -- he tried to make up a story to tell us that Day-Day shot at him if the police get me and T.J.

     Did you see that?

A.   Yes.

Q.   Okay.  Why were you centering in on those questions and answers right there in the interrogation?

A.   That statement gives me pause for concern that I need to

Spizzirri - cross

1598

decipher what is actually true, what actually happened, versus, what is part of some, you know, scripted version of events that R.J. planted in his head, or that he came up with on his own to avoid telling anybody what really happened. For whatever reason.

Q. Maria, can you move ahead to page 356.

Okay. On the bottom there, beginning on line 17.

ASA Spizzirri: And know -- again, we heard these snippets before, but we can play them again, if you want, ASA Spizzirri.

ASA Spizzirri: And knowing people just the way I know people, not you or not R.J., or not anyone in particular, just people, I got a hard time swallowing you didn't know.

Mr. Brown: I didn't. If I knew, I would tell you.

ASA Spizzirri: No, you wouldn't tell me because you think that puts you in a lot more trouble.

Mr. Brown: No.

Do you see that?

A. Yes.

Q. I mean, we had already gone through Detective McDonald telling him, hey, there are consequences if you know R.J. had a gun going to the park; right?

A. Yes.

Q. You knew that?

A. Yes.

Q.   Right?

A.   Yes.

Q.   And here he's telling you:  Hey, hey, I didn't know.  If I knew, I would tell you.  Like, I would tell you the truth.

        What did you think about that statement of Marcel Brown at that time?

A.   I don't know if I know what you mean, counsel.

Q.   Yeah.  I mean, Marcel Brown had been lying for many, many hours; right?

A.   Yes.

Q.   And were you pressing him on this point, saying I got a hard time swallowing that you didn't know for a reason?

A.   Yes, it just wasn't resonating with, again, the totality of the circumstances, what he had already said.  I just wanted to be sure.

Q.   Okay.  The totality of the circumstances.  You've used that word here in the questioning of Marcel Brown.

        Were part of the circumstances at this point of the questioning that Marcel Brown had said:  Yeah, R.J. -- R.J. probably had a gun?

A.   Yes.

Q.   Were part of the circumstances:  Hey, hey, I had seen R.J. with a gun before?

A.   Yes.

Q.   Were part of the circumstances:  Hey, R.J. suffered gun

possession and discharge convictions in the past?

A.   Yes.

Q.   Prior to August of 2008?

A.   Yes.

Q.   That R.J. was a shit starter?

A.   Yes.

Q.   That there were fights between, whatever we call them, the guys at the White Castle and the guys at Amundsen Park?

A.   Yes.

Q.   We already covered you knew that he lied about Day-Day being a shooter?

A.   Yes.

Q.   Lied about seeing Eddie Cane?

A.   Yes.

Q.   And he lied that his cousin, R.J., was not a shooter. Stood with that lie for hours; right?

A.   Yes.

Q.   You're aware of all of those circumstances?

A.   Yes.

Q.   Do they play a role in why you were disbelieving Mr. Brown at this point?

A.   Yes.

Q.   Are those the circumstances that you're talking about when you say:   The circumstances don't add up, Marcel?

A.   Yes, that's the totality of the circumstances that I have

gone back to several times now.

Q.   Maria, can you move back to page 358, please.

     Ms. Spizzirri, line 4 there, you say:  And I'm not lying to you.  I have most of the story right now for you, but I do know that what you came in here saying is not what you're saying now.

     Mr. Brown:  Mm-hmm.

     Did you understand what mm-hmm meant?

A.   I took it as an acknowledgment of what I just said to him.

Q.   Okay.  And then you continue:  Okay.  And you admitted that you were lying.

     Brown:  Yeah.

     Spizzirri:  Because R.J. put you up to it.  You were scared.  But now, you know.

     Mr. Brown:  Yeah.

     Right?

A.   Yes.

Q.   Okay.  He's admitting to you that he was scared; right?

A.   Yes.

Q.   Okay.  Maria, can we play tape 23:37:30 to around 23:38:30.  About one minute.

     (Said video clip displayed in open court.)

BY MR. GIBBONS:

Q.   Okay.  We can stop there, Maria.  Thanks.  So let me just ask Maria to put up page 362.

Do you have that in front of you, ASA Spizzirri?

A.   Yes.

Q.   Beginning on line 4, you say the following:  Listen to me. Marcel, I don't want you to tell me anything that's not true. Okay?  I'm not making you any promises.  I'm -- if I've said anything to you that makes you think that you feel like you have to say something to get me to leave you alone, then tell me that.  That's not why I keep asking you.  Okay?  Do you feel that way?

Do you see that?

A.   Yes.

Q.   Why did you say those words to Marcel Brown?

A.   Because I did not want him repeating back to me anything I said because he thought it was the right thing to say or was his ticket out of there, or -- I -- I did not want his perception of the situation to be anything other than what it was.

Q.   And let me ask the home run question here.  At any point did you think he was doing that; and if he did, what did you do about it?

A.   Wait.  Doing what?  Sorry.

Q.   Yeah.  Did you think Marcel Brown was making things up just to appease you?

A.   No, I don't think he was making things up.  My concern was that he wasn't being completely forthcoming with everything.

Q.   Because of all the circumstances we've already talked about?

A.   Correct.

Q.   Okay.

All right.  On line 11 to 16, you say -- Brown says: About the gun thing.

And you say:  Okay.  You think that I just want you to say that whether it's true or not?

Brown:  No.  I think you want me to say that because you think it's true.

Spizzirri:  I think it's true.

Why did you say that to him?

A.   I was being honest with him.  I did think it was true.

Q.   And, again, is it the circumstances that we just went over that led you to, you know, believe that he was lying to you still?

MR. LOEVY:  Objection.  Asked and answered, your Honor.

THE COURT:  Sustained.

BY MR. GIBBONS:

Q.   Maria, can we put up page 371, please.

Ms. Spizzirri, I'm going to direct your attention to line 15.

A.   Yes.

Q.   And beginning there, it says:

Mr. Brown: At the time I didn't ask did he have it, but I kind of figured that he had it on him.

Spizzirri: But why?

Brown: Because, like, he don't go into the park with me. And he knows nobody like him.

Spizzirri: So it was just all of these circumstances you're telling me that made it seem like he had a gun?

Brown: Yeah.

Spizzirri: Okay.

Do you see that?

A. Yes.

Q. Okay. When he said there when he -- when Mr. Brown said on lines 18 and 19, because, like, he don't go into the park with me and he knows nobody like him.

Did you believe he was talking about R.J.?

A. Yes.

Q. And that there was hostilities between at least R.J. and people in that park?

A. Yes.

Q. Maria, can you put up page 372, please. The very next page.

Okay. ASA Spizzirri. Beginning on line 2.

Spizzirri: Okay. All of those things, now that you're looking back on that, makes this make a little bit more sense to you? Okay. Did he say anything that added to that?

Brown: I'm getting tired of these "Ns," you know, fuck 'em up.

Do you see that?

A. Yes.

Q. Right before he made that statement, did you ask him a leading question, like -- or a non-leading question?

A. I would consider that a non-leading question.

Q. Meaning, it's an open-ended question; right?

A. That's what I think.

Q. Okay. When you asked him that question, were you trying to coerce something out of Marcel Brown?

A. No.

Q. Were you inserting your words into his mouth?

A. No.

Q. On line 14, next paragraph, you say: Okay. Does fucking people up to R.J. or to you mean shooting them, or does fucking them up mean -- dot, dot, dash.

Do you see that?

A. Yes.

Q. Brown: When he say it, it means, like, shooting somebody.

Do you see that?

A. Yes.

Q. Did you get cut off in your questioning there?

A. I believe so.

Q. Okay. And did Marcel Brown then pick up and answer that

Spizzirri - cross

1606

question?

A.   Yes.

Q.   Were you trying to provide an answer as to what fucking them up meant?

A.   No.

Q.   Okay.  I just have about five minutes left.

     Mr. Loevy put up a handwritten demonstrative.  Do you remember that?

A.   Yes.

Q.   Handwritten?  And I think, if my memory serves me right, he had one -- Number 1 being what R.J. said on the way to the park; right?

A.   Yes.

Q.   And then Number 2, he had up a box that said what R.J. said going away from the park; right?

A.   Correct.

Q.   And you said you had some confusion about the sequence of these events; right?

A.   Yes, I just -- I just found the questions with regard to that confused me a bit.

Q.   Okay.  I'm going to just try to flush that out.

     If you turn to page 315, specifically lines --

     Do we have 315 up, Maria?

     Specifically lines 11 on to page 316.

     Spizzirri:  Okay.  All right.  So in the car, in the

Spizzirri - cross

1607

car what's being said?

Brown:  TJ was trying to find the new CD he just bought on the glove -- in the armrest.  R.J., like, I'm getting tired of these "M" "Ns."

Okay.

We wasn't paying no attention.  He put the CD in and cut the radio up and we just driving.

Spizzirri:  Okay.  What else was he mumbling about back there?

Brown:  He was saying stuff, but I wasn't --

Spizzirri:  Okay.  Now, the car is not that big; right?

And then we go on, onto page 316.

Right, Maria?

And then you follow up on line 6.

Well, give me some of what he was saying.

Brown:  Well, okay.  I'm tired of these "Ns."

Okay.

And he said some more stuff after that.

Well, come on.  I know you know.

Do you see that?

A.  Yes.

Q.  That's on page 315 in the interrogation, and Marcel Brown is telling you what R.J. said on the way to the park?

A.  Yes.

Q.  Right?

A.  Yeah.

Q.  Later we go to page 324, and we go to lines 13, beginning on line 13.  Are you there?

A.  Yes.

Q.  Okay.  And it says, beginning on line 13, and I'm going to read to line 21.

Brown:  So I did a U-turn.  And, like, when we got, like, from the park, I asked him where he started shooting.  And he was putting a gun in his right pocket, like, they started shooting at me first.

Spizzirri:  Okay.

Mr. Brown:  And I'm -- he's, like, I'm going to fuck them "Ns" up tonight.

Do you see that?

A.  Yes.

Q.  That's later, speaking about something that R.J. said leaving the park; right?

A.  Yes.

Q.  Okay.  You never inserted the timing of these statements into your questioning; right?

A.  No.

Q.  These were separate statements that Marcel Brown was attributing to his cousin, both going to the park and then leaving the park.  Separate conversations; right?

Spizzirri - cross

1609

A.   Yeah.   When you read it and it's full of context, it becomes clear.

Q.   Okay.   Then when we turn to page 344, which is now later in your questioning, and specifically lines 2 to 6, you drill down on one of the conversations.

You say:  Okay.   In the car, though, he said, I'm going to fuck these "Ns" up.   Is that what he said, or did I get it wrong?

Brown:  I'm getting tired of these "Ns."   I'm going to fuck them up.

Do you see that?

A.   Yes.

Q.   You're drilling down, then.   You're not confusing the timing of these statements; right?

A.   Correct.

Q.   Okay.   Mr. Loevy asked you some very direct questions about, you know, did you make some untrue statements to Marcel Brown regarding, I think in one area that my notes indicate was the number of witnesses.   Do you remember that?

A.   Something to that effect, yes.

Q.   Yeah.   Did you go in there, or did you intentionally let him, Marcel Brown, to trick him to get him to say something?

A.   No.

Q.   I mean, you as a prosecutor, it's legal to lie to a suspect to get them to say something; right?

Spizzirri - cross

1610

A. It is.

Q. But you didn't go in there as a tactic to do that; right?

A. No.

Q. All right. During your entire questioning of Marcel Brown, were you trying to play him?

A. Was I trying to what?

Q. Trying to play him, trick him.

A. No. No.

Q. Were you trying to overcome his free will?

A. No.

Q. Did you believe at any point you inserted your version of the events into his head?

A. No.

Q. Do you believe you coerced any statements out of Marcel Brown in any way?

A. No.

Q. Do you believe, as you sit here today, that Marcel Brown's statements were voluntary?

A. Yes.

Q. It's all on tape?

A. Yes.

Q. You never threatened Marcel Brown; right?

A. No.

Q. Did you ever see any detective threaten Marcel Brown?

A. No.

Spizzirri - cross

1611

Q.   Marcel Brown did get emotional at one point?

A.   He did.

Q.   And when he was getting emotional, did you believe you're overcoming his will at that point?

A.   No, I thought it was an appropriate emotion to have, given the setting and context of what was going on.

Q.   When he was getting emotional, did you believe it influenced your evaluation of the voluntariness of his statements to you?

A.   No.

Q.   Could you explain a little more what you mean by that answer?

A.   To me, in looking at voluntariness, you're assessing, is this person giving this statement, are they telling you what happened because that's what happened.  Because they're -- they're voluntarily, willfully, talking to you.

        The fact that there's tears surrounding an event, that has consequences all the way around, with his family, with his cousin, with himself.  The fact that he is in custody.  It's -- it's emotional.  It's upsetting.  Of course it is.  I didn't think that was an inappropriate reaction, such that he wasn't being voluntary with me.  I don't know what other word to use. But I didn't see it as his will was overborne or this was a product of coercion.  He was appropriately expressing emotion that was relative to the entire situation.

Spizzirri - cross

1612

Q. Okay. Last area. If I heard your testimony earlier, it's the Cook County State's Attorney's office that makes the decision to charge Marcel Brown; right?

A. Yes.

Q. And I know you have the felony review folder up there. On page 4, it does show that, as you described earlier, Fabio?

A. Yes.

Q. And so that would be who you believe was either the trial sup or the deputy in felony review who approved murder charges?

