1712

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                    Plaintiff,         )
                                       )
          vs.                          )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) September 5, 2024
                    Defendants.        ) 9:05 o'clock a.m.


VOLUME EIGHT
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Defendants:         GREENBERG TRAURIG, LLP
                            BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

1713

APPEARANCES (Cont'd):

Court Reporter:                    JOSEPH RICKHOFF, CSR, RMR, CRR
                                   Official Court Reporter
                                   219 S. Dearborn St., Suite 2118
                                   Chicago, Illinois  60604
                                   (312) 435-5562
                                   joseph_rickhoff@ilnd.uscourts.gov

                    * * * * * * * * * * * * * * * * * *

                    PROCEEDINGS RECORDED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1714

(Proceedings heard in open court:)

THE CLERK:  19 C 4082, Brown vs. Mancuso.

THE COURT:  All right.  Good morning to the parties.

MR. GIBBONS:  Good morning, your Honor.

MR. FLYNN:  Good morning, your Honor, Kyle Flynn and all the same appearances for defendants.

THE COURT:  Good morning.

MR. BOWMAN:  Locke Bowman, your Honor, and Tom Kayes and Vanessa del Valle.  Our colleagues Mr. Loevy and Mr. Manes are in route.

THE COURT:  Okay.  I did call the case a few minutes early, but if it's all right with all of you, I would love to hear where things stand and what updates you have, or if there are issues that need my attention this morning.

MR. BOWMAN:  Nothing comes to my mind, Judge.

I know there was some correspondence involving Mr. Loevy and Mr. Flynn last night.  And I don't want to suggest that Jon might not have issues when he arrives, but --

THE COURT:  Okay.

Counsel.

MR. FLYNN:  Yeah, there was some back-and-forth regarding what witnesses were or were not being called.  I think I know who they're calling today, but it caused issues with us for who we wanted to call because we thought they were calling other witnesses.  We can let Mr. Loevy discuss it when

1715

he gets here.

But I can update the Court regarding Ms. Ocampo.

THE COURT: That was next. Yes.

MR. FLYNN: We never were able to reach her, and we don't think she's here today.

THE COURT: Okay.

MR. FLYNN: So, at this time we'd like to move for the body attachment.

MR. GIBBONS: And, your Honor, we can file affidavits from the investigators with the Court on all the steps that we took. They were extensive. Telephonic, and a lot of different attempts to locate her at her known place of residence, front door, back door, sitting in different spots, to no avail.

THE COURT: Okay.

Mr. Kayes, I'll give you an opportunity to respond. Just give me one second.

(Pause.)

THE COURT: And I don't want to ask too much detail on the public record, but I do just want to confirm, if you know, the -- and I'm getting a little bit ahead of myself, but I do just want to be sure that the body attachment, assuming that issues, lists an address that I believe you gave to my courtroom deputy. Is that correct?

MR. FLYNN: Correct.

THE COURT: Okay. I just want to be sure that what

1716

she provided me, if we go that route, is accurate, to the best of your knowledge.

I think it probably makes sense to have a very short -- thank you -- a very short filing on the docket of just a basic summary of the steps that the investigator took. I don't think you need to go into great detail. But something that just sort of summarizes the actions taken, I think, would be useful for making a complete record.

But I'm happy to hear from Mr. Kayes first if there are other issues or concerns you want to raise on this topic.

MR. KAYES: So, focusing just on our show cause hearing and not on some of the arguments made in the brief the defendants filed last night, I think that -- I think everybody would agree that Ms. Ocampo was entitled to the best notice practicable under the circumstances.

And what I'm hearing is, A, there's kind of a problem with timing, because she had about a day to get notice, maybe a little less.

And B, what I have not heard from defendants -- we've heard they've sent somebody, they knocked on some doors. Sometimes people aren't home. And what I didn't hear is that they went home the day after you told them this is what you got do and put a letter in FedEx First Overnight that would have gotten there in the morning, been waiting on her doorstep. I haven't heard that they left anything in paper that she could

1717

read saying, hey, if you don't show up on Thursday morning, somebody's going to maybe come arrest you.

And I don't know if we can satisfy the best notice practicable under the circumstances standard, which I think is a prerequisite to issuing a writ or an arrest warrant, unless somebody put a piece of paper on the door rather than just, you know, knock, knock. And maybe the guy stuck out the place for 36 hours. And I think that would be a different story.

THE COURT: Sure.

MR. KAYES: But if he showed up for a minute, knocked, looked around back --

THE COURT: And tiptoed away. I get it.

I think that we might have a response just based on what I'm perceiving here. But I'd like to hear defendants' response.

I'm going to ask you to just file something brief. But if you could just make a record of whatever it is that you did or didn't do.

MR. GIBBONS: Yeah. I mean, I actually thought that was the order. And I'm surprised counsel said he didn't hear different things, because we didn't go through anything. The Court asked for a summary. I started out by saying, we'll file an affidavit with all these details. So --

MR. FLYNN: For the record, he did leave a note that said exactly what Mr. Kayes just said in the door jamb that she

1718

was using when she first -- when he first served her with a trial subpoena. So, that has been satisfied.

THE COURT: All right. Okay.

MR. GIBBONS: Your Honor, the one thing that hasn't come up yet, you know, when we served her with a subpoena, you know, the subpoena actually has a contempt notice in it: If you do not abide by this lawful service, you will be held in contempt of court.

That's in every subpoena served. And every witness has gotten them. So, Marisol Ocampo is fully aware that she will be held in contempt when she doesn't show.

So, I just want to make sure the record's clear. I know we're all outlining a lot of different facts trying to button a hole into a case. But, you know, there's a long record in relation to this issue, including the Court asking the parties to designate transcripts on the understanding that there was a great possibility.

Why else would the parties have spent hours designating deposition transcripts but for the fact that there was an expectation that she might not show and we might be going down this route. This is not a surprise to anyone. The Court ordered us to do these deposition transcripts for a reason.

MR. BOWMAN: I think the Court made very clear at the time that the issue of her availability was one yet to be

1719

addressed. You reserved that question. You made that as clear as a bell to all of us.

We all have to exercise abundance of caution, even though we understand the law, and we're right on the law, to make sure that we're not -- that we don't come up in a situation of not being prepared.

So, we did what we had to do. We face this situation now. The Court has ruled. And we are where we are.

THE COURT: So, look, I agree that the exercise of going through the deposition designations for Ms. Ocampo was something that I did say I was doing with an anticipation that if we needed to use it, it would be there and ready and available. And everybody went to great pains to designate and to object and counter-designate and counter objections.

And so that we're clear, I also did my part on that. I spent time over the weekend, not at all -- it's not a competition. You all did a ton more work than anyone else could have done. But I made my preliminary rulings on those designations with an eye toward having them ready so that we could first address the issue of unavailability.

That's where we are now with this posture.

I agree with Mr. Gibbons that, number one, the subpoena itself -- I understand that Ms. Ocampo threw it back or said I'm not coming. But the subpoena itself, like every subpoena, makes it clear there could be a penalty, a sanction,

1720

a contempt finding as a result of failing to comply. That's the same admonishment given to anyone who receives any subpoena issued by the Court.

I understand that the circumstances here are very different than your ordinary circumstance because of all that it took to get Ms. Ocampo to sit for a deposition. And that's why, with the suggestion or argument that the plaintiffs made with regard to Ms. Ocampo, that I held off on issuing the writ of body attachment Wednesday, to allow an opportunity for Ms. Ocampo to appear voluntarily.

The defense counsel have represented to me that they will file an affidavit detailing their efforts in a summary way, but that they did exactly what we asked them to do, which is to leave some form of a notice on the door in a way that would allow Ms. Ocampo to have notice of today's hearing.

Obviously, the timing of it makes it difficult to believe that she would actually appear today. But there's always a chance that she might. And she may not even appear. She might even just call someone and say, what is this all about, I told you that I'm not going to be there, et cetera, et cetera.

So, I take defendants at their word. I have no reason to doubt that they did exactly what I asked them to do.

And, so, with that, I am going to issue the writ of body attachment. I'm going to issue that this morning so that

the U.S. Marshal Service can make their way to try to see if they can locate her for purposes of having her here tomorrow morning.

I will keep you posted. And, obviously, the moment I hear something and have an opportunity to let you know about that, I'll share it with you as promptly as I can.

To close the loop on the record, it's 9:16 on the day that I set the show cause hearing, and Ms. Ocampo is not here. Obviously, if she arrives in the next -- any period of time today or anyone hears from her, we'll make a record of that, as well.

But we're just in less than ideal circumstances in terms of how we can move forward with the case and her testimony in particular. And I took -- I think it was a wise step to try to take action to let Ms. Ocampo appear on her own. That opportunity, essentially, has now come and there has been no appearance by her and no contact from her by the parties.

And, so, I'll issue that writ of body attachment this morning.

MR. LOEVY: We'd like to update you on scheduling, your Honor.

MR. FLYNN: Your Honor, if can we could stay on the Ocampo issue briefly?

MR. LOEVY: Sure. Sorry.

THE COURT: Sure.

1722

MR. FLYNN: Hypothetically speaking, if they cannot find her tomorrow, she doesn't come in tomorrow, the Court will determine potentially she's unavailable. If the Court makes that determination, we will, I think, go back to the designations.

We were hoping that with respect to the designations, we could get your rulings, because we will need to put together a video with those designations that are admissible, and it does take our team a few hours to put something like that together.

MR. LOEVY: Your Honor, you did rule, I believe, on the record that it was too late. They had made --

THE COURT: Right.

MR. LOEVY: -- too late effort, so they weren't going to get the privilege of reading it without having taken advance steps to get her here.

THE COURT: Yeah, that was the ruling.

MR. FLYNN: I misunderstood the ruling.

THE COURT: Yeah, that she is unavailable -- that I would not find that she was unavailable based on the finding that as of the time she was -- the appropriate steps had not been taken to declare her unavailable as of the time that --

MR. GIBBONS: So, if the U.S. marshals can't find her, she's still going to be declared as a potentially available witness to the defense?

1723

I mean, we just need all to make a record on this, because this is going to be a monster issue if this case goes up on appeal.

MR. LOEVY: It's not even --

MR. GIBBONS: She's an important witness to the case.

MR. LOEVY: Not even close. If the U.S. Marshal can't find her in the next 20 hours, that's nobody's fault but the defense. They knew this issue at the pretrial conference.

MR. GIBBONS: We've already beat that horse to death. The record is what the record is, but, I mean, the U.S. Marshal Service not being able to locate a witness is pretty powerful evidence that she's avoiding all of us.

MR. LOEVY: Well, you know, I think you -- enough's been said.

THE COURT: So, I just want to make one thing abundantly clear about Ms. Ocampo's testimony via her deposition. And I say this because I think it's important for purposes of the request that is sort of being tossed around here, which is now declare her unavailable and let us read and designate portions of her deposition testimony.

And in fairness to the defense, that's essentially what you asked me to do in your filing two nights ago. And I appreciate that.

The testimony concerning witness tampering is -- I am not going to allow that testimony, regardless. It is at a

minimum a 403 problem. It is confusing. It's not clear. It would cause undue delay. It ticks almost all the boxes.

So, even if I let the parties designate portions because I deem her unavailable, portions of Ms. Ocampo's testimony in her deposition, the testimony about Mr. Brown's cousin and whether or not some person who worked on behalf of Mr. Brown's team and all of that witness tampering stuff is out, regardless.

So, I just -- I want to be crystal clear about that. That is not changing under any circumstance, from my perspective. You're obviously welcome to take whatever steps you believe are appropriate post-trial on that.

But I do just want to be clear that that testimony is muddy and difficult to follow. It's not substantiated. She's inconsistent throughout her statements. And, so, I wouldn't allow that in.

The question then becomes whether other portions of her testimony essentially -- I'm calling it the first half. But when I say the first half, I just mean her testimony about the substantive underlying events, as to whether I would allow some designation of that portion of the testimony.

MR. LOEVY: But, your Honor, you did rule on that, and I don't see any reason to revisit it, because they're just dead wrong on the law.

You can't -- they didn't even ask her to appear in the

month before trial. They didn't call her and say, are you coming? They obviously preferred the deposition strategically. And you can't wait until the trial's almost over and then blame the U.S. Marshal for not acting fast enough. They are just -- they don't want her cross-examined. And they didn't do it right. This isn't an appeal issue. It's not even close.

But I don't think there's any motion to reconsider pending, and it wouldn't be proper if there was.

MR. GIBBONS: Well, it's always proper to ask a Court to reconsider.

THE COURT: And it's actually -- and I don't mean to cut you off, Mr. Gibbons, but it's not actually a motion to reconsider. What's still pending is your motion to bar her testimony. And I'm just clearing up the record here.

The defense -- I'm sorry, the plaintiffs filed a motion to bar her testimony, and they did that one of the nights this week. That's at Docket Entry 407. Excuse me, no, Docket Entry 405. That was the motion that was filed on Monday evening. And that motion is still pending.

And, so, you are right, Mr. Loevy. I said what I said about the door on this is closed. But in the interest of just sort of trying to be as fair as I possibly can, I'd like to think about that issue during our first break. I'll let you know my decision on it.

In the meantime, what I need to do is work on getting

1726

this writ out the door.  And, so, we'll table this issue for a few hours so that we can take the steps necessary to see if someone can go find her for purposes of tomorrow morning.

MR. LOEVY:  Well, your Honor, last thing on that, we did in the designations object that she was not unavailable.

THE COURT:  Yes, you did.

MR. LOEVY:  And they still didn't take any steps. They thought, hey, we'll just read her dep, because that's what they prefer.  The law -- there's never been a case where you could do what they've done here.

MR. GIBBONS:  Your Honor, that's the same argument he made, like, 38 seconds ago.

MR. LOEVY:  And it -- and we did file it for --

MR. LOEVY:  John, I don't interrupt you.  So, just to finish --

MR. GIBBONS:  Jon, I thought you were finished.  My apologies.

MR. LOEVY:  That's okay.

But it actually would be reversible the other way.  To declare someone unavailable under these circumstances where they didn't even ask her to come to court, that would give us --

THE COURT:  Well, they did ask her to come to court. It's just that it went left immediately, right?  When you hand someone a trial subpoena, that is saying, you are now under an

1727

obligation to come to court.

And I agree with you, Mr. Loevy, that the prudent thing to do, if you really wanted her to be here, would be to take the steps we've been talking about. I completely agree with you. I think that it would have been the right thing to do.

And by that, it's not a value judgment. It's just, if you really wanted her to be here, there would have been ways to do it.

But the reality is, it's a little hard for me, as I sit here now, to conclude that I'm going to go to the trouble of asking the U.S. Marshal to go out and find her, and if they're unable to find her, I still can't find -- declare her unavailable?

MR. LOEVY: Your Honor, because there's 20 hours left.

THE COURT: I don't know that that's right, Mr. Loevy.

MR. LOEVY: There's 20 hours left. The U.S. marshal is not going to find her. I mean, they don't -- they have other priorities. You know, the defendants can't set up a situation where they have to -- the United States government has to jump on their cue. They're not going to find her.

THE COURT: I agree that that's --

MR. GIBBONS: Your Honor, they found her within 24 hours for her deposition.

THE COURT: Right.

1728

MR. GIBBONS: So --

MR. LOEVY: I don't --

MR. GIBBONS: -- I don't know what basis Mr. Loevy has to say that. Maybe they have their own investigator out there looking for Marisol Ocampo. I suspect they do. But, you know, there's no proof that they can't find her. She was found once.

THE COURT: Right. Look, I don't want to keep going round and round about this, because at this moment, we don't actually know what's going to happen. I agree with everyone that the odds are low. And I'm sensitive to that. But it is a little difficult for me, as I sit here now, to say that at this time tomorrow if we get a call from the U.S. Marshal Service saying, we sent a team out there this morning at 7:00 a.m. We knocked on her door, we waited, she's not there -- which we all agree that that's likely to happen -- it's a little difficult for me to get my head around the idea that she is not then unavailable.

MR. KAYES: Your Honor, a couple --

MR. LOEVY: 7:00 a.m.? I mean, what if she --

THE COURT: Whatever time it is.

MR. LOEVY: I mean, but that's, like, two hours of unavailability. They've been doing -- they should have been looking for months.

MR. GIBBONS: Your Honor, we've --

MR. LOEVY: That's what the law says.

1729

MR. GIBBONS:  -- we've beat this fact pattern to death.

Just for the record, we did file a response to their motion, which I know you've gotten and has not been ruled on yet.  But I just wanted to make sure when you're considering this, we did file a written response.

THE COURT:  Yes.  Yes.

MR. KAYES:  And, your Honor, a couple cases that are exactly on this point.  And the Seventh Circuit most clearly in *Griman* is going to tell you that reasonableness isn't just about what you do, it's about when you do it.

THE COURT:  When do you it.  I completely agree.

Look, I agree.  The problem is that there's nothing that I can do to unwind or change what should have happened over the 45 days before trial should have started.

I understand that your point, Mr. Kayes, is, well, you don't have to do anything.  You should just say that because they didn't take those steps at the appropriate time, she's unavailable, and sort of the line has been drawn in the sand.  And I appreciate that that's your point on it.

But part of what I have to do is also take into account the facts as they are evolving right now.  Right now in the last week or few days, whatever period of time you want to consider.

Look, I understand at bottom that Ms. Ocampo's

1730

testimony is a lightning rod in terms of, one side really wants to keep it out and one side really wants to get it in. And that's really what we're fighting about, in fairness. I completely understand that.

But part of what I have to do is make what I believe to be the right decision based on all the facts and circumstances. And I'm going to do the best I can with that.

For now, I'd like to table the issue and get to the topic of witnesses so that we can get started as close to 9:30 as we can.

MR. BOWMAN: Judge, sorry, just one more --

THE COURT: Sure.

MR. BOWMAN: -- point for the factual record to set the context in which everybody was operating in terms of what we knew about Ms. Ocampo, what we knew about the difficulty of getting her here.

I'm not standing here this morning with a firm recollection of the process. But I do have a distinct memory of coming to this courthouse, not once, but twice after Judge Ellis had involved the United States Marshal Service in the process of getting Ms. Ocampo here. I don't know what the gap was, but I can state that it sputtered.

We all knew that. We all knew that she was a huge problem in terms of bringing her to court. The process to get her to the deposition consumed months. And, so, nobody was

writing on a blank slate.  And I just wanted to make that point.

THE COURT:  Fair enough.  Fair enough.

MR. LOEVY:  And we're not trying to keep her testimony out.  We're trying to cross-examine her.  That's the point.

THE COURT:  But you did --

MR. LOEVY:  She said she has no memory.

THE COURT:  But you did cross-examine her.

MR. LOEVY:  Well, she had no memory and we -- the deposition was the deposition.

THE COURT:  Right.  And it was your deposition.

MR. LOEVY:  True.  But, you know, I think strategically they like the deposition.

THE COURT:  And strategically you'd like to keep it out.

MR. LOEVY:  We'd like to cross-examine her.

THE COURT:  And you did.

MR. LOEVY:  All right.

THE COURT:  You did.

I know we disagree on whether the circumstances were ideal.  I get that.  I completely understand that.  But I just think arguing to me that you'd like to cross-examine her falls a little flat, because you did have the opportunity.  It wasn't ideal.  It was under horrible circumstances in the sense that everybody had to jump through hoops to get there.  And I've

1732

read the deposition a couple of times, and it's a mess.  It's a hot mess.  That's the technical term for it.  I completely agree.

Okay.  I will get you something on that as soon as I can, but let's get to the issue of the witness timing, if we can.

MR. LOEVY:  We can, your Honor.

And we told the defendants immediately before leaving court that if they didn't want to call T.J., we wouldn't call T.J.  They subsequently confirmed that they're not calling T.J.

THE COURT:  Okay.

MR. LOEVY:  So, that shrunk our case considerably as of then.

We are going to finish Debra Scott.  We're going to call Cutler.  And there was some concern about, you know, we said we'd let Cichon break in, but then they said Cichon's going to go Friday.  Dr. Cutler is here from out of town.  He's going to go next and then he's going to leave town.

Because he's been here since when?

MR. BOWMAN:  He's been here -- he was here all day yesterday --

THE COURT:  Okay.

MR. BOWMAN:  -- waiting to testify.

MR. LOEVY:  So, after Cutler, depending on the timing -- we've asked Ms. Kerbis to come to court through her

1733

attorney. And this is unfortunate, your Honor. You always assume the best out of everybody's intentions and such. But in our view, there's an attempt to protract this.

So, we were told by an assistant for the attorney who represents Kerbis, oh, your subpoena's no good, or you didn't subpoena her. And, then, we said, yes, we did. And, then, she said, well, your subpoena's no good. And, then, they said, well, she can't testify today. She has to go tomorrow. In other words, to stay in their case and make it longer.

And we've written them an e-mail saying, come on. You guys -- you don't want us to get their address to subpoena them. You can't play games with us like this.

And they said, well, she must go tomorrow.

So, we are going to keep our case open to call her if you let her testify.

But that's it. So, they're going to get the case late morning today. And we keep impressing on them, if they run out of witnesses, they can't just keep pushing people to Friday so they have more time to find Marisol and more time to kick the closing to Monday.

We could finish this evidence today.

MR. GIBBONS: I'm not sure why Jon thinks he's running the courtroom. But when he rests, we get a chance to put on our case.

And I have to tell you, I take umbrage that we're

1734

doing anything tactical with the Cook County State's Attorney's Office.

The Court should know that they will not allow us to talk to their witnesses. There's a wall there. They have outside lawyers who do a job of protecting those lawyers in that office and the office. They have a lot of reasons for that, including deliberative process and whatnot.

To suggest that any current ASA is in our control or we are playing some game with their schedule is ludicrous. Jon has the same ability to talk to the Cook County State's Attorney's Office lawyers, outside lawyers, as we do. Whatever he was told comes from them, not manufactured by the defense.

So, any suggestion there that we are somehow manipulating witness appearances in a courtroom for Friday is ludicrous. We don't have any control over the ASAs. That became abundantly clear yesterday in Spizzirri's. I had no opportunity to talk to Spizzirri before. There's a wall.

And, so, I just need to personally say that that is really insulting for guys that have tried cases each against each other for 25 years.

MR. LOEVY: I'm not accusing anybody of anything. I'm saying there's been a lot of pressure to let's do more on Friday, let's do more upon Friday. I keep trying to end it, they keep trying to not end it. But now they have to put their witnesses on the table.

1735

THE COURT: Slow down.

MR. LOEVY: Now they have to put their witnesses on the table, and there are none. So, it's their turn.

THE COURT: Okay.

MR. FLYNN: If I could respond to that, your Honor.

The gamesmanship on these witnesses has been appalling. I've never experienced anything like it. Yesterday at the end of court he added three or four new witnesses. Then he said, okay, we won't call T.J., and then a few hours he said, we won't call Felicia. And it's just back and forth, back and forth.

So, we're in a position where we were ready to call Cichon yesterday. We said he had to go in the morning. He represented to the Court that's not a problem. Last night he says, nope, we're not doing that anymore. So, Cichon has to go to Friday because of his decision.

Same thing with Kerbis. We had nothing to do with that. She has to go on Friday.

We told him a long time ago that Segovia, the medical examiner, has to testify on Friday.

We have Dr. Welner here ready to go today.

Mr. Dorsch is another witness of ours. Again, we told him he's not going to go till Friday because he added all these witnesses. We're now trying to find out if he's available today. We haven't heard back yet on that.

And, then, the one last witness, your Honor, just to give you an update is Amanda Moore. She's another one of the eyewitnesses who saw R.J. shooting, testified at the criminal trial. We thought we were going to have her. She sent us some text messages yesterday saying that she fears for her life and she wants to talk to the judge. We're still trying to get her here, but that's where that's at.

THE COURT: Okay.

MR. LOEVY: We have to respond to anybody fearing for their life, because this is a witness who's been on both sides' lists, and we've been contacting her before trial, too.

MS. DEL VALLE: Yes, your Honor. I spoke with Amanda Moore yesterday evening around 10:00 p.m. She explained to me that she was contacted by the defense counsel. They asked her if she was going to come to court. She said that she didn't want to come to court, and that their attorney told her that they were going to tell that to you and then take the next -- take steps forward and then get back to her today. There was no mention of being threatened. No mention of any of that.

MR. LOEVY: In fact, you had talked to her before trial --

MR. FLYNN: I can show you the text messages, your Honor. Can we proffer the text messages to the Court if they don't believe us?

THE COURT: I believe -- I don't believe that any one

1737

of you would stand up here and tell me something that's not true. I have absolutely no doubt about that. So, I don't need to see anything at all. I assume that every single one of you takes your obligations very seriously.

I know from prior work, miscommunications happen and games of telephone become complicated. And that is not at all to disparage anything that any of you had.

I would like to move forward with getting the evidence in. So, let's do that. Let's take the opportunity to get Ms. Scott back on the stand. I realize that there are a number of moving parts. We have figured this out for the better part of eight days. We will figure out what comes next.

I appreciate hearing what some of the next sets of witnesses are for purposes of today, and that the defense is in a position to call some and potentially get some here. And if there's something more that you need to do with me with regard to Ms. Moore, I'll do it, to the extent that it's appropriate.

But it sounds like at least one or both of you have been in touch with her in a way that will get her here if we need her here.

MR. LOEVY: If she wants to come, you know. She --

MR. GIBBONS: Your Honor, just on the timing thing, Jon suggested we'd be finished this morning. I don't see that happening. Locke took an hour and ten yesterday, said he had 10 minutes, maybe 10, maybe 15. I have at least an hour.

Then we've got an expert, who I think the direct is going to be 30 to 45 minutes.  My cross will be the same.

I think we're going to get done with those two witnesses by lunch, potentially.  If there's any more on their end, that's going to be in the afternoon.

MR. LOEVY:  Let's see what happens.

THE COURT:  Okay.

Mr. Bowman, how much longer do you have with Ms. Scott?

MR. BOWMAN:  About ten minutes, maybe a little more.

THE COURT:  And remind me of the length of your cross.

MR. GIBBONS:  It will less than Locke's.  I would suspect about an hour.

THE COURT:  I thought that's what you said.  I just wanted to confirm.

Okay.  Terrific.

(Pause.)

(Jury in.)

THE COURT:  Please be seated.

Good morning and welcome back, ladies and gentlemen.

Ms. Scott, you remain under oath.

Mr. Bowman, you may continue your inquiry.

MR. BOWMAN:  Thank you, Judge.

DEBRA SCOTT, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (Resumed)

BY MR. BOWMAN:

Q.   Good morning, Ms. Scott.

A.   Good morning.

Q.   I wanted to take you back quickly to a subject you testified about yesterday afternoon.  When you were at Grand and Central at the Area 5 police station on September 3, did you tell us that your daughter Cierra was with you?

A.   Yes.

Q.   As well as Taneshia Branch, who was your niece?

A.   Yes.

Q.   And Almanique Scott was there, as well?

A.   Yes.

Q.   How long were the three of them at the station?  I know you don't know exactly, but just approximately.

A.   Maybe over a hour or two.

Q.   At any point while you were there at Area 5, did any detective take any action to request the opportunity to speak with any of the three of those girls?

A.   No.

Q.   Did any of those three refuse to speak with the police at that time?

A.   No.

Q.   I neglected to ask you a question about Marcel as a child coming up and up to the date of his arrest.

     Was he involved in gangs at all?

A.   No.

Q.   Could you describe your son as a teenager?

A.   He was a good kid.  He was a mama's boy.

Q.   I asked you yesterday about an incident in which unfortunately a bullet flew into your home when you were living on Parkside.  Do you remember talking about that?

A.   Yes.

Q.   Did that have anything to do with Marcel?

A.   No.

Q.   So, when we left off yesterday afternoon, you were talking about what happened when Marcel was released from the Department of Corrections in July of 2018, and you walked us through a picture that included folks in your family.

     You said that Marcel couldn't wait to get in the car?

A.   Yes.

Q.   And can you tell us what happened -- where did you take Marcel?

A.   To my house.

Q.   And what did you find when you got to your home?

A.   Family, friends, church people was there.

Q.   How many folks?

A.   I can't even count.

Q.   What was the general mood?

A.   Everybody was happy to see Marcel home.  And when I got there, I ran downstairs to get Cierra.  I say, wake up, wake

Scott - direct

1741

up. And she was, like, Ma, you know I got to go to work. I do 12 hours. I say, no, get up, I got a surprise.

And when she came upstairs, she ran to her brother and jumped in his arms and was crying.

Q. How -- what did you observe about Marcel's mood during this gathering at your home right after he was released?

A. He didn't want no one there. He was nervous.

Q. Did he say or do anything to indicate that to you?

A. Yes. He came up to me and, like, Ma, Ma. Everywhere I went, he went.

Q. In the early days of Marcel's freedom, did you have to take any steps to acclimate him to being in the free community again?

A. Yes.

Q. Can you tell us some of the things that you had to do?

A. First, when he came home that night, I told him, you can sleep in my bed, you can have my bed. He was like, no, the bed too soft. I don't want to sleep in it. And he wanted to sleep on the floor or the couch.

Q. In those early days after his release, what did you do about clothes for Marcel?

A. We got up, my daughter and I, we took him to the store, and Daveal took him to buy little things, but not much.

Q. Did you suggest that he could just do that on his own?

A. No. He wouldn't go.

Scott - direct

1742

Q.   Why was that?  Did he explain?

A.   It was hard for him to communicate with the world again.

Q.   In those early days, what did you observe about Marcel when he was sleeping on the couch or on the floor in your home?

A.   He wouldn't sleep.  He'd pace the floor all night walking. And he was so much under a lot of distress, and he was just like walking, walking back and forth.  And I'm, like, what's wrong?  You can go to sleep.  And he was, like, no.

Q.   How did he learn to use the TV?

A.   My granddaughter.

Q.   And what did she do?

A.   She was teaching him how to work it, and he couldn't understand.  So, she made fun of him and he got upset.  He went into the bathroom.

Q.   Did Marcel spend more time than you would have expected in the bathroom when he was staying in your home?

A.   Hours.

Q.   Did you ever ask him about that, what was he doing in there?

A.   Yes.  I always have to knock on the door, like, hey, you can't hold up the washroom too long.  Why you in there so much? And he was, like, this is where I get to think and let my emotions.

Q.   Did there come a point when Marcel began seeing a therapist?

A.   Yes.

Q.   Did you encourage him to do that?

A.   Yes.

Q.   As a result of seeing the therapist, in your mind, were there improvements in Marcel's state of well-being?

A.   A little bit.

Q.   Did there come a point, Ms. Scott, at which Marcel moved out of your home and found his own place?

A.   Yes.

Q.   How long had he been living with you before he moved away?

A.   Probably almost two years.

Q.   And where did he move?

A.   With his girlfriend Tyasia.

Q.   Where did they live?

A.   In Berkeley.

Q.   Was Tyasia someone that Marcel knew from before?

A.   Yes.  She was his previous -- his same girlfriend when he got locked up.

Q.   And did Tyasia and Marcel have anyone else living in the home with them when they moved away?

A.   Yes.

Q.   Who?

A.   Her daughter.

Q.   How old was her daughter?

A.   I think her daughter was about, maybe seven, if I'm not

mistaken.

Q. And were Tyasia and Marcel blessed with a child?

A. Yes.

Q. How old is the baby?

A. She's two.

Q. And her name?

A. Malani.

Q. And can you tell us, based on your observations, what you've seen about Marcel's relationship with his daughter?

A. Oh, he love her very much, and she loves her dad.

Q. And what about Marcel's relationship with Tyasia's daughter, the older girl?

A. Excellent. She love him, too.

Q. Is Marcel working now?

A. Yes.

Q. His job?

A. CeaseFire, helping with the community.

Q. Are you proud of your son, Ms. Scott?

A. Yes.

Q. Tell us why.

A. I'm so proud of him. First, he had a hard time, because I convinced him to go get other jobs, and he tried to get other jobs. But he'll work for a day at the temp service or two, and they'll come back and they'll fire him. And he'll come home crying. And I'll be, like, why, what's wrong? And he's, like,

they fired me.

So, I called up to the job and asked to speak to the human resource office, and they told me they fired him because his background.

Q.   So, Ms. Scott, at the minute, Marcel is working, he has a family and that's a source of pride for you; is that fair?

A.   Yes.

Q.   Do you see things in Marcel that lead you to suspect that he has some lingering pain as a result of what happened to him?

A.   Yes.  He have a lot of pain and suffering.

Q.   Can you tell us a little bit about what you've seen?

A.   He always being depressed.  He just walk, and he just get very upset.  And when his sisters say something wrong, he get upset.  They tell him he's not going to be nothing, he was a mama' baby.  You not going to accomplish nothing because you always up under mama.

Q.   And he's moved beyond that?

A.   Yes.

MR. BOWMAN:  Ms. Scott, that's all I have.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  All right.  Thank you, Mr. Bowman.

Mr. Gibbons.

MR. GIBBONS:  Your Honor, I don't know if I'll need the transcripts, but I have them of her deposition if we need them.

THE COURT:  Okay.  Thank you.

CROSS-EXAMINATION

BY MR. GIBBONS:

Q.  Good morning, Ms. Scott.

My name is John Gibbons.  I represent the detectives in this case.  You're aware of that?

A.  Yes.

Q.  Okay.  We've not met before, right?

A.  I don't recall.

Q.  Okay.  I hope you appreciate that I have to ask you some questions.  That's part of my job.  Do you understand that?

A.  Yes.

Q.  Okay.  And I tend to have a loud voice, often told that by my wife.  So, I apologize if my voice gets loud.  I mean no disrespect by that, okay?

