1997

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                   Plaintiff,          )
                                       )
              vs.                      )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) September 6, 2024
              Defendants.              ) 9:01 o'clock a.m.


                        VOLUME NINE
        TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
        BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:        LOEVY & LOEVY
                          BY:  MR. JONATHAN I. LOEVY
                               MR. LOCKE E. BOWMAN, III
                               MR. TOM KAYES
                          311 N. Aberdeen Street, 3rd Floor
                          Chicago, Illinois  60607

                          MACARTHUR JUSTICE CENTER
                          BY:  MS. VANESSA DEL VALLE
                               MR. JONATHAN M. MANES
                          160 E. Grand Avenue, 6th Floor
                          Chicago, Illinois 60611


For the Defendants:       GREENBERG TRAURIG, LLP
                          BY:  MR. JOHN F. GIBBONS
                               MR. KYLE L. FLYNN
                               MR. TYLER L. SALWAY
                               MR. QUINN FORD
                          77 W. Wacker Drive
                          Chicago, Illinois  60601

1998

APPEARANCES (Cont'd):

Court Reporter:                    JOSEPH RICKHOFF, CSR, RMR, CRR
                                   Official Court Reporter
                                   219 S. Dearborn St., Suite 2118
                                   Chicago, Illinois  60604
                                   (312) 435-5562
                                   joseph_rickhoff@ilnd.uscourts.gov

                * * * * * * * * * * * * * * * * * *

                    PROCEEDINGS RECORDED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: 19 C 4082, Brown vs. Mancuso.

THE COURT: Good morning.

MR. LOEVY: Good morning, Judge, Locke Bowman, Tom Kayes, Vanessa del Valle, and Jonathan Manes are here for plaintiff. Mr. Loevy is en route.

THE COURT: Okay. Good morning.

MR. FLYNN: Good morning, your Honor, Kyle Flynn and John Gibbons for the defendants.

THE COURT: Good morning.

So, just to give you a short update, to no one's surprise, the Marshal Service has actually been delayed in trying to actually go and find Ms. Ocampo. To get the federal government to do things quickly is a monumental task, and so -- I say that as a person who is a part of that institution. But to no one's surprise, there has not been any movement to actually locate her. If I receive further updates, I'll let you know.

But, suffice it to say, I do not expect that she will actually appear this morning, whether it's because she received the notices or information left by the investigator on behalf of the defense or because the U.S. Marshal Service is actually able to find her. I don't anticipate that she will appear this morning unless she appears voluntarily.

Good morning, Mr. Loevy.

MR. LOEVY: Good morning, your Honor.

THE COURT: Yes?

MR. LOEVY: We would love to be heard before you make your decision about whether to allow it to be read, unless you're already decided.

THE COURT: No, no. I am happy to give you an opportunity to be heard, but I do want -- because there are a number of issues that we need to address. But I do want to know as a preliminary matter, the filing last night on this topic, on the docket -- sorry. Just give me a moment to pull it up.

(Pause.)

THE COURT: The filing last night on the docket, both -- the first filing related to and summarized defendants' efforts to notify Ms. Ocampo in the last 48 or 72 hours. But more recently, plaintiff filed a supplemental statement regarding the attempts to locate her and why that doesn't amount to unavailability. But the piece that I'm interested in is that the designated portions of Ms. Ocampo's deposition testimony runs two hours. Is that still where we are?

MR. FLYNN: Yes, your Honor. We didn't know it was going to be that long until we actually put the video together based on your rulings.

We would be willing to forgo the deposition and just have an actor come in and read the designated portions of the

2001

criminal trial transcript to avoid the two hours.

MR. LOEVY: That would be more problematic from our perspective because the deposition is where she acknowledges she doesn't stand by it.

THE COURT: Where does she acknowledge that?

MR. LOEVY: I mean, not in words.

THE COURT: You have to remind me.

MR. LOEVY: I mean, not even in any line. I mean, she's there. She's like, I don't want to be here, I don't remember, I don't remember. You know, we're going to ask the jury to infer she's not standing by that testimony.

MR. FLYNN: I don't remember --

THE COURT: But she says later on in the designations -- this part I remember -- whatever I said before, whatever I told -- these are my words, I'm summarizing -- but what I said before is the truth, is what I stand by.

I mean -- well, I'll let you answer the question. Because I have to tell you that part of my reluctance has always been that the deposition testimony is a mess. You know, I've already talked about it, but I repeat those same arguments here. It's internally inconsistent. There are certainly concerns about her sobriety at that moment, even just in that moment.

So, I'll need you to tell me, in light of your argument, that the fact that it's two hours long, how that's

problematic. Why would we then revert to using the deposition if defense is now prepared to just rely on the criminal trial testimony, which I realize raises an 804 consideration? But I'd like to hear from you on why it is that that isn't sufficient under the circumstances.

MR. LOEVY: All right, your Honor. Then I would like to, if I could, make our argument.

THE COURT: Certainly.

MR. LOEVY: I believe you understand our position on why she's not unavailable because, you know --

THE COURT: Yes.

MR. LOEVY: -- it started too late, et cetera. That's really the starting point.

THE COURT: Yes.

MR. LOEVY: Your Honor ruled before, well, you had an opportunity to cross her. And I thought about it, and it's a fair point. But if that excused unavailability, the exception would swallow the rule because every deposition, there's an opportunity to cross her. It really doesn't turn on our opportunity. It turns on what they did. And they obviously liked the cross-examination, so they didn't make efforts to get her to trial in the month. And the case law is pretty clear, there are consequences when you don't do that.

So, it's not that we had an opportunity. It's that they sort of liked how the cross went and, therefore, didn't

get her to court.

So, legally, there is not -- if they showed you their best case, it would be six miles away from this on unavailability where they didn't even -- you know, she said, I'm not going to come, and they ignored her, and they didn't even ask her to come.

And the record gets stronger. We're going to tender to your Honor a letter -- we asked them last night for a copy of what they provided to her. And we'll provide you a copy right now.

(Tendered.)

MR. LOEVY: And I suppose we'll file it in one way or another so it's part of the record.

As Mr. Kayes points out, this doesn't even tell her where and when to appear. You know, she has -- there's no notice to her of -- that she's in contempt if she doesn't -- you know, she doesn't -- there's no opportunity. She's like -- you know, so this isn't -- they're not trying to get her to court. And if they were, they would have given her notice that she was going to -- the marshal was going to come out to get her unless she did X.

THE COURT: Can I just ask a quick question to clarify on that point?

The filing at 418 last night by the defense states in sum and substance, among other things, in addition to some

phone calls and voicemail messages, not necessarily to Ms. Ocampo, but to family members and others associated with her, that on September 4th, a private investigator returned to her residence, knocked on her door, no answer, left a card, stayed at the residence and didn't see anyone, attempted to make contact again with no response. The private investigator left an envelope containing a copy of the subpoena and materials served on Ms. Ocampo on July 30th. And I presume this is the letter explaining that Ms. Ocampo had been ordered to appear and the potential consequences if she ignored that.

If the representation is that he left a copy of the subpoena --

MR. LOEVY: Which had the date of August 26th, which is done.

THE COURT: -- with a note that says, please call, including potentially a note that says we're -- the Judge is going to give you more time before she sends the marshals out -- look, I would have written it different, but it doesn't have to be perfect in order to give her some notice that, hey, you need to reach out.

Look, none of this is ideal. And, so, the idea that we're going to sit here and try to hold it to the standard of -- it's not even perfection. It's just that ship has sailed. I would have handled it a bit differently. I agree with you. But I think there has been some attempt to reach

2005

her, including by leaving a copy of the subpoena.

MR. LOEVY:  But the subpoena had a date that is two weeks ago.  So, nobody's explained to her, you need to come to court today, September 5th.  And maybe she doesn't want to talk to them.  Maybe she doesn't feel comfortable talking to them.  Maybe she -- they didn't give her in writing what she needs to do.

You should cancel the writ, among other things.  It's not fair to her.  She has not been told, if you don't do this, they're going to arrest you.

So -- and I'm not trying to cancel the writ.  Obviously, the trial's over this morning.  But it's not fair to her.  They haven't made a showing.

THE COURT:  Okay.

MR. LOEVY:  And my --

THE COURT:  Assume that I disagree with you --

MR. LOEVY:  All right.

THE COURT:  -- on that point, but you can make your other points.

MR. LOEVY:  The other point is we've asked for her address so we can ask her.  And when they sent us the subpoena, they had blacked out her address.  And we immediately wrote them an e-mail -- we put this in a prior filing -- tell us the address.  They won't tell us the address.

So, they're saying, oh, you know, whatever they're

saying she's telling them. They are denying the plaintiff access to find her so that we can find out how unavailable she is.

And that's -- you know, particularly in light of the fact that we've been skeptical about this threat thing. But now they're playing it twice.

Amanda Moore is a young -- she was 14 years old. She didn't see anything in the park. Vanessa had a conversation with her. She didn't say anything about being threatened. She said, look, I don't remember it. I was in the park. I didn't see anything. I barely remember it.

She didn't feel threatened or in any way suggest threatened.

So, for them to represent to the Court that a second witness feels threatened to come to court and say, I didn't see anything in the park, then, you know what, maybe they're asking leading questions. So, it's skeptical to us. But that's maybe, you know, a side note.

But we are asking to enforce Rule 26(a)(1) and 37(c)(1), which were enforced against us, you know, when we lost our claim because there was a sanction for not doing it the right way.

Returning to it, we think we've made a clear case there is no basis to read this deposition. I get that judges like to be fair and they like to give both sides a case and

2007

that, you know, that would be a presumption. It's like, well, they didn't have a case; we have a case. You should resist that temptation because the law is you have to have admissible evidence. This isn't admissible evidence. It's not a matter of being fair to them. This isn't admissible evidence.

THE COURT: Okay. So, look, I don't want to go back and forth on this point. I agree with you, Mr. Loevy, and your arguments that there is little doubt in light of the circumstances leading up to Ms. Ocampo's deposition that occurred in this building in 2022 and all that it took to get her here that the defendants did not use reasonable diligence prior to trial to find her and serve her in a way that was reasonable under the circumstances. If that were the end of the analysis and it was just that consideration alone, I don't think that unavailability would have been established.

Like it or not, I directed the parties to take steps in the intervening days to attempt to notify her, which I stand by and I believe was the right thing to do. And I realize it was over your objection, but that's what I indicated. Unfortunately, as we sit here this morning on Friday, the 6th, at 9:13 in the morning, there has been no movement on the actual ability to find and put hands on her consistent with the writ. I don't anticipate that she will actually be here. It's possible, of course, but I doubt it.

But I did read and have reviewed the steps the

2008

defendants explained to try to locate her, which included calling her, although her number was blocked; calling family members, leaving some voicemail messages for people who may have been associated with her; and, by having a private investigator sit outside a known address for her, or at least one known address for her, on September 4th, leaving her with a copy of a subpoena and a letter.

The letter is not -- as I mentioned, it's not ideal. It's not perfect. I don't know that it's a letter that I would have drafted in that way. But I think that there is at least some indication, at least some basis, to conclude that she might even be dodging service. There's no way to know that for sure. Who's to say?

So, I raise all those points to say that even though I believe and I'm convinced that the efforts to find her came far too late and it is true that the defendants should have raised this issue earlier and sought my help to find her, there have still been efforts in the last few days to try to notify her, and she has not been found or located.

I, like many of my colleagues in the building, prefer to have cases decided on their merits. There is testimony. I wonder how helpful it is to either side. But there is deposition testimony and trial testimony that the defendants wish to offer at trial. And, so, because of the preference for cases to be decided on their merits, I'm going to allow some

version of the testimony.

And, to be honest with you, Mr. Loevy, the case that convinces me that this is the right thing to do is the *Kuri* case, which is the case that you raised before Judge Chang, *Kuri vs. Folino*, 409 F.Supp.3d 626. And I don't say that because I don't think you should have raised it with me. You should have. And I know the posture was a bit different.

But, ultimately, the judge in that case allowed the testimony -- again, under some different circumstances -- but allowed a video deposition to be played for the jury because at the time, he was convinced that there had been a showing of unavailability, even though, in the end, it turns out there really wasn't. Right? There really had not been enough efforts.

And similar to the reasoning there, I think because there is a preference to decide cases on their merits, I'm going to allow some of the testimony to be presented.

So, from my perspective, then, that leaves us with the question of whether or not we proceed with allowing some of the video deposition testimony to be presented, which is a mess, as I previously indicated, and is lengthy, for the reasons that you've indicated, and certainly would not allow us to conclude all of the evidence in a timely fashion today. It would just eat up a lot of our time.

I take defendants' suggestion about the trial

testimony as a reasonable suggestion. And I realize that it presents a slightly different problem under Rule 804 because the question is whether or not you had -- or really Mr. Brown's counsel had -- an opportunity and similar motive to develop the testimony by direct or cross.

Ms. Ocampo's testimony doesn't really implicate Mr. Brown directly. And, so, if you believe that the motive or dynamic to cross her changed in some way in connection with the trial testimony from today, point that out to me. Otherwise, I think it would be cumulative and cause undue delay to play both.

I gave you the designations on both because I put the time into it, as have you. Nothing about that was intended to suggest that I prejudged the issue. But I don't think we need both.

MR. LOEVY: Well, we -- you know, that's in your discretion. Nobody can argue with you. But I don't think there's any question that it has to be the deposition. I mean, everybody was on notice. The cross-examination point comes back at the defendants. They were on notice this was their one chance to get her. Both sides, that's how it works. This is your trial testimony. Ask your questions. We ask our questions. It's longer. In your mind, it might not be as good. But really, we insist we have a right to play it if she's unavailable. So, you know --

2011

THE COURT:  Which is why I'm asking.  I appreciate that it's not for me to just direct that you must do this as opposed to this without at least hearing your perspectives on it.  If your preference is for the deposition testimony, whatever the length may be, obviously, that throws a wrinkle into our plans for the day, which is okay.

MR. LOEVY:  You know, it doesn't, though, your Honor, because Welner's going to finish and then that's it.  You know, if Kerbis shows up, that's less than a half an hour.  And there are no other witnesses.

MR. FLYNN:  Cichon.

MR. LOEVY:  Cichon.

But we should be able to finish today, you know, even if we read the whole thing.

THE COURT:  Okay.

MR. LOEVY:  Or played the whole thing.

THE COURT:  I've done a lot of talking.  I'll give you an opportunity, Mr. Flynn.

MR. FLYNN:  I think we could do the transcript and deposition and still finish today.  I agree with Mr. Loevy there.

What I don't agree with him on is to tell us how to put our case forth.  We think the criminal trial transcript is what should be read.  If they want to, in rebuttal, play all the video designations of Ocampo, they have that right.  But

they can't force us to choose which testimony we want to use in our case-in-chief.

MR. LOEVY:  It's not so much that.  It's that they knew when they walked into that deposition that she might -- it's the same arguments they made against us.  They knew she might not come to trial, so they were obligated to do it.  And, frankly, they did, at the deposition, read her her criminal trial testimony.  And, then, she said, you know -- basically gave what we think is a fair perception that it's not real.

So, they can put on the evidence -- you've already said that -- over our objection.  But they should put on the evidence.

THE COURT:  Okay.  So, it sounds like we'll finish with Welner.  I'm going to get to the point you're making. We're going to finish with Welner.  We have Cichon.

MR. FLYNN:  Cichon, yes.

THE COURT:  Sorry.  Cichon.

And, then, what, you would play or read what?  You would prefer to just read the criminal trial portion of this, knowing that Mr. Loevy is going to stand up in rebuttal --

MR. LOEVY:  I wouldn't rebut.  Our objection is if -- they have no right to do anything but play the deposition.  If they want her testimony and you're going to allow her to be unavailable, then the remedy is --

THE COURT:  But why doesn't that apply to the trial

testimony? That's what I was saying earlier, is I think there was a similar motive. And I don't know why they wouldn't be permitted to play the trial testimony if that's what they choose. And I thought -- maybe I misunderstood, but I thought what you were saying is, then if they're going to do that, I'm going to play the deposition in rebuttal.

MR. LOEVY: What I was saying, your Honor, is they haven't made a showing she's unavailable. But if you -- you disagree with me, so they have. Then their remedy is her deposition. That's the only remedy. We had a chance to cross-examine at the deposition --

THE COURT: You had a chance to cross-examine at the trial.

MR. LOEVY: Well, but, your Honor, at the trial is a criminal matter. He -- Mr. Brown didn't even testify at the criminal trial. Completely different circumstances. You know, if you're going to --

THE COURT: But the rule says -- I just want to be precise here. I appreciate your position on it. I'm just trying to make sure I'm clear. The rule says that the testimony here in this case from the criminal trial can be offered if the party had an opportunity and similar motive to develop the testimony by direct, cross or redirect.

MR. LOEVY: I understand that, your Honor. But you're now in the discretionary position I'm going to dispense with

the notice requirement -- or the unavailability. I'm going to let him do something.

THE COURT: Right.

MR. LOEVY: That something --

THE COURT: And they told me what they want to do is the criminal trial.

MR. LOEVY: And they should not have the luxury of handpicking what they want to do. If they get the luxury of overruling the unavailability, then at this trial, we sought out relief and got her cross-examined and got her deposed. And at that deposition, they had an opportunity to say, here's your criminal testimony. What do you stand by? And she's like, not really.

How could they get -- you've allowed them the indulgence of saying you can get in testimony despite unavailability. You should not let them handpick the stuff that was 16 years ago before he understood the issues at this trial. I mean, you should say to them, you have no options or read the deposition, when the plaintiff at least had notice that this trial and the issues in this trial were what you should cross-examine on.

THE COURT: All right. So, Mr. Flynn or Mr. Gibbons, what's your position? Because you went through the trouble of both designating and preparing a video. Does it just make sense to put this to bed and to play the deposition testimony?

You both will get what you want out of it. It seems like we'll finish.

MR. FLYNN: Your Honor, again, we prefer the trial transcript. If they want to play the video with our designations, we wouldn't object.

MR. LOEVY: All right. So, if -- but if they're calling, we're not playing the video, just so we're all clear. They're going to call in their case Marisol Ocampo.

And Mr. Bowman reminds me, at the criminal trial, police misconduct was not even on the table. The issue wasn't the same motive.

If they want to call this witness, our position is you should tell them I'm going to let you call this witness over plaintiff's objection, but you got to call her through the deposition. Doesn't seem like any other outcome is fair.

MR. GIBBONS: Your Honor, I mean, it's our case-in-chief. We're putting on our evidence as we see fit. That's going to be the criminal trial transcript. And, then, if Mr. Loevy wants to introduce other evidence in regards to that witness, as Mr. Kyle Flynn's just said, we don't have any objection to that.

THE COURT: Yeah, I don't see -- and I don't mean to cut you off, Mr. Gibbons.

I don't see, Mr. Loevy, why that's not the remedy. I'm going to say she's unavailable. We're in the defense case.

Defense, put on your evidence about Ms. Ocampo.  They elect to put on trial testimony.  I don't agree with you that 804 bars the testimony.

MR. LOEVY:  Well --

THE COURT:  You may then play the deposition designations if that's what you want to do.

It seems to me like you're trying to get me to force them to play the thing you want them to play.  And I'm not going to tell them that they have to do it that way.

MR. LOEVY:  I made my argument that I think you should make that available to them.  You're the one who's the judge --

THE COURT:  Yes.

MR. LOEVY:  -- not me.  So, that's how it's going to be.

We are -- in our rebuttal, then, we would like to play the designations that we want to play.  It will be our case then, so we get to pick.

THE COURT:  But then in response to that, they're going to play -- they're going to want to play their portion, and I'm not playing it twice.

MR. LOEVY:  No, but that would be cumulative because at the deposition, their portion is, I'm going to read you the criminal trial testimony.  They don't get it twice.

MR. FLYNN:  Small portion.

THE COURT:  That objection is overruled.  We are not

going to go through and say, well, then now only certain portions.

And I don't think, even at this late stage, Mr. Loevy, you would even be prepared to piecemeal her deposition testimony in that way.

MR. LOEVY: All we would do is call our examination of her. They are choosing to do the criminal testimony instead of their examination when they said, Ms. Ocampo, isn't this what you said at the criminal --

THE COURT: And you're doing that in your rebuttal case. And they're allowed to respond to your rebuttal case by putting on their -- and, look, if that's not what you want to do, you should tell me. And I don't mean to continue to cut you off. I'm just trying to get to the bottom of the matter.

MR. FLYNN: Your Honor's correct, that's what we want to do.

THE COURT: Okay. So, what we're going to do is just go back and forth because when you play a portion of the deposition testimony, the portion that you want to ask about, they're going to be able to say, look, our redirect on that is our portion of it.

MR. LOEVY: Okay. Well, we'd like to play -- if you're going to let them handpick what they want to play and they're going to do the criminal trail first, then in our rebuttal case, we're going to play our examination of Ms.

2018

Ocampo.

THE COURT:  Fine.

MR. FLYNN:  With our counter-designations.

MR. LOEVY:  No.  If you want to call him -- I think I'm understanding the Court to say --

MR. FLYNN:  That's not how this works.

MR. LOEVY:  Well, we're in an unusual situation because your Honor has said that they get to play part of her testimony in the criminal trial testimony.  We are, in our rebuttal case, going to call our exam of Marisol Ocampo, and then we're going to stop.  If they want to rebut that, we don't -- you're going to let them, but that will be their case.

MR. FLYNN:  If I could clarify that, your Honor, when we do the trial transcript, we'll be also using their counter-designations just like they use ours.

THE COURT:  Exactly.  You play it once as a continuing feed based on the designations that have been done.  It's confusing to the jury otherwise.  They won't understand the progression of the testimony.  You don't piecemeal it in the way that you're suggesting.  If you're going to -- it's the whole reason that we do designations --

MR. LOEVY:  I'm not --

THE COURT:  -- that we figure it out in advance what it's going to look like so that we don't do this sort of piecemeal back-and-forth and no one understands the who, what,

when, where of the testimony.

MR. LOEVY: Maybe I'm being misunderstood. I'm not saying we only want to play our designations from our lawyer's exam. We're saying we're going to play Vanessa's entire exam. Their designations, our exam -- designations. We're saying is then their attorney stood up, and they're going to -- it's going to be cumulative. I don't understand why there's not a cumulative or Rule 403. You're letting them do it twice.

But then let them do it twice. They can call their attorney if they want to. We want to call our attorney with both sides' designations. That's what we want to put into our rebuttal case.

THE COURT: Right. But you're telling me that I -- to accommodate that request, Mr. Loevy -- and maybe I'm misunderstanding it. To accommodate that request, we would be playing the deposition in a piecemeal way.

MR. LOEVY: We would hit stop. We'd play the entire deposition from Vanessa's exam, their designations and our designations. Nothing's parsing out. And, then, we would stop.

And, then, they could either stop or say, we would like to play another attorney 's examination, which is our view they shouldn't because it's cumulative.

THE COURT: I understand.

MR. LOEVY: They've already heard it. But if they

want to do that, they can do that.

THE COURT: If we want to go through this formality of you saying, I'm going to hit stop and sit down and then they're going to stand up and hit play at the same time because it's the rest of it, fine. This, to me, is petty and silly.

MR. LOEVY: All right.

THE COURT: It's petty and silly about testimony and evidence that is really a sideshow as to the point of why we're even here.

But I made the decision. That's where we're going to go. If you want to hit stop at the appropriate time in your rebuttal case and they pick up from the same point and hit play, fine. Then that's the way we'll do it.

MR. LOEVY: I think that issue is then resolved, your Honor. Thank you for letting us say everything we wanted to say, even though you disagreed with us.

THE COURT: Certainly.

MR. FLYNN: Your Honor, with the trial transcript, are we supposed to do the same weird way of doing it where when Mr. Brown's attorneys got up, we got to stop and sit down and say, your turn?

THE COURT: I would think we shouldn't do that. That seems like --

MR. FLYNN: I agree.

MR. LOEVY: We do that all the time.

2021

THE COURT:  This is all ridiculous.  It's just silly. And I realize that people are fighting hard for their clients' respective positions, but this is just silliness.  But if you all want to engage in that in front of the jury, be my guest.

MR. FLYNN:  We do not want to engage in it.

MR. BOWMAN:  With respect to the reading of the trial transcript -- which will not be playing a video, it will be reading -- what we just did, Jon and I, in the case we finished in front of Judge Tharp was that we were allowed, both sides -- everybody wanted this -- to have the separate question reader --

THE COURT:  Correct.

MR. BOWMAN:  -- representing the questions of the side in the prior proceeding.  And I think for clarity, that should happen.

THE COURT:  That makes perfect sense to me.  We should just have people read and -- for the portions that actually need to be physically read to the jury.  That makes sense.

MR. LOEVY:  All right.

THE COURT:  Okay.  I think all of our jurors are here, but let me check.

MR. GIBBONS:  Your Honor, I think we have a couple of other issues.

THE COURT:  Sure.

MR. GIBBONS:  And I don't know if we can resolve

anything. I proposed a stip last night to Mr. Loevy in relation to the ASA. I've not heard back. I do think we can keep the ASA off the stand. There's different ways of doing that. But I need to -- because I did represent to the Court that I would try to work with Mr. Loevy on that. And I proposed several ways to do it.

I'm still optimistic we can do that because everything I've proposed is actually in the criminal trial transcript to the word. And if Jon has some objection to some of it, we might need the Court's guidance. Because it would be the same thing --

THE COURT: Right.

MR. GIBBONS: -- as if I'm asking a question to the ASA, Jon objects, we get a ruling, sustained or overruled.

We can do that now, and then if we have the Court's advance rulings on some of these areas, we could tailor our stip to that and we could keep an ASA off the stand, who is going to have to constantly turn to a criminal trial transcript and say, yes, this witness was on the stand on this date; yes, I did ask this question; yes, I did elicit this information, all of which I believe is relevant only to Marcel Brown.

And Jon may have a different idea on that, but it's all in the transcript. And I can't see why, even though we don't seem to agree on anything, we can't get through this one to shorten what could be an hour to an hour-and-a-half of

2023

testimony because we're going to have to constantly go through pages.

I'm more than happy to do it that way. And I will do it that way. I'm prepared to do it that way. But I do think we should reach a stip on this. I don't know why we're not.

MR. LOEVY: Well, your Honor, we're not going to resolve this in the next two minutes. I wanted to reach a stip. I've been saying it all along. We have a huge disconnect.

After midnight, after I was asleep, we did get a draft of a stip. I understand why Mr. Gibbons just said the substitute would be an hour-and-a-half of testimony, because he just has a different universe on what this evidence is coming in for. We are not, in my view, retrying the criminal case. And that's what they proposed, a seven-page stipulation of punch by punch.

When I hoped we'd work it out, I hoped we would start working before midnight yesterday. Now we're going to have to do it this morning.

You can do this in a paragraph. Some witnesses testified that R.J. and Marcel were in the park and one of them shot. And, your Honor, what you're going to have to think about -- you're not going to decide it now -- is what is this coming in for. They want it to come in for the truth, which is why they want all the details. What really is it coming in

2024

for?

We proposed one sentence. The statement was used at the trial. What is it coming in for? Why do we need seven pages of what happened?

THE COURT: Right.

MR. LOEVY: What's it coming in for?

MR. FLYNN: Materiality, your Honor.

MR. LOEVY: And materiality, your Honor, the suppression claim is out of the case.

MR. FLYNN: It's part of the fabrication claim, your Honor.

MR. LOEVY: Materiality has dropped out the case.

MR. FLYNN: Part of the fabrication claim, your Honor.

MR. LOEVY: Well, it's not. But you're not going to decide that right now, so I think we should start with the witnesses here.

THE COURT: I'm going to encourage the parties, even though you'll being very limited in your ability to do so, to just try to reach a stipulation. I really -- it's a little disappointing -- or "unfortunate" is probably the better word. It's not disappointing. It's unfortunate that you weren't able to do it. But you need to continue to work on it, and we'll get it sorted out.

MR. GIBBONS: Your Honor, I think there's one motion that was filed --

2025

THE COURT:  Yes.

MR. GIBBONS:  -- at 12:51 a.m.

THE COURT:  Yes.

MR. GIBBONS:  -- regarding Segovia.  Segovia, obviously a witness that has been known about by everybody.  It's actually on both witness lists.  She's been tendered.  Everyone knows who she is.

I haven't even read the motion, to be honest with you.  So, at some point we have to deal with Segovia.  This will drive us into Monday.  We're going to -- we've already tried to do this once with a late midnight filing where we didn't have a chance to brief it.  I haven't read the cases.  I would like the opportunity to do that.  I haven't read it yet.  I've been preparing for today's testimony.  So, we would need the weekend to respond to this, which means we push Segovia till Monday.

But, you know, I can't respond to things filed at 1:00 in the morning when I'm getting up and preparing witnesses for trial.  So, I object and ask the Court to bar that type of filing.  It's the second time it's happened in a week.  But if we have to address it, then we're going to need the weekend to do it.

THE COURT:  Okay.  We'll see where we are with it later in the day today.  I also -- I started to read it, but I didn't have a chance to finish it.  I'd like to give defense counsel an opportunity to respond.  It may just be that we

can't resolve it fully today.

Anything else we should take up before we bring in the jury?

MR. LOEVY:  If I could just get one minute to set up.

THE COURT:  Certainly.

And we can get Dr. Welner back in the courtroom to be ready to go.

(Pause.)

(Jury in.)

THE COURT:  You may be seated.

Good morning.  Welcome back, ladies and gentlemen.  We are ready to resume with the testimony of Dr. Welner.

Dr. Welner, you remain under oath.

THE WITNESS:  Yes, your Honor.

THE COURT:  Mr. Loevy, you may resume your cross-examination.

MR. LOEVY:  Thank you, your Honor.

MICHAEL WELNER, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. LOEVY:

Q.  All right, Dr. Welner.  Fair to say there is a community of experts, scholars, academics, who study the phenomenon of wrongful convictions, right?

A.  There is a community of scholars who study wrongful convictions, that's correct.

Q. The answer is "Yes," right?

A. Yes.

Q. Richard Ofshe, Dr. Cutler, Shari Berkowitz are some of the scholars in that community, correct?

A. I don't know that they study wrongful convictions. Richard Ofshe is retired and a restaurateur now. In terms of Dr. Cutler, I know that he has studied false confessions.

Q. All right. As far as people on the other side, people who represent police officers, you sort of have a monopoly on being the expert who is the go-to guy if you're a police officer accused of a false confession, right?

MR. FLYNN: Objection. Argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. One of the reasons you're able to charge so much money in connection with these consulting gigs is because you're really a community of one on the other side of that; is that a fair summary?

A. No. And when you say so much money, I think it's important to point out to you that what I'm charging on this case relative to cases that I am consulting on other matters is lower.

Q. Lower?

A. And, so, it's not a matter of a specific sum. I will take on a case if I feel that it has merit, if I feel that it has --

sufficiently within my qualifications and if I have the time. But if I take a case, for example, this case, for this fee, I'm not taking a case that I'm charging more for another subject matter. So, I don't know that one relates to the other. That's all.

Q. You've made more than a million dollars in cases where Chicago police officers were accused of false confessions, correct?

A. It's quite possible.

Q. And, in fact, you said you only take them when -- I think you said when you believe in it, something like that?

A. I take -- what happens is when I'm approached on a case, I have a lengthy, complimentary discussion with any attorney about the substance of their case in which I ask them pointed questions. And within an hour or two, I can ascertain whether there are reasons that I should definitely not be involved in the case because I would be concerned that I would then come back to the attorneys and say, I can't help you. And I can tell that from the outset. Sometimes you can tell that at the outset. Sometimes you cannot.

Q. All right.

A. So, that happens routinely. And I think that results in a lot of cases being turned away from our practice.

Q. Daniel Taylor, for example, had a case against Chicago police officers were he alleged --

MR. FLYNN:  Object, your Honor.

MR. LOEVY:  Your Honor, he is saying --

MR. GIBBONS:  You know, we can get into the motivation here, but he's trying to bring in other cases.  He knows he's overstepping your orders pretrial.

MR. LOEVY:  Your Honor, this is directly in rebuttal to what he's saying.  He brought up that he only does it if he believes in it.  I'd like to bring up some of the other cases that he's represented.

I'll leave it to one case, your Honor.  How about that?

THE COURT:  Look, I'm giving you a little bit of latitude here, but only a little bit in light of the earlier testimony.

So, the objection is overruled.

BY MR. LOEVY:

Q.  Daniel Taylor confessed to a crime that it turned out he was in jail for at the time that the crime was committed?

MR. FLYNN:  Note my objection for the record again, your Honor.  This violates a motion in limine order.

THE COURT:  It's noted for the record.

BY MR. LOEVY:

Q.  All right.  You nonetheless decided to get involved and charged almost a half-million dollars representing those Chicago police officers, correct?

A.   Well, that misstates the case.  And your question also misstates my earlier testimony.  I didn't say that I take cases that I believe in.  I said I refuse cases when I listen after a lengthy conversation and I say there's a problem with this case where I can see at the outset.

I don't know what I'm going to find until I work on a case.  It doesn't mean I believe in a case.  But you can see at the outset, you can identify problems and say, I can't get involved in this because this is an insurmountable problem.  That's very different from, quote, believing in a case.

As to Mr. Taylor, there continues to this day to be a matter of dispute as to whether he was in jail or not.  So, you're misstating the case and its facts.  And I worked on a case of five people who were involved with five different disputed confessions in addition to Mr. Taylor.

Q.   And, you know, I'm not supposed to argue with you, but there really isn't a dispute if someone's in jail or not because there's records, right?

A.   Well, there's a dispute about the record and how that record came to be.  And one side, the record was accurately documented.  And the other side pointed out ways in which the documentation, the timing could and would have been mistaken, and also pointed to other evidence that showed that Mr. Taylor was involved and directly implicated as others had implicated him.

Q.   All right.  And you did --

A.   So, to this day, that point remains unresolved with one side feeling the way it does and the other disputing it.

Q.   All right.  But you did bill almost a half-million dollars in that case, right?

MR. FLYNN:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   You've also represented Chicago police officers --

MR. FLYNN:  Objection, your Honor.  You already ruled he could get into one case.

THE COURT:  It was one case, Mr. Loevy.

MR. LOEVY:  One case on the facts.  Can I list --

THE COURT:  No.

MR. LOEVY:  -- names?  All right.

BY MR. LOEVY:

Q.   Let's talk about the phenomenon of false confessions.  They do happen, we agree, correct?

A.   Yes, sir.

Q.   It's counterintuitive that someone would confess against their self-interest, right?

A.   It is, unless you hear the whole story and sometimes conclude that it would be in their interest to confess.  So, it's --

Q.   Sometimes they occur, false confessions?

A.   Yes, sir.

Q.   And I think I found the article that you said is forthcoming.

MR. LOEVY:  May I approach, your Honor?

THE COURT:  You may.

BY MR. LOEVY:

Q.   Showing you a copy.

MR. LOEVY:  I'll call it 421, your Honor.

(Tendered.)

BY THE WITNESS:

A.   Thank you.

BY MR. LOEVY:

Q.   Is this the article that's going to be published?

A.   Well, it is published if you have it.

Q.   Well, I couldn't find a source on it.  Is this the article you're talking about?

A.   The source is right here on the article.

Q.   Is this the article you're talking about?

A.   Yes, sir.

MR. FLYNN:  Can I get a copy, Mr. Loevy?

MR. LOEVY:  Sure.

MR. FLYNN:  Thank you.

BY MR. LOEVY:

Q.   All right.  And you do acknowledge in your article that false confessions leading to wrongful convictions is an

undisputable fact essentially, correct?

