2289

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                    Plaintiff,         )
                                       )
          vs.                          )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) September 9, 2024
                    Defendants.        ) 9:05 o'clock a.m.


                         VOLUME TEN
          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Defendants:         GREENBERG TRAURIG, LLP
                            BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

2290

APPEARANCES (Cont'd):

Court Reporter:                    JOSEPH RICKHOFF, CSR, RMR, CRR
                                   LAURA LaCIEN, CSR, RPR, RMR, F/CRR
                                   Official Court Reporters
                                   219 S. Dearborn St., Suite 2118
                                   Chicago, Illinois  60604
                                   (312) 435-5562
                                   joseph_rickhoff@ilnd.uscourts.gov

                    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                         PROCEEDINGS RECORDED BY STENOTYPE
            TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

2291

(Proceedings heard in open court:)

THE CLERK: 19 C 4082, Brown vs. Mancuso.

THE COURT: All right. Good morning.

Can I have counsel for the parties place appearances on the record, please.

MR. BOWMAN: Locke Bowman, Tom Kayes, Vanessa del Valle, Jonathan Manes. Mr. Brown is here. Mr. Loevy stepped out. He's in the hall.

THE COURT: Walking in right now.

Good morning to you all.

MR. FLYNN: Good morning, your Honor, Kyle Flynn, John Gibbons, Quinn Ford, and Tyler Salway for the defendants. Detective Mancuso is also here.

THE COURT: All right. Good morning.

Just two things to deal with this morning in our few minutes. One relates to the jury instruction issue and one relates to a juror issue.

So, I sent out a revised version of the instructions to the parties on Saturday. On Sunday, the parties -- specifically, plaintiff's counsel -- asked that I make an adjustment to Instruction 30 on accomplice liability, essentially asking that I add some language -- let me pull it up here -- that I add some language that would indicate the following -- to add the following sentence: To be legally accountable for the conduct of another, it is not enough that

the accused person drove the principal to the scene of the crime and then drove the principal from the scene, if the accused did not intend to promote or facilitate the offense.

The parties apparently did confer in the sense that they spoke in advance of sending this e-mail.

And, so, my question is for Mr. Flynn. Do you intend to argue -- well, let me just ask more broadly. What is your response to the e-mail that was sent on Sunday proposing this addition, in light of the arguments that you intend to make?

MR. FLYNN: We object to the addition. This was already something that we discussed on Friday during the jury instruction conference. The Court denied the request, and they're trying to get another bite at the apple.

I will not stand up there and argue that just simply driving means that you are accountable for murder. So, if that's their only fear, then I will not make that argument.

THE COURT: Okay.

MR. LOEVY: That makes sense to us, your Honor. It was a conditional request.

THE COURT: Understood. And it was. And your e-mail was perfectly clear about that. And so, rather than go back and forth, I thought it best to just address it this morning.

So, the instruction as drafted and in Instruction 30 will stand with no modification.

Okay. This morning, my courtroom deputy was attending

to the jury, as she normally does, making sure they're here, et cetera. And one of the jurors, Steven Patterson, Juror No. 8, asked Ms. Deanes, when is the Black trial?

Her response was, I don't know, or she may even need to address that.

And I raise that with the parties because I don't believe that I have -- I can look, but I don't believe that I have a case in which a plaintiff -- a named plaintiff is a Mr. or Ms. Black.

The case that I do have with the word "Black" in it is Blackmon. And I'm obviously making some assumptions here. But I thought it appropriate, in light of Eric Blackmon's connection to some of the facts in this case, to at least raise with the parties the fact that a juror, Mr. Patterson, asked about the trial in the Black case.

For purposes of completeness, I will also add that Mr. Patterson also told Ms. Deanes that he was aware that we could get down to as few as six jurors without running afoul of the requirement for the number of jurors for a civil case.

I just found this information out 10 or 15 minutes before you. So, this is not information I've been holding onto, to be very clear. I wouldn't do that.

And I've just double-checked. I don't have a case in which a party is named Black. I just did a quick find. I have a case where Blackmon is a plaintiff.

2294

So, I pass that information on to the parties for their consideration and suggestions on what, if anything, to do.

MR. LOEVY: What a unusually chatty juror.

I don't imagine there's anything to do.

MR. FLYNN: We agree, your Honor.

THE COURT: Okay.

MR. GIBBONS: Yeah, I mean, we polled the team. No one has any idea what a plaintiff or defendant named Black has to do with this case.

THE COURT: Yeah. Okay. Fair enough. I just wanted to make a record on that.

So, we will check to see if everyone is here.

As I indicated, I instruct first, so I tend to get started with that promptly as close to 11:15, 11:20 as we can, and then we'll roll into Mr. Loevy's opening. We'll take a 10-minute rest break. We'll proceed to the defense's -- I'm sorry, opening -- closing. Then we'll proceed to the defense's closing and we'll see where we are.

I would love to try to get all of this evidence -- all of the arguments in before giving the jury their lunch break. I will do everything possible, including giving them a heads-up at our rest break, that we will probably try to push them a little bit longer.

So, to the extent that we can finish all of the

2295

argument as close to 1:00, even a few minutes after 1:00 as possible, I'd prefer to do that. But I certainly won't keep them -- you know, if we're taking a really long time, then we may need to figure out what to do. But the plan is to try to get it all in and have them take just a slightly longer lunch break.

MR. LOEVY: All right, your Honor. A couple of things. I'll need the Elmo and the document camera for the --

THE COURT: Certainly.

MR. LOEVY: And we'll play some video, too.

We're splitting our closing, Mr. Bowman is going to take some of the damages.

And, then, it's been my universal practice that the attorneys exchange demonstratives so they don't have to object during closing. I've offered to show Mr. Flynn mine. It would be unusual to show the jury something that the other side has not seen. Mr. Flynn respectfully disagreed. I've already written my closing. He's already written his. I would ask that we adhere to the usual practice in the building.

MR. FLYNN: Your Honor, there's a motion in limine on this. We could agree to do that if we wanted to. And I'm respectfully not agreeing to it this time.

THE COURT: Okay. Consistent with my prior ruling, I'm not going to make the parties do that. I do think that if anyone intends to use something that hasn't been displayed to

2296

the jury prior to now and there's even a chance that it could be -- slow us down, I'd encourage the parties to think about that. But I certainly won't require it.

In an ideal world -- the evidence is already closed -- you're already using things that -- demonstrative or otherwise, that are already in the case. Maybe you're not. But to the extent it slows things down, it will just slow things down. So, I won't require it.

MR. LOEVY: Thank you, your Honor.

All right. Then we're ready to go.

THE COURT: Okay.

MR. FLYNN: Your Honor, we have some issues.

THE COURT: Oh, I'm sorry. I'm so sorry.

MR. FLYNN: No problem.

THE COURT: I apologize.

MR. FLYNN: Some of our issues relate to exhibits and the directed verdict motion and the jury instructions. I think those are all things we can handle later. I know we're trying to get going.

THE COURT: Yes.

MR. FLYNN: But there is a couple issues I just wanted to bring up with respect to Mr. Loevy's closing argument. I just want to make clear that he's not going to call Mr. Brown an exoneree or that he was exonerated. I think we're all in agreement on that.

2297

THE COURT: Right.

MR. FLYNN: And we also want to forbid any argument that there was no evidence that Mr. Brown was connected to the murder prior to his admissions.

The Court's already ruled that there was evidence connecting him to the murder, there was probable cause. If he wants to argue there was no evidence of an intent to murder until he made those admissions, we understand that argument. We just want to make clear that that's the argument he's making.

MR. LOEVY: This wasn't discussed with us, but that is consistent with my understanding, that there was no evidence of murder, that he intended to commit the murder.

THE COURT: Okay. With that agreement, thank you for clarifying. I think we're all on the same page with that.

MR. FLYNN: Thank you.

THE COURT: Okay. All right. We'll check on the jury and be ready to go here momentarily.

(Recess from 9:15 a.m., until 9:32 a.m.)

THE COURT: It sounds like our jurors are now here, so we'll get them lined up.

(Jury in.)

THE COURT: Please be seated.

All right. Good morning, ladies and gentlemen. I hope everyone had a nice weekend.

As I mentioned on Friday, we have closed all the evidence. And it is now time for me to instruct you on the law, which will be followed by the parties' closing arguments.

I am going to read the instructions to you now. Please listen carefully. And you're welcome to take notes, but be aware that I'm going to provide you with a printed copy of these instructions for use during your deliberations, so there's no need to feel as if you have to take down all of what I'm saying, because you will have the instructions -- a copy of the instructions with you during your deliberations.

After I finish instructing you, the plaintiff's lawyer will give his closing arguments. Then the defense counsel will give his closing argument. And because the plaintiff bears the burden of proof, plaintiff has a short opportunity for a rebuttal argument, and then the case will be yours to deliberate.

With that, I will begin with the instructions.

Members of the jury, you have seen and heard all the evidence and arguments of the attorneys. Now I will instruct you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence in the case. This is your job, and yours alone.

Your second duty is to apply the law that I give you to the facts. You must follow these instructions, even if you

disagree with them.  Each of the instructions is important, and you must follow all of them.

Perform these duties fairly and impartially.

Nothing I say now, and nothing I said or did during the trial, is meant to indicate any opinion on my part about what the facts are or about what your verdict should be.

The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations.

A stipulation is an agreement between both sides that certain facts are true.  You must treat the stipulations as having been proved for the purposes of this case.

Certain things are not to be considered as evidence. I will list them for you:

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, that testimony or exhibits are not evidence and must not be considered.

Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded.  This includes any press, radio, Internet or television reports you may have seen or heard.  Such reports are not evidence and your verdict must not be influenced in any way by such publicity.

Third, questions and objections or comments by the lawyers are not evidence.  Lawyers have a duty to object when

Jury Instructions

2300

they believe a question is improper.  You should not be influenced by any objection, and you should not infer from my rulings that I have any view as to how you should decide the case.

Fourth, the lawyers' opening statements and closing arguments to you are not evidence.  Their purpose is to discuss the issues and the evidence.  If the evidence as you remember it differs from what the lawyers said, your memory is what counts.

Any notes you have taken during the trial are only aids to your memory.  The notes are not evidence.  If you have not taken notes, you should rely on your independent recollection of the evidence and not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollections or impressions of each juror about the testimony.

In determining whether any fact has been proved, you should consider all of the evidence bearing on the question regardless of who introduced it.

The way exhibits are named is not relevant and should not be considered in determining the weight to give the exhibits, if any.

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it another fact exists.  In the law, this is called an inference.  A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case.

You may have heard the phrases "direct evidence" and "circumstantial evidence."  Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact.  Circumstantial evidence is proof of a fact, or a series of facts, that tends to show some other fact is true.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a moment ago and I saw it raining."  Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  You should decide how much weight to give to any evidence.  In reaching your verdict, you should consider all the evidence in the case, including circumstantial evidence.

You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all.  You also must decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things:

The ability and opportunity the witness had to see, hear, or know the things that the witness testified about; the witness' memory; any interest, bias, or prejudice the witness may have; the witness' intelligence; the manner of the witness while testifying; and the reasonableness of the witness' testimony in light of all the other evidence in the case.

You may consider statements given by certain witnesses under oath before trial as evidence of the truth of what he or she said in those earlier statements, as well as in deciding what weight to give his or her testimony.

In considering a prior inconsistent statement, you should consider whether it was simply an innocent error or an intentional falsehood and whether it concerns an important fact or an unimportant detail.

It is proper for a lawyer to meet with any witness in preparation for trial.

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any

party to present as exhibits all papers and things mentioned during the trial.

I have a duty to caution or warn an attorney who does something that I believe is not in keeping with the rules of evidence or procedure. You are not to draw any inference against the side whom I may caution or warn during the trial.

During the trial, certain testimony was presented to you by the reading of a deposition and video. You should not give this testimony -- you should give this testimony the same consideration you would give it had the witness appeared and testified here in court.

You will recall that during the course of this trial, I instructed you that I admitted certain evidence for a limited purpose. You must consider this evidence only for the limited purpose for which it was admitted. This includes the evidence concerning witness statements the detectives testified they received in connection with the investigation of the murder of Paris Jackson. These witness statements may be considered by you for the purpose of understanding what the detectives testified to have known during the course of their investigation, and for no other purpose.

Certain diagrams, sketches, and charts have been shown to you. Those materials are used for convenience and to help explain the facts of the case. They are not themselves evidence or proof of any fact.

You have heard witnesses give opinions about matters requiring special knowledge or skill.  You should judge this testimony in the same way that you judge the testimony of any other witness.  The fact that such person has given an opinion does not mean that you are required to accept it.  Give the testimony whatever weight you think it deserves, considering the reasons for giving the opinion, the witness' qualifications, and all the other evidence in the case.

When I say a particular party must prove something by a preponderance of the evidence, or when I use the expression "if you find," or "if you decide," this is what I mean:  When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

You must give separate consideration to each claim and each individual in the case.

In considering a claim premised on one individual's conduct, you must not consider evidence admitted only against other individuals or only as to other claims.

In this case, the plaintiff, Marcel Brown, is a private citizen.  Michael Mancuso, Kevin McDonald, Garrick Turner, and Rubin Weber are or were police detectives.  All persons are equal before the law and are entitled to the same fair consideration, irrespective of their status as law enforcement officers, private citizens or otherwise.

Plaintiff Marcel Brown has two claims.  I will list

those for you.

First, plaintiff's first claim is that Mancuso, McDonald, Turner, and Weber violated his constitutional right under the Fifth Amendment to be free from self-incrimination by coercing him into making involuntary, incriminating statements that were used against him during his criminal case.

Plaintiff's second claim is that Mancuso, McDonald, Turner, and Weber violated his constitutional right under the Fourteenth Amendment to a fair trial by fabricating evidence used against him during his criminal case.

The defense denies each of plaintiff's claims.

I will now instruct you as to what plaintiff must show to prove his claim.

Plaintiff claims that at least one of Mancuso, Turner, Weber, or McDonald violated his constitutional right against self-incrimination by coercing him into making involuntary, incriminating statements. To succeed on this claim, plaintiff must prove, as to the individual under consideration, each of the following things by a preponderance of the evidence:

One, plaintiff made incriminating statements;

Two, the incriminating statements were not made by plaintiff voluntarily but rather were made involuntarily as a result of coercion knowingly used by the individual;

Three, the incriminating statements were used against plaintiff during his criminal case; and

Four, plaintiff was damaged as a result.

If you find that plaintiff has proved each of these things by a preponderance of the evidence as to any individual that I've listed above, then you must decide for plaintiff, and go on to consider the question of damages.

If, on the other hand, you find that plaintiff has failed to prove at least one of these things by a preponderance of the evidence as to each of the individuals I listed above, then you must decide against plaintiff.  If you find against plaintiff, then you will not consider the question of damages as it relates to this claim.

To find for plaintiff, you must unanimously agree that plaintiff has proved each of the things listed above as to the particular individual listed above.

To do something knowingly means realizing what one is doing and being aware of the nature of one's conduct; not acting through ignorance, mistake, or accident.

An incriminating statement is voluntary if, in the totality of the circumstances, it is the product of a rational intellect and free will and not the result of psychological intimidation, or deceptive interrogation tactics which have overcome a person's free will and ability to make a rational choice.  An incriminating statement that is not voluntary is coerced.

In assessing whether one of the individuals listed

above coerced plaintiff into making involuntary, incriminating statements, you should also consider the totality of the circumstances of the interrogation.  This means you should consider all factors relating to the interrogation together, instead of considering different factors in isolation.

Evaluating the totality of the circumstances for coercion is determined based on the facts of each case.  You should consider the tactics used by the individuals listed above during plaintiff's custodial interrogation.  The factors you may consider include, but are not limited to:

Characteristics of the plaintiff that were known or should have been known to the individual officers listed above.

Whether plaintiff understood his rights and the consequences of waiving those rights.

The length and time of day of the interrogation.

The physical setting of the interrogation.

The manner and tone with which the officers interrogated plaintiff and the overall conduct of the interrogation.

The number of officers involved.

The presence or absence of weapons.

Whether any physical violence or other harm were used.

Whether any threats were made.

Whether the police provided the suspect with facts that ultimately were part of an incriminating statement.

Whether officers sought an explicit waiver of the right to silence and/or an attorney.

Whether plaintiff had the ability to communicate with others, including an attorney, during his custody.

The tactics the individual officers used -- excuse me. The tactics the individual officers listed above used during their questioning, including deceit, promises of leniency, threats of harm, or physical or psychological abuse.

No one factor is determinative. Specific methods of interrogation, including the use of deceit, engaging in accusatory questioning, making false or misleading statements about evidence of a person's guilt, posing as a friend, and making statements to such person about the potential legal consequences of the crime being investigated, are not in and of themselves prohibited unless, if taken together with the totality of the circumstances, they result in overcoming a person's free will and ability to make a rational choice.

Plaintiff claims that at least one of Mancuso, McDonald, Turner, or Weber violated his constitutional right to a fair trial by fabricating evidence that was used against plaintiff in the criminal case. To succeed on this claim, plaintiff must prove, as to the individual under consideration, each of the following three things by a preponderance of the evidence:

First, the individual knowingly fabricated evidence

relating to the plaintiff's statements that were introduced against plaintiff in his criminal case;

Second, the evidence was material; and

Three, that the plaintiff was damaged as a result.

Fabricated evidence is material if there is a reasonable likelihood that the result in the criminal proceeding would have been different if the evidence had not been used.

If you find that plaintiff has proved each of these things by a preponderance of the evidence as to the individual listed above, then you must decide for plaintiff, and go on to consider the question of damages.

If, on the other hand, you find that plaintiff has failed to prove at least one of these things by a preponderance of the evidence as to each individual listed above, then you must find against plaintiff.  If you find against plaintiff, then you will not consider the question of damages as it relates to this claim.

To find for plaintiff, you must unanimously agree that plaintiff has proved each of the things listed above as to the particular individual listed above.

An action causes an injury if, in the natural and ordinary course of events, the action produced the injury.  The action need not be the only cause, nor the last or nearest cause.  It is sufficient if it combines with another cause

resulting in injury.

If you find in favor of plaintiff on one or more of plaintiff's claims, then you must determine the amount of money that will fairly compensate plaintiff for any injury that you find he sustained and is reasonably certain to sustain in the future as a direct result of the conduct you found proves that claim or claims. I'm instructing you on damages only so that you will have guidance in the event you decide in plaintiff's favor on one or more of his claims.

Plaintiff must prove his damages by a preponderance of the evidence. Your award must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money; they include both the physical and mental aspects of injury, even if they are not easy to measure.

You should consider the following types of compensatory damages, and no others:

The physical, mental, and emotional pain and suffering that plaintiff has experienced and is reasonably certain to experience in the future.

The loss of a normal life that plaintiff has experienced and is reasonably certain to experience in the future.

The loss of liberty that plaintiff experienced.

No evidence of the dollar value of physical or mental

and emotional pain and suffering, loss of liberty, or loss of a normal life has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on account of these factors. You are to determine an amount that will fairly compensate the plaintiff for the injury he has sustained.

Plaintiff is seeking damages arising from his pretrial detention, which spanned from September 5th, 2008, through January 6th, 2011. By pretrial detention, I mean the time between his arrest and his conviction. Before awarding damages to plaintiff arising from his pretrial detention, you must find two things.

You must find in plaintiff's favor on his first claim for coerced incriminating statements.

And second, you must find that the incriminating statements that you find satisfy element one of that claim were used at a pretrial hearing and caused plaintiff's pretrial detention.

If you do not find both of these things by a preponderance of the evidence, then you cannot award damages to plaintiff for his pretrial detention.

If you find for plaintiff based on the conduct of Michael Mancuso, you may, but are not required to, assess punitive damages against Mancuso. The purposes of punitive damages are to punish a person for his or her conduct and to

serve as an example or warning to that person and others not to engage in similar conduct in the future.

Plaintiff must prove by a preponderance of the evidence that punitive damages should be assessed against Mancuso. You may assess punitive damages only if you find that his conduct was malicious or in reckless disregard of plaintiff's rights. Conduct is malicious if it is accompanied by ill will or spite, or is done for the purpose of injuring plaintiff. Conduct is in reckless disregard of plaintiff's rights if, under the circumstances, Mancuso simply did not care about plaintiff's safety or rights.

If you find that punitive damages are appropriate, then you must use sound reason in setting the amount of those damages. Punitive damages, if any, should be in an amount sufficient to fulfill the purposes that I have described to you, but should not reflect bias, prejudice, or sympathy toward any party. In determining the amount of punitive damages, you should consider the following factors:

The reprehensibility of Mancuso's conduct; the impact of Mancuso's conduct on plaintiff; the relationship between plaintiff and Mancuso; the likelihood that Mancuso would repeat the conduct if an award of punitive damages is not made; and the relationship of any award of punitive damages to the amount of actual harm the plaintiff has suffered.

Plaintiff must prove by a preponderance of the

evidence that the particular individual you are considering was personally involved in the conduct plaintiff complains about as I have described it to you in the instructions above. You may not find in plaintiff's favor based on what persons other than the particular listed individual under consideration did and did not do.

You have heard evidence about whether Mancuso's, McDonald's, Turner's, and/or Weber's conduct complied with or violated Chicago Police Department policies, procedures, practices, or regulations. You may consider this evidence in your deliberations as to each of plaintiff's claims, but such violations standing alone are not enough to establish liability. The issues you are to consider have been described to you in the instructions above.

A person is held legally accountable for murder under Illinois law even though he did not kill the victim if he intends to promote or facilitate the offense through his actions. Proof of acts to facilitate or promote an offense need not be supported by words of agreement, but may be drawn from the circumstances surrounding the commission of the act by the principal. However, the accused person is not guilty under an accountability theory merely because he is associated with the principal or is present at the scene of the crime; he must have intended to promote or facilitate the offense through his actions.

A person cannot be found accountable for the conduct of another based on acts taken solely after the commission of the offense. You may consider actions taken after the offense to the extent that they raise an inference of prior or concurrent participation in the events. However, actions taken only after the commission of the offense do not establish an independent basis to hold a person accountable for an offense that has already been completed.

Upon retiring to the jury room, you must select a presiding juror. The presiding juror will preside over your deliberations and will be your representative here in court.

Forms of verdict have been prepared for you.

Take the forms to the jury room when you have reached -- and when you have reached a unanimous verdict -- when you have reached unanimous agreement on the verdict, your presiding juror will fill in and date the appropriate form, and all of you will sign it.

Your deliberations should continue as necessary during the same general hours that we have conducted the trial, that is, between roughly 9:30 a.m. and 5:00 p.m. In providing you with this information, I intend no comment on the appropriate length of your deliberations; that is a matter for you, the jury, to decide.

I do not anticipate that you will need to communicate with me. If you do need to communicate with me, the only

proper way is in writing. The writing must be signed by the presiding juror, or, if he or she is unwilling to do so, by some other juror. The writing should be given to the court security officer who will give it to me. I will respond either in writing or by having you return to the courtroom so I can respond orally.

The verdict must represent the considered judgment of each juror. Your verdict, whether for or against the parties, must be unanimous.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors. Discuss your differences with an open mind. Do not hesitate to reexamine your own views and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or effect of evidence solely because of the opinions of other jurors or for the purpose of returning a unanimous verdict.

All of you should give fair and equal consideration to all the evidence and deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror. You are the impartial judges of the facts.

And with that, I will acknowledge Mr. Loevy to begin his closing statement.

MR. LOEVY: Thank you, your Honor.

CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

BY MR. LOEVY:

May it please the Court, counsel.

Before I begin, I want to thank you again. All of you have a lot going on in your lives. You've taken time out of your schedules to participate in Marcel's trial. And hopefully you have a better understanding of why this is so important.

If you have been screwed by the system as bad as he had, had your rights violated as egregiously as his, you have a right to come to a court and get justice from your community. And your community decides what's right. Not the Chicago Police Department, not Judge Jenkins, a cross-section of the community. And it only works if people show up. So, thank you very much for participating.

It's been a long time since you heard from Marcel Brown, and I want to remind you, three weeks ago, two weeks ago, you liked him. He's a good guy. He told you he's a family man. He is basically with the same woman he's been in love with for 20 years. His most important thing is his child, his two-year-old. Her arm is -- her name in on his arm. That is his whole world, his whole life. That and his stepchild.

You heard about his job. He works for CeaseFire, that community organization. It's the only job he could get. He kept getting fired because of his background with this case. And CeaseFire, he goes into the communities and he mediates

disputes and he helps the children, the kids, the tough kids: You don't want to go that path. I've been there.

And he's able to do that. He's able to make peace.

They saw Marcel Brown that day not as a person. They saw him as a gang kid, a drug kid, a gun kid. He is none of those things. He's a nice kid.

