UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Marcel Brown, | |
| *Plaintiff,* | No. 19 CV 4082 |
| v. | Judge Lindsay C. Jenkins |
| City of Chicago, *et al.* | |
| *Defendants.* | |

MEMORANDUM OPINION AND ORDER

Following his exoneration, Plaintiff Marcel Brown brought this action under 42 U.S.C. § 1983 against the City of Chicago and Chicago Police Department Detectives Michael Mancuso and Kevin McDonald, alleging that Defendants coerced a confession and fabricated evidence that were used to wrongfully convict him in violation of his Fifth and Fourteenth Amendment rights. A jury found in Brown's favor on both claims and awarded damages. Before the court are the parties' post-trial motions: for judgment as a matter of law, for a new trial, to amend the judgment, and for prejudgment interest. [Dkts. 458, 466, 460, 457.] For the reasons below, Defendants' motion for judgment as a matter of law, for a new trial, and to amend the judgment are each granted in part. Brown's motion for prejudgment interest is denied.

## I.  Factual Background[1]

In August 2008, Plaintiff Marcel Brown was 18 years old, had just graduated high school, and was working while planning to attend college. [Tr. 211:16–213:05.] On the evening of August 30, Brown was at a White Castle with friends, including his cousins Terry Scott ("TJ") and Renard Branch, Jr. ("RJ"). [Tr. 215:13–218:04.] Brown received a call from his sister asking to be picked up from Amundsen Park, where she'd gotten into an argument. TJ and RJ had sisters at the park too, and at least one of them also received a call to pick up their sister. [Tr. 216:21–218:10.] Brown drove TJ and RJ to the park. His cousins went to find the sisters while Brown stayed in the car. After waiting for a few minutes, Brown left the car to find TJ and RJ. [Tr. 219:8–24.]

---

[1] In recounting the facts of the case, the court recites the evidence in the light most favorable to the non-moving party. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 300–01 (7th Cir. 2010).

Shortly after Brown entered the park, gunfire broke out. Brown dropped to the ground. [Tr. 222:05–24.] When the shots stopped, he ran back to his car where TJ and RJ joined him. Brown started the car as more shots fired. [Tr. 223:07–19.] At that point, he also learned that RJ had exchanged shots with somebody. [Tr. 223:22–24.] Brown drove himself and his cousins away from the park and eventually returned home. [Tr. 223:25–225:16.]

The next morning, the body of 19-year-old Paris Jackson was found in Amundsen Park. He had suffered a fatal gunshot wound to the chest. [Tr. 227:04–228:16; 794:15–20; 980:16–981:01; 2109:16–2110:02.] The Chicago Police Department ("CPD") responded to the scene. Among the responding officers were Defendants Detective Michael Mancuso and Detective Kevin McDonald. Mancuso led the homicide investigation. [Tr. 980:01–982:04.] During the investigation, several eyewitnesses told detectives that RJ had fired a gun in the park on August 30 and that Brown had driven RJ there before the shooting. [Tr. 1010:12–1014:18; 1021:06–1022:07; 1218:14–1219:11.]

On September 3, 2008, CPD officers found Brown at his home and brought him to the Area 5 police station. [Tr. 194:09–17; 237:13–240:07; 1036:17–1037:09.][2] RJ was also arrested as a suspect. [Tr. 1265:21–1264:16.] Brown remained in custody from about 3:00 p.m. on September 3 until 1:30 a.m. on September 5, during which he was interrogated about his involvement in the murder of Paris Jackson. [1087:01–23]. CPD's electronically recorded interview ("ERI") system captured the interrogation on video. [Tr. 1037:06–23; 2162:06–13.]

During his detention, Detectives Mancuso, McDonald, Garrick Turner, and Rubin Weber, and Cook County Assistant State's Attorney ("ASA") Michelle Spizzirri questioned Brown. Detectives gave him his *Miranda* warnings at the beginning of the interrogation and on the night of September 4, as did Spizzirri on September 4. [Tr. 1041:17–1042:11; 1389:22–1390:05; 1588:13–14.] Brown did not request an attorney or refuse to answer any questions. [Tr. 1042:12–18.]

At trial, Brown emphasized the conditions of his confinement. He was kept in the same, cold room for over 30 hours and slept very little during that time. [Tr. 241:2–243:25.] He had nowhere to sleep except for a narrow bench with no pillow or bedding. Tr. 281:18–25; 875:09–21.] He tried to sleep on the floor or in a chair but never slept for more than an hour at a time, [Tr. 282:12], and McDonald repeatedly interrupted his sleep the first night by entering the room around 3:00 or 4:00 a.m. to re-ask questions about the shooting. [Tr. 281:10–12.] Brown was given no food other than snacks the first day, and he was first given a meal the morning of September 4. [Tr. 871:12–873:07.]

---

[2]     The parties dispute whether he was arrested or if he came to Area 5 voluntarily. [*Compare* Tr. 237:13–240:07 with Tr. 1036:17–1037:09.]

Brown also asked for a phone call multiple times while detained but was consistently put off. [Tr. 243:21–244:12.] There was also testimony that Brown's family hired an attorney, Wham Cary, to represent Brown. [Tr. 697:22–698:91.] Cary testified that he attempted to reach Brown at Area 5 but was not given access to him. [Tr. 755:18–756:06.]

At 7:00 p.m. on September 4, Spizzirri arrived at Area 5. Part of the Felony Review Division, Spizzirri was tasked with doing a "log and burn" of Brown's interview recordings, which means she—and other ASAs—watched previously recorded video statements and wrote out what was captured on video. [Tr. 1453:11–16; 1458:09–16.] After reviewing the logs and burns from other ASAs (for parts of the interrogation she did not herself watch) and speaking with police, Spizzirri also questioned Brown herself. [Tr. 1484:04–16.] She testified that she did not observe any red flags indicating that Brown was being coerced when she reviewed the ERI and log and burn, or when she interviewed Brown. [Tr. 1468:21–1469:04.]

During the interrogation, Brown initially denied any involvement in the shooting at Amundsen Park. He insisted that he didn't know RJ had a gun when they went there and didn't know he intended to shoot anybody. [Tr. 346:06–09]. As the hours dragged on and Defendants repeatedly rejected Brown's story and insisted on the "truth," his story changed. [Tr. 356:10–361:10.]

Brown eventually told Spizzirri that he assumed RJ had a gun when they went to the park and that RJ made comments implying that he was going to shoot whoever was messing with their sisters. [Tr. 1604:01–1605:22.] Brown told Spizzirri he'd lied about what RJ said in the car because RJ told him they needed to have a story if they got caught. [Tr. 1595:09–13.] Mancuso summarized Brown's incriminating statements in a police report, later used during Brown's bond and grand jury hearings, and at his criminal trial. [Tr. 2162:06–17.]

Brown was convicted of murder and sentenced to 35 years in prison. [Tr. 1687:13–14]. Ten years into his sentence, in 2018, a court vacated his conviction based on a newly discovered constitutional violation. [Tr. 109:02–112:04.]

Brown brought this § 1983 action against CPD detectives and the City of Chicago alleging multiple constitutional violations. By the time the case proceeded to trial, Brown pressed only two claims against Defendants: that Mancuso and McDonald (1) coerced his confession and (2) fabricated portions of the police report that summarized his statements during the interrogation—both of which were used to convict him in violation of his Fifth Amendment and Fourteenth Amendment due process rights.[3] *See Brown v. City of Chicago*, 709 F. Supp. 3d 558 (N.D. Ill. 2023)

---

[3]     Brown dropped his failure to intervene and conspiracy claims during trial. [*See* Tr. 2219:25–2220:13; 2244:11–16.] Brown also alleged a *Monell* claim against the City of Chicago, but the parties agreed to bifurcate it and stay discovery. [*See* Dkt. 88.]

(granting in part and denying in part Defendants' motion for summary judgment); [Dkt. 390 (dismissing all claims against other defendants).]

The case went to trial on August 26, 2024. On September 5, Defendants moved for a directed verdict, which the court took under advisement. [Tr. 1916:06–20.] On September 9, 2024, the jury returned a verdict in Brown's favor on both claims against all Defendants and awarded him $50 million in compensatory damages and $50,000 in punitive damages.[4] [Tr. 2476:14–2478:19.]

## II. Post-Trial Motions

The parties filed a series of post-trial motions now before the court: (1) a Rule 50(b) renewed motion for JMOL, [Dkt. 458]; (2) a Rule 59 joint motion for a new trial, [Dkt. 466]; (3) a Rule 59(e) motion to amend the judgment, [Dkt. 460]; and (4) a motion for prejudgment interest, [Dkt. 457.] The court grants the motion for JMOL as to the fabrication claim, the motion for a new trial as to punitive damages, and the motion to amend the judgment as to a setoff of damages. It denies the motion for prejudgment interest.

## III. Rule 50(b) Motion

Under Rule 50, a court may grant judgment as a matter of law ("JMOL") if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on" an issue on which the party was fully heard during trial. Fed. R. Civ. P. 50(a)(1). A Rule 50(a) motion may be made any time before the case is submitted to the jury. Fed. R. Civ. P. 50(a)(2). If the court does not grant the motion, the movant may file a renewed motion for JMOL within 28 days after entry of judgment under Rule 50(b). Since a Rule 50(b) motion is simply a renewal of a Rule 50(a) motion, it "can be granted only on grounds advanced in the preverdict motion." *Ziccarelli v. Dart*, 142 F.4th 477, 483 (7th Cir. 2025) (quoting *Thompson v. Memorial Hospital of Carbondale*, 625 F.3d 394, 407 (7th Cir. 2010)).

Defendants made a Rule 50(a) motion on both claims before the close of trial, which the court took under advisement. [Tr. 1916:06–13; 1992:21–1993:06.] Now they move for judgment as a matter of law under Rule 50(b). Brown argues that the court cannot consider the Rule 50(b) motion because Defendants failed to articulate the bases for their Rule 50(a) motion before the case went to the jury, denying Brown notice and an opportunity to correct any defects in his case. [Dkt. 494 at 29–33.][5] He also argues that even if the motion was proper, it fails on the merits. [*Id.* at 37.]

---

[4] McDonald passed away before the trial, so the jury only assessed punitive damages against Mancuso.

[5] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

The court finds that Brown had sufficient notice of multiple Rule 50(b) grounds: (1) that Brown failed to prove that Mancuso fabricated a police report; (2) that Brown failed to prove Defendants coerced his confession; (3) that Defendants' relevant conduct was not unconstitutional; and (4) that Brown failed to prove he's entitled to pretrial detention damages for a Fifth Amendment violation. On the merits, however, Defendants are entitled to judgment as a matter of law only on fabrication grounds.

## A.    Notice of Rule 50(b) Grounds

A Rule 50(a) motion must "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). If the court does not grant JMOL, and the movant renews the motion under Rule 50(b) after judgment is entered, the court may only grant it on a basis previously articulated in the pre-verdict motion. *Ziccarelli*, 142 F.4th at 483. The purpose of these rules is "to allow the responding party an opportunity to cure any defect in its case before it is submitted to the jury." *Laborers' Pension Fund v. A & C Environmental, Inc.*, 301 F.3d 768, 777 (7th Cir. 2002).

How strictly a court enforces Rule 50(a)(2) depends on whether its notice function has been served: "the question is whether the non-moving party should have understood the grounds that were raised by the Rule 50(a) motion." *Ziccarelli*, 142 F.4th at 484. If those grounds aren't specified in the Rule 50(a) motion itself, courts look to "the broader trial context, including arguments made outside the four corners of a Rule 50(a) motion" to assess whether a party has been put on notice. *Id.* This may include, for example, pretrial or trial filings or oral arguments on the record. *See id.* at 484–85 (collecting cases); *Moran v. Raymond Corp.*, 484 F.2d 1008, 1010 n.1 (7th Cir. 1973) (holding that party's citation of a case during oral Rule 50(a) motion sufficiently preserved the argument for a Rule 50(b) motion). If other sources provide notice, a Rule 50(b) motion is proper even if the movant failed to identify any factual or legal grounds in their Rule 50(a) motion. *See Ziccarelli*, 142 F.4th at 482, 485 (reviewing pretrial motions to determine whether nonmovant was on notice of the bases for Rule 50(b) motion because oral Rule 50(a) motion specified no grounds). But a party may only "rely on specific facts or arguments" not previously raised if "the non-moving party is clearly on notice of a more general argument in the same genre." *Id.* at 485.

If, however, a court determines that the nonmovant lacked notice of the grounds for a Rule 50(b) motion, it must enforce Rule 50(a)(2) strictly. The renewed motion for JMOL must be rejected, even if a court had taken the Rule 50(a) motion under advisement, even if the court was "impatien[t] or reistan[t] to hearing the argument," and even if the nonmovant did not object to the propriety of the pre-verdict motion. *Ziccarelli*, 142 F.4th at 488. No matter the circumstances, the onus is on the movant to place its bases for JMOL on the record. *Id.* ("[E]ven if a district judge makes clear that she or he does not want to hear the grounds for a Rule 50(a) motion

(which a judge should not do), counsel must still make those grounds clear, whether orally or in writing or both.")

Here, the parties don't dispute that Defendants failed to explicitly state any grounds for their motion before the case went to the jury. Defendants first moved for a directed verdict just before Brown rested his case on September 5, 2024. Defense counsel stated, "[y]our Honor, I'm moving for a directed verdict on all claims. We'd like to know if they're dropping any other claims. Obviously, we want to paper this motion. But to the extent you want to hear any argument, we can of course provide that now as well." [Tr. 1916:06–10.] The court indicated that it would take the motion under advisement and didn't want to delay the trial, but that counsel was free to raise any points. [Tr. 1916:11–16.] Defense counsel did not.