A. That's who -- yes, who -- I believe, based on the way we did things and the note here, that that is who was contacted.

Q. Okay. And so, I just want to make sure this is clear. There is a difference between being arrested; right?

A. Arrested and what?

Q. And charged.

A. Yes.

Q. You're right.

A. Yes, there's a difference.

Q. There is a difference between arrested and charged; right?

A. There is.

Q. Arrested, the detectives can do; right?

A. Yes.

Q. And -- but they -- detectives can't charge somebody.

Let me say that differently.

Detectives can't charge a murder case?

Spizzirri - cross

1613

A.   No.   There -- there is an agreement, understanding, protocol, whatever you want to label it as, that when the detectives are seeking homicide charges, they consult the state's attorney's office for approval or rejection of those charges.

Q.   Okay.  And -- and in your experience, as a felony review person and a long-time prosecutor, would it be fair to say that before the state's attorney's office decides to charge them, they would consider all the evidence available to them?

A.   Of course.

Q.   They don't have tunnel vision and just look at one little piece of evidence; right?

A.   Not when you're reviewing it for charges, no.

Q.   They would look at witness statements?

A.   Yes.

Q.   They would look at forensic evidence?

A.   Yes.

Q.   Any confessions or admissions made?

A.   Yes.

Q.   And the circumstances surrounding those confessions and/or admissions?

A.   Yes.

Q.   Mr. Loevy asked you about the interrogation length, and there was a question about on, and on, and on.  Do you remember that questioning?

A.   Yes.

Q.   I mean, that's not true; right?  You can't go on, and on, and on; right?

A.   Right.

Q.   Got to cut it at 48 hours?  Cut --

          MR. LOEVY:  Objection, your Honor.  That was the law issue we were talking about.

          MR. GIBBONS:  Well, this has come out through the witness.

          THE COURT:  It has come out a couple of times.  So, sustained.  I'm sorry.  I'm sorry.  The objection is overruled.  I apologize.  The objection is overruled.  You can answer.

BY MR. GIBBONS:

Q.   I don't want to belabor it, but you have to make a decision in 48 hours; right?

A.   Correct.

Q.   So it cannot go on, and on, and on?

A.   Correct.

Q.   Okay.

          MR. GIBBONS:  I've got nothing else, your Honor.

          THE COURT:  All right.  Mr. Loevy, about how long?

          MR. LOEVY:  I would say 15 minutes.

          THE COURT:  Okay.  We're going to get to -- we'll do your 15 minutes, and then we'll take our afternoon break.

                         REDIRECT EXAMINATION

BY MR. LOEVY:

Q. All right. You just told Mr. Gibbons it can't go on, and on, and on because, at 48 hours, he's got to see a judge; right?

A. That's correct.

Q. Of course, Marcel didn't know that at the time; right?

A. I don't know.

Q. Well, you have a videotape of every interaction with him, and nobody explained that to Marcel; right?

A. No one explained that to him.

Q. But you knew you guys were on the clock, you had about 15 more hours until you had to release him because you didn't have any evidence; right?

A. I wasn't on a clock. But I know that 48 hours is the rule before he has to go to the judge.

Q. Backing up, I think you said you're from the River Forest community. That's where you guys live?

A. For a brief time I lived in River Forest, yes.

Q. Oh, you don't live there now?

A. Well, I grew up in River Grove, moved to River Forest at the early part of my marriage, and then moved to Elmhurst.

Q. Because of all the coincidences, that would have put your children and Marcel at the same high school, Oak Park/River Forest. It's one high school; right?

A. Um, I didn't have -- my daughter was just born when we were

in River Forest.

Q.   No, I understand.  But that was the same --

A.   Oh, area.

Q.   Yeah.

A.   My kids went to private school, but, yeah, it would have been -- yes.

Q.   All right.  And you said -- you told Mr. Gibbons you've had experience with juveniles in the course of your lawyer duties; right?

A.   Yes.

Q.   Juveniles are different than adults; right?

A.   Yes.

Q.   Just because you have your 18th birthday doesn't -- you're not required to forget that the person was formerly a juvenile; right?

A.   When I'm in the role of my prosecutor job, I am acting in accordance with Illinois law.  And Illinois law sees 18 years as adults.  And that is the rights that he was advised of.

Q.   All right.  But he had -- you had the discretion to treat him as a few months past his birthday, if you wanted to; right? You could have treated him differently than you did a 30-year-old, hardened gang member; right?

A.   My evaluation of voluntariness is the same, regardless of age.

Q.   Fair enough.

You told Mr. Gibbons about handwritten statements, and you explained that, when you're dealing with the Chicago Police Department, you like to get it in writing that they weren't coerced, they weren't threatened, they weren't beaten. Why did you want to get that all in writing?

A. Because it's an acknowledgment by the individual that that didn't happen outside of the presence of the police.

Q. Because otherwise, people would say when they interacted with the Chicago Police Department that they were coerced, they were threatened, and they were beaten if you didn't lock them in writing that they didn't say those things?

A. Sometimes, unfortunately, they do say that.

Q. All right. You said that you do that because you don't want the detective interjecting. You want them outside the presence of the detective; right?

A. For that particular subject, correct.

Q. Right. Because if the detective's there, they can interject; right?

A. Possibly, sure.

Q. And we've already established, Marcel did not get that opportunity to talk to you without the detective interjecting. Right?

A. He did not.

Q. For example, the time Mancuso interjected was when Marcel tried to say: Hey, you told me if I told the truth I could go

Spizzirri - redirect

1618

home, and then he interjected.  Right?

A.  He was setting the record straight, in my opinion.

Q.  Right.  So if he hadn't been there, Marcel might have been able to explain to you:  Look, these guys really gave me the impression if I told you the truth I could go home.  That would have happened if you had said it outside the presence of the police officer; correct?

A.  And I would have gone back and reviewed the video to see if that was true.

Q.  All right.  Let's talk about the interrogation.  He asked you about your first impression.  Fair to say your first impression of Marcel was a scared, deferential, polite child.  Would you agree?

A.  I would agree with polite.

Q.  You didn't see him as scared and deferential?

A.  Not initially when I came in.

Q.  You just looked at that boy and you said, that's a gang member; right?

A.  I did not think that either.

Q.  You didn't see just a nice kid who went to Oak Park/River Forest?

A.  He was polite when I came in.  And he was polite for the entirety of the interview, quite honestly.  There was no issue whatsoever with his demeanor and being rude, or -- you know, he was friendly.  He was nice.

Q.   You were asked about red flags, or you would have asked about them.  Of course, you knew from logging and burning that he had been in there for 31 hours, he had only eaten one meal, and he hadn't slept.  Right?  Those were red flags.

A.   I thought he did sleep for a number of hours.

Q.   All right.  Well, if you were -- you did review the tape, though; right?

A.   Right, I'm -- I'm talking about my independent recollection now.  I would have looked at that.  And as I independently recall, I believe there were a number of hours that he slept.

Q.   And I think -- maybe I asked you, but if you had learned that he had been up all night, and now here you are on the second night, you wouldn't have done anything different any ways, what you told us?

MR. GIBBONS:  Objection.  Assumes facts not in evidence.

THE COURT:  Overruled.  She can answer.

BY THE WITNESS:

A.   It would have depended on the impact that the lack of sleep had on him.  That would be one factor to consider, yes.

BY MR. LOEVY:

Q.   All right.  You were asked about whether you thought -- there's no doubt in your mind Marcel understood his rights.  Do you remember that, Mr. Gibbons asking you that?

A.   Yes, sir.

Spizzirri - redirect

1620

Q.   Of course, if he understood his rights, he could have said to you:  Ms. Spizzirri, you know, all things being equal, I'd prefer not to talk to you?

A.   He could have.

Q.   He could have.  But you believe he understood that?

A.   Yes.

Q.   And you believe he understood that if he wanted to have a lawyer present, all he had to do was ask and he could have a lawyer present?

A.   That's correct.

Q.   And he, nonetheless, said to you:  I want to tell you the truth.  I want to tell you what I know.  Right?

A.   He said he wanted to talk to me.

Q.   And we've already established that you understood that he had been led to believe that convincing you that he was telling the truth was his ticket out of the room; correct?

A.   That's not what I said.

Q.   You were asked about whether McDonald, on page 18 of that transcript, explained the law to Mr. Brown.  Do you remember counsel asking you about that?

A.   Yes.

Q.   Now, would you agree with me that Marcel, his understanding of legal concepts was probably pretty limited?

A.   I can't answer that.

Q.   Well, you interacted with him; right?

A.   I did.

Q.   All right.  He didn't have a lawyer with him; right?

A.   He did not.

Q.   Would you agree with me that, when Mr. McDonald was sort of barking at him legal accomplice liability, that's not a substitute for having his own lawyer.  Do we agree?

        MR. GIBBONS:  Objection.  Form of the question.  Argumentative.

        THE COURT:  Sustained.  Rephrase the question.

BY MR. LOEVY:

Q.   You could see that Marcel was having trouble with concepts; right?

A.   I didn't think so.  No.

Q.   Do you remember when you said to him:  Marcel, I think you had that realization in the car.  And you said:  Marcel, do you know what realization means?

        Do you remember asking him that question?

A.   I don't know if I asked what does realization mean.  If it's in the video, counsel --

Q.   Which it is.

A.   -- I'll agree with you.  Okay, then I did.  I don't recall that, but, okay.

Q.   This is a boy that you said:  Marcel, you know, I think in the car you had a realization.  Marcel, do you know what a realization is?

That's how you were treating Marcel Brown; right?

A.   I was treating him respectfully.

Q.   But you didn't have any reason to believe he had any idea what was going on about his legal liability; did you?

A.   With all due respect, counsel, I've talked to individuals much younger than him that know as much about the law as I do.

Q.   All right.  Marcel didn't; did he?

A.   I don't know what he knew.

Q.   All right.  Let's play 210, please, on the interrogation.

    (Said video clip displayed in open court.)

BY MR. LOEVY:

Q.   All right.  Do you have any reason to disagree with him?

A.   To disagree with Mr. Brown?

Q.   Yeah.  Mr. Brown is having to think fast, and Mancuso apparently had a question.  It's ambiguous; right?

A.   I'm not trying to be difficult.  I don't understand your question.  Can you just ask me differently?

Q.   Sure.  Mr. Brown said to you, directly.

A.   Yes.

Q.   You said to him:  Listen, you think I'm trying to make you say something?  And he said:  Yes.

    Right?  He said --

A.   He didn't say:  Yes.  He said:  About the gun.

Q.   Yeah, he said, yeah, I do think you're trying to make me say about the gun.  And then he explained to you in English:  I

Spizzirri - redirect

1623

feel like what you're saying to me is, if I admit my cousin had a gun, I can go home. But I didn't know he had a gun, and that's why I'm feeling all this angst.

That's what's going on; right?

A. Well, those are your words. But I stopped him, and I made it very clear to him that what he said wasn't going to either keep him locked up or send him home. I just wanted to know what happened.

Q. You just wanted the truth; right?

A. That's right.

Q. And then the very next sentence you told him what the truth was; right?

A. I didn't tell him what the truth was.

Q. Actually, yes. You said: Marcel, I think you had a gun.

A. I -- I think you did. I think you did. He could correct me at any time on any level, and I gave him ample opportunity to do so.

Q. But if he wants to get out of that room, he's got to start telling the truth, as you define it?

MR. GIBBONS: Objection. Asked and answered. We've --

MR. LOEVY: I've move on, your Honor.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. You were asked by Mr. Gibbons about whether he

said that in the back seat R.J. was saying that he was tired of those "N words" and who said it first. Do you remember that?

A.   Yes.

Q.   Okay. Showing you page 209. If we could have the document camera.

There were -- some times when Brown told the story, he said: I'm just finna to go park -- to the park, see what's up with my sister. They, like, I'm coming. We get in the car. Listen to music. We drive up. Before I can, like, park --

And then, you know, then they're going into the park.

Sometimes when he's telling the story, he's, like, we're just in the car; right?

A.   Yes.

Q.   And sometimes he started conforming to the police version that R.J. was in that backseat getting angrier and angrier; right?

A.   You're characterizing it differently than I would.

Q.   All right. You said that he started lying about Day-Day. That was your words to Mr. Gibbons, that he was lying; right?

A.   Right.

Q.   You don't know if Day-Day was shooting in the park; correct? You don't know. You weren't there. Can you agree with me?

A.   Well, I wasn't, but the witnesses who talked to the police were. And I don't think anybody else ever said that.

Q.   Actually, you weren't even in court when we went through it.  Nobody is saying, either way -- you know, let's just say I'm you.  You don't know if Day-Day was shooting in the park; right?

Look, R.J. was saying Day-Day was shooting in the park; right?

A.   Right.

Q.   T.J. was saying R.J. was shooting in the park; right?

A.   Right.

Q.   Cierra was saying Day-Day was shooting in the park, or somebody was shooting in the park?

Taneshia was saying somebody was shooting in the park.

So you can't say witnesses are saying.  I'm just asking you.

A.   My review of what I knew when I talked to him was not that anybody else saw Day-Day shooting.

Q.   I'm asking a different question.

A.   Was I there?  No, I wasn't there.  I don't know if Day-Day really, in fact, was there shooting.

Q.   That's all I am asking.

A.   Okay.

Q.   So you don't know if Day-Day was there shooting.

A.   I don't know if Day-Day was shooting.

Q.   Now, you know Mr. Brown has told two stories.  The first time he got there, he said there was two people shooting.  And

then after a while, he said, all right, only R.J. was shooting.
Those are different stories; right?