A.  Okay.

Q.  All right.

Prior to coming to court today, had you met with Locke Bowman and some of the lawyers for your son?

A.  Yes.

Q.  Okay.  And, in fact, you've met them multiple times over the years; would that be fair to say?

A.  Don't recall.

Q.  Do you recall meeting them before your deposition to prepare for your deposition?

A.   Yes.

Q.   And do you remember meeting with them in the last days before you testified here today?

A.   Yes.

Q.   And they went over the questions that you might be asked, right?

A.   Only with Locke.

Q.   Okay.  And was Marcel with you at that time?

A.   No.

Q.   Okay.  Just you and Locke?

A.   Yes.

Q.   Went over a little bit of the question and the answers, right?

A.   Yes.

Q.   Okay.  Would you agree with me that in the summer of 2008, Marcel hung out a lot with both R.J. and T.J.?

A.   Can you repeat that?

Q.   Sure.

     Would you agree with me that in the summer of 2008, that Marcel hung out a lot with R.J. and T.J.?

A.   Yes.

Q.   Okay.  And you and R.J.'s mother are sisters, right?

A.   Yes.

Q.   And remind me of her name again?

A.   Sarah Scott.

Scott - cross

1748

Q.   Sarah.  Okay.

Just a few questions about the neighborhood around Parkside.

I think you've already testified to this, but you would agree with me that the area around that home at 1347 North Parkside was violent, right?

A.   Yes.

Q.   You previously have described in your deposition that there were shootouts on that block, right?

A.   Yes.

Q.   And there were people around selling drugs, hanging out, doing some bad things, right?

A.   Yes.

Q.   And, in fact, you witnessed, personally witnessed one of your neighbors get shot in the head in the moments before --

MR. LOEVY:   Objection to relevance, your Honor.

THE COURT:   Sustained.  Sustained.

BY MR. GIBBONS:

Q.   You would agree with me that you heard gunfire all the time in that neighborhood, right?

MR. LOEVY:   Same objection, your Honor.  The neighborhood's not on trial.

MR. GIBBONS:   But the gunfire is.  We've heard a lot about gunfire in 911 calls.

THE COURT:   The objection is sustained.

Scott - cross

1749

MR. GIBBONS:  The objection is sustained?

THE COURT:  The objection is sustained.

MR. GIBBONS:  Okay.

BY MR. GIBBONS:

Q.  Was violence in the neighborhood one of the primary reasons you wanted to move out of the neighborhood?

A.  Not really.

Q.  Just a couple of questions about R.J.

You knew, did you not, that he had trouble with the law prior to August --

MR. LOEVY:  Objection to relevance of her knowledge.

MR. GIBBONS:  Can I finish the question, please?

THE COURT:  You may finish the question, yes.

BY MR. GIBBONS:

Q.  You knew prior to 2008 that R.J. had trouble with the law; did you not?

A.  No.

MR. LOEVY:  Objection to her knowledge of R.J.'s trouble with the law; is not at issue, your Honor.

THE COURT:  Overruled.  In light of the direct yesterday, he can ask some questions about this topic.

BY MR. GIBBONS:

Q.  Did not know that?

A.  No.

MR. GIBBONS:  Your Honor, may I approach the witness?

Scott - cross

1750

THE COURT:  You may.

(Tendered.)

MR. GIBBONS:  Jon, I'm on Page 154, Lines 6 to 10.

MR. BOWMAN:  Just one second, John.

MR. GIBBONS:  Sure.  Sorry, Locke.  I forgot, your witness.

BY MR. GIBBONS:

Q.  You were on oath -- excuse me.  You were under oath when you gave a deposition on November 16th, 2021; is that right?

A.  Yes.

Q.  And you were sworn to tell the truth, right?

A.  Yes.

Q.  Okay.  Were you asked this question and did you give this answer:

"Question:  Did R.J. ever get in trouble with the law before August 2008?

"Answer:  Yes."

Did you give that answer?

A.  What do you mean did he get in trouble with the law?

Q.  I'm just right now asking if you gave that answer to that question.

A.  If it's in there, yes.

Q.  In fact, you knew that R.J. had been arrested for possessing a gun prior to August 2008, right?

MR. LOEVY:  Same objection, your Honor.

THE COURT:  Overruled.  In light of the direct yesterday, she can answer.

BY THE WITNESS:

A.  Yes.

BY MR. GIBBONS:

Q.  Okay.  Now, Mr. Bowman asked you some questions about Saturday, August the 30th, 2008, and I want to talk about that day right now, okay?

A.  Okay.

Q.  All right.  During that afternoon, there was a block party, right?

A.  Yes.

Q.  And at that block party, Cierra, Taneshia, Almanique, women you just mentioned, got into an argument with some of the girls, did they not, at that party?

A.  Yes.

Q.  You don't know those other girls' name, but you broke up that fight, right?

A.  Yes.

Q.  Okay.  And after that incident, you told the girls, Cierra, Taneshia, Almanique, to go home, right?

A.  Yes.

Q.  And in your mind, you believed they went home, right?

A.  Yes.

Q.  Okay.  But they didn't, and you know that now, right?

Scott - cross

1752

A.   No.

Q.   You know they ended up at Amundsen Park, right?

A.   No.

Q.   Okay.  You still don't know that?

A.   That did not happen.

When you asking me a question about the block club party, they was at home because I was at home with them.  So, I know they was at home.

Q.   All right.  And you know they were at home until you left to go to the party at Vern's Club, right?

A.   Yes.

Q.   Then at some point did you learn that they left home?

A.   Yes.

Q.   Okay.  And Vern's Club is not very far away from your home, right?

A.   No.

Q.   All right.  And on direct, you testified that you told Marcel to stay home that night, right?

A.   Yes.

Q.   Why did you tell him to stay home?

A.   I told him to stay home because he was babysitting his sisters.

Q.   And he didn't listen to you, right?

A.   No.

Q.   He went to the White Castle and was chilling with his

friends, right?

A. I didn't know that.

Q. You agree with me that your sister Sarah called you while you were at the party at Vern's Club, right?

A. Yes.

Q. Sarah told you that the girls, Cierra, Taneshia and Almanique, had called her about a stabbing, that they were present for a stabbing, right?

MR. BOWMAN: Objection. Hearsay, relevance.

THE COURT: Can you rephrase the question, Mr. Gibbons?

MR. GIBBONS: I can.

THE COURT: Thank you.

MR. GIBBONS: I'm not offering for the truth of the matter asserted, but what this witness does.

BY MR. GIBBONS:

Q. Sarah told you that the girls, Cierra, Taneshia and Almanique --

THE COURT REPORTER: Mr. Gibbons.

MR. GIBBONS: Sure, Joe. Sorry.

BY MR. GIBBONS:

Q. Sarah told you that the girls, Cierra, Taneshia and Almanique, called her about being present when somebody got stabbed; isn't that right?

MR. BOWMAN: Objection. Same objection to the -- her

state of mind on this is not relevant. Objection.

THE COURT: Overruled. She can answer. It's relevant.

BY THE WITNESS:

A.   Not for sure.

BY MR. GIBBONS:

Q.   You're not for sure because you don't remember that now?

A.   No.   Because the phone call that I received was different from what you saying.

Q.   Can you look at transcript page 187, which is in front of you.   And I'd like you to read that page to yourself, please, and see if this refreshes your recollection.

A.   Trying to find the page.

Q.   Yeah.   187.

A.   Okay.

(Pause.)

MR. BOWMAN:   Your Honor, we object to this line of questioning.   She's not a witness to any of this.   And this was not discussed in her direct.   And it's hearsay for no apparent purpose.

THE COURT:   So, the objection is overruled.

You raised a relevance objection before, and there is some relevance because she was a witness to some version of the events.

The hearsay objection is overruled because it's not

being offered for its truth.

I think those were the bases for your objection.

MR. LOEVY: They were.

BY MR. GIBBONS:

Q. Ms. Scott, does that refresh your recollection that Sarah told you that the girls were -- the girls, Cierra, Taneshia and Almanique, called her about being present when someone got stabbed?

A. Yes.

Q. And, so, you heard about a stabbing in Amundsen Park from your sister. But did anyone tell you that there was also a shooting at the park?

A. No.

Q. In this phone call with your sister, you told Sarah to go pick up the girls, right?

A. Don't recall.

Q. You didn't leave the party yourself, right?

A. No.

Q. Do you know if, in fact, Sarah picked them up?

A. No.

Q. Don't recall that?

A. No.

Q. She might have?

A. What I recall, I don't recall what you saying.

Q. I don't understand. What I recall you don't recall what I

was saying.  What does that mean?

A.   How are you putting it?  How are you saying it to me?

Q.   I'm just asking you if you have any recollection of --

A.   I don't recall.

Q.   Okay.  Do you recall whether you asked your sister Sarah if the girls were all right, including your daughter?

A.   Don't recall.

Q.   Would you agree with me that when you left Vern's party at 3:00 a.m. in the morning, you did not know anything about a shooting at Amundsen Park?

A.   No.

Q.   You would not agree with me?

A.   No.

Q.   You did know something about a shooting?

A.   No, I did not.

Q.   Let me take the negatives out of it.

Would you agree with me that when you left Vern's Tavern at 3:00 a.m., you were unaware that there was a shooting at Amundsen Park, correct?

A.   Yes.

Q.   When you got home at 3:00 a.m., did you wake up your daughter Cierra and ask her about the stabbing?

A.   No.

Q.   Let's talk about Sunday, the next day.

I think you testified in relation to Mr. Bowman's

questions that you went to church that morning, right?

A.   Yes.

Q.   Did you go to church around 11:00 or 12:00?

A.   Yes.

Q.   Okay.  And you went alone?

A.   Yes.

Q.   You didn't wake up Marcel on this Sunday to go to church?

A.   No.

Q.   Okay.  Would you agree with me that when you left for church before 11:00 or 12:00, no one was up in the house?

A.   Yes.

Q.   When you went to church, were you aware that Paris Jackson's body had been found in Amundsen Park?

A.   No.

Q.   When you got home from church --

        MR. GIBBONS:  Strike that.

BY MR. GIBBONS:

Q.   Approximately when did you get home from church?  Early afternoon?

A.   I don't recall a time.

Q.   Okay.  But services would take at least an hour or so; would you agree with that?

A.   No.

Q.   How long do they take?

A.   Sometimes two and three hours.

Scott - cross

1758

Q.   Okay.  So, if you went at 11:00 or 12:00, the earliest you're getting home is early afternoon; can we agree on that?

A.   I don't recall the time.

Q.   Okay.  When you did get home, whatever that time may be, people were up in the house, right?

A.   Yes.

Q.   Okay.  And when you first got home, you first talked to your daughter Cierra, right?

A.   Don't recall.

Q.   All right.  Let's go to your transcript.  Look at Page 191, please.  And I'm going to ask you to read Lines 1 to 10 on that page.

A.   191?

Q.   191, please, yes.

     (Pause.)

BY MR. GIBBONS:

Q.   Are you done reading that?

A.   Yes.

Q.   Does that refresh your recollection that upon getting home from church you talked to your daughter Cierra first?

A.   Yes.

Q.   Cierra told you about the stabbing?

A.   Don't remember.

Q.   Isn't it true that Cierra didn't tell you anything about a shooting at Amundsen Park?

A. Yes.

Q. She didn't tell you anything that the shooting involved R.J. with Marcel as the driver, right?

MR. BOWMAN: Objection. Argumentative.

MR. LOEVY: She already established that they didn't talk about the conversation.

THE COURT: Sustained.

BY MR. GIBBONS:

Q. R.J. and Marcel were in the house; were they not?

A. Yes.

Q. Now, we're talking this Sunday after you get home from church, right?

A. Yes.

Q. Okay. And Marcel at that point never came up to you and said, Mom, we have to have a talk, right?

A. No.

Q. At that time, Marcel didn't come up to you and said, Mom, R.J. shot in the park, did he?

A. No.

Q. You came to understand that a body was found in the same area that R.J. was shooting in, didn't you?

A. Yes.

Q. Okay. Now, you had mentioned on direct that you heard rumors to the effect that R.J. was the shooter, right?

A. I heard rumors that multiple people was shooting.

Scott - cross

1760

Q.   Okay.   And was one of the rumors that R.J. was one of the multiple shooters?

A.   Yes.

Q.   And when you heard that R.J. was a shooter, did you know it was in Amundsen Park?

A.   Yes.

Q.   Same place that the body of Paris Jackson was found, right?

A.   Yes.

Q.   And did you go up to Marcel at that point and said, Marcel, what's going on?

A.   Yes, I talked to him.

Q.   When did that occur?

A.   When I got out the church.

Q.   Your testimony now is that you talked to Marcel when you got back from church?

A.   Because everybody was in the house.   We all was talking.

Q.   Isn't it true that Marcel left your house on that Sunday morning with R.J. and T.J.?

A.   Don't recall.

Q.   Do you know that Marcel, T.J. and R.J. left and went over to T.J.'s house?

        MR. LOEVY:   Objection.   Asked and answered.

        THE COURT:   Sustained.

BY MR. GIBBONS:

Q.   T.J. lived close by, right?

A.   Not that close.

Q.   How far away?

A.   From Austin to Central.

Q.   Mile?

A.   To me, maybe two miles.

Q.   Okay.  Are you aware that your sister Sarah went to T.J.'s house and picked those three up, R.J., T.J. and Marcel?

A.   No.

Q.   This is the first you're hearing about that?

        MR. LOEVY:  Objection.  Assumes facts not in evidence, your Honor.

        THE COURT:  Overruled.  He can probe it.

BY MR. GIBBONS:

Q.   You can answer.

A.   Don't remember.

Q.   Do you recall your sister Sarah driving Marcel, T.J. and R.J. back to your house and Marcel then going up to his bedroom?

A.   What do you mean up to his bedroom?  His bedroom wasn't up.

Q.   Okay.  I did the same thing with Marcel.

        Do you recall your sister Sarah dropping the three off, R.J., T.J. and Marcel, at your house and Marcel going into his bedroom?

A.   I can't answer that question because the time you saying, I wasn't there.  I was at church.  If you saying in the morning.

Scott - cross

1762

Q.   Were you there when your sister Sarah dropped off the boys at your house?

A.   No.

Q.   When you got back from church, isn't it true that Marcel was in his bedroom?

A.   Yes.

Q.   And did you go into his bedroom and say, Marcel, what was your involvement in these rumors I'm hearing about R.J. being a shooter?

A.   I went to the door of his bedroom and I called him out.

Q.   Did he come out?

A.   Yes.

Q.   What did he tell you then?

A.   I was asking my son, I hope you didn't have nothing to do with this.

Q.   And what was his response?

A.   He was, like, no, Ma, I didn't.

Q.   What else?

A.   And, then, we all sat around, my sister and everybody was having a conversation.

Q.   No, don't move on.  You're at the door.  You're talking to your son Marcel.  You asked him, did you have anything to do with it?  He said, no, I didn't.  What else?

A.   And that's it.  And I believed him.

Q.   Didn't ask about R.J. shooting?

Scott - cross

1763

A.   No.

Q.   R.J. was your nephew, right?

A.   Yes.

Q.   Okay.  You then had at some point that afternoon or early evening what I'm calling a family meeting.  You know what I'm talking about?

A.   Yes.

Q.   That's the one that Locke went over with you yesterday.

Who was at this family meeting?

MR. LOEVY:  Objection to calling it a family meeting.  He said he's calling it a family meeting.

THE COURT:  It's been referred that way in prior testimony.  Overruled.

BY MR. GIBBONS:

Q.   Who was at this family meeting?

A.   It was me, myself, my sister Sarah, my brother Terry, R.J. father Rabbit, and Marcel, Terry, R.J., Taneshia, Almanique and Cierra, and my other kids.

Q.   Okay.  And at this family meeting, would it be true that Cierra, Taneshia and Almanique said they were there when shots were fired in the park?

A.   Yes.

Q.   That R.J. and Marcel were also there in the park?

A.   Marcel wasn't in the park.

Q.   We'll come back to that.

At this meeting, R.J. admitted having a gun and shooting, right?

A.   Yes.

Q.   All right.  On direct, I believe you testified -- I just want to clear this up -- that you said, R.J. said they were shooting at us and I shot back.  Did I get that right?

A.   Yes.

Q.   All right.  When you said, "they were shooting at us," who did you mean when you used the word "they"?

A.   I don't know the people.

Q.   Were those people ever identified in this family meeting?

A.   I still don't know them if they identified.  I don't recall.

Q.   You don't recall if anyone said that they knew the identity of the shooter in the park besides R.J.?

A.   Don't recall.

Q.   And in this statement you made, they were shooting at us, who was the us?

A.   Taneshia, Almanique, T.J., R.J., and Cierra.

MR. GIBBONS:  I'm sorry, I missed the names, Joe.

I could ask the Court.

THE COURT:  Sure.  She said Taneshia, Almanique, T.J., R.J., and Cierra.

BY MR. GIBBONS:

Q.   But not Marcel?

A.   No.

Q.   And you're not including Marcel in that statement because you didn't believe Marcel was in the park, right?

        MR. BOWMAN:  Objection.  Argumentative.

        THE COURT:  Over- --

        MR. GIBBONS:  I think she testified to that.

        THE COURT:  Overruled.  She can answer.

BY THE WITNESS:

A.   Repeat your question.

BY MR. GIBBONS:

Q.   Sure.

        At this family meeting, you left it believing Marcel was not in the park, right?

A.   He wasn't in the park.

Q.   I'm sorry?

A.   He wasn't in the park.

Q.   And based on this meeting, family meeting, you believed that Marcel was in his car when R.J. was shooting in the park, right?

A.   Yes.

Q.   You know today that's not true, right?

A.   No.

Q.   You still think R.J. -- excuse me.  You still think Marcel was in the car when R.J. was shooting in the park?

A.   Yes.

Scott - cross

1766

Q.   At this meeting, Marcel never said he saw Day-Day shooting, right?

A.   I don't recall names.

Q.   Do you recall Marcel saying he could identify anyone who was shooting in the park besides R.J.?

A.   No.

Q.   Did R.J. say what he did with the weapon during this family meeting?

A.   No.

Q.   And R.J.'s 15 years old at the time, right?

A.   I don't recall his age.

Q.   Was he around 15 years old?

A.   He was young.

Q.   Was he around 15 years old?

A.   I don't recall the age at the time.

Q.   And we have a gun that's still out there at the family meeting, as far as you know.  Did anyone press him on the gun's whereabouts?

A.   Not to my knowledge.

Q.   Was anyone worried that that gun could be used again?

A.   No.

Q.   It's true that you never found out what R.J. did with the gun, right?

A.   Yes.

Q.   You don't know whether he broke it down, threw it in a pond

or a sewer, right?

A.   No.

Q.   Never had a private conversation with your nephew R.J. about that gun, right?

A.   No.

Q.   At this family meeting, was it discussed at all where this 15-year-old kid got the gun from?

A.   His parents was talking to him, and I was talking to my son at the meeting.

Q.   You're all in the family meeting.  I get it.  At this family meeting I'm asking whether it was discussed where R.J. got the gun.

A.   Don't recall.

         MR. LOEVY:  Objection.  Asked and answered, your Honor.

BY THE WITNESS:

A.   Don't recall.

BY MR. GIBBONS:

Q.   Any discussion at the meeting how long R.J. had the gun for?

A.   No.

Q.   Did R.J. supply the family with any other details about the shooting except, they shot at us and I shot back?

A.   No.

Q.   That was the theme, right?

Scott - cross

1768

MR. BOWMAN:  Objection.  Form.

THE COURT:  Sustained.

Rephrase it.

BY MR. GIBBONS:

Q.   In fact, Rabbit, R.J.'s dad, was the one who suggested self-defense could be a defense to his son's shooting; isn't that true?

A.   Don't recall.

Q.   At this family meeting, right, Paris Jackson's body had been identified at that point, right?

A.   I don't recall.

Q.   You don't recall now that your kids were talking about the fact that it was Paris Jackson, the kid they knew from high school, who was actually the dead body in the park?

A.   When we had the family meeting, I don't recall nobody's knowing that person name at the time.

Q.   Okay.  But they knew there was a dead body, right?

A.   Yes.

Q.   In the same area that R.J. and presumably somebody else was shooting, right?

A.   Yes.

Q.   At that moment, as the aunt, were you concerned that R.J. had just murdered someone in the park?

A.   No.

Q.   Why not?

A.   Because he say he shot in the air.

Q.   I just asked you, like, less than five minutes ago were there any other details at the family meeting, and you said, I don't recall.  But now recall the direction he shot?

          MR. BOWMAN:  Objection.  Form.

BY THE WITNESS:

A.   Because you asked me a question and I'm telling you what happened.

          THE COURT:  The objection is overruled.

BY MR. GIBBONS:

Q.   Let's flush that out.

          You now recall that R.J. told the family the direction he shot in?

A.   He didn't tell the family.  He told me.

Q.   Privately?

A.   Because I asked.

Q.   Privately?

A.   Yes.

Q.   And did you ask him why he shot in the air?

A.   I asked him what he was doing with a gun.

Q.   Okay.  And what did he say?

A.   He couldn't give me a answer.

Q.   Did you ask him why he only shot in the air and not at the person presumably shooting at him?

A.   Yes.  When I asked him why he was shooting, he said they

Scott - cross

1770

was shooting at him, and he shot in the air and he pulled my daughter down.

Q. I got the daughter part. I'm just trying to figure out whether you questioned him about the direction of his shot.

A. No.

Q. Are you supplying this detail because you are, in fact, a little bit worried that R.J. could have murdered Paris Jackson?

A. No.

Q. Did R.J. tell you in this private conversation that he was running and shooting?

A. No.

Q. Did R.J. tell you that there was a lot of people in the park?

A. Yes.

Q. All right. Let's go back to the family meeting and Marcel's participation in it.

Did Marcel say in that family meeting that he did, in fact, drive R.J. to the park?

A. Yes.

Q. Okay. Did he say anything else?

A. Yes.

Q. What else did he say?

A. He drove them there to go pick up his sister.

Q. What else?

A. That's it.

Q.  No other details?

A.  No.

Q.  Did you question Marcel at all about any of the details about R.J.'s role in the shooting?

A.  No.

Q.  And isn't it true that Marcel never told you that he, in fact, drove R.J. away from the park?

A.  That's not true.

Q.  It's not true that Marcel drove R.J. away from the park?

A.  Yes.

Q.  How do you know that's not true?

A.  Because my son --

MR. LOEVY:  Sorry.  I thought the question was unclear.  I guess --

THE COURT:  Overruled.

BY THE WITNESS:

A.  Because my son did not drive him away from the park.  My son got pulled over at Austin and Bloomingdale by the detectives and they searched him, pulled him out the car, and they told him to go home.

BY MR. GIBBONS:

Q.  Okay.  What is the basis of your belief that Marcel Brown did not drive R.J. away from the park?

MR. BOWMAN:  Objection to the form of the question.

BY THE WITNESS:

A.   I just answered you.

BY MR. GIBBONS:

Q.   No, you answered me with what you know, but how do you know that?

A.   Because my son told me that.

Q.   That's what I'm asking.

Marcel told you that he did not drive R.J. away from the park, right?

A.   He told me the detectives pulled him over and R.J. was not in the car with him.

Q.   I'm just asking about the first part of this.

A.   And I just answered you.

Q.   Okay.  Just make sure we're clear on this.  R.J. -- excuse me.  Marcel told you he did not drive R.J. away from the park, right?

A.   No.

Q.   And you just told us that Marcel was stopped by detectives in the neighborhood, right?

A.   Yes.

Q.   And during that stop, no gun was found, right?

A.   Yes.

Q.   R.J. was not in the car, right?

A.   Yes.

Q.   Did you know that Marcel had dropped R.J. off at the nearby White Castle before he was pulled over by the police?

Scott - cross

1773

A.   No.

Q.   You don't think that happened?

A.   No.

Q.   And you don't think that happened because Marcel told you that didn't happen?

A.   No.

Q.   How do you -- why don't you think it happened?

A.   Because how could he drive him to White Castle and get pulled over right there Austin and Bloomingdale?  Why would he backtrack from White Castle to come back to where the incident happened at?

Q.   Maybe he was dropping R.J. and the gun off so he wouldn't get in trouble.  Could that be a possibility?

A.   No.

Q.   Isn't it true that you believed after the family meeting that R.J. ran home to your house?

A.   Don't recall.

Q.   Go to your deposition, please.  Page 215.  I would ask you to read lines, like, 9 to 14, but feel free to read the whole page.

     (Pause.)

BY THE WITNESS:

A.   Okay.

BY MR. GIBBONS:

Q.   Okay.  Does that refresh your recollection?

A.   Yes.

Q.   Okay.  So, in fact, during this family meeting, R.J. said he ran from the park all the way back to your house, right?

A.   Yes.

Q.   Do you know now that not to be true?

A.   No.

Q.   You don't think it's untrue because of what you had been told by Marcel and R.J. about what they did, right?

A.   Rephrase that.

Q.   Sure.

     Your belief that R.J. ran all the way home was based on what you were being told by R.J. and Marcel, right?

A.   Marcel just said he ran.  Marcel never told me he ran to my house.  R.J. did.

Q.   And did R.J. say that in the family meeting?

A.   That wasn't discussed.

Q.   When did he --

A.   To me, it wasn't discussed.

Q.   When did he tell you that?

A.   Afterwards.

Q.   Okay.  Let's move ahead to September 3rd.

     This is the day a lot of police came to the house, right?

A.   Yes.

Q.   And you described, I think, that there were police in front

of the house, right?

A.   In front of my house, on the side of my house, and in the back of my house.

Q.   Lot of cops?

A.   Yes.

Q.   And they were there to pick up Marcel, right?

A.   They was there to question Marcel.

Q.   Okay.  And a lot of them were there, right?

A.   Weren't a lot, lot.

Q.   I don't know what that means, a lot, lot.

A.   It was just like police was in the front, police was in the back, police was on the side.  I couldn't really see how many in the back because I never went to the back.  I just know they was back there.

Q.   All right.  And Marcel eventually was taken from the house away in a police car, right?

A.   In a detective car.

Q.   Detective car.  That's different than a police car?

A.   Yes.

Q.   The difference is one is unmarked and one is marked?

A.   Yes.

Q.   Okay.  And it's your recollection or testimony that he wasn't handcuffed when he was taken away?

A.   He wasn't.

Q.   And when he's put in the car and they depart, you no longer

Scott - cross

1776

can see him, right?

A.   I can see him.

Q.   Well, when they leave your premises and drive away, you're not trailing them in a car, right?

A.   No.

Q.   So, you don't know if he was handcuffed in the car on the way to the police station, right?

A.   No.

Q.   You don't know that either way?

A.   He wasn't handcuffed when he got in the car, because I gave him a jacket.

Q.   I understand that.  You've made that clear.  Now I'm just trying to figure out if you know whether he was handcuffed on the way to the police station?

A.   No.

Q.   Do you know whether he was handcuffed when he was out of the police car being taken into the area?

A.   How would I know that?

Q.   That's my question.  You don't know it?

A.   I don't know.

Q.   Okay.  So, Marcel is taken away from the house somewhere around 3:00 p.m. I think we've seen that on the tapes.  Does that comport with your recollection?

A.   Yes.

Q.   Okay.  And when Marcel is taken from the house around 3:00

p.m. on September 3rd, you had not hired a lawyer yet, right?

A.   No.

Q.   Okay.  Sometime after Marcel is taken away, your sister called you about the fact that cops were raiding other family member places.  Did I hear that right?

A.   No.

Q.   Okay.  Tell us about the call with the sister.

A.   Wasn't a call.

Q.   Oh.  How did you learn that cops were looking for R.J.?

A.   She was standing right there next to me.

Q.   And how did she learn that?

A.   She got a phone call, not me.

Q.   She got the phone call?

A.   Yes.

Q.   And, then, she relayed the information to you?

A.   Yes.

Q.   And you learned through that communication that the cops were raiding other places where they thought they could find R.J., right?

A.   They was raiding places that -- because him and his dad had the same name.  They was raiding all the locations where his dad used to live.

Q.   And when you say "raiding," what do you mean by that name -- by that term?

A.   Because they was told to me the polices jumped out all the

Scott - cross

1778

cars, they was at everybody -- all his locations and they had guns out.

Q. That's the raid you're talking about looking for R.J.?

A. Yes.

Q. Okay. Serious stuff, right?

A. Yes.

Q. Okay. And you then at some point spoke to Rabbit, right? R.J.'s dad?

A. Later.

Q. Okay. At some point you talked to Rabbit about what to do -- or what the family was going to do in relation to R.J., right?

A. No.

Q. On direct, you testified you're so worried that the cops are going to shoot him, you got to turn him in. How did you learn that?

A. I told that to my sister.

Q. You were the one who said that?

A. Yes.

Q. Okay. And you suggested that R.J. turn himself in to your sister?

A. How can he turn hisself into my sister?

Q. No. You said to your sister, hey, the family should turn R.J. in; is that right?

A. No. I told my sister, when she told me that, I said, hey,

you need to go get your son out of school, call back his dad, and we need to take him to the police station.

Q. Why did you tell your sister that?

A. Because they said they had guns out. I was afraid they gonna shoot him.

Q. Okay. And at this point, Marcel's already been taken away, right?

A. Yes.

Q. Okay. And family must have taken your advice, right, because they do get R.J. and they do bring him to the police station, right?

A. We all brought him to the police station.

Q. Okay. And one of the persons who was there was Renard Senior, right?

A. Yes.

Q. Rabbit, I think you called him, right?

A. Yes.

Q. Okay. And you gave us the names of the number of people who went to the police station on direct. I don't need to go through those again.

But there was a large group, right?

A. Yes.

Q. Okay. And at some point, you learned that Rabbit had hired a lawyer named Wham Cary to turn R.J. in, right?

A. Yes.

Q.   When and how did you learn that?

A.   Through my sister.

Q.   Okay.  It's true, when you heard that, you never said to anyone, I also want to hire Wham Cary for Marcel, right?

A.   I did say that.

Q.   You did?

A.   Yes.

Q.   At that moment where they're hiring Wham Cary for R.J., you said, hey, I'd like to hire him for my kid?

A.   I asked Renard that while we was in the parking lot waiting on Cary to arrive.

Q.   Got it.  Okay.  Let's talk about that sequence.

     So, you get to Area 5 and there's a parking lot there, right?

A.   Yes.

Q.   Do you recall what time that is?

A.   Maybe 4:00 or 4:30.

Q.   Okay.  And you were all waiting out in the parking lot for this lawyer Wham Cary to arrive, right?

A.   Yes.

Q.   How long are you waiting before Wham arrives?

A.   Wham probably got there maybe about 30 minutes.

Q.   Okay.  So, if you get there at 4:00, 4:30, it's now 4:30 or 5:00?  Is that about right?

A.   Yes.

Scott - cross

1781

Q.   Okay.  And Marcel had been in the police station now going on two hours, right?

A.   Don't recall how long he been in there.

Q.   Well, if he left your house around 3:00, and we're now at around 5:00, it's about two hours, right?

A.   Yeah.

Q.   And at that point, you had not hired any lawyer for Marcel, right?

A.   I hired a lawyer.

Q.   Okay.  I'm just taking this in baby steps.

When you're in the parking lot, before Wham Cary arrives, it's around 5:00 p.m., you had still not hired any lawyer for Marcel, right?

A.   No.

Q.   I'm wrong?

A.   I hired Wham Cary --

Q.   Yeah.

A.   -- in the parking lot.  And he said, wait, let me turn in R.J. first.

Q.   Yeah.  I get that.  I'm at a point when Wham's not in the parking lot yet.

A.   Oh.  He wasn't in there.

Q.   Okay.  Before Wham arrives on the scene, you had not telephonically hired any lawyer, right?

A.   No.  Rabbit did.

Scott - cross

1782

Q. Rabbit hired a lawyer for his son R.J., right?

A. Yes. And I asked him a question about my son. And he asked -- he was on the phone with Wham Cary.

Q. Is it your testimony now that you believed you hired Wham Cary on a telephone before Wham Cary got to the police station?

A. No, it's not I believe. I knew I hired a lawyer for my son.

Q. Okay. We'll get to that.

Now, on direct, did I hear right that you believe you were at the police station for one to two hours in total?

A. For who?

Q. No, just in total, the whole episode.

A. No, that's not true.

Q. How long were you there for?

A. We was there for a couple hours.

Q. Okay. A couple in my mind means two. Does it --

A. No, it maybe was three or four.

Q. You could have been there four hours?

A. Yes.

Q. You have a distinct recollection of this?

A. No, because I just got a feeling that I -- just clicked in my head the time. If it was at 3:00 and we were sitting there waiting, it was quarter to 5:00 before he brought Renard in, and we still waiting and sitting. The time do tick.

Q. Okay. I'm with you.

Scott - cross

1783

Marcel's taken away around 3:00, right?

A.  Yes.

Q.  I'm just setting up the scene.

The family gets to the parking lot 4:00, 4:30 of the police station, right?

A.  Yes.

Q.  Wham arrives 30 minutes later, maybe 5:00, 5:00-ish, right?

A.  Yes.

Q.  Okay.  From that point on, when Wham arrives, how long are you at the police station before you get thrown out?

A.  Maybe two-and-a-half hours.

Q.  Okay.  So, back to the parking lot with the family.

R.J. is obviously there, right?

A.  Yes.

Q.  He and the family are waiting for Wham so Wham can turn him in, right?

A.  Yes.

Q.  T.J. was also there, right?

A.  Yes.

Q.  Okay.  Wham arrives, right?

A.  Yes.

Q.  Talks to all of you?

A.  No.

Q.  What does he do?

A.  He was talking to Rabbit --

Scott - cross

1784

Q.   Talking to Rabbit.  Outside of your presence?

A.   No, we all was standing there.  I was standing to the side and they was standing there.  And he was talking to them.  And he said, okay, let's proceed and take him in.