A.   Yes, sir.

Q.   And I think you said yesterday that you have some questions about how common the phenomenon is, right?

A.   No.  It's very uncommon.

Q.   Well --

A.   I have questions about how uncommon it is.  But all available evidence from a variety of sources demonstrate that it's rare.  But we can't quantify how rare it is.

Q.   We'll talk about that.  I think you said yesterday that you've reviewed one case involving a false confession.  Did I misunderstand you?

A.   No.  What I said was that the first false confession that I saw was at Bellevue Hospital.  I have seen other false confessions over the course of my career of cases that I have reviewed.  You know, several.  And --

Q.   Several?

A.   Yes.

Q.   Because I think -- didn't you swear an affidavit that you reviewed over 70 cases involving disputed confessions?

A.   That's correct.

Q.   All right.  But when you call them disputed, that means somebody's saying the confession was false, right?

A.   False or forced.  And, then, someone else saying that it is not.  Those are disputed.

Welner - cross

2034

But among that group, there are several that were -- that ultimately I conclude and I believe to be false --

Q. Got it.

A. -- confessions.

Q. You talked yesterday about the DNA data from the registry. And the numbers are that in their study, they believed 24 percent of these DNA exonerations involved people who had falsely confessed. That's their data, right?

A. Actually, I didn't talk about that. I believe Dr. Cutler gave that percentage. And since I was asked, I went back, and his testimony is incorrect. The percentage was actually 13 percent, not 24 percent.

Q. Showing you what I'll call 421 -- they publish their data, right?

A. I looked on their Web site last night, so I would say that my review is current.

Q. All right. Take a look at --

(Tendered.)

BY THE WITNESS:

A. Thank you.

BY MR. LOEVY:

Q. -- this article.

Can you tell the jury what the article's source is there, what the journal is?

A. Yes. This is an article from 2018, which is six years

before I checked the data on their Web site.

Q. Sir --

A. And it's --

Q. -- if you'd just answer the questions. I asked you the name of the --

A. It is on the general acceptance of confessions research, opinions of the scientific community.

Q. And the journal, sir?

A. Is American Psychologist.

Q. And it says right there in the first line after the abstract that within the database of the Innocence Project, false confessions contributed to 28 percent of the first 347 post-conviction DNA exonerations.

If you could just focus on my question, that's what that sentence says, correct?

A. That's what that sentence says.

Q. Thank you.

And, then, it continues that the national registry, once they got to 2,000 cases, then the statistic dropped -- or, actually, 1927 cases, the statistic dropped to 13 percent?

A. Yes. I believe 13 percent is the number that I just gave you, not 24 percent.

Q. You gave it to me in response to a question I didn't ask you, but now here I am, okay?

If you count their first 2,000 exonerations, the

number dropped from 24 percent to 13 percent, right?

A.   Yes.

Q.   That's probably attributable to the early exonerations were DNA exonerations, and then the latter ones you can get exonerated for all kinds of reasons; would you agree --

A.   No.   I don't think anyone's resolved that question.   We could speculate about the reasons that -- why the numbers dropped.   I believe my testimony yesterday was that there are a number of cases that are misclassified as false confessions that are something else and they could have just simply improved their means of how to classify something so it's more accurate.   But there are any number of explanations.

          MR. LOEVY:   Your Honor, if we could have the document camera, please.

          THE COURT:   Yes.   One moment.

BY MR. LOEVY:

Q.   So, I guess it's fair to say nobody knows how many false confessions there are, right?

A.   That's correct.

Q.   A lot of people confess?

A.   Yes, sir.

Q.   Hundreds of thousands -- give me a number.   Estimate how many.

A.   I don't know, and I can't speak to that.   I don't have the expertise, but confession is common.

Q. All right. So, I've drawn a picture here, and I'm going to ask you to bear with me. And assume for my hypothetical that this diagram represents all of the false confessions and it's -- you know, pretend there was a million dots on this page. So, I'm not asking you to actually agree with me that this is the exact number, but that's what I'm trying to show.

Do you understand that?

A. I'm following you, but I --

Q. That's all I'm asking.

A. I don't yet understand.

Q. Fair?

A. I'm listening.

Q. Following but not understanding?

A. Yes.

Q. Got it.

So, I'm saying each of these dots is a person, and that person is saying, I confessed. And for a lot of those dots, they confessed because they're guilty, right?

A. Yes.

Q. And for some of those dots, someone's saying, I confessed, but I'm not guilty. I was coerced, I was tricked, I didn't -- it's not true.

For some of those dots. You agree at least some of those dots would be that, right?

A. I agree that there is a rare percentage of --

Welner - cross

2038

Q.  I didn't ask you --

A.  -- overall confessions.

MR. FLYNN:  Could we just --

BY THE WITNESS:

A.  I just -- some versus lot is very amorphous, and I'm trying to give a precise answer.

MR. LOEVY:  Your Honor --

BY THE WITNESS:

A.  So, I agree that there are those within that -- those dots that falsely confessed.

BY MR. LOEVY:

Q.  And we just don't know how common, right?

A.  Yes, sir.

Q.  You don't know, and I don't know, and no one knows?

A.  We only know that they're rare from the available data.

Q.  Now, we have a subset in this universe of these dots -- well, let me back up.

For each of these dots, let's say this dot is Mr. Jones and he's saying, I confessed, but it's not true, and the police are saying, you confessed, and you're guilty.  We don't know who's right, the police or Mr. Jones, right?

A.  That's correct.

Q.  And we never will, right?

A.  We could.

Q.  Well, we'd have to get pretty lucky, like DNA evidence, to

find out definitively, right?

A.   Well, there are a number of things that establish whether a confession is, in fact, false or not.  But then DNA can sometimes demonstrate that someone was guilty and disputed a confession.

Q.   Exactly.

A.   So, evidence may emerge, but until the evidence does, it remains in dispute, yes, sir.

Q.   We don't agree on much, but would you agree that for the vast majority of these dots, we're never going to know, we're never going to find out if they were true or not true?

A.   I just don't know without a more granular consideration.

         And, by the way, just to answer your question, I'll bet we agree on much more than you represent.

Q.   Well, we'll find out.

         But for this subset here -- and I've drawn a box around it.  It's not to scale.  I'm asking you to assume in that box, those are the dots where we are going to be able to turn over the card and find out if they were guilty or innocent.  Do you understand what I'm depicting?

A.   I just don't know.

Q.   All right.  Then I'll explain it again.

A.   Oh, no, I understand your question.  What I'm saying is --

Q.   That's all I'm asking.

A.   -- I just don't know.

Yes.

Q.   That's all I'm asking.  Do you understand what I'm presenting to you?  I'll ask it again.

I'm asking you to understand that this box depicts all the dots for which we have DNA evidence so we can turn over the card and say, oh, my gosh, that confession is true, or, oh, my gosh, that confession is false.

Do you understand what I'm trying to illustrate?

A.   I understand the illustration.

Q.   So, in this box, we know that the first 347 DNA exonerations, about 28 percent of them were false confessions, right?

A.   No, we don't know that because the Innocence Project does have difficulties with their classification that I identified yesterday.  So, that 28 percent figure is not only overstated, but there was a research article that studied it that demonstrated it to be overstated.

Q.   By the way, you said that yesterday.  That's not written in your report, is it?

A.   It's not, but I'm responding to your question.

Q.   All right.  But I did want to follow up on that.  Your report, you understood, was our opportunity to test your opinions.  You were supposed to write them down, right?

A.   That's correct.

Q.   And what you just said and what you said with Mr. Flynn,

Welner - cross

2041

that's not in your report, your issues with the numbers, correct?

A.   I wasn't asked about the numbers in my report.  You're asking me about them now, and I'm telling you.

Q.   Back to my example.  In this box for which we can actually flip over the cards, at least 10 percent turns out to be false confessions, right?

A.   Yes, sir.

Q.   And for all the rest of them, we just don't know, right, because we don't have DNA?

A.   Or other irrefutable evidence beyond DNA.

Q.   All right.  Let's talk about the factors that contribute to false confessions, and let's find out how much we really do agree or disagree.

Can you list for me some factors that would contribute to false confessions?

A.   Threats.

Q.   All right.  Like, for example, could a threat be --

A.   Threat of violence.

Q.   Well, could a threat be, listen, if you don't start cooperating and telling us what we want to hear, you're going to go to prison for a really long time?  That could be a threat, right?

A.   It's a threat, but that's not what I was speaking to about threats and its association with false confessions.

Association of false confessions is threat of violence or physical harm.

Q. I'm asking you about the threats about --

A. Threat of going away to -- for, quote, a really long time has not been demonstrated to cause a false confession.

Q. If you don't cooperate, if you don't tell us what we want to hear, you will go to prison, that's improper; do we agree on that?

A. Well, it's improper. It's legally improper. But you asked me a question of what's associated with false confessions. Threats of, if you don't cooperate, are absolutely not associated. And threats of --

MR. LOEVY: Your Honor --

BY THE WITNESS:

A. Well, I'm answering your question.

BY MR. LOEVY:

Q. My question was: That's improper, right?

A. It's legally improper.

Q. Then you can stop there and we'll just take it question and answer.

You've testified in court before, right, sir?

A. Yes, sir.

Q. Something you're quite familiar with, right?

A. Not that familiar. But, again, for two times a year, I've been in court enough times.

Q.   All right.  So, you've been enough times to know you're supposed to answer the question and let your attorneys --

MR. FLYNN:  Objection.  Argumentative.

BY MR. LOEVY:

Q.   -- do it on redirect?

THE COURT:  Overruled.

MR. LOEVY:  All right.

THE COURT:  Please ask your next question.

MR. LOEVY:  Sure.

BY MR. LOEVY:

Q.   It is, to your understanding, legally improper to tell someone, unless you cooperate, unless you start changing your story, you're going to prison for a long time?

MR. FLYNN:  Objection.  Asked and answered.

BY THE WITNESS:

A.   That's not the question I answered.

BY MR. LOEVY:

Q.   But that's what you said.

A.   No.  I said --

THE COURT:  Okay.  So, please let me rule on objections.

The objection is overruled.  The witness may answer the question.

BY THE WITNESS:

A.   Okay.  You asked about two things, and it is legally

Welner - cross

2044

improper to say, unless you confess and tell us what we want to hear, you're going to go away, not unless you cooperate. That's two different ideas you merged into the same question.

Q. Take out the "unless you confess." How about, unless you start cooperating, you're going to go away for a long time. That's legally improper, right?

A. Yeah. I would defer to the attorneys, but I don't understand that to be.

Q. Didn't you just say that?

A. No. I said it with respect to your saying, unless you tell us what we want to hear and you confess. That's legally improper.

Q. All right. What other factors might lead to wrongful confessions?

A. Violence.

Q. What other factors? And we'll talk about them each in detail. Let's just list them.

A. Yes. An accumulation of abuse.

Q. Continue. Another factor?

A. What my research demonstrated was threats of the death penalty.

Q. Any other factors?

A. What my research also demonstrated was confronting a suspect that they had -- falsely confronting a suspect that they had failed a polygraph when they had not.

Q.   All right.  How about denial of access to an attorney?
Could that lead to false confessions?

A.   Well, it's not a studied factor, but, logically, if one has
access to an attorney, then it might cause them to make
different decisions, which include a confession.  But nobody's
ever studied it or explored it.

Q.   Nobody's ever studied it.  I'm going to throw you the ball
now.

     Why would denial of access to an attorney increase the
risk of false confessions?

A.   Because if an attorney came, then a person might completely
cease the interrogation, and you can't confess.  It would
eliminate confession altogether, whether true or false.

Q.   And you would agree that it is an improper interrogation
tactic to knowingly and intentionally deprive someone of an
attorney?

A.   It is an improper interrogation tactic to knowingly
deprive, correct.

Q.   How about denial of phone calls?  Could that also increase
the risk of a false confession?

     MR. FLYNN:  Objection.

BY THE WITNESS:

A.   That's not demonstrated in any context.

BY MR. LOEVY:

Q.   So, no one has actually studied whether if you deny someone

access to a phone call, that correlates with false confessions? I understand that's your answer. It's never been studied?

A. Yes.

Q. All right. Now let's leave that aside, whether it's been studied or not.

In your view, if you isolate someone for a protracted time and deny them access to the outside world through a phone call, do you believe that that might be able to increase the risk of a false confession?

A. It could, but it depends on the phone calls. There's a very famous false confession case in which somebody's father told them to confess. Turned out to be a false confession.

So, you don't know what's going to happen on the phone call. You don't know who they're going to call.

It's different from an attorney. An attorney is a trained professional and is under such certain circumstances, and perhaps many circumstances, just going to tell the client to cease participating. It's just different from a personal call which could be to anybody.

Q. Okay. Thank you.

I'm going to ask you to give me a "Yes" or "No." Denials of lawyers is a factor in increasing the risk of false confession or not?

I'll write "Yes" or "No?"

A. Yes.

Q. How about denial of phone call?

A. It's uncertain.

Q. Uncertain. That's fair.

How about youth, someone being very young?

A. Well, it depends what you mean by very young.

Q. How about 18 years old? Is that a risk factor for wrongful convictions?

A. It's not. 13 and 14 are. Above 16 is not.

Q. All right. I'm going to ask you some carefully constructed questions. You can tell me, I agree, disagree, or, I can't answer "Yes" or "No."

A. Yes, sir.

Q. Fair?

Do you agree with Dr. Cutler that a juvenile's brain doesn't really fully develop until they reach their mid-20s? "Yes," "No," or, I can't answer that "Yes," "No"?

A. I think that the brain is constantly changing. So, the premise of that the brain is developed in the mid-20s, the brain is constantly changing. So that the science and my own published research disproves that testimony.

Q. So, sir, again, I'm asking to you say "Yes," "No," or I can't answer that "Yes," "No"?

A. I can't answer it "Yes" or "No," and I answered it as best I did. No and explaining.

Q. Well, I'm going to ask you to leave the explaining for your

attorney on redirect --

A.   Yes, sir.

Q.   -- and just answer mine.  And if you can't answer it "Yes," "No," if it's not a fair question, say, I can't answer that "Yes," "No."  Fair?

A.   Yes, sir.

Q.   How about young people being more obedient to authority figures than older people?  Do you agree, you disagree, or you can't answer that "Yes," "No"?

A.   I can't answer that "Yes" or "No."

Q.   It's okay.

A.   It depends on the person.

Q.   Fair.

     How about Dr. Cutler's opinion that youth are more focused on the short-term as opposed to long-term consequences and, therefore, they're more vulnerable to false confessions?  You agree, disagree, or you can't answer "Yes" or "No"?

A.   I think that that -- that applies when you're talking about youth up to about 15 years old.  And as people get a little bit older, they become far more aware of longer-term consequences.

Q.   So, you're not going to do the thing by saying "Yes," "No," or, I can't answer that?

A.   No, I will.  I just said the answer is yes if it applies to 13 to 15, and the answer is no once you start going above that.

Q.   All right.  Tell me if you agree with this statement:  A

more youthful age may be associated with naivete for the criminal justice system. Those with little contact with the criminal justice system may be more naive about important aspects of the interrogation, including one's asserting one's rights to an attorney.

Do you agree or disagree?

A. Actually sounds like something I wrote. So, I may have written it.

Q. Do you agree with it?

A. I agree with it, and I wrote it.

Q. Sir, if you could just answer the question.

A. Yes, sir.

Q. Okay. Thank you.

How about naivete directly influences vulnerability to false confessions, particularly in coerced, internalized confession contexts? Do you agree with that, disagree with that, or you just can't answer it "Yes" or "No"?

A. I agree.

Q. So, can we agree, then, that being very young, 18 years old, probably makes you more susceptible to false confessions than an adult?

A. No, my testimony is that it does not.

Q. All right. Then I'll give you a "No."

Let's talk about the next one. Actually, no, let's talk about youth.

Welner - cross

2050

I think you said that 16's the cutoff.  If you're below 16, then you're at risk of a false confession.  Why is that?

A.   You're at greater risk just demonstrably.  Why?  There are a variety of questions, but that's what is demonstrated.

Q.   I'm throwing you the ball again.

Why is someone 16 and younger at more risk for falsely confessing?

A.   Naivete, less contact with people who are perhaps in gangs and less people who are in contact with people who are in criminal activity and interacting with the police.  Less opportunity for that.

More impressionable by adults.  More responsive to authority.  More likely to be compliant in response to pressure by authority.  And more likely to be suggestible with exceptions.  But yes, that impacts that age group.

Q.   They're children, right?

A.   They're youth.  Children are younger.  They're teenagers. And teenagers differentiate from children as we understand that in the scientific community.

Q.   Now, everything you just said about 16-year-olds, that can apply to some 18-year-olds, right?

A.   I'm not sure that I understand the question.

Q.   Thank you for telling me that.  I'll try to make it clear.

You just said 16-year-olds are at greater risk of

false confessions because of all the reasons you said. They can be obedient. They can -- you know, they can not understand the situation. Do I need you to --

A. Yeah, I believe you asked me about before 16. I wasn't --

Q. Oh, sorry.

A. -- speaking about -- I think you said 13- and 14-year-olds.

Q. I said before 16.

A. Yes, sir.

Q. Do those things you said also apply to some 18-year-olds?

A. Those things if someone's exceptionally naive, has had very little contact with other criminal peers, has had very little contact in evading the police and familiarity with the criminal justice system, that person may be naive at 18. That person may be naive at older years, also.

So, naivete relates to one's life experience, and that life experience may be well developed, hardened by the time a person is 16 or 17.

Once you get younger, you're talking about a far more smaller subset of people who have had that kind of contact and who would be less naive in interrogation.

Q. I'll try again, and you can tell me "Yes," "No," or, I can't answer?

A. Okay.

Q. What you said about 16 and younger, or younger than 16, that could apply to some 18-year-olds, fair?

Welner - cross

2052

A.   Yes, that's fair, sure.

Q.   All right.  That's an easier way to answer it, isn't it?

          MR. FLYNN:  Objection.  Argumentative.

          THE COURT:  Sustained.

BY MR. LOEVY:

Q.   You have some numbers in your report.  Can you explain to the jury what these reference?  And I'm trying to delete the rest of your report so it's clear that we're not putting your report on the screen.

A.   Oh, I see.  That's right here?

Q.   Yeah.

A.   Well, if I --

Q.   These support your opinion about the distribution, right?

A.   Yeah.  I think those -- I believe -- and if you could, without showing the jury --

Q.   Do you have a copy of your report?

A.   Yeah, that would be very helpful.  Thank you so much.

          Would you like this back or would you like me to keep it up here?

Q.   Keep that.

A.   Okay.

          And what page is this?

Q.   This is Page 29 -- or 28, I believe.  29.

A.   Okay.  I see it.

Q.   See the numbers?

A.   Yes.

Q.   And I think your point is -- because like, let's say, 16-year-olds, there are 26 documented cases in the subset of data you looked at --

A.   Yes.

Q.   -- of false confessions among 16-year-olds.  And there are 26 false confessions among 21-year-olds in this particular subset, right?

A.   You said there are 26.  That's correct.  This is -- and this is referring to the subset of -- this refers to national registry of exonerations database that we've been discussing.

Q.   Now -- so, you're saying because there are just as many 21-year-olds who confessed as there are 16-year-olds, you see no difference.  That's the testimony you gave to Mr. Flynn?

A.   No, that's not my testimony.  What my testimony was, that in this -- these numbers, the distribution, you see we specifically were talking about 30, and we were talking about 35, the 17- and 18-year-olds.  And what I did was I pointed out that there's a crime -- there's a distribution curve of violent crime that's compiled by the Department of Justice Bureau of Statistics -- Justice Statistics.  And it shows that homicide is much more common within the range of 18 to 21.  So, you have much more 18- to 20-year-olds represented in that population.

      So, for there to be 30 false confessions among a much larger population of people being interrogated for said crimes

and then further being -- that includes those who deny and those who confess, that's not remarkable. When you look at age 14 and 15 in the numbers there, even though the numbers are less, 13 and 15, it's much more uncommon under those same statistics for homicides to occur by 14- and 15-year-olds. It's a much less common event.

Q. Let me make sure I understand it, then, because maybe we're talking past each other. But it looks to me like if you got 28 false confessions among 14- and 15-year-olds, if you add them up, and there are 26 among 21-year-olds, you're saying that that's roughly comparable?

A. Well, the numbers are, yeah. When you -- when you --

Q. All right.

A. That's right. That's correct.

Q. So, here's my follow-up question: Isn't it true that there's, by orders of magnitude, far more 21-year-olds being interrogated for murder than there are 13- and 14-year-olds such that the 13- and the 14-year-olds are vastly overrepresented in false confessions? Would you agree?

A. Yeah. They're overrepresented. That's correct.

Q. And, in fact, the 18-year-olds are -- if the 18-year-olds are also interrogated, like a high school kid, far, far less frequently for murder interrogations than, say, a 21-year-old, then 18-year-olds are way overrepresented by the same analysis; wouldn't you agree?

A.   That wasn't my testimony.  My testimony --

Q.   That's my question.

A.   Yeah, that -- that just -- that ignores the violent crime curve that shows that the prevalence of homicide is highest in the 18 to 21 age group.  So, those groups are being interrogated more frequently.

Q.   But you just lumped 18 and 21.  My only question was: Isn't 21 far more likely to be interrogated for homicide?

A.   No, because 18 -- there are more homicides committed by 18-year-olds than there are by 21s in that group.  The peak is in that range, but there are more 18-year-olds even than 21s.

Q.   Let's talk about the length of interrogation.  Could that be a factor in false confessions, long and protracted interrogations?

A.   No.  What my testimony was, it's what happens during the interrogation, not the length.

Q.   So, there's no correlation, in your view, between length of interrogation and false confession?

A.   There's a correlation that I discussed before, that there are a number of false confessions that happened in very lengthy interrogations.

Q.   Well, let me ask you this --

A.   But it's what happened in those hours as opposed to the length itself.

Q.   Do you agree with this statement:  Interrogations of

Welner - cross

2056

several hours have been features of a number of proven false confessions?

A.   I agree with that.

Q.   And in your article, the one that you've got in front of you --

A.   Yes, sir.

Q.   -- the new article, there's a sentence that -- this is on Page 5:   Police interrogation training counsels against interrogations longer than four hours without a confession, except in unusual circumstances.

        Did I read that right?  Longer than four hours without a confession, except in unusual circumstances?

A.   I just need to find it.

Q.   Dead middle of the page, citing Inbau, a study he did in 2012.

A.   I'm just looking for it.

Q.   While you're looking, I'll read it since I garbled it. Police interrogation training --

A.   I see it.

Q.   I'm going to read it for other people's benefit, all right, sir, because I garbled it.

A.   Okay.

Q.   Police interrogation training counsels against interrogations longer than four hours without a confession, except in unusual circumstances.

That is a sentence in your article, correct, sir?

A. Yes. And it's joined with the next sentence, which I would be -- I'd like to be able to add that because --

Q. All right. That's fair. Why don't you do that.

A. It says: The training explains that longer interrogations tie up resources where otherwise needed on questioning that is not likely to yield a confession or useful information.

And that was my testimony yesterday.

Q. That's what you said. After about four hours, you pretty much should stop, go look for other evidence, right?

A. Yes.

Q. After four hours --

A. Except for unusual circumstances.

Q. After four hours, you're wasting your time to keep asking the same question over and over again?

A. You may well be wasting your time, except for unusual circumstances, or exceptional, or whatever word I used.

Q. Now, as far as the length of interrogations, you cited the Cleary paper, right?

A. Yes, I did.

Q. Who is Cleary?

A. Cleary is a social scientist.

Q. And Cleary determined that most interrogations were only a few hours; would you agree with that?

A. Yes, sir.

Welner - cross

2058

Q.   And I'm going to show you a copy of the study, but I'm not -- actually, I'll just ask questions.  Maybe you agree.

Isn't it true that an interrogation of longer than a few hours really is an outlier?

A.   No, actually.  Not on Cleary's study.

What Cleary's study showed was that interrogations -- and she had a study of over 200 people that she questioned who were inmates.  And what they said was that interrogations ranged.  And by the way, she separated custody time from interrogations.  So, this is just interrogation.  An interroga- --

Q.   Are you sure about that?

A.   Yes.

Q.   All right.

MR. LOEVY:  I'd like to publish -- I'd like to move --

BY THE WITNESS:

A.   Show you the data.  Put it -- yeah.

MR. LOEVY:  Excuse me, your Honor.  May I move Plaintiff's 422 into evidence?  It's a copy of the Cleary study that he's referencing.

THE COURT:  Any objection?

MR. FLYNN:  Yes, your Honor.  We object to moving this into evidence.

MR. LOEVY:  I'd like to put it on the screen and show him the language that Cleary -- that he just says -- and is in

his report he said -- it's a footnote in his own report.

MR. FLYNN:  He can show it to the witness, your Honor, but it's not in evidence.

THE COURT:  Yeah, I don't think it's in evidence.  So, you should show it to him and --

MR. LOEVY:  Well, we move --

THE WITNESS:  Your Honor, may I finish my answer?

MR. LOEVY:  -- it into evidence.

We move it into evidence, your Honor.

THE COURT:  There's been an objection, and I'm not inclined to let it into evidence, certainly without seeing it and having a better sense of whether it's admissible evidence.

MR. LOEVY:  Tendering a copy.

THE COURT:  Yes.

(Tendered.)

BY MR. LOEVY:

Q.  Sir, you cite --

MR. LOEVY:  May I ask a question, your Honor?

THE COURT:  Hold on.  There's a lot of moving parts.

MR. LOEVY:  Yeah.  I was going to lay a foundation, your Honor.

THE COURT:  Okay.  Attempt to lay the foundation.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  You cited the Cleary study at Footnote 50 of your report,

correct?

A.   May I finish my last answer?

Q.   Sir, if you'd play by the rules.

THE COURT:  No, you can't, sir.

THE WITNESS:  Okay.

THE COURT:  Thank you.

THE WITNESS:  All right.

BY THE WITNESS:

A.   I cited a study in where?

BY MR. LOEVY:

Q.   Footnote 50 in your report.

A.   My report, okay.  Got it.

MR. LOEVY:  Your Honor, the page in particular was 276, and the second column is where we're going.

THE WITNESS:  Okay.

BY MR. LOEVY:

Q.   All right.  So, you relied on this study in forming your opinions, correct?

A.   It was informative.

Q.   And, in fact, you said in your report that this study proved your point that you're only supposed to count the time when there's questioning, right?

A.   Actually, not Footnote 50.  Footnote 50 is -- that Footnote 50 relates to a different idea in my report.

Q.   Is it your testimony, sir, that you only count the time

when they're talking or you count all custodial time?

A.   My testimony is that custodial time is different from interrogation time, and you count the time in actual interrogation, yes.

Q.   And you cited Cleary for that proposition, correct?

A.   I did.

Q.   All right.

        MR. LOEVY:   Then, your Honor, we'd move Cleary into evidence.

        MR. FLYNN:   We object, your Honor.

        THE COURT:   Mr. Loevy, I'm not inclined to let this document into evidence.  You're welcome to ask him questions about it --

        MR. LOEVY:   All right.

        THE COURT:   -- and impeach him with it or refresh his recollection or whatever you wish to do with it, but I won't admit it.

        MR. LOEVY:   Thank you, your Honor.

BY MR. LOEVY:

Q.   If you turn to Page 276 in the Cleary study that I handed you, sir, and you look at the second column underneath her table --

A.   I'm sorry, but you didn't hand me the Cleary study.

Q.   I thought I did.  I will.

        MR. LOEVY:   May I approach, your Honor?

Welner - cross

2062

THE WITNESS:  Thank you, your Honor.

MR. LOEVY:  I'll send one back to you.

(Tendered.)

BY MR. LOEVY:

Q.  Turn to Page 276.

A.  Yes.

Q.  Second column there, you see it underneath her table?

A.  Second column.

Q.  She says interrogation duration was recorded as the moment when the questioning began until the moment when the conversation concluded and/or the individuals left the room or the video recording was turned off.  That's how they measured it, correct?

A.  Yes.  I don't see it.  I'm still not there.  So, perhaps you could point it to me.

MR. LOEVY:  Can I have the screen up for just the witness, your Honor?

THE COURT:  Yes.

THE WITNESS:  Thank you.

THE COURT:  You should be good to go.

BY THE WITNESS:

A.  I see it.  I see it.

BY MR. LOEVY:

Q.  And, then, she says the median interrogation lasted 46 minutes, correct?

A.   Yes.

Q.   And, then, the shortest lasted six, the longest was four hours and 48 minutes, you agree?

        That's the question pending, sir.  The longest was four hours and --

A.   No, I agree that that's what she writes, but it states else something different in the article.  So, I have to read that whole section.  There's something different about that.

Q.   All right.  Then the next sentence says:  Overall, 68 percent of interrogations concluded in less than an hour, and 84 percent in less than two hours.

        Do you agree that that's what it says?

A.   Yes.

Q.   And that she also in this study -- if you turn to Page 279, the bottom quarter of that page -- you can follow with me on the screen if you like, sir.  She cites -- she surveys other studies, too, right?

A.   Yes, she does.

Q.   And she says in the other studies -- the Feld study, for example, 2013, reported that 90 percent of his juvenile sample concluded in under 30 minutes and the longest was 90 minutes, correct?

A.   That's correct.

Q.   And she cites the Leo study 1996, that 71 percent in his adult sample concluded in under an hour and 92 percent in under

two hours, right?

A.   Yes.

Q.   And the last one is Cassell and Hayman, '96, asked investigators to estimate length for 86 specific interrogations, and they reported the vast majority lasted fewer than 30 minutes, correct?

A.   That's correct.

Q.   And she sort of summarized up here, the median was 46 minutes and the mean was 66 minutes.  Fair?

A.   Yes, sir.

Q.   So, an interrogation of 31 hours is a vast outlier; would you agree?

A.   It's not an interrogation.  She distinguishes between custodial time and actual interrogation.  That's not what she was referring to in this article.

Q.   All right.  Would you agree, though, with the question that an interrogation of 31 hours would be a vast outlier?

A.   Yes, if someone was being interrogated for 31 hours, it would be an outlier.  But she doesn't report custodial time when she lists.

Q.   Well, we went --

A.   So, some of these people may have been in custody for far longer than 31 hours.

Q.   But we did cover that she said that she's measuring until the ERI got turned off, right?  That's what the words on the

piece of paper say, right?

A.   Yeah.  My read of that is that is, according to my answer, that she was measuring interrogation by the time of the interrogation as opposed to custody.

Q.   Of course, she did say until they turned the tape off, right?

A.   I understand.

Q.   All right.  So, length of interrogation, last chance, do you want to say that there is a correlation between interrogations that are outlier long and false confessions; "Yes" or "No"?

          MR. FLYNN:  Objection.  Argumentative.

BY THE WITNESS:

A.   I already testified that --

          THE COURT:  Overruled.  You can answer.

BY MR. LOEVY:

Q.   "Yes," "No," or you want something else?  I got to write something down and I don't want to write down a long answer.

          MR. LOEVY:  Can we have the screen for the jury, please?

BY MR. LOEVY:

Q.   So, "Yes," "No," or tell me something succinct I can write here.

A.   My answer already was that there is a correlation.

Q.   Can I put it down?

Welner - cross

2066

A.   There's not a causation.

Q.   Can I write it down?

A.   Yes, there is a correlation.

Q.   Okay.  How about sleep deprivation?  Can sleep deprivation correlate with false confessions?

A.   Sleep deprivation?

Q.   How about "Yes," "No," or, I can't answer it "Yes," "No"?

A.   No one can answer it because it's not been studied.

Q.   If you can't answer it, you can't answer it, right?

A.   It can't be answered.

Q.   All right.  Since it wasn't clear, let me ask again.

       Do you believe that sleep deprivation can correlate with false confessions; "Yes," "No," or, I can't answer that?

A.   I don't.  I don't believe that it can because sleep deprivation hasn't been noted anywhere in any of the hundreds of disputed confessions and non-disputed confessions that I've ever seen.

Q.   Because --

A.   It doesn't happen.

Q.   Most interrogations don't implicate sleep deprivation because they're over in two hours, right?

A.   No.  I've seen -- I've seen disputed confessions implicate sleep deprivation.  When someone's not deprived of sleep, there is no sleep deprivation.  So, it's just something that doesn't happen in interrogation.

Q.   It doesn't happen in interrogation, does it?

A.   It doesn't happen in police interrogation.

Q.   Because they're over before sleep deprivation to become a factor, right?

A.   No, because sleep deprivation is the active prevention of somebody from falling asleep.  And that doesn't -- that has not happened in the interrogations that I've reviewed, disputed or undisputed.

Q.   All right.  I want to focus on that.  So, the act of disruption of sleeping we'll say --

A.   Active prevention of sleep.

Q.   Say by --

A.   That's different from waking someone up.

Q.   The active prevention of sleeping, I'm going to give you -- waking someone up, leaving the lights on, that can be actively preventing sleeping, right?

A.   Not necessarily.

Q.   But it could be, right?

A.   It depends on how fatigued a person is.

Q.   I'm having trouble why you're drawing a line between actively waking someone up, why that is not depriving them of sleep.  If the person's trying to sleep and you wake them, isn't that your definition of sleep deprivation?

A.   No, it's disrupted sleep.  Sleep deprivation is by every academic and scientific definition the active prevention of a

person from falling asleep.

Q. Why is --

A. When a person's awakened, they may be under-slept, they may be uncomfortable, but it's different from actively preventing the body from being able to restore at all. And it's precisely why a number of sleep professionals have demonstrated the benefits of even short napping. Because people can restore within a fairly short period of time whenever they have been unable to catch up on sleep. It doesn't mean that a person who's awakened is not comfortable. But it's just not sleep deprivation, no matter how the question can be asked.

Q. I'll call it sleep disruption.

A. Fair enough. I can agree with that, sure.

Q. So, is intentional sleep disruption a problem? Is that acceptable?

A. Is it acceptable? It's kind of a moral judgment. I don't know whether --

Q. Well, have you ever seen that as an accepted tactic?

MR. FLYNN: Objection.

BY MR. LOEVY:

Q. Is that an accepted tactic, to intentionally disrupt sleep?

MR. FLYNN: Objection. Argumentative. Outside the scope.

THE COURT: Let me rule.

Overruled. The witness can answer.

Welner - cross

2069

BY THE WITNESS:

A.   I'm not aware of it as a tactic.  I'm not aware of it as a conscious tactic.  I do believe that it's an artifact of extended periods of time, either day or night, that when -- in my experience, lengthy and extensive experience, of watching interrogations, disputed and undisputed, when a person is alone in a room for a long time, invariably many of them go -- many of those individuals go to sleep.  And that's reflected in the Cleary article that you just cited to me, that very language.

     And if then a person's woken up from that sleep, whether it's the nighttime or the daytime, it's disrupted.  But it's not a tactic.  The officer comes in at their own prerogative and they want to talk to the person.

     So, as for whether that's a tactic or not, I'm not aware of that, or even any discussion of that as a tactic, that someone consciously does that in order to have an impact on the suspect and to in some way affect the interrogation.

BY MR. LOEVY:

Q.   That was a long answer, but maybe we agree.  I think what you're saying is intentional sleep disruption should not be part of the police's arsenal.  We agree; "Yes," "No"?

A.   I don't even know that it is.

Q.   But not even a thing, you're saying.  It's like it's unheard of?

A.   It's not even a thing.

Q.   Yeah.

A.   It's not something that I've read about.  It's not something that I've described.  I'm sure there's an outlier in which someone is -- but I would suggest that when that happens, it's probably part of an overall aversive environment when it happens as an intentional exercise by an officer.

Q.   And I think we're a little unclear, but you're saying they shouldn't do that, right?  They shouldn't intentionally disrupt sleep, right?

A.   Look, every -- I think my best answer is it's always prudent to keep someone comfortable under circumstances.  And when a person's sleep is disrupted, they're not going to be as comfortable.