You heard he grew up in a tough neighborhood in Austin, but he grew up in a family with love. He was hanging out with his friends, riding bikes, playing video games. He was not anything but a nice kid.

And he had his whole future in front of him. He could have worked at the Post Office like his sister. He could have started a construction company like his stepfather who was such an important influence in his life. He could have gone to college like his youngest sister at Concordia now.

Everything was an opportunity, and it was all taken from him. His entire life. He was kidnapped from his life. All of a sudden he's thrown into the Cook County Jail, strip searched, abused, walks down that long tunnel. He thinks he's done. He thinks he's going home. He is being shackled and sent into pure hell.

And then, of course, after his conviction and 35-year sentence for something he had nothing to do with, he's sent to Menard, the worst prison in the Illinois Department of Corrections system. If you commit murders and rapes and the

worst crimes, that's where they put this kid who was five-four, 105 pounds. You know, you can't get there unless you commit a heinous crime, unless you're in another prison and you get in so many fights and stuff, then they put you in Menard. That's where he had to live.

And you heard that his conviction was overturned and he walked out of prison. And that was a happy day. And his conviction was overturned. He only had to serve ten years of that 35-year sentence.

But there is a massive hole in Marcel Brown's life, and he wants justice. He deserves justice. And we appreciate you participating in that.

So, let's talk about August 30th, 2008.

Normal day in his life. He's hanging out. There's a block party that day. Whole neighborhood. That night he's at White Castle. It's a warm Saturday night, almost 16 years ago to the day. Hanging out with his friends not causing any trouble.

His sister -- his older sister calls from the park. She wants him to pick him up. She doesn't drive. Fine. Marcel, you know, he's not in any hurry. Goes and pick up his sister. His cousins hop in the car. They got sisters in the park, too.

He gets to the park. His cousins jump out to go get the girls. They're taking forever. They're not coming. So,

he jumps out too, walks into the park. It's a dark park. It's nighttime. But all of a sudden, having nothing to do with him, somebody starts shooting from one side behind him, shooting from in front of him, shooting from behind him, and he's in the caught in the crossfire. He hits the deck. Shooting stops, he gets up, runs back to the car. His cousins are back at the car. They jump in the car. There's another shot. He gets out of there. He hasn't done anything wrong.

What happened? What happened? R.J. says, well, they were shooting at me. Day-Day was shooting at me, I shot back. Marcel doesn't want anything to do with it. R.J.'s out of his car. He goes home.

Whatever else happened in that park, it had absolutely nothing to do with Marcel. He didn't commit a crime. He didn't do anything wrong.

Now, you don't have to decide what happened in the park. That's not your job. You're not -- it's not a criminal case, and R.J.'s not on trial. But R.J. told you what happened in the park. He walked in there. He wasn't trying to murder everybody. Somebody shot at him. He shot back.

R.J.'s a different person today than he was back then. Back then, he was making bad decisions. Today he says he's got two kids, he's been working at his job for two years, he worked as a meat packer two years before that.

But back then, he was hanging out in the streets. He

was, in fact, a gang member, whatever it means to be a 15-year-old freshman at Proviso East and be in a gang. There were kids in that neighborhood in a gang. He was one.

Do not look at Marcel and say these two are the same. Those are different kids. R.J. told you, that's my square cousin. You know, he's a square, a mama's boy. I didn't hang out with him.

He's 18. He's out of high school. You think his friend group, you think he was hanging out with his freshman friends and his freshman cousin and their friends? Sure, they were all in the same neighborhood, but these are two kids. Don't let them lump them together.

Now, they want you to believe that R.J. went in that park looking for murder. And that's R.J., not Marcel. But it's not the case.

If R.J. truly intended to go into that park and he walked into the playground area, which was lit, and he intended to start murdering people that were messing with his sister, he would have had to shoot everybody in the park, because they knew him. Everybody knew each other.

So, if he's going to go murder somebody messing with his sister, unless you think he's just suicidal, he would have had to kill everybody. He wasn't looking to murder people.

And nor is there any victim. Nor did anybody come forward, did they tell you, who was he shooting at? He's

messing somebody in the park? That's 12-year-old Deshaun Grayer they're told. There's nobody saying he was messing with him. His story is made up.

But whatever the story is, it's got nothing to do with Marcel. Marcel did not go to that park looking to hurt anybody. He looked -- went to that park waiting to pick up his sister. He was not trying to commit any crimes.

So, you don't have to believe Marcel, but you can. Judge Jenkins just told you, if you find him credible, that he wasn't trying to hurt anybody that day, you can. But if you prefer to look at actions, look at his actions. Why would he drive his Malibu to the park if the plan was to shoot people in the park? Everybody in the neighborhood knew his Malibu. It just doesn't make sense.

Nor does it make sense that he would have walked into the crossfire. If he knew there was a shootout about to happen, why would he walk into the park and get caught in the crossfire? Why would he let his sister be caught in a shootout? And he says that persuasively. I didn't think there was going to be any shooting going on. I wouldn't want my sister to get shot.

He did not have anything to do with it.

And some getaway driver. If he's the getaway driver, he left the car. It doesn't make sense because none of this is true. He was not guilty of murder.

And Judge Jenkins just told you about accomplice liability. He's not that. He didn't share a plan. It's not enough -- I'll make you a promise. He will not argue it's enough to drive someone to the park and from the park. That's not first degree murder. You have to intend for it to happen. You have to share in the plan. And he did not have any of those things.

So, if he did not intend to commit murder and he's not guilty of it, how did he get convicted? Well, that's the claims in the case. Let's talk about the claims in the case.

The first instruction I want to mention is the preponderance instruction that Judge Jenkins just read you. More likely than not.

This is not a criminal case. We don't have to prove anything beyond a reasonable doubt. There are no criminal implications. It's just more likely than not. So, as you listen to the evidence and the arguments, which side is making more sense? It's not a high burden. If you put all the evidence on our side, all the evidence on their side, which is more likely?

Some people say it's the foodball field with the 50-yard line. If we push it to 45, we win. Dead tie, they win because we have the burden of proof.

But as you listen to the evidence, which side's making more sense? It's not a difficult standard.

The claim is the coerced confession.

So, I want to put this up so we take this -- this is where the action is. So, don't take your eye off the ball. We have to prove that at least one of Mancuso, Turner, Weber, or McDonald. At least and only one. We don't have to prove all of them. You might decide, well, I think McDonald did it. That's enough. Only one defendant.

Now, the elements at issue, three of them are not disputed. The ones in yellow are not disputed. Plaintiff made incriminating statements, they were used against him, and that he was damaged. They're not going to dispute that. That's not in dispute.

The only interesting question is whether the incriminating statements were not voluntary but were the result of coercion.

And Judge Jenkins defined that for you. The totality of the circumstance, is it a product of free will or psychological intimidation and deceptive interrogation?

Now, what the heck does that mean? You know, coercion. Coercion is making someone do something they don't want to do.

Now, this is not a physical coercion case. It's not like Chicago police officers tortured Marcel or beat him. This is a mental coercion case. And you can have a mental coercion case. That's why we're here.

Psychological coercion. What does that mean? In our system, what we do is we ask juries to decide that. Judge Jenkins said, I'm going to tell you what the law is and you tell us. I mean, if it's a continuum, there's legitimate interrogation and there's too much. And the question here is, is this too much? And I'm going to suggest to you if ever there was a case of too much, how could it not be this case? Because they couldn't have done more mental and psychological coercion than they did here. This case is too much.

Judge Jenkins told you the factors. Let's talk the factors.

I'm going to start with the fact that they denied him a lawyer. This is a big one. Everybody agrees that you had to have a lawyer. If there's a lawyer asking to get into that room, Marcel Brown needs to know that. It is required. Nobody disputes it. Absolutely required.

Now, Wham Cary says, I was there. That family hired me. I went up to that desk and I said I want to talk to Marcel Brown and they gave me the runaround and they told me Marcel doesn't want to talk to me. That happened.

Debra Scott told you it happened. She said, I regretted letting him go to the police station when they took him from my house. I knew my son didn't do anything wrong. They wanted to ask him some questions, I knew he didn't do anything wrong, I let him go without a lawyer. Think how she

feels.

When R.J. got surrendered by Wham Cary that day -- remember R.J.'s family hired Wham Cary -- she wasn't going to let that happen twice. She took out that $350 and she paid Wham. She got a discount because he was already there. And Wham talked to the police. There's just no question about it.

Now, they want to dispute that, but I want to talk about what's not in dispute. What's not in dispute is that if a lawyer requests access, the person in the room needs to be notified. That is required.

The second one is particularly important. Mancuso and McDonald would have been told -- he admitted that unequivocally, no question. The lady at the desk doesn't decide if the lawyer gets to talk to the person. The lady at the desk brings it to the lead detectives. The lead detectives are the ones in charge of that interrogation. They have to make the decision. He said, absolutely, no question. If there's a lawyer there, it comes to me and I decide.

It's also not disputed Marcel wasn't told, because we have a videotape. And nobody said, hey, Marcel, there's a lawyer who wants to talk to you.

It's also not disputed Mancuso, Spizzirri, and Turner all said, if a lawyer arrives, the interrogation is over.

So, the only question is, did -- is Wham telling the truth?

And we have proof. They got his ID card. And they dated it, and they put the time at 6:00 o'clock. He was in that station.

And the most damning piece of evidence of all, the ATM record. Deb Scott said, I had some cash, I took cash from my family. And gosh darn if she didn't at 555 West Grand, the police station, take 80 bucks out at 7:30 that night. Was she taking her family to dinner? She took out 80 bucks to pay Wham Cary.

There is no dispute that Wham Cary got paid. Wham Cary says, I remember it happened when I went to the desk and got that runaround and they told me doesn't want to talk to me. I remember it because it's the only time in my career it's ever happened.

So, that means they cheated. And they cheated on purpose. They knew he had a right to a lawyer and they wouldn't give him access. And that is a damning fact.

As is the fact they wouldn't give him a phone call, also required. Not disputed. Within a reasonable amount of time you're supposed to get a phone call. Ten times he asked for a phone call, and they kept lying to him. They kept saying, oh, yeah, couple minutes, five minutes, five minutes, it's coming, it's coming. He didn't get one until 31 hours after the state's attorney left. That's police officers not playing fair. That's cheating.

Now, Mr. Flynn's going to get up here and he's going to tell you, well, why would we give him a phone call?  There's an investigation going on.  What if he called R.J.?  That's him calling his client a liar, because his client said to Marcel, oh, you'll get a phone call in just a couple minutes.  And now he's going to get up here and tell you he was lying the whole time, he was playing a trick.  We can't have him calling R.J.

Well, you know what?  R.J. got arrested at 4:00 p.m. on day two, and they didn't give him a phone call after R.J. got arrested either.

In fact, you saw that at 10:00 p.m., right before the state's attorney came, he asked one more time.  He asked Turner, how about my phone?  Oh, runaround, runaround.

This was not an accident.  It was not the investigation.  They were cheating on purpose.  They were denying him access so they could coerce him.

The other factors are the length of the interrogation. This was an outlier at 31 hours of interrogation.  You heard Dr. Cutler say, the studies measure interrogation length from when you start to when you turn off the tape.

And Dr. Welner tried to dispute that.  He said, no, no, no, it's only talking time.  We said, Dr. Welner, that's your opinion, where are you getting it?  He's like, oh, it's the Cleary study, the Cleary study.

Well, did you read it?  Because the Cleary study said,

all the measurements of length of interrogation are until you turn off the interrogation, because the in between time also counts. If you make a guy stew and you say, all right, Marcel, think about it, we'll be back in a couple minutes, that still counts.

And these studies show interrogations last an hour, two hours. That's the median. That's how long they're supposed -- how many times can you ask him, did you have a gun? They're supposed to be an hour or two. This is 31 hours. It's even -- it's five or six hours if you accept their counting. It's still 50 percent more than interrogations are supposed to go.

And you were told that long interrogations, particularly outlier interrogations, correlate with wrongful convictions and false confessions.

Remember Dr. Cutler's explanation? The DNA evidence started getting convictions overturned, and they looked at the first 350 innocent people who were falsely convicted, and they found that in a quarter of those cases, a quarter of them, somebody had falsely confessed, someone had confessed to a crime that DNA proved they didn't commit. And they looked at it and they said, well, what's goings on?

And serious academics, like Cutler, not Welner, the generalist, they looked at it and they said, you know what, overly long interrogations is what correlates with false

confessions. Over four hours is what Cutler told you. Once it goes over four hours, you start getting a disproportionate amount of false confessions.

Ironically, that's the point Welner agreed on. He said, yeah, after four hours you're wasting your time.

So, if everybody agrees four hours is too long of an interrogation, why is that kid in the room for 31 hours?

And you have to look at these factors in the totality.

Another factor, if we're listing them, is youth.

Marcel -- what's psychologically coercive to an adult is different if you're 18. Marcel was just a few months past his birthday. If it would have happened a few months earlier, he would have been juvenile. He would have gotten the juvenile officer or a parent. And he's not an adult in there. It's not a fair fight against grown men. He's naive to the criminal justice system.

Dr. Cutler told you, juveniles are immature. They're short-term thinkers. They're focused on, can I get out of this room, instead of, how about the next 35 years. They're immature. They have judgment issues. And that's also something he told you correlates to false confessions in the DNA data, is that particularly young suspects -- remember Welner tried to say, well, once you're 16, you're an adult. No. An expert can't -- they can't pay a guy to tell you something you know is not true.

If you're really young, the circumstances are psychologically coercive. And that's what we have here.

There's also the lack of sleep. Those rooms are not built to be slept in. There's no bed. There's no bedding. There's no pillows. He spent 31 hours in there. They started at 3:00 p.m., they interrogate him until 4:00 a.m., and then he doesn't sleep -- you saw it -- not more than an hour at a time. They were waking him. It's impossible to sleep on those benches. He was up every hour. He basically has an all-nighter, then they interrogate him all day, and then the state's attorney comes close to midnight the second day. The man is working -- the kid is working on his second all-nighter in a row. That's psychologically coercive. That lowers your resistance. You can't resist anymore.

Anybody that's ever pulled an all-nighter -- they tried -- Mancuso tried to say sleep deprivation is not a thing. Of course it is. If you're up all night, you try to stay awake as long as you can the next day so you can get back on your schedule, maybe go to sleep at 7:00 or 8:00. But you don't do two all-nighters in a row.

And that's what they had this kid doing, and that is psychologically coercive and it is unfair.

You know, don't forget that McDonald woke him.

MR. LOEVY: If we could play clip 41 -- 142.

If we could have the clips, your Honor.

BY MR. LOEVY:

This is him sleeping at 4:30 in the morning.

(Said video was played in open court.)

BY MR. LOEVY:

All right. And, then, he tries to go back to sleep and the guy comes back in.

MR. LOEVY: Play 144.

(Said video was played in open court.)

BY MR. LOEVY:

This is a man intentionally not letting a kid sleep. It's 4:30 in the morning. You know, he comes back later and he turns the lights out. Remember he was so cold in there, he said, can I have a blanket? You think the Chicago Police Department isn't set up to give somebody a blanket if they're going to keep people in there? They give him a T-shirt, and he has to pick whether he's going to use it as a pillow or a blanket.

This is not normal. You know, you don't have to interrogate somebody at 4:30 and ask him the same questions over and over again. If ever there was psychologically, involuntary circumstances, I can't imagine what it would be if not this.

You know, Dr. Cutler said, well, it's never been studied. That was their big cross-examination. That's because sleep deprivation in interrogation is not a thing. There's

nothing to study. This is an outlier case.

What has been studied is sleep deprivation affects your ability to resist and to function.

Another factor is food. You know, between September 3rd when he's arrested and early into September 5th, he had exactly one meal. He had, you know, that McDonald's midmorning on the second day.

The room is not set up for food. There's no food service in there. Remember Mancuso said, the only food he's going to get is if we decide to feed him and pay on our own dime.

And I get it that he didn't eat when they gave him a sandwich halfway through the second day. By then he said, I was so terrified, I was just thinking about survival. I didn't want to eat.

But let's not lose sight of the fact that he had a grand total of one meal. And that makes it harder to resist what they're doing to him. All these factors go in totality.

And also don't forget, on the first day, when they arrested him at 3:00 p.m., they never fed him a meal. They didn't feed him dinner. That first day when they interrogated him until 4:30 in the morning, he never got dinner.

So, this is not how you treat someone with dignity and respect, as they tried to suggest in opening statement.

They could have taken him to the lockup at the bottom

of the police station. There's a bed there. He says, well, it's not a comfortable bed, but it's a bed. There's a phone. There's people. Instead, they kept him socially isolated on purpose in this room with no windows and no clocks. Assume he doesn't know whether it's day or it's night, and they did that on purpose. His whole universe -- it's a psychology. His universe becomes the room. He's dependent on his captors. They have to -- if he wants to go to the bathroom or get food or get -- he's entirely dependent on them. And that's why they kept him socially isolated, so that they could move him where they wanted to move him.

You know, don't forget, children are obedient to authority. They're conditioned to respond to adults. When they kid got woken in there, he wasn't like an adult. Marcel right now would be like, man, what are you doing? We'll talk in the morning.

That kid got up and said -- he woke himself up, he's like, yeah, started answering questions. They're obedient to authority.

Remember when they asked him for his shoelaces?

MR. LOEVY: Let's play that, 111.

(Said video was played in open court.)

BY MR. LOEVY:

You see what they did there? They said, do me a favor, take off your shoelaces. He didn't say, why? He just

took off his shoelaces.  He's an adult used to responding to adults.

You know why they took off his shoelaces?  By this point in the interrogation they were worried he was going to hang himself.  Because they could see this kid, they were breaking him down, and they didn't want him to have shoelaces in there.

They also used improper tactics, all kind of tactics. They couldn't even admit that this was a tag team.  You know, while Weber is doing that and McDonald's in there waking him, he's home sleeping.  So, they're taking turns going in there asking him questions while they're going home sleeping.

They got good cops, they got bad cops.  McDonald's the bad cop.  They didn't admit any of that.

There's also terrible contamination going on. They're telling him the facts.  You saw it over and over again.  They're not asking him.  They're telling him.  They're arming him with facts that he can then spit back, and they're rehearsing it.  They're asking him leading questions, and then they rehearse it.

And they finally get him saying, okay, there's only one shooter, and they go over it and they go over it and they go over it.  That's not how you conduct a legitimate investigation.

Another factor here is the lies and the trickery.

And the worst one, in my opinion, is that they tricked him into thinking he was just there as a witness against R.J., he wasn't under arrest. If you're under arrest for murder, don't you think you got a right to know you're under arrest for murder?

MR. LOEVY: Let's play 6.1.

(Said video was played in open court.)

BY MR. LOEVY:

All right. We just don't know. I'm not locked up. Just standard. Relax. You're just a witness. Is that fair? If you're under arrest for murder, you think you aren't supposed to be told you're under arrest for murder?

And then later.

(Said video was played in open court.)

BY MR. LOEVY:

This is many hours later.

MR. LOEVY: Go on there, Lilia.

(Said video was played in open court.)

BY MR. LOEVY:

Again, this is hours later. They've already been interrogating him for two or three or four hours.

MR. LOEVY: Go ahead.

(Said video was played in open court.)

BY MR. LOEVY:

All right. You know, Mancuso said, oh, we made it

clear to him he's under arrest. We told him at his house. We put him in handcuffs. Does that look like a kid who understood who he was under arrest?

And remember the clip, I'm not going to play it, where Mancuso -- he asked Mancuso, I thought you said I wasn't under arrest? Mancuso said, well, yeah, actually you are.

They were lying then, and they lied to you when they told you, he understood from the start he was under arrest. He didn't understand.

Another lie was -- you know, all kinds of lies. They told him he was just a witness. They told him -- remember they pitched that -- they gave him an out that --

MR. LOEVY: Let's play 26.

(Said video was played in open court.)

BY MR. LOEVY:

I didn't have nothing to do with it. He's like, look -- Mancuso's like, I'm trying to coach you into a way that will be better for you. All you got to do is say you stayed in the car, which wasn't true. Probably trying to trick him.

But he's, like, I'm not trying to play a game. I'm telling you what happened. I don't care if it's worse for me or better for me. I got out of the car. I'm telling you the truth. That's what that kid said. They're playing a game.

Other lies and trickery, the five-minute phone call we already talked about. They told him over and over again,

you'll get a phone call in a minute, knowing they weren't intending to give him a phone call.

MR. LOEVY: Let's play 49, too. 49.

BY MR. LOEVY:

They were telling him, you're just a witness, you can go home as soon as you tell the truth to the state's attorney.

(Said video was played in open court.)

BY MR. LOEVY:

All right. Mancuso told him -- that's when he's like, I didn't see -- and the truth is he didn't see the shooting. The park is dark. He knew there was shooting. They turned him into a witness that he wasn't.

But Mancuso's saying, the sooner you tell the truth, you'll get out of here, you'll go home. And that became the theme that we'll talk about later, because that's -- he believed them. But it was a trick and it was a lie and it was a trap.

They told him that R.J. was saying that he knew he had a gun. He said -- and that was a lie, because R.J. wasn't talking. He said, I didn't know there was a gun.

They told him T.J. said they knew they were there was a gun. That was a lie. T.J. walked out of there. He didn't know there was a gun.

And Marcel said, I don't know what to tell you, I didn't know there was a gun. They couldn't trick him or trap

him into it.

I thought one of the bad ones was -- you know, to get him -- Marcel was, like, there was two shooters and there was at least ten shots. And they were trying to stay say, no, no, no, it's just a couple of shots, because they want it to be just R.J. shooting.

And he's like, no, R.J. pop, pop. You know, and the other guy -- lots of pops, at least ten shots. And the police try to tell him that's not true.

MR. LOEVY: Let's watch that clip, Lilia. That is No. 18 -- 118.1.

(Said video was played in open court.)

MR. LOEVY: Did I get it wrong? Did it say that there was more than ten shots?

Can you play it again?

(Said video was played in open court.)

MR. LOEVY: Back it up.

BY MR. LOEVY:

You can see it on the transcript. He said, nobody's says ten shots were being fired.

And I'm sorry we clipped it badly, but if you look at the document camera --

MR. LOEVY: If we could have the document camera.

BY MR. LOEVY:

Lots of people were saying ten shots being fired.

These are the 911 calls. Ten shots heard. Ten shots hears. Group of male Blacks, white T-shirts. A group with guns, plural, 20 shots fired. Ten shots fired.

There was a shootout. There were two people shooting. And they told Marcel, no, no, the witnesses are saying just a couple of shots, just a couple, just one shooter, just one shooter.

They eventually got him there, but that was them telling him what happened, not the other way.

You know, the biggest lie of all was when Mancuso tried to say, I wasn't trying to move him from A to B. Spizzirri, too: I wasn't trying to move him from A to B. Of course that's what they were doing. He was trying to tell them the truth, and they were trying to move him. And that's what they did. They kept telling him, you got to tell us the truth. And he kept saying, I'm telling you the truth. And they said no, no, no, not that truth. We want a different truth.

MR. LOEVY: Let's play the long montage then, Lilia.

BY MR. LOEVY:

So, I'm going to show you -- obviously, it doesn't go in order. It's just clips as you see the progression. Let's take a look at how they got this kid where they got him.

MR. LOEVY: If we could have the screen back, your Honor.

(Said video was played in open court.)

BY MR. LOEVY:

Of course, you know, keeping in mind, Mancuso knows every word's being recorded and Marcel doesn't.

MR. LOEVY: Continue.

(Said video was played in open court.)

BY MR. LOEVY:

So, remember, when the state's attorney got there, they kept telling him, you got to convince the state's attorney. He's the only the criminal defendant in Chicago history who is begging to talk to the prosecutor. Can we get the state's attorney so I can go home? You tell me if I tell the truth, I can go home. I want to the talk to the prosecutor. I want to talk to the prosecutor.

Finally, she shows up. The reason they didn't want her in there is because they didn't have any evidence. The only evidence that he intended to commit murder they hadn't developed yet. So, they couldn't bring her in because there was no evidence. So, then they took their shot.

(Said video was played in open court.)

BY MR. LOEVY:

Why is that so hard to accept? Him and T.J. didn't have any part of his actions.

They let T.J. go. T.J. didn't do anything. Why is it just so incredibly implausible that he didn't intend to murder

anybody?

(Said video was played in open court.)

BY MR. LOEVY:

How many times do they have to say -- you heard Mancuso say it, Turner say it, Spizzirri say it -- don't tell me just what you want me to hear. Why do they keep saying over and over again, don't just tell me what you want me to hear. Because they're feeding it to him.

MR. LOEVY: Keep going.

(Said video was played in open court.)