Defendants raised the directed verdict motion for a second time at trial on September 5. Referring to the motion, Defense counsel asked, "[y]our Honor . . . I'm not sure if we're just going to file paperwork on that or if you want to hear argument." [Tr. 1992:21–23.] The court responded, "I'm happy to have you file something if you're prepared to. I don't want to make more work for you, so I think the question really is which would you prefer to do on the directed verdict." [Tr. 1992:24–1993:02.] Defense counsel stated they would file something but not on that day. The court agreed: "That's fine. As I mentioned, my normal practice is to take it under advisement. So, you know, I don't think there's any reason to strictly require that you file something tonight." [Tr. 1993:03–13.] There was no further discussion about when the motion would be filed.

*After* the jury received the case on September 9, Defendants raised the motion a third time. This was the first time they stated specific grounds for the motion: "[W]e had mentioned . . . when [Plaintiff] rested, that we were going to file a motion for directed verdict based on qualified immunity, lack of causation, and insignificant evidence." [Tr. 2462.] Defense counsel requested to file the motion on September 16, and the court accepted. [Tr. 2463:04–07.] Brown agreed to file a briefing schedule but preserved his objection to the Rule 50(a) motion: "I just want to note that this is subject to our objection that the way they're handling their 50(a) is kind of not how the rule envisions as it comes to timing." [Tr. 2463:12–19.]

After the jury reached its verdict and before entering judgment, the court set a post-verdict briefing schedule for the Rule 50(a) motion. It also indicated that it would deny the motion and enter judgment, after which Defendants could file a Rule 50(b) motion. [Dkt. 429.] Brown objected, arguing that a Rule 50(a) motion at this point would be improper because Defendants failed to specify the "law and facts that entitle it to judgment as a matter of law" before the case was submitted to the jury, as required by Rule 50(a)(2). [Dkt. 432 at 2.] The court overruled Brown's objections and allowed the briefing to proceed. [Dkt. 436.] Defendants filed their Rule 50(a) brief on September 16. [Dkt. 437.]

Brown now revives his argument that post-verdict briefing on a Rule 50(a) motion cannot meet Rule 50(a)(2)'s notice requirement where the pre-verdict motion was contentless. [Dkt. 494 at 30.] The court agrees.

The purpose of Rule 50(a)(2) is to "allow the responding party an opportunity to cure any defect in its case before it is submitted to the jury." *Laborers' Pension Fund*, 301 F.3d at 777 (emphasis added) (citing Rule 50, Advisory Committee Notes, 1991 Amendment). In the time since the parties briefed their post-trial motions, the Seventh Circuit reiterated this point with emphasis in *Ziccarelli*. 142 F.4th 477. There, the court concluded that a contentless Rule 50(a) motion taken under advisement does not satisfy Rule 50(a)(2), and it scoured the record for arguments that would have given the nonmovant notice while it still had time to cure. *Id.* at 480, 484–88. A brief filed post-trial obviously wouldn't fulfill that same need.

Defendants attempt to distinguish *Ziccarelli* because, there, defendants raised their Rule 50(a) motion orally and never requested briefing whereas here, they asked the court when and how to file a written brief. [Dkt. 540 at 2.] This is a distinction without difference. *Ziccarelli* was clear that the party moving for JMOL bears the burden of placing its grounds on the record *before* the case goes to the jury, "whether orally or in writing or both," whatever the court's disposition. 142 F.4th at 488. And here, the court gave Defendants the option to argue their grounds in writing or orally, but they chose not to. [Tr. 1916:11–16; 1992:24–1993:02.] Consequently, Defendants' belated Rule 50(a) briefing cannot now supply the grounds for a renewed motion for JMOL. To the extent that the court erred in indicating otherwise when it set the briefing schedule, that error did not prejudice Defendants because, by the time they requested a briefing schedule for the Rule 50(a) motion, the case had already been submitted to the jury and the time to specify their grounds had passed.

Defendants' other arguments are equally unavailing. They argue that their Rule 50(a) brief should be considered because Brown knew they wanted to file briefing but didn't object until he "believed he could argue Defendants technically forfeited their right to file a Rule 50(a) motion." [Dkt. 507 at 11.] But per *Ziccarelli*, a nonmovant's failure to object to an insufficiently specific pre-verdict Rule 50(a) motion does not make it proper. 142 F.4th at 477.

Defendants also argue that Brown "derailed" their Rule 50(a) motion by refusing to clarify which claims he would drop or identify which theory of fabrication he was proceeding under until the jury instruction conference, which was after the evidence closed. [Dkt. 507 at 10–11.] But the jury instruction conference was held before the jury received the case, so Defendants still had ample opportunity to state their grounds for JMOL, and Brown, if he perceived any holes in his case, could have then requested that the court reopen evidence. *See United States v. Medina*, 430 F.3d 869, 879 (7th Cir. 2005) (discussing judge's discretion to reopen evidence).

7

Consequently, Defendants' post-verdict Rule 50(a) briefing does not satisfy Rule 50(a)(2)'s notice requirement.

The next question, then, is whether anything in the "broader trial context" alerted Brown to Defendants' grounds for JMOL before the case went to the jury. *Ziccarelli*, 142 F.4th at 484. Defendants point to instances before and during trial where they argued issues supporting their Rule 50(b) motion. [*See* Dkts. 435 at 5–6; 540-1 at 1–3.] Although Brown never disputed that these were sufficient to put him on notice, the court reviews them afresh to determine whether Defendants' 50(b) motion can be considered.[6]

### 1. Insufficient Evidence of Fabrication

The court first considers Defendants' fabrication argument: that Brown failed to prove Mancuso knowingly fabricated the police report, which summarized incriminating statements Brown made during his interrogation. [Dkt. 459 at 43–48.][7] The argument has two components. First, that Brown failed to show that the report did not accurately reflect his statements. Second, that Brown failed to show that Mancuso knew Brown's statements were substantively false, so he could not have knowingly fabricated false evidence.

The court finds that Brown was aware of Defendants' fabrication arguments prior to and during trial. First, in summary judgment briefing, Brown made statements of fact about why Brown went to the park and what he knew. [*See* Dkt. 282 at 3 ("Plaintiff was not aware that RJ had a gun when he drove RJ and TJ to the Park.").] Defendants objected to those facts, asserting that Brown made certain

---

[6]     Brown instead argued that that the notice exception articulated in *Laborer's Pension Fund* is distinguishable because the moving party's Rule 50(a) motion had content but was not sufficiently specific whereas here, Defendants' Rule 50(a) motion made no argument at all. [Dkt. 494 at 35–36 (citing *Jimenez v. City of Chicago*, 877 F. Supp. 2d 649 (N.D. Ill. 2012).] But it does not matter whether a Rule 50(a) motion has insufficient content or no content at all—if the nonmovant was clearly on notice of the grounds for the renewed motion, those grounds can provide a basis for judgment as a matter of law. *Ziccarelli*, for example, also involved a "content-free" Rule 50(a) motion. 142 F.4th at 487. Instead of rejecting the Rule 50(b) motion out of hand, the court scoured the record for evidence that the plaintiff was on notice of the grounds on which the district court granted the Rule 50(b) motion. *Id.* at 485–87. It ultimately found no such evidence but was unbothered by absence of content in the Rule 50(a) motion.

[7]     The parties stipulated at trial that the report made the following statements, which fall into two buckets: (1) "Marcel Brown states that he knew Branch had a gun when he got in his car to go to the park. … He said that he knew Branch had the gun when he was in the car," and (2) "Brown stated that when Branch said he was going to go F them up, he knew Branch meant he was going to go shoot them. … Brown said that Branch said I'm tired of these Ns messing with my sister, they're going to die." [Tr. 2162:17–2163:01.]

opposing statements during his interrogation—the same statements that Brown now argues were falsely recorded in the police report. [*See, e.g.*, *id.* at 3 ("Plaintiff confessed to ASA Michelle Spizzirri that he knew that, on the evening of August 30, 2008, R.J. possessed a gun and that R.J. intended to use the gun to shoot individuals at the Park.").] Fabrication, which was not a topic of summary judgment, didn't arise at this point. But it was clear that Defendants maintained that Brown admitted in his interrogation that he knew RJ had a gun and intended to shoot someone at the park. This notion—that the police report accurately reflects what was said in the interrogation—is core to Defendant's fabrication argument.

The parties then explicitly debated fabrication in their proposed jury instructions. In the proposed jury instructions filed before trial, Defendants proposed a line stating that "[a]n officer does not fabricate evidence, or otherwise violate a wrongly convicted person's constitutional rights, by coercing a witness into giving an incriminating statement or testimony." [Dkt. 348-9 at 38 (citing *Hill v. Cook County*, 463 F. Supp. 3d 820 (N.D. Ill. May 31, 2020)).] This previewed Defendants' post-trial argument that a coerced statement is not necessarily fabricated. [Dkt. 459 at 47–48.] Brown's disagreement with Defendants' reading of *Hill* demonstrated his awareness of this line of argument. [Dkt. 348-9 at 36–37.]

Then, at trial, Brown argued in closing that the police report had been fabricated because Mancuso included statements that he knew Brown never made. [Tr. 2343:07–14; 2344:10–13.] In response, Defendants made many of the same arguments they do now: that the report was a summary, not a verbatim transcript of Brown's interrogation, and that it accurately reflected statements Brown made:

> We also have this fabrication claim. … First of all, that police report is a summary. It's not a verbatim summary. It's not a transcript of what's said in the police -- or in the interview. It's a summary of what occurred in the room. … They stipulated that the ERI video was available but they stipulated to instead having Detective Mancuso read from his report [at the criminal trial]. … They let Detective Mancuso read from his report because it does accurately reflect what's in those videos.

[Tr. 2433:09–2434:04.]

In sum, the parties debated the contents of the interrogation video and police report enough throughout this case such that Brown should have known Defendants would challenge a finding of fabrication post-verdict. Rule 50(a)(2)'s purpose was served and the court may consider fabrication as a basis for judgment as a matter of law. *See Laborers' Pension Fund*, 301 F.3d at 777 (finding content-free Rule 50(a) motion proper where "the court and [opposing party were] made well aware of [defendant's] view of the legal deficiency in [plaintiff's] case.").

### 2.    Insufficient Evidence of Coercion

Defendants argue that they were entitled to JMOL on the coercion claim, reasoning that Brown failed to prove that they knowingly coerced his confession or that they were personally responsible for his injury. They also argue that, regardless, the superseding actions of prosecutors and Brown's defense attorney broke the chain of causation. The court finds that, based on the pretrial and trial record, Brown had sufficient notice of each of these arguments.

### a.    Knowing Coercion

On Brown's Fifth Amendment claim, Defendants argue that Brown failed to prove that "Defendants 'knowingly' coerced his confession." [Dkt. 459 at 25.] The argument has two parts: that Defendants did not engage in coercive tactics and that, in any event, they lacked "awareness that their conduct was unconstitutional." [*Id.* at 26.]

The general dispute about whether Defendants' acts amounted to coercion was the crux of the case and litigated enough to provide notice. As discussed below, Defendants fulsomely argued in pretrial proceedings that certain acts were legal and could not even be considered towards coercion. See *infra*, Part III.A.3. Although Defendants could have flagged specific factual issues better in pretrial proceedings (e.g., whether Brown was denied food or water, and how the *Miranda* warning impacted his coercion claim), the court will consider Defendants' coercion argument for the purposes of judgment as a matter of law.

Meanwhile, the parties debated the second question—Defendants' knowledge—in their proposed jury instructions. The second element of Brown's proposed instruction required him to prove that "[t]he incriminating statements were not made by Plaintiff voluntarily but rather were made involuntarily as a result of improper tactics *knowingly* used by Defendant." [Dkts. 348-9 at 30 (emphasis added).] He defined knowingly as "realizing what one is doing and being aware of the nature of one's conduct; not acting through ignorance, mistake, or accident." [*Id.*]

Defendants, on the other hand, proposed instructing the jury that Brown must prove that "[t]he Defendant *knowingly* used improper coercion methods during his questioning of Plaintiff." [*Id.* at 34 (emphasis added).] Brown, despite using the word in his own instruction, argued that an element "requiring that Defendants use improper tactics 'knowingly' … is unnecessary," because "the notion that this conduct was accidental is not serious." [*Id.* at 32.]

Defendants, however, observed that cases establish that § 1983 liability must be based on a defendant's "knowledge and actions." [*Id.* (citing *Trexler v. City of Belvidere*, 2024 WL 554304, at *4 (N.D. Ill. Feb. 12, 2024))]. They also proffered their own definition in Proposed Instruction 40 (Knowingly Definition): "[t]o act or

participate knowingly means to act or participate voluntarily and intentionally and not because of mistake, accident or other innocent reason." [*Id.* at 66.] They again cited *Trexler*, and Brown again maintained that the instruction was unnecessary.

Finally, at trial, Defendants argued in closing that "to find for the plaintiff in claim one, you have to believe that the detectives were knowingly coercing a statement out of Marcel Brown." [Tr. 2431:01–07.] They pressed the point, too. [Tr. 2430:15–18 ("you have to believe that Turner went in there, said these things, went out, got with Detective Mancuso and they knowingly put together this big plan to go in there later and try to get him to take these statements."); Tr. 2345:09–13 ("the closest thing … [to] some kind of motive for the defendants in this case to knowingly, knowingly coerce a confession … is that the detectives had some kind of pressure to solve this murder.").]

Between the proposed instructions and closing arguments, Brown had sufficient notice that Defendants were disputing 'knowing coercion'—both as a legal and factual matter. The court will consider it as grounds for JMOL.

### b.  Personal Involvement

Next, the court considers Defendants' personal involvement argument: that Brown failed to prove they were personally responsible for eliciting his confession or using it against him at trial. [Dkt. 459 at 18–21.] Instead, they argue that only Spizzirri, the other prosecutors, and Brown's defense attorney could be responsible for any violations.

The parties debated personal involvement in their proposed jury instructions, during the jury instruction conference, and in closing arguments. The court instructed the jury on personal involvement:

> Plaintiff must prove by a preponderance of the evidence that the particular individual you are considering was personally involved in the conduct Plaintiff complains about as I have described it to you in the Instructions above. You may not find in Plaintiff's favor based on what persons other than the particular, listed individual under consideration did or did not do.