A.   Well, that was one of the different stories.

Q.   Right.  So you don't know if the first story he told was true, that there was two people shooting, or the second story he told after hours in there with the police was true.  You don't know which one's true; correct?  You don't know.  You weren't there.

A.   No, I wasn't there.

Q.   So you don't know.  And you don't know if it was the police who got him off of there were two shooters by telling him, oh, all the witnesses are saying one shooter, you're not going to be believed if you say there was two shooters.  You don't know which story was true; right?

A.   Counsel, I don't even know what you asked me.  I'm sorry.

Q.   Why do you think that Eddie Cane -- he lied about Eddie Cane.  I didn't understand that.  What lie did he tell about Eddie Cane?

        Mr. Gibbons was asking those leading questions, and you said, yeah, he lied about Eddie Cane.  What did he lie about?

A.   The conversations that there were about Eddie Cane being there I thought were surrounding the fact why he didn't call him and handle it on the phone.

Q.   No, but you told Mr. Gibbons that Mr. Brown was lying about

Eddie Cane.  And you said, yeah --

A.   I'd have to go back and review specifically where he said that.

Q.   No, I'm asking about the testimony you gave 15 minutes ago. You said -- you said --

MR. GIBBONS:  Your Honor, if this is a trap, then there's a transcript in front of her in which Mr. Brown admits lie --

MR. LOEVY:  Oh, he's going to tell him?  He just told him.

MR. GIBBONS:  She can just use the transcript.  That's the fair thing to do.

MR. LOEVY:  He just told her the answer, your Honor.

THE COURT:  Okay.  To the extent that that was an objection, it's sustained.

Mr. Loevy, either ask another question because the witness has answered that she does not know what you're referring to.  And you're at -- you're about at 15 minutes, so.

MR. LOEVY:  All right.  I will --

THE COURT:  Thank you.

MR. LOEVY:  -- move toward the end here.

BY MR. LOEVY:

Q.   You said he had no credibility in your eyes.  Did you judge him as guilty because he had no credibility?

A.   I didn't say no credibility.  I said it was a -- it was

problematic for me that we were starting off knowing that he was being untruthful about things and gave reasons why he was being untruthful. And that concerned me.

Q. All right. You said to Mr. Gibbons that lying was not a tactic. But you did lie, correct, about R.J. and T.J.?

A. I think those were hypothetical questions. I didn't come out and say I spoke to him and he said this. I said, what if they were saying. What if he said.

Q. All right. I'm not going to go through the business about: Where did he say F 'em up, in the back seat, or on the way there, on the way back. But let me just ask you one sum-up question. It's really confusing who's saying what, when about F them up; right?

A. When we do it like this, and go back and forth, yes. When we were engaged in conversation and we're talking sequentially and flowing, no.

Q. Wasn't it confusing when Mr. Gibbons did it with you, too?

A. No. And I -- when I --

Q. That's the answer, then. When Mr. Gibbons went through it, it made total sense to you, then?

A. If there was a question Mr. Gibbons asked --

MR. GIBBONS: Objection. Argumentative.

BY THE WITNESS:

A. I asked him to re-ask it if I didn't understand it. I think that happened two or three times, counsel.

Spizzirri - redirect

1629

BY MR. LOEVY:

Q.   Last question on this topic.

        If I may, your Honor?

        THE COURT:  Yes.  But for completeness of the record, the objection is sustained.

        You can ask your last question.

BY MR. LOEVY:

Q.   If that was, in fact, supposedly Marcel Brown's huge conviction -- confession, the business about mess him up and, you know, I'm going to "F" up those "N words," that's a pretty weak confession; isn't it?

        MR. GIBBONS:  Objection.  Argumentative.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  You were asked by Mr. Gibbons what you were trying to do in there.  And this is my last area, but, can you acknowledge, you were trying to get Mr. Brown to incriminate himself?

A.   That is not --

        MR. GIBBONS:  Objection.

BY THE WITNESS:

A.   -- true.

        MR. GIBBONS:  Asked and answered.  Argumentative.

        THE COURT:  Sustained.

        MR. LOEVY:  All right.  I have no further questions,

your Honor.

THE COURT: All right. Thank you.

MR. GIBBONS: Your Honor, I just have two questions.

THE COURT: Okay. And then we'll take our break. And I'm going to just hold you to --

MR. GIBBONS: Maybe one question.

RECROSS EXAMINATION

BY MR. GIBBONS:

Q. If during the log and burn that we've been talking about you or any member of your felony review team had seen something inappropriate happen, would you have done something about it?

A. Yes.

MR. GIBBONS: Nothing further.

THE COURT: All right. Thank you. The witness is excused.

THE WITNESS: Thank you.

THE COURT: All right. Ladies and gentlemen, we're going to take a 20-minute break so that I can resolve a couple of things with the lawyers. Please don't discuss the case. We'll be ready to start at -- it's about 3:10, so be ready to start at about 3:30. All rise.

(Jury out at 3:07 p.m.)

THE COURT: All right. You may be seated.

Ms. Spizzirri, you are excused.

(Witness excused.)

THE COURT: We're going to let the court reporters switch, so we'll take -- have the lawyers take their 10-minute break now, and we will resume in 10 minutes to iron out all that needs to be ironed out. So I'll see you in 10 minutes.

(Recess taken.)

THE COURT: All right. We're back on the record, and I appreciate that you didn't get as long of a break as you might otherwise have wanted, but I think there were a couple of things I'd like to sort out before we get the jury back in here. In no particular order, the hearsay instruction, the limiting instruction on hearsay, where do we stand on that.

MR. GIBBONS: Your Honor, if I may, Mr. Flynn is still using the facilities.

THE COURT: Okay. Okay. No problem. Should we wait for him for all of these matters, which is fine? I just want to know if it's better to wait for him. It's okay if that's the case. Oh, here he comes. I saw him in the hallway.

(Brief pause.)

THE COURT: All right. Okay. In no particular order, let's just talk through a couple of the topics we need to resolve before we bring in the jury. Hearsay, the limiting instruction on hearsay, are we in agreement on that, or are there some matters that I need to --

MR. LOEVY: We still haven't heard from the defendants, Your Honor. I think you should just give the

Spizzirri - recross

1632

instruction you see fit at this point.

MR. FLYNN: Your Honor, the hearsay instruction that we proposed to Your Honor is the one we'd like to use. Our Wi-Fi went down, so it's an issue that I'm having right now.

THE COURT: Okay. You are correct. The last time we touched on this issue, you had proposed some different language, so I think actually the question should be what is Mr. Loevy's response to that. Otherwise --

MR. KAYES: So, Your Honor, I think the primary problem with their instruction is this. You know, the statements by witnesses to the detectives are for what the detectives knew, and that "knew" makes it sound like these are facts and they're the truth. And I think the language we proposed to you is a little bit more conventional about how the hearsay is described.

I do want to correct the record. The last sentence is not in the current pattern, although I swear I had some memory that we had that sentence on there. I think I do want to say it is particularly important in this case because we're very concerned that in closing the defense is going to come up and say a bunch of things are true that were only ever said as not-for-the-truth hearsay, because a lot of their main themes in the case are supported by things that have only come in not for their truth, for example, you know, the gang crew stuff, how many people saw what, that kind of thing.

THE COURT: Okay. Can someone remind me -- and it's just because we have a different reporter in now -- what the defendants' proposal was? I apologize that I don't have it in front of me, but you can just even read it.

MR. FLYNN: Yes.

THE COURT: Thank you.

MR. FLYNN: You have heard evidence concerning witness statements that were given to the detectives in connection with their investigation of the murder of Paris Jackson. These witness statements are to be considered by you for the purpose of understanding what the detectives knew throughout the course of their investigation and for no other purpose.

THE COURT: Okay. That's the instruction I will give, and I'll give it when the jury steps back in.

MR. LOEVY: Would you consider the word "knew" there because "knew" assumes its own conclusion. You know, "claimed to know" or "claimed to have been told"?

MR. KAYES: Or "heard."

MR. LOEVY: Or "heard" or "claimed to have heard." I mean, "knew" establishes it as fact.

MR. FLYNN: It's their state of mind, Your Honor, so it's what they know.

THE COURT: It's what they know.

MR. LOEVY: But we dispute that they knew it.

THE COURT: I understand, but --

MR. FLYNN: What do you mean by that, you dispute that they knew?

MR. LOEVY: We have no reason to accept a single word they've said as truth.

MR. FLYNN: The witnesses said?

MR. LOEVY: Right, because the witnesses aren't here. It's hearsay. The officers claim -- for all we know, those witnesses could all be mice.

THE COURT: Okay. We could do this for hours. The instruction will be what Mr. Flynn just read. That is -- and I apologize just because we're doing realtime here. Can you give it to me? You probably don't have it in writing, so give it to me one more time, Mr. Flynn --

MR. FLYNN: Sure.

THE COURT: -- just so that I have a way to be able to read it accurately to the jury.

MR. FLYNN: You have heard evidence concerning witness statements that were given to the detectives in connection with their investigation of the murder of Paris Jackson.

THE COURT: Okay.

MR. FLYNN: These witness statements are to be considered by you for the purpose of understanding what the detectives knew throughout the course of their investigation and for no other purpose.

THE COURT: Okay. Thank you.

MR. KAYES: Your Honor, I'm sorry. One thing. "That are to be considered"? I think in the pattern it should be "may."

THE COURT: "May."

MR. KAYES: "May be considered."

THE COURT: "May."

MR. FLYNN: Sure.

THE COURT: All right. That's how we will handle the instruction.

All right. The judicial notice issue, have the parties made any headway on where we'll resolve that question? There was some back-and-forth on who was going to call who and what and that kind of thing.

MR. FLYNN: Mr. Loevy and I have discussed this, and we're also trying to potentially not call Karen Kerbis if we can get away with it. I've put together a draft of five stipulations I haven't shared with Mr. Loevy, but I'll share it tonight.

THE COURT: Okay.

MR. FLYNN: It includes the stipulation that they want regarding the police report being read into evidence, but then it would also include other events that occurred at the criminal trial.

THE COURT: Okay.

MR. LOEVY: Let's cross our fingers that we can get

Spizzirri - recross

1636

that done by agreement, Your Honor.

THE COURT: Fair enough, and we'll cross that bridge if we need to get to it and put a pin in it.

MR. LOEVY: So the big one, Your Honor, is what we're going to tell that juror who wants to know where we are.

THE COURT: Right.

MR. LOEVY: I can apprise you from our side.

THE COURT: Yes.

MR. LOEVY: We are going to switch it up and call Debra given the timing. I agree that this trial hasn't always gone as fast as we had hoped in places. So that will leave -- hopefully we'll finish Debra in an hour and 15 minutes. That's Marcel's mother. Then in the morning, our leadoff witness would be Cutler. We have Heidemann, Marcel for some brief rebuttal, Aunt Felicia, and McHugh that we could call if we're not going to finish this week, but we are at the moment where the defendants told us they would see if we could finish the trial tomorrow, in which case we would cut everybody. But that is going to mean that they finally put their cards on the table about who their witnesses are tomorrow.

MR. FLYNN: Your Honor, when we discussed this over the weekend, they were going to rest today. That's not happening. I'll say that first. Second, we never agreed that we would fit our case all in one day.

MR. LOEVY: I didn't say that.

Spizzirri - recross

1637

MR. FLYNN:  We said it's possible.

MR. LOEVY:  Right.

MR. FLYNN:  Based on everything I know standing here, I don't think we're closing on Friday.  I know we all want to go home and be done with this, but I do think closings are going to go into Monday.

MR. LOEVY:  Your Honor, there's more to it than that because I think partly what's motivating the defendants is, well, maybe we can take a few more days for Ocampo, maybe we can find a witness, and as Mr. Flynn disclosed in our discussions, he said there's other considerations there.  Well, we're finally at the point that they have to tell us who their witnesses are, and they don't have enough witnesses to fill up even half a day.

MR. GIBBONS:  Your Honor, here's the problem.  It works fine when you have an agreement to disclose your witnesses the next day when you're the plaintiff because you've got it down.  What we would need to disclose our witnesses is a representation in open court on the record that these are the only witnesses they're calling, because what's going to happen as soon as we disclose our witnesses, they're going to have a lightning bolt and they're going to say:  You know what?  We're going to call these witnesses to get ahead of the defense witnesses.

That's not the way it works.  Mr. Loevy can try his

case any way he wants. We're going to try our case based on when they say they rest, we're going to tactically figure out how we best respond to their case. That hasn't happened yet. With all due respect, I don't have any problem disclosing the witnesses at some point, but I have an open mind right now.

MR. LOEVY: Your Honor --

MR. FLYNN: We probably disagree on where this case is sitting, you know, but if they tell us with certainty who their witnesses are, right now I just heard him say: Yeah, we may call Heidemann. We may call Felicia. We may put Marcel on for more testimony.

You know, that's just too much of a moving target right now.

MR. LOEVY: You know, that's irritating, if I can use the word "irritating," because every day you asked us who are the witnesses tomorrow and we told them so that we could prepare. It's their turn.

THE COURT: Okay. Here's where we are because I'm -- as I know you are, I'm primarily concerned with giving the jury a reasonable estimate of the timing. We're going to put Ms. Scott on today. Cutner is the witness for tomorrow?

MR. LOEVY: Cutler.

THE COURT: Cutler. I'm sorry. Cutler. I can't read my own writing.

MR. LOEVY: And that's a 45-minute witness, Your

Honor.

THE COURT:  Do you intend to rest after Cutler?

MR. LOEVY:  No, we intend to call Marcel for five minutes.

THE COURT:  Okay.