Q.   Okay.  And, then, they go into the police station and Wham turns in his client R.J., right?

A.   Yes.

Q.   Was Wham paid for his representation of R.J. in your presence in the parking lot?

A.   No.  I know he got paid for R.J., but it wasn't in my presence.

Q.   How do you know he got paid?

A.   His dad told me.

Q.   What did his dad tell you?

A.   He have to pay Wham Cary.

Q.   How much?

A.   I don't recall the amount.

Q.   Cash?

A.   I don't know how he paid him.

Q.   But it was your understanding that the lawyer needed to be paid before he did any work for R.J., right?

A.   I don't know that.

Q.   When Wham and R.J. went into the police station, did you go in with them?

A.   We all went.

Scott - cross

1785

Q.   Everyone went in?

A.   Yes.

Q.   Okay.  Did you see Wham present his ID card and whatnot to the police officer at the front desk?

A.   We never made it to the front desk yet.

Q.   Okay.  Let's take it in baby steps, then.

You get to the front door.  Police officers swarm on R.J., take him away, handcuff him and whisk him away, right?

A.   Yes.

Q.   I mean, R.J. is a suspected shooter at this point, right?

A.   That's what they say, yes.

Q.   Did you expect the police to do anything but that?

A.   No.  They did they job.

Q.   Okay.  So, now we're at the door.  R.J. gets taken away and you go in the police station?

A.   Yes.  I was standing there.

Q.   Okay.  And do you see Wham identify himself to any police officer?

A.   Yes.

Q.   What do you see?

A.   He was standing there, and he was -- come through the door, before he can even introduce hisself, the officer told my nephew to turn around, put your hands behind your back, and he started reading him his rights and putting the handcuffs on him.  And Wham told him, I'm his attorney, I'm bringing him in.

And he was telling R.J., do not talk without your attorney.

Q. Got that. Let's move for the minutes beyond that now.

A. Okay.

Q. You go into the station, don't you?

A. Yes.

Q. Do you see Wham present his identification to any police officer at the station?

A. I don't recall.

Q. We've seen an exhibit of Wham Cary's identification that shows that happens around 6:00 p.m. Would that be generally your recollection of when you all went into the police station?

        MR. BOWMAN: Object to the form of the question as to what the document shows.

        THE COURT: Sustained.

        Just rephrase the question.

        MR. GIBBONS: Sure.

BY MR. GIBBONS:

Q. Do you believe you went into the police station somewhere around 6:00 p.m.?

A. No.

Q. You think it was earlier, later?

A. It was before 6:00.

Q. Okay. Do you know that R.J.'s ERI will show that he went into the cell at 5:57 p.m.?

A. I don't know that. How would I know that?

Scott - cross

1787

Q.   Have you ever seen the transcript of R.J. being in the cell?

A.   No.

Q.   Have you ever seen the tape showing it's 5:57 p.m.?

MR. LOEVY:  Objection, your Honor.  He's just testifying.  We don't know --

MR. GIBBONS:  I'm asking if she saw the tape.

THE COURT:  Overruled.  He's asking if she saw it.

BY THE WITNESS:

A.   No.

BY MR. GIBBONS:

Q.   Okay.  Putting aside the time for a second, you never witnessed Wham Cary show his identification to anyone at the police station?

A.   No.

Q.   Okay.  Now, T.J. was there also, right?

A.   Yes.

Q.   And on direct, you testified that there was a conversation between Wham and police officers regarding T.J., right?

A.   Yes.

Q.   This is before we ever get to your son, right?  Now Wham is dealing with T.J., right?

A.   Yes.

Q.   And he's working on getting T.J. turned in to the police, right?

Scott - cross

1788

A.   Yes.

Q.   Do you recall if Wham was paid cash to represent T.J.?

A.   No.  I don't recall.

Q.   Do you have any understanding of why Wham Cary doesn't recall this at all?

          MR. LOEVY:  Objection, your Honor.

          MR. BOWMAN:  Objection.

          MR. LOEVY:  It's not proper.

          THE COURT:  Sustained.

BY MR. GIBBONS:

Q.   So, in our sequence here, in your recollection, Wham now turns in T.J. before he starts to deal with Marcel Brown, right?

A.   He didn't turn T.J. in, because he asked the police officer, he say, I have a client here, another one, T -- Terry Scott.  You guys looking for him?  And the officer told him, no, we are not.  So, he told the mom to take him home.

Q.   And, then, there was further phone calls and dialogue and T.J. came back, and then Wham turned him in, right?

A.   Yes.

Q.   Okay.  This was all before Wham is dealing with your son's issues, right?

A.   Yes.

Q.   Okay.  Now, would you agree with me that you needed to pay Wham Cary before he went up and inquired about your son?

A. Yes.

Q. Okay. And do you recall how much money Wham Cary wanted to do that?

A. Yes.

Q. How much?

A. $350.

Q. Cash, right?

A. Yes.

Q. Okay. And you didn't have $350 on you, right?

A. Yes.

Q. You did have $350 on you?

A. Not all of it in cash.

Q. Okay. So, you had to go to the ATM in the lobby to get cash, right?

A. Yes.

MR. BOWMAN: Your Honor, I think I neglected yesterday to move this particular exhibit into evidence. I so move at this point.

THE COURT: Okay. It will be admitted, to the extent you didn't yesterday. Thank you.

MR. GIBBONS: Yeah, no objection.

BY MR. GIBBONS:

Q. Do you have that in front of you?

A. Yes.

Q. And this actually is a bank record you obtained, right,

Scott - cross

1790

through a subpoena and whatnot, right?

A. I didn't.

Q. The lawyers got it?

A. Yes.

Q. Okay. And did I hear you right on direct that this was a child support account?

A. Yes.

Q. Child, children, Marcel's account? I'm confused about the word "child."

A. It was Marcel child support.

Q. Okay. And the fourth entry down -- and Mr. Bowman went through this yesterday -- the one we see here is for $81.51, right?

A. Yes.

Q. And this is the money you were withdrawing to pay Wham, right?

A. Yes.

Q. And why did you take out -- I know there's a fee on there of 95 cents, but why did you take out, like, $82.50?

A. So I can have enough money, $350.

Q. So, did you have like 250-plus dollars in cash on you already?

A. I had -- I don't know how much I had in cash at the time. My sister gave me a little, couple dollars. Kenya gave me a couple dollars. And we were short, so I had to go to the ATM

to take out the 81.50.

Q.   Okay.  So, you worked to collect the money that Wham Cary wanted before he would do anything in relation to Marcel, right?

A.   Yes.

Q.   Okay.  This withdrawal is at 19:39:29.  Do you see that?  On the --

A.   Yes.

Q.   Okay.  That's military time, but it's 7:39 p.m., right?

A.   Yes.

Q.   Okay.  So, it's your testimony that at 7:39 p.m., Wham Cary's still in the station waiting for your money to begin to represent Marcel Brown, right?

A.   Yes.

Q.   So, you hand over the money to Marcel -- excuse me, about Wham Cary -- shortly before 8:00 p.m., right?

A.   Soon as I got the money out the machine.

Q.   Yeah.  And we -- well, the money comes out of the machine at 7:39 p.m., right?

A.   Right.  I can't tell you the time that I handed -- that he was handed the money.

Q.   Okay.  But we know it's after 7:39 p.m.?

A.   Yes.

Q.   Okay.  And this would be now four-and-a-half hours after Marcel has already been in the interrogation room, right?

A. Yes.

Q. Okay. And do I have this right that your first recollection is that Wham Cary went up to the lobby desk to inquire about Marcel?

A. Yes.

Q. Okay. Were you with him?

A. Yes.

Q. And it's true that you can't identify the police officer who was behind the desk, right?

A. I can't identify.

Q. But I think on direct you called her --

A. It was a lady.

Q. She, right, a lady?

A. Yes.

Q. So, it was not one of the male detectives in this homicide investigation, right?

A. No.

Q. Okay. And at some point Wham and you leave and you sit down and wait, right?

A. Leave and go where?

Q. Well, I don't know. You go up and you're asking about Marcel and you don't get to see him, right?

A. No. We asked -- Wham Cary says, I'm here to see my client. I'm representing Marcel Brown.

Q. Got that.

Scott - cross

1793

A.   And the lady told him to hold for a minute and she walked back to the phone.

Q.   Okay.

A.   And she picked the phone up --

Q.   Right.

A.   Couple of minutes --

Q.   But you don't know who she called, right?

A.   No, I don't know.

Q.   You didn't hear what she said, right?

A.   No.

Q.   She could have been talking to her boyfriend, right?

A.   I don't know.

Q.   Okay.  So, when that's happening, you guys are standing there or sitting down waiting?

A.   No, we were standing.

Q.   Okay.  So, how long do you wait for?

A.   We were standing there maybe -- maybe five or six minutes. I don't recall.

     She told us to turn to the left over there by the stairs and proceed up the stairs to the second floor and go through those double doors to the detective.

Q.   Okay.  So, you now proceed up to the second floor of Area 5, right?

A.   Yes.

Q.   All right.  And who is with you now?

Scott - cross

1794

A.   Everybody.

Q.   The whole team that you mentioned is following Wham Cary up the stairs?

A.   Except R.J. and T.J.

Q.   Well, right, because R.J.'s in the cell, right?

A.   Yes.

Q.   And T.J.'s turned himself in, right?

A.   Yes.

Q.   Okay.  We got that.

     But everybody else is going up the stairs with Wham, right?

A.   Yes.

Q.   You would think Wham would remember that, right?

A.   Yes.

Q.   All right.  You get to the second floor, and it's your testimony that Wham makes an inquiry to a person up there about representing Marcel and he wants to see Marcel, right?

A.   Yes.

Q.   Okay.  And you're told to wait?

A.   He told Wham to hold on.  He went to the phone, made a phone call, and he came back and Wham was giving him his credentials, showing -- giving him this, and Wham was signing the book.  And he told us, the officer is not here yet.  We'll have to wait outside.

Q.   All right.  So, it's your testimony that Wham presented his

credentials sometime after 7:41 to somebody on the second floor of the police station; is that what you're saying?

A. A detective on the second floor.

Q. Have you seen any evidence that that ever happened, documentary evidence?

A. No.

Q. Okay. And you said somebody -- Wham Cary purportedly signed a book at this time on the second floor?

A. I can't hear you. Can you go back to the mic?

Q. Did Wham Cary sign a book on the second floor? Is that your testimony?

A. Yes.

Q. Have you ever seen any documentary evidence that that ever happened?

A. No. I seen the book when he was signing it while I was standing there.

Q. I understand. But all these years now have gone by --

        MR. LOEVY: Objection, your Honor. Foundation.

        MR. GIBBONS: Let me finish the question.

BY MR. GIBBONS:

Q. All these years have gone by. There has been proceedings galore. Have you ever seen a document that would confirm that Wham Cary ever signed a book on the second floor of Area 5?

        MR. LOEVY: Objection, your Honor. Foundation and --

        THE COURT: Overruled. She can answer.

Scott - cross

1796

BY THE WITNESS:

A.   I seen the book when I was standing there when he was signing it.

BY MR. GIBBONS:

Q.   Yeah.

A.   If that's what you asking.

Q.   No, that wasn't my question at all.

Have you ever seen, since that day, any copy of that book?

A.   No.

MR. BOWMAN:  Objection.  Asked and answered.

THE COURT:  Overruled.

Her answer can stand.

BY MR. GIBBONS:

Q.   Before you said that you don't recall much about the police officer on that second floor either, right?

A.   No.

Q.   You don't know if the person was tall, short, hair color, bald, or anything else, right?

A.   No.

Q.   Okay.  So, you can't say that it was any of the detectives who were investigating the homicide of Paris Jackson, right?

A.   I knew one of the detectives, so I knew it wasn't him.

Q.   Okay.  Fair enough.  We're excluding one detective who you knew.

Scott - cross

1797

But you can't say as you sit here right now that it was any detective who was investigating the homicide of Paris Jackson was informed of this information that Wham Cary was on the second floor, right?

A.   What do you mean by that?  Do you mean the officer that was behind the desk?

Q.   No.  We have an officer behind the desk.  I heard that, right?

A.   Yes.

Q.   Officer you can't identify in any way, right?

A.   Yes.

Q.   I'm asking you whether you have any information that it could be any of the detectives who were investigating this case.  You don't know that, right?

A.   No.

Q.   Okay.  On direct you said that Wham went up one time, told to wait; went up a second time, told to wait; went up a third time, told to wait, right?

A.   No.

Q.   How many times did he go up?

A.   Two.

Q.   Two times.  Okay.

And how long were you waiting to see what would happen?

A.   We was there for a couple of hours.  I don't know the exact

Scott - cross

1798

time.

Q. Okay. So, you were there for a couple of hours waiting to see if Wham could get in and see your son, right?

A. Yes.

Q. All right. So, if this process started after you paid Wham at 7:45, we're now at 9:45 or 10:00 o'clock, and you're telling us you're sitting on the second floor of the police station waiting to see if Wham Cary could get in and see Marcel?

A. We were sitting there until the detective came out.

Q. I understand that. I'm talking about the timing.

A. I don't know the exact time. I know I was sitting there, and I was sitting on the floor.

Q. And you paid Wham Cary $350 bucks for this?

A. Yes.

Q. And he's still sitting there with you?

A. Yes.

        THE COURT: Mr. Gibbons, about how much longer do you have for --

        MR. GIBBONS: Five to ten.

        THE COURT: Great.

BY MR. GIBBONS:

Q. Okay. And after this couple of hours, police officers came up to you and ordered you to leave the station?

A. Yes.

Q. And Wham was with you?

A.   He was with us proceeding down the stairs.

Q.   But Wham was thrown out of the public police station with you, is your testimony?

A.   He was still standing over talking to the officer.  I -- we went on out the door because the officer told us if we didn't leave out, he was going to arrest us.

Q.   I heard that.

A.   And I didn't want to go to jail.

Q.   Did they throw Wham out, too?

A.   He was standing there talking to the officer.

Q.   Did they throw Wham out with you?

A.   No, he didn't leave out directly with me.  He end up coming out behind us.

Q.   So, you're saying that you were thrown out but Wham Cary wasn't?

A.   I'm not saying that.  I'm telling you what the police officer said.  Everybody get up, proceed down these stairs, and if you come back to the police station, we all gonna go to jail.

Q.   Okay.  These police officers that purportedly threw you out of a public police station, you can't identify them, right?

A.   No.

Q.   You have no belief that it was the detectives who were investigating the homicide of Paris Jackson, right?

A.   No.

Scott - cross

1800

Q.   Now, it is true, would you agree with me, that you never heard, while at the police station, any police officer tell Wham Cary that Marcel did not want to see him?

A.   That's what he told me.

Q.   No.   That wasn't my question.   My question was, did you ever hear --

A.   No.

Q.   Let me just finish, so we're clear.

You never heard a police officer tell Wham Cary that your son Marcel did not want to see him, right?

A.   No.

Q.   What I said was accurate, right?

A.   Yes.

Q.   You talked about the trial.   Just a couple questions there.

You attended every day.   Did I hear that correct?

A.   Yes.

Q.   It went for multiple days over many continuances?

A.   It went for -- yes.

Q.   Okay.   And witnesses were called at the trial, right?

A.   What do you mean witnesses?

Q.   Witnesses.   You're a witness.   Witnesses went to the stand, told their story, right?

A.   I didn't get on the stand.

Q.   No.   No.   I'm describing what a witness is.

A.   Oh, okay.

Scott - cross

1801

Q.   You were at the trial every day, right?

A.   Yes.

Q.   You watched what was happening in the courtroom, right?

A.   Yes.

Q.   Witnesses were called up there and testified.  I'm not going to get into what they said, but they were called to the stand and told their testimony, right?

A.   The police officers, yes.

Q.   There was more than police officers, right?

A.   No.

Q.   You don't recall that there were other witnesses in the case besides police officers?

A.   Besides the mother of Paris Jackson.

Q.   How about Marisol Ocampo?  She testified, right?

A.   Marisol Ocampo did not come to court.

Q.   You're telling us that Marisol Ocampo was not a witness in the criminal trial of your son?

A.   I didn't say that.  I said she did not come to court, sitting in that waiting room.  When I was sitting there looking, I never seen Marisol come up to the stand.  I seen Eddie Cane.

Q.   Okay.  Eddie Cane testified.  You remember that, right?

A.   Yes.

Q.   And there were other witnesses besides Eddie Cane, right?

A.   Could have been, yes.

Q.   Okay.  Last set of questions.

Mr. Bowman took you through when the judge reversed the conviction, right?

A.   Okay, yes.

Q.   And went through -- it's a happy day, right?

A.   Yes.

Q.   But at that point, there was still a moment of uncertainty, right, because the State's Attorney's Office still could have recharged Marcel Brown, right?

A.   Not to my knowledge.

Q.   When you left that day, you thought the case was over.  Is that your statement?

A.   I left what day?

Q.   Well, the day that the judge reversed the conviction.  It wasn't over, right?

A.   No.  Marcel was still in jail.

Q.   Right.  Because the State's Attorney's Office was still deciding whether to retry the case, right?

A.   I guess.

MR. GIBBONS:  I've got nothing further at this time, your Honor.

THE COURT:  All right.  Thank you.

So, it's about 11:00 a.m.  We'll take our morning break.

Please don't discuss the case.  We will take a

15-minute break and be ready to resume at 11:15.

All rise.

(Jury out.)

THE COURT:  Please be seated.

Ms. Scott, you can step down from the witness stand. And you're welcome to leave the courtroom for the break.

All right.  Mr. Bowman, about how much longer do you have for your testimony -- or for cross-examination?  Sorry.

MR. BOWMAN:  About 10 to 15 minutes, Judge, for redirect.

THE COURT:  Okay.  There may be some recross, I understand.  But our next witness is Cutler?

MR. LOEVY:  Correct.

MR. BOWMAN:  Yes.

THE COURT:  All right.  Other matters we should take up?

MR. LOEVY:  Not for the plaintiff.

MR. FLYNN:  None, your Honor.

THE COURT:  Okay.  See you in 15 minutes.

(Recess from 10:58 a.m., until 11:14 a.m.)

THE COURT:  Ms. Scott, you can resume the witness stand.

(Jury in.)

THE COURT:  You may be seated.

Ms. Scott, you remain under oath.

Scott - redirect

1804

Mr. Bowman, you may resume your examination.

MR. BOWMAN:  Thank you, Judge.

REDIRECT EXAMINATION

BY MR. BOWMAN:

Q.  Ms. Scott, Mr. Gibbons just now asked you a lot of questions about your memory of dates, times, conversations, and he asked you about your deposition transcript.

You recall all those questions, right?

A.  Yes.

Q.  He asked you about your deposition in particular, showed you some questions, right?

A.  Yes.

Q.  When was your deposition, Ms. Scott?  Do you recall?

A.  I don't remember.

Q.  It was about almost three years ago; isn't that right?

A.  Yes.

Q.  And three years ago in 2021 when your deposition was taken, that was already many years after the events that Mr. Gibbons was asking you about from 2008, right?

A.  Yes.

Q.  Did you do your best today and in your deposition to recall these conversations and events?

A.  Yes.

Q.  Mr. Gibbons asked you a number of questions about Amundsen Park on the night of August 30, 2008.

Were you in the park that night?

A. No.

Q. Do you have any personal knowledge about anything that happened in the park?

A. No.

Q. Who was there?

A. No.

Q. Who did what to whom?

A. No.

Q. That's not something you personally know anything about, correct?

A. Yes.

Q. You were asked some questions about who drove who to the park. Do you remember being asked those questions?

A. Yes.

Q. And you weren't there that night and you have no knowledge about who was driving who at what time; isn't that fair?

A. Yes.

Q. Because you weren't a witness to what happened in the park, full stop, right?

A. Yes.

Q. Ms. Scott, do you spend a lot of time every day thinking about this shooting all the way back in 2008 and what happened and who said what to whom and all of that?

A. No.

Scott - redirect

1806

Q.   If you forgot that Marcel drove R.J. from the park, kicked R.J. out of the car and then went on home, that's possible, right?

MR. GIBBONS:  Objection.  Leading.

THE COURT:  Sustained.

Rephrase.

BY MR. BOWMAN:

Q.   Is it possible that your memory and your knowledge about who drove away from the park with whom and who was in the car is unclear?

A.   Yes.

Q.   It has been 16 years, has it not, since all of this happened?

A.   Yes.

Q.   Did you -- before you took the stand to testify today, did you go back and study all the papers and the records and the transcripts and the reports about what had happened?

A.   No.

Q.   You went from your memory; is that right?

A.   Yes.

Q.   Ms. Scott, the events of August 30, 2008, and all that happened after it, is this something that your family has tried to forget and put behind yourselves?

A.   Yes.

Q.   It has been 16 years; has it not?

MR. GIBBONS: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. BOWMAN:

Q. Now, you were asked some questions about who shot at R.J. Do you remember being asked those questions on that subject?

A. Yes.

Q. If you were to be -- to have been told or to be told a name as to who that was, would that mean anything to you?

A. No.

Q. If the name Day-Day was said to you, do you know that person?

A. No.

Q. Does the name Day-Day mean anything to you?

A. No.

Q. Today?

A. No.

Q. And in 2008?

A. No.

Q. Mr. Gibbons asked you some questions about whether you had spoken to R.J. about R.J.'s actions in the park. You remember Mr. Gibbons asking you about that?

A. Yes.

Q. And this was on August 31st, the day after it had happened. And you said certain things you hadn't asked R.J. about. Do you remember that?

Scott - redirect

1808

A.   Yes.

Q.   It was R.J.'s parents' responsibility to ask their son those questions; was it not, Ms. Scott?

A.   Yes.

Q.   Your responsibility was to speak to your son, right?

A.   Yes.

Q.   And did you do that?

A.   Yes.

Q.   Bottom line, during that meeting and after that meeting, did your son ever tell you that he did anything wrong?

A.   No.

Q.   Was he consistent in telling you, Ma, I didn't have nothing to do with nothing?

A.   Yes.

Q.   When you took the actions that you took on September 3rd and going forward all those years, did you believe your son when he told you that he had nothing to do with shooting anyone?

A.   Yes.

Q.   You were asked some questions about a stabbing that happened in Amundsen Park.  And, again, you weren't there.  You have no personal knowledge about it; is that right?

A.   Yes.

Q.   You understood, from listening to the people who were there, that that stabbing happened after the shooting, right?

Scott - redirect

1809

A.   Yes.

Q.   And it happened outside of the park; did it not?

A.   Yes.

Q.   According to what you heard?

A.   Yes.

Q.   And that stabbing did not involve Taneshia, Cierra or Almanique, correct?

MR. GIBBONS:  Your Honor, I'm trying to let him not lead every question, but I don't want to keep popping up. These are all leading questions.

THE COURT:  Sustained.

MR. BOWMAN:  I'm anticipating -- sorry, Judge.

THE COURT:  Sustained as to leading, but I'll let you explain.

MR. BOWMAN:  I was anticipating a denial.

THE COURT:  Okay.  The objection is sustained.

You can ask your next question.

BY MR. BOWMAN:

Q.   What did you learn from anyone about whether or not your nieces and your daughter was involved in any way in that stabbing?

A.   I don't think they was involved in a stabbing.

Q.   And, actually, did you also hear, when you listened to people, about rumors as to another girl who had been involved?

A.   Yes.

Q.   And who was that?

A.   I think -- I don't remember.

Q.   If I suggested Marisol to you --

MR. GIBBONS:  Objection.  Leading.

Why doesn't Locke just testify.

THE COURT:  Okay.  The objection is sustained.

Mr. Bowman, do your best to ask non-leading questions.

BY MR. BOWMAN:

Q.   Let me move to another area.

You were asked some questions about September the 3rd. That was the day that your son was arrested, correct?

A.   Yes.

Q.   And the day that Wham Cary represented your son at the police station?

A.   Yes.

Q.   So, Mr. Gibbons asked you a lot of questions about times that various things happened.  Did you do your best to answer as to the times that you arrived at Area 5, times that Mr. Cary did the next thing, and so forth?

A.   Yes.  I tried to remember.

Q.   And sitting where you're sitting 16 years later, are you able to say with certainty what times all these things happened?

A.   No.

Q.   Were you making a record of, this happened at this time,

Scott - redirect

1811

this happened at this time, so forth, writing it down?

A.   No.

Q.   You're going off of your best memory 16 years later; is that fair?

A.   Yes.

Q.   Did it feel to you as if it was taking forever?

MR. GIBBONS:   Objection.   Leading.

THE COURT:   Sustained.

BY MR. BOWMAN:

Q.   There is a record -- placing on the screen again Exhibit 383 -- of exactly the time that you withdrew the money from your ATM account; is that not correct?

A.   Yes.

Q.   We don't need to rely on memory about that, fair?

A.   Yes.

Q.   And that time was September the 3rd at 7:39 p.m., correct?

A.   Yes.

Q.   Why were you staying in the police station for multiple hours on September 3rd?

A.   Waiting for the lawyer to go see my son.

Q.   Did you want to leave that -- your son in that station by himself?

A.   No.

Q.   Did you do everything that you could to try and protect your son, Ms. Scott?

Scott - redirect

1812

A.   Yes.

Q.   Mr. Gibbons asked you some questions about your attendance at the trial.  There were multiple continuances during the trial; isn't that right?

A.   Yes.

Q.   Did your family have any power to make this trial go faster?

A.   No.

Q.   Was it hard on your family?

A.   Yes.

Q.   Tell us why.

A.   It was hard on us because I was missing days of work and --

Q.   And was it also hard to have Marcel in the Cook County Jail for those years?

A.   Yes.

Q.   As you listened to the trial, did you hear any witness say that Marcel specifically did anything wrong?

        MR. GIBBONS:  Your Honor, objection.

        THE COURT:  Sustained.

        MR. GIBBONS:  I mean --

        THE COURT:  Sustained.

BY MR. BOWMAN:

Q.   I have one last area to go over with you, Ms. Scott.

        You were asked a number of questions about conversations that you had with your son Marcel.  In all of

Scott - redirect

1813

those conversations, was Marcel clear with you as to whether he was part of any shooting at anyone on August the 30th, 2008?

A.   He was clear that he didn't have nothing to do with it.

Q.   Did he ever hesitate in responding to you that he had nothing to do with anything that happened wrong on that night?

A.   No.

Q.   When Marcel struggled after his conviction was overturned, did he express to you any concern about the unfairness of being convicted of that murder?

A.   Yes.

Q.   What did he say?

A.   They wrongly convicted my son for something that he did not do, and --

MR. BOWMAN:  I have nothing further.

THE COURT:  Thank you.

Anything based on that, Mr. Gibbons?

MR. GIBBONS:  I have nothing further for Ms. Scott.

THE COURT:  All right.  Ms. Scott, you are excused. Thank you for your testimony.  You may step down.

(Witness excused.)

THE COURT:  All right.  Plaintiff may call his next witness.

MR. BOWMAN:  Your Honor, at this point, plaintiff calls Brian Cutler.

THE COURT:  All right.

MR. BOWMAN: We're just getting him now.

(Pause.)

THE COURT: Mr. Cutler, please approach the witness stand and we'll get you sworn.

THE WITNESS: Yes, your Honor.

THE COURT: Sir, before you take your seat, please raise your right hand.

(Witness sworn.)

THE COURT: Mr. Bowman, you may begin your examination.

MR. BOWMAN: Thank you, Judge.

BRIAN CUTLER, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. BOWMAN:

Q. Good morning, sir.

Could you introduce yourself one more time so folks get your name?

A. Sure. My name is Brian Cutler.

Q. And we have asked you, Dr. Cutler, to be an expert witness in this case; have we not?

A. Yes, you have.

Q. Your current occupation is what, sir?

A. I'm a professor and program director at Fielding Graduate University.

Q. And I'd like to start off by asking you to tell the jury

what your educational background is.

A.   Sure.

I have a bachelor's in psychology from the University of Rochester.  That was 1982.  A master's in experimental psychology from the State University of New York at Geneseo, 1984.  And a Ph.D. in psychology from the University of Wisconsin at Madison.  That was 1987.

Q.   Could you tell the jury a little bit about what it is that you do?

A.   Yes.  Well, I've been in academia, a university faculty member since leaving graduate school.  In my current role, I administer a Ph.D. and master's program in what's called media psychology.  And I supervise graduate students' dissertations, teach occasional classes, conduct research, and perform administrative functions at my university.

Q.   Your field of expertise and specialty is, what?

A.   It is social and forensic psychology.

Q.   Would you tell the jury what that is?

A.   Social psychology is the psychology of how people think, feel and behave in social situations.  It's one of the original core areas of psychology.  Social psychologists study processes such as social influence, attitudes and behavior, persuasion, relationships, relationships between people, relationships between groups.  So, it's like the psychology of everyday, normal behavior.

Forensic psychology -- it's a newer field, although it's not really very new -- is the intersection of any area of psychology and any area of law.

So, my work is in the intersection of social psychology, although I also do work in other areas like cognitive psychology and the criminal justice system.

Q.   Has your work focused in the past years on the specific subject of false confessions?

A.   Yes, it has.

Q.   What have you done, sir, in that particular area?

A.   Well, as a teacher, I began following this area as the research and writing came out in our forensic psychology field. So, that was since the late '80s and '90s.

As a book editor, I've invited other experts to contribute chapters in books that I have edited, such as the Encyclopedia of Psychology Law in the American Psychological Association's Handbook of Forensic Psychology.  I was editor of our -- of the peer-reviewed journal Law and Human Behavior for six or seven years.  And I oversaw the peer-review process for probably a thousand manuscripts.  A portion of those were on the topic of false confessions.

In 2014, I began my own research program on the topic. And I received, in 2016 -- I was teaching at a university in Canada at the time -- a grant from a research-granting agency in Canada to study certain aspects of interrogations and false

confessions, and I've been doing that since.

Q.   Have you published the results of research or otherwise in academic journals on the subject of false confessions?

A.   I have, yes.

Q.   And those journals have been peer reviewed?

A.   Yes.

Q.   The publications were peer reviewed?

A.   Yes.

Q.   And what does that mean?

A.   Peer review is our method of quality control in science. So, it's also our way of communicating sciences to the scholarly community and to the rest of the world.

So, before research is published in a peer-reviewed journal, it goes through a rigorous, usually a double blind review process.  So, a researcher who conducts a study or a series of studies submits a manuscript to a journal.  The editor sends the manuscript out to other experts in the field without the author's identity.  The reviewers provide the editor with critical feedback about the manuscript.  They make recommendations about whether the manuscript should be rejected outright, it doesn't meet the journal's standards; revised and resubmitted for further consideration; or accepted.

The editor makes an editorial decision.  And, then, if the decision is favorable, eventually accepted, the manuscript is published in the peer-reviewed journal, and it has the --

it's considered having met our quality control standards in science.

Q.   So, let me ask you another question about your study.

In the course of your work on false confessions, have you had the opportunity to examine how police are trained to conduct interrogations?

A.   I have, yes.

Q.   Tell us about what you -- just in short, general terms, what study and research you've undertaken in that regard.

A.   Sure.   There are a couple of dominant methods of training of police interrogation.   One of them was developed by Reid & Associates, a Chicago company that has been training interrogators for probably 60, 70 years.   I've taken their training.   I have familiarized myself with their training manuals.   I refer to them often in my work.   I've looked at other training materials, such as that of another Chicago firm Wicklander-Zulawski.   And I follow methods that are used in the UK that are known as non-confrontational methods of interrogation.

So, I try to keep abreast of various methods of interrogation.

Q.   Dr. Cutler, we, asking you to come here, have been obliged to pay you for your time; have we not?

A.   Yes.

Q.   And does the fact that we've paid you, as opposed to

Q. Mr. Gibbons or somebody else, have any effect on what you're about to tell us on the subject of false confessions?

A. It does not. I consider myself paid for my time, yes.

Q. Dr. Cutler, I want to start by asking you about false confessions generally.

Is that a thing? Do false confessions happen?

A. False confessions happen. That is a fact. There are documented cases of wrongful conviction, and some percent of those documented cases of wrongful conviction have involved false confessions. That is, where the individuals who were convicted for those crimes actually confessed to crimes they did not commit and have spent years, sometimes decades in prison.

It may seem counterintuitive, illogical or even unbelievable, but when one comes to understand the vulnerabilities of individuals and the processes that led to their false confession, it becomes more understandable.

Q. Drilling down on the point that you made about wrongful convictions, it is true, sir, in the 1990s, that there were a number of exonerations of individuals that came about because of the presentation of DNA evidence; is that right?

A. That's correct. In the 1990s, DNA evidence became used in resolving criminal cases and also in exonerating individuals.

Q. And DNA, when it points away from the defendant, is a pretty darn good indication that the individual was actually

Cutler - direct

1820

innocent, fair?

A.   Absolutely.

Q.   And have researchers focused in on the DNA exonerations and studied evidence that was used against those people to convict them of the crime that they didn't commit?

A.   Yes.   That work has been done.

Q.   And have researchers examined the extent to which the person exonerated by DNA evidence had confessed to the crime that they didn't commit?

A.   That has been done, as well.

Q.   Can you tell the jury a little bit about the state of the knowledge on that?

A.   Sure.   There's an organization called the National Registry of Exonerations.   It's housed by the University of Michigan. And they accumulate information about cases of wrongful conviction since 1989.   And they've identified about 600 cases of wrongful convictions where the exoneration was based on DNA evidence.   Among those 600 -- about 600 cases, about 140 of them, 24 percent, involved false confessions.