Q.   All right.  Now, you've said that it hasn't been studied, but let me ask you if you agree with Dr. Cutler.  And if you'd give me "Yes," "No," or, I can't answer "Yes," "No."

        Do you agree with Dr. Cutler if you are deprived of sleep, regardless of whether it was intentional, if you are deprived of sleep -- are you following my hypothetical? -- that that does interfere with your thinking and you're reasoning ability?  Do you agree, disagree, or you can't answer that question?

A.   If a person is -- has -- I believe my earlier testimony is that if a person has not slept enough, that a person may be fatigued.  And fatigue can affect a person's thinking and

reasoning. And that that's overwritten by arousal, that when a person is aroused, that that fatigue is no longer operative. So, it relates to how aroused a person is.

Q. I'm going to ask it again. And this time if you say, I can't answer "Yes," "No," you can just tell me that.

A. Okay.

Q. Because it's a fair question.

Do you agree or disagree with Dr. Cutler that if a person is experiencing sleep deprivation, that can interfere with their ability to think and use judgment; "Yes," "No," or you just can't answer that?

A. I think that as you worded it there, I would agree with that.

Q. All right. Would you agree that if someone is sleep deprived, they are less able to exercise that resistance muscle, they're diminished in their ability to resist? Agree, disagree or you just can't answer that?

A. The answer is it depends how long the person is actively sleep --

Q. You can't answer --

A. No, the answer is I can answer it.

Q. Okay, sorry.

A. But it depends how long that person's been sleep deprived. If that person has been sleep deprived for -- if a person's been prevented from sleep -- and this is based on my own

professional experience -- for 36 to -- for 36 hours or so, that's different from a person who's been deprived of sleep and prevented from sleep for 72 hours, absolutely. So, it really depends on duration.

Q. You mentioned Guantanamo yesterday, or was that Dr. Cutler?

A. I think he mentioned it. And I believe that I was asked on direct whether I've consulted in Guantanamo. And I have, yes.

Q. And they intentionally used sleep deprivation, didn't they?

A. They did.

Q. And that's a form of torture, isn't it?

A. It depends on -- it depends on the context in which it's used. And it was used for ways that I am unable to discuss. But it was not used in a form that relates to confession.

However, based on those experiences, there's a rich amount of data to be able to inform the effects of sleep deprivation that I've seen and that I've reviewed.

Q. Do you agree --

A. I know what sleep deprivation looks like.

Q. You've written in your report that fatigue can affect -- no, I'm sorry. Fatigue can reflect the effects of a long interrogation and affect decision making. You stand by that statement?

A. Yes, sir.

Q. So, although it hasn't been studied, would you agree with me that -- actually, I'm going to call it sleep disruption

because I think that's the term you feel more comfortable with.

Can sleep disruption be a factor in false confessions; "Yes," "No," or you can't answer it?

A.   It can't be answered.

Q.   Can't be answered.  Okay.

I'm going to get to not eating.  You would agree with me that resistance is like a muscle.  You know, if you come in and you're fresh, you're able to resist; but over time, you fatigue and you lose your ability to resist, right?

A.   I don't agree.  I think that really simplifies the concept because there are all kinds of intervening points that affect resistance.

Q.   Would you agree with Dr. Cutler, "Yes" or "No," that if you haven't eaten -- even if you were offered food, just if you haven't eaten much -- that that would deplete your self-regulation; "Yes," "No," or you can't answer?

A.   I don't agree --

Q.   You can't answer -- don't --

A.   No, no, I specifically don't agree because a person can be fatigued and, as I pointed out, have fight or flight in a very arousing situation and appetite becomes irrelevant.

Q.   I think you said yesterday that having no food is not something that's been studied because it's not really a thing, right?

A.   Well, I can't say that it's not a thing because, as you

pointed out, or I guess came up in the earlier testimony, there's an article by Kassin that says -- that makes reference to, quote, food deprivation.  But food deprivation is something that just doesn't happen.

There are instances in which people are hungry, that's correct.  But that's not been studied.  But that's to be differentiated from situations in which people don't eat but they're not hungry because they're aroused and they don't have an appetite.

Q.  I think you said, hey, I could testify without eating, right?

A.  Well, it's just -- it's an example --

Q.  Sure.

A.  -- of what happens when you may not have eaten, but because you're aroused, you're not -- your body's not responding to symbols of -- to symptoms of hunger.  And that has everything to do with your sympathetic nervous system and how it works.

When you're activated in fight or flight, your sympathetic nervous system gets aroused and part of that -- it affects many things.  Your pulse goes up.  Your blood pressure goes up.  But your hunger diminishes, and you mobilize yourself cognitively to deal with the task at hand.

And that's why under such circumstances, fight, flight, some people engage what makes them anxious and some people withdraw.

Welner - cross

2075

Q.   Sir, this fight, flight you described, this hyperarousal, we evolve to do that in the face of threats, right?  That's part of the human --

A.   Yes, sir.

Q.   -- human condition.

But it becomes a problem when you are stuck in that hyperaroused fight or flight for too long.  Then you risk collapse; would you agree?

A.   Again, I think for that you'd probably have to consult someone who's much more familiar with duration of --

Q.   You're not an expert?

A.   -- hyperarousal.

Pardon?

Q.   You're not an expert in how long you can be aroused -- I'm sorry, it was a --

A.   I'm not an expert on that.

Q.   You would agree with me, though, that while humans are built to face a very stressful situation by getting hyper-resolved, that there comes a point when you're in overdrive, you're in turbo, but after a while, you do crash, right?

A.   I can --

Q.   You can't stay in hyper turbo drive forever?

A.   Again, it depends on the individual.  Surgeons will conduct surgery for 18 hours and they're aroused constantly.  People in

the military, they don't crash. They have to go and they have to conduct missions. People who are involved in criminal activity that occurs at all hours of the day and night in which they ignore their sleep cycle, they're aroused while they're doing it and it may take quite a long time, and they don't necessarily crash.

So, it really depends on the individual. Some people have a better capacity for sustained hyperarousal than others.

Q. Fair.

Not having nourishment, then; not having food. You said, hey, you've eaten -- haven't eaten. You wouldn't want to do this after having one meal over the course of two days. You wouldn't want to go to battle in court without eating, having food in your stomach, would you?

A. I've probably done it.

Q. All right. Can we write a "Yes" or a "No" between not eating being a factor?

A. It's just not -- no, it's not a factor.

Q. Not a factor. Okay.

How about being cold for a long period of time? Does that wear down your resistance?

A. That's not a factor.

Q. Okay. How about complete social isolation for a long period of time? You know, if someone is cut off from the outside world, they're put into a room where they have no

contact with the outside world, there's no windows, they're just -- everything they get is going through their interrogators. You're familiar with that phenomenon, right?

A. Well, it's -- excuse me. It happens in every interrogation. In the Cleary study that we were talking about, 25 percent -- 25 percent -- of the people studied were in custody for over a day before they were ever even interrogated. So, they had isolation of over a day.

So, it's common to be isolated for a sustained period of time in interrogation and --

Q. You said that over a day --

A. -- and independent of that, in custody. People were isolated in custody.

Q. Let's talk about that "over a day."

MR. LOEVY: Your Honor, I'm going to approach with 422, the other Cleary study cited in Footnote 48 of your report.

(Tendered.)

BY MR. LOEVY:

Q. That over a day --

MR. FLYNN: Do you have a copy, Jon?

MR. LOEVY: Sure.

Your Honor, if I could have the screen again just for the witness?

THE COURT: Yes.

BY MR. LOEVY:

Q. Did you read the Cleary study, sir?

A. Yes.

Q. It's not that most people were interrogated over a day, it's that most people -- or that some portion of respondents, 13 percent, weren't interrogated until after they had been interrogated -- detained for a day, correct?

A. But that's what my testimony was. My testimony was that they were detained for -- there's a large number of people in this study who were detained for over a day before they were even interrogated. So, they were detained. They were isolated. They were detained.

Q. Before the interrogation started?

A. Even started, that's right.

Q. Before it even started.

And, in fact, the Cleary study, if you look at Page 315 on your screen, you know, almost a quarter of them were detained for a week or longer before the interrogation even started?

A. That's right.

Q. So, they might have been in jail for a week and then the interrogation started?

A. That's correct.

Q. That's not the same thing as saying they were put in an interrogation room for a day and then the questions started.

That's not the same thing.

A.   Well, it may be the same thing.  There are variables that could exist.  But my overall point is that isolation is common in custody independent of interrogation.

          MR. LOEVY:  Can we have the document camera back, your Honor?

BY MR. LOEVY:

Q.   So, are we going to put a "Yes," "No," or you can't answer for complete social isolation for prolonged period, that does or does not correlate with wrongful convictions -- confessions, false confessions?

A.   Again, a correlation?  I think that there are false confessions that have been identified in which people were isolated for a long time.  But to my testimony earlier, it depends what happens in that isolation.

Q.   You want to give me a "Yes," "No" or --

A.   No.  The answer is no.

Q.   The answer is no, okay.

          How about not realizing that someone's a suspect.  You talked about that in the article you wrote, didn't you?

A.   Yes.

Q.   If someone doesn't know they're a suspect, that increases the risk of a false confession, correct?

A.   In a coerced internalized case.

Q.   All right.  So, we can put a "Yes" there if someone doesn't

realize they're under arrest, doesn't realize they're a suspect. That could correlate to a false confession?

A. It can -- correlates, depends. It depends on all of the factors of the internalized confession that I spoke to.

Q. I thought you said "Yes" --

A. If they're present --

Q. -- but I'll --

A. -- yes.

Q. -- change it to depends?

A. Depends, yes, please.

Q. All right. How about contamination? That can lead to false confessions, correct? You've been pretty firm on that in your writing?

A. No. It's part of a false confession. It doesn't lead to a false confession because if a person was there, it can't be contaminated. But in cases of false confessions, when a person wasn't there and they gave a false confession, details were filled in on -- that contaminated and made the statement look like a true statement.

But those are in individuals who were not involved and who had no idea what had happened but had their statements contaminated by outside influences.

Q. All right, sir. Do you remember -- this is Page 140 of your deposition --

A. Yes.

Q.   -- Lines 4 through 13.

MR. FLYNN:  One moment.

THE WITNESS:  May I have it, please?

MR. LOEVY:  I'm going to read it to you.

THE WITNESS:  Thank you.

MR. LOEVY:  Your Honor, may I proceed?

THE COURT:  Just giving counsel a moment.

MR. FLYNN:  It's improper impeachment.

MR. LOEVY:  I need another copy so I can show the Judge.

Let me ask the question.  I'll just make it super clear.

BY MR. LOEVY:

Q.  Do you acknowledge that in some false confession cases, contamination has resulted in the context appearing believable, even though it is a false confession.

You would go beyond that, wouldn't you?

A.  Well, I agree with that statement, but I don't know whether I -- when you say go beyond, go beyond in what way?  I agree with that, yes, I do believe -- I do agree with that.

Q.  All right.  Do you remember being asked this question and giving this answer:  "Question --"

MR. FLYNN:  Objection, your Honor.  Improper impeachment.

MR. LOEVY:  He just said he wouldn't go beyond that,

and he expounded at his deposition on that exact thing.

MR. FLYNN: He said he believes it.

MR. LOEVY: Here's a copy, your Honor. Page 140.

(Tendered.)

(Pause.)

THE COURT: The objection is overruled. It's impeaching. He can answer.

MR. LOEVY: Thank you, your Honor.

BY MR. LOEVY:

Q. Do you remember being deposed and giving this answer to this question:

"Question: Is it, to your knowledge, that in some false confession cases, contamination has resulted in confessions appearing believable, even though it is a false confession?

"Answer: Oh, I would go beyond that to say that in most false confessions that are associated with wrongful convictions, that contamination has contributed to those confessions, those confessions not being identified as false until after the conviction. That's what the research has demonstrated, that it was prevalent."

Did you give that answer to that question?

A. Yes, and that's my opinion.

Q. Contamination can be a big problem, right, in false confessions? That's a question. "Yes," "No," or, I can't

answer it?  Can contamination be a big problem in causing false confessions?

A.   No.   Contamination doesn't cause false confessions.   It causes false confessions to be believable, as I pointed out in that testimony.   It doesn't cause the false confessions.   But when contamination happens, the statement that you later look at looks legitimate and believable because contamination happened.

Q.   So, detectives really shouldn't be feeding the information to the suspect, they should be getting it back, right?

A.   That's correct.   But you can't feed information to a suspect who is there.   Contamination causes false confessions to appear believable because they make it look like the person who gave the false confession was there, because otherwise how would they have known that.   But they weren't there.   And that's how they relate to false confessions.

Q.   Not to --

A.   Because the person who wasn't there gave a statement that appeared to be believable because of the contamination.

Q.   Not to argue with you --

A.   So, it's a back-end problem, not a front-end problem.

Q.   Not to argue with you, but a detective can tell someone in a room about what other witnesses are saying, about events that happened before they got there, about what someone they didn't know said.   They can still contaminate even if they were there,

right?

A.   There are a variety of ways in which contamination can occur.

Q.   "Yes," "No," or does it create -- does it contribute to the problem of false confessions, contamination?

A.   I'm going to say no, because it doesn't cause false confessions.

Q.   I didn't say cause.  I said contribute to the problem of false confessions.

A.   Yes, it contributes to the overall problem.

Q.   I think we covered maximization, threats.

     Suggestions of leniency, does that contribute to the overall problem?

A.   Suggestions of leniency do not.  Promises of leniency do.

Q.   How about threats and maximization?

A.   Threats do, and maximization depends.

Q.   Okay.  And lies and trickery?

A.   Limited to false polygraph.

Q.   All right.  So, that's no, except poly.

     How about scarcity?  Do you know what scarcity is?

A.   I do.

Q.   Does that contribute to the problem of false confessions?

A.   No.

Q.   Didn't you in your report suggest that you called it -- yeah, with respect to scarcity, that instilling someone with

the sense of immediacy, like last chance, that that can cause a false confession?

A.   Can we refer to my report?

Q.   This is Page 45.

A.   Yes, sir.

Q.   Second paragraph.

A.   That's not what I wrote in my report.

Q.   Do you --

A.   What I wrote was -- I'll show you what I wrote.

Q.   Second paragraph.  Would you agree that with respect to scarcity, waiting for a state's attorney to decide could distill a sense of immediacy?

A.   Yes.

Q.   All right.

A.   Absolutely.

Q.   All right.  And I think I'm going to just cover a few more topics here.

     Leading questions can contribute to false confessions, correct?

A.   It depends on the -- in an internalized and coerced compliant, it can.

Q.   How about grooming?  You said something yesterday about grooming?

A.   Yes.

Q.   Tell the jury what you meant.

Welner - cross

2086

A.   Grooming is -- grooming occurs within the process of the internalized confession where a suspect distrusts their memory, person wasn't aware of what they were doing because of -- what he or she was doing because he was either asleep or intoxicated or potentially psychotic or just in such acute distress over the nature of the event -- specifically a death -- that one's memory just becomes clouded and within the interrogation setting does not realize that one is a suspect.  And the detective grooms essentially the person who distrusts their memory, can't remember what happened, is naive, doesn't recognize that one is suspected of criminal wrongdoing into slowly adopting details -- well, could it be this, could it be that, could it be the other -- that incriminate a person directly in the crime itself.  And by the end of that grooming -- because for all intents and purposes, it's a grooming that occurs -- the person internalizes the idea that they were the perpetrator.

Q.   And that can be combined with extremely aversive and toxic circumstances, right?

A.   It's not, because --

Q.   It could be, I said.

A.   No, it's not.

Q.   Okay.

A.   It misstates --

Q.   That's sufficient.

A.   -- the internalized.

Q.   It can --

A.   Yeah, it's a completely different scenario.

Q.   Can an interrogation get so aversive and toxic that the suspect confesses just to end the experience as soon as possible, and therefore contributing to a false confession. That can happen, right?

A.   Yes, sir.

Q.   There's no doubt in your mind about that one?

A.   Yes, sir.

Q.   All right.  You were right.  There are some things we agree about.  Look at that.

A.   There's a lot we agree on.

Q.   Well, how about this last one, then:  That you would look at all these things in the totality, you wouldn't look at them in isolation, to decide whether there's a false confession. You'd agree with that right?

A.   No, because there are a lot of things that you mentioned that are irrelevant.

Q.   How about the relevant --

A.   So, I would look at the relevant issues.  You would look at them in their totality.

Q.   How about the relevant ones?  I think you said --

A.   Yes, sir.

Q.   -- the length -- you'd consider them all together and

you --

A.   The length I consider to be irrelevant.

Q.   I'm sorry.  I'm sorry if I misquoted you.  No, I wrote "Yes" on length of interrogation.

A.   No, I said --

Q.   Did I sneak that past you?

A.   -- it depends what happens during the interrogation.  It's not the length itself.  It's what happens during that time.

Q.   All right.  I must have misheard you then when we were going over there "Yes," huh?  Because you seem like a guy who wouldn't let me write "Yes" if you weren't saying "Yes."

MR. FLYNN:  Objection.  Argumentative.

THE COURT:  Sustained.

MR. LOEVY:  I don't have any other questions.

THE COURT:  All right.  Thank you.

Mr. Flynn.

MR. FLYNN:  Your Honor, I'll probably be 15 or 20 minutes if you want to take a break.

THE COURT:  If you're just going to be about 15 minutes, let's go 15 minutes because that means we can take our break at 11:00.

MR. FLYNN:  Sure.

THE COURT:  And it will get Dr. Welner off the stand as opposed to a break.

REDIRECT EXAMINATION

BY MR. FLYNN:

Q.   Hello again, Dr. Welner.

A.   Good morning to you.

Q.   I want to start by asking you some questions about Mr. Loevy's questions yesterday --

A.   Okay.

Q.   -- at the end of the day.

Mr. Loevy began his cross by asking you about the different areas that you're an expert in.  Do you remember that?

A.   Yes, sir.

Q.   Are those all areas that are encompassed within your field of forensic psychiatry?

A.   Yes.  Those are all part of the sub-discipline of forensic psychiatry.

Q.   Mr. Loevy also asked you about the $3 million that your company has made.  Is that money all going into your pocket?

A.   No.  The practice has a number of expenses.  We self-fund research.  We pay taxes.  I have a number of people who work within the practice.  There are many consultants who work in the practice.  Just as attorneys, they're paid for their professional time.

But that's what the practice makes for the cases I work on, plus the cases that other people work on.

Q.   And I think you were getting into this a little bit this

Welner - redirect

2090

morning.  If you took other cases more than you take cases like this one, you would actually make more money?

A.   That's correct.

Q.   And with respect to your research and publications, do you get paid for any of that work?

A.   No.

Q.   Mr. Loevy was just asking you about scarcity.  Is scarcity interchangable with coercion?

A.   No.

Q.   Would you explain?

A.   Scarcity only refers to -- scarcity has more to do with arousal, actually.  Scarcity is recognition that there is a limited time in which one has to act.

And, again, it's a very common experience that people have well beyond interrogation.  For a limited time only.  Black Friday.  Okay?  An opportunity.  There's one spot left in this class.  Do you want to sign up for this class?

So, it's the closing window.

Am I going to go to the Cubs game tonight or not?  It starts at 6:45.  If I don't leave now, I'm not going to beat traffic.  It's done.  I have to make that decision.

So, scarcity refers to the urgency with which one has to decide what one's going to do because a window is closing.  Either I do this or I do that, and I have to make a decision at this point that I can no longer delay.

Welner - redirect

2091

Coercion is when a person -- it's actually the opposite because coercion relates to a person's inability to make a decision. You're going to the Cubs game. You have no choice. You're in the car and I'm taking you. Whether you're -- you know, I don't care if you're a Yankee fan. Or you're going to buy this.

Q. Understood.

A. So -- but scarcity is make a decision. You make a decision because you only have a limited time in which -- after which you're not going to have that opportunity to make that decision because, you know, time's up.

Q. Mr. Loevy also asked you some questions about contamination. I think there's some misunderstanding about what exactly contamination is. Could you define it, describe it?

A. Yes. Contamination, as it relates to interrogation settings, are when an interrogation occurs and a person is unable to provide details of what they're being questioned about, whether it's a witness or a suspect, but by virtue of what they pick up, either from a questioning detective or information that might otherwise be available to them, media accounts, word on the street.

There's a famous movie, *The Usual Suspects,* in which Keyser Soze pulls up information right -- or Keyser Soze's name is right up on a board. That's contamination. It's extraneous

detail that's pulled in that a suspect did not know that then gets embedded into the narrative. That's what it is.

Q. Okay. So, contamination is about events that the suspect couldn't have known happened?

A. That's correct. Contamination fills the gap for a person who wasn't there and can't answer a question.

Q. And with respect to contamination in the false confession context and research into this, is it situations where the suspect was not even at the scene and then was given information about the scene --

A. That's correct.

Q. -- that then corroborated the false confession?

A. That's correct. These are situations in which someone falsely confessed to a crime that they did not commit and they didn't commit it and they weren't even there. They were the wrong person who had been ultimately prosecuted.

But they gave a statement that was convincing because there were details that would be persuasive to anyone in this room that they were there, and that, by virtue of being there, also corroborated or supported the idea that they did what they said they did in there. But without the contamination, they wouldn't have been able to make those kinds of statements.

Q. Understood. Okay.

Mr. Loevy also asked you about age and how that may be a factor. I believe you told me already that it's below 16,

and then you told Mr. Loevy below 16 it can be a factor but not at 18?

A.   Correct.

Q.   Mr. Loevy showed you those numbers.  I won't bore everybody with them again.  But I believe what you were saying is that the numbers are higher at 18 because more 18-year-olds are committing murder, correct?

A.   That's correct.

Q.   I just want to make sure that's clear.

A.   And what I testified to yesterday is more 18-year-olds are being interrogated, either because they're suspects who get cleared or suspects who are not, because these murders are happening in the context of their age group and they are questioned among other people who are peers who could potentially be suspects, as well.

Q.   Mr. Loevy also asked you questions about someone's naivete. Could you talk about what factors go into looking at that factor?

A.   Well, someone who is more naive is someone who has had no contact with the criminal justice system, no exposure to peers who may themselves be -- for which criminality may be more of a part of their lifestyle, whether they're in gangs or whether they have otherwise offended or broken the law before.  Nobody in their family who may have had experiences with police officers or themselves have not interacted with police officers

in questioning.

So, essentially, people who have had very little exposure to criminal activity and how people who are participating in criminal activity want to avoid the police, want to avoid disclosure to the police and why, or their own experience from directly having contact with police who would be holding them accountable if they convey all details.

Q.  Understood.

Mr. Loevy asked you some questions about aversive and toxic interrogation environments.  Do you remember that?

A.  Yes.

Q.  If an interrogator is giving the suspect comforts like blankets and warming up their food and giving them mints, is that indication to you that it's not an aversive and toxic environment?

A.  Yes.  It's the exact opposite.  And a toxic -- yeah.

Q.  And if a situation where the suspect is actively trying to speak to the interrogators and bring them back into the room, is that an indication to you it's not an aversive and toxic environment?

A.  Yes, that's correct.

Q.  I want to ask you some questions about the length of interrogation.  And I just want to make sure this is clear. What is the difference between custodial time, custodial detention versus an interrogation?

A.   Okay.  Custodial time is the amount of time a person is in custody from the time they've been taken in by police and put in some -- whatever area from which they don't leave until there's some question of whether they're going to be charged and held or released.  That's -- within that, within that, there are encounters that police will have with that individual to ask them questions.  And that's an interrogation.

Q.   So, in these studies that Mr. Loevy discussed with you, and we talked about some yesterday, when they're talking about the length of interrogation, are they referring to interrogators being in the room asking questions?

A.   They're talking about interrogators being in the room asking questions.

Q.   I believe he also asked you about the Cleary study that said that for interrogations under that definition, they usually go -- or they can go up to four hours except for unusual circumstances, right?

A.   Well, that was that study.  But Cleary had another study which I've already cited to in which the interrogations ranged from a half hour to 12 hours, and we've discussed that study here, as well.  So, in that sample of her 57, the interrogations ranged up until 4 -- what is it, 4:45 in that sample of 57.  In the sample of over 200, they ranged half hour to 12 hours.

Q.   So, Mr. Loevy asked you a question about a 31-hour

interrogation. You were referring to -- it was a hypothetical. That would be a situation where there's an interrogator in the room asking him questions for 31 hours?

A. That's correct.

Q. You ever seen a case like that?

A. I have.

Q. Really?

A. Yeah.

Q. We won't get into that.

If someone is left alone in the room for several hours with the lights off, is that an indication that there's no sleep deprivation?

A. Please ask the question again.

Q. Sure.

If someone is left alone in a room with the lights off for several hours, is that an indication that there's no sleep deprivation?

A. Yes, because there's no active effort to prevent that person from sleeping. And, in fact, if the lights are off, it only facilitates the possibility that a person will go to sleep.

Q. And in your experience and the research that we've discussed, when sleep deprivation is discussed, are those situations like having loud music playing for hours and hours on end?

A. Yes, sir.

Q. You said on cross-examination that fatigue is different than sleep deprivation, and that fatigue can affect judgment. But can fatigue affect one's voluntariness?

A. No.

Q. And, then, Mr. Loevy also asked you questions about food deprivation. Do you remember that?

If someone literally has food on their lap while they're making admissions, is that an indication that they are not deprived of food?

A. No.

MR. LOEVY: Objection. Leading.

BY THE WITNESS:

A. It's an indication that they choose not to eat.

THE COURT: I didn't hear the objection, Mr. Loevy.

MR. LOEVY: Leading and -- leading.

THE COURT: Sustained as to leading.

You can re-ask your question.

BY MR. FLYNN:

Q. Dr. Welner, what's an indication that somebody is not food deprived while they're making admissions?

A. If the person has food available to them and chooses not to eat.

MR. FLYNN: Nothing further, your Honor. Thank you.

THE COURT: Thank you.

2098

Mr. Loevy, anything based on that?

MR. LOEVY:  No, your Honor.

THE COURT:  All right.  Dr. Welner, you are excused. You may step down.

(Witness excused.)

THE COURT:  Ladies and gentlemen, we're going to take our morning break.  It's about -- it's a few minutes to 11:00. Please don't discuss the case.  And we'll be back ready to go at ten minutes after 11:00.

All rise.

(Jury out.)

THE COURT:  You may be seated.

Just briefly on scheduling.  So, we'll be back in about ten after 11:00.  Defendant is going to call Cichon.

MR. FLYNN:  Yes, your Honor.

THE COURT:  About how long do you anticipate that direct?

MR. FORD:  Half an hour, your Honor.

THE COURT:  Okay.  Obviously, there will be some cross and redirect.

And, then, after that, are we moving to -- what are we moving to?

MR. LOEVY:  We probably should take a lunch break so we can work on the stips together and see how we do.

THE COURT:  Okay.

MR. LOEVY:  That would be my suggestion.

MR. GIBBONS:  I think there are three stips we've got to discuss.  The ME, the evidence tech, and the ASA.  And I'm hopeful.

THE COURT:  Yeah.  So, I'm happy to take the lunch break and even give everyone a touch longer if we think we can work out some materials that when they return, we're sort of off to finish things up.  But I just want to be sure that I'm clear with defense.

Who are the other witnesses beyond Cichon or what other testimony, stips aside, are you looking to present, just so I have a sense of the day?

MR. FLYNN:  If we're able to agree on stips, it would just be Ocampo.

THE COURT:  Okay.  And is it the parties' preference to just get through Cichon and give them a lunch break and then do everything else we have to do after --

MR. FLYNN:  Yes.

THE COURT:  -- including Ocampo?  Okay.  Great.

So, we'll do that.  Hopefully that will take us to maybe 12:00, 12:15-ish, depending how long you need for cross if he's a 30-minute direct.  If it's sooner than that, great.  That's fine.  But we'll take it from there.

MR. LOEVY:  Your Honor, if we --

MR. GIBBONS:  Go ahead, Jon.

2100

MR. LOEVY:  If it's like 11:30 or so, maybe we should start on Ocampo and not kill the time.

MR. FLYNN:  I think we're coming back at 11:10; is that right?

We're going to still be in our direct at 11:30.

MR. LOEVY:  Oh, then I'm off on the time.

THE COURT:  Right.

MR. LOEVY:  I'm off by an hour.

THE COURT:  Yeah, it will take at least a half an hour -- hopefully just a half an hour -- just for the direct.  I'm sure you'll have some cross.  We'll be super close to --

MR. LOEVY:  I'm off by an hour, your Honor.  I'm sorry.

THE COURT:  That's okay.

Okay.  See you all in --

MR. GIBBONS:  Your Honor, the only other thing is I've got to leave at 3:30.  I know I've talked about this several times.  And I really don't want to do that in the presence of the jury.

THE COURT:  Of course.

MR. GIBBONS:  The jury instructions, the team can handle.  But the appearance of it would not look good, and I don't want to do that.

THE COURT:  Absolutely.  If we get to a point where it's approaching even 3:30, even before that, I'm happy to just

take a break that will allow you to just step away. And perhaps they won't even notice. We don't need to bring it to their attention, unless you want me to raise it. I don't think you do. But we'll just be mindful to take break well in advance of 3:30 so that you can --

MR. GIBBONS: A 3:30 break would be great. I mean, I can scoot at 3:30 and I don't look like I'm walking out of the courtroom.

THE COURT: We'll make sure there's a break time so that you can do that without being a distraction.

MR. GIBBONS: Thank you, your Honor.

THE COURT: Okay. See you in ten minutes.

(Recess from 11:00 a.m., until 11:10 a.m.)

THE COURT: Good morning. Can we get our last witness on the witness stand?

(Jury in.)

THE COURT: You may be seated.

The defense may call its next witness.

MR. FORD: The defense calls Dr. Mark Cichon.

THE COURT: Sir, I'm going to have you raise your right hand and have my clerk swear you in.

THE LAW CLERK: State your name for the record.

THE WITNESS: My name is Mark Cichon.

(Witness sworn.)

THE COURT: Mr. Ford, you may inquire.

MR. FORD:  Thank you, Judge.

MARK CICHON, DEFENDANTS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. FORD:

Q.  Good morning.

A.  Good morning.

Q.  Can you introduce yourself again to the jury, please?

A.  Sure.  My name is Mark, M-a-r-k, E., Cichon, C-i-c-h-o-n.

Q.  Dr. Cichon, what's your profession?

A.  I am a emergency medicine physician.

Q.  Do you have a medical degree?

A.  I do.

Q.  From what institution?

A.  From Chicago College of Osteopathic Medicine.

Q.  What year did you get that degree?

A.  1985.

Q.  Are you licensed to practice medicine?

A.  I am.

Q.  Where and when did you get a license?

A.  1986 in Illinois.

Q.  What is your practice area?

A.  My practice area, my specialty is emergency medicine.

Q.  Can you just give us a brief explanation of what that is?

A.  Sure.  Acute care, episodic care in the emergency department.  In addition, I teach.  I do a little bit of

Cichon - direct

2103

research.  And I oversee pre-hospital paramedic program for Loyola.  And I also oversee the helicopter program for what's called LifeStar, which is a critical care ambulance.

Q.  Are you board certified?

A.  I am.

Q.  What year did you obtain board certification?

A.  March of 1991.

Q.  And you just touched on it a little bit, but can you please tell the jury a little bit more about your work experience?

A.  Sure.  39 years as an emergency medicine physician practicing, for the most part, 36 years in trauma centers, three years in a small community hospital, overseeing care in the emergency department.  Just retired as the chairman of the department.  I teach at the medical school.  I teach and run -- oversee the medical direction of the paramedic program, as well.

Q.  And are you -- I believe you might have mentioned it -- an Air Methods Corporation Joliet LifeStar transport program --

A.  Yes.

Q.  -- are you involved with that?

Can you explain what that is?

A.  Sure.  LifeStar is a helicopter program.  Air Methods owns it.  And I am the medical director for the last 20 years at the LifeStar program that's based now in Joliet.

Q.  While on the positions you just discussed, have you gained

any experience of treating patients with gunshot wounds?

A.   I have.

Q.   Has your experience included treating patients specifically with gunshot wounds to the chest area?

A.   It has.

Q.   And have you any experience with treating patients with gunshot wounds who ultimately die?

A.   Unfortunately, some do, both in the emergency department, as well as in transport in the helicopter.

Q.   You mentioned some of the positions you have as a teacher?

A.   Correct.

Q.   Are you also an instructor of any courses?

A.   I am.  I'm -- the advanced trauma life support course is a course that I've been involved with since residency, first as a provider, then as an instructor, and then finally as an instructor for other instructors, for the care of trauma patients in what we call the golden hour, the first hour of care.

Q.   When you say "trauma patients," can you explain briefly what kind of patients those are?

A.   Trauma can cover penetrating, blunt trauma.  Falls, shootings, stabbings, motor vehicle collisions.  Anything acute, high velocity, high probability of internal injuries as a result of trauma.

Q.   The positions you just discussed as a teacher and

Cichon - direct

2105

instructor, in those positions, any of them, do you instruct on things that relate to treating patients with gunshot wounds?

A.   Part of that is, both in the clinical setting in the emergency department, in the classroom setting for the sophomore medical students at Stritch, and also in our community work where we have like Stop the Bleed Programs and, for pre-hospital and first responders, the Tourniquet Program that we've been instructing on for the last five, six years.

Q.   And just briefly, you mentioned Stop the Bleed Program and Tourniquet Program.  Can you give just a general -- very general overview of what does that mean, what's that about?

A.   So, we realize that many times, especially with trauma, penetrating trauma, whether it's knife, dismemberment from motor vehicle accidents or shootings, that the initial people on the scene may be lay people.  It may be a store owner, a community member, or it may be the first responder, meaning a policeman that pulls up.  So, we went ahead and started training, through some grants and research, tourniquets, applications of tourniquets, applications of the Stop the Bleed Program, which is packing wounds, knowing where to pack wounds, how to pack wounds in order to stop blood loss.

Q.   Thank you.

       Last background question:  Do you do any research?

A.   I do.

Q.   Does any of your research relate to gunshot wounds?

Cichon - direct

2106

A.   It has through the grants and the work we did like with the Tourniquet Program, Narcan Program, and Stop the Bleed Programs.

Q.   Okay.  Now I'd like to move to a different area.

Were you asked by counsel for detectives to provide expert opinions relating to this case?

A.   I was.

Q.   And, generally speaking, this relates to the death of a 19-year-old man named Paris Jackson?

A.   Yes, sir.

Q.   Specifically, were you asked to rebut certain opinions offered by one of plaintiff's experts?

A.   I was asked to review and provide my opinions, correct.

Q.   And sort of generally at a high level, what were you asked to evaluate and form an opinion on, the subject areas, if you will?

A.   The subject areas was the magnitude of the injury, the probability that there would be external bleeding from this, the probability of motor function and ability to ambulate following something like this, the wounds experienced, and then finally whether the possibility existed that upon finding the body on the grate, that there would have been some control of the bleeding.

Q.   Just to follow up on the third area, you said the word "ambulate."  Can you explain what "ambulate" means?

A.   Ambulate is the ability to move, motor function in a coordinated manner.  Getting up, walking in and out.  Once I get up and walk out from the stand, that's ambulating, the actual act of moving.

Q.   Thank you.

So, before we get into those opinions, I want to ask, do you do this work for free?

A.   I do not.

Q.   You're being paid for your work on this case?

A.   Being paid for my time, correct.

Q.   How much do you charge?

A.   Basically, $400 an hour.

Q.   Now, this type of work, you know, being an expert witness today, is that your primary source of income?

A.   No.  My primary source of income is still medicine, practice of medicine.  So, this constitutes maybe about 12 to 15 percent of my income.

Q.   Does the fact that you're being paid by our side, counsel for the detectives, as opposed to the plaintiff, have any effect on the substance of your opinions in this case?