BY MR. LOEVY:

She said, do you feel like I'm trying to make you say something to get out of here, and he said actually, yes, about the gun thing.

And let's play what happens next.

(Said video was played in open court.)

BY MR. LOEVY:

So, she is saying, look, the truth is you knew you had a gun. He's been told over and over again, to get out of that room, he's got to tell the truth. He's been told over and over again, to get out of that room, he's got to tell -- convince the state's attorney he's telling the truth.

She just told him what the truth is. The truth is, I need R.J. to have that gun. And he's at this point, he stopped thinking about his cousin. He's only thinking about getting

out of that room.  He's at close to midnight on his second night.  She says, you got to tell me the truth.

How many times did Mancuso say, truth, truth, truth? She just told him what the truth is.  The truth is, you knew he had the gun.

MR. LOEVY:  Keep going.

(Said video was played in open court.)

BY MR. LOEVY:

Remember she said, are we done talking?  They left. He lasts about two minutes in that room, he's starts knocking. He's crying.  He's talking to God.  He's knocking on the door. Bring them back, bring them back.

He can't face another all-nighter.  This kid -- it's not fair.  He didn't have a lawyer.  He didn't have a phone call.

Play what happens after she comes back in the room.

(Said video was played in open court.)

MR. LOEVY:  Stop.

BY MR. LOEVY:

So, she leaves and she goes and charges him with murder.

Now it's past midnight.  She's gone.  They send Mancuso in one more time.  After the state's attorney's gone, after they send him in, let's try again.

MR. LOEVY:  Play it.

(Said video was played in open court.)

BY MR. LOEVY:

So, that's day three. They give up. They can't get him to say it because it's just not true.

Why is it so crazy he didn't know what his cousin had in his pocket? And they couldn't get him to say it. And, then, they charge him. And, then, Mancuso writes in his police report, Marcel Brown states that he knew Branch had a gun when he got in his car to go to the park.

That's -- I don't know, that's not what anybody saw. Mancuso knew he didn't say it and he wrote that in his police report. And that police report got sent to the prosecutors. That police report got him held at the bond hearing, and it got him convicted of murder. Whatever else is true, Marcel Brown did not state that he knew R.J. Branch had a gun. What kind of game are they playing?

This was a coerced incriminating statement. You should check for the plaintiff.

Judge Jenkins has told you the totality of the circumstances is what matters. You don't just consider one factor. You consider them all in conjunction. Look what they did. They arrested him first for murder. They decided before they ever met him, this kid's guilty of first degree murder, he intended to do that at the park, he's part of the plan.

They arrest him at 3:00 on day one, and then they get

the evidence later.  Except they never got the evidence.  They couldn't do it without pushing him harder and harder and harder.  They're pushing him so hard they worried he's going to use his shoelaces on himself.

They arrested him first and they tried to get the evidence later.  It is psychological coercion.  If there was ever psychological coercion worse than this, it would be difficult to imagine what it is.

Let's get to the fabrication claim.

You know, they wrote in their police report, and you heard that Mancuso testified at the grand jury, that Brown gave a statement admitting that he drove Branch to the park with the intention of shooting someone, admitting it.  That's not true.  And that held him at the bond hearing and it got used against him at the criminal trial.

That is fabricated, and you should check the box for plaintiff on the fabrication claim, too.

The only question on the fabrication claim is whether the statement was material.  And if you look at the instruction for fabrication, they didn't only fabricate evidence.  He didn't know there was a gun.  And the evidence they wrote down was he knew there was a gun.

Plaintiff was obviously damaged.  So, was it material?

And materiality is defined, if there's a reasonable likelihood it would have been different if the evidence had not

been used.  Well, there was no other evidence of intent.  Zippo.  Nothing.  But their claim that he intended to commit murder.

And you know what?  Marcel Brown did not intend to commit murder.

Let's talk about some of the defendants' arguments because the claims in this case are easy.  I want to talk about their credibility first.

You know, they at various times took liberties with the facts.  They had that sleeping demonstrative, remember, with the bed icon.  They tried to tell you he slept through the night.  Mancuso and Flynn tried to tell you he slept through the night.  He didn't sleep through the night.

They said the sleeping started at 3:30.  You just saw clips.  They're waking him at 4:30.  He didn't sleep through the night.

Their credibility -- they said that he had got all these phone calls early.  It becomes futile.  Ten times you ask for the phone.  They're not giving you the phone.  You stop asking for the phone.  But he did ask, and they forgot to put it on their chart.  He asked at 10:00 p.m. before Spizzirri got in there.  That somehow didn't get on the timeline.  He wanted to talk to his mother, and he would have learned there's a lawyer.

They put this other demonstrative up, no paper trail

of the call, the 911 call that came in at 11:41, 41 minutes later.

There was paper trail. You saw the paper. That's how he knew where the call came from. That's misleading. You can't trust what they're saying.

Why is that relevant that there was a 911 call at 11:41? Because nobody's quite sure what happened to Paris in the park.

And I'll give you the least credible thing they did at the trial. Mr. Flynn asked Mr. Mancuso, see this grate where the body was found? Remember the discoloration on the grate? Maybe that's blood. Remember, he showed you a photo and said, maybe there's blood on the grate.

There was a stipulation that is not disputed that there was no blood found anywhere but those three spots. There was no blood on the grate.

So, when he asked that question of him, he knew there was no blood on the grate. He knew the evidence techs had gotten under the grate, had gotten on the grate, found no blood, and he still tried to make you think maybe there was some blood on the grate.

That's not credible. Why is that important? Because if R.J. had shot Paris, and Paris ran and died on the grate with a bloody shirt -- and you've seen the photographs. This is a very bloody shirt. It's a black shirt.

MR. LOEVY: I've got it here, Lilia. Thanks.

BY MR. LOEVY:

It is a very bloody shirt. If he got shot and ran over and fell on the grate and died facedown on that grate, some blood would have transferred from the shirt to the grate.

And if he's got a bullet hole in his heart, and gravity alone would have had some blood drop. Remember they went down the stairs looking for blood? They found three -- they searched the entire area. They found three drops, but nothing under the grate.

What's going on there? None of the people in the park saw Paris get shot? None of them? Most of the people didn't see Paris in the park. A few people -- Marisol Ocampo claimed to see him. Five police cars respond. Nobody sees the body in the parking lot? What's going on?

Maybe what's going on is, his body was moved to that grate. He didn't die at 11:41. We don't know, because nobody ever investigated it.

But if he had died in the way they're claiming he died, certainly would expect to see some blood.

What's not credible? They call Officer Dorsch, who is telling you, well, I didn't see the body. Well, he didn't go in the park. He was on the scene for two minutes.

Who they didn't call were the other four police cars that cleared the scene two hours later --

MR. FLYNN: Objection. Burden shifting.

BY MR. LOEVY:

What you didn't hear from --

MR. FLYNN: Objection.

THE COURT: Okay. So, the objection is overruled.

Ladies and gentlemen, you will recall the evidence, and as I have indicated to you, the burden remains with the plaintiff to prove his case by a preponderance of the evidence.

Mr. Loevy, you're at about an hour.

MR. LOEVY: I got 51 minutes on the timer, your Honor. I've got a timer here.

THE COURT: Okay. I'm just letting you know that --

MR. LOEVY: Sure.

THE COURT: -- that includes your rebuttal.

BY MR. LOEVY:

You did not hear any police officer who was at the scene. You heard from a guy who wasn't at the scene. That's misleading.

You heard about the grate. That Dr. Arden -- they're trying to say it's a post-mortem grabbing of the grate. His thumb is not touching the grate. If you grab something, you don't do it without your thumb. Dr. Arden's opinion is more credible.

The other issues on their credibility are that Mr. Brown supposedly was disrespectful and was aggressive

during the interrogation.  Remember when he told you that?

MR. LOEVY:  Let's play that clip what they're talking about.  It's 30.2.

If we can have the camera over there.

(Said video was played in open court.)

BY MR. LOEVY:

This is, of course, only 40 minutes into the interrogation.  Mr. Brown -- remember he tried to tell you Mr. Brown never changed his demeanor.  He was a little bit more active before all this happened.

MR. LOEVY:  But continue.

(Said video was played in open court.)

BY MR. LOEVY:

So, they say that's evidence of disrespect and aggressiveness:  I ain't down with this, Joe.  They won't give him his phone.  They're trying to make him see something he didn't see.

First of all, it's not disrespectful.  Joe means dude or man.  But Mr. Mancuso thought, you shouldn't call a police officer dude or man.  Well, you also shouldn't tell somebody you got to see something you didn't see, and you shouldn't deny him a phone call.

He didn't wasn't disrespectful.  He wasn't rude.  Why did Mr. Flynn tell you that they treated him that way and he was the one who's disrespectful?  You saw that video.  It's not

true.

The next credibility problem they have is the misleading transcript. They showed you a transcript where they were talking about enemy territory. Remember? And they say Mr. Brown supposedly agrees with Mr. Mancuso about enemy territory. They're having two different parallel conversations when I showed -- when I actually played the clip. He's talking about one thing. Mancuso's talking about something else. Mancuso's saying what he says and he says, yeah, and he goes back to what he's saying. And, then, they show you the transcript and they're like, ah-hah, we caught him saying this.

It's not credible. It's a trick. Those transcripts don't give the full flavor of what's going on there.

Another misleading thing they tried to suggest in the illustration is that supposedly Marcel admitted that R.J. always had a gun, always carried a gun, they told you in opening. No. Yes, they got him in the course of this conversation. He thinks they're trying to get R.J. He thinks they're trying to develop evidence on R.J. He thinks that's his ticket out of the room. So, they're trying to get R.J. carrying a gun. He says, I don't know, I don't know. All right, he always carried a gun. I don't know. I never seen the gun. I heard he got arrested with a gun.

Over 31 hours they get him to say some random things, and they're trying to turn that into, ah-hah, Marcel knew he

always carried a gun. You saw on the screen today, he didn't always carry a gun. He goes to school. He's with his family. It would be unusual.

The most uncredible thing they did was calling Dr. Welner. I mean, that was ridiculous. Dr. Cutler was an academic. He studies this stuff. He's a serious person who teaches. Dr. Welner's a professional expert. They paid Dr. Welner $175,000 to try to tell you a story that you knew wasn't true.

Dr. Cichon, their other expert, got 3500 bucks. He thought that was a fair amount of money for his work. Why did they pay this hired gun, this guy who's an expert in everything? Remember Welner says, I'm a jack of all trades. You want intoxication, you want black rage, whatever that means. I'll be an expert in anything. That's not credible.

Dr. Welner, at the end of the day, ultimately agreed with what we're saying, is that, you know what, you can't do some of the things they did. He should send us half the bill. At the end of the day, he wasn't fundamentally disagreeing. He said, look, sometimes you can groom someone. He was clearly being groomed by some of the good cops. Mancuso was being the good cop.

And you can make -- what Welner says, you can make an interrogation so aversive and so toxic that the guy just wants to get out of the room. And that's what they did to Marcel.

And Dr. Welner doesn't disagree.

But they shouldn't have called an expert like that. It wasn't credible.

Similarly, Marisol Ocampo, she didn't come to court. You heard she didn't even come to her deposition. They said at the beginning of the transcript that we had to go pick her up. At that deposition, she said she's high on Ecstasy, she's still drunk from the night before. This is not a credible witness. This is a woman who was under arrest for a stabbing in the -- it happened outside the park.

MR. FLYNN: Objection. Facts not in evidence.

MR. LOEVY: It happened --

THE COURT: Ladies and gentlemen, you will recall the evidence as you recall it.

BY MR. LOEVY:

It was after the shooting, outside the park with a different group of girls, Alicea Hardiman. And her boyfriend got arrested for this shooting. Her boyfriend was Eddie Cane. Edward, Eugene, he went by a lot of names.

MR. FLYNN: Objection, facts not in evidence.

BY MR. LOEVY:

Marisol Ocampo --

THE COURT: Ladies and gentlemen, you will recall the evidence. The lawyers -- it's just a summary of what they believe the evidence has shown.

MR. LOEVY: You heard it, Marisol Ocampo says, my boyfriend, Eddie Cane, got arrested and I thought they were trying to pin the murder on him.

You heard Mancuso admit -- he read that police report, refreshed his recollection -- somebody said that Eddie Cane had a gun that night.

So, Marisol Ocampo is not a disinterested witness. She said, I called the police station to see what's up with my boyfriend. They came and picked me up, put her in a room for 15 hours, and she signs a statement at 2:45.

Now, we don't have a video. We should. She was a person of interest in that stabbing, because somebody had said that she was the one who supplied the knife.

But remember what Turner said? Oh, I didn't take it seriously, so I never asked her if she was involved in the stabbing. Give me a break. They were asking her about the stabbing. They were asking her about her boyfriend. 15 hours later she signs a statement saying R.J. was -- you know what she said? R.J. was saying, I'm going to F those N words up.

Turner's -- Turner investigated the stabbing. His exact words end up in Marisol Ocampo's mouth. The same words that he suggested to Marcel. And she signs it. Two years later she goes to the trial. Mancuso used the word locked in. They locked in Marisol Ocampo. And they show her her statement. She has to read her statement two years later. She

has to regurgitate her statement.

Mr. Flynn showed you how the game is played. Remember at that deposition, he just read her statement to her. She's like, oh, yeah, that's true, that's probably true if I said that.

When Ms. del Valle asked her, she's like, I don't remember R.J. being -- I don't remember saying anything. That's how they play this. It's a game. It's a game to them.

If they had any witness other than a woman whose boyfriend was under arrest for murder, who was arguably under arrest for a stabbing, where are they? You know, there's nobody in the park other than this woman telling their story.

And by the way, even if you credit every word she said, it has nothing to do with Marcel Brown. Nothing. She didn't say anything about Marcel Brown. Only thing she remembered is he didn't have anything to do with it.

So, Marisol Ocampo doesn't change anything.

Where is any other park witness who wasn't under arrest?

They told you in opening that there was a gang war, this USDA thing. Well, that didn't pan out. I suspect he's going to drop the USDA out. It's a rap group. He said, we're 14, 15 years old. In our neighborhood, we call ourselves the name of our favorite artist. Young Jeezy's group is called USDA. It's not a gang. There's no turf. There's no

territory. There's no enemies. He spun you a fiction.

And Mancuso admitted it. I never developed any evidence. Everybody said R.J. -- even Marisol Ocampo said, that's just guys doing their thing. It's not a gang.

R.J. said I can only be in one gang. And R.J. was in a gang. He was in the Mafia Insane Vice Lords. USDA is not a gang.

Nor was this park some dangerous park. I mean, they're just hoping you just don't get it. There's no mall in this neighborhood. This is where the kids hung out. This is, the block party went to the park. It's not a gang park. There's kids. There's girls. There's a playground. This is a summer night. People hang out in the park. People went in the park.

Marcel says, I've been in that park a million times. I play softball there. I go to picnics there. I hang out at night. Those are my friends in the park. He's trying to tell you, oh, we had this rival rap groups, and you don't go in that park without a gun.

Marcel walked into the park without a gun because he's comfortable in that park and that's his park.

And if anything, the only gang that operated in the neighborhood, remember Dorsch told you, was the Insane Mafia Vice Lords.

So, R.J., this is his neighborhood. He's not at risk

of anything.  This is his neighborhood.  So, this whole thing didn't pan out.  I assume they're going to drop it and stop trying to tell you that silly story.

Just like they tried to tell you that silly Day-Day story.  They asked Marcel in a 660 page deposition, did you ever have a problem with Day-Day?  He's like, well, honestly, when I was 14, we were all hanging out, 30 guys hanging out, and Day-Day started picking on my friend Jamel who was -- he was bullying, we got in a fight and then it was over.  Now we're hanging out in the next second, and we've been hanging out ever since.

They asked R.J., he's like, yeah, I saw him recently.

These are not enemies.  They tried to make it like, ah-hah, you're going to shoot each other.  He's like, no.  Why would I tell you at my deposition?  You know, they wouldn't have known it but for they asked him a question and he gave them an honest answer.  You ever have a problem with Day-Day?  Actually, when we were 15, we got in a fight once, but we're cool.

That's how they know, because he told them.  They're trying to turn, ah-hah, he just admitted it.  It's a gang warfare, fight, USDA, Young Money.  It's silliness.

Another thing they're going to talk about is this mantra that Mancuso, Spizzirri, Turner kept saying over and over again:  Well, it's his fault this lasted so long because

he kept lying.  He kept lying.

Marcel said, look, I didn't actually see anything.  It was a dark park.  There's people shooting.  That's what I really know.

He did try to protect his cousin early on.  He's not -- you know, the irony is, he shouldn't have had to be a witness against his cousin.  If he understood his rights, he would have said, no thanks, go find your own witnesses.  I don't have to be a witness against my cousin.  I have a constitutional right in this great country of ours not to be a witness.

They overrode that.  So, he said, fine, I did lie about my cousin.  My cousin admitted to me he was shooting.  You know, my mom told me, don't go to jail for what somebody else did.  Fine, he was shooting.  He said, I lied.  He could use that word.

You know how many times Mancuso admitted he lied?  He couldn't get that word out of his mouth.  It wasn't a lie.  Every time I caught him in a lie, he couldn't admit it.

Marcel was candid.  You know what, I shouldn't have said my cousin wasn't involved.  Little did Marcel know he shouldn't have been asked, because he should have had a lawyer.  But he did at the beginning try to deny that.  But then after that he was straight.

And they got -- they were the ones who got him off the

one shooter, two shooter. He believes to this day there were two shooters, and he was told the other shooter was Day-Day.

So, he did tell the police there was this Day-Day guy shooting. And the police over and over kept saying -- remember, Weber was the one who did it: Stop saying it's Day-Day. We're not believing it. There weren't enough shots. The state's attorney's not going to believe it. There was only a few shots. One shooter, one shooter, buddy. You're never getting out of here until you come over to one shooter.

So, eventually he said, fine, there's only one shooter. I don't know -- if you guys are saying -- remember, he was actually genuinely surprised that other people weren't saying Day-Day. Remember I played those clips? He's like, what about what the other people are saying? Aren't you asking the people? He believed the other shooter was Day-Day.

After a while, they beat him down mentally, fine, one shooter. You guys want one shooter, there's one shooter. And then they're like, oh, my God, he could have told us that eight hours ago. They changed his story, and then complained his story changed.

Just like the stuff in the back seat. He said, we weren't saying anything in the back seat. It's three or four minutes to the park. We're listening to music.

They get him to rehearse over and over again. You've got to get R.J. mad. He gets it. He's not a fool. He's not

getting out of that room until R.J.'s getting mad in the back seat.

Turner puts those words in his mouth:  Going to pop those N words off for messing with my sister.  Eventually he adopts some of that.  Oh, you could have told us that eight hours ago.  There you go drawing it.

They changed his story by not accepting the truth, and then they complained and accused him of changing his story. You can't do that.

They call him a master legal strategist.  There's a clip early on in the interrogation, Page 18 of this massive transcript.  McDonald says, you know, if you got a gun and you knew he had a gun, it goes one way.  And if you didn't know he had a gun, it goes the other way.  And as someone pointed out, he didn't say which way is good for Marcel, which way is bad for Marcel.

And they're trying to say this is a legal scholar who understood the law, who had his arms all the way around this and, therefore, he knew.

That's not the case.  This was all going over Marcel's head.

And don't forget, they gave him a lot of advice.  They told him multiple times, if you didn't pull the trigger, you're safe.  So, he would have thought he's safe.  I didn't pull the trigger.  I can say whatever they want him to say.  But he's

saying, I wanted to tell the truth.

They also told him the opposite of that. They said, you're guilty. You're going down because you drove there.

Those are two things that contradict. They're both not true.

But they -- this is not the only advice they gave him. They told him, it's better for you if you don't get out of the car. I showed you that. They basically said, as long as you get the truth, you're going home. They told him, if you -- you know, I played the clip for you. Say there was a gun and you can go home. You know, if you tell me the truth, and the truth is he didn't have a gun, they imply to him, that's what he needs to do.

Spizzirri tells the worst of all. She says, it is in your best interest. That's her exact words. You can remember it. It's in your best interest to tell me the truth. And, then, she told him what the truth was. The truth is, you knew he had a gun.

If you're Marcel Brown and you're not super understanding what's going on, maybe he thinks they're trying to get R.J., they need a witness to say R.J. had a gun. But he's like, I didn't know he had a gun. Why is that so hard to believe that he didn't know he had a gun?

You know, I already mentioned T.J. He suggested why frame Marcel? You know, they didn't want Marcel to be a

witness against R.J. They wanted to get R.J. So, now when they send him to trial, R.J. is standing next to Marcel. Marcel is on the dot, too. He's standing trial. That's why they went after this kid. They decided before he got in the room, we're going to arrest both of these kids for murder.

T.J., who is in the same car, walks. There's no video of what happened in the T.J. Mancuso slipped. He said, T.J. didn't do anything. Well, if T.J. didn't do anything, then why did Marcel do something? They blame the plaintiff.

Don't let them blame Spizzirri. Spizzirri said she had a small part in this.

Judge read you a causation instruction. The police officers' actions don't have to be the only cause, nor the nearest cause. The police officers' action can be sufficient if they combine with another cause.

So, Spizzirri at that point was their instrument. She asked questions. They teed it up. Then she hits it. But don't forget, Spizzirri did not write the police report. Spizzirri did not testify to the grand jury that the investigation revealed that defendant Brown gave a statement admitting that he drove Branch to the park and he knew he had the intention of shooting somebody that night.

That was Mancuso who told that lie, not Spizzirri. And he's not being sued for his testimony. He's being -- that testimony shows he had bad faith and that he knowingly

fabricated evidence and coerced a false, incriminating statement.

I want to talk about a few more subjects before turning it over to damages. And I want to talk about the individual defendants.

Now, keep in mind, as we've said ad nauseam, we win if any defendant did it. Any, not all. Any. So, I want to talk about each one.

I want to start with Weber. Weber was the guy who, remember, he had had an earlier encounter with the police where his family was a witness and Weber treated him with kindness. So, Weber played that. Remember on the video he's like, I know you're a good guy. I've told them you're a good guy. I can vouch for those police officers. They're straight shooters. They're not screwing you around. And, then, he used that.

And this kid, it was all going over his head.

Weber then later said, this DD stuff, Day-Day stuff's, got to go. Stop with the Day-Day stuff. Weber said, they're not going to believe it, you got to put that away.

There's a clip that arguably sounds irrelevant about Weber.

MR. LOEVY: It's 69, if you could tee it up.

BY MR. LOEVY:

I want to play it because what it shows is how Weber knows it's all a big game. Weber knows there's a video here.

And Marcel asks for the phone. Look how Weber plays it.

(Said video was played in open court.)

MR. LOEVY: See what he did there? I think she -- he closes the door. He tried to make it pretend like his voice was trailing off. He's playing. They're cheating. This is not legitimate. His voice didn't trail off. He was denying this boy a phone call. And that's bad intent.

The next police officer, Turner. This is the memory guy. Remember at the deposition he said, listen, both my parents got Alzheimer's, my memory's shot. And, then, he gets up there with the defense counsel and he tells that story about the stabbing and had this long explanation for why he never asked Marisol if she was involved in the stabbing, his memory suddenly came back.

The reason Turner's part of this is because Turner's the one who put it in Marcel's mouth. Turner's the one who said -- Marcel's just like, I'm telling you what happened. I didn't know anything. And Turner's like, you know what I think happened? I think R.J. was in the backseat saying, I'm going to F with those N words. And, then, what do you know, they rehearse it and that becomes the story.

Of all the crazy, lucky guesses, Turner just nailed it. He guessed R.J.'s exact words that become part of the story.

Turner kept saying, too, I'm not telling you what you

want to hear. Don't just tell me what we want to hear. He was part of it.

McDonald was the bad cop. He's deceased. But you can find against him, too. He's probably the worst. He's the guy who did that waking up stuff. He's the guy Marcel had to say, dude, can you not talk so loud? He's the guy who was feeding him information, who was badgering him, who was intimidating him. There has to be a bad cop in the story.

And McDonald was part of this. You know, the way he woke him at 4:00 a.m., even Mancuso said you can't do that.

So, that brings it to Mancuso, and he definitely was part of this. He's part of the long interrogation, the no lawyer, the no phone calls, the arrest him first, lie to him about the arrest.

But what really Mancuso did that bothered me the most is he abused his trust. You could see Marcel thought he was the good cop. Marcel kept telling him, you know I don't got a gun. I didn't know about the gun. And Mancuso says, yeah, I know you told him. And you can see Marcel saying, you told the state's attorney that, right? You told the state's attorney that? And Mancuso sort of hedges. And he believes he's got a friend.