[Dkt. 441 at 30 (Instruction 28: Requirement of Personal Involvement).] Defendants initially proposed that the instruction list specific examples of other people whose actions Defendants cannot be held liable for, "including other Chicago Police Department detectives, officers, or employees." [Dkt. 348-9 at 64.] At the jury instruction conference, Defendants argued that the instruction should also mention Spizzirri because "she was a large part of this case" and that any injurious actions she took should not be attributed to Defendants. [Tr. 2255:04–21.] Brown countered that this instruction would be confusing and that Defendants could argue their point

in closing. The court agreed. [Tr. 2258:11–2260:24.] In closing, Defendants predictably pressed the personal involvement argument:

> I want to show you one other jury instruction and that's Personal Involvement. And one part out of this I want you to read is that you may not find in plaintiff's favor based on what other persons did. So if, in this case, you feel like somebody who is not a detective in this case did something wrong, that's for them.

[Tr. 2431:14–19.] They then specifically emphasized that Spizzirri was responsible for eliciting the confession:

> I want to make clear that it wasn't our detectives who actually elicited those statements about what R.J. said on the way to the car. That was ASA Spizzirri. We don't represent her. We don't represent Cook County State's Attorney's Office.

[Tr. 2431:21–25.] They made a similar argument regarding the ASAs and their decisions to charge and prosecute Brown:

> And the ASAs are the legal experts who made the independent decision of whether or not to prosecute, whether or not to charge, and whether they should do that based on Marcel's admissions; not our clients.

[Tr. 2434:04–08.] Though Defendants don't press the relevance of Brown's defense attorney's acts to the same extent, Brown was, as is sufficient, "on notice of a more general argument in the same genre." *Ziccarelli*, 142 F.4th at 485.

These arguments are related to—and often blend into—those relating to superseding causes, discussed hereafter. Brown was on notice of those, too, as evidenced by his response to Defendants' jury instruction on superseding acts, applicable here. [Dkt. 348-9 at 83–85.] Indeed, he now cites in opposition to the personal involvement argument that the "theory is defeated as well by … bedrock causation principles." [Dkt. 494 at 47.]

Thus, considering the jury instructions and closing arguments together, the court concludes that Brown was on sufficient notice of a personal involvement argument to warrant consideration of its merits.

### c.   Causation

Similarly, Defendants maintain that they cannot be liable for any constitutional injury because Cook County prosecutors and Brown's defense attorney were superseding causes. More specifically, they claim that those actors were fully aware of the circumstances of the interrogation when they elicited the confession and used it at trial. [Dkt. 459 at 21–24.]

Causation wasn't raised at summary judgment,[8] in other pretrial motions, or during the pretrial conference. Nevertheless, Brown was aware of the argument. Among the proposed jury instructions was Defendants' Proposed Instruction 50 (Superseding Acts by Prosecutors Preclude Liability):

> To find for the plaintiff on the involuntary coerced confession claim, you must find that the Defendant you are considering deliberately supplied misleading information to the prosecutors and the court regarding the circumstances of the confession.

[Dkt. 348-9 at 83.] They explained that they sought the instruction because "[t]he jury must be informed that Plaintiff has failed to meet his burden if the evidence shows the Assistant State Attorneys, being fully informed, engaged in superseding conduct that was the actual cause of Plaintiff's damages." [*Id.*] In support, they cited the very precedent they rely on in their Rule 50(b) motion. [*See id.* ("The causal link between a police officer's fabrication and the victim's injury may be broken if that police officer tells a prosecuting attorney before trial about the fabrication. We noted in *Buckley IV* that the officers in *Jones* would not have been liable 'if the prosecutors had known the truth and proceeded anyway' because 'then the immunized prosecutorial decisions would be the cause of the injury." (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012))); *see also id.* (citing *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)).]

Brown objected to Proposed Instruction 50 and advanced a view of causation now echoed in his opposition to JMOL. [Dkts. 348-9 at 83–84; 494 at 41–46.] He argues that proximate cause requires only "some direct relation between the injury asserted and injurious conduct" and that an injury may have multiple proximate causes. [Dkt. 348-9 at 84.] He states that a superseding cause must be one that makes the injury "an unforeseeable consequence of the defendant's conduct," [*id.* (quoting *Whitlock*, 682 F.3d at 584)], and that a prosecutor's use of a coerced confession in a criminal trial is not sufficiently unforeseeable where an officer "handed" the confession "over to the prosecutors because they *expected* them to use it." [*Id.* at 83–84 (emphasis added) (citing *Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009); *Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007)).]

The court ultimately rejected Defendants' instruction in favor of a broader instruction on causation,[9] but it cannot be said that Brown was unaware of

---

[8] Defendants didn't move for summary judgment on Brown's Fifth or Fourteenth Amendment claims.

[9] The instruction read: "An action 'causes' an injury if, in the natural and ordinary course of events, the action produced the injury. The action need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury." [Dkt. 441 at 26 (Instruction 24: Causation).]

Defendants' legal view of causation or how it related to the facts of the case and Brown's claims.

Furthermore, the issue of causation vis-à-vis the Cook County State's Attorney's Officer ("SAO") was front and center during the trial. Defendants put on evidence to support their theory that the prosecutors were superseding causes in any coercion. Spizzirri was central to this argument. Defendants emphasized Spizzirri's awareness of the circumstances of Brown's detention and interrogation, and her involvement in obtaining his confession. Both parties asked her, in depth, about what she knew (and how she knew it) prior to eliciting the confession. [*See, e.g.,* Tr. 1484:04–1485:13; 1580:09–1582:14.] She also testified that the SAO would have considered all the evidence available before making a charging decision, including, for example, confessions or admissions and the circumstances surrounding them. [Tr. 1612:23–1613:22.]

At closing, it was apparent that Brown expected Defendants to make a causation argument involving Spizzirri and other Cook County prosecutors:

> Don't let them blame Spizzirri. Spizzirri said she had a small part in this. *Judge read you a causation instruction. The police officers' actions don't have to be the only cause, nor the nearest cause. The police officers' action can be sufficient if they combine with another cause.*
>
> So, Spizzirri at that point was their instrument. She asked questions. They teed it up. Then she hits it. But don't forget, Spizzirri did not write the police report. Spizzirri did not testify to the grand jury that the investigation revealed that defendant Brown gave a statement admitting that he drove Branch to the park and he knew he had the intention of shooting somebody that night.

[Tr. 2361:10–22 (emphasis added).] In response, Defendants emphasized their view of causation—that Defendants could not be responsible for any constitutional violation because the prosecutors were fully apprised of the interrogation context and made an independent decision to prosecute:

> And the evidence that you heard from ASA Spizzirri is that there was a team of ASAs . . . There was a team that were going out there and they were monitoring. They were watching Marcel's interrogation video . . . and they were doing what's called logging and burning. They watch each hour and they summarize what they saw. So when the next ASA comes out, they can look at that summary and see what's happened and then do their own logging and burning. Multiple experienced ASAs were watching this interview and not one of them ever came into that room and said stop what you're doing, this is coercive.

14

*The detectives also could not mislead the ASAs as to what happened in that room. The ASAs had the videos.* They were watching it all for themselves. And then when ASA Spizzirri got there, she read some of the earlier summaries from the other ASAs, she watched some of the video herself, and she went into the room and she elicited Marcel's admissions.

[Tr. 2432:02–2433:08 (emphasis added).] On rebuttal, Brown asserted his competing view of causation regarding both Spizzirri and the other prosecutors:

They're trying to blame the State's Attorneys. They say that it was these State's Attorneys' decision. . . . That argument assumes its own conclusion. It assumes that if a Cook County State's Attorney saw something improper, they would do something about it instead of prosecute it and you can't assume that. [Tr. 2451:15–22.]

Don't forget, if anybody is saying well maybe it was all Spizzirri's false [sic], *don't forget the proximate cause instruction. Maybe Spizzirri was a cause but all we have to prove is that they were a cause, not the only cause, not the last cause,* just a cause and they're the ones who did this and they're the ones who wrote the reports.

[Tr. 2452:16–21 (emphasis added).]

Based on the proposed jury instructions, evidence presented at trial, and closing arguments, the court concludes that the parties' positions on causation were clear to the court and to each other before the case went to the jury. Rule 50(a)(2)'s purpose was served and the court may consider causation as a basis for JMOL.

### 3. Underlying Acts Not Unconstitutional

Next, Defendants argue that the conduct in question was not unconstitutional, and so it cannot support a coerced confession claim. These acts include: (1) improper questioning techniques; (2) refusing Brown a phone call; (3) failing to inform Brown that an attorney was there to see him (where Brown did not request one); and (4) detaining Brown for over 30 hours. [Dkt. 459 at 27.] The court finds each of these issues were raised repeatedly throughout the case.

First, Defendants repeatedly argued that interrogation techniques they employed were legally permissible—and thus don't constitute coercion. They did so in seeking to bar Brown's false confessions expert, [Dkt. 309 at 12–13], and in defending the opinions of their police practices expert, [Dkt. 313 at 14–16]. Defendants also proposed a jury instruction on voluntary statements (Proposed Instruction 42) that would have instructed the jury that officers are legally permitted to engage in certain interrogation techniques without rendering any incriminating statement involuntary. [Dkt. 348-9 at 68–69.]

15

Second, Defendants amply argued that denying Brown a phone call for an extended period was legal. They did so in a *Daubert* motion seeking to bar Brown's expert [Dkt. 308 at 15–16], and in defending their own, [Dkt. 313 at 12–13]. Defendants also argued this point during trial. [*See, e.g.*, Tr. 2410:20–2411:02 ("even if you think that Brown should have been -- should have been able to use a phone call or should have been able to make a phone call when he requested it, that is not a violation of his U.S. Constitutional rights.").]

Third, Defendants argued in motions *in limine* that, even if they denied an attorney access to Brown, that did not violate his constitutional rights, especially because he hadn't asked for an attorney. [Dkt. 331 at 3, 7–10.] They repeated the point at trial. [*See, e.g.*, Tr. 2411:03–18 ("before we get into the details, here again not telling someone that they got an attorney outside to see them is not a violation of the U.S. Constitution.")]

Fourth, Defendants argued about the propriety of Brown's 34-hour detention in *Daubert* motions. They argued that Brown's false confessions expert should be barred from arguing that the length of his interrogation was improper because he hadn't offered a basis for that conclusion. [Dkt. 308 at 8–9.] In another *Daubert* brief, they noted that a person can be legally detained for up to 48 hours in Illinois. [Dkt. 313 at 12.] Defendants proposed a jury instruction to a similar effect, stating that it's presumptively reasonably to detain a person for 48 hours in Illinois if there's probable cause to believe they've committed a crime. [Dkt. 348-9 at 71.] Defendants reiterated these points at trial. [Tr. 2406:07–12 ("detaining Mr. Brown for 30-plus hours in the police station that day … is decidedly not a violation of his U.S. Constitutional rights.").]

Defendants also argued that whether any of the above acts are impermissible under Illinois law is irrelevant to whether they are impermissible under the U.S. Constitution. [*See, e.g.*, Dkt. 308 at 15–16.] Consequently, Defendants laid the groundwork to revive these arguments in their Rule 50(b) motion.

### 4. Qualified Immunity

Defendants argue that they are entitled to qualified immunity on the coerced confession claim. [Dkt. 459 at 33.] They only referenced qualified immunity as one of their affirmative defenses. [*See* Dkt. 141 at 29.] Although listed, it is extremely generic and does not refer to any specific facts that would indicate the nature of the qualified immunity argument.[10] It was therefore not "forcefully presented to the

---

[10] The affirmative defense states: "At all times material to the events alleged in Plaintiff's SAC, reasonably competent police officers, objectively viewing the facts and circumstances then confronting Defendant Officers, would have believed that the actions

district court, so the function of Rule 50 was not served." *Ziccarelli*, 142 F.4th at 487. The court will not consider it as a basis for JMOL.

### 5.    Damages for Pretrial Detention

Finally, Defendants argue that Brown should not have been able to seek damages for pretrial detention. Brown was also clearly on notice of this claim for purposes of Rule 50(a)(2) because it was the subject of a motion *in limine*. [Dkt. 333.] Defendants also moved for reconsideration after the motion was denied. [Dkt. 357.] They reassert their objections to the court's ruling, so it may be considered post-verdict.

## B.    Merits of Rule 50(b) Grounds

On a Rule 50(b) motion, the court asks whether the jury had a "legally sufficient evidentiary basis" for its verdict. Fed. R. Civ. P. 50(a)(1). "To do so, [courts] consider all the evidence in the record and 'construe the facts strictly in favor of the party that prevailed at trial.'" *May v. Chrysler Group, LLC*, 716 F.3d 963, 971 (7th Cir. 2013 (quoting *Schandelmeier–Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011)). A court must draw reasonable inferences in the prevailing party's favor and avoid weighing the evidence or making credibility determinations. *Id.* It must also disregard evidence favorable to the moving party that the jury is not required to believe.

### 1.    Insufficient Evidence of Fabrication

Defendants argue that no reasonable jury could conclude from the evidence presented at trial that Mancuso fabricated the police report summarizing Brown's interrogation statements. The court agrees.

To prove fabrication of evidence, a plaintiff must show that "(1) the defendant knowingly fabricated evidence against the plaintiff, (2) the evidence was used at his criminal trial, (3) the evidence was material, and (4) the plaintiff was damaged as a result." *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1156 (N.D. Ill. 2022) (citing *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020)).

"Fabricated testimony is testimony that is made up; it is *invariably false*. False testimony is the equivalent; it is testimony *known to be untrue* by the witness and by whoever cajoled or coerced the witness to give it." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) ("*Fields II*") (emphasis added). It is necessarily distinct from coerced testimony, which "may be *true or false." Id.* (emphasis added). The Seventh Circuit has been explicit in this regard. *See Coleman v. City of Peoria, Illinois*,

---

taken were objectively reasonable and were within clearly established constitutional limits. Defendant Officers, therefore, are entitled to qualified immunity." [Dkt. 141 at 29, ¶ 11.]