MR. LOEVY:  We intend to call Aunt Felicia for ten minutes.

THE COURT:  Okay.

MR. LOEVY:  Then McHugh for five minutes, and then we're hopeful that we're going to stip out Kerbis and Heidemann and the witness that Mr. Flynn -- he's talking about the medical examiner.  I can't imagine we're not going to be able to figure out a stipulation on the medical examiner.  So we'll be done by mid-morning tomorrow, and then we will rest, Your Honor.

THE COURT:  Okay.

MR. LOEVY:  And I'll also say we will cut all these witnesses if they decide to enter an agreement to finish tomorrow.  That's up to them completely.

MR. FLYNN:  Which we're not going to do.

MR. LOEVY:  Okay.

MR. GIBBONS:  Your Honor, could I just be heard on one thing?  We all heard Marcel Brown is getting back on the stand.  Under what rules is he doing that?

MR. LOEVY:  Rebuttal.

Spizzirri - recross

1640

MR. GIBBONS: They can call him as a rebuttal witness --

MR. LOEVY: Yeah.

MR. GIBBONS: -- once we're finished. We get to put on our case, and then their rebuttal case starts. This is not let's get Marcel up there to comment on our case right now which hasn't been put on. That's way out of order.

MR. LOEVY: Your Honor, it's rebuttal. They've put their case on in our case. We're ambivalent if Marcel goes last, Your Honor, but we don't want to waive rebuttal because frankly I thought they'd argue it the other way, that it's too late to bring up things.

MR. GIBBONS: Let us put on our case. Then if they want to put on a rebuttal case, they have that right.

MR. LOEVY: We're okay with that, Your Honor.

THE COURT: Okay, fine. Okay. So depending on how the parties work out some of this information this evening and even into tomorrow, I'm just doing the numbers based on straight math and hours in the day. Plaintiff's case will take until midday tomorrow under ideal circumstances. You may stipulate some of that away; you may not.

Defense has said, and I don't anticipate this will change, although I understand that it's just your preliminary view, that Cichon -- I'm not going to pronounce it right, Cichon. Who's your expert?

Spizzirri - recross

1641

MR. FLYNN:  Cichon.

THE COURT:  Close.  Cichon is your expert.  Will that person be here and ready to go tomorrow?

MR. FLYNN:  So he is ready to go.  He was ready to go today.  He's ready to go tomorrow.  However, he has a hard stop at noon.  He's accepting some lifetime achievement award.  So we're hoping if the case is still going maybe we could slide him in at 11:00, something like that.

MR. LOEVY:  You know, as long as that's legit, because it's a little skeptical that they want their guy to go right after our guy.  I mean, that's a little scary.

MR. FLYNN:  What do you mean "your guy"?  No, Cichon is not a --

MR. LOEVY:  Oh, I stand corrected.

MR. FLYNN:  Cichon is the blood guy.

MR. LOEVY:  Yeah, we will accommodate that.

THE COURT:  Okay.  So all right.  So then whatever the order is in light of witness need, et cetera, will you have -- will the defense have your next set of witnesses to fill the afternoon?

MR. FLYNN:  Yes.

THE COURT:  That's really the $10,000 question, and I mean that.  Not that you would say anything to skirt one way or the other, but like I genuinely need to know:  Do you have witnesses who will be lined up to be called tomorrow in the

afternoon?

MR. FLYNN: We do.

THE COURT: Okay. So based on that representation, all I can tell the jury now is that we intend to wrap up the case on Friday and that odds are the closing arguments will be Monday, and if we can get it done sooner, we will get it done sooner. I am not going to tell this jury, who have been sitting here patiently for a day and a half, that we're going to close or we anticipate closing on Friday, and then say to them on Friday: Just kidding. We can't get it done.

MR. LOEVY: That makes perfect sense. We don't have an issue.

THE COURT: I would rather tell them: Surprise. The parties have done some really hard work to get things done quicker, and we're ready to get it done quicker.

MR. GIBBONS: Yeah, I agree with all of that. You know, we've got a jury conference that's going to be --

THE COURT: Right.

MR. GIBBONS: You know, I suspect we're going to wrap up evidence Friday morning. We can get to the jury conference and bang that out the right way. The jury can go home early on Friday. We argue on Monday, deliberate afternoon. I mean, it seems like a very cogent, proper way to do this.

MR. LOEVY: Your Honor, the only thing that we're concerned about is if they don't have witnesses for Thursday

afternoon.  If they don't have witnesses, they have to close.

THE COURT:  Yes, and that's a fair sort of footnote to all of this.  If it turns out that there aren't witnesses to fill the afternoon, tomorrow afternoon, then we're going to have the jury instructions conference tomorrow afternoon and move forward with the case like that.  Based on everything you've told me, I don't expect that that will be the case, but if it turns out that, you know, it's this time tomorrow and you're out of witnesses, then we're going to move to the jury instructions conference even if we have to take a break to let everybody get to separate corners and be ready and spill over into the, you know, early evening so that we can get it done. That will just be where we are.

MR. LOEVY:  So they would close their case then if they run out of witnesses.

THE COURT:  Yes.  I mean, yes, that's exactly what I'm getting at.  If you don't have witnesses that you're ready to call on Thursday, we're going to move to the jury instructions conference.

MR. LOEVY:  Okay.

THE COURT:  I'm trying to move things along as efficiently as I can, giving the parties the latitude they need, but if we're out of witnesses, the jury is going home and we're doing the jury instructions conference.

MR. LOEVY:  Thank you, Your Honor.

Spizzirri - recross

1644

THE COURT: Okay.

MR. GIBBONS: Your Honor, you know, one thing we haven't talked about is the Ocampo issue.

THE COURT: Right.

MR. GIBBONS: It could be, you know, one to three hours depending on where this goes.

THE COURT: Right.

MR. GIBBONS: We'll give the Court, obviously, a report on what our investigators found, but I don't know the report yet.

MR. FLYNN: No contact as of yet.

THE COURT: Yes, and I'm not surprised. We'll see where we are with her tomorrow morning. If she shows, we'll all be here, so if she shows at 9:00, if she shows at 9:15, if she shows at 10:00. If she doesn't show at all, we'll make the appropriate record and see where we are and take it from there. Just update me on the record as you know more and there is more to update.

MR. LOEVY: And we'll wait another hour and 15 minutes for them to disclose their witnesses because we don't want to feel like chumps, that we've been telling them every day and then they're not going to tell us.

MR. FLYNN: Once we know who their last witnesses are, which I'm still unclear on, we will tell them our witnesses.

THE COURT: Okay. All right.

MR. GIBBONS: Your Honor, I just want -- if we tell him our witnesses, the next thing I know they're calling them in their case in chief. That's a complete sandbag. I'm not going to agree to that without a representation that that's not going to occur.

THE COURT: I think we've settled the matter for purposes of letting the jury know. We'll have a few minutes at the end of the day today, and you all have time to caucus and figure out where you are. It does feel like a moving target. So I'm interested in giving you all as much time with the witnesses as I can. So I'm going to read that hearsay instruction, the limiting instruction, I'll provide the jury with the estimate that we think we're going to close on Monday, and we'll see where we are from there. All right?

MR. FLYNN: Thank you, Your Honor.

MR. GIBBONS: Thank you, Your Honor.

MR. LOEVY: Thank you.

MR. BOWMAN: Thank you, Your Honor.

(Discussion off the record.)

THE COURT: All rise.

(Jury in at 3:35 p.m.)

THE COURT: All right. Please be seated.

All right. Ladies and gentlemen, I have a couple of matters to raise with you before we begin with our next witness. We received a note about timing, and I just want to

Spizzirri - recross

1646

tell you our best estimate of where we are now. I anticipate that the evidence in the case will take through the end of the week, that the evidence will not conclude likely until Friday, and that will lead to opening -- to closing arguments, excuse me, on Monday. That is an estimate. As I indicated to you at the very beginning of the case, there's always a possibility that things will conclude sooner. But our best estimate right now is that the evidence will proceed through the end of the week and that the closing arguments will be on Monday, at which point the case will be yours to deliberate. So that's the information that I can provide you now on that topic.

I know one of the jurors passed a note about another topic which we'll be in a position to address tomorrow and later in the course of the trial. I wish I could give you quicker answers to all your questions in a faster way, but I can't always do that because it's important that I consult with the parties before providing information to you.

Okay. Before we swear in the next witness, let me just give you one additional instruction. You have heard evidence concerning witness statements that were given to the detectives in connection with their investigation of the murder of Paris Jackson. The witness statements may be considered by you for the purpose of understanding what the detectives knew throughout the course of their investigation and for no other purpose.

All right.  With that, I will ask the witness in the witness box to please stand and raise your right hand.  Is it Scott?  Is your last name Scott?

THE WITNESS:  Yes.

THE COURT:  All right.  Please raise your right hand, and I'll ask my clerk to swear you in.

THE CLERK:  Could you please state your name for the record?

THE WITNESS:  Debra Scott.

(Witness duly sworn.)

THE CLERK:  You have been sworn, and you may be seated.

THE WITNESS:  Thank you.

THE COURT:  All right.  Mr. Bowman, you may begin your examination.

MR. BOWMAN:  Thank you, Judge.

DEBRA SCOTT, PLAINTIFF'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. BOWMAN:

Q.  Ms. Scott, could you tell us your name one more time, please, so everyone has it?

A.  Debra Scott.

Q.  And, Ms. Scott, do you recognize this gentleman seated right here behind me (indicating)?

A.  Yes.

Scott - direct

1648

Q.  Who is that?

A.  Marcel Brown.

Q.  And what relation is he to you?

A.  My son.

Q.  Ms. Scott, where do you live?

A.  246 Englewood Avenue.

Q.  Is that in Bellwood?

A.  Yes.

Q.  And as a youngster coming up in Chicago, where did you live?

A.  1347 Parkside.

Q.  And did you live on other -- at other addresses on the West Side of Chicago?

A.  Yes.

Q.  Did you go to high school?

A.  Yes.

Q.  Where?

A.  Foreman.

Q.  Did you graduate?

A.  No.

Q.  Did there come a point when you left high school and went to work?

A.  Yes.

Q.  Can you tell us what the circumstances were and how you went about going to work?

A.   I had to work to support my kids.

Q.   Ms. Scott, do you have children who are adults now?

A.   Yes.

Q.   How many?

A.   Four.

Q.   Can you give us their names?

A.   Cierra Jackson, Marcel Brown, Kenneth Bardlett, Davisha Grant.

Q.   And you have one other daughter who is not yet an adult, am I right?

A.   Yes.

Q.   And who is that?

A.   Her name is Devonna Scott.

Q.   Was there a man named Davell Grant who was a part of your family for a number of years?

A.   Yes.

Q.   And who was Davell Grant?

A.   Davell Grant was my fiancee, and it's Davisha Grant's dad.

Q.   What was Davell Grant in relation to Marcel Brown?

A.   Like a role model, like a father.

Q.   And a stepfather, in fact?

A.   And a stepfather, yes.

Q.   Now, do you have grandchildren?

A.   Yes.

Q.   How many?

Scott - direct

1650

A.   Five.

Q.   All right.  So I want to take you back to when you went to work to support your family and your kids.  Where initially did you get work?

A.   I was working at Fellows.

Q.   And what is Fellows?

A.   It's a company, a big warehouse where we made boxes and paper shredders and mouse pads and stuff.

Q.   How long did you work at Fellows?

A.   I was -- I worked three years as a temp and 23 years as a regular employee.

Q.   During your three years as a temp, what was your position?

A.   Working on the line.

Q.   And when you say "working on the line," can you tell the folks on the jury what that involved?

A.   It involved operating a machine and shredders and stuff, putting them together, putting the pieces to make the machines work.

Q.   Did you -- at some point you said you became a permanent employee?

A.   I became a machine operator.

Q.   And what does a machine operator do?

A.   I operate the machine, make sure it's running right and correctly, and I make sure the people are doing the right thing that's on my line going through the machine.

Q. And when you say "the machine," tell us what you're referring to.

A. The machine that reseals the packages for the product.

Q. So is the person who operates the machine in charge of the line?

A. Yes.

Q. And making sure that everything runs according to plan?

A. Yes.

Q. How long did you hold that -- it's a supervisory position?

A. It was like a supervisory position.

Q. You didn't have the title, but you had the responsibility. Fair?

A. Yes.

Q. How long did you have that supervisory position?

A. I had that position -- I've been doing that position for about 20 years.

Q. Now, Ms. Scott, did you leave Fellows at one point?

A. Yes.

Q. When was that approximately?

A. 2018.

Q. What was your reason for leaving?

A. Injury.

Q. And specifically are you applying for disability benefits at this point?

A. Yes.

Scott - direct

1652

Q.   And as your application for disability benefits is proceeding, are you doing a little bit of part-time work?

A.   Yes.

Q.   Can you tell us what you're doing?

A.   I'm a crossing guard for the kids.

Q.   And where are you doing that?

A.   In Elmhurst.

Q.   You indicated that you lived for a number of years on Parkside in Chicago.

A.   Yes.

Q.   Were you at that address during part of Marcel's high school years?

A.   Yes.

Q.   And was there, Ms. Scott, an event that took place that made you decide that you wanted to look for a different residence?