Q.   So, what you're saying is that 24 percent of the people exonerated by DNA evidence had confessed to the crime that they didn't commit?

A.   That's -- that's what the records show, exactly.

Q.   And does that have significance in your field in terms of informing your work?

Cutler - direct

1821

A.   It certainly does.  It has significance in that it establish -- it helps establish that false confession isn't the words you use.  It's a thing.  It happens.  It has very real consequences.  And it helps us identify specific contributors to wrongful conviction, one of them being false confession.  And it steers us toward cases that we can analyze to better understand how the false confessions led to wrongful convictions and other aspects of false confessions.

Q.   What's the reason that it's important to know about false confessions and how they come about?

A.   Well, the reason is that many of us have the goal of improving justice.  To the extent that we can understand what leads to false confessions, we can make changes.  We can change the way we do interrogations, for example, to reduce the risk of false confession, and thereby reduce the risk of miscarriages of justice.

Q.   I want to ask you some specific questions.

Actually, before I do that, let me ask you this:  Has the research identified risk factors that exist for producing a false confession?

A.   Yes, it has.

Q.   So, I want to ask you about that.  But before I do, I want to make a couple of points clear.

Number one, Dr. Cutler, you are not here to tell us whether Marcel Brown did or did not confess falsely; is that

Cutler - direct

1822

right?

A.   That's correct.  That's not my role.

Q.   Not something you would ever do?

A.   Correct.

Q.   In any case?

A.   Correct.

Q.   And, in fact, Judge Jenkins, before this trial, has also set ground rules on your -- on the scope of your testimony, right?

A.   Yes.

Q.   Not to talk about that subject, yes?

A.   Yes.

Q.   And Judge Jenkins has also instructed --

        MR. GIBBONS:  Your Honor, I'm going to object in that that leaves the insinuation that he does have an opinion.  And that's improper.

        MR. BOWMAN:  I can ask him.  He doesn't have an opinion one way or the other.

        THE COURT:  That's fair.  That's a fair question.

        So, the objection is sustained.  And you may ask the question you just indicated.

        MR. BOWMAN:  Sure.

BY MR. BOWMAN:

Q.   Dr. Cutler, you don't have an opinion one way or the other as to whether Marcel Brown confessed falsely, correct?

Cutler - direct

1823

A.   I do not.

Q.   And that's because, among other things, you weren't in Amundsen Park on August 30, 2008, and you don't know what happened there?

A.   Correct.

Q.   All right.  Now, another ground rule, Dr. Cutler, is that you are not here to talk about Marcel Brown's specific interrogation, who said what to whom and how it unfolded; is that right?

A.   Correct.

Q.   And that is as a result of a ground rule that the judge has laid down?

A.   Yes.

Q.   All right.  So, with that, I want to talk with you about risk factors for false confessions.

     Is being young, 18 years of age, a risk factor for false confession?

A.   It is.  The psychological research on risk factors for false confession identifies youth as a common risk factor.

     When people become -- when youths turn 18 years old, they may become adults for legal purposes, but their thinking, their maturity, their decision making does not change overnight.  From a psychological standpoint, maturation occurs over time and well into the mid-20s.

     So, youth, including 18-year-olds, are known for

impulsiveness, for being susceptible to social influence, to being obedient to authority, and to making decisions on the basis of short-term rewards over long-term consequences. That's characteristic of youth decision making, and that is what puts them at particular risk for false confession in interrogation settings.

Q.   I want to ask you about the length of an interrogation, and whether a long interrogation is also a risk factor for false confessions.

But before I do, I want to ask you some questions to set the context.

Have researchers developed information about what is the typical length of a police interrogation?

A.   Yes, they have.

Q.   What is the state of knowledge about that?

A.   There were two surveys of police officers that were conducted about 10, 15 years apart.  The surveys were published in peer-reviewed journals.  Combined, they surveyed about 1100 police officers from around the U.S.

And these police officers were asked, what is typical length of interrogation?

And the average in both of these surveys, conducted decades apart, was virtually identical:  1.6 hours.

The police training literature has information on interrogation length, as well.

Cutler - direct

1825

Q.   Well, I was going to ask you about that.

You indicated that you have been exposed to this police training literature.  Is there any discussion in the police training about guardrails on how long an interrogation should last?

A.   Yes.  So, for example, the Reid Institute, which I mentioned earlier, recommends that a well-conducted interrogation shouldn't last more than three or four hours. And Wicklander-Zulawski, another training agency, recommends an hour-and-a-half as an upper limit for interrogations.

Q.   So, let me now turn to the question I wanted to ask you, which is:  Is a long interrogation a risk factor for the individual under questioning to confess falsely, and why?

A.   It certainly is.  What happens in long interrogations is that the suspect becomes fatigued.  Fatigue contributes to diminished thinking capacities.  When people are fatigued, they're less flexible in their thinking.  They become more impulsive and they become more susceptible to social influence.

They also become less able to regulate their thoughts, feelings and behavior.  In psychology we study a process called self-regulation, the ability to control your own thinking, emotions, and behavior.

What this translates to in an interrogation setting is reduced ability to resist the pressure of the investigators. So, as the interrogation continues in time, gets longer, it

Cutler - direct

1826

reduces the suspect's ability to resist the pressure of the investigators.

Q.   And does prolonged interrogation afford opportunities to the interrogator with respect to how they conduct the interrogation?

A.   Well, interrogations are conducted through -- by interrogators who use various strategies or tactics that they may have been taught to use.  So, longer interrogations mean longer time to use tactics that put pressure on suspects to confess.

Q.   So, you were talking about what we know about expected usual length of interrogation.  An interrogation lasting for more than a day, is that within the range or is that an outlier?

A.   That would be an outlier.  That is a -- very extreme with respect to guidelines for interrogations and what's typically done.

Q.   There's been some discussion in this trial about the period of time of questioning in an interrogation process versus the period of time that the suspect is actually in police custody, and how do you measure the length of an interrogation.

        What is your expert opinion with regard to how you should go about identifying the actual length of an interrogation?

A.   My opinion is consistent with what I know from the

psychological research on interrogation and the training literature on interrogation. Both define interrogation length as the amount of time that the suspect is isolated for the purpose of interrogation.

So, if an interrogation lasts an hour-and-a-half, the average time, and the suspect is interrogated for an hour-and-a-quarter and left alone for 15 minutes, the length of the interrogation is an hour-and-a-half.

In fact, leaving a suspect alone for some period is itself sometimes an interrogation tactic. Trainers of interrogation train that under certain circumstances, it's appropriate to leave the suspect alone with instructions to, I want you to think about this, I want you to think about what we've been talking about, consider your options.

So, that may be used as part of the tactic, and that's overall included as part of the interrogation.

Q. You've used the word "isolation." I want to turn to that subject and ask you, is isolation of the interrogation subject also a risk factor for false confession?

A. Yes, it is.

Q. Can you explain?

A. Sure. Isolation itself is stressful. If you think back over the past couple of years during the height of the COVID epidemic, you may have known -- you may have yourself experienced isolation. And it is a stressful event.

Cutler - direct

1828

People are social beings. When they are in anxiety-provoking situations or new situations or ambiguous situations, they look to others for information and they look to others for social support.

When people are isolated and they don't have that level of support, they become even more stressed and more motivated to end the situation, in this case an interrogation.

So, longer periods of isolation create more stress. They deplete the suspect's ability to resist influence by the investigators. They increase the risk of false confession.

Further, when a suspect is isolated from people they're close to, like family or their own representative, the only information that is available to them is from the interrogators. So, to the extent that the isolated suspect is seeking information, that's where they're getting it from, the interrogators who are authority figures.

And people tend to be influenced by and obedient to authority figures. So, the isolation magnifies the effect of the authority figures on the suspect.

Q. So, speaking of isolation, would the denial of a phone call requested by a suspect contribute as a risk factor for false confession?

A. Well, the denial of a phone call is -- increases isolation, and requesting a phone call is typically a sign of being stressed by being isolated.

Q.   And what about denial of access to a lawyer?  Does that contribute to isolation and also constitute a risk factor for false confession?

A.   Well, my understanding is that if a suspect had advice from a lawyer, the interrogation probably wouldn't happen or would probably stop, halt at that point.

Q.   And that would, if the person hadn't confessed already, eliminate the risk of a false confession?

A.   Right.

Q.   So, another subject.  What about sleep deprivation or fatigue?  Is that a risk factor for false confession?

A.   It is.  When we are deprived of sleep or otherwise fatigued, we know -- fatigue, we know from our own experience that even not getting enough sleep, an hour or two short of sleep can leave us with brain fog, can affect our thinking ability, our reasoning ability.  It affects our ability to self-regulate, generally.

So, when we are deprived of sleep, we become less able to resist pressure.  And the suspect who is deprived of sleep becomes more susceptible to influence, less able to resist the pressure from interrogators.

Q.   In your review of the police training literature about interrogation, are you aware of anything that authorizes a police interrogator to interfere directly with a suspect's ability to sleep during the course of a very lengthy

interrogation?

A. Well, I've not encountered a recommendation -- when we're limiting this to interrogations of criminal cases within the U.S., I've not encountered any recommendation that an interrogator should interfere with the suspect's sleep.

Q. In fact, are you aware of circumstances in which -- in other countries, interrogators have used fatigue and sleep deprivation as an interrogation technique to deplete autonomy and overcome the subject's will and capacity to resist?

A. Well, in international crimes and investigations of terrorism and interrogations of prisoners of war, sleep deprivation has been used as a way to soften people up, not only in other countries, but within the U.S., for example, with prisoners held at Guantanamo.

Q. Let me ask you about another risk factor. Deprivation of adequate nourishment. Is denying the interrogation subject the opportunity to eat or creating an environment where the interrogator knows that the interrogation subject is not eating, is that a risk factor for false confession?

A. It is. So, I talked about sleep and stress as factors that deplete self-regulation and reduce the suspect's ability to resist pressure from the investigators. Reduced blood sugar has the same effect. We know from our own experience if we skip meals, if we go a day without eating, that can affect our own thinking, our own impulsivity, our own ability to regulate

our behavior.  We may lash out, say something, do something, that we later regretted.

The same goes for a suspect during interrogation. When their blood sugar gets low, when they're hungry, that depletes their ability to resist influence by the investigators.

Q.   Next question, next subject:  What about being questioned under conditions of discomfort?  Does that constitute a risk factor for false confession?

A.   Yes.   There's some specific research on the influence of pain and discomfort on self-regulation.  And like food deprivation, sleep deprivation, discomfort reduces the ability to self-regulate.  And in the context of an interrogation, reduces a suspect's ability to resist influence by the investigators.

Q.   And can an uncomfortably cold environment be an example of such a thing?

A.   Yes.

Q.   So, very briefly, as we come to the end of my list here, sir, I want to ask you about some techniques of questioning. And my question is the same.  Are these techniques contributors or risk factors for false confession?

And the first technique I want to ask you about is the refusal to accept denials or repeatedly accusing the suspect of lying.  Is that a risk factor for false confession?

A.   Yes.   That is an accusatory tactic that is taught to interrogators.

And, you know, to this point I've been talking about as an effect risk factors that reduce a suspect's ability to resist pressure by the interrogators.   Tactics such as repeatedly accusing a suspect of lying has that effect, but it has another effect, as well.   And this is important for understanding the psychology of false confessions.

When a suspect repeatedly tells what he believes is the truth and is repeatedly told that he's lying, the suspect may come to believe that he has no chance of convincing the interrogator of what he believes to be true.   No chance at all.   And this has the effect of what I call reducing the suspect's autonomy.   The option essentially becomes taken off the table for the suspect.   It becomes futile to keep trying to explain the truth if you're repeatedly accused of lying.

You know, you think about it if you're driving home in Chicago in your usual route and you come to a road that's closed.   That road is taken off the table.   You now need to find a different way home, right?   Preferably a route that's not as long.

So, to the suspect, when that option of convincing the suspect -- excuse me, convincing the interrogator of what the suspect believes is the truth is taken off the table, the suspect's options become limited.   His -- he now must choose a

Cutler - direct

1833

different path.  And that's when the idea of falsely confessing goes from an illogical phenomenon to what seems logical, as that may be the path that leads to the next best goal: mitigating damage, getting a more lenient sentence.

So, the suspect's goal shifts from convincing the interrogators of his innocence to the more lenient treatment in the criminal justice system.  And that may be by falsely confessing.

Q.   I wanted to ask you another question about questioning. Does the use of contaminating questions play -- have a role to play in false confession?

A.   It often does.

Q.   First of all, tell the folks on the jury what people in your field mean when they refer to contamination in this context.

A.   Sure.  Contamination refers to providing the suspect with information that only a guilty suspect would know.  The investigators may have information that the suspect doesn't. And by providing that information to the suspect, they are, in essence, educating the suspect on what happened and what to say if they -- if and when they confess.

So, the suspect is not the original source of information of those facts.  It is the investigators who are the original source of information for those facts.

But when they are adopted by the suspect and repeated

Cutler - direct

1834

in a confession, that confession becomes more compelling to outsiders.  People evaluating the confession may not know that it was the police who were the source of that information.  They believe it was the suspect who produced those information.

And that's why -- one of the reasons why false confessions appear compelling is they contain details that only a guilty suspect would know.  But in reality, those details may have been provided by the police.  That's what we call a contaminated confession.

Q.   From your study of the training manuals relating to police interrogation, are police trained with respect to the use of contaminating questions, and what is the training?

A.   The training is --

MR. GIBBONS:  Your Honor, he is not a police practices expert.  We're now running far afield of what his expertise is.

THE COURT:  I'm just rereading the question.

(Brief pause.)

THE COURT:  Some of this I'm not sure where we're going with it, Mr. Bowman, and I don't know the extent to which it was disclosed previously.  So, can you --

MR. BOWMAN:  I --

THE COURT:  -- perhaps move to a different area and we can circle back to this?  I'm a little reluctant to give a ruling without some --

MR. BOWMAN:  Sure.  I'll tell you what I'll do.

To be clear, Judge, he has testified to a foundation for answering that question based on his review of the manuals and subjecting himself to the --

MR. GIBBONS: That doesn't make him a police practices expert. He's a forensic psychologist. We agree with that, not a police practice guy.

MR. BOWMAN: But in this particular field, the police practice informs the research, and it is encompassed within his report. I don't have -- I can't respond with specifics on the fly here.

THE COURT: Okay. The objection is overruled.

I will let you answer the question.

And if there are additional objections, we'll deal with them as they come. But the objection is overruled.

You can answer.

BY MR. BOWMAN:

Q. What is the training?

A. The training is first to take great care to not contaminate the confession, to provide the suspect with such detail. So, to limit the amount of evidence that is used in the course of interrogation, to avoid doing things like showing photos, crime scene photos.

And there's one technique that also is recommended, and that's creating a holdback list that is --

Q. Dr. Cutler, I appreciate your responsiveness to the

question.  I'm going to --

MR. GIBBONS:  Your Honor, I'm going to move to strike that answer based on his lack of expertise.

THE COURT:  Overruled.  You can cross him on it.

MR. BOWMAN:  Okay.

BY MR. BOWMAN:

Q.  Sorry to cut you off.  I want to ask you a final question.

Based on your research and background in this area, is it proper to look at each of the risk factors for false confession that you've been testifying about separately, one by one in isolation, or should they all be looked at together, and why?

A.  These factors should be looked at together.  They are related to each other.  They have similar effects.  When you combine the influence of long interrogation times, isolation, the repeated use of tactics, vulnerable populations or conditions of interrogation that increase vulnerability, such as when they run very long and isolation continues, but combined they can create a very oppressive environment that leads suspects to feeling hopeless, worn down, inability to resist the pressure from interrogators, they may feel that their options have become limited, their autonomy has become limited.  Their motivation shifts toward -- from convincing anyone of their innocence to mitigating damage, to getting better treatment by the criminal justice system.  And,

ultimately, they may say anything to end the oppressive situation, even if it's a false confession.

MR. BOWMAN:  Thank you, Doctor.

That's all I have at this time.

THE COURT:  All right.  Thank you, Mr. Bowman.

Cross-examination.

CROSS-EXAMINATION

BY MR. GIBBONS:.

Q.  Good afternoon, Dr. Cutler.

A.  Good afternoon.

Q.  We have not talked before, right?

A.  We have not.

Q.  Okay.  You've been in academia since 1987, if I heard your direct --

A.  Correct.

Q.  -- examination correctly?

Let's not talk over one another because Joe will get very mad at me, okay?

A.  Yes, sir.

Q.  The academia world is different than, like, other worlds, right?

A.  Yes, in many ways.

Q.  Yeah.  Like a practicing forensic psychologist working with clients is -- like police departments -- would be different than the world of academia, right?

Cutler - cross

1838

A. Yes.

Q. And your world, since 1987, has been strictly in the academic world, right?

A. It has been largely academic world, although I have done a fair amount of consulting and testifying in cases. Other than that, my world has been academic.

Q. And that testifying, consulting world was premised on your academic achievements, right?

A. Correct.

Q. I think we got Locke --

MR. GIBBONS: Strike that.

BY MR. GIBBONS:

Q. I think Mr. Bowman confirmed with you that you are not here to opine as to whether any statements made by Marcel Brown were true or false, right?

A. Correct.

Q. Okay. All right. Touch on the topics you talked about.

Isolation. You would agree with me that there are valid reasons for interrogation rooms, right?

A. May I have the question again, please?

Q. Sure.

You would agree with me that there are valid reasons for interrogation rooms, right?

A. Interrogation rooms?

Q. Rooms.

Cutler - cross

A.   Yes.

Q.   I know.  Nine days of trial now.  I've lost my voice.

A.   Understood.

Q.   The answer was "Yes"?

A.   Yes, sir.

Q.   Okay.  I mean, after all, homicide detectives are trying to solve crimes, right?

A.   Yes.

Q.   Interviewing suspects in a isolated, sterile setting, such as an interrogation room, affords them some privacy, right?

A.   Correct.

Q.   Free of distractions?

A.   Correct.

Q.   Probably a good idea not to have a window overlooking Lake Michigan, right?

A.   Personally, I think sunlight, natural light is a good thing.

Q.   You'd like to have sunlight, natural light.  But there's a valid reason for having four walls in a sterile environment; would you agree with me?

A.   Yes.

Q.   Okay.  Private rooms without windows also can shield outsiders from seeing who may be talking to the police, right?

A.   Yes.

Q.   You would agree that's a benefit, right?

Cutler - cross

1840

A. Yes.

Q. To law enforcement. Yes?

A. Yes.

Q. Okay. But it's also a benefit potentially to the suspect who might not want to be seen cooperating with the police, right?

A. That's correct.

Q. It might be that a suspect would feel intimidated if he knew that there was a known, let's say, gang member also in that same facility who might see him cooperating with the police; fair to say?

A. That's -- that's correct.

Q. Would you agree with me that there has been no research, no research done, to show that interrogations done in interrogation rooms are less reliable than those conducted in a more open space?

A. I would agree with you.

Q. In Mr. Bowman's questioning, you talked about factors that could influence the reliability of an admission or a confession, right?

A. I don't use the phrase reliability of a confession. But I did talk about risk factors.

Q. I always walk up here without a pen.

Okay. And, so, let me ask it differently then. You went through a number of factors that could influence these

Cutler - cross

1841

risk factors, right?

A.   Yes.

Q.   And you used the word "could," because really no one can say with certainty, not in your world or any other world, whether any one specific factor actually triggered a person to confess; isn't that fair?

A.   Yes.  Well, a factor can increase -- a factor may increase the risk of false confession, but we don't know that it specifically caused somebody to falsely confess.

Q.   Okay.  Let's talk about sleep for a second.

On direct, correct me if I'm wrong, did I hear you say that an hour or two can lead to a person having brain fog?

A.   Yes.

Q.   Doesn't that occur, like, regularly with a lot of busy people?

A.   Yes.

Q.   And that could lead them to have brain fog, like almost every day?

A.   It could.

Q.   You would agree with me that the more rested you are lowers that risk factor?

A.   Yes.

Q.   Would you also agree with me that there are no studies that have been done which studies the amount of sleep and its correlation to false confessions?

Cutler - cross

1842

A. No.

Q. You believe there is a study?

A. Yes.

Q. What is that study?

A. There was a study by Shari Berkowitz, which was a controlled experiment on sleep and the risk of false confession.

Q. And when you say a controlled experiment, it was not a real life situation, right?

A. It wasn't a -- an interrogation in an actual crime.

Q. What I mean by that is, you're not analyzing, like, tapes of real confessions with a lack of sleep. You're doing a controlled experiment under controlled situations, right?

A. Correct.

Q. That was the basis of that study, right?

A. Yes.

Q. Okay. Any other study that you can think of which will speak to the concept that there's a correlation between sleep and the lack of sleep and false confessions, besides the Berkowitz study?

A. No. There's other studies on sleep deprivation, fatigue and other psychological phenomenon, but not directly on false confessions.

Q. And how about research that identifies false confessions in murder cases? Any correlation to those types of confessions

and the lack of sleep?

A. No, we wouldn't -- in our studies of actual cases --

MR. GIBBONS: Your Honor, I don't mean to interrupt.

BY MR. GIBBONS:

Q. That was a "Yes" or "No," do you know of any studies where there's a correlation in a murder case between the lack of sleep and a confession?

A. I would say no.

Q. Okay. Since we're talking about sleep deprivation, I assume it would be important to know how much sleep a suspect normally would get, right?

A. That could be helpful, yes.

Q. I mean, different people need different amounts of sleep every day to be a functioning human being; would you agree with that?

A. I would.

Q. You would also want to know how many breaks a suspect had during the interrogation where they were afforded the opportunity to sleep; would that be a fair statement?

A. That could be useful information, as well.

Q. You're not aware of any studies, and I'm assuming you don't have any expertise to know whether a person is more likely rested when they wake themselves up or woken up from sleep as opposed to be --

MR. GIBBONS: Strike that. Let me ask that

differently.

MR. GIBBONS:  Hey, Jon, that's --

MR. LOEVY:  I apologize.  I do apologize.  That was unprofessional.

Mr. Bowman -- it was unrelated to anything Mr. Gibbons was doing.  He made me laugh.  Had nothing to do with what he was doing.  It was unprofessional.  I apologize.

THE COURT:  All right.  Thank you.

MR. BOWMAN:  I apologize, too, Judge.  It's my bad.

MR. LOEVY:  It had nothing to do with anything John was saying, and I'm sorry I interrupted you.

THE COURT:  Thank you.

BY MR. GIBBONS:

Q.  You don't have any expertise, do you, to know whether a person is more likely rested when they wake themselves up from sleep as opposed to be awakened by an interrogator, do you?

A.  I don't.

Q.  In fact, you're not a sleep expert, right?

A.  That's correct.

Q.  All right.  Let's talk about food and water.

Would you agree with me that that has not been identified in research as a risk factor to confessing?

A.  I believe it has.

Q.  Well, what's the research?

A.  There have been review papers written on false confessions

generally and risk factors for false confessions where food deprivation was cited.

Q. Can you tell us the specific name of the research paper and who wrote it?

A. There was a scientific review paper by Saul Kassin and colleagues published in 2010 in the journal Law and Human Behavior. And I believe they mentioned food deprivation.

Q. You believe or you know that to be the case and are using that research paper as part of your support of your opinion in this case?

A. To the best of my memory --

MR. LOEVY: That was two questions, your Honor.

BY THE WITNESS:

A. -- they mentioned it.

THE COURT: The objection is overruled.

His answer can stand.

BY MR. GIBBONS:

Q. If we're talking about food deprivation, I think you would agree with me that it would be important to know when the suspect last ate before they went into the interrogation room, right?

A. Yes.

Q. Would you also agree with me that different people eat different amounts of food every day to function?

A. Yes.

Cutler - cross

1846

Q.   A 300-pound guy might actually need more food than a 105-pound guy, right?

A.   Yes.

Q.   Would you expect the interrogator to think it reasonable that a person who was indeed hungry would actually eat the food they were given?

A.   I'm not sure.

Q.   Why are you hesitant to answer that?

A.   Well, suspects are typically under stress.  Interrogation is a stressful situation.  Some people eat under stress, eat more under stress.  Some people eat less under stress, or don't eat under stress.

Q.   But if hunger is causing some of the stress, which I thought you said on direct it did, would you agree with me that eating would alleviate hunger?

A.   Yes.

Q.   Would you agree with me that an interrogator, at least in the United States, cannot make a suspect eat?

A.   Yes.

Q.   You talked about physical comfort or discomfort.  Do you remember that line of questioning?

A.   Yes.

Q.   Okay.  We would agree that it would be improper to manually manipulate the temperature of an interrogation room, right?

A.   I'm sorry, you trailed off at the end.

Cutler - cross

1847

Q.   That's because I walked away from the mic, another bad
habit of mine.

     You would agree with me that it would be wrong to
purposely manipulate the temperature in an interrogation room,
right?

A.   It would be wrong to make it uncomfortable.

Q.   Yeah.  Too hot, too cold, that would be wrong?

A.   Yes.

Q.   But you would agree with me that there are certain
interrogation rooms where neither the suspect nor the
detectives have any control over the temperature of the room,
right?

A.   That's probably the case.

Q.   You would agree with me that one way to alleviate cold
would be to give somebody a blanket, right?

A.   Yes.

Q.   Another way would be to give him an extra layer of clothing
to wear, right?

A.   Yes.

Q.   Let's talk about length of interrogation.

     Is it fair for me to say that you do not have an
opinion on the ideal length of an interrogation?

A.   On the ideal length, I do have an opinion on that, yes.

     MR. GIBBONS:  Give me one second, your Honor.

     (Pause.)

BY MR. GIBBONS:

Q. You gave a deposition in this case.

MR. GIBBONS: Jon -- Locke, I'm on Page 153, Line 11.

BY MR. GIBBONS:

Q. Sir, you gave a deposition in this case on March the 1st, 2023?

A. Yes, that sounds right.

Q. You were under oath, right?

A. Yes.

Q. And were you asked this question and did you give this answer:

"In your experience or in your opinion -- in your opinion, what is an ideal length for an interrogation? Let me modify that, the ideal maximum length for an interrogation.

"Answer: I don't really know. I know research on how long interrogations typically take --"

THE COURT REPORTER: Mr. Gibbons.

MR. GIBBONS: Slow, Joe?

BY MR. GIBBONS:

Q. "Answer: I don't really know. I know research on how long interrogations typically take. I know what trainers of interrogation teach about the length of interrogation. But beyond that, I don't -- I don't really have an opinion on an ideal length."

Did you give that answer?

Cutler - cross

1849

A.   Yes.

Q.   Would you agree with me that interrogation can take longer if a suspect's story keeps changing?

A.   Yes.

Q.   Agree with me that interrogations could take longer if a suspect lies about certain material things in the investigation?

A.   Yes.

Q.   In fact, would you agree with me that that could cause the interrogators, detectives, to have to leave the interrogation, go out and try to figure out whether the lie is indeed a lie?

     Would you agree with that?

A.   It could, yes.

Q.   And that could contribute to the overall length of an interrogation?

A.   Yes.

Q.   If a detective knows that somebody is lying, or at least reasonably believes that somebody is lying based on, let's say, 20 other witnesses, would you agree with me --

     MR. LOEVY:   Objection.   There's no foundation for that question because there's no such evidence here, your Honor.

     MR. GIBBONS:   I can ask it any way I want.

     THE COURT:   I'll let him get out the question.

BY MR. GIBBONS:

Q.   Let's start again.

Cutler - cross

1850

If a suspect is lying, would that not contribute to the suspicions that a detective interrogating that suspect may have?

A. It could.

Q. Okay. And it may cause that detective to ask more and more questions to get to the root of the lie if they're on the hunt for the truth, right?

MR. LOEVY: Objection. Asked and answered, your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. It could, yes.

BY MR. GIBBONS:

Q. You are aware that in different jurisdictions, suspects can be held legally for a certain amount of time, right?

A. Yes.

Q. You would expect police detectives to know what that legal length of an interrogation to be, right?

A. I would think so.

MR. LOEVY: Objection, your Honor. I thought we weren't going to get into that subject.

MR. GIBBONS: I'm just asking if he thinks that that's reasonable.

THE COURT: Okay. So, based on that, the objection is overruled.

Cutler - cross

1851

BY MR. GIBBONS:

Q. Would you agree with me that interrogator training literature does not state that interrogations should not exceed six hours?

A. There is -- there is some interrogation literature that would say that.

Q. There could be bona fide reasons, right, for an interrogation lasting longer than six hours, right?

A. I don't know.

Q. Well, how about if a suspect lies for all of six hours, and the detectives have to keep going out, running out the ground ball, coming back and asking questions again, would that be a bona fide reason for an interrogation lasting longer than six hours?

A. Not necessarily.

Q. Not in your mind?

A. No.

Q. What should they do? Should they just stop the interrogation?

A. Under certain circumstances, it makes sense to stop the interrogation and continue it at a different time or on a different day.

Q. Let the lying suspect continue to lie, give him a break?

A. Yes.

MR. GIBBONS: Your Honor, I've got a little -- I have

1852

about a half hour left or 40 minutes. I don't know -- we're not going to get done. I know you're cognizant of 12:30, 12:40 lunch.

THE COURT: Yeah, absolutely.

We'll take our lunch break now. Now is as good as any time. It's about 12:30.

We will resume at 1:40. So, please be back in the jury room and ready to go.

And please don't discuss the case. We'll see you in a little over an hour.

(Jury out.)

THE COURT: All right. You may be seated.

Sir, you are excused for the lunch break.

I will -- you are on cross-examination, so I will ask that you don't discuss your testimony during the break. And we'll see you back in about an hour.

THE WITNESS: Thank you, your Honor.

THE COURT: All right. Thank you.

All right. Anything we should take up?

MR. LOEVY: Your Honor, we do intend to rest after Dr. Cutler, subject to recalling Kerbis if the attorney will cooperate -- or calling her in our case. So, close subject to that.

Have we admitted all the documents when we closed? Have we got -- anything we forgot?

1853

MR. GIBBONS:  Your Honor, we're not going to stand on that formality.  If they move them in now or if they remember it during our case, we're not going to object on that basis.

MR. LOEVY:  Thank you.

And I apologize again, Mr. Gibbons.  That was rude, and sorry about that.

MR. BOWMAN:  I'm sorry, too, John.  It was my fault.

MR. LOEVY:  Yeah, he told the joke.  I'm throwing him under the bus.

THE COURT:  No loyalty.

MR. LOEVY:  Just kidding.

But we did say that they -- at lunch they were going to tell us their witnesses, and we are there.

THE COURT:  All right.  So, I'm happy to have you answer that question.  You have about a half an hour, give or take, with Mr. Cutler.

I assume you'll do some redirect, Mr. Bowman?

MR. BOWMAN:  Yes.

THE COURT:  Okay.  And rest subject to our discussion.

So, can we just confirm with the defense the witnesses that you intend to call?  You mentioned a few this morning, but it would be helpful if you can confirm now.

MR. FLYNN:  Yes.  We have confirmed that Mr. Dorsch is available.  He will be our first witness.

THE COURT:  Okay.

1854

MR. FLYNN: And we will also call Dr. Welner.

We believe that will take us through the end of the day.

THE COURT: Okay.

MR. LOEVY: And, then, tomorrow, your Honor, we did reach what I believe was an agreement on the universe of witnesses. So, that only lives Cichon, Kerbis pending -- you know, and maybe at the end of the day we'll talk a little bit about --

THE COURT: Right.

MR. LOEVY: -- what that even means.

Then they want to call the medical examiner, presumably to prove that Paris was, in fact, dead.

But that's it.

MR. GIBBONS: And then we, of course, have the Marisol Ocampo issue hanging over all of us.

THE COURT: Right. And Moore.

MR. LOEVY: Oh, and Moore.

MR. FLYNN: Yeah. We're still trying to figure that out, but it's not looking good.

THE COURT: Okay. So, I think that answers Mr. Loevy's question about witnesses and roughly the witness order.

MR. GIBBONS: And that could get us to a jury instruction by late morning.

THE COURT: Okay.

1855

MR. LOEVY:  Or we could do jury instructions today, your Honor, you know.  Oh, I guess -- well, it's your preference.  You tell us how you want to do it.  We could do it on Friday or get it over with.

THE COURT:  What are the parties' -- well, I know Mr. Loevy's preference.

MR. LOEVY:  Although I've lost the battle.  We ain't closing on Friday.

THE COURT:  Yeah, I was going to say, none of this changes the big picture movement in my view, because it does appear that there are a handful of witnesses left.  And we all know that the directs and crosses take some time, as all trials do.

MR. GIBBONS:  Your Honor, it's the ninth day of trial.  We're all getting tired by 4:30.  I would greatly prefer to do jury instruction conference late tomorrow morning.

THE COURT:  Okay.

MR. LOEVY:  We have no preference.

THE COURT:  Okay.  We'll do it tomorrow.

That will actually give me an opportunity to take a look at the versions this evening and not deal with it this afternoon in a way that is a bit -- it's not so much rushed, but it would give me less time to review it than you.  We will all be a little fresher, I think, earlier in the day than later in the day.

1856

So, we'll do the jury instruction conference tomorrow.

MR. FLYNN: We have another issue, your Honor. And we don't have to address it now, but we would like to address it at some point today. It has to do with the stipulations we've been discussing regarding the evidence that came in during the criminal trial. We said we were going to propose stipulations last night. Based on conferring with my team, we don't think that we can do it via stipulations. We do believe that at this point, that the transcripts of the grand jury and the criminal trial should be moved into evidence. And if that's denied, we'd like to put them into evidence for purposes of appeal.