A.   It does not.  I've done work for both.

Q.   You guessed my next question.  In the course of doing this sort of work, have you been retained by both plaintiffs and defendants in cases?

A.   I have.

Q. You do not work exclusively for defendants?

A. No. You have to be fair.

Q. Have you ever served as an expert witness on behalf of Chicago police detectives before?

A. I have not.

Q. How about more generally, have you ever served as an expert witness for the Chicago Police Department?

A. I have not.

Q. And last thing, have you ever served as an expert witness for our legal team that's representing the defendant detectives?

A. I have not.

Q. Okay. Back to your opinions.

Now, do you rely on -- have you relied on any materials to form the opinions that you have about this case?

A. A specific article, no. It's based on basically 39 years of training, teaching, clinical experience, what I've experienced in the emergency department, and through my years of training and working in courses, picking up -- reading articles, textbooks, and so forth, through the years.

Q. Got it. So, you rely on that experience and what you just said.

And did you also review any materials related to this case --

A. I --

Cichon - direct

2109

Q.   -- that you used to form opinions?

A.   I did.

Q.   What -- can you describe what materials you relied on?

A.   Sure.  I reviewed the medical examiner's autopsy report, the medical examiner's report, the toxicology report, the deposition of the medical examiner, the -- Dr. Arden's report and Dr. Arden's deposition, and then the crime scene photos that I was able to see.

Q.   Did you also have a chance to review the testimony that Dr. Arden provided in this trial?

A.   I did.

Q.   That makes -- because you're rebutting his opinions, correct?

A.   Correct.

Q.   Okay.  Now to the opinions.

        Based on your review of the materials in this case, did you learn about the injury that ultimately caused Paris Jackson's death in August of 2008?

A.   I did.

Q.   Can you describe the injury to the jury, please?

A.   The injury was a gunshot wound that went from the left chest exiting -- post in the back, and exited on the right chest in the area of the front.

        And in that process, the bullet transected a portion of the left lung, fractured some ribs, and also went through or

Cichon - direct

2110

transected the pulmonary artery, the left ventricle -- I'm sorry, the right atrium, and a coronary artery.

Q.   Did it also -- you described the effects to the place it hit in the heart.  Did it also impact any other organs in Paris Jackson's body?

A.   I think I mentioned it broke some ribs, went through the skin, went through muscle, obviously, adipose or fat tissue, going through -- from entrance to exit, and the major vessels in the center of the chest cavity.

Q.   And based on your, you know, lengthy experience, can you describe the effects of an injury like this?

A.   Sure.  The biggest effect is the transection of the bullet through what we call the mediastinum.  And that's the center cavity of the heart -- the center cavity of the chest.

When you look at the chest, behind the sternum, which is the breast bone here, is what we call the mediastinum.  That is the area that's demarked, it contains the heart, the major vessels, the esophagus, nerves that go from the brain down to the diaphragm, the vagus nerve, and tissue in that area.

And when it was transected, it cut through or cut the pulmonary artery.  The pulmonary artery is that artery that comes out of the right ventricle that goes to the lungs.  It takes unoxygenated blood going to the lungs and then the lungs oxygenate it and return it back to the heart through the pulmonary vein.  That is what we in medicine call a low

pressure system.  And what I mean by that is the right ventricle is low pressure.  The left ventricle is high pressure because it circulates the blood through the body.

So, when it's transected, it caused bleeding to occur. When it cut the lung, it also caused bleeding to occur.  And when it went through the left atrium, which is -- or the right atrium, I'm sorry, the right atrium -- it's a low pressure system, it caused blood to go into the area around the heart, which is called the pericardial sac.

Now, this sac is fibrous.  It doesn't stretch much. In fact, it only stretches for a little bit and then any additional blood in that cavity will compress the heart.  It strangles the heart.  So, with each successive heartbeat, more blood is going into that area and is slowly, progressively choking the heart so it can't circulate blood into the periphery.

Q.  Does that filling of the -- the effects you described, does that have a technical term for it?

A.  We call it pericardial tamponade.  And it's a process that unfortunately was very quick.  And it caused Mr. Paris to succumb to those injuries.

Q.  Now, would this injury have caused Mr. Jackson -- would it have had any effect on his level of consciousness?

A.  Yes.  Because each time the -- well, the bleeding will cause the decreased blood to be perfused.  The pericardial

Cichon - direct

2112

tamponade will cause the heart to start to not pump adequately. And, then, the other area was the coronary artery that was cut. And that's the blood supply to the heart muscle itself. When you have someone who's having a heart attack, it's a blockage of the coronary arteries, and then the muscle doesn't function properly.

So, progressively, and over a short period of time, it's going to cause decreased perfusion to the brain, which will cause an alteration in function of the body and ability to ambulate. And if you were to see it from the outside, would look like someone staggering as they're walking because they're losing the ability to function appropriately.

Q. So, now I'd like to move specifically to the topic of bleeding from the injury.

So, in reviewing Dr. Arden's testimony, do you recall if he had any opinions about the amount of blood found at the scene?

A. As I understood his testimony, he said that there was not a lot of blood for this kind of injury at the scene.

Q. So, would Mr. Jackson's injuries have caused any bleeding?

A. Yes, it would cause bleeding, as we saw in the autopsy and on the photos from the autopsy and medical examiner.

Q. So, drawing on your experience and your medical training and, you know, your experience treating traumatic injuries like this, can you explain the bleeding that's caused by, you know,

the injury like Mr. Jackson suffered?

A.   Yeah.   So, when the vessel's cut, blood's going to start to leak out into the mediastinum.   When the atrium was cut by the bullet, blood is going to start going more into the pericardial sac, as well.   And, then, the lung itself gets violated. There's going to be bleeding occurring from that, as well.

Q.   So, three sources of bleeding there?

A.   Yes.

Q.   I'd like to talk about that first category of bleeding. Now, would that be strictly internal bleeding or external bleeding?   Can you explain the nature of it a little bit more?

A.   All of this is going to be internal to the point where -- especially in the pericardial sac, where it's filling that sac. It doesn't extrude or come out externally from that.

      The pulmonary vessel, it's a low oozing of blood. It's not the high kind of squirting like you see in Hollywood. This would be oozing of blood.   And that's going to collect both in the lung, as well as some leakage out.

      And, then, the third area, the coronary artery, is going to also be violated in that pericardial sac.

Q.   So, sticking with the internal bleeding right now, based on your review of the autopsy performed in this case, do you recall the amount of internal blood loss that was observed?

A.   They found in the base of the lung probably like 500 cc's, so like half a liter of blood.   They found in the pericardial

sac, my understanding, in the area of about 120 cc's of blood. So, a little bit more than -- what would that be?  Kind of a pint, little bit more than a pint of blood.

Q.   Do you remember there being any blood in or around the lungs that was noted?

A.   There was in the lung -- in the chest cavity, there was, as well as in the lungs.

And, then, also there was some aspiration, meaning that when the lung was cut, probably blood came up through the bronchus and then was inhaled.  So, an aspiration or inhaling of the bloody fluid.

Q.   So, that's the internal bleeding.  Now I'd like to talk about any external bleeding.

Based on your review of the case materials, did Mr. Jackson's injuries cause him to bleed externally or outside the body?

A.   Yes.

Q.   And I think you might have touched this.  Based on your, you know, experience, would Mr. Jackson's injuries have caused him to spurt blood externally?

A.   No.  Typically, this is a low pressure system that gets violated.  So, it's going to be more of an oozing out.  Plus, all the tissue that's surrounding the area.  What do I mean by that?  You got muscle, you got fat, you got skin.  Inside these compartments in the chest cavity, the mediastinum itself has

fascia that goes up and down. Around the vessels there might be fat, there might be tissue, there might be -- kind of the gristle when you're pulling chicken apart, that's kind of the same thing in the human body, is the best example. But that contains blood and it prevents it from this kind of spurting out.

Q. And what, if any, effect did the injury have on Mr. Jackson's overall blood pressure?

A. Well, obviously, his pressure is going to be dropping, both from some of it being the loss of blood, which is not going to be as much as the pericardial or the strangulation of his heart; is going to cause a progressive decrease in blood pressure and a progressive decrease in perfusion then to the rest of the body, including the brain.

Q. And is there, generally speaking, based on your experience, a relationship between a person's blood pressure and the amount of external bleeding you'd see from an injury?

A. As pressure goes down, there would be less and less external bleeding, as well.

Q. Now, in reviewing the materials in this case, did you see any evidence of external bleeding?

A. Yes, there was.

Q. I'd like to show you a photo -- actually, two photos. They've already been admitted into evidence.

Can I have the document camera, please, your Honor?

THE COURT:  Certainly.

BY MR. FORD:

Q.  So, Dr. Cichon, I'd like to show you what has been marked already as Plaintiff's Exhibit 318.17.  Dr. Cichon, have you seen this photo?

A.  I have.  This is the T-shirt that was right up against the victim.

Q.  And do you see evidence of what would be external bleeding from the injury?

A.  This is all -- this is all blood.  And this looks like it might be even more concentrated areas of blood.

Q.  You see evidence of clotting?

A.  This looks like -- this area in here, in here, as well as here, looks like it could be clotted blood or blood that may have been pushed up against for a period of time.

I mean, it's a young individual.  He's not on blood thinners like a cardiac patient would be.  So, blood is going to clot in a routine, in a normal time period.

Q.  I'd like to show you another photo, also in evidence.  It's been previously marked as Plaintiff's Exhibit 318.16.

Let me clear it.  I got you.

A.  You got that.  Thank you.  Sorry.

Q.  No problem.

Dr. Cichon, do you recognize this photo?

A.  So, this is the shirt that was external or the outside

shirt over the T-shirt.

Q. Got it.

And do you see more blood on that shirt?

A. Yeah. When you look -- what did I do? Sorry.

This area right in through here, it's more blood.

Q. Okay. I'd also like to talk now about some blood spots. I got a couple more photos.

Based on your review of the case materials and Dr. Arden's testimony, do you recall evidence of three areas of blood spots at the crime scene?

A. Correct.

Q. I'm showing you what's been admitted into evidence as Plaintiff's Exhibit 41.56.

Dr. Cichon, have you seen this photo before?

A. I have.

Q. And can you, you know -- do you see where the two areas of blood were found at the scene?

A. Both by these markers here, 5 and marker 6, there's areas of what is ultimately found to be blood.

Q. Okay. And one more photo. It's been marked previously as Plaintiff's Exhibit 41.55. Have you seen this photo before?

A. Yes.

Q. And is that the third area of blood --

A. Yes.

Q. -- that you recall?

A.   Around the marker there, that was also found to be blood.

Q.   Okay.  Dr. Cichon, based on your medical training and experience and your review of the materials in this case, would you expect to see more external bleeding from an injury like this than the blood found on, you know, the shirts and the spots on the ground we're looking at?

A.   In my experience, no.  Patients coming in with these types of injuries or this type of injury to the center of the chest who is losing pressure quickly is not going to be flowing blood out.  It's going to be contained in an area and it's not going to be -- because of the time frame involved, it's not going to be pouring and dripping all over.

Q.   Now I'd like to talk about specifically blood in another location.  Do you recall Paris Jackson's -- where Paris Jackson's body was found?

A.   Yes.

Q.   Can you just describe where that was?

A.   So, as you saw in the other photo, his body was found on a grate.

Q.   After reviewing Dr. Arden's testimony, do you recall Dr. Arden's opinion that Mr. Jackson's body was placed on the grate?

A.   Yes.

Q.   Do you recall that Dr. Arden 's opinion rested in part on his observation of a lack of blood underneath the grate?

Cichon - direct

2119

A.   Correct.

Q.   Do you agree with Dr. Arden's opinion?

A.   I respectfully disagree with that.

Q.   And I'd like to show you one photo that's also been previously admitted.  It's Plaintiff's Exhibit 41.60.

Dr. Cichon, using this photo, can you explain your answer as to why you disagree with Dr. Arden?

A.   Well, couple things.  As you can see on this grate, it's not flat.  It's kind of -- has a little bit of a slope to it, which would cause blood to kind of pool in the lower aspects of the chest cavity.

Two, victim is laying on the grate on his clothing.  And I think that one of the other crime scene photos shows that when they turn him over, the grate itself is resting right on that area of the wound, which coincides with what we teach in Stop the Bleed, and that's to put something up against and hold pressure at.  And that's why I wouldn't expect to see a lot of bleeding.

Q.   I'm going to -- since you brought it up, another photo admitted as Plaintiff's Exhibit 318.2.

Dr. Cichon, have you seen this photo before?

A.   I have.

Q.   Let's see if it will focus.

I believe you were just talking about, you know, the pressure applied by the grate.  Can you use this photo and

explain a little bit more about what you mean?

A.   So, when you see obviously the shirt was lifted but in the area of the wound, it's -- there's a mark there so -- and a mark here.  I think even here, like in this area.  Sorry.

But that would coincide with resting on the grate. And the weight of the victim on the grate on his shirt, his clothing, that's also putting pressure and sealing -- trying to put some sealing on the wound, much like we teach in Stop the Bleed Program.  Grab something, hold pressure on it, and move along until EMS arrives.

Q.   I'm going to put this photo up one more time.  It was just up, Plaintiff's Exhibit 41.60.

Did you explain, does the positioning of his body and the elevation of his chest have any effect on external bleeding you want to see?

A.   Yes.

Q.   You expect to see?

A.   Because at this point, obviously if he had collapsed onto the grate, the blood pressure was such that it's not pumping anymore.

Two, gravity does have an effect on how a person's lying.  And if you look topographically from the side, his head is higher than his feet.  In the emergency department, it would be what we call like a reverse Trendelenburg or just someone with the carc (phonetic) higher, kind of like when we get a

Cichon - direct

2121

chest X-ray of someone in the emergency department, it's not flat. We have them sit up. And what that does then is it gives us an idea of fluid that may collect in the lung cavity.

So, if someone, say, for heart failure comes in, we get that chest X-ray and we look at it, we could tell if there's fluid in the lungs by some of the obliteration of typical landmarks of a chest X-ray.

So, much like that, gravity will fall. And it was actually, I think, I believe found on autopsy. There was 500 cc's or ml's of blood in the chest cavity.

Q. So, based on everything you just told us, would you expect to see any additional blood accumulated under the grate?

A. Not necessarily, no.

Q. Okay. I think this is the last area I wanted to ask you about, and that's the area of consciousness, which you talked about a little bit before.

You explained -- I don't want to make you repeat it -- that Mr. Jackson, you'd expect him to lose consciousness from this injury. Based on your training and treating injuries like this, do you have any opinion as to how long the process would take from when Mr. Jackson was shot to when he would lose consciousness?

A. I would agree with what Dr. Arden said, and that was anywhere 15 to 30 to even 45 seconds, because each progressive beat of the heart is going to cause more blood to kind of spurt

Cichon - direct

2122

out into that pericardial sac. So, as that progressive beating of the heart -- what does it take? You know, 15 seconds. It may be -- if you look at someone in that kind of a state, a fight or flight response, their heart rate might get up to a hundred. So, you're looking at 15, 20 beats of the heart and that's all filling in that sac, eventually being choked more and more and more, decreasing perfusion to the brain, which provides coordination of all the muscles and all the other functions of the body.

Q. And do you have an opinion about whether or not during that time period between when he's injured and when he loses consciousness Mr. Jackson would have been able to ambulate --

A. Yes.

Q. -- move?

What's your opinion?

A. My opinion on that is he would be able to sustain ambulation, getting progressively slower during the process of decreasing perfusion to his brain. Kind of like, you know, you're going, you're going, you're going and you're slowly being more and more and more discoordinated, unable to function in a unified, straightforward manner.

Q. I'd like to show you one other photo that's already been admitted into evidence. It's Plaintiff's Exhibit 41.52. Zooming out.

Dr. Cichon, have you seen this photo?

A.   I have.

Q.   Do you see evidence marker 4?

A.   I do.

Q.   That's -- do you recall seeing another photo of evidence marker 4?

A.   The previous one showed the blood spurt, and then the other ones are, I guess, for lack of a better term, kind of around the corner from the end of that flower pot, or whatever it is.

Q.   Okay.  So, I'd like to ask you a question, you know, a hypothetical.  If we assume that the evidence marker 4 is the general location where Paris Jackson was shot and hit by the bullet, would Mr. Jackson have been able to ambulate from that location to the grate where he was found?

A.   Yes.  My opinion is yes.

Q.   And related question:  Based on your medical training and experience treating gunshot wounds, do you have any opinion as to whether Mr. Jackson would have been able to lower himself onto the grate when he got there?

A.   I have an opinion.

Q.   Can you share that opinion with the jury, please?

A.   I think my opinion is that, yes, he would be able to lower himself because he's progressively getting worse.  It's not a instantaneous -- if he had been hit in the aorta, which is the other vessel that supplies direct circulation to the body, his pressure would have dropped instantaneously.

But this was on the low pressure side, the venous side, where times we get patients who may survive this. But it's a very dramatic type of -- it's not the flip of a light switch and you collapse and drop. It is more along the lines of progressively getting less circulation, less circulation, less circulation, and you're going slower and slower and staggering and eventually falling.

Q. And do you recall, you know, from your review of materials seeing any abrasions or marks on Mr. Jackson's face?

A. I did.

Q. Are they consistent with what you just described as a gently lowering himself onto the grate?

A. Yes.

MR. FORD: Nothing further. Thank you, Dr. Cichon.

THE WITNESS: Thank you.

THE COURT: Cross-examination, Mr. Bowman.

MR. BOWMAN: Thank you.

CROSS-EXAMINATION

BY MR. BOWMAN:

Q. Good morning, Doctor. How are you?

A. It's still a good morning.

Q. I wanted to start off on the subject of money. You indicated you've done a little bit of work on this case. You've reviewed a substantial amount of testimony and some photographs and thought this through, prepared a report, and so

Cichon - cross

2125

forth, yes?

A.   Correct.

Q.   And, of course, you need to be paid for your time, correct?

A.   Correct.

Q.   Our information is that as of the point when you gave your deposition in this case, you had charged about $3400 for your time?

A.   Correct.

Q.   And, then, it's been a little bit more since then?

A.   Correct.

Q.   Do you think that $3400 is a fair amount of money to compensate you for your work on the case, your review of the materials, and so forth?

A.   Up to that time period, yes.

Q.   And how much are you being paid to come here today?

A.   Basically for trial, it's the same:  $400 an hour.

Q.   You are an emergency physician?

A.   Yes, sir.

Q.   And, obviously, if any of us here had a medical emergency, we would very much want to see you?

A.   Thank you.  I take that as a compliment, counselor.

Q.   It sounds like you're good at your work, yes?

A.   You're always welcome for coffee.  You don't have to be a patient.

Q.   In all seriousness, sir, your area of specialty is the

Cichon - cross

2126

preservation of life --

A.   Correct.

Q.   -- correct?

A person comes to you, for example, to draw us back to what we're here about this morning, with a gunshot wound, a serious gunshot wound, and it is your job and your responsibility to try and preserve the life of that person, yes?

A.   As best as possible.

Q.   As best as possible.

And sometimes you succeed?

A.   Correct.

Q.   And sometimes you do not?

A.   Correct.

Q.   And in the case where you are treating a gunshot victim and you lose the battle for life, your work, unfortunately, is at an end?

A.   Correct.

Q.   You are -- Dr. Arden told us that his field of specialty is pathology?

A.   Correct.

Q.   Forensic pathology?

A.   Correct.

Q.   I mean, you saw his deposition and you know this, yes?

A.   Yes.

Cichon - cross

2127

Q. And that is not your specialty?

A. Correct.

Q. Dr. Arden explained that for many years he was a medical examiner?

A. Correct.

Q. The work of a medical examiner is to conduct a post-mortem examination in the circumstance of a violent or unexplained death, right?

A. Yes.

Q. This is not work that you have done, but you know this?

A. Correct.

Q. The work of a medical examiner is in some cases to perform autopsies?

A. Correct.

Q. And this -- the work of an autopsy is to examine a body -- the changes in a body that have occurred as a result of injury, yes?

A. Correct.

Q. To figure out which injuries occurred prior to death?

A. Correct.

Q. Antemortem injuries, I think, is the Latin?

A. Correct.

Q. Which injuries occurred right around the time of death, yes?

A. Correct.

Cichon - cross

2128

Q.   And which injuries occurred post-mortem, after death?

A.   Correct.

Q.   This is not work you do?

A.   Correct.

Q.   The work of a pathologist is, in part, to participate with law enforcement and investigators in the medical examiner's office investigating death scenes.  You know this, right?

A.   Yes.

Q.   We looked at some photographs in your direct testimony that were taken at a death scene?

A.   Correct.

Q.   Those documented what was left behind as artifacts as a result of events that had occurred in proximity, or evidence that existed in proximity, to a deceased body, right?

A.   Correct.

Q.   This -- the examination of photographs like those and the assessment of their significance, that is not work that you do?

A.   Well, and I'll kind of disagree with that in the sense that we get descriptions of mechanisms of injury in the emergency department from EMS, which help formulate the differential diagnosis as clinicians as to what is the probability of internal injuries as a result.

          For example, if a steering wheel is bent, we kind of have a different idea of what we're going to be looking for. If an airbag deploys, we're going to have a different idea of

what we're looking for.  If there's crush to the front of the car in a motor vehicle collision, that will give us an idea of what to look for, as well.

So, I can't agree a hundred percent with what you're saying because there is clinical relevance to seeing these things.  And, fortunately or unfortunately, seeing these things also with what a medical examiner has conveyed in their report as a clinician makes perfect sense with why I got to the opinions I got.

Q.   Do you go to death scenes?

A.   Typically, I don't because --

Q.   Your job -- sorry.  That's a "No"?

A.   Correct.

Q.   You do not, as a matter of professional practice, go to death scenes, examine evidence and conduct hypotheses as to how a person died.  That's not your job?

A.   That's correct.  We only use information from scenes on patients who arrive alive to determine potential injuries and probabilities of injury, as well.

Q.   You don't go to death scenes?

A.   Correct.

Q.   You have never been trained at the FBI Academy on how to analyze a death scene?

A.   Correct.

Q.   You are not in that business?

A.   I'm a clinician, correct.

Q.   Blood spatter, blood patterns, not your thing?

A.   Correct.

Q.   You are not in a position, based on your professional training and the practice of medicine in which you engage, to make inferences about movements that occurred prior to a person's death from artifacts that are left at the death scene; is that not true?

A.   Well, I guess, as I understand your question, like in a police investigation versus what would typically happen in the clinical presentation of a patient --

Q.   I'm --

A.   Let me finish.

Q.   Sure.  Go ahead.

A.   -- who is exsanguinating and undergoing pericardial tamponade, that I do see and experience quite frequently, especially with the helicopter program.

Q.   I totally get that you understand tamponade, you understand the mechanisms of death, and you -- right in your wheelhouse to talk with us about the lethality of Paris Jackson's gunshot wound and what it did to him.  I get that.  My question is different.

You do not go to death scenes and analyze the artifacts at death scenes in order to make inferences about events that occurred in proximity to a person's death.  That's

not your job?

A.   Correct.

        MR. FORD:  Objection.  Asked and answered.

        THE COURT:  Sustained.

        MR. BOWMAN:  May the answer stand, please?

        THE COURT:  The answer will stand, yes.  But the objection is sustained.  So, let's move on, is what I'm trying to convey.

BY MR. BOWMAN:

Q.   In the materials that you examined listed in your report, you did not list that you reviewed the deposition of the forensic investigator of the Chicago Police Department who examined the scene, put down those evidence markers that we looked at and documented the scene?

A.   Correct.

Q.   So, any reason for that?

A.   No.

Q.   Are you aware that the forensic investigators found zero blood underneath the grate where Paris Jackson's body was lying?  Are you aware of that fact?

A.   I am through the reading of other depositions.  Dr. Arden's, yes.

Q.   And you're aware -- are you aware that it was not for lack of trying that they didn't locate any blood beneath that body? They looked for it; you understand that?

A.   I'll accept that, correct.

Q.   Are you aware that forensic investigators searched everywhere in that scene for any visible blood?

A.   Correct.

Q.   And that it was important to them to find any visible blood that they could?

MR. FORD:  Objection.  Evidence -- or it's not in evidence, the fact.

MR. BOWMAN:  Well, it's a question I'm asking.

MR. FORD:  And lack of foundation.

THE COURT:  The objection is overruled.

I'll let you put this to him.  But I do think there may need to be some foundation for the area you're going.

BY MR. BOWMAN:

Q.   Well, you did look at the photographs, right?

A.   I did.

Q.   And you understood -- it was explained to you the significance of those photographs?

A.   Correct.

Q.   The significance of the markers that you looked at?

A.   Correct.

Q.   And you understood that those markers documented the only blood that forensic investigators located in their diligent search of that scene?

A.   Correct.

Q.   And it resulted in three discrete drops of blood being located at evidence markers No. 4, No. 5, and No. 6, right?

A.   Correct.

Q.   Have you been informed that no blood was found on the grate underneath Paris Jackson's body?

A.   Correct.

Q.   You had been informed that Paris Jackson's body was rolled over as part of the investigation, yes?

A.   Yes.

Q.   And an examination was made of that grate on which Paris Jackson's body was resting, correct?

A.   Correct.

Q.   And no blood at all was located there?

A.   Okay.

Q.   You disagree?

A.   No.  I have no reason to disagree.

Q.   Well, would it change your opinion to know that, that this man lay on this grate for a period of time and zero blood was located on that grate?  Does that seem strange?

A.   It doesn't seem strange.  And I guess if you look at the picture when they pull his shirt up, there isn't much blood on his skin, as well.  So, for whatever reason, maybe in that period of time, the blood congealed or it's -- was sucked into the shirts that he wore and prevented whatever movement, either to the grate or to the skin.

Q.   Do you have any knowledge as to whether any cleaning was performed on that chest before that photograph was taken?

A.   I don't.

Q.   Dr. Cichon, Paris Jackson bled externally before he died?

A.   Yes.

Q.   And the external bleeding was significant?

A.   It was enough to stain the shirts, correct.

Q.   I mean, we looked at -- we've looked at this several times. This is a pretty bloody shirt, right?

A.   Correct.

Q.   And there are portions of that shirt that are deeply, darkly stained with blood here and here, as you indicated on direct examination?

A.   Correct.

Q.   And, then, substantial amount of blood all throughout that shirt?

A.   Correct.

Q.   And there is blood on the overshirt, as well, all in through here, again, as you indicated on direct examination?

A.   Correct.

Q.   I mean, to put it in very simple terms, this is a man who has a hole through and through, from the back of his chest to the front of his chest, as a result of a gunshot that penetrated his heart and at least one major, two -- maybe two, major arteries, right?

A.   Correct.

Q.   And you've explained that --

A.   Right.

Q.   -- the artery that is involved is on the low pressure side of the heart as opposed to the high pressure side of the heart?

A.   Correct.

Q.   And, so, that affects the amount of the bleeding, right? That's your point?

A.   Correct.

Q.   But it doesn't mean that this guy is not bleeding significantly as a result of this wound.  We can agree on that?

        MR. FORD:  Objection.  Asked and answered.

        THE COURT:  Sustained.

BY MR. BOWMAN:

Q.   Well, do you understand, have you been informed about the police theory as to why the condition of this sidewalk is important?

        MR. FORD:  Objection.  Lack of foundation. Argumentative.

        MR. BOWMAN:  It's a question.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   No.  That's not what I was asked to review.

BY MR. BOWMAN:

Q.   Well, let me ask you hypothetically, sir, if Paris Jackson

Cichon - cross

2136

sustained a bullet wound somewhere around here at the bottom of the photograph that we're looking at, which is Plaintiff's Exhibit 41.52, he -- and had ambulated in some fashion or another to the grate where he died, the theory is -- or my hypothetical is that he ambulated down that sidewalk. Okay?

A. Okay.

Q. Okay. And as he was walking down the sidewalk or running down the sidewalk, his heart would be beating; would it not?

A. As I think both Dr. Arden had mentioned, probably anywhere from 15 to about 30 seconds.

Q. For that very short period of time, he would be capable of running or walking down the sidewalk before his conscious experience ended, correct?

A. Correct.

Q. And during that period of time, with each exertion to move his body forward by walking or running, the beating of the heart would be heightened, right?

A. Well, not necessarily. With a pericardial tamponade, the beat of the heart is progressively diminishing because you're strangling the heart.

Q. I get that. So -- but the point is without a heartbeat, without the ability to exert, he's not moving down that sidewalk?

A. Well, as I said, he's moving for a period of time, progressively getting weaker and weaker or discoordinated --

uncoordinated further and further as he's progressing.

Q. I appreciate that, sir. He begins to stagger?

A. Stagger might be the external sign you would see. But the reality is a greater discoordination of the individual.

Q. And a lessening of the force of his heartbeat?

A. Correct.

Q. But the heartbeat is persisting?

A. Well, and that's a big question because the coronary artery was also severed. So, was the myocardium stunned at that point? That's difficult to tell. I don't know if anybody can answer that.

Q. In the simplest terms, the man is bleeding externally as he is ambulating in some fashion or another down this sidewalk?

A. To a degree, yes, but not to the degree that was described of the spurting of blood or mass amounts of blood.

Q. I don't think anybody has described the spurting of blood during this trial. We are talking about the kind of bleeding that occurs when you're shot through the heart and shot through a major vessel on the low pressure side. You're going to bleed, right?

A. And, as I said, because of all the tissue and the location. It's --

Q. I just asked you a simple --

MR. GIBBONS: Your Honor, can he answer the question, please?

MR. BOWMAN:  I don't think my question is being answered.

MR. GIBBONS:  Your Honor, he was cut off.  Can he finish his answer?

THE COURT:  Okay.  We'll let the witness finish his answer.

And, then, you can ask a different question.

MR. BOWMAN:  Sure.

BY THE WITNESS:

A.  Again, where the location, as you said, shot through the heart, shot through the vessel, that's all contained in what's called the mediastinum.  That is an area, a distinct anatomical area, that is surrounding the heart.  And, then, surrounding that is the lungs.  Surrounding that is the rib cage. Surrounding that is tissue, fat, and then finally skin.

So, yes, there's going to be bleeding.

But as you saw from the autopsy report, the majority of the bleeding that occurred around the heart was what was killing this individual with each progressive beat of the heart.

BY MR. BOWMAN:

Q.  I'm not trying to argue with you on that point.  I understand what you're saying.  I have a different question. It is a simple question.

He continues to bleed as -- externally, however much

Cichon - cross

2139

or however little, as he's going down that sidewalk?

A.   Probably not.  And, again, because his pressure is dropping.  So, it's not pushing out blood after the initial insult.

Q.   Is this -- you saw these blood-stained shirts.  We just looked at them a minute ago?

A.   Correct.

Q.   This is evidence of external bleeding; is it not?

A.   Correct.

Q.   That external bleeding happened at some point between when he was shot and -- on this theory at least, when he was shot and when he ended up on the grate, right?

A.   As I said, it probably occurred initially, and as his pressure dropped, less blood was flowing out.

Q.   Right.  But through the process, he was bleeding progressively less, yes?

A.   Internally and subsequently, if it's internally, it's not going to be -- it's not going to push out if it reaches a critical pressure that it can't push anything further out those holes, as we see that.

Q.   So, you'd say that most of the bleeding would happen down here at the base of the sidewalk?  Is that where he would have the significant external blood loss?

A.   Most of the bleeding in my experience when patients encounter this is initially.  Those first -- it may be the

first two, three, four, five heartbeats and then things are going to start getting strangled and the pressure's dropping. Otherwise --

Q.   So --

A.   Otherwise, you could have been moving further.  And I think Dr. Arden pointed it out.  At the most, 15 to 30 seconds. There's nothing to disagree there.

Q.   Right.  No, I don't think we have a disagreement.

In that 15 or 30 seconds, that's when the bleeding would happen?

A.   Well, I think that the initial bleeding that you see on that shirt is probably pretty close to the time the heart was penetrated.  And, then, subsequently that bleeding is going to be decreasing because his perfusion's decreasing.  Clinically, that's what we see in the emergency department.

Q.   Now, we looked at the shirts.  I think we agreed there was a substantial amount of blood on the shirt.  Did we agree about that?

A.   Yes, we did.

Q.   You have never looked at the shirts in real life?

A.   Correct.

Q.   You don't know what material they're made of?

A.   I don't.

Q.   You don't know if they're thick shirts or thin shirts, summer shirts, what kind of shirts they were?

Cichon - cross

2141

A.   Correct.

Q.   You don't know how -- what their ability to absorb blood was?

A.   Well, correct.

Q.   And you're certainly not in a position to say to a reasonable degree of scientific certainty that all of the blood that Paris Jackson lost externally was visible on those shirts, right?

A.   Correct.

Q.   Some of it could have gone someplace else?

A.   And, again, that's not my opinion.  My opinion is that the blood's contained in the shirts based on what I know as a clinician and seeing patients who sustained similar injuries that do arrive alive.

Q.   All right.  Dr. Cichon, you testified that you're here to rebut Dr. Arden's opinions.  Different subject.  You reviewed his deposition?

A.   I did.

Q.   And you noted, did you not, sir, that in his deposition, Dr. Arden was asked and he opined that the placement of Paris Jackson's fingers on the grate did not indicate that Paris Jackson was gripping the grate.  You remember that?

A.   Correct.

Q.   And you are not here offering a contrary opinion?

A.   Correct.

Q. It's not your area, right?

A. Correct.

Q. Now, I want to talk with you about this issue of no blood on the grate itself. You, in your medical practice, you have the emergency transport. You have individual hypothetically with a gunshot. You transport that person on a stretcher?

A. Correct.

Q. And if there is a gunshot, you may expect that there would be some blood that would appear on the sheet on the stretcher when the patient was removed from the stretcher, right?

MR. FORD: Objection. Incomplete hypothetical.

THE COURT: Overruled. I'll let him answer to the extent he can. And you're welcome to address it on redirect if you wish.

BY THE WITNESS:

A. In your hypothetical, if they arrived to me in the emergency department, then they're still alive. They typically will have a blood pressure. So, yes, you may encounter that. And plus, they're laying flat as opposed to having their head raised.

BY MR. BOWMAN:

Q. Well, the medical practice when you remove a patient with a bloody wound from a location where they're lying is to change the sheet, right?

A. I don't understand what your question is.

Cichon - cross

2143

Q. You wouldn't just allow another patient to use that same bed space without sanitizing it, right?

A. Oh, yes, correct.

Q. Of course. Because there might be biological material on that space, right?

A. Correct.

Q. Blood, right?

A. Potentially.

Q. And that's what you would expect?

A. In someone who arrives to the ER alive, correct.

Q. Okay. Now, you talked about pooling of blood after death, right?

A. Correct.

Q. This is the process of lividity; do I have that right?

A. Well, that's not what I'm referring to. That's more of a pathologist.

What I was referring to, the gravitational settling in the chest cavity that we saw on autopsy of the blood that was found at the base of the chest cavity. Correct.

Q. Right. That is the result of gravity after death, correct?

A. Correct. Like lividity or -- would be, as well.

Q. Right. And it is the result of lying in place and this pooling effect happens, right?

A. Correct.

Q. So, again, these processes that occur after death, that's

not your bailiwick, that's not what you do?

A.   Correct.

Q.   And exactly how the blood would pool, what the effect of relative elevation of the feet and the chest, you're not in a position to respond to Dr. Arden on that subject; isn't that right?

A.   Except for how this was viewed and what I understand from the medical examiner's report, correct.

Q.   Right.   Just relying on what the medical examiner said?

A.   Correct.

Q.   Now, I think I heard you say in response to Mr. Ford's questions that the -- in your view, it's not probable or it's possible that there would be no blood on the grate, no blood underneath the grate, even if Paris Jackson arrived at that grate alive, collapsed on grate and expired there?