MR. LOEVY: Play 3- --

BY MR. LOEVY:

I'm going to show you what happened. After the

state's attorney left, after Marcel's been charged, look how Mancuso played it at No. 321, after midnight on day three.

(Said video was played in open court.)

BY MR. LOEVY:

This child is asking Mancuso, can you look out for me? He's been dealing with this guy for more than 24 hours. He says -- he believes in his heart Mancuso knows he hasn't done anything wrong because he has honestly and credibly told Mancuso, I didn't know there was a murder happening. And Mancuso's been playing him. And Mancuso, no, he's not going to look out for him. He's been lying to him. He's been lying to him the whole time.

And when that state's attorney -- he didn't even have the balls to tell Marcel, you've been charged with murder. He just played him.

And you know what happened after that videotape? After that videotape, Marcel said, he told me, say your prayers. Say your prayers. That's what Mancuso was doing. It was all a big game.

Now, this was hard for Marcel to watch, watch that video. It's like watching a video of yourself abused as a child. He knows he didn't do anything wrong. He had to watch that on the screen. And he had a plan to stay cool on the witness stand. It's a bad look. Remember when Welner lost his cool at the end of the day? It's a bad look. He wanted -- you

know, he wanted to stay calm, and he didn't.

My favorite philosopher of all time, the boxer Mike Tyson, says, everybody's got a plan until you get punched in the face. Marcel had a plan to stay calm. But watching himself get abused, and then having another guy who looked like that get up there and try to tell him he's guilty of murder, that he intended to hurt somebody in that park, it was too much for him to be told again that he intended to hurt somebody in that park.

He intended to pick up his sister. He wasn't trying to hurt anybody. He wasn't trying to murder anybody. He wasn't part of any plan. And when the lawyer started cross-examining him, he said, no, don't put words in my mouth. Remember, he really fought back. Maybe he was too defensive. But he's like, listen, Mr. Lawyer, you're better at words than me maybe a little bit, but don't put them in my mouth. Don't trip me. Don't trap me. I'm done with that. I am not a child anymore. You can't do that to me.

If it looked defensive to you, that was Marcel saying, we're not playing that again. You're not going to do that to me. I'm a grown man. He said, respect me. You didn't respect me as a child. It's time to respect me. And he insisted on that. And he deserved it.

So, that brings us to damages. We have a huge disequilibrium here of injustice. You have to right it. You

can't give him back what he's lost.  You have to compensate him.

You should consider that there's no remorse.  Mr. Mancuso said, I'd do it all over again, wouldn't change a thing, even knowing what I know now.  This is an injustice.

So, it brings us to compensatory damages.  You're going to get the verdict form.  It's easy, check for plaintiff and for plaintiff.  And, then, you're going to have to decide the damages.

The first period is before the conviction.  The police report was used to hold him.  That lie that he knew there was a gun.  And we're going to ask you to put $5 million on the first line, compensatory damages.

And we're going to ask you to put $25 million on the line for the Menard, for a total of 30.

And the punitive damages line we want you to put 50,000.  No more.  And it's very important that you get that right.  The punitive damage line is against Michael Mancuso, 50,000.  That's enough to serve the purposes.  The bigger numbers are on these two lines.

And I'm going to get a chance to address you in rebuttal, but my colleague Mr. Bowman is now going to address you about why that amount of damages is appropriate.

Thank you for listening.

BY MR. BOWMAN:

As Marcel Brown sits here this morning, and for the rest of his life, his story will be that as an 18-year-old kid just out of high school, he went to jail and then he went to prison for something that he didn't do.

He didn't intend for this to be his story, but it is. He didn't plan it this way. This reality won't go away. He remained unjustly confined in prison for the entirety of the decade of his 20s, that formative period.

This deep unfairness flows like a river through this case. And your job is to assess the amount of money that will fairly compensate Marcel Brown for all that he has endured.

You must assess the amount of money that will fairly compensate Marcel Brown for the loss of his liberty. You must assess the amount of money that will fairly compensate Marcel Brown for all the pain and suffering that he has endured and that he will endure. You must fairly compensate Marcel Brown for his loss of a normal life.

The instructions say that there are some damages that are hard to measure, but you cannot turn away from measuring those damages nonetheless. You must award them.

And what we ask of you is that as you decide the amount of money that will fairly compensate Marcel Brown, that you look at the whole sweep of this story. Don't look away.

Start on the morning of September 5, 2008, as it slowly begins to dawn on Marcel Brown, and continues to become

clear to him over time, that he has been tricked, and that his words that have been grabbed out of him unfairly, those words will be the words that will be used to convict him of a crime he did not commit.  The pain of that understanding, that is the pain of unfairness.

And as you measure up the damages in this case, remember the cost to Marcel of being unfairly treated.

Jon Loevy just mentioned, you know, during cross-examination Marcel lost his composure, he spoke out of turn, and the anger that he tries to hold inside of him welled up and came out in this courtroom.  And you saw, it was literally exposed to you what this pain costs Marcel today and what it will continue to cost him.  The rage that he lives with because he was unfairly sent to prison for something he did not do.  That pain stays inside of Marcel and it will not leave him.

So, count the full measure of that pain when you add up the amount of money that will fairly compensate Marcel Brown.

As you add up the amount of money that will fairly compensate Marcel, don't forget who this 18-year-old boy was.

You know, each one of us, we wake up every morning, we have a sense of who we are.  I am this person.  Marcel Brown woke up in the summer of 2008 and he knew who he was.  I am Marcel Brown.  Because my mother sacrificed and paid the higher

rents in Oak Park, I am a graduate of Oak Park-River Forest High School.

I am Marcel Brown. My girlfriend is Tyasia Wills. And this afternoon and the next day we will talk about our future together.

I am Marcel Brown. I know I need to get a job. I've gotten a job. I want to do better. I want to go to Triton College. I need to register for Triton College.

I am Marcel Brown. I live at 906 Humphrey in Oak Park, Illinois. My mother lives there. My sisters live there. My brother lives there. And I had a dog named Joy.

That is who Marcel Brown was.

And think about the night of September 5, 2008, as Marcel Brown settled in for the first of many sleepless nights in Division IX of the Cook County Jail surrounded by squalor and hate and filth and despair. You know that he asked himself, as the tears were streaming down his face, he asked himself, why has everything that defined me, defined my identity been stripped away from me in a heartbeat?

Consider the pain of being unfairly accused, that all of this was taken away from Marcel for no reason. He was innocent of the crime that sent him to the Cook County Jail for two years and more.

So, add that pain in as you consider the amount of all the pain and suffering that Marcel is owed compensation for.

Consider the life that Marcel lived in the Cook County Jail for those years.

Remember, as he carried that blanket and the sheets and tried to drag the mattress behind him on that September 5, 2008 evening in the Cook County Jail, remember, Marcel Brown weighed all of 105 pounds and stood five feet, four inches tall. And he told you that he was preyed upon, he was abused, he was a victim of gangs.

Consider, as you weigh the amount of damages that Marcel Brown is owed, the immense physical courage that this man exhibited. He could have joined a gang. He could have gotten that protection. And he chose not to. He never became part of gang life. Not in the Cook County Jail, not later at the Menard Correctional Center. And as a result of that, he was terrorized and he was brutalized. He balled himself up and he endured it.

Remember his mother would come and ask him and say, Marcel, how are you doing? I see you have a bruise on your face. Marcel would say, it's okay, it's nothing, Mom. But it was not okay. Marcel endured endless abuse.

Consider, as you add up all the pain and damages that Marcel has suffered, consider that he spent those years at the Cook County Jail wanting to believe that his innocence would prevail. And as he waited month after month after month as his case was continued, hoping and expecting that, because he had

not done anything, it would get figured out. Why would it take so long for them to figure out that he had done nothing wrong, this 18-year-old boy is asking. He felt as if he was stuck in a time capsule. Remember that pain as you add up all the pain and suffering in this man's life.

And there was the event, the thing that Marcel Brown cannot speak of. He told you he was confined in a cell in the Cook County Jail in Division 9 with an older man and he was a sexual predator. And that man took hold of him and that man turned him around and that man pressed himself against him. And, then, that thing happened that Marcel could not say. And as that thing was happening, all the men up and down the row could hear what was happening and they began clanging on their doors. And, finally, this man was pulled off of Marcel.

That thing lasted for just a few minutes. But as Marcel told not just half of that story, you saw the tears come, you saw his voice break, you saw the heartbreak well up in him, and you know that even though that event just took a matter of minutes, it lives inside of Marcel's body and his heart today, and it will remain with him for the rest of his life.

So, do be sure and add that in as you're calculating the amount of damages to compensate Marcel for all his pain and suffering.

Don't forget to compensate Marcel for the day in

January 2011 when hope was extinguished and he was told that he was guilty of a murder he did not commit, that he would be going to an Illinois prison for 35 years for a murder he did not commit, that he would serve all of those years for a murder he did not commit. Imagine that pain and suffering, and don't forget to add that in.

By all means, by all means, be sure in your calculation to add in what Marcel Brown experienced on that long bus ride from Stateville Correctional Center down to Menard Correctional Center at the very tip of Illinois. As he drove down there, he was shackled. Shackled by his hands, his hands shackled to his feet, his hands and feet, which were shackled and Marcel were shackled to the next man next to him, another convicted criminal, and on and on down the line, each man shackled to the next man, and a bucket in the back of the bus for them to piss in.

And Marcel said, in that minute, on those hours -- in those hours, I felt like a slave. Subjected to that for something he did not do. Add that pain and suffering in.

Remember that at Menard, just as it had been at Cook County Jail, Marcel was not a member of a gang. He was traumatized. He was victimized every day. He suffered bruises. He suffered injuries. He lived in Menard Correctional Center in a cell so narrow that he could stretch out his arms and touch both sides of the cell, and not much

longer. And he lived in that tiny environment with another man. He did not know, he had not control over who that other man would be, except that he could be sure that the man confined with him who he did not know and could not choose was a person convicted of a heinous and horrible crime.

Marcel sat there five feet-four, just barely over a hundred pounds, living in that situation day after day after day. Count that in.

And do not forget, as you are measuring up the amount of the damages that are owed to Marcel Brown, do not forget that over time, all of the bonds that tied him to his family and his loved ones and his community gradually came asunder. Remember that.

Remember that Tyasia Wills stayed with him until he was convicted for over two years, and then she concluded and Marcel agreed that it was time for her to move on. She married somebody else. She had a child with somebody else. And that news traveled over the months down to Marcel Brown, and he heard that and he absorbed that pain, that hurt. Remember that.

Remember that his mother came down six hours, 350 miles down, 350 miles back every week for that first year that Marcel was at Menard Correctional Center, but it was too much. And over time, the visits tapered off and it was every month, and then it was every couple months, and then it was once a

year, and then it was less.

Remember Marcel, he said, at first, there were people around to answer my phone calls and say hello, and then eventually, my phone calls stopped getting answered.

The years went by. The summers, suffocatingly, unbearably hot. The winters, excruciatingly cold.

And birthdays went by, and holidays went by year after year. Remember Marcel would say, I called up at home, I called up my home on the holidays and I would speak to everyone. They passed the phone around. And people would say, hey, Marcel, how are you? He didn't have a very good answer to that question.

And after a few minutes, he would hang up the phone and there would be this feeling of emptiness. Those lives, the lives of the people nearest and dearest to him were moving on. And Marcel's words, "I was left behind in a time capsule."

You see, even for family, even for dear friends, it is impossible to invest a great deal in the life of someone who will not be coming back for the next 35 years. Remember that when you add up all of the damages that are owed to Marcel.

Marcel began to feel like he wanted to kill himself. And he shook himself eventually out of that despair and he began to fight his case. He got good lawyers. Appeals were filed. They went back to court. And by the grace of God, in July of 2018, almost ten years later, Marcel Brown came home.

And there is a wonderful picture that you saw --

MR. BOWMAN: If we could have the document camera.

BY MR. BOWMAN:

-- of Marcel with his family on that joyous day, all his folks around him. Look for just a minute at that picture and see that little girl that is holding herself next to Marcel. You might think, well, that's Marcel's little sister from when he went away. No, it's not. That -- his mother is standing there next to him. That is her granddaughter. A whole generation has come up, and Marcel has missed that.

There is a loss, a hole in Marcel's life that resides there and will reside there for the rest of his days. There is a part of his family history that he does not share. And all of this is so deeply wrong because it happened for no reason because this man is innocent. You don't get better from this.

For all he has accomplished, Marcel Brown is not okay. I mean, we can be delighted that he has a job, and we can smile because love has prevailed and Tyasia Wills has come back into his life. It's a beautiful thing. And it's wonderful that he has a daughter. And God love him for all that he has done.

But it is not okay. Marcel is not all right. You saw the anger that wells up inside of him. You saw -- Marcel testified. He said, it is so hard for me sometimes to be in the company of other people that I have to go off by myself and I have to work things out inside of my head. This is the

coping strategy that he learned when he was isolated and away in prison, and he cannot shake it off.

His mother said, for that first year-and-a-half that Marcel was with me, I would urge him to sleep in a bed and he couldn't do it. He needed to sleep on the floor because he had gotten used to a harder sleeping surface.

He would go into the bathroom. He'd stay in the bathroom for hours, we couldn't get him out, because he could not bear to be in the company of other people.

You understand, the 20s, the decade that Marcel lost, that is the formative decade of life. That is the decade in which a person finds a job, a person finds a loved one, a person starts a family, a person finds their community, a person builds their relationship to their community. That decade, that decade is the one that Marcel was robbed of.

And as a result of that, the foundation is not stable. Marcel is not going to be okay. He is going to suffer for the rest of his life. He is going to be defined by this horrible thing that happened to him for no reason.

And you have to measure in -- when you measure out all of the damages in this case, don't forget that measure of damages for the loss of a normal life. Marcel's life is not normal and it will not ever become normal. So, add that in.

Remember that the purpose of damages is to deter misconduct and to punish. And another purpose of damages is to

fully compensate Marcel for all that he has lost. And that is your responsibility. And as I said at the beginning, all we want you to do is not forget any part of it. Add it all up.

The money that you will award Marcel, that will be the measure of justice. We trust you. It will be in your hands soon. You have the opportunity, the responsibility to weigh fairly what will compensate Marcel, to do justice in this case. And in the end, that's what we ask. Do justice.

THE COURT: All right. Let's take our morning break. It's a little later than normal. We'll take a ten-minute break.

Please don't discuss the case. We're almost there.

All rise.

I'll see you in ten minutes.

(Jury out.)

THE COURT: All right. Mr. Flynn, confirming the length of your closing.

MR. FLYNN: Say right around 90 minutes, your Honor.

THE COURT: Okay. So, given the break we're taking now, I'm happy to ask the jury how long they are willing to go before they take their lunch break. And I'm happy to try to push them a little bit. But in fairness, it may be a little difficult if they're not willing to stay to let Mr. Loevy do his rebuttal, which I will give you 20 minutes to do in light of the length of your opening close.

So, we'll just address that with the jury when they come back.

Were you going to say something, Mr. Loevy?

MR. LOEVY: Yes, your Honor. We calibrated it carefully and timed it at 95 minutes. And you had given us -- we planned for a 25-minute rebuttal. I'm not saying I'll use it all, but --

THE COURT: I'll give you 20 minutes for rebuttal. That's it. The case is not going to be won or lost on your calculation of five extra minutes.

And we'll just see where the jury is in terms of how long they want to go.

MR. LOEVY: Thank you, your Honor.

MR. FLYNN: Thank you, Judge.

(Recess from 11:43 a.m., until 11:54 a.m.)

(Proceedings heard in open court; jury in.)

THE COURT: All right. You may be seated.

Ladies and gentlemen, Mr. Flynn on behalf of the defense will give his closing statement. When he finishes, we'll see where we are and I'll ask you from your seats whether you prefer to take a lunch break at that time and then we'll come back for a rebuttal argument or if you want to continue to push through. I'll just give you the option at that time depending on where we are.

And so with that, Mr. Flynn, you may begin your

closing argument.

CLOSING ARGUMENT

MR. FLYNN:  Good morning again.  Before I get started, I want to thank all of you again for sitting here with us over the last two weeks.  And that's not just lip service.  I'm not just saying it because I feel obligated to say it.  We truly do appreciate you coming in here.  I know many of you live in the suburbs.  Getting to and from the courthouse everyday was probably difficult and it means a lot to me and my trial team, it means a lot to Detective Mancuso, and it means a lot to Detective McDonald.  We hope that you look back on this experience in a positive way because you served an important role in the American justice system.

Now as the Court has instructed you, in this case plaintiff has the burden of proving their case.  In order for you to find for plaintiff on either of their claims, they must prove by a preponderance of the evidence every element of that claim.  That means they have to show it to you that it's more likely than not the case and they have to prove it with evidence.  And for plaintiff to win a case, their case has to be built on a firm foundation, a firm foundation of actual evidence.  Not fast-talking arguments; actual evidence.  But plaintiff's case is built on a foundation of sand.  Made-up stories that were not corroborated by any people or any evidence.  And a foundation of sand cannot support a verdict

against the defendants in this case. And because of that, when you go back to the deliberation room this afternoon, we ask that you find against plaintiff for both claims because the detectives in this case, they did their job, they asked the tough questions, they got to the truth, and they got justice for Paris Jackson.

In opening statement, I told you that Marcel Brown has a pattern of lying. Remember that? He starts with a big lie, he works his way down to a half lie when the big lie is not working, and then finally he works his way around to the truth; and you saw that in the CPD interview. When he first got there, he said it was only Day-Day shooting, I saw Day-Day shooting, R.J. wasn't shooting. After a few hours went by and that wasn't working, he said okay, R.J., he was shooting, but Day-Day shot first. It was only in self defense. And finally, about 12 hours into the interview, he finally came around and said okay, R.J. was the only shooter.

He then entered into self-preservation mode and started with his big new lie. He had no idea R.J. was going to shoot on the way to the park. How could he know that R.J. had a gun? That didn't work after a while. He worked his way down to his half lie. Well, I didn't necessarily know he had a gun but R.J. is a shit starter and he's always got his gun with him. Finally, he got around to the truth when he told ASA Spizzirri that on the way to the park, R.J. was saying things

like he's gonna F them up and they're all gonna die. And that pattern has been followed in this case with respect to how Paris Jackson died.

Let's talk about the big lie first, that somebody else, some unidentified person killed Paris somewhere else that same night and carried his dead body to the park and threw it on the grate. That big lie is supported by their expert, Dr. Arden. He was one of the first witnesses they called on the first day. He's the older guy with the glasses. I cross examined him. Before we talk about this theory, remember, Dr. Arden has worked on 16 cases for this law firm. I asked Dr. Arden, I said, has there ever been a time they called you up and said, hey, could you provide an expert witness opinion for us on a case and you said no? He said no, I don't think that's ever happened.

And so this theory, this big lie that Paris Jackson was killed somewhere else and carried to the park is based on the testimony of Dr. Never Says No. And so let's talk about this theory and just how ridiculous it is.

You'd have to believe that Paris Jackson was killed somewhere else that same night and whoever this person was that killed him carried him into the park and threw him on the grate. You don't just have to believe that to believe this crazy story. You also have to believe that whoever it was that was carrying his dead body in the park for whatever reason

Closing Argument - Mr. Flynn

2383

carried him down the same sidewalk that Paris would have been running down when R.J. was shooting in the spark.  How do we know that?  Because of the blood trail.  Even Dr. Never Says No said that whoever it was that carried his body would have had to carry him down that sidewalk because that's where the blood is.  Remember that big spot of blood at the corner of the fieldhouse evidence marker number four and then more spots of blood further down closer to the body?  So that's the first thing you'd have to believe.

And plaintiff's proof of this is Dr. Never Says No big testimony that there just wasn't enough blood at the crime scene.  But you heard from Dr. Cichon, our expert, who we called on Friday.  Dr. Cichon actually treats gunshot wounds to the chest, has been treating wounds like that for years.  Their doctor has never treated a gunshot wound in his life.  Who are you more likely to believe?  And what did our doctor say?  He said yeah, I treated wounds like that.  And he looked at the autopsy report and he said, yeah, there was a lot of internal bleeding, which makes sense, there was some blood on the shirts and the amount of blood found at the crime scene is about appropriate for that nature, for that type of injury, for that type of gunshot wound.

And then they make a big deal about the lack of blood found underneath the grate but Dr. Cichon explained that, too.  You saw -- nobody likes looking at this but -- I know you can

only -- you only have to look at his chest.  You see the crisscross pattern on his chest.  Their doctor admitted there's a crisscross pattern on his chest.  What caused that?  His body pressing against that grate, that metal grate.  And that's right on the gunshot wound.  You can literally see the crisscross on the wound itself.  So when you combine that with the two shirts, that acted as a dressing.  Dr. Cichon testified it's like a dressing that he would put on this type of wound to keep blood from coming out so that explain why there's no blood underneath the grate.

Plaintiff also wants you to ignore the arms and the hands of Paris Jackson.  Although plaintiff wants you to ignore this fact, you heard the stipulation I read on Friday.  A stipulation -- the testimonial stipulation is if there's a witness that we would call that only has a couple thing to say and the parties agree that that's what they would say, you stipulate to what they would say.  That stipulation I read to you on Friday was from the medical examiner, Dr. Sagovia.  She's the one that conducted the autopsy on Paris Jackson.  And that stipulation, both parties agree, if Dr. Sagovia was called, she would have said that based on her analysis, it looked to her like Paris Jackson was gripping the grate.

Detective Mancuso took the stand.  He's the only person in this room, the only person that you heard from this entire trial that actually saw that body in person as it laid

on that grate.  He also told you it appeared to him like he was gripping the grate.  Why is that important?  Because if Paris's dead body was on thrown on the grate by this unknown unidentified person, he couldn't grip the grate.  And plaintiff will contend that, well, you can't really see if Paris is gripping the grate, the thumb is not locked in and just the fingers are so that's not really a grip.  Okay.

Well, what nobody can deny is the placement of his arms.  Look how his arms and his hands are above his head.  Think about this.  If you are to believe their story somebody took his limp dead body, which I'm sure would be difficult to carry, and threw him on the grate and if you're a dead limp body you get thrown on the grate, why would your arms go above your head?  They wouldn't.  The only explanation for his arms being above his head like that are the truth.  It's the truth.  It's that he got shot, he walked and ran down that sidewalk another 46 feet, he got to this grate, and he collapsed.  And he was trying to get away from R.J.'s bullets gripping the grate trying to get away and that's where his body was found.  That's where he breathed his last breath.

One last point on this:  Mr. Loevy talks about these five police officers that responded to the shots fired calls.  Don't you think all the work that they've done in this case that if there was one police officer that actually went to the back of that park or actually went into that parking lot that

they would have called him?  And you've seen pictures -- you'll have the pictures with you in the deliberation room.  You'll see pictures that were taken at the crime scene.  And I asked Detective Mancuso, in that picture is the corner of the fieldhouse, is Paris's body still there?  And it was.  But it was difficult to see it.  It was back in the corner and that was in the middle of the day.  So even if there was an officer that went to the back of the fieldhouse that night, it would have been difficult to see this body.

What's more likely regarding how Paris died?  This ridiculous story about him being killed somewhere else and carried to the park or R.J., just like Marisol Ocampo told you, R.J. came into the park, saw Paris and his friends, started firing his weapon at Paris and his friends, Paris and his friends took off along the backside of the fieldhouse -- these are all Marisol Ocampo's words -- and Paris got a bullet to the back as he was running away right before he made that corner of the fieldhouse where that big spot of blood is.  It's so obvious what happened here.

Don't let them fool you with sand.

And despite plaintiff hiring an expert to support this theory that Paris was killed somewhere else, they haven't spent a ton of time on it.  And this follows this same pattern.  They start with a big incredible story and they work their way down to a half lie.  So let's talk about the half lie.  It's the

same half lie that Marcel Brown said in the interview room when he got to phase -- I still have to keep them straight -- when he got to phase two of his interrogation, that R.J. was shooting in the park but Day-Day was shooting too.

And remember, nobody disputes that R.J. was shooting in the park. R.J. took the stand and told you he was shooting in the park. But what is in dispute is that there was a second shooter or that this guy named Day-Day was shooting; and we'll talk about that. And just like it should be difficult to believe today, it was difficult for the detectives to believe at the police station during Marcel's interview.

So why is it difficult for the detectives to believe that there's this second shooter? Day-Day. Because they interviewed 20 eyewitnesses, people who were at the park when the shooting occurred. Eight of them specifically said I know who the shooter was, I saw R.J., I know who R.J. is, R.J. was shooting.

MR. LOEVY: Objection, your Honor. He's saying what the witnesses said. He admits it's not offered for the truth.

THE COURT: Ladies and gentlemen, you recall the evidence and the instructions I previously gave you so rely on your own recollection of the evidence.