925 F.3d 336, 346 (7th Cir. 2019) ("Coerced testimony is not necessarily fabricated. A reluctant witness or co-conspirator whose testimony an officer must pry out through aggressive interrogation techniques may be telling the truth despite the measures used"); *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014) ("[A] prosecutor fabricating evidence that she knows to be false is different than getting 'a reluctant witness to say what may be true.'" (quoting *Fields II*, 740 F.3d at 1112)); *Whitlock*, 682 F.3d at 584 ("Evidence collected with these kinds of suspect [coercive] techniques, unlike falsified evidence and perjured testimony, may turn out to be true.").

For the report here to be fabricated or otherwise false, the jury would have had to find that either (1) Mancuso's police report knowingly attributed statements to Brown that he never made, or (2) if Brown made the statements in the report, Mancuso knew that they were substantively false. There is no legal basis to find either.

There was insufficient evidence for a reasonable jury to conclude that the report attributed to Brown statements he never made. As stipulated at trial, the report said the following:

> Marcel Brown states that he knew [RJ] had a gun when he got in his car to go to the park. Brown stated that when [RJ] said he was going to go F them up, he knew [RJ] meant he was going to go shoot them. Brown said that [RJ] used that phrase in the car on the way to the park. He said that he knew [RJ] had the gun when he was in the car. Brown said that [RJ] said I'm tired of these Ns messing with my sister, they're going to die . . . .

[Tr. 2162:19–2163:01.] A jury could not have possibly found these statements literally false because Brown said each of them either verbatim or in substance. The entire interrogation was recorded and entered into evidence. [Dkt. 350 at 2–5.] The parties also filed indices of clips used at trial. [*See* Dkts. 434, 473.] The clips where Brown made the statements documented in the police report were among those played for the jury.

Brown made the statements documented in the report late in his interrogation when Spizzirri interviewed him. Spizzirri asked Brown whether he knew that RJ had a gun when they left for the park. As Brown argues now, he first denied and then equivocated on this point. But eventually, he stated, "I think he—he had it on him." [Tr. 1144:06–19; Dkt. 430-1 ("ERI Tr.") at 370:08–09.][11] He also said, "[a]t the time I didn't ask did he have it, but I kind of figured he had it on him." [Tr. 1601:20–22,

---

[11]     Brown argues that the ERI transcript cannot be relied on because it was not admitted into evidence. While true, the ERI video was admitted into evidence, the parties played clips from that video, and read from the corresponding sections of the ERI transcript after playing each clip. The court may rely on portions of the interrogation that the jury heard. It cites to the ERI transcript for ease of reference.

18

1603:21–1604:02; ERI Tr. 371:15–16.] Then, when Spizzirri asked whether the circumstances "made it seem like he had a gun," Brown responded affirmatively. [Tr. 1604:03–05, ERI Tr. 371:17–19.]

Spizzirri also asked Brown what RJ said in the car. Brown said that RJ said, "I'm getting tired of these n*****, you know, fuck 'em up." [Tr. 1601:20–22, ERI Tr. 372:02–07.] Spizzirri asked whether that meant "shooting them," and Brown responded, "When he say it, it means, like shooting somebody)." [Tr. 1605:15–22; ERI Tr. 372:14–22.] Brown also confirmed that RJ said this in the car. [Tr. 1603:22–1605:08; ERI Tr. 373:02–10.] Spizzirri asked again whether RJ said anything else in the car. Brown replied that RJ was mumbling to himself and said "I'm tired of these n*****. These n***** touch my sister, they gonna die." [Tr. 1144:20–1145:06; ERI Tr. 375:03–12.]

A jury, then, could not reasonably conclude that Brown did not make the statements reflected in the police report.

He also argues that omissions—based on excluded details of coercion and the summarized nature of the report—were sufficient for a jury to find that it was fabricated. [Dkt. 494 at 65–68.] But, as discussed, the Seventh Circuit has "consistently drawn a distinction between coerced and fabricated testimony." *Camm v. Faith*, 937 F.3d 1096, 1111 (7th Cir. 2019). *See also Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) ("[C]oercion and fabrication are not synonyms … Even more specifically, we have drawn a line between coerced testimony— … [which] may be true or false'—and fabricated testimony—which is 'invariably false.'" (quoting *Fields II*, 740 F.3d at 1110)).

Brown's coercion arguments thus fall flat, at least in the context of fabrication. He specifically argues that the report is fabricated because it omits details about the coercive interrogation conditions, e.g., that it lasted over thirty hours, that Brown was denied a phone call, that Mancuso "manipulated" him to confess, etc. [Dkt. 494 at 66–67]. And, that Turner "implanted in his mind" the statement, and language, regarding RJ's threats to murder someone, which Brown later recited in his confession. [*Id.* at 66 (citing Tr. 1377–78).] But these aren't arguments for fabrication. The details omitted from the police report may show that Brown was coerced, but they do not show that the statements in the report were necessarily untrue. *See Hyung Seok Koh v. Graf*, 307 F. Supp. 3d 827, 860 (N.D. Ill. 2018) (granting defendants summary judgment on fabrication claim even where officers fed plaintiff information that he eventually adopted because plaintiff failed to show officers knew the information was false); *Olson v. Cross*, 714 F. Supp. 3d 1034, 1052 (N.D. Ill. 2024) (same).

Nor does the summarized nature of the report make it false. Defendants stated at trial that the report was a summary. [Tr. 2433:12–15.] "That [a police] report was

not a comprehensive recitation … does not make it a false account." *Jones v. York*, 34 F.4th 550, 563 (7th Cir. 2022). For this reason, a jury cannot reasonably find—as Brown now argues—that the report was untrue because he did not ever say, verbatim, the words in the report. Nor does omitting the repetitive questioning or Brown's repeated denials render the report invariably false. Again, details of the interrogation are relevant to whether the confession was coerced, not that it was false as reported. *See Koh*, 307 F. Supp. 3d at 858 (granting defendants summary judgment despite acknowledging "that these reports could have been more detailed, and that if they had been more detailed they would have presented a fairer picture of the interrogation").

*Koh* is instructive because it dealt with a strikingly similar fabrication claim. There, the plaintiff argued that the officer defendants coerced his testimony and then prepared false police reports. *Id.* at 857. In granting summary judgment on the fabrication claim, the court concluded that the report could not be considered false because "the things [defendants] related in their reports were true, as a literal matter." *Id.* at 858. Plaintiff did make the statements and gestures that the report said he did. *Id.* Although the report omitted details that may have more comprehensively reflected the interrogation, the court explained, those omissions did not indicate that the officers were "deliberately falsifying evidence in order to mislead the prosecutors." *Id.* at 858, 858 n.42. The court also observed that the report cautioned that notes of the plaintiff's statements were "summary, not verbatim" and that "the interrogation could be viewed in full on videotape." *Id.* at 859. The fabrication claim and evidence here are nearly identical.

Brown, for his part, cites no cases to support his position except *O'Doan v. Sanford*, a Ninth Circuit decision offered to distinguish the supposed omissions in Mancuso's police report from those in *O'Doan*. 991 F.3d 1027 (9th Cir. 2021). But the defects are, in fact, similar. The *O'Doan* plaintiff had just suffered a seizure, was in a "postictal" state, and resisted arrest. *Id.* at 1032–33. The arrest report, however, made no mention of the seizure, despite officers' pre-incident warning of his condition and subsequent receipt of medical discharge papers. *Id.* at 1035. The court nonetheless granted summary judgment for the defendants on a fabrication claim, observing that "fabrication, in other words, must mean something more than a mere omission." *Id.* at 1045.

*Hurt v. Wise* provides an example of when omission *does* veer into fabrication. 880 F.3d 831 (7th Cir. 2018), *abrogated by other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019). There, a police report stated that a witness recognized and correctly identified two suspects in a photo array, but it omitted that she did not personally remember seeing them, and that she may have instead recognized them from the news. *Id.* at 838. In other words, the report distorted her testimony, such that 'recognition' meant something entirely different to the witness than it did in the

report. This is different from Brown's testimony; no context would change the fundamental meaning of his statements.

Ultimately, fabrication is about falsity. And not just falsity, but *knowing* falsity. There is no other evidence in the record (and Brown points to none) indicating that Mancuso knew the actual substance of Brown's statements was false. It is not enough that, based on the use of "suggestive interrogation methods," an officer "should have known [the story] was unreliable." *Camm*, 937 F.3d at 1112. *See also Olson*, 714 F. Supp. 3d at 1052 (granting summary judgment even though defendants "questioned whether [plaintiff] was being wholly truthful in his confession, and harbored some doubt that his confession" was accurate). Fabrication requires more.

In *Harris v. City of Chicago*, for example, the defendant officer had solid exculpatory evidence affirming without doubt that the plaintiff's confession couldn't be true. 2015 WL 1331101, at *5 (N.D. Ill. Mar. 19, 2015). Here, there was no such evidence. CPD identified RJ and Brown as suspects through eyewitnesses who said they saw RJ shooting in the park the day before Paris Jackson was found dead, and that they saw Brown drive RJ to the park shortly before the shooting. [Tr. 1218:10–1219:03.] At trial, expert witnesses debated whether forensic evidence found at the scene of the crime would have allowed someone to conclude whether Jackson was shot and killed in the park, or if his body had been moved there later. [*See, e.g.*, Tr. 2118:13–2119:03.] The jury was free to believe either version of events. But no evidence demonstrated that *Mancuso* knew or should have known how Jackson's body ended up in the park, and so he did not know for certain whether Brown could possibly be implicated in his death.

In sum, there is no evidence from which a jury could reasonably find that Mancuso fabricated his police report. The evidence presented was better suited to a coercion claim and, without more, could not also prove fabrication. Defendants are thus entitled to JMOL on Brown's fabrication claim.

## 2. Insufficient Evidence of Coercion

Defendants challenge the coercion finding, arguing that Brown failed to prove detectives engaged in knowing coercion, and that in any event, there is no evidence of their "personal involvement" or a "causal connection between (1) the sued officials and (2) the alleged misconduct." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017).[12]

---

[12]    These arguments overlap, and so do aspects of the court's analysis. The court nonetheless followed Defendants' lead and parsed them accordingly.

### a. Knowing Coercion

Defendants argue that a reasonable jury could not conclude that Defendants knowingly coerced Brown's confession. Most forcefully, they argue that no evidence supports that they "acted with knowledge or any awareness that their conduct was unconstitutional." [*Id.* at 26.]

To prove a Fifth Amendment coerced confession claim, a plaintiff must show that (1) his confession was improperly coerced and (2) it was used against him in a criminal case. *Chavez v. Martinez*, 538 U.S. 760, 770–71 (2003). "A confession is voluntary if 'it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *Hicks v. Hepp*, 871 F.3d 513, 527 (7th Cir. 2017) (quoting *United States v. Vallar*, 635 F.3d 271, 282 (7th Cir. 2011)). To determine if a confession is voluntary or coerced, courts analyze the totality of circumstances surrounding the confession "from the perspective of a reasonable person in the suspect's position." *Id.* Relevant factors include "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Id.* (quoting *United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015)).

Absent from the analysis is anything relating to 'knowledge,' which is less an element of coercion than it is relevant to § 1983 claims generally. *See Trexler*, 716 F. Supp. 3d at 671 (citing *Kuhn v. Goodlow*, 678 F.3d 552, 556 and *Childress v. Walker*, 787 F.3d 433, 439-40 (7th Cir. 2015)). The Seventh Circuit's § 1983 case law does not frame knowledge as requiring awareness of unconstitutionality, as Defendants suggest. Rather, it is discussed most explicitly in the context of supervisors and others who *fail* to act, *i.e.* those who don't directly "participate in the offending act." *Childress*, 787 F.3d at 439–40. In these cases, "[l]iability can also attach if the conduct causing the constitutional deprivation occurs at [one's] direction or with [one's] knowledge or consent." *Id.* at 440 (collecting cases) (internal quotations omitted). *See also Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) ("official 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.'" (quoting *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)).

Knowledge, then, concerns not the legal effect of the conduct, but the conduct itself. This is consistent with the court's jury instruction, which defines knowledge as "realizing what one is doing and being aware of the nature of one's conduct; not acting through ignorance, mistake, or accident." [Dkt. 441 at 23.] A reasonable jury could certainly find that Defendants knowingly engaged in the tactics in question.

Separately, Defendants argue that—knowledge notwithstanding—Brown failed to prove they "engaged in tactics that overcame Plaintiff's free will." [Dkt. 494

at 26.] At trial, both parties put on evidence that supported and cut against a finding of coercion. But on a Rule 50(b) motion, the court cannot weigh the evidence or make credibility determinations—it must view the evidence in Brown's favor. On that score, more than enough evidence supports the verdict.

For example, Brown presented expert testimony explaining how various factors such as youth, physical isolation, sleep and food deprivation, and discomfort can elicit involuntary confessions. [Tr. 1823:14–1831:18.] Many of these factors were shown to be present in this case. Although Brown was legally an adult at the time of the interrogation, he was only eighteen and had just graduated high school. [Tr. 1466:21.] He was held in physical isolation for over 30 hours with little and often interrupted sleep and no communication with the outside world. [Tr. 1466:15–25.] He also didn't receive a full meal until the second day of his interrogation. [Tr. 874:04–09]. Even though he was only actively questioned for about five hours, [Tr. 1087:03–05], the total length of his detention was still relevant. *See Janusiak v. Cooper*, 2019 WL 78953, at *4 (E.D. Wis. Jan. 2, 2019), *aff'd*, 937 F.3d 880 (7th Cir. 2019) ("Interrogation tactics short of physical force can amount to coercion . . . . Such tactics include long interrogation sessions or prolonged detention paired with repeated but relatively short questioning.")

The interrogation video also showed Defendants repeatedly question Brown, reject his proclamations of innocence, and suggest to him alternative and incriminating versions of what happened. [*See, e.g.,* Tr. 346:06–349:15]. These, too, were discussed in expert testimony as risk factors for false confessions. [Tr. 1831:21–1834:09.] Brown's story slowly evolved over time, eventually coming to adopt statements that were first suggested by detectives who interrogated him. [*See, e.g.,* Tr. 349:14–17.] He also stated explicitly that he thought Defendants wanted him to admit to the crime. [*See, e.g.,* Tr. 346:17–25.]