A.   Yes.

Q.   Can you tell us about that?

A.   It was the school system.  I wanted a better school system for my kids and get them out the neighborhood.

Q.   And when you say to get them out of the neighborhood, what are you referring to?

A.   It was kind of bad.

Q.   Did you make efforts to find a different home for yourself and for your family?

A. Yes.

Q. And where -- and you succeeded? You moved where?

A. I moved to Oak Park. The first apartment I had was on 50 Superior.

Q. And then did you eventually rent a home in Oak Park?

A. Yes, 906 South Humphrey.

Q. And were you living at 906 South Humphrey during the events of this case that we're going to be talking about?

A. Yes.

Q. When approximately was it that you moved to Oak Park?

A. I think it was -- Marcel was a sophomore.

Q. And did Marcel enroll in high school in Oak Park?

A. Yes.

Q. What school did he go to?

A. Oak Park-River Forest.

Q. Ms. Scott, is religion important in your family?

A. Yes.

Q. Important for your kids and for you?

A. Yes.

Q. When you had -- when your kids were growing up and you were living on Parkside in Chicago, was there a specific church that you attended?

A. Yes.

Q. What's the name of that church?

A. Narragansett Church of God.

Scott - direct

1654

Q.   And how many years did you attend that church?

A.   I think seven.

Q.   As a family?

A.   Yes.

Q.   Did Marcel attend with you?

A.   Yes.

Q.   What was, what was Marcel's pattern in terms of getting to church with you?

A.   I'd get him up.  He loved the church.

Q.   And did he go on a regular basis?

A.   Yes.  They loved to go to church every Sunday, and then on some days the church would have events for the kids where they played the church's plays with a Jesus.

Q.   And all manner of activities for Marcel and his siblings.

A.   Yes, yes.

Q.   And there came a point when you left Narragansett?

A.   Yes.

Q.   Did you begin attending a different church at that point?

A.   Yes.

Q.   Is that the church that you attend now?

A.   No.

Q.   Okay.  Where are you currently attending?

A.   I'm currently attending Mt. Zion Temple of Deliverance.

        THE REPORTER:  I'm sorry?

        THE WITNESS:  Mt. Zion.

BY MR. BOWMAN:

Q. Temple of Deliverance?

A. Temple of Deliverance.

Q. How long have you been a member there?

A. Going on 11 years.

Q. And what was the church between Narragansett and Temple of Deliverance?

A. It was good.

Q. What was its name?

A. The other church that I went to?

Q. Yes, ma'am.

A. Bill Ministries, Winston.

Q. At the current time, since his release from prison, has Marcel been attending church with you?

A. Yes.

Q. And does he attend there with anyone else connected to him?

A. Yes.

Q. Who is that?

A. Tyasia and his daughter Malani.

Q. And Tyasia is who?

A. His girlfriend.

Q. So, Ms. Scott, I want to take you back to August 30, 2008, and ask you if you could tell us what you did that afternoon, and that's the afternoon that the events happened in the park.

A. That day I went to my cousin's to help him set up a block

Scott - direct

1656

club party for the kids back to school.

Q. And your cousin is?

A. His name is James Dean.

Q. And where was the block party?

A. On Mason and I think Bloomingdale, right off the corner.

Q. And at about what time did you leave the party?

A. I left maybe about 4:00, 3:00.

Q. Did you go -- where did you go?

A. Home.

Q. And home was 906 South Humphrey?

A. Yes.

Q. Who did you find at home when you arrived?

A. Marcel, Taneshia, R.J., T.J., and Davisha.

Q. Devonna, the little one?

A. And Devonna, my baby.

Q. Did you have plans that evening?

A. Yes.

Q. What were your plans?

A. I was going to work the door for my cousin.

Q. And when you say "work the door," what do you mean by that?

A. Another event.

Q. And what do you mean by working the door? Tell us about what that was.

A. I'd sit at the door and collect money and search people and make sure that they didn't bring nothing in.

Scott - direct

1657

Q.   And this event was where?

A.   In Oak Park.

Q.   At a club?

A.   Yes.

Q.   What time did you go over there?

A.   Maybe about 9:00, not for sure.

Q.   Who drove you?

A.   Marcel.

Q.   Did you have instructions for Marcel?

A.   Yes.

Q.   What were they?

A.   When he dropped me off, to go home, park the car, and stay in the house.

Q.   And you were at this party until late in the morning.  You got home at what point?

A.   Around 3:00 or a little bit after 3:00.

Q.   And what did you find when you got home?

A.   Everyone was asleep.

Q.   Did you -- the next morning is Sunday, correct?

A.   Yes.

Q.   August 31st?

A.   Yes.

Q.   And did you have a commitment on Sunday morning?

A.   Yes.

Q.   Where did you go?

A.   I got up, got dressed, and went to church.

Q.   When you got up and got dressed and went to church, who else was awake in your home?

A.   No one.

Q.   You went to church, and you came back home?

A.   Yes.

Q.   What did you find when you got back home?

A.   Everybody was there.  The kids was up.

Q.   And did you have the impression that the kids were engaged in some kind of conversation amongst themselves?

A.   Yes.

Q.   Were you initially clued in as to what that conversation was?

A.   Not really.

Q.   Did you ask about it?

A.   Yes.

Q.   And did you learn that there were rumors in the neighborhood about something that had happened in Amundsen Park that morning?

A.   Yes.

Q.   Can you tell us what you heard?

A.   I heard someone say there was a body in the park.

Q.   And did you hear rumors as to whether -- I should have asked you this.  R.J. Branch, who is he in relation to you?

A.   My nephew.

Scott - direct

1659

Q. T.J. Scott, who is he in relation to you?

A. My nephew.

Q. R.J. is whose son?

A. My sister Sarah.

Q. And T.J. is whose son?

A. And my brother Terry.

Q. So did you hear any rumors on August the 31st about any involvement that R.J. had or didn't have in connection with that body at Amundsen Park? Were people talking?

A. Yes.

Q. What did you hear?

A. It was rumors that was going around.

Q. And what were the rumors?

A. That they found a body in the park, and some people were saying that he did it and some people were saying he didn't.

Q. And when you say "he," who are you referring to?

A. R.J.

Q. Now, Ms. Scott, after you heard these rumors, did you have communications with R.J.'s parents and with T.J.'s parents about what you were hearing?

A. Yes.

Q. And did you convene a meeting? Did the folks in your family convene a meeting at your home on the evening of August 31st?

A. Yes.

Scott - direct

1660

Q.   And who was there at that meeting?

A.   It was me, Debra Scott, my sister Sarah, my brother Terry, Marcel, Taneshia, R.J., T.J., and Devonna and Davisha, and my son K.J.

Q.   Was R.J.'s father there as well?

A.   And Renard, yes.

Q.   That would be R.J.'s dad?

A.   Yes.

Q.   And Sarah's former partner.

A.   Husband.

Q.   Former husband.

A.   Yeah.

Q.   Now, would it be fair to say that the family had questions for the boys?

A.   Yes.

Q.   What were the questions for R.J.?

A.   Did you kill someone?

Q.   And did you have -- and what did you hear from R.J.?

A.   He said no.

Q.   What did he say had happened?

A.   He say he went to the park to get the girls.

Q.   And did he admit to shooting off a gun?

A.   Yes.

Q.   What did he say in relation to that?

A.   They was shooting at us, and I shot back.

Scott - direct

1661

Q.   So, Ms. Scott, did you have a question for your son Marcel?

A.   Yes.

Q.   And what was your question for Marcel?

A.   I said:  You didn't have no gun.  Was you involved in this?
         And he said no.

Q.   Did you have words for Marcel about his not having been at home the night before as you had expected him to be?

A.   Yes.

Q.   What did you tell him?

A.   I was very angry.  I was very mad.  I think I popped him a couple times, and I put him on a punishment.

Q.   And following this meeting and fast-forwarding a few days, I want to take you to September the 3rd in the afternoon.  You were working that day?

A.   Yes.

Q.   Working at Fellows?

A.   Yes.

Q.   And when did you get off of work as a matter of -- when did your shift end on September the 3rd?

A.   2:00 p.m.

Q.   And at that point, did you drive home?

A.   Yes.

Q.   Who was with you?

A.   My sister, Sarah Scott.

Q.   How does she happen to be with you?

Scott - direct

1662

A.   We work together.

Q.   When you got home, what did you see?  Or as you were arriving to your home, what did you see?

A.   Police everywhere.

Q.   And what did you think about that?

A.   At first I didn't know if they was at my house or not till I got a little closer.

Q.   And you discovered that they were at your house?

A.   Yes.

Q.   What did you do?

A.   I got out the car.  Hurried up and parked and got out the car, and I jumped out, and I was like:  Hey, what's going on?
     And one of the officers came up to me and was like: Hi, Ms. Scott.

Q.   Did you recognize that officer?

A.   Yes.

Q.   Have you figured out now what his name is?

A.   It started with a W.

Q.   Okay.  You don't know his name.

A.   No.

Q.   Did you recognize him?

A.   Yes.

Q.   And what made you recognize him?

A.   From a previous case in my old house.

Q.   What had happened?

A.   We was all on the porch, and someone was shooting a gun and the bullet shot through my house.

Q.   And you called the police?

A.   And I called the police.

Q.   And did it take awhile for the police to investigate the matter and apprehend the person who had done that?

A.   Yes.

Q.   And when had they found the individual?

A.   I don't remember the date, but they found him after I moved from over there and I moved in Oak Park.

Q.   Now, realizing that you don't remember the date, about how much prior to September 3rd, 2008, had they come to you and said:  We've found the person?

A.   I think a couple years.

Q.   All right.  When they found the person and informed you of that, what was the procedure that followed?

A.   I had to go down to the Grand and Central Police Station to look at a lineup.

Q.   And did you answer questions?

A.   Yes.

Q.   And did Marcel, your son, answer questions?

A.   No.

Q.   He did not?  How did Detective Weber treat you?

A.   Like a victim person.

Q.   He was kind?  He was courteous?

A. Yes.

Q. So you're seeing Detective Weber again. What did he say to you on this date, September 3rd, 2008?

A. He came up to me and said: Hi, Ms. Scott. How you doing? We just want to ask your -- Marcel Brown some questioning.

Q. And what did you say in response?

A. And I said: Hold on. Let me go in the house.

Q. Did you go in the house?

A. Yes.

Q. Did the police attempt to come into the house with you?

A. Yes, and I had to stop them.

Q. When you got into the house, what did you do?

A. I got in, closed the door behind me, and I went straight to Marcel's room.

Q. And did you say anything to Marcel at that point?

A. Yes, I said the police all outside. They all in the back of the house, on the side of the house.

Q. And you understood at this point this probably had to do with Amundsen Park.

A. Yes.

Q. Now, you had Marcel come to the front to talk to the police, is that right?

A. Yes.

Q. And what was the conversation between Marcel and yourself and the police officers who were at your house at this point?

Scott - direct

1665

A.   They said:  Marcel, we want to ask some questions about what happened over at Amundsen Park.

And my son said:  You could ask me questions here.

And the officer said:  No, you have to come to the station.

Q.   Did Marcel look to you for advice at this point?

A.   Yes.

Q.   And what did you say?

A.   I told my son to go:  You tell the truth.  You have nothing to hide.  You didn't do anything.

Q.   And you were saying that to Marcel based on what he had told you back on Sunday morning, August the 31st, is that right?

A.   Yes.

Q.   Did you give Marcel anything to take with him?

A.   Yes, I did.

Q.   What was that?

A.   As they was taking him out, I said:  Hold on.

I ran back in the house and got a jacket, and I gave him a jacket.

Q.   And then he's out the door and into the police car.

A.   Yes.

Q.   At any point while the police were in your presence, did you hear any police officer say to Marcel, your son, that he was under arrest?

Scott - direct

1666

A.   No.

Q.   Did you hear any police officer say to your son that he was under arrest for first degree murder?

A.   No.

Q.   Did you hear any police officer give Marcel, your son, his constitutional rights under the Miranda?

A.   No.

Q.   Did you see any police officer put handcuffs on Marcel at any point?

A.   No.

Q.   As he was being led out of the house?

A.   No.

Q.   As he was being put in the car?

A.   No.

Q.   As you watched Marcel drive away, what was the feeling in the pit of your stomach?

A.   I should have never let him leave without a lawyer.

Q.   Did you have concerns?

A.   Yes.

Q.   Did you share those concerns with your sister?

A.   Yes.

Q.   At that point, did your sister receive a phone call?

A.   Yes.

Q.   And without getting into the details of it, what did you learn that was also transpiring in relation to R.J.?

A.   She got a phone call that they was looking for R.J. and they was raiding his dad's house, everywhere he live.

Q.   Did Sarah and her -- and R.J.'s dad make a plan as to what to do about R.J.?

A.   Yes.

Q.   What was the plan?

A.   The plan was to go -- she sent her husband to go get him out of school, pick him up.

Q.   And where was R.J. in school?

A.   I forgot the name of the school he went to.

Q.   It was a special school.

A.   Special need kids.

        MR. GIBBONS:  Your Honor, objection.

        THE COURT:  The objection is sustained.  You can ask a different question.

        MR. BOWMAN:  Sure, I'll ask a better question.

BY MR. BOWMAN:

Q.   Did R.J. go to the local high school?

A.   No.

Q.   And was there a plan -- or was part of this plan to get R.J. to the police station at Grand and Central?

A.   Yes.

Q.   Tell us what the family planned to do and decided.

A.   We decided to get him because we didn't want no one shooting him.  So everybody decided to go pick him up at

Scott - direct

1668

school.  His dad called a lawyer, and he said meet at the police station, and that's what we all did, and he would be there.

Q.   The lawyer's name was?

A.   Cary.

Q.   And his first name?

A.   That's all I know.

Q.   If I were to suggest Wham Cary to you, would that help you remember?

A.   Yes.

Q.   So R.J. went to the police station in the company of whom?

A.   Myself, Debra Scott, his mother Sarah Scott, his dad Renard Branch, and T.J. Scott, Felicia Frazier, Kenya Johnson.

            THE REPORTER:  I'm sorry?