If the transcripts are not put in, we think we're going to need summaries regarding what was put into evidence and what was said during the criminal trial and the grand jury on that point.

And we're happy to discuss it further now or we can do it later, as well.

MR. LOEVY: You know, they are proposing summaries. We haven't seen them. I asked them, can we stipulate? That is a summary. And they said they would work on a stipulation with a summary and they didn't show us one, and they said they weren't going to. But it remains our preference to reach a stipulation. But they've got to show us something.

THE COURT: Okay. I appreciate you raising this as something to be thinking about down the road. For better or

1857

worse, I think the parties should still work on either summaries or a stipulation or some combination thereof.

I don't know that there's anything for me to decide right now. I certainly can't make any decisions in this moment. But I'm happy to take the time necessary to make the decisions when we know we're at an impasse on a particular topic or issue.

MR. LOEVY: You know where you could weigh in, though. I mean, it's relevant to something, what happened at the trial. You know, we have to show that his confession was introduced, and it was. That's not a backdoor excuse to say, well, let us just play our greatest hits from the trial, for a couple of reasons.

First of all, a lot of the evidence is against R.J., not against Marcel. It's not in dispute that Marcel drove to the park and that he drove away from the park. So, when they say we need to summarize the trial, you know, you could let him ask one question or you could let him ask -- you could let him elicit every fact that came out at the trial. You're going to have to decide, in our view, what is relevant. It just goes to the materiality. But do they get to just say what happened -- everything that happened at the trial? That would backdoor Marisol Ocampo right back in. Why is that relevant?

MR. FLYNN: If I could briefly respond. It does go exactly to materiality. They're arguing that the statements

1858

that came in through Mancuso were material, and we have to show why there was all this other evidence, which the Court's already ruled showed probable cause, makes it not material.

THE COURT: Right. I mean, that's the framework through which -- or the lens through which I'm viewing this. You're trying to show that it is the root cause of the conviction.

And you're trying to show there was all this other evidence.

It seems to me that the cleanest way to do this is for the parties to try to reach some version of a stipulation or summaries to put in about that. It solves some of the problems that Mr. Loevy was asking about the other day with regard to judicial notice, or at least telling the jury that some version of his -- Mr. Brown's statements were admitted at trial. It seems to me the best way to do it.

Obviously, I can't force you to reach a stipulation, or I won't force you to reach a stipulation. But you should continue to work on it, and I'll decide where to draw the lines when you tell me this is the landscape of where we are with it.

MR. FLYNN: Understood.

MR. LOEVY: There's nothing for you to decide right now. But --

THE COURT: Right.

MR. LOEVY: -- where this all started was, we wanted

1859

to get in the judge saying, there was basically no evidence but this. And you said we don't get to do that. So, they're like, we want to put in evidence. But then you'll have to decide, is this evidence that, you know, outweighs the confession or that could even bear on the confession not being material?

I don't even think they're going to be able to propose to stipulate anything that would be relevant to whether the confession was used against him. The whole thing turned on the confession.

THE COURT: Understood.

And to be clear -- and I agree, generally speaking, Mr. Loevy, with your proposition. But the problem that I had is that what it is that you originally proposed having me tell the jury was a quote from the judge contained in a transcript. And, you know, the language that you asked me to put in, you know, I don't think it's an appropriate version of the way to present that evidence to the jury.

And as a result of my saying I was not prepared to take judicial notice of that by reading that quote, that's sort of where things stand.

Again, if the parties can come to some reasonably fair language that addresses this issue, that solves the problem. It really does.

MR. LOEVY: That's what we should do.

THE COURT: And that's what you should do.

It just seems to me that in every case there's going to be some things everybody would like to see and some things that the other side would like to keep out, but there's got to be a balanced way to reach some sort of general language that gets at this, even if it's in sort of a bulleted fashion or in a bit of a summary fashion.

And, then, you'll argue it to the jury.

But I will make any decisions I need to make at the right time.

So, thank you for flagging it. I really do appreciate that.

MR. GIBBONS: Thank you, your Honor.

THE COURT: All right. Enjoy your lunch break. I'll see you in about an hour.

(Recess at 12:44 p.m., until 1:40 p.m.)

*   *   *   *   *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Joseph Rickhoff                         September 5, 2024
Official Court Reporter

1861

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 CV 4082
                                       )
                Plaintiff,             )
                                       )
                vs.                    )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) September 5, 2024
                Defendants.            ) 1:30 o'clock p.m.


           TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
        BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois 60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Individual          GREENBERG TRAURIG, LLP
Defendants:                 BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois 60601

1862

APPEARANCES (Cont'd):

Court Reporter:              LAURA LaCIEN, CSR, RPR, RMR, F/CRR
                             PATRICK MULLEN, OCR
                             Official Court Reporters
                             219 South Dearborn Street
                             Suite 2118
                             Chicago, Illinois 60604
                             (312) 435-5562

             *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                    PROCEEDINGS RECORDED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out.)

THE COURT:  Mr. Cutler, I can have you resume the witness stand if you wouldn't mind.  We're still waiting on at least one juror.

(Brief pause.)

THE COURT:  All right.  I think we're ready to resume.

(Proceedings heard in open court; jury in.)

THE COURT:  All right.  Please be seated.

All right.  Mr. Cutler, you remain under oath. Mr. Gibbons, you may resume your cross examination.

MR. GIBBONS:  Thank you, your Honor.

BRIAN CUTLER, PLAINTIFF'S WITNESS, PREVIOUSLY DULY SWORN

CROSS EXAMINATION

BY MR. GIBBONS:

Q.  Mr. Cutler, I want to just kind of finish up on some of the factors that we've been talking about and you talked about with Mr. Bowman.

Isolation again, would you agree with me that there are valid reasons for detectives to question a suspect alone?

A.  Yes.

Q.  You would agree with me that, for practical purposes, you might not want a witness to influence another witness if you did it in kind of a group setting, right?

A.  Yes.

Q.  And speaking of this isolation factor, I would imagine you

Cutler - Cross

1864

would want to see how many times the suspect actually physically left the interrogation room. Would that be fair to say?

A. I think that's a useful measure; yes.

Q. Okay. Well, it would influence that risk factor, right?

A. Not necessarily.

Q. Okay. Well, we talked about alone time a little bit. Alone time, I think you testified on direct, leaving a suspect alone in a room could be an interrogation tactic. Did I -- Did I hear that right?

A. Yes.

Q. But it's also fair, would you agree with me, that leaving a suspect alone at times might be beneficial to the suspect?

A. I don't know.

Q. Giving a person a little time to chill out and collect their thoughts is not necessarily an interrogation tactic, right, it could be just being nice?

A. Well, there could be multiple reasons for leaving a suspect alone.

Q. Right. I'm asking about this one. Leaving them alone for periods of time might actually just be human kindness?

A. I suppose.

Q. All right. Let's talk about youth for a second. You will agree with me that 18 years old -- an 18 year old is an adult in the eyes of the law, right?

Cutler - Cross

1865

A.   Yes.

Q.   An 18 year old can join the military on their own, right?

A.   Yes.

Q.   An 18 year old can vote?

A.   Yes.

Q.   An 18 year old is allowed to emancipate themselves from their parents, aren't they?

A.   Yes.

Q.   An 18 year old can choose what gender they want to choose to live their life as; at isn't that fair to say?

A.   Yes.

Q.   These are fairly momentous decisions an 18 year old can make, would you agree with that?

A.   I would.

Q.   Okay.  You testified that youth are obedient to authority. Did I hear that right?

A.   Yes.

Q.   Would you equally agree with me that there are certain youth that are not obedient to authority?

A.   There are certainly individual differences in obedience to authority and there are individual differences in terms of who -- who is considered an authority.

Q.   Okay.  Parents, right, there are 18 year olds who push back against their parents, right?

A.   Yes.

Cutler - Cross

1866

Q.   There are -- there are authority figures such as teachers. There are 18 year olds who push back against teachers, right?

A.   Yes.

Q.   There are youth who push back against authority figures, would you agree with that?

A.   Yes.

Q.   Okay.  Let's talk about life experiences.  People's life experiences would be relevant to consider when understanding a suspect's statement to a police.  Would you agree with that?

A.   I would think so.

Q.   Okay.  And would you agree that none of us, no two of us have the same life experiences?

A.   I would agree.

Q.   Okay.  For example, if a suspect or a witness is scared of a -- let's say a shooter in a murder investigation, that might be relevant information to know, right?

A.   Yes.

Q.   Okay.  It might be relevant to know if a suspect or a witness is scared about being labeled a snitch on the street, right?

A.   Yes.

Q.   I mean, in that context, you would kind of need to know the street we're talking about, right?

A.   I suppose.

Q.   I mean, a street in -- pick out the richest community in

Cutler - Cross

1867

Illinois -- I don't know what it is -- that might be different than living in a -- in an area that is controlled by gangs. Would you agree with that?

A.   Yes.

Q.   Knowing that might cause a suspect witness -- let me ask that differently.

Being concerned about being labeled a snitch might cause a suspect to say something because they fear retaliation, fair to say?

A.   Yes.

Q.   Would you also agree with me that some young people are not as worldly about criminal activity as others?

A.   Yes.

Q.   I mean, some of our youth grow up in neighborhoods that are fortunately immune to criminal activity, right?

A.   Yes.

Q.   And there are other neighborhoods in and around Chicago and in many parts of the country that are infested with criminal activity, right?

A.   Yes.

Q.   Vastly different experiences, right?

A.   Yes.

Q.   Some youth become aware of the dangers on the street more readily than others, right?

A.   Yes.

Q.   I mean, some are smart enough to start to figure out how to live in that environment surrounded by criminal activity, right?

A.   Yes.

Q.   They're smart enough to figure out how to drop off a shooter with a gun right before the police get to them, right? There are people worldly like that, right?

MR. LOEVY:  Objection, your Honor.  He's starting to argue with his questions.

THE COURT:  Sustained as to argumentative.

BY MR. GIBBONS:

Q.   Let's talk about a plan.  Would a person's confidence that they have a plan going into an interrogation room lower the likelihood of a false confession?

A.   I'm not sure I understand the question.

Q.   Yeah.  Let's say the suspect or witness has hatched a plan with others on how they're going to deal with questions when they go into that interrogation room, wouldn't that lower the likelihood of a false confession?

A.   I don't know.

Q.   Ever seen any studies on that?

A.   No.

Q.   Okay.  You discussed contamination and things like that; right.  Would you agree with me that true statements made by the detective to a suspect lessens the overall risk?

Cutler - Cross

1869

A.   I'm not sure which risk you're referring to.

Q.   The risk of contamination.

A.   No.

Q.   Why would you disagree with that?

A.   If the police provide a suspect with information that they didn't know whether it's true or false, it's still contamination.

Q.   Okay.  Let me follow up on that.

So if the suspect knows the fact to be true before the interrogator says it, that's not contamination, right?

A.   Correct.

Q.   And you would agree with me in a similar vein that if the suspect tells the interrogator a fact before that fact is ever mentioned by the interrogator, that's not police contamination, right?

A.   Correct.

Q.   All right.  Let's talk about initiating contact.  How about a suspect who initiates contact with the investigator, would that be an indicator of a lower risk of coercion?

MR. BOWMAN:  Objection.  Form of the question.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  Oh.  Not necessarily.

BY MR. GIBBONS:

Q.   But that it could, could be an indicator of a lower risk of coercion if that suspect knocks on the door and says I don't

Cutler - Cross

1870

want to talk to the police?

A. It's possible.

Q. Okay. How about a person being interviewed or interrogated who is motivated to cover up for a family member, would that influence these risk factors?

MR. LOEVY: Objection to argument, your Honor. It's not expertise.

THE COURT: Overruled. He can answer.

THE WITNESS: May I have the question again, please?

BY MR. GIBBONS:

Q. Yeah. How about a person who is being interrogated who is motivated to cover up for a family member in relation to a crime, does that lower the risk that the questioners did anything wrong in this false confession world you're talking about?

A. I don't know that it affects the behavior of the investigators.

Q. Why is that?

A. I -- perhaps I don't understand the question. I -- the suspect may have certain motivations and the investigators have their motivations and they choose tactics and questioning strategies on the basis of their goals.

Q. And you have seen suspects who actually do go into these interrogations with their own set of motivations, right?

A. Yes.

Cutler - Cross

Q.   And sometimes that's not to tell the truth, right?

A.   That is -- yes.  That is sometimes the case.

Q.   All right.  I mean, you would agree with me that in the criminal world -- and you studied some of this -- family members are interrogated and questioned all the time, right?

A.   Yes.

Q.   Okay.  And it's not uncommon for a family member to try to lie to cover up for another family member, right?

A.   I don't know how common that is.

Q.   Okay.  Would you agree with me in the context where one family member is lying to protect another family member that they're not being coerced into saying something they're not planning on saying?

A.   No.  I wouldn't agree with that.

Q.   You would not agree with that?

A.   No.

Q.   All right.  You talked about interrogation tactics and you talked about the Reid School, right?

A.   Yes.

Q.   And Wicklanders -- rather, Wicklanders left the Reid School, right, years ago and started their own school in Chicago, right?

A.   Yes.

Q.   All right.  But the reality is, is you don't know how Chicago Police Department train their detectives, do you?

Cutler - Cross

1872

A.   I don't.

Q.   Okay.  You don't know any of the training that the detectives involved in this case received; isn't that fair to say?

A.   Yes.

Q.   Okay.  All right.  Let's talk about mental illness for a second.  Would you agree with me that there's an overrepresentation of individuals with mental illness amongst false confessors?

A.   Yes.

Q.   I mean, that is a big number, people suffering from mental illness who go in and say I did it when they really didn't do it, right?

A.   Yes.

Q.   All right.  So understanding if a suspect has mental illness would be important to know, right?

A.   Yes.

Q.   Okay.  All right.  Last topic.

     You talked about some studies done in the 1990s regarding false confessions overturned because of DNA evidence, right, on direct?

A.   Yes.

Q.   All right.  Now you would agree with me that DNA has absolutely nothing to do with this case, right?

          MR. BOWMAN:   Objection.

THE WITNESS: I don't know.

THE COURT: I'm sorry. There was an objection and I didn't get the basis for the objection.

THE WITNESS: Sorry.

MR. BOWMAN: The basis for the objection it is beyond the range of what the witness is to testify about --

THE COURT: Response?

MR. BOWMAN: -- in this case.

MR. GIBBONS: Well, he talked about these studies having nothing to do but -- anything but DNA. I just want to understand why that's relevant to the case.

THE COURT: Okay.

MR. GIBBONS: I didn't bring up DNA. He did on direct.

THE COURT: Okay. With that explanation, the objection is overruled. And, sir, you can answer.

BY MR. GIBBONS:

Q. Now I'm just asking a simple question. Those cases and all those studies about DNA exonerations, et cetera, this is not a DNA case, you understand that, right?

A. I don't know the full amount of evidence.

Q. Okay. All right. Last topic.

You talked, I think, about a Michigan study if I have the state right -- I think it was involving DNA -- that looked over 600 wrongful convictions. Did I get that right?

Cutler - Cross

1874

A.   Yes.

Q.   And if I understand that study right, there were 600 convictions that were looked at span decades, right?

A.   Yes.

Q.   Okay.  And over those decades academians like yourself found 600 wrongful convictions, right?

A.   That was -- the work of the National Registry of exonerations had identified 600 DNA-based exonerations in which -- yeah, since 1989.

Q.   Okay.

A.   That's where that number came from.

Q.   Since 1989, 600 of them.

And 140 out of the 600 had some sort of false confession associated with it.  Is that your testimony?

A.   That's correct.

Q.   And that's how you came up with this 24 percent figure, right?

A.   Correct.

Q.   And you are aware, right, that there are vastly more cases that are tried in courtrooms across America than 600, right?

A.   Yes.

Q.   I mean, in Cook County alone, we have 30 or 40,000 felonies, arrests a year.  You're aware of that, right?

A.   I'm aware that there are vastly more.  I'm not aware of the numbers, sir.

Q.   Tens of thousands of convictions each year in courtrooms across America; fair to say?

A.   Yes.

Q.   Okay.  So putting this figure into context of 600, you would agree with me that's statistically very small, right?

A.   Yes.

MR. GIBBONS:  I've got nothing else, your Honor.

THE COURT:  All right.  Thank you, Mr. Gibbons. Redirect, Mr. Bowman.

MR. BOWMAN:  Judge, could we have just a minute?

THE COURT:  Of course.

MR. BOWMAN:  Thanks.

(Counsel conferring.)

REDIRECT EXAMINATION

BY MR. BOWMAN:

Q.   Dr. Cutler, just a few questions for you based on the cross examination.

In your review of materials in this case, did you have the opportunity to review Detective Mancuso's deposition?

A.   I did.

Q.   And on the subject of training, do you recall Detective Mancuso testifying that he had basically no training that he recalled on interrogations?

MR. GIBBONS:  Your Honor, objection.  Misstates the evidence.  Hearsay.  Unless we're going to introduce the entire

Cutler - Redirect

1876

Mancuso deposition.

MR. LOEVY: Show him the document.

MR. BOWMAN: I have the excerpt here that forms the basis for my question.

THE COURT: Okay. Make a record of it, if you could, for Mr. Gibbons and then I'll just take a quick look.

MR. BOWMAN: Yes. It is at Page 53, Lines 13 through 54, Line 1.

THE COURT: Mr. Gibbons?

MR. GIBBONS: Your Honor, I don't -- I don't know. Are you -- are they impeaching their own witness, which I guess they have the right to do, because the witness has already testified he doesn't know what training CPD had -- officers had and he didn't know what any training these detectives had. So I guess Locke can impeach his own witness but I think it's far afield of what we're doing here.

THE COURT: Okay.

MR. BOWMAN: Well, I think I objected at the time on that basis but it's in and I -- I mean, I can show Dr. Cutler the transcript and see if it refreshes his recollection.

THE COURT: Okay. The objection is overruled. I do agree that you are, to some degree, impeaching your own witness but you're permitted do that and so I'll let you do that if you wish to show him the excerpt or ask him questions about that line of questioning put to Mr. Mancuso in his deposition.

BY MR. BOWMAN:

Q. Fair to say that you're not sitting here today with photogenic recall of Mr. Mancuso's deposition?

A. I think that's more than fair to say; yes.

Q. All right.

MR. BOWMAN: Let me -- if I may approach, your Honor.

THE COURT: You may.

BY MR. BOWMAN:

Q. Let me hand you the page of the deposition that we've been talking about. My question for you is whether this refreshes your recollection on the subject of Detective Mancuso's training.

A. It does.

Q. And, Dr. Cutler, with your recollection refreshed, what did you learn from your review of the materials about Mancuso's recollections as to his training on interrogation?

A. That he's -- he did not have specific training, interrogations.

Q. You were asked some questions about contamination and true statements to a witness and whether -- when a detective tells a witness something that's true, whether that can be contamination in an interrogation. Do you recall Mr. Gibbons asking you about that?

A. Yes.

Q. Can you tell us whether it can be contamination for a

Cutler - Redirect

1878

detective to tell the subject of an interrogation something that's true, can that be contaminating?

A.   Yes.

Q.   And can you tell us why?

A.   The contamination is providing suspects with details that they didn't know, whether they are true details or exaggerated or false details.  It's providing suspects with details that they can incorporate into a confession that is contaminating the suspect's confession.

Q.   All right.  Now when a detective tells a suspect something that's false, presents false evidence to a suspect in a question, can that be a risk factor -- is that a risk factor for false confession?

A.   Using false evidence is definitely a risk factor for false confession.  Decades of psychological research shows that when we provide people with misleading information, we -- they become vulnerable to manipulation.  Research in a wide variety of areas shows that false information can affect people's judgment, decision making, memories for events witnesses, memories for events experienced, and studies of false evidence shows that use of false evidence increases the risk of false confession.

Q.   Another subject, age.  Mr. Gibbons listed a number of things that 18 year olds can do:  Serving in the military, voting, and so forth.  In terms of risk factor of vulnerability

Cutler - Redirect

1879

to making a false confession, is being 18 years old any different than being 25 years old?

A. Yes.

Q. Why?

A. Vulnerability is a matter of degree just as cognitive emotional maturity is a matter of degree. Being granted the rights to vote, to serve in the military, and other such statuses does not change one's level of maturity, of thought, or judgment. That changes over time with age. We need those cutoffs to draw distinctions but that doesn't change people psychologically.

Q. Another question on the subject of isolation. Mr. Gibbons asked you some questions about whether it is valid to question an interrogation subject alone and you indicated that it -- that it is for a number of reasons, correct?

A. Yes.

Q. Is there a difference between questioning a suspect alone and engaging in prolonged interrogation and isolation of the individual?

A. Yes, for certain.

Q. And can you explain why, sir?

A. Well, individuals have the option to -- to allow themselves to be interrogated alone but there are risks associated with prolonged interrogation and those are risks that I've described earlier, people become fatigued, they -- their ability to self

Cutler - Redirect

1880

regulate declines, their -- they lose the ability to -- to resist influence by the investigator in prolonged interrogations.

Q. Mr. Gibbons asked you whether it could, under certain circumstances, be nice to leave a person alone. You indicated there could be circumstances where it would be. Yes?

A. Yes.

Q. Can it also be mean to leave a person alone under certain circumstances?

A. Yes.

Q. Such as what?

A. Such as a person doesn't want to be there, they want to get done whatever they have to do, yet they are delayed by being left alone.

Q. And this idea of leaving a person to stew, is that a nice thing to do to a subject in your judgment?

A. It is -- in my judgment, it is not. It is an interrogation tactic that renders suspects more stressed.

Q. You told -- acknowledged to Mr. Gibbons that there could be valid reasons for interrogating a person in a room that has four walls and no windows. Are there valid reasons for placing a person in such a room indefinitely?

A. None that I know of.

Q. What -- and I think you may have said this, but what are the average times that suspects are placed in these kinds of

sterile environments for the purposes of interrogation?

A.   Well, according to the surveys of police officers that I mentioned, the average length of interrogation is about 1.6 hours.

Q.   You were asked some questions about food and the deprivation of food and Mr. Gibbons specifically asked you if you could cite to any studies about food deprivation and the effect of food deprivation on interrogation and you suggested one possibility.

Are there numerous studies on food deprivation and interrogation or is this something that folks have not written about?

A.   People write about food deprivation and interrogation, but my opinions are not solely based on research on interrogations. I draw opinions based on general psychology, psychological research.  So there's research on hunger and self regulation that's not about interrogation, but I believe it is relevant.

Q.   Fair to say that where you're talking about an interrogation that's an hour and a half in length, the question of food deprivation doesn't come up, right?

A.   Generally not.

Q.   You went back and forth with Mr. Gibbons about a question from your deposition as to the ideal maximum length for an interrogation.  Do you remember that?

A.   Yes.

Cutler - Redirect

1882

Q.   Do you have an opinion as to what the ideal maximum length of an interrogation is?

A.   I do.  I concur with trainers that a well-conducted interrogation should last no more than three or four hours.

Q.   Last -- last subject, Dr. Cutler.  You talked about --

MR. LOEVY:  Pardon me.

(Counsel conferring.)

BY MR. BOWMAN:

Q.   Sorry.  Just to clarify your last answer, three or four hours from the start of the interrogation to the end of the interrogation process, correct?

A.   Correct.

Q.   So we're not talking about how long the questions were; we're talking about how long the subject is in isolation in the room, yes?

A.   Yes.

Q.   Last subject.  You talked about brain fog as a situation we all get in from time to time as a result of the ebbs and flows of sleep and rest in our daily lives.

Is there a difference between that circumstance and being deprived of sleep for multiple nights?

A.   It is a difference that is a matter of degree.  The more sleep deprived, the more fatigue we have, the less clearly we are able to think and the -- we have less ability to self regulate.

Q.   You talked when you were being questioned by Mr. Gibbons about a study and I don't have the author's name here.  I'm going to say Berkowitz.

A.   Correct.

Q.   Can you explain what you recall about that study?

A.   I -- it won't take long because I don't recall much.  It was a controlled experiment in a laboratory where students were randomly assigned the conditions in which they were allowed to sleep through the night versus not sleep through the night.  And then they had participated in a -- what we call a simulated interrogation, which is typical of laboratory studies on false confessions, and they were -- the sleep deprived participants were more likely to falsely confess.

          MR. BOWMAN:  Thank you, Doctor.  That's all I have.

          THE COURT:  All right.  Mr. Gibbons, anything based on that?

          MR. GIBBONS:  Just five minutes, your Honor.

          THE COURT:  All right.

                    RECROSS EXAMINATION

BY MR. GIBBONS:

Q.   The Reid School has come up a number of times in the examination here, right?

A.   Yes.

Q.   And the Reid School was nationally taught for decades across the country, right?

Cutler - Recross

1884

A.   Yes.

Q.   And over time, the Reid School and the thinking changed, right?

A.   Yes.

        MR. BOWMAN:  Objection, your Honor, as to this -- as to scope.

        MR. GIBBONS:  Well, I'm going to get to his questions about Mancuso in a second.

        THE COURT:  Okay.  Based on that, the objection is overruled.

BY MR. GIBBONS:

Q.   So knowing that there was shifting teachings by the experts -- whether they be Reid School or Wicklander in that group -- it shifted over time, right?

A.   Yes.

Q.   What year did Mancuso get out of the academy?

A.   I don't recall.

Q.   What year did Detective McDonald get out of the academy?

A.   I don't recall.

Q.   Did you know if they were taught in the academy under the old Reid School, the Wicklander school, or any other evolving school?

A.   I -- I don't know other than what we've already reiterated from the deposition.

Q.   Are you familiar with roll call training at the Chicago

Police Department?

A.   With what?  I'm sorry.

Q.   Roll call training.

A.   No.

Q.   Okay.  In the recross by Mr. Bowman, you talked about the differences between an 18 and 25 year old.  Did I hear that right?

A.   Yes.  I believe that's correct.

Q.   I mean, were you using -- were you just using that as like an example?  I mean, every 18 year old and every 25 year old is different, right?

A.   Yes.

Q.   I mean, there will be some 25 year olds that are less mature than an 18 year old, right?

A.   Yes.

Q.   Be 25 year olds that are less street hardened than an 18 year old, right?

A.   Yes.

Q.   I mean, you kind of got to look at the person, don't you?

A.   There are certainly individual differences; yes.

Q.   Okay.  One question.  You would agree with me, would you not, that in this country, 18 year olds are psychologically seen fit to serve in our country's military?

A.   Yes.

Q.   You talked about some of these factors, combination of

Cutler - Recross

1886

them, which could lead to fatigue -- and I'm not to go through your whole list -- but fatigue, inability to resist questions, wearing down, those kind of things, right?

A.  Yes.

Q.  An experienced questioner -- let's say an experienced Assistant State's Attorney, prosecutor, should be looking for signs of that.  Would you agree with me?

MR. LOEVY:  Objection to scope and expertise.  Partly scope.

THE COURT:  Sustained.  Sustained.

BY MR. GIBBONS:

Q.  Some of these signs would be visible to the questioner, right?

A.  I'm not sure what signs you're referring to.

Q.  Well, would any of the signs you mentioned in your hours of testimony be visible to the questioner?

A.  They could be, yes.

Q.  Okay.  And if they could be, we would want to know if the questioner was paying attention to those signs; would we not?

A.  For certain purposes, yes.

Q.  Okay.  For trying to understand if that person was actually, in fact, wearing down, showing an inability to even understand the question, right?

A.  Yes.

Q.  Okay.  Last topic.  You talked about an ideal

interrogation -- strike that. Bad word.

You talked about interrogation lasting three or four hours. Do you remember that line of questioning?

A. Yes.

Q. All right. How about a situation where the suspect has actually lied --

MR. LOEVY: Objection, your Honor.

BY MR. GIBBONS:

Q. -- for all four hours during that three- to four-hour period, should the interrogator just say we're done, can't investigate anymore?

MR. LOEVY: That's a verbatim question from the last round.

THE COURT: Okay. The objection is overruled -- I'm sorry. It's a verbatim question from?

MR. LOEVY: From the last time Mr. Gibbons stood up there, he --

MR. GIBBONS: It's recross. And I heard that like 20 times from Mr. Loevy every time I objected asked and answered.

THE COURT: Okay. All right. The objection is sustained.

MR. GIBBONS: Sustained?

THE COURT: Yes. The objection is sustained.

BY MR. GIBBONS:

Q. Okay. So after this three or four hours of questioning

Cutler - Recross

1888

whatever the state may be, in your mind the interrogation should end?

A.   Yes.

Q.   And if the murder is not solved, so be it?

          MR. BOWMAN:  Objection.  Argumentative.

          THE COURT:  Sustained.

          MR. GIBBONS:  It was argumentative.  Thank you, your Honor.

          THE COURT:  All right.  You are excused.  Thank you.

          THE WITNESS:  Thank you, your Honor.

     (Witness excused.)

          THE COURT:  All right.  Plaintiff?

          MR. LOEVY:  Subject to our discussion outside court, the plaintiff rests, your Honor.

          THE COURT:  All right.  We are now ready to hear presentation of evidence on behalf of the defense subject to some matters that may come up over the course of the next day or so.  Is defense prepared to call their next witness -- or their first witness?

          MR. FLYNN:  Yes, your Honor.

          MR. GIBBONS:  Your Honor, we have some things we have to take care of at the end of their case now without the jury.

          THE COURT:  And we will do that at our break.  We'll do that at our break.

          MR. FLYNN:  Understood.

THE COURT:  If you can call your first witness.

MR. FLYNN:  Your Honor, at this time the defense calls Brian Dorsch.

THE COURT:  Okay.  Thank you.

(Brief pause.)

THE COURT:  All right.  Good afternoon, sir.  If you can please approach the witness stand.  And before you take your seat, I'll have my clerk swear you in.

LAW CLERK:  Sir, can you state your name for the record?

THE WITNESS:  Brian Dorsch.

(Witness sworn.)

LAW CLERK:  You've been sworn.  You may be seated.

THE COURT:  All right.  Counsel, you may inquire.

BRIAN DORSCH, DEFENDANT'S WITNESS, FIRST DULY SWORN

DIRECT EXAMINATION

BY MR. FORD:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Can you introduce yourself for the jury, please?

A.  Officer Brian Dorsch, Star 4257, Chicago police.

Q.  Officer Dorsch, what -- what do you do for a living?

A.  I'm a Chicago police officer.

Q.  And did you work for the Chicago Police Department in August of 2008?

Dorsch - Direct
1890

A.   Yes, I did.

Q.   What position did you hold with the Chicago Police Department in August of 2008?

A.   I worked on the tactical team.

Q.   Can you explain to the jury what the tactical team is?

A.   Basically responded to all priority calls, men with gun, narcotics, stuff like that.

Q.   And were you assigned to a particular district in Chicago --

A.   Yes.

Q.   -- as part of the tactical team?

A.   Yes, I was.

Q.   What district was that?

A.   The 25th District.

Q.   How would you describe the 25th District?

A.   It's very big and busy.

Q.   And did the 25th District encompass Amundsen Park?

A.   Yes, it did.

Q.   Can you describe the size of Amundsen Park for the jury?

A.   Four blocks wide east to west and maybe two, three blocks long north or south.

Q.   Okay.  Do you remember if you were working on August 30th, 2008?

A.   Yes, I was.

Q.   Do you remember if during your shift that day you responded

Dorsch - Direct

1891

to any calls of shots fired in the area of Amundsen Park?

A.   Yes.

Q.   Do you remember what time you would have responded -- you did respond to the calls of shots fired?

A.   Approximately 11:00 p.m.

Q.   11:00 p.m.  So was it dark outside?

A.   Yes.

Q.   Do you remember, were there multiple calls of shots fired when you responded?

A.   Yes, there were.

Q.   What do you remember about responding to those calls of shots fired near Amundsen Park that day?

A.   Arriving, there was a large crowd running southbound.

Q.   And southbound across what street?

A.   Bloomingdale.

Q.   And is Bloomingdale the street that borders the south side of the park?

A.   Yes.

Q.   Do you remember what route you took to respond to that call of shots fired?

A.   I came up North Avenue and then northbound on either Meade or McVicker.

Q.   All right.

         MR. FORD:  I'd like to show Officer Dorsch what's been marked -- or what is Joint Exhibit 38 but it's just off

the -- it hasn't been published yet to the jury.

THE COURT: Okay. Any -- have you shown it to opposing counsel?

MR. FORD: It's an agreed exhibit.

THE COURT: Okay.

(Counsel conferring.)

MR. FORD: I don't see it.

BY MR. FORD:

Q. Officer Dorsch, can you see that?

A. Yes.

Q. Do you recognize what this depicts?

A. The area around the park.

Q. Okay.

MR. FORD: Your Honor, may I publish this to the jury?

THE COURT: Any objection?

MR. LOEVY: No, your Honor.

THE COURT: All right. You may publish and -- it will be admitted and you may publish.

(Joint Exhibit 38 received into evidence.)

MR. FORD: Thank you.

BY MR. FORD:

Q. Officer Dorsch, do you see -- you just described your route for the jury that you took to the park. I think -- I haven't been up here, but I think you can mark on the map with your finger. Do you mind sort of drawing the route you took to the

park that day?

A. Like I said, I wasn't -- I'm not sure if we came up McVicker or Meade but we came North Avenue. And I don't know if we came up McVicker that way. Or if it was Meade, we came up this way (indicating).

Q. And that's how you got to Bloomingdale?

A. Yes.

Q. Do you remember if you drove down Bloomingdale west to the edge of the park, to the end of the -- western border of the park?