         MR. FORD:   Objection.   Asked --

BY MR. BOWMAN:

Q.   Is that what you're saying?

         MR. FORD:   Objection.   Asked and answered.

         MR. BOWMAN:   I haven't gotten to this yet.

         THE COURT:   Okay.   I'll overrule the objection because I assume you're getting to --

         MR. BOWMAN:   Yeah.

         THE COURT:   -- your next point.   So, overruled.

BY THE WITNESS:

A.   Correct.

BY MR. BOWMAN:

Q.   But you can't, to a degree of scientific certainty, say that the effect of this grate would be to stop the flow of blood such that there would be no blood on the grate, no blood underneath the grate if Paris Jackson collapsed on the grate?

A.   As I said, more probably than not, it wouldn't continue bleeding because the collapse indicates low blood pressure. Two, the location of the grate over the wound and the dressings, much like we treat in Stop the Bleed process.

So, yes, more probably than not, bleeding had stopped at that point.

Q.   Well, bleeding had stopped, but if there's not coagulation, there can still be leakage of blood after active bleeding stops, right?  We all have that experience?

A.   Yeah.  Yes.

Q.   And that is something that could have happened here, right?

A.   And I said probably it did not, but --

Q.   Yeah.  And you're dealing in probabilities by applying your knowledge about stanching wounds in an emergency room to this crime scene, right?

A.   And based on experience of treating patients who had these that arrived to the ER alive, correct.

Q.   Now, to be clear, to be very clear, a person with the injuries that Paris Jackson suffered would never arrive alive

Cichon - cross

2146

in the emergency room, right?

A.   That is correct.

Q.   You have never treated a person with these particular injuries in an emergency room because he'd be dead before he got to you?

A.   Well, as Dr. Arden pointed, and I agreed, about 15 to 30 seconds of life after the gunshot wound, correct.

Q.   Well, it's not 15 to 30 seconds of life, sir.  It's 15 to 30 seconds of consciousness, right?

A.   Well, in this particular case, as his consciousness is diminishing, he didn't have a stroke.  He didn't have anything blocking his blood vessels to his brain.  He lost consciousness because his pressure was dropping resulting in traumatic death.

Q.   Right.  Which would follow after a period of time -- and a very short period of time -- after his loss of consciousness?

A.   And the manner of his death with that cardiac constriction, decreasing perfusion, resulting in lack of blood flow --

Q.   Right.

A.   -- all over, including into that pulmonary artery.

Q.   Diminishing and diminishing heartbeat following his loss of consciousness, that's what happened to this guy?

A.   Correct.

Q.   So, there is a little gap, maybe not very long, but a little gap between his loss of consciousness and the point at which the heart stops and he is no longer living.  Do you agree

to that?

A.   I think it's more reverse that the heart completely stopped and then the loss of consciousness completely.

Q.   So, you think he was flat-out dead after 15 seconds?

A.   I think that the constriction of his heart resulted in poor perfusion, which resulted in probably a quivering of the ventricle of the heart, which is in the terminal moments we see clinically that occur, correct.

Q.   Again, to be clear, this is not an injury you've ever treated?

A.   Well, they never arrive.  However, similar types of injury to the mediastinum, I have encountered and treated in my career.

Q.   So, you hypothesized what Paris Jackson's movements would look like in the seconds before his death when Mr. Ford was asking you questions?

A.   Well, hypothesized based on clinical knowledge of how people react as pressure's dropping, as they, quote, black out. Say, in an event where someone is fainting.  That's the same types of events that occur.  There may be a staggering followed by a fall.

Q.   Right.  But the idea in the emergency room is you don't want anybody to fall, right?

A.   Well, yes, counselor.

Q.   When you're dealing with somebody who is in a life-

Cichon - cross

2148

threatening situation, you want to get them lying down so they don't fall --

A.  Correct.

Q.  -- right?

So, your opportunity to observe people falling is limited by nature of the -- by virtue of the nature of the work you do, right?

A.  I wouldn't say that.  Again, I've encountered patients who have subsequently had drops in blood pressure that I've seen experienced in the department.  So, I got to say no if you're saying that I've never seen someone drop their blood pressure and not function in the emergency department setting.  Yes, I have.

Q.  I didn't say that.  What I'm saying is, is that's not something you've studied, how people fall in these kinds of circumstances, right?

A.  Well, yes, it is, because that's an indicator of patient's perfusion and ability to walk.  And when we examine patients in the department, we have them get up and walk.  We do what we call orthostatic vital signs on them to measure blood pressure laying down, sitting up and standing to see --

Q.  Right.

A.  -- that the pressure is functioning.

Q.  Yes.

A.  So, yes, that is part of the study in emergency medicine.

Q.   Sure.   A process that you engage in in your work of saving lives?

A.   As a clinician, correct.

Q.   And doing your best to keep people safe and prevent falls, yes?

A.   Correct.

Q.   And where necessary getting them in a position where if they were to lose consciousness, there wouldn't be any untoward effect.   That's your whole thing, right?

A.   Potentially.

Q.   And you do not examine bodies that have -- in a park setting or on the street someplace, God forbid, has happened just yesterday in another part of our country, where the person has experienced a gunshot wound, things have happened, and their body ends up in a particular location.   You're not there coming to examine the circumstances and examine the injuries.   It's not what you do, right?

          MR. FORD:   Objection.   Asked and answered.

          THE COURT:   Sustained.

BY MR. BOWMAN:

Q.   One last area.   The question that Mr. Ford asked you, I'm not going to put up this image of Paris Jackson's face.   But there were lines on the face as a result of his lying on the grate.   You testified about that?

A.   Correct.

Cichon - redirect

2150

Q.   And you do not disagree with the medical examiner's conclusion that those lines on the face were post-mortem injuries to Paris Jackson?

A.   Correct, I don't.

Q.   All right.  Thank you very much, sir.

THE WITNESS:  Thank you, sir.

THE COURT:  Mr. Ford, anything based on that?

MR. FORD:  Two questions, your Honor.

REDIRECT EXAMINATION

BY MR. FORD:

Q.   Dr. Cichon?

A.   Yes, sir.

Q.   You are not a forensic pathologist; is that fair?

A.   Correct.

Q.   Do you think that not being a forensic pathologist has limited your ability to render the opinions you've talked about today?

A.   No.

MR. FORD:  That's it.  Thank you, your Honor.

THE COURT:  All right.  Dr. Cichon, you are excused.

THE WITNESS:  Thank you, your Honor.  Thank you for listening.

THE COURT:  All right.  Ladies and gentlemen, we are going to take our afternoon lunch break.  It is just about 12:30.  Let's be back and ready to go at about 1:40.  We'll try

to wrap things up for you the best we can.  Please don't discuss the case during your lunch break.  We'll see you in about an hour.

All rise.

(Jury out.)

THE COURT:  All right.  You may be seated.

So, I want to give the parties as much time as I can over the course of the next 45 to 50 minutes, maybe even shorter if necessary so that we can spend some time on the back end figuring out where we are and what remains.  It may be that if we can't resolve everything, we just bring the jury back in, get going with whatever we're going to present via Ocampo, let the jury go, and then resolve what we have to resolve with our time this afternoon so that we can be ready to go with whatever remains on Monday.

MR. LOEVY:  Well, your Honor, the witness is here. So, I think from our perspective, either we reach a stipulation over lunch or we don't; and, if we don't, there's potentially an hour-and-a-half or whatever it is.

THE COURT:  Right.  If we don't, then she takes the stand.

MR. LOEVY:  Yeah.

MR. FLYNN:  Agreed.

THE COURT:  All right.  So, I'm hoping that -- why don't we plan collectively to come back into the courtroom at

2152

about 1:20 just to touch base with you all.  If you need a little more time, I've tried to give us a little more time. We'll just see where we are at about 1:20.

MR. LOEVY:  Sound good.

MR. FLYNN:  Thank you, Judge.

THE COURT:  See you then.

(Recess at 12:29 p.m., until 1:20 p.m.)

*     *     *     *     *


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Joseph Rickhoff                      September 6, 2024
Official Court Reporter

2153

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 CV 4082
                                       )
                Plaintiff,             )
                                       )
            vs.                        )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) September 6, 2024
                Defendants.            ) 1:20 o'clock p.m.


            TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:         LOEVY & LOEVY
                           BY:  MR. JONATHAN I. LOEVY
                                MR. LOCKE E. BOWMAN, III
                                MR. TOM KAYES
                           311 N. Aberdeen Street, 3rd Floor
                           Chicago, Illinois 60607

                           MACARTHUR JUSTICE CENTER
                           BY:  MS. VANESSA DEL VALLE
                                MR. JONATHAN M. MANES
                           160 E. Grand Avenue, 6th Floor
                           Chicago, Illinois 60611


For the Individual         GREENBERG TRAURIG, LLP
Defendants:                BY:  MR. JOHN F. GIBBONS
                                MR. KYLE L. FLYNN
                                MR. TYLER L. SALWAY
                                MR. QUINN FORD
                           77 W. Wacker Drive
                           Chicago, Illinois 60601

2154

APPEARANCES (Cont'd):

Court Reporter:          LAURA LaCIEN, CSR, RPR, RMR, F/CRR
                         PATRICK MULLEN, OCR
                         Official Court Reporters
                         219 S. Dearborn Street, Suite 2118
                         Chicago, Illinois 60604
                         (312) 435-5562
                         joseph_rickhoff@ilnd.uscourts.gov

* * * * * * * * * * * * * * * * * * *

PROCEEDINGS RECORDED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out.)

THE COURT: All right. Good afternoon. If we can get appearances on the record.

MR. LOEVY: Good morning, your Honor. John Loevy; and the same appearances for the plaintiff.

MR. FLYNN: Kyle Flynn; and same appearances for defendants.

THE COURT: Good afternoon. So what's the good news?

MR. LOEVY: It is good news, your Honor. We have three stipulations, three stipulations.

MR. GIBBONS: And it's a Friday. We were able to reach three stipulations and have a ham sandwich.

MR. LOEVY: And we ate.

THE COURT: All right. I love it. Okay.

MR. GIBBONS: The case with end with these three stipulations and then Marisol Ocampo, how ever we're playing that out.

MR. LOEVY: I talked to Mr. Flynn, actually. You're going to read two of the stipulations in your case and then we're going to read the evidence tech in our rebuttal case with our Ocampo rebuttal.

MR. GIBBONS: Okay.

THE COURT: I love it. That's great news. Happy to hear you all worked it out. We had odds; I lost. He's still young.

MR. GIBBONS:  And optimistic.

THE COURT:  And optimistic.  I am not.  I am neither.  Okay.  Great.

MR. LOEVY:  Wouldn't you want to tell them what a stipulation is, though, your Honor?

THE COURT:  Yes.

MR. LOEVY:  If you're going to do that, that's fine.

THE COURT:  I will remind them -- it's in the instructions, but I'll remind them just briefly before you read them.

Okay.  So how do we want to just run through how we're going to do this?  We'll bring the jury back in.  You want to read the stipulations now or at the end?  I'd defer to you.  Just tell me how you want to do it.

MR. GIBBONS:  Yeah.  I think we read ours now, you think?

MR. FLYNN:  Yeah.

THE COURT:  We're still in your case so I would assume --

MR. FLYNN:  Yeah.  We're just trying to think before or after Ocampo.

MR. GIBBONS:  Let's read them now.

MR. FLYNN:  We'll read them now.

THE COURT:  Okay.  So we'll have you read your stipulations, we'll get agreement on the record, and then we'll

do the Ocampo.  I'll also remind them that deposition testimony should be treated like all other testimony.  That's also in the instructions.  We'll get through that piece of it.  Mr. Loevy will read his stipulations and you rest your case --

MR. LOEVY:  And then we're done.

THE COURT:  -- and then we're done.

MR. GIBBONS:  And I will just wave at you at 3:30.

THE COURT:  Yes.  Please do, please do.  I will do my best to remember but don't -- don't hesitate to get my attention.

MR. GIBBONS:  Okay.

MR. LOEVY:  Well, we're going to play our portion of the Ocampo dep and then we're going to say we rest, and then it will be their call how tired they are and reading the jury whether they want to do a re-rebuttal case.

THE COURT:  Fine.

MR. LOEVY:  And then you guys -- hopefully, you won't.

MR. FLYNN:  Can we -- can we figure that out?  We got a video made that's got everyone's designations -- we made it last night -- and so I'm not sure what's being suggested here because at the deposition they started and then I went and then they went again.

THE COURT:  Yeah.  It sounds like there's just going to be a point where Mr. Loevy is just going to stop --

MR. LOEVY:  We're done.

2158

THE COURT: -- and then you'll be able to hit Play --

MR. FLYNN: Okay.

THE COURT: -- on your half.

MR. FLYNN: And then when I'm done talking, I can hit Pause.

MR. LOEVY: Sure, you know.

MR. FLYNN: Do you have our tape that you're using and then you're going to hit Pause on our tape?

MR. LOEVY: We only have one tape so we're going to ask that they be the keeper of the tape.

MR. GIBBONS: Okay.

MR. FLYNN: Our tape, right, is that what you're saying?

MR. LOEVY: You're tape.

MR. FLYNN: Okay. Got it.

THE COURT: All right. Okay. The jury might still be straggling a bit because I told them 1:40 so I'm just going to run to the restroom and come right back out and we'll be ready to go in a few minutes unless there's something else we should deal with.

MR. FLYNN: Nothing right now, your Honor.

THE COURT: Okay.

MR. KEYES: Kyle, is the first thing you guys are going to do is to read the stipulation?

MR. GIBBONS: Yeah.

MR. FLYNN:  Yes.

MR. KEYES:  Okay.  We may need an extra five minutes just because --

MR. GIBBONS:  We're typing up the stips so we're all on the same page.

THE COURT:  Yes.  Take your time.  We have time.

(Recess taken.)

THE COURT:  One quick question I should ask Mr. Gibbons is to maybe relay to Mr. Flynn the length of time you believe your closing will take.  You don't need to tell me now but I think one thing we'll want to talk about at the jury instruction conference is the overall length so if you could just give him a sense of that so that he could relay it to me. I don't need you to tell me now.

MR. FLYNN:  I'm closing, your Honor.

THE COURT:  Oh, I'm sorry.

MR. GIBBONS:  Oh, you're asking who is closing?

THE COURT:  I'm so sorry.  I thought maybe you were closing and it turns out Mr. Flynn is closing.

MR. GIBBONS:  Yeah.  It's the first time in 36 years I won't.

THE COURT:  There you go.

MR. GIBBONS:  It's his case.

THE COURT:  All right.  I stand corrected.  Never mind.  He'll know the answer.  All right.  All rise.

(Proceedings heard in open court; jury in.)

THE COURT:  All right.  You may be seated.

All right.  On behalf of the defense, I believe we have a stipulation.  Is that where we are?

MR. FLYNN:  Yes.

MR. LOEVY:  Yes.

THE COURT:  Hold on.  We're having a little trouble hearing you for the court reporter.  Just give us one second, ladies and gentlemen.

(Counsel conferring.)

THE COURT:  So, ladies and gentlemen, we're going to have defense counsel read a stipulation; and I apologize.  I'm just pulling it up here.  And as I will remind you at a later point when we give you jury instructions, a stipulation is simply an agreement between the parties that something is true or that a fact has been proven.  So the parties will read -- and in this case, the defense will read the stipulation to you now and you should accept that evidence as true.

And do you wish for me to read it or are you going to read it?

MR. FLYNN:  I'm happy to read it, your Honor, but there are two of them.  I just want to make clear.

THE COURT:  Okay.  So there are two stipulations by the defense at this time.

MR. FLYNN:  Stipulation 1.  The parties have entered

2161

into the following stipulation: Dr. Arian Sagovia performed a postmortem examination of Paris Jackson on September 1st, 2008, as part of her duties with the Cook County Medical Examiner's Office. If called to testify at this trial, Dr. Sagovia would testify as follows:

In her postmortem examination, Dr. Sagovia noted two injuries she characterized as postmortem injuries, a one-inch yellow/tan abrasion on the inner left forearm and a one-inch yellow/tan abrasion on the left elbow. Dr. Sagovia testified that it is possible these abrasions occurred as Paris Jackson was being transported from the crime scene to the Cook County Medical Examiner's Office.

Dr. Sagovia also reviewed crime scene photos and testified that in those photos, Paris Jackson's fingers appeared to be gripping the grate upon which his body is resting. Dr. Sagovia testified that it seemed unlikely that Paris Jackson's fingers gripping the grate would have occurred postmortem.

Stipulation Number 2. The criminal trial of R.J. Branch and Marcel Brown titled The People of the State of Illinois versus Renard Branch and Marcel Brown began on November 24th, 2009. Cook County Assistant State's Attorney Karen Kerbis called the following witnesses who talked about their observations in Amundsen Park the night of August 30th, 2008, when the shooting occurred: Marisol Ocampo, Eugene

Stanciel, Amanda Moore, Krystine Jenkins, and Jasmine Jenkins.

At Mr. Brown's criminal trial, the parties stipulated that Detective Mancuso gave Mr. Brown his Miranda rights, Mr. Brown acknowledged those rights, and Mr. Brown agreed to talk to Detective Mancuso and Detective McDonald.

At Mr. Brown's criminal trial, the parties agreed that the electronic recording interview system was working during Mr. Brown's CPD interview on September 3rd through the 5th, 2008, and that a tape could be made but the parties stipulated to allowing Detective Mancuso to read from his supplementary report regarding his statements which were recorded in his report with respect to Marcel Brown's statements made during the CPD interview.

At Mr. Brown's criminal trial, Detective Mancuso read portions from two pages of his supplementary report which contained a summary of the electronically recorded interview of Mr. Brown. The report stated that during the interview conducted by Detective Mancuso and ASA Spizzirri, the following occurred, quote, Marcel Brown states that he knew Branch had a gun when he got in his car to go to the park. Brown stated that when Branch said he was going to go F them up, he knew Branch meant he was going to go shoot them. Brown said that Branch used that phrase in the car on the way to the park. He said that he knew Branch had the gun when he was in the car. Brown said that Branch said I'm tired of these Ns messing with

my sister, they're going to die, end quote. The trial ended with a guilty verdict on January 6th, 2011. Thank you.

THE COURT: All right. Okay. We are now ready for any additional evidence the defense wishes to present in its case.

MR. FLYNN: Your Honor, at this time we call Marisol Ocampo by way of transcript.

THE COURT: Okay. Ladies and gentlemen, we're going to read portions of a prior testimony from a witness named Marisol Ocampo whose name you've heard. We're going to read portions of that testimony to you from the criminal trial.

Obviously the individuals doing the reading are not the actual individuals who participated in the under oath exchange at Mr. Brown's criminal trial but we have asked some of the participants in the case to read the questions as the questioner and read the answers of Marisol Ocampo as she answered those questions under oath at a trial.

I'll give you more information about how you can consider depositions when we give you jury instructions but what is important for you to know now -- and I just used the word deposition, I meant to say under oath testimony -- is you should consider that evidence in the same way as you consider any other evidence.

And so with that, I think we're going to have someone play the role of Marisol Ocampo. And I'll actually ask you to

take the witness stand to read those portions of the testimony and we'll have Mr. Ford read. Are you --

THE COURT REPORTER: I'm sorry. I can't hear you.

MR. FORD: Sorry. I'll be reading Ms. Kerbis and the Court, unless your Honor wants that differently.

THE COURT: No, no. That will be fine.

Okay. So Mr. Ford will read the portions of the transcript in which the Assistant State's Attorney at the trial asked questions of the witness and we'll also, at various times, have him read portions of any ruling made by the Court, the judge, in the criminal case.

So what you'll hear Mr. Ford read are those portions of the transcript and we'll have our witness playing Ms. Ocampo read Ms. Ocampo's answers to you. I'm sure you'll get this very quickly.

First thing's first, however, I'm going to ask the witness standing in the witness seat to actually raise your right hand and be sworn in your own name that you will faithfully read the answers given under -- that were given under oath at the prior proceeding.

LAW CLERK: Ma'am, could you please state your name for the record.

MS. MANKOWSKI: Emily Mankowski.

(Ms. Mankowski sworn.)

LAW CLERK: You've been sworn and may be seated.

Ocampo - Direct (Read)

2165

MR. FORD: Your Honor, one more thing. There are portions of the transcript that are defense counsel, their criminal defense counsel. I believe members of the plaintiff's counsel will read that part just so you know.

THE COURT: All right. That sounds good.

So I'm confident you'll catch on. Just listen as you would any other testimony.

And, Mr. Ford, you may proceed.

MARISOL OCAMPO, DEFENDANT'S WITNESS

DIRECT EXAMINATION

BY MR. FORD:

Q. In a nice loud voice so everybody can hear you, introduce yourself and spell your first and last name.

A. My name is Marisol Ocampo. First name M-a-r-i-s-o-l. Last name O-c-a-m-p-o.

Q. What do people call you?

A. Marisol.

Q. Do you have gum in your mouth right now?

A. No.

Q. Marisol, how old are you?

A. 20.

Q. What part of the city did you grow up in?

A. Evanston, Illinois.

Q. As you were growing up, who did you live with?

A. My mother and her boyfriend.

Ocampo - Direct (Read)

2166

Q.   Was there a point in time that you were no longer allowed
to live with your mother and her boyfriend?

A.   Yes.

Q.   How old were you when that happened?

A.   14 to 15.  16.  15, 16.

Q.   Where did you go to live?

A.   Renard and Marcel's house.

Q.   When you say "Renard," do you mean -- do you mean Renard
Branch?

A.   Yes.

Q.   How did you known Renard and Marcel, how did you know to
move in with them?

A.   Taneshia Branch.

Q.   Who is Taneshia Branch?

A.   That's Renard's sister.

Q.   How did you know Taneshia Branch?

A.   We went to Steinmetz together.

Q.   At that time when you were either 14 or 15 or 16 when you
moved in with Renard Branch and Marcel Brown, what was your
relationship with Taneshia?  You said you knew each other from
Steinmetz.  Were you friends?

A.   Yes.  We were friends.

Q.   When you moved into the Branch-Brown home, for lack of a
better word, was Taneshia also living there?

A.   Yes.

Q.   At a certain point you moved out of the Branch and Brown home?

A.   Yes.

Q.   Did you remain friends with Taneshia Branch?

A.   Yes.  We were on falling-off terms but we are still associated.

Q.   I'm sorry.  You were falling off to her but you were still negotiating?

A.   Somewhat, yes.

Q.   What does that mean?

A.   I wasn't coming around.

Q.   Is it fair to say your friendship was not as strong over the years?

A.   Yes.

Q.   How old were you when you moved out of the house?

A.   The Branch house?

Q.   Yeah.

A.   16, 17.  16.

Q.   About how long did you live with those two families?

A.   A month.

Q.   Back in August of 2008, specifically August 30th, 2008, the day Paris Jackson was killed, do you remember that day?

A.   Yes.

Q.   Where were you living at the time?

A.   5014 West Division, my mother's house.

Q.  You were now back with your mother?

A.  Yes.

Q.  At that time how would you describe your relationship with Renard Branch?

A.  Not good.

Q.  How would you describe your relationship with Marcel Brown?

A.  I didn't have anything against him.  He didn't have nothing against me.

Q.  How would you describe your relationship with Taneshia Branch back in -- on August 30th, 2008?

A.  We didn't talk.

Q.  You what?

A.  We did not associate.

Q.  On August 30th, 2008, did you have any children?

A.  Yes.

Q.  How many children did you have?

A.  One.

Q.  How many -- how many children do you have now?

A.  Two.

Q.  Who is the father of those children?

A.  Eugene Stanciel.

Q.  On August 30th, 2008, late evening hours or the evening hours of August 30th, 2008, where were you?

A.  At a block party.

Q.  You have to speak up and more clearly and loudly.

A.   At a block party on Mason and Bloomingdale.

Q.   Is Mason and Bloomingdale near a park?

A.   Yes.   Amundsen Park.

Q.   Beside Eugene Stanciel being with you at this block party, did you have any other members of your family at the block party?

A.   Friends, yes.

Q.   At the time, you had one child?

A.   Yes.

Q.   Was your child with you at the block party?

A.   Yes.

Q.   How old was your child?

A.   One.

Q.   Do you know a young girl by the name of Shaniqua Grayer?

A.   Yes.

Q.   Was Shaniqua with you at the block party?

A.   Yes.

Q.   Did you know a young man -- a young man at the time by the name of Paris Jackson?

A.   Yes.

Q.   How did you know Paris Jackson?

A.   The neighborhood and school.

Q.   Was that Steinmetz school, high school?

A.   Yes.

Q.   I'm going to show you what I've already shown to counsel

Ocampo - Direct (Read)

2170

and I have marked People's Exhibit No. 2, who is People's Exhibit No. 2 a picture of, Marisol?

A.  Paris Jackson.

Q.  Is this the way Paris looked at the time you knew him?

A.  Yes.

Q.  Had Paris Jackson been at the block party with you?

A.  I didn't see him at the block party.

Q.  Were there a lot of people at the block party?

A.  Yes.

Q.  Was there a point in time that night when you and Eugene took your baby and left the block party?

A.  Yes.

Q.  Where did the three of you go?

A.  To Amundsen Park.

Q.  Now it was about -- what time was it?

A.  The block party was over at like 9:00 o'clock.  8:00, 9:00 o'clock.

Q.  When you went down to the park, did other people from the block party go with you or walk over to the park, too?

A.  Yes.

Q.  Is it fair to say that during the course of that night before anything bad happened, is it fair to say that as time went on that night, other people that were at the block party came over to Amundsen Park?

A.  Yes.

Ocampo - Direct (Read)

2171

Q.   When you got to the park, what part of the park did you go to?

A.   The -- by the swings.

Q.   Are the swings on the side of the fieldhouse?

A.   Yes.

Q.   The front of the fieldhouse faces onto Bloomingdale, right?

A.   Yes.

Q.   Now when you were by the swings shortly before anybody started shooting, when you were by the swings, who else that you remember was around the swing area?

A.   It was a lot of us.

Q.   Do you remember if Shaniqua Grayer was with you at the swings or was she a little bit away from you?

A.   She was a little bit away.

Q.   What about Eugene, was Eugene with you by the swings or was he a little bit away?

A.   He was by the swings.

Q.   Was there a point -- a point in time Eugene -- let me ask you this.  Did you see a group of young men away from the swing area standing in and around a park bench?

A.   Yes.

Q.   Was Paris Jackson part of that group of young men?

A.   Yes.

Q.   Who else was in that group of young men?

A.   A lot of them.  Eugene definitely was in the group, too.

Ocampo - Direct (Read)

2172

Q.   You just said a moment ago --

A.   He was in the swings and he left and went with Paris Jackson's group where they was at.

Q.   About how many other young men were in the area by the park bench?

A.   Like eight, nine, ten.

Q.   What are those young men doing?  You can be honest about it.

A.   Shooting dice.  They're doing a lot.

Q.   Were they drinking?

A.   Yes.  They were drinking.

Q.   And were people as far as you could tell smoking marijuana?

A.   No.  I didn't see that.

Q.   You couldn't see that.  Okay.  Now at some point as you're by the swing set, did Taneshia Branch arrive at the park?

A.   Yes.

Q.   Had Taneshia been at the block party?

A.   When I came, it was almost over with.  I don't remember seeing her at the block party.

Q.   Was that the first time you saw Taneshia Branch that night when she came to Amundsen Park?

A.   Yes.

Q.   Was she with -- what kind of group of people was she with?

A.   It was a lot of girls.

Q.   Did you know some of the girls?

Ocampo - Direct (Read)

2173

A.   Yes.

Q.   When Taneshia came up to the park, did you at any point in time before any shooting started and before any argument started, did you at any point in time see her with Renard Branch?

A.   Yes, when they first walked to the park.

Q.   Then at some point, you didn't see Renard Branch?

A.   I saw him walking back towards the car.

Q.   What car are you talking about?

A.   It was a brown Malibu.

Q.   Were you able to see who was in the car the first time you noticed that car?

A.   No.  But when I turned and looked to see where Renard was going, I looked in the car.

Q.   Were you able to see who was in the car?

A.   Yes.

Q.   Who were you able to tell was in the car?

A.   Renard and Marcel and, I don't know his name, T.J.

Q.   The first time you saw Renard, he was not at the car.  He was by the park with his sister, correct?

A.   Yes.

Q.   That first time that you noticed Renard Branch at the park, did you have a conversation with him?

A.   No.

Q.   As the night went on after Renard left the park, was there

Ocampo - Direct (Read)

2174

an argument that begin taking place between some of the people at that park?

A.   After, yes.

Q.   Who was arguing?

A.   Taneshia Branch and Deshaun Grayer.

Q.   Deshaun Grayer a boy or a girl?

A.   A boy.

Q.   About how old was Deshaun Grayer at that time?

A.   12 years old.

Q.   As he was arguing with Taneshia, where were they, where were they standing?

A.   In the middle of the swings and the slides.

Q.   Were you still in the playground area?

A.   Yes.  I was standing by the bench.

Q.   Was your child in that swing area?

A.   Yes.

Q.   As Taneshia was arguing first with Deshaun Grayer, could you see where Eugene was?

A.   He was trying to get his cousin Deshaun Grayer and tell him --

Q.   I'm sorry.  He was trying to get his cousin Deshaun Grayer --

         Oh, sorry.  I'm sorry.

A.   He was trying to get his cousin Deshaun Grayer.

Q.   So Eugene and Deshaun are cousins?

A.   Yes.

Q.   Eugene is also cousins with Shaniqua Grayer, correct?

A.   Yes.

Q.   Is Shaniqua Grayer cousins with Deshaun Grayer, too?

A.   Yes.

Q.   At this time before Eugene goes over to the argument between Taneshia and Deshaun, as you said, trying to get his cousins?

A.   Yes.

Q.   When Taneshia and Deshaun are first arguing, what are they arguing about?  What is this teenage girl and this 12 year old boy, what are they arguing about?

A.   Something that happened the day before that I didn't have no idea about.

Q.   And is that when Eugene walks over to you, as you put it, get his cousin Deshaun?

A.   Yes.

Q.   When you use that phrase "get his cousin," what exactly do you mean?

A.   He tried to pull him back.  He pulled him back, Taneshia walked over and got on the phone.

Q.   At that point when you saw Taneshia get on the phone, you mean a cell phone?

A.   Yes, a cell phone.

Q.   Did you know who Taneshia was talking to or could you hear

Ocampo - Direct (Read)

2176

what she was saying?

A.   No.

Q.   After Taneshia made that phone call, did Taneshia stay at this park or did she leave?

A.   She stayed at the park.

Q.   Did you stay in that swing set and playground area?

A.   Yes.

Q.   Where did Eugene go?

A.   He was standing around.

Q.   How far was the playground area from the area where the boys, including Paris Jackson, were shooting dice and drinking?

A.   It was not really far.  Like from here, I guess, to the door.

Q.   When you say "from here," do you mean from the bench?

A.   Yes, to the door.

Q.   Glass door or wooden door?

A.   The wooden door.

Q.   35 to 40 feet.

        MR. KAYES:  So stipulated.

BY MR. FORD:

Q.   Were you still in the area of the park that was well lit?

A.   Yes.

Q.   Were you still -- were there still a lot of people in the park?

A.   Yes.

Q.   What is the next thing that happened as you stayed in the area of the swing set with the baby?

A.   She got on the phone 20 minutes later.  Renard and T.J. is getting out of the car.

Q.   Let me stop you.  Renard Branch, correct?

A.   Uh-huh.

Q.   Is that a "yes"?

A.   Yes.

Q.   And the man you know as T.J. correct?

A.   Yes.

Q.   You said they got out of the car?

A.   Yes.

Q.   First of all, what kind of car did they get out of?

A.   It was a brown Malibu.  They got out on Moody and Wabansia and walked through the entrance.

Q.   Hold on.  Wabansia?

A.   I mean Bloomingdale.  I'm sorry.

Q.   So this brownish or brown Malibu as you described it, did you see it arrive at Bloomingdale and Moody or did you notice it at Bloomingdale and Moody?

A.   I noticed it.

Q.   Had you ever seen this car before that night?

A.   Yes.

Q.   On the times that you had seen this Malibu before August 30th, 2008, about how many times had you seen it, let's say, in

Ocampo - Direct (Read)

2178

the month of August?

A. Quite a lot maybe.

Q. On those times that you saw the car, were you able to say who was driving it, who was driving the car?

A. Yes.

Q. Who did you see driving the car?

A. Marcel Brown.

Q. Back to shortly after Taneshia makes the phone call, you said you see the Malibu at the corner of Bloomingdale and Moody, correct?

A. Yes.

Q. Could you see at that point who was sitting in the driver's seat?

A. Marcel Brown.

Q. Did you see anybody -- anybody get out of the car?

A. R.J. and T.J.

Q. Do you know Renard Branch by a nickname or a street name?

A. Yes.

Q. What name do you know him by?

A. R.J.

Q. The times you have said R.J. earlier in testimony, who did you mean?

A. Renard Branch.

Q. When you would speak to Renard Branch, what did you call him?

A.   R.J.

Q.   You said you saw R.J. and T.J.  When they got out of the car, where did they go?

A.   They were coming toward the fieldhouse.

Q.   Were they coming toward the side of the fieldhouse that you were on the side with the swing sets?

A.   No.  They were coming toward the swing set where everybody was at.

Q.   Is it fair to say that most of the people in the park that night were at the swing set area?

A.   Yes.

Q.   Were there other children at the park area at the swing set area besides your own?

A.   Yes.

Q.   As R.J. walked, where did R.J. go as he walked to the area of the swing set?

A.   He walked towards his sister first.

Q.   Without telling us what his sister said, did you see the two of them having a conversation?

A.   The two of who?

Q.   R.J. and Taneshia, his sister.

A.   Yes.

Q.   Were you able to hear anything R.J. said?

A.   Yes.

Q.   What did you hear him say?

A.   He said who fucking with you, sis, I got these N-words.

Q.   At the time did you see anything in R.J.'s hand at that point?

A.   No.

Q.   Did he and his sister have a conversation at that point?

A.   That's what was said.

Q.   What is the next thing that happened after that?

A.   He pulled the gun out.  He started pointing it everywhere.

Q.   When he first pulled the gun out and started pointing it everywhere, would you please stand up and -- as if you were R.J. -- show the Court what he did with his hand and how he pointed the gun?

A.   He walked to his sister.  At first it was hanging out of his pocket.

Q.   It was what?

A.   The gun was hanging out of his pocket as he was walking. Then he pulled it out.  He said who did it, sis, who fucking with you, I got these N-words.  He pointed it everywhere.  I got scared and my child is on the swing and he's just pointing it.  Shaniqua Grayer grabs my son and runs.

Q.   I want to stop you for a minute.  Did R.J. point his arm out straight with the gun?

A.   Yeah, straight.

Q.   Indicating for the record her right arm is extended out and she's waving her arm back and forth.

A.   Right.

Q.   That's what she did.  When he did that, when the defendant pulled out the gun and waved it around in the way you had just described, what did you do?

A.   I was arguing with Taneshia Branch.

Q.   What were you arguing with Taneshia Branch about at the moment after the defendant Renard Branch pulls his gun out, what are you arguing with your sister about?