Mr. Flynn, you may continue.

MR. FLYNN: The detectives were relying on the 20 eyewitnesses that they spoke to and eight of them said they saw

R.J. shooting. Eight of them said they saw Marcel drive the Malibu drive R.J. there seconds before the shooting. And you know what none of them said, not a one of them? Said that they saw a second shooter, that they saw Day-Day shooting, that they saw anybody else shooting. Nobody else mentioned that. Don't you think that if it was true that somebody would have said I saw Day-Day shooting?

MR. LOEVY: He's offering it for the truth, your Honor.

THE COURT: Ladies and gentlemen, you will recall the evidence and my instructions about how evidence may be used in particular with regard to statements.

Mr. Flynn, you may continue.

MR. FLYNN: And they brought nobody to this trial to tell you that there was a second shooter in the park that day except for the guy who is here asking for $30 million and his cousin, the felon -- R.J. Branch -- who shot up a park. That's it. Isn't that interesting?

They testified that R.J.'s sister Taneshia Branch, his cousin, she was there. She was at the park. That's who they were allegedly going to pick up. Marcel Brown's sister was there, Cierra Jackson. Marcel's other cousin was there, Almanique Scott. They rode over to the park with T.J. Scott, their other cousin. None of them came here and testified and said anything about there being a second shooter

in the park.  None of them even took the stand and said, yeah, the reason they came over that night was because they were coming to pick us up.  None of them.  It would have taken ten minutes of your time to have one of them come in here and testify of that.

Mr. Loevy is a seasoned trial attorney.  He knows that having a witness like that come in here and testify, that would at least lend some corroboration to this fictitious story but he couldn't get him in here because it's difficult to get people to come in here and lie, to get people to come in here and make up a story and commit perjury.  But it might not be difficult for someone asking for $30 million and his cousin who shot up a park.  And those are the only two whoever said that there was a second shooter.

Anybody who has ever watched a couple episodes of Law and Order knows that when you confront a suspect with hard evidence against them, what does the first thing that they do? It wasn't me.  It was that guy over there.  It's textbook.  And that's exactly what they were doing in this case and what they're still doing today trying to convince you that there was this second shooter even though there's no other evidence. That's ridiculous.

So let's talk about the testimony of R.J. Branch, the star witness that they called here I think it was last week. Again, the one single third-party witness that they brought

here to testify about what happened in the park. That's all you got from them. Either Marcel's words or R.J.'s words.

And there's a reason -- I want to show you Instruction Number 8. This was an instruction that Judge Jenkins read to you earlier this morning regarding your analysis of the credibility of witnesses. There's a reason why the jury box is that close to the witness box. It's because you, as jurors, have the duty to assess the credibility of these witnesses. An instruction like that, you know who that's written for, it's written for witnesses just like R.J. Branch. Can you really believe anything that came out of his mouth when I cross examined him last week? Let's talk about some of these things.

When I was asking him questions about what happened that day, he told me that for the first time that he ever touched a gun was the day that he got shot at Amundsen Park or got shot at at Amundsen Park. The first time that he ever touched a gun was when he bought a gun, from his word, a crack head this same exact day that he got shot at at Amundsen Park. And I said, R.J., why did you buy the gun? He says, oh, no reason. Just felt like something to do. Does that sound like credible testimony?

R.J.'s version of the truth is that after he bought this gun, the first time he's ever bought a gun he goes to his usual hangout out at the White Castle hanging out with Marcel and the rest of the USDA crew and he was very careful during

his rehearsed direct testimony to tell you Marcel didn't know I had a gun, I didn't tell anyone I had a gun. Nobody knew. So R.J. allegedly touches a gun for the first time, buys it from a crack head, goes and hangs out with his friends, and doesn't mention it to anybody?

And this whole ridiculousness about whether he had touched a gun before or not, remember I asked him about his previous gun arrests, possession of a gun, one of which he pled guilty to? Remember he said, oh, no, the cops put that on me. Again, textbook. Lie, lie, lie.

R.J.'s story continues with him asking you to believe, just like Marcel asked you to believe, that they just went to the park just to pick up their sisters. Just a normal day going to pick up their sisters. If that was the purpose, R.J. could have pulled up in Marcel's Malibu and any of them could have called their sisters -- they just all had been on the phone with their sisters a few minutes before when they were at White Castle -- and said, hey, we just pulled up out front, come jump in, let's take off. But they didn't do that, no. R.J. with a gun in his pocket went running into the park because they weren't there to pick up their sisters. They were there to confront the Amundsen Park crew who they had heard were messing with their sisters. That's what happened.

R.J. wants you to believe that once he got into the park, out of nowhere for some unknown reason, some guy named

Day-Day opens fire on them.  I said this guy named Day-Day, what's his real name?  Well, I don't know his real name.  Okay. Well, why did he shoot at you?  Oh, I don't know.  You'd have to ask him.  That's what he said when I cross examined him. And I said wasn't it -- did it mean something to you that this guy named Day-Day, you don't even know his real name, he opens fire at you in the park with your sister there, with your female cousins around you and you just don't care?  You don't care to find out why?  It's because it's all made up.  Day-Day was never shooting in the park.

I then asked R.J. what did you do with the murder weapon?  What did you do with that gun?  Just keep in mind, the detectives still to this day have never found that gun.  And R.J. told me when he was on the stand, I threw it in the pond. And remember I pulled up his deposition transcript and when I asked him that same exact question at his deposition in this case and at the deposition he said I threw the gun in a sewer. And in the deposition, he didn't just say any sewer.  He said the sewer at Parkside and LeMoyne.  He gave me -- he gave me the cross streets of this sewer.  But up on the stand, he said it was in the pond.  And who knows.  They threw the gun in a sewer, in the pond, threw it in the Atlantic Ocean for all I know.

But here's what I do know is that when you're talking about the truth, it's not difficult to keep it straight in your

head because there's only one truth.  But when you're lying, when you're telling lie after lie after lie to try to save yourself and maybe get 30 million for your cousin, it gets difficult to keep your lies straight and that's a great example.  And when you have doubts about the credibility of their star witness R.J. Branch, you should have doubts about their entire case.

And so why make up this half lie back in 2008 and still be telling it here today?  Because if people think that there was a second shooter, people might think that somebody else killed Paris.  But we know what really happened and the detectives knew what really happened before they ever started the interview with Marcel.  R.J. heard people were messing with his sister, including some of the Amundsen Park crew.  Taneshia Branch always starts trouble.  R.J. always serves as her backup.  And on that night when he served as her backup, it went too far.  He brought a gun, he fired the gun in the park, and Paris Jackson was shot to death.  That's the truth.

And last Friday afternoon, you heard all of this from Marisol Ocampo.  Marisol was not afraid to go to the police the morning after the shooting when she heard Paris had been killed.  She went there freely and voluntarily.  She was not intimidated.  She was not coerced into providing a statement. She did what she thought was right because when that shooting happened, she was there with a young child and she was upset

that R.J. Branch would come into the park and open fire with their little kid there. Who wouldn't be? She said enough is enough. I got to tell the police what happened. And Marisol Ocampo said in no uncertain terms not only at the criminal pretrial when we had the actress player up here but also at her deposition when we played her the video -- or played you the video on Friday that R.J. came to the park in Marcel's Malibu with Marcel driving. R.J. came into the park and said who is it, who is it to his sister asking who the guys were that were messing with his sister. She pointed over to Paris Jackson and his crew of guys. R.J. went after them, unloaded his revolver, and Paris died.

And Marisol Ocampo doesn't have any ax to grind. She has no reason to make this up. You heard her say that she lived with Marcel and R.J. for a few months. Marcel and R.J. both testified that, yeah, Marisol lived with us for a few months before that shooting. She doesn't have anything against these guys but she saw what she saw. She knew it was wrong and so she reported it to the police.

And we're sorry that you had to sit through Marisol's account four different times but it's important to note that this account of events about what happened in the park as she saw it, she said it four different times, she said it to the detectives a few hours after the shooting occurred, she said it to the ASA when she gave her ASA handwritten statement a few

hours after that, she testified to it under oath at the grand jury a few days later, and she ultimately testified to it during the criminal trial a year or so later.

And 15 years later when she was deposed -- and you saw that video -- she looked over those statements, she looked at her testimony, and it all came back to her. She says "yeah, that's exactly what happened." And keep in mind, other than the shooter and his accomplice, that's the only fact witness that was presented to you in this trial about what happened in the park.

And at that deposition, she was struggling at the beginning, no doubt about it. She had a hangover. Honestly, I had a bit of a headache just watching some of that. And she was doing her best when plaintiff's counsel was asking her questions trying to recount details of an event that happened 15 years ago. She was doing her best to remember it. She had difficulty like any of us would if you tried to remember something that happened 15 years ago. But what she had -- what she remembered for sure is that when I showed her those statements, it clicked back and she said that's what happened. Whatever I told the police and whatever I said at the criminal trial, that's what happened.

And the best plaintiff can do to disparage Marisol Ocampo is to make up facts. Mr. Loevy just stood up here and said that Ms. Ocampo was arrested for a stabbing. First of

all, that didn't happen. That's made up. They said that Ms. Ocampo's boyfriend Eugene Stanciel was arrested for the murder of Paris Jackson. That's a lie. That never happened. They're just making things up to do whatever they can to disparage Marisol Ocampo because she's so bad for their case, because she's a third-party witness who has nothing to lose, has no reason to come in here and lie to you about what happened in the park. And she told you exactly what happened.

And I do want to talk about that stabbing because other than the lies that Mr. Loevy said, that's the best that they got for claiming that she was somehow coerced into giving a statement and I want to make sure you're very clear on these facts. There was a stabbing that occurred and one of the witnesses of the stabbing told the detectives I heard from my sister that maybe I saw Marisol Ocampo with a knife. That's it. That's their evidence. And it goes even further. When that witness told the detective that I saw Marisol Ocampo with a knife, Marisol Ocampo had already provided her statement to the detectives about the shooting hours before that. It could not have had any impact on Marisol Ocampo's statement about the shooting because they heard that from that witness hours later.

And it goes even one step further. That witness who said I heard it from my sister that she saw Marisol Ocampo with a knife, Detective Turner, he took the stand. He investigated that. He went back and looked at his police reports and he

said I went and talked to the sister about that and the sister said no, I never saw Marisol Ocampo with a knife, and that was it. That's the extent of this evidence that Marisol Ocampo is involved in some stabbing. They're just grasping as straws trying to discredit poor Marisol Ocampo because they know how bad she is for their case.

And, ladies and gentlemen of the jury, we're not standing up here saying that Marcel Brown is a terrible human being. We're not saying that. He testified that he's found God. He's testified that he's a father and we truly hope that that's all true. And nobody enjoys hearing about the hardships that someone goes through while they're in prison. I think all of us agree that we wished the conditions of our prisons were better but that's not what this case is about.

And we're also not saying that Marcel and R.J. drove to the park that night with the intention of killing Paris Jackson but they did drive to the park knowing there would be a fight, knowing R.J. had a gun, knowing R.J. was going to use that gun on the Amundsen Park crew, and a person died because of it.

It was a senseless thing to do, no doubt. But when you participate in a senseless thing that results in the murder of a human being, you go to prison. You get convicted and you go to prison. That's the world we live in. And then when you come to this trial all these years later like Marcel Brown did

and lie about what occurred, you certainly should not collect millions of dollars.

So let's talk about the lies that Marcel told on the stand. He tried to wiggle out of everything he could when Mr. Gibbons was cross-examining him. He was well prepared. He knew everything that he could know about that ERI video of his interview. And he's a clever guy. He was a clever guy up there. He was a clever guy back in 2008 when he was trying to wiggle out of the questions that the detectives were asking him in the video. And sometimes a person's cleverness can get them into even more trouble. And there's one thing that has not changed about Marcel Brown and that's his ability to lie to people. So let's talk about those.

Marcel said on the stand that he's never had a conversation with R.J. about the shooting in the park. That's what he said. Think about that. If we're to believe their story R.J. had touched a gun for the first time that day, Marcel and his cousin drives him to the park, there's an alleged gun battle, bullets flying everywhere, R.J. gets back in the car. The next day, a body is found in that same park and him and his cousin never have a conversation about it? It's not credible. You know, so why would Marcel stand up there and lie to you about something like that? It's because of that story they concocted about Day-Day shooting in the park the next day when Paris was found dead. He's hoping that if he

can convince you that him and R.J. never had any conversation at all about the shooting, maybe you'll think that they never made up this story together about Day-Day, but it's just a lie.

And I'm sure you'll all remember at one point on the stand Marcel said that after the shooting in the park, all the people in the park just stayed there. Does that make any sense? If there's a shooting in a public place that everyone is just going to hang out? No. If there's a shooting in a public place, everybody is going to flee and it's just another lie that Marcel told you. And so why would he tell you that lie? Because if he can convince you that people stayed in the park after the shooting, maybe you'll think it's less likely that Paris Jackson was killed there. But it's just another lie, just more sand thrown at you and he's hoping it will convince you to give him millions of dollars.

Mr. Gibbons next asked Mr. Brown about when he heard Paris's body was found and Marcel up on the stand said, well, I was getting a call about a body in Amundsen Park, I was getting a call about a body at White Castle, I got this other call about a body over here, body there, body there. There's no evidence of any other bodies. It's just another made-up lie.

We also asked Marcel when he was on the stand about how -- when they found out Paris was dead the next morning after the shooting, him, R.J. and T.J., they -- they got out of the house. They hid. He denies that. He denies that they

hid. But you heard the phone call that he made a couple years later to a young woman and you're going to have that phone call in the deliberation room and I encourage you all to listen to it. Listen to it three times. It's only, I think, 20 or 30 seconds long.

And in that phone call, he's describing what he did that morning when he heard Paris Jackson's body was found. He's talking about how he went and got T.J. downstairs, he went and got R.J. in another room, they got their stuff and they hid. And when Marcel took the stand, he was prepared for that phone call and he knew it was going to be one of our exhibits. He said I didn't say "hid." I said "did." Again, listen to the phone call. The word "did" makes no sense in that sentence. It's just him again lying to you and hoping that you don't believe that he was in hiding the next morning because he says that he didn't do anything wrong.

And I also want you to listen to the end of that phone call. It's unrelated to the issue I was just talking about, but at the end of the phone call you hear who Marcel Brown really is. And he says that when a gangbanger kills another gangbanger, you don't go to the police. You keep that on the street. That's what he believes. You're going to hear it from his own voice on that phone call that you're going to have.

So why is that important? Mr. Loevy made this big grand point about why would R.J. go over there in Marcel's

Malibu that people know and shoot at the other gangbangers in front of all these people?  It's because in their world that they lived in, you kill another gangbanger, people don't normally snitch on you.  So they weren't concerned about the police.  This was a gang-on-gang crime in their minds.

Mr. Gibbons later asked Marcel about how the detectives gave him his Miranda rights and told him that he had a right to an attorney.  Mr. Brown said I never requested an attorney, I didn't know what a lawyer was, I didn't go to law school.  That was his testimony.  Come on.  Do you know any 18 year old anywhere who doesn't know what a lawyer is let alone an Oak Park High School graduate?  And you don't just have to rely on circumstantial evidence.  You also know that he had a relationship, Mr. Brown had a relationship with ASA Spizzirri.

Remember when she first enters the room towards the end of the interview and he recognizes her?  It's because she was the attorney on another case earlier that summer.  Remember that case we heard about where somebody -- Marcel got into it with some guy and his uncle came over and shot up his house?  Well, that was investigated by Detective Turner, by Detective Weber and ASA Spizzirri was the attorney on that case.  They were the victims in that case and they got justice from Marcel and his mother, the guy that shot up their house.

So I bring that up because he had a prior relationship with an attorney, with a lawyer.  He knew what a lawyer was,

Closing Argument - Mr. Flynn

2402

but he sits on the stand and he lies to you about it because if he could convince you that he didn't know what a lawyer was, maybe he could convince you that he didn't understand his rights.

Marcel also testified -- and Mr. Loevy drove it home even further -- that there was no rivalry between the USDA and the Amundsen Park crew. Marcel says no, me and Day-Day, me and Day-Day were friends back then, there was no big rivalry. Another lie. First of all, they didn't try to corroborate that with Day-Day. They didn't call Day-Day to say oh, yeah, we were friends back then because it's a lie.

How else do we know that it's a lie? The first thing that Marcel said when he went into the interview room with the CPD, R.J. wasn't shooting, and I saw Day-Day shooting. He was laying a murder on Day-Day. With friends like that, who needs enemies? It's because they were not friends. They were enemies but Marcel came here and told you this lie that him and Day-Day were friends in hopes of convincing you that there was no rivalry between USDA and the Amundsen Park crew, but there was. And when you have doubts about the credibility of their star witness R.J. Branch and the credibility of the plaintiff himself, you should have doubts about their entire case.

So let's talk about the detectives interview of Marcel Brown. When someone tries to convince you of a story that is not supported by credible evidence and you know it's not the

truth, it becomes difficult to believe anything else that comes out of their mouths. That's human nature. I think we've all had somebody in our lives that's lied to us -- some more than others -- and the people that have lied to us, the more and more they lie, the more and more difficult it gets to believe anything that comes out of their mouths; and that's exactly the experience that the detectives were going through when they were in the interview room with Marcel Brown.

You've seen this timeline. This is the timeline of Marcel's time at the police station. Remember, phase one is the big lie. R.J. wasn't shooting at all. It was only Day-Day. Phase two, R.J. was shooting but Day-Day shot too. Phase three, okay, R.J. is the only shooter but I had no idea he was shooting and then finally he makes his admissions. And remember, at 3:00 a.m. there when he enters into phase three where he admits that the whole Day-Day story was made up, he only admits to that because right before then, they were talking to T.J., the other guy in the car. And T.J. admitted, you know what, R.J. was the only shooter and we got together the day after when we found Paris was dead and we made up this story about Day-Day. That's what happened at 3:00 a.m.

MR. LOEVY: Your Honor, he's arguing the truth again. We'd ask for that jury instruction.

MR. FLYNN: That's what the detectives learned, your Honor.

THE COURT: All right. Ladies and gentlemen, you will recall the evidence and my instructions about how that evidence may be used.

Mr. Flynn, you may continue.

MR. FLYNN: So they learned this information from T.J., they went back into the room at 3:00 a.m., they confronted Marcel and said guess what we just learned from T.J., we heard about how you guys got together and you made up this story about Day-Day shooting. And it was only then that Marcel finally came around to that truth, that Day-Day wasn't shooting, that it was all made up.

And I want to pause there because I think it's important to understand, Mr. Loevy throughout this trial has had to -- has tried to put this in your head that this entire 30-plus hours Marcel Brown was just consistently saying I didn't know R.J. had a gun, I didn't know R.J. had a gun. That's not the case. He came in in phase one and specifically said R.J. wasn't shooting. I saw with my own eyes Day-Day shooting. And you're going to have this tape back then -- back there in the deliberation room. I encourage you, if you have any questions about what is said during that tape or the sequence of anything -- I know Mr. Loevy will play a clip here and then back up and play a clip there and play a clip there -- I encourage you to watch all of it that you can because it will show you that Mr. Brown came into that interview room and lied

and lied and lied about a murder for hours. There's nothing consistent about his account of events during his time at the police station.

And when you lie and lie and lie to detectives about the serious thing, so serious such as -- as serious as murder, you're gonna look a little more guilty and Marcel looked a little more guilty with every lie that he told throughout 30-plus hours. And telling lies and changing your story in material ways, it's going to increase the length of the interrogation. It's going to increase the length of time that you're at the police station because when material things change in a suspect's account of events, you gotta go back, you gotta start over, you gotta say okay, what's your story now, let's start from the beginning. You heard detective McDonald say that at one point. All right. Let's start from the beginning, what's the truth, as you're saying it is now. What is it?

Not only that's going to lengthen the interrogation, when you get these new facts coming in, you gotta go out as a detective and investigate those facts. Well, you don't have to go out. They could have just said we know you're lying but they're good detectives. They gave him the benefit of the doubt and they said okay, well, you're the first person that said they saw this Day-Day guy shooting in the park, we'll go find Day-Day so that took some time. They went out and they

found Day-Day. They interviewed Day-Day. They went out and they found T.J. They interviewed T.J. They were doing detective work. They weren't just isolating him for 30-plus hours and trying to coerce him. They were doing detective work and doing the best they could with a suspect that was constantly changing his story.

And while we're on this topic of the 30-plus hours, I want to make it clear that detaining Mr. Brown for 30-plus hours in the police station that day, that is decidedly not a violation of his U.S. Constitutional rights. If it was a violation, they would have certainly -- they would have certainly told you about it.

Plaintiff just wants you to focus on one fact, that Marcel was there for 30-plus hours. Pay no attention to the reasons why, pay no attention to why it took that long, pay no attention to whether it and itself is a violation of his constitutional rights and just assume that it must have been coercive.

Plaintiff's case is like one of those big murals that we've all seen that are actually made up of hundreds of little bitty tiles. From far away, it just looks like a big beautiful painting but you take one step closer and you start to see some of those cracks. You take another step closer and you see some more of those cracks. That's exactly what their case is about. Take 34 hours, for example. From far away, 34 hours at the

police station, it must have been coercive.  But take a step closer and you hear that Mr. Brown kept changing his story in material ways.  You take another step closer and you hear that they treated him professionally.  They gave him the bathroom, they gave him food, they gave him water.  You take another step closer, you hear that they turned the lights out from six-plus hours and didn't bother him and let him get some sleep.  And eventually when you're as close to that mural as the law requires you to get as a juror, you see that their case is full of cracks.

Plaintiff has attempted to convince you that the conditions of Marcel's interview were much worse than they actually were.  They brought up a lot of theories and I want to walk through some of them because none of them are a violation of his constitutional rights.  Not only the length of time that he was in the police station, but most of everything else that they've talked about.

Before I get to the list of those, I want to point out that the detectives were careful about respecting Marcel's constitutional rights.  They gave him his Miranda rights three different times and asked him do you understand your rights and three times he said yes.  Concrete examples of the detectives respecting Marcel's rights.

So let's walk through some of those issues that Mr. Loevy brought up that are decidedly not violations of the

U.S. Constitution. First, Mr. Loevy claims that Marcel didn't know he was under arrest. Come on. First of all, you heard detectives testified. They told him he was under arrest. He was handcuffed. I had played that sound of the video when he first enters the -- right before he enters the interview room, you hear that clinking noise, that clicking noise that handcuffs make. He was in handcuffs when they get -- went and got him from his house. He was a suspect in a murder.

And I believe at some point, plaintiff's counsel said, oh, that clinking noise, I think that that was the lock on the door. Well, if that was the case, why didn't they play you the sound of the lock on the door another time and compare the two? They didn't because it's not the lock on the door. It's handcuffs. And I did that. I played you that clip where Detective Turner and Detective Mancuso when they came in and you actually see the handcuffs and they handcuff him and bring him in for fingerprints and it's that same clicky noise because he was in handcuffs.

And let's move one step past the handcuffs. Marcel testified and his mother testified that when they came to his house to arrest him that day, there was a ton of cops there. Cops in the front, cops in the back, cops on the side. Ladies and gentlemen of the jury, this was not a social call. They were there to arrest a murder suspect. Everybody in Marcel's house knew that he was under arrest. Everybody in Marcel's

neighborhood knew he was under arrest.

And plaintiff's theory that Marcel didn't know he was under arrest, there are a couple times in the ERI where Marcel asks am I locked up, am I under arrest.  He knows he's under arrest.  He's in a room.  He was handcuffed before he got there.  He's in a room.  He can't leave.  He's 18 years old. He knows he's under arrest.  What he's asking in those clips is am I charged, are you charging me with murder.  And the police explain to him each time, the detectives, they say we don't know yet, that's up to the ASA and it was the ASA that ultimately charged him towards the end of the interview.

And again, even if you were to believe that Marcel was not put in handcuffs and that the detectives led him to believe he wasn't under arrest, that is decidedly not a violation of his U.S. Constitutional rights.

Next, plaintiff made a big deal about Marcel's requests for a phone call.  Plaintiff wants you to believe that throughout this interview Marcel was just constantly asking to make a phone call and that's just not the truth.  I showed you this before.  These are the requests for a phone call. Mr. Loevy said I left one out.  I didn't leave one out.  He's talking about the time that plaintiff asked Mr. Turner if he still got his phone.  That's not a request for a phone call. He's just making sure that the police still got his phone.  The true request for a phone call are all identified on this chart.

And so you'll see that all of them prior to his admissions are in the first four-and-a-half hours of his interview. And so why is that important? Because keep in mind -- and I've identified it there -- R.J. doesn't turn up at the police station until 5:50. So for the vast majority of these requests to make a phone call, they're still out there trying to find the shooter, R.J.