Viewing the evidence in Brown's favor, as the court must in ruling on a Rule 50(b) motion, there was a legally sufficient basis to find that physical exhaustion and psychological pressure induced by Defendants' knowing conduct, combined with Brown's young age and relative inexperience, were enough to render his confession involuntary.

### b.    Personal Involvement

Defendants also contend that Brown failed to prove they were personally involved in coercing his confession. To be personally involved, an official may participate directly in the injury or "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Knight*, 590 F.3d at 463 (cleaned up) (quoting *Johnson*, 444 F.3d at 583); *Childress*, 787 F.3d at 440. Defendants argue that police cannot be held liable for a prosecutor's decision to introduce (or defense counsel's decision not to challenge) a coerced confession. [Dkt. 459 at 19.] They also reason that

because Spizzirri ultimately elicited the confession, the detectives cannot be personally responsible for prior acts. [*Id.* at 20.]

Their most persuasive argument is that the case is analogous to *Blackmon v. Jones*, which held recently that plaintiffs cannot pursue § 1983 actions against police for arranging suggestive photo arrays. 132 F.4th 522, 525 (7th Cir. 2025), reh'g denied, 2025 WL 1154854 (7th Cir. Apr. 18, 2025). *Blackmon*, which relied on the Supreme Court's decision in *Vega v. Tekoe*, reasoned that (1) the constitutional violation was not the identification itself but its use at trial, and (2) prosecutors, not police, introduce such evidence. *Blackmon*, 132 F.4th at 524–25 (relying on *Vega*, 597 U.S. 134 (2022)). *Vega* held similarly in the context of *Miranda* warnings, which the Court observed were merely prophylactic protections, not Fifth Amendment rights. *Vega*, 597 U.S. at 142. Thus, "a violation of Miranda does not necessarily constitute a violation of the Constitution, and therefore such a violation does not constitute 'the deprivation of [a] right . . . secured by the Constitution.'" *Id.* at 150 (citing § 1983).

This court understands the apparent application. Coercion is suited to a similar analysis. In *Chavez v. Martinez,* a Supreme Court plurality held that "mere coercion does not violate the text of the Self–Incrimination Clause absent use of the compelled statements in a criminal case against the witness." 538 U.S. 760, 769 (2003). And the Seventh Circuit agreed: "a claim for violation of the Fifth Amendment right against compulsory self-incrimination is complete and accrues when an accused's unlawfully obtained inculpatory statement—whether coerced or obtained without *Miranda* warnings—is introduced as evidence at trial to convict him of a criminal offense." *Johnson v. Winstead*, 900 F.3d 428, 434 (7th Cir. 2018). Mapped onto *Blackmon,* Brown would be unable to pursue his § 1983 claim because (1) police don't necessarily "violate a suspect's constitutional rights" by coercing a confession,[13] and (2) they are not responsible for "introducing into evidence the results." *Blackmon*, 132 F.4th at 524–25.

Defendants' problem, however, is that it is not clear whether the Seventh Circuit intended for *Blackmon* to displace prior decisions, which permit similarly situated plaintiffs to pursue such claims. *See Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1027 (7th Cir. 2006) ("use of [] confession … allows a suit for damages [against police] under § 1983"); *Hurt*, 880 F.3d at 846, *abrogated on other grounds by Lewis*, 914 F.3d 472. Circuit Rule 40(e) prevents a panel from overruling a prior decision without first circulating a decision among active members. *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002).

---

[13]     "*Chavez* left open the possibility" of a distinct coercion violation "'depend[ing] not on its Fifth Amendment feature but upon the particular charge of outrageous conduct by the police. … That claim, however, if it is to be recognized as a constitutional one that may be raised in an action under § 1983, must sound in substantive due process.'" *Sornberger*, 434 F.3d at 1024 n.11 (citing *Chavez*, 538 U.S. at 779–80).

*Vega*, the basis for *Blackmon*, specifically observed that any application of prophylactic rules requires a cost-benefit analysis, and that "[a]lowing the victim of a *Miranda* violation to sue a police officer for damages under § 1983 would have little additional deterrent value, and permitting such claims would cause many problems." *Vega*, 597 U.S. at 151. A cost-benefit analysis could well conclude that coercion demands different treatment than photo arrays (or *Miranda* warnings). Indeed, the harm—beyond that associated with the use of coerced confessions at trial—is so significant that the Fourteenth Amendment may provide a discrete remedy. *See* Footnote 13, *supra*. There may be separate deterrent value in ensuring police coercion does not rise to that level. Until the appellate court explicitly overrules itself, then, this court remains bound by precedents that permit such claims.

If § 1983 claims are available against those responsible for coercing confessions, which *Sornberger* and *Hurt* suggest is true, then 'personal responsibility' contemplates an "affirmative link" to the coercion itself. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017). *See also Coleman v. City of Chicago*, 2025 WL 2410325, at *38–39 (N.D. Ill. Aug. 20, 2025) (describing how coercive interrogation tactics can render police personally involved in coerced confession). It is thus not dispositive that Defendants didn't themselves elicit the confession or otherwise introduce (or acquiesce to) it at trial. This pinhole view of the process ignores evidence from which the jury could reasonably conclude that Defendants were personally responsible for creating a coercive interrogation setting, such as depriving Brown of food and sleep, isolating him in a single room and denying him a phone call, and using interrogation tactics designed to elicit an incriminating statement. This is sufficient to affirmatively link them to Brown's coercion claim.

### c. Causation

Defendants next argue that, regardless of their involvement, the actions of prosecutors and defense counsel were superseding causes, sufficient to break the chain of causation. Courts assess causation in § 1983 cases using "general principles of causation from tort law." *Hunter v. Mueske*, 73 F.4th 561, 567–68 (7th Cir. 2023) (citing *Whitlock*, 682 F.3d at 582–83). A plaintiff must therefore show that the alleged tortious act is both (1) a but-for cause, and (2) a proximate cause of the injury. *Id.* at 568. Questions relating to superseding causes implicate the latter.

Proximate cause exists when "the [plaintiff's] injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.* (alteration in original) (quoting *United States v. Luce*, 873 F.3d 999, 1012 (7th Cir. 2017)). The concept of proximate causation recognizes that "[i]njuries have countless causes, and not all should give rise to legal liability." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011). Consequently, proximate cause limits liability to injuries that are reasonably related to a defendant's wrongful act. "The greater the separation between

the conduct and the injury, the less likely that proximate causation can bridge the gap." *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d 838, 853 (N.D. Ill. 2022). A wrongful act need not be the only proximate cause, nor the nearest in space or time to the plaintiff's harm—it simply must create a reasonably foreseeable injury. *Whitlock*, 682 F.3d at 583.

Superseding (or intervening) causes break the chain of causation. These occur when "something culpable [] intervenes . . . some action of a third party that makes the plaintiff's injury an unforeseeable consequence of the defendant's [wrongful act]." *Id.* at 584 (quoting *Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 621 (7th Cir. 2002)). While a plaintiff bears the burden of proving causation, the burden of proving a superseding cause is on the defendant. *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 757 (7th Cir. 2011). This means that a plaintiff need not "prove a series of negatives" that "positively excludes every other possible cause" of the injury, but a defendant may rebut evidence of causation with evidence of a specific superseding cause. *Id.*

Defendants contend that "fully informed prosecutors' conduct acts as a superseding cause." [Dkt. 507 at 18.] The law supports that proposition. *See Whitlock*, 682 F.3d at 583 ("causal link between a police officer's fabrication and the victim's injury may be broken if that police officer tells a prosecuting attorney before trial about the fabrication"); *Buckley v. Fitzsimmons*, 20 F.3d 789, 796–97 (7th Cir. 1994) ("police who bilked the prosecutor were liable for the injury their deceit caused. Things would be different … if the prosecutors had known the truth and proceeded anyway"); *Washington v. City of Chicago*, 98 F.4th 860, 874 (7th Cir. 2024) ("independent fact-gathering by the State's Attorney's Office, leading to an independent decision to prosecute plaintiffs, rendered superfluous any lies, misleading statements, or omissions by defendants").

They also contend that the evidence "demonstrates that the prosecutors were *fully aware* of the conditions, tactics, setting, and circumstances surrounding the interviews." [Dkt. 459 at 23] (emphasis added). That "prosecutors involved in this case *unquestionably knew* the truth and proceeded anyway, which broke the causal link between the Detectives' actions and Plaintiff's injuries." [*Id.* at 24] (cleaned up) (emphasis added).[14] That based on the log-and-burn process, in which the ASAs reviewed and summarized portions of the interrogation, someone "would have done something had they believed there was misconduct in the interrogation." [*Id.* at 12]. This includes Spizzirri, who they argue "had *all* relevant information concerning the interrogation" prior to eliciting the confession. [*Id.* at 24 (emphasis added)].

But a reasonable jury could disagree with that characterization. Sufficient evidence was presented at trial to permit different conclusions—that neither Spizzirri

---

[14]    Similarly, a jury has no way of knowing what Brown's defense attorney at trial knew or relied on in his representation.

nor the other prosecutors were fully and unquestionably aware of the relevant circumstances, and that the information-gathering process was neither independent nor untainted.

Spizzirri's testimony revealed gaps in her, and the other ASA's, awareness—gaps that a jury could reasonably find precluded an informed, and thus superseding, decision. She "thought [Brown] did sleep for a number of hours," and confirmed that, if she had learned he had been up all night, it may have affected her analysis. [Tr. 1619:05–20]. Brown, meanwhile, testified that he never slept for more than an hour. [Tr. 282:10–12]. She said she didn't believe, but did not know with certainty, that he was allowed a phone call [Tr. 1477:15–23]. Similarly, she said she "*may* have known" he had only eaten one meal, and that it's "*probably*" something she "would have looked at before" going in—but, again, not unquestionable certainty. [Tr. 1466:12–14 (emphasis added)].

And she definitely didn't know that Brown's mother had hired an attorney, or else she might not have taken his statement. [Tr. 1476:17–1477:14]. ("Q. You wouldn't have proceeded to take a statement of Marcel if you knew there was an attorney trying to see him that the police blocked? A. No. That would have been a concern of mine."). A reasonable jury might infer that a prosecutor left entirely in the dark in one respect—and who cannot say for certain whether she was in the know in others—was insufficiently informed across the board.

In fact, Spizzirri herself suggested that the log-and-burn process is at least somewhat uncomprehensive, involving summaries and person-to-person tendencies. [Tr. 1581:02–12]. She made clear that her preparation did *not* involve watching a full video, but rather involved "watching the portions that [she] was logging and burning," and "look[ing] at the logs and burns from the previous ASA … and [speaking] to the detective before [she] went in." [Tr. 1483:14–1484:16]. She later confirmed that speaking to detectives is necessary to "complement [her] knowledge before [she goes] in and start[s] to question a suspect." [Tr. 1581:02–19].

A jury could well be skeptical of this piecemeal approach. And any mistrust of the detectives' ability to accurately fill the gaps is also reasonable, given that (1) Spizzirri was unaware that an attorney was trying to access Brown, and (2) Mancuso's summary of the interrogation was itself less-than-comprehensive. Therefore, a jury could reasonably doubt whether Spizzirri was even *capable* of knowing the full circumstances due to police involvement. At minimum, it confirms that her information-gathering process—unlike the fact-gathering in *Washington*—was not wholly independent.

The same goes for the prosecutors' decision to charge Brown and use his confession in pretrial and trial proceedings. The fragmented log-and-burn process could well prevent any single member of the team from knowing the complete picture.

And Mancuso testified that he knew prosecutors would rely on his police report in deciding whether to pursue the conviction. [Tr. 936:12–20]. So, the jury was entitled to believe Brown's argument that the "police report got him held at the bond hearing, and it got him convicted of murder." [Tr. 2343:12–14]. If true, this could cast doubt on the independence of the prosecutors' decisions and the extent to which they were fully informed.

Because coercion concerns the totality of circumstances—any one of which could tip the scales from the jury's perspective—ambiguities relating to *how much* any single downstream decisionmaker knew are highly relevant. This is especially true given that, on the issue of superseding causes, defendants bear the burden of proof. *BCS Servs., Inc.*, 637 F.3d at 757.

And again, the standard defendants must meet to merit judgment as a matter of law is "formidable." *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 623 (N.D. Ill. 2019) (quoting *Florez v. Delbovo*, 939 F. Supp. 1341, 1342 (N.D. Ill. 1996)). The court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Robinson v. Perales*, 894 F.3d 818, 833 (7th Cir. 2018). It must also "'disregard all evidence favorable' to the movant that 'the jury is not required to believe.' *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150–51, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000)).

Therefore, lingering questions as to what any potential superseding actor knew—and how they may have known it—would permit a reasonable jury to reach the conclusion it did.

### 3.    Underlying Acts Not Unconstitutional

Defendants argue that conduct Brown claims violated his constitutional rights was not illegal and so cannot support a coerced confession claim. These acts include: (1) improper questioning techniques; (2) refusing Brown a phone call; (3) failing to inform Brown that an attorney was there to see him (where Brown did not request one); and (4) detaining Brown for over 30 hours. [Dkt. 459 at 27.]

The first flaw in Defendants' argument is that an act need not be illegal in a vacuum to contribute to unconstitutional coercion. *See, e.g., Aleman v. Vill. of Hanover Park*, 662 F.3d 897, 906 (7th Cir. 2011) ("[T]he law permits the police to pressure and cajole, conceal material facts, and actively mislead—all up to [a] limit[]") (quoting *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990)). The second and third are that circumstances are considered in their totality, rather than independently, and that the ultimate question is their effect on the suspect. *See Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018).