            THE COURT:  Slow down a little bit.

            THE WITNESS:  Oh, Kenya Johnson.

BY MR. BOWMAN:

Q.   And was Taneshia Branch there?

A.   Yes.

Q.   And was Almanique Scott there?

A.   Yes.

Q.   And was Cierra, your daughter, there?

A.   Yes.

Q.   Did Wham Cary, the lawyer, eventually arrive?

A.   Yes.

Scott - direct

1669

Q. Was there a discussion involving the family and R.J. and Wham Cary outside of the police station at Grand and Central?

A. Yes.

Q. Tell us about that conversation.

A. When he pulled up, everybody got out the car and everybody was getting together. And Renard Branch went over and talked to Cary, and he got R.J. and T.J. and he said: Okay. Everybody start proceeding to the Grand and Central Police Station.

Q. Did you overhear advice being given to R.J. by the lawyer, Wham Cary?

A. Yes.

Q. What was that advice?

A. I'm going to take you in, no questions without your attorney.

Q. When Mr. Cary and R.J. went into the police station, did the family accompany them or did they stay outside?

A. No.

        MR. GIBBONS: Objection to the form of the question.

        THE COURT: Sustained. Ask a different question.

BY MR. BOWMAN:

Q. How did, how did it happen that R.J. went in the police station, and who accompanied him?

A. All of us.

Q. What did you see transpire at the police station?

A.   Before we get to the police doors, it was like they was all right there, like they knew we was coming.

Q.   And what did you see?

A.   Then all the police officers was there, and Cary was like: Okay, open the door.

        Everybody went in, and the police officer said:  Turn around, Renard.  You're under arrest.

        And they started reading him his rights, and they put him in handcuffs and they took him down the stairs.

Q.   All right.  What happened next?

A.   And then next Felicia Frazier say:  T.J.

        And then Cary told the police officer:  You looking for T.J.

        And the police officer said no.

Q.   And then what happened?

A.   So Cary turned around and told Felicia to take Terry home.

Q.   Terry being T.J.?

A.   T.J., yes.

Q.   And then what happened next in relation to T.J.?

A.   And as we was standing there, she took him and before she can get in her car to drive off, her grandma called her and say:  The police all over the house.  They all inside the house looking for T.J.

Q.   And so what was done in relation to T.J. at that point?

A.   She pulled back around.  She brought him back to the

Scott - direct

1671

station, up to where we were standing at the doors, and she told Cary and Cary told the officer:  You looking for T.J.

He was like:  No.

He said:  Yes, you is because you's raiding his house now as I'm speaking to you.

Q.  T.J. eventually goes into the police station?

A.  Yes.

Q.  Did you at this point have a conversation with Renard, R.J.'s father, in relation to your own son Marcel?

A.  Yes.

Q.  Tell us about that conversation.

A.  I had a conversation with Renard.  I asked him:  Can Cary represent my son to see what's going on with him?

Q.  At that point, was it your understanding that Renard spoke with Wham Cary?

A.  Yes.

Q.  And did you get a report back from your ex-brother-in-law?

A.  Yes.

Q.  What did you learn?

A.  He said he would go up and represent my son.

Q.  And did he, "he" being the lawyer?

A.  Yeah, Cary.

Q.  Was there a discussion about how much money this would cost?

A.  Yes.

Scott - direct

1672

Q.   And what was the conversation about money?

A.   He told me he gonna charge me $350.

Q.   Did you have $350?

A.   No.

Q.   What did you do?

A.   I started digging in my purse, scrapping up money that I be hiding, counting everything.  And I was a little short, and I turned around and asked my sister and I asked Kenya, and they gave me a couple of dollars, what they had in their pocket.  And I went in my pocket and got my credit card out.  I went to the ATM machine that Grand and Central have and I withdraw the balance that I needed to make $350.

        MR. BOWMAN:  All right.  At this point, I want to display to the witness page 4 of Plaintiff's Exhibit 383 which I believe is not objected to.

        THE COURT:  Any objection?

        MR. GIBBONS:  I don't know what it is.

    (Discussion off the record.)

        MR. GIBBONS:  No, no objection.

        MR. BOWMAN:  May I have the document camera on?

BY MR. BOWMAN:

Q.   Showing you the exhibit that I just mentioned, Ms. Scott, do you recognize this?

A.   Yes.

Q.   Without getting into the details, did you go to some effort

Scott - direct

1673

to track this document down?

A. Yes.

Q. And can you tell us what it is?

A. It's a child support card.

Q. And does it show the transactions that were made on your child support card?

A. Yes.

Q. And what is a child support card, Ms. Scott?

A. It's a child support card where the father pays the mother for child support for the son.

Q. So this account is where your child support money went for Marcel?

A. Yes.

Q. He had just turned 18, right?

A. Yes.

Q. Or he -- yes. And does it show on the exhibit the transaction that you just described at the ATM at 5555 West Grand, Grand and Central?

A. Yes.

Q. Specifically looking right here on the fourth entry down, do you see the date and the time and the location of a transaction in which you withdrew $81.50 from your account?

A. Yes.

Q. And were you also charged a 95 cent fee for that transaction?

Scott - direct

1674

A.   Yes.

Q.   You took the money that you had in your pocket, that you'd gotten from your family, and that you had withdrawn from your child support account, and what did you do with it?

A.   I gathered it all up together, and I sat down.  Then Renard Branch came over to me and said:  Do you have the money for Cary?

     And I said yes, and I gave him the money.

Q.   And after, after that, did you observe the money being passed along to Mr. Cary?

A.   Yes.

Q.   What did Mr. Cary do on Marcel's behalf at that point?

A.   He got the money.  He counted it.  He put it in his pocket.  Then he got up, and we kind of got up behind him and we walked to the front desk at Grand and Central.

Q.   And were you present in the vicinity of Mr. Cary when he spoke with the person at the front desk there?

A.   Yes.

Q.   And what did Mr. Cary say in your presence?

A.   He said:  Hi, ma'am.  I'm here looking for my client, Marcel Brown.

Q.   And did he identify himself as a lawyer?

A.   Yes.

Q.   And what was the response?

A.   She said:  Hold on a second.

She walked away, got on the phone. A couple minutes went by, and then she came back to us and she said: Turn and go up those stairs, up to the second floor to the detectives.

Q. Did Mr. Cary take those stairs up to the detective area on the second floor?

A. Yes.

Q. Did you go with him?

A. Yes.

Q. Did others in your family also go?

A. Yes.

Q. Who went?

A. It was Sarah, Debra Scott, Wham Cary, Renard Branch, Felicia Frazier, Kenya Johnson.

Q. And yourself.

A. Yes.

Q. Did you -- tell us what happened on the second floor.

A. We made it to the second floor. We went in the double doors. We stood at the front desk. We waited till the guy walked around to us, and Cary said: I'm here to see my client, Marcel Brown.

Then he went in his pocket to get his credentials, and he gave it to the guy. And he started signing the book, and the guy was like: Hold on a minute.

Q. And then after a minute or some time had gone by, what happened next?

Scott - direct

1676

A.   He asked the officer can he see his client, and the officer said the detectives on the case is not here.

Q.   And when he said "his client," who was he referring to?

A.   Marcel Brown.

Q.   Did he name Marcel Brown?

A.   Yes.

Q.   What, what did you do at that point?

A.   I turned to him and I said:  Shouldn't you be able to see your client without the detectives there?

And he was like:  Yes.

Q.   And after that conversation with you, did Mr. Cary have a subsequent conversation with the person at the detective --

A.   Yes.

Q.   Tell us what was said.

A.   He asked him again can he see his client, Marcel Brown, and the officer told him:  No, you cannot.  You have to wait till the detectives come.

Q.   Did you wait?

A.   Yes.

Q.   How long did you wait?

A.   I don't know the exact time --

Q.   And was --

A.   -- but it was awhile.

Q.   And was Mr. Cary waiting with you?

A.   Yes.

Scott - direct

1677

Q.   And were your other family members waiting?

A.   Yes.

Q.   This was on the second floor?

A.   Yes.

Q.   Was there seating for you?

A.   Not for all of us, no.

Q.   After a period of time had gone by, did Mr. Cary make a subsequent request?

A.   Yes.

Q.   Did you overhear it?

A.   Yes.

Q.   What happened?

A.   We got up, went back into those double doors, and he asked the officer again:  I'm here to see my client, Marcel Brown.

Q.   And then what happened?

A.   He told him:  The detectives not here yet.  You have to go back out and sit and wait.

Q.   And then tell us what happened next.

A.   We went out and we sat down and we was waiting.  And then a little time went by, and an officer -- a detective came out. He was talking to Renard because he knew him, and as he was talking to him for a couple seconds, a couple seconds went by and he went through the door, he came back out, and he said: Everybody, get up.  Get up.

          And I'm looking like:  What's going on?

Scott - direct

1678

He said: Everybody, get up. Get up. You all finna get out. If you come back, we gonna lock all of you all up.

And they proceeded us and walked behind us out the doors.

Q. And you left the building at that point?

A. Yes.

Q. Did you go home?

A. Yes.

Q. How were you feeling when you got home?

A. Mad.

Q. And were you also concerned about your son?

A. Yes.

Q. Did you take any action to attempt to contact Marcel that evening of September 3?

A. Yes.

Q. What did you do?

A. I called the police station.

Q. Meaning Grand and Central.

A. Yes.

Q. Who did you speak to?

A. The lady at the front desk.

Q. What was the conversation? What did you say, and what did she say?

A. I was asking her about my son and can I speak to him, and she was like: You have to -- I don't have no information.

Scott - direct

1679

He's upstairs with the detectives.

Q.   Did you ask her to do anything?

A.   Yes, I asked her to call upstairs.

Q.   And then what was the response?

A.   She said the officer wasn't there.

Q.   So do you have any idea how many calls you made to Grand and Central over the course of the next few hours and the following day?

A.   I made a couple of them.

Q.   When September 4 went by, you heard nothing from Marcel.

A.   No.

Q.   Then September 4 ends, and it comes into the early, early morning of September 5, the next day, correct?

A.   Yes.

Q.   During that time, it would be fair to say that you were sitting by the phone?

A.   Yes.

Q.   Did the phone ring?

A.   Yes.

Q.   About what time of day or night did your phone ring?

A.   I don't know the time.

Q.   Was it in the daytime or in the nighttime?

A.   It was night.

Q.   The early morning of September 5.

A.   I think it was like in between.  I'm not for sure.

Scott - direct

1680

Q.   In any event, who was on the line?

A.   Marcel.

Q.   And what was the conversation between you and Marcel?

A.   I was so glad.  I was like:  Oh, you okay?  Did they feed you?

        And he was like:  Yeah, ma, they fed me McDonald's.

Q.   Did Marcel make any statement to you about what was going to happen?

A.   I was asking him:  Is you okay?

        He was like:  Yeah, mom, I'm okay.  They said they gonna release me in a little while.

Q.   Then what did you do?

A.   Then I was like:  I love you.  You gonna be all right.

        Then the officer in the background told him to give him the phone, it's time to go, and he took the phone.

Q.   Did Marcel come home in a little while?

A.   No.

Q.   What did you do?

A.   A couple hours went by.  I got up, and I called the police station again.

Q.   And what did you learn?

A.   I talked to the lady at the front desk, and I asked:  Hi. I'm looking for my son, Marcel Brown.  They said they was gonna release him.

        And she was like:  Hold on a second.

Scott - direct

1681

It took a couple minutes. She came back to the phone. She was like: No, ma'am, your son is getting on the next bus now.

Then I'm like: The bus?

She said: Yes.

I'm like: Where he going?

She said: He's going to 26th and California.

Then I'm like: Oh, my God. Can you give me the information? Where do I need to be? What's the room?

Q. And what did she tell you?

A. She told me to go to 26th and California to Room 101.

Q. And did you go there?

A. Yes.

Q. What time did you arrive?

A. I jumped up and put my clothes on. I called my sister, and I got right over there. I don't know the time. I thought court started at 9:00.

Q. And did you learn what time Marcel was going to be in front of the court?

A. Yes.

Q. And what did you learn?

A. 1:30 that evening.

Q. You waited?

A. Yes.

Q. Tell us what you saw and observed at 1:30 on the court

Scott - direct

1682

call.

A.   He was up on the screen when we went in for court.

Q.   Now, that's unusual.  "Up on the screen" meaning on a video camera?

A.   Yes.

Q.   Not in the courtroom.

A.   Yes.

Q.   Was his the only case that was being considered by the judge that afternoon, or were there others?

A.   It was others.

Q.   At a certain point, did you see your son on the video screen?

A.   Yes.

Q.   And what did you do when you saw your son?

A.   I just broke down.

Q.   And what did you learn, Ms. Scott?

A.   That they was charging my son.

Q.   With what crime?

A.   Murder.

Q.   Within the next day or two, did you have an opportunity to talk with Marcel on the phone?

A.   Yes, he called.

Q.   You hadn't had any chance to talk with him in court, is that right?

A.   No.

Scott - direct

1683

Q.   He called you, and what did he say to you and what did you say to him?

A.   I asked him was he okay:  Is you all right?

He was like:  Yeah, mom, I'm okay.

I'm like:  You sure?

I'm like:  Keep calling me.

Q.   And as you were listening to him telling you that he was okay, were you able to hear and observe anything else on the phone as to what he was doing?