A. I did not.

Q. You never made it that far?

A. No.

Q. Did you ever drive around the perimeter of the park?

A. No.

Q. And what's the street that is -- borders the west side of the park, do you --

A. Merrimac.

Q. Merrimac. Did you ever drive on Merrimac that night?

A. No.

Q. And let me see if I can clear this real quick.

Do you mind marking on the map -- you know, you testified that you saw a group of people that night when you were responding to the shots fire call?

A. Yes.

Q.   Can you mark, you know, where you saw that group and what they were doing?

A.   Approximately that location and running south that way and then some were going eastbound (indicating).

Q.   Okay.  So did you ever drive into the park when you responded to calls of shots fired that night?

A.   Nope.

Q.   Why not?

A.   The crowd I saw was running south and east and nothing caught my eye or attention in the park to go towards there.

Q.   Do you ever remember getting out -- do you remember ever getting out of your vehicle that night when you responded to shots fire call?

A.   No, I didn't.

Q.   Can you see on the map -- the jury's heard a lot about it. Does Amundsen Park have a fieldhouse?

A.   Yes.

Q.   Did you ever drive around the fieldhouse that night?

A.   No.

Q.   Did you ever walk around the fieldhouse that night?

A.   No.

Q.   Do you see the -- well, should I say, is there a parking lot near the fieldhouse?

A.   There is.  Yes.

Q.   Do you know, is it on the north side of the fieldhouse?

A.   It is on the northwest corner, I believe.

Q.   Do you know how you access that parking lot if you're driving a car how you would get there?

A.   I believe it's off Merrimac.

Q.   Merrimac?

A.   Yes.

Q.   So did you ever, you know, drive into that parking lot that night?

A.   No.

Q.   And do you ever -- do you recall seeing any other police units responding to call of shots fired?

A.   Yes.

Q.   How many would you say?

A.   Two or three.

Q.   Could there possibly have been, you know, a couple more than that?

A.   Sure.  Yeah.

Q.   The ones that you remember, do you remember where they were?

A.   Approximately, yes.

Q.   Where were they?

A.   So around Merrimac, Melvina, in that area.

Q.   Okay.  Did you ever see those police cars drive into Amundsen Park?

A.   No.

Dorsch - Direct

1896

Q.   Did you ever see them drive north of the fieldhouse into the parking lot or that area?

A.   No.

Q.   Do you remember how long you stayed on the scene of that -- of the calls of shots fired that night?

A.   Two minutes, if that.

Q.   Why did you leave after two minutes?

A.   I decided to follow the crowd that went southbound.

Q.   Do you remember what you did after you left?

A.   The park area?

Q.   Well, after -- yeah.  After you -- as you were following the group when people -- you know, what happened next?

A.   I went down to Wabansia and wound up coming back northbound somehow on one of those streets to Bloomingdale.

Q.   Did you do anything else to respond to those calls of shots fired after that?

A.   No.

Q.   Some more -- a general question.  How many calls of shots fired would you say you responded to during your career as a Chicago police officer?

A.   In my career, a thousand.

Q.   Would you say that calls of shots fired are a common occurrence when you're working in the 25th District?

A.   Yes.

Q.   And calls of shots fired, would you say they're a serious

thing?

A.   Yes.

Q.   But they are not a rare thing?

A.   No.

Q.   And is there a difference between, you know, a call of shots fired and a call of a person shot?

A.   Yes.

Q.   What's the difference?

A.   Well, it's more direct.  I mean, you got more information of the situation that's going on.

Q.   Going back to August 30th, 2008, that night, do you remember receiving or responding to any calls of a person shot?

A.   No.

Q.   So given your experience responding to so many calls of shots fired, if you get to a scene and nothing immediately catches your eye, are you going to spend a significant amount of time investigating the scene?

A.   Not usually, no.

Q.   So back in Amundsen Park in August 30th, did you see any evidence when you responded that there was someone injured by these shots fired?

A.   No.

Q.   So was there any reason to search every nook and cranny of the park?

A.   No.

Dorsch - Direct

1898

Q.   As you sit here today, do you know whether police found a body the following day, August 31st, 2008?

A.   Yes, I do.

Q.   And that's a 19 year old named Paris Jackson --

A.   Yes.

Q.   -- that's your understanding?

Do you know as you sit here today where that body was found?

A.   I remember it was behind the fieldhouse.

Q.   Behind the fieldhouse.  So I guess -- this is one of my last questions.  Just because, you know, you or another officer did not spot a body behind that fieldhouse that night, does that mean to you that the body was not there?

A.   No.

Q.   No, it doesn't mean that?

A.   No, it does not.

Q.   One last question.  You're testifying about August 30th, 2008, today.  Have you ever testified in a courtroom about that before this?

A.   Yes.

Q.   When was that?

A.   The day -- I don't remember the date but it was a criminal trial.

Q.   Criminal trial?

A.   Yes.

Dorsch - Cross

1899

Q.   Thank you.

MR. FORD:   Nothing further.

THE COURT:   All right.   Thank you.   Cross Examination, Mr. Loevy.

MR. LOEVY:   Thank you, your Honor.

BY MR. LOEVY:

Q.   All right.   Officer Dorsch, it sounds like on this day in 2008, you were working a normal shift, right?

A.   Yes.

Q.   And you hear on your radio shots fired and you do what you do, you went to the scene, right?

A.   Correct.

Q.   And you now know you were one of five police cars that responded, correct?

A.   I was one of some cars.   I don't know exactly how many.

Q.   Do you remember -- you gave a deposition in the case.   Do you remember that?

A.   Yes.

Q.   And do you remember you went through the records and looked at the police reports and such?

A.   Yes.

Q.   And the five cars were 45S, gang saturation is -- I mean, gang saturation.   What's 45S?

A.   That was the sergeant of the saturation unit.

Q.   And then 2561B, what's that?

Dorsch - Cross

1900

A.   That was my unit.

Q.   2520 and 2532, those are just beat cars?

A.   One's a sergeant and one's a beat car.

Q.   How about 1669C?

A.   That is a 16th District gang car that was probably detailed to the 25th District because it was busy.

Q.   All right.  So in each of those cars, is there one police officer or two police officers?

A.   It depends on the assignment of tac teams.  And gang cars are always two.  Sergeants are usually one.

Q.   So somewhere between one and two police in each of those cars?

A.   Yes.

Q.   And you didn't get out of your car it's my understanding. You were only there for two minutes?

A.   Correct.

Q.   And you certainly never drove into the park?

A.   No.

Q.   Now part of the police's job that night when there's a calls for shot fired is someone is supposed to make sure that no one is hurt, correct?

A.   Correct.

Q.   And that someone wasn't you, right?

A.   No.

Q.   You just took off?

Dorsch - Cross

1901

A.   No.   I followed the crowd southbound to make sure.

Q.   You weren't doing anything wrong by doing that, right?

A.   No.

Q.   There's plenty other police doing what they were doing, right?

A.   Yes.

Q.   And one of the reasons that police respond to shots fired is to see if there's a need for any emergency responders, correct?

A.   Correct.

Q.   And that requires at least some police officers to pay some careful attention around the area to make sure that there's not a need for emergency services, somebody has to do that, right?

A.   Not necessarily.   I mean, if we had more information, yeah. But to do that on every shots fire calls, no.

Q.   All right.   You remember giving a deposition in this, sir, in this case?

A.   Yes.

Q.   And this was back in March of 2021.   This is Page 109, Lines 2 through 9.   Do you remember being asked these questions --

        MR. FORD:   John, hold on one second.

        MR. LOEVY:   Sure.   I'm just getting the question out.

BY MR. LOEVY:

Q.   Do you remember being asked these questions --

MR. GIBBONS:  John, we need to get to the paper.

THE COURT:  Okay.

MR. LOEVY:  I'm not going to read it until we pause.

THE COURT:  Okay.

MR. GIBBONS:  It sounded like you were going to read it.

MR. FORD:  Can you say that page one more time?

MR. LOEVY:  That's what I'm trying to do.  109, 2 through 9.

(Brief pause.)

MR. FORD:  Okay.

MR. LOEVY:  May I continue?

THE COURT:  You may.

BY MR. LOEVY:

Q.  All right.

"And you are trying to determine if there's an ongoing emergency where people's lives are imminently at risk?

Answer:  Yes.

And that all requires careful attention to the area where you understand the shots to be coming from?

Answer:  Correct."

And backing up to the previous page, 108, and 18 to the bottom to give you more context, "and so you are trying to identify if there's any need for emergency response such as an ambulance?

Answer:  Correct.

And you're trying to identify if there's a need for an emergency response with an evidence technician if there's a crime scene?

Answer:  Sure."

You gave those answers, right?

MR. FORD:  Objection, your Honor.  Improper impeachment.  This is not talking specifically about the call. It's just generally shots fired.

THE COURT:  Overruled.  It's proper.

BY MR. LOEVY:

Q.   All right.  So if there's a -- by the way, there was a lot of calls that night about shots fired, like five or six calls into dispatch, right?

A.   I don't remember how many.

Q.   All right.  But one of the things the police do when they respond is not just check a box, they have to see if anybody got hurt, right?

A.   Yes.

Q.   That's their job.  Now you didn't do that?

A.   No.

Q.   But somebody else presumably did, correct?

A.   I have no idea.

Q.   But you would assume that -- how about this:  If the police department was doing the job the way it was supposed to be done

Dorsch - Cross

1904

and five cars respond, you would expect the police to be coordinating making sure somebody does what needs to be done?

MR. FORD: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Coordinating, you expect the police officers to coordinate with each other to make sure that the job gets done, correct?

MR. FORD: Objection. Asked and answered.

THE COURT: Sustained. You've already asked that question.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. It's your belief that although you personally didn't get out of the car, other Chicago police officers would have thoroughly investigated the scene, correct?

MR. FORD: Objection. Asked and answered.

MR. LOEVY: That's a different question, your Honor.

THE COURT: I think that's a different question. Overruled.

THE WITNESS: Can you repeat that?

BY MR. LOEVY:

Q. Sure. Although you personally didn't get out of your car and go into the park, you believe that other Chicago police officers would thoroughly investigate this call that night?

A. There were cars on scene. I -- how thoroughly it was

Dorsch - Cross

1905

investigated, I don't know what they did.

Q.   But you believe they would have thoroughly investigated the shots fired call?

A.   Yes.

Q.   Okay.  And the Chicago Police Department are good at what they do?

A.   Yes.

Q.   Now the call didn't get cleared until 1:11 a.m., correct?

A.   I have no idea.

Q.   All right.

        MR. LOEVY:  Approaching with Exhibit 416.  May I approach, your Honor?

        THE COURT:  You may.

BY MR. LOEVY:

Q.   Take a look and see if that refreshes your recollection about the cars that responded and the time that this had got cleared?

A.   Okay.

Q.   Does it refresh your recollection?

A.   I see that it was cleared at 1:11.  Yes.

Q.   1:11 a.m.?

A.   A.M.

Q.   So about two hours after the police responded?

A.   Correct.

Q.   And it does refresh your recollection that I got the beats

Dorsch - Cross

1906

right about the cars that responded?

A.   Two of the cars.

Q.   It's got -- all right.  Do you see the tabs on there?  Why don't you make sure that we got it right?

A.   45 Sam and 2561Z.

Q.   Check the rest of the tabs just to make sure that it's clear.

     (Brief pause.)

          THE WITNESS:  These are different times, 2520.

BY MR. LOEVY:

Q.   And the car that responded and the time?

A.   Also a different time, 2532 and 1669C.

Q.   All right.  So the right car, some of them arrived 20 minutes later, that kind of thing, right?

A.   Correct.

Q.   All right.  But did we get all the right cars responding?

A.   As far as I know, yes.

Q.   Let's take a look at what -- the park.

          MR. LOEVY:  Can I have the document camera, please, your Honor?  This is an exhibit that's in evidence.  Looks like it's 37.

BY MR. LOEVY:

Q.   Do you see the screen, sir?

A.   I do.

Q.   All right.  This is a park.  You know this park, right,

Amundsen Park?

A.   Yes.

Q.   This is the parking lot what I'm circling with my finger, correct?

A.   Yes.

Q.   So you can access it from the street and drive into the park through this -- through this driveway, right?

A.   Correct.

Q.   And you didn't do that that night, right?

A.   No.

Q.   But if a police car wanted to park at Amundsen Park, that's where they would park, correct?

A.   They could, yeah.

Q.   Sure.   I mean, that's the parking lot, right?

A.   Correct.

Q.   And showing you a picture from the next morning, 3:19, that's the edge of the fieldhouse and the police where the police can park, correct?

A.   That's the parking lot.

Q.   Yeah.

A.   Yes.

Q.   All right.   So -- and then showing you another view, this is Plaintiff's 389, this is another way in how you drive into the park, correct?

A.   I have no idea where that's at.   No.

Q.   I'll back it out.  This is the area that I believe it is --
and you'll see if you can confirm that.  This is the fieldhouse
here.  You see the littler part and then the big part.  And
then showing you the other angle I just showed you.  And then
this view, that appears to be driving into the parking lot of
the fieldhouse, correct?

A.   That's what it appears to be; yeah.

Q.   All right.  And in the parking lot, the next morning at
least -- showing you Plaintiff's Exhibit 169 -- there was a
dead body, correct?  That's your understanding?

A.   Yes.

Q.   And you didn't drive into the park or the parking lot that
night, right?

A.   No.

Q.   You were only there for two minutes?

A.   Correct.

Q.   All right.  And this body would be in the parking lot then
that we just showed on the prior photographs, correct?

A.   In the parking lot?

Q.   Well, in the corner of the parking lot.  Basically where my
finger is indicating, right?

A.   I can't see.  I don't know.  I don't know where that's at.

Q.   I'll show you another angle.  This is Defendant's 169, Page
51.  Now this is the next morning.  So this police officer -- I
don't mean to imply he was there that night, but this is where

the body was, correct?

A.   In the picture, yeah.

Q.   All right.  No police officers discovered a body the night of the 30th.  We agree about that, right?

A.   Correct.

Q.   Now if you got a thousand calls over your career for shots fired, I take it this one doesn't stand out in your mind?

A.   No.

Q.   Another day at the office for you?

A.   Yes.

Q.   You might have responded to another call that night, right?

A.   I'm sure I did.

Q.   So you probably don't really even remember this, do you?

A.   I do.

Q.   Do you remember every shot fired call?

A.   No.

Q.   All right.  You were asked to testify at Mr. Brown's criminal trial, correct?

A.   Correct.

Q.   And do you know why you were called to testify to add what piece of relevant evidence?

A.   No, I don't.

Q.   Do you know what piece of relevant evidence you were called to testify at this trial?

A.   Honestly, no.  I don't.

Dorsch - Cross

1910

Q.   All right.   The area around the fieldhouse was lit, correct?

A.   The field itself was lit.   I don't know about the lighting around the fieldhouse.

Q.   Those police cars had search lights too, correct?

A.   When?

Q.   I mean, Chicago police cars have those little lights on the --

A.   Correct.

Q.   Yeah.   Some of the work they do is at night, right?

A.   Correct.

Q.   And switching to just an unrelated topic, there was a gang on the west side of Chicago, correct?

A.   There was many gangs, yes.

Q.   And this particular park was in a neighborhood that was the Mafia Vice Lords, correct?

A.   I don't recall which gang.

Q.   Do you remember giving a deposition, sir?   Oh, you already established that.   This is Page 27, Lines 14 through 18.

A.   Okay.

        MR. LOEVY:   Your Honor, may I have permission to read that?

        THE COURT:   I think we just give Mr. Ford one moment.   All right.   Yes, you may proceed.

BY MR. LOEVY:

Dorsch - Cross

1911

Q. All right. What gangs -- what were the gangs that were active in that area at that time? And your answer was: From what I recall, the Mafia Insane Vice Lords were in that area.

Did you give that answer?

A. Yes.

Q. And is that your general recollection?

A. That's what I recall, yeah.

Q. All right. On the scene that night to the best of your knowledge, no citizen said anything about anybody being injured or hurt or shot, correct?

A. Correct.

Q. And when you found -- when you heard the next day that a body had been found in the park, you didn't even connect it to the shots-fired thing you responded to the night before, correct?

A. I'm --

Q. Didn't even connect it.

A. I'm sure I did. I don't know why I wouldn't.

Q. All right. This is Page 142, Line 16 through 24. Do you remember giving these answers to these questions? I'll pause.

(Brief pause.)

MR. LOEVY: May I, your Honor?

THE COURT: Any objection, Mr. Ford?

MR. FORD: No.

THE COURT: You may proceed.

BY MR. LOEVY:

Q.  All right.  So it is your testimony that it was your belief that the calls of shot fired were thoroughly investigated by CPD the night of August 30th, 2008?  And you said:  Yes, I do much.  And then the next question was:  When you heard that there was a homicide investigation and a body found in Amundsen Park the next day, did you connect that to the calls of the shots fired?  Answer:  No.

And then the answer -- it continues on to Page 143, Lines 1 through 6, that you responded to.  I had no reason to.  So it is your belief that they could have been entirely unrelated -- I'm sorry.  So it is your belief that that could have been entirely unrelated to the calls of shot fires that you responded to?  Answer:  Yes, absolutely.

Did you give that answer?

A.  I did.

Q.  All right.

MR. LOEVY:  I don't have any other questions.

THE COURT:  All right.  Thank you, Mr. Loevy.  Mr. Ford, anything based on that?

MR. FORD:  Just a couple.

REDIRECT EXAMINATION

BY MR. FORD:

Q.  Officer, I just have a couple follow-up questions.  So do you remember Mr. Loevy asking about the clear time?

A.   Yes.

Q.   Can you tell from that document OEMC -- we can pull it up if you want -- was it your responsibility to clear that call?

A.   No.

Q.   Would that be the responsibility of 45 Sam?

A.   Yes.

Q.   And again, what was 45 Sam?

A.   Sergeant on the saturation team.

Q.   Could he decide -- assuming it's a he -- could that sergeant decide what time to clear it?

A.   Yes.

Q.   Is there -- based on your experience as a Chicago police officer, are there times in which there's a delay between the time someone is finished responding to a call and then the time they actually clear the call?

A.   Yes.

Q.   I'm going to pose to you a hypothetical.  If that sergeant had been responding to another call close by -- let's say a stabbing -- and that took that officer time, would that explain a delay in why there is a -- a period of hours before that call was cleared?

          MR. LOEVY:  Objection, your Honor.  There's no evidence about any delay.  What delay are we talking about?

          MR. FORD:  Well, the dispatch time and then the time of the cleared call.

THE COURT: So the objection is sustained.

MR. FORD: Okay. I'll withdraw it, your Honor.

THE COURT: Yes.

BY MR. FORD:

Q. One last point. I wanted to re-show you the picture that Mr. Loevy showed you.

MR. FORD: Can I get that -- is the document camera still on?

THE COURT: Yes, it is.

BY MR. FORD:

Q. All right. Officer Dorsch, this is Exhibit 41.45. Do you remember Mr. Loevy showing you this photo?

A. Yes.

Q. And it's hard to make out. Do you see that, the body right there?

A. I do.

Q. And again, you didn't drive behind the fieldhouse that night, right?

A. No.

Q. And you didn't see any officer drive behind the fieldhouse, right?

A. No.

Q. Assuming you did drive behind the fieldhouse, is it any guarantee that you would spot that body on the night?

MR. LOEVY: Objection, your Honor. He doesn't have a

foundation.  I mean, he wasn't there.

MR. FORD:  Based on his experience of being a police officer responding to shots fire calls.

THE COURT:  On that basis, overruled.  He can answer.  He can answer.

BY MR. FORD:

Q.  Is it a guarantee, Officer Dorsch, that you would spot a dead body?

A.  No.

Q.  Thank you.

MR. FORD:  Nothing further.

THE COURT:  All right.  Officer, you may step down.  Thank you.

THE WITNESS:  Should I leave this up here?

THE COURT:  Yes, please.

(Witness excused.)

THE COURT:  Ladies and gentlemen, we will take our afternoon break.  It is 2:45.  So we'll take a 20-minute break and we'll be ready to go about five after 3:00.  Please don't discuss the case and we'll see you in about 20 minutes.  All rise.

(Proceedings heard in open court; jury out.)

THE COURT:  All right.  Please be seated.

I neglected to mention before we resumed testimony that because I knew we were going to rest plaintiff's case

1916

during the testimony that I would take up any motions during the break as opposed to stopping testimony at that point. So I assume there is a motion by the defense that I'm happy to hear from you now if that's appropriate or if you propose a different time.

MR. FLYNN: Your Honor, I'm moving for a directed verdict on all claims. We'd like to know if they're dropping any other claims. Obviously, we want to paper this motion. But to the extent you want to hear any argument, we can of course provide that now as well.

THE COURT: So I'm happy to hear anything you want to raise. I will tell you now that my practice has been to take matters under advisement. And I realize that, you know, some of this is, while important for a variety of reasons, I certainly don't want to slow things down. And so if there's something you wish to raise, now would be a good time to do it. But I do think it's appropriate to ask Mr. Loevy in light of the fact that the plaintiff has rested and there has been at least a suggestion that there would be some claims dropped, now might be the right time to say that.

MR. LOEVY: Sure. The defendant Weber -- not Weber. Burke. Burke is not a defendant but he was a name on the verdict form and we did have an agreement when we were doing this unorthodoxed thing about the verdict form but they reserved the right to move for a directed verdict on a person

1917

as opposed to a defendant.

THE COURT:  Okay.

MR. LOEVY:  And we are -- we will drop Burke from all claims in the lawsuit so he wouldn't be in one of the named choices.

As far as claims, we're preserving our claims.  You've made some rulings that are -- spell real trouble for a couple of them but we don't concede them.  Well, actually, for one of them.  Rufus McGee -- no.  The suppression -- 911-related suppression, you did bar us from putting that on so we don't agree with -- agree.

THE COURT:  Of course.

MR. LOEVY:  You know, our view continues to be that if that last witness would have given us a Brady violation, we could add Brady, you know, because we don't -- you don't know what you don't know and it could come out.  Your Honor has ruled that that particular thing is out and so we're abiding so we -- we still preserve the right to pursue that claim.

THE COURT:  Okay.

MR. FLYNN:  So if I got that right, they're preserving their Brady claim just on the 911, the Rufus McGee claim is gone and the Eugene Stanciel fabrication claim is gone, can we agree on that?

MR. LOEVY:  I agree that Eugene Stanciel we provided no evidence on.

MR. FLYNN:  Rufus McGee?

MR. LOEVY:  And I agree that we provided no evidence on Rufus McGee.

MR. FLYNN:  So there's no Brady claim other than you're preserving your rights on the 911 calls?

MR. LOEVY:  We would like an opportunity to confer and respond if we're going to make an argument that anything else has been suppressed, but I concede Stanciel and Rufus and the 911 are out.  So at the appropriate time, maybe at the end of the day, we can report to the Court our response to that particular claim.

THE COURT:  Sure.

MR. FLYNN:  No problem, your Honor.

THE COURT:  All right.  Thank you.  Okay.  See you in about ten minutes.

(Recess taken.)

(Exchange of reporters took place.)

THE COURT:  All right.  Do we have Mr. Welner ready?

MR. FLYNN:  Yes.

THE COURT:  He can take the witness stand.

MR. FLYNN:  You can take the stand.

THE WITNESS:  Yes, sir.

(Jury in at 3:05 p.m.)

THE COURT:  All right.  You may be seated.

All right, sir.  We're going to swear you in, so

please remain standing while I have my clerk swear you in.

THE CLERK:  Sir, could you state your name for the record?

THE WITNESS:  My name is Michael Welner, W-e-l-n-e-r, M.D.

(Witness duly sworn.)

THE CLERK:  You have been sworn.  You may be seated.

THE WITNESS:  Thank you.

THE COURT:  All right.  Mr. Flynn, you may proceed when you are ready.

MICHAEL WELNER, DEFENDANT'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. FLYNN:

Q.  Good afternoon, Dr. Welner.

A.  Good afternoon.

Q.  What is your occupation?

A.  I'm a psychiatrist and a forensic psychiatrist.

Q.  And have you been board certified?

A.  I'm board certified in psychiatry, adult psychiatry.  I'm board certified in forensic psychiatry, which is the intersection of law and psychiatry, and I have in the past been board certified in clinical psychopharmacology, which is the treatment of psychiatric disorders with medication and other physical treatments, and in disaster medicine, which is the intersection of psychiatry and significant events, whether it

be war or pandemic or biological-chemical terrorism.

Q. And your role in this case is to respond to the opinions of Dr. Cutler who they had testify this morning, correct?

A. Yes, that's what I've been asked to come and talk to you about today.

Q. Okay. And how does forensic psychiatry relate to your responsibilities in this case?

A. Forensic psychiatry, the intersection of psychiatry and the law, specifically is the application, how psychiatry gets applied as a medical science, as a science to questions that come up before courts. And forensic psychiatry engages questions in criminal law and non-criminal law, whether it be family courts in divorce or employment cases in fitness for duty.

In criminal cases, there is an evaluation side where you review materials and you review evidence and you integrate that with the research of what we've been able to learn, and the clinical side. The clinical side of forensic psychiatry deals with the emotional conflicts and the experiences of people who are under arrest and who uniquely when they are in jail have the experiences of how they relate to police, how they relate to what they've been arrested for, how they relate to the experiences of other people in the community with whom they may have been arrested, other kinds of behavioral issues that can cause them to break the law on the clinical side.

Welner - direct

1921

And on the evaluative side, I'm looking at questions that come up in specific cases that may relate to certain populations or certain kinds of questions at stages of a case, and that stage may go from when a person is first interrogated in the nature of their fitness to waive Miranda, which are rights that a person needs to be presented with, to questions of whether a confession is forced or false, and then beyond that in an arc of a case, whether a person is competent to stand trial or competent to be their own attorney or competent to take a plea, to questions at trial of criminal responsibility, whether a person was legally insane at the time of the crime or whether a person had some sort of diminished capacity, was intoxicated in a way that it should be considered in terms of how blameworthy they are.

And then post-trial, to questions that may impact sentencing: Is there something about the person's background, is there something about the person's upbringing, is there something about the person's future risk that should be considered as part of potential sentencing considerations?

So it's before, during, and after a person's engagement in these kinds of proceedings for the most part.

Q. Okay. So let's back up for a second. When did you complete your psychiatric training?

A. So I was -- I completed my psychiatric residency, went to medical school, finished medical school and completed my

Welner - direct

1922

psychiatric residency training in 1992, and completed a fellowship subspecialty training in forensic psychiatry. Like other disciplines, psychiatry has many different subspecialties. Forensic psychiatry is one. Child psychiatry is another, geriatric psychiatry. So they're areas that you specialize. So I completed that subspecialty training in forensic psychiatry also in 1992, and then I entered practice, hard to believe, but 30-odd years ago.

Q. And you were an attending physician at Bellevue Hospital --

A. I was.

Q. -- on the forensic psychiatry unit?

A. Yes.

Q. Did you have patient care responsibilities there as it relates to your responsibilities in this case?

A. Yes. The forensic psychiatry unit at Bellevue Hospital, it's within the hospital, but it's a separate jail unit. You know, you most certainly have it here in Chicago where people who are under arrest and people who are already in the jail system, they come because their behavior can't be managed in the jail, or sometimes there are evaluations that need to be done before they go to trial.

So as a caregiver, you are working with people who are under arrest. You're their psychiatrist. They're speaking to you about their personal experiences, about their conflicts, about the situation they're in which is very different from

what you might find in work that you do in the community. People will tell you about experiences and emotions and reactions and feelings that you're not going to hear about from your, from your ordinary patient because it's a subculture, just as it would be if you were a military psychiatrist. There's a whole culture within that of things that you encounter that you don't encounter in the community. So that's the treatment setting of a place like Bellevue Hospital with a corrections unit.

Q. And while you were there, did you encounter confessions?

A. I did.

Q. All right. And did you encounter any false confessions?

A. Once. Confessions in a forensic psychiatrist setting are routine. People will be in custody, and interrogations sometimes are conducted. But often, especially for major crimes, they're conducted and people are referred for evaluation. And those confessions are not necessarily disputed; in other words, one side saying that it was forced and the other side saying that it was not, one saying that it's false and one side saying that it's not. So you would encounter or one would encounter in that setting on a regular basis confessions.

On one occasion I did encounter, it was my first professional experience three years after I came there of someone who had confessed to something that he had not done,

and that's a false confession.

Q.   Understood.  And from there, after Bellevue Hospital you entered into private practice, is that correct, in forensic psychiatry?

A.   Yes, yes.  I began private practice in 1992 at the same time that I was at Bellevue Hospital.  After I left Bellevue Hospital, I was in full-time private practice with part of my practice being a clinical practice of treating people with psychiatric disorders and people with different diagnoses, and then there was separate to that a forensic psychiatric practice of assessment.

Q.   And through your 30 years, would you say you have extensive experience with reviewing and evaluating confessions in various types of cases?

A.   Yes.  When I was walking you through earlier the arc of a case, when you do a presentencing evaluation, it's very common to have a confession that's part of the case file that you're reviewing.  When you're reviewing an insanity case or a criminal responsibility case or a case of someone's intoxication, you're reviewing documents that very commonly include a confession.  And then in disputed confessions, you are also reviewing confessions.

So over the years, I've had the opportunity to review hundreds, many hundreds of confessions at this point from cases in which a confession was disputed and in cases where a

Welner - direct

1925

confession was not.

Q.   Now let's drill down on disputed confessions.  I just want to make sure that we understand that.  Is a disputed confession where one side says it's false and one side says it's true?

A.   Yes.  So when I'm saying "disputed," I'm not taking sides. One side says it's false, and one side says it's not.  When a case gets brought to you, you just see that it's a dispute. There are questions that are brought to your attention, and you do your best to inform the court and the attorneys that are asking you the questions.  So that's what I'm referring to. It's meant to encompass not only false confessions but also forced confessions, because people will have disputes in the court over whether somebody was coerced or whether they weren't.

Q.   Approximately how many years have you been consulting on disputed confessions?

A.   Over 20 years, since 2001.

Q.   Is it true that many people who offer a confession may have regrets later because they realize that confession evidence is strong evidence to convict them?

A.   Yes, especially when the confession --

        MR. LOEVY:  Your Honor, we have an objection.  This isn't in his report, regrets or any such subject.

        THE COURT:  Response, Mr. Flynn?

        MR. FLYNN:  Your Honor, Dr. Welner in his report does

discuss reasons for retracting confessions that are --

MR. LOEVY:  If I could just get the page, Your Honor, because I don't -- I will stand corrected.

MR. FLYNN:  I don't have it in front of me, Your Honor.  One second.

I'll move on, Your Honor.  We can go back to it later.  I don't want to hold up everybody.

THE COURT:  Okay.  Thank you.

BY MR. FLYNN:

Q.   And it's your professional opinion that false confessions do occur sometimes.

A.   False confessions have been identified, they do occur, and I have seen them in my professional career.

Q.   And what is your current position?

A.   I'm chairman of The Forensic Panel, and I'm a clinical professor of psychiatry at Mount Sinai School of Medicine.

Q.   What is The Forensic Panel?

A.   The Forensic Panel is a multispecialty forensic science practice, psychology, pathology, toxicology, criminalistics, neuroradiology, and emergency medicine.

Q.   And what do your current practice activities consist of?

A.   The breakdown of my professional life, about 50 percent of my time is consulting on cases such as this.  20 percent of my time is supervision of others within my practice.  About 10 to 15 percent of my time is on research, and the rest of the time

is teaching and writing.

Q.   Okay.  And you already mentioned that you treated patients during your career.  Did that stop at some point?

A.   Yes.  During the period of COVID and the transitions, the practice transition as well, at that point I stopped seeing patients clinically.  I don't believe in seeing patients remotely.  The whole world went remote, and that's just not the way I was trained to practice psychiatry.  So I stopped my clinical practice then.

Q.   Are you on the panel of New York Supreme Court's highly qualified independent psychiatrists?

A.   Yes.

Q.   What is that?

A.   The New York state maintains a group of forensic psychiatrists that when the court independently has questions over people -- about people within the criminal justice system, they reach out to that psychiatrist for opinions and input by agreement of both sides to have that person appointed to help inform the court.

Q.   Have you lectured on disputed confessions before professional audiences?

A.   I have since 2002.

Q.   That's when you started doing that?

A.   That was the first time that I believe I gave a lecture.

Q.   Okay.  And did you --

Welner - direct

1928

A.   It may have been 2003, but right around that time.

Q.   Did you chair a symposium at the American Academy of Forensic Sciences on how to assess cases of disputed confessions?

A.   Yes.

Q.   Did you lecture before a judicial panel of the New York State Appellate Court panel on conviction integrity with recommendations that you gave to the justice system?

A.   That's correct, about how to -- how to prevent false confessions, what could be done in interrogations in order to safeguard them and to give the justice system more confidence in the interrogations being taken.

Q.   And have you personally conducted a study on false confessions?

A.   I have.

Q.   Can you tell us a little bit about that study?

A.   In 2004 and 2005, I took a closer look at a number of ideas, ideas that had been brought up in the academic literature as possibly responsible for causing false confessions at a time where we really didn't have answers.  So the purpose of the study was to look at over 50 different items that had been raised, specifically about the interrogation itself, about the vulnerabilities of a suspect, and, thirdly, the nature of how police interrogated the suspect to see -- and I referenced them into the data that was available from the

complete data files made available to me of cases that were undisputed false confessions, in other words, both sides agree that someone had falsely confessed and the case had been resolved, in order to see what factors were responsible for moving someone who had been denying responsibility into confessing and, indeed, either associating or causing the false confession.