A.   Because he pointed the gun to Eugene Stanciel and put it to his face and I got in front of Eugene Stanciel and then he pointed to Cool.  And he pointed to Cool.  He seen Paris's group --

Q.   Let me stop you.  You said he pointed the gun to Cool, correct?

A.   Yes.

Q.   Eugene Stanciel is your boyfriend and father of your child?

A.   Yes.

Q.   Who is Cool?

A.   Tyrone.

Q.   What is Cool's relationship to you and your boyfriend?

A.   Nothing.  He's just the neighborhood.

Q.   Fair to say he's a friend?

A.   Yeah, the neighborhood.

Q.   A moment ago, you said you stepped in front of Eugene Stanciel?

Ocampo - Direct (Read)

2182

A.   Yes.

Q.   Did you intend to take a bullet for Eugene Stanciel?

A.   No.

Q.   Why did you step in front of Eugene Stanciel when the defendant pointed the gun at him?

A.   Because I know -- I knew Renard was not the reason they came up there because of Eugene Stanciel.  It was because of Eugene's cousin.  And Taneshia said when he pointed the gun to Eugene Stanciel, Taneshia Branch said no, not Eddie Cane.

Q.   When Taneshia said no, not Eddie Cane, his cousin, what did the defendant do?  What did Renard Branch, the guy you call R.J., what did he do?

A.   He ran towards Paris's group.

Q.   And where was Deshaun Grayer, if you know, when defendant ran towards the group that Paris was in?

A.   He was with Paris's group.

Q.   He was part of that group that had been by the bench?

A.   Yes.

Q.   When the defendant ran in the direction of the boys at that bench that included Deshaun Grayer and included Paris Jackson, was the gun still in his hand?

A.   Yes.

Q.   How was he holding the gun at the time, Marisol?

A.   He just shooting it.

Q.   Was his arm extended out just the way you have shown?

A.   Same he was doing it at first, shooting it.

Q.   You saw him shoot the group at the group that included Paris Jackson and Deshaun Grayer?

A.   Yes.

Q.   As the defendant Renard Branch began shooting at that group, what did the boys in that group do?

A.   They were running toward the fieldhouse.

Q.   So were they running towards Bloomingdale or away from Bloomingdale?

A.   Towards Bloomingdale.

Q.   Towards Bloomingdale or away from Bloomingdale?

        MR. MANES:  Objection.  She answered the question.

        THE COURT:  You got to get closer to the mic.

        MR. MANES:  Objection.  She answered the question.

BY MR. FORD:

A.   Running towards the back of the fieldhouse.

Q.   Is Bloomingdale at the front of the fieldhouse or at the back of the fieldhouse?

A.   That's the front.  They was running towards Narragansett.

Q.   So when you say they were running towards Bloomingdale, were you right or were you wrong?

A.   I was wrong.

Q.   Okay.  When the defendant was shooting at the direction of the boys that were running away that included Paris and Deshaun Grayer, what did you do?

A.   I was arguing with Taneshia Branch.

Q.   So you were still standing there still arguing?

A.   Yes.

Q.   Why didn't you start running?

A.   Because I was mad.

         MR. MANES:  Objection.  I will withdraw.

BY MR. FORD:

Q.   What were you specifically mad about?

A.   Because my son was right there while he was shooting the gun.

Q.   Had someone taken your son away from the swing set area?

A.   Yeah, yes.  Shaniqua Grayer.

Q.   When Shaniqua Grayer took your son away, did she take him out of your arms or out of somewhere else?

A.   Out of the stroller.

Q.   When Shaniqua Grayer picked up your son and took him away, did she run in the direction to Bloomingdale or away from Bloomingdale?

A.   She was running towards Bloomingdale.

Q.   So she was running towards the front of the park?

A.   Yes.

Q.   Okay.  What did you -- after R.J. the defendant fired at those boys, could you tell if any of the boys in that group had been hit?

A.   No.

Ocampo - Direct (Read)

2185

Q. Was there a point in time that you were not able to see those boys anymore because they're -- the direction they were in?

A. Yes.

Q. As you saw the defendant running after the boys that included Paris Jackson and Deshaun Grayer, those boys as you testified were running to the back of the fieldhouse, correct?

A. Yes.

Q. As they ran towards the back of the fieldhouse, did the defendant continue to chase them and shooting at them?

A. Yes.

Q. Was there a point in time that you were no longer able to see all the boys in that group as they continue running?

A. Yes.

Q. Why was that?

A. Because I was arguing with Taneshia Branch.

Q. Was there a point in time that those boys ran behind the fieldhouse?

A. Yes.

Q. You're not able to see behind the fieldhouse, correct?

A. No.

Q. Did you see the defendant come back in your direction ever again that night, did you see him again after he run and chased those boys?

A. Running back toward the car.

Ocampo - Direct (Read)

2186

Q.   Where was the car as the -- by that, you mean the brown --

A.   The brown Malibu.

Q.   Where was that car as the defendant was running towards it?

A.   I didn't see it no more.

Q.   When the defendant -- you said he was running toward the car?

A.   He was running back towards Bloomingdale and Moody.

Q.   So that brown Malibu was still at Bloomingdale and Moody?

A.   Yeah.

Q.   Did you find your child?

A.   No, because I was still arguing with Taneshia Branch.

Q.   I'm sorry?

A.   No.

Q.   Was there a point in time that you did eventually find your child?

A.   Yes.

Q.   Where did you eventually find your child?

        MR. MANES:  Objection.  What's the relevancy for that?

        THE WITNESS:  On Meade and Bloomingdale?

        MR. FORD:  Overruled.

BY MR. FORD:

Q.   Who was your child with?

A.   Shaniqua.

Q.   Where did you go after you got your child and met up again with Shaniqua?

Ocampo - Direct (Read)

2187

A.   I was walking towards Mason and Bloomingdale.

Q.   What was at Mason and Bloomingdale?

A.   Shaniqua Grayer's grandmother.

Q.   Where did you stay that night?

A.   I went back home.

Q.   Where was your home -- where was your home at that time?

A.   5014 West Division.

Q.   Where was -- I know you said you were living with your mother and your mother's boyfriend.  Was Eugene also living with you at that house?

A.   No.

Q.   So you went home to your mom's house on Division.  And when was the next time -- did you talk to Eugene that night?

A.   Yes.

Q.   When did you learn that someone -- that Paris Jackson had been killed?

A.   The next morning.

Q.   How did you learn that?  Who told you?

A.   A lot of people called my phone.

Q.   When you heard that Jackson Paris had been killed that morning, what did you do?

A.   I called the police.

Q.   And did you eventually go to the police station at Grand and Central and talk to the police?

A.   Yes.

Ocampo - Cross (Read)

2188

Q.   Where the detectives sit?

A.   Yes.

Q.   Okay.  Were you eventually interviewed by the state's attorney?

A.   Yes.

Q.   One of those state's attorneys took a statement from you at the police station?

A.   Yes.

Q.   And then on September 9th, 2008, did you come to this building and testify before a grand jury?

A.   Yes.

Q.   Investigator, you don't know, right?

A.   I don't know.

Q.   Who else did he drive you down with?

A.   Shaniqua Grayer and Eugene Stanciel.

Q.   You're still romantically involved with Eugene Stanciel?

A.   Yes.

        MR. FORD:  I have nothing else.  Mr. Wiener, you will go first throughout.  You started in opening statements.

                    CROSS EXAMINATION

BY MR. MANES:

Q.   Ms. Ocampo, good afternoon.

A.   Hello.

Q.   I represent Marcel Brown.  Before the shooting, you saw Marcel Brown pull up in this Malibu; is that correct?

A. Yes.

Q. How far away from the shooting was the Malibu at the time that the shooting occurred -- at the time that you saw R.J. with a gun and shooting?

A. It was a long distance.

Q. You say it was the length of a football field, how long was it?

A. Twice this room.

Q. Did you ever see Marcel get out of that car?

A. No.

Q. On September 1st, did you go to Area 5 and talk to Detective Mancuso and Detective Whalen? Did you talk to detectives at Grand and Central on September 1st?

A. Yes.

Q. Did you tell Detective Mancuso and Detective Whalen that when R.J. approached this young lady, he at that point pulled a dark-colored handgun from his front pants pocket?

A. Yes.

Q. You never told the detectives that it was hanging from his pocket and you could see it, did you?

A. He did not ask, that I remember.

Q. But you never told him that; is that correct?

A. If I'm not mistaken, I mentioned it.

Q. You also made a handwritten statement taken on September 1st with Assistant State's Attorney Michael Hogan and Detective

Ocampo - Cross (Read)

2190

Mancuso; isn't that correct?

A.   Yes.

Q.   In that handwritten statement, you told -- you signed the bottom of each page?

MR. MANES:   May I approach the witness, Judge?

The court says?

MR. FORD:   You may.   Are you marking something as an exhibit?

BY MR. MANES:

Q.   A copy of a handwritten statement as defendant Marcel Brown's No. 1.   Miss Kerbis.   I just ask you to look at this. Do you recognize the document that I'm showing you?

A.   Yes.

Q.   Is that the handwritten statement that you gave on September 1st at 2:42 in the morning at Grand and Central?

A.   Yes.

Q.   Okay.   And in that handwritten statement, you told -- and you signed each and every page of this; is that correct?

A.   Yes.

Q.   Bottom of which you made corrections, correct?

A.   Yes.

Q.   In that handwritten, you told the state's attorney and the detective that R.J. pulled a gun from his pants pocket; is that correct?

A.   Yes.

Q. You never said in that handwritten statement that you saw the gun hanging out of his pants pocket before he pulled the gun; isn't that right?

A. Yes.

MR. FORD: I'm sorry?

THE WITNESS: Yes.

BY MR. MANES:

Q. Did you ever see Marcel Brown with a gun?

A. No.

Q. Did you ever see Marcel Brown yell or encourage R.J. to shoot anybody?

A. No.

CROSS EXAMINATION

BY MR. KAYES:

Q. The people who were sitting playing dice, they were the people that were sitting drinking the vodka and playing dice; is that correct?

A. Yes.

Q. That included the victim in this case; is that correct?

A. Yes.

Q. You saw, after the argument, you saw the car come again; is that correct?

A. Yes.

Q. You also said that before the car came back that you had seen Renard Branch in the park talking to Taneshia; is that

correct?

A. Yes.

Q. While he was talking to Taneshia the first time you saw him, that was before any argument took place?

A. Yes.

Q. He left the park; is that correct?

A. Yes. That's correct.

Q. You didn't see him get into any car at the time he left the park in the first place; is that correct?

A. From the first time I seen him?

Q. Yes.

A. Yes, he got in the brown Malibu.

Q. The first time?

A. Yes, the first time.

Q. So somebody dropped him off in the Malibu, he got out, talked to his sister, and got back in the Malibu and left?

A. Yes.

Q. You had occasion, did you not, to speak with police officers the day after this incident took place which is August 31st, 2008, sometime before 2:00 o'clock in the morning, you talked to police?

A. I talked to them around the time that --

Q. Do you recall on the date of August 31st speaking to Officer Mike Mancuso?

A. Yes.

Ocampo - Cross (Read)

2193

Q. And at that time, he was taking notes about what you were saying; is that correct?

A. Yes.

Q. And at that time, you never told Officer Mancuso that you had seen Renard Branch arrive at the park, talk to his sister, and then leave?

A. Yes. I did mention that.

Q. You did mention that?

A. Yes.

Q. And did you indicate to him that time when you spoke to him on the 31st, you didn't indicate to him that Renard Branch when he came back said something about I'll kill you N-words, did you?

A. He said that the second time his sister called him.

Q. The second time when you're talking -- and when you were talking to Officer Mancuso the second time, you never told him that Renard Branch said anything about killing N-words?

A. Yes, I did.

Q. Okay. And that took place on August 31st, 2008?

A. I'm not quite sure of the time; but yes, I did mention that.

Q. You do know who Officer Mancuso was; is that correct?

A. Yes.

Q. Isn't it true that in that first statement you gave to Officer Mancuso, you told him that Taneshia then called her

Ocampo - Cross (Read)

2194

brother Renard?

A.   Yes.

Q.   You also told him shortly after Renard and T.J. arrived in the car; is that correct?

A.   Yes.

Q.   You told him that Renard Brown -- strike that.  You indicated that Marcel Brown was driving the car and stayed in the car?

A.   The first time, yes.

Q.   You also told him that T.J. and Renard Branch walked up to the park; is that correct?

A.   No, not the first time.

Q.   You didn't tell that to them the first time?

A.   No.  I said the first time Renard got out of the car by his self with his sister, walked into the park.

Q.   Then you told him after he walked into the park, you told him that Renard started talking to Tasha and asking who is it, who is it?

A.   That was the second time.

Q.   The second time you said Tasha said Renard, it's those boys over there?

A.   Yes.

Q.   At that time Renard pulled out a gun and began shooting?

A.   No.

Q.   And began shooting at the group, isn't that what you told

Ocampo - Cross (Read)

2195

Officer Mancuso the day after this happened?

A.  No.

Q.  You didn't tell him anything about you at that time having to jump between Renard and anybody, did you?

A.  Yes.  I did tell him.

Q.  You did not see -- after the shots were fired, how long was it from the time the first shot was fired until the time the last shot was fired?

A.  I don't know.  Not long.  A second, two seconds.

Q.  Two seconds.  And how many shots did you hear?

A.  Five, six.

Q.  You didn't tell how many -- Officer Mancuso how many shots you heard?

A.  I probably mentioned it.  I don't know.  But I know it was five or six shots.

Q.  You told Officer Mancuso the day after this happened that when the shots fired, you ran; is that correct?

A.  No, I did not.

Q.  Well, did you run away after the last shot was fired?

A.  No.

Q.  You just stood there and talked to Taneshia?

A.  Yes.

Q.  You did not tell Officer Mancuso that Taneshia and you stood there and kept on talking after the shooting took place, did you?

Ocampo - Cross (Read)

2196

A.   Yes.  I did.

Q.   After the shooting took place, did you go and look for any of the boys who had run to the back of the fieldhouse?

A.   No.

Q.   After the shooting took place, did you see anybody fall as Renard was chasing them?

A.   No.

Q.   Did you happen to see Taneshia after the shooting took place in the area of Meade?

A.   Yes.

Q.   Did you stab her at that time?

A.   No.

Q.   Who stabbed her?

A.   I don't know.

Q.   Did she get stabbed?

A.   Who?

Q.   Taneshia.

A.   I don't know.

Q.   You weren't present at the time of the stabbing?

A.   No.

Q.   You indicated that on September 1st, 2008, at about 2:43 a.m., you were interviewed by a state's attorney and the police at that time; is that correct?

A.   Yes.

Q.   You've been shown what's been marked as Defense Exhibit

Ocampo - Cross (Read)

2197

No. 1 -- Defendant Brown No. 1.  I would ask -- I would ask to adopt.  I will call it Branch No. 1 for identification.

MR. FORD:  You're also marking a copy?

MR. KAYES:  Yes.

BY MR. KAYES:

Q.  I ask you to look at what's been marked as Defendant Branch No. 1 and ask if you look at that, and ask if you know what it is.

A.  Excuse me?

Q.  Do you know what that was?

A.  Yes.  I know what this is.

Q.  What is that?

A.  This is what I signed.

Q.  This is a statement you read before you signed it?

A.  Yes.

Q.  You made additions and deletions to it and from it; is that correct?

A.  Yes.

Q.  No one told you what to say when you made that statement; is that correct?

A.  No.

MR. FORD:  No it's not correct or no one told you?

THE WITNESS:  No.  No one told me.

BY MR. KAYES:

Q.  That statement truly and accurately reflects what you told

the police on that date, is that correct, and the state's attorney?

A. Excuse me?

Q. That truly and accurately represents what you told them on that day?

A. Yes.

Q. Is there anything in that statement that indicates that you stood between Renard Branch and anybody as he was pointing a gun?

A. Yes.

Q. What does it say?

A. She grabbed Cool and Taneshia said not you to Eugene. Deshaun -- I don't see that.

Q. Does it stay I jumped between Renard and anybody?

A. It says I -- no, it doesn't say that. But it says I grabbed Cool, which meant Eugene Stanciel, and it says it right here.

Q. You grabbed him but that's not what you told the judge. You told the judge you stood between Renard and Eugene; is that right?

A. That's what it says, it say Cool.

Q. It says you grabbed Cool?

A. I didn't grab Cool. I grabbed Eugene because Renard was pointing the gun toward Cool, toward Eugene and Cool.

Q. When you were interviewed by the state's attorney today,

were you interviewed in the presence of other people?

A.   No.

Q.   Who were you interviewed by?

A.   A detective and an attorney.  There was a lot of people.

Q.   Who was the attorney?

A.   I don't remember her name.

Q.   You ever talk to anybody about this case who wasn't a law enforcement official from the time it happened to the time you gave your first statement?

A.   No.

Q.   You indicated when you saw Mr. Renard Branch get out of this car, he walked into the park; is that correct?

A.   Yes.

Q.   That's what he did, he walked through a gate?

A.   The first time?

Q.   Yes.

A.   The first time yes, he walked through the gate.

Q.   The second time?

A.   The second time, I guess he walked through the gate again.

Q.   You saw him coming out of the car and walk to the park?

A.   Yes.

Q.   He never jumped over any fences, did he?

A.   No.

        MR. KAYES:  I have nothing further, Judge.

                REDIRECT EXAMINATION

Ocampo - Redirect (Read)

2200

BY MR. FORD:

Q. Marisol, you've been interviewed by police and state's attorneys a lot of different times on this case, correct?

A. Yes.

Q. When you were here today, who interviewed you?

A. You.

Q. Okay. Now you were asked by Renard Branch's lawyer about hearing -- about telling police that you heard Renard Branch say when he came back to that park to talk to Taneshia, talking about killing, and I won't use the word, but it's the word that begins with the letter N. You know what word I'm referring to?

A. Yes.

Q. Once again in the grand jury, Page 10, were you asked these questions and did you give this answer:

Question, beginning at Line 6: Did R.J. say anything when he pulled the gun out?

Answer: Yes.

Where did he pull the gun out from?

Answer: His pocket.

Question: And what did he say after he pulled the gun out?

Answer: He was asking his sister like who was messing with her. He was like which one sis, which one. Who is fucking with you because I kill a N-word for my sister.

A. Yes.

Ocampo - Redirect (Read)

2201

Q.   Were you asked these questions and did you -- did you -- were you asked this question and did you give this answer?

Question:  What was he doing with the gun when he was saying this?

Answer:  He was pointing it everywhere.

Were you asked that question, did you give that answer?

A.   Yes.

Q.   On that same note, referring to the same thing that Renard Branch said to his sister, when you were interviewed by Assistant State's Attorney, a young man by the name of Mike Hogan, an Assistant State's Attorney, who typed out a statement on a computer, while you talked to him, do you remember that, do you remember talking to him a day or two after the murder at the police station he took your statement?

A.   Yes.

Q.   Referring to Page 2 of Ms. Ocampo's handwritten statement, did you say the following or tell the following to Mike Hogan, the Assistant State's Attorney, in the presence of Detective Mancuso:  Mari states when R.J. got to the park, people started to run.  And I'm sorry, Mari states she turned around and saw Renard Branch with a gun in his pocket.  Mari states that R.J. pulled out the gun and asked Taneshia which one sis while he was pointing the gun at them.  Mari states that Taneshia said

when he got those hoes, said when he got those hoes and that, it was the boys. And pointed at them. Mari states that -- Mari states that Taneshia pointed at Eugene and Cool. Mari states that she noticed Paris Jackson who was with Eugene started to run. Mari states that R.J. asked the boys which one is fucking with my sister, I will kill all you N-words.

Did you tell the Assistant State's Attorney Mike Hogan that Renard Branch said that at that time and you signed a statement to that effect?

A. Yes.

Q. Finally, when you were asked questions about continuing to argue, Marisol, the lawyer for Renard Branch asked you about telling Detective Mancuso about continuing to argue with Taneshia even as Renard was shooting, how you stayed there and continued to argue with Taneshia.

Going back to that same handwritten statement, Page 2, Page -- into Page 3. Beginning at the top of Page 3, did you tell the assistant state's attorney Mari states -- did you tell the assistant state's attorney, Mari states that R.J. started shooting at the boys who were running away. Mari states that Paris was part of the group of boys that R.J. was shooting at. Mari states that she saw R.J. fire around five shots at Paris's group and then ran back to the Malibu. Mari states she started arguing with Taneshia and didn't pay attention to the Malibu anymore so she didn't say where R.J. went after that.

Ocampo - Redirect (Read)

2203

Did you tell the state's attorney that?

A. Yes.

Q. Similarly, in the grand jury beginning at the bottom of Page 11 -- I'm sorry, beginning at the top of Page 12 in the grand jury when you're talking about Renard Branch shooting, were you asked this question and did you give this answer?

Question: What did you do when he, referring to Renard Branch, started shooting?

I was still -- I was arguing -- Answer: I was still arguing with his sister at the same time that he was shooting. We were standing right behind him.

Were you asked that question in the grand jury and did you give that answer?

A. Yes.

Q. By the way, did you see anybody out there with a gun that night except for Renard Branch?

A. No.

THE COURT: All right. That will conclude testimony testimony of -- the criminal testimony of Ms. Ocampo.

Ma'am, you may step down. Thank you for your assistance.

MR. FLYNN: Your Honor, at this time we have an issue with exhibits and a secondary issue but I think we can handle all that on a break.

THE COURT: Okay.

2204

MR. FLYNN: And so with the exception of those two issues, the defense rests.

THE COURT: All right. So the defense has rested. Does the plaintiff wish to present any rebuttal evidence?

MR. LOEVY: May we speak to you at the sidebar?

THE COURT: Certainly.

(Proceedings had at sidebar.)

MR. LOEVY: Hi, Judge. We lost the battle, too.

THE COURT: I'm having a little trouble hearing you. Thank you.

MR. LOEVY: We lost the battle on having her declared unavailable. But she would ask that you explain why we're reading the deposition transcript, that she was given a subpoena, she didn't show up, and that you the Court had determined her unavailable? Otherwise, the jury is getting a very distorted view of what's going on here why we're playing this deposition. They should know why we're playing this deposition, that you have determined that she didn't show up pursuant to her subpoena so you're giving us permission to play her deposition testimony. And we should tell the jury that she had to get arrested to give that testimony.

THE COURT: I'm not going to go that far. I -- you know, I might be willing to just explain that testimony is being presented by way of her prior statements because I've declared her unavailable but that's the extent of which -- to

which I'd be willing to go. I'm not going to explain --

MR. LOEVY: Well, unavailable could be like you gave her an excuse. It should be unavailable because she was subpoenaed and she didn't appear in court.

THE COURT: I'm prepared to just instruct them that the testimony that they just heard and that they're about to hear -- assuming you're going to offer it -- is being offered because I've declared her unavailable.

MR. LOEVY: That gives her an excuse. We're better off without it so I guess --

THE COURT: All right.

MR. LOEVY: Thank you.

(End of sidebar.)

THE COURT: All right. The defense has rested subject to the matter you said we could take up at our break.

Does the plaintiff have any rebuttal case it wishes to present?

MR. LOEVY: Your Honor, at this time we'll complete Mari Ocampo's testimony via the deposition.

THE COURT: Okay. So, ladies and gentlemen, we're going to play portions of a prior deposition testimony of the same witness, Ms. Ocampo. That deposition was recorded via video and so we're going to play that for you.

I believe that that will be -- other than perhaps a stipulation, the end of the testimony and so we will finish

2206

that today and let you go.  At least that is our expectation. I don't expect that it will take -- it will spill into tomorrow -- I'm sorry, spill into Monday so we are on track with the time frame that I indicated to you earlier in the week.

So we'll begin the testimony now.  We will take our afternoon break in roughly an hour, give or take, just to give you a chance to stretch and use the restroom and then we'll come back to finish the testimony and we'll get you out of here.  So with that --

(Brief pause.)

THE COURT:  It's not connecting.  All right.  Give me one second.

(Ocampo video played.)

THE COURT:  Let's pause here.  It's 3:15 I want to take a ten-minute rest break.  If you can come back at 3:25, we'll finish this up and get you out of here for the day. Please don't discuss the case.  Almost there.  All rise.

(Proceedings heard in open court; jury out.)

THE COURT:  All right.  You may be seated.  I'm going to try to keep this break as close to ten minutes as we possibly can so we can just get this done, have the stipulation read, and get the jury out of here.

The question that I would ask the parties to think about is the juror who indicated travel plans beginning on the

10th and how we want to deal with that. You don't need to tell me now, but if -- if there's anything we need to say or do on that, you know, today is the day to let him know. Maybe there's nothing to do. But I just want to plant that in your heads for whether we should do anything about that before we let the jury go.

MR. LOEVY: Thanks, your Honor.

THE COURT: Okay. See you in ten minutes.

MR. LOEVY: Thank you. And, Mr. Gibbons, safe travels.

MR. GIBBONS: Thank you, your Honor.

(Recess taken.)

(Exchange of reporters took place.)

THE COURT: All right. We're back on the record.

Mr. Loevy?

MR. LOEVY: Just to apprise the Court, you know, there's an exam, and then there's his direct. I had proposed cutting her redirect and his redirect, but I understand that they have their reasons that they don't want to do that.

THE COURT: Okay.

MR. LOEVY: But there is two objections. You know, in context you did allow them to read the criminal trial testimony. So coming up, Mr. Flynn is about to read the criminal trial testimony again, and we again renew our cumulative objection after we sit down that they get to read it

2208

again because you allowed them to choose to do it through the way they did it.

MR. FLYNN:  Do you have the section on that?

THE COURT:  Yes, if it really is rereading the trial testimony, I would like to --

MR. FLYNN:  I would just like to review it.

(Discussion off the record.)

MR. LOEVY:  While he's working on that and we're working on that, we did forget an objection on the very last page.  I don't know if you have the transcript, Your Honor.  On the very last page of the edited version, there is a reference to a threat that did not come out, the very last question and answer, and that's not fair to put in there because there's no context for, you know, who she's claiming she's afraid of.  All of that other stuff has been cut.  That should have to come out for consistency, lest it looks like she's afraid of Marcel.

THE COURT:  I'm sorry.  What's the page number?

MR. LOEVY:  The version that I have doesn't have page numbers.

(Discussion off the record.)

MR. LOEVY:  No, that's not going to work, either.  I'm going to tender Your Honor a copy.

THE COURT:  Thank you.  Yes.

MR. LOEVY:  Oh, it is page 281.  Do you have it up there?  It's 281-07 to -14.

2209

THE COURT: Okay.

MR. LOEVY: Here, I'll hand up the page.

THE COURT: I've got it. I've got it.

MR. FLYNN: Hey, Tom, what page is that on?

MR. LOEVY: It's 281-07 to 281-14. It's the last question and answer on the record. But as I saying, it implies she's not afraid of the process server or if she's afraid of the cousin. All the threat stuff has come out. We shouldn't leave in one reference.

THE COURT: I want to get Mr. Flynn's position on that.

MR. FLYNN: I was working on the last one.

THE COURT: I get it.

MR. FLYNN: I have no objection. I have no objection to skipping through the criminal trial transcript reading. I believe it starts on page 215.

THE COURT: Okay. So we'll cut that.

MR. FLYNN: Okay.

THE COURT: So I'm hoping you -- Maria or you can signal when to stop.

MR. FLYNN: We'll figure that out.

THE COURT: Yes, yes, yes, yes.

MR. FLYNN: With respect to -- I believe he's talking about the very last. Is he saying he's reraising an objection to that?

MR. LOEVY: Yes, I think we failed to be comprehensive in light of the Court's rulings on threats in taking out some of the context of who she's afraid of. We can't leave one reference to it where people could think it's Marcel that she's afraid of instead of that cousin or the process server or whoever she's afraid of.

MR. FLYNN: Well, I think it's for the jury to decide who she's talking about.

THE COURT: Okay. I'll sustain the objection, and we'll cut it. We'll cut that part.

MR. FLYNN: If they're reraising objections, can I reraise just one?

THE COURT: Yes.

MR. FLYNN: My colleague is giving me the page and citation. Do you have it?

MR. FORD: Not yet.

MR. FLYNN: All right. We're working on it, but there is an objection to a discussion regarding other incidents where she's accused of stabbing. We objected to that. It's propensity. I just wanted to make sure the Court understood our objection.

MR. LOEVY: And we had responded that it wasn't being offered for propensity. In fact, nobody is saying she's involved in the stabbing. It's why she would have been afraid that the police were roping her in, and I think that's why you

overruled the objection.

THE COURT: Yes, so the objection will remain overruled. I don't recall specifically and I'm getting a page number, but I did understand it and the objection will be overruled.

MR. LOEVY: Okay. So how are we going to ensure that the --

(Discussion off the record.)

THE COURT: We're not going to go back and forth on it. We've already agreed.

MR. LOEVY: That's fine.

THE COURT: Yes, we're going to cut that.

MR. FLYNN: Pursuant to the Court's ruling at the end, we are cutting?

MR. LOEVY: 281-07 through 281-14, which is the end of the tape.

MR. FLYNN: Yeah, so you can stop it at that.

MS. DEL VALLE: We'll stop at 281-06.

MR. FLYNN: Yes.

MR. LOEVY: Yep.

MS. SCAVO: And you've got the previous cite of 268-15 through 269-04.

MR. SALWAY: I left you a note for that, yeah.

MR. LOEVY: Sorry, Maria. That was accidentally omitted.

THE COURT: Okay. We're going to get the jury lined up.

MR. LOEVY: Let's do it.

THE COURT: As we do that, if anyone believes that we should inquire of Tyler Campbell who has a vacation on the 10th, please let me know. Otherwise, I'm just going to let them all go, and we'll see them on Monday. But if you think there's some reason we should deal with that prior, you know, prior to Monday, you just need to let me know that.

MR. FLYNN: It's up to the Court.

THE COURT: Yes. We'll just have them come back, and we'll see where we are.

All rise.

(Jury in at 3:34 p.m.)

THE COURT: All right. You may be seated.

All right. We can resume the recording.

(Said video testimony displayed in open court.)

MR. LOEVY: Keep going Kyle, right?

MR. FLYNN: This is the criminal trial transcript part.

MR. LOEVY: Oh, gotcha.

(Said video testimony displayed in open court.)

MR. FLYNN: And I'm sure everybody will be happy to hear that we've agreed to end the tape there.

THE COURT: All right. Thank you.

MR. LOEVY:  It could have gone on, Your Honor.

THE COURT:  Okay.  Anything else we need to present to the jury before we excuse them?

MR. BOWMAN:  Your Honor, there is one more thing.

THE COURT:  There's a stipulation to be read, so we'll just read that and we'll get you out of here.

Mr. Bowman, you may proceed.

MR. BOWMAN:  Thank you, Judge.

Ladies and gentlemen, the parties have entered into the following stipulation.  On the morning of August 31, 2008, Chicago police investigators, forensic investigators Fred Heidemann and Victor Rivera were assigned to conduct a search for evidence at the scene of the recovery of Paris Jackson's body in Amundsen Park.  Investigators Heidemann and Rivera processed the scene, searching for anything that might have evidentiary value, including blood.  They examined the walkway along the west side of the gym leading to the grate on which Paris Jackson's body lay, they examined the area beneath the grate where Paris Jackson's body lay, and after Paris Jackson's body was removed from the grate, they examined the portion of the grate on which the body had rested.  They also searched the entirety of the designated crime scene.  The blood that the investigators found was marked by placing Evidence Cones 4, 5, and 6 at the location of the blood.  There was no other blood that investigators found anywhere at the scene.

THE COURT: All right.

MR. LOEVY: With that, plaintiff rests-rests.

THE COURT: All right. Ladies and gentlemen, we will have closing arguments beginning Monday morning. We're almost there. Please don't discuss the case. I admire your patience with us here today, but we will begin with closing arguments Monday morning. Please be here and ready to go at 9:15. We will get started as close to 9:15 as we can. Have a great weekend.

All rise.

(Jury out at 4:45 p.m.)

THE COURT: All right. You may be seated.

All right. I'd like to just take a short break for everyone's comfort, just ten minutes, so that we can get going on the jury instructions conference. Unless there's anything we need to address right now, I will see everyone in ten minutes.

MR. LOEVY: See you then. Thanks.

THE COURT: Okay. Thank you.

(Recess.)

THE COURT: All right. We're ready to have our jury instructions conference. I'll say this, you know, now in case because it's been a long week. You know, you certainly aren't required to have anyone stick around for the conference who you don't want to if there's anyone who would prefer to get out of

here.  It looks like Mr. Mancuso may have left, which is totally appropriate.

Mr. Brown, it's entirely up to you and anyone else on your team.  I'm not trying to influence your decision either way.  I'm just letting you know that it's not necessary for anyone who doesn't need to stay.  I know we're waiting on Mr. Loevy, so you have a minute to decide.

(Discussion off the record.)

MR. BOWMAN:  Your Honor, Mr. Loevy has encouraged us to get started without him.

THE COURT:  Okay.  Sounds good.

All right.  So I'm going to be working from essentially the version that was sent to my proposed order box last night.  I think you're welcome to stand, and you're also welcome to take a seat.  Wherever you're comfortable, there's no rules for this kind of thing.

I think the easiest way to do this is to simply call out each instruction and give you a moment to object. Obviously if there are disputes, we'll just turn to those, but otherwise I'll indicate if you don't object it will be given, and that's, you know, sort of applicable to the first dozen or so.

Okay.  Instruction No. 1, functions of the court and the jury, that instruction will be given.

No. 2, Instruction No. 2 on evidence, that will be

2216

given.

Instruction No. 3, what is not evidence, will be given.

Instruction 4 on note-taking will be given.

Instruction 5, consideration of all the evidence, will be given.

Instruction 6 on weighing the evidence will be given.

Instruction 7 on direct and circumstantial evidence will be given.

8 on deciding what to believe, including testimony of witnesses, will be given.

9 on prior inconsistent statements will be given.

10 on lawyers interviewing witnesses will be given.

11 on the number of witnesses will be given.

Absence of evidence, No. 12 will be given.

13 on burden of proof will be given.

14 on the presiding juror and the general verdict will be given.

15, communication with the court, will be given.

16, disagreement among jurors, will be given.

17 on experts and 18 on multiple claims will be given.

All right.  19, all parties equal before the law, I am going to propose one thing.  The parties can certainly think about this and tell me their views on it.  So Instruction 19, I think what needs to be addressed and I think this might be the

2217

place to do it is the fact that there are individuals, specifically Turner and Weber, who are not defendants in the case but whose conduct will be considered.           This sort of gets at the question that a juror asked, and I have no idea what day it was but someday during this trial about who are the defendants and what happened to those who you've named and we didn't hear.  I think it does make sense to try to insert something which would try to tie up that question.  I don't feel strongly about it, but I do think it's a little strange that we're going to be continuing to mention Turner and Weber who are actually not defendants.

MR. LOEVY:  Well, this instruction doesn't use the word "defendants," and so actually, if you think about it, it sort of works.  Plaintiff is a private citizen.  Mancuso, Turner, Weber were detectives, and we should say McDonald is a detective.  Introducing the idea of a personal representative just is a back doorway of implying, you know, that it comes out of his estate or something.  We should just say Brown is a citizen, the four police officers are or were police detectives, and we don't say all parties, but all persons are equal before the law, because really what we're getting at is all people.  It doesn't matter if you're --

When I first started doing these trials, I was the one begging to say that people get to count as much as cops, and now the cops are worried they're getting less respect.  But we

2218

can say all people are equal irrespective of their status as officers or private citizens or otherwise.

THE COURT: Okay. So part of the -- I don't disagree with that suggestion, but part of the concern that I have is that your suggestion may not take into account what we say on the verdict form.

MR. LOEVY: Well, it sort of --

THE COURT: But I just want to take a look at the verdict form. I apologize. I don't mean to cut you off.

MR. LOEVY: Sure, I understand.

THE COURT: I just want to take a look at it.

(Discussion off the record.)

THE COURT: Okay. The verdict form does not indicate the word "defendant."

MR. KAYES: I think, Your Honor, we did try to address that concern in the verdict form consistent with the agreement, the somewhat unique and special agreement reached at the beginning of the trial.