So think about that, this is a critical part of the investigation. They've been interviewing witnesses for three or four days, they finally find the driver, and now they're trying to find the shooter. You think it makes sense to let the driver jump on a phone call and potentially tip off the shooter, hey, get out of town, hey, they've got 20 eyewitnesses, here's what the witnesses are saying, hey, let R.J. know he needs to hide the murder weapon, they're coming for us. There's a lot of valid reasons why you wouldn't want Marcel using a phone call in those early stages of the interview especially when R.J., the shooter, is still out there in the wind.

Also, keep in mind, Marcel was given a phone call. It's there at the end. He's given a phone call at 1:10. They don't keep him for making a phone call the entire time he's there. And here again, even if you think that Brown should have been -- should have been able to use a phone call or should have been able to make a phone call when he requested

it, that is not a violation of his U.S. Constitutional rights. And if it was, they would have told you about it.

Next, let's talk about Wham Cary. Wham Cary is an attorney who we all heard from who claims that he was turned away while he was at the police station. First, before we get into the details, here again not telling someone that they got an attorney outside to see them is not a violation of the U.S. Constitution -- of his U.S. Constitutional rights. Mr. Loevy --

MR. LOEVY: Objection, your Honor. That opens the door.

MR. FLYNN: It doesn't open the door, your Honor.

THE COURT: Okay. We'll deal with it if we need to. Please continue.

MR. FLYNN: The U.S. Constitution requires you as a suspect, if you ask for an attorney, you are given an attorney. It's undisputed that that never happened here. Marcel never asked for an attorney.

And it's difficult to believe this Wham Cary story that they've spun for you. And before we get into it, I want to clear up any confusion. We don't dispute that Wham Cary was at the police station that night. We don't dispute that he turned R.J. in. He surrendered R.J. a little before 6:00 o'clock that night. That's why this photocopy of his ID was made. Don't let them fool you into thinking that they

Closing Argument - Mr. Flynn

2412

photocopied this for Marcel Brown. It had nothing to do with Marcel Brown. This was photocopied because he surrendered R.J. Remember R.J.'s dead and had a case with Wham Cary and that you heard R.J. -- the police were looking for R.J. so they called up Wham Cary and said hey, help me surrender my son and that's what happened. We don't deny it. But what we do deny is that Wham Cary ever represented Marcel Brown that night.

And they've got you just two witnesses to support this theory that Wham Cary was there to represent Marcel Brown: Wham Cary and Marcel's mother, Deb Scott. So let's first talk about the similarities between their two accounts of events. There's not a lot. Two similarities between their account of events of what happened at the police station that night. Neither one of them can identify any person they spoke to regarding Wham Cary representing Marcel Brown. They can't tell you anything about the person and that's where the similarities end because their account of events of what happened at the police station that night are vastly different.

Wham Cary took the stand first and we asked him what happened and he said that he tried to speak with Marcel Brown and after a couple attempts, some unidentified person said Marcel Brown doesn't want to speak to you and he left the police station. That's his account.

Marcel's mother took the stand and we asked her do you remember going down that way. She says no, I don't remember

anything like that. I don't remember anybody saying that Marcel Brown didn't want to speak to Wham Cary. What she said happened is that when they tried to speak to Marcel Brown, the detectives threw them out of the police station, said if you don't get out of here, we're going to throw you in jail.

We asked Wham Cary about that do you remember them ever kicking you out of the police station or anything like that? He says no. Me being thrown out of a public station, that's never happened. If that ever happened, I would certainly remember it.

Their stories just don't sync up. And by the way, both Marcel's mother and Wham Cary said that there were several other family members that were there with them that night at the police station. Where are they all at? Why weren't they called to testify to say oh, yeah, Wham was there to represent Marcel Brown. Because it's all made-up.

And if that's not enough evidence to convince you, let's look at the hard evidence. Everyone agrees that Wham Cary showed up at the police station a little before 6:00 p.m. You see it right there. We asked Wham Cary that. He says okay, that sounds about right. We know that R.J. Branch was put in his interview room at 5:55 when the video was turned on.

Why is that important? Because when Wham Cary turned R.J. over, by all accounts, he was immediately handcuffed and whisked away to an interview room. Okay. That was a little

before 6:00 o'clock. And what Deb Scott told you is that after that happened, she then said will you represent my son and she pulled together some money out of her purse. She got some money from some family members and whatever was left extra that she needed to pay Wham Cary, she got it out of an ATM. That's their big piece of evidence that they love, the transaction history from the ATM.

Here's what's really important about this transaction -- and you can see it for yourself -- she withdrew that money at 7:39 p.m. So, remember, they get there at 6:00 p.m. and she's not withdrawing the money until 7:39 p.m. Why is that important? You heard Wham Cary. He told you that he doesn't do anything for a client until he gets money up front. Remember he said time is money? Those are his words. Do you think that he turned over R.J. at 6:00 o'clock after business hours and then just sat around in the police station for an hour and a half hoping that somebody pays him to represent Marcel Brown? No. Because it didn't happen. I don't know what this withdrawal of money is for. I mean, if you look at this transaction history, there's transactions for Sam's Beauty and Athenian candle. I don't know what she took out 80 bucks for but I could tell you it wasn't for Wham Cary. Wham Cary would have been long gone by then.

Finally, even if you still somehow believe that Wham Cary was there to represent Marcel Brown, there's no evidence

that any information about Wham Cary representing Marcel Brown ever made its way to the detectives in this case and you cannot find them liable for something that they had no knowledge of. And again, it's not a violation of the U.S. Constitution.

Let's talk next about the comfort of the interview room. Again, there's nothing about that interview room that is a violation of Marcel's constitutional rights. And if there was, they would have told you about it. And nobody up here is saying that that interview room is the Four Seasons. It's not the Ritz Carlton. Police stations are not comfortable places. And plaintiff's own expert, Cutler -- last Thursday or Friday -- he said there's a reason for that. There's a reason for windowless interrogation rooms; and that's what Brown was put into. Police do not interrogate murder suspects at spas. They interrogate murder suspects in interrogation rooms. And the detectives did what they could to make him comfortable under the circumstances: Bathroom breaks, food, snacks, water, blanket, McDonald's. This was not Guantanamo Bay like plaintiff is trying to make it out to be.

What that video shows are detectives who are investigating a murder of a murder suspect who continually lies to them and they're doing their best to keep him comfortable under the circumstances.

So let's talk about sleep deprivation. Mr. Loevy said sleep deprivation hasn't been studied because it's not a thing

in interrogation and it's not a thing in this interrogation either. Dr. Welner defined what sleep deprivation is. It's when the interrogator actively stops a person from going to sleep. That's not this case. Dr. Welner's example was an interrogator blaring music for hours and hours and hours making it impossible to go to sleep. That's not this case.

You saw the time lapse that I played with the lights out where he went uninterrupted for six-plus hours with the lights out with a blanket. That's not sleep deprivation. They had no reason to turn that -- those lights out other than their care for his comfortability. They could have kept the lights on if they wanted to; but they turned it off because in those circumstances, they were doing their best to keep him comfortable.

And one more thing about the time lapse, I know Mr. Loevy slowed down and played three or four different times in the time lapse where Mr. Brown wakes up and blows his nose because he has allergies. Ladies and gentlemen, if he was home in his bed and he has allergies, he would wake up and blow his nose. That's not sleep deprivation. That's just somebody waking up in the middle of the night like we all do for whatever reason.

And me putting Sleeping on this chart, I wasn't trying to mislead you. That's the time when the lights are out and they were trying to let him sleep and it's not sleep

deprivation.

Now, of course, the detectives turn the lights out, they gave him a blanket, they gave him food, they gave him water, and Marcel says oh, that's just the detectives. Anytime they were doing anything nice, they were just trying to butter me up. Remember that? He said that a few times. This is the epitome of damned if you do, damned if you don't.

If the detectives had been screaming at him in his face, maybe hit him a couple times, Mr. Loevy would stand up here and say those detectives are evil. The detectives give him a blanket and McDonald's and treat him nicely, Mr. Loevy stands up here and says they're evil. No matter what the detectives did in that room with Marcel Brown, Mr. Loevy is going to stand up here and say it was wrong.

And with respect to the circumstances of the interview room, for anybody that's been on a long flight maybe flying coach maybe in the middle seat if you get unlucky, nobody is comfortable in those circumstances but the airline does what it can to make you comfortable in those circumstances. They turn the lights out for you, they give you some food, they give you something to drink, they make the bathroom available. If you're lucky, they might give you a blanket. It's exactly what the detectives did in this case. Under these circumstances, they did what they could to make him comfortable.

And what is the alternative? There were only two

Closing Argument - Mr. Flynn

2418

other alternatives other than leaving him in that room:  Let him go; alternative number one.  Well, we couldn't do that.  He had been implicated in a murder by multiple eyewitnesses and he had spent hours and hours and hours lying to the detectives' faces about the murder.  And remember, right before they shut those lights out right around there at 3:00 a.m. when he enters into phase three, that's when he first comes clean about how he made up this story about Day-Day shooting.  So not only had he had been lying for hours, he had just admitted that he had been lying for hours in connection with a murder.  You can't just let the guy go.  So alternative number one is out the window.

What's alternative number two?  They could have taken him down to a lockup, but that wouldn't have been much better.  You heard what the lockup is like.  You're in a jail cell maybe in there with other people.  And it's still just a metal bench that you're sleeping on with no bedding or anything like that.  And there's a really solid reason why they didn't take him to the lockup during 3:30 to 10:30:  R.J. was down there.  R.J. was in the lockup.  And remember, right before they shut the lights out at 3:30 when he enters into phase three, that's where he admits to concocting a story with R.J. about Day-Day shooting.  They couldn't go put him in the lockup overnight and potentially let him communicate with R.J. and concoct some other big story with him, the shooter in this case.  So that alternative was out, too.  So they left him in the room and

they made him as comfortable as they could under the circumstances.

Plaintiff also argues -- and he's still arguing -- that there was food deprivation. I am puzzled that they're still making this argument. When Marcel is making his admissions to Spizzirri, he literally has a sandwich on his lap. They were not depriving him of food. It's clear what's going on in this case. Plaintiff got a list of risk factors from their expert, Dr. Cutler, and they just picked as many as they could that might apply and just threw them all at you hoping to see what sticks even if the evidence doesn't support it. He wasn't deprived of food. He literal -- he was given snacks, he was given McDonald's, and he literally had a sandwich in his lap when he made his admissions.

So now let's talk about Marcel's admissions. They really start on night one during the top left corner where he tells Detective Mancuso that R.J. always keeps the gun on him. I can't remember exactly what Mr. Loevy said about that on closing argument but there's no uncertainness about what he's saying here. Mr. Mancuso is asking him where does he keep the gun and he says he'd just have it on him, he just keeps it on him. It's pretty clear what he's saying here.

On the next day, he admits that R.J. is a shit starter. A little while later, he says that R.J. is a pitbull and he goes crazy. A little while later, he talks about a gun

fight that he knows that R.J. was in.  These are just some of the early admissions.

And this argument that there was no evidence that the detectives were relying on him with respect to Marcel Brown's involvement in the murder prior to these admissions is just wrong.  It's just false.  Again, they had spoken to 20 eyewitnesses and eight of them told these detectives they saw Marcel drive R.J. to the park and a few more said they saw him drive R.J. away from the park.  There was evidence that Mr. Brown was connected to this murder before he ever stepped foot in that room.  That's why he was arrested.

So let's talk more about these snippets.  As the case progresses, he later talks about how Taneshia always starts trouble and R.J. serves as her backup.  We talked about that earlier.  He then later tells Spizzirri that on the way to the park, he said I'm going to F these Ns up.  Later on, he says that when he hears R.J. say F them Ns up, it means he's gonna shoot somebody.  And then later after that, a few minutes later he says that on the way to the park, R.J. said these Ns messing with my sister, they gonna die.

And just to be clear, we're not saying that Marcel ever explicitly said to the detectives or ASA Spizzirri I knew R.J. had a gun on the way to the park.  He never made that statement.  We don't say that he did.  And he knew better than to make that statement.  I encourage you again to watch that

first interaction between Detective Mancuso and McDonald and Mr. Brown and they lay it out for him.  Detective Mancuso -- Mr. Loevy already talked about it -- he says it could get handled this way or get handled that way.  And then a few minutes later, Detective Mancuso drives it home even further and says you could be held accountable for driving him over there and being a part of this just the same as if you pulled the trigger.  Unless, of course, you didn't know he had a gun. Those are Mancuso's words to him in the first few minutes of the interview.

Marcel Brown's a clever guy.  He knew from that point on that he could not admit that he knew R.J. had a gun and he never did.  But what he did do is he provided enough information to make it clear that he had to know R.J. had a gun.  The rivalry between USDA and Amundsen Park.  The fact that R.J. was saying things in the back like I'm gonna kill him, I'm gonna F him up.  He knew R.J. had a gun on the way to the park.

And while we're on that point, don't forget what Marisol Ocampo said in her deposition.  She read her statement that she gave to the detectives.  She told the detectives that when she saw R.J. get out of Marisol's Malibu, she saw the gun in his pocket before he ever pulled it out.  And so if Marcel could see R.J.'s gun in his pocket when he got out of Marcel's Malibu, we're supposed to believe that Marcel didn't see the

Closing Argument - Mr. Flynn

2422

gun in R.J.'s pocket when he got into his Malibu, it's just more sand that they're throwing at you.

With respect to these admissions that we just went over, I want to make clear that this case is not about whether you think these statements were enough to show that Marcel knew there was a plan for R.J. to shoot up the park. It's not what this case is about. That was a decision that the State's Attorney's Office made. The State's Attorney's Office looked at these statements, looked at the other evidence in the case. They made the decision to charge him with murder. And it was the judge that looked at this same information and made the decision to convict him of murder. That decision, those decisions were not made by the detectives. That's not the detective's role. Detectives did what they do in all murder investigations: They gather evidence and they present it to the State's Attorney and they decide whether or not to charge.

This case is also not about whether you think spending ten years in prison is a harsh or fair punishment for somebody's role in the homicide of another. Even if you think that that punishment is harsh for being the driver and being part of the plan, that's not what this case is about. The detectives had nothing to do with the amount of time that Marcel Brown stayed behind bars.

What is at issue in this case is whether the detectives violated Marcel's constitutional rights by

improperly coercing him into making admissions. And you've heard the detectives had an obligation. They had a duty for Paris Jackson to keep pressing Marcel for the truth. They had to find out if he was responsible for the murder, had to find out if he was part of the plan for R.J. to go shoot up the park. And they couldn't just let him go. If he assisted with this murder, who is to say he wouldn't assist with another murder if they just let him go? That's why this accountability, this accomplice murder charge, that's why it exists because if you're part of the plan that led to a murder, you also need to be held responsible.

And it's no big wonder why the detectives were asking Marcel about what R.J. was saying in the car on the way to the park. They had so many eyewitnesses that they had spoke to. You heard Mr. Mancuso tell Marcel, yeah, just about everyone we talked to said Taneshia starts trouble and R.J. serves as her backup. The detectives knew what was going on in the park that night. They knew that Taneshia made a call and said she was in trouble and so her pitbull brother came over with his gun. They knew and Marcel knew before they ever got over there.

And, of course, if somebody is riding over with their cousins to the park to go defend their sister with a gun in their pocket, of course they're going to be saying something to their cousins. They're not just going to have the music on and taking a nice little drive over to the park, no. There's going

to be things that are said and Marcel eventually told the detectives exactly what was said.

And keep in mind, there was that other individual in the car, T.J. T.J. Scott, their other cousin. He could have come here and testified and told you whether R.J. said those things or not. His cousin could have came and testified but he didn't because, again, it's not easy to get someone to come in here and lie on the stand in front of a room full of people.

I want to talk about this idea in the interview room that Marcel just thought he was going to be a witness, that he didn't think he was a suspect. Again, I encourage you to look at the evidence. When Marcel makes these admissions, he says things like I don't want to go to jail for what he did. I don't want to have to get in trouble for what R.J. did. He knew the entire time because the detectives laid it out for him from the very beginning that he could be in trouble for this. So this idea that he's saying all this bad stuff about R.J. just because he thinks he's just going to be a witness, it's clearly not the case and you can see that. You don't have to take my word for it. You can see it in the interview.

And during this interview, Marcel tried so hard to distance himself from R.J. After he admitted R.J. was the only shooter, he acted like he barely even knew the guy. I take just one exchange between Detective Mancuso and Mr. Brown. This was -- this was night one right before they turned the

lights out.  And Detective Mancuso -- this is right after Brown had admitted that R.J.'s always got a gun on him.  And Mancuso says, well, have you ever been with him when he's driving around the park just firing shots out of the car?  Mr. Brown's response is pretty interesting here.  He says no, I've been out of town over the summer.  Detective Mancuso didn't say anything about it happening in the summer.  Mr. Brown was just trying to distance himself.

What Detective Mancuso had actually heard was that it was actually a gold car that they were driving around with R.J. firing shots at.  So Detective Mancuso says, well, we hear a story that this car driving around the park that's firing shots out, we hear it's a gold car.  What does Mr. Brown say?  Oh, R.J., well, he's got stolen cars.  He was probably in one of his stolen cars.  Stolen Chevy Cavalier?  Oh, yeah.  What color was it?  Gold.  That wasn't my gold Malibu that R.J. was driving around or inside while we were firing shots out of the car.  It must have about this stolen car that he had, another gold Chevy.  Not a Malibu, though, it was a Cavalier.

And not only was Marcel trying to distance himself from R.J. in this interview and throughout the interrogation, Marcel continued to try to distance himself from R.J. up on the stand.  He said me and R.J., we were different ages.  We hardly knew the guy.  He was into gangs.  I was into chicks.  And he even got R.J. to take the stand in his rehearsed direct

testimony and there was two main things that R.J. was sure to get out while he was up on the stand, he was a lover boy, Marcel was a lover boy. He was into chicks. I would never hang out with him and Marcel definitely didn't know I had a gun. It was so rehearsed and it's just simply not the truth.

And take it from Marisol Ocampo at her deposition. Marisol Ocampo said that when she saw the Malibu pull up, her words were Marcel and R.J. were in the Malibu that they're always in. Even Marisol Ocampo knew that they were always riding around together in that Malibu. They weren't these long-distance cousins. They hung out every day and Marcel was involved in all of that stuff that R.J. was involved in too.

So going back to the interview, Mr. Loevy claims that Marcel was broken down and he wasn't defensive and he didn't put up his defenses towards the end but Mr. Brown is just a soft-spoken guy. He's not a loud guy. He kind of mumbles sometimes. When Mr. Loevy was examining him up on the stand, there were times where I couldn't tell if I was listening to him in the ERI tape or if it was him talking here in the courtroom because that's just kind of how he is. And because he's kind of soft spoken and mumbled sometimes, it doesn't mean that Mr. Loevy was coercing him when he was up on the stand and it doesn't mean that when he was mumbling and kind of quiet in the interview room that the detectives were coercing him then either.

Mr. Loevy also has argued that, wow, Marcel Brown appeared to be so anxious in there. Being anxious does not mean that you're being coerced. Marcel was told very early on that he could be held responsible for this murder. Of course he was anxious. Wouldn't anybody be anxious if they're potentially going to be charged with a murder of a human being? If being anxious means that you're being coerced, every confession and every murder ever would be coerced because wouldn't everybody be anxious if they're being interrogated about a murder?

Mr. Loevy has also twisted the facts regarding the detectives telling Marcel that if he doesn't cooperate, he's going to go to prison. Again, please look at the evidence. The detectives never once said that if you don't cooperate with us, you're going to go to prison. There was a couple times where Detective Mancuso said you might take that drive down 55 down to Joliet -- and keep in mind, though, that's at the very beginning of the interview in phase one when Mr. Brown is saying that R.J. wasn't the shooter and that Day-Day was shooting, I saw Day-Day shooting with my own eyes.

But again, he never said that if you don't cooperate, you're going to go to prison. He was just trying to get him to tell the truth about R.J. shooting in the park which was corroborated by so many eyewitnesses they had already spoken to.

At this trial, plaintiff has also attempted to twist Detective Turner's questions -- excuse me -- into contamination. I want to start by defining what contamination actually is when it comes to confessions. Dr. Welner explained it to us. Contamination is where an interrogator takes an external known, external known information, brings it into the room with the suspect, tells the suspect and tries to get the suspect to adopt it and that could make their confession more believable because it matches the hard evidence. That's contamination.

Let me give you an example. If they're investigating a murder and they know that the victim died with an ax, if they go into the suspect's room and said we know you killed him with an ax and then they adopt that information, that makes their confession more believable. That's not this case.

Detective Turner went in there and was asking questions about what R.J. said in the car on the way to the park. He didn't know what R.J. said. Nobody was in that car. He wasn't taking external information and trying to get Marcel to adopt it. He was going in there and just asking him did he say something like this, did he say something like that. And why did Detective Turner frame his questions that way?

Detective Turner had worked undercover for 12 years. He spent most of his time around gangbangers. And he went into that room, when he went into that room, Marcel had already

admitted that R.J. was the only shooter and so at that point they were just trying to figure out what was going on in the car on the way to the park. That was Detective Turner's goal in going into that -- into that room that day.

And so Detective Turner was trying to figure out what a known gangbanger or Vice Lord, R.J., was saying in the car on the way to the park and he relied on his 12 years of undercover experience, kind of thought about what he might be saying, and didn't try to get Mr. Brown to adopt statements. He just asked questions.

First of all, it was Mr. Brown that first ever said that on the way to the park R.J. said he was getting tired of him. That next snippet is Detective Turner's interview. And Detective Turner says hey, did R.J. say something like check this gat, I got my gat. Detective Turner says in the snippet in the top right corner, did he say he's getting tired of this shit like he's gonna pop them Ns off? Those are questions. That's not Detective Turner trying to insert statements into Mr. Brown's head or to get Mr. Brown to adopt statements of what R.J. said. And keep in mind, the ultimate admissions that Mr. Brown made to Spizzirri -- I'm going to show you next -- take a look at these and let's compare them to those. Detective Turner was asking did he say anything about having a gat? Did he say anything about popping those Ns off. You're not going to see anything in the admissions about a gat.

Closing Argument - Mr. Flynn

2430

You're not going to see anything in Mr. Brown's admissions about popping some Ns off.  No.

He told Spizzirri something different.  He told Spizzirri that he was going over there -- R.J. was going over there to F them up and that they're gonna die.  Nothing about popping somebody off.  Nothing about a gat.  This is not contamination and these are not statements that plaintiff was just adopting all these hours later when he was in the room with Spizzirri.

And keep in mind -- we're going to talk about the jury instruction here in a moment about what they have to prove for the coerced confession claim.  They have to show that the detectives knowingly coerced Marcel Brown.  So in order -- if you think that this was contamination and that they were trying to get him to adopt statements, you have to believe that Turner went in there, said these things, went out, got with Detective Mancuso and they knowingly put together this big plan to go in there later and try to get him to take these statements. That's not these guys and that's what they need to show you for them to be successful in their claims.

So let's talk about those claims.  First, the coerced incriminating statements.  The one that's really at the heart of this dispute, like I just mentioned, is number two.  The incriminating statements were not made by plaintiff voluntarily but, rather, were made involuntarily as a result of coercion

knowingly used by the individual, by the detective. And if you go to the bottom there, it states that to do something knowingly means realizing what one is doing and being aware of the nature of one's conduct not acting through ignorance, mistake or accidents. So to find for the plaintiff in claim one, you have to believe that the detectives were knowingly coercing a statement out of Marcel Brown.

Their other claim, fabrication. It's a lot like the last claim. It's all, again, just based on Marcel's statements to the police. To prove this claim, you have to believe that in the police report, the summary that Mr. Mancuso put together, that he fabricated what Marcel said; and we'll talk about that here in a second. And before we get into these two claims, I want to show you one other jury instruction and that's Personal Involvement. And one part out of this I want you to read is that you may not find in plaintiff's favor based on what other persons did. So if, in this case, you feel like somebody who is not a detective in this case did something wrong, that's for them. They're not our clients and that's not what this case is about.

So let's go back to the coerced confession claim. I want to make clear that it wasn't our detectives who actually elicited those statements about what R.J. said on the way to the car. That was ASA Spizzirri. We don't represent her. We don't represent Cook County State's Attorney's Office. That's

not part of this case if you think that she did anything wrong.