28

Moreover, Brown's coerced confession claim was only partially based on the acts listed above. As argued extensively at trial, many factors contribute to the voluntariness of a confession including age, the length of an interrogation, food or sleep deprivation, physical isolation, and interrogation tactics. [*See* Dkt. 494 at 17–22.] In a totality-of-circumstances test, all factors are considered together. *Dassey v. Dittmann,* 877 F.3d 297, 303, 314 (7th Cir. 2017); *see also United States v. Huerta,* 239 F.3d 865, 871 (7th Cir. 2001) (listing as relevant factors "age, education, intelligence level, and mental state; the length of the . . . detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep"). Brown put on more than enough evidence for a reasonable jury to conclude that Defendants' actions prompted an involuntary confession. *See supra*, Part III.B.2.a.

### 4.    Damages for Pretrial Detention

Defendants revive their challenge to Brown's ability to win pretrial detention damages on his Fifth Amendment coerced confession claim. [Dkt. 459 at 35.] The government used Brown's confession during his bond and grand jury hearings. [Dkt. 494 at 59.] Defendants argue that Brown is nevertheless not entitled to damages for his pretrial detention under the Fifth Amendment because there was probable cause to arrest him. [Dkt. 459 at 35; *see Brown*, 709 F. Supp. 3d at 569–73 (awarding summary judgment on malicious prosecution claim because there was probable cause to arrest Brown).

The court already rejected this position in ruling on Defendants' motion *in limine. See Brown v. City of Chicago*, 2024 WL 5438519, at *11–13 (N.D. Ill. July 30, 2024). In the Seventh Circuit, a plaintiff may recover damages for any injury caused by a Fifth Amendment coerced confession violation. *Id.* at *12 (citing *Jackson*, 888 F.3d at 265).

The court further held that the existence of probable cause doesn't preclude pretrial detention damages if the coerced confession was material to the pretrial proceeding in which it was used. *Id.* at *12 ("[T]he existence of probable cause—meaning Plaintiff *could have been* detained without the confession—does not mean that a jury could not find that Plaintiff *would have been* detained without the confession"). The court reemphasized this point in denying Defendants' motion to reconsider: "[A] jury could conclude a plaintiff was detained because of a confession notwithstanding the existence of probable cause without the confession." *Brown v. City of Chicago*, 2024 WL 5438523, at *3 (N.D. Ill. Aug. 22, 2024). As an example, the court suggested that "if a judge at a bond hearing spent several minutes discussing a (coerced) confession and its impact on his decision to order detention, [] a reasonable jury [could] nonetheless conclude the confession caused the detention, regardless of whether probable cause existed independently." *Id.* The court stands by these conclusions.

At trial, the jury heard sufficient evidence to conclude that Brown's confession was material to the bond and grand jury determinations. Brown testified that the police report summarizing his confession was read at his bond hearing and that he was ultimately held in detention. [Tr. 376:04–13.] There was no evidence that any other evidence was presented at the bond hearing.

Mancuso, meanwhile, stated that he testified as to the same police report before the grand jury. [Tr. 930:18–932:03.] Defendants argue that this evidence is insufficient for a jury to find that Brown's confession influenced the outcome of the bond hearing or grand jury. The court disagrees. A jury could conclude that the report summarizing Brown's confession, which plainly concludes that he knew RJ had a gun and intended to shoot someone in the park, was influential during these pretrial proceedings. It would be surprising indeed if it was not. Brown didn't need to present more for a preponderance of the evidence standard, and Defendants failed to present any evidence to the contrary.

The motion for JMOL is therefore denied on this basis, too.

## IV.  Motion for a New Trial

Defendants filed a joint motion for a new trial under Rule 59 alongside their Rule 50(b) motion. Because the court granted judgment as a matter of law on Brown's Fourteenth Amendment fabrication claim, it must first conditionally rule on the motion for a new trial should that ruling be reversed or vacated. Fed. R. Civ. P. 50(c)(1). A court may also grant a new trial on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).

Among these reasons, a party is entitled to a new trial if the jury's verdict is "against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Lewis v. McLean*, 941 F.3d 886, 891 (7th Cir. 2019) (quoting *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018)). In determining whether to grant a new trial, a court must perform "its own assessment of the evidence presented," and view that evidence "neutrally." *Id.* (quoting *Mejia v. Cook County*, 650 F.3d 631, 634 (7th Cir. 2011)). "A new trial should be granted, however, 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (quoting *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011)).

But there is a wrinkle. The court denies judgment as a matter of law on Brown's Fifth Amendment claim, yet the jury returned a single damages verdict on both claims. Though compensatory damages—which flow from Brown's injuries and

loss of liberty—are unaffected by any § 1983 redundancy,[15] the punitive damages calculation could well be skewed by the jury's fabrication verdict. For this reason, Defendants are, at minimum, entitled to a new trial on punitive damages.[16] *See Jamsports & Ent., LLC v. Paradama Prods., Inc.*, 382 F. Supp. 2d 1056, 1067 (N.D. Ill. 2005).

The open question is whether Defendants are also entitled to a new trial on liability for the Fifth Amendment claim. Finding that Defendants are not entitled to a wholly new trial, the court grants it as to punitive damages only and conditionally grants it in full on the Fourteenth Amendment claim.

## A. Insufficient Evidence of Fabrication

Should the court's grant of judgment as a matter of law on Brown's fabrication claim be vacated or reversed, the court finds that a new trial is warranted because the verdict on this claim was against the manifest weight of the evidence.

As discussed in ruling on Defendants' Rule 50(b) motion, Brown failed to prove that Mancuso's police report inaccurately summarized any of Brown's incriminating statements, or that he or any other Defendant was aware that those statements were false. See *supra* Part III.B.1. This was so viewing the evidence in Brown's favor. In ruling on a motion for a new trial, the court instead weighs the evidence itself and arrives at the same conclusion. *Lewis*, 941 F.3d at 891. Consequently, the court conditionally grants a motion for a new trial on Brown's fabrication claim.

The remaining sections in Part IV assess whether Defendants are entitled to a new trial on Brown's Fifth Amendment coerced confession claim.

## B. Unfairly Prejudicial Evidence

Defendants argue that the court erred in admitting evidence relating to (1) Wham Cary, (2) the denial of a phone call, (3) postconviction proceedings, and (4) prior CPD lawsuits. When evidence is improperly admitted, "a court should grant a new trial only in 'extraordinary situations' where the 'the improperly admitted evidence had a substantial influence over the jury, and the result reached was inconsistent with substantial justice.'" *Payne v. Maher*, 2015 WL 4483954, at *1 (N.D.

---

[15] *See Restivo v. Hessemann*, 846 F.3d 547, 572 n.22 (2d Cir. 2017) (observing that § 1983 claims for malicious prosecution and denial of fair trial were each independently sufficient to sustain the jury's damages award "because there was a single injury: the wrongful imprisonment."). Defendants raise this exact argument in moving for a setoff. [Dkt. 460 at 12.]

[16] Defendants occasionally argue that court errors involving officer misconduct inflamed the jury award. [Dkt. 467 at 13, 40.] Because Defendants are entitled to a new trial on punitive damages, these arguments are moot. *See Smith v. City of Chicago*, 2025 WL 1744919, at *22 (N.D. Ill. June 24, 2025) (tying officer misconduct to punitive damages).

Ill. July 22, 2015) (quoting *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002)). Put another way, "there must be a 'significant chance . . . that [the error] affected the outcome of the trial.'" *United States v. Morales*, 2023 WL 7049879, at *6 (N.D. Ill. Oct. 26, 2023) (quoting *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1048 (7th Cir. 2000)).

### 1. Wham Cary

Brown presented evidence that his mother hired an attorney, Wham Cary, who Detectives prevented from seeing Brown. Defendants contend that this evidence should have been excluded, and that it unfairly prejudiced the jury. [Dkt. 467 at 7.] Though the court recognizes that such evidence should not have been admitted without a clear limiting instruction, it is not persuaded that any error prejudiced Defendants.

Defendants moved before trial to exclude evidence relating to Cary, arguing it was irrelevant and, even if relevant, otherwise impermissible under the Federal Rules of Evidence. [Dkt. 333 at 25 ("probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, or wasting time") (citing F.R.E. 403).] The court disagreed, ruling that Brown could present such evidence because denying Brown access to his attorney could be probative of Defendants' state of mind, and because "the absence of an attorney is also relevant to the totality of the circumstance." *Brown*, 2024 WL 5438519, at *8. It continues to appreciate the relevance of a suspect's "access to counsel" on the voluntariness of his confession, *see Holland v. McGinnis*, 963 F.2d 1044, 1050 (1992) (quoting *Darwin v. Connecticut*, 391 U.S. 346, 348–49), as well as the relevance of an officer's state of mind to a jury tasked with deciding questions of knowledge, intent, and deceit.[17]

Even so, the court sought to cabin Brown's use of the evidence in two ways. Most explicitly, it instructed him that, to avoid confusing the jury of the issues, he "may not argue that [the denial of an attorney] violated Illinois law." *Brown*, 2024 WL 5438519, at *8. The order also carefully noted that it was Cary's *absence* that was relevant to the totality of circumstances, "since Plaintiff was unaware that Cary was available, [and thus] from his point of view during the interrogation he was not *denied* an attorney." *Id.* at *8 n.7 (emphasis in original). *See also Moran v. Burbine*, 475 U.S. 412, 427 (1986) ("Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right."); *Hicks*, 871 F.3d at 527 ("We evaluate coercion from the perspective of a reasonable person in the suspect's position.") The corresponding jury instruction pressed the *absence*-versus-*denial* distinction, asking

---

[17]     *See supra* Part III.B.1 (knowing fabrication); Part III.B.2.c (discussing the relevance of concealment to causation).

"[w]hether Plaintiff had the ability to communicate with others, including an attorney, during his custody." [Dkt. 441 at 24.]

Brown's attorney ignored this distinction throughout trial, which Defendants predicted. [Dkt. 333 at 27.] He argued, again and again, that the denial of an attorney was an independent factor bearing on the totality of circumstances. He stated in opening that "Brown was denied an attorney, and he was denied an attorney on purpose. That is going to go to the totality of the circumstances." [Tr. 21:10–12.] When questioning an expert on false confessions, Brown asked "about denial of access to a lawyer[.] Does that contribute to isolation *and also* constitute a risk factor for false confession?" [Tr. 1829:01–03 (emphasis added)]. And in closing, he listed the factors contributing to the totality of circumstances, "start[ing] with the fact that they denied him a lawyer." [Tr. 2324:12–16.] He argued that, while defendants "say[] that is not independently a constitutional violation. In conjunction with all factors, it can be." [Tr. 2446:04–05.] This misstates the law.

Having now seen how Brown used evidence relating to Cary, it is clear that, at minimum, the court should have given a limiting instruction if it was to admit the evidence at all. The parties never disputed that Brown was incommunicado, and any state-of-mind relevance was derivative. The limited relevance was substantially outweighed by the potential for prejudice or confusion, given the time spent on the issue at trial.

But hindsight also provides the benefit of seeing how this evidence fit, more broadly, into Brown's case. And on balance, the court disagrees that there's a significant chance the error affected the outcome. Brown presented evidence of numerous factors that *did* bear on the totality of circumstances. *See supra* Part III.B.2.a. Considerable time was spent with Mancuso, Spizzirri, and expert witnesses discussing Brown's age, the length and conditions of his interrogation, any deprivation of sleep and food, and the nature of the questioning. The denial of an attorney—assuming the jury even considered it in that context, given the more apt framing in the jury instruction—was but one factor of many to be considered in their totality. "Wholly apart from" the denial, "there was sufficient evidence from which a rational jury could have concluded that" Defendants coerced Brown's confession. *David v. Caterpillar, Inc.*, 324 F.3d 851, 864 (7th Cir. 2003) (affirming denial of new trial "[e]ven if the district court erred in admitting" evidence).

Defendants also object to "Plaintiff's counsel's continuous insistence that Plaintiff's 'right' [to an attorney] was violated." It is thus worth considering whether this framing posed any prejudicial harms, beyond that relating to the totality analysis. Defendants identify two: that the jury was under the impression that this violation was "the but for cause of Brown being questioned at all, making Plaintiff appear more isolated and vulnerable," and that it was under the impression that

"Defendants [already] violated law enshrined in the U.S. Constitution." [*Id.* at 13–14.]

The first concern can't be squared with the fact that they don't dispute Brown's lack of contact with an attorney. Revisiting the *absence*-versus-*denial* distinction, it's the former that contributed to any depiction of Brown as "isolated and vulnerable." Whether or not an attorney was denied access behind the scenes has no bearing, as Defendants themselves argue, on Brown's interrogation-room reality.

Meanwhile, Defendants cannot persuasively argue that the jury was swayed by a mere *impression* that they had violated the U.S. Constitution when they *explicitly* told the jury otherwise. [Tr. 2411:03–18; 2415:04.] More to the point, Defendants themselves said at opening that Brown's conviction was overturned "for reasons unrelated to this case." [Tr. 76:09–10.] This, too, toed the line of permissibility, curbing the effect of any offsetting mention of Brown's violated rights. [*See* Tr. 87:04–88:23; 170:04–172:06.] As a result, there is no "significant chance" this "affected the outcome of the trial." *Morales,* 2023 WL 7049879, at *6 (internal quotations omitted).

In sum, because the evidence did not have a "substantial influence over the jury," such that the "result reached was inconsistent with substantial justice," any error in admitting it does not provide grounds for a new trial. *Shick,* 307 F.3d at 611 (internal quotations omitted).

## 2.    Phone Call

Defendants similarly challenge the decision to "allow evidence and argument regarding the 'right' to a phone call." [Dkt. 467 at 14.] But evidence relating to the officers' denial of a phone call—over Brown's repeated requests—was relevant to the totality of circumstances. And any reference to 'rights' was not prejudicial, given the lack of genuine harm.