A.   There was a lot of noise in the background.

Q.   Did you go and see Marcel?

A.   Yes.

Q.   Do you remember the particular division of Cook County Jail where you went to see your son?

A.   Yes.

Q.   And what division was it?

A.   10.

Q.   If I were to suggest to you Division 9, would that sound right, or you're not sure?

A.   I'm not for sure.

Q.   Okay.  Over the course of the next three years, did you have many, many occasions to go to the division of Cook County Jail where Marcel was being held to visit with him?

A.   Yes.

Q.   About how often did you go and visit your son during that

Scott - direct

1684

three-year period?

A.   Every week.

Q.   We're obviously not going to talk about all of those visits.  I'd just like to know about what the process was and what was typical.  Okay?  Can you describe for the folks on the jury what the process was for you getting into the jail to the place where you would have an opportunity to talk with Marcel?

A.   It was crazy.  I'd get there.  I have my purse, I have my kids, and I'm running to the door.  Then when I get to the door, the guard was like:  Oh, you can't have this.  You can't have that.  You have to -- can't none of this go in with you.

Then I'm like:  Oh, wow, okay.

And I asked the guard:  Well, can I run back to my car and take everything back to my car, and I can be able to visit?

And he was like:  Yes.

Q.   And then did you pass through into the jail complex or into this physical portion of the jail?

A.   Yes.

Q.   Describe after you went through this entry process where you went.

A.   You have to wait in line because people's in front of us to check in to give our ID's.  The place was terrible.  It was nasty, stinky, and my baby was like:  I want water.  I need to go to the bathroom.

And I told him:  No, you cannot use the bathroom here.

It's too nasty.  It's too filthy.

Q.  Was there a visiting area in the portion of the jail where Marcel was staying?

A.  Yes, it's a little sitting thing, and we got to sit like on bricks to wait till they called our name.

Q.  And when they called the name, where did you and your children go?

A.  We get up and we have to go through this metal detector and be searched again, take off our shoes and stuff and shake them. Then once we get searched and go in, we go to the elevator and we go up on the second floor.

Q.  And what did you find on the second floor?

A.  A lot of glasses with different spaces and the phones so you can talk to see the visitors, and it was nasty in there.

Q.  So you talked about a phone?

A.  Yeah, I think it was a phone.

Q.  And so how did these visits work?  Explain it for folks.

A.  Well, you get up and you go up to the window.  When he come out, he sit at a window.  Then we go up and we talk to him on the phone, you know, through the glass.

Q.  So you're talking through Plexiglas.

A.  Yes.

Q.  And what would you typically talk about with Marcel?

A.  I was just scared.  I just told him:  Son, is you okay?  Is you all right?  Nobody is doing anything to you?  Nobody is

taking advantage of you?

And he was like: Ma, I'm okay. I'm okay -- which I knew he wasn't.

Q. What gave you an indication that he wasn't okay?

A. Because I could see it in his eyes.

Q. Can you describe it for us?

A. They was bloodshot red. His hair is all over his head. He had a bruise under his eye, something that he didn't have when he left home.

Q. So at the end or as this three-year period started winding down, Marcel's case came up for trial in court, is that right?

A. Yes.

Q. Did you attend every day of Marcel's trial?

A. Yes.

Q. Every time that Marcel's case came up for any kind of a hearing before the judge before trial, were you there?

A. Yes.

Q. When the trial ended, the result was that Marcel was convicted, right?

A. Yes.

Q. Were you in court on that day?

A. Yes.

Q. Did you see and observe your son Marcel when the judge rendered his decision that Marcel was guilty?

A. Yes.

Scott - direct

1687

Q.   What did you see and observe?

A.   He put his head down at the table.

Q.   And was he then taken out of the courtroom?

A.   Yeah.  When he stood up and the guard was taking him out, he turned around and looked at me and we was doing sign language, and I was telling him, you know:  I love you.  I'm gonna be there for you.

Q.   About a month later, after he was found guilty, was there a hearing where the amount of his sentence was decided?

A.   Yes.

Q.   Were you present for that hearing as well?

A.   Yes.

Q.   Do you remember what sentence was imposed on Marcel?

A.   I think 35 years.

Q.   As that sentence was imposed, were you able to see and observe your son?

A.   Yes.

Q.   What did you see?

A.   He was crying a little bit.

Q.   Did you make eye contact with him?

A.   Yes, sir.

Q.   Did you -- and then he was taken out of the courtroom.

A.   Yes.

Q.   You understood that at that point he would go down to the prison that would be assigned for him, correct?

Scott - direct

1688

A.   Yes.

Q.   Did you have an opportunity to give your son a hug, any kind of a embrace before he left?

A.   No.

Q.   Did you shortly thereafter eventually learn where Marcel would be spending his time in the Illinois Department of Corrections, in the prison?

A.   Yes.

Q.   Where?  What prison?

A.   Menard Correctional Center.

Q.   Where is Menard Correctional Center in relation to the City of Chicago?

A.   A six-hour drive.

Q.   Is it on the Mississippi River --

A.   The river.

Q.   -- at the very bottom of Illinois?

A.   Yes.

Q.   Did you visit Marcel at the Menard Correctional Center?

A.   Yes.

Q.   And tell us -- well, let me ask you this first.  You went to visit him down there a number of times.

A.   Yes.

Q.   And those visits, initially they were more frequent than they ended up being later on?

A.   Yes.

Scott - direct

1689

Q. And what was that -- what was the reasons for that?

A. I cut the visits. I used to go every week. I cut the visits down, and it had got down to twice a month. Then it got down to once a month.

Q. And is it fair to say that driving 350 miles down to the Menard Correctional Center, visiting your son, and then driving 350 miles back to Chicago with your kids is a lot of work?

A. Yes.

Q. And it's expensive?

A. Yes.

Q. Did it sometimes happen that you would drive all the way down to Menard Correctional Center and you'd be unable to see your son?

A. Yes.

Q. Tell us about that.

A. I'd get in the car. I'd get there. I'd get the kids, and we'd get ready to go in. Then I'd get to the door, ring the bell, and the lady or the guy say: Oh, you cannot visit. We on lockdown.

Q. And then what would you do?

A. Turn around and get back in my car, get the kids something to eat, and go home.

Q. Most of the time you got in?

A. Yes.

Q. And I'd like for you to describe for the folks on the jury

Scott - direct

1690

your first experience visiting Marcel at Menard Correctional Center.  What was the process there for getting into the prison?

A.   They had rules again.  You cannot wear no cut-up pants, no sandals.  You had to wear jogging pants or a T-shirt with no V-neck.  So a couple times I had to leave the jail to go to Walmart to buy clothes for the kids, and then we'd come back to the jail and go in.  You have to have two pieces of ID, and you have to have 50 cents for the machine to put your keys and your IDs in.  Then I had to get money to put on a card so I can buy something to eat.

Q.   And that something to eat would come from vending machines in the visiting room?

A.   Yes.

Q.   And then what was the process once you got through the security at the front gate?  How did you find your way to the room where you would meet with Marcel?

A.   The guard would come and get us and walk us through two or three doors, and we would turn and go in the visiting room with my son.  And when I see him, I hold him so tight and I cried.

Q.   Was this the -- this was now more than three years after September 3 of 2008, correct?

A.   Yes.

Q.   Was this opportunity to hold your son so tight in the visiting room of Menard Correctional Center the first

Scott - direct

1691

opportunity that you had to touch Marcel Brown in that interval of time since the police took him away from your home?

A.  Yes.

Q.  It was very meaningful to you.

A.  Yes.

Q.  What did you talk about with Marcel?

A.  I always asked him:  Is you okay, son?  Is you doing all right?

Q.  And what would he say?

A.  He was like:  Yeah, mom, I'm okay.  Don't worry.

Q.  He was always looking out for you not to worry.

A.  Yes.

         MR. GIBBONS:  Objection, form of the question.

         THE COURT:  Sustained.  You can rephrase.

BY MR. BOWMAN:

Q.  Well, when Marcel would tell you that he was doing okay, did you believe him?

A.  No.

Q.  Why not?

A.  Because I could tell in his eyes and sometimes I could tell in his voice.

Q.  What did you see in his eyes, and what did you hear in his voice?

A.  His voice, like he'd be crying, and his eyes was bloodshot red.

Q. During visits, would you talk about family?

A. Yes.

Q. Would you talk about his case?

A. Sometimes.

Q. Would you talk about things that you were encouraging Marcel to do in order to better himself while he was in prison?

A. Yes.

Q. What advice did you give to your son?

A. I told my son to go to school, try to get in school down there.

Q. Did you encourage him to get a job?

A. Yes.

Q. In those years when he was at Menard Correctional Center, did you send things to Marcel?

A. Yes.

Q. What did you send him?

A. I sent him a Bible. I sent him crossword puzzles. I sent him plenty of pictures.

Q. And as the visits began to wear on you and they tapered off, did you continue talking with Marcel on the telephone?

A. Yes.

Q. Was that expensive?

A. Yes.

Q. Can you tell us about that?

A. I used to call on the phone with your bank card to add

Scott - direct

1693

money to your card, and one day I freaked out because when it wouldn't let me add money on my card I was having a breakdown. I called the lady, and I was like:  Why I can't put mean on my card?

        And she was like:  Oh, you have to go to the Currency Exchange and do a Western Union.

Q.   So it was a pretty significant investment for your family to make those phone calls to Marcel.

A.   Yes.

Q.   How many calls do you think you had with Marcel over the years that he was at Menard Correctional Center?

A.   Woo, maybe almost a million.

Q.   A lot.

A.   Yes.

Q.   I want to fast-forward to the point when Marcel's case went back to court.  Did Marcel obtain new lawyers to help him in his case?

A.   Yes.

Q.   Who were those lawyers?

A.   Two of them I don't remember, but I remember Karen.

Q.   And who was Karen?

A.   His attorney.

Q.   Her last name?

A.   Daniel.

Q.   And did Ms. Daniel have conversations with you, without

Scott - direct

1694

getting into the substance of them, on the subject of Marcel's case and what she was hoping to achieve on Marcel's behalf?

A.   Yes.

Q.   So in July of 2018, were you in court back up here in Cook County for a hearing in the courtroom of the same judge who had convicted Marcel and sentenced him to all that time in prison?

A.   Yes.

Q.   And did that judge make a ruling in relation to Marcel's case?

A.   Yes.

Q.   He vacated the conviction, is that right?

A.   Yes.

Q.   What was your reaction when you heard that?

A.   The judge said first:  Before I give the verdict, do not yell.  Do not scream.

        MR. GIBBONS:  Your Honor, we have a pretrial set of motions and rulings by the Court on this.

        THE COURT:  On the --

        MR. GIBBONS:  I'm not sure whether the witness has been instructed, but we've already had one witness who has already not abided by this Court's ruling.

        MR. BOWMAN:  It's damages, Judge.  That's the only thing I'm going into.

        THE COURT:  All right.  So the objection is overruled, but only to the extent that I trust that Mr. Bowman has

Scott - direct

1695

discussed this with the witness and will interject if she strays into that area.

MR. BOWMAN: I will.

THE COURT: All right. So the witness can answer.

THE WITNESS: Okay.

BY MR. BOWMAN:

Q. So Judge Gainer had given everybody some instructions that they were to hold their emotions in check.

A. Yes.

Q. And then he said Marcel Brown's conviction was vacated, right?

A. Yes.

Q. I'm interested in how you reacted and how you felt when you heard that?

A. I was so happy I was crying. I broke down.

Q. Did you see -- was Marcel in court for this hearing?

A. Yes.

Q. Where was he seated?

A. Seated in front of the judge.

Q. And who was on either side of him?

A. His attorneys.

Q. And were you able to see Marcel's reaction?

A. Yes.

Q. What did you see?

A. Happy, smile.

Scott - direct

1696

Q.   Did you then go back to court about a month later for a second hearing in front of Judge Gainer?

A.   Yes.

Q.   And it was at that point that Judge Gainer ruled that Marcel was to come home and that the case against him was over, correct?

A.   Yes.

Q.   What did you do at that point?

A.   I was happy.

Q.   And was there anything that you had to do in relation to Marcel to get him home?

A.   Yes.

Q.   Tell us about it.

A.   I had to wait till they released him.  Then as we was leaving, my family and everybody was outside waiting, and I grabbed my son and my son grabbed me and he was like "ma," and we was running to the car.

Q.   On the way out of the courtroom, did you and Marcel and the family pause for a photograph?

A.   Yes.

Q.   I'm going to place on the document screen what's in evidence as Plaintiff's Exhibit 417.4.  Ms. Scott, do you recognize the people in this photograph?

A.   Yes.

Q.   Do you see your son Marcel?

Scott - direct

1697

A.   Yes.

Q.   He's right here in the purple shirt (indicating)?

A.   Yes.

Q.   And do you see yourself next to Marcel?

A.   Yes.

Q.   This is you here, right (indicating)?

A.   Yes.

Q.   And then next to you, who's this (indicating)?

A.   My mother.

Q.   Who is this little girl in pink in front of Marcel (indicating)?

A.   My granddaughter, Kristiana Dudley.

Q.   And this young man standing behind you, who is that?

A.   His name is Tre.

Q.   And who is he?

A.   Marcel's friend.

Q.   And there's another face poking out just next to Marcel's on the left, who is that?

A.   That's my baby, Devonna Scott.

Q.   She's a lot older in this picture than she was when you had her staying home with Marcel on August the 30th, right?

A.   Yes.

Q.   Who is the young woman in the lime, the lime coat?

A.   Quetta.

Q.   And who is she?

Scott - direct

1698

A.   Marcel's sister.

Q.   And this woman here, who is that (indicating)?

A.   My sister Sarah.

Q.   That's R.J.'s mom.

A.   Yes.

Q.   And finally who is on the left?

A.   Mary, my church sister.

Q.   I'm sorry.  Your what?

A.   Mary, my church sister.

Q.   Church sister.

A.   Yes.

Q.   A close friend from church.

A.   Yes.

           THE COURT:  Mr. Bowman, can you give me an estimate on how much longer you think you have?