Q. Have you consulted with the United States Congress?

A. I have.

Q. And have you consulted to both prosecutors and defense attorneys on cases regarding disputed confessions?

A. I have.

Q. Prior to this case, have you ever consulted on a case for me or my trial team?

A. I have not.

Q. How do psychiatry and psychology relate to one another as it relates to these disputed confessions?

A. We both, psychiatry and psychology both rely on the same sources of information, the same sources of scientific literature to inform this area. There's no difference such as you might see in law enforcement. Law enforcement has a different literature and a different perspective from the behavioral sciences. But when it comes to the behavioral sciences, the social scientists, the psychiatrists, the psychologists are reading and writing in the same venues.

Welner - direct

1930

Q.   Okay.  And has your experience added to your understanding in this area?

A.   Absolutely.

Q.   How so?

A.   Because, because as in many areas where research is really very, very limited, theory can guide one's orientation.  But when you live a case, you learn things at a granular level, so you see things at a granular level that are instructive.  And even with the study that I began in 2004 that I talked about, I didn't complete it because I felt I needed more cases.  I was only able to access just over 10 cases of confirmed false confessions.

But the nature of the questions that I was asking was affected by my having now worked on those cases for three years and thinking about what questions I should be asking.  If I were entirely relying on what people were publishing in theory pieces, I would have approached it differently and it would have been operating in a much more shallow level.

It's also why you interview people, because you get to know them as people and you appreciate the individual experience.  Everyone is different.  They relate to things. You can't put people into some neat box, and I think that that affects a forensic psychiatric perspective in ways over time you appreciate more.

What I know now from experience is that I don't know

what's coming next. I don't know what I'm going to find after 30 years. The only thing that I do that I'm better at now is that I ask better questions, but I still don't know what's coming because everyone has a different story.

Q. Dr. Welner, I think we could go on and on about your background. I've got one question that I missed. Dr. Cutler, today he said something about Guantanamo Bay. Have you actually consulted on confession issues to the military tribunals at Guantanamo?

A. Yes, I have on number of the cases.

Q. So turning to this case, what questions were presented to you here?

A. A series of questions, as you noted earlier, that grew out of the original report of Dr. Cutler: How do people come to confess? What's a false confession? How are those -- how are false confessions identified? What do we have as the basis of our scientific understanding of false confessions? What's to be said about the available research in this area? What's the significance of age? What do we understand about what is coercive in terms of an interrogation? What kinds of factors or what kinds of qualities in the interrogation have been demonstrated to be coercive and what have not? What are subtypes of false confessions and the typologies or what kinds of patterns have emerged about when false confessions arise? What is the significance of leading questions in questions of

Welner - direct

1932

false confessions?  What is the significance of social influence in questions of false confession?

What's the significance, when I say "what's the significance," what do we understand from research?  What do we understand from demonstrated cases about the duration of interrogation and how that affects false confession questions?  What about the significance of sleep deprivation or deprivation of food or anything else that's been understood or developed in the question of false confessions?  What's the significance of isolation on confessions and false confessions, and what do we understand about contamination?

Q.  Okay.  So we'll get to all those points.  Before we get there, what materials did you review in this case?

A.  I reviewed what I believed to be and what was presented to me as the entire investigative file.  You have to understand how someone came to be a suspect in the first place, so that's important background and context in a disputed confession evaluation.  I reviewed witness statements of, I believe, 15 or 16 different witnesses that were questioned.  I reviewed the interrogation itself of the individual here and the videotape of it.  I reviewed background information about the individual, Mr. Brown.  I reviewed trial transcripts.  I reviewed post-trial motions and responses, the arguments of both sides, the court opinions, and I reviewed reports of Dr. Cutler and other individuals and depositions.

Welner - direct

1933

Q.   Okay.

A.   There may have been some other documents, but I reviewed an extensive array of source materials.

Q.   Now, the jury has already heard that Dr. Cutler's role in this case was not to determine if Mr. Brown's statements were a false confession and, therefore, it's not your role in this case either, correct?

A.   That's not my role in this case.

Q.   Okay.  And what is your hourly rate for this case?

A.   I believe it's 675 an hour.

Q.   Okay.  So let's back up.  Can you just define based on your expertise what a confession is?

A.   A confession is when someone takes responsibility for something, knowing that it's something that was wrong to do. In the legal context, it's taking responsibility for something, knowing that there are consequences attached to that.  And when it's a major crime, it's taking responsibility for something, knowing that there are significant consequences, maybe unknown, but significant consequences associated with taking responsibility for it.

Q.   And is that -- the confessions, are they different than what you would call admissions?

A.   Yes.

Q.   How so?

A.   Admissions may be statements where someone concedes

something circumstantial, that they were at a certain place at a certain time, may have even had a connection to someone who was involved, but not taking responsibility for the crime itself and not with a clear awareness of what the penalties might be and what the consequences might be.

Q. So can someone make an admission without it being a confession?

A. Sure, certainly, and it happens all the time.

Q. Okay. And so when you as a forensic scientist are assessing a false confession --

A. I'm sorry.

Q. Go ahead.

A. There's an important distinction. The difference between admissions and confessions are also appreciated in the pressures on an individual not to confess. The awareness of the consequences of confessing to a major crime creates pressures within an individual to not confess, which is why there's interrogation because there's a recognition of the significant penalties.

In an admission, those pressures are not the same because a person is not necessarily aware that if they admit to something or if they do not admit to something that they are necessarily going to be -- going to face the same kind of accountability.

Q. Understood. When you as a forensic scientist are

Welner - direct

1935

assessing --

MR. LOEVY: Your Honor, we'd move to strike that. That is not disclosed. It seems to be a brand new opinion that's never been disclosed.

THE COURT: Response, Mr. Flynn?

MR. FLYNN: Page 15 of his report.

MR. LOEVY: Do you have a copy of the report, Your Honor?

THE COURT: I'm sure it's somewhere, but I certainly don't have it handy.

MR. LOEVY: I have an extra copy I can hand up.

THE COURT: Thank you.

(Brief pause.)

MR. FLYNN: It's the top paragraph of page 15, Your Honor, first two paragraphs.

MR. LOEVY: Your Honor, that is close enough. I will withdraw the objection.

THE COURT: All right. Thank you. The answer will stand.

Mr. Flynn, you may proceed.

BY MR. FLYNN:

Q. Dr. Welner, when you as a forensic scientist are assessing a false confession, what do you focus in on?

A. Like many other evaluations in forensic psychiatry, the evaluation is known as contemporaneous. In other words, it's

very time-specific.  What you look at in a disputed confession is what moved the person from denying responsibility to accepting responsibility.  You look at that period of time and you focus on it in particular within the interrogation, what was going on then, and again the three qualities:  what was going on in -- what was the nature of the interrogation, what were the vulnerabilities of the suspect, and what was the context in which all of this was taking place.

Q.   Dr. Welner, why do people confess?

A.   People confess -- and this has been studied with people who have claimed to have confessed.  They were interviewed about why they had confessed and gave a variety of different answers which were pooled into three different types of influence: perception of proof, external pressures, and internal pressures.

Internal pressures are one's guilt, one's shame, which a person then relieves, gets something off of their chest. External pressures may come from the police.  They may come from peers.  They may come from family.  Perception of proof is the sense that a suspect believes that there's enough evidence to convict them anyway, that there's no point in denying, and that a person should approach the interrogation differently, that eventually police are going to find out what happened and so the proof will exist and the quality of proof will be significant enough that there's no point in not confessing at

Welner - direct

1937

that point or not offering a confession.

Q. So I just want to make sure I understand that last point. How do police in general use perception of proof in an interrogation?

A. It's very important to recognize that every interrogation is different. There's no pro forma out-of-the-box way of interrogation. There's training. There's different things. But it's just like you going to law school. You know, you practice the way you practice. You learn what you learn, but then you go out into the real world, just as I mentioned before about experience.

So different detectives have different styles of how they conduct interrogation, but suspects will be presented with either evidence against them or the idea that evidence would be available to them that would be incriminating of the suspect to increase a suspect's sense of belief in the strength of that evidence. There are a variety of ways to do it, again, either with "we know this" or "this person is talking to us," things like that, you know, or "we have this record" or "we have that record and it shows this." And so by converging all of that and laying it out for a suspect, then the suspect then weighs: Okay. Well, do I continue to deny or shall I give my side of what happened?

And that's how perception of proof relates to interrogation and relates to the confession.

Welner - direct

1938

Q.   Can someone who is guilty make a false confession?

A.   Most certainly, and it's common because just because a person confesses, it doesn't mean that they don't stop caring about their own interest.  So a person can give a confession but can present an account in a way that's as self-serving as possible so that it portrays them in a more sympathetic light, in a less blameworthy light, and other features.  It may impact other people involved in the case in a way they confess, or it may relate to the victim in such a way, and just the nature of the event, particularly when there aren't other available witnesses.

And so, again, I think the take-home point is just because a person confesses, it doesn't mean that a suspect doesn't care about themselves anymore, and certainly expresses things in a way that they feel will place themselves in the most positive light.  It may be an issue of blameworthiness or it may relate to some of the concepts that I mentioned earlier about shame, and this is just also in my own experience of interviewing people talking about what they do.  So that's common, and there may be many false details that go along with a person taking responsibility for a crime in which they know punishment is part of it.

Q.   I want to talk to you about some research when it comes to false confessions.  You talked some about your own study that you put together.  Dr. Cutler talked about -- first, before we

Welner - direct

1939

get into much of the research, Dr. Cutler discussed a University of Michigan Registry of Exonerations. Are you familiar with that?

A. I am.

Q. Okay. According to Dr. Cutler, some of those exonerees had falsely confessed, is that right?

A. According to him, yes, and some of those exonerees have, that's correct.

Q. And could you explain a little bit further?

A. Well, what's listed as a false confession, a false confession is what I've described to you, but in studies such as that they may also include other cases that don't replicate what I'm talking to you about, for example, a person who is denying and then ultimately confesses. What are also included in those cases and listed as false confessions may be people who pled guilty to crimes to which -- which they didn't commit. When someone does that, it's not in an interrogation. It's something that happens as a matter of negotiation with attorneys and in courts without the pressure of the interrogation room.

Or what may be listed as a false confession in that registry may be cases which are not undisputed. In other words, the person was released from custody or found to not be guilty beyond a reasonable doubt, and so they were released, not held accountable, and yet there's a real dispute as to

whether they were responsible or not.

So there's a distinction between what would be undisputed false confessions where nobody really argues and then certain instances in which the justice system resolved the case as it did but there are two parties who see things very differently. There are cases not only of false pleas, but then there are also cases in which a third party may say: Well, I saw you confess. I heard it.

But you say you never confessed, and yet that evidence of the third-party witness may be responsible for your conviction and you may be innocent. You never said you confessed but someone said that you did, and that gets included as a false confession in certain samples.

Q. In that registry, the University of Michigan registry that Dr. Cutler relies on, it just throws those all into one bucket, those false confessions?

A. It throws -- it throws other categories that are not necessarily distilled purely in the way that I've just described.

Q. Okay.

A. The inclusion criteria are more loose. But there are absolutely cases in that study that are false confessions. In terms of drilling down on the exact numbers, that's something that one would find that they don't necessarily have the same pedigree and profile of what we're talking about today. The

suspect goes into interrogation.  The suspect confesses.  It's a question of whether the suspect is innocent or guilty.  If the suspect is innocent and confessed, it's a false confession. It seems pretty straightforward, but in these research paradigms it gets muddy.

Q.   Understood.  So I understand there's different types of research when it comes to confessions.  There's empirical research, and then there's this academic social science research, right?

A.   Well, the two are -- you know, social sciences can do empirical research, also, but there are a variety of ways of conducting research.  Empirical research is one of them, and it is very important to a discipline like this.

Q.   What's the difference between empirical research and the social science research?

A.   "Empirical" refers to just practical experience as opposed to logic, and doing it, living it, and seeing it.  The exercise that one has of actually participating in an interrogation or viewing an interrogation as it happens of a major crime is empirical data.

         If I were to conduct an experiment that uses a paradigm to recreate a computer crashing or whether someone saw something on someone's paper or not, that wouldn't be empirical.  That would be a facsimile that I might create artificially to try to simulate the experiences of a

confession. The reason that it does not is that the interrogation setting is distinct in its pressures. There are pressures on a suspect not to confess. There's the urgency of the questioning that's going in the interaction. There are the stakes involved in a high-stakes case that can't possibly be replicated in some facsimile study of whether a college student who's participating in something to get perhaps five points of extra credit, whether they participate in an exercise where someone then turns around and says: You let someone look at your work.

And then the other person says: No, I didn't.

Yes, you did.

No, I didn't.

It just doesn't recreate. It doesn't recreate the consequences, it doesn't recreate the interrogation setting, and that's why empirical exercises, such as the one that we have in this case, are ones that are so much more informative, and it's also why principally the data that we learn about false confessions from are from undisputed false confessions. Because you can then take a look at data where there's no dispute what happened and then you can deconstruct it in a way that I've spoken about earlier, so how did that person -- when that person went from denying responsibility to embracing responsibility, what was going on. That's a distinctive setting that's not recreated in facsimile exercises.

Welner - direct

1943

Q. Understood. And it's fair to say that your opinions in this case are based on that empirical real-world research?

A. I think that's actually -- my opinions in this case are based on what we understand from empirical research as well as the data from confirmed false confessions. There are empirical studies about interrogation. There are no empirical studies about false confessions, but there are empirical studies of interrogation in which people are walking through interrogations and observing them in videotapes and things like that and learning about that experience therein.

Q. Dr. Cutler's opinions are based on social science research. Is that fair?

A. Well, I didn't hear his testimony, but let's say that he --

Q. Well, his report.

A. I think that he values a universe of material from a variety of different sources.

Q. Well, are there limitations with social science research when it comes to false confessions?

A. Sure.

Q. What are those limitations?

A. Well, there's a lot that is theory-dependent. So, in other words, I can say that something is undesirable for an interrogation, but it doesn't mean it causes a false confession. You know, any number of things can be unpleasant in an interrogation, but it doesn't mean that it translates

Welner - direct

1944

into someone taking responsibility in a murder case.

And so the leap that one makes from theory to saying that this matters is the reason that we do research at any time. Otherwise, we're really just guessing, and someone who guesses and says "yeah, I think that would be bad" are really no more qualified than anybody in this room with life experience that say, "yeah, I think that could have done it."

I think that research enables science as a discipline to say, you know, we actually looked at this, and sometimes you get surprised by the results. I've researched many different areas, and in every area that I've researched, and beyond what we've discussed, I have been surprised by many things that I've studied. That's why you do the studies.

So I think that's the big difference and the caution about theory. You know, theory sounds good, but in the real world it can be very misleading unless you actually put it to the test.

Q. Is one of Dr. Cutler's opinions that's based on social science regarding how frequently false confessions occur?

A. I'm not familiar with his exact opinion about how frequently. I think that he said that false confessions occur extremely frequently, you know, words to that effect. He testified about that they occur with great frequency.

Q. And that's what I meant. It was a poorly worded question. How do you respond to that conclusion by Dr. Cutler?

A.   Well, there's been tremendous effort over the last 25 years to identify as many false cases -- false confession cases in major crimes as possible, and it involves a variety of different institutions, a variety of different professional interests.  It's well-funded, unlike a lot of other areas of interest in study.  People want to know.  People are asking these questions.  It's not one of these areas where people want to know but nobody is asking and nobody is funding.  You know, this really does get studied.

But in spite of that, we've only been able to identify, to use the University of Michigan study, no more than a few hundred undisputed cases of false confessions in major crimes.  So however they happen, when you measure that against the universe of major crimes and interrogations that happen and convictions that happen and cases that get challenged and go through the appeal process, we're talking about a few hundred that spans decades of collecting data.

Now, if you want to break that down over 50 years, 60 years, when people really started to more seriously gather data, they happen.  I've seen them happen.  But we're dealing with a commonality if it's not at that level and it's slightly above, but we're not talking about it with all the time or very frequently.  No, it's a phenomenon.  It's why the justice system wants to understand it more because it contributes, as the University of Michigan study pointed out, to wrongful

conviction.

Q. In your view, does the social science academic research that Dr. Cutler relies on, does it overstate the frequency of false confessions?

A. Yes.

Q. Based on actual empirical research and data, what do experts in your field generally understand concerning false confessions, the frequency of false confessions?

A. Nobody knows. Nobody has identified it. It could be now. There are laws on the books now that weren't available 20 years ago where all interrogations are recorded, and you have great cooperation between law enforcement and the scientific community. So there is the wherewithal to look at a body of interrogations, to get that data from agencies, to study the frequency of cases, and going through dispositions to see what cases get reversed on confession grounds against the overall number. It can be done.

In my own professional experience, I conducted research that drew from several jurisdictions, I believe nine jurisdictions, getting entire case files. This is not relating to disputed confessions but in another area that related to sentencing, and I got 750 case files. So if you want to do the work, it's there. It can be done.

That wasn't necessarily possible 20 to 30 years ago, but now you've got, again, laws on the books where in states,

Welner - direct

1947

Illinois as an example, where you have all interrogations being recorded. So it's all there. The data is there. It simply needs to be studied, and I think that if it's studied the question will be more precisely informed.

Q. Okay. Earlier today -- excuse me -- earlier today Dr. Cutler discussed what he was calling risk factors that could increase the likelihood of a false confession. I know you listed some of them at the top of your testimony. I won't ask you to do it again, but we are going to get into some of those risk factors.

Before we do, does the mere presence of a risk factor during an interrogation mean that that particular risk factor was the cause of a confession?

A. Not necessarily, but I need to point out to your question, if I may, I didn't testify that those are risk factors. I testified that I was asked to address those areas. Some of those are risk factors, some of them are not, and some of them are risk factors in a particular context, which is what you were alluding. You know, in some instances a risk factor may be relevant. In another case, yeah, it could potentially be a risk factor, but when you deconstruct what took somebody from denial to confession it's immaterial. So you take it on a case-by-case basis.

Q. Okay. Thank you for that clarification.

Does the presence of a risk factor during an

Welner - direct

1948

interrogation mean that a confession was given involuntarily?

A.   Not necessarily.

Q.   If you --

A.   But it could.  It could.  Again, it's cause for just greater scrutiny.  If something is there, you look at it more closely, just as you might be impacted by the absence.

Q.   So I want to start with what was identified as a risk factor by Dr. Cutler, and that is somebody's age.  Do you have any opinions concerning age as a risk factor?

A.   I do.  That's something that's been looked at.  In order to answer the question properly, it's important to understand the typology or different types of false confessions that have been identified and confirmed, undisputed cases, and to some degree have been studied in a variety of ways.

The coerced/compliant confession refers to confessions when they are false, and that occurs because the environment is so toxic and so aversive within the interrogation that the suspect confesses just to make it end, because they want to get out of the room and they want to get away from the questioners.  That is a coerced/compliant confession.  Not surprisingly, that reflects threats, violence, physical abuse, and the fear that officers or detectives are in those settings able to engender in a suspect to move that suspect from denial to confession.  That's coerced/compliant.

An internalized confession involves a distinct set of

circumstances of a naive suspect -- and that's "naive" meaning in particular naive to the criminal justice system -- in a dynamic that's actually more seemingly harmless and relates to the detectives in a way where he doesn't realize that he's a suspect. And the nature of the crime involves a victim that's very close to him or to whom he has a close relationship, family, very close friend, and he's emotional and highly impacted by what's happened, shock, distress, even psychosis or, you know, just clear emotional upset.

The individual's recollection of what happened at the time of the crime is uncertain either because the person was asleep or intoxicated or himself under mental distress. So that individual can't account for his movements. If they say where were you, he can't explain. So he has what's known as memory distrust.

So you have memory distrust, you have a suspect that's naive to the criminal justice system, and he's talking to the police because he feels like he's just helping police solve the crime and he doesn't realize that he's suspected of anything.

That individual, part of their naivety is what's known as suggestibility. I was referring earlier to individual vulnerabilities, a person who's more suggestible in internalized false confessions and in coerced/compliant false confessions. That can be a quality in which on the basis of suggestions of detectives, the suspect who doesn't trust his

memory starts taking in these suggestions, and then at the end of the interrogation the person internalizes a narrative where he did it.  He doesn't remember that he did it, but he takes on these suggestions and gradually, gradually, gradually forms a narrative where he is the perpetrator of this crime.

So in that instance, age is meaningful because age may be associated with naivety to the criminal justice system, as is intellect.  So false confessions are more represented among people who are intellectually disabled, what was once known as mentally retarded, as a byproduct of their naivety not realizing what was transpiring.

So for those people who are naive, a good number of whom are younger people, that is when age becomes consequential.  People who are younger may be more compliant to authority and may not be.  But some young people are more compliant than they would be as adults.  If they are more compliant than they would be as adults, then they may be more vulnerable to the pressure of officers who create a very toxic, very aversive and frightening experience of interrogation that they can't stand up to.

Q.  It depends on the person.  Can we agree on that?

A.  It depends -- whether we agree or not, it depends on the person.  It depends on the individual, and there are individuals who are of a certain age that are sophisticated about the criminal justice system and the street and police

officers, et cetera, and then there are others who are very inexperienced and they are very different.

I would add one final point, and that is in undisputed cases of false confession there is an overrepresentation of people who are 13 or 14 years old relative to the violent crime curve. As you get older in your teens, by the time you get to the late teens, that erases, wherein there's no difference between how many false confessions have been identified in later adolescents, in particular 18 and up, with the incidents of crime.

You know, crimes and violent crimes peak around the age of 18 to 21, so it more closely tracks the peak. But before then when violent crime is less common, particularly in those that are 16 and younger, false confessions are overrepresented. Again, that's going to reflect what I spoke to you about before, the possibility that a younger person is more suggestible, more naive, more compliant, those qualities being the individual vulnerabilities that contribute to false confessions in the way that they do.

Q. Let me just make sure I understand one point there. It's my understanding based on empirical research that there is no age at which individuals are more likely to confess once they reach that 18-to-19-year-old range?

A. Yes. Nobody has -- nobody has empirically researched when people are more likely to confess, true or false. The

Welner - direct

1952

empirical data that we have is that in undisputed false confessions, there's an overrepresentation among younger adolescents.  The numbers of 13-and-14-year-olds who have confessed to major crimes are definitely higher than the numbers of major crimes that are falsely confessed, and they are definitely higher of major crimes of that population.  We can say that.  It gets a little bit fuzzier as one gets older, and by the time one reaches 18 there's no real distinction.

Q.   I'm going to switch gears now.  Dr. Cutler during his testimony discussed deprivation of food.  He mentioned the paper by Kassin.  Are you familiar with any study out there that says that the deprivation of food can lead to a false confession?

A.   Certainly not to murder.  Again, I want to point out that we're not talking about whether somebody is confessing to fare beating, you know, jumping over a turnstile, or vandalism.  We're talking about a murder case, and there's absolutely no research that addresses this issue.

I am familiar with a Kassin 2010 article.  That's what you asked me about, which is a review article, and it may be something that's incidentally mentioned as a, quote, risk factor.  But again, this is the difference between theory and something that's actually been studied.  You know, somebody can put anything in their theories and berate it in an article, but it doesn't mean that it has been studied and really understood.

Welner - direct

1953

So my familiarity with that article is that there's nothing in that article that develops food being deprived -- and let's make it clear what we're talking about in that article, food deprivation:  You will not eat.  I am not giving you food.  I refuse to give you food.  I don't care if you're hungry, you will starve and you're in an interrogation.

That's what deprivation is.  Deprivation is the conscious act of depriving someone of something, not that you decline to eat, not that you aren't hungry.  Because in urgent, stressful situations, I don't feel hungry now, and I'm feeling the stress of testifying to you and this whole experience.  I'm not hungry.  I didn't eat lunch.

Hunger is variable to the situation.  It may relate to arousal.  Deprivation is:  I'm hungry, and you're not giving it to me, and you're making it clear I'm not going to eat, as is any other kind of deprivation.

Q.  Switching gears again, during his testimony today Dr. Cutler discussed opinions as to how police respond to an individual's denial during an interrogation.  Do you have similar opinions?

A.  I need you to be clearer about exactly what those opinions were because I --

Q.  Sure.  Yeah, Dr. Cutler discussed how an interrogator's denial of somebody after they tell the truth or what they say is the truth, that that could potentially lead to a false

confession. Do you agree?

A. The back-and-forth of interrogation in my experience in viewing hundreds, many hundreds of confessions, be they videotaped, audiotaped, transcribed, is common. There's a back-and-forth and a back-and-forth, and sometimes a person doesn't confess. And the confession ultimately ends with back-and-forth and back-and-forth and back-and-forth, and the suspect is pressed, the suspect denies, and the suspect denies to the end. Then the suspect is either arrested or released, and that happens in many cases. It may have happened in this case, also.

Be that as it may, there are other indications or other cases in which a person ultimately confesses. The denial itself has not been associated in any study with a false confession. It's what police do in response to the denials. The denials are just, you know, the passage of the back-and-forth. The false confessions happen either on the basis of the vulnerability of the suspect and the interplay with what police do as that denial persists.

Q. A more realistic explanation as to why someone confesses is not the interrogator's denials but, instead, the conveyance of a disproven lie by the suspect?

MR. LOEVY: Objection to leading, Your Honor. You know, I'll just withdraw it.

THE COURT: Okay.

Welner - direct

1955

BY THE WITNESS:

A.   Well, actually I didn't understand the question, so if you could rephrase it for me.

BY MR. FLYNN:

Q.   It's a very poorly worded question.  So Dr. Cutler's opinion is that repeated denials by an interrogator can lead to false confession.  We just talked about that.

A.   Yes, and that's just -- that's not so.

Q.   Is a more realistic explanation for someone giving a confession that they've given a story over and over and it's been disproven by the interrogator?

         MR. LOEVY:  Well, that question is objectionable, Your Honor.  More realistic?

         THE COURT:  So the objection is sustained.  Mr. Flynn, you can rephrase the question.

BY MR. FLYNN:

Q.   Is a more understandable explanation that it's a disproven lie that's been conveyed?

A.   You have to take it on a case-by-case basis.  Every person -- again, over the course, when you say "disproven," what are police doing to disprove it?  The police may present additional evidence that may contribute to a suspect's perception of proof.  So then it's not the denial, the repeated denial and the denial of denial, but it's a suspect reaching a place because police reacted by presenting information that

Welner - direct

1956

demonstrates more persuasive evidence to a suspect that causes him to confess.

In cases of the coerced/compliant that I talked about, it's not that the interrogation starts out as so toxic and so aversive. That may not happen until well into the interrogation, after that denial and response, denial and response. Then in some interrogations detectives cease to be professional, and then they create an atmosphere that's so aversive and so toxic. But that's an end point of all those denials. It's not because of the denials and the detectives saying: I don't believe you.

It's what the detectives do when they run out of patience, when they start doing things that are not proper. So what I'm saying is that's the exact opposite of, well, that can't be true because this. So then the suspect gets presented with something that the suspect may interpret as evidence of proof.

So what you're basically saying is that is a vehicle by which perception of proof in a more extended interrogation in which lies are manifest and police confront someone and say that's a lie, that that can't possibly be true, that's how that is a culmination. But the culmination in a confession may be explainable by a whole range of things. You take it on a case-by-case basis.

But again, the denial and then saying, well, we don't

believe your denial, that's very common, and it's also common in cases that don't end up in confessions at all and the suspect ultimately simply goes home, regardless of whether police believe they're guilty or not.

Q.   Is there any empirical research, research or studies demonstrating that confronting a lying suspect about one's lies persuades them into falsely confessing?

A.   No, no.

Q.   And you mentioned a minute ago a toxic environment.

A.   Excuse me.

Q.   Go ahead.

A.   Confrontation happens all the time with people.  We confront people as clinicians in psychotherapy.  People are confronted all the time.  It doesn't mean that it creates a toxic environment, you know.  I know you're ragging on your spouse, but you don't come home till 11:00 o'clock and you've been in a bar all evening.  That's confrontation.  That doesn't create a toxic environment, you know.

I know you say you're clean, but I've got a urine screen that says it's cocaine positive and, no, it's not a false positive.  That's a confrontation.  That's not a toxic or aversive element, you know.  I know what you said, but guess what, you know, this is information we have, so that's a lie. That's a confrontation.  That doesn't create a coercive, aversive, toxic environment.  It's just a frank communication

Welner - direct

1958

that's represented in a whole range of human interactions.

Q.   Are you familiar with Dr. Cutler's opinions on the technique he refers to as evidence baiting?

A.   I'm familiar with that term.

Q.   Okay.  What is it?

A.   It's holding out the idea to a suspect saying we have this, we have this, in a way to lure the suspect because of a belief that that evidence may be powerful.

Q.   And how does that relate to perception of proof?

A.   Well, it's up to the suspect to appreciate whether that evidence is powerful or not.  You know, just to use a hypothetical that doesn't relate to this case, you know, someone could say:  Well, you know what?  The neighbor saw you -- and this is from another case, so this is an actual example -- the neighbor saw you light the fire.

Well, the innocent suspect says:  I didn't light the fire.  So if you have a witness that says I did, well, good luck with that.  I didn't light the fire.

But that's evidence baiting, you know:  I've got a neighbor who says that.

And so the person is still taking it in and saying: Well, how powerful is this?

Now, of course, the suspect who lit the fire may say: Oh, my God.  A neighbor saw me light this?  Okay.

Then they weigh whether this is, in fact, legitimate

or whether the neighbor could have actually had a good enough view, you know: Could they really see me through the window? Could they really see me pouring gasoline?

So these are -- you know, evidence baiting is done by officers and, again, each person is different. I can't speak to the motivation of an individual officer, but officers are always taught to maintain a sense of credibility with a suspect. So when a detective holds something like that out, they must realize that if the suspect believes them to be disingenuous or manipulative it may kill the communication, and the rapport is extremely important in being able to keep the dialogue going.

So it fits into that overall, that overall atmosphere of what transpires in an interrogation where a suspect is facing pressures not to confess and there are motivated officers who are thinking about how to get the suspect to believe that they're better off confessing.

Q. Dr. Cutler discussed the duration of an interrogation. He opined that it's linked to false confessions. Do you have any concerns with that conclusion?

A. Well, the foundation of this discussion comes from an article that was published in a Law Review in 2004 by a sociology and a law professor in which they collected data from what they represented as false confessions, and most of which were, and for 44 cases they were able to demonstrate that the

length of time in custody for those false confessions was typically over six hours and sometimes much longer.

What they did not highlight in the article was that they -- apart from where they got the data from, and in some instances they got it from media accounts, which is not what we use in the science. I hope I'm not insulting anyone by saying this, but we don't rely on media sources because even well-intentioned media, and I can tell just from the nature of the cases that I've worked on, they don't see what someone who's working in the case sees. So they have a limited quality, a limited quality and quantity of information available to them to then turn around and inform the public.

So the source material for these 44 cases was compromised in some measure, but also most importantly is that the study never differentiated, never distinguished between just being in custody and being actually interrogated. So it used the idea of being under arrest, being in a cell, being in a room, with actually sitting with detectives who were asking questions as if they were interchangeable, and there's nothing in the experience or even demonstrated empirical research, which I'm going to refer to in a moment, that equates the two.

So the answer to the question is there are false confessions that occurred after very extended times in custody, but it gets back to the point that I mentioned earlier. When false confessions happened, the suggestibility of the suspect,

Welner - direct

1961

I mentioned before about internalized confessions. A person just doesn't come up with some narrative that they were responsible for killing their mother in five minutes. It's a grooming that takes place over time, over an extended period of time in what may be a benign atmosphere. Then by the end of those 12 hours, 16 hours, 18 hours, the person says they killed their mother and they're full of grief, and they are entirely innocent. Again, it's taken from an actual case.

Or the example that I mentioned earlier, denial, you know, I don't believe you, denial, I don't believe you, denial, I don't believe you, and then at some point in a coerced/compliant confession the detectives abandon their professionalism and start threatening and start getting physical, and that happens after some extended period because they run out of patience.

So it's not the duration. It's what happens in that time. So it may just be that over time in those false confession cases that the interrogating detectives ran out of tools in their toolbox, and rather than standing down they did things that facilitated a false confession either in an internalized way or in a coerced/compliant way.

But that could have been done, and I've seen it in my professional experience. You can create a coerced/compliant atmosphere in less than an hour if you as a motivated law enforcement official walk into an interrogation and decide --

and certainly, you know, the City of Chicago is familiar with this -- that you're going to create a toxic atmosphere in which a person is frightened enough to offer a confession. You don't need six hours for that.

So you take it on a case-by-case basis. There are no shortcuts. There are no generalizations. But if you're going to say something is scientifically based, you have to base it on objective data, and you have to base it on fully informed data and you have to separate custody from actual interrogation, and I'll talk to you about that if you want to me to go into it on another question.

Q. I just want to zone in on something that you said a moment ago. Dr. Cutler, when he discusses an interrogation or the length of interrogation, he's discussing all of the hours in custody, and what you said is that an interrogation is when someone is actually in the room interviewing somebody.

A. Yes, yes.

Q. Okay. And why is it concerning that Dr. Cutler -- what issues do you have with Dr. Cutler looking at the entire length of custody as the interrogation?

A. Well, it's not an issue of "issue." Look, there's a study by Cleary in which she looked at videotaped interrogations of a large number of individuals, 50 different people, again, empirical research, what happens when you actually look, and she said for the most part people were sleeping, walking

around, relaxing. That's very different from what's going on in interrogation. You know, you can't equate sitting around with what's going on in interrogation for a major crime, which is a very intense experience, and she demonstrated that.