THE COURT: Right, and that's really all I was trying to capture. If I'm overthinking it or injecting something into it that the parties aren't concerned about or you will have to deal with when this is all said and done, fine.

MR. KAYES: I think we can get away with it. I don't think we need to change anything in 18.

THE COURT: Okay. So Instruction No. 19 --

MR. KAYES: Excuse me. 19.

THE COURT: -- will just say?

MR. LOEVY: Marcel Brown is a private citizen. Mancuso, Turner, Weber, and Kevin McDonald are or were police detectives. And then it would say -- we'd cross the rest of it out about the estate, which is, under my proposal it would be all persons are equal before the law and are entitled to the same fair consideration irrespective of cop or private.

THE COURT: Okay. So just to make sure I'm clear on this because we're making sure as we speak, we'll say: In this case, plaintiff Marcel Brown is a private citizen. Mancuso, Turner, McDonald, and Weber are or were police detectives.

MR. LOEVY: All persons are equal.

THE COURT: Right. Then it would just go to that last part: All parties or persons -- you're right -- all persons are equal before the law and entitled to the same fair consideration irrespective of their status as law enforcement officers, private citizens, or otherwise.

Okay. So with those modifications, 19 will be given.

Okay. Instruction 20, I guess I should confirm that the defense is okay with that change.

MR. FLYNN: Yeah, let's start the conference off with some agreement here. No objection.

MR. LOEVY: Thank you.

THE COURT: Okay. No. 20, Proposed 20, all right.

2220

Plaintiff Marcel Brown has three claims.

MR. LOEVY: Well, that's now two. We've got only two claims, Your Honor. We've decided no failure to intervene, so two claims.

MR. FLYNN: No objection there.

THE COURT: Okay. Thank you.

Plaintiff Marcel Brown has two claims. I will list them for you. Plaintiff's first claim is that Mancuso, McDonald, Turner, and Weber violated his constitutional right under the Fifth Amendment to be free from self-incrimination by -- and here's my proposal -- coercing him into making involuntary incriminating statements that were used against him during his criminal case.

I think in light of everything that everybody proposed, I think that that's my suggestion, but we're here to talk through your views and so I encourage you to weigh in or ask me to repeat or what have you.

MR. LOEVY: You know, I don't -- we proposed and prefer the language "improperly caused him to give an involuntary confession." I don't believe "coerce" -- you know, "coerce" is a term of art, and I don't think we have to prove "coerce." I think we have to show that they caused him to give an involuntary confession. But, you know, it's --

THE COURT: Yes, I appreciate that you have made that argument from the beginning. I disagree. I think coercion is

2221

required, that proof of coercion is required. So I appreciate and have heard your position on that, but I do think that coercion is required. But I'm happy to hear from the defense and from the plaintiff if there's something else.

MR. LOEVY: No, you understand our position and you disagree, so we're good.

THE COURT: Okay.

MR. FLYNN: We agree with the Court, Your Honor.

THE COURT: Okay. So that will be number 1.

Number 2, plaintiff's second claim is that Mancuso, McDonald, Turner, and Weber violated his constitutional right under the Fourteenth Amendment to a fair trial by fabricating evidence used against him during his criminal case. That's my proposal.

MR. LOEVY: That's an improvement, Your Honor. We're okay with that.

MR. FLYNN: Your Honor, we feel at this time, now that the fabrication claim is simply plaintiff's statement, that should be made clear here.

THE COURT: I'm sorry. I'm just rereading what you said. Okay. So you are proposing to add something that this arises from his statement.

MR. FLYNN: Correct, because that's the only thing that the fabrication claim would be based on at this point.

MR. LOEVY: It gets ambiguous because fabricating the

2222

police report in the statement? I mean, this is the claim instruction. It's fabricating evidence. Maybe we should have that fight somewhere else.

MR. FLYNN: It just seems vague.

MR. LOEVY: You know, I think it's allowed to be vague. We are alleging that you are fabricating evidence.

THE COURT: Okay. Let's just put a pin in it because I do want to just see what we're saying in the fabrication instruction. So we'll come back to whether there's something more to add under Proposed Instruction 20. I take your suggestion, though, that perhaps we should be more specific. So we'll hold on of finalizing 20 for the moment.

Okay. Proposed Instruction 21, which is the coerced confession claim, so I'm just going to read it, at least the first part of it: Plaintiff claims that at least one of Mancuso, Turner, Weber, or McDonald violated his constitutional right against self-incrimination by coercing him into making involuntary incriminating statements. To succeed on this claim, plaintiff must prove as to the individual under consideration each of the following things by a preponderance.

So here's my proposal: 1. Plaintiff made incriminating statements.

I would remove the word "false."

2. The incriminating statements were not made by plaintiff voluntarily but, rather, were made involuntarily as a

2223

result of coercion knowingly used by the individual.

Then 3 and 4 I think are unchanged.  3 is the incriminating statements were used against plaintiff during his criminal case and plaintiff was damaged.

So let's just take that chunk first.

MR. LOEVY:  Your Honor, it looks --

MR. FLYNN:  You know, do we define "coercion"?

THE COURT:  We give -- in the pages that follow, we give some instruction on the factors with regard to coercion.

MR. LOEVY:  On the factors and we tie to it, yeah. Okay, it's tied in.  I see.  All right.  Plaintiff sees what you've done there.

MR. FLYNN:  No objection from the defense.

THE COURT:  Okay.  All right.  So then it will be the two normal statements:  If you find that plaintiff has proved each of these things by a preponderance of the evidence as to any individual listed above, then you must decide for plaintiff and go on to consider the question of damages.

Okay.  There's some edits to the next sentence.

MR. LOEVY:  Yeah, this one is sticky, Your Honor, because you remember the framework we're in here is we win if any person did it.  So you've got to read it super carefully because the way it was first written before we edited it, it sounded like if we missed at least one as to any person we lost.  So if they fail to prove at least one of these things as

to each -- and that's not true, right?

THE COURT: Well, it's as to any, but I'm trying to process your point. So --

MR. LOEVY: I'm in the second paragraph. The first paragraph, I think, works.

THE COURT: Okay. Okay. Okay. Okay.

MR. LOEVY: The second paragraph. Sorry.

THE COURT: Thank you for clarifying. Okay. So the second paragraph reads: If, on the other hand, you find that plaintiff has failed to prove -- and this is my proposal -- at least one of these things by a preponderance of the evidence as to each individual listed above, then you must decide against plaintiff and not consider damages.

MR. LOEVY: That I think does solve it.

MR. BOWMAN: Yeah, it does.

THE COURT: So just read it again because that we're all --

(Discussion off the record.)

MR. LOEVY: It's LSAT logic, Tom says.

THE COURT: I was horrible at that.

(Laughter.)

THE COURT: If, on the other hand, you find that plaintiff has failed to prove at least one of these things by a preponderance as to each individual listed above, then you must decide against plaintiff.

MR. BOWMAN:  "As to every individual listed above" would be better.

THE COURT:  Well, but "every" would suggest that you have to check it for everyone and unless you have every one, I think.

MR. BOWMAN:  No, this is the failure.

THE COURT:  This is all the disjunctive thing that I give.

MR. LOEVY:  Particularly with our strange framework, it gets even trickier than usual.  But, you know, the way we originally had it also worked, but they might also both be true.  We had "has failed to prove any."

MR. BOWMAN:  "Against."

MR. LOEVY:  "Against anyone."

MR. KAYES:  No, because that would let them win if we failed to prove against even one but didn't prove against others.

THE COURT:  Right, right.

MR. KAYES:  This was the only one I could figure out.

(Discussion off the record.)

MR. LOEVY:  Okay.  We have a consensus on our side that this is logically coherent.

MR. FLYNN:  So is the "at least" and the "as to each" what plaintiff is proposing?

THE COURT:  Right.

2226

MR. FLYNN: Okay.

MR. LOEVY: Is this our edit or the Court's edit?

MR. KAYES: This is ours.

MR. FLYNN: This is you.

THE COURT: Part of what I'm reading to you at various points -- and I try to flag it for you -- is what we're suggesting, but this, I think, is your instruction.

(Discussion off the record.)

MR. FLYNN: No objection from the defense.

MR. LOEVY: Well, I think if we failed to prove at least one of these things as to each person, there is no room to run, right? Because if that's true, that we have to prove it against at least one, I think it's logical.

MR. BOWMAN: I think it is.

(Discussion off the record.)

THE COURT: Listen, whatever you guys decide, I'm just go to read it. Just pick one.

(Discussion off the record.)

THE COURT: Are we off the record for a second, or what are you -- because Pat is trying to get you down.

MR. LOEVY: Sorry, Pat. We were in internal deliberations, in parentheses.

(Discussion off the record.)

MR. LOEVY: All right. We're done. We're done. We can live with it as edited.

2227

THE COURT: All right. So that will be given.

I don't think we need the next paragraph, which starts "to find for plaintiff you must unanimously agree."

MR. FLYNN: We would push for that paragraph. We think the jury is a little confused, and there's a concern that potentially two jurors could think that one individual may have done something and two other jurors think another individual did something, and you've got to have consensus about one individual.

MR. LOEVY: We have not understood the defense's point on that, and they've been articulating it the whole trial. The instructions are structured so that they must unanimously find. This is -- this paragraph is redundant. It is confusing. It's already confusing enough, and we shouldn't try to say it a third time. It adds nothing. It just doesn't add anything.

THE COURT: All right. So it's a unanimity issue.

MR. FLYNN: Yeah.

MR. LOEVY: We don't usually instruct on unanimity because the instructions say: You must all find.

That's a problem that the court solved a long time ago.

MR. FLYNN: This is unusual circumstances, though, Your Honor.

THE COURT: Yes, I think Mr. Flynn is right, but let me just read it again.

2228

(Discussion off the record.)

THE COURT: Right. It just means that all nine of them have to agree, and I'm using an example. All nine of them have to agree that -- and I'm just going to pick a name -- Turner, so that plaintiff has proved Turner proved all of -- plaintiff proved that Turner did all four things, right?

MR. LOEVY: Yeah.

THE COURT: That's what it means. As Mr. Flynn just said, it can't be, well, two of them think it's Turner and three of them think it's Mancuso and another two think it's McDonald.

MR. LOEVY: Oh, sure, it's unanimous. Sorry to interrupt you.

THE COURT: No, that's okay.

MR. LOEVY: The instructions make clear that they can't find against Turner or Mancuso or anybody else unless they unanimously find. That's true in this case and in every case with multiple defendants. This concept about you must unanimously agree is being injected where it's not needed because the instructions already require unanimity. You must unanimously find each of the elements, and you must unanimously find whatever you find.

THE COURT: But this also adds the point to the defendant's benefit that they must be unanimous as to whomever they reach that conclusion on.

2229

MR. LOEVY:  But that's redundant.  That's always the case.

MR. BOWMAN:  May I?

MR. LOEVY:  Yeah.

MR. BOWMAN:  Judge, Instruction No. 18 on multiple claims --

THE COURT:  Yes, and that's actually what I was just going to say.  Do we have that?

MR. BOWMAN:  -- requires them to give separate consideration to each claim and each individual in the case, and they're also instructed that they must be unanimous.  So the combination of the unanimity requirement and this separate consideration requirement in Instruction 18 addresses the defendant's concern.

Mr. Loevy is exactly right.  We just parsed through the first two paragraphs in order to assure ourselves that they were as clear as they could be in this fairly complicated context, and to add in another paragraph that redundantly restates matters that are addressed in the paragraph just above it, or those two paragraphs in combination, is really mistaken and unfair and unnecessary.

MR. FLYNN:  Your Honor, we do not believe it's redundant.  Paragraph -- excuse me -- Instruction 18 is referring to the different claims and how you've got to look at each claim differently, and this paragraph that we're

discussing in 21 is discussing how you need to look at each element of the specific claim and it's got to be unanimous against the individuals.  There's a difference there.

MR. BOWMAN:  It's separate consideration not only to each claim but to each individual.  So what they're --

THE COURT:  Give me --

MR. BOWMAN:  Sorry.

THE COURT:  Give me one second.  I just want to make sure I'm understanding.

(Discussion off the record.)

THE COURT:  Okay.

MR. LOEVY:  Another way we could do it would be -- the second sentence is the one that I find confusing.  If you just gave the first sentence, it would be redundant but less confusing.

THE COURT:  So what if, what if we go back up at the very top and say, you know, plaintiff claims at least the four names violated his rights.  The second sentence:  To succeed on this claim, plaintiff must unanimously prove --

MR. LOEVY:  Then it's redundant.

THE COURT:  -- as to the individual under consideration.

I know.  I know.  I get your argument, I do, but part of what I'm trying to do is balance the need for unanimity which the defense has raised.  I appreciate that there is a

2231

reading of this that would make it redundant, but my suggestion is: To succeed on this claim, plaintiff must prove unanimously as to the individual under consideration each of the following things.

MR. LOEVY: That's more confusing.

THE COURT: Then move that paragraph we were talking about a few down.

MR. KAYES: Your Honor, I think "unanimously prove," is -- I think the concept you're getting at is they have to unanimously find, and I think it doesn't quite -- I see what you're trying to do.

THE COURT: That's fine. That's fine.

MR. LOEVY: The reason this is new to all of us is that we've all been trying cases in this building for a long time and you never emphasize unanimity. You know, it just doesn't get redundantly ever put into any jury instruction in any case. It's already in there that they can't do anything unless they all do it. That's why, you know, in case after case after case you never say you must unanimously find. It's gratuitous. I get why defendants would like it, but it never happens.

MR. FLYNN: Your Honor, this instruction is not clear. We've spent -- before we even got to this paragraph, it took them ten minutes to figure out how the last paragraph was going to make sense.

THE COURT: Right.

MR. FLYNN: It's a difficult paragraph. It's a difficult instruction. This makes it clearer to the jury.

THE COURT: So I am prepared to offer the following, just the first sentence of the paragraph at issue: To find for plaintiff, you must unanimously agree that plaintiff has proved each of these things listed above as to a particular individual listed above.

MR. LOEVY: It's redundant, but it does no harm.

THE COURT: So I won't give the second portion of the sentence because it really just says the same thing in a different way. So over both of your objections, I will give: To find for plaintiff, you must unanimously agree that plaintiff has proved each of the things listed above it as to a particular individual listed above.

MR. LOEVY: It could say at least one particular individual listed above.

THE COURT: No. I mean, unless the defense has something to add on that or agrees --

MR. FLYNN: I don't think it's necessary.

THE COURT: -- I'll just give the one sentence and strike the second sentence.

MR. LOEVY: Okay.

THE COURT: Okay. Then it's to do something knowingly means to realize that -- the knowingly instruction, to do

2233

something knowingly means realizing what one is doing, being aware of the nature of one's conduct, not acting through ignorance, mistake, or accident.

Okay. The next paragraph: A confession is voluntary if in the totality of the circumstances it is the product of a rational intellect and freewill and not the result of psychological intimidation or deceptive interrogation tactics which have overcome a person's freewill and ability to make a rational choice.

MR. LOEVY: Then it keeps going. It keeps going and does define "coerced" on the next page.

THE COURT: Right. So I would not include the next sentence because I think we cover that in the part that follows. So I would eliminate the sentence that says: Specific methods of interrogation, including the use of deceit, are not in and of themselves prohibited unless if taken together with the totality of the circumstances they result in overcoming one's freewill and ability to make a rational choice.

That to me is just a very confusing sentence.

MR. LOEVY: That one is on the defense. They may want that it's not prohibited, but we're ambivalent.

THE COURT: To be clear, though, I would keep the last sentence, which is: A confession that is not voluntary is coerced.

MR. LOEVY: And now we have defined "coerced" effectively, so we're okay with taking out that it's not prohibited.

THE COURT: And I think some version of -- actually some version of it is below, so I would direct the defendant's attention to, I think, the very last paragraph on the following page which has -- maybe we just move it.

MR. FLYNN: We're fine with moving that.

THE COURT: Okay.

(Discussion off the record.)

THE COURT: Okay. So we'll read "the confession is voluntary" sentence and say "a confession that is not voluntary is coerced."

Then it's: In assessing whether one of the individuals listed above coerced plaintiff into making involuntarily incriminating statements, you should also consider the totality of the circumstances of the interrogation. This means that you should consider all factors relating to the interrogation together instead of considering different factors in isolation.

MR. LOEVY: We have a suggestion that I think you're likely to find persuasive. We should take out the word "confession" in the previous paragraph and call it "incriminating statement" to be consistent. You know, "confession" isn't a defined term, and here we're talking about

2235

incriminating statements. We can argue about whether it was a confession.

THE COURT: We have switched, so what's the defendant's --

MR. LOEVY: So that would be in the second place and in both places in the paragraph. Sorry to interrupt.

MR. FLYNN: So the Court has decided that "confession" is out and "involuntary statement" is in?

MR. LOEVY: "Incriminating."

THE COURT: I think it would make sense to just be consistent because I think it's -- I don't want to create questions like is there a difference in an incriminating statement and a confession. Especially given the nature of the testimony we've heard, I want to be consistent.

MR. FLYNN: If we're being consistent, Your Honor, I think it should be "coerced confession." If you look at the claim, Claim 1 at the top of this instruction, it's "coerced confession." That's what the claim is.

MR. LOEVY: But it really is more accurately an incriminating statement. You know, you can debate whether an incriminating statement is a confession or not. You can say something is an incriminating statement that's not a confession, probably. All the Constitution requires is that you don't incriminate yourself. It doesn't say you have a right not to confess. So I think it is a much better and more

accurate term.  You have a right against self-incrimination.

THE COURT:  Okay.  I'm going to -- I'm going to overrule the objection to the use of the word "confession" here and take plaintiff's suggestion.  So the paragraph will read: An incriminating statement is voluntary if in the totality of the circumstances it is the product of a rational intellect and freewill and not the result of psychological intimidation or deceptive tactics which have overcome a person's freewill and ability to make a rational choice.  An incriminating statement that is not voluntary is coerced.          So over the objection, that's the instruction I'll give.

Then the next paragraph:  In assessing whether one of the individuals listed above coerced plaintiff into making involuntary incriminating statements, you should consider the totality of the circumstances of the interrogation.  Consider everything together and not in isolation.

Then it's:  Evaluating the totality of the circumstances for coercion is determined based on the facts of each case.  You should consider the tactics -- you should consider the tactics used by the individuals listed below during plaintiff's custodial interrogation.  The factors you may consider include but are not limited to, and then there are 10 things, 12 things listed.

MR. FLYNN:  Your Honor, we object to this entire section.  We think that these are issues of fact.  It's up to

the jury to decide what they think may have caused a potential false confession. They've heard from experts that talked about the different factors. There's a disagreement amongst the experts about what are risk factors and what are not, so we don't think this belongs in an instruction.

THE COURT: So I'm going to give it over your objection. I agree with you that there are lots of things the jury heard that they can take into consideration that are not listed here. The statement says that you can consider or may consider. The factors you may consider include but are not limited to, so you're free to argue that there are other considerations that some of the evidence bore out not listed here. So it's not an exclusive list, and I think you're free to argue, you know. If there's some consideration that's not listed here that you think should be, you're welcome to argue that because it's a non-exhaustive list.

MR. FLYNN: We don't have anything to add, Your Honor.

MR. LOEVY: A typo, Your Honor, you switched "above" to "below," but it's actually --

MR. KAYES: I did.

MR. LOEVY: Oh, we did. We got it backwards. The individuals are actually listed above, and the factors are listed below.

THE COURT: Okay.

MR. LOEVY: So we should undo that reference.

THE COURT:  You got that?

THE CLERK:  Yes.

THE COURT:  Okay.  So we'll list the, you know, ticked-off bullets, and it will say in the last paragraph, which I don't think anyone had an objection to, no one factor is determinative, specific methods of interrogation, and the rest of the paragraph as written.

MR. LOEVY:  That sounds good.

THE COURT:  Okay.  So with those modifications, 21 will be given.

Okay.  22 is the fabrication claim.  All right. Plaintiff claims that at least one of Mancuso, McDonald, Turner, or Weber violated his constitutional right to a fair trial by fabricating evidence that was used against plaintiff in the criminal case.

Then I would strike the next paragraph.

To succeed on this claim, plaintiff must prove as to the individual under consideration each of the following three things by a preponderance, and there's no dispute as to what those three things are.

MR. LOEVY:  No, we're okay with that.

MR. FLYNN:  Your Honor, we would just -- like we said earlier when we were discussing fabrication, it needs to be defined.

THE COURT:  Right.  Thank you for reminding me.  I

2239

tend to think we may be able to find something that points the jury to what we're talking about here and it's really just the statement.

MR. LOEVY: Yeah.

THE COURT: It shouldn't be too controversial. Does the defense or plaintiff have a suggestion of what we could add to just point them to what -- I mean, namely the statement. I don't know.

MR. LOEVY: The summary? I don't think we need to say anything, Your Honor. I think we should argue in closing what was fabricated.

MR. FLYNN: I think leaving it open-ended, Your Honor, is going to be confusing to the jury.

THE COURT: Do you have a suggestion?

MR. FLYNN: Yes, Your Honor. In the first element there, you could say something along the lines of: The individual knowingly fabricated a police report regarding plaintiff's incriminating statements and they were introduced against plaintiff in his criminal case, something along those lines.

MR. LOEVY: Well, what if they fabricated plaintiff's statements through suggestion, leading, threats, and coercion? You know, we could say evidence, including plaintiff's statements and the police report, but I just don't know what it buys us to go beyond evidence.

MR. FLYNN: Leaving it open-ended like this, Your Honor, will leave the jury guessing is there other evidence that was fabricated, and none of that evidence actually came in.

MR. LOEVY: We'd have to prove by a preponderance of the evidence that such evidence was fabricated.

THE COURT: Oh, okay. This is factor 1: The individual knowingly fabricated evidence, namely, the police report -- or knowingly fabricated the police report that was introduced against plaintiff in his criminal case?

MR. LOEVY: Or the information in the police report.

THE COURT: The information in the police report? How about the information in the police report?

MR. LOEVY: That would be part of it, but we also think plaintiff's statement was fabricated. We could say knowingly fabricated plaintiff's --

THE COURT: But it has to be something that was introduced against him in his criminal case. So the statement standing alone -- if I'm wrong, please tell me.

MR. LOEVY: Well, I guess, was the statement --

THE COURT: The statement standing alone wouldn't qualify because it has to be something that was introduced against him in his criminal case, if you read the elements.

MR. LOEVY: Although, you know, it does go to the grand jury thing because it was testified to at the grand jury.

2241

So it was used to hold him, if we're still going to bifurcate the time periods.

MR. FLYNN:  I think we're getting ahead of ourselves.

MR. LOEVY:  But if you said fabricated evidence, you wouldn't have to draw the fine line, or you could say --

MR. FLYNN:  I don't understand the distinction.

MR. LOEVY:  -- fabricated the police report and the statement vis-à-vis the grand jury or fabricated just the police report vis-à-vis the trial.  That seems to be more than it's worth.

THE COURT:  Okay.  We're not using "vis-à-vis" in a jury instruction.

MR. LOEVY:  Yeah.

THE COURT:  No one will -- right, I get what you're getting at.

MR. FLYNN:  Your Honor, the fabrication claims only relate to a criminal trial, not the grand jury.

THE COURT:  Yes, I mean --

MR. BOWMAN:  That's not true.

MR. LOEVY:  What did he say?

MR. BOWMAN:  Fabrication claims only relate to the criminal trial, not the grand jury.

MR. LOEVY:  No, you can hold him, and he could spend two and a half years in the county jail.  But Tom has a suggestion:  The individual knowingly fabricated evidence

2242

relating to plaintiff's statements.

That would cover both the statements and the summary of them.

THE COURT: I could live with that.

MR. FLYNN: Could I have it read again? Sorry.

THE COURT: Sure. The individual knowingly fabricated evidence relating to the plaintiff's statements that was introduced against plaintiff in his criminal case.

MR. FLYNN: Yeah, I can live with that, too.

THE COURT: I tell you. Okay. So that will be the the modification to element number 1. We'll give 2 and 3 as written. We'll give the definition of "material," fabricated evidence is material, and then I think we've used this pretty much everywhere, but it will be that same "if you find."

If you find that plaintiff has proved each of these things by a preponderance as to an individual listed above, then you must decide for plaintiff and go on to consider damages. If, on the other hand, you find that plaintiff has failed to prove at least one of these things by a preponderance as to each individual listed above, then you must find against plaintiff. Don't consider damages.

Then I think it's the same sentence: To find for plaintiff, you must unanimously agree that plaintiff has proved each of the things listed above as to a particular individual listed above, period.

MR. LOEVY: Your Honor, then we're one short. The "an individual" in the second paragraph, if you find against us -- no, the first, the first paragraph where it says if you find plaintiff has proved these things as to any individual listed above.

THE COURT: As to any individual.

MR. LOEVY: Yes, because we win if we get any.

THE COURT: Any objection to "any" in the "if you find plaintiff has proved"?

MR. FLYNN: No objection.

THE COURT: Okay. So with those modifications, it will be given.

Okay. 23 is out. Proposed 23 is out, so that will not be given. The failure to intervene claim is out, so that will not be given.

MR. KAYES: I'm sorry, Your Honor. Ms. Del Valle just pointed out a typo in 21, the Court's limiting instruction. I don't think it will be controversial. There's an "any" missing in the last sentence of the first paragraph.

MS. DEL VALLE: And the same thing with fabrication as to any individual.

MR. KAYES: Then also, the same portion of Claim 2 as well, there's a missing "any."

THE COURT: I'm sorry. Can you direct me? Say it again.

2244

MR. KAYES: The first paragraph of Instruction 21, the last sentence of that paragraph reads: To succeed on this claim, plaintiff must prove as to -- blank -- the individual. It should read as to -- oh, actually, no, that's right.

THE COURT: That's right, as to the individual under consideration.

MR. KAYES: I'm sorry.

THE COURT: That's all right. Okay.

MR. KAYES: I'm just trying to confuse the process.

(Laughter.)

THE COURT: Okay. So 24, Proposed 24, the failure to intervene claim, that's out and will not be given.

MR. LOEVY: Correct.

THE COURT: 25, conspiracy, that's out and will not be given.

MR. LOEVY: Correct.

THE COURT: Okay. The state law, okay. So then the next one is Plaintiff's Proposed 27, damages on compensatory. Okay, just a couple of things to raise here. So the first paragraph: If you find in favor of plaintiff on one or more of plaintiff's claims, then you must determine the amount of money that will fairly compensate plaintiff for any injury that you find he sustained and is reasonably certain to sustain in the future as a direct result of the conduct you found proves that claim or claims.

One of you suggested adding the "conduct," I think, and I would leave that in there.

MR. LOEVY:  Isn't it a pattern?

MR. KAYES:  Just to bring everybody up, it's a slight variation on the pattern because it was defendant-specific in that portion, and "conduct" seemed to be the way.  Mr. Salway is shaking his head, so I know I must be right here.

MR. SALWAY:  Yeah.  I mean, me and you did that.  We had to go and scrub this thing for the references.

MR. KAYES:  Actually, yeah, that might have been Mr. Salway.

THE COURT:  Okay.  So that will be the modification without objection, I believe.

All right.  Then the only other change to the compensatory damages or potential change is halfway down:  You should consider the following types of compensatory damages and no others, colon.  I think the question is to "physical" in the physical, mental, and emotional pain and suffering that plaintiff has experienced and is reasonably certain to experience in the future.  I think "physical" is appropriate in light of Mr. Brown's testimony.  I think he testified to his experiences, and that included some physical touching.  We'll just call it that.

MR. FLYNN:  Yeah, no objection, Your Honor.

THE COURT:  Okay.  So with that modification, 27 will

2246

be given.

Punitive damages, 28 will be given.

No inference from my questions, I don't even know -- if you want me to give it, I'll give it.

MR. LOEVY:  You didn't ask any questions.

THE COURT:  Okay.  Let's take it out unless someone feels strongly.  I try not to ask any questions, so we'll take out 29.

Comments by the lawyers will be given.

Stipulations?

MR. LOEVY:  Your Honor, we don't think it would be a normal practice to list stipulations.  That would give that evidence more importance than all the other evidence.

THE COURT:  Correct.  I would just give the standard instruction, which is -- maybe I already did it, so we might be able to take it out, but the definition.  I think we already say it in here about stipulations.  It should be in what is evidence.  Yes, in Instruction 2 we say:  A stipulation is an agreement between both sides that certain facts are true.  Treat them as having been proven as true.

So I think we can take 32 out completely.

MR. LOEVY:  Yeah.

MR. FLYNN:  No objection.

THE COURT:  Okay.  So that will not be given.

All right.  Deposition testimony is the next

instruction.  It's listed on the draft as 33.  So that will be given.

MR. LOEVY:  34 is confusing, Your Honor, because on page 42 of these instructions which was formerly 36, for some reason on the changes that added sentence was supposed to be proposed on 34.  So we are proposing that underlined sentence that you see on page 42 go with Instruction 34.

MR. KAYES:  Does that make sense?

MR. LOEVY:  So Instruction 34, limited purpose of evidence, has the three lines, and then we're proposing to add the five lines that on my printed copy at least are on page 42 on the crossed-out redacted damages instruction.  We're not sure why it ended up there.  So that would mean those two would combine into Instruction 34 on page 40.

THE COURT:  Okay.  Let me just see it, though.

(Discussion off the record.)

THE COURT:  Any objection?

MR. FLYNN:  Yes, Your Honor.  Well, we don't have an objection to moving some of that language over, but this is very similar to the instruction that we went back and forth on with respect to Mancuso and Turner.  We agreed that we needed to remove -- or the Court agreed, anyway, that we should move "they may not be considered for their truth" because that's not actually in the pattern instruction.  So we removed that last sentence.  We could use the same instruction that Your Honor

2248

already gave, I think, on Tuesday.

THE COURT: Right.

MR. SALWAY: Your Honor, it's different in other sections, too.

MR. LOEVY: Yeah, I should have been clear. This is not the one you proposed before. This is our proposal, and we want to be heard on why we should do that when you're --

THE COURT: Yes, I'm there.

MR. LOEVY: All right. The instruction that you gave, which one is it?

MS. DEL VALLE: The one in bold.

MR. LOEVY: In bold, yes. We don't agree that witness statements were given to the defendants. We agree that the defendants claim they got witness statements and they claim that certain things were told to them, but we don't agree that they got them or that they knew what they claim they were told.

So now that we've had a little more time than we did in the moment when we were arguing it, the instruction that you gave assumes their view. It assumes its own conclusion. It assumes that they were given statements and that, therefore, they knew it.

So our underlined language is in our view much more neutral. You know, the defendants claim to have received the information. Plaintiff denies they received the information. But, you know, you can't just say they received it because that

2249

would be accepting their reality.

So we want -- we think we need to give the underlined language to clarify that there is a dispute. As I said at the time, the other witnesses might have been mice for all we know. They haven't proved it. None of the witnesses came in.

MR. FLYNN: Your Honor, may I respond?

THE COURT: Yes.

MR. FLYNN: I understand Mr. Loevy wants a second bite at the apple on this issue. If you gave the instruction, it would be conflicting with the instruction you already gave, and that's an issue. Then Marisol Ocampo now has testified that she gave statements like this to the detectives. So I think the instruction we gave before is sufficient and we should stick with it.

THE COURT: Yes, I am a little concerned that what I already gave would be inconsistent or come off of or change what I --

MR. LOEVY: That's actually the problem, Your Honor. If they are inconsistent and they conflict, then you're accepting their premise. The original instruction said these statements were given and the defendants knew it, and now you're going to tell them something inconsistent with that, which is, the defendants allegedly received this information and claimed to know it. If they're inconsistent, it's because the first instruction was wrong.

THE COURT: But you told me -- okay.

MR. LOEVY: I objected on this basis to the instruction. We were operating in a hurry.

THE COURT: Yes, and I get it. I'm not going to hold -- we were operating in a hurry, and I get it.

MR. LOEVY: Do you remember that I said "mice"? You know, I was making an objection. We had to operate and we did it, but we should get it right now and we should not instruct the jury that the defendants got these statements or that they knew anything, only that they claimed to know.

(Discussion off the record.)

MR. LOEVY: Tom has a suggestion. Instead of saying "claimed," you could say the detectives testified to having received it.

MR. FLYNN: And, Your Honor, there's been no evidence in this case that the detectives didn't get these statements.

MR. LOEVY: But it's hearsay.

MR. FLYNN: They can't inject their theory into your instruction.

MR. LOEVY: Well, I mean, you gave them permission to say you can throw an out-of-court statement at the jury. Then we said: Well, we object. There's no proof.

Then you said: Well, I'm admitting it for a very limited purpose, not because it's true.

THE COURT: Okay. So I think what we should do is

this: You will recall that during the course of the trial I instructed you that I admitted certain evidence for a limited purpose. You may consider it only for the purpose for which I admitted it -- or for which it was admitted. This includes the evidence concerning the witness statements the detectives testified they received in connection with the investigation of the murder of Paris Jackson.

I'm just looking at the next sentence.

(Brief pause.)

THE COURT: Yes, I think the last sentence is what we already said: These witness statements may be considered by you for the purpose of understanding what the detectives may have known.

I will go back and look to see what we said there.

MR. LOEVY: You said "knew." You said "knew," which is our problem, because that assumes that they're telling the truth.

THE COURT: Okay. So I would say: These witness statements may be considered by you for the purpose of understanding what the detectives --

MR. LOEVY: You could be consistent and say "testified to have known."

THE COURT: Yes, "testified to have known."

MR. LOEVY: And for no other purpose.

THE COURT: During the course of their investigation

2252

and for no other purpose.

MR. LOEVY:  And in light of the confusion, you know, I'll tell you what.  Maybe you can put brackets around "may not be considered for their truth" until you hear closing argument, because if there's insinuation and suggestion, hey, all these witnesses, you know, said this, you'll listen and see if it's being offered for the truth or truly for what they knew.

We'd ask that -- you know, it sounds like you're not inclined to add that last sentence, but hold off and see how he argues it.  We're going to be -- if he makes an argument that he relies on those witness statements and wants the jury to infer truth, then we're going to ask you to clarify that.

THE COURT:  So, Mr. Flynn, I'll hear you out, but I am inclined to give the modification that I just read aloud.  I think the question for you is to make any record you wish to make and also the suggestion about "may not be considered for their truth."

MR. FLYNN:  So we think we should stick with the instruction already given, but we understand your approach. With respect to the final sentence, it's not part of the pattern instruction.  We think it should be removed, the same argument we had the last time we gave an instruction like this. But if Your Honor wants to bracket it, then we understand.

THE COURT:  Okay.  So as it stands, we won't give it, but it's with the caveat that if at some point because of

2253

argument we need to, I will. But it's on to you to tell me if you think we need it so that we can have some argument on it. Otherwise, it won't be included as a default.

MR. KAYES: Your Honor, apart from the fact that it's not in the pattern, I think we can all agree it is indisputably true.

THE COURT: Right.

MR. KAYES: Is there any other concern with the addition of that language?

THE COURT: No, other than the fact that I'm trying to be as consistent as I can be to what I said before. But, you know, it's not as though that can't be overridden. You know, if at some point you think it's necessary to give because of what's been said in closing, I'll give it.

MR. KAYES: Thank you, Your Honor.

THE COURT: So I appreciate you flagging that, and if you think we're at a point where it needs to be given during the instructions post-closing, you will tell me.

MR. KAYES: Yeah.

THE COURT: So with that modification, 34 will be given.

MR. LOEVY: And I think defense counsel probably agrees that they're not going to ask the jury to infer that anything those witnesses said, to use it for purposes of the truth.

2254

THE COURT: Right. Okay. The redaction instruction, No. 36, do we need that?

MR. LOEVY: I don't think so.

MR. FLYNN: I don't think so.

THE COURT: Okay. It will not be given. I didn't think so.