And the evidence that you heard from ASA Spizzirri is that there was a team of ASAs. Remember, Assistant State's Attorneys, ASA was Spizzirri was one of them? There was a team that were going out there and they were monitoring. They were watching Marcel's interrogation video. Those videos that we've all seen, they were watching them and they were doing what's called logging and burning. They watch each hour and they summarize what they saw. So when the next ASA comes out, they can look at that summary and see what's happened and then do their own logging and burning. Multiple experienced ASAs were watching this interview and not one of them ever came into that room and said stop what you're doing, this is coercive.

The detectives also could not mislead the ASAs as to what happened in that room. The ASAs had the videos. They were watching it all for themselves. And then when ASA Spizzirri got there, she read some of the earlier summaries from the other ASAs, she watched some of the video herself, and she went into the room and she elicited Marcel's admissions.

Spizzirri knew full well how long Marcel Brown had been there, she knew how often he was given food, she knew how often he was given something to drink and, most importantly, ASA Spizzirri had years of experience interviewing witnesses like Marcel Brown. 18 year olds like Marcel Brown. And she told you that when she went into that room, she assessed Marcel

Brown's condition and she saw no signs of impairment, no signs of undue fatigue, no signs of being beaten down or having the inability to discuss with her what happened. In fact, just the opposite. He wanted to talk to her about what happened. And the ASAs are the legal experts who made the independent decision of whether or not to prosecute, whether or not to charge, and whether they should do that based on Marcel's admissions; not our clients.

We also have this fabrication claim. Mr. Loevy discussed how Detective Mancuso at the criminal trial read a portion of his police report about what Marcel said in the interview room. First of all, that police report is a summary. It's not a verbatim summary. It's not a transcript of what's said in the police -- or in the interview. It's a summary of what occurred in the room. And here's something very important. I read a different stipulation to you on Friday when I stood right here and at the criminal trial, there was a stipulation between those parties. In the criminal trial, Marcel and his criminal defense attorneys stipulating to having Detective Mancuso read from that police report. They stipulated that the ERI video was available but they stipulated to instead having Detective Mancuso read from his report. Don't you think that if Marcel or his criminal defense attorney thought that Detective Mancuso's report was inaccurate that it inaccurately reflected what was in the video? They would have

said no, no, no. We're not going to let him read that report. We're going to play the videos. But they didn't do that.

They let Detective Mancuso read from his report because it does accurately reflect what's in those videos. And it's only now all of these years later Marcel and his new attorneys are claiming that Detective Mancuso inaccurately summarized the interview of Marcel in his police report.

One other point I'll make on this is that there are no claims that the officers in this case withheld any evidence. There are no claims that the officers didn't have sufficient evidence to arrest Marcel. There are no claims that there was a lack of evidence to charge Marcel. There are no claims that officers fabricated evidence relating to Paris Jackson or his body or the cause of death -- nothing like that in this case -- because these guys are good detectives.

And I understand that you may have sympathy for Marcel Brown. Mr. Bowman was up here for 20 or 30 minutes talking about Mr. Brown's time in prison. But you know what they didn't mention, do you know what they don't seem to have any sympathy for is Paris Jackson. Paris Jackson is the guy that lost his life because of all this nonsense. He's the guy that didn't get to experience anything after 19 years old. He's the guy that had parents. He's the guy that had a newborn baby who grew up her entire life without ever knowing her father. No mention of Paris Jackson on this side of the trial. And even

Closing Argument - Mr. Flynn

2435

if you have sympathy for Paris Jackson or you have sympathy for Marcel Brown, that cannot affect your analysis of the evidence. The evidence has to control your verdict.

And this is not a false confession case that you hear about on Dateline or the Nightly News. There's zero allegations of physical abuse. There were no times that the detectives were in his face screaming or had a hot light on him. Nothing like that. The one time that Detective McDonald raised his voice Marcel asked him to stop. He said you're right, I'm sorry. Does that sound like something a coercive interrogator would do?

And then take Detective Mancuso. I can't imagine how someone could have a better temperament in an interrogation room with a murder suspect who had been lying to him for hours and hours and hours. From the beginning, he told Marcel that he could be held accountable. He tried to give Marcel an out, tried to say that hey, maybe if you didn't know he had a gun, maybe it would be handled a little differently. How about the clip where he comes in, he brings him McDonald's and says is that hot enough, do you -- check it real quick, is it warm, if not, I'll warm it up for you, are you good, okay. Is that something that a coercive interrogator would do? No.

Also, what motivation would these detectives have to coerce a confession out of Marcel Brown? Detective Mancuso and McDonald had no prior relationship with Marcel Brown.

Closing Argument - Mr. Flynn

2436

Detective Weber and Turner knew him from before from that case they investigated earlier that summer but in that case, they helped him. When that guy got shot up their house, they were the victims and they caught the guy and they brought him to justice. They helped him in that case and now a few weeks later, they're going to frame him for a murder and coerce a confession? It just doesn't make any sense. In reality what these detectives were doing was their job.

And the closest thing that I've remotely heard from plaintiff that would establish some kind of motive for the defendants in this case to knowingly, knowingly coerce a confession from Marcel for the murder is that the detectives had some kind of pressure to solve this murder. They brought Marcel into the interrogation room on day five. This wasn't some case that had been hanging out there for weeks and weeks and weeks. And keep in mind that they charged -- they got R.J. that same night and the next day they charged R.J. for murder. That's before Marcel made any of his admissions. So the detectives had already found their guy. They already had the shooter arrested and fully charged by the State's Attorney's Office. The crime was solved. There was no pressure to solve this murder. It's already solved. But what they needed to find out was whether Marcel should also be held responsible and that's why they continued to ask him questions. Not because they were pressured to. Not because they had this case looming

over their heads that they needed to solve. They did it because they were getting justice for Paris Jackson to make sure that not just the shooter was held responsible but anybody else that assisted the shooter should also be held responsible.

And as I said at the beginning, plaintiff's case must be built on a solid foundation of evidence. For you to find for plaintiff, they had to give you a solid foundation of evidence but all they've done is just thrown sand at you. Not evidence. And when you go back to the deliberation room this afternoon, we ask that you come to the verdict against plaintiff on both claims and for the defendants because the defendants did their job, they asked the tough questions, they got to the truth, and they found justice for Paris Jackson. Thank you.

THE COURT: All right. Thank you, Mr. Flynn. Ladies and gentlemen, as I indicated to you, I will give you the option of how to proceed. It's 1:18. I've given Mr. Loevy 20 minutes for a rebuttal. It's up to you on how you want to proceed and we can do it by way of hands. If you would like to take a lunch break or a short break even just to go to the restroom, I'm happy to do that and I'll give you a second. Or we can press through to finish for 20 minutes. I will not do what the lawyers ask me to do. I'm going to ask -- do what you ask me to do. And so I think the easiest way to do this is if anyone would like to take just, you know, a ten-minute stretch

break, rest break, please just raise your hand. Okay.

And if anyone -- because we're going to at least do that. If anyone wants to go ahead and take a lunch break, I'm happy to give you a slightly shorter lunch break now. I wouldn't give you, you know, the full hour because we're almost there. So if anyone wants to take a full lunch break now, I'm happy to give that to you now. Otherwise, we'll come back in ten minutes and I'll give Mr. Loevy 20 minutes and the case will be yours. Okay.

So we'll take a ten-minute break. Please don't discuss the case. We are almost there. We'll see you in ten minutes.

COURTROOM DEPUTY: All rise.

(Proceedings heard in open court; jury out.)

THE COURT: All right. I'll see you in ten minutes.

(Recess taken.)

(Proceedings heard in open court; jury in.)

THE COURT: All right. In an effort to be -- you may be seated. And to be mindful of the jury's time, I'm going to hold you to 20 minutes.

And, Mr. Loevy, you may begin.

MR. LOEVY: Thank you, your Honor.

FINAL ARGUMENT

MR. LOEVY: We'll take the analogy about a foundation. There is a foundation for our case. The foundation is this man

did not intend to murder anybody.  He wasn't a part of any plan to murder anybody and everything flows from that.  Their case is the case that becomes sand and falls apart because they're trying to prove a lie.  They're trying to prove that he a legitimately confessed to a crime that he didn't commit.

I heard them say that they're running away from well, maybe he didn't say he had a gun.  That's what he wrote down; and I wrote it down.  We're not saying he necessarily knew there was a gun in the car.  His police report that the criminal justice system relied on said Marcel Brown states that he knew Branch had a gun when he got in the car to go to the park and that they intended to kill him.  Now they're telling us two weeks later, oh, we didn't really mean he knew he had a gun.  For -- they tried in that interview room until after Spizzirri left admit you had a gun.  Now they're admitting he never admitted he had a gun.  It's fabricated.

Let's talk about the witnesses a little bit and then the interrogation.  I want to start with R.J.  He didn't sound rehearsed to me.  He sounded kind of raw actually just telling it like it is.  Rehearsed, that's Turner.  Spizzirri, Mancuso, that's rehearsed.  R.J. told you what happened.  You know, and they're saying that he went to the park intending to murder everybody.  I don't think so.  He would have had to kill everybody in the park.  They never answered that point.  Everybody knew R.J.  So if everybody knew R.J., then he can't

really get away with murder.  It's not real.

I gave you a plausible hypothesis.  Maybe R.J. did take out that gun trying to be a tough guy.  Somebody in the dark shot at him, a shootout ensued.  But that is not a plan to commit murder and Marcel was not part of any plan.

As far as T.J., that is true.  T.J. didn't testify. We had respect for your time.  You guys heard enough to win. It's not disputed.  We didn't have to call for a point that's not disputed.  Even Mancuso said T.J. didn't know anything. That's why he wasn't charged.  That's why he walked out of the station.  What he never answered for you was if T.J. didn't know anything, then how did Marcel know anything?  They were in the same car.

As far as Marisol, I will tell -- Mr. Flynn said, he said a third-party witness with no reason to lie, why would she come in here and say that?  She didn't come in here and say that.  She didn't come in here and say that at all.  She didn't even come into her deposition.  Their best witness, their only witness had to be arrested for a stabbing and they're trying to deny she was arrested.

MR. FLYNN:  Objection.

MR. LOEVY:  She was a suspect --

THE COURT:  Ladies and gentlemen, you will recall the evidence.  The lawyers' statements are simply a summary.  Your recollection controls.

MR. LOEVY: She was a suspect in a stabbing. They forgot to ask her questions about it and her boyfriend was arrested for the shooting. They lock her into the statement four times. She regurgitates it. Mr. Flynn showed you how it's done. He regurgitated it on that deposition. Oh, it clicked for her. I don't think it clicked for her. This -- out of all the 20 witnesses in the park, this is their witness, the woman who had to spend 15 hours in a police station. Where is everybody else from the park? Zero witnesses corroborated.

What I heard Mr. Flynn say is some people saw R.J. shoot, some people saw Marcel drive or in the park. Not one of them are telling their story. 20 witnesses; not one of them. The objection was that's hearsay. Witnesses that are not here and don't testify, you're not supposed to accept that for the truth. That's them claiming what they heard.

There's no other evidence he said that it was a shoot-out in the park. Yes, there was. There's the OEMC tape that there was at least ten shots that they tried to lie about during the interrogation.

Speaking of lies, they tried to say that Marcel is a liar because he said people stayed in the park. Their greatest hits from six hours of testimony was Marcel doesn't know what happened to the other people in the park. Maybe they ran away and maybe they didn't. All he knows is he ran away. That makes him a liar that his rumors about where the body was?

Final Argument - Mr. Loevy

2442

That they played this one phone call, they had -- they apparently recorded the jail calls. They played a grand total of one call that supposedly implicates him. If he said anything incriminating on any jail call, you would have heard it. Instead, they're trying to make it like he hid. The police picked him up at his house. He wasn't hiding because he didn't have anything to hide from because he didn't do anything. R.J. put the gun in the ocean, the pond, the sewer. Who cares? He got rid of the gun. He doesn't remember what he did with that gun.

You compare those with the defendant's actual lies that they -- remember they said we weren't trying to move him from A to B. We were just asking him questions. You'll get a phone call; that's a lie. No witnesses says ten shots; that's a lie. We -- you have no reason to be nervous, you're not under arrest; that's a lie. That's real lies. Not this nonsense they're talking about.

He spent the first ten minutes of his closing talking about where Paris died. If it's not clear, who cares where Paris died? All we pointed out is it's a little weird that there's no blood on the grate if it happened the way they said. They didn't investigate it. That is not a house of sand. I don't know where Paris died. You don't know where Paris died. The point is this was a pretty strange police investigation. They can't explain why there's no blood on the grate.

Nobody -- apparently nobody asked.

Let's get to the claims, whether there was a coerced incriminating statement. Mr. Flynn kept saying this doesn't prove a constitutional violation, this doesn't prove a constitutional violation. He's missing the point. The totality of a coercive interrogation is a constitutional violation. That's what Judge Jenkins told you to decide. You decide. If you add up all these things, does it violate his rights and the answer is yes.

I'm going to start with not being under arrest. He's like, come on. Marcel knew he was under arrest. You saw the tape. Marcel was genuinely shocked hours into that interrogation. He wasn't faking it. What do you mean I'm under arrest. You told me I wasn't under arrest. You heard Mancuso say, oh, we read these rights to everybody, it's just a formality, we're just talking to you. And then he gets up here and says he knew he wasn't under arrest. You saw it. You watched it with your own eyes. He was trying to convince you of something that's not true.

The Miranda rights, he said, oh, they read it to him three times and he said yes -- actually, my memory of the Miranda tape was sometimes they asked him and he sort of stared at them. If he understood his rights, he would have shut up. If he understood his rights and he knew there was a lawyer waiting for him, he would have talked to his lawyer.

Final Argument - Mr. Loevy

2444

The length of the interrogation, he says 31 hours doesn't violate the constitution.  31 hours in conjunction with his age and lack of sleep and the other factors can violate the constitution in totality.

He says, well, this tells a beautiful story far away from the painting.  I like that, he's acknowledging to you it looks kind of good what we're saying.  But he says if you get close to it, it doesn't withstand scrutiny.  He says, well, we gave him bathroom breaks, we turned the lights out at 4:30 a.m., we warmed up his McDonald's.  That doesn't destroy the beautiful painting; okay.  It still is a beautiful painting. It's a beautiful painting.  Unfortunately, beautiful is the wrong word but it's a constitutional violation and it violates his rights.

You heard about the lawyer.  You know what's not in dispute about the lawyer?  The four things --

If we could have the document camera, your Honor.

The four things that I said were not in dispute are not in dispute.  If he requests a lawyer, he needs to be notified.  Mancuso and McDonald would have been notified.  He doesn't deny that.  The person at the front desk, it's Debra Scott and Wham didn't try to remember something 16 years ago. They didn't claim to remember it.  They told you the truth.  I talked to some lady at this desk.  That lady would have told the defendants and he wasn't told and that would have ended it.

Final Argument - Mr. Loevy

2445

It is not disputed.

You know, what is he saying that Debra and Wham can't identify that person?  It would be crazy if they could. They're just being honest.  He says Debra and Wham are telling different stories because Debra got kicked out and Wham didn't. No.  That means they're both telling me their recollection.  It makes sense to me.  Wham says they didn't kick me out.  They -- I went there, they gave me the runaround.  They told me he doesn't want to talk to me.  And when they told me he doesn't want to talk to me, what can I do.  It never happened in my whole career, but I left.  Deb was the one who got booted from the police station because she's a powerless woman who they could do whatever they want with.  They said get out of here. Get your family out of here.  She wasn't lying about bringing your whole family.  Wham saw her whole family, too.  There was about six to eight members of their family there.

The ATM they can't beat.  You know, the timing works perfectly.  Wham's ID was checked at 6:00 p.m.  He's not lying. It says that on the piece of paper, 6:00 p.m.  He does his business with R.J., and just like Debra said, we wanted a lawyer too.  So an hour and a half later, she withdraws 80 bucks from that ATM.  And don't lose sight of it.  It says 5555 West Grand.  That's the police station ATM.  She is in the police station withdrawing money so that Wham will be her lawyer, too.  Wham didn't stick around for an hour and a half

just to wait for her.  He stuck around an hour and a half to surrender R.J.  And when did R.J. is done being surrendered, she puts the money together.  The timing actually works perfectly and they can't beat it.  He says that is not independently a constitutional violation.  In conjunction with all factors, it can be.

Same with the phone call.  You know, they're still trying to defend the chart that there was this call at 10:00 o'clock.  I'm going to play it.  2:43.

If we can have the screen, your Honor.

(Video played.)

MR. LOEVY:  All right.  That's why Mr. Flynn couldn't put it on the chart.  It's 10:00 o'clock.  He's looking for his phone.  You know, the magic words didn't work the first ten times he asked.  Come on.  They're playing a game and he's still trying to play a game.  That's before Spizzirri got there.  They are doing it on purpose.  You know, you did bring up R.J. was -- he could have conferred with R.J.  He did call Mancuso a liar.  Mancuso said you'll get it in a minute, you'll get it in a minute.  They had no intention of giving it to him, period.  He says they gave him one, yeah.  That was at 1:30 in the morning after they were already done doing everything that they wanted to do.

Let's talk about the conditions.  He says, hey, you don't get a spa, you know.  We didn't abuse him.  We warmed up

his McDonald's.  You know, they gave him one small blanket that wasn't big enough for a human and, you know, they're like, well, you know, we didn't know blankets.  I mean, if they're going to keep people in that room, they know how cold it is. They need to give them blankets.  He had to choose.  He got a T-shirt and a blanket.  He had to choose between a pillow and a blanket.  He says, well, we -- we gave him bathroom breaks. Okay.  They gave him bathroom breaks.  You know, sleep deprivation, leaving the lights on.  They did do sleep deprivation.  That is Guantanamo.  When you don't let someone sleep and you interrogate them, that's not proper.

You know, he said Mr. Mancuso was nice.  And, you know, Mr. Mancuso had a nice demeanor while he's stabbing him in the back.  Remember the trust point?  Mancuso is pretending to be Marcel's friend on that tape and Marcel believed him. Marcel believed him that he was going to tell that State's Attorney that he knew he didn't have a gun and he wasn't involved and he was screwing him the whole time.  He might have sounded nice and, yes, he offered to warm his McDonald's but he put him away by violating his rights.

Let's talk about the sleep.  Welner says you have to intend it to be sleep deprivation for it to count to be sleep deprivation.  Why?  Because Welner says so?  You know, they're trying to say that we called Dr. Never Says No and he really wanted to talk about Dr. Never Says No and he paid this guy

$175,000. Maybe Dr. Arden believed in the cases where people are suing for wrongful convictions. Maybe he was right when he sued the Chicago Police Department for wrongful conviction. Maybe Dr. Welner, when he defended those wrongful convictions including the case where the guy was in jail for the -- during the crime that he confessed to, Dr. Welner is the real Never Says No. He defended that guy for a half a million bucks.

MR. FLYNN: Objection, your Honor. Facts not in evidence.

MR. LOEVY: That is the fact.

THE COURT: Ladies and gentlemen, you will recall the evidence and your recollection of the evidence controls.

MR. LOEVY: He's still looking at the timeline with the lie, it's not 3:30, and he didn't sleep for nine hours and there was no bed.

Let's talk about the food. He's real puzzled, Mr. Flynn. That was his word. Let me explain it to him. We're not only saying that they never -- they starved him and fed him no food. We're saying if you eat one meal over the course of 31 hours, you're resistance will be lower and then the other things they did to him in the totality makes it easier to overcome someone's will. I also am saying he didn't get dinner on the night that they interrogated him from 3:00 p.m. until 4:00 a.m. They forgot to feed him dinner. That's a fact. They didn't give him a sandwich and he didn't eat it. They

didn't give him anything.

And there's a clip and we're not going to play it where he says early what's to eat and Weber tells him no, not in here. In here, we got chips and stuff. "In here" implying you can't get out of the room. You're not going to eat until you get out of the room. And he wasn't getting to get out of the room until he started telling their story. Again, he says that's not a violation of constitutional rights. Well, in conjunction with the other things, it could be.

The contamination point, he says Turner is just asking him questions. You saw the video. Turner was putting stuff in his head including you're going to mess with these N-words. He's basically telling Marcel and then rehearsing with him. And it was Turner's idea and that was not legitimate.

Mr. Flynn says we couldn't just let him go. Well, actually they could have just let him go. They could have said this boy was not intending to commit murder, we can let him go. They -- the reason they couldn't, according to him, is because he's already been arrested. They assumed their conclusion before they started. They arrested him before they got the evidence to prove that he intended murder. They could have let him go but he wasn't going to get out of there, they were running out of time until they got it.

They say there's no motive. Well, there was pressure because he had already been arrested and he could have been a

Final Argument - Mr. Loevy

2450

witness for R.J. if they let him go.  He could have said there was more than one shooter.  He couldn't be a witness for R.J. when they were both standing in court both on trial.  They decided what happened before they started.  They said, you know what happened, that kid and that kid committed a murder.  All we got to do is prove it.  They just forgot that they didn't have any proof.

He said that they saw 20 witnesses out there telling them their story.  No.  Some of those witnesses say they saw R.J. shoot and some of those witnesses say they saw Marcel somewhere either driving -- driving basically and maybe one of them said they saw him in the park.  None of them said anything.  That's -- the reason I was objecting, the Judge instructed you that's only admitted for a limited purpose and no other and not admitted to the truth.  Since none of those witnesses came to court and testified and were cross examined, you can't assume it's true what they said.  You can only say they claim they were told that.  And now that we've heard the whole trial, the what they were told is nothing.  None of them said there weren't two shooters.  None of them R.J. was the only shooter.  All they said -- some of them said R.J. was in the park and some of them said Marcel was in the park and you heard from none of them.

They're still trying to use that transcript.  They're still trying to say that this transcript proves that if you

Final Argument - Mr. Loevy

2451

take this sentence and that sentence, this proves that he knew he always had a gun. We already talked about that. In other places, he says I've never seen him with a gun. In other places, he says he says I know he once got arrested for a gun. They're interrogating this kid on and off for 31 hours they're gonna say things but he didn't say anything. Really what's amazing is how little incriminating he did say.

Mancuso said on that tape some kids are not good at lying. This -- once Marcel decided, look, you got my cousin, I'm going to tell the truth so I can go home, he basically just started answering the questions to the best he could. He was guileless, he was naive, and he just answered the question because he actually believed them when he had told them if you just tell the truth, you can get out of here sooner.

They're trying to blame the State's Attorneys. They say that it was these State's Attorneys' decision. No. The State's Attorneys burned the interrogation tape and they said, well, that proves nothing wrong happened. That argument assumes its own conclusion. It assumes that if a Cook County State's Attorney saw something improper, they would do something about it instead of prosecute it and you can't assume that. You don't know if the Cook County State's Attorneys had a lot of wrongful convictions. You don't know either way. The fact that these State's Attorneys didn't stop this doesn't prove anything. And, you know, what's there to stop? They

reviewed it after the fact. And if it's not -- it's -- they're prosecutors. That's what they do, they prosecute it.

The next person along the line gets the report. Marcel shows up at the bond hearing. The State's Attorney picks up the police report. Let's see. Marcel admits he knew there was a gun. Marcel admits he knew there was a plan --

MR. FLYNN: Objection. Facts not in evidence.

MR. LOEVY: -- that's what happens, that --

THE COURT: Ladies and gentlemen, you'll recall the evidence.

Mr. Loevy, you may continue.

MR. LOEVY: A new State's Attorney gets the file, well, and tells the judge this kid knew there was a gun, knew there was a plan. Okay. No bond and you're convicted. That's how it works. That fabricated police report was the problem. It was not Spizzirri. Don't forget, if anybody is saying well maybe it was all Spizzirri's false, don't forget the proximate cause instruction. Maybe Spizzirri was a cause but all we have to prove is that they were a cause, not the only cause, not the last cause, just a cause and they're the ones who did this and they're the ones who wrote the reports. It's not a good look to try to blame the State's Attorneys.

Now the last thing to talk about is damages and there's nothing to rebut because he didn't talk about it. They didn't cross examine Marcel's witnesses, they didn't cross

examine Marcel, and they didn't say a word about the powerful summation lock. They're all in. Give them credit. If you think Marcel went to that park intending to murder people and that he knew there was a gun and he was part of a plan, give him nothing but they are admitting to you that, you know what, he didn't even suggest that those are inappropriate numbers. He didn't suggest that the evidence doesn't prove it. They're all in. So now the ball is back at you guys. Which side is more likely?

Everybody agrees what the damages should be. The only dispute is whether we've proved more likely than not that his rights were violated in the way that were suggested. And I appreciate that you've been here for two weeks. We didn't call every witness in the universe but we called enough. We called enough to prove to you that his rights were violated. He was dealt with unjustly. It's time to do some justice. Thank you very much.

THE COURT: All right. Thank you, Mr. Loevy.

All right. Ladies and gentlemen, you are excused and you may begin your deliberations. We will send -- we will send back the instructions to you. One moment.