Defendants' arguments here are similar to those relating to Wham Cary. But unlike an attorney, Brown explicitly asked to call his mother multiple times. [Tr. 828:02–08.] Thus, there is no *access*-versus-*denial* distinction here; Brown was acutely aware that officers were not, at least for a time, permitting him to contact his mother. Tactics that induce a "sense of isolation or hopelessness" can, coupled with other factors, "interfer[e] with the capacity for rational choice." *Weidner v. Thieret*, 866 F.2d 958, 964, 959 (7th Cir. 1989) (noting that defendant testified that officers refused to let him call his parents). The court did not err by allowing the jury to consider the effect of Brown's denied requests.

To the extent that Defendants take issue with "the impression that … [this] was a violation of *his right*," the court fails to see how such framing could have substantially influenced the jury. [Dkt. 467 at 15 (emphasis added).] Defendants are

mistaken if they believe that the legality of police actions alters the totality-of-circumstances analysis. *See supra* Part III.B.3. And if they are primarily concerned that mention of "rights" made Defendants appear more capable of committing other constitutional violations, they—as they did with mention of Brown's 'right to an attorney'—made crystal clear to the jury that denying Brown a phone call *did not* violate his rights. [Tr. 2410:20–2411:02 ("And here again, even if you think that Brown should have been -- should have been able to use a phone call or should have been able to make a phone call when he requested it, that is not a violation of his U.S. Constitutional rights. And if it was, they would have told you about it.").]

Accordingly, evidence relating to the phone call was relevant. And if Brown went too far in framing it as a denial of his rights, any harm is too insignificant to warrant a new trial.

### 3. Postconviction Proceedings

Defendants also argue that the evidence related to Brown's postconviction proceedings was unfairly prejudicial. In its order on motions *in limine*, the court directed counsel not to "elicit testimony that gets into the substance of the evidence and findings in trial or postconviction proceedings, which are inadmissible hearsay and excludable under Rule 403." *Brown*, 2024 WL 5438519, at *14. Brown's first witness, Gregory Swygert (Brown's post-conviction counsel), stepped over this line when he testified that Brown's conviction was overturned "because a constitutional violation was found." [Tr. 109:23-110:4.] Defendants now argue that this prejudiced their case.

But even before Swygert took the witness stand, Defense counsel made a similar error when, in opening argument, they improperly commented that Brown's conviction was overturned "for reasons that are unrelated to this case." [Tr. 76:09–10.] Due to these mutual and opposing errors, the parties agreed to be careful to avoid the issue going forward and potentially craft a jury instruction addressing the issue. [Tr. 170:04–172:24.] Given that the parties made (minor) errors on both sides, the court does not find Swygert's comment unfairly prejudicial.

To the extent that Defendants argue the court should have given an instruction, they forfeited this argument when they failed to craft an instruction, request an instruction, or object to the absence of an instruction during the trial. *See also United States v. Resnick*, 823 F.3d 888, 895–96 (7th Cir. 2016) ("no rule requiring the court to give even an unsolicited limiting instruction when potentially prejudicial testimony is offered" for post-forfeiture plain-error review purposes).

### 4. Prior CPD Lawsuits

Finally, Defendants claim that evidence about prior lawsuits against CPD prejudiced their case because such testimony can be highly inflammatory. [Dkt. 467

at 35 (citing *Saunders v. City of Chicago*, 320 F. Supp. 2d 735, 740 (N.D. Ill. 2004)). Two witnesses are relevant here, and neither made statements that constitute the kind of prejudice needed to grant a new trial. Brown questioned his forensic expert, Dr. Arden, on re-direct about his work with the firm, which included "allegations against the Chicago -- . . . ." [Tr. 184:05–15.] Defendants interjected and the court cut off the questioning before it could go further. Consequently, Arden's testimony did not prejudice Defendants' case. [Tr. 184:16–185:22.]

Plaintiff's counsel also arguably elicited improper testimony from Welner, Defendants' forensic expert. In attempting to demonstrate Welner's bias in cases against CPD, Plaintiff's counsel mentioned that Welner earned significant money "in cases where Chicago police officers were accused of false confessions." [Tr. 2028:06–08.] Brown then referenced a specific case against CPD involving Daniel Taylor. [Tr. 2028:24–25.] Over Defendants' objection, the court gave Plaintiff's counsel a "little bit of latitude" to proceed with that line of questioning. [Tr. 2029:01–15.] Counsel implied that Taylor had confessed to a crime that he couldn't have committed because he was in jail at the time. [Tr. 2029:17–18.]

The court afforded Brown a bit of room to develop his point because it was also relevant to Welner's own biases. But Defendants are correct that testimony about prior unrelated cases about CPD runs the risk of biasing the jury against police. However, Welner forcefully argued that Brown had mischaracterized the Taylor case and explained that it was disputed whether Taylor was in jail when the crime was committed. [Tr. 2030:11–2031:03.] And after this colloquy, the court refused to allow Brown to mention any other cases. [Tr. 201:09–14.] On balance, the court doesn't find this single reference to a prior CPD case so prejudicial that it affected the trial outcome.

## C.     Insufficient and Improper Jury Instructions

The parties proposed competing jury instructions. Now, Defendants argue that the court improperly rejected certain instructions and issued other inaccurate instructions that prejudiced their case. "To win a new trial based on an incorrect jury instruction, [the movant] 'must show both that (1) the instruction inadequately states [the applicable] law; and (2) the error likely confused or misled the jury causing prejudice to the [movant].'" *Kuberski v. Rev Recreation Grp., Inc.*, 5 F.4th 775, 779 (7th Cir. 2021) (quoting *Gile v. United Airlines, Inc.*, 213 F.3d 365, 374–75 (7th Cir. 2000)).

### 1.     Proposed Instruction 43

Defendants challenge the omission of Proposed Instruction 43 (Length of Interrogation). The instruction read:

Once there is probable cause that an individual may have committed a crime, it is presumptively reasonable under the Constitution for a police officer to detain an individual and investigate that crime for up to 48-hours before a judge must make a determination as to whether the individual may be detained further. Detention of a suspect within this time frame is not, by itself, inherently coercive.

[Dkt. 348-9 at 71.] The court refused to give this instruction and included length of interrogation as a factor to consider for coercion. [*Id.* at 23.] It stands by that conclusion. As it explained, "[s]pecific methods of interrogation are not in and of themselves prohibited unless, if taken together with the totality of circumstances, they result in overcoming a person's free will and ability to make a rational choice." [*Id.*] The same is true of the length of an interrogation. Even if detention is presumptively reasonable for 48 hours, the length, combined with other factors that exert physical or psychological pressure, could overcome a person's free will and elicit a coerced confession. Put another way, the totality-of-circumstances test approaches length of interrogation differently than the Fourth Amendment approaches length of detention. Defendants cite cases only involving the latter. *See Lopez v. City of Chicago*, 464 F.3d 711, 721–22 (7th Cir. 2006); *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991).

## 2.   Proposed Instruction 50

Defendants also challenge the omission of Proposed Instruction 50 (Superseding Acts by Prosecutors Preclude Liability). As discussed, superseding causes are relevant to proximate cause, especially in § 1983 cases involving improperly obtained evidence used in a defendant's criminal proceedings. *See supra*, Part III.B.2.c. Defendants proposed, and the court rejected, the following:

To find for the plaintiff on the involuntary coerced confession claim, you must find that the Defendant you are considering deliberately supplied misleading information to the prosecutors and the court regarding the circumstances of the confession.

[Dkt. 348–9 at 83.] The court concedes that the jury's understanding of proximate cause would have been more complete had it instructed them on superseding causes. It is also clear from the evidence that there was a colorable superseding causation argument based on the Cook County SAO's process for reviewing the interrogation. But the court finds no error in omitting Proposed Instruction 50, and even if there were, it would not have affected Defendants' substantial rights.

First, the instruction incorrectly shifts the burden of proof to Brown, requiring him to prove there was no superseding cause. *BCS Servs., Inc.*, 637 F.3d at 757 (holding that defendants bear the burden of proving a superseding cause). It also overstates the law, which is principally concerned with whether a prosecutor's

decision is fully informed. *See Washington*, 98 F.4th at 874. A prosecutor can lack full knowledge without being deliberately misled. Accordingly, the court did not err in failing to give the instruction.

Second, even if the omission was erroneous, it did not seriously prejudice Defendants' case. Defendants still argued their view of causation, *see supra* Part III.A.2.c, which was far from bulletproof based on the evidence presented. *See supra* Part III.B.2.c. And the essence of their superseding cause argument—that other officials were responsible for "conduct that was the actual cause of Plaintiff's damages"—was communicated in the court's instruction on personal involvement. [Dkt. 441 at 30.]

### 3. Instruction 28

Defendants also argue that a minor revision in Instruction 28 (Requirement of Personal Involvement) prejudiced them. [Dkt. 467 at 19.] Their proposed instruction read:

> Plaintiff must prove by a preponderance of the evidence that the particular Defendant you are considering was personally involved in the conduct that Plaintiff complains about. You may not hold any particular Defendant liable for what other persons*, including other Chicago Police Department detectives, officers, or employees*, did or did not do.

[Dkt. 348-9 at 64 (emphasis added).] The final instruction issued was largely the same, except that the court replaced the emphasized text above with "other than the particular, listed individual under consideration." [Dkt. 441 at 30.] In other words, instead of listing specific examples of persons, the final instruction broadened it to anyone except Defendants. The court disagrees that this minor revision, which made the instruction more accurate, could have confused the jury or unfairly affected the outcome of the trial.

The same is true of Defendants' posited Spizzirri-specific addendum to the rule, which they requested in the jury instruction conference:

> "[D]uring the course of trial, you have heard testimony from and concerning ASA Michelle Spizzirri. Ms. Spizzirri is not a party to this lawsuit, and whether Ms. Spizzirri violated plaintiffs' U.S. Constitutional rights is not at issue in this trial. You should not consider Ms. Spizzirri's conduct when deciding whether to find in favor of plaintiff on his claims."

[Tr. 2256:23–2257:15.] Instruction 28, as given, covers Spizzirri, too. The court didn't err in declining to over-instruct on Spizzirri, nor did it prevent Defendants from making the exact argument to the jury. [Tr. 2431:15–2432:01.]

### 4. Instruction 22

Instruction 22 (Claim 1: Coerced Incriminating Statements) provided a non-exhaustive list of factors the jury could consider in evaluating the totality of circumstances. [Dkt. 441 at 24.] Defendants objected to the instruction, arguing it should not have provided the list because each party put on experts who debated the relevant factors. [Tr. 2236:24–2237:05.] By setting out a list, Defendants argue that the instructions favored Brown's expert over theirs. [Dkt. 467 at 22–25.] Defendants also point out that the Seventh Circuit's Pattern Criminal Jury Instructions advise against listing factors to avoid focusing the jury on specific factors to the exclusion of others. [*Id.* at 23 (citing Seventh Cir. Patt. Crim. Jury Instr. § 3.09 cmt.).]

Even if the list of factors was unnecessary, it was not an incorrect statement of law or confusing. Defendants identify three factors that their expert, Dr. Welner, testified are not proven to cause false confessions: age (specifically that an 18-year-old is not more likely to falsely confess than older adults), length of interrogation, and denial of a phone call. The first two factors are indisputably relevant to the voluntariness of a confession. *See Hicks*, 871 F.3d at 527 (listing age and length of detention as factors relevant to coercion). And the court did not specifically instruct on age, but rather "[c]haracteristics of the Plaintiff that were known or should have been known to the individual officers listed above." It also didn't instruct on phone calls—only "[w]hether Plaintiff had the ability to communicate with others, including an attorney, during his custody." [Dkt. 441 at 24.] Prolonged isolation and "denial of access to counsel and to family members can under some circumstances constitute a very real factor when considering coercion." *U.S. ex rel. Conroy v. Pate*, 240 F. Supp. 237, 243 (N.D. Ill. 1965).

The broad relevance of these factors to a totality-of-circumstances analysis does not mean the jury was required to find that each was present in this case. Expert testimony left the parties room to debate the weight the jury should assign them based on the circumstances of the case, e.g., how vulnerability to coercion changes with age, and at what point the length of detention becomes coercive, etc. [*See, e.g.*, Tr. 2047:06–08, 2055:12–16.] Consequently, a jury could understand from the instructions that age is relevant, but, at the same time, believe Defendants' expert that age becomes far less relevant once a person turns eighteen. Similarly, they could understand from the instructions that the length of an interrogation is relevant, but believe that the length of Brown's interrogation was not long enough to be coercive. Or, that isolation is relevant, but the denial of a phone call does not itself alter the analysis.

In short, the court's inclusion of a non-exhaustive list of factors was not contrary to the law, did not render the parties' experts irrelevant, and did not improperly direct the jury to weigh improper factors in its coercion analysis.

### 5.     Probable Cause

Defendants contend that the court erred in not instructing the jury that probable cause existed to arrest Brown. At summary judgment, the court held that there was probable cause when granting summary judgment on Brown's separate malicious prosecution claim. *Brown*, 709 F.Supp.3d at 569–70. It granted Brown's motion *in limine* to bar use of the term "probable cause," because probable cause was not an element of the claims at issue and "inserting this legal issue into the trial" would risk confusing the issues. *Brown*, 2024 WL 5438519, at *7. It nonetheless recognized that the propriety of Brown's arrest might be relevant to the jury's evaluation of whether his rights were violated and its damages calculation. *Id*. At trial, it declined to issue a jury instruction on probable cause but told the parties they had "room to argue what [they'd] like to argue." [Tr. 2276:03–08.] This was the correct decision.

Defendants argue that the lack of a probable cause instruction prejudiced their case in two ways. First, they claim that Brown was allowed to "falsely present the case" as if Brown were targeted for no reason at all and imply that Defendants coerced his confession because they needed it to detain him. [Dkt. 467 at 28.] There were instances at trial when Brown's counsel claimed that police had no evidence to detain him, which contradicts the court's finding of probable cause. [Tr. 2340:15–19, 2344:1.] At the same time, however, Defendants had ample room to present the evidence that supported a finding of probable cause. They were simply prevented from using the term itself. And Defendants did indeed present some of that evidence, e.g., the fact that eyewitnesses claimed to have seen Brown drive RJ to the park and RJ shooting in the park. Defendants could have put additional witnesses on the stand but chose not to. "Put simply, Defendants had every opportunity to negate any suggestion that police targeted Brown for no reason at all.

Second, Defendants argue that the existence of probable cause was relevant to whether the coerced confession caused Brown's pretrial detention. This bears on pretrial damages. As the court explained, a jury could still award damages for pretrial detention based on a Fifth Amendment violation independent of probable cause. *See supra* Part III.B.4. And, again, nothing stopped Defendants from presenting evidence that would keep a jury from finding that something *other* than the confession caused pretrial detention, consistent with the court's damages instruction. [Dkt. 441 at 28 ("You must find that the incriminating statements … were used at a pretrial hearing and caused Plaintiff's pretrial detention.").] Put differently, Defendants could present to the jury all evidence that informed the pretrial detention decision, which—to be sure—long predated this court's legal determination of probable cause. Since the instruction was unnecessary, and because its omission would not—and did not— prejudice Defendants, the court stands by its decision not to explicitly instruct on probable cause.

### D.  Transcripts Not Admitted into Evidence

Defendants also argue that the court erred by not admitting the grand jury hearing transcript into evidence, and that the error prejudiced their substantial rights. [Dkt. 467 at 29–30 (citing *Thomas v. United States*, 41 F.3d 1109, 1119 (7th Cir. 1994)).] As discussed *supra*, Part III.B.4, to prove pretrial damages on the coercion claim, Brown needed to show that his confession was material to the outcome of his bond or grand jury hearing. Defendants argue that the transcript would have affirmatively shown that the police report didn't influence the outcome of the grand jury hearing. [*Id.* at 30.]

The court, however, never affirmatively ruled to exclude the transcripts. Defendants sought to admit them during the trial, but the court stated that it couldn't "make any decisions in this moment" and suggested that agreed-upon summaries— an idea suggested by Defendants—were preferable. [Tr. 1856:02–1857:05.] It deferred "mak[ing] the decisions" until the parties reached an impasse. [Tr. 1857:03–07; 1860:08–09.] There was no further request to admit the transcripts into evidence— only one to file them under seal as part of the record. [Tr. 2461:02–22.] The court did not err, because it never ruled.

Even if the suggestion that the parties instead work toward summaries did constitute a ruling, the court sees no error. Defendants were not prevented from calling the relevant witnesses to testify about their grant jury testimony. Indeed, with Marisol Ocampo, they did. [*See* Tr. 2188:09–11; 2200:13–2201:09.] The court is not persuaded that any refusal to admit the transcripts would have been erroneous, since no testimony contained therein was off limits. [*See* Tr. 930:18–931:09 (overruling hearsay objection to testimony about grand jury statements).] Defendants can't argue their case was so prejudiced by the absence of such testimony when they forwent opportunities to secure it.

### E.  Improper Comments

Finally, Defendants contend that misrepresentations from Plaintiff's counsel constitute prejudicial error. "Parties seeking a new trial based on counsel's improper comments must show that misconduct occurred and that it prejudiced their case." *Magnuson v. Trulite Glass & Aluminum Sols., LLC*, 2025 WL 2556258, at *2 (7th Cir. Sept. 5, 2025) (quoting *Viramontes v. City of Chicago*, 840 F.3d 423, 431 (7th Cir. 2016) (cleaned up).

They first argue that Plaintiff's counsel "misrepresented the circumstances under which two key eyewitnesses in this case—Marisol Ocampo and Eugene Stanciel—provided their statements to police about the Amundsen Park shooting." [Dkt. 467 at 36.] Regardless of whether the remarks are even appropriately labeled misrepresentations, the court disagrees that they prejudiced Defendants. The remarks went to whether Ocampo and Stanciel were disinterested in Brown's

41

criminal trial. This is, at most, tangential to the pretrial damages issue, and in any event was contradicted at trial by Defendants. Particularly in light of explicit jury instructions that attorney questions, opening arguments, and closing arguments are not evidence, the remarks were not sufficiently egregious to require a new trial. [Dkt. 441 at 4.] *See Viramontes*, 840 F.3d at 431 ("longstanding presumption that curative instructions to the jury mitigate harm that may otherwise result from improper comments") (internal quotations omitted).

Defendants also argue that, in closing arguments, Brown's attorney misrepresented the extent of an assault Brown suffered while in prison, which implicates his compensatory damage award. [Dkt. 467 at 39.] They contend that the attorney implied that Brown was the victim of rape, when Brown himself testified to being the victim of *attempted* rape. [*Id.*] The court is not persuaded that, on balance, this remark is among the rare few that warrants relief. *Magnuson*, 2024 WL 1216338, at *16 ("improper comments during closing argument rarely rise to the level of reversible error in the Seventh Circuit"). To the extent the remark was a misrepresentation, it required an inference—and one that was clarified by actual testimony at trial. [*See* Tr. 418:12; 425:16–426:19.] And again, the jury was notified that closing arguments do not themselves constitute evidence.

Even assuming the remarks constituted misrepresentations, Defendants suffered no prejudice, so they are not entitled to a new trial.

## F. Cumulative Error

"Trial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law." *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000). The only true error Defendants have identified is the introduction of testimony about Wham Cary. The other potential error is a passing remark about prior unrelated cases against CDP, which the court does not believe was significant enough to compound any harms posed by testimony about Cary.[18]

## V. Motion to Amend Judgment

Defendants have also moved to remit Brown's jury award, pursuant to Rule 59(e). They argue that $50 million in compensatory damages "for less than ten years of incarceration does not stand up against a reasonable analysis." [Dkt. 460 at 3.]

---

[18]    To the extent counsel's misrepresentations were erroneous, each was relevant to something *other* than Fifth Amendment liability. Remarks about Ocampo and Stanciel concerned pretrial detention damages, and the closing remark about sexual assault concerned compensatory damages. *See supra* Part IV.E. None of these compound the others.

The Seventh Circuit permits remittitur, and it offers three factors to guide the analysis: "whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015). Factors two and three are "two ways of describing the same inquiry: whether the jury verdict was irrational." *Id.* Moreover, comparison to past awards is "not as important as the review of the evidence in the case at hand," which we review "in the light most favorable to the verdict." *Id.* at 545, 543.

On that record, the $50 million award is neither irrational nor so excessive it need be reduced.

Defendants frame Brown's experience as an inmate as "[un]deserving of extraordinary compensation," highlighting that he attended religious and anger management programming, worked as cell house help, stayed in contact with his mother, lifted weights, and had positive relationships with many guards and cell mates. [Dkt. 460 at 4–5.] The court need not recount every fact of Brown's ten-year detention to conclude that a rational jury could disagree and instead find that the circumstances warrant a sizable award. But to name a few, based on Brown's testimony: he struggled with suicidal thoughts, [Tr. 427:16–428:23], was the victim of an attempted rape, [Tr. 425:16–426:19], lost fights, [Tr. 391:10], was harassed by mentally ill prisoners, [Tr. 398:17–399:03], saw an acquaintance who hanged himself, [Tr. 427:05–15], witnessed deaths and extreme violence, [Tr. 399:20–401:10], and struggled to receive medical care, [Tr. 408:07–409:15]. This was instead of experiencing the twenties that a recent high school graduate, intent on attending college and "start[ing his] own construction company," would have expected. [Tr. 212:01–213:05.] Moreover, though Defendants argue that that no evidence suggested "unusually lasting hardships," [Dkt. 460 at 5], Brown testified that he still struggles with the trauma. [Tr. 458:10–25.] In a light most favorable to the verdict, this evidence bears a rational connection to the reward.

Nor does the "mere fact that [the] jury award[ed] more damages than requested," render it monstrously excessive. *Hill v. City of Harvey*, 732 F. Supp. 3d 862 (N.D. Ill. 2024). Or, simply, that it's "bigger than previous awards in similar cases." *Adams*, 798 F.3d at 545.

To the latter point, while Defendants observe that "it is typical for plaintiffs to ask the jury to award $1 million per year for every year of incarceration,"[19] there are examples of juries awarding far more than that on a per-year basis. *See, e.g., Adams*, 798 F.3d at 545 (citing, with implicit approval, $3 million remitted award for 4.5-

---

[19]    They never shared this with the jury, and so any discrepancy is explicable by Defendant's failure to provide parameters rather than "passion and prejudice." *Adams*, 798 F.3d at 543.

month detention, or $12 million per year adjusted for 2007-to-2024 inflation); *Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008) (affirming verdict, which supported $9.063 million award for four-year detention, or $3.54 million per year adjusted for 2006-to-2024 inflation).[20] Moreover, the jury was asked (and entitled) to consider more than just the ten years of detention when calculating damages. [Tr. 2377:17–23.] And, regardless, the Seventh Circuit is cautious about placing too much weight on previous awards. *Adams*, 798 F.3d at 545.

In sum, while $50 million in compensatory damages is undoubtedly significant for a ten-year detention, the court is not persuaded that the jury's decision was irrational. *See id.* at 543 ("It is entirely possible that another jury might have evaluated [] damages more modestly, but that is not the standard.") Defendants, however, are entitled to a setoff based on Brown's previous settlement with the County Defendants regarding the injuries flowing from his confession. *Fed. Deposit Ins. Corp. v. Chicago Title Ins. Co.*, 12 F.4th 676, 690 (7th Cir. 2021) ("full setoff may be awarded only where the settlement covers the same injury as that for which the non-settling defendant was found responsible").

## VI.  Prejudgment Interest

Finally, Brown has moved for $19,927,133.13 in prejudgment interest, arguing it is necessary to compensate him for the ongoing "time-value of his pain and suffering." [Dkt. 457 at 6.] Defendants raise numerous challenges, most notably to (1) the availability of prejudgment interest for non-economic damages, and (2) the idea that the jury failed to compensate Brown for ongoing damages. [Dkt. 498 at 3.]

The Seventh Circuit has "committed the issue of prejudgment interest to the trial judge's discretion." *DeMauro v. Loren-Maltese*, 2007 WL 9821268, at *3 (N.D. Ill. Sept. 25, 2007); *Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) (observing the "presumption in favor of granting such interest," at least in situations involving economic damages). Exercising this discretion, this court declines to grant prejudgment damages, finding that the jury was well aware it was compensating Brown for the ongoing consequences of his incarceration. In doing so, it need not consider the question currently before the Seventh Circuit: whether prejudgment interest is available only for economic damages, or whether a party who suffers non-economic damages may also recover.

In *Bolden v. Pesavento*, the case before the Seventh Circuit and upon which Brown overwhelmingly relies, the district court awarded damages "for the 22 years that Bolden spent in prison," and not for any time thereafter. 2024 WL 1496199, at

---

[20]   The Seventh Circuit's use of inflation in *Adams* suggests its relevance here. *See* 798 F.3d at 545. The court uses the government's CPI Inflation Calculator, adjusting for month and year of verdict. *CPI Inflation Calculator*, U.S. Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.html.

*3 (N.D. Ill. Apr. 2, 2024). Prejudgment interest was thus necessary to fill the gap. In reaching that conclusion, the court considered "the transcript from closing arguments," where plaintiff's counsel "asked for compensation for the incarceration," *not* "for the wait after incarceration ended." *Id*.

Brown's situation is different. In closing arguments, his counsel made clear to the jury that it was to compensate him for more than just the ten years of incarceration. [*See, e.g.*, Tr. 2377:17–23] ("Marcel is not going to be okay. He is going to suffer for the rest of his life. He is going to be defined by this horrible thing that happened to him for no reason. And you have to measure in — when you measure out all of the damages in this case, don't forget that measure of damages for the loss of a normal life. Marcel's life is not normal and it will not ever become normal. So, add that in.")]

The jury instructions here are also distinct from *Bolden's* at a critical juncture, which supports finding that this jury was aware it was compensating Brown for more than just ten years. Here, the jury was instructed to consider:

1. The physical, mental, and emotional pain and suffering that Plaintiff has experienced and is reasonably certain to experience in the future.
2. The loss of a normal life that Plaintiff has experienced and is reasonably certain to experience in the future.
3. The loss of liberty that Plaintiff experienced.

[Dkt. 441 at 27.] *Bolden's* instruction was identical, except it did not separately mention "loss of liberty," i.e. incarceration. Jury Instructions, *Bolden*, 17 CV 417, Dkt. 599 at 43. Here, with "loss of liberty" distinguished from the more general "loss of a normal life," the jury was on notice that Brown's losses extended beyond his detention. Therefore, unlike in *Bolden*, it can't be said that the jury believed it was only compensating Brown for his period of incarceration.

On this score, the court believes Brown's $50 million in compensatory damages covers all post-release entitlements. [21] At minimum, a substantial (and uncertain) share of the award would be ineligible for interest, to the extent some of Brown's injuries have yet to accrue. But, given the emphasis on ongoing losses, the court is persuaded that the damages verdict also contemplates the time value of money— especially since the jury was asked to "*fully* compensate [Brown] for all that he has

---

[21] Indeed, Brown agreed as much when (persuasively) challenging remittitur. [Dkt. 492 at 17. ("The jury's verdict certainly reflects the evidence that the jury heard regarding the ways in which Mr. Brown's devasting experience affected him after his release, and how it will continue to affect him going forward. By all indications, Mr. Brown will continue to live with this pain for the rest of his life, and the jury was perfectly entitled to infer its permanency. The jury verdict reflects a rational valuation of another perhaps 50 years or more of emotional suffering.")].

lost," and to "not forget any part of it." [Tr. 2378:01–03 (emphasis added).] Accordingly, the motion for prejudgment interest is denied.

## VII. Conclusion

For the reasons above, the motion for judgment as a matter of law is granted as to the fabrication claim, and a new trial on that issue is conditionally granted should this judgment be vacated or reversed. A new trial is granted on punitive damages only for the coerced confession claim. Finally, the judgment is amended to account for a setoff of damages in the amount that Brown settled with County Defendants. By agreement, the judgment is also amended to include the City of Chicago as defendant and to dismiss the bifurcated *Monell* claim.

Enter: 19-cv-4082
Date: September 30, 2025

_____

Lindsay C. Jenkins