           MR. BOWMAN:  I can wrap this up in just about three minutes.

           MR. LOEVY:  Can I confer with you for one minute?

           MR. BOWMAN:  Yeah.

     (Discussion off the record.)

           MR. BOWMAN:  You know, after talking to Mr. Loevy, I'd rather not cut it down.  I've got maybe, if I don't rush, ten more minutes.

           THE COURT:  Okay.  Okay.  I think that is a good indication then that we can just break for the day.

1699

So, ladies and gentlemen, it's 4:45. We will see you tomorrow morning at 9:30. Please be here by 9:15, as you have been. Please don't discuss the case, and we'll see you in the morning. Have a good night. All rise.

(Jury out at 4:44 p.m.)

THE COURT: All right. You may be seated.

Ms. Scott, you are excused, so you can step down and we'll have you back on the stand tomorrow morning at 9:30.

(Witness excused.)

MR. GIBBONS: Your Honor, can I have one minute to use the facilities?

THE COURT: Of course.

MR. GIBBONS: Thank you.

THE COURT: And anyone else who needs to take a rest break, please feel free. We'll just resume in a moment.

Mr. Bowman, I do want to tell you that when you finish working for Mr. Loevy, you have a great job waiting for you at NPR. My clerk said that to me the other day, and it's so true. I think you should get a good job in radio.

MR. BOWMAN: I get props from your court reporters all the time.

(Discussion off the record.)

MR. GIBBONS: Thank you, Your Honor.

THE COURT: Of course. Oh, we're really fine. We've been moving at a pretty fast pace, all things considered, in

terms of activity.

Okay. Issues and topics that we should discuss? I have a couple small items, but I'm happy to hear from the parties first.

MR. LOEVY: Scheduling, Your Honor.

THE COURT: Yes.

MR. LOEVY: You know, I had apprised the Court that we had this offer open that if we promised to be done and they promised to be done, we wouldn't call witnesses. That's not -- it's nobody's fault. We're just not going to do that. So since we're not going to close on Friday, it looks like, we're going to call more witnesses, and I hope, you know, everybody understands that we aren't going to get the bad part without the good part. So since we're not going to finish, we're going to call more witnesses.

So we are going to call -- we'll finish Ms. Scott. We're going to call Cutler next. The remaining witnesses are -- and I still believe that Felicia is a very short witness, you know, ten minutes. She's the aunt. She's going to say she was -- you're smiling because nothing has been as short as we hoped.

THE COURT: It's like you can read my mind, Mr. Loevy.

MR. LOEVY: Well, she was in the station, and they weren't trying to hear what they were saying. So I don't know how long that will take. We're going to call Kerbis if we

1701

can't work out a stipulation.  We're going to call the evidence tech if we can't work out a stipulation, and we are going to call T.J., which is a little longer.  You know, I had said we're going to call McHugh, but I think we're not going to call McHugh.  So I guess that we hope to finish in the morning.

(Discussion off the record.)

MR. LOEVY:  We said evidence tech, but he's dead.  So we're going to be reading the evidence tech.

THE COURT:  Okay.

MS. DEL VALLE:  He's not dead.

MR. BOWMAN:  He's not dead yet.

MR. LOEVY:  Oh, I'm sorry.

THE COURT:  Your precision, Mr. Loevy, I'll tell you, is remarkable.  I'm teasing.

MR. LOEVY:  He's dead to us.

THE COURT:  For your purposes, he might as well be.

Okay.  So today's or this evening's version -- and I don't really mean that pejoratively -- I'm just saying as of this evening, and I know things might change, we will finish with Scott, Cutler, Kerbis to the extent there's no stipulation, reading the evidence tech's testimony by designation, T.J. Scott's testimony, and then you said you're going to cut McHugh, but we'll see.

MR. LOEVY:  And then Felicia, Aunt Felicia.

THE COURT:  Aunt Felicia.  Okay.  So, look, I have

1702

been sitting here listening as all of you have, and I see no way we get through all of that testimony by lunch tomorrow. I would be over the moon to be proven wrong.

MR. LOEVY: By morning I'm saying, Your Honor.

MR. GIBBONS: There's just no chance.

THE COURT: There is no -- Mr. Loevy, I hope you prove me wrong, I really do, and I mean that in every possible positive way. I really hope you prove me wrong. You should call whoever you wish, but I think that it's fair to say that at the lunch break tomorrow, depending on where we are and how things may have changed over the course of the evening and into tomorrow morning, I would just ask that it may be that at the lunch break we should probably indicate to the defense if they need to have their witness moving in the direction of the courthouse for testimony on Thursday. We'll just need to see where we are.

I'm not telling you now that we need to do it, but depending on, you know, where things land, you may need to just have your witness ready. We'll just have to see where we are.

MR. LOEVY: So does that mean that they're not going to tell us who we should prepare tonight to cross-examine? We would like to know who to prepare to cross-examine. That's the courtesy that they've had for two weeks now.

THE COURT: Okay. I suspect that part of the issue is what's been relayed, which is that this list has changed even

1703

from an hour ago, so here's what I'm going to do in the interest of fairness.  When we reconvene tomorrow morning, if you confirm for me, Mr. Loevy, that this list has not changed -- and if it gets shrunk, that's fine -- if this list remains the list that it is, then I'll ask the defense to provide the next two names, to confirm that, you know, their expert is first up and to confirm their next two names, but that will be contingent on you telling me that your list doesn't change.

MR. LOEVY:  Fair enough, Your Honor.

THE COURT:  They've been given notice of that, and so they know that I'll turn to them and ask that question tomorrow morning at 9:15 after you confirm that you are where you are. I don't think that that prejudices you in any meaningful way because I actually don't think we're going to get through all these witnesses, including the defense's first witness, by the end of the day tomorrow.  I certainly hope that we do, but I think you will have the time you need to prepare.

I do want to do our level best to fill the day tomorrow so that the time on Friday can be spent finishing up all the testimony to the extent that we're able to do that, and then we can set aside the time we need on Friday likely in the afternoon to work on the jury instruction issues, which brings me to one other topic that I want to be sure I raise with you, which is, I had asked for a draft of the parties' proposal on

1704

the jury instructions by tomorrow morning.  I don't know where we stand with that.

MR. FLYNN:  We sent our draft last night.  That's where it stands.

THE COURT:  Yes.

MR. KAYES:  A little after -- around midnight.

MR. FLYNN:  Right.

THE COURT:  Okay.

MR. KAYES:  We'll try to send something back this evening.

THE COURT:  Okay.

MR. KAYES:  It may be --

THE COURT:  So I think what probably makes sense because it is helpful to me to have my clerk take a look at your draft in advance before we sit down for a conference just to sort of get through it and make, you know, make some suggestions and notes for me, and I'd also like an opportunity to do that.  I'm happy to do that Thursday evening, meaning at the end of the day.  So if you can just get it to me, a version of it to me tomorrow afternoon to give him a chance to take a look at it, we can even take a look at it simultaneously.  But it's helpful to me to have a second set of eyes to work with me on it.

MR. KAYES:  Sure.

THE COURT:  So if you can just send, you know, a

revised draft, you know, by -- I don't know, tomorrow afternoon, maybe around the lunch break. You're not going to be able to do much during the day, you know, while we're doing this, so I don't know if there's any magic to the time I set. What I'm looking for is an opportunity for me to have a chance to substantively and meaningfully review it in a way that makes me as prepared as I can be for our objections on Friday afternoon or whatever time it is.

MR. GIBBONS: Your Honor, one observation there. It's clear based on this lineup of witnesses left that there's claims that are going to be dismissed.

THE COURT: Okay.

MR. GIBBONS: I mean, if we can get to that quicker, they're going to drop them. We all know that. Then we don't have to worry about those instructions, and then we can see how we use the names of other detectives in some of these other instructions. An easy example, Eddy Stanciel is not going to testify. There's a claim built around Eddy Stanciel. The only involvement Detective Burke has in the case is Eddy Stanciel. He was supposedly the guy that, you know, fabricated the Eddy Stanciel statement. He's out of the case now, so that count has got to go. Burke has got to go, but we've got jury instructions that are polluting all of this. So, you know, we're wasting a lot of time doing this.

THE COURT: So to that point, I mean, I am not

1706

interested in getting a version of instructions with claims that we're not pursuing. It is not helpful. It does help us resolve the issues. It only makes it more complicated. So I think decisions on that need to be made tonight.

MR. LOEVY: Well, we can clarify right here and right now. I agree with Mr. Gibbons that Burke is out. You know, Burke wasn't mentioned and we're not calling Stanciel by agreement, so Burke is out.

THE COURT: Okay.

MR. LOEVY: As far as claims, you know, we don't agree with being cabined into what can support a suppression claim. It's our belief that tomorrow if we find there's something that was suppressed we could have a suppression claim. So you'll have to adjudicate that, Your Honor, as to where we are on that.

THE COURT: All I'm asking is that the version that's sent to us tomorrow afternoon reflects, you know, or strips away claims and former defendants that just are no longer in play. You know, the time for -- you know, look, I really -- you've gotten my point.

MR. LOEVY: We do.

THE COURT: I don't need to repeat myself to have you be clear on it. I'm asking in the most respectful way that I can in the sense that I know your time is precious and that you have to work together on these things. Please just don't send

1707

us a version that focuses on claims and defendants that are no longer in play.

MR. LOEVY: Your time is, too, Your Honor, and you've been generous with it.

THE COURT: And that's okay. Look, jury instructions are -- you know, they take time, and we'll get through them and we'll put together a version that gives everyone the lay of the land. It's just please just -- you've heard me, so I won't repeat.

MR. KAYES: Your Honor, given the time constraints and I think the fact that from my skim of what was sent last night I think this wouldn't be a burden, I think maybe what we'll do, rather than try to get something from us to them and back and agreed, maybe I'll try to just put our stuff in, make it obvious who's saying what --

THE COURT: And that's fine.

MR. KAYES: -- and get you that.

THE COURT: That's totally fine.

MR. KAYES: I'll try to do that with enough time so if they want to throw an email on top of that, we can do it that way.

THE COURT: Right, we can deal with it then. To the extent that it's just you don't agree, that's fine.

MR. LOEVY: Yeah.

THE COURT: Just indicate it, similar to how you did

1708

it the first time around, you know, so that we can take a look at what the dueling proposals are. I'm completely fine with that, particularly on the claims, you know, and the portions of the instructions that are a little more complicated or there are dueling positions on it. That sounds great.

MR. KAYES: Thank you, Your Honor.

MR. FLYNN: Your Honor, if we can get back to scheduling, I think we're done with that topic. We have two experts. Dr. Cichon, he had the issue I raised earlier. I think at this point there's no way he's going in the morning, so we'll move him to Friday.

But now we have a new issue, now that we know about these new witnesses. Dr. Welner is an out-of-town witness. He's out of Palm Beach, I believe. He cannot testify on Friday, so we need to fit him in at some point tomorrow.

THE COURT: Okay.

MR. LOEVY: Let's make that happen.

THE COURT: Okay. Great. Cichon will be Friday --

MR. FLYNN: Welner tomorrow.

THE COURT: -- and Welner will be tomorrow in light of these other moving parts.

MR. LOEVY: We appreciate that. Then we know who to prepare for.

THE COURT: Awesome. Wonderful.

MR. GIBBONS: I'd like to order that transcript.

1709

Mr. Loevy just said he appreciates anything that the defense did in this case.

MR. LOEVY: Oh, come on. It's been very --

MR. GIBBONS: Well, I just need to re-echo something I said last week. I do have a flight Friday to a family wedding that I really can't miss. I need to leave the courthouse, you know, really no later than like 3:45. The team can handle it. I wouldn't disrespect a jury. I have to be here if the jury is here, but I'm not going to -- jury instructions can move on without me. I just want to again alert the Court to that.

THE COURT: I appreciate that. I'm happy to hear that, you know, once the jury is gone -- and I'm confident they will be gone -- when we get to the jury instructions, you're okay with us continuing in your absence. I'm confident your colleagues will provide you with, you know, the final set, as will I, and that's totally fine, no issue at all.

MR. GIBBONS: Thank you.

THE COURT: Thank you.

Other topics, issues, questions, concerns?

MR. GIBBONS: None from defense.

MR. LOEVY: None from the plaintiff.

THE COURT: Okay. The one other bug I just want to reiterate and put in your ear is exhibits. Just something to keep in mind, we'll have time on Monday to get them squared away but, you know, at some point the efforts will need to turn

1710

towards making sure the exhibits are prepared and up and ready to go. So we'll have time. It's not like the jury has to have them instantaneously, but I'm confident that they'll want to be looking at the records sooner rather than later. So have a good night.

MR. GIBBONS: Well, thank you, Your Honor.

THE COURT: I will see you tomorrow at 9:00 o'clock in the event we have some developments on Ocampo.

(Proceedings concluded at 5:00 o'clock p.m.)

1711

C E R T I F I C A T E

We, Sandra Tennis and Patrick Mullen, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled trial before the Honorable LINDSAY C. JENKINS, one of the judges of said court, at Chicago, Illinois, on September 4, 2024, in the afternoon session.

/s/ Sandra Tennis
/s/ Patrick Mullen
Official Court Reporter
United States District Court
Northern District of Illinois
Eastern Division