She did another study of people who had stated that they had given confessions, and a large number of them said that they were in custody for 12 hours or more before they were interrogated. It's understandable in certain precincts where it's really busy and people have this case and that case and the other case, and they're understaffed and overworked and they have to do this paperwork, and they tell somebody to just cool their heals and they sit there.

That's not -- you know, interrogations and confessions are not like a 52-minute serial drama where everything has to fit in. You know, there are large lapses. If you haven't been through that experience, it's kind of like being a patient in an emergency room. You go and the doctor sees you and then you wait because they're seeing other patients. So you wait. Now, you may be stressed over what you have or you may be waiting for a test, but waiting is part of the experience in a busy and taxed environment.

And so what this research in particular demonstrated is how common an experience that is. It's not an exceptional experience at all. It's common. Yet these people are not translating into false confessions. So that's further evidence

from an actual study of what actually even happens in interrogation, and it illustrates the gap between theory of people who pretend that things are the way they envision them to be and what you actually learn when you ask questions of people who can inform you about these things.

Q. So I think you came close to answering this. I don't think we have to go into detail, but is there or has there ever been any empirical studies to determine that there's any causal relationship between the duration of an interrogation increasing the likelihood of a false confession?

A. No, it's only what has happened during that time. And I do want to underscore this because you mentioned Dr. Cutler. There's no absolute prohibition that you can't interrogate beyond four hours or X hours. Police practices, police do understand and accept especially in simpler cases that most interrogations are going to be less than two hours, you know, your robbery, your theft. When cases become more complex, there are competing stories, it's a major crime, there are multiple potential suspects, well, things get complicated. There are more questions to ask, and there are more -- there's more back-and-forth. One goes from one room and one goes to the other room and has more questions.

So these police training materials allow for the idea that some interrogations are going to go beyond four hours, but what they do say is if you interrogated for more than four

Welner - direct

1965

hours, you shouldn't go for more than four hours if the suspect continues to deny because you're wasting time. You're sitting there focusing on someone who may or may not be innocent. You're not getting anywhere. Go gather more evidence because there's only one of you to go around and you may be missing something that's material to the case.

So that's the context in which this discussion takes place, but it allows that there are certain cases that are more complex and an interrogation has to go beyond that four-hour period.

Q. Two more topics to cover with you. One of the risk factors that Dr. Cutler identified, well, what he calls a risk factor is isolation?

A. Yes.

Q. First, is there any empirical research or evidence that demonstrate that isolation causes false confessions?

A. No.

Q. Can you explain?

A. Well, isolation is so common to the criminal justice experience, to the jail experience, that if isolation were even associated with confession, let alone with false confession, it would be incorporated as a police tactic by now and it's not. It has no bearing on confession or false confession. It may be unpleasant. It may be lonely. It may be a time for introspection, but a time for introspection creates all kinds

Welner - direct

1966

of possibilities.

And it's removed from the notion of the three contributors, which are what actually happens in the interrogation: what are the interrogators doing, what are the suspect's vulnerabilities, what is that interplay or the context.

And when I talk about context, I need to explain. There's another type of false confession that happens in multiple-suspect crimes. These are proven undisputed false confessions, and I've worked on a number of them, including one here in Chicago where police -- and police don't even necessarily have to be coercive. They can say: Hey, I talked to you. Okay. I'll talk to you, but do you know what? He's here and he's your buddy, and you were both there and he says you did this. Now I don't have to talk to you but, you know, I've talked to him. All right?

And you're thinking: Oh, my God. I was with him. We were there. I don't know what he said, but I'm going to say my piece.

Then I go to him and I say the same thing: Oh, you know, I talked to him, and do you know what he told me? You gave me a story, that he realizes that you're talking and you say what you say.

So then those are cases in which police -- you know, there may be no police misconduct, but they are responsible for

Welner - direct

1967

many, many true confessions in many cases in multiple-suspect cases. But there are identified false confessions that have happened from leveraging one, and that's context. That's context, but isolation doesn't exist in that context because isolation is ubiquitous. It's ubiquitous in the criminal justice system.

Q. Sticking with isolation, Dr. Cutler was asked earlier today that if a suspect is left alone could that be good for them, and he said he didn't know. Do you know? Can it good for them?

A. I think it's a case-by-case basis because there are times when being alone can be constructive and times when it is not. It can be constructive in a way where a person can really reflect and deliberate and think about the situation and what they've been presented with and what to do and strategize that you really don't have the flexibility to do when you're sitting there with an interrogating officer who's asking you questions and you're responding and you're living in the moment.

On the other hand, isolation can also be an unpleasant experience in which a person can be lonely. A person can feel removed. A person can be caught up in anxiety and thinking about what's going to happen to them without the opportunity of reassurance.

So you take it not only on a case-by-case basis, but also it fluctuates. You know, at one time isolation could be

desirable:  I'm sick of these guys.  I want to get a nap.  They left.

Okay?  Or it could be unpleasant:  I want human contact.

So that can happen.  There are undulations.  There are ups and down over time where isolation is going to have one effect or the other.  You can't generalize.

Q.  The last topic is sleep deprivation, another factor that Dr. Cutler discussed today.  First, what's the difference between sleep deprivation and fatigue?

A.  Sleep deprivation is the active prevention of sleep.  It's when a person is actively prevented from going to sleep that otherwise -- that their body would otherwise cause them to fall asleep or seek the opportunity to rest and that person is prevented from falling asleep.  Fatigue is when someone is tired, and if fatigue continues to advance, well, then the individual will eventually go to sleep or attempt to sleep and rest.

Q.  Okay.  So if somebody can't sleep because they are anxious about something, is that sleep deprivation?

A.  No, it's arousal.  And, again, it's very important.  I mentioned the example of the emergency room.  You know, going to a waiting room in the emergency room at 3:00 o'clock in the morning, you'll see plenty of relatives who haven't slept.  They're very anxious.  They're very aware.  They're very

concerned.  They don't know what the news is.  They don't know what the test result is.  They're highly aroused.  They may be fatigued, but they're very aroused.  They're not deprived of sleep.  The situation heightens their awareness and their arousal.  Sleep deprivation is when one is actively prevented from what one would naturally do, which is following up on extending fatigue by resting and sleeping.

Q.  Is speaking to detectives or interrogators and providing admissions, is that an example of arousal like you were talking about?

A.  In an interrogation setting, absolutely, especially for a major crime.  I spoke about this in a research context.  It's a distinctive experience.  There's urgency attached to it, especially when the subject matter relates to the crime itself. You know, it may not necessarily be as arousing as if one goes in and the detectives are talking about, well, you know, tell me what school you went to or something like that.  When the conversation really deals with the matter at hand and the potential consequences and implications, then the level of arousal is high.

Q.  Does a suspect necessarily get more fatigued as an interrogation progresses?

A.  There's an ebb and flow, and it does relate to arousal. The monotony of sitting in a room alone is going to contribute to someone's fatigue.  The engagement by officers is going to

have an impact on that, again, in a major case because suspects are aware of the consequences.

I will tell you -- and I've spoken to hundreds of videotaped interrogations that I've seen -- I've never seen anyone fall asleep in an interrogation, and there's a reason for it, because they're activating experiences. Now, when a suspect is alone over time, a person may get fatigued, bored, and then over time he may start to feel fatigue. It's not like these interrogation rooms come with coffee makers. You know, if you're tired, you're tired.

So I think it distinguishes itself from the custodial experience to what happens in interrogation.

Q. Is there any empirical research in actual murder cases that fatigue causes a person to no longer have the capacity to make choices whether to confess or not to confess?

A. In my experience in murder cases, fatigue can be a contributor to people's judgment. People can make judgment decisions based on fatigue, how fatigued they are, and that's an intangible that you deal with on a case-by-case basis. Again, that also, that also weighs against arousal because when you're aroused you're not as fatigued. But when a person is fatigued and they're not necessarily bolstered by an arousal that has them thinking about what they're saying and why they're saying it or the broader implications, that can affect a person's choices in interrogation.

Welner - direct

Q.   Does fatigue erase voluntariness?

A.   No, it does not.  It relates to -- the significance of fatigue relates to decisionmaking not only in the interrogation context, but in a variety of stressful situations, of course, not limited to interrogation.

MR. FLYNN:  Thank you, Dr. Welner.  Nothing further at this time.

THE WITNESS:  I just wanted to add anecdotally, you know, for purposes of illustration, you know, we all know doctors, so I'm sure what I'm going to tell you is not going to be surprising.  So in my training as a physician, it was a right of passage that you go without sleep for ages.  When those rules started to evolve, things were a little different than when I trained 30-odd years ago.  So we joke about how easy the medical students and the residents have it, but there was never a concern that doctors who go without sleeping for, you know, a day or two days didn't have the ability to make a voluntary decision.  The issue was:  Does it affect their judgment?  Are they going to make a decision that would in some way imperil a patient?

So that's what it is.  It's a decision issue.  It's an issue of, you know, that you make a decision because you're tired that you wouldn't necessarily have made otherwise, but you're still making that decision.

MR. FLYNN:  Understood.  Thank you, Dr. Welner.

THE COURT: All right. Thank you, Dr. Welner.

MR. LOEVY: Can I start, Your Honor?

THE COURT: You can. I'll give you a few moments to get going.

CROSS-EXAMINATION

BY MR. LOEVY:

Q. All right, sir. Tell the jury how much you've been paid in connection with your testimony in this case.

A. I've been paid for my time on this case approximately $175,000.

Q. $175,000 for this case?

A. Yes.

Q. And you are a professional expert witness, would you agree?

A. No, I'm a forensic psychiatrist.

Q. You would --

A. Excuse me. I'm answering your question. I testify probably twice a year --

Q. You have --

A. -- and I work on probably 50 to 60 cases a year. So the overwhelming majority of the cases I work on do not go to trial and they resolve. So I'm a forensic psychiatrist. I provide assessment. I give it to people like yourself, and then you make decisions about whether to bring it into a courtroom like this.

Q. You are the sole owner and chairman of a company that you

called The Forensic Panel, right?

A.   Yes, I am.

Q.   And that is your sole source of income, correct?

A.   It is.

Q.   All right.  So although you're a practicing -- well, you said you're a psychologist, but your sole source of money is in connection with these 60 or so consulting gigs you do a year, correct?

A.   No.  First of all, I'm a psychiatrist and, second of all, like Loevy & Loevy, it's a practice.  So it's a practice that bills for its time, as do you.  The income comes from cases that I work on --

Q.   But the --

A.   -- and it comes from other practitioners in the practice in addition to my own.  There are cases that I don't work on, but because I am the owner of practice, as the business earns, it earns either from my work or the work of other people.

Q.   And how much does it earn a year?

A.   Approximately $3 million a year.

Q.   All right.  And that's just -- you are the sole owner and and the chairman, correct?

A.   And the sole taxpayer, correct.

Q.   And you don't just do wrongful conviction experts, right?  You're an expert.  You're more of a generalist.  Would that be fair to say?

Welner - cross

1974

A.   There are cases that I work on.   There are cases that I don't.   I don't work on family court-related cases.   I work on a number of criminal types of cases, death investigations, securities-related cases, some civil.   Those are the cases that I work on.   Other cases, other people in the practice work on.

Q.   And I want to drill down now on your expertise.   So say someone calls up on the phone and they say:  Dr. Welner, I need an expert witness in a death penalty hearing.

Would you say you're an expert in that?

A.   That's a legal type of hearing.   If they say they need an expert in a death penalty hearing, it really depends on the nature of the question.

Q.   Don't you testify at death penalty hearings, sir?

A.   We consult on some death penalty cases if it's --

Q.   That's what I'm asking.

A.   -- if it's an area of our expertise.

MR. FLYNN:   Let the witness answer.

BY THE WITNESS:

A.   If it's an area of our expertise within a death penalty case, then we may consult on it or we may not.

BY MR. LOEVY:

Q.   Do you consult on the psychiatric aspects of intoxication and behavioral presentations of intoxication and involuntary intoxication?   Is that something you're an expert in, too, sir?

A.   Yes, sir.

Q.   How about sports psychology?  If an attorney calls up and says "Dr. Welner, I need you to give me a consult on sports psychology, and can we pay you to be our expert," will you be that, too?

A.   That's not something that I've done recently, but it's something that I've done in the past.

Q.   And if somebody called you tomorrow, would you be a sports psychology expert?

A.   Probably not because I haven't done it recently.  So I would stick with what -- the parts of the practice that I'm more active in.

Q.   You did the case with the sports fanatic who did something out of enthusiasm for the Alabama Crimson Tide.  You were the expert, right?

A.   Yes, sir.

Q.   How much did they pay in that one?

A.   I don't recall.

Q.   How about religious zeal form psychosis?  Are you an expert in that, sir?

A.   Yes, sir.

Q.   So if someone called you up and said "can we pay you $150,000," you'd say "I'm an expert in that."

A.   That's not how it works, actually.  What people will do --

Q.   How about --

A.   Excuse me.  What people will do is they'll call me and

Welner - cross

1976

they'll say: I have this question. Is this in your area of expertise?

Q. Right.

A. And what I will do is I'll deliberate about whether it's a case that I would be qualified in, whether it's a case for which there's enough evidence that's available to answer the questions that they'd like me to answer, and, three, whether it's a case that I would prefer to even be involved in, because there's some cases that I don't think are desirable for our practice and we would decline for that reason.

Q. Even if they were going to give you 150,000 and if you weren't just interested?

MR. FLYNN: Objection, argumentative.

MR. LOEVY: All right. I'll withdraw it.

BY MR. LOEVY:

Q. We only have a few minutes, and I'm trying to get through the list of what you're an expert in. How about psychiatric malpractice?

A. Yes, depending on the nature of psychiatric practice. If it's something that's not in my practice, I wouldn't be involved.

Q. How about a personal injury case? Emotional damages, would you take that?

A. Yes.

Q. How about securities, competency to invest?

A.   Yes.

Q.   Drafting a will competency?

A.   Yes, sir.

Q.   How about employment-related?  Say I called you up and said:  Will you be an expert in an employment case?

Is that something you're expert in?

A.   I've done a lot work in related employment questions, but these days there are other people in the practice that are taking those cases?

Q.   Fetal abduction by maternal evisceration, are you an expert in that?

A.   Yes, that's an area that I've researched and published on.

Q.   Mob violence?

A.   That's an area that I have expertise on.

Q.   Psychotropic medications?

A.   Yes.

Q.   And educator sexual abuse?

A.   Pardon?

Q.   Educator sexual abuse?

A.   Yes, that's another area I've published on and worked in.

Q.   Recovered memory?

A.   No, recovered memory is -- recovered memory is not a case that gets presented for my consultation.

Q.   Do you have on your resume that you wrote a book chapter entitled "Recovered Memory"?

A.   Yeah, I did.  And since you read the chapter, you'd know that what I talked about is how the recovered memory area was a very flimsy area of the forensic sciences and one that had a very limited foundation.

Q.   So if an expert called you and said "can we pay you $150,000 to be an expert in recovered memory" --

MR. FLYNN:  Objection, argumentative.

MR. LOEVY:  If I can finish the question, Your Honor.

THE COURT:  You may.

BY MR. LOEVY:

Q.   -- you'd had say:  No, I'm not an expert in recovered memory?

MR. FLYNN:  Objection, argumentative.

BY THE WITNESS:

A.   I don't think that I --

THE COURT:  Please let me rule on the objection. Overruled.  You may answer.  You may answer the question.

BY THE WITNESS:

A.   Well, I don't think that I've ever received a call or even taken a call where someone says:  Can I pay you $150,000 to do this?

That maybe how you approach people, but that's not how I'm used to being approached.

BY MR. LOEVY:

Q.   You tell them it's going to cost them $150,000.

A.   Pardon?  No, I don't tell them that.  Occasionally people will ask me about a budget of a case, and I may tell them what's involved, and I will prepare them if it's a case that may require significant investment because people would want to know when something is very time consuming.

Q.   Sure.

A.   But again, just as you invest hours in this case and you bill for every single hour, we spend time on a case, and if we work on one case we're not working on another case.  The phone rings.

Q.   Sure.

A.   If we agree to take a certain case, we're not taking another case.

           THE COURT:  So, Mr. Welner or Dr. Welner, please try to confine your answers just to the question that's asked.

BY MR. LOEVY:

Q.   I'm just going --

           THE COURT:  Mr. Loevy, ask your next question.

           MR. LOEVY:  Yes, Your Honor.

BY MR. LOEVY:

Q.   I'm going to try to get through your areas of expertise, so maybe it would be yes or no.  Okay?

           How about religion-inspired homicide?

A.   Yes.

Q.   Domestic violence?

Welner - cross

1980

A.   Yes.

Q.   Child sexual abuse, accommodation syndrome?

A.   No, not that.   There are limited areas of child sexual abuse, limited areas.

Q.   Some areas then.

A.   Just limited areas, that's the best way -- that's the closest to yes I can say.

Q.   Fair.   Geriatric crime?

A.   Yes.

Q.   Female psychopathy?

A.   Female psychopathy, yes.

Q.   You wrote an article called "A Good Smack, Child Allegations of Abuse."   Is that something you're an expert in?

A.   Again, I believe I answered that there are very limited areas of child abuse and allegations of abuse that I'm involved in right now.

Q.   Are you an expert in child gun violence?

A.   No.

Q.   Did you write an article on the subject?

A.   I may have.   I've written many, as you can see, many, many articles over 30 years on a variety of topics, some of which I would no longer consider myself to have expertise in and some I maintain expertise in.

Q.   Date rape drugs?

A.   Yes.

Q.   Cult dynamics?

A.   Yes.

Q.   Black rage?

A.   Yes.

Q.   Mass killers?

A.   Yes.

Q.   Battered women versus antisocial personalities?

A.   Yes.

Q.   Medication offenses?

A.   Yes.

Q.   Maybe to make it easier, tell us what you're not an expert in.

          MR. FLYNN:  Objection, argumentative.

          THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  You're not really a false confession expert, wouldn't you agree?

A.   I think we've gone over my qualifications and --

Q.   You've never published a peer-reviewed article?

          MR. FLYNN:  Your Honor, Mr. Loevy keeps cutting off my witness.  It can't continue.

          THE COURT:  You've got to let the witness finish the answer, and the witness will answer.

BY THE WITNESS:

A.   Okay.  I've worked for over 20 years on disputed confession

cases.  I've worked on over 70 cases in over 20 states, including some of the most well-known cases in America on disputed confessions.  I've worked for prosecutors.  I've worked for defense attorneys.  I've worked for prosecutors whom I've told:  This is a false confession, and this person should go.

I've seen a variety of different cases in different contexts.  I've published a chapter --

MR. LOEVY:  Your Honor, at some point --

BY THE WITNESS:

A.  -- in The Encyclopedia of Forensic Sciences & Legal Medicine on disputed confessions.  I believe I'm answering your question about whether I'm an expert in this or not.

Q.  May I ask you another question, sir?

A.  Sure.

Q.  You've never published a peer-reviewed paper on the subject, correct?

A.  The Encyclopedia of Forensic Sciences & Legal Medicine is peer-reviewed and it's also an Elsevier publication, probably the most prestigious forensic science encyclopedia that there is, and I published a chapter that's being released this year on the assessment of disputed confessions.

Q.  Okay.

A.  And that's peer-reviewed.

Q.  All right.  So you're saying it's coming out.

A.   It's in print.

Q.   All right.  So I guess I didn't know that, but up until this chapter that's coming out, you had never published on the subject of false confessions, correct?

A.   In a peer-reviewed publication.

Q.   Right.

A.   I've published in non-peer-reviewed publications, such as the ones that you've been citing to me in going through my CV.

Q.   All right.  Let's see if we can we go through seven more minutes.  You mentioned that you had studied false confessions when you were talking to Mr. Flynn, correct?

A.   Yes.

Q.   You said you looked at about 20 cases --

A.   Correct.

Q.   -- and then you just stopped looking?

A.   Yes.

Q.   You never created a draft on that study, correct?

A.   I didn't publish an article.  I only lectured before professional audiences on the findings.

Q.   And the study that you were talking about with Mr. Flynn, fair to characterize that research as half-baked?  Is that a fair characterization?

          MR. FLYNN:  Objection, argumentative.

          MR. LOEVY:  No, that's a quote, Your Honor.

BY THE WITNESS:

Welner - cross

1984

A.   No.   If you can give me the context, then we can look at the entire thing.   What I said is I would not want to publish an article about results that are partial because I would not want to publish something that is half-baked and potentially mislead people with partial results.   The study itself --

BY MR. LOEVY:

Q.   Didn't you characterize --

A.   -- the study --

MR. FLYNN:   He's doing it again, Your Honor.

MR. LOEVY:   He's not answering the question.

THE COURT:   All right, gentlemen.   All right.   First of all, when an objection is made, please let me rule on it. Okay?

Please let the witness finish his answer.

To the witness, please confine your answer just to the question that's been asked.

The last objection was argumentative, and that objection is sustained.   Mr. Loevy, you may ask your next question.

BY MR. LOEVY:

Q.   Would you characterize the research that you did in 2000 and 2005 -- well, let me ask this question.   Have you previously said under oath that you would characterize the research you did in 2000 and 2005 as half-baked?

A.   No, what I said is I would not publish, I would not publish

Welner - cross

1985

findings that were incomplete because I would not want to publish something that was half-baked. The research was very well-designed and not at all half-baked, and it was a very solid methodology that should be taken up again in due course.

Q. Do you remember giving a deposition in the matter of Daniel Taylor versus the City of Chicago on May 17th, 2008?

MR. FLYNN: We don't have copy of this, Your Honor.

MR. LOEVY: I have an extra copy. I have one for the Court as well.

MR. FLYNN: What are the pages?

MR. LOEVY: The page is 28, lines 10 through 13.

MR. GIBBONS: Your Honor, it's not possible for us to review a 300-page transcript for the context of a page and cite, because we all know having done this now that he's going to take a snippet that will be well out of context.

MR. LOEVY: Your Honor, this is a speaking objection.

MR. GIBBONS: So all we're asking for is some time to review this before he asks what he thinks is an impeaching question.

MR. LOEVY: Your Honor, if you look at page 28, I think you'll see it's pretty straightforward.

THE COURT: All right. I'm just going to look at the lines and decide if we can get through this question. I appreciate the objection on that, but let me just take a look at it.

MR. LOEVY:  It's page 28, lines 10 through 13.

MR. FLYNN:  Can the witness get a copy?

THE COURT:  He can.  But the question and answer appears to be impeaching, so he can have my copy.

MR. LOEVY:  Thank you, Your Honor.

BY MR. LOEVY:

Q.  Do you remember being asked this question?

THE WITNESS:  Your Honor, may I have an opportunity to look at this, please?

THE COURT:  Of course.

BY MR. LOEVY:

Q.  This is page 28, lines 10 through 14.  Do you remember being --

A.  Excuse me.  I'm answering your question, and I don't need it repeated.  I just need to concentrate on looking at it. Thank you.

Q.  Do you remember being asked this question?

A.  Excuse me.  I'm reading this.

Q.  It's only four lines, sir.

A.  No, I'm reading what led into it.

Q.  I see.

MR. LOEVY:  Your Honor, actually I'd like permission to read the question, but you'll tell me when, Your Honor.

THE COURT:  I will.  I'm going to give the witness a moment, and then we'll have you --

THE WITNESS:  I think that --

THE COURT:  There isn't a question pending, Dr. Welner.  I'm going to allow Mr. Loevy to ask his questions now that you've had an opportunity to take a look at the transcript.

BY MR. LOEVY:

Q.  Sir, do you remember at the deposition on May the 17th, 2018, being asked the following question and giving the following answer:

"So as it stands now, you would characterize the research that you did in 2004 and 2005 as half-baked.

"Answer" -- your answer -- "I think that's a fair characterization."

The question is:  Did you give that answer?

A.  I've answered the question already.  I've said that that is a snippet from a five-page -- five pages of discussion that deal with the term "half-baked" that are precisely the context that I mentioned, and I said that if I was going to do a study that in some way responds to research that is itself half-baked, then I don't want to submit something for publication that's incomplete and do the same thing.

Q.  Sir, the question was --

A.  The research was not -- excuse me.

Q.  -- did you give that answer.

A.  Excuse me.

Welner - cross

1988

MR. LOEVY:  Your Honor, I'd ask that the witness be asked to answer the question of did he give that answer.

THE COURT:  Okay.  You cannot speak over one another if only because of the court reporter.

Sir, the question is:  Were you asked that question, and did you give that answer?

THE WITNESS:  I was asked that question within a five-page exchange.  I gave that answer, and I believe that the jury hears and understands exactly what I was talking about in the context of "half-baked," and if they don't then you should ask me on redirect --

THE COURT:  All right.  That answer --

BY THE WITNESS:

A.  -- and I'll read the entire --

THE COURT:  Excuse me.  That answer will be stricken.

We're going to stop for the day, ladies and gentlemen. It is 4:45, and we will resume tomorrow morning at 9:15. Please don't discuss the case.  We'll see you tomorrow ready to go at 9:30.  All rise.

(Jury out at 4:44 p.m.)

THE COURT:  All right.  You may be seated.

Dr. Welner, you are excused, but the one thing I do want to say aloud to all parties with the benefit of Dr. Welner in the room and the jury out of the room is that the dynamic that's occurring in the last hour, half-hour, whatever time

period you want to give it, is not an acceptable way to conduct ourselves in this building, in this trial, in this courtroom, and I will not stand for it.

I want to be abundantly clear. The job of the lawyers is to ask questions. The job of the witness is to answer the questions that are asked. I will strike testimony from the record that is non-responsive. I encourage everyone to take a deep breath and to come back tomorrow fresh and professional to finish presenting the evidence to the jury. When objections are made, please let me rule on the objections before you continue.

I understand that there have been times over the course of the trial where a lawyer will simply rephrase the question because they recognize that their question was improper or there's a way to rephrase it, and I appreciate that. We are all at the end of day 9. I appreciate that there are some frayed nerves, and for lack of, you know, a better expression we're all working on a little less sleep than we otherwise would, and I appreciate that. But we're at the finish line, gentlemen. We're at the finish line, and I'd just encourage everyone to just take a deep breath and let's get the work done.

Dr. Welner, you're excused. We'll see you tomorrow morning at 9:30.

THE WITNESS: Yes, Your Honor.

1990

(Witness excused.)

THE COURT: All right. Let's take a ten-minute break just so everyone can use the restroom and catch their breath, and then we can talk just about next steps. It will only take a couple of minutes. But let's just take a few minutes to use the restroom and take a breather, and I'll see you all in just ten minutes. Okay?

MR. GIBBONS: Thank you, Your Honor.

MR. FLYNN: Thank you.

MR. LOEVY: Thank you.

(Recess at 4:47 p.m.)

THE COURT: All right. If everyone is ready, let's go back on the record. We have everyone still here, so I want to talk about the matters that remain, timing, witnesses. You know, this way we can sort of game out the rest of the day for tomorrow.

So I'll just first ask to finish up with the witness that we have now, Mr. Loevy, how much longer do you anticipate needing for Dr. Welner tomorrow morning?

MR. LOEVY: If we got into a cadence where I ask a question and he answers it, I hate to throw it out like that, but I don't have all that much to do with him. I don't want to be overpromising because I suspect it's going to take longer than any of us intend, but I think realistically it should be a half-hour to 45 minutes. Let's call it an hour, Your Honor,

because I just don't think it's going to go smooth.

THE COURT: Okay. All right.

MR. LOEVY: One hour.

THE COURT: One hour. Thank you.

I'm confident that defense counsel will have some redirect. I won't make you estimate now because you don't really know enough about how it's going to go.

Remaining witnesses for tomorrow?

MR. FLYNN: Dr. Cichon.

THE COURT: Okay.

MR. FLYNN: I just learned that he's got another issue tomorrow, so he's got to be out by noon. So hopefully we can get through him. I think we can. I don't think that will be an issue.

THE COURT: Okay.

MR. FLYNN: And from there, we've got Mr. Segovia, the medical examiner, if we're not able to reach a stip, and Kerbis, if we're not able to reach stipulations, and Marisol Ocampo, and that's it.

THE COURT: Okay.

MR. LOEVY: So we will finish tomorrow.

THE COURT: Okay. I agree with that, and we must. Really, we must finish tomorrow. So I think it's fair to say that that lineup of witnesses, stipulation or otherwise, will take up a majority of the morning. Assuming that we, you know,

1992

do take up the majority of the morning, it probably will make sense once we get through that evidence, if we're anywhere close to the lunch hour, to take a short lunch break just to let everybody, you know, catch their breath. I don't think we need to take a long lunch break, just a short one, and then dive directly into the jury instructions conference.

I'm certainly not interested in keeping anyone in the building well into the afternoon. I recognize that Mr. Gibbons will be departing for a flight regardless, but my hope is that we can just spend some time either late morning or early afternoon hammering out the jury instructions so that we can clean it up, resolve the objections, resolve the issues, clean up the set and circulate the set to you on Friday, if not Saturday morning, depending on how long it takes me to clean them up.

Other issues? Topics? I know there are some other things that the parties clearly will need to discuss and work out and I'm looking forward to hearing tomorrow morning where we are on that, but I'm also happy to take up any other topics that we should discuss this afternoon.

MR. FLYNN: Just the directed verdict, Your Honor, but I'm not sure if we're just going to file paperwork on that or if you want to hear argument.

THE COURT: If you are -- I'm happy to have you file something if you're prepared to. I don't want to make more

1993

work for you, so I think the question really is which would you prefer to do on the directed verdict.

MR. FLYNN: We're happy to file something, but just to be clear it's not going to be tonight, Friday.

THE COURT: That's fine. As I mentioned, my normal practice is to take it under advisement. So, you know, I don't think there's any reason to strictly require that you file something tonight.

MR. FLYNN: Yeah.

THE COURT: There are plenty of other big-picture items that I know the parties need to focus on, and I'm fine with that.

MR. FLYNN: Great.

THE COURT: Other issues or perspective from the defense?

MR. FLYNN: No, Your Honor.

THE COURT: Okay. Anything else on behalf of plaintiff?

MR. LOEVY: You know, if we don't reach a stipulation on Kerbis, you know, then my understanding is she's going to come to court tomorrow and we want to call her in our case, but it would be brief testimony is my understanding, you know, given her role in this case.

THE COURT: Right. Okay. So on that note then, I mean, is there anything that the parties suggest or recommend

1994

that we do with the motion to intervene or for protective order, technically?  I don't -- I don't even suggest that I have a good suggestion, or I don't mean to suggest that I have a good idea on how to deal with that.  It may just be that it's one of those things we need to deal with tomorrow, and perhaps the person who, you know, has filed that motion will accompany her if she came to court.

I just don't know, and so I don't want to set us up for a situation where we really can't resolve the issue because, you know, no one really knew what was happening and then all of a sudden she shows up and says:  Sorry.  I can't testify at all because it's not clear to me what the rules of the road are, et cetera.

MR. GIBBONS:  Your Honor, just a suggestion.  I really think Kerbis should be a stip, but it would have to be along these lines if we're going to go down this route tonight. There's witnesses.  Both sides have the criminal transcript, direct very succinct statements about what that witness testified to that we think impacted a decision on Marcel Brown. Defense can put in what they think or an objection, and then we get to that.

So we don't put an ASA up there who no one has talked to, got guardrails.  There's a lot of decisions that get made at the state's attorney's office as to putting a witness on, why they put a witness on, why they asked certain questions,

1995

what they feel.  All of that is clearly going to be deliberative process, and she's not going to be able to answer that.  It's going to get very stilted from both sides.

I don't know, Your Honor.  Can we do it that way?

MR. LOEVY:  I don't want to be like nah-nah-nah-nah, but we've been the one asking that and you guys told us last night no stip.  We want the stip.

MR. GIBBONS:  Okay.  I'm going to work with Mr. Loevy on this to see if we can get a stip done --

MR. LOEVY:  Okay.

MR. GIBBONS:  -- on this ASA, and we'll give it a shot.  If we can't, we can't.  Your Honor, I have stipped to a lot of things over the years.  I'm optimistic we can get this done, but maybe we can't.  I don't know, but we'll give it a go.

THE COURT:  Okay.

MR. LOEVY:  Let's give it a go.  You know, sadly we haven't really stipped to anything at this trial.  We should be doing better.  There's a --

THE COURT:  Oh, I'm aware.  I'm aware.  I'm very aware.  Look, everybody in this room has done this before.  I'm confident that, you know, with some good faith effort to get it done you can do it.  If you can't, we'll deal with it.  We'll figure it out.  You know, it will just be a little bit harder to get some of these things resolved, but I do think everyone

1996

would benefit if the parties try, you know, to streamline this by way of stipulation.

MR. LOEVY: Great. We will double-down on getting one done.

MR. GIBBONS: Yeah.

THE COURT: Okay. Thank you.

So let's arrive tomorrow by 9:00. I don't have anything else up in the morning. We'll obviously have a few things to work out and figure out, and we'll take it from there. So I'll see everyone in the morning.

MR. LOEVY: Thanks, Judge.

MR. GIBBONS: All right. Thank you.

MR. FLYNN: Thank you.

THE COURT: Thank you.

(Proceedings adjourned at 5:04 p.m. to 9:00 a.m., 8/6/24.)

C E R T I F I C A T E

We, Laura LaCien and Patrick Mullen, do hereby certify that the foregoing is a complete, true, and accurate transcript of the trial proceedings had in the above-entitled case before the Honorable LINDSAY C. JENKINS, one of the judges of said court, at Chicago, Illinois, on September 5, 2024, in the afternoon session.

                              /s/ Laura LaCien
                              /s/ Patrick Mullen
                              Official Court Reporters
                              United States District Court
                              Northern District of Illinois
                              Eastern Division