All right, demonstratives.

MR. LOEVY: We probably should cut the "such as" and "describe," you know, because it's probably more effort than it's worth.

THE COURT: Right.

MR. FLYNN: No objection.

THE COURT: Okay, certain diagrams, sketches, and charts. Are we going to put in the little thing with the dots today, Mr. Loevy?

MR. LOEVY: This might make a repeat in closing.

THE COURT: Okay. Certain diagrams, sketches, and charts have been shown to you.

MR. BOWMAN: Such as Mr. Loevy's dots.

THE COURT: Yes.

MR. LOEVY: It took longer than you think.

(Laughter.)

THE COURT: Okay. Can we just -- is there a suggestion that we just say "certain diagrams, sketches, and charts have been shown to you," period?

2255

MR. LOEVY: Period, yes.

THE COURT: Thank you. And then those materials. So with that modification, it will be given.

All right. 38, personal involvement.

MR. LOEVY: I thought we agreed.

MR. BOWMAN: That's out.

MR. LOEVY: We agreed when we reached our deal by the door before the trial started. This one becomes redundant because the instructions ask did any of the four people do it.

MR. BOWMAN: It also goes out because the interference claim -- the failure to intervene claim is gone, and that's the only reason for this.

THE COURT: Failure to intervene, okay. So do you agree we can remove the personal involvement?

MR. FLYNN: Well, Your Honor, we were -- we think that it needs to be tweaked. We have concerns regards ASA Spizzirri. She was a large part of this case. I don't know if it needs to be somehow added to this or as a new instruction. We have something that we put together about an hour ago that explains that the detectives cannot be held responsible for something that Ms. Spizzirri did.

MR. LOEVY: Well, we'll have to see it.

THE COURT: Yes.

MR. LOEVY: The devil is in the details there because they could be.

THE COURT: Fair enough. Are you in a position to read it?

MR. FLYNN: Yes. Before we get there, Your Honor, we want to keep part of this instruction as well because this instruction isn't just referring to Detective Mancuso and the former defendants. It's also referring to the other individuals that we heard about in this case, such as the individual that was at the desk that spoke to Wham Cary, the individual that spoke to Deb Scott. It needs to be clear if the jury finds that they did anything wrong, that does not -- there needs to be personal involvement by these detectives. So I'll start there, and then I can read the ASA Spizzirri instruction next.

MR. LOEVY: Your Honor, it is a little off-putting because we agreed to take it out, but Mr. Flynn makes a point.

MR. FLYNN: I don't believe we agreed to take it out.

THE COURT: Understood. I don't want to quibble about the -- I understand why you're raising it, you know, but I want to keep moving forward with forward progress. So what's your suggestion?

MR. FLYNN: For Spizzirri or for --

THE COURT: For both. You can give them to both.

MR. FLYNN: Well, for Spizzirri, it's: During the course of the trial, you've heard testimony from and concerning ASA Michelle Spizzirri. Michelle Spizzirri is not a party to

this lawsuit, and whether Ms. Spizzirri violated plaintiff's U.S. Constitutional right is not at issue in this trial. You should not consider Ms. Spizzirri's conduct when deciding --

THE COURT: Counsel, slow down. He's trying to take it down.

MR. LOEVY: It's almost like it doesn't matter because it's not coming in anyway from our position.

THE COURT: Go ahead, Mr. Flynn.

MR. FLYNN: During the course of this -- during the course of trial, you have heard testimony from and concerning ASA Michelle Spizzirri. Ms. Spizzirri is not a party to this lawsuit, and whether Ms. Spizzirri violated plaintiffs U.S. Constitutional rights is not at issue in this trial. You should not consider Ms. Spizzirri's conduct when deciding whether to find in favor of plaintiff on his claims.

MR. LOEVY: That's factually inaccurate because Mancuso sat right next to her. So if he watched her do it and then knowingly summarized it in his report -- missummarized it, he would be liable for a constitutional violation. That's just using a tool. That's like if I used somebody's knife and I, you know, grabbed his arm and, you know, that business (indicating).

The jury already knows she's not a party, and the jury already knows that they can only find against defendant -- find for us if a defendant did it. So not only is it unnecessary to

say, by the way, this person is not a party, but it's also wrong.

THE COURT: So what about just the first two sentences, because I actually do think that it's important in light of his concern to let the jury know that Ms. Spizzirri -- I mean, you're sort of saying the obvious in the first sentence.

MR. LOEVY: That's the point. You know, you're not a defendant either, Your Honor, and we're not telling them that. We're telling them who the parties are.

MR. FLYNN: But Ms. Spizzirri had a large role in this case at this trial.

THE COURT: Right.

MR. LOEVY: That sounds like argument. You know, there's nothing stopping him from saying: Spizzirri is not on that verdict form or on the instruction of the claims. You're not going to see one word about her.

This is just a pro-defense reinforcement that gives him a hook to argue it. You know, he can argue all day that Mancuso shouldn't be liable for what she did, and we'll argue he sat right next to her. But they're not going to think that she's a party because she's not on the -- not one word is said about her. It's just like if I was the defendant, I'd want it, but it doesn't add anything.

MR. FLYNN: The purpose of jury instructions is to

assist the jurors in understanding difficult issues, and the fact that it was ASA Spizzirri that took the most damning admissions here can be confusing. So it needs to be clear that the detectives cannot be on the hook for anything they found she did wrong.

MR. LOEVY: But they could be. That's our problem.

MR. FLYNN: No, they'd be on the hook for their own actions.

MR. LOEVY: Yeah, but it would be confusing because they could be liable for something she did if they sat next to her and told her what to say.

THE COURT: Which is why I'm not going to give the instruction or the portion of his proposed instruction that says you should not consider Ms. Spizzirri's conduct when deciding whether to find in favor of plaintiff's claims on it.

MR. LOEVY: Yeah.

THE COURT: I appreciate why you suggested that, but I'm not going to give that because it's not true. You can't use that as a basis to, you know, find the defendants liable. We've already talked about the instructions that cover that. So then the question is from defense's perspective -- and obviously I'll give you an opportunity to weigh in -- is whether we should just give the first portion of what he suggested, which is just to remind the jury or say to the jury, you know: You've heard testimony concerning Spizzirri. She is

2260

not a party to the lawsuit.

MR. LOEVY: I mean, again, she is not a party to the lawsuit states the obvious. It's helpful to the defense to, you know, just say, hey, by the way, she's not a party, but it doesn't add anything. So why give it if it doesn't add anything?

MR. KAYES: Your Honor, I think the risk that the jury mistakenly believes that ASA Spizzirri is a defendant is far lower than the risk that the jury over-construes that instruction to kind of get at the sentences you don't want to include and say: Well, she kind of was there. So for the bits she was there, we can't really hold these guys responsible for what she was doing while they were there or what they did before she was there that kind of softened Marcel up to talk to her.

MR. LOEVY: So maybe the followup sentence should be -- we can tell them that, but then there should be a bookend that says defendants can be liable for Ms. Spizzirri's conduct if they, you know, condoned it or facilitated it.

THE COURT: Look, I'm not going to give any of this instruction at all. The only portion I was inclined to give related to her, you know, her not being a party to the case, and that's known. You're welcome to argue it, so it will not be given over your objection -- over your request.

MR. FLYNN: Moving back to 38, Your Honor?

2261

THE COURT: Yes.

MR. FLYNN: We would keep all of the language up through "plaintiff's favor based on what persons" in the third line there.

MR. SALWAY: So the model instruction is just "other persons." It's not "other than the particular listed individual under consideration," which again I think is my -- sorry, my apologies -- which I think is, you know, us trying to work it, because I think it's "other defendants" or something like that.

THE COURT: Okay. Hold on. We've got to not talk over each other, so Pat doesn't miss anything.

MR. LOEVY: We were talking to each other. Sorry.

MR. SALWAY: My apologies. But this instruction is important because this case is not Mr. Brown versus the Chicago Police Department, and that's what it's going to become if an instruction like this isn't given. That's why this instruction is in the model instructions.

MR. LOEVY: Well, I think the instruction is: Don't find against one defendant if it was another defendant. That's what the pattern actually is talking about. The reason I thought we reached an agreement by the door is because we don't have that concern anymore. You know, it's an all-in yes or no. So Mancuso doesn't need to worry about Turner. He don't need to worry about McDonald. That's why this isn't necessary

2262

anymore.

This business about other employees of the department, detectives, officers, that's not part of the model, it's my understanding, because how could it be.

MR. BOWMAN: It's my further understanding -- and I could be wrong about this, and I haven't researched it -- but my recollection from a discussion we had last month in a different case is that the entirety of the instruction is to be given in conjunction with a failure to intervene claim, and the purpose is to sort out how individual responsibility interfaces with that claim.

And I don't know if the comments on this particular instruction explicitly say it's not necessary in the absence of a failure to intervene claim, but that was the consensus the last time I went around this track.

THE COURT: Okay.

MR. SALWAY: Your Honor?

THE COURT: Yes, please.

MR. SALWAY: Yes, Your Honor. So that's actually not right, either. So they originally argued that this instruction shouldn't be included due to the fact that they had a failure to intervene and the conspiracy claims, and that's why that original language says: Nothing in this instruction overrides the Court's instruction regarding failure to intervene liability as set forth in Instruction X. They argued

2263

that this should not be given because they had those claims. Now they don't have this claim -- those claims, so that argument fades away. The reason why they want this claim, though, is so they can argue that, you know, the guy at the desk, that creates liability. That is why this instruction is really important, because this is not a case against the Chicago Police Department.

THE COURT: Right. So here's what I'm going to give: Plaintiff must prove by a preponderance of the evidence that the particular individual you are considering was personally involved in the conduct that plaintiff complains about. You may not find in plaintiff's favor based on what persons other than the particular listed individual under consideration did or did not do.

MR. KAYES: Your Honor, that "conduct complained about," because it's not tied to anything specific in the elements instructions, can do a little violence to understanding.

THE COURT: No, we should correct that.

MR. KAYES: If there's a way to correct it and the Court wants to give it, obviously we'll respect that. I do think that Mr. Salway's concern about, you know, we're going to get people angry at the door guy and never connect it up to Mancuso, A, we're not going to argue that because we wouldn't do that and, B, we lose obviously if we do that under the

2264

elements instructions as they're currently written.

So, you know, I understand that there's very often an individual personal involvement instruction given, but I have never liked that "conduct complained of" because it would allow a juror to mistakenly believe, oh, there's something they're complaining of that has nothing to do with the elements instruction and, poof, we lose for a wrong reason. I think, again, the risk of not giving it is less than the risk of giving it.

THE COURT: And I appreciate that. I would like to try to find a way to craft it that corrects for the issue you just raised, but I think it's appropriate to give it and I'm persuaded by the defense's argument on that.

MR. LOEVY: Okay. I'm not sure the conduct plaintiff complains about is the scariest comment. Sometimes we might be at the point where --

THE COURT: So here's what I want to do in considering the lateness of the hour. I'm going to take a crack at tweaking this just a little bit in light of the "complains of" and so forth. The version, the Word version that we will circulate to the parties tomorrow will have our proposal. When I send that to you, I will indicate that you'll have, you know, a period of time in which to tell me, you know, your objections or a proposed alternative and then, you know, I'll just decide on what to do.

So rather than try to take the time up now, I'll take a stab at it in the version I send you and give you a chance to propose alternatives or tell me that you're okay with what we proposed.

MR. FLYNN: Understood.

THE COURT: Okay. So with some modification TBD, we'll give a version of that, of 38.

All right. We don't need to give the knowing instruction because we already did that. We don't need to give -- I think the next one we should talk about --

MR. FLYNN: I think we skipped 39, Your Honor.

MR. SALWAY: Yeah, Your Honor. There's some instructions that were removed based on -- so we received the, you know, version from you and your law clerk during the last month, and there was some that were removed outright, and we do want to create the record that we think that our Instruction 39 should be included. It's our position that negligence is not sufficient for plaintiffs to meet their claim and, therefore, an intent requirement instruction should be given.

MR. LOEVY: You know, my response is the instructions you have given clearly require the necessary mental state, and emphasizing it was properly excised.

THE COURT: Okay. So you made your record and I appreciate it, but I'm not going to give that over your objection -- over your request.

Okay. I think we are at --

MR. LOEVY: 44.

THE COURT: -- almost there, 44.

MR. FLYNN: Did we make a record on 42?

MR. SALWAY: Oh, wait. Where we at? I'm sorry. I'm at 41 which was -- so it was deleted in that same draft, although my understanding is that we gave this due to the suppression claim which has been dismissed.

THE COURT: Right, right.

MR. FLYNN: We can discuss 43.

THE COURT: So I think we're now at 43.

MR. SALWAY: Yeah.

THE COURT: I apologize for jumping around. So this is one that I think I took out.

MR. LOEVY: You did.

THE COURT: And so I appreciate why you've asked for it, but I'm not prepared to give it. I think the instruction that we gave or we're going to give in the larger instruction above with the factors to consider, et cetera, et cetera, is sufficient to cover it. I appreciate you making your record on it.

MR. SALWAY: Your Honor, is this 43, length of interrogation?

THE COURT: Yes.

MR. SALWAY: Yes. Our position is that that's legally

2267

and factually accurate, and the jury was asking about this exact question. We appreciate that you've already ruled on it, but we do want to make that record and just want to say that the jury has expressed confusion over a lot of these issues that I think the instructions could clear up.

THE COURT: Okay. Fair enough. I will not give it over the request.

Okay, 44. Okay. I think with this one, I don't know that we heard a whole lot about this, but I think what I'm prepared to give is: You have heard evidence that -- you have heard evidence about whether Mancuso, McDonald, Turner, and/or Weber's conduct complied with or violated department policy, procedure, practices, or regulation, which I think they did hear some of that. You may consider this evidence in your deliberations as to each of plaintiff's claims, but such violations standing alone are not enough to establish liability. The claims --

MR. LOEVY: You could stop there.

THE COURT: Yes, I think we should just stop there, but I'm happy to hear from you.

MR. FLYNN: Your Honor, we would like to add a sentence there that's somewhat like that sentence. I don't like the "remember that." It's unusual.

THE COURT: Yes, I don't either.

MR. FLYNN: But I think a sentence something along the

lines of "the claims at issue relate to whether plaintiff's U.S. Constitutional rights were violated," just to make that clear.

MR. LOEVY: Well, you know, it was their witness who a few times blurted out "law" and "Constitution." But I think when you put the period where you put it, Your Honor, gets it done.

THE COURT: Okay. I will adjust a portion of the last sentence: The claims are about whether plaintiff's constitutional rights were violated.

MR. FLYNN: Can we say U.S. Constitutional because of the issue with Sweigart?

MR. KAYES: Your Honor, Mr. Loevy may shoot me down, but you could also just tie it back to the elements instructions and say: The issues are as I have instructed you in -- you know, he needs to prove these things specifically and not make, you know, I think the general reference to the Constitution, which I think in general the Seventh Circuit patterns try to avoid talking about sources of law and things like that for that reason.

MR. LOEVY: Yeah, it really would be unusual to say whether plaintiff's constitutional rights were violated. How about -- that's not a bad suggestion: The issues are as I instructed you in the instructions above.

THE COURT: Yes, I think I'll just say: The issues

2269

you are to consider have been described to you in the instructions above --

MR. BOWMAN: Yes.

THE COURT: -- and just leave it at that. So over an objection and proposed modification, that will be the instruction.

MR. LOEVY: Your Honor, you know, we still believe they should have -- a few witnesses did say it violated the law. Mr. Turner blurted it out. We understand if you're not going to do it, but it should say whether they violated department rules, policies, procedures, practices, regulations, or Illinois law. We still think Illinois law -- well, I guess we lost the battle on that.

THE COURT: Yes, I'm not going to go there. So that will be the instruction.

Okay. Almost there. Almost there. I think the next one is 46.

MR. BOWMAN: Yeah.

MR. LOEVY: This one is a big one for us.

THE COURT: Okay. So here's what I'm prepared to give. It's a slight modification to both of yours but not -- I think it's probably the right one on accomplice liability: A person is held legally accountable for murder under Illinois law even though he did not kill the victim if he intends to promote or facilitate the offense through his actions. Proof

2270

of acts to facilitate or promote an offense need not be supported by words of agreement but may be drawn from the circumstances surrounding the commission of the act by the principal.  However, the accused person is not guilty under an accountability theory merely because he is associated with the principal or is present at the scene of the crime.  He must have intended to promote or facilitate the offense through his actions.

That's close to the defendant's proposal.  It's not word for word, but respectfully plaintiff's proposal has just too much.

MR. LOEVY:  Well --

MR. BOWMAN:  It's based on the --

MR. LOEVY:  Yeah, it's based on the Illinois Supreme Court.

MR. BOWMAN:  And it's based on the Illinois pattern.

MR. LOEVY:  It is.  Your Honor, it is critical to us that the jury understands that the law is you cannot be liable just for driving someone from the scene if you didn't know it was going to be committed.  That's our whole case.

THE COURT:  So where -- help me find the line in here that goes for that.  I'm not going to tell the jury, for example, the Illinois Supreme Court held this.  I'm not going to say that.

MR. LOEVY:  Well, as long as -- we can take out that

2271

clause but say: An accused accomplice is not criminally liable for murder if he didn't know that the passenger intended to shoot the gun.

I mean, that is the law, and it's a critical thing for the jury to understand. But the real -- the more important sentence is the one above it because there is an Illinois Supreme Court case that it's not enough that the accused person drove the principal to the scene and drove him from the scene if they didn't know a crime was going to be committed.

THE COURT: Yes, I am willing to give that line.

MR. LOEVY: That one is critical to us.

THE COURT: That is a true statement, and that's actually 99 percent of what the testimony we've been hearing has gone to. So I'd be happy to fold in that sentence.

MR. SALWAY: Your Honor, we would object to that sentence being added. Our instruction is neutral. It is fair. It could be given in any case where this is an issue. Plaintiff has consistently been arguing that our proposed instructions are tainted in our favor and they skew too far one way, and now they're doing the exact same thing with their instruction here. The instruction should be as you just gave it because it was perfectly neutral, it doesn't sway the jury one way or the other, and it accurately reflects the language in the Illinois statute. The Illinois statute, of course, doesn't talk about a car or anything like that. So we would

2272

stand by the instruction you just gave that closely follows our instruction.

MR. LOEVY: Your Honor, on this -- were you going to talk, Locke?

MR. BOWMAN: Illinois Pattern Instruction 5.03, which I haven't had a minute to pull up but I'm guessing it can be, contains suggested additions based on the circumstances of the case. What we did when we proposed this instruction was we went to the pattern and we went to the comments and the proposed additions and put together an instruction that fit the facts and circumstances here as the Illinois Supreme Court Rules Committee indicates in the comments should be done, and I can take a minute and pull it up.

THE COURT: So I'm going to do what I did before, which is, I'm going to put a pin in this one. I would like to actually look at the Illinois instruction. I'm telling you now that I'd like to just see if there isn't some, you know, something we can do to sort of address some of this, you know. So you'll see my suggestion tomorrow, but I need to look at the Illinois Pattern to know. I'd be shooting blind without it and kind of guessing, and I don't want to do that.

MR. BOWMAN: Our strong view, given the centrality of this issue in this case -- I mean, it's hypercentral -- is that the pattern with the commentary and the additions that are recommended under specific circumstances, that that be the

2273

touchstone here so that we don't get in a situation of flying blind and deviating from the considered judgment of Illinois authority as to how to instruct.

MR. LOEVY: It's not --

MR. SALWAY: Your Honor, if I may be heard, again, we would reiterate that this is exactly what we just went through. For example, the ASA Spizzirri instruction we were wanting to give, everything in that instruction was legally and factually accurate, and plaintiff's counsel argued that that is just putting argument in the instructions before the jury, and that is exactly what they're trying to do right now.

They can get up and argue that driving him to the -- driving somebody in the car is legally not enough. That's fine, but putting it in the instruction is putting plaintiff's arguments in the instruction and then allowing the jury to take them back to the deliberation room, and it would be improper based upon the rulings already entered.

MR. LOEVY: Your Honor, this is to us the most important issue.

THE COURT: Understood. I'll give you an opportunity to address it, and then we're going to move on.

MR. LOEVY: Thank you, Your Honor.

That's exactly the point. The Spizzirri one was redundant. It didn't add anything. This is completely different. The jury already knew that if Spizzirri did

something that's gratuitous because you already instructed them who the defendants are. This instruction by contrast and that sentence, the jury won't know unless you tell them. They're not legal scholars. This is a piece of law that they won't know and can't infer, and it's not redundant in any instruction. That's critical to understanding our case. Driving is not enough. If they didn't -- since that is a fact, if they didn't appreciate that, they'd be wrong, and then our case would be in real trouble.

THE COURT: Okay.

MR. LOEVY: So if it's the law, it belongs in there.

THE COURT: Okay. I appreciate all the arguments. I will let you know what I plan to do, and I'll give you an opportunity to respond when I put out a suggestion to you.

Okay. Let me just stop.

(Discussion off the record.)

MR. LOEVY: We're almost done.

THE COURT: We're almost done. Okay. I think 49 is the next instruction, but I want to make sure I'm not skipping anything.

MR. FLYNN: That's the next one for us, Your Honor.

MR. LOEVY: Yes.

THE COURT: Okay, pretrial damages -- I'm sorry -- pretrial detention.

MR. FLYNN: Your Honor, this brings up one of the

2275

issues I brought up at the end of the case in chief that I wanted to discuss. It's two-fold. First of all, Your Honor, we think that there needs to be two instructions regarding probable cause and what the Court has found on probable cause. I know we discussed this before, but things have changed.

One, they have to show materiality with respect to the grand jury in order to get pretrial detention damages; and, two, during Detective Mancuso's cross-examination Mr. Loevy asked him multiple times: There was no evidence of a murder until Mr. Brown provided you a statement.

He went over that again and again and again.

MR. LOEVY: Not murder.

MR. FLYNN: The jury needs to understand that there was a finding of probable cause, and they need to understand that there was testimony from several individuals at the grand jury in order to determine if there is materiality here with respect to the statement that was used at the grand jury.

MR. LOEVY: What we argued was there was no evidence of intent --

MR. FLYNN: Untrue. That's not what was said.

MR. LOEVY: -- because there was a murder. Nobody disputed there was a murder. There was no evidence that Mr. Brown intended to commit it until he confessed. That's why they kept him in the room for 31 hours.

MR. FLYNN: That's not the question that we're asking.

2276

MR. LOEVY:  There is no evidence of Mr. Brown's intent except Mr. Brown saying:  I knew about it.

THE COURT:  Okay.  I appreciate the argument.  I'm not going to give the probable cause instruction.  I appreciate that you've raised that.  I don't think it's appropriate.  I've already addressed the issue, so I'm not prepared to give that.  I mean, you have room to argue what you'd like to argue, but I'm not going to give that.

Okay.  I think there was a second piece to your argument, Mr. Flynn, and I just want to make sure I let you flesh it all out.

MR. FLYNN:  Yes, Your Honor.  Okay.  The second piece, perhaps we could do this by stipulation.  It's just we didn't get around to it today.

THE COURT:  Sure.

MR. FLYNN:  We'd like something -- and, again, it could be a stipulation -- that this was the date that he was charged and this was the date that he was convicted, so the Court -- excuse me -- so the jury fully understands what the dates of pretrial detention are and what the second set is as well.

THE COURT:  That seems reasonable to put in the dates.  Those are known.

(Discussion off the record.)

MR. FLYNN:  Did we already do that?

2277

MR. LOEVY: We proposed it, and you rejected it. I'm not sure. You know, we are sort of in a gotcha situation. You know, if they forgot to prove that, they have a failure of proof and the proof is now closed. So I think we're going to stand on that. We had proposed it, and they rejected it.

THE COURT: But now is the time to fix it, to your point earlier. And by "fix it," I don't mean to do the work for anyone. I just mean, you know, it seems to me if it's something you proposed earlier, it's reasonable to put it in here. It's a helpful piece of information. It's factually accurate in terms of the dates, particularly if you proposed it before.

MR. LOEVY: Well, it's certainly not disputed that those are the dates.

THE COURT: Right.

MR. LOEVY: What we did object to was bifurcating the claim. You know, we think that there should just be a damages claim.

THE COURT: Right.

MR. LOEVY: And if the defendants forgot to prove the predicate, you know, I've been in the situation where I forgot to prove something, and it sucks.

MR. FLYNN: I don't know how we forgot to prove it, Your Honor. We know the date that he was charged.

THE COURT: Yes, I'm happy to put it in. So we should

2278

just do that because I'm prepared to do it.

MR. LOEVY: Okay.

THE COURT: So I don't know the dates off the top of my head. I suppose we can go back and look. I think we'll go back and look at the proposal. Maybe I don't have it. If you know it, I'm happy to have you tell me.

MR. FLYNN: I know September 5th, 2008, is when he was charged.

MR. LOEVY: I guess --

THE COURT: All right. Here's what we'll do. We'll do our best and then bracket it in a way that you all can add the correct dates since you'll know, and you'll then have the opportunity to fix that tomorrow.

MR. LOEVY: And that's, of course, over our objection --

THE COURT: Yes, it is.

MR. LOEVY: -- that the record is closed.

THE COURT: I think it's clear, but for the pretrial detention instruction the instruction will read -- and I'm skipping ahead:

1. You must find in plaintiff's favor on his first claim for coerced confession.

Yeah, just to be clear, I'll take out "involuntary" instead of "coerced."

Then if you do not find both these things by a

preponderance, then you cannot award damages to plaintiff for his pretrial detention.

(Discussion off the record.)

THE COURT: Oh, I'm sorry. My clerk just pointed out to me that we actually are not using the word "confession."

MR. LOEVY: It's "incriminating statement."

THE COURT: I'm trying to get away from that word, so to be consistent it will say "incriminating statement."

MR. LOEVY: It's better.

THE COURT: All right. I think the last one is causation.

MR. LOEVY: Yeah. We are proposing the pattern, the long version. You know, it doesn't have to be the cause. It need not be the last cause or the nearest cause.

THE COURT: Response?

MR. SALWAY: Yes, Your Honor. First, this isn't, again, the pattern instruction. The pattern instruction is only the second paragraph. The first paragraph is somewhat inconsistent with the second paragraph because it says what a cause is, but then below it defines a cause differently. It says how an injury can be caused, and then it says it below in a different manner. So the instruction itself is confusing.

Additionally, we've proposed putting in a proximate cause instruction using the Illinois Pattern Instruction. It was 51. Plaintiff objected to it and said it was unnecessary,

and the Court agreed and struck it. So we would argue that it's improper to include it now.

THE COURT: So your proposal is just the second paragraph?

MR. LOEVY: We can live that with, too, Your Honor. If that is the pattern, then that's probably what we should just do.

THE COURT: Okay.

MR. SALWAY: So just the second paragraph?

THE COURT: Just the second paragraph is what I'm prepared to give. I think the defendants agreed.

MR. SALWAY: I mean, our position would be plaintiff's original position that it doesn't add anything. This is already established by all of the instructions that describe the cause and how the cause is proven. We don't think that it's necessary. We think that they're just trying to use this to, you know, bolster their claims.

THE COURT: Understood, and I appreciate the record. But I'm prepared to give a version of this, and so it will just be the second paragraph, "an action causes," and that will be it.

MR. LOEVY: Yeah.

MR. SALWAY: And, Your Honor, one last thing. We did skip over, again, one of our instructions that was deleted out which we do think is appropriate. If we are going to give

causation instructions, I feel like I should bring it up. We proposed a superseding act causation instruction that we would urge be given.

MR. FLYNN: No. 50.

MR. SALWAY: It was No. 50 originally, yes. My apologies.

THE COURT: That's okay.

MR. LOEVY: I don't think we have that one.

THE COURT: I'm just looking it up real quick.

(Discussion off the record.)

THE COURT: So it's the following: To find for the plaintiff on the involuntary coerced confession claim, you must find that the defendant you are considering deliberately supplied misleading information to prosecutors and the Court regarding the circumstances of the confession.

I'm not prepared to give that. So with that, you know, you have requested it, and I will not give that.

MR. SALWAY: Understood.

MR. KAYES: Your Honor, very briefly, from what we've heard today -- and this is about the accomplice liability instruction and that critical last sentence -- from what we have heard today, I expect, you know, defendants are going to argue that Marcel Brown is guilty. They're going to argue the guy has got a certificate of innocence and he's guilty, which they're entitled to do.

But because they're going to argue that he's guilty, we have to put up, I think, a fairly accurate, you know, line as to where guilt -- innocence ends and guilt begins, because from what I hear, they're going to argue that he's, you know, guilty on the basis of things that are clearly not, you know, guilt-generating under Illinois law. I think that's the real importance of that last sentence because, you know, I think defendants are going to get up there and say: Look, he drove him to the park and back, ba-da-bing, ba-da-bang, ba-da-boom.

MR. LOEVY: And the law is otherwise.

MR. KAYES: And the law is pretty clearly more limiting. I think, you know, if defendants want to promise they're not going to do that, maybe that's a different universe. But I don't know that, you know, I don't know that they'll want to tell us their arguments now, and I don't know that in the heat of the moment --

MR. LOEVY: They wouldn't apply it.

MR. KAYES: Yeah.

MR. LOEVY: Anyway.

MR. KAYES: I'm sorry to bring it back up because we were so close.

THE COURT: That's okay. It's actually better to air some of the concerns early. It helps hopefully folks to think about it over the weekend.

Mr. Flynn?

2283

MR. FLYNN: Our instruction is based on Illinois law, the statute that Mr. Salway already mentioned, and I will not argue anything to the contrary regarding Mr. Brown's guilt or innocence.

THE COURT: Okay.

MR. SALWAY: Your Honor, to once again just repeat plaintiff's argument, if we made that argument to the jury, the jury would read the instruction that we proposed and realize that we are incorrect, and then they would not find in our favor. Plaintiff made that exact argument about the ASA Spizzirri instruction and several others. The same thing can be said here.

MR. LOEVY: Your Honor, it doesn't -- that argument doesn't work because they could hear my argument and read the instruction and say, well, maybe driving fits. They could say maybe driving fits, but it doesn't.

THE COURT: Fair enough. Fair enough. That's why I'd like to take a look at the pattern. I appreciate you all airing this out. I trust that everyone will, you know, faithfully argue the case consistent with the facts and consistent with the instructions that we've been sitting here for an hour and a half hashing out.

I have not had a fulsome opportunity to look at the verdict forms because we've been so focused on other things. If there's anything that anyone wants to raise about that now,

2284

speak now. I've received defendants' revision. I think it was sent out this afternoon.

MR. LOEVY: I don't have that.

(Discussion off the record.)

THE COURT: This just may be something where we need to just take a look at it.

MR. LOEVY: Do you have a copy of your proposal?

MR. SALWAY: So I will say that our proposal was the exact same as theirs. It just took out the fabrication claim because we were going to argue right now that there shouldn't be a fabrication claim, but I think that we've come out -- that the Court has come out on the other end of that.

THE COURT: Right. So the fabrication claim will remain, but the failure to intervene comes out, which I think you've now addressed. So I'm looking at the defendant's version, and I think that's right. Then there are spaces for compensatory and punitive, if appropriate, right? So it's just section 1, liability, first claim, involuntary confession, second claim --

MR. KAYES: Eureka, I think we agree.

THE COURT: -- failure to intervene.

MR. LOEVY: On the second page, though, we are objecting to the bifurcation of the compensatory damages, but I understand you've already decided this.

THE COURT: Yes, I think that's the safest way and the

2285

way I'm going to do it.

    (Discussion off the record.)

        MR. LOEVY:  Yeah, Mr. Bowman stands corrected.  It's the Illinois Supreme Court case, not the pattern.

        THE COURT:  Okay.

        MR. LOEVY:  It's that Taylor case.

        THE COURT:  I'll take a look at it.  I appreciate that, and I thank you for correcting me because I'll be sitting at my desk tomorrow like:  Where is it?

        MR. KAYES:  A consistency note for the verdict form, I believe we said that confession language rather than the incriminating statement.

        THE COURT:  Yes, we'll fix the confession language in the verdict form as well so it doesn't refer to confession.

        MR. BOWMAN:  What the pattern does say -- and this is what I intended to be referring to -- is that conduct occurring after the offense cannot be considered for the purpose of establishing accomplice liability.  So, therefore, driving away from the scene would be irrelevant, and there's actually a case or a couple of cases that say that.

        THE COURT:  Okay.

        MR. LOEVY:  It might be a different one.

        THE COURT:  Okay.  So in the interest of time, we have some work to do.  We'll get a draft to you sometime tomorrow afternoon and give you time to kind of send revisions to us.

2286

MR. FLYNN: As a reminder issue, when we rested, I said that we -- with respect to the exhibits, could we just have the weekend to make sure we've got everything?

THE COURT: Absolutely. We'll take care of that on Monday.

MR. FLYNN: Then issue number 2, I just wanted to confirm that during closing argument I can use transcripts from the trial as a demonstrative.

MR. LOEVY: Your Honor, we would object to that. We didn't pay for them for one thing, some of them. We have the video from the ERI, but we would ask you to defer to -- I think most judges don't let you use trial transcripts.

THE COURT: Yes, I typically don't in part because the jury can't even ask for them, and I think that's yet another reason to stay away. So you can't use the transcripts.

MR. FLYNN: What about the transcript of the ERI as opposed to playing a bunch of clips?

THE COURT: Yes, that's fine, but the trial transcript is a no.

MR. FLYNN: Understood.

THE COURT: Okay. Last thing and then we're going to go. Mr. Loevy, how long?

MR. LOEVY: We want collectively two hours. We would use an hour and a half probably split on the first round and then a half-hour for rebuttal.

2287

THE COURT: Okay, so 30 minutes for your back end.

MR. LOEVY: Yeah.

MR. FLYNN: And I think an hour-10, an hour-15.

THE COURT: Okay. I'm going to hold you to those times. I want to try to start as close to 9:15 as we possibly can. Unfortunately, because I don't want to break up arguments, it's likely -- and I still need to think about the math here, but chances are we'll have to get through Mr. Flynn's closing, take a short lunch break, and then do the rebuttal. I don't know that it's going to be possible to do all three before lunch.

MR. LOEVY: I think we should try, you know, because we're talking about three hours and 15 minutes. That gets us to 12:30 and a break.

MR. FLYNN: A morning break after their opening close?

THE COURT: I'm happy to keep that break short, and I'm happy to do everything we can to try to fit in even if we have to just tell the jury we're going to stretch it a little bit for lunch. I'm happy to do that.

(Discussion off the record.)

THE COURT: I don't want to do it. I want to get this in and to the jury, even if I have to tell them we're just going to make you, you know, sit a little longer. But I just want to be clear to the extent that you can't do it, you know, there may be a little bit of an issue there. So it's just

something to keep in mind.  But it's my preference to get it all in so that they can eat and talk and hopefully be done with everything they need to do on Monday.

MR. LOEVY:  Sounds good.

MR. FLYNN:  Great.

THE COURT:  All right.  Good luck to everybody.

MR. LOEVY:  Thanks, Judge.

MR. FLYNN:  Thank you, Judge.

THE COURT:  Thank you very much for your patience.

(Proceedings adjourned at 6:36 p.m., to 9:15 a.m., 9/9/24.)

C E R T I F I C A T E.

We, Laura LaCien and Patrick Mullen, do hereby certify that the foregoing is a complete, true, and accurate transcript of the trial proceedings had in the above-entitled case before the Honorable LINDSAY C. JENKINS, one of the judges of said court, at Chicago, Illinois, on September 6, 2024, in the afternoon session.

*/s/ Laura LaCien*
*/s/ Patrick Mullen*
Official Court Reporters
United States District Court
Northern District of Illinois
Eastern Division