(Brief pause.)

THE COURT: We have one last matter which will involve the CSO and then we'll get you to your deliberations.

COURTROOM DEPUTY: Please raise your right hand.

(Court Security Officer sworn.)

THE COURT: All right. Thank you very much. You are excused.

COURT SECURITY OFFICER: All rise.

(Jury deliberating at 1:46 p.m.)

(Proceedings heard in open court; jury out.)

THE COURT: All right. You may be seated.

So it's my understanding that the exhibits have not been uploaded which means that the jury is deliberating, will begin deliberating and they don't have access to exhibits.

MR. FLYNN: We just have a couple of issues on the exhibits. One of the issues I know off the top of my head is the transcript of the ERI. We believe that it should be back there with the jury. We believe there should be multiple copies because it was such a pivotal part of this case. I'm not sure if plaintiff agrees.

MR. LOEVY: Well, you know we don't agree but the evidence is the evidence and the transcript for the reasons that have been argued in closing, et cetera, is not a reliable proxy for that evidence and the transcripts are not evidence.

THE COURT: Okay. So this is an issue that we should have addressed prior to, you know, the parties' resting. You know, ordinarily there is an instruction that I would have given the jury had this issue been flagged which reads, in sum and substance, that the transcript is being provided as an aid

and we didn't do that. So I'm not sure it makes good sense to send back a transcript to the jury now that we haven't admonished them or instructed them about and unfortunately we're now dealing with this issue when the jury has received the case.

So if the transcript is the issue, my reaction is it's not going to go back and I'm less concerned about a transcript and more concerned about the evidence that is prepared to be uploaded to get uploaded promptly.

MR. LOEVY: All right. Our understanding is it is -- Lillia has informed me that it is ready to go back to them, our stuff is. And you think theirs is too?

(Counsel conferring.)

MR. LOEVY: All right. Ms. Martinez informs me we sent them a list of all the exhibits that were admitted on both sides. And when was that?

MS. MARTINEZ: This morning.

MR. LOEVY: This morning. And we have -- I don't know what the stake of it is, status of it is.

MR. FORD: What is the status?

THE COURT REPORTER: Can you get by the mic if we're on the record, please?

MR. FORD: Are you submitting those exhibits that plaintiffs put forward and we can do the ones for defendants? We only have like three the defendants put in so we can do

2456

those right now.

MR. LOEVY:  Your Honor, I would suggest you give us three minutes to confer.

THE COURT:  Yeah, so let's take a break.  I'm going to come back out in 15 minutes and my hope is that we have the material up and ready because they're gonna start asking for material so we'll see you in 15 minutes.

COURTROOM DEPUTY:  All rise.

(Recess taken.)

(Exchange of reporters took place.)

(Proceedings heard in open court:)

MR. BOWMAN:  I think we've resolved everything, didn't we?

MR. GIBBONS:  I think the teams have resolved the exhibits, but we probably should put it on the record.

THE COURT:  Yes.

MR. GIBBONS:  I just wanted to revisit, your Honor, the transcript.  I certainly understand the Court's frustration a little bit.

I will say that I have a pretty good recollection of a juror sending a note about this topic.  And there was some colloquy about what we're going to do.  No decision was made. And we punted it until we got to today, which was pretty quick in relation to the evidence.

I know last week I said I'm not going to stand on

formality of the plaintiffs having to move their exhibits in before the end of the case, and Mr. Loevy reciprocated. So, today went really fast.

Here's just my thought: We've all looked at this tape a lot. It's very confusing at times, it's very hard to hear at times. The parties worked really hard on getting a stipulation that -- in all honesty, I've never seen a transcript of that length with so little differences of opinion about what it said.

I suspect that within an hour, the jury is going to send a note saying, can we have a copy of the transcript, which both sides have utilized to a great extent. They have seen the way of the Loevy firm did it, with the transcripts on the bottom, and they've seen the way we did it with the transcripts on the overhead.

They've been reading along for two weeks now. Now to tell them that they're not going to have that aid back there, I think, is probably going to throw them a curve ball. Totally agree that they would need to be instructed that the best evidence is the tape. But that instruction is going to take, if you brought the jury back in, 10 seconds to 20 seconds. While I think if we don't give them that, they're going to be in there with that tape for hours and days without the help of something written.

And I think it's going to greatly elongate the

deliberations, which isn't necessarily anyone's problem or fault. It's just, we're going to be back here in an hour with a note saying, can we get the transcript.

And I'm just suggesting a way to maybe alleviate that, right after lunch you instruct them on, this is just an aid, the best evidence is the tape.

But that's my best pitch, because I think we are going to have to deal with a jury note on that rather quickly.

THE COURT: Okay. So, your recommendation is that if and when, and it's very likely we might, we could take it up then, including by way of an instruction and providing the transcript. Is that --

MR. GIBBONS: That would be my suggestion, or we just do it affirmatively now when they come back from lunch, before they get the ERI. Both would work.

MR. LOEVY: And we would propose that. And we all got a sort of read on how you judge, and you're not like a gotcha person or -- you know, trying to get to the right place, you've made that clear. But when the evidence closes and the jury gets the case, then it's too late to put in evidence. And, you know, there's -- a veteran trial attorney like Mr. Gibbons can't say, well, it moved too fast. You have to do that at a certain time before it's too late. What if we were like, Judge, oh, we forgot this report we wanted to put in. You can't do that.

MR. GIBBONS:  Well, except I specifically put on the record that we would like the opportunity before that happened, and I made it very clear that --

THE COURT:  You did.

MR. GIBBONS:  -- we needed that opportunity.

So, I'm not trying to play gotcha.  I mean, I understand Jon doesn't want it in.  I get that.  All I'm suggesting is, as kind of fairly experienced trial lawyers here, that question is coming.  There's no question in my mind about that.  So, we can address it then or address it now.

THE COURT:  I am prepared to address it if the question comes.

The jury has begun its deliberations now.  We actually provide lunch on the days they deliberate.  So, they are in there deliberating now, and I'm not inclined to interrupt that now.  They've been waiting for ten-plus days.

But if and when the question comes, I'm happy to take it up then.

To the extent that we go there -- and I'm not saying would -- I agree we would have to instruct the jury on that, because the transcript isn't evidence.  No one moved it into evidence, and you couldn't, right?  It's really just an aid -- I shouldn't say you couldn't.  It's just an aid.

So, we'll take it up if and when the question arises.

And I understand that the plaintiff objects, and

that's a fair objection.

Can I just get confirmation, as I know there may be other things we need to talk about, that the exhibits are loaded? And I just want to make sure that we're not -- we're talking about transcripts, but I'm not even sure where we stand with the actual exhibits having been made available.

MR. KAYES: Your Honor, thanks to Ms. Martinez on our side, Mr. Ford on the defense side, I believe they're just being uploaded. And Ms. Deanes is on top of it, as well.

THE COURT: Okay.

MR. KAYES: So, I think we're --

THE COURT: Give me one second to just --

MR. KAYES: -- in the clear there.

THE COURT: -- ping her to make sure -- she's at her desk, so I'm sure she's on it.

Okay. Thank you very much. I appreciate everyone's --

MR. FORD: There's just one thing. On Exhibit 41, we might have to drop a different version. But the videos are going to take a little longer. We'll sort this out. It will take ten seconds.

THE COURT: Great. I appreciate your efforts to get that done.

Other topics and issues.

MR. FLYNN: Yes, your Honor. I have three minor

2461

topics.

Last week we moved to include the grand jury transcripts and the criminal trial transcripts. I understand your Honor's ruling that those were not going to be in evidence. But we wanted them as part of the record. And those are in the Box.com. But they're not, obviously, admitted exhibits.

Is that enough, or what else do we need to do with respect to those types of exhibits?

THE COURT: Okay. I think what I would have you do -- so, Box.com does not actually make them available on the docket. So, I think just at your convenience, if you'd like for them to be a part of the record, you should just file them as exhibits on the docket.

MR. FLYNN: And we will file the grand jury transcripts --

THE COURT: Under seal.

MR. FLYNN: Yeah.

THE COURT: Yes. Please do grand jury under seal. Even though we heard about it, it still shouldn't be a part of the public docket.

MR. FLYNN: Okay.

Your Honor, we wanted to preserve our objection to Jury Instruction No. 23. We believe that "criminal case" was the incorrect language.

2462

We preserve our objection for appeal on Jury Instruction No. 26 regarding the time, the clock starting with the arrest, for appeal.

THE COURT: Yes.

MR. FLYNN: And, then, my last issue, your Honor, we had mentioned when we rested that we were filing -- or when they rested, that we were going to file a motion for directed verdict based on qualified immunity, lack of causation, and insignificant evidence. We're just asking for a briefing schedule on that.

And we're also asking, respectfully, that the Court does not enter judgment until that motion is fully briefed and ruled upon.

MR. LOEVY: One clarification there, your Honor. It's our understanding that qualified immunity has been waived -- or intentionally waived as part of an agreement to dispense with the Monell briefing. And maybe Mr. Flynn forgot. But there is no qualified immunity defense by agreement.

MR. FLYNN: I don't think that's the case, but we can deal with that when we file the motion.

THE COURT: Okay.

(Pause.)

MR. FLYNN: The City agreed to indemnify, but it's not that the officers themselves would waive the qualified immunity. That's the issue.

2463

MR. LOEVY: Well, whatever was agreed, I'm sure it's written down somewhere.

THE COURT: Let's hope so.

MR. FLYNN: We would just ask for a week, your Honor, if we could file that motion on Monday.

THE COURT: Yes.

All right. So, file your motion by Monday, the 16th.

Mr. Loevy or Mr. Bowman, do you want me to set a response date now, or do you want me to -- we can also -- I can also have the parties just propose a briefing schedule with the motion that will be filed on Monday.

MR. KAYES: I think it would be fine to have defense propose a briefing schedule. They can ask us, we can work it out.

THE COURT: Right.

MR. KAYES: I just want to note that this is subject to our objection that the way they're handling their 50(a) is kind of not how the rule envisions as it comes to timing.

So, we want to preserve that objection.

THE COURT: Fair enough. This is a little unusual, at least in terms of how it works. But I freely admit that Mr. Flynn made it very clear that he wished to file something on it, and I was fine with that. I had indicated to the extent that a motion for directed verdict had been made orally, I would have taken it under advisement anyway, which I think is

always the right -- usually the right thing to do.

So, just please remember when you file your motion on Monday to have consulted so that we can just put a briefing schedule on.

I'm happy to rule on it before entering judgment one way or the other. It's going to matter for purposes of appeal either way, so I'm fine with that.

MR. FLYNN: Thank you, Judge.

MR. KAYES: Your Honor, I don't want to be a stick in the mud for no reason, but I believe that -- I don't know that the Court can avoid entering judgment while that's pending. And I'd just like the opportunity to give you an answer on that at some point, because I think there may -- Rule 58 may kind of force you to do it, and I believe we -- you know, we want to get the show on the road.

MR. LOEVY: There's interest implications, too.

THE COURT: Yeah, no, I understand. And I'm happy to have the parties tell me what to do. I mean, the ordinary experience has been -- I say experience as if I've been doing this a really long time. But my ordinary experience has been that once the jury verdict is returned and we enter that verdict, we would enter judgment. That doesn't preclude either party from filing their post-trial motions; briefing it; I rule within a reasonable period of time; and, then, to the extent that any party wishes to add that position or that ruling to

2465

their notice of appeal, you would just supplement your notice of appeal to add the Court's ruling on issue X or issue Y.

I would need to do a little bit of research on what is technically the right way to do it. But I think the parties should confer on that, because if, in fact, we get a verdict in short order, in the next couple of days, or whatever it's going to be, that would have some implication.

So, I take Mr. Flynn's point, but I do think the parties should confer on that, and then when we get a verdict, we'll talk about what we should do.

MR. FLYNN: Understood.

THE COURT: I would just need to take a double, triple look at Rule 58 et cetera.

MR. KAYES: Thank you, your Honor.

MR. LOEVY: Speaking of "thank you, your Honor," thank you, your Honor. You did a lot of work and were very patient with us, and we appreciate you.

THE COURT: No, you all did a ton of work. I've done a good number of trials, and this is the longest one as a judge. Not the longest one as a lawyer. So, I appreciate that a lot of work had to go into everybody getting here and it takes a lot of work.

And, so, I appreciate your efforts to get this done and your professionalism. I appreciate how much work goes into it, and everyone feels passionately about their sides. And

2466

thanks very much for your continued attention and always being here promptly and ready to go. This could have drug on much, much longer for all kinds of reasons. So, I appreciate your efforts in that regard.

If you would do me a favor and make sure that Ms. Deanes has a way to reach you. Her office is just out there, or she can just reach you if we have questions. You certainly don't have to stay in the building. You're welcome to leave if you wish. But please be like 20 minutes away, right, just so we don't keep folks waiting too, too long.

I typically don't relay the contents of notes until everyone is here. So, that will sort of delay our resolution of any questions that we may get.

So, just be roughly 20 minutes away. You're also welcome to stay if you want.

MR. GIBBONS: Will Ms. Deanes let us know when the jury goes home for the day?

THE COURT: Yes.

MR. GIBBONS: I've gotten caught where juries stay till 7:00 and lawyers don't know whether they're still deliberating.

THE COURT: No, we will let you know any information we get, including if by 5:00 o'clock or so they have not reached a verdict, we will let them know -- what we'll probably do is just inquire with them, do you want to stay a bit longer

2467

or do you want to go home and come back tomorrow, and we'll relay that to you as close to 5:00 p.m. as possible.

So, thank you all again.

MR. GIBBONS:  Thank you.

MR. FLYNN:  Thank you, your Honor.

THE COURT:  See you soon.

(Proceedings concluded at 2:22 p.m.)

                *     *     *     *     *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Joseph Rickhoff          September 10, 2024
Official Court Reporter

/s/ Laura LaCien             September 10, 2024
Official Court Reporter

2468

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MARCEL BROWN,                          ) Case No. 19 C 4082
                                       )
                    Plaintiff,         )
                                       )
             vs.                       )
                                       )
MICHAEL MANCUSO AND GERI YANOW,        )
Personal Representative of the         )
Estate of KEVIN MCDONALD,              ) Chicago, Illinois
                                       ) September 9, 2024
                    Defendants.        ) 3:12 o'clock p.m.


          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE LINDSAY C. JENKINS


APPEARANCES:


For the Plaintiff:          LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
                                 MR. LOCKE E. BOWMAN, III
                                 MR. TOM KAYES
                            311 N. Aberdeen Street, 3rd Floor
                            Chicago, Illinois  60607

                            MACARTHUR JUSTICE CENTER
                            BY:  MS. VANESSA DEL VALLE
                                 MR. JONATHAN M. MANES
                            160 E. Grand Avenue, 6th Floor
                            Chicago, Illinois 60611


For the Defendants:         GREENBERG TRAURIG, LLP
                            BY:  MR. JOHN F. GIBBONS
                                 MR. KYLE L. FLYNN
                                 MR. TYLER L. SALWAY
                                 MR. QUINN FORD
                            77 W. Wacker Drive
                            Chicago, Illinois  60601

2469

APPEARANCES (Cont'd):

Court Reporter:                        JOSEPH RICKHOFF, CSR, RMR, CRR
                                       Official Court Reporter
                                       219 S. Dearborn St., Suite 2118
                                       Chicago, Illinois  60604
                                       (312) 435-5562
                                       joseph_rickhoff@ilnd.uscourts.gov

                    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                     PROCEEDINGS RECORDED BY STENOTYPE
           TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

2470

(Proceedings heard in open court; jury out:)

THE COURT: Good afternoon. It looks like we have everyone back.

I received a note from the Court Security Officer that says: Can we please see Detective Mancuso's statement/report for the criminal trial in relation to the second claim? It was the statement plaintiff's counsel referred to in his closing argument. Also, could we have access to the last 15 minutes of the interrogation video, please?

There's no signature on who that's from. I'll pass that to Mr. Matosian to pass to you.

On the last question, Ms. Deanes is working to get all the exhibits uploaded. It's just going to take a little bit of time. And, so, I think to some degree we can indicate to them that we're working on getting the exhibits available to them in terms of the video. But, obviously, I wouldn't take action on any of this without consulting you.

So, if you want a take a moment, fine. If you have suggestions, I'm happy to work on a note that we can send back.

MR. LOEVY: I mean, the gist of the response to the first question should be that it was -- the relevant content of the report was presented to you by stipulation.

Did we send the stipulation back?

THE COURT: Probably not. I mean, you would know. I wouldn't know.

MR. FLYNN: We did not in the stipulations, so --

MR. GIBBONS: I would agree with that. I think that would the answer the question. And the stip would answer it.

MR. LOEVY: I think that's right.

THE COURT: All right. So, one option --

(Pause.)

THE COURT: So, I think one thing we could do, because we have given them a printout -- printed out copy of the instructions, is we could print the stipulations and give them a copy of those, unless the parties feel differently.

And, then, we could also put together some agreed language on -- along the lines the parties have just said, which is the stipulation -- we are enclosing printed copies of the stipulations or something similar.

MR. LOEVY: I think that's probably right. We could say, the relevant portion of the report is included in the parties' stipulation. Because they're not going to get the report, but --

THE COURT: Right.

So, I'll give you all a moment to think about it. In any event, we have to wait a few minutes anyway because it's going to take a few minutes for the video, et cetera.

(Pause.)

MR. GIBBONS: Your Honor, are you waiting for us to respond in some way or --

THE COURT: I was just going to give both parties an opportunity to consider their respective positions, but if you're ready to tell me your proposals or dueling positions, I'm happy to take that up now.

MR. GIBBONS: I thought Jon's suggestion was the right one. You answer it by simply saying the parties -- something like in relation to your first inquiry, we refer you to the stipulations that the parties entered in the case, and send it back to them.

MR. LOEVY: Well, there was three stipulations. We might want to refer to the stipulation regarding the report.

MR. GIBBONS: Yeah. Okay.

THE COURT: Okay. So, we need to provide the jury with the stipulations, though. So, unfortunately, I'm digging through my proposed order box here and it's giving me some trouble. So, if someone can re-forward them all to me now, I'm in a position to print them, and then send them back with the note. And I'll make reference to that.

MR. BOWMAN: The single stipulation?

THE COURT: So, I'm happy to send back one stipulation if that's what the parties agree to do. I mean, stipulations are in evidence. So, if we haven't submitted them all, presumably they'd all go in. But I'm happy to do whatever you agree to have me do.

MR. LOEVY: I think one's plenty. What do you think?

2473

MR. FLYNN:  That's fine.

THE COURT REPORTER:  I can't hear you.

MR. LOEVY:  We agree to one, one going back.

THE COURT:  Okay.  So, in relation to the first question, "We refer you to the parties' stipulation -- "

MR. LOEVY:  "Regarding the relevant portion of Mancuso's report."

MR. GIBBONS:  Or, I mean, why reframe their question? "Which is attached hereto."

THE COURT:  I was just going to say maybe we just say --

MR. GIBBONS:  Less words.

THE COURT:  Right.  We're sending it back.  So, it's fine to just say, "which I am attaching to this note."

"Regarding the second question --"

MR. LOEVY:  Our understanding is the entire video will be being --

THE COURT:  Right.

MR. LOEVY:  -- is made available soon.

MR. GIBBONS:  Yeah.

THE COURT:  "The entire video is being --" "the entire video will be available to you shortly, along with the rest of the admitted exhibits in the case."

Okay.  So, the note will read -- sorry, I'm just putting it together.

2474

MR. LOEVY:  Your Honor, we're going to tender you back the note if you want to make it more responsive.

THE COURT:  Yes, please.  Thank you.

(Tendered.)

THE COURT:  "Dear jury, in relation to the first question, we refer you to the parties' stipulation, which I am attaching to this note.  Regarding the second question, the entire video will be available to you shortly, along with the rest of the admitted exhibits in the case."

So, if somebody can shoot me that.

MR. KAYES:  Just did, your Honor.

THE COURT:  Thank you.

We will send all of that out to the jury now.

MR. KAYES:  Actually, your Honor, small point.  At some point my e-mail got dropped off the chain we were using.

THE COURT:  Totally inadvertent.  Thank you for letting me know.  We will make sure that doesn't happen again.

MR. KAYES:  Thank you.

THE COURT:  Okay.

MR. GIBBONS:  Okay.  Thank you, your Honor.

MR. FLYNN:  Thank you, Judge.

(Pause.)

THE COURT:  Hold on one second before you leave.

The hard drive apparently has 36 exhibits.

THE CLERK:  But the one that's on Box.com --

2475

THE COURT:  Has many more.

THE CLERK:  Those should be included, as well?

MS. MARTINEZ:  Say it again.

THE CLERK:  Should the ones that are on Box.com be included as exhibits?

MS. MARTINEZ:  The ones on the Box link are exhibits, and then --

THE CLERK:  I'm going to need you to put those on a hard drive -- on a zip drive for me because it won't transfer.

MS. MARTINEZ:  Okay.

MR. KAYES:  Ms. Deanes, I'm sorry, are you referring to all the files on the Box drive or just the video files?

THE CLERK:  The video files work.  It's the other files.

MR. KAYES:  Okay.

THE CLERK:  Paper documents, or whatever it is, just won't transfer.

MR. KAYES:  We'll do that right away.

THE COURT:  Thank you.

We'll send this back, including with the stipulation. Thank you.

MR. GIBBONS:  Thank you, your Honor.

(Jury continued its deliberations at 3:24 p.m.)

(Proceedings heard in open court at 4:03 p.m.; jury out:)

THE COURT:  All right.  Good afternoon.

2476

I'll note that we have all lawyers and parties present. I've been advised that the jury has reached a verdict.

So, we will call the jury in, publish the verdict, and then poll the jury regardless of the outcome and take it from there.

So, Ms. Deanes, can you get the jury, please.

(Jury in.)

THE COURT: Please be seated.

Good afternoon, ladies and gentlemen. I understand you have reached a verdict. If I can ask the forms of verdict to be passed to the Court Security Officer.

(Tendered.)

THE COURT: All right. It appears that the verdict forms are correctly completed and signed. So, I will publish the verdict.

"We, the jury, unanimously find as follows:

"Section I: Liability.

"For each of Plaintiff's claims, indicate your verdict by marking the appropriate box."

First, claim 1, "Coerced Incriminating Statements." The box is checked "For Plaintiff."

Second Claim, Fabrication. The box is checked "For Plaintiff."

The jury has awarded damages, and I will publish that

2477

portion of the verdict.

"A.   Compensatory Damages.

"For the period before Plaintiff's criminal conviction, we, the jury, award to plaintiff damages of:  $10 million.

"For the period after Plaintiff's criminal conviction, we, the jury, award to plaintiff damages of:  $40 million."

"Punitive damages."  The line is as to defendant Michael Mancuso, "$50,000."

Signed by each of the jurors, dated today, including by the presiding juror.

Ms. Deanes, can you please poll the jury.

Ladies and gentlemen, Ms. Deanes will ask you to confirm verbally that it is your verdict.

Ms. Deanes.

THE CLERK:  ████████████, was this and is this now your verdict?

JUROR ████████:  Yes.

THE CLERK:  ████████████, was this and is this now your verdict?

JUROR ████████:  Yes.

THE COURT:  ████████████, was this and is this now your verdict?

JUROR ████████:  Yes.

THE CLERK:  ████████████, was this and is this now

your verdict?

JUROR ████: Yes.

THE CLERK: ████████████, was this and is this now your verdict?

JUROR ██████: Yes.

THE CLERK: ██████████, was this and is this now your verdict?

JUROR ██████: Yes.

THE CLERK: ████████████, was this and is this now your verdict?

JUROR ██████: Yes.

THE CLERK: ████████████, was this and is this now your verdict?

JUROR ████: Yes.

THE CLERK: ██████████, was this and is this now your verdict?

JUROR ██████: Yes.

THE COURT: So say you all.

JURY MEMBERS: (Affirmative responses.)

THE COURT: Ladies and gentlemen, thank you very much for your time and patience over the last 10 or so days, 11 or so days. You are excused. I would like to thank you personally back in the jury room. So, we will excuse you with the thanks of the parties. And if you'll give me just one moment, I'll be back to thank you all and we'll get you out of

2479

here promptly.

All rise.

(Jury out.)

THE COURT: I would like to just step back and express my thanks to the jury. I don't allow parties to speak with the jury. So, just so we're clear on the rules of the road with that.

I don't know if there's anything else we need to address today. I think you have some dates from me and time to confer. But unless there's anything else from either of the parties?

(No response.)

THE COURT: All right. Thank you very much. Have a good afternoon.

(Proceedings concluded at 4:09 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Joseph Rickhoff                          September 13, 2024
Official Court